FILED
2023 JUL 26
CLERK
U.S. DISTRICT COURT

Michael E. Welsh (Massachusetts Bar No. 693537)
welshmi@sec.gov
Casey R. Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel: (801) 524-5796

## SEALED

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited liability company; BRENDAN J. STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual;<br><br>Defendants, | Case: 2:23-cv-00482<br>Assigned To : Stewart, Ted<br>Case No.:  Assign. Date : 07/26/2023<br>Description: Securities and Exchange Commission v. Digital Licensing et al<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* APPLICATION FOR ENTRY OF TEMPORARY RESTRAINING ORDER AND ORDERS (1) FREEZING ASSETS; (2) REQUIRING ACCOUNTINGS; (3) PROHIBITING THE DESTRUCTION OF DOCUMENTS; (4) GRANTING EXPEDITED DISCOVERY; (5) REPATRIATING ASSETS; AND (6) ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND MEMORANDUM IN SUPPORT**<br><br>Judge: |

ARCHER DRILLING, LLC, a Wyoming
limited liability company; BUSINESS
FUNDING SOLUTIONS, LLC, a Utah
limited liability company; BLOX LENDING,
LLC, a Utah limited liability company;
CALMFRITZ HOLDING, LLC, a Utah
limited liability company; CALMES & CO,
INC., a Utah corporation; FLAHERTY
ENTERPRISES, LLC, an Arizona limited
liability company; IX VENTURES FZCO, a
United Arab Emirates company; PURDY
OIL, LLC, a Nebraska limited liability
company; THE GOLD COLLECTIVE LLC,
a Utah limited liability company; and UIU
HOLDINGS, LLC, a Delaware limited
liability company,

       Relief Defendants.

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ........................................................................................................... **i**

**TABLE OF AUTHORITIES** ..................................................................................................... **ii**

**STATEMENT OF FACTS** ......................................................................................................... **2**

   I.     DEFENDANTS AND RELIEF DEFENDANTS .............................................................. 2

   II.    DEFENDANTS' FRAUDULENT "NODE LICENSE" INVESTMENT SCHEME ....... 6

   III.   DEFENDANTS' ATTEMPTS TO LIQUIDATE AND RELOCATE ASSETS ........... 11

**ARGUMENT** ........................................................................................................................... **12**

   I.     THE SEC IS SEEKING EMERGENCY RELIEF TO PROTECT INVESTORS AND IN

   THE PUBLIC INTEREST .......................................................................................... 12

   II.    THE SEC HAS MADE A *PRIMA FACIE* SHOWING THAT DEFENDANTS

   VIOLATED THE FEDERAL SECURITIES LAWS .................................................. 13

   III.   THE ANCILLARY RELIEF SOUGHT BY THE SEC IS NECESSARY .................... 22

**CONCLUSION** ....................................................................................................................... **25**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aaron v. SEC,*

    446 U.S. 680 (1980) ................................................................................................ 16

*Basic, Inc. v. Levinson,*

    485 U.S. 224 (1988) ................................................................................................ 15

*ChinaCast Educ. Corp. Sec. Litig.,*

    809 F.3d 471 (9th Cir. 2015) ................................................................................. 16

*Edward J. Mawood & Co. v. SEC,*

    591 F.2d 588 (10th Cir. 1979) ............................................................................... 16

*Ernst & Ernst v. Hochfelder,*

    425 U.S. 185 (1976) ................................................................................................ 16

*FTC v. Affordable Media, LLC,*

    179 F.3d 1228 (9th Cir. 1999) ............................................................................... 22

*Grossman v. Novell, Inc.,*

    120 F.3d 1112 (10th Cir. 1997) ............................................................................. 16

*Herman & MacLean v. Huddleston,*

    459 U.S. 375 (1983) ................................................................................................ 14

*Lorenzo v. SEC,*

    139 S. Ct. 1094 (2019) ........................................................................................... 13

*Notaro v. Koch,*

    35 Fed. R. Serv. 2d 580 (S.D.N.Y. 1982) ............................................................. 24

*SEC v. Aimsi Tech., Inc.*,

    650 F. Supp. 2d 296 (S.D.N.Y. 2009) ....................................................................... 25

*SEC v. Aragon Capital Advisors, LLC*,

    No. 07 Civ. 919, 2011 WL 3278642 (S.D.N.Y. July 26, 2011) ................................. 25

*SEC v. Art Intellect, Inc.*,

    No. 2:11–CV–357, 2013 WL 840048 (D. Utah Mar. 6, 2013) .................................... 14, 19, 20

*SEC v. Bravata*,

    No. 09–12950, 2009 WL 2245649 (E.D. Mich. July 27, 2009) .................................. 20

*SEC v. Bremont*,

    954 F. Supp. 726 (S.D.N.Y. 1997) ........................................................................... 23

*SEC v. Calvo*,

    378 F.3d 1211 (11th Cir. 2004) ................................................................................ 18

*SEC v. Cell>Point, LLC*,

    No. 21-cv-01574, 2022 WL 444397 (D. Colo. Feb. 14, 2022) .................................. 12, 13

*SEC v. Collyard*,

    154 F. Supp. 3d 781 (D. Minn. 2015) ....................................................................... 20

*SEC v. Compania Internacional Financiera SA.*,

    No. 11 Civ 4904, 2011 WL 3251813 (S.D.N.Y. July 29, 2011) ............................... 25

*SEC v. Dain Rausher, Inc.*,

    254 F.3d 852 (9th Cir. 2001) .................................................................................... 16

*SEC v. Erwin*,

    No. 13-cv-03363-CMA-KMT, 2021 WL 3773649

    (D. Colo. Aug. 25, 2021) ......................................................................................... 20

*SEC v. Feng*,

    935 F.3d 721 (9th Cir. 2019) ................................................................................ 20

*SEC v. GenAudio Inc.*,

    32 F. 4th 902 (10th Cir. 2022) ............................................................................. 18

*SEC v. Hansen*,

    No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984)................................. 20

*SEC v. Haswell*,

    654 F.2d 698 (10th Cir. 1981) .............................................................................. 22

*SEC v. Hickey*,

    322 F.3d 1123 (9th Cir. 2003) .............................................................................. 22

*SEC v. Holschuh*,

    694 F.2d 130 (7th Cir. 1982) ................................................................................ 18

*SEC v. Int'l Chem. Dev. Co.*,

    469 F.2d 20 (10th Cir. 1972) ................................................................................ 18

*SEC v. Int'l Swiss Inv. Corp.*,

    895 F.2d 1272 (9th Cir. 1990) .............................................................................. 23

*SEC v. Kenton Capital, Ltd.*,

    69 F. Supp. 2d 1 (D.D.C. 1998) ........................................................................... 21

*SEC v. Kik Interactive Inc.*,

    492 F. Supp. 3d 169 (S.D.N.Y. 2020)................................................................... 14

*SEC v. Kramer*,

    778 F. Supp. 2d 1320 (M.D. Fla. 2011) ............................................................... 21

*SEC v. Manor Nursing Ctrs., Inc.*,

    458 F.2d 1082 (2d Cir. 1972) ................................................................. 16

*SEC v. Merrill Scott & Assocs., Ltd.*,

    505 F. Supp. 2d 1193 (D. Utah 2007) ...................................................... 19

*SEC v. Parrish*,

    No. 11-cv-00558, 2012 WL 4378114 (D. Colo. Sept. 25, 2012) ............... 19

*SEC v. Pros Int'l, Inc.*,

    994 F.2d 767 (10th Cir. 1993) ................................................................. 22

*SEC v. RMR Asset Mgmt. Co.*,

    479 F. Supp. 3d 923 (S.D. Cal. 2020) ...................................................... 20

*SEC v. Scoville*,

    913 F.3d 1204 (10th Cir. 2019) .......................................................... 12, 14

*SEC v. Smart*,

    678 F.3d 850 (10th Cir. 2012) ................................................................. 14

*SEC v. Spongetech Delivery Sys., Inc.*,

    No. 10-cv-2031, 2011 WL 887940 (E.D.N.Y. Mar. 14, 2011) .................. 23

*SEC v. Traffic Monsoon, LLC*,

    245 F. Supp. 3d 1275 (D. Utah 2017) ...................................................... 12

*SEC v. Unifund SAL*,

    910 F.2d 1028 (2d Cir. 1990) ........................................................ 12, 22, 23

*SEC v. Wencke*,

    622 F.2d 1363 (9th Cir. 1980) .......................................................... 23, 24

*SEC v. Wolfson*,

    539 F.3d 1249 (10th Cir. 2008) ................................................................ 14

*SEC v. Zandford*,

    535 U.S. 813 (2002) ................................................................................... 17

*Simpson v. AOL Time Warner, Inc.*,

    452 F.3d 1040 (9th Cir. 2006) .................................................................. 17

*United States v. Naftalin*,

    441 U.S. 768 (1979) ................................................................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7 (2008) ...................................................................................... 12

**Statutes**

Section 10(b) of the Securities Exchange Act of 1934,

    15 U.S.C. § 78j(b) .......................................................................... 13, 15, 17

Section 15(a)(1) of the Securities Exchange Act of 1934,

    15 U.S.C. § 78o(a)(1) ................................................................................ 19

Section 17(a) of the Securities Act of 1933,

    15 U.S.C. § 77q(a) ......................................................................... 13, 15, 17

Section 20(b) of the Securities Act of 1933,

    15 U.S.C. §§ 77t(b) ............................................................................. 12, 23

Section 21(d) of the Securities Exchange Act of 1934,

    15 U.S.C. § 78u(d) ............................................................................. 12, 23

Section 3(a)(4) of the Securities Exchange Act of 1934,

    15 U.S.C. § 78c(a)(4) ................................................................................ 19

Section 5 of the Securities Act of 1933,

15 U.S.C. § 77e ................................................................................................... 18, 19

Plaintiff Securities and Exchange Commission ("SEC") brings this emergency action, and seeks emergency relief pursuant to Federal Rule of Civil Procedure 65(b), to stop an ongoing fraudulent securities offering.  Defendants have unlawfully solicited hundreds of investors to purchase over $49 million of Digital Licensing Inc. (herein, "DEBT Box") securities, by misrepresenting that those securities would let investors "mine" digital cryptocurrency assets "backed" by revenues from "real projects."  Defendants' representations are false: the "node software license" securities Defendants offered and sold do not allow investors to mine crypto assets, and the crypto assets Defendants pre-generated and apportioned to investors are propped up by sham businesses, failed contractual partnerships, and fanciful, nonexistent technology.

In June, Defendants began to liquidate investor funds and move operations overseas.  On June 26, 2023, Defendant iX Global, LLC ("iX Global")—the multi-level-marketing entity through which the DEBT Box "node licenses" are primarily promoted—closed its main accounts with Bank of America and cashed out over $720,000 in putative investor funds.  Meanwhile, DEBT Box's principals claim DEBT Box is in the process of moving its operations to the United Arab Emirates for the express purpose of evading the federal securities laws.  For instance, in a June 14, 2023, promotional video posted on YouTube, Defendant Jacob Anderson claimed Defendants "have moved all of [DEBT Box's] operations to Abu Dhabi," so as to "be under the jurisdictional control of Abu Dhabi, not the SEC."  Defendants have also taken action to block SEC investigative staff from viewing their social media sites, and appear to have recently deleted a website containing training materials for the scheme's promotors.

Meanwhile, Defendants continue to expand their fraudulent solicitation efforts. The primary DEBT Box website—which contains the same misrepresentations to investors about the node software licenses and the purported business ventures and technology backing them—

promises Defendants will be offering two new "node licenses" to "mine" additional crypto assets. Other Defendants have spun-off the DEBT Box model into the FAIR Project, which offers identical "software-mining licenses" to investors with the promise of "mining" crypto assets backed by revenues from the use of artificial intelligence in the pharmaceutical industry.

The SEC seeks to stop this ongoing offering fraud and protect investors' assets and funds, and thus respectfully requests the Court hold an immediate hearing and enter an *ex parte* order, in the form proposed as **Exhibit 1**, entering a temporary restraining order and ancillary relief.

## STATEMENT OF FACTS

### I.   DEFENDANTS AND RELIEF DEFENDANTS

#### A.   DEBT Box and the "DEBT Council"

**Digital Licensing Inc. (d/b/a "DEBT Box")** is a Wyoming corporation headquartered in Sheridan, Wyoming and operating out of Draper, Utah. (*See* Ex. 2, Declaration of Joseph Watkins ("Watkins Decl.") ¶ 45.) Defendants Jason Anderson, Jacob Anderson, Schad Brannon, and Roydon Nelson—who call themselves the "DEBT Council"—purport to be the co-founders of DEBT Box, and together exercise control of the entity. (*See id.*)

**Jason R. Anderson**, age 43, is a resident of Utah. In addition to his role with DEBT Box, Anderson is a member of Relief Defendants UIU Holdings, LLC, and Business Funding Solutions, LLC, and the Registered Agent for Relief Defendant Blox Lending, LLC. (*Id.* ¶¶ 45, 52, 53, 60.) Also, along with Defendant Ryan Bowen, Anderson is a member, and manager, of the Lazy Magnolia Brewing Company, LLC ("Lazy Magnolia"), a Mississippi limited liability company headquartered in Kiln, Mississippi, whose revenues purportedly support DEBT Box's "BEV" crypto asset. (*Id.* ¶ 46.) **Jacob ("Jake") S. Anderson**, age 40, is a resident of Utah, and is Defendant Jason Anderson's brother. **Schad E. Brannon**, age 50, is a resident of California.

2

Brannon is currently DEBT Box's acting President. (*Id*. ¶ 45.)  **Royden B. Nelson**, age 50, is a resident of Utah, and is currently DEBT Box's sole Director, Treasurer, and Secretary. (*Id*.)

### B. DEBT Box's Business Associates

**Western Oil Exploration Company, Inc.** ("Western Oil") is a Nevada corporation headquartered in Las Vegas, Nevada. (Ex. 2, Watkins Decl ¶ 47.)  Defendant **James Franklin,** age 64, a resident of California and two-time SEC recidivist, is the founder and President of the company. (*Id*.)  According to representations made by Defendants, Western Oil's business operations support DEBT Box's "BLGD" and "XPLR" crypto assets. (*Id*. ¶¶ 17, 34.)  Defendant **Ryan Bowen**, age 46, is a Utah resident, and a member of Lazy Magnolia—the bottling company Defendants claim supports DEBT Box's "BEV" crypto asset. (*Id*. ¶ 46.)

### C. DEBT Box's Marketers and Promoters

**iX Global, LLC** is a Utah limited liability company headquartered in North Salt Lake, Utah. (Ex. 2, Watkins Decl. ¶ 48.)  iX Global is a multi-level marketing company (*i.e.*, "MLM") that has partnered with DEBT Box to market DEBT Box's securities and which, through Joseph Martinez and other Defendants, is presently soliciting investors. (*Id*. ¶¶ 9–16, 22, 25, 31, 32, 61.) Defendant **Joseph Martinez**, age 36 and a resident of Utah, is the company's Registered Agent. (*Id*. ¶ 48.)  **Travis Flaherty**, age 46, is a resident of Arizona and the Registered Agent for Relief Defendant Flaherty Enterprises.  Flaherty is an iX Global "Brand Ambassador" and, as such, has solicited investors to purchase DEBT Box securities. (*Id*. ¶¶ 18, 20, 23, 24, 56, 61.)  **Brendan Stangis**, age 25, is a resident of Michigan.  As a promotor, Stangis has solicited DEBT Box investors. (*Id*. ¶ 61.)  **Matthew Dillon Fritsche**, age 30, is a resident of Utah and the Registered Agent for Relief Defendant Calmfritz Holdings, LLC. (*Id*. ¶ 54.)  As a promotor, Fritzsche has solicited DEBT Box investors. (*Id*. ¶ 61.)

**B & B Investment Group, LLC** ("Core 1 Crypto") is a Utah limited liability company headquartered in South Jordan, Utah. (Ex. 2, Watkins Decl. ¶ 49.) Defendants **Mark Schuler**, age 45 (aka "Billy Beach"), and **Benjamin Daniels**, age 48, are residents of Utah and the co-founders and sole members of Core 1 Crypto. (*Id*.) Through Core 1 Crypto, Schuler, Daniels, and Defendant **Alton Parker**, age 49 and a resident of Utah, solicited investors to purchase DEBT Box securities. (*Id*. ¶ 61.) **BW Holdings, LLC** (d/b/a the "FAIR Project") is a Utah limited liability company headquartered in Salt Lake City, Utah. (*Id*. ¶ 50.) The FAIR Project is a DEBT Box spin-off created by Defendants Schuler, Daniels, and Parker, and for which defendant Jason Anderson purports to act as a "consultant." (*Id*. ¶¶ 36–39.) The FAIR Project offers investors DEBT Box-like mining licenses which purportedly "mine" cryptocurrency assets backed by revenues from artificial intelligence technology in the pharmaceutical industry. (*Id*.)

### D.   Relief Defendants

**Archer Drilling, LLC** is a Wyoming LLC originally headquartered in Pine Bluff, Wyoming, and now headquartered in St. George, Utah. (Ex. 2, Watkins Decl. ¶ 51.) Defendant James Franklin was Archer Drilling's original owner and managing director, although, in recent court filings, DEBT Box now claims to be the entity's rightful owner. Archer Drilling received at least $1,610,000 in investor funds to which it has no legitimate claim. (Ex. 3, Declaration of Karaz S. Zaki ("Zaki Decl.") ¶ 18.)

**Business Funding Solutions, LLC** is a Utah limited liability company headquartered in Draper, Utah. Defendant Jason Anderson is the sole member of, and the Registered Agent for, this entity. (Ex. 2, Watkins Decl. ¶ 52.) Business Funding Solutions, LLC received at least $11,960,000 in investor funds to which it has no legitimate claim. (Ex. 3, Zaki Decl. ¶ 18.)

**Blox Lending, LLC** is a Utah limited liability company headquartered in Draper, Utah. Defendant Jason Anderson is the sole member of, and the Registered Agent for, the entity. (Ex. 2, Watkins Decl. ¶ 53.) Blox Lending, LLC received at least $4,700,000 in investor funds to which it has no legitimate claim. (Ex. 3, Zaki Decl. ¶ 18.)

**Calmfritz Holdings, LLC** is a Utah limited liability company headquartered in Sandy, Utah. Defendant Matthew Fritzsche is the Registered Agent for the entity. (Ex. 2, Watkins Decl. ¶ 54.) Calmfritz Holdings, LLC received at least $12,700,000 in investor funds to which it has no legitimate claim. (Ex. 3, Zaki Decl. ¶ 18.)

**Calmes & Co Inc.** is a Utah corporation with its principal place of business is Sandy, Utah. (Ex. 2, Watkins Decl. ¶ 55.) Calmes & Co, Inc. received at least $300,000 in investor funds to which it has no legitimate claim. (Ex. 3, Zaki Decl. ¶ 18.)

**Flaherty Enterprises, LLC** is an Arizona limited liability company with a principal place of business in Queen Creek, Arizona. Defendant Travis Flaherty is a member of, and the Registered Agent for, the entity. (Ex. 2, Watkins Decl. ¶ 56.) Flaherty Enterprises received at least $260,000 in investor funds to which it has no legitimate claim. (Ex. 3, Zaki Decl. ¶ 18.)

**IX Ventures FZCO** is a company headquartered Abu Dhabi and with a principal place of business in Draper, Utah. Upon information and belief, Defendants Jason and Jake Anderson control this entity. (Ex. 2, Watkins Decl. ¶ 57.) IX Ventures FZCO received at least $1,350,000 in investor funds to which it has no legitimate claim. (Ex. 3, Zaki Decl. ¶ 18.)

**Purdy Oil, LLC** is a Nebraska limited liability company with its principal place of business in Pine Bluffs, Nebraska. (Ex. 2, Watkins Decl. ¶ 58.) Purdy Oil, LLC received at least $2,670,000 in investor funds to which it has no legitimate claim. (Ex. 3, Zaki Decl. ¶ 18.)

**The Gold Collective LLC** is a Nevada limited liability company headquartered in Las Vegas, Nevada.  Defendant Royden B. Nelson is the Registered Agent for the entity, and its manager.  (Ex. 2, Watkins Decl. ¶ 59.)  The Gold Collective, LLC received at least $3,980,000 in investor funds to which it has no legitimate claim.  (Ex. 3, Zaki Decl. ¶ 18.)

**UIU Holdings, LLC** is a Delaware limited liability company headquartered in Draper, Utah.  Defendant Jason Anderson is the Registered Agent for the entity and its sole member.  (Ex. 2, Watkins Decl. ¶ 60.)  UIU Holdings, LLC received at least $200,000 in investor funds to which it has no legitimate claim.  (Ex. 3, Zaki Decl. ¶ 18.)

## II.   DEFENDANTS' FRAUDULENT "NODE LICENSE" INVESTMENT SCHEME.

### A.   The Node License Securities

Beginning in March 2021, and continuing to the present, Defendants have offered securities in the form of "node software licenses" or "node licenses."  (*See* Ex. 2, Watkins Decl. ¶ 7.)  To purchase a DEBT Box node license, an investor is required to sign up for an account with Defendant iX Global, and pay a $145 initiation fee.  (*See id.* ¶¶ 9, 13.)  Once an investor obtains an account, and pays that fee, the investor may purchase various DEBT Box node licenses for prices ranging between $1,000 and $12,000 per license.  (*Id.* ¶ 13.)  Upon purchase of one or more licenses, the investor becomes entitled to receive one or more of eleven DEBT Box crypto assets which, according to DEBT Box's website, Defendants' representations, and DEBT Box's Twitter account, are "linked to real world commodities" and "backed by royalties coming from various industries."  (*Id.* ¶¶ 8, 12, 16, 22, 28.)

In addition to touting how each crypto asset (or in their words, crypto "token") is "supported" or "backed by" various underlying businesses and commodities, Defendants have represented to investors that DEBT Box would undertake efforts to develop the DEBT Box

6

ecosystem and "increase the value" of the DEBT Box crypto assets "for all license and token holders." (*Id*. ¶¶ 18, 25.) Defendants represented they would periodically reduce the supply of crypto assets by purchasing and then "burning" (*i.e.*, removing from circulation) those "tokens." (*Id*. ¶¶ 8, 28, 31, 35.) According to Defendants, this "burning" would be achieved, in part, through revenues DEBT Box received from the projects "backing" these crypto assets. (*See id*.) For example, according to a recent Tweet from DEBT Box's Twitter, "#Commodity-generated royalties are one of the key areas that maintain value of D.E.B.T.'s #token projects," because "[r]oyalties from commodity, beverage & real estate projects are converted to #tokens, and then burned to create digital value." (*Id*. ¶ 28 & Ex. 26.)

## B.      Defendants' Misrepresentations Regarding the Node License Securities

To promote DEBT Box node license securities, DEBT Box and its controlling members, who call themselves the "DEBT Council" (*i.e.*, Defendants Jason Anderson, Jake Anderson, Brannon, and Nelson) repeatedly represented to investors that the DEBT Box node licenses "mined" DEBT Box's crypto assets through a "proof of work" consensus mechanism akin to mining for bitcoin. (*See* Ex. 2, Watkins Decl. ¶¶ 15, 16.) This description of the node license's mining capabilities was repeated by Jason Anderson, Jake Anderson, Brannon, and Nelson in numerous YouTube videos, social media posts (on Facebook, Instagram, and elsewhere), and in emails to investors.

These representations are false and misleading: as a definitional matter, DEBT Box's node licenses did not, and could not, "mine" crypto assets. Instead, each of the eleven DEBT Box crypto assets is a BEP-20 token created through the execution of a smart contract on the BNB Blockchain, the first of which was created in December 2021—several months after the initial offering of node software licenses were offered to the public. The total supply of each

BEP-20 token created by DEBT Box is coded into the smart contract for each DEBT Box crypto asset at inception.  Thus in short, the DEBT Box crypto assets were pre-generated, all at once, by Defendants, and then distributed to investors on a periodic basis at Defendants' whim.

To demonstrate the likelihood of their success in "increasing the value" of the DEBT Box crypto assets, DEBT Box and the DEBT Council also touted to investors various underlying business partnerships, technologies, revenues, and royalties that, according to Defendants, would increase the value of the DEBT crypto assets being "mined" by the node licenses.  But the businesses and technology supposedly "backing" the crypto assets were a sham.

*First*, DEBT Box, the DEBT Council, Western Oil, and Franklin made numerous misrepresentations regarding DEBT Box and its partners' success at generating revenue through oil drilling operations.  These Defendants variously claimed, among other things, to have "hit payload" of oil; to have started extracting oil from an "oil pool that is 100 billion barrels in size;" to have received millions of dollars in profits from their oil partnerships; and to have partnered with numerous oil wells that were actively producing oil at upwards of a rate of 100 barrels a day.  (*See* Ex. 2, Watkins Decl. ¶¶ 15, 17, 20, 23, 24, 25, 27.)  In reality, DEBT Box's and Western Oil's purported active oils wells were not operational—a fact Defendants knew and indeed recently admitted (as to the Nevada well) to investigators from the U.S. Bureau of Land Management.  (*See id*. ¶ 43 & Ex. 34, Declaration of Michael A. Mortensen ¶¶ 27–35.)

*Second*, DEBT Box, the DEBT Council, Western Oil and Franklin misrepresented the partnerships and technology purportedly backing DEBT Box's "XPLR" crypto assets.  Among other things, these Defendants claimed that DEBT Box had access to fanciful and "advanced proprietary remote sensing and satellite imagery technology", which was further bolstered through a partnership with an Australian technology company, Fleet Space.  (*See* Ex. 2, Watkins

Decl. ¶¶ 8, 18, 20, 26, 34.)  DEBT Box's marketing materials claimed that their technology was capable of scanning the earth "through the frequencies" to determine exactly where gold, oil, or indeed any "mineral on the periodic table" was located, and "pinpoint gold, for example, or aluminum or silver, or natural gas within six centimeters in the ground." (*Id*. ¶¶ 18, 26.)  DEBT Box had no such technology, and no such deal with Fleet Space—whose CEO was forced to ask DEBT Box to cease and desist after learning that DEBT Box was misrepresenting their purported partnership and misappropriating Fleet Space's marketing materials.  (*See id*. ¶ 40 & Ex. 31, Declaration of Flavia Tata Nardini.)

*Third*, Defendants made misrepresentations regarding the partnerships supposedly supporting DEBT Box's "BEV" crypto asset.  Defendants claimed that the underlying beverage bottling company, Lazy Magnolia, had secured "multi-million-dollar" bottling contracts, including with retailers such as "7-11, Aldis, Food Lion, Sam's Club and more." (*See* Ex. 2, Watkins Decl. ¶ 8.)  What's more, on or about August 3, 2022, Jason Anderson—leading a group of investors on a tour of the brewery—represented Lazy Magnolia was generating "over $12 million a month in revenue" from its nascent rain water bottling business.  (*Id*. ¶ 21.)  But Lazy Magnolia was barely operational; had been covertly purchased by Jason Anderson and Bowen in December 2022; had no contracts with any of the cited retailers; and was not generating anything close to "12 million dollars a month" in revenue.  (*See id*. ¶ 42 & Ex. 33.)

And rather than use investor funds, as Defendants promised, to "grow the ecosystem" or support those underlying businesses Defendants claimed were generating millions of dollars in revenues, bank records and social media postings show Defendants dissipated investor funds on personal and luxury expenses—including on houses, Ferraris, Lamborghinis, and "extreme" vacations.  (*See* Ex. 3, Zaki Decl. ¶ 19 & Ex. 8; Ex. 2, Watkins Decl. ¶ 32.)

C.       **Defendants' Widespread Solicitation of Investors.**

To promote the node license securities, DEBT Box partnered with iX Global to access its large network of MLM marketers. Led by Defendants Martinez and Flaherty, Defendants began to broadly solicit hundreds of investors through the typical MLM channels. (Ex. 2, Watkins Decl. ¶ 61.) iX Global and the other Promotor Defendants (*i.e.*, Martinez, Flaherty, Bowen, Daniels, Schuler, Core 1 Crypto, Parker, Stangis, and Fritzsche) worked on a commission basis, receiving a percentage of the value of each node license they sold to investors, and received substantial compensation for their efforts. (*See id.* ¶¶ 10, 61.) For example, bank records show that iX Global received no less than $23,000,000 of investor funds, Martinez received at least $3.1 million, and Flaherty at least $576,000 (plus another $260,000 through his entity Flaherty Enterprises). (*See* Ex. 3, Zaki Decl. ¶ 18.) Meanwhile, Defendant Fritzsche received at least $13 million through entities he controlled. (*See id.*) Defendants raised at least $49 million from investors in connection with their offering of the node software licenses. (Ex. 3, Zaki Decl. ¶ 13) And this amount, calculated solely from deposits of fiat currency in a handful of Defendants' bank accounts that the SEC has reviewed, likely significantly underestimates the total investor funds which entered the scheme—much in the form of cryptocurrency.

D.       **Defendants' Attempts to Conceal the Truth from Investors.**

To prevent investors from discovering the falsity of their misstatements, Defendants took significant steps to lull investors and otherwise deceive them about the businesses purportedly "backing" the securities. For example, DEBT Box and the DEBT Council created "accounts" for DEBT Box investors that falsely created the appearance that the node licenses were "mining" new crypto assets and that those "tokens" were increasing in value based on revenues generated by underlying businesses. And they took steps to conceal the true status of DEBT Box's

purported partnerships with Fleet Space and Lazy Magnolia from investors, including by deceiving them about Fleet Space's termination agreement and refusing to disclose the details of their claimed underlying contracts with other "partners."  (Ex. 2, Watkins Decl. ¶¶ 35 & Ex. 29.)

  **E.**  **Defendants' Fraudulent Scheme Expands**

  Defendants' fraudulent scheme continues to expand.  The primary DEBT Box website—which still contains the same misrepresentations to investors about the node software licenses and the purported business ventures and technology backing them—asserts Defendants will soon be offering two new node licenses, to "mine" the new "REV" and "DLS" crypto assets. Meanwhile, Defendants Schuler, Daniels, and Parker have spun-off the DEBT Box model into the FAIR Project, which offers so-called "software-mining license[s]" to investors with the promise of "mining" crypto assets with a "proof of work" algorithm backed by revenues from the use of artificial intelligence in the pharmaceutical industry.  (*See id*. ¶¶ 36–39.)  As of the filing of this action, both the primary DEBT Box website and the related iX Global and FAIR Project promotional sites remain active and continue to solicit investors.  In fact, only a few days ago, iX Global announced a partnership with the FAIR Project to promote its new "software mining licenses" "on the IX platform."  (*See id*. ¶ 39.)

**III.**  **DEFENDANTS' ATTEMPTS TO LIQUIDATE AND RELOCATE ASSETS.**

  On June 26, 2023, iX Global, LLC closed its primary accounts with Bank of America and removed over $720,000 in putative investor funds from those accounts.  (*See* Ex. 3, Zaki Decl. ¶ 20.)  Meanwhile, DEBT Box's principals claim DEBT Box is in the process of moving its operations to the UAE for the express purpose of evading the federal securities laws.  In a June 14, 2023, promotional video posted on YouTube, Defendant Jake Anderson says Defendants "have moved all of [DEBT Box's] operations to Abu Dhabi," so as to "be under the

11

jurisdictional control of Abu Dhabi, not the SEC."  (Ex. 2, Watkins Decl. ¶ 27.)  A review of the

bank records of Relief Defendant IX Ventures FZCO, a UAE company, shows that it now has

over $2 million in a UAE bank account, at least $1.35 million of which are funds investors paid

to Defendants to purchase node licenses.  (*See* Ex. 3, Zaki Decl. ¶ 18.)

## ARGUMENT

### I.  THE SEC IS SEEKING EMERGENCY RELIEF TO PROTECT INVESTORS AND IN THE PUBLIC INTEREST.

Section 20(b) of the Securities Act of 1933 ("Securities Act") and Section 21(d) of the

Securities Exchange Act of 1934 ("Exchange Act") empower the Court to grant injunctive relief

where it appears that a person is engaged in violations of the federal securities laws.  *See* 15

U.S.C. §§ 77t(b) & 78u(d).  Preliminary injunctive relief is appropriate where a plaintiff shows

"(1) he is likely to succeed on the merits of his claim, (2) he will suffer irreparable harm if the

injunction is denied; (3) his threatened injury outweighs the harm the grant of the injunction will

cause the opposing party; and (4) if issued, the injunction will not adversely affect the public

interest."  *SEC v. Scoville*, 913 F.3d 1204, 1213–14 (10th Cir. 2019), quoting *Winter v. Nat. Res.

Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "[I]n cases involving SEC enforcement actions,"

moreover, "courts have reformulated the traditional requirements" and "have not required the

SEC to show irreparable injury, but rather require the SEC to show that defendant's actions

violate the defendant's statutory obligations."  *SEC v. Cell>Point, LLC*, No. 21-cv-01574, 2022

WL 444397, *5 (D, Colo. Feb. 14, 2022) (unpublished), citing *SEC v. Unifund SAL*, 910 F.2d

1028, 1035–40 (2d Cir. 1990).  As such, to support the requested equitable relief, the SEC "must

show a likelihood of prevailing on the merits and a reasonable likelihood that the wrong will be

repeated."  *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1296 (D. Utah 2017); *see also*

*Cell>Point LLC*, 2022 WL 444397 at *5 (citing cases).  The evidence set forth in support of this

Motion is sufficient to make the requisite showing.

## II.   THE SEC HAS MADE A *PRIMA FACIE* SHOWING THAT DEFENDANTS VIOLATED THE FEDERAL SECURITIES LAWS.

### A.   Defendants Violated the Anti-Fraud Provisions of the Securities Laws.

As an initial matter, the SEC has made a *prima facie* showing that Defendants DEBT

Box, Jason Anderson, Jake Anderson, Brannon, Nelson, Bowen, Western Oil, and Franklin

violated the anti-fraud provisions of the federal securities laws.

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)] prohibits, in the offer and sale

of securities, (1) "employ[ing] any device, scheme or artifice to defraud;" (2) "obtain[ing] money

or property by means of any untrue statement of a material fact or any omission to state a

material fact necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading;" and (3) "engag[ing] in any transaction, practice, or

course of business which operates or would operate as a fraud or deceit upon the purchaser."  *See*

15 U.S.C. § 77q(a).  Similarly, Section 10(b) of the Exchange Act prohibits such fraud "in

connection with the purchase or sale" of securities.[1]

The language of these provisions is "expansive" and designed to "capture a wide range of

conduct."  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101–02 (2019).  As the Supreme Court has

emphasized, there is "considerable overlap among the subsections of" Rule 10b-5 and Section

--------

[1] In particular, Exchange Act § 10(b) and Rule 10b-5 thereunder make it unlawful (1) for any person to employ any device, scheme or artifice to defraud; (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

13

17(a), and thus the same underlying conduct may establish a violation of more than one subsection. *Lorenzo*, 139 S. Ct. at 1102 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983)).  The primary "difference between § 17(a) and § 10(b) lies in the element of scienter," in that "Section 10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is sufficient for § 17(a)(2) and § 17(a)(3).  *SEC v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012), citing *SEC v. Wolfson*, 539 F.3d 1249, 1256–57 (10th Cir. 2008).

> **1.   The Node Licenses Defendants Offered and Sold to Investors Are Investment Contracts, Which Are Securities.**

Under Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10), an "investment contract" is a security. 15 U.S.C. §§ 77b(a)(1); 78c(a)(10).  An investment contract requires a scheme involve:  "(1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *Scoville*, 913 F.3d at 1220.  The DEBT Box and FAIR Project "node licenses" and "software-mining licenses" meet each of these requirements to constitute investment contracts.  First, DEBT Box and the FAIR Project raise funds from investors in the form of U.S. dollars, bitcoin, or ether.  (*See* Ex. 2, Watkins Decl. ¶ 13.)  Second, the proceeds of the offerings were pooled and used to finance DEBT Box's operations and promotional activities.  (*See generally* Ex. 3, Zaki Decl.)  *See SEC v. Art Intellect, Inc.*, No. 2:11–CV–357, 2013 WL 840048, *15 (D. Utah Mar. 6, 2013) (unpublished) (common enterprise satisfied where the scheme was "for profit").  Third, investors were promised profits from the Defendants' ventures in the form of crypto assets, which would purportedly increase in value through Defendants' efforts in securing successful partnerships and using the profits from those partnerships to "burn" those crypto assets.  (Ex. 2, Watkins Decl. ¶¶ 8, 18, 28, 31, 35.)  *See SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 180 (S.D.N.Y. 2020) (finding a similar scheme to constitute an investment contract).

14

2.    **Defendants Made Material Misstatements And Omissions To Investors, with Scienter and In Violation of Section 17(a)(2) and Section 10(b).**

The evidence set forth in support of this Motion further establishes a *prima facie* case that Defendants DEBT Box, the DEBT Council (Jason Anderson, Jake Anderson, Brannon, and Nelson), Western Oil, and Franklin violated Section 17(a)(2) of the Securities Act, and Section 10(b) of the Exchange Act, by making material misstatements and omissions to investors.

Defendants made misrepresentations about nearly every aspect of the DEBT Box investment. Among other things, Defendants DEBT Boxand the DEBT Council claimed— falsely—that purchasing a DEBT Box node license would allow an investor to "mine" various crypto assets in a "proof of work" process akin to mining bitcoin, when by definition the DEBT Box BEP-20 tokens were pre-generated by a smart contract and could not be "mined." (Ex. 2, Watkins Decl. ¶ 8 & Exs. 2–12; *id*. ¶ 15.) They also represented to investors that the businesses "backing" the BLGD, XPLR, and BEV crypto assets were viable and profitable when in fact these businesses were defunct, did not have the partnerships or contracts Defendants claimed, and were not significantly profitable. (*See supra* at II.B.) Meanwhile, Franklin and Western Oil made material misrepresentations and omissions to investors about the viability of DEBT Box's and Western Oil's oil wells—despite knowing (and despite other Defendants admitting to the BLM) that the wells were not operational. (*See supra* at II.B.)

These representations—which were fundamental to the purported value of the node licenses, were material. For purposes of Section 17(a)(2) and Rule 10b-5(b), a statement or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *Grossman v.*

*Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997). It cannot be disputed that any reasonable investor would want to know that the supposedly lucrative business Defendants represented were "backing" the value of the DEBT Box crypto assets were ***not*** in fact involved in profitable business partnerships or generating millions of dollars in revenue. Likewise, it cannot be disputed that a reasonable investor would want to know that those crypto assets were not being "mined" like bitcoin but had already been pre-generated by Defendants.

Furthermore, the evidence shows Defendants knew, or should have known, that these representations were false and misleading.[2] For example, Franklin and Western Oil knew— because Franklin claimed to have been working on both sites—that the Nevada and Nebraska oil wells touted to investors were not operational. And DEBT Box and the DEBT Council knew— because they were directly involved in the purported underlying businesses and technology (indeed, they themselves owned and controlled the underlying companies)—that the businesses purportedly backing the "XLPR" and "BEV" crypto assets were not in possession of the technology, lucrative partnership agreements, or retail contracts Defendants had claimed.

Finally, these Defendants made the false statements and omissions "in the offer or sale" and "in connection with the purchase or sale" of securities and in interstate commerce. *See SEC*

_____

[2] Scienter, for purposes of Section 10(b), has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "Willful or reckless behavior satisfies the scienter requirement." *Edward J. Mawood & Co. v. SEC*, 591 F.2d 588, 596 (10th Cir. 1979). The scienter of an entity's management can be imputed to the entity. *See ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972). Thus, here the DEBT Council Defendants scienter can be imputed to DEBT Box; and Franklin's scienter to Western Oil. For purposes of Section 17(a)(2), only negligence is required. *Aaron v. SEC*, 446 U.S. 680, 701–02 (1980). To show negligence, the SEC must show that a defendant failed to conform to the standard of care that would be exercised by a reasonable person. *See SEC v. Dain Rausher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

*v. Zandford*, 535 U.S. 813, 822 (2002) (fraud that "coincide[s]" with the securities transactions satisfies the "in connection with" requirement of Section 10(b)); *United States v. Naftalin*, 441 U.S. 768, 777-78 (1979) ("in the offer or sale" is broad enough to cover the entire selling process for purposes of Section 17(a)).  Defendants made these statements online, through social media, and to numerous investors as part of sales pitches to induce investors to purchase node licenses.  Thus, the SEC has met all elements of a *prima facie* case for violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

> ### 3. Defendants Engaged in a Scheme To Defraud, in Violation of Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act.

In addition, the SEC has set forth a *prima facie* case that Defendants DEBT Box, Jason Anderson, Jake Anderson, Brannon, Nelson, Franklin, Western Oil, and Bowen violated Sections 17(a)(1) and (3) and Section 10(b) of the Exchange Act and Rules 10b–5(a) and 10b–5(c) thereunder by engaging in a scheme to defraud the DEBT Box node license purchasers.  To be liable for a scheme to defraud, a defendant "must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *See Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006).

DEBT Box and the DEBT Council deceived investors into believing that the node licenses they purchased were actually mining crypto assets and that the businesses underlying at least the BGLD, XPLR, and BEV assets were generating significant revenues.  In addition to the misrepresentations described in detail above, by creating and using the "back office" DEBT Box accounts to falsely represent to investors that their node licenses and the purported crypto assets they were mining had a particular value, DEBT Box and the DEBT Council members created the deceptive appearance of both mining activities and profitable underlying business activities, and

deceived investors into believing they were earning returns on their investments.  Bowen also

engaged in deceptive acts:  he partnered with Jason Anderson to purchase Lazy Magnolia,

allowed Lazy Magnolia to be used as part of the DEBT Box scheme.  Similarly, Franklin and

Western Oil engaged in deceptive acts by hosting investor events at their oil well sites and

leading investors to believe that the wells were something other than merely exploratory.  And

these Defendants also took steps to prevent investors from discovering the truth—including by

refusing to give information in response to investor inquiries regarding the underlying

technology and businesses.

> **B.    Defendants Violated the Registration Provisions of Section 5(a) and (c) of the Securities Act.**

The SEC has also established a *prima facie* case that all Defendants violated the

registration provisions of Section 5 of the Securities Act.  To establish such violations, the SEC

must demonstrate that Defendants, directly or indirectly, offered or sold securities, through

interstate communication or the mails, without a registration statement having been filed or in

effect.  *See SEC v. Int'l Chem. Dev. Co.*, 469 F.2d 20, 27 (10th Cir. 1972); *SEC v. GenAudio*

*Inc.*, 32 F. 4th 902, 939 (10th Cir. 2022) ("To make a prima facie case under §§ 5(a) and (c), the

following elements must be shown: '(1) no registration statement was in effect as to the

securities, (2) the defendant sold or offered to sell these securities, and (3) interstate

transportation or communication and the mails were used in connection with the sale or offer of

sale.'") (citation omitted).[3]  As discussed above, the node licenses offered and sold by

---

[3] Furthermore, a defendant may be liable as a "necessary participant" or "substantial factor" in the
unregistered offer or sale of securities if that defendant was involved in the organization or
promotion of the securities offering.  *See SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *SEC
v. Holschuh*, 694 F.2d 130, 140 (7th Cir. 1982); *SEC v. Parrish*, No. 11-cv-00558, 2012 WL

Defendants are securities. (*See supra* at II.A.1.)  Defendants never filed a registration statement as to those securities, and no exemption to the registration provision applies.  (*See* Ex. 2, Watkins Decl. ¶ 62.)  Each Defendant, in roles as either an organizer of the securities offering, or as a promotor, participated in this unregistered offer and sale, in violation of Sections 5(a) and 5(c). *See* 15 U.S.C. § 77e(a) and (c).

## C. Defendants Violated the Broker Registration Provisions of Section 15(a)(1) of the Exchange Act.

Finally, the SEC has made a *prima facie* case that the Promotor Defendants, who marketed the securities offering and solicited investors to purchase DEBT Box's node licenses, violated Section 15(a)(1) of the Exchange Act by acting as unregistered brokers.  Section 15(a)(1) makes it unlawful for a broker to "make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless registered with the SEC.  *See* 15 U.S.C. § 78o(a)(1).  Section 15(a)(1) is a strict liability statute, neither scienter nor negligence is required to prove a violation.  *See SEC v. Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1216 (D. Utah 2007); *Art Intellect, Inc.*, 2013 WL 840048 at \*20.

Section 3(a)(4)(A) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4)(A); *see also* 15 U.S.C. § 78c(a)(9) (defining "person" to include a company).  Courts in the Tenth Circuit, determining "whether a person has engaged in the business of being a

---

4378114, \*4 (D. Colo. Sept. 25, 2012) (unpublished) ("S]ellers of securities include persons who solicit purchases and who are motivated at least in part by a desire to serve their own financial interests.").

broker," apply the so-called "*Hansen* factors," which focus on "conduct-based factors and a 'totality of the circumstances approach.'" *SEC v. RMR Asset Mgmt. Co.*, 479 F. Supp. 3d 923, 926 (S.D. Cal. 2020), quoting *SEC v. Feng*, 935 F.3d 721, 731 (9th Cir. 2019); *see, e.g.*, *Art Intellect*, 2013 WL 840048, at *20. The *Hansen* factors consider whether the defendant, for example, received transaction-based income (such as commissions) for his solicitation and regularly participated in securities transactions.[4] *See Art Intellect*, 2013 WL 840048, at *20, citing *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984)(unpublished)); *see also SEC v. Erwin*, No. 13-cv-03363-CMA-KMT, 2021 WL 3773649, *11 (D. Colo. Aug. 25, 2021) (unpublished) (applying the *Hansen* factors). No one factor is dispositive and a court can find a person acted as a broker even where only one or two of the *Hansen* factors are met. *See, e.g., SEC v. Collyard*, 154 F. Supp. 3d 781, 789 (D. Minn. 2015) (*reversed on other grounds* 935 F.3d 721 (8th Cir. 2019).

Courts particularly emphasize two of the Hansen factors as important when analyzing whether a defendant was "in the business of effecting transactions in securities for the account of others" under Section 3(a)(4)(A) of the Exchange Act: (1) regularity of participation in securities transactions and (2) receipt of transaction-based compensation. *See, e.g., SEC v. Bravata*, No. 09–12950, 2009 WL 2245649, *2 (E.D. Mich. July 27, 2009) (unpublished) ("regularity of participation [in securities transactions] is the primary indicia of being 'engaged in the

---

[4] In sum, the *Hansen* factors are: "(i) whether the person works as an employee of the securities' issuer; (ii) whether he receives a commission rather than a salary; (iii) whether he sells or has sold the securities of another issuer; (iv) whether he participates in negotiations between the issuer and investor; (v) whether he provides advice or a valuation as to the merit of an investment; and (vi) whether he actively, rather than passively, finds investors." *Erwin*, 2021 WL 3773649, at *11, citing *Hansen*, 1984 WL 2413, at *10.

business.'") (internal quotations omitted); *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) ("transaction-based compensation is the hallmark of a salesman").

Here, Defendants Jason Anderson, Jake Anderson, Nelson, Brannon, Martinez, Flaherty, Schuler, Daniels, Bowen, Stangis, Fritzsche, iX Global, and Core 1 Crypto each acted as a broker in repeatedly soliciting investors—by the hundreds through social media, YouTube video postings, and live "seminars" and "interviews"—to purchase the "node software license" securities.  (*See* Ex. 2, Watkins Decl. ¶ 61.)  They received transaction-based payments for the node licenses they sold—indeed, the entire purpose of the MLM structure of the investment scheme was that promotors could earn commissions for bringing new investors into the scheme. (*See id*. ¶ 10.)  None of these defendants was registered with the SEC as a broker, nor associated with any registered broker.  (*Id*. ¶ 63.)  Thus, these defendants violated § 15(a)(1). *See SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 13 (D.D.C. 1998) (defendants acted as brokers when collectively they solicited 40 investors to purchase a total of $1.7 million in investments).

**D.      The SEC Has Shown the Violations Are Likely to Be Repeated.**

The SEC has also demonstrated that Defendants' violations will be repeated—indeed, the violations are currently ongoing, as Defendants continue to offer unregistered DEBT Box (and now FAIR Project) securities, continue to act as unregistered brokers promoting these securities and soliciting investors, and continue to make false statements to prospective investors about the securities on their website.  In general, whether a likelihood of future violations exists depends upon the totality of the circumstances, and courts consider factors including (i) the degree of scienter; (ii) the egregiousness of the violations; (iii) the defendants' opportunities to commit future violations; (iv) the defendants' recognition of wrongdoing; and (v) the sincerity of defendants' assurances, if any, against future violations.  *See SEC v. Pros Int'l, Inc.*, 994 F.2d

767, 769 (10th Cir. 1993).  The degree of defendants' scienter "bears heavily" on this analysis. *Id*. at 769, citing *SEC v. Haswell*, 654 F.2d 698, 699 (10th Cir. 1981).

In this case, Defendants' fraudulent scheme, which is ongoing, was perpetrated with a high degree of scienter on the part of DEBT Box and the DEBT Council.  The evidence shows that these Defendants made numerous, repeated false statements to investors about the nature of the node licenses, their value, and lied about basic facts regarding the business ventures purportedly underlying those securities:  going so far as to make up stories about active oil wells, "proprietary" earth-scanning technology and satellite partnerships, and "multi-million dollar" contracts with retail bottlers.  Defendants also actively took steps to prevent investors from learning the truth of these misrepresentations—all the while spending investor money on houses, fancy cars, and "extreme" vacations.  A temporary restraining order is necessary to protect investors from Defendants continued, unrepentant conduct.

## III. THE ANCILLARY RELIEF SOUGHT BY THE SEC IS NECESSARY.

### A. The Court Should Freeze Defendants' and Relief Defendants' Assets.

An order freezing assets is also appropriate here, to preserve the *status quo* and to ensure to the extent possible that sufficient funds are available to satisfy any final judgment the Court might enter against Defendants and Relief Defendants  *See*, *e.g.*, *Unifund SAL*, 910 F.2d at 1041–42; *see also SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003).  "[T]he public interest in preserving the illicit proceeds [of a defendant's fraud] for restitution to the victims is great." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999).  Here, Defendants collected, at a minimum, $49 million in investor funds through their fraudulent scheme, and preserving whatever remains is necessary to prevent additional harm to investors.

To obtain an asset freeze, the SEC must show a *prima facie* case that a violation of the securities laws has occurred. *See Unifund SAL*, 910 F.2d at 1040–41; *see also* 15 U.S.C. §§ 77t(b) and 78u(d)(1). As set forth above, the SEC has established a *prima facie* case that Defendants have violated the federal securities laws—and indeed are continuing to promote their fraudulent securities scheme to this day. Moreover, the bank records obtained by the SEC show Defendants are rapidly dissipating investor funds, both through luxury purchases and by recently draining accounts of those funds. (*See* Ex. 3, Karaz Decl. ¶¶ 18–20.) The SEC's investigation shows that Defendants and Relief Defendants currently hold significant assets in real estate, personal property, and in bank accounts—all of which should be preserved to prevent dissipation. (*See* Ex. 4, Declaration of Jenny McBride.)

**B.     The Court Should Order Accountings and Document Preservation.**

The Court's broad equitable powers in SEC enforcement actions also include the ability to order ancillary relief to require an accounting and prohibit document destruction. *See SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980). To accurately determine the scope of a defendant's fraud, and the ability of both defendants and relief defendants to disgorge illicit proceeds, courts frequently require defendants and relief defendants to provide a verified accounting of all monies or property obtained as a result of the unlawful activity, as well as a summary of their current financial resources or assets. *See*, *e.g.*, *SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031, 2011 WL 887940, *5 (E.D.N.Y. Mar. 14, 2011) (unpublished) (noting that ordering an accounting is "minimally intrusive") (citing *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997)). Here, such accounting is necessary, as Defendants appear to have already gone to significant lengths to dissipate assets and relocate investor funds outside the United States, and

23

because many of the investor funds in this action were invested through cryptocurrency that is not readily traceable through third-party subpoenas. Furthermore, because Defendants have already shown the lengths they will go to avoid compliance with the federal securities laws, the Court should protect the documents necessary for full discovery in this matter by issuing an order prohibiting the alteration and destruction of relevant documents.

### C. The Court Should Permit The SEC To Take Expedited Discovery.

The Court should also permit the SEC to issue expedited written discovery on Defendants, Relief Defendants, and third-parties with relevant information regarding Defendants' fraudulent scheme. Expedited discovery is authorized by Rules 30 and 34 of the Federal Rules of Civil Procedure and a court's broad equitable powers in SEC enforcement actions to order all necessary ancillary relief. *See Wencke*, 622 F.2d at 1369. Moreover, where urgent relief is sought and expedited discovery is necessary to accomplish that result, a court may grant expedited discovery. *See Notaro v. Koch*, 35 Fed. R. Serv. 2d 580, 95 F.R.D. 403, 405 (S.D.N.Y. 1982). Expedited discovery—and in particular, discovery regarding Defendants' and Relief Defendants' financial accounts and receipt and use of investor funds—is required in this case to enable the SEC to more fully to develop the evidence prior to the preliminary injunction hearing, and effectuate any Order entered by this Court freezing assets.

### D. Defendants Should Be Ordered to Repatriate Assets.

Finally, the SEC seeks a repatriation order requiring Defendants and Relief Defendants to repatriate to accounts in the United States all investor funds and assets transferred outside this Court's jurisdiction. Under the broad equitable powers granted to courts by Section 21(d)(5) of the Exchange Act, courts routinely order defendants to repatriate illicit profits they have moved

abroad, usually to help effectuate an asset freeze.[5]  Here, a repatriation order is necessary

because Defendants have already transferred significant assets to the United Arab Emirates—

including approximately $2 million in an account for Relief Defendant IX Ventures FZCO; and

expressed the specific intent to move operations abroad to avoid the SEC's jurisdiction.  (*See* Ex.

2, Watkins Decl. ¶ 27.)  For the protection of investors, the Court should order Defendants to

reverse any transfer of assets and return them to the jurisdiction of this Court.

**<u>CONCLUSION</u>**

For the foregoing reasons, the SEC respectfully asks the Court to grant the SEC's Motion

and enter the proposed Temporary Restraining Order (*see* Ex. 1) and the ancillary relief

requested herein.

Dated: July 26, 2023.

Respectfully submitted,


**SECURITIES AND EXCHANGE COMMISSION**


*/s/ Michael E. Welsh*                                                    `
Michael E. Welsh
Casey R. Fronk
Attorneys for Plaintiff
Securities and Exchange Commission

---

[5] *See*, *e.g.*, *SEC v. Compania Internacional Financiera SA.*, No. 11 Civ 4904, 2011 WL 3251813, *13 (S.D.N.Y. July 29, 2011) (unpublished); *SEC v. Aragon Capital Advisors, LLC*, No. 07 Civ. 919, 2011 WL 3278642, *10 (S.D.N.Y. July 26, 2011) (unpublished); *SEC v. Aimsi Tech., Inc.*, 650 F. Supp. 2d 296, 303 (S.D.N.Y. 2009).