# Exhibit 33

<u>DECLARATION OF RICK LEE SERENA</u>

I, Rick Lee Serena, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over the age of 21 and am a resident of the State of Utah.  I make this declaration based upon my personal knowledge.  If called to testify, I could and would competently testify to the following facts:

2.      For the past fifteen years, I have been employed in various capacities in the nutraceutical and beverage manufacturing industry. Through my work in this industry, I have developed business relationships with several beverage companies, including Anheuser-Bush, Life Cider Vinegar, and Claffey's Frozen Cocktails, among others.

3.      In 2020, I was working for Intermountain Nutrition. Through my work with Intermountain Nutritional, I became friends with John Rigby.

4.      Rigby and I talked about going into business together and started exploring options.

5.      In November 2020, Rigby and I identified a Mississippi brewery called Lazy Magnolia Brewing Company on a website that lists businesses for sale.

6.      In April 2021, Rigby and I first traveled to Mississippi to visit the brewery.

7.      For the next several months, we conducted due diligence, including reviewing Lazy Magnolia' financials. Attached here to as "Exhibit A" is a true and correct copy of one of the financial documents we received during due diligence, which shows Lazy Magnolia's net income in 2021 as $426,721.

8.      During due diligence we determined that Lazy Magnolia had excess manufacturing capacity that could lead to expansion and increased revenue. Our goal was to bring new customers to the brewery through my existing relationships in the beverage industry and provide bottling and packaging services for them.

9.      Based on these factors, we decided that Lazy Magnolia looked like a good business

opportunity.

10.     During this timeframe, I became acquainted with David Brown through my work at

Intermountain Nutrition's subsidiary Nebo Packaging.

11.     Through my work with Brown, I began discussing with him Rigby and my business

venture plans and mentioned that we had identified Lazy Magnolia as a business we would like

to acquire.

12.     Brown indicated that he could find capital to fund our venture.

13.     We decided to bring Brown in as a partner who would be responsible for finding funding,

and Brown began seeking funding through his business Renegade Manufacturing Group, LLC.

14.     Although I do not have much personal knowledge of how Brown identified investors to

help fund our purchase of Lazy Magnolia, I learned that he had negotiated with Jason Anderson,

his brother Jake Anderson, and Ryan Bowen to provide the initial financing. I understand that the

deal was intended to be structured as the Andersons and Bowen as providing the funding, but

that Renegade Manufacturing Group would be the actual purchaser of Lazy Magnolia. I also

understand that Renegade Manufacturing Group paid initial earnest money of $100,000 on the

purchase of Lazy Magnolia.

15.     At the end of November 2022, Rigby and I met the Andersons and Bowen for the first

time when they were on a site visit to the brewery in Mississippi.

16.     We were initially told that the purchase was set to close on December 9, 2022, but it kept

getting pushed back until it finally closed on December 22, 2022.

17.     Rigby and I remained in Mississippi following the close of the deal to begin managing

the operations of the brewery. Our initial tasks included cleaning the facility and obtaining bids

from contractors to complete the necessary work to expand the brewery's production capabilities as we planned.

18.     While we were doing this initial work, we were anticipating receiving operating agreements with Renegade Manufacturing Group that would govern our roles with the brewery.

19.     On January 15, 2023, however, Jason Anderson and Bowen arrived at the brewery unannounced.

20.     They told Rigby and me that Renegade Manufacturing Group was no longer part of the deal and insinuated that Renegade Manufacturing Group had made misrepresentations to them.

21.     Jason Anderson also said that he was aware that Lazy Magnolia had only made approximately $100,000 in net income in 2022, and told us that he felt he was doing Brown a favor by excluding him from such a low profit business.

22.     Jason Anderson and Bowen asked Rigby and me to stay on and run the operations of the brewery. They offered us $80,000 a year and 10% ownership in the company. I requested $90,000 a year, and they agreed. They told us they would formalize this in a written agreement, which they would get to us shortly.

23.     During this meeting, Jason Anderson and Bowen also indicated that, as part of our compensation, we would receive what they referred to as "licenses" for a crypto investment through their company Debt Box. I did not fully understand what this was, but I went through the process to set up the licenses, but never actually received the licenses. At some point, Jason Anderson mentioned something called the BEV token, and that Debt Box would be using Lazy Magnolia to promote the token.

24.     Rigby and I were surprised by the accusations Jason Anderson made about Renegade Manufacturing Group, so after the Andersons and Bowen left, we spoke with Brown.

3

25.     Brown indicated that he had been pushed out of the deal and that the Andersons and Bowen completely changed the terms of the deal. Brown shared with us communications he had with his attorneys, and what Brown said seemed accurate.

26.     Rigby and I were therefore hesitant about moving forward with the Andersons and Bowen, but felt that we had no other option after having invested so much time and effort into this business venture.

27.     Near the end of January, I returned home to Utah. While in Utah, I met with the Andersons and Bowen. I inquired about our operating agreements, and Jason indicated surprise that I did not have it already and that the agreement would be ready by the end of the day.

28.     At this meeting, we also discussed plans for the brewery. I said that I was working on getting contracts with beverage companies like Anheuser-Busch, Heaven Hill, Claffey's Frozen Cocktails, and Rancho La Gloria, but we need to get the necessary equipment to accommodate their packaging needs.

29.     We also needed to do some repairs and other work at the brewery in order to bring in this new business.

30.     I had worked with contractors and obtained bids on all the work that needed to be done. The only thing we needed to move forward was to pay initial deposits to the contractors. The Andersons and Bowen ensured that they would provide the necessary funding.

31.     I returned to the brewery shortly after this meeting. Rigby and I were doing what we could to keep the business going, but really needed to get the contractors in to make progress.

32.     I tried to follow up with the Andersons and Bowen about the deposits, but received no response. I was frustrated with the lack of communication.

33.     We also had yet to receive our written operating agreements, which only added to our concerns. We were, however, receiving monthly ACH deposits of $7,500 as our compensation.

34.     On or around February 27, 2023, Jason Anderson, Bowen, and Bowen's wife Brittney came back to the brewery.

35.     They stated that their plan for the trip was to pay all deposits for equipment and contractors before they left. However, by the time they left, not a single deposit was made.

36.     They also spoke with some equipment manufacturers and contractors to negotiate pricing, but never finalized any contracts.

37.     By the beginning of March 2023, Rigby and I were extremely frustrated with the Andersons and Bowen.

38.     They had made several promises that they had not kept. For example, they never got us our operating agreements, they had not ordered the necessary equipment to accommodate the packaging needs of the new customers I had been working with, and they never paid the deposits for the contractors to do work on the brewery. I had lost all trust in the Andersons and Bowen.

39.     On or around March 6, 2023, I decided to end my employment at Lazy Magnolia, so I packed up and headed back to Utah. Rigby also terminated his employment.

40.     I sent an email to Jason Anderson, Bowen, and their associate Derrick Hope to let them know we were done and headed back to Utah. A true and correct copy of this email is attached here to as "Exhibit B."

41.     After I terminated my employment, none of the potential customers I had been trying to recruit went forward in bringing their business to Lazy Magnolia.

42.     When I spoke with one of my contacts, Chris Claffey of Claffey's Frozen Cocktails, on or around March 22, 2023, he told me that he sent a cease-and-desist letter to Debt Box ordering

it to stop using his company to promote the BEV token because Claffey's Frozen Cocktails had nothing to do with Debt Box or BEV.

43.     To my knowledge, the Andersons and Bowen do not presently have any potential new customers of their own. Therefore, it is my understanding that to date, Lazy Magnolia has not expanded its business beyond what it already had when the Andersons and Bowen purchased the brewery in December 2022. Any representations that the Andersons, Bowen, or other affiliates of Debt Box have made that Lazy Magnolia is making millions of dollars in profits are false.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in ___SALT LAKE CITY UT___ on ___JUNE 30th___, 2023.

___Rick S___
Rick Lee Serena

# Exhibit A

**S501 Full Service Beverage Manufacturer**
**Adjusted Profit and Loss Statement January Thru December, 2021 Accrual Basis**

| Ordinary Income/Expense | | 2021 | % | Note | | Adjustment | | Adjusted Amount |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Sales: Packaged Beer | $ | 1,705,656 | 54% | | $ | - | $ | 1,705,656 |
| Contract Brew Income (Co-packing beer) | $ | 332,950 | 10% | | $ | - | $ | 332,950 |
| Water & Soda Income (Co-packing non-alcoholic) | $ | 480,906 | 15% | N1 | $ | - | $ | 480,906 |
| Sales: Merchandise | $ | 83,712 | 3% | | $ | - | $ | 83,712 |
| Sales: Miscellaneous | $ | 168 | 0% | | $ | - | $ | 168 |
| Sales: Events, Tours, Memberships | $ | - | 0% | | $ | - | $ | - |
| Sales: Food | $ | 134,764 | 4% | | $ | - | $ | 134,764 |
| Sales: On Premis Beer | $ | 96,336 | 3% | | $ | - | $ | 96,336 |
| Sales: Off Premise Beer | $ | 83,140 | 3% | | $ | - | $ | 83,140 |
| Tips Holding | $ | (241) | 0% | | $ | - | $ | (241) |
| Gain/Loss on Sale of Assets | $ | 3,500 | 0% | | $ | - | $ | 3,500 |
| Sale of Raw Materials | $ | 2,458 | 0% | | $ | - | $ | 2,458 |
| Other (keg deposit close out, credit card rewards) | $ | - | 0% | | $ | - | $ | - |
| Grant Income | $ | 263,793 | 8% | N2 | $ | (263,793) | $ | - |
| **Total Income** | $ | 3,187,142 | 100% | | $ | (263,793) | $ | 2,923,349 |
| | | | | | | | | |
| **Cost of Goods Sold** | | | | | | | | |
| Production Labor (Cost of Labor) | $ | 519,495 | 16% | N3 | $ | (50,000) | $ | 469,495 |
| Brewery Purchases | $ | 825,228 | 26% | | $ | - | $ | 825,228 |
| Brewing/Filtering Other | $ | 23,224 | 1% | | $ | - | $ | 23,224 |
| Packaging Other | $ | 57,728 | 2% | N4 | $ | - | $ | 57,728 |
| Packaged Beer Inventory Adjustments | $ | (366) | 0% | | $ | - | $ | (366) |
| Raw Material Inventory & Pricing Adjustments | $ | 14,538 | 0% | | $ | - | $ | 14,538 |
| Packaging Materials Inventory Overage/Shortage | $ | 3,769 | 0% | | $ | - | $ | 3,769 |
| Waste and Loss | $ | 143,307 | 4% | N5 | $ | (120,979) | $ | 22,328 |
| Utilities | $ | 76,106 | 2% | | $ | - | $ | 76,106 |
| Delivery - Outbound | $ | 6,794 | 0% | | $ | - | $ | 6,794 |
| Freight - Inbound | $ | 26,341 | 1% | | $ | - | $ | 26,341 |
| Excise Tax | $ | 30,261 | 1% | | $ | - | $ | 30,261 |
| Brewery Supplies | $ | 34,048 | 1% | | $ | - | $ | 34,048 |
| Negative Inventory Variance (SYS) | $ | 1,271 | 0% | | $ | - | $ | 1,271 |
| G/L Incr/Decr account (SYS) | $ | 557 | 0% | | $ | - | $ | 557 |
| System COGS (SYS) | $ | 181 | 0% | | $ | - | $ | 181 |
| Merchandise | $ | 43,263 | 1% | | $ | - | $ | 43,263 |
| Food & Supplies | $ | 56,968 | 2% | | $ | - | $ | 56,968 |
| **Total COGS** | $ | 1,862,713 | 58% | | $ | (170,979) | $ | 1,691,734 |
| | | | | | | | | |
| **Gross Profit** | $ | 1,324,429 | 42% | | | | | $1,231,615 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Manager's Salary | $ | 50,000 | 2% | N3 | $ | - | $ | 50,000 |
| Administrative Labor | $ | 36,153 | 1% | | $ | - | $ | 36,153 |
| Licenses and Permits | $ | 16,701 | 1% | | $ | - | $ | 16,701 |
| Repairs and Maintenance | $ | 48,781 | 2% | | $ | - | $ | 48,781 |
| Waste Disposal | $ | 12,287 | 0% | | $ | - | $ | 12,287 |
| Office & General | $ | 5,626 | 0% | | $ | - | $ | 5,626 |
| Utilities, phone, vehicle non-marketing | $ | 15,263 | 0% | | $ | - | $ | 15,263 |
| Rentals and Leases | $ | 21,898 | 1% | | $ | - | $ | 21,898 |
| Bank Service Charges | $ | 2,302 | 0% | | $ | - | $ | 2,302 |
| Meals-non Marketing (50%) | $ | 60 | 0% | | $ | - | $ | 60 |
| Insurance: Health & Disability | $ | 78,794 | 2% | N6 | $ | (14,400) | $ | 64,394 |

### S501 Full Service Beverage Manufacturer
### Adjusted Profit and Loss Statement January Thru December, 2021 Accrual Basis

| | | | | | | |
|---|---|---|---|---|---|---|
| Insurance: Other EE Benefits | $ | 620 | 0% | $ | - | $ | 620 |
| Gift Card Usage | $ | 17,089 | 1% | $ | - | $ | 17,089 |
| 401k Matching | $ | 13,333 | 0% | $ | - | $ | 13,333 |
| Vacation Pay | $ | 50,931 | 2% | N7 | $ | (8,435) | $ | 42,496 |
| Insurance: Worker's Compensation Insurance | $ | 6,235 | 0% | $ | - | $ | 6,235 |
| Insurance: G&L, P&C, Flood | $ | 48,482 | 2% | $ | - | $ | 48,482 |
| Taxes - Use: Use Tax - 7% | $ | 5,312 | 0% | $ | - | $ | 5,312 |
| Taxes - Use: Use Tax - 1.5% | $ | 2,189 | 0% | $ | - | $ | 2,189 |
| Other Expenses | $ | - | 0% | $ | - | $ | - |
| Property Taxes | $ | 30,439 | 1% | $ | - | $ | 30,439 |
| Payroll Taxes | $ | 58,495 | 2% | $ | - | $ | 210 |
| Sales Tax | $ | 210 | 0% | $ | - | |
| Professional Fees: Legal & Legislative | $ | 66,003 | 2% | N8 | $ | (51,003) | $ | 15,000 |
| Professional Fees: Accounting | $ | 8,700 | 0% | $ | - | $ | 8,700 |
| Professional Fees: HR | $ | 21,362 | 1% | $ | - | $ | 21,362 |
| Professional Fees: IT | $ | 30,218 | 1% | $ | - | $ | 30,218 |
| Professional Fees: Facility | $ | 710 | 0% | $ | - | $ | 710 |
| Marketing & Sales | $ | 192,606 | 6% | N9 | $ | (143,982) | $ | 48,624 |
| Memberships | $ | 4,964 | 0% | $ | - | $ | 4,964 |
| Graphic Art and Web Design | $ | 595 | 0% | $ | - | $ | 595 |
| Advertising - General | $ | 9,917 | 0% | $ | - | $ | 9,917 |
| Amortization | $ | 3,639 | 0% | N10 | $ | (3,639) | $ | - |
| Depreciation | $ | 179,485 | 6% | N10 | $ | (179,485) | $ | - |
| Interest | $ | 84,244 | 3% | N10 | $ | (84,244) | $ | - |
| Bad Debt | $ | 12,338 | 0% | $ | - | $ | 12,338 |
| Beer for Tasting Room | $ | 97,381 | 3% | $ | - | $ | 97,381 |
| Supplies for Tour Area | $ | 6,020 | 0% | $ | - | $ | 6,020 |
| Entertainment | $ | 5,848 | 0% | $ | - | $ | 5,848 |
| Advertising for Tours | $ | 3,050 | 0% | $ | - | $ | 3,050 |
| Merchandise Labor | $ | 89,125 | 3% | $ | - | $ | 89,125 |
| Shipping Merchandise | $ | 300 | 0% | $ | - | $ | 300 |
| Reconciliation Discrepancies | $ | 1,597 | 0% | $ | - | $ | 1,597 |
| Tap Room Maintenance | $ | 1,288 | 0% | $ | - | $ | 1,288 |
| Other Expenses | $ | (2,986) | 0% | | |
| Credit Card Service Fees | $ | 10,142 | 0% | $ | - | $ | 10,142 |
| **Total Expense** | $ | 1,347,746 | 42% | $ | 485,188 | $ | 807,049 |
| | | | | | | |
| **NET INCOME** | $ | (23,314) | -1% | SDE P&L 2021 | $ | 424,566 |

**S501 Full Service Beverage Manufacturer**
**Adjusted Profit and Loss Statement January Thru December, 2021 Accrual Basis**

**NOTES FOR S501 - 2021**

N1   Reveue is just the Co-Packing Fee.  Their largest copacking client supplies the COGS.  All of the bottles, cans, labels, packaging, they just charge for the copacking services causing a low revenue for this client.

N2   One-Time, non-recurring income.  PPP funds that have been forgiven and Employee Retention Credit used to pay payroll taxes.

N3   Moved Manager's Salary from Production Labor in COGS to Expenses.

N4   Includes Richards Rainwater Bottles Reimbursements, Returned Kegs

N5   In anticipation of selling the business this is the writedown of waste and loss since opening the business.

N6   Health Insurance for owners at $1,200 per month.

N7   Vacation pay reclassified as Severance Pay to relieve business of several challening employees. $3,340 for JB & $5,095 for TL.

N8   Trademark Defense. One-time, nonrecurring expense.

N9   Marketing & Tap Room labor that received funds for PPP that woud not have been paid without the PPP funds.

N10  By definition of EBITDA all Interest, Taxes, Depreciation and Amortization is added back.  Includes Keg depreciation of $26,393 for the year.

One-Time Expense spent on re-branding, new brand artwork, and web page upgrades.

## S501 Full Service Beverage Manufacturer
## Form 1065 Recast Tax Return 2021 (Accrual Basis)

| Ordinary Income/Expense | | Total | % | Note | | Adjustment | | Adjusted Amount |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Gross Receipts | $ | 2,919,851 | 99% | | $ | - | $ | 2,919,851 |
| Net Gain Form 4797 | $ | - | 0% | | $ | - | $ | - |
| Other Income | $ | 16,198 | 1% | N1 | $ | - | $ | 16,198 |
| Service Charges | $ | - | 0% | | $ | - | $ | - |
| **Total Income** | $ | **2,936,049** | **100%** | | $ | **-** | $ | **2,936,049** |
| | | | | | | | | |
| **Cost of Food Sold** | | | | | | | | |
| Inventory Beg of Year | $ | 523,880 | 18% | | $ | - | $ | 523,880 |
| Purchases | $ | 1,040,290 | 35% | | $ | - | $ | 1,040,290 |
| Cost of Labor | $ | 519,495 | 18% | N2 | $ | (50,000) | $ | 469,495 |
| Delivery Costs | $ | 6,794 | 0% | | $ | - | $ | 6,794 |
| Beer Buyback | $ | 5,863 | 0% | N3 | $ | (5,863) | $ | - |
| Cost of Food Sold | $ | 56,968 | 2% | | $ | - | $ | 56,968 |
| Freight | $ | 26,341 | 1% | | $ | - | $ | 26,341 |
| Utilities | $ | 76,106 | 3% | | $ | - | $ | 76,106 |
| Inventory End of Year | $ | (451,470) | -15% | NX | $ | 1 | $ | (451,469) |
| **Total COGS** | $ | **1,804,267** | **44%** | | $ | **(55,862)** | $ | **1,748,405** |
| | | | | | | | | |
| **Gross Profit** | $ | **1,131,782** | **39%** | | $ | **(55,862)** | $ | **1,187,644** |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Salaries and wages | $ | 89,125 | 3% | N2 | $ | (39,125) | $ | 50,000 |
| Repairs and Maintenance | $ | 50,069 | 2% | | $ | - | $ | 50,069 |
| Bad Debt | $ | 12,338 | 0% | N3 | $ | (12,338) | $ | - |
| Rent | $ | 21,898 | 1% | | $ | - | $ | 21,898 |
| Excise Tax | $ | 30,261 | 1% | | $ | - | $ | 30,261 |
| Taxes & Licenses - Licenses & Permits | $ | 16,701 | 1% | | $ | - | $ | 16,701 |
| Taxes & Licenses - Payroll Taxes | $ | - | 0% | | $ | - | $ | - |
| Taxes & Licenses - Other | $ | 30,439 | 1% | | $ | - | $ | 30,439 |
| Taxes & Licenses - Sales | $ | 7,711 | 0% | | $ | - | $ | 7,711 |
| Interest | $ | 84,244 | 3% | N4 | $ | (84,244) | $ | - |
| Depreciation | $ | 179,485 | 6% | N4 | $ | (179,485) | $ | - |
| Retirement Plans | $ | 13,333 | 0% | | $ | - | $ | 13,333 |
| Employee Benefit Programs | $ | 153,669 | 5% | N5 | $ | (8,435) | $ | 145,234 |
| Advertising | $ | 199,026 | 7% | N6 | $ | (143,982) | $ | 55,044 |
| Amortization Expense | $ | 3,639 | 0% | N4 | $ | (3,639) | $ | - |
| Bank Service Charges | $ | 12,443 | 0% | | $ | - | $ | 12,443 |
| Beer for Tasting Room | $ | 97,381 | 3% | | $ | - | $ | 97,381 |
| Dues Memberships and Subscriptions | $ | 4,964 | 0% | | $ | - | $ | 4,964 |
| Graphics and Web Design | $ | 595 | 0% | | $ | - | $ | 595 |
| Insurance | $ | 48,482 | 2% | N7 | $ | (14,400) | $ | 34,082 |
| Legal and Accounting | $ | 126,993 | 4% | N8 | $ | (51,003) | $ | 75,990 |
| Meals | $ | 622 | 0% | | $ | - | $ | 622 |
| Miscellaneous Expense | $ | 1,597 | 0% | | $ | - | $ | 1,597 |
| Office and Admin | $ | 41,779 | 1% | | $ | - | $ | 41,779 |
| Office Postage | $ | 300 | 0% | | $ | - | $ | 300 |
| Other Deductions | $ | (2,986) | 0% | | $ | - | $ | (2,986) |
| Live Music for Taproom | $ | 5,848 | 0% | | $ | - | $ | 5,848 |
| Supplies | $ | 40,068 | 1% | | $ | - | $ | 40,068 |
| Waste Disposal | $ | 15,263 | 1% | | $ | - | $ | 15,263 |
| Utilities and Phone | $ | 12,287 | 0% | | $ | - | $ | 12,287 |
| **Total Expense** | $ | **1,297,574** | **44%** | | $ | **(536,651)** | $ | **760,923** |
| | | | | | | | | |
| **NET INCOME** | $ | **(165,792)** | | | **2021  SDE** | $ | | **426,721** |

# S501 Full Service Beverage Manufacturer
## Form 1065 Recast Tax Return 2021 (Accrual Basis)

**NOTES FOR S501 Full Service Beverage Manufacturer - 2021 Recast TAX RETURN**

N1  That amount is the balance of Employee Retention Tax Credits after wiping out payroll taxes.

N2  Moved Manager's Salary from Production Labor in COGS to Expenses.  Remaining funds used to pay Owner's taxs.

N3  Beer that had to be disposed of due to COVID shutdown of clients as well as bad debt assocated with customers.

N4  By definition of EBITDA all Interest, Taxes, Depreciation and Amortization is added-back.

N5  Vacation pay reclassified as Severance Pay to relieve business of several challening employees.  JB for $3,340 &
    TL for $5,095.

N6  Marketing & Tap Room labor that received funds for PPP that woud not have been paid without the PPP funds.

N7  Health Insurance for owners at $1,200 per month.

N8  Professional Fees are Legal = $37,714 of which about $20,000 is for a Trademark dispute, Accounting = $13,300 this
    is a little higher due to some additional services related to COVID-PPP Loan assistance, major refinance of debt,
    Human Resources = $15,115, and Information Tech Services $31,736 that include:Obeer, Expensify, VIP, and
    shipping complaint.  Tech Services is a little lower because of how they pay their ERP system.  Subscription model
    now instead of owning and maintaining licenses.

All information contained in this document has been
secured from the seller.  Business Brokers of San Antonio
in no way guarantees the accuracy of such information,
nor does it warrant any assumptions as true and correct.

| Signature | Printed Name | Date |
|---|---|---|

SEC-SL-02891-E-0021426

**S501 Full Service Beverage Manufacturer**
**Form 1065 Recast Tax Return 2020 (Accrual Basis)**

| Ordinary Income/Expense | | Total | % | Note | | Adjustment | | Adjusted Amount |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Gross Receipts | $ | 3,051,957 | 98% | | $ | - | $ | 3,051,957 |
| Net Gain Form 4797 | $ | 13,624 | 0% | | $ | - | $ | 13,624 |
| Other Income | $ | 34,284 | 1% | N1 | $ | - | $ | 34,284 |
| Service Charges | $ | - | 0% | | $ | - | $ | - |
| **Total Income** | $ | 3,099,865 | 100% | | $ | - | $ | 3,099,865 |
| | | | | | | | | |
| Purchases | $ | 1,174,212 | 38% | N2 | $ | (22,020) | $ | 1,152,192 |
| Cost of Labor | $ | 529,057 | 17% | | $ | - | $ | 529,057 |
| Delivery Costs | $ | 10,495 | 0% | | $ | - | $ | 10,495 |
| Excise Tax | $ | 32,690 | 1% | | $ | - | $ | 32,690 |
| Freight | $ | 19,349 | 1% | | $ | - | $ | 19,349 |
| Utilities | $ | 77,725 | 3% | | $ | - | $ | 77,725 |
| **Total COGS** | $ | 1,843,528 | 59% | | $ | (22,020) | $ | 1,821,508 |
| | | | | | | | | |
| **Gross Profit** | $ | 1,256,337 | 41% | | $ | (22,020) | $ | 1,278,357 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Salaries and wages | $ | 200,884 | 6% | | $ | - | $ | 200,884 |
| Repairs and Maintenance | $ | 57,772 | 2% | | $ | - | $ | 57,772 |
| Bad Debt | $ | 4,431 | 0% | N2 | $ | (4,431) | $ | - |
| Rent | $ | 48,146 | 2% | | $ | - | $ | 48,146 |
| Taxes & Licenses - Licenses & Permits | $ | 23,158 | 1% | | $ | - | $ | 23,158 |
| Taxes & Licenses - Payroll Taxes | $ | 52,192 | 2% | | $ | - | $ | 52,192 |
| Taxes & Licenses - Other | $ | 6,198 | 0% | | $ | - | $ | 6,198 |
| Taxes & Licenses - Sales | $ | 30,126 | 1% | | $ | - | $ | 30,126 |
| Interest | $ | 91,472 | 3% | N3 | $ | (91,472) | $ | - |
| Depreciation | $ | 153,405 | 5% | N3 | $ | (153,405) | $ | - |
| Retirement Plans | $ | 13,793 | 0% | | $ | - | $ | 13,793 |
| Employee Benefit Programs | $ | 81,788 | 3% | N4 | $ | (9,024) | $ | 72,764 |
| Advertising | $ | 16,965 | 1% | | $ | - | $ | 16,965 |
| Amortization Expense | $ | 1,475 | 0% | N3 | $ | (1,475) | $ | - |
| Bank Service Charges | $ | 3,200 | 0% | | $ | - | $ | 3,200 |
| Credit Card Fees | $ | 10,025 | 0% | | $ | - | $ | 10,025 |
| Graphics and Web Design | $ | 7,717 | 0% | | $ | - | $ | 7,717 |
| Insurance | $ | 50,999 | 2% | | $ | - | $ | 50,999 |
| Legal and Accounting | $ | 82,801 | 3% | N5 | $ | (20,000) | $ | 62,801 |
| Marketing | $ | 122,756 | 4% | N6 | $ | (28,075) | $ | 94,681 |
| Meals | $ | 3,338 | 0% | | $ | - | $ | 3,338 |
| Miscellaneous Expense | $ | - | 0% | | $ | - | $ | - |
| Office Postage | $ | 5,836 | 0% | | $ | - | $ | 5,836 |
| Other Deductions | $ | 7,205 | 0% | | $ | - | $ | 7,205 |
| Professional Fees | $ | 15,115 | 0% | N5 | $ | - | $ | 15,115 |
| Supplies | $ | 25,532 | 1% | | $ | - | $ | 25,532 |
| Tuition and Gifts | $ | 10,936 | 0% | N4 | $ | (3,652) | $ | 7,284 |
| Utilities and Phone | $ | 22,948 | 1% | | $ | - | $ | 22,948 |
| **Total Expense** | $ | 1,150,213 | 37% | | $ | (311,534) | $ | 838,679 |
| | | | | | | | | |
| **NET INCOME** | $ | 106,124 | | | | 2020 SDE | $ | 439,678 |
| | | | | | | | | 14% |
| **Excluded T&E** | $ | (12,696) | | | | | | |
| | | | | | | | | |
| **M-1 Reconciliation** | $ | 93,428 | | | | 2020 M-1 SDE | $ | 426,982 |

## S501 Full Service Beverage Manufacturer
## Form 1065 Recast Tax Return 2020 (Accrual Basis)

**NOTES FOR S501 Full Service Beverage Manufacturer - 2020 Recast TAX RETURN**

N1   One-time income from the state of Mississippi established to help businesses in Mississippi with 50 or fewer employees recover from the economic impact of COVID-19, including operating expenses and salaries. Remaining is miscellaneous income.

N2   Beer that had to be disposed of due to COVID shutdown of clients as well as bad debt assocated with customers.

N3   By definition of EBITDA all Interest, Taxes, Depreciation and Amortization is added-back.

N4   Severance Pay to releave business of several challening employees.
$3,430 Insurance BCBS & Gardian Employee O.G -  (Employee Benefit Programs)
$3,652 Gifts - Employee O.G.
$5,594 Vacation Pay - Employees O.G. and T.E. – (Employee Benefit Programs)

N5   Professional Fees are Legal = $37,714 of which about $20,000 if for a Trade Mark dispute, Accounting = $13,300 this is a little higher due to some additional services related to COVID-PPP Loan assistance, major refinance of debt, Human Resources = $15,115, and Information Tech Services $31,736 that include:Obeer, Expensify, VIP, and ShipComplaint. The Tech Services is a little lower because of how they pay their ERP system.  Subscription model now instead of owning and maintaining licenses.

N6   One-Time Expense spent on re-branding, new brand artwork, and web page upgrades.

All information contained in this document has been secured from the seller.  Business Brokers of San Antonio in no way guarantees the accuracy of such information, nor does it warrant any assumptions as true and correct.

Signature                                   Printed Name                          Date

SEC-SL-02891-E-0021428

## S501 Full Service Beverage Manufacturer
## Form 1065 Recast Tax Return 2019 (Accrual Basis)

| Ordinary Income/Expense | | Total | % | Note | Adjustment | | Adjusted Amount |
|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | |
| Gross Receipts | $ | 3,125,492 | 100% | | $ - | $ | 3,125,492 |
| Net Gain Form 4797 | $ | 2,840 | 0% | | $ - | $ | 2,840 |
| Other Income | $ | 11,601 | 0% | N1 | $ - | $ | 11,601 |
| Service Charges | $ | - | 0% | | $ - | $ | - |
| **Total Income** | $ | 3,139,933 | 100% | | $ - | $ | 3,139,933 |
| | | | | | | | |
| Inventory at beginning of year | $ | 510,227 | 16% | | $ - | $ | 510,227 |
| Purchases | $ | 1,122,024 | 36% | | $ - | $ | 1,122,024 |
| Cost of Labor | $ | 404,491 | 13% | N2 | $ (14,000) | $ | 390,491 |
| Delivery Costs | $ | 5,509 | 0% | | $ - | $ | 5,509 |
| Excise Tax | $ | 38,879 | 1% | | $ - | $ | 38,879 |
| Freight | $ | 24,138 | 1% | | $ - | $ | 24,138 |
| Utilities | $ | 62,821 | 2% | | $ - | $ | 62,821 |
| Inventory at end of year | $ | (501,860) | -16% | | $ - | $ | (501,860) |
| **Total COGS** | $ | 1,666,229 | 53% | | $ (14,000) | $ | 1,652,229 |
| | | | | | | | |
| **Gross Profit** | $ | 1,473,704 | 47% | | $ (14,000) | $ | 1,487,704 |
| | | | | | | | |
| **Expenses** | | | | | | | |
| Salaries and wages | $ | 284,188 | 9% | | $ - | $ | 284,188 |
| Repairs and Maintenance | $ | 81,015 | 3% | | $ - | $ | 81,015 |
| Rent | $ | 80,289 | 3% | | $ - | $ | 80,289 |
| Taxes & Licenses - Licenses & Permi | $ | 16,244 | 1% | | $ - | $ | 16,244 |
| Taxes & Licenses - Payroll Taxes | $ | 56,892 | 2% | | $ - | $ | 56,892 |
| Taxes & Licenses - Sales & Use | $ | 5,188 | 0% | | $ - | $ | 5,188 |
| Taxes & Licenses - Property | $ | 30,522 | 1% | | $ - | $ | 30,522 |
| Interest | $ | 87,924 | 3% | N3 | $ (87,924) | $ | - |
| Depreciation | $ | 132,353 | 4% | N3 | $ (132,353) | $ | - |
| Retirement Plans | $ | 12,293 | 0% | | $ - | $ | 12,293 |
| Employee Benefit Programs | $ | 90,241 | 3% | N4 | $ (17,765) | $ | 72,476 |
| Advertising | $ | 19,504 | 1% | | $ - | $ | 19,504 |
| Amortization Expense | $ | 384 | 0% | N3 | $ (384) | $ | - |
| Bank Service Charges | $ | 3,794 | 0% | | $ - | $ | 3,794 |
| Credit Card Fees | $ | 8,739 | 0% | | $ - | $ | 8,739 |
| Graphics and Web Design | $ | 28,076 | 1% | | $ - | $ | 28,076 |
| Insurance | $ | 39,584 | 1% | | $ - | $ | 39,584 |
| Marketing | $ | 181,982 | 6% | N5 | $ (28,075) | $ | 153,907 |
| Meals | $ | 7,215 | 0% | | $ - | $ | 7,215 |
| Miscellaneous Expense | $ | 8,258 | 0% | | $ - | $ | 8,258 |
| Office Postage | $ | 6,787 | 0% | | $ - | $ | 6,787 |
| Other Deductions | $ | 11,195 | 0% | N6 | $ - | $ | 11,195 |
| Professional Fees | $ | 107,172 | 3% | N7 | $ 8,676 | $ | 115,848 |
| Supplies | $ | 15,222 | 0% | | $ - | $ | 15,222 |
| Tuition and Gifts | $ | 20,614 | 1% | | $ - | $ | 20,614 |
| Utilities and Phone | $ | 24,223 | 1% | | $ - | $ | 24,223 |
| **Total Expense** | $ | 1,359,898 | 43% | | $ (257,825) | $ | 1,102,073 |
| | | | | | | | |
| **NET INCOME** | $ | 113,806 | | | **2019 SDE** $ | | 385,631 |
| | | | | | | | 12% |

### S501 Full Service Beverage Manufacturer
### Form 1065 Recast Tax Return 2019 (Accrual Basis)

**NOTES FOR S501 Full Service Beverage Manufacturer - 2019 Recast TAX RETURN**

N1   Other income, mostly one time items, reimbursements for some project items from bottled water client, the income is exactly offset by expenses in the repairs and maintenance line items.

N2   Severance Pay to releave business of several employees - Employees F., E., and Z.

N3   By definition of EBITDA all Interest, Taxes, Depreciation and Amortization is added-back.

N4   Employee Benefit Programs provide $14,909 (family medical), $1,400 (Dental and Vision), and $1,456 (Life, LTD, STD) for a total of $17,765.

N5   One-Time Expense spent on re-branding, new brand artwork, and web page upgrades. Also Tap Room Beer.

N6   Other Deductions are entirely distributor bill backs, essentially marketing and sales expenses.

N7   Legal expenses are normally $3K/month retainer.  This year had a Trademark filing and related expneses dealing with a TM dispute.  Accounting = $12,070, Human Resources = $15,323, and Information Tech Services $32,955.

All information contained in this document has been secured from the seller.  Business Brokers of San Antonio in no way guarantees the accuracy of such information, nor does it warrant any assumptions as true and correct.

| Signature | Printed Name | Date |
|-----------|--------------|------|

SEC-SL-02891-E-0021422

## S501 Full Service Beverage Manufacturer
### Form 1065 Recast Tax Return 2018 (Accrual Basis)

| Ordinary Income/Expense | | Total | % | Note | Adjustment | | | Adjusted Amount |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Gross Receipts | $ | 3,272,404 | 100% | | $ | - | $ | 3,272,404 |
| Net Gain Form 4797 | $ | 5,353 | 0% | | $ | - | $ | 5,353 |
| **Total Income** | $ | 3,277,757 | 100% | | $ | - | $ | 3,277,757 |
| | | | | | | | | |
| Inventory at beginning of year | $ | 421,044 | 13% | | $ | - | $ | 421,044 |
| Purchases | $ | 1,441,403 | 44% | | $ | - | $ | 1,441,403 |
| Cost of Labor | $ | 297,587 | 9% | | $ | - | $ | 297,587 |
| Delivery Costs | $ | 4,325 | 0% | | $ | - | $ | 4,325 |
| Excise Tax | $ | 43,465 | 1% | | $ | - | $ | 43,465 |
| Freight | $ | 26,686 | 1% | | $ | - | $ | 26,686 |
| Utilities | $ | 86,393 | 3% | | $ | - | $ | 86,393 |
| Inventory at end of year | $ | (510,227) | -16% | | $ | - | $ | (510,227) |
| **Total COGS** | $ | 1,810,676 | 55% | | $ | - | $ | 1,810,676 |
| | | | | | | | | |
| **Gross Profit** | $ | 1,467,081 | 45% | | $ | - | $ | 1,467,081 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Salaries and wages | $ | 345,921 | 11% | | $ | - | $ | 345,921 |
| Repairs and Maintenance | $ | 59,660 | 2% | | $ | - | $ | 59,660 |
| Rent | $ | 98,715 | 3% | | $ | - | $ | 98,715 |
| Taxes & Licenses - Licenses & Permi | $ | 25,170 | 1% | | $ | - | $ | 25,170 |
| Taxes & Licenses - Payroll Taxes | $ | 54,359 | 2% | | $ | - | $ | 54,359 |
| Taxes & Licenses - Other | $ | 31,863 | 1% | | $ | - | $ | 31,863 |
| Taxes & Licenses - Sales | $ | - | 0% | | $ | - | $ | - |
| Interest | $ | 93,812 | 3% | N1 | $ | (93,812) | $ | - |
| Depreciation | $ | 192,092 | 6% | N1 | $ | (192,092) | $ | - |
| Retirement Plans | $ | 15,776 | 0% | | $ | - | $ | 15,776 |
| Employee Benefit Programs | $ | 94,296 | 3% | N2 | $ | (17,273) | $ | 77,023 |
| Advertising | $ | - | 0% | | $ | - | $ | - |
| Amortization Expense | $ | 384 | 0% | N1 | $ | (384) | $ | - |
| Bank Service Charges | $ | 3,844 | 0% | | $ | - | $ | 3,844 |
| Continuing Education | $ | 16,957 | 1% | | $ | - | $ | 16,957 |
| Credit Card Fees | $ | 10,169 | 0% | | $ | - | $ | 10,169 |
| Graphics and Web Design | $ | - | 0% | | $ | - | $ | - |
| Insurance | $ | 37,783 | 1% | | $ | - | $ | 37,783 |
| Marketing | $ | 183,627 | 6% | | $ | - | $ | 183,627 |
| Meals | $ | 3,803 | 0% | | $ | - | $ | 3,803 |
| Miscellaneous Expense | $ | (14,507) | 0% | | $ | - | $ | (14,507) |
| Office Expense | $ | 8,314 | 0% | | $ | - | $ | 8,314 |
| Other Deductions | $ | - | 0% | | $ | - | $ | - |
| Payroll Expense | $ | 16,048 | 0% | | $ | - | $ | 16,048 |
| Professional Fees | $ | 69,249 | 2% | N3 | $ | - | $ | 69,249 |
| Supplies | $ | - | 0% | | $ | - | $ | - |
| Travel | $ | 5,572 | 0% | | $ | - | $ | 5,572 |
| Utilities | $ | 23,472 | 1% | | $ | - | $ | 23,472 |
| **Total Expense** | $ | 1,376,379 | 42% | | $ | (303,561) | $ | 1,072,818 |
| | | | | | | | | |
| **NET INCOME** | $ | 90,702 | | | 2018  SDE | $ | | 394,263 |
| | | | | | | | | 12% |

SEC-SL-02891-E-0021431

## S501 Full Service Beverage Manufacturer
## Form 1065 Recast Tax Return 2018 (Accrual Basis)

**NOTES FOR S501 Full Service Beverage Manufacturer - 2018 Recast TAX RETURN**

N1     By definition of EBITDA all Interest, Taxes, Depreciation and Amortization is added-back.

N2     Employee Benefit Programs provide family medical,dental, vision, and life for a total of $17,765.

N3     Professional Fees are Legal = $18,500, Accounting = $11,975, Human Resources = $16,048, and Information Tech
        Services $37,467 that include:Obeer, Expensify, VIP, and ShipComplaint.  Human Resources is a little higher because
        of about 25 extra people on payroll as part of close-out of MDA project.

All information contained in this document has been secured
from the seller.  Business Brokers of San Antonio in no way
guarantees the accuracy of such information, nor does it
warrant any assumptions as true and correct.

_____                    _____                  _____

Signature                                                          Printed Name                                Date

SEC-SL-02891-E-0021432

# Exhibit B

SEC-SL-02891-E-0021434

| | |
|---|---|
| **From:** | Jon Rigby < ███ @mfg-elevated.com> |
| **Sent:** | Wednesday, June 28, 2023 2:28 PM |
| **To:** | Rick Serena |
| **Subject:** | Fwd: LMBC |

Jon Rigby
Elevated Manufacturing
Cell: 801-921-9340


Begin forwarded message:

**From:** "rick ." < ███ @lazymagnolia.com>
**Subject: LMBC**
**Date:** March 6, 2023 at 6:16:07 AM PST
**To:** Jason Anderson <jason@bloxlending.com>, Ryan Bowen
<boweninvestments@yahoo.com>, " ███ @gmail.com"
< ███ @gmail.com>
**Reply-To:** "rick ." < ███ @lazymagnolia.com>

Jon and I received a call from our attorney yesterday afternoon. He advised us to "get out of there as fast as you can ". Unfortunately I can not elaborate any further.
We have taken his advice and currently headed back to Utah. Furthermore,  we were direct to cease all communication with the LM group and LMBC.

Rick

<u>Sent from Yahoo Mail on Android</u>

1

# Exhibit 34

## DECLARATION OF MICHAEL ALLEN MORTENSEN

I, Michael Allen Mortensen, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am over the age of 21 and am a resident of the State of Nevada.  I make this declaration based upon my personal knowledge.  If called to testify, I could and would competently testify to the following facts:

2.     Since November of 2020, I have worked as a Special Agent for the U.S. Bureau of Land Management ("BLM") in the Elko, Nevada Field Office.

3.     As a Special Agent, I conduct criminal and civil investigations related to activities on federal land.  My duties with regard to these investigations include participating in fact-finding inquiries to determine whether federal laws have been, are presently being, or are about to be violated.  As part of this role, I interview witnesses, obtain and review documents, and investigate facts potentially relevant to such inquiries.

4.     Beginning in November 2020, I was assigned to an ongoing investigation (the "Western Oil Investigation") concerning an entity called Western Oil Exploration Company ("Western Oil"). The information set forth in this declaration is based on my personal knowledge and experience, documents I reviewed in the course of the Western Oil Investigation, including documents and other information provided to the BLM, and witness interviews and testimony that I or other members of the investigative team conducted.

5.     Western Oil represents itself as an oil and gas exploration company. I understand that Western Oil has operated under the control of James E. Franklin since at least November 2020.

6.     An individual named Nicole T. Scott, who I understand to be Franklin's wife, was issued a lease on federal land in White Pine County, Nevada, effective January 1, 2010. The leased land included two well sites known as the Scott Federal #25-1 and the Scott Federal #35-1.

1

7.      In 2019, Western Oil submitted an Application for Permit to Drill ("APD") on the Scott Federal #35-1 (the "Well Site").

8.      The BLM approved Western Oil's APD on April 21, 2020. A true and correct copy of portions of the approved APD is attached hereto as "Exhibit A."

9.      The approved APD authorized Western Oil to drill at the Well Site until Scott's lease expired. Had Western Oil been diligent in its drilling operations during this timeframe, it would have had the option to seek a two-year extension from the expiration of the lease.

10.     As part of obtaining its approved APD, Western Oil agreed to certain conditions of approval ("COAs") regarding its activities on federal land.

11.     In or around July 2020, the Elko field office was notified by the BLM's Nevada Minerals Branch Chief that Western Oil had multiple noncompliance issues related to its activities at the Well Site.

12.     These noncompliance issues were due to breaches of the COAs to which Western Oil's approved APD was subject. For example, Western Oil had destroyed some county roads in the process of working at the Well Site. Additionally, Western oil had failed to maintain dust control during operations, which could cause a threat to the surrounding area.

13.     As a result of these noncompliance issues, the BLM issued a stop order on July 24, 2020, prohibiting Western Oil from engaging in any drilling activities at the Well Site. A true and correct copy of this stop order is attached hereto as "Exhibit B."

14.     Also due to these noncompliance issues, on or around July 15, 2020, my office opened the Western Oil Investigation.

15.     As the Special Agent assigned to the Western Oil Investigation, I have taken numerous investigative steps including a site visit, interviewing witnesses, and issuing subpoenas.

2

16.     Through my investigation, I learned that Western Oil did not reach the anticipated and allowed depth of 10,000 feet and failed to reach formation.

17.     During the drilling process, Western Oil has not submitted any documentation of oil logs or samples to BLM to prove that Western Oil has produced oil. If Western Oil had successfully produced oil, it would be required to notify BLM. BLM has received no such notification.

18.     Accordingly, the Well Site has not produced any oil to date.

19.     I further learned that although Western Oil eventually came in compliance and BLM lifted the stop order on or around July 26, 2021, shortly thereafter, Western Oil had to cease operations again due to sage grouse winter habitat season.

20.     Therefore, Western Oil was once again required to cease drilling at the Well Site on or around November 1, 2021.

21.     Although BLM once again approved drilling operations beginning the summer of 2022, through my investigation, I determined that Western Oil has not, in fact, conducted any drilling activity since November 2021.

22.     I also learned through my investigation that on December 16, 2022, BLM issued a decision finding that Scott's lease on the Well Site had expired as of August 31, 2021. This matter is under appeal at the Interior Board of Land Appeals (IBLA).  A true and correct copy of the lease expiration notice is attached hereto as "Exhibit C."

23.     Additional steps that I have taken in this investigation include analyzing Western Oil's bank records. Through this analysis, it became apparent that the Western Oil had received investments from several individual and entities.

24.     Among the investors I contacted was Roydon Nelson, who I, along with a colleague, Special Agent Michael Hauck, first spoke with via telephone on or around July 20, 2022.

3

25.     During this call, Nelson told me that he had known Franklin for several years and had invested over $500,000 with Franklin. Nelson indicated that his business partner, Schad Brannon, was also involved in the venture with Franklin.

26.     Nelson told me that, in addition to his oil project in Nevada, Franklin also had an oil drilling project in Nebraska.

27.     Nelson told me he did not think Franklin had done anything wrong and that he is a "squeaky clean" person.

28.     On or around January 3, 2023, Nelson emailed BLM Field Manager Jared Bybee.  In the email, Nelson stated that he was preparing a lawsuit against Western Oil and Franklin.

29.     Soon after I learned about the email, I called Nelson. Nelson said that he had recently identified problems with Western Oil. He told me that he wanted to cooperate with my investigation because Franklin is "dirty" and a "bad guy."

30.     I was surprised that Nelson had so drastically changed his perspective of Franklin since last we spoke.

31.     Later that same day, Nelson and Brannon called me to discuss further.

32.     Brannon stated that he and Nelson invested millions of dollars with Franklin but now believed that Franklin had defrauded them.

33.     He said Franklin lied to them about the progress of the oil well and that Franklin had not completed drilling to depth.

34.     Brannon and Nelson told me they had also funded Western Oil's Nebraska well.

35.     After this phone conversation, Nelson emailed me a copy of a draft complaint he was planning to file against Franklin and Western Oil. A true and correct copy of the email chain is

4

attached hereto as "Exhibit D." A true and correct copy of the draft complaint is attached hereto as "Exhibit E."

36.     The draft complaint listed Digital Licensing, Inc. as the plaintiff. This was the first time I had heard of this entity.

37.     Although Brannon and Nelson told me they would send me additional documents, I have received nothing further from them.

38.     My investigation into Western Oil and Franklin is ongoing.

        I declare under penalty of perjury that the foregoing is true and correct.


Executed in ___ELKO, NEVADA___ on ___July 25___, 2023.


_Michael Allen Mortensen_
                    Michael Allen Mortensen

5

# Exhibit A


**AFMSS**

**U.S. Department of the Interior**
**Bureau of Land Management**

*Application for Permit to Drill*

## APD Package Report

Date Printed: 07/09/2020 07:09 PM

APD ID: 10400047267

APD Received Date: 09/19/2019 02:33 PM

Operator: WESTERN OIL EXPLORATION COM

Well Status: AAPD

Well Name: SCOTT FEDERAL

Well Number: 35-1

APD Package Report Contents

  - Form 3160-3

  - Operator Certification Report

  - Application Report
  - Application Attachments
      -- Operator Letter of Designation:  1 file(s)
      -- Well Plat:  2 file(s)

  - Drilling Plan Report
  - Drilling Plan Attachments
      -- Blowout Prevention Choke Diagram Attachment:  1 file(s)
      -- Blowout Prevention BOP Diagram Attachment:  1 file(s)
      -- Casing Design Assumptions and Worksheet(s):  3 file(s)
      -- Proposed horizontal/directional/multi-lateral plan submission:  1 file(s)
      -- Other Variances:  1 file(s)

  - SUPO Report
  - SUPO Attachments
      -- Existing Road Map:  1 file(s)
      -- Existing Road Improvement Attachment:  1 file(s)
      -- Attach Well map:  1 file(s)
      -- Water source and transportation map:  1 file(s)
      -- Aquifer documentation:  2 file(s)
      -- State appropriation permit:  1 file(s)
      -- Construction Materials source location attachment:  1 file(s)
      -- Well Site Layout Diagram:  1 file(s)
      -- Recontouring attachment:  1 file(s)
      -- Existing Vegetation at the well pad attachment:  2 file(s)
      -- Existing Vegetation at the road attachment:  2 file(s)
      -- Other SUPO Attachment:  1 file(s)

  - PWD Report

Attachment 2
Page 1 of 445

- PWD Attachments
    -- None


- Bond Report
- Bond Attachments
    -- None

Form 3160-3
(June 2015)

FORM APPROVED
OMB No. 1004-0137
Expires: January 31, 2018

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## APPLICATION FOR PERMIT TO DRILL OR REENTER

5. Lease Serial No.
NVN082639

6. If Indian, Allotee or Tribe Name

1a. Type of work:  ☑ DRILL   ☐ REENTER

1b. Type of Well:  ☑ Oil Well   ☐ Gas Well   ☐ Other

1c. Type of Completion:  ☐ Hydraulic Fracturing   ☐ Single Zone   ☑ Multiple Zone

7. If Unit or CA Agreement, Name and No.

8. Lease Name and Well No.
SCOTT FEDERAL

35-1

2. Name of Operator
WESTERN OIL EXPLORATION COMPANY

9. API Well No.

3a. Address
848 RAINBOW BLVD., SUITE 2818, LAS VEGAS, NV 891

3b. Phone No. *(include area code)*
(602) 449-6411

10. Field and Pool, or Exploratory
Wildcat

4. Location of Well *(Report location clearly and in accordance with any State requirements.*)*

At surface   NWNE / 227 FNL / 2877 FWL / LAT 39.303959 / LONG -115.636616

At proposed prod. zone   NWNE / 227 FNL / 2877 FWL / LAT 39.303959 / LONG -115.636616

11. Sec., T. R. M. or Blk. and Survey or Area
SEC 35/T17N/R56E/MTD

14. Distance in miles and direction from nearest town or post office*
34 miles

12. County or Parish
WHITE PINE

13. State
NV

15. Distance from proposed* location to nearest property or lease line, ft. (Also to nearest drlg. unit line, if any)   227 feet

16. No of acres in lease
3840

17. Spacing Unit dedicated to this well
160.0

18. Distance from proposed location* to nearest well, drilling, completed, applied for, on this lease, ft.   41035 feet

19. Proposed Depth
10000 feet / 10000 feet

20. BLM/BIA Bond No. in file
FED: NVB001959

21. Elevations (Show whether DF, KDB, RT, GL, etc.)
6324 feet

22. Approximate date work will start*
10/30/2018

23. Estimated duration
45 days

24. Attachments

The following, completed in accordance with the requirements of Onshore Oil and Gas Order No. 1, and the Hydraulic Fracturing rule per 43 CFR 3162.3-3 (as applicable)

1. Well plat certified by a registered surveyor.
2. A Drilling Plan.
3. A Surface Use Plan (if the location is on National Forest System Lands, the SUPO must be filed with the appropriate Forest Service Office).
4. Bond to cover the operations unless covered by an existing bond on file (see Item 20 above).
5. Operator certification.
6. Such other site specific information and/or plans as may be requested by the BLM.

25. Signature
(Electronic Submission)

Name *(Printed/Typed)*
LORENZO III  / Ph: (602) 449-6411

Date
09/19/2019

Title
CEO

Approved by *(Signature)*
(Electronic Submission)

Name *(Printed/Typed)*
JARED BYBEE / Ph: (775) 289-1847

Date
04/21/2020

Title
Associate District Manager

Office
Nevada State Office

Application approval does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.
Conditions of approval, if any, are attached.

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.



APPROVED WITH CONDITIONS

Approval Date: 04/21/2020

Attachment 2
Page 3 of 445

(Continued on page 2)

*(Instructions on page 2)

## INSTRUCTIONS

GENERAL: This form is designed for submitting proposals to perform certain well operations, as indicated on Federal and Indian lands and leases for action by appropriate Federal agencies, pursuant to applicable Federal laws and regulations. Any necessary special instructions concerning the use of this form and the number of copies to be submitted, particularly with regard to local, area, or regional procedures and practices, either are shown below or will be issued by, or may be obtained from local Federal offices.

ITEM I: If the proposal is to redrill to the same reservoir at a different subsurface location or to a new reservoir, use this form with appropriate notations. Consult applicable Federal regulations concerning subsequent work proposals or reports on the well.

ITEM 4: Locations on Federal or Indian land should be described in accordance with Federal requirements. Consult local Federal offices for specific instructions.

ITEM 14: Needed only when location of well cannot readily be found by road from the land or lease description. A plat, or plats, separate or on the reverse side, showing the roads to, and the surveyed location of, the wen, and any other required information, should be furnished when required by Federal agency offices.

ITEMS 15 AND 18: If well is to be, or has been directionany drilled, give distances for subsurface location of hole in any present or objective productive zone.

ITEM 22: Consult applicable Federal regulations, or appropriate officials, concerning approval of the proposal before operations are started.

ITEM 24: If the proposal will involve hydraulic fracturing operations, you must comply with 43 CFR 3162.3-3, including providing information about the protection of usable water.  Operators should provide the best available information about all formations containing water and their depths.  This information could include data and interpretation of resistivity logs run on nearby wells.  Information may also be obtained from state or tribal regulatory agencies and from local BLM offices.

## NOTICES

The Privacy Act of 1974 and regulation in 43 CFR 2.48( d) provide that you be furnished the following information in connection with information required by this application.
AUTHORITY: 30 U.S.C. 181 et seq., 25 U.S.C. 396; 43 CFR 3160
PRINCIPAL PURPOSES: The information will be used to: (1) process and evaluate your application for a permit to drill a new oil, gas, or service wen or to reenter a plugged and abandoned well; and (2) document, for administrative use, information for the management, disposal and use of National Resource Lands and resources including (a) analyzing your proposal to discover and extract the Federal or Indian resources encountered; (b) reviewing procedures and equipment and the projected impact on the land involved; and (c) evaluating the effects of the proposed operation on the surface and subsurface water and other environmental impacts.
ROUTINE USE: Information from the record and/or the record win be transferred to appropriate Federal, State, and local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecution, in connection with congressional inquiries and for regulatory responsibilities.
EFFECT OF NOT PROVIDING INFORMATION: Filing of this application and disclosure of the information is mandatory only if you elect to initiate a drilling or reentry operation on an oil and gas lease.

The Paperwork Reduction Act of 1995 requires us to inform you that:
The BLM conects this information to anow evaluation of the technical, safety, and environmental factors involved with drilling for oil and/or gas on Federal and Indian oil and gas leases. This information will be used to analyze and approve applications. Response to this request is mandatory only if the operator elects to initiate drilling or reentry operations on an oil and gas lease. The BLM would like you to know that you do not have to respond to this or any other Federal agency-sponsored information collection unless it displays a currently valid OMB control number.

**BURDEN HOURS STATEMENT:** Public reporting burden for this form is estimated to average 8 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding the burden estimate or any other aspect of this form to U.S. Department of the Interior, Bureau of Land Management (1004-0137), Bureau Information Conection Clearance Officer (WO-630), 1849 C Street, N.W., Mail Stop 401 LS, Washington, D.C. 20240.

Attachment 2
Page 4 of 445

**Approval Date: 04/21/2020**

**Additional Operator Remarks**

**Location of Well**

0. SHL: NWNE / 227 FNL / 2877 FWL / TWSP: 17N / RANGE: 56E / SECTION: 35 / LAT: 39.303959 / LONG: -115.636616 ( TVD: 0 feet, MD: 0 feet )

PPP: 0 / 0 / SECTION: / LAT: 0.0 / LONG: 0.0 ( TVD: 0 feet, MD: 0 feet )

BHL: NWNE / 227 FNL / 2877 FWL / TWSP: 17N / RANGE: 56E / SECTION: 35 / LAT: 39.303959 / LONG: -115.636616 ( TVD: 10000 feet, MD: 10000 feet )

## BLM Point of Contact

Name: Hanna M. Fritz

Title: Land Law Examiner

Phone: (775) 861-6537

Email: hfritz@blm.gov

(Form 3160-3,  page 3)

**Approval Date: 04/21/2020**

**Review and Appeal Rights**

A person contesting a decision shall request a State Director review. This request must be filed within 20 working days of receipt of the Notice with the appropriate State Director (see 43 CFR 3165.3). The State Director review decision may be appealed to the Interior Board of Land Appeals, 801 North Quincy Street, Suite 300, Arlington, VA 22203 (see 43 CFR 3165.4). Contact the above listed Bureau of Land Management office for further information.

Attachment 2
Page 6 of 445

(Form 3160-3,  page 4)

**CONDITIONS OF APPROVAL AND STANDARD OPERATING PROCEDURES
APPLICATION FOR PERMIT TO DRILL OIL & GAS WELLS**

Operator:
**Western Oil Exploration Company**

| Well Number: | Number: | Location: |
|---|---|---|
| **Scott Federal 25-1 E.** | **NVN-82639** | **SE¼ NW¼NW ¼ Sect 25, T. 17 N. R. 56** |
| **Scott Federal 35-1** | **NVN-82639** | **NW¼NE¼ Sect 35, T. 17 N. R. 56 E.** |

**A COPY OF THIS MUST BE FURNISHED
TO YOUR FIELD REPRESENTATIVE TO ENSURE COMPLIANCE**

**Agency Contacts**

## BUREAU OF LAND MANAGEMENT

**Nevada State Office**
PO Box 12000 (1340 Financial Blvd)
Reno, NV 89520-0006
(775) 861-6499

| | |
|---|---|
| Petroleum Engineer: | John Menghini |
| Office Telephone: | (775) 861-6573 |
| Cell: | (775) 223-1359 |
| Email: | jmengnin@blm.gov |
| | |
| Petroleum Engineer Technician: | Jose Rios |
| Office Telephone: | 775-861-6641 |
| Cell: | 775-335-5934 |
| Email: | jrios@blm.gov |

**Bristlecone Field Office**
702 Industrial Way
Ely NV. 89301
(775) 289-1800

| | |
|---|---|
| Authorized Officer: | Jared Bybee |
| Office Telephone: | (775) 289-1847 |
| Email: | jbybee@blm.gov |
| | |
| Surface Compliance: | Stacy Holt |
| Office Telephone: | (775) 289-1893 |
| Email: | slholt@blm.gov |
| Fax: | (775) 289-1910 |

## NEVADA DIVISION OF MINERALS (NDOM)

**Nevada Division of Minerals**
400 W. King Street # 106
Carson City, NV 89703
(775) 684-7045

| | |
|---|---|
| Oil, Gas and Geothermal Program: | Lowell Price |
| Office Telephone: | (775) 684-7045 |
| Fax: | (775) 684-7052 |

**In case of an Emergency and the Authorized Officer is not available, please contact John Menghini.**

**Standard Conditions of Approval (COA)**

1.  Approval of this APD does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.  In addition, approval of this APD does not imply that the operator has legal access to the drilling location.  When crossing private surface 43 CFR 3814 regulations must be complied with and when crossing public surface off-lease the operator must have an approved right-of-way.

**Approval Date: 04/21/2020**

2

2. All operations shall conform to the Code of Federal Regulations, 43 CFR 3160, Bureau of Land Management Onshore Orders and the Nevada Division of Minerals Oil and Gas chapter 522 – Oil and Gas General Provisions.

3. A complete copy of the approved APD must be at the drill site during the construction of the roads and drill pad, the drilling of the well, and the completion of the well.

4. The anticipated spud date will be reported orally to the Authorized Officer <u>24 HOURS PRIOR TO SPUDDING</u>, followed by submitting Form 3160- 5 with actual spud date and time to the BLM.

5. Verbal notification shall be given to the Authorized Officer at least 24 hours in advance of formation tests, BOPE tests, running and cementing casing (other than conductor casing), and drilling over lease expiration dates.

6. A progress report needs to be filed a minimum of once a week starting with the week the well was spudded and continuing until the well is completed.  This report should be emailed or sent via AFMSS2.  A Completion Report Form 3160-4 must be submitted upon completion of the well.  The report will include the spud date, casing information such as size, grade, weight, hole size, and setting depth, amount and type of cement used, top of cement, depth of cementing tools, casing test method, intervals tested, perforated, acidized, fractured and results obtained and the dates all work done.

7. Deviation from the approved APD must receive prior approval.  If you want to change your operations in any way, you must first receive approval (oral or written) from the BLM and from the NDOM.

8. Any information you desire to be held confidential <u>must be clearly marked</u> "CONFIDENTIAL "on each page.

9. All survey monuments found within the area of operations shall be protected.  Survey monuments include but are not limited to: General Land Office and Bureau of Land Management Cadastral Survey Corners, reference corners, witness points, U. S. Coast and Geodetic benchmarks and triangulation stations, military control monuments, and recognizable civil (both public and private) survey monuments.  In the event of obliteration or disturbance of any survey monuments, the incident shall be reported in writing to the Authorized Officer.

10. If at any time the facilities located on public lands authorized by the terms of the lease are no longer included in the lease (due to a contraction in the unit or other lease or unit boundary change) the BLM will process a change in authorization to the appropriate statue.  The authorization will be subject to appropriate rental or other financial obligation determined by the authorized officer.

11. The Completion Report and all test information obtained from this well shall be submitted within 30 days after the well is completed.

12. No later than the fifth business day after any well begins production on which royalty is due anywhere on a lease site or allocated to a lease site, the operator must notify the BLM by letter or sundry notice of the date on which such production commenced.  The date is defined as follows:  the date on which liquid hydrocarbons are first sold or shipped from a temporary storage facility, such as a test tank, and for which a run ticket is required to be generated, or the date on which liquid hydrocarbons are first produced into a permanent storage facility, whichever occurs first.  If you intend to sell from a test tank, it must be calibrated as specified in Onshore Order Number 4, Part C, and sealed in accordance with Onshore Order Number 3.  You can initially notify orally, but you must follow-up with a letter or sundry notice.  Reference is made to 43 CFR 3162.4-1(c).  As a minimum, such notice must provide the following information:
Operator's name, address and telephone number.
b. Well name and number.
c. Well location (¼ ¼ Section, Township, Range, MDBM).
d. Date well placed in a producing status.
e. The nature of the well's production, i.e., crude oil, natural gas.
f. The lease communitization, or unit number applicable.

13. An Hydrogen Sulfide (H₂S) Contingency Plan as outlined in Onshore Order No. 6 will be submitted when required by this office.  However, minimum safety precautions must be taken at all times.  Personal safety equipment, including a portable hydrogen sulfide detector situated in a position to detect gas from the well, and two or more OSHA-approved protective breathing apparatus must be

2

on location.  If company policy requires more than this, please supply this office with a copy of the company plan or requirement, if not already submitted.

14. Abandonment program approval must be obtained prior to plugging the well.  Following an oral approval, a sundry notice titled "Notice of Intent to Abandon" will be submitted within five business days.  Failure to obtain approval prior to commencement of abandonment operations shall result in immediate assessment under 43 CFR 3163.1(b) (3).  Notice:  if no logs are run (mud or electric), all open sections of hole will be filled with cement in a manner which precludes interzonal migration of fluids.

15. Directional surveys (inclination and azimuth) shall be run on the well wherever the inclination exceeds 10 degrees, or the projected bottom hole location is within 200 feet of the spacing unit or lease or unit boundary.

16. Pursuant to 43 CFR 3162.7-1(b), production testing will be permitted into test tanks only.  No oil will be permitted into the reserve pit except in emergency situations.

17. The State of Nevada (NAC 522A.215) requires that samples of cuttings shall be collected at a minimum of 30-foot intervals from surface to the surface casing point, and on 10-foot intervals from surface casing shoe to total depth.  A minimum of two 15 milliliter of cuttings per sampling interval must be cleaned, dried, and placed in 3" x 5" sample envelopes, properly identified and sent prepaid to the Nevada Bureau of Mines and Geology (NBMG) University of Nevada, Reno, Mail Stop 178, Reno, Nevada 89557-0088.  You may contact David Davis at (775) 784-6691 x 133.

   a. **Note:**  the cuttings are not to be sent to the Division of Minerals.  The cuttings are due within 15 days of completion of the well.  The operator will be responsible for the cost of any further handling of the samples by the NBMG required to meet standards set out in this permit condition.

   b. Two copies of all logs run on the well and where possible, one copy of the computed logs in electronic format such as LAS or PDF are to be submitted to the NDOM within 30 days of the date of being run.

   c. All BOPE tests of 5000 psi or greater shall be conducted by an independent contractor.  Test charts and test results are to be submitted to the Bureau of Land Management within 48 hrs.

*A. CONDITIONS OF APPROVAL/DESIGN FEATURES ANALYZED IN THE ENVIRONMENTAL ASSESSMENT*

1. Western Oil is required to adhere to all applicable Federal, State, Tribal and local laws and regulations, including but not limited to the Methane and Waste Prevention Rule, 43 CFR 3160- Onshore Oil and Gas Operations, and State of Nevada Executive Order 2018-32 - Order Establishing Use of the Nevada Greater Sage-Grouse Conservation Plan and Credit System.

2. Western Oil shall restrict unauthorized travel off existing roads and trails.

3. Western Oil is required to adhere to all ACEPMs (Appendix C) and RDFs (Appendix G) as COAs. Western Oil may elect to implement BMPs (Appendix B) in future proposals to further reduce impacts from production.

4. All personnel shall adhere to a 15 mile per hour (mph) speed limit on all unpaved access roads to the project area in order to reduce fugitive dust and to minimize collisions with horses and wildlife.

5. All new fencing shall be flagged every 16 feet with white flagging that is at least one-inch wide and has at least 12 inches hanging free from the top wire of the fence to minimize impacts to wild horses and wildlife.  Temporary road signs shall be installed to indicate the presence of wild horses and wildlife during site construction and exploration drilling.

6. To minimize vegetation and soil disturbance and impacts to visual resources, vehicle travel on the playa surface would be limited to that necessary to construct and reclaim the drill pad.

7. During drilling activities, trenches shall surround all pumps, motors and the rig such that runoff will be directed to a sump area on the well site and pumped into a haul off tank.

Approval Date: 04/21/2020

4

8. According to Notice to Lessees (NTL) 87-1 production facilities shall be painted according to stipulations provided by the surface managing agency; the well is located on BLM surface and will be painted in accordance with Standard Environmental Colors. Western Oil would paint the production facilities (e.g. tanks and pipeline) on each APD pad with approved colors.

9. Western Oil shall report to BLM and immediately respond to minor and major undesirable events in accordance with all applicable Federal, State, and local laws and regulations including NTL-3A.

10. Western Oil shall incorporate noise reduction measures including engine exhaust mufflers, engine housing acoustic shielding, and acoustic shielding.

11. Western Oil shall conduct noise monitoring in accordance with Appendix M of the 2015 ORSO ARMPA (Appendix I).

12. Night lighting is required to ensure no livestock are injured during drilling operations. Western Oil shall install night shades for night lighting to reduce background light.

13. Western Oil shall conduction reclamation by restoring and re-seeding dominant species on the project site with BLM approved seed mix.

14. Western Oil shall comply with all applicable Lease Stipulations (Appendix E).

15. Western Oil shall conduct a 1-mile raptor survey to document hawks and eagles surrounding the Lease area. Depending on results of this survey, Western Oil may be required to consult with the US Fish and Wildlife Service.

16. Perch deterrents are required on all temporary housing and other above ground facilities to discourage nesting and perching of raptors, corvids, and other predators.

### *B. LEASE STIPULATIONS*

As stated above, the proposed wells would be located on lease NVN-82639. The standard lease stipulations for the lease are included as Appendix E of the Western Oil Scott Federal 25-1 and 35-1 Environmental Assessment.

### *C. MITIGATION MEASURES FOR THE PROPOSED ACTION*

The following mitigation measures were developed from the Scott Federal 25-1 and 35-1 Environmental Assessment:

**Construction and reclamation standards**

Any authorized construction and reclamation is to be consistent with the Gold Book (2007 ed.) and BLM Manual 9113 (Engineering Road Standards). All applicable Gold Book standards, guidelines, and Best Management Practices (BMPs) would be required for any oil and gas exploration or development on the proposed lease parcels.

The operator would minimize or preclude releases of oil into open pits. Unless the Authorized Officer approves the release, no oil should go into a pit except in an emergency. The operator must remove any accumulation of oil or condensate in a pit within 48 hours of discovery.

**Air Quality**

Fugitive dust would be minimized in the project area by the required reduced speeds of travel (15 miles per hour) during project activities.

Fugitive dust would be minimized by utilizing a water truck to spray down the roads and construction area(s) within the project area as needed.

The following measures will be implemented as appropriate if the well enters into production:

4

1. Flaring or incinerating hydrocarbon gases at high temperatures to reduce emissions of incomplete combustion;
2. Emission control equipment of a minimum 95 percent efficiency on dehydration units, pneumatic pumps, produced water tanks;
3. Vapor recovery systems where petroleum liquids are stored;
4. Tier II or greater, natural gas or electric drill rig engines;
5. Secondary controls on drill rig engines;
6. No-bleed pneumatic controllers (most effective and cost-effective technologies available for reducing VOCs);
7. Gas or electric turbines rather than internal combustions engines for compressors;
8. $NO_x$ emission controls for all new and replaced internal combustion oil and gas field engines;
9. Apply water to dirt and gravel roads during periods of high use and control speed limits to reduce fugitive dust emissions;
10. Interim reclamation to re-vegetate areas of the pad is not required for production facilities; Western Oil will re-vegetation any pad area not needed for production to reduce the amount of dust from the pads;
11. Co-locate wells and production facilities to reduce new surface disturbance;
12. Use directional drilling and horizontal completion technologies whereby one well provides access to petroleum resources that would normally require the drilling of several vertical wellbores;
13. Gas-fired or electric pump jack engines;
14. Velocity tubing strings;
15. Cleaner technologies on completion activities (i.e. green completions), and other ancillary sources;
16. Centralized tank batteries and multi-phase gathering systems to reduce truck traffic;
17. Forward looking infrared (FLIR) technology to detect fugitive emissions; and,
18. Air monitoring for $NO_x$ and ozone.

**Flood Protection**

The operator would construct and maintain flood protection to the 100-year flood level for the pad, reserve pit, open top tanks, and associated structures.

**Water Quality**

Onshore Order No. 2, Drilling Operations, requires that all formations containing usable quality water (not exceeding 10,000 ppm total dissolved solids) be protected via cement. If usable quality water is encountered while drilling below the surface casing shoe, yet above the anticipated cement top for the usable quality water, it would require protection by bringing the cement at least ±200' above the usable quality water zone. Results (cementing reports, CBL, depth of flow, rate of flow, water quality, if available, etc.) would be reported to the BLM. Any necessary remedial operations would be conducted prior to drilling out that casing shoe.

Ely Field Office Authorized Officer shall be contacted for a verbal approval prior to commencing remedial work, plugging operations on newly drilled boreholes, changes within the drilling plan, changes or variances to the blowout preventer equipment (BOPE), deviating from conditions of approval, and conducting other operations not specified within the APD. The contact number for the Authorized Officer (Field Manager) is 775-289-1840 or the BLM Nevada state Office Oil & Gas Program Lead (John Menghini) 775-861-6573 for verbal approvals. The secondary contact is the Assistant Field Manager for Non-Renewable Resources, at 775-289-1860 or the BLM Nevada state Office Oil & Gas Program Lead (John Menghini) 775-861-6573.

Although not proposed or reasonably foreseeable, if after drilling of the well is completed hydraulic fracturing is proposed, prior approval and further NEPA analysis would be needed.

6

6

**Approval Date: 04/21/2020**

Due to the shallow water table, the reserve pit will be lined with bentonite to prevent contamination of the aquifer.

**Wildlife and Livestock, Including Migratory Birds and Other Protected Species**

The operator would notify the Bureau of Land Management (BLM) authorized officer and nearest Fish and Wildlife Service (USFWS) Law Enforcement office within 24 hours, if the operator discovers a dead or injured federally protected species (i.e., migratory bird species, bald or golden eagle, or species listed by the FWS as threatened or endangered) in or adjacent to a pit, trench, tank, exhaust stack, or fence.  (If the operator is unable to contact the FWS Law Enforcement office, the operator must contact the nearest FWS Ecological Services office.)

Collisions with wildlife would be minimized in the project area by the required reduced speeds of travel (15 miles per hour) during project activities.

Removal of nesting substrate during the nesting season would be eliminated by the requirement (Appendix G) to either avoid the nesting season or conduct nest surveys and avoid ground disturbing activities within 300 feet of active nests.

Impacts to sensitive and migratory bird species would be reduced or eliminated by one of the following mitigation measures:

1. Construction or other ground disturbing activities would be limited to August 16 through October 31 (timing extended by a waiver).
2. If construction or other ground disturbing activities would occur during March 1 to July 31, a survey for all migratory bird species would be required to be completed by a certified wildlife biologist (approved by the BLM) prior to ground disturbing activities.  If active migratory bird nests were found, avoidance of the nest location with the appropriate size buffer would be required.

Impacts to eagles would be reduced or eliminated by one of the following mitigation measures:

1. Construction or other ground disturbing activities would be limited to August 16 through November 1.
2. If construction or other ground disturbing activities would occur during March 1 to July 31, a survey for eagles would be required within a 5-mile radius of the project area, and an eagle conservation plan (ECP) would be required in cases where eagles and/or their nests are likely to be impacted. A certified wildlife biologist (approved by the BLM) would determine if the project has the potential to disturb breeding behavior and if the proponents need to apply for a permit to authorize unintentional take.

The operator would design, construct, and maintain exclosure fencing for all open cellars and pits containing freestanding fluids to prevent access by livestock and large forms of wildlife such as deer, elk, and pronghorn. At a minimum, the operator would adequately fence all fluids pits and open cellars during and after drilling operations until the pit is free of fluids and the operator initiates backfilling. The operator would maintain the fence in order to protect livestock, wildlife, and public health and safety.

The operator would be required to adhere to the Greater sage-grouse timing stipulations in Appendix E and Required Design Features in Appendix G.

**Approval Date: 04/21/2020**

8
**Fencing**

The operator would:
1. Construct a rigid structure made of steel tubing or wooden posts with cable strung across the pit at no more than 7-foot intervals along the X-axis and Y-axis to form a grid of 7-foot squares.
2. Suspend netting a minimum of 4 to 5 feet above the pit surface.
3. Use a maximum netting mesh size of 1.5 inches to allow for snow loading while excluding most birds in accordance with USFWS recommendations.
4. Cover the top and sides of the netting support frame with netting and secure the netting at the ground surface around the entire pit to prevent wildlife entry at the netting edges. Note: Hog wire panels or other wire mesh panels or fencing used on the sides of the netting support frame is ineffective in excluding small wildlife and songbirds unless covered by smaller meshed netting.
5. Monitor and maintain the netting sufficiently to ensure the netting is functioning as intended, has not entrapped wildlife, and is free of holes and gaps greater than 1.5 inches.

The operator would construct and maintain pits, cellars, open-top tanks, and trenches, that are not otherwise fenced, screened, or netted, to exclude livestock, wildlife, and humans (for example, lined, clean water pits, well cellars, or utility trenches) to prevent livestock, wildlife, and humans from becoming entrapped. At a minimum, the operator would construct and maintain escape ramps, ladders, or other methods of avian and terrestrial wildlife escape in pits, cellars, open-top tanks, or at frequent intervals along trenches where entrapment hazards may exist.

Immediately following active drilling or completion operations, the operator would take actions necessary to prevent wildlife and livestock access, including avian wildlife, to all open-topped tanks that contain or have the potential to contain salinity sufficient to cause harm to wildlife or livestock, hydrocarbons, or Resource Conservation and Recovery Act of 1976-exempt hazardous substances. At a minimum, the operator would net, screen, or cover open-topped tanks to exclude wildlife and livestock and prevent mortality. If the operator uses netting, the operator would cover and secure the open portion of the tank to prevent wildlife entry. The operator would net, screen, or cover the tanks until the operator removes the tanks from the location or the tanks no longer contain substances that could be harmful to wildlife or livestock.

**Soils Reclamation**

Upon the proper plugging and abandonment of the well, the proponent would remove as much gravel as practicable from the proposed well pad and lightly scarify any non-compacted area and scarify the compacted area(s).

The gravel pit constructed to provide gravel for construction of the proposed drill pad will be scarified prior to vacating the pit.

**Vegetation Resources**

Standard operating procedures (Appendix D) require adherence to measures for the control and eradication of weeds within the project area in accordance with the Ely District Integrated Weed Management Plan (BLM 2010).

**Cultural Resources**

In the event of an unanticipated discovery, any cultural (historic or prehistoric site or object), paleontological resource, or human remains discovered by the permit holder, or any person working on their behalf, during the course of project related construction shall be immediately reported to the BLM Authorized Officer by
8

telephone, with written confirmation. The permit holder shall suspend all operations within 100 meters of such discovery and protect it until an evaluation of the discovery is made by the BLM Authorized Officer.

The permit holder is responsible for the cost of evaluation and mitigation of any unanticipated discoveries Any decision on treatment and/or mitigation would be made by the Authorized Officer. Operations may resume only upon written authorization to proceed from the Authorized Officer.

**Other approval, testing, and reporting requirements**

Any well control issues shall be addressed according to the terms of Onshore Order #1 and #2.

The BOPE shall be installed, tested, and operated in conformance with Order #2.

Ram type preventers and associated equipment shall be tested to approved stack working pressure if isolated by test plug or to 70 percent of internal yield pressure of casing if BOP stack is not isolated from casing (see item I.D.1. of Onshore Order # 2). Pressure shall be maintained for at least 10 minutes or until requirements of test are met, whichever is longer. If a test plug is utilized, no bleed-off of pressure is acceptable. For a test not utilizing a test plug, if a decline in pressure of more than 10 percent in 30 minutes occurs, the test shall be considered to have failed. Valve on casing head below test plug shall be open during test of BOP stack.

Annular type preventers shall be tested to 50 percent of rated working pressure. Pressure shall be maintained at least 10 minutes or until provisions of test are met, whichever is longer.

Prior approval would be required if the operator drills beyond the depth indicated in the APD.

If the well is productive and it is determined that the reservoir extends beyond the lease boundary a Communization Agreement may be set up.

After running and cementing the production casing, in order to determine cement top and quality, a cement bond log, cement evaluation tool, or equivalent shall be run. Results would be reported to the BLM Ely Field Office. Any necessary remedial operations would be conducted prior to drilling out of the casing shoe.

The operator shall submit the (a) mud/drilling log (e.g. Pason disc), (b) driller's event log/operations summary report, (c) production test volumes, (d) directional survey, and (e) Formation Integrity Test (FIT) results with the well completion report. Please contact the AO for clarification.

In accordance with 43 CFR 3162.4(b), the operator shall submit a complete set of electrical/mechanical logs in .LAS format or hard copies with standard Form 3160-4, Form 3260-4 Well Completion or Recompletion Report and Log. Please contact John Menghini at 775-861-6573 if there are any questions.

Two copies of all logs, and a single copy of core descriptions, core analyses, drill stem tests, well-test data, geologic summaries, sample descriptions, and all other surveys or data obtained and compiled during the drilling and/or completion operations shall be submitted to the BLM, Bristlecone Field Office.

Daily drilling and completion progress reports shall be submitted to the BLM, Nevada State Office and Bristlecone Field Office on a daily basis, and shall include daily mud reports, details of casing that has been run and its cementing, water flows, lost circulation zones, hydrocarbon shows and other information that describes drilling conditions.

A formation integrity test shall be performed at the surface casing shoe. Prior to drilling more than 20 feet below the shoe, the test shall expose the shoe to the minimum mud weight equivalent necessary to control anticipated pressure at the next casing point or total depth.

**Approval Date: 04/21/2020**

10

Gamma Ray Log shall be run from total depth to surface.

All cement bond logs shall be run by the logging company at zero pressure. Logs determined to be run under pressure shall be re-run.

Nevada State Office personnel shall be contacted for approval prior to running non-API (American Petroleum Institute) Standard casing downhole. Please contact John Menghini at 775-861-6573 with the specifications and manufacturer of the pipe, and a decision would be made whether the pipe can be used.

Prior to running used or reconditioned API-grade casing downhole, a petroleum engineer in the Nevada State Office shall be contacted to obtain approval. Approval would be granted if the pipe has been tested and shown to have retained 87 1⁄2 (or greater) of its original wall thickness.

**Waste disposal**

A trash dumpster would be placed onsite and waste material would be hauled to a BLM-approved landfill when the dumpster is full.

Drilling fluids and cuttings would be handled in the fenced reserve pit.

Produced fluids would be contained in test tanks on location during completion work. Produced water would be contained in the reserve pit during completion work per Onshore Order #7 (BLM, 2019).

If formation water were encountered, an appropriate application process would be conducted for water disposal.

Portable chemical toilets would be rented and installed onsite. The rental company would haul away and dispose of sewage according to BLM specifications. Water from any showers in portable living areas would be disposed of at approved RV disposal sites.

All oil, diesel, or fluid spills would be immediately contained and removed, including associated contaminated soils, to an approved disposal site.

All hazardous substances would be stored in appropriate containment to prevent site contamination. Current Safety Data Sheets would be available on the site for all chemical substances that are used during the course of construction, drilling, and completion operations for this project.

Attachment 2
Page 16 of 445

**Approval Date: 04/21/2020**




# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Bristlecone Field Office
702 North Industrial Way
Ely, Nevada  89301
https://www.blm.gov/nevada

In Reply Refer To:
3160 (NVL0600)
NVN-82639

## DECISION RECORD

|  |  |  |
|---|---|---|
| Western Oil Exploration | : | Decision Record |
| 312 Helene Drive | : | DOI-BLM-NV-L060-2020-0002-EA |
| Bellevue, NE 68005 | : |  |
|  | : |  |

I have reviewed the application, the Environmental Assessment (EA), and have made a Finding of No Significant Impact (FONSI) for Western Oil Exploration's proposal for the Scott Federal #25-1 and #35-1 exploratory oil wells.  Based on that review and the decision file as a whole, I approve this project with the following stipulations derived from design features in the EA and FONSI and BLM standard stipulations.  In accordance with 43 CFR §3165.4(c) this Decision is in full force and effective immediately.

## CONDITIONS OF APPROVAL AND STANDARD OPERATING PROCEDURES
## APPLICATION FOR PERMIT TO DRILL OIL & GAS WELL

Operator:       Western Oil Exploration
Lease:          NVN-82639
Well#1          Scott Federal 25-1
Location:       Section 25, T. 17 N., R. 56 E., SE 1⁄4 of NW 1⁄4 of NW 1/4

Well #2:        Scott Federal 35-1
Location:       Section 35, T. 17 N., R. 56 E., Section 35, NW 1⁄4 of NE 1/4

Agency Contacts:

BUREAU OF LAND MANAGEMENT
Nevada State Office
PO Box 12000 (1340 Financial Blvd)
Reno, NV 89520-0006
(775) 861-6400
Petroleum Engineer:          John Menghini
Office Telephone:            (775) 861-6573
Cell:                       (775) 223-1359
Email:                      jmenghin@blm.gov
Petroleum Technician:        Jose Rios
Office Telephone:            (775) 861-6641
Cell:                       (775) 335-5934
Email:                      jrios@blm.gov

Attachment 2
Page 17 of 445

INTERIOR REGION 10 • CALIFORNIA-GREAT BASIN
CALIFORNIA* NEVADA* OREGON*

Approval Date: 04/21/2020

BUREAU OF LAND MANAGEMENT
Ely District Office
702 North Industrial Way Office
Ely, NV 89301
(775) 289-1800

| | |
|---|---|
| Authorized Officer: | Jared Bybee |
| Telephone: | (775) 289-1847 |
| Email: | jbybee@blm.gov |
| Environmental Protection Specialist: | Stacy Holt |
| Telephone: | (775) 289-1893 |
| Email: | sholt@blm.gov |
| Fax: | (775) 289-1910 |

NEVADA DIVISION OF MINERALS
Nevada Division of Minerals
400 W. King Street # 106
Carson City, NV 89703
(775) 684-7045
Oil, Gas and Geothermal Program:
Office Telephone: (775) 684-7040
Fax: (775) 684-7052

**In case of an Emergency and the Authorized Officer is not available, please contact: John Menghini**

### Conditions of Approval/Design Features Analyzed in the EA

1. Western Oil is required to adhere to all applicable Federal, State, Tribal and local laws and regulations, including but not limited to the Methane and Waste Prevention Rule, 43 CFR 3160 – Onshore Oil and Gas Operations, and State of Nevada Executive Order 2018-32 – Order Establishing Use of the Nevada Greater Sage-Grouse Conservation Plan and Credit System.
2. Western Oil shall restrict unauthorized travel off existing roads and trails.
3. Western Oil is required to adhere to all ACEPMs (Appendix C) and RDFs (Appendix G) as COAs. Western Oil may elect to implement BMPs (See Appendix B) in future proposals to further reduce impacts from production.
4. All personnel shall adhere to a 15 mile per hour (mph) speed limit on all unpaved access roads to the project area in order to reduce fugitive dust and to minimize collisions with horses and wildlife.
5. All new fencing shall be flagged every 16 feet with white flagging that is at least one-inch wide and has at least 12 inches hanging free from the top wire of the fence to minimize impacts to wild horses and wildlife. Temporary road signs shall be installed to indicate the presence of wild horses and wildlife during site construction and exploration drilling.

6.  To minimize vegetation and soil disturbance and impacts to visual resources, vehicle travel on the playa surface would be limited to that necessary to construct and reclaim the drill pad.

7.  During drilling activities, trenches shall surround all pumps, motors and the rig such that runoff will be directed to a sump area on the well site and pumped into a haul off tank.

8.  According to Notice to Lessees (NTL) 87-1 production facilities shall be painted according to stipulations provided by the surface managing agency; the well is located on BLM surface and will be painted in accordance with Standard Environmental Colors.  Western Oil would paint the production facilities (e.g. tanks and pipeline) on each APD pad with approved colors.

9.  Western Oil shall report to BLM and immediately respond to minor and major undesirable events in accordance with all applicable Federal, State, and local laws and regulations including NTL-3A.

10. Western Oil shall incorporate noise reduction measures including engine exhaust mufflers, engine housing acoustic shielding and acoustic shielding.

11. Western Oil shall conduct noise monitoring in accordance with Appendix M of the 2015 GRSG ARMPA (see Appendix I).

12. Night lighting is required to ensure no livestock are injured during drilling operations. Western Oil shall install night shades for night lighting to reduce background light.

13. Western Oil shall conduction reclamation by restoring and re-seeding dominant species on the project site with BLM approved seed mix.

14. Western Oil shall comply with all applicable Lease Stipulations (see Appendix E).

15. Western Oil shall conduct a 1-mile raptor survey to document hawks and eagles surrounding the lease area.  Depending on results of this survey, Western Oil may be required to consult with the US Fish and Wildlife Service.

16. Perch deterrents are required on all temporary housing and other above ground facilities to discourage nesting and perching of raptors, corvids, and other predators.

## **Standard Conditions of Approval**

1.  Approval of this APD does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon. In addition, approval of this APD does not imply that the operator has legal access to the drilling location. When crossing private surface 43 CFR 3814 regulations must be complied with and when crossing public surface off-lease the operator must have an approved right-of-way.

2.  All operations shall conform to the Code of Federal Regulations, 43 CFR 3160, Bureau of Land Management Onshore Orders and the Nevada Division of Minerals Oil and Gas chapter 522 – Oil and Gas General Provisions.

3.  A complete copy of the approved APD must be at the drill site during the construction of the roads and drill pad, the drilling of the well, and the completion of the well.

4.  The anticipated spud date will be reported orally to the Authorized Officer 24 HOURS PRIOR TO SPUDDING, followed up by submitting Form 3160- 5 with actual spud date and time to the BLM.

**Approval Date: 04/21/2020**

5. Verbal notification shall be given to the Authorized Officer/PET at least 24 hours in advance of formation tests, BOPE tests, running and cementing casing (other than conductor casing), and drilling over lease expiration dates.

6. A progress report needs to be filed a minimum of once a week starting with the week the well was spud and continuing until the well is completed. This report should be emailed. A Completion Report Form 3160-4 must be submitted upon completion of the well. The report will include the spud date, casing information such as size, grade, weight, hole size, and setting depth, amount and type of cement used, top of cement, depth of cementing tools, casing test method, intervals tested, perforated, acidized, fractured and results obtained and the dates all work done.

7. Deviation from the approved APD must receive prior approval. If you want to change your operations in any way, you must first receive approval (oral or written) from the BLM and from the NDOM.

8. Any information you desire to be held confidential <u>must be clearly marked</u> "CONFIDENTIAL" on each page.

9. All survey monuments found within the area of operations shall be protected. Survey monuments include, but are not limited to: General Land Office and Bureau of Land Management Cadastral Survey Corners, reference corners, witness points, U. S. Coast and Geodetic benchmarks and triangulation stations, military control monuments, and recognizable civil (both public and private) survey monuments. In the event of obliteration or disturbance of any survey monuments, the incident shall be reported in writing to the Authorized Officer.

10. If at any time the facilities located on public lands authorized by the terms of the lease are no longer included in the lease (due to a contraction in the unit or other lease or unit boundary change) the BLM will process a change in authorization to the appropriate statue. The authorization will be subject to appropriate rental or other financial obligation determined by the authorized officer.

11. The Completion Report and all test information obtained from this well shall be submitted within 30 days after the well is completed.

12. No later than the fifth business day after any well begins production on which royalty is due anywhere on a lease site or allocated to a lease site, the operator must notify the BLM by letter or sundry notice of the date on which such production commenced. The date is defined as follows: the date on which liquid hydrocarbons are first sold or shipped from a temporary storage facility, such as a test tank, and for which a run ticket is required to be generated, or the date on which liquid hydrocarbons are first produced into a permanent storage facility, whichever occurs first. If you intend to sell from a test tank, it must be calibrated as specified in Onshore Order Number 4, Part C, and sealed in accordance with Onshore Order Number 3. You can initially notify orally, but you must follow-up with a letter or sundry notice. Reference is made to 43 CFR 3162.4-1(c). As a minimum, such notice must provide the following information:
a. Operator's name, address and telephone number.
b. Well name and number.
c. Well location (¼ ¼ Section, Twp., Rge., MDBM).
d. Date well placed in a producing status.
e. The nature of the well's production, i.e., crude oil, natural gas.
f. The lease communication, or unit number applicable.

Approval Date: 04/21/2020

13. An Hydrogen Sulfide (H2S) Contingency Plan as outlined in Onshore Order No. 6 will be submitted when required by this office. However, minimum safety precautions must always be taken. Personal safety equipment, including a portable hydrogen sulfide detector situated in a position to detect gas from the well, and two or more OSHA approved protective breathing apparatus must be on location. If company policy requires more than this, please supply this office with a copy of the company plan or requirement, if not already submitted.

14. Abandonment program approval must be obtained prior to plugging the well. Following an oral approval, a sundry notice titled "Notice of Intent to Abandon" will be submitted within five business days. Failure to obtain approval prior to commencement of abandonment operations shall result in immediate assessment under 43 CFR 3163.1(b) (3).
Notice: if no logs are run (mud or electric), all open sections of hole will be filled with cement in a manner which precludes interzonal migration of fluids.

15. Directional surveys (inclination and azimuth) shall be run on the well wherever the inclination exceeds 10 degrees, or the projected bottom hole location is within 200 feet of the spacing unit or lease or unit boundary.

16. Pursuant to 43 CFR 3162.7-1(b), production testing will be permitted into test tanks only. No oil will be permitted into the reserve pit except in emergency situations.

17. The State of Nevada (NAC 522A.215) requires that samples of cuttings shall be collected at a minimum of 30-foot intervals from surface to the surface casing point, and on 10 foot intervals from surface casing shoe to total depth. A minimum of two 15 milliliter sets of cuttings per sampling interval must be cleaned, dried, and placed in 3" x 5" sample envelopes, properly identified and sent prepaid to the Nevada Bureau of Mines and Geology (NBMG) University of Nevada, Reno, Mail Stop 178, Reno, Nevada 89557-0088. Note: the cuttings are not to be sent to the Division of Minerals. The cuttings are due within 15 days of completion of the well. The operator will be responsible for the cost of any further handling of the samples by the NBMG required to meet standards set out in this permit condition.

18. Two copies of all logs run on the well and where possible, one copy of the computed logs in electronic format such as LAS or PDF are to be submitted to the NDOM within 30 days of the date of being run.

19. All BOPE tests of 5000 psi or greater shall be conducted by an independent contractor. Test charts and test results are to be submitted to the Bureau of Land Management within 48 hrs.

**Rationale for Decision:**

1) The Proposed Action is in conformance with the 2008 Ely District Record of Decision and Approved Resource Management Plan and the 2015 Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region for Greater Sage-Grouse. Section 1.4 of the Environmental Assessment documents the conformance review.

2) The Proposed Action is consistent with all other applicable federal, state, local, and tribal policies and plans to the maximum extent possible.

3) Implementation of the Proposed Action will allow Western Oil Exploration to exercise its rights under the lease agreement to explore for additional reserves of oil and gas so as to meet the increasing energy needs of this Nation. The selected action will meet the BLM's purpose in considering approval of the application to improve access roads and drill two exploration

oil wells to provide a legitimate use of the public lands to the proponent. Any impacts resulting from the proposed action will be minimized through the carefully planned proposed action developed in the APD, the standard State and Federal operating regulations for oil and gas exploration, and the site-specific and standard conditions of approval as listed above.  As a result of the analysis for the proposed oil and gas wells, it was determined that the Proposed Action will not result in unnecessary or undue degradation to the public lands.

**Public Involvement:**

On October 16, 2019 a Preliminary Environmental Assessment including Scott Federal #25-1 was released for a 30-day public comment period, concluding on November 15, 2019. The BLM received comments from the Nevada Department of Wildlife, the Sagebrush Ecosystem Technical Team, the Toiyabe Chapter of the Sierra Club, Western Watersheds Project, and one interested individual.  During the comment period, the BLM also received comments on the APD for Scott Federal #35-1 that was posted to the BLM Automated Fluid Minerals Support System 30-day federal public posting portal on September 25, 2019. Comments were received which led to substantial changes to the Preliminary Environmental Assessment.  The BLM Authorized Officer decided to offer another public comment period on the Preliminary Environmental Assessment.

On December 20, 2019, the BLM released a second version of the Preliminary Environmental Assessment including both Scott Federal #25-1 and Scott Federal #35-1 for public comment.  The comment period was originally set to conclude on January 17, 2020, which was subsequently extended to February 6, 2020. The BLM received comments from the American Wild Horse Campaign, the Nevada Department of Wildlife, the Sagebrush Ecosystem Technical Team, the United States Fish and Wildlife Service, Western Oil Exploration, Western Watersheds Project, and one interested permittee. Substantive comments were received, leading to changes to the Environmental Assessment (See Appendix J of the EA for a summary of public comments and BLM response).

**Appeal of the Decision:**

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR, Part 4 and Form 1842-1 (enclosed).  If an appeal is taken, a notice of appeal and/or request for stay must be filed in writing, on paper, in this office, either by mail or personal delivery.  Notices of appeal and/or request for stay that are electronically transmitted (e.g., email, facsimile, or social media) will not be accepted as timely filed.  The notice of appeal is considered filed as of the date our office receives the hard copy and places our BLM date stamp on the document.

Approval Date: 04/21/2020

Your Notice of Appeal must be filed in this office 702 N Industrial Way, Ely, Nevada 89301-9408 within 30 days from receipt of this decision.  As the appellant you have the burden of showing that the decision appealed from is in error.  Enclosed is BLM Form 1842-1 that contains information on taking appeals to the IBLA.

This decision will remain in effect while the IBLA reviews the case, unless a stay is granted by the IBLA.  If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

**Request for a Stay:**

If you wish to file a petition pursuant to regulations 43 CFR 4.21 for a stay of the effectiveness of this decision during the time that your appeal is being reviewed by Interior Board of Land Appeals (IBLA), the petition for a stay must accompany your notice of appeal.  A petition for a stay is required to show sufficient justification based on the standards listed below.  Copies of this notice of appeal and petition for a stay must also be submitted to each party named in the decision and to the IBLA and to the appropriate Office of the Solicitor (see 43 CFR 4.413) at the same time the original documents are filed with this office.  If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

**Standards for Obtaining a Stay**

Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards:

    (1)  The relative harm to the parties if the stay is granted or denied,
    (2)  The likelihood of the appellant's success on the merits,
    (3)  The likelihood of immediate and irreparable harm if the stay is not granted, and
    (4)  Whether the public interest favors granting the stay.

**Approved by:**

_____

Jared Bybee                          Date
Associate District Manager
Ely District Office

INTERIOR REGION 10 • CALIFORNIA-GREAT BASIN
CALIFORNIA*, NEVADA*, OREGON*
**Approval Date: 04/21/2020**

# U.S. Department of the Interior
# Bureau of Land Management

## Finding of No Significant Impact

**Western Oil Exploration**

**Application for Permit to Drill**

**Scott Federal #25-1 and #35-1 Oil Wells**

**File Number: NVN-82639**

**DOI-BLM-NV-L060-2020-0002-EA**

**April 2020**

<u>**PREPARING OFFICE**</u>
U.S. Department of the Interior
Bureau of Land Management
Bristlecone Field Office
Ely, Nevada

**Approval Date: 04/21/2020**

**Introduction**

I have reviewed Environmental Assessment (EA) DOI-BLM-NV-L060-2020-0002-EA for Western Oil Exploration's Applications for Permit to Drill (APD) Scott Federal #25-1 and #35-1 oil wells on federal mineral lease NVN-82639, dated February 2020, taking into consideration the project design specifications, including design features identified in the EA. I have also considered the Council on Environmental Quality's (CEQ) criteria for significance (40 CFR 1508.27), both with regard to the context and the intensity of impacts described in the EA.

**Context**

The Proposed Action would occur within Newark Valley, located in southwestern White Pine County, Nevada. The project includes site-specific actions directly involving approximately 5.66 acres of BLM administered land that by itself does not have international, national, regional, or statewide importance. Implementation of the Proposed Action will allow Western Oil Exploration to exercise its rights under the federal mineral lease NVN-82639 lease agreement to explore for, test the feasibility of future development, and if present develop oil and gas resources. Any impacts resulting from the Proposed Action will be minimized through the carefully planned Proposed Action developed in the APD, the standard State and Federal operating regulations for oil and gas exploration, and the conditions of approval.

**Intensity**

1) *Impacts that may be both beneficial and adverse:*
   I have considered the potential intensity/severity of the impacts anticipated from the proposed action to improve two-track access roads, constructing two well pads, well heads and reserve pits, and using industry standard techniques to drill for oil and gas with a single 10,000-ft. vertical exploration drill hole on each well pad. The maximum potential total area of surface disturbance for all activities that are part of the Proposed Action is approximately 5.66 acres (1.33 acres for #25-1 and 4.33 acres for #35-1). All well pad disturbance would occur within the proposed 250 x 160 and 500 x 350-foot disturbance boundaries respectively.

2) *The degree to which the Proposed Action affects public health or safety:*
   The proposed project is comparable to other similar activities and projects already undertaken on BLM administered lands within the Ely District Office and nationwide with no unusual health or safety concerns. Operators must comply with federal safety regulations outlined in 43 CFR 3160 and the Onshore Oil and Gas Orders. Implementation of measures to meet these standards and regulations will minimize risks to public health and safety; therefore, any impacts to public health and safety are not considered significant.

3) *Unique characteristics of the geographic area such as proximity to historical or cultural resources, parks lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas:*

**Approval Date: 04/21/2020**

No park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas would be adversely affected by the proposed development. The project area has been surveyed and analyzed for biological, historical and cultural resources. No historical or cultural resources were identified within the area of potential effect.

4) *The degree to which the effects on the quality of the human environment are likely to be highly controversial:*
The methods chosen to implement the drilling project are accepted methods to meet resource and management objectives and are not considered highly controversial.

5) *The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks:*
The proposed project is not unique or unusual. The BLM has experience implementing similar projects in similar areas and have found effects to be reasonably predictable. The effects to the human environment are fully analyzed in the EA. There are no predicted effects on the human environment which are considered to be highly uncertain or involve unique or unknown risks.

6) *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration:*
The proposed project does not set a precedent for future actions that may have significant effects.  Project implementation includes using existing and improved two-track access roads, constructing 2 well pads, well heads and reserve pits, and using industry standard techniques to drill for oil and gas with a single 10,000-ft. vertical exploration drill hole on each well pad. Any future proposals submitted within the project area would be considered independently and be subject to site specific NEPA analysis and documentation.

7) *Whether the action is related to other actions with individually insignificant, but cumulatively significant impacts:*
The EA identified the potential for cumulative effects of the Project for the following resources: Air Quality and Atmospheric Values, Floodplains, Water Resources – Surface and Ground, Fish and Wildlife, Special Status Species, Migratory Birds, Soil Resources, Vegetation, Visual Resources Management and Wild Horses. Cumulative impacts to all resources were not determined to be significant.

8) *The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing on the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources:*
There are no known significant scientific, cultural, or historic resources in the area; therefore, the Proposed Action will not cause the loss or destruction of significant scientific, cultural or historical resources.

9) *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973:*

No threatened or endangered plant or animal species or their habitats exist in or near the project area.

10) *Whether the action threatens a violation of Federal, State, local or tribal law or requirements imposed for the protection of the environment:*
This action would not violate federal, state, or local laws or requirements. The proposed action is fully consistent with the 2008 Ely District Record of Decision and Approved Resource Management Plan. The EA is in full compliance with the National Environmental Policy Act of 1969 and is consistent with the Federal Land Policy and Management Act of 1976, as amended. Approval of the Proposed Action would not result in undue or unnecessary resource degradation due to operator compliance with State and Federal regulations, the Lease Terms, the Design Features and Conditions of Approvals.

**Finding of No Significant Impact**

I have determined that, with incorporation of the design features, the Proposed Action will not significantly affect the quality of the human environment and that preparation of an Environmental Impact Statement (EIS) is not required.

_____

Jared Bybee                                              Date
Associate District Manager
Ely District Office

**Approval Date: 04/21/2020**



# United States Department of the Interior



**BUREAU OF LAND MANAGEMENT**
Bristlecone Field Office
702 North Industrial Way
Ely, Nevada 89301
https://www.blm.gov/nevada

In Reply Refer To:
3160 (NVL0600)
NVN-82639

## DECISION RECORD

| Western Oil Exploration | : | |
|---|---|---|
| 312 Helene Drive | : | Decision Record |
| Bellevue, NE 68005 | : | DOI-BLM-NV-L060-2020-0002-EA |
| | : | |

I have reviewed the application, the Environmental Assessment (EA), and have made a Finding of No Significant Impact (FONSI) for Western Oil Exploration's proposal for the Scott Federal #25-1 and #35-1 exploratory oil wells. Based on that review and the decision file as a whole, I approve this project with the following stipulations derived from design features in the EA and FONSI and BLM standard stipulations. In accordance with 43 CFR §3165.4(c) this Decision is in full force and effective immediately.

## CONDITIONS OF APPROVAL AND STANDARD OPERATING PROCEDURES
## APPLICATION FOR PERMIT TO DRILL OIL & GAS WELL

Operator:      Western Oil Exploration
Lease:         NVN-82639
Well#1         Scott Federal 25-1
Location:      Section 25, T. 17 N., R. 56 E., SE 1⁄4 of NW 1⁄4 of NW 1/4

Well #2:       Scott Federal 35-1
Location:      Section 35, T. 17 N., R. 56 E., Section 35, NW 1⁄4 of NE 1/4

Agency Contacts:

BUREAU OF LAND MANAGEMENT
Nevada State Office
PO Box 12000 (1340 Financial Blvd)
Reno, NV 89520-0006
(775) 861-6400
Petroleum Engineer:        John Menghini
Office Telephone:          (775) 861-6573
Cell:                      (775) 223-1359
Email:                     jmenghin@blm.gov
Petroleum Technician:      Jose Rios
Office Telephone:          (775) 861-6641
Cell:                      (775) 335-5934
Email:                     jrios@blm.gov

Approval Date: 04/21/2020

**Attachment 2**
Page 28 of 445

INTERIOR REGION 10 • CALIFORNIA-GREAT BASIN
CALIFORNIA*, NEVADA*, OREGON*
* PARTIAL

**Approval Date: 04/21/2020**

BUREAU OF LAND MANAGEMENT
Ely District Office
702 North Industrial Way Office
Ely, NV 89301
(775) 289-1800
Authorized Officer:                          Jared Bybee
Telephone:                                   (775) ███████
Email:                                       ███████:@blm.gov
Environmental Protection Specialist:         Stacy Holt
Telephone:                                   (775) 2██████
Email:                                       █████@blm.gov
Fax:                                         (775) ██████

NEVADA DIVISION OF MINERALS
Nevada Division of Minerals
400 W. King Street # 106
Carson City, NV 89703
(775) 684-7045
Oil, Gas and Geothermal Program:
Office Telephone: (775) 684-7040
Fax: (775) 684-7052

**In case of an Emergency and the Authorized Officer is not available, please contact: John Menghini**

### Conditions of Approval/Design Features Analyzed in the EA

1. Western Oil is required to adhere to all applicable Federal, State, Tribal and local laws and regulations, including but not limited to the Methane and Waste Prevention Rule, 43 CFR 3160 – Onshore Oil and Gas Operations, and State of Nevada Executive Order 2018-32 – Order Establishing Use of the Nevada Greater Sage-Grouse Conservation Plan and Credit System.
2. Western Oil shall restrict unauthorized travel off existing roads and trails.
3. Western Oil is required to adhere to all ACEPMs (Appendix C) and RDFs (Appendix G) as COAs.  Western Oil may elect to implement BMPs (See Appendix B) in future proposals to further reduce impacts from production.
4. All personnel shall adhere to a 15 mile per hour (mph) speed limit on all unpaved access roads to the project area in order to reduce fugitive dust and to minimize collisions with horses and wildlife.
5. All new fencing shall be flagged every 16 feet with white flagging that is at least one-inch wide and has at least 12 inches hanging free from the top wire of the fence to minimize impacts to wild horses and wildlife.  Temporary road signs shall be installed to indicate the presence of wild horses and wildlife during site construction and exploration drilling.

**Attachment 2**

6. To minimize vegetation and soil disturbance and impacts to visual resources, vehicle travel on the playa surface would be limited to that necessary to construct and reclaim the drill pad.

7. During drilling activities, trenches shall surround all pumps, motors and the rig such that runoff will be directed to a sump area on the well site and pumped into a haul off tank.

8. According to Notice to Lessees (NTL) 87-1 production facilities shall be painted according to stipulations provided by the surface managing agency; the well is located on BLM surface and will be painted in accordance with Standard Environmental Colors. Western Oil would paint the production facilities (e.g. tanks and pipeline) on each APD pad with approved colors.

9. Western Oil shall report to BLM and immediately respond to minor and major undesirable events in accordance with all applicable Federal, State, and local laws and regulations including NTL-3A.

10. Western Oil shall incorporate noise reduction measures including engine exhaust mufflers, engine housing acoustic shielding and acoustic shielding.

11. Western Oil shall conduct noise monitoring in accordance with Appendix M of the 2015 GRSG ARMPA (see Appendix I).

12. Night lighting is required to ensure no livestock are injured during drilling operations. Western Oil shall install night shades for night lighting to reduce background light.

13. Western Oil shall conduction reclamation by restoring and re-seeding dominant species on the project site with BLM approved seed mix.

14. Western Oil shall comply with all applicable Lease Stipulations (see Appendix E).

15. Western Oil shall conduct a 1-mile raptor survey to document hawks and eagles surrounding the lease area. Depending on results of this survey, Western Oil may be required to consult with the US Fish and Wildlife Service.

16. Perch deterrents are required on all temporary housing and other above ground facilities to discourage nesting and perching of raptors, corvids, and other predators.

## Standard Conditions of Approval

1. Approval of this APD does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon. In addition, approval of this APD does not imply that the operator has legal access to the drilling location. When crossing private surface 43 CFR 3814 regulations must be complied with and when crossing public surface off-lease the operator must have an approved right-of-way.

2. All operations shall conform to the Code of Federal Regulations, 43 CFR 3160, Bureau of Land Management Onshore Orders and the Nevada Division of Minerals Oil and Gas chapter 522 – Oil and Gas General Provisions.

3. A complete copy of the approved APD must be at the drill site during the construction of the roads and drill pad, the drilling of the well, and the completion of the well.

4. The anticipated spud date will be reported orally to the Authorized Officer 24 HOURS PRIOR TO SPUDDING, followed up by submitting Form 3160- 5 with actual spud date and time to the BLM.

Approval Date: 04/21/2020

Attachment 2
Page 30 of 445

5. Verbal notification shall be given to the Authorized Officer/PET at least 24 hours in advance of formation tests, BOPE tests, running and cementing casing (other than conductor casing), and drilling over lease expiration dates.

6. A progress report needs to be filed a minimum of once a week starting with the week the well was spud and continuing until the well is completed. This report should be emailed. A Completion Report Form 3160-4 must be submitted upon completion of the well. The report will include the spud date, casing information such as size, grade, weight, hole size, and setting depth, amount and type of cement used, top of cement, depth of cementing tools, casing test method, intervals tested, perforated, acidized, fractured and results obtained and the dates all work done.

7. Deviation from the approved APD must receive prior approval. If you want to change your operations in any way, you must first receive approval (oral or written) from the BLM and from the NDOM.

8. Any information you desire to be held confidential <u>must be clearly marked</u> "CONFIDENTIAL" on each page.

9. All survey monuments found within the area of operations shall be protected. Survey monuments include, but are not limited to: General Land Office and Bureau of Land Management Cadastral Survey Corners, reference corners, witness points, U. S. Coast and Geodetic benchmarks and triangulation stations, military control monuments, and recognizable civil (both public and private) survey monuments. In the event of obliteration or disturbance of any survey monuments, the incident shall be reported in writing to the Authorized Officer.

10. If at any time the facilities located on public lands authorized by the terms of the lease are no longer included in the lease (due to a contraction in the unit or other lease or unit boundary change) the BLM will process a change in authorization to the appropriate statue. The authorization will be subject to appropriate rental or other financial obligation determined by the authorized officer.

11. The Completion Report and all test information obtained from this well shall be submitted within 30 days after the well is completed.

12. No later than the fifth business day after any well begins production on which royalty is due anywhere on a lease site or allocated to a lease site, the operator must notify the BLM by letter or sundry notice of the date on which such production commenced. The date is defined as follows: the date on which liquid hydrocarbons are first sold or shipped from a temporary storage facility, such as a test tank, and for which a run ticket is required to be generated, or the date on which liquid hydrocarbons are first produced into a permanent storage facility, whichever occurs first. If you intend to sell from a test tank, it must be calibrated as specified in Onshore Order Number 4, Part C, and sealed in accordance with Onshore Order Number 3. You can initially notify orally, but you must follow-up with a letter or sundry notice. Reference is made to 43 CFR 3162.4-1(c). As a minimum, such notice must provide the following information:

    a. Operator's name, address and telephone number.
    b. Well name and number.
    c. Well location (¼ ¼ Section, Twp., Rge., MDBM).
    d. Date well placed in a producing status.
    e. The nature of the well's production, i.e., crude oil, natural gas.
    f. The lease communization, or unit number applicable.

13. An Hydrogen Sulfide (H2S) Contingency Plan as outlined in Onshore Order No. 6 will be submitted when required by this office. However, minimum safety precautions must always be taken. Personal safety equipment, including a portable hydrogen sulfide detector situated in a position to detect gas from the well, and two or more OSHA approved protective breathing apparatus must be on location. If company policy requires more than this, please supply this office with a copy of the company plan or requirement, if not already submitted.

14. Abandonment program approval must be obtained prior to plugging the well. Following an oral approval, a sundry notice titled "Notice of Intent to Abandon" will be submitted within five business days. Failure to obtain approval prior to commencement of abandonment operations shall result in immediate assessment under 43 CFR 3163.1(b) (3).
Notice: if no logs are run (mud or electric), all open sections of hole will be filled with cement in a manner which precludes interzonal migration of fluids.

15. Directional surveys (inclination and azimuth) shall be run on the well wherever the inclination exceeds 10 degrees, or the projected bottom hole location is within 200 feet of the spacing unit or lease or unit boundary.

16. Pursuant to 43 CFR 3162.7-1(b), production testing will be permitted into test tanks only. No oil will be permitted into the reserve pit except in emergency situations.

17. The State of Nevada (NAC 522A.215) requires that samples of cuttings shall be collected at a minimum of 30-foot intervals from surface to the surface casing point, and on 10 foot intervals from surface casing shoe to total depth. A minimum of two 15 milliliter sets of cuttings per sampling interval must be cleaned, dried, and placed in 3" x 5" sample envelopes, properly identified and sent prepaid to the Nevada Bureau of Mines and Geology (NBMG) University of Nevada, Reno, Mail Stop 178, Reno, Nevada 89557-0088. Note: the cuttings are not to be sent to the Division of Minerals. The cuttings are due within 15 days of completion of the well. The operator will be responsible for the cost of any further handling of the samples by the NBMG required to meet standards set out in this permit condition.

18. Two copies of all logs run on the well and where possible, one copy of the computed logs in electronic format such as LAS or PDF are to be submitted to the NDOM within 30 days of the date of being run.

19. All BOPE tests of 5000 psi or greater shall be conducted by an independent contractor. Test charts and test results are to be submitted to the Bureau of Land Management within 48 hrs.

**Rationale for Decision:**

1) The Proposed Action is in conformance with the 2008 Ely District Record of Decision and Approved Resource Management Plan and the 2015 Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region for Greater Sage-Grouse. Section 1.4 of the Environmental Assessment documents the conformance review.

2) The Proposed Action is consistent with all other applicable federal, state, local, and tribal policies and plans to the maximum extent possible.

3) Implementation of the Proposed Action will allow Western Oil Exploration to exercise its rights under the lease agreement to explore for additional reserves of oil and gas so as to meet the increasing energy needs of this Nation. The selected action will meet the BLM's purpose in considering approval of the application to improve access roads and drill two exploration

Approval Date: 04/21/2020

oil wells to provide a legitimate use of the public lands to the proponent. Any impacts resulting from the proposed action will be minimized through the carefully planned proposed action developed in the APD, the standard State and Federal operating regulations for oil and gas exploration, and the site-specific and standard conditions of approval as listed above. As a result of the analysis for the proposed oil and gas wells, it was determined that the Proposed Action will not result in unnecessary or undue degradation to the public lands.

**Public Involvement:**

On October 16, 2019 a Preliminary Environmental Assessment including Scott Federal #25-1 was released for a 30-day public comment period, concluding on November 15, 2019. The BLM received comments from the Nevada Department of Wildlife, the Sagebrush Ecosystem Technical Team, the Toiyabe Chapter of the Sierra Club, Western Watersheds Project, and one interested individual. During the comment period, the BLM also received comments on the APD for Scott Federal #35-1 that was posted to the BLM Automated Fluid Minerals Support System 30-day federal public posting portal on September 25, 2019. Comments were received which led to substantial changes to the Preliminary Environmental Assessment. The BLM Authorized Officer decided to offer another public comment period on the Preliminary Environmental Assessment.

On December 20, 2019, the BLM released a second version of the Preliminary Environmental Assessment including both Scott Federal #25-1 and Scott Federal #35-1 for public comment. The comment period was originally set to conclude on January 17, 2020, which was subsequently extended to February 6, 2020. The BLM received comments from the American Wild Horse Campaign, the Nevada Department of Wildlife, the Sagebrush Ecosystem Technical Team, the United States Fish and Wildlife Service, Western Oil Exploration, Western Watersheds Project, and one interested permittee. Substantive comments were received, leading to changes to the Environmental Assessment (See Appendix J of the EA for a summary of public comments and BLM response).

**Appeal of the Decision:**

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR, Part 4 and Form 1842-1 (enclosed). If an appeal is taken, a notice of appeal and/or request for stay must be filed in writing, on paper, in this office, either by mail or personal delivery. Notices of appeal and/or request for stay that are electronically transmitted (e.g., email, facsimile, or social media) will not be accepted as timely filed. The notice of appeal is considered filed as of the date our office receives the hard copy and places our BLM date stamp on the document.

Approval Date: 04/21/2020

INTERIOR REGION 10 • CALIFORNIA-GREAT BASIN
CALIFORNIA*, NEVADA*, OREGON*
* PARTIAL

Your Notice of Appeal must be filed in this office 702 N Industrial Way, Ely, Nevada 89301-9408 within 30 days from receipt of this decision. As the appellant you have the burden of showing that the decision appealed from is in error. Enclosed is BLM Form 1842-1 that contains information on taking appeals to the IBLA.

This decision will remain in effect while the IBLA reviews the case, unless a stay is granted by the IBLA. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

**Request for a Stay:**

If you wish to file a petition pursuant to regulations 43 CFR 4.21 for a stay of the effectiveness of this decision during the time that your appeal is being reviewed by Interior Board of Land Appeals (IBLA), the petition for a stay must accompany your notice of appeal. A petition for a stay is required to show sufficient justification based on the standards listed below. Copies of this notice of appeal and petition for a stay must also be submitted to each party named in the decision and to the IBLA and to the appropriate Office of the Solicitor (see 43 CFR 4.413) at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

**Standards for Obtaining a Stay**

Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards:

    (1) The relative harm to the parties if the stay is granted or denied,
    (2) The likelihood of the appellant's success on the merits,
    (3) The likelihood of immediate and irreparable harm if the stay is not granted, and
    (4) Whether the public interest favors granting the stay.

**Approved by:**

Jared Bybee
Associate District Manager
Ely District Office

4/3/2020
Date

Approval Date: 04/21/2020

Attachment 2
Page 34 of 445

# Exhibit B

Form 3160-12
(December 1989)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

**NOTICE TO SHUT DOWN OPERATION**

| Number | 20JR0009S |
|---|---|
| Page | 1 of 2 |

| Identification | |
|---|---|
| IID | |
| Lease | NVN082639 |
| CA | |
| Unit | |
| PA | |

☐ Certified Mail - Return Receipt Requested

☒ Hand Delivered Received by HAND DEL. 07/24/2020

| Bureau of Land Management Office | Operator |
|---|---|
| RENO STATE OFFICE | WESTERN OIL EXPLORATION COMPAN |
| Address: 1340 FINANCIAL BLVD RENO NV 89520 | Address: 848 RAINBOW BLVD., SUITE 2818 LAS VEGAS NV 89107 |
| Telephone: 775-861-6641 | Attention: LORENZO ORTEGA III |
| Inspector: RIOS | Attn Addr: 312 HELENE DRIVE BELLEVUE NE 68005 |

| Site Name | Well/Facility/FMP | 1/4 1/4 Section | Township | Range | Meridian | County | State |
|---|---|---|---|---|---|---|---|
| SCOTT FEDERAL | 35-1 | NWNE 35 | 17N | 56E | MTD | WHITE PINE | NV |
| Site Name | Well/Facility/FMP | 1/4 1/4 Section | Township | Range | Meridian | County | State |
| Site Name | Well/Facility/FMP | 1/4 1/4 Section | Township | Range | Meridian | County | State |

**YOU ARE ORDERED TO IMMEDIATELY SHUT IN THE ABOVE OPERATION ACCORDING TO 43 CFR 3163.1(a)(3)**

| Date | Time (24 - hour clock) | Corrective Action To Be Completed By | Report Corrective Action By | Date Corrected |
|---|---|---|---|---|
| 07/24/2020 | 12:00 | 08/24/2020 | | |

Remarks
Hand Delivered 07/24/2020
Immediate Shutdown Order of Operations:
The Authorized Officer is issuing an immediate shutdown order of operations at the Scott Federal 35-1 wellsite due to concerns with previous Incidents of Non-compliance, unresolved issues and violations, and the potential for immediate, substantial, and adverse impacts on public health and safety, wildlife and livestock, natural resources, environmental quality, and surface resources with continued operations.
Corrective Action:
1) Prior to shutdown of operations, the operator must secure the Scott Federal 35-1 wellbore with a
(Remarks continued on following page(s).)

When violation is corrected, sign this notice and return to above address.

| Company Representative Title | | Signature | | Date |
|---|---|---|---|---|
| Company Comments | | | | |

**WARNING**

Operations are not to be resumed until permitted by the authorized officer. Failure to comply with this notice within the time allowed may incur an assessment under (43 CFR 3163.1) and may also incur Civil Penalties under 43 CFR 3163.2

Section 109(d)(1) of the Federal Oil and Gas Royalty Management Act of 1982, as implemented by the applicable provisions of the operating regulations at Title 43 CFR 3163.2(f)(1), provides that any person who "knowingly or willfully" prepares, maintains, or submits, false, inaccurate, or misleading reports, notices, affidavits, record, data, or other written information required by this part shall be liable for a civil penalty of up to $25,000 per violation for each day such violation continues, not to exceed a maximum of 20 days.

**REVIEW AND APPEAL RIGHTS**

A person contesting a violation shall request a State Director review of the Incidents of Noncompliance. This request must be filed within 20 working days of receipt of the Incidents of Noncompliance with the appropriate State Director (see 43 CFR 3165.3). The State Director review decision may be appealed to the Interior Board of Lands Appeals, 801 North Quincy Street, Suite 300, Arlington VA 22203 (see 43 CFR 3165.4). Contact the above listed Bureau of Land Management office for further information.

| Signature of Bureau of Land Management Authorized Officer | Date | Time |
|---|---|---|
| # 0856 | 07/24/2020 | 1500 |

SIGN & RETURN

**Additional information for Shutdown Order Number 20JR0009S**

BLM Remarks, continued

method approved by the Authorized Officer. Due to current operational conditions noted in the daily drilling reports, the operator must receive approval from the Authorized Officer before continuing with operations to secure the wellbore. Once the wellbore is secured and verified by the Authorized Officer representative, the shutdown order is effective immediately and will remain in effect until all unresolved issues and violations are resolved.

2) A proposal for further well operations shall be submitted by the operator on Form 3160-5 for approval by the Authorized Officer prior to resuming drilling and completion operations or other proposed operations. Resuming drilling operations or additional surface disturbance without prior approval is strictly prohibited.

Please note, the abatement date for the shutdown order cannot be determined at this time. A 30-day period will be granted but may be extended if issues and violations are not resolved and additional time to achieve compliance is required. The shutdown order will remain in effect until the all the conditions specified above are met and approved by Authorized Officer.

# Exhibit C

2020BLM02397-R028



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Nevada State Office
1340 Financial Boulevard
Reno, Nevada 89502-7147
https://www.blm.gov/nevada

In Reply Refer To:
NVN082639
3107 (NV922.j)

DEC 1 6 2022

CERTIFIED MAIL – 9171 9690 0935 0246 0099 01

### D E C I S I O N

Nicole T. Scott                                  :
PO Box 720294                                    :                 Oil and Gas
San Diego, CA 92172                              :

#### Drilling Extension Denied
#### Lease Expired

Your federal oil and gas lease serialized as NVN082639 (the Lease) was issued effective
January 1, 2010. On December 30, 2019, the Lease was granted an extension pursuant to
43 CFR 3107.6 with a new primary term ending on August 31, 2021.

On April 17, 2020, the Bureau of Land Management (BLM) approved an application for permit
to drill (APD) the Scott Federal #35-1 well on the Lease. Activities to drill the
Scott Federal # 35-1 well on the Lease began prior to and continued over the August 31, 2021,
expiration date for the Lease. Daily drilling reports submitted for the Scott Federal #35-1 well
indicate that the well has only been drilled to a depth of 5,234 feet, which is well short of the
approved and anticipated depth of 10,000 feet, and no new drilling operations have occurred
since November 12, 2021.

Leases on which actual drilling operations were commenced prior to and are diligently
prosecuted over the end of the primary term of the lease are eligible for a 2-year drilling
extension in accordance with 43 CFR 3107.1.

Based upon a review of the available information, this office has determined that the activities to
develop the Scott Federal # 35-1 well on the Lease do not meet the requirements for actual
diligent drilling operations and a lease extension pursuant to 43 CFR 3107.1. As a result, the
Lease expired effective August 31, 2021.

INTERIOR REGIONS 8 & 10 • LOWER COLORADO BASIN & CALIFORNIA-GREAT BASIN
ARIZONA, CALIFORNIA, NEVADA, OREGON*
* PARTIAL

Attachment #1,  Page 1 of 2

**2020BLM02397-R028**

<u>Appeal Procedures</u>

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR, Part 4 and the enclosed Form 1842-1. If an appeal is taken, your notice of appeal must be filed in this office (at the above address) within 30 days from receipt of this decision. The appellant has the burden of showing that the decision appealed from is in error.

If you appeal this decision, please provide this office with a copy of your Statement of Reasons.

If you wish to file a petition pursuant to regulation 43 CFR 4.21 (58 FR 4939, January 19, 1993) (request) for a stay (suspension) of the effectiveness of this decision during the time that your appeal is being reviewed by the Board, the petition for a stay must accompany your notice of appeal. A petition for a stay is required to show sufficient justification based on the standards listed below. Copies of the notice of appeal and petition for a stay must also be submitted to each party named in this decision and to the Interior Board of Land Appeals and to the appropriate office of the Solicitor (see 43 CFR 4.413) at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

<u>Standards for Obtaining a Stay</u>

Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards:

   (1)  The relative harm to the parties if the stay is granted or denied,

   (2)  The likelihood of the appellant's success on the merits,

   (3)  The likelihood of immediate and irreparable harm if the stay is not granted, and

   (4)  Whether the public interest favors granting the stay.

If you have any questions, please contact Jonathan Estrella at 775-▮▮▮▮▮, send a facsimile to 775-861-6711, write to the attention of NV922.j at the address on the letterhead, or send electronic mail to ▮▮▮@blm.gov.

Justin Abernathy
Deputy State Director
Division of Energy and Minerals

cc: Western Oil Exploration
    848 Rainbow Blvd., Ste 2818
    Las Vegas, NV 89107

    Ely District Office, Bristlecone Field Office (NVL06)

    Office of Natural Resources Revenue

**Attachment #1,  Page 2 of 2**

# Exhibit D

## Re: Fw: [EXTERNAL] Re: BLM Mortensen contact information

**Schad Brannon** <schadebrannon@gmail.com>
Mon 1/9/2023 9:44 AM
To: Mortensen, Michael A <          @blm.gov>
Cc: Roy Nelson <roydog.nelson@gmail.com>
Michael

I/we are ready to fully support your investigation. How do we handle the next steps? We are technically under NDA for some of this information so I would like to understand how it is going to be handled and hopefully understand who it's going to be reviewing the information. Are you preparing the information/evidence for the local district attorney or the Nevada State District Attorney (Arron Ford) to consider an indictment and the pursuit of a prosecution?

Are we emailing you this information?
Are we communicating with the other stakeholders and recommending they contact you directly?
Any luck with identifying who we can speak to at the BLM about our situation?

Kindly advise

Schad

On Wed, Jan 4, 2023 at 3:18 PM Mortensen, Michael A <          @blm.gov> wrote:
> Schad, I forgot to add you to the email, I just sent this to Roy
>
> Michael Mortensen
> Special Agent
> Bureau of Land Management
> Elko District Office
> Office: 775-
> Cell: 775-
> Email:             @blm.gov
>
> ────────────────────────────────
>
> **From:** Mortensen, Michael A <          @blm.gov>
> **Sent:** Wednesday, January 4, 2023 3:17 PM
> **To:** Roy Nelson <roydog.nelson@gmail.com>
> **Subject:** Re: [EXTERNAL] Re: BLM Mortensen contact information
>
> Roy,
>
> I read through the court documents you are preparing. What evidence do you have that shows he diverted funds to other accounts not associated with WOE?
> Do you have documentation that shows WOE or Franklin was committing fraud and misrepresenting to investors?
> Do you have any documentation that shows WOE was oversold, or investors were not receiving what they were promised or agreed too.

Do you have the bank account information where you sent him 2 million dollars for investment?  How was this sent? Wire transfers?

Michael Mortensen
Special Agent
Bureau of Land Management
Elko District Office
Office: 775-
Cell: 775-
Email:                    @blm.gov

---

**From:** Roy Nelson <roydog.nelson@gmail.com>
**Sent:** Tuesday, January 3, 2023 2:55 PM
**To:** Mortensen, Michael A <                    @blm.gov>
**Cc:** Schad Brannon <schadebrannon@gmail.com>
**Subject:** [EXTERNAL] Re: BLM Mortensen contact information

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Michael,

Here is the lawsuit we have prepared against James Franklin, Western Oil. Please take a look and let me know where we start to assist you from here.

Many thanks,

Roy Nelson
Mobile: (801)
Ghana: +233 50 864 1920
WhatsApp: (801) 946-9881
WhatsApp: +233 50 864 1920
Casual Email:   roydog.nelson@gmail.com

The information contained in this e-mail transmission is intended only for the personal and confidential use of the recipient(s) named above. If this message has been received in error, you are hereby notified that any review, dissemination or copying of this message and its attachments, is strictly prohibited. If you received this e-mail in error, please immediately notify the sender by return e-mail and delete this message and any attached materials from your system.

4/14/23, 8:40 AM                                     Mail - Mortensen, Michael A - Outlook

On Tue, Jan 3, 2023 at 1:16 PM Mortensen, Michael A < ██████████ @blm.gov> wrote:
Roy,
You can email me documents to this email. Thank you!

Michael Mortensen
Special Agent
Bureau of Land Management
Elko District Office
Office: 775- ███████ 1
Cell: 775- █████████
Email: ██████████ @blm.gov

--

Many thanks,

Schad E. Brannon
Chairman/Founder

Cell USA / WHATSAPP: +1 (818) 426-4280

Direct Email:   schadebrannon@gmail.com

Toll-Free One Number                     Pass Code for outside the U.S.

USA +1 (351) ████████               329560

**Confidentiality Notice:** This email, including attachments, may include non-public, proprietary, confidential, or legally privileged
information. If you are not the intended recipient or an authorized agent of an intended recipient, you are hereby notified that
any dissemination, distribution, or copying of the information contained in or transmitted with this email is unauthorized and
strictly prohibited. If you have received this email, in error, please notify the sender by replying to this message and permanently
delete this email, its attachments, and any copies of it immediately. You should not retain, copy or use this email, or any
attachment for any purpose, nor disclose all or any part of the contents to any other person.

SEC-BOLM-E-0000011

# Exhibit E

2020BLM02397-R029

1   Barry F. Cannaday (Texas Bar No. 03743500)
    DENTONS US LLP
2   2000 McKinney Avenue
    Suite 1900
3   Dallas, Texas 75201-1858
    Telephone:    (214) 259-0900
4   Facsimile:    (214) 259-0910

5   Nick Janda (California Bar No. _____)
    DENTONS US LLP
6   4655 Executive Drive
    Suite 700
7   San Diego, CA  92121
    Telephone:  (619) 699-2515
8   Facsimile:    (619)

9   Attorneys for Digital Licensing, Inc.

10

11          **IN THE SEVENTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

12                      **FOR THE COUNTY OF WHITE PINE**

13

14  Digital Licensing, Inc., a Wyoming          | Case No.:
    corporation;                                | Dept. No.:
15
                                                |
16          Plaintiff,                          |     COMPLAINT FOR:

17      v.                                      | **1) DECLARATORY JUDGMENT;**
                                                | **2) BREACH OF CONTRACT;**
18  Western Oil Exploration Company, a          | **3) BREACH OF COVENANT OF GOOD**
    Nevada Corporation; James E Franklin, II,   | **FAITH AND FAIR DEALING;**
19  an individual; Nicole T. Scott, an          | **4) NEGLIGENCE AND GROSS**
    individual; and [the Remaining Working      | **NEGLIGENCE**
20  Interest Owners in the Lease],              | **5) UNJUST ENRICHMENT;**
                                                | **6) CONVERSION;**
21          Defendants.                         | **7) FRAUD;**
                                                | **8) CIVIL CONSPIRACY.**
22
                                                |
23                                              | *EXEMPT FROM ARBITRATION:*
                                                | *DECLARATORY RELIEF REQUESTED*
24

25          COMES NOW, Plaintiff Digital Licensing, Inc. by and through their attorneys, the Law

26  Offices of _____, and complain and allege against Defendants

27  WESTERN OIL EXPLORATION COMPANY, JAMES E. FRANKLIN, II and NICOLE T.

28  SCOTT as follows:

                                    **Attachment #1,  Page 1 of 14**

2020BLM02397-R029

## PARTIES AND JURISDICTION

1.      Plaintiff DIGITAL LICENSING, INC. is a Wyoming corporation.

2.      Defendant WESTERN OIL EXPLORATION COMPANY is a Nevada corporation.

3.      Defendant JAMES E. FRANKLIN, II is an individual and resident of California.

4.      Defendant NICOLE T. SCOTT is an individual and resident of California.

5.      This Court has jurisdiction over this action as the allegations involved a Nevada entity, and the events described in this Complaint occurred in the State of Nevada.

## GENERAL ALLEGATIONS

6.      On October 22, 2020, Global Bullion Holdings entered into the Scott Federal Lease Exploration Agreement (the "*Exploration Agreement*") with Defendant Western Oil Exploration Company ("*Western Oil*") under which Global Bullion Holdings ("*GBH*") agreed to participate with Western Oil in the drilling of the Scott Federal #1 Well (the "*Scott Federal Well*") on Federal Lease No. NVN 82639 (the "*Scott Federal Lease*") in return for receiving a 1% Working Interest in the Scott Federal #1 Well for each $250,000 invested by GBH the Scott Federal Well.   A true and correct copy of the Exploration Agreement is attached to this Complaint as Exhibit A.

7.      Attached as Exhibit III to the Exploration Agreement, by reference, was a A.A.P.L. form 610 - 1989 Operating Agreement dated August 8, 2018 (the "*Operating Agreement*") that was to govern the operations relating to the drilling, completion and operation of the Scott Federal Well under which Western Oil was designated as Operator and GBH was a Non-Operator.   A true and correct copy of the Operating Agreement is attached to this Complaint as Exhibit B.

8.      Plaintiff Digital Licensing, Inc. ("*DLI*") has succeeded to all of GBH's rights and obligation under the Exploration Agreement and the Operating Agreement.

9.      Upon information and belief, Defendant NICOLE T. SCOTT ("*Scott*") is the owner of Scott Federal Lease on which the Scott Federal Well was to be drilled.   The second paragraph

- 2 -

Attachment #1,  Page 2 of 14

2020BLM02397-R029

of the Exploration Agreement recites that Western Oil entered into a Farmout Agreement with the owner of Scott Federal Lease under which Western Oil acquired 100% of the Working Interest and Operating Rights in Scott Federal Lease, subject to a "Lease holder Overriding Twelve and One-Half Percent (12.5%) Royalty."

10.    DLI participated in the cost of the drilling of the Scott Federal Well in an amount in excess of [$2,000,000] for a [4.63%] Working Interest in the Well.

11.    Under the terms of a September 10, 2018 Drilling Plan submitted by Western Oil to its investors, Western Oil was to drill the Scott Federal Well to a projected total depth of 10,000' (the "***Initial Targeted Depth***"), but as a result of the negligence and gross negligence of Western Oil, as more particularly described below, the drill pipe for the Scott Federal Well became "stuck" at approximately [6,000'] depth, rendering further drilling to the Initial Targeted Depth impracticable and uneconomic.

### Removal of Western Oil as Operator

12.    Pursuant to the provisions of Article V.B of the Operating Agreement, the Non-Operators have the right to remove Western Oil as Operator under the Operating Agreement for "good cause" if Western Oil fails to conduct its activities under the Operating Agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch in accordance with good oilfield practice. Such removal is to be effectuated by a majority vote of the Non-Operators, after excluding the interest of the Operator.

13.    By letter dated 20 September 2022 (the "***Removal Notice***"), Western Oil was notified that it had been removed as Operator for good cause under the Operating Agreement by a vote of a majority in interest of the Non-Operators after excluding the interest of the Operator. A true and correct copy of the Removal Notice is attached hereto as Exhibit C.

- 3 -

Attachment #1,  Page 3 of 14

**2020BLM02397-R029**

14.     In the Removal Notice, Western Oil was also notified that pursuant to the provisions of Article V.B of the Operating Agreement, Archer Drilling, LLC had been appointed successor operator to Western Oil by a vote of a majority of the Non-Operators after excluding the interest of the Operator.

<u>**Subsequent Operations/Non-Consent**</u>

15.     The Removal Notice further notified Western Oil that a majority of the Working Interest owners bearing the costs of drilling the Scott Federal Well had elected, pursuant to Article VI.F of the Operating Agreement, to terminate operations for further drilling of the Scott Federal Well to the Initial Targeted Depth.

16.     In a Notice of Subsequent Operations dated 20 September 2022, DLI proposed a Subsequent Operation under Article VI.B of the Operating Agreement relating to the plugging back of the Scott Federal Well and drilling vertically to the Scotty Wash Zone (the "***Subsequent Operations Proposal***"). A true and correct copy of the Subsequent Operations Proposal is attached hereto as <u>Exhibit D</u>.

17.     Under the terms of Article VI.B of the Operating Agreement, a failure by a Working Interest Owner to timely elect to participate in a proposed Subsequent Operation will result in such party (a "***Non-Consenting Working Interest Owner***") relinquishing its interest in the Subsequent Operation until the Working Interest Owners who timely elected to participate in the Subsequent Operation (the "***Participating Working Interest Owners***") have recovered from the proceeds of production from such Subsequent Operation an amount equal to 500% of the Non-Consenting Working Interest Owners' share of the cost of conducting such Subsequent Operation (the "***Non-Consent Penalty***").

18.     The Participating Working Interest Owners who timely elected to participate in the Subsequent Operation proposed by DLI were: DLI, Scott Moncrief, Mary Ellen Moncrief, [Nevada

- 4 -

**Attachment #1,  Page 4 of 14**

2020BLM02397-R029

Exploration Resources?], [others?].  The Non-Consenting Working Interest Owners who failed to timely elect to participate in the Subsequent Operation proposed by DLI and who are, accordingly, subject to the Non-Consent Penalty are:  Western Oil, [others].

### Western Oil's Negligence/Gross Negligence

19.    Western Oil's inability to drill the Scott Federal Well to the Initial Targeted Depth was the result of Western Oil's negligence and gross negligence in failing to operate as a reasonable and prudent Operator under the Operating Agreement, which failures exhibited a wanton indifference by Western Oil to the damages that would be incurred by DLI and the other Working Interest Owners in the Scott Federal Well as a result of Western Oil's negligence and gross negligence.  Western Oil's negligent and grossly negligent acts included, but were not limited to, the following :

a.  Western Oil's reckless conduct in failing to have adequate experienced staff to supervise critical aspects of the drilling operations for the Federal Scott Well.

b.  Western Oil's actions in failing to maintain drill hole integrity which Western Oil knew or should have known would result in damage to the drill hole preventing Western Oil from reaching the Initial Targeted Depth in the Federal Scott Well.

c.  Western Oil's reckless failure to insert casing in the drill hole to prevent the drill string from becoming stuck in the drill hole.

d.  Western Oil's reckless and wanton behavior in failing and refusing to follow federal law and federal regulations relating to the drilling of the Federal Scott Well resulting in the Bureau of Land Management ("**BLM**") shutting down Western Oil's operations for the drilling of the Federal Scott Well.

e.  Western Oil's reckless and wanton behavior in failing and refusing to follow White Pine County's ordinances relating to the maintenance of roads associated with the drilling of the

- 5 -

Attachment #1,  Page 5 of 14

**2020BLM02397-R029**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Federal Scott Well resulting in White Pine County shutting down Western Oil's operations for the drilling of the Federal Scott Well.

### Western Oil's Fraud and Misappropriation of Funds

20.     DLI provided funds to what it believed were Western Oil accounts pursuant to the Exploration Agreement in amounts which were in excess of [two million dollars ($2,000,000.00)].

21     These funds were to be used by Western Oil for the drilling of the Scott Federal Well to the Initial Targeted Depth.

22.     The funds that DLI provided actually went to accounts other than Western Oil's accounts.

23.     Unbeknownst to DLI, the funds provided by DLI which were intended to be deposited in the account of Western Oil and to be applied to the cost of the drilling of the Scott Federal Well pursuant to the Exploration Agreement were diverted into other accounts under the control of the Defendants.

24.     The funds that were improperly diverted by Western Oil to other accounts under the control of the Defendants were not used in the drilling of the Scott Federal Well, but, instead were used for improper purposes, including the unauthorized purchase of gold mining claims and the purchase of materials and assets for the personal benefit of Defendant James E. Franklin, II ("*Franklin*").

25.     After discovering the misrepresentations made by Defendants regarding the funds contributed by DLI to Western Oil, DLI requested Defendants to disclose documents and information relating to Western Oil's use of such funds, but Defendants have refused to make any such disclosures.

26.     Western Oil, Franklin and Defendant Nicole T. Scott ("*Scott*") have committed conversion of DLI funds, and have engaged in committing fraud.

- 6 -

**Attachment #1,  Page 6 of 14**

2020BLM02397-R029

**FIRST CLAIM FOR RELIEF**
(Declaratory Relief against All Defendants)

27.     DLI incorporates by reference and affirms each and every allegation previously asserted as if fully set forth herein.

28.     NRS 30.040 states, "Any person interested under a deed, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

29. DLI asks this court to declare the rights of the parties as to the agreements DLI and Defendant Western Oil have entered into as described above.  Specifically, DLI asks this court to find and declare that:

a.      Western Oil failed to conduct its activities under the Operating Agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch in accordance with good oilfield practice.

b.      Western Oil was grossly negligent in its conduct of operations under the Operating Agreement with respect to the drilling of the Federal Scott Well.

c.      Western Oil has been removed as Operator under the Operating Agreement and Archer Drilling, LLC has been appointed as successor Operator under the Operating Agreement.

d.      Pursuant to Article VI.F of the Operating Agreement, operations for the drilling of the Federal Scott Well to the Initial Targeted Depth have been terminated.

e.      Pursuant to Article VI.B of the Operating Agreement DLI has issued a valid and binding Subsequent Operations Proposal to which Western Oil failed to timely respond, resulting

- 7 -

Attachment #1,  Page 7 of 14

SEC-BOLM-E-0000032

2020BLM02397-R029

in Western Oil being a Non-Consenting Working Interest Owner in the Subsequent Operations

Proposal subject to the Non-Consent Penalty set out in Article VI.B of the Operating Agreement.

f.        Upon completion of the Subsequent Operations, DLI shall be entitled to (i) an

assignment of an undivided [___] percent of the Working Interest and Operating Rights in the Scott

Federal Lease and (ii) its share of the Non-Consent Penalty recoverable out of revenues from the

Subsequent Operations.

### SECOND CAUSE OF ACTION
(Breach of Contract against Western Oil)

30.     DLI incorporates by reference and reaffirms each and every allegation

previously asserted as if fully set forth herein.

31.     Defendant Western Oil entered into, or otherwise agreed to be, and was bound by the

terms of the Exploration Agreement and the Operating Agreement.

32.     At all relevant times herein, DLI performed the obligations and duties required

of it by the Exploration Agreement and the Operating Agreement or was excused from such

performance.

33.     Defendant Western Oil breached his contracts with DLI by failing to comply

with the terms of the Exploration Agreement and the Operating Agreement, which breaches

included, but were not limited to (i) Western Oil's obligations to pay its proportionate share of

the mobilization and demobilization fees and its proportionate share of the drilling and

completion costs of the Federal Scott Well, as required by Section1, Paragraph 2 of the

Exploration Agreement and (ii) Western Oil's failure to conduct its activities under the

Operating Agreement as a reasonable prudent operator, in a good and workmanlike manner in

accordance with good oilfield practices, and in compliance with applicable law and

regulations.

- 8 -

Attachment #1,  Page 8 of 14

**2020BLM02397-R029**

34.   The breaches of the contract by Western Oil have caused damages to DLI in excess of [two million dollars ($2,000,000.00).

### THIRD CAUSE OF ACTION
(Breach of Implied Covenant of Good Faith and Fair Dealing against Western Oil)

35.   DLI incorporates by reference and reaffirm each and every allegation previously asserted as if fully set forth herein.

36.   In Nevada, inherent in every contract is an implied covenant of good faith and fair dealing.

37.   The parties entered into the Exploration Agreement and the Operating Agreement which are valid and enforceable contracts under Nevada law.

38.   DLI performed all of its obligations (except where excused) and fulfilled all conditions precedent to Western Oil's performance.

39.   Western Oil breached the implied covenant of good faith and fair dealing when Western Oil failed to perform its obligations pursuant to the Exploration Agreement and the Operating in the manner outlined above in this Complaint.

40.   As a direct and proximate result of Defendant Western Oil's breach of the implied covenant of good faith and fair dealing, Western Oil has caused damages to DLI in excess of [two million dollars ($2,000,000.00).]

41.   DLI  is entitled to its reasonable attorney's fees due to Defendant Western Oil's breach of the covenant of good faith and fair dealing.

### FOURTH CAUSE OF ACTION
(Negligence and Gross Negligence against Western Oil

42.   DLI incorporates by reference and reaffirm each and every allegation previously asserted as if fully set forth herein.

- 9 -

**2020BLM02397-R029**

43.     Western Oil's inability to drill the Scott Federal Well to the Initial Targeted Depth was the result of Western Oil's negligence and gross negligence in failing to operate as a reasonable and prudent Operator under the Operating Agreement.  Western Oil's negligent and grossly negligent acts included, but were not limited to, those set out in Paragraph 19 of this Complaint above.

44.     As a direct and proximate result of Western Oil's acts of negligence and gross negligence, DLI has been damaged in an amount in excess of [$2,000,000.00].

45.     Due to Western Oil's gross negligence, Plaintiff is entitled to an award of punitive damages to punish Western Oil to make an example of Western Oil.

**FIFTH CAUSE OF ACTION**
(Unjust Enrichment against all Defendants)

46.     DLI incorporates by reference and reaffirm each and every allegation previously asserted as if fully set forth herein.

47.     Defendants have been unjustly enriched by the wrongful act of Western Oil in diverting the payments made by DLI to uses for the personal benefit of Defendants unrelated to the drilling of the Federal Scott Well.

48.     As such, said Defendants have been unjustly enriched to the detriment and damage of DLI and DLI is entitled to recover from Defendants all amounts which were paid by DLI to Western Oil and which were improperly diverted to the personal benefit Defendants.

49.     DLI has retained the services of an attorney to prosecute this action for unjust enrichment against Defendants and is entitled to an award of attorney's fees and costs incurred.

**SIXTH CAUSE OF ACTION**
(Conversion against all Defendants)

- 10 -

**2020BLM02397-R029**

50. DLI incorporates by reference the allegations set forth above as though fully restated herein.

51. Defendants, by means of their aforementioned duplicitous conduct, exerted wrongful dominion over the funds paid by DLI to Western Oil pursuant to Exploration Agreement and the Operating Agreement.

52. Defendants' wrongful dominion over the funds paid by DLI to Western Oil is in denial of, or inconsistent with DLI's contractual rights under the Exploration Agreement and the Operating Agreement.

53. Defendants' wrongful dominion was in derogation, exclusion, or in defiance of DLI's rights under the Exploration Agreement and the Operating Agreement.

54. Defendants' aforementioned acts and/or omissions have directly and proximately caused DLI damages in excess of the statutory minimum.

55. It has been necessary for DLI to retain legal counsel to commence this action, and DLI is entitled to reasonable attorneys' fees and costs of suit to pursue this action.

### SEVENTH CAUSE OF ACTION
(Fraud against Western Oil)

56. DLI repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

57. Western Oil made false representations when it promised to use Plaintiff DLI's money for the drilling and completion of the Federal Scott Well according to the terms of the Exploration Agreement and, instead diverted a significant portion of such funds to the personal use of Defendants.

58. Further, Western Oil made false representations with respect its operations being in compliance with BLM regulations and the permitting requirements of White Pine County.

- 11 -

US_ACTIVE\122639514\V-2

SEC-BOLM-E-0000036

SEC-BOLM-E-0000021

2020BLM02397-R029

59.     At the time that Western Oil made said representations, Western Oil either knew the representation to be false or Western Oil lacked a sufficient basis of information to make said representations.

60.     Western Oil intended to induce Plaintiff to act in reliance upon the false representations set forth above so that Western Oil and the other Defendants could be enriched thereby.

61.     DLI justifiably relied upon Western Oil's representations.

62.     As a direct and proximate result of Western Oil's false representations, DLI has been harmed in an amount in excess of [$2,000,000.00.]

63.     Due to Western Oil's fraudulent actions, DLI is an entitled to award of punitive damages to punish Defendant Western Oil and to make an example of Defendant Western Oil.

64.     DLI has been compelled to retain the services of an attorney to prosecute this action and, therefore, DLI is entitled to reasonable attorney's fees, costs and interest as damages of suit incurred herein.

## EIGHTH CAUSE OF ACTION
(Conspiracy to Commit Fraud against all Defendants)

65.     DLI repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

66.     Defendants combined and conspired with each other with the intent to commit the fraud described above for the purpose of unlawfully diverting funds invested by DLI for the purpose of drilling and completing the Federal Scott Well to the personal use of one or more of the Defendants.

67.     As a direct and proximate result of Defendants' conspiracy to defraud DLI, , DLI has been harmed in an amount in excess of [$2,000,000.00.]

- 12 -

US_ACTIVE\122639514\V-2

Attachment #1, Page 12 of 14

SEC-BOLM-E-0000037

**2020BLM02397-R029**

68.     Due to Defendants' conspiracy to commit fraud, Plaintiff is an entitled to award of punitive damages to punish Defendants to make an example of Defendants.

69.     DLI has been compelled to retain the services of an attorney to prosecute this action and, therefore, DLI is entitled to reasonable attorney's fees, costs and interest as damages of suit incurred herein.

WHEREFORE, PLAINTIFF PRAYS FOR
THE FOLLOWING RELIEF AGAINST DEFENDANTS:

1.     For Declaratory Relief as set forth in Plaintiff's First Claim for Relief

2.     For Damages against Western Oil in an amount greater than [$2,000,000.00] as a result of Western Oil's breach of contract, breach of implied covenant of good faith and fair dealing, and fraud.

3.     For Damages in an amount of greater than [$2,000,000] against all Defendants as a result of Defendants' unjust enrichment, conversion and conspiracy to commit fraud.

4.     Punitive Damages against all Defendants for fraud and conspiracy to commit fraud;

5.     For an award of pre-judgment interest, as well as reasonable attorneys' fees as both normal and special damages, and other costs; and

6.     For such other and further relief that this Court deems just and proper.

*[Signature Page Follows]*

- 13 -

**Attachment #1,  Page 13 of 14**

**2020BLM02397-R029**

1 | Dated: November ____, 2022               DENTONS US LLP

2

3 |                                 By:    */s/ Barry F. Cannaday*
                                          Barry F. Cannaday (*Pro Hac Pending*)
4 |                                        2000 McKinney Avenue
                                          Suite 1900
5 |                                        Dallas, Texas  75201-1858
                                          Telephone: (214) 259-1855
6 |                                        Facsimile:   (214) 259-0910

7 |                                        Nick Janda (*Pro Hac Pending*)
                                          4655 Executive Drive, Suite 700
8 |                                        San Diego, California  92121
                                          Telephone: (619) 699-2515
9 |                                        Facsimile:   (619)

10 |                                       Attorneys for Plaintiff Digital Licensing, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -

**Attachment #1,  Page 14 of 14**

SEC-BOLM-E-0000039