# Exhibit A

Michael E. Welsh (Massachusetts Bar No. 693537)
welshmi@sec.gov
Casey R. Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel: (801) 524-5796

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 2:23-cv-00482-RJS |
| vs. | |
| DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, | **RECEIVER JOSIAS N. DEWEY'S DECLARATION IN SUPPORT OF SEC'S MOTION TO CLARIFY TEMPORARY RECEIVERSHIP ORDER**<br><br>Chief Judge Robert J. Shelby |

an individual; BW HOLDINGS, LLC
(d/b/a the "FAIR PROJECT"), a Utah
limited liability company; BRENDAN
J. STANGIS, an individual; and
MATTHEW D. FRITZSCHE, an
individual,

Defendants,

ARCHER DRILLING, LLC, a
Wyoming limited liability company;
BUSINESS FUNDING SOLUTIONS,
LLC, a Utah limited liability company;
BLOX LENDING, LLC, a Utah
limited liability company;
CALMFRITZ HOLDINGS, LLC, a
Utah limited liability company;
CALMES & CO, INC., a Utah
corporation; FLAHERTY
ENTERPRISES, LLC, an Arizona
limited liability company; IX
VENTURES FZCO, a United Arab
Emirates company; PURDY OIL,
LLC, a Nebraska limited liability
company; THE GOLD COLLECTIVE
LLC, a Utah limited liability company;
and UIU HOLDINGS, LLC, a
Delaware limited liability company,

Relief Defendants.

## DECLARATION OF JOSIAS N. DEWEY

1.      My name is Josias N. Dewey. I am over 18 years of age and competent to testify to

the matters detailed in this declaration. I am a partner at Holland & Knight, LLP ("HK") in Miami,

Florida.

2. I have practiced law since 1998 and am a member in good standing of the State Bar of Florida. I previously served as the court-appointed Receiver for Titanium Blockchain Infrastructure Services, Inc. in *Securities and Exchange Commission v. Titanium Blockchain Infrastructure Services, Inc.*, No. 18-cv-4315 (C.D. CA 2018).

3. On July 28, 2023, I was appointed as Temporary Receiver in the above captioned matter over Defendant Digital Licensing, Inc. and its affiliates and subsidiaries (hereinafter, "DLI" refers to Digital Licensing, Inc. together with its affiliates and subsidiaries, and "Digital Licensing, Inc." refers solely to that singular entity). *See* Temporary Receivership Order, *SEC v. Digital Licensing, Inc.*, No. 23-cv-00482 (D. Utah), ECF No. 10 (hereinafter "OAR"). The terms "affiliates" and "subsidiaries" are not defined in the OAR.

4. Based on my and my team's efforts to date, summarized below, each of the following entities is directly owned, managed, operated and/or controlled by one or more of Defendants Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, and Roydon B. Nelson (collectively, the "DEBT Council Defendants"):

    **A.** Relief Defendant Blox Lending, LLC ("Blox")

    **B.** Relief Defendant Business Funding Solutions, LLC ("BFS")

    **C.** Relief Defendant The Gold Collective, LLC ("Gold Collective")

    **D.** Relief Defendant UIU Holdings, LLC ("UIU")

    **E.** Digital Commodity House Entities

5. Prior to the imposition of the Receivership, the DEBT Council Defendants managed, operated, and controlled Digital Licensing, Inc., the primary entity through which the sale of DEBT Box software licenses occurred, as described more fully in the SEC's complaint. Furthermore, the DEBT Council Defendants used each of the entities listed above in furtherance

of consolidated business activities for or on behalf of Digital Licensing, Inc., including the sale of DEBT Box licenses, the commingling of investor proceeds, and transactions with entities that purportedly supported the various "projects" listed on the DEBT Box website.

## SUMMARY OF RECEIVER'S EFFORTS TO DATE

6.     HK advises and assists me in carrying out my duties and responsibilities set forth in the OAR. With my authority, HK retained qualified vendors to assist in, among other things: (a) data collection and preservation; (b) tracing of DLI cryptocurrency and other digital asset (hereinafter "Digital Assets") transactions; and (c) tracing of various DLI financial transactions (hereinafter "Fiat Assets"), all for the purpose of providing information to HK in connection with its ability to provide legal advice to me in my capacity as Receiver.

7.     Over the last four weeks, HK, its vendors, and I (collectively "Team") have carried out a number of actions designed to, among other things, (a) understand the nature of DLI's business operations; (b) understand the roles and relationships of DLI and the DEBT Council Defendants vis-à-vis other Defendants, Relief Defendants, and third parties; and (c) marshal relevant information, records, and assets belonging to the Receivership Estate ("Estate").

8.     This work has involved (a) speaking with more than 20 relevant individuals; (b) analyzing financial transactions from 28 bank accounts and payment processors; (c) analyzing and tracing myriad digital asset transactions across scores of digital wallets; (d) speaking or attempting to speak with counsel for various Defendants and Relief Defendants; (e) conducting public records research; (f) securing or attempting to secure DLI's books and records; and (g) securing or attempting to secure DLI's assets in their varying forms and locations. This work has illuminated an interconnectedness of many of the parties in this action, including notably between Digital Licensing, Inc. and the entities set forth in ¶ 4 above, whom together carry out the operations alleged in the SEC's complaint.

#227551078_v1

9.      Through these efforts, which are ongoing, the Team has developed significant evidence showing, among other things: (a) consolidation of various entity email accounts—including Digital Licensing, Inc. email accounts and various accounts for entities listed in ¶ 4 above —into an umbrella email domain controlled by the DEBT Council Defendants; (b) common ownership and operation of the entities described herein, including a shared physical office location and employees; (c) DLI's extensive Digital Asset transactions, which occurred on a scale and magnitude greater than alleged in the SEC's complaint; (d) extensive commingling of Fiat Assets traceable to DEBT Box investor proceeds among Digital Licensing, Inc. and the above-named entities; (e) several joint legal representations involving individual and entity Defendants and Relief Defendants on the one hand, and Digital Licensing, Inc. on the other, that have presented ongoing challenges to obtaining DLI case files; and (f) several ongoing and time sensitive litigations in which Digital Licensing, Inc. is not itself named as a party but in which other Defendants and Relief Defendants in this action are named, including entities identified in ¶4 above.

10.     Although the Team's analysis continues, my personal observations herein are based on evidence obtained and verified over the last four weeks. Where appropriate, I have attached exhibits to support the statements herein.

**Websites and Emails**

11.     On August 2, 2023, the Team interviewed Defendant Roydon Nelson. During that interview, Mr. Nelson volunteered certain information about DLI and informed the Team that a service provider (the "Provider") hosted numerous domains, websites, and data for numerous entities, including Digital Licensing, Inc.

12.     The same day, the Team contacted the Provider, shared a copy of the OAR and gave the Provider time to review that document, pose questions, and discuss and understand my role and responsibilities as Receiver for DLI. The Team communicated with Provider on numerous occasions that day and, among other things, the Provider informed the Team that he communicated with Mr. Nelson that morning, and Mr. Nelson encouraged the Provider to cooperate with me, as the Receiver, and the remainder of the Team. The Team requested access to all of DLI's information in the Provider's possession or control, and relied on the Provider to use his own discretion and experience in identify the data belonging to DLI. Among other things, the Provider produced an Excel spreadsheet identifying the various email domains he serviced for DLI at the direction of Mr. Nelson and Mr. Brannon, whom the Provider understood were involved in the operation and oversight of DLI. A copy of that spreadsheet is attached hereto as **Exhibit 1**.  The domains Provider believed to be DLI's, each with individual email accounts and data repositories, included:  (a)  UniversalDev.com;  (b)  Digitallicensinginc.com;  (c)  Archer-drilling.com;  (d) Theminingcollective.com;  (e)  Igniseng.com;  (f)  Universalresourceestimate.com;  (g) aemghana.com; (h) resonancefrequencyexploration.com; and (i) Digitalcommodityhouse.com. Notably, most email accounts associated with these domains were setup to forward to and consolidate in specific email accounts at universaldev.com.

13.     At the Team's request, the Provider terminated others' existing administrative access, provided administrative access to the Team to download encrypted and other data belonging to DLI, and removed dual-factor authorization on certain accounts. The data was preserved but not accessed prior to implementing filtering and review protocols.

14.     The Team implemented a protocol designed to limit the Team's access to materials in the first instance to those documents clearly associated with Digital Licensing, Inc., while

6

preserving but not accessing other materials. As detailed further below, a review of various communications within the Digital Licensing, Inc. domain revealed that several of the DEBT Council Defendants used various other email accounts to conduct business for and on behalf of Digital Licensing, Inc.

15.     Moreover, under Mr. Nelson and Mr. Brannon's direction, the Provider also controlled domain access for other websites associated with DLI and DEBT Box— www.DigitalCommodityHouse.com and www.DigitalLicensingInc.com. The Provider granted proper administrative credentials to the Team, which took control of those websites and redirected those landing pages to the Receiver's website at www.DebtBoxReceiver.com.

16.     Furthermore, we learned that the Provider did not control the primary website associated with DEBT Box: thedebtbox.com. Rather, that website is hosted by Vercel, Inc. Vercel indicated that the contracting party for hosting services for thedebtbox.com is not Digital Licensing, Inc., and that Vercel will not reveal the contracting party that acted on Digital Licensing, Inc.'s behalf without a subpoena, more specific OAR, or other order of this court.

17.     Without access to thedebtbox.com, the Team is unable to access critical information such as customer lists, email accounts, and books and records relating to DLI.

**Bank Records and Fiat Asset Tracing**

18.     Following my appointment, the SEC provided the Team with bank statements and supporting source material for 28 bank accounts and payment processors owned or controlled by various Defendant and Relief Defendant entities. These records are not a comprehensive collection of the Fiat Asset transactions related to DLI and the other conduct alleged in the SEC's complaint. However, they provide a detailed assessment of the flow of funds coming into Digital Licensing, Inc. bank accounts, along with detailed transaction data for other parties.

19.     According to various bank records provided by the SEC, including bank signature cards and statements, Defendants Jason Anderson (Blox, BFS, and UIU), Jacob Anderson (Blox and UIU), and Roy Nelson (Gold Collective) had signatory authority and/or controlled the bank accounts for Blox, BFS, Gold Collective, and UIU.

20.     To date, based upon a review of these bank records, publicly available blockchain records, and documents provided by Defendants and third parties, we estimate that there have been more than $20 million in Fiat Asset transactions and more than $110 million in Digital Asset transactions associated with the sale of DEBT Box licenses between November 2021 and August 2023.

21.     As detailed further below, between March 22, 2021 and May 30, 2023, over $17 million in Fiat Assets were transferred from accounts in Digital Licensing, Inc.'s name to accounts in the name of, among others: (a) BFS; (b) Blox; and (c) Gold Collective.



*Figure 1: Digital Licensing, Inc. transactions to Relief Defendants*

#227551078_v1

22.     Moreover, as detailed further below, several asset purchases and financial transactions associated with various entities purportedly associated with DLI's DEBT Box tokens were made from accounts in the name of entities other than Digital Licensing, Inc., including (a) BFS; (b) Blox; (c) Gold Collective; and (d) UIU.

23.     Finally, several million dollars of DLI assets have been transferred to banks overseas, limiting the Receiver's ability to marshal these assets without time intensive and costly repatriation efforts.

**Digital Asset Tracing**

24.     DLI operates under the DEBT Box brand and purports to be a "software" company wherein a user can purchase a "node license" that "mines" certain cryptocurrency tokens that are purportedly backed by real-world commodities. A copy of thedebtbox.com home page, containing these representations, is attached hereto as **Exhibit 2**.

25.     To better understand DLI's DEBT Box business, the Team performed several investigative tasks, including: (a) interviewing several of the Defendants; (b) interviewing DEBT Box service providers; (c) analyzing wallet addresses disclosed by Defendants and other third parties[1]; (d) examining DEBT Box-related smart contracts; (e) investigating the primary blockchain-based markets for DEBT Box-related tokens; (f) reviewing information made public by Defendants on thedebtbox.com and other sources; (g) analyzing interactions between addresses associated with DLI and DEBT Box; (h) interviewing DEBT Box investors; and (i) reviewing information submitted by DEBT Box investors via the DEBT Box Receiver's website. What follows is my preliminary assessment of the DEBT Box business.

---

[1] The Debt Council Defendants confirmed the ownership of a list of wallet addresses. This list of addresses is available to the Court upon request.

#227551078_v1

26.     The blockchain components of the DEBT Box business consist of (a) "project tokens," (b) the DEBT token, and (c) markets for exchanging between these tokens.

27.     Each project token is associated with a purported real-world business or commodity project, including real estate, oil and gas, exotic vehicles, gold, beverage distribution, natural gas, and satellite technologies. Each project token has its own smart contract and several blockchain addresses associated with the project. The DEBT Box business minted a large batch of each project token to be used as token rewards for DEBT Box investors.



*Figure 22: DEBT Box Project Tokens (screenshot from TheDebtBox.com home page).*

28.     The DEBT Box token holders can exchange their tokens on PancakeSwap, a decentralized cryptocurrency exchange. The market is limited: project tokens may only be

exchanged for DEBT tokens. Thus, the DEBT token is a medium of exchange for the different DEBT Box project tokens.

29.     The DEBT token itself may then be traded for project tokens or for BSC-USD[2]— again, using PancakeSwap.[3]

30.     The DEBT Box business earns revenue, in part, by selling DEBT Box "licenses" to investors. These licenses grant DEBT Box investors the right to accumulate project tokens. DEBT Box investors' licenses and their project token rewards are not reflected on the blockchain; instead, DEBT Box investors' licenses and accumulated project tokens are accounted for using off-chain[4] software.

31.     DEBT Box investors wishing to withdraw value from the DEBT Box business (a) "withdraw" their project token rewards from their off-chain DEBT Box account to their own on-chain, privately-controlled wallet; (b) exchange the project tokens for DEBT tokens; and (c) then sell DEBT tokens for BSC-USD, typically on PancakeSwap.

32.     Fully understanding the DEBT Box business is not readily apparent from blockchain information alone. Identifying the persons or entities controlling an address— sometimes called attribution—requires additional information and analysis. For example, entities may publish an address to which investors or consumers should send digital assets as part of an investment or sale agreement, as Digital Licensing, Inc. did in the DEBT Box Lite papers.  *See* **Exhibit 3.** This indicates that the entity likely controls that address—either directly or indirectly through agents. Additionally, certain on-chain transaction patterns may indicate a common control

---

[2] BSC-USD is a Binance stablecoin token pegged to the U.S. Dollar. A stablecoin is a token whose value is fixed to a predetermined currency.
[3] The Team identified several smaller markets for DEBT tokens, but the preliminary analysis shows that these other markets have negligible trading volumes.
[4] Off-chain refers to information that is not embedded in the blockchain and thus only available to the custodians of that information. Information available on a blockchain is referred to as "on-chain."

person orchestrating related transactions, permitting attribution of clusters of addresses to one set of persons or entities. To help conduct this analysis, HK employed a vendor qualified to conduct digital asset analysis and tracing.

33.     Some Defendants and Relief Defendants have disclosed certain wallets under their direct or indirect control. This information, combined with information Defendants and Relief Defendants have disclosed publicly—and analysis of the interactions between these wallets—has allowed me to identify a preliminary set of wallets that belong to the Debt Box business and thus the Receivership Estate. The Team also identified a set of the Debt Box business wallets as being controlled by Blox, which are detailed below.

34.     Using blockchain and conventional financial transaction data, the Team calculated an approximate amount of revenue realized by the DEBT Box business via DEBT Box license sales. Investors purchased at least <u>$130 million</u> of DEBT Box licenses between November 2021 and August 2023, primarily using digital assets to make their purchases. A more accurate amount of DEBT Box investor investments will only be possible with full access to DLI's books and records.

35.     To date, the Team has identified more than $5 million USD equivalent presently in various digital asset wallets related to the DEBT Box business.

36.     The DEBT Council Defendants have informed the Team that several wallets are controlled by code hosted on Amazon Web Services, causing the wallets to engage in automated transactions within the DEBT Box business. For example, one DLI-controlled wallet has engaged in over 2,100 transactions since August 3, 2023. *See* fig. 3. These automated transactions are dissipating Receivership Estate assets. This is because every blockchain transaction has fees assessed in token form (known as "gas"), and thus each transaction causes assets to dissipate.

Presently, the Team has been unable to obtain the necessary underlying information and access to stop this from happening.



*Figure 3: Sample of automated DEBT Box transactions. (Data derived from www.bscscan.com)*

37.     Further, blockchain transactions indicate that assets belonging to DLI were transferred after the Court issued its Temporary Restraining Order. On August 17, 2023, nearly two weeks after the asset freeze went into effect, an address, confirmed by Defendants to be owned by DLI, transferred 195.53 BNB ($49,000 USD equivalent), $10,102.53 BSC-USD and $1,000 USDC to addresses beginning in 0x5eCa and 0x0Ab0. The 0x5eCa address immediately transferred 4.39 BNB ($960 USD equivalent), $1,000 USDC, and $10,163.74 BSC-USD to Binance, an offshore digital asset exchange.



*Figure 44: Sample transactions from DLI-controlled address to Binance. (Data derived from www.bscscan.com)*

38.    Also, between August 17 and 18, 2023, the 0x0Ab0 address transferred 1,010.98

BNB    ($220,000    USD    equivalent)    to    a    newly    created    wallet.



*Figure 55: Transactions showing the interactions between the REV token and address 0x0Ab0. (Data derived from www.bscscan.com)*

**Ongoing Lawsuits and Lack of Access to Legal Files**

39.    Research of ongoing and recently resolved litigation revealed more than two dozen

active and recently closed lawsuits involving numerous parties in this case, including cases

involving DLI, Blox, and The Gold Collective. Additionally, there are several other pending

lawsuits involving parties to this action that the Team is currently evaluating to assess in terms of

their relationships to Digital Licensing, Inc.

40.    Pursuant to Section VI of the OAR, we are actively taking steps to stay known legal

proceedings in which Digital Licensing, Inc. is a party. The lack of specificity around the phrase

"affiliates and subsidiaries" has made it difficult to determine whether the Receiver can or should

stay other litigations involving parties to this action but in which Digital Licensing, Inc. is not

named as a party. This increases the risk that proceedings involving or impacting Receivership

interests may continue without the Receivership Estate being in a position to protect them, and

such interests may be harmed as a result.

41.    Additionally, the Team aimed to immediately collect all of DLI's legal files,

including communications. Again, given concerns about the scope of the OAR, the Team has been

limited in its efforts to obtain complete legal and case files.

#227551078_v1

42.     We learned that, in addition to other law firms, one large firm ("Firm") provided extensive legal work for Digital Licensing, Inc. and several other Defendants and Relief Defendants, sometimes in the form of joint representations.

43.     Following several discussions with Firm personnel, we learned that Firm has a client number for Digital Licensing, Inc. ("DLI Client Number"). That DLI Client Number includes several matters, including DLI Client Number matters for (a) Blox Lending General Corporate Advice; (b) Western Oil Exploration; and (c) Archer Drilling Contract. Additionally, there is a client matter for "Securities Assessment."

44.     In the Blox Lending General Corporate Advice matter under the DLI Client Number, Firm charged several thousands of dollars in fees for work it performed for DLI, Blox, and other DEBT Box entities:

- "Call with DEBTbox to discuss [. . .], underlying questions, and proposed revisions."

- "Review the DEBT, GROW, and BLGD Lite Papers to assess [. . .] and prepare revisions and open questions for [Attorney's] review and comment."

- "Meet and correspond with [Attorney] re characterization of tokens as securities; begin to review client documents."

- "Conference call with client regarding DebtBox and Black Gold operations"

- "Prepare for and participate in internal conference regarding BLOXLending, thedebtbox, and Black Gold Rewards"

- "Begin drafting privacy policy for thedebtbox"

- "List out all of the necessary considerations from the discussion with Digital Licensing, Inc., as well as all additional terms/considerations were requested via email"

- "Meet regarding Privacy & Terms Discussion / Digital Licensing, Inc."

- "Analyze Digital Licensing Data Protection Officer Letter and Policy"

- "Call with Digital Licensing to discuss [….] and specifics needed to complete an initial draft"

The below Figure is an example of one such invoice from the Firm to DLI for legal work performed for both DLI and Blox.



Digital Licensing, Inc.
30 N Gould St., Ste. N
Sheridan WY 82801
United States

April 26, 2022

Invoice No. 2512115

Client/Matter: 15809834-000001

Blox Lending General Corporate Advice

Payment Due Upon Receipt

*Figure 66: Excerpt of Firm Invoice.*

45.     Simultaneously with its representation of Digital Licensing, Inc., Firm has represented or continues to represent Defendants Blox, BFS, UIU, Jason Anderson, and Jacob Anderson in various matters.  The Team and Firm are in ongoing conversation about the best and most efficient method for ensuring receipt of necessary materials.

46.     The Team's identification and collection of complete files from a variety of law firms has been complicated, in part, by concerns about what, exactly, constitutes DLI case files. The lack of specificity associated with the term "affiliates and subsidiaries" has directly impacted the Team's ability to obtain these files to carry out the responsibilities set forth in the OAR.

### DEBT BOX AND THE DEBT COUNCIL
### EVIDENCE OF AFFILIATES AND SUBSIDIARIES

**Blox Lending, LLC**

47.     According to evidence reviewed and analyzed by the Team, Blox plays a critical role in the operational and financial aspects of DLI's business.

48.     Defendant Jason Anderson is Blox's registered agent, sole managing member, and authorized signatory for all five of Blox's bank accounts (with his brother Defendant Jacob Anderson being the only other authorized signatory). *See* Composite **Exhibit 4**.



*Figure 7: Excerpt of Blox Application for Account 8442*          06985

49.      Blox's principal place of business is in the same building as Digital Licensing, Inc. *See* fig. 7; *infra* ¶¶ 69, 85.

50.      The SEC provided the Team with records for five Blox bank accounts. These records include Blox's fiat transactions spanning the period from August 17, 2020 to June 21, 2023. During that period, based on those bank records provided by the SEC, Blox received more than $20 million in deposits. Although our analysis is ongoing, based on the same records, at least 66% of the deposits into Blox's accounts during that period came from bank accounts in the name of: (1) Digital Licensing, Inc.; (2) Defendant iX Global; and (3) UIU. At least an additional 17% of deposits during this period came from non-party Green Fusion, LLC, a Utah LLC managed by Defendant Jacob Anderson—with an address in the same office building as Digital Licensing, Inc., Blox, and others)—and non-party Profit Vault, LLC, a Utah LLC managed by Defendant Matthew Fritzsche, his brother, Ryan Fritzsche, non-party Emily Tabor-Eads,[5] and Gordon Anderson, Defendants Jason and Jacob Anderson's father.

---

[5] Ms. Eads appears to be an active employee and representative of DLI and several of the other entities described in this declaration.



*Figure 8: Source of Blox deposits.*

51.    Banking records provided by the SEC coupled with explanations provided by Defendants, suggest Blox played a direct role in connection with receipt of proceeds tie to DEBT Box license sales. For example, on February 14, 2023, pursuant to Blox's banking records, Defendant iX Global wired nearly $3.1 million directly to Blox. According to information provided by Defendants, iX Global paid Blox in connection with the purchase of DEBT Box licenses for iX Global's subsequent sale to investors. *See* **Exhibit 5.**

| 8 | Blox Lending | | | | |
|---|---|---|---|---|---|
| 9 | | 2/14/2023 | $3,099,317 | Bank of America 8643 | Receiving Bank was an America First Credit Union Account. |

*Figure 9: iX Global/Blox transaction excerpt.*

52.    Furthermore, banking records provided by the SEC indicate that Blox provided $1.15 million to Digital Licensing, Inc. in two financial transactions, occurring on June 8, 2022 and June 16, 2022. Digital Licensing, Inc. then transferred a significant portion of these funds to Purdy Oil for the purported purchase of three oil rigs. *See* **Exhibit 6**. More specifically, with regard to the June 16, 2022 transaction, on that date Blox transferred $900,000 to Digital Licensing, Inc.

One day later, on June 17, 2022, Digital Licensing, Inc. sent $900,000 to Purdy Oil with the transaction description "NEBRASKA LOW."  Although the Team has not been able to establish which party owns the rigs, counsel for the DEBT Council Defendants has claimed that these rigs belong to Digital Licensing, Inc. and are part of the Receivership Estate. *See* **Exhibit 7.**

53.     Moreover, on March 10, 2023, Digital Licensing, Inc. provided $500,000 to Blox. Six days later, Blox transferred these funds to LM Investment Holdings, LLC for use in connection with the acquisition of Lazy Magnolia Brewery—an enterprise purportedly related to the DEBT Box BEV token.



*Figure 10: Digital Licensing, Inc. wire to Blox and Blox wire to LM Investment Holdings, LLC*

54.     Blox also controlled or was integrally involved in certain aspects of the on-chain DEBT Box business.

55.     Indeed, Blox itself had its own DEBT Box project token:



*Figure 1111: Blox Token symbol from thedebtbox.com.*

56.     Defendants disclosed several digital asset wallets that belong to Blox, and the Team's analysis evidences that these wallets—and others controlled by Blox—served critical roles in the DEBT Box business.

#227551078_v1

57. For example, based on these disclosures and public blockchain data, BLOX controls the address receiving DEBT Box investor proceeds derived from NATG project token license sales.



*Figure 1212: Transactions showing Blox-controlled wallet receiving NATG license revenue. (Data derived from www.bscscan.com)*

58. Upon receipt of the license proceeds, Blox then used same to purchase tokens from the PancakeSwap liquidity pool.



*Figure 1313: Transactions showing Blox purchasing DEBT tokens from PancakeSwap. (Data derived from www.bscscan.com)*

59. Indeed, Blox-controlled wallets received over $22.4 million of USD equivalent traceable to DEBT Box investor proceeds.[6] Specifically, Blox addresses received DEBT Box investor proceeds associated with the GROW, NATG, XPLR, ALUM, BEV, BLOX, and DRIP project tokens.



---

[6] Defendants have self-identified this wallet as belonging to Blox.

#227551078_v1

*Figure 1414: Exemplar transactions showing Blox receiving funds from the NATG Payments Wallet. (Data derived from www.bscscan.com)*

60.    Moreover, based on materials provided by the DEBT Council Defendants, Blox was the primary liquidity provider for the DEBT token—the central token of the DEBT Box business. Blox owns 99.93% of the tokens associated with the DEBT token/BSC-USD liquidity pool.



*Figure 1515: Ownership distribution of the BSC-USD/DEBT Liquidity Pool. (Data derived from www.bscscan.com)*

61.    In addition to being the primary source of liquidity for DEBT Box investors, BLOX used assets contributed by DEBT Box investors to purchase nearly $22.4 million of DEBT tokens out of the DEBT liquidity pool.

62.    Blox was also involved in transactions relating to other aspects of the DEBT Box business, including funding certain project tokens or facilitating certain project tokens' liquidity pools.



*Figure 16: Excerpt of Blox and GROW project token transactions. (Data derived from www.bscscan.com)*

21

*Figure 167: Excerpt of Blox and ALUM project token and liquidity pool transactions. (Data derived from www.bscscan.com)*

63.      Furthermore, personnel using Blox email addresses worked on behalf of the DEBT Box business to list the DEBT token on different exchanges and market-making platforms, including MEXC (**Exhibit 8**) and FlowDesk (**Exhibit 9**).

64.      Moreover, personnel using Blox email addresses were involved in authoring and facilitating the publication of DEBT Box business marketing and investments materials sent to current and prospective DEBT Box investors. *See* **Exhibits 10 - 12.**

**<u>Business Funding Solutions, LLC</u>**

65.      According to evidence reviewed and analyzed by the Team, BFS plays a critical role in the operational and financial aspects of Digital Licensing, Inc.'s business.

66.      DEBT Council Defendant Jason R. Anderson is BFS's registered agent, sole managing member, and authorized signatory for its bank account. *See* **Exhibit 13**; *See* **Exhibit 14**.

67.      In a February 6, 2023 email from DEBT Council Defendant Roy Nelson to a Business Services Portfolio Manager at Mountain America Credit Union ("MACU"), Nelson provided a description of DLI's business. In that description he noted the following: "Revenues are primarily generated through the sales and management of software licenses. This company frequently interacts with The Gold Collective, Business Funding Solutions (a sales and marketing

company), Blox (a commercial lending organization) and Menxons (a joint venture partner in Africa)." *See* **Exhibit 15.**



*Figure 18: Digital Licensing Inc. Address Excerpt*

68.     Attached to the same email, Nelson provided a corporate resolution to open a bank account. Nelson provided the following address as Digital Licensing, Inc.'s primary business address: 13894 South Bangerter Parkway Suite 100 Draper Utah 84020, (**Exhibit 16)**—the same address used in an invoice addressed to "The DEBT Box" (**Exhibit 17).**

*Figure 19: BFS Bizpedia Address Excerpt68*

69.     BFS, UIU (*see infra* ¶ 8585), and Blox (*see supra* ¶ 480) use the same building as Digital Licensing Inc.'s primary place of business (*supra* ¶ 6768). 85068

70.     The SEC provided the Team with records for one BFS bank account. These records include BFS's fiat transactions spanning the period from May 31, 2018 to May 4, 2023. During that period, BFS received more than $27 million in deposits. More than 60% of the deposits in BFS's accounts during this period came from (1) Digital Licensing, Inc.; (2) UIU; (3) Gold Collective; and (4) Blox.



*Figure 170: Sources of BFS deposits.*

71.     Notably, from November 4, 2021 to November 4, 2022, Digital Licensing, Inc. contributed at least $10,042,761.04—or approximately 95%—of the funds deposited into BFS's bank account. During this period, aside from six deposits with a collective value of less than $29,000, the only non-Digital Licensing, Inc. deposit was from Gold Collective for $499,400.00.

72.     Records from Defendant iXGlobal show iXGlobal transmitted $400,000 in direct payments to BFS between March 29, 2023 and June 9, 2023 to obtain Debt Box licenses. *See* **Exhibit 5.**

73.     Overall, 99.9% of the $27 million that flowed into BFS from May 31, 2018 to May 4, 2023, was withdrawn. At least 46% (or nearly $12.5 million) of such withdrawals were directed to UIU and Defendant Jason Anderson.



*Figure 181: BFS withdrawals.*

74.     During the period alleged in the SEC's Complaint, beginning March 2021, the percentage of BFS' withdrawals to UIU and Jason Anderson increases to at least 60% (or approximately $10 million of the total $16.5 million withdrawn during that period).

75.     Furthermore, several transactions from BFS to Jason Anderson include "DEBT Box" in the memo fields, including transactions for legal fees and other work for DLI.

**The Gold Collective, LLC**

76.     According to evidence reviewed by the Team, Gold Collective plays a critical role in Digital Licensing, Inc.'s purported international projects, predominantly in Ghana. These projects appear to include drilling, mining, and farming operations from which DEBT Box investors would indirectly benefit.

77.     According to the company's filings, Gold Collective is a Nevada limited liability company managed by DEBT Council Defendant Schad Brannon. *See* **Exhibit 18**. Moreover, another Debt Council Defendant, Roydon Nelson, is listed on the statements for at least two Gold Collective bank accounts provided by the SEC. *See* **Exhibits 19-20**.

78.     On July 6, 2023, Debt Council Defendant Schad Brannon acted as the representative of both The Gold Collective and Digital Licensing, Inc. when they filed a lawsuit in Nevada state court. *See* **Exhibit 21.**  In the lawsuit, *The Mineral Collective, LLC d/b/a The Gold Collective, LLC, and Digital Licensing, Inc., v. Giuliano,* these plaintiff entities used the same legal counsel and Brannon verified allegations—under penalty of perjury—that he and Debt Council Defendant Roydon Nelson manage both The Gold Collective and Digital Licensing, Inc.  *See id.* ¶ 3 & p. 11. Mr. Brannon further verified that these entities together loaned money to defendants in that case for "general business development activities and to perform work for Plaintiffs' businesses, including but not limited to, digital currency projects, natural resource development projects, and development of new commodity business opportunities with third parties known to the Defendants." *See id.* ¶ 12. Going further, Mr. Brannon verified that The Gold Collective and Digital Licensing, Inc. "are in the mineral location and mining business, and contract with individuals all over the world to further their mining practices" and that they believed defendants in that case would "help promote and grow Plaintiffs' mining interests through local connections, research, developing business systems, and identifying new sources for mining activity." *See id.* ¶ 17.

79.     The SEC provided the Team with records for five Gold Collective bank accounts. These records include Gold Collective's fiat transactions spanning the period from March 13, 2019 to February 14, 2023. During that period, Gold Collective received approximately $8 million in

26

deposits. According to those same bank records, Gold Collective appears to have received at least $3.5 million of that sum in wire transfers from Digital Licensing, Inc, representing more than 44% of Gold Collective's incoming deposits during the period. Of the remaining 55%, at least 13% came from DEBT Council Defendant, Roydon Nelson. The remainder of Gold Collective's deposits, and subsequent outflows, are currently being analyzed.

80.     Furthermore, pursuant to Digital Licensing, Inc.'s bank records, from February 14, 2023 to May 18, 2023, Gold Collective received an additional $952,000 in deposits from Digital Licensing, Inc., bringing total Gold Collective deposits to $4,496,394.30.

81.     This is consistent with internal communications provided by the Defendants describing Gold Collective's operations, whereby they claim that the Gold Collective interests in purported gold and silver projects were to be assigned to DLI. A PowerPoint created by the Debt Council Defendants reveals the Gold Collective was to be purportedly associated with one of the DEBT Box Tokens (Au). *See* **Exhibit 22**.

82.     Once funds were deposited in Gold Collective's bank accounts, they were sent to other parties, including: (a) BFS; (b) Defendant Western Oil Company; (c) Menxons Company Limited; and (d) Defendant Schad Brannon.

## **UIU Holdings, LLC**

83.     According to evidence reviewed and analyzed by the Team, UIU assists Digital Licensing, Inc. facilitate various financial transactions.

84.     According to organizational documents, Defendant Jason Anderson owns 100% of UIU, serves as its registered agent, and is an authorized signatory for UIU's bank accounts (with his brother Defendant Jacob Anderson being the only other authorized signatory). *See* **Exhibits 23-24; Composite Exhibit 25.**

27

85.     According to documentation filed with the IRS, UIU uses the same operating address as BFS (*supra* ¶ 6869) and Blox (*supra* ¶ 480), and within the same building as Digital Licensing, Inc. (*supra* ¶ 67680). *See* **Exhibit 23.**



*Figure 2219: Excerpt of UIU's EIN Application*

86.     The SEC provided the Receiver and his team with bank records for UIU spanning two bank accounts over the period November 13, 2019 to December 5, 2022. These records establish that approximately 34% (or at least $5,451,000.00) of all of UIU's deposits originated from BFS.

87.     Additionally, BFS accounted for nearly 22% (or at least $3,440,116.01) of all of UIU's withdrawals. And although Blox did not make any deposits to UIU during this time, Blox received nearly 47% (or at least $7,427,413.72) of all UIU withdrawals, meaning nearly 70% of all outflows from UIU went to BFS and Blox.[7]

88.     Most of the transactions from October 2020 and onwards, between UIU and BFS/Blox, included transaction descriptions for loans and real estate. Additionally, eleven withdrawals from UIU to BFS were executed via check, signed by Defendant Jason Anderson.

---

[7] Between Digital Licensing, Inc. deposits and UIU deposits, these amounts comprised at least 44% of Blox's deposits between August 17, 2020 and June 21, 2023.

**Digital Commodity House Entities**

89.     The DEBT Council Defendants used several purported entities under the "Digital Commodity House" umbrella to facilitate DEBT Box operations, including Digital Commodity House, LLC, Digital Commodity Software House, FZCO, and Digital Commodity House, FZCO. Collectively, I refer to these entities as "DCH." According to records of the United Arab Emirates Ministry of Economy, Digital Commodity Software House's registration expired on May 30, 2023, and Digital Commodity House, FZCO is active. *See* **Exhibit 26.**

90.     According to materials provided by the Provider, the DCH domain name – digitalcommodityhouse.com – was one of the websites Provider controlled in his work for DLI. Additionally, all DCH emails were consolidated under the umbrella universaldev.com domain detailed above. *See* **Exhibit 1**.



*Figure 2320: Mar. 15, 2023 The DEBT Box Tweet regarding DCH LLC*

91.     Additionally, a review of Digital Licensing, Inc.'s financial transactions reveals two outgoing transfers in 2022, totaling $600,000 to DCH. Immediately following these,

transactions, Digital Licensing, Inc. sent IFZA $5,664 for "company organiza[tion]"[8] and another $1,280.25 for "visa." These two withdrawals from Digital Licensing, Inc. took place on October 26, 2022 and November 18, 2022, respectively.

92.     Furthermore, Defendant Jason Anderson represented in a public interview where he was identified as "The DEBT Box founder" that DLI intended to move its headquarters and operations to Dubai to mitigate the risks of "regulatory uncertainty." *See* D. Michael Vick, *Exclusive Interview with The DEBT Box Founder, Jason Anderson*, YOUTUBE (Oct. 26, 2022), https://youtu.be/x75A6Sxh1qU (at 22:50).

93.     Moreover, materials provided to the Receiver by the DEBT Council identify DCH as the owner of the Treasury account for the DEBT Box tokens. **Exhibit 27.**

94.     Through at least November 30, 2022, and upon information and belief through June 12, 2023, the terms of sale listed on thedebtbox.com provided  that "These DEBT Purchase and License Terms of Sale ("Terms") are entered into by and between you ("you" and "your") and Digital Licensing, Inc. and its affiliates, including DEBT Box (collectively "DEBT", "we," "our" or "us")[.]" *See* **Exhibit 28** (emphasis added).

95.     At a date presently unknown, thedebtbox.com Terms changed and replaced "Digital Licensing, Inc" with "Digital Commodity House, FZCO." *See* **Exhibit 29**.

96.     Notably, the Terms of thedebtbox.com are governed by the laws of the State of Wyoming—where Digital Licensing, Inc. is incorporated—and require disputes to be resolved via arbitration conducted in Wyoming. This has remained the same even after the change of "Digital Licensing, Inc" to "Digital Commodity House, FZCO."

---

[8] Pursuant to its website (https://ifza.com/en/), IFZA is a "leading Free Zone Community in Dubai with world-class infrastructure, state-of-the-art facilities, and business friendly regulations, making it an ideal destination for foreign investors looking to set up and grow their business."

97.     Furthermore, in or around the same time period, the website www.digitallicensinginc.com included the announcement that "Digital Licensing, Inc.  is now Digital Commodity House, LLC."  *See* **Exhibit 30**.

98.     Similarly, through at least May 8, 2023, the Privacy Policy on thedebtbox.com listed "Digital Licensing, Inc., and its affiliates, including DEBT Box" as the owner of the policy. At an unknown date, the Privacy Policy was updated to replace "Digital Licensing, Inc." with "Digital Commodity House, FZCO." There is a disclaimer in terms that states "Our Services are **hosted in the United States and intended for visitors located within the United States**." *See* **Exhibit 31** (emphasis added).

99.     The Team's investigation identified several high value digital asset wallets. Even though the wallets presently contain nearly $2.5 million in USD equivalent digital assets traceable to the sale of DEBT Box licenses, the DEBT Council Defendants stated that these wallets "belong to DCH and not DLI." *See* **Exhibit 32**.

100.    Based on a corporate board resolution for Digital Commodity Software House ("DCSH") on June 22, 2022, Roy Nelson is listed as the Chairman, and both Schad Brannon and Emily Tabor Eads are listed as additional directors. *See* **Exhibit 33**.

101.    Defendants created a PowerPoint presentation for DCSH which graphically portrayed as a de facto holding company for various DLI- and DEBT Box-related projects. *See* **Exhibit 22**.

**Examples of Commingling Amongst Entities**

102.    The following paragraphs summarize one indicative tracing exercise illustrating the commingling and flow of funds by and between various parties detailed herein.  This exercise

#227551078_v1

covers transactions between May 11, 2022 and September 9, 2022 with few intervening transactions.

103.    On May 11, 2022, Digital Licensing, Inc. sent BFS a payment for $2 million, labelled "COMMISS." As detailed in ¶ 7171 above, at least 95% of BFS's incoming deposits during this time frame were from Digital Licensing, Inc.

104.    Twelve days later, on May 23, 2022, BFS sent UIU $2 million with the transaction description "Loan Paydown".

105.    Two days later, on May 25, 2022, UIU sent Blox two transfers of $500,000 each for a total of $1,000,000.00 ("UIU's First Payment"). The descriptions for the transactions include the description "Real Estate."

106.    On or around May 25, 2022, Blox's bank account had a balance of approximately $1,018,406.77. Blox received UIU's First Payment for $1 million, bringing its balance to approximately $2,018,406.77.

107.    Blox then made four withdrawals between May 31, 2022 and June 30, 2022 to three entities and received no deposits. Among the withdrawals, Blox sent (a) $1,150,000.00 to Digital Licensing, Inc.[9] and $250,000.00 to IX Global LLC. Subtracting these withdrawals, another transaction, and associated fees from Blox's beginning balance, the Blox account was left with a balance of approximately $109,178.73 on or around June 30, 2023.

---

[9] Pursuant to ¶ 52, Blox sent Digital Licensing, Inc. $1.15 million, which Digital Licensing, Inc. forwarded $900,000 to Purdy Oil for the purchase of three rigs. As explained in ¶¶103 103 through 112**Error! Reference source not found.**, this $1.15 million likely originated from Digital Licensing, Inc. In effect, these funds were transferred from Digital Licensing, Inc. to BFS, from BFS to UIU, from UIU to Blox, and from Blox ultimately recycled back to Digital Licensing, Inc. as a "loan" for Purdy Oil mining equipment.

108. Without any intervening withdrawals within the UIU account, on July 15, 2022, UIU sent an additional $1,000,000.00 to Blox, with the transaction description "Re Loan" ("UIU's Second Payment").

109. Following the UIU Second Payment, there are four withdrawals totaling $430,849.10 payable to, among other parties, Defendants Purdy Oil, LLC and Western Oil. Following these withdrawals, Blox had a balance of approximately $678,331.68.

110. As detailed in ¶ 7171 above, at least 95% of BFS's incoming deposits during this time frame were from Digital Licensing, Inc.

111. On September 8, 2022, BFS wired $1.13 million to UIU.

112. On September 9, 2022, UIU sent $1 million to Blox—bringing Blox's total account balance on September 9, 2022 to $1,678,331.68.

113. Also on September 9, 2022, Blox sent Metro National Tile Trust $1,089,051.72 with the transaction description "Escrow 93828 Address 1638 E 12500 South, Draper, UT 84020." Salt Lake County records indicate that Defendant Matthew Fritzsche owns this property. This is also the location where the Team interviewed him on August 2, 2023.



*Figure 2421: Blox wire to Metro National Title Trust.*

33

Dated: August 25, 2023.                    Respectfully submitted,


                                           **HOLLAND & KNIGHT LLP**
                                           701 Brickell Avenue, Suite 3300
                                           Miami, Florida 33131
                                           Telephone: 305-374-8500

                                           /s/ Josiah N. Dewey
                                           joe.dewey@hklaw.com

                                           *As Receiver for Digital Licensing, Inc.*

34