# Exhibit 18

DIVISION OF CORPORATIONS AND COMMERCIAL CODE
## BUSINESS SEARCH

# GOLD COLLECTIVE, LLC, THE

Update this Business

**Entity Number:** 12361613-0161
**Company Type:** LLC - Foreign
**Address:** 1810 East Sahara Avenue Suite 425 Las Vegas, NV 89104
**State of Origin:** NV
**Registered Agent:** Roydon Bleak Nelson
**Registered Agent Address:**
1812 W. Sunset Blvd Suite #1-345
St. George, UT 84770

View Management Team

## Status: Active

Purchase Certificate of Existence

**Status:** Active 🟢 *as of 06/22/2021*
**Renew By:** 06/30/2024
**Status Description:** Current
The "Current" status represents that a renewal has been filed, within the most recent renewal period, with the Division of Corporations and Commercial Code.
**Employment Verification:** <u>Not</u> Registered with Verify Utah

## History

View Filed Documents

**Registration Date:** 06/22/2021
**Last Renewed:** 05/16/2023

## Additional Information

**NAICS Code:** 2122 **NAICS Title:** 2122-Metal Ore Mining

<< Back to Search Results

Business Name:

# Exhibit 19



**ZIONS BANK**®

P.O. Box 30709, Salt Lake City, UT 84130-0709

**Statement of Accounts**
Page  1 of 2
This Statement: July 31, 2019
Last Statement: July 28, 2019

Primary Account ███████3585

0037728                    1613-06-0000-ZFN-PG0021-00000

THE GOLD COLLECTIVE VI LLC
ROYDON BLEAK NELSON
400 S 4TH ST STE 102
LAS VEGAS NV  89101-6201

For 24-hour account
information, please contact:

1-800-789-BANK (2265)

**zionsbank.com**

# Exhibit 20



# ZIONS BANK.

P.O. Box 30709, Salt Lake City, UT 84130-0709

**Statement of Accounts**
Page 1 of 2
This Statement: July 31, 2019
Last Statement: July 22, 2019

Primary Account ███ 3593

0037729                    1613-06-0000-ZFN-PG0021-00000

THE GOLD COLLECTIVE LLC
ROYDON BLEAK NELSON
1812 W SUNSET BLVD # 1-345
SAINT GEORGE UT 84770-6565

For 24-hour account
information, please contact:

1-800-789-BANK (2265)

**zionsbank.com**



# Exhibit 21

Electronically Filed
7/6/2023 2:15 PM
Steven D. Grierson
CLERK OF THE COURT

**COMP**
SHAWANNA L. JOHNSON, ESQ.
Nevada Bar No.: 12791
Law Offices of Shawanna L. Johnson, Esq.
3311 S. Rainbow Blvd., Suite 144
Las Vegas, NV 89146
Tel: 702-755-6949
Fax: 702-294-2229
sjohnson@sljlaw702.com
*Attorney for Plaintiffs*

CASE NO: A-23-873510-C
Department 13

EIGHTH JUDICIAL DISTRICT COURT
CLARK COUNTY, NEVADA

| | |
|---|---|
| THE MINERAL COLLECTIVE, LLC, a Nevada Limited Liability Company d/b/a THE GOLD COLLECTIVE, LLC; DIGITAL LICENSING, INC., a Wyoming Corporation, <br><br> Plaintiff(s), <br><br> -vs- <br><br> JOHN ANTRIM GIULIANO, an individual; HOLISTIC HORMONE SOLUTIONS, LLC, a Nevada Limited Liability Company; VIBRANT INVESTMENT GROUP, INC., a Florida Corporation; DOE INDIVIDUALS I through X; ROE ENTITIES I through X, inclusive, <br><br> Defendant(s). | CASE NO. _____ <br><br> DEPT. NO. _____ <br><br> **COMPLAINT** <br><br> **Exempt from Arbitration:** <br>     **Amount in controversy greater than $50,000.00** |

COMES NOW, Plaintiffs The Mineral Collective, LLC d/b/a The Gold Collective, LLC, and Digital Licensing, Inc., (collectively referred to as "Gold Collective" or "Plaintiffs"), by and through their attorney, SHAWANNA L. JOHNSON, ESQ., hereby file this Complaint, and aver and allege the following:

**THE PARTIES**

1.     Plaintiff The Mineral Collective, LLC, is a Nevada Limited Liability Company, with a principal place of business at 1810 E. Sahara Avenue, Suite 425, Las Vegas, NV 89104. The Mineral Collective does business as The Gold Collective, LLC.

LAW OFFICES OF SHAWANNA L. JOHNSON, ESQ.
3311 S. RAINBOW BLVD., SUITE 103
LAS VEGAS, NV 89146

2.      Plaintiff Digital Licensing, Inc. ("DLI"), is a Wyoming Corporation, with a principal place of business at 30 N. Gould Street, Suite N, Sheridan, WY 82801.  The Company is authorized to and does conduct business in Nevada, thereby availing itself of this jurisdiction.

3.      The Gold Collective and DLI are managed by Schad E. Brannon and Roy Nelson.

4.      Defendant John Antrim Giuliano is an individual citizen of the State of Washington, with a home address of 317 112th Street, NE, #254, Bellevue, WA 98004.  He conducts business through his companies, one of which is a Nevada Limited Liability Company, and one of which is a Florida Corporation which does business in Nevada.

5.      Defendant Holistic Hormone Solutions, LLC ("HHS") is a Nevada Limited Liability Company, with a principal place of business at 9525 Hillwood Drive, Suite 100, Las Vegas, NV 89134.  It is managed by Giuliano.

6.      Defendant Vibrant Investment Group, Inc., is a Florida Corporation, with a principal place of business at 100 SE 6th Street, Ft. Lauderdale, FL 33301. It is also managed by Giuliano. The Company does business in Nevada, and has purposely availed itself of the benefits of this jurisdiction, thus making personal jurisdiction over the company fair and just.

7.      The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does I through X and Roe Corporations X through XX, including without limitation, any employer, franchisor, or owner d/b/a thereof, not currently known and therefore not yet named herein, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names.  Plaintiffs are informed and believe, and therefore allege, that each of the Defendants designated as Doe Defendants or Roe Corporations is responsible in some manner for the events and occurrences referred to in this Complaint, and/or owes money to Plaintiffs and/or may be affiliated with the Defendants.  Plaintiffs will ask leave of the Court to amend this Complaint to insert the true names and capacities of Doe Defendants I through X and Roe Corporations X through XX when the same have been ascertained, and to join said Defendants in this action.

**JURISDICTION AND VENUE**

8.      Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

9.      Jurisdiction is proper in this Court, as the acts and complaints alleged herein involve a contract for money loaned and breach thereof, which was executed and/or partially performed in Clark County, Nevada.

10.     Venue is proper in this Court, as the actions and complaints alleged herein involve a contract for money loaned and breach thereof, which was executed and/or partially performed in Las Vegas, Nevada, and as the Defendants are citizens of the State of Nevada or have purposely availed themselves of Nevada law.

**GENERAL ALLEGATIONS**

11.     Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

12.     This Complaint involves Plaintiffs' suit for breach of contract related to money loaned to Defendants and each of them to for general business development activities and to perform work for Plaintiffs' businesses, including but not limited to, digital currency projects, natural resource development projects, and development of new commodity business opportunities with third parties known to the Defendants.

13.     On or about October 22, 2021, Plaintiffs entered into a loan transaction with Defendant Giuliano on his own behalf, and on behalf of his companies Vibrant Investment Group, Inc., and Holistic Hormone Solutions, LLC.

14.     Plaintiffs loaned a total of $153,000.00, which was wired into the accounts of all three Defendants as follows:

| Date | Amount | Entity | Wire Confirmation |
|---|---|---|---|
| 10/22/2021 | $3,000.00 | Holistic Hormone Sol. | 2021202200004039 |

3

| 12/20/2021 | $71,000.00 | Vibrant Invest. Group | 2021122000000196 |
| 12/20/2021 | $71,000.00 | John Giuliano | 2021122000007803 |
| 4/7/2022 | $5,000.00 | Holistic Hormone Sol. | 2022040700001534 |
| 4/15/2022 | $3,000.00 | Holistic Hormone Sol. | 2022041500007100 |

15.    Defendant Giuliano indicated that he would use the money, along with his companies, for general business development to build his businesses and also to aid in building Plaintiffs' businesses as well.

16.    Defendants accepted the money as loans, and agreed and became bound to pay back the amounts loaned.

17.    Plaintiffs are in the mineral location and mining business, and contract with individuals all over the world to further their mining practices.  Defendants agreed to be bound by the promise to repay, and represented that they had the tools and strategy to help promote and grow Plaintiffs' mining interests through local connections, research, developing business systems, and identifying new sources for mining activity.

18.    Defendants did not perform as expected.

19.    The loans, however, were not based on whether Defendants performed, or not, and were to be repaid regardless of the outcome.

20.    Despite numerous communications between the parties, and Defendants' promises to repay, no payment has been made.  Thus, the entirety of the $153,000.00 is outstanding.

21.    Plaintiffs caused to be sent a Demand of Repayment letter on February 15, 2023, as a last attempt to have Defendants make arrangements to repay the debt.

22.    Defendants did not respond to the letter, and have refused further communications.

4

23.     Therefore, this lawsuit is necessary for Plaintiffs to collect their money, along with interest as permitted, and attorney's fees and any other consequential damages.

24.     Given that Defendants have never repaid any of the loaned funds, and have stopped communicating altogether, there is a reasonable claim that Giuliano, on his own behalf and that of his companies, fraudulently misrepresented his intentions with respect to the use of funds and his ability to deliver on his business development promises.

25.     Giuliano did not provide any definitive proof of his efforts and activities, and did not provide progress updates, written correspondence, or any deliverables to justify his work or efforts with the loan money.

26.     Plaintiffs believe Giuliano misrepresented his intentions and capabilities. Specifically, he promised to develop multiple business opportunities with companies in Nevada, Texas, Louisiana, Arizona, Peru, and California.

27.     He promised to connect the managers and CEOs of these projects in these jurisdictions with Plaintiffs' businesses, thereby growing profitable lines of business such as natural gas and oil leases, petrol products, securities and credit facilitation, tokenization of assets, real estate and project financing, software mining licenses, cargo shipping, and acquisitions of oil fields.

28.     He did not deliver on any of it.  He did not make single connection or project in any of the aforementioned jurisdictions or with any of the specific business partners with which he described as having personal connections.

29.     His ultimate lack of communication or delivery of any useful work, along with non-payment of any of the funds, is a strong indicia of fraud and intentional misrepresentation.

30.     It appears that at the time he borrowed the money, he did not intend to use any of the money for legitimate purposes, and did not intend to pay back the money.

31.     Instead, he used the money to travel, staying in 4 star and 5 star hotels pretending to conduct business development activities when in fact he was simply funding an international lifestyle taking trips sometimes with his girlfriend Vanessa.

32.     Upon information and belief, he traveled with his girlfriend for personal pleasure to locations such as Iceland, Fiji, Dubai, Cypress, Monaco, Ireland, Las Vegas, Los Angeles, New York, and Miami, just to name a few.

33.     As collection efforts stepped up over the last several months, Giuliano made empty promises to repay, only to eventually cut off all communications with Plaintiffs.

34.     Plaintiffs are therefore entitled to compensatory damages for the amount loaned, plus special and/or punitive damages for fraud and intentional misrepresentation.

35.     Plaintiffs have been harmed by Defendants' actions, in that they are without the use of their money, and have no reasonable means outside of the legal process to collect their damages.

36.     Plaintiffs bring this lawsuit to be vindicated, to be made whole, and to recover their damages and financial outlays, including interest, attorney's fees, and costs.

37.     As a result of the Defendants' actions, Plaintiffs have been required to retain the services of the undersigned to prosecute this action and to seek reimbursement for the damages they have suffered therefrom, in an amount to be determined at trial, but in no event less than $15,000.00.

//

//

## FIRST CLAIM FOR RELIEF
Breach of Contract – All Defendants

38.   Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

39.   Defendants borrowed $153,000.00 in or about October 2021, agreeing to repay the amounts in full.

40.   Plaintiffs performed under the contract and wired the money to Defendants on the dates set forth herein.

41.   Defendants breached the Agreement without justification and have refused to repay any amounts.   Defendant did not provide any deliverables and failed to make any of the promised business connections.

42.   Defendants also breached the Agreement by not using the money for the intended purpose of business development for Plaintiffs' benefit, and instead used the money for personal travel and enrichment.

43.   Defendants have cut off all contact and have made no efforts to repay.

44.   Plaintiffs have been damaged by Defendants' actions, which are the actual and proximate cause of said damages.

45.   As a result of the Defendants' actions, Plaintiffs have been required to retain the services of the undersigned to prosecute this action and to seek reimbursement for the damages they have suffered therefrom, in an amount to be determined at trial, but in no event less than $15,000.00.

## SECOND CLAIM FOR RELIEF
Breach of the Covenant of Good Faith and Fair Dealing – John Giuliano

46.   Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

7

47.     In every Nevada contract is an implied duty of good faith and fair dealing, whereby the parties covenant to act in good faith in carrying out the provisions of the contract.

48.     The loan agreement in this case constitutes a contract under Nevada law, and Defendant John Giuliano was thus required to act in good faith with respect to the Agreement.

49.     Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.

50.     In this case, Giuliano breached his duty, by making empty promises about his intentions and capabilities, but yet failing to carry through on any of his promises.

51.     He provided Plaintiffs with a specific list of contacts, companies, and business opportunities that induced Plaintiffs to loan him the money.  He gave names, locations, and promises about connecting his purported contact list and business people with Plaintiffs in order to grow Plaintiffs' businesses in oil and gas, mineral exploration, funding, tokenization, and other financial arrangements ancillary to their businesses.

52.     Giuliano did not connect any of these contacts to Plaintiffs, and has not delivered any written or other proof of his work and has not accounted for the use of Plaintiffs' money.

53.     Guiliano remained bound, for himself and on behalf of his companies, to repay the money loaned regardless of the outcome of his agreements and promises.

54.     Not only did he not deliver on his agreements and promises, but he has also not repaid any of the loaned money.

55.     It is clear that Defendant Giuliano intended to borrow the money under false pretenses, and has not repaid the funds as agreed.

56.     Defendant Giuliano made such promises to induce Plaintiffs to loan him the money.  Had he not exaggerated his intentions and efforts and experience, Plaintiffs would not have loaned him the money.

57.     As it stands, his failure to perform and to repay, knowing full well at the time he borrowed the money that he would not thus comply, constitutes bad faith.

58.     Defendant's bad faith actions are the proximate and actual cause of Plaintiffs' damages.

59.     As a result of the Defendant's actions, Plaintiffs have been required to retain the services of the undersigned to prosecute this action and to seek reimbursement for the damages they have suffered therefrom, in an amount to be determined at trial, but in no event less than $15,000.00.

### THIRD CLAIM FOR RELIEF
Unjust Enrichment – All Defendants

60.     Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

61.     Defendants have received and accepted the benefit of Plaintiffs' money, which was supposed to be used for their business development and also to provide business development for Plaintiffs' global mining businesses.

62.     Plaintiffs complied with their part of the deal, and Defendants received and accepted $153,000.00 as a loan that needed to be repaid.

63.     Defendants received the benefit of the money, but did not provide the services promised, and did not repay the money.

64.     It would be unfair and not in good conscience and equity for Defendants to receive $153,000.00 for turning in no work, performing no discernable duties, and for not repaying the loaned amount.

65.     Defendants would be unjustly enriched at Plaintiffs' expense if the Court allows them to hide behind their bad actions and theft without paying for the valuable money loaned to them.

66.     Accordingly, Plaintiffs should recover the maximum damages against Defendants to prevent such unjust enrichment.

67.     As a result of the Defendants' actions, Plaintiffs have been required to retain the services of the undersigned to prosecute this action and to seek reimbursement for the damages

they have suffered therefrom, in an amount to be determined at trial, including attorney's fees and costs, but in no event less than $15,000.00.

## **FOURTH CLAIM FOR RELIEF**
Fraudulent Misrepresentation – All Defendants

68.    Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

69.    Defendants promised to use the funds loaned for general business development purposes for their own businesses, and to further the interests of Plaintiffs' mining and financial operations.

70.    Defendants made promises and misrepresentations concerning their capabilities, intended use of funds, and business acumen and experience.   Defendants made those misrepresentations to induce Plaintiffs to loan the money.

71.    All of those promises turned out to be false.  It appears from Defendants' actions, they never intended to comply with their stated intentions or with repayment of the money.

72.    After receiving the money, Defendants produced little in the way of firm client development results, and did not send updates, deliverables, or anything tangible to document their work on Plaintiffs' behalf.

73.    Defendants also used the money for personal travel all over the world.

74.    None of the purported travel or money spent provided any benefit to Plaintiffs.

75.    Defendants further did not make any payments towards the $153,000.00 loan, and have now cut off all contact and communications.

76.    Defendants thus engaged in fraudulent and bad faith behavior by taking the money, and delivering none of the services, and then failing to repay even a dime of the money. These are all indicia of fraud, as it shows Defendants did not intend to remain true to the purpose of the transactions herein.

77.     Had Plaintiffs known that Defendants would not comply, they would not have loaned the money.

78.     Defendants' actions have harmed Plaintiffs, in that they have been defrauded out of $153,000.00, and have nothing to show for it and no repayment.

79.     Defendants' bad faith actions are the proximate and actual cause of Plaintiffs' damages.

80.     As a result of the Defendant's actions, Plaintiffs have been required to retain the services of the undersigned to prosecute this action and to seek reimbursement for the damages they have suffered therefrom, in an amount to be determined at trial, but in no event less than $15,000.00.

Plaintiffs reserve the right to amend their Complaint upon discovery of additional causes of action or claims for relief.

WHEREFORE, Plaintiffs seek the following relief:

1.   Judgment in their favor on all claims;

2.   Attorney's fees and costs incurred in bringing his action;

3.   Prejudgment and post-judgment interest to the extent permitted by law;

4.   Any special or punitive damages to the extent permitted by law;

5.   Any other relief the Court deems just and proper.

Dated this 6th day of July, 2023.

Respectfully submitted,

/s/ Shawanna L. Johnson
SHAWANNA L. JOHNSON, ESQ.
Nevada Bar No. 12791
Law Offices of Shawanna L. Johnson, Esq.
3311 S. Rainbow Blvd., Suite 144
Las Vegas, NV 89146
*Attorney for Plaintiffs*

11

## **VERIFICATION**

Under penalties of perjury, I declare that I am the representative of the Plaintiffs in the above-titled action, that I have read the foregoing Complaint, and know the contents thereof; that the pleading is true to the best of my knowledge, except for those matters contained therein which are stated upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Dated this 3rd day of July, 2023.

/s/ Schad E. Brannon (with permission)

SCHAD E. BRANNON, on behalf of Plaintiffs

12

# Exhibit 22





# Exhibit 23

# OPERATING AGREEMENT
# MEMBER MANAGED

**January 8, 2020**

## RECITAL:

The parties to this agreement (the "Members") are entering into this agreement for the purpose of forming a limited liability company under the Limited Liability Company Act of the state of Delaware (the "Act").

## AGREEMENTS:

1. **FORMATION**

   **1.1**   **Name.**  The name of this limited liability company (the "Company") is UIU Holdings LLC, a Delaware Limited Liability Company.

   **1.2**   **Articles of Organization.**  Articles of organization for the Company were filed with the Secretary of State for the state of Delaware on October 30, 2019.

   **1.3**   **Duration.**  The Company will exist until dissolved as provided in this agreement.

   **1.4**   **Principal Office.**  The Company's principal office will initially be at 16192 Coastal Highway, Lewes, Delaware 19958, but it may be relocated by the Members at any time.

   **1.5**   **Designated Office and Agent for Service of Process.**  The Company's initial designated office will be at 16192 Coastal Highway, Lewes, Delaware 19958, and the name of its initial agent for service of process at that address will be UIU Holdings LLC.  The Company's designated office and its agent for service of process may only be changed by filing notice of the change with the Secretary of State of the state in which the articles of organization of the Company were filed.

   **1.6**   **Purposes and Powers.**  The Company is formed for the purpose of engaging in the business of Structured Finance and Collateral Fund Management.  The Company has the power to do all things necessary, incident, or in furtherance of that business.

   **1.7**   **Title to Assets.**  Title to all assets of the Company will be held in the name of the Company.  No Member has any right to the assets of the Company or any ownership interest in those assets except indirectly as a result of the Member's ownership of an interest in the

Company. No Member has any right to partition any assets of the Company or any right to receive any specific assets upon liquidation of the Company or upon any other distribution from the Company.

## 2.   MEMBERS, CONTRIBUTIONS AND INTERESTS

**2.1   Initial Members.** The names and addresses of the Members of the Company, the amounts of their initial capital contributions, and their initial Ownership Interests are:

| Name and address | Contribution | Ownership Interest |
|---|---|---|
| Jason Anderson ███████████ | $1,000.00 | 100% |

Each Member's Ownership Interest at any time will be determined by the ratio of the Member's aggregate capital contributions to the aggregate capital contributions of all Members.

**2.2   Initial Capital Contributions.** The initial capital contributions of Profit Vault, LLC must be paid to the Company, in cash, immediately after all parties have signed this agreement. The initial capital contribution of $1,000.00 must be made by UIU Holdings LLC's transferring to the Company the assets listed on the attached Exhibit A. The transfer of the assets must be made immediately after all parties have signed this agreement by UIU Holdings LLC's executing and delivering to the Company such documents as may be necessary to transfer the assets listed on the attached Exhibit A to the Company free and clear of all liens and encumbrances. The transfer documents must include warranties of title and good right to transfer.

**2.3   Additional Members.** Except as otherwise provided in the section of this agreement relating to substitution, additional Members of the Company may be admitted only with the consent of all Members.

**2.4   Additional Contributions.** Except as otherwise provided in the Act, no Member will be required to contribute additional capital to the Company. Additional capital contributions to the Company may be made by the Members only with the Members' unanimous approval. If

the Members approve additional capital contributions, the Members must set a maximum amount for such contributions that will be accepted from the Members. Each Member will then have the right, but not the obligation, to contribute a pro rata share of the maximum based upon the Member's Ownership Interest. If any Member elects to contribute less than the Member's pro rata share of the maximum, the other Members may contribute the difference on a pro rata basis in accordance with their Ownership Interests or on any other basis they may agree upon.

**2.5    No Interest on Capital Contributions.**  No interest will be paid on capital contributions.

**2.6    Capital Accounts.**  An individual capital account will be maintained for each Member. A Member's capital account will be credited with all capital contributions made by the Member and with all income and gain (including any income exempt from federal income tax) allocated to the Member. A Member's capital account will be charged with the amount of all distributions made to the Member and with all losses and deductions (including deductions attributable to tax-exempt income) allocated to the Member. Members' capital accounts must be maintained in accordance with the federal income tax accounting principles prescribed in Treasury Regulations §1.704-1(b)(2)(iv).

## 3.    ALLOCATION OF PROFITS AND LOSSES

**3.1    Determination.**  The net profit or net loss of the Company for each fiscal year will be determined according to the accounting principles employed in the preparation of the Company's federal income tax information return for that fiscal year. In computing net profit or net loss for purposes of allocation among the Members, no special provision will be made for tax-exempt or partially tax-exempt income of the Company, and all items of the Company's income, gain, loss, or deduction required to be separately stated under IRC §703(a)(1) will be included in the net profit or net loss of the Company.

**3.2    Allocation of Net Profits and Net Losses.**  The net profit or net loss of the Company for a fiscal year will be allocated among the Members in proportion to their Ownership Interests.

**3.3    Allocations Solely for Tax Purposes.**  In accordance with IRC §704(c) and the corresponding regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company will be allocated among the Members, solely for income tax purposes, so as to take into account any variation between the adjusted basis of such property for federal income tax purposes in the hands of the Company and the agreed value of such property as set forth in this agreement, or in any document entered into at the time an additional contribution is made to the Company. Any elections or other decisions relating to the allocations to be made under this section will be made by action of the Members. The

allocations to be made under this section are solely for purposes of federal, state, and local income taxes and will not affect, or in any way be taken into account in computing, any Member's capital account, allocable share of the net profits and net losses of the Company, or right to distributions.

    **3.4**    **Prorates.** If a Member has not been a Member during a full fiscal year of the Company, or if a Member's Ownership Interest in the Company changes during a fiscal year, the net profit or net loss for the year will be allocated to the Member based only on the period of time during which the Member was a Member or held a particular Ownership Interest. In determining a Member's share of the net profit or net loss for a fiscal year, the Members may allocate the net profit or net loss ratably on a daily basis using the Company's usual method of accounting. Alternatively, the Members may separate the Company's fiscal year into two or more segments and allocate the net profits or net losses for each segment among the persons who were Members, or who held particular Ownership Interests, during each segment based upon their Ownership Interests during that segment.

**4.**    **DISTRIBUTIONS**

    **4.1**    **Distributions to Pay Taxes.** To enable the Members to pay taxes on income of the Company that is taxable to the Members, the Company must make cash distributions to the Members. During each fiscal year the Company must distribute an amount equal to the product of (a) the highest aggregate rate of federal, state, and local income and self-employment tax imposed on the Company's income for that fiscal year (taking into account the deductibility of state and local income taxes for federal income tax purposes) allocated to any Member who was a Member for the full fiscal year times (b) the amount of the taxable income of the Company allocated to all Members for that fiscal year. Distributions must be paid at least quarterly during each fiscal year at times that coincide with the Members' payment of estimated taxes, and the amount of each distribution will be based upon the anticipated taxable income of the Company for the fiscal year of the distribution and the anticipated tax rates of Members, as determined at the time the distribution is made. The Company's obligation to make distributions under this section is subject to the restrictions governing distributions under the Act.

    **4.2**    **Additional Distributions.** Subject to the restrictions governing distributions under the Act, additional distributions of cash or property may be made from time to time by the Company to the Members, at such times and in such amounts as the Members determine.

    **4.3**    **Allocation of Distributions.** All distributions to pay taxes and additional distributions must be made to Members in proportion to their Ownership Interests.

**5.**    **ADMINISTRATION OF COMPANY BUSINESS**

    **5.1**    **Management.** All Members have the right to participate in the management and conduct of the Company's business. Subject to the limitations imposed by this agreement or by

action of the Members, each Member is an agent of the Company and has authority to bind the Company in the ordinary course of the Company's business.

**5.2    Actions by Members.** Except as otherwise provided in this agreement, all decisions requiring action of the Members or relating to the business or affairs of the Company will be decided by the affirmative vote or consent of Members holding a majority of the Ownership Interests.  Members may act with or without a meeting, and any Member may participate in any meeting by written proxy or by any means of communication reasonable under the circumstances.

**5.3    Approval of Other Members Required.** In addition to the other actions requiring unanimous Member approval under the terms of this agreement, no Member has authority to do any of the following without the prior written consent of all other Members:

**5.3.1**    To sell, lease, exchange, mortgage, pledge, or otherwise transfer or dispose of all or substantially all of the property or assets of the Company;

**5.3.2**    To merge the Company with any other entity;

**5.3.3**    To amend the articles of organization of the Company or this agreement;

**5.3.4**    To incur indebtedness by the Company other than in the ordinary course of business;

**5.3.5**    To authorize a transaction involving an actual or potential conflict of interest between a Member and the Company;

**5.3.6**    To change the nature of the business of the Company; or

**5.3.7**    To commence a voluntary bankruptcy case for the Company.

**5.4    Devotion of Time; Outside Activities.** Each of the Members must devote so much time and attention to the business of the Company as the Members agree is appropriate. Members may engage in business and investment activities outside the Company, and neither the Company nor the other Members have any rights to the property, profits, or benefits of such activities.  But no Member may, without the consent of all other Members, enter into any business or investment activity that is competitive with the business of the Company, or use any property or assets of the Company other than for the operation of the Company's business.  For this purpose, the property and assets of the Company include, without limitation, information developed for the Company, opportunities offered to the Company, and other information or opportunities entrusted to a Member as a result of being a Member of the Company.

**5.5    Compensation and Reimbursement.** Members who render services to the Company are entitled to such compensation as may be agreed upon by the Members from time to

v

time.  Any compensation paid to a Member for services rendered will be treated as an expense of the Company and a guaranteed payment within the meaning of IRC §707(c), and the amount of the compensation will not be charged against the share of profits of the Company that would otherwise be allocated to the Member.  Members are also entitled to reimbursement from the Company for reasonable expenses incurred on behalf of the Company, including expenses incurred in the formation, dissolution, and liquidation of the Company.

**5.6     Self Interest.**  A Member does not violate any duty or obligation to the Company merely as a result of engaging in conduct that furthers the interest of the Member.  A Member may lend money or transact other business with the Company, and, in this case, the rights and obligations of the Member will be the same as those of a person who is not a Member, so long as the loan or other transaction has been approved or ratified by the Members.  Unless otherwise provided by applicable law, a Member with a financial interest in the outcome of a particular action is nevertheless entitled to vote on such action.

## 6.     ACCOUNTING AND RECORDS

**6.1     Books of Account.**  The Members must keep such books and records relating to the operation of the Company as are appropriate and adequate for the Company's business and for the carrying out of this agreement.  At a minimum, the following must be maintained at the principal office of the Company: (a) financial statements for the three most recent fiscal years; (b) federal, state, and local income tax returns for the three most recent fiscal years; (c) a register showing the current names and addresses of the Members; (d) a copy of the Company's articles of organization and any amendments thereto; (e) this agreement and any amendments thereto; (f) minutes of any meetings of Members; and (g) consents to action by Members.  Each Member will have access to all such books and records at all times.

**6.2     Fiscal Year.**  The fiscal year of the Company will be the calendar year.

**6.3     Accounting Reports.**  Within 90 days after the close of each fiscal year, Company must deliver to each Member an unaudited report of the activities of the Company for the preceding fiscal year, including a copy of a balance sheet of the Company as of the end of the year and a profit and loss statement for the year.

**6.4     Tax Returns.**  The Company must prepare and file on a timely basis all required federal, state, and local income tax and other tax returns.  Within 90 days after the end of each fiscal year, the Company must deliver to each Member a Schedule K-1, showing the amounts of any distributions, contributions, income, gain, loss, deductions, or credits allocated to the Member during the fiscal year.

**6.5     Tax Matters Partner.**  Anytime the Company has more than 10 Members, any Member is an entity other than an estate or a C corporation, or any Member is a nonresident alien individual, the Members must designate one of the Members as the tax matters partner of the Company in accordance with IRC §6231(a)(7) and keep such designation in effect at all times.

vi

## 7.  DISSOCIATION AND DISSOLUTION

**7.1   Withdrawal.** A Member may withdraw from the Company only after giving notice of withdrawal to the other Members at least 90 days prior to the effective date of the withdrawal.

**7.2   Expulsion.** A Member may be expelled from the Company by an affirmative vote of the Members holding a majority of the Ownership Interests held by Members other than the expelled Member if the expelled Member has been guilty of wrongful conduct that adversely and materially affects the business or affairs of the Company, or the expelled Member has willfully or persistently committed a material breach of the articles of organization of the Company or this agreement or has otherwise breached a duty owed to the Company or to the other Members to the extent that it is not reasonably practicable to carry on the business or affairs of the Company with that Member. The right to expel a Member under the provisions of this section does not limit or adversely affect any right or power of the Company or the other Members to recover any damages from the expelled Member or to pursue other remedies permitted under applicable law or in equity. In addition to any other remedies, the Company or the other Members may offset any such damages against any amounts otherwise distributable or payable to the expelled Member.

**7.3   Events of Dissolution.** Except as otherwise provided in this agreement, the Company will dissolve upon the earliest of: (a) the death, incompetence, withdrawal, expulsion, bankruptcy, or dissolution of any Member; (b) approval of a dissolution of the Company by unanimous consent of the Members; or (c) at such time as the Company has no members.

**7.4   Effect of Member's Dissociation.** Within 120 days following the death, incompetence, withdrawal, expulsion, bankruptcy, or dissolution of a Member, the other Members (whether one or more) may elect to continue the Company by themselves or with others, and to cause the Company to purchase the interest of the dissociating Member pursuant to the provisions of the sections of this agreement relating to purchase price and payment for member's interest. Making the election is in the sole discretion of the other Members and requires the consent of other Members holding a majority of the Ownership Interests held by the other Members. Notice of the election must be given in writing to the dissociating Member or the dissociating Member's successor in interest promptly after the election is made. If the other Members do not so elect, the Company will be dissolved.

**7.5   Purchase Price.** If the other Members elect to cause the Company to purchase the interest of a dissociating Member under the section of this agreement relating to effect of member's dissociation, the purchase price of the dissociating Member's interest in the Company will be determined by agreement between the other Members (acting by vote) and the dissociating Member. If an agreement on the purchase price is not reached within 30 days following the election to purchase the interest of the dissociating Member, the interest must be valued by a third party appraiser selected by the other Members who is reasonably acceptable to

the dissociating Member, and the purchase price will be the value determined in that appraisal. In appraising the interest to be purchased, the appraiser must determine the fair market value of the interest as of the date of the event of dissociation. In determining the value, the appraiser must consider the greater of the liquidation value of the Company or the value of the Company based upon a sale of the Company as a going concern. The appraiser must also consider appropriate minority interest, lack of marketability, and other discounts. If the appraisal is not completed within 120 days following the election to purchase the interest of the dissociating Member, either the other Members or the dissociating Member may apply to a court of competent jurisdiction for the appointment of another appraiser, in which case the court-appointed appraiser must appraise the interest of the dissociating Member in accordance with the standards set forth in this section, and the purchase price will be the value determined in that appraisal.

**7.6**    **Payment for Member's Interest.**  The purchase price for the interest of a Member purchased under the section of this agreement relating to effect of member's dissociation will be paid as follows:

**7.6.1**    The purchase price will bear interest from the date of the election of the other Members to purchase the dissociating Member's interest at the prime rate of interest in effect on the date of the election as quoted in The Wall Street Journal or, if that publication is not available, another reputable national publication selected by the other Members that is reasonably acceptable to the dissociating Member.

**7.6.2**    The purchase price will be payable in accordance with the terms of a promissory note of the Company providing for the payment of the principal amount in 60 equal monthly installments, including interest on the unpaid balance, with the first installment to be due one month after the date of closing and an additional installment to be due on the same day of each month thereafter until the promissory note is paid in full. The promissory note will bear interest from the date of the closing at the rate specified above. The promissory note must provide that if any installment is not paid when due, the holder may declare the entire remaining balance, together with all accrued interest, immediately due and payable. Partial or complete prepayment of the remaining balance due under the promissory note will be permitted at any time without penalty, provided that any partial prepayment will not affect the amount or regularity of payments coming due thereafter.

**7.6.3**    The purchase must be closed within 30 days following the determination of the purchase price. At the closing, the dissociating Member must sign and deliver to the Company a written assignment transferring the entire interest of the dissociating Member in the Company to the Company free and clear of all encumbrances. Such assignment must contain warranties of title and good right to transfer. At the closing, the Company must pay the accrued interest on the purchase price then due to the dissociating Member, and the Company must also deliver its promissory note to the dissociating Member. Each of the other Members must sign and deliver to the dissociating Member a

security agreement granting a security interest to the dissociating Member in that percentage of the interest of each of the other Members in the Company equal to the Ownership Interest of the dissociating Member being purchased by the Company. The security agreement must be in a form reasonably acceptable to the attorney for the dissociating Member and will secure payment of the promissory note by the Company. The security agreement must provide that if there is a default in the payment of the promissory note by the Company and the security interest is foreclosed or the interest in the Company is retained by the secured party in satisfaction of the indebtedness, the interest may be transferred without the necessity of tendering the interest to the Company under the section of this agreement relating to tender of interest and the person acquiring the interest in the Company will be admitted as a member of the Company without further consent of the Members being required.

> *As an example of the operation of this provision, if the Ownership Interest of a dissociating Member was 25% and there are three other Members, each with an Ownership Interest of 33-1/3% after the purchase of the dissociating Member's Ownership Interest by the Company, each of the other Members would be required to grant the dissociating Member a security interest in an Ownership Interest of 8-1/3%.*

**7.7    Effect of Purchase of Member's Interest.**  A dissociating Member will cease to be a Member upon the election of the other Members to cause the Company to purchase the dissociating Member's interest pursuant to the section of this agreement relating to effect of member's dissociation. Thereafter, the dissociating Member will have no rights as a Member in the Company, except the right to have the dissociating Member's interest purchased in accordance with the terms of this agreement.

**7.8    Successor in Interest.**  For purposes of this section relating to dissociation and dissolution, the term "dissociating Member" includes the dissociating Member's successor in interest.

**8.    WINDING UP AND LIQUIDATION**

**8.1    Liquidation Upon Dissolution.**  Upon the dissolution of the Company, the Members must wind up the affairs of the Company unless the dissolution results from the dissociation of a Member and the other Members elect to continue the Company under the provisions of this agreement relating to effect of member's dissociation. If the affairs of the Company are wound up, a full account must be taken of the assets and liabilities of the Company, and the assets of the Company must be promptly liquidated. Following liquidation of the assets of the Company, the proceeds must be applied and distributed in the following order of priority:

**8.1.1**   To creditors of the Company in satisfaction of liabilities and obligations of the Company, including, to the extent permitted by law, liabilities and obligations owed to Members as creditors (except liabilities for unpaid distributions);

**8.1.2**   To any reserves set up for contingent or unliquidated liabilities or obligations of the Company deemed reasonably necessary by the Members, which reserves may be paid over to an escrow agent by the Members to be held by such escrow agent for disbursement in satisfaction of the liabilities and obligations of the Company, with any excess being distributed to the Members as provided below; and

**8.1.3**   To Members in proportion to the positive balances of their capital accounts, after taking into account all adjustments made to capital accounts for the fiscal year during which the distributions to Members are made.

**8.2**   **Distribution of Property in Kind.**  With approval of the Members, property of the Company may be distributed in kind in the process of winding up and liquidation.  Any property distributed in kind will be valued and treated for the Company's accounting purposes, in accordance with Treasury Regulations §1.704-1(b)(2)(iv)(e)(1), as though the property distributed had been sold at fair market value on the date of distribution.  If property is distributed in kind, the difference between the fair market value of the property and its adjusted tax basis will, solely for the Company's accounting purposes and to adjust the Members' capital accounts, be treated as a gain or loss on the sale of the property and will be credited or charged to the Members' capital accounts in the manner specified in the section of this agreement relating to capital accounts.

**8.3**   **Negative Capital Accounts.**  If any Member has a negative balance in the Member's capital account upon liquidation of the Company, the Member will have no obligation to make any contribution to the capital of the Company to make up the deficit, and the deficit will not be considered a debt owed to the Company or any other person for any purpose.

# 9.   TRANSFER OF MEMBERS' INTERESTS

**9.1**   **General Restrictions.**  No Member may transfer all or any part of such Member's interest as a member of the Company except as permitted in this agreement.  Any purported transfer of an interest or a part of an interest in violation of the terms of this agreement will be null and void and of no effect.  For purposes of this section a "transfer" includes a sale, exchange, pledge, or other disposition, voluntarily or by operation of law.

**9.2**   **Permitted Transfers.**  A Member may transfer all or a part of the Member's interest in the Company with the prior written consent of all other Members.  If the other Members do not consent to a particular transfer, the Member may transfer all or a part of the Member's interest if such interest or part has been tendered for sale to the Company in accordance with the section of this agreement relating to tender of interest, the tender has not been accepted within the time limit set forth in that section, the transfer is made to the transferee

x

named in the notice of tender within 180 days after the notice of tender is effective, and the transfer is at a price and upon terms no more favorable to the transferee than those set forth in the notice of tender.

**9.3     Tender of Interest.** If a Member wishes to transfer all or part of the Member's interest in the Company and the other Members do not consent, the interest or the part to be transferred must be tendered to the Company by giving written notice of such tender to the Company. Such notice must contain the name and address of the proposed transferee, the price to be paid by the proposed transferee for the interest, if any, and the terms of the proposed transfer. If a Member's interest is transferred by operation of law, the successor in interest to the transferring Member may give the required notice of tender to the Company at any time following the transfer, and such successor in interest will be deemed to have given the notice of tender at the time any other Member gives notice to the successor in interest and to all other Members of the failure to give the notice of tender. Within 30 days after a notice of tender is given, the other Members may accept the tender on behalf of the Company and have the Company purchase the interest tendered for the lesser of the price set forth in the notice of tender (if the proposed transfer is to be by sale) or the price applicable to the purchase of a Member's interest pursuant to the section of this agreement relating to the effect of member's dissociation. The tender must be accepted on behalf of the Company by giving notice of acceptance to the transferring Member or the transferring Member's successor in interest. The purchase may, at the option of the other Members, be on the terms set forth in the notice of tender, if any, or the terms set forth in the section of this agreement relating to payment for member's interest. For purposes of those provisions, the date of the acceptance of tender will be deemed to be the date on which the other Members elected to purchase the interest of a dissociating Member.

**9.4     Effect of Tender.** The Member tendering the interest will cease to be a Member with respect to the tendered interest upon an acceptance of the tender by the Company. Thereafter, the Member tendering the interest will have no rights as a Member in the Company, except the right to have the tendered interest purchased in accordance with the terms of this agreement.

**9.5     Substitution.** If the interest of a Member is transferred, the transferee of the interest may be admitted as a Member of the Company if the transferee executes and delivers to the Company a written agreement to be bound by all of the terms and provisions of this agreement. But the transferee is entitled to be admitted as a Member only if all of the other Members consent to the admission of the transferee as a Member, and this consent may be withheld reasonably or unreasonably. If a Member who is the only member of the Company transfers the Member's entire interest, the transferee will be admitted as a Member of the Company effective upon the transfer without the requirement of an agreement to be bound by this agreement or consent. If the transferee is not admitted as a Member, the transferee will have the right only to receive, to the extent assigned, the distributions from the Company to which the transferor would be entitled. Such transferee will not have the right to exercise the rights of a Member, including, without limitation, the right to vote or inspect or obtain records of the Company.

## 10.   INDEMNIFICATION AND LIABILITY LIMITATION

**10.1   Indemnification.** Except as otherwise provided in this section, the Company must indemnify each of the Members to the fullest extent permissible under the law of the state in which the articles of organization of the Company have been filed, as the same exists or may hereafter be amended, against all liability, loss, and costs (including, without limitation, attorneys' fees) incurred or suffered by the Member by reason of or arising from the fact that the Member is or was a member of the Company, or is or was serving at the request of the Company as a manager, member, director, officer, partner, trustee, employee, or agent of another foreign or domestic limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise. The Company may, by action of the Members, provide indemnification to employees and agents of the Company who are not Members. The indemnification provided in this section is not exclusive of any other rights to which any person may be entitled under any statute, agreement, resolution of Members, contract, or otherwise. But despite any other provision of this agreement, the Company has no obligation to indemnify a Member for:

**10.1.1** Any breach of the Member's duty of loyalty to the Company;

**10.1.2** Acts or omissions not in good faith that involve intentional misconduct or a knowing violation of law;

**10.1.3** Any unlawful distribution under the Act; or

**10.1.4** Any transaction in which the Member derives improper personal benefit.

**10.2   Limitation of Liability.** No Member of the Company is liable to the Company or to the other Members for monetary damages resulting from the Member's conduct as a Member except to the extent that the Act, as it now exists or may be amended in the future, prohibits the elimination or limitation of liability of members of limited liability companies. No repeal or amendment of this section or of the Act will adversely affect any right or protection of a Member for actions or omissions prior to the repeal or amendment.

## 11.   MISCELLANEOUS PROVISIONS

**11.1   Amendment.** The Members may amend or repeal all or part of this agreement by unanimous written agreement. This agreement may not be amended or repealed by oral agreement of the Members.

**11.2   Binding Effect.** The provisions of this agreement will be binding upon and will inure to the benefit of the heirs, personal representatives, successors, and assigns of the Members. But this section may not be construed as a modification of any restriction on transfer set forth in this agreement.

**11.3    Notice.**  Except as otherwise provided in other sections of this agreement, any notice or other communication required or permitted to be given under this agreement must be in writing and must be mailed by certified mail, return receipt requested, with postage prepaid. Notices addressed to a Member must be addressed to the Member's address listed in the section of this agreement relating to initial members, or if there is no such address listed for a Member, the address of the Member shown on the records of the Company.  Notices addressed to the Company must be addressed to its principal office.  The address of a Member or the Company to which notices or other communications are to be mailed may be changed from time to time by the Member's or the Company's giving written notice to the other Members and the Company. All notices and other communications will be deemed to be given at the expiration of three days after the date of mailing.

**11.4    Litigation Expense.**  If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this agreement, including any proceeding in the United States Bankruptcy Court, the prevailing party in such proceeding will be entitled to recover a reasonable attorney's fee in such proceeding, or any appeal thereof, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law.

**11.5    Additional Documents.**  Each Member must execute such additional documents and take such actions as are reasonably requested by the other Members in order to complete or confirm the transactions contemplated by this agreement.

**11.6    Counterparts.**  This agreement may be executed in two or more counterparts, which together will constitute one agreement.

**11.7    Governing Law.**  This agreement will be governed by the law of the state in which the articles of organization of the Company have been filed.

**11.8    Severability.**  If any provision of this agreement is invalid or unenforceable, it will not affect the remaining provisions.

**11.9    Third-Party Beneficiaries.**  The provisions of this agreement are intended solely for the benefit of the Members and create no rights or obligations enforceable by any third party, including creditors of the Company, except as otherwise provided by applicable law.

**11.10   Authority.**  Each individual executing this agreement on behalf of a corporation or other entity warrants that he or she is authorized to do so and that this agreement constitutes a legally binding obligation of the corporation or other entity that the individual represents.

IN WITNESS WHEREOF, the undersigned have duly executed this operation Agreement as of the date first above written as Members.

MEMBER NAMES                                    SIGNATURE

JASON ANDERSON


CORPORATE SEAL


xiv

# STATEMENT OF AUTHORIZED PERSON
**************************

IN LIEU OF ORGANIZATIONAL MEETING
FOR
UIU Holdings LLC
October 30, 2019

We, Harvard Business Services, Inc., the authorized person of UIU Holdings LLC -- a Delaware Limited Liability Company -- hereby adopt the following resolution pursuant to Section 18-201 of the Delaware Limited Liability Company Act:

**Resolved:** That the Certificate of Formation of UIU Holdings LLC was filed with the Secretary of State of Delaware on October 30, 2019.

**Resolved:** That on October 30, 2019 the following persons were appointed as the initial members of the Limited Liability Company until their successors are elected and qualify:

Jason R Anderson

**Resolved:** That the undersigned signatory hereby resigns as the authorized person of the above named Limited Liability Company.

This resolution shall be filed in the minute book of the company.

Harvard Business Services, Inc., Authorized Person
By: Michael J. Bell, President

*** This document is not part of the public record. Keep it in a safe place. ***

X

 **IRS** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH  45999-0023

Date of this notice:  11-05-2019

Employer Identification Number:
████7466

002907.199799.190072.8698 1 MB 0.428 530

Form:  SS-4

Number of this notice:  CP 575 G



UIU HOLDINGS LLC
JASON R ANDERSON SOLE MBR
███████████████

For assistance you may call us at
1-800-829-4933

002907

IF YOU WRITE, ATTACH THE
STUB OF THIS NOTICE.

## WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN).  We assigned you EIN ████7466.  This EIN will identify you, your business accounts, tax returns, and documents, even if you have no employees.  Please keep this notice in your permanent records.

When filing tax documents, payments, and related correspondence, it is very important that you use your EIN and complete name and address exactly as shown above. Any variation may cause a delay in processing, result in incorrect information in your account, or even cause you to be assigned more than one EIN.  If the information is not correct as shown above, please make the correction using the attached tear-off stub and return it to us.

A limited liability company (LLC) may file Form 8832, Entity Classification Election, and elect to be classified as an association taxable as a corporation.  If the LLC is eligible to be treated as a corporation that meets certain tests and it will be electing S corporation status, it must timely file Form 2553, Election by a Small Business Corporation.  The LLC will be treated as a corporation as of the effective date of the S corporation election and does not need to file Form 8832.

IMPORTANT REMINDERS:

*   Keep a copy of this notice in your permanent records.  This notice is issued only one time and IRS will not be able to generate a duplicate copy for you. You may give a copy of this document to anyone asking for proof of your EIN.

*   Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

*   Refer to this EIN on your tax-related correspondence and documents.

*   Provide future officers of your organization with a copy of this notice.

Your name control associated with this EIN is UIUH.  You will need to provide this information, along with your EIN, if you file your returns electronically.

If you have questions about your EIN, you can contact us at the phone number or address listed at the top of this notice.  If you write, please tear off the stub at the bottom of this notice and include it with your letter.  Thank you for your cooperation.

# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "UIU HOLDINGS LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-SIXTH DAY OF AUGUST, A.D. 2021.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "UIU HOLDINGS LLC" WAS FORMED ON THE THIRTIETH DAY OF OCTOBER, A.D. 2019.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

7679222   8300

SR# 20213087466

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204013617

Date: 08-26-21

# *State Of Delaware*

Entity Details

5/26/2022  12:09:31PM

File Number: 7679222

Incorporation Date / Formation Date:  10/30/2019

Entity Name:  UIU HOLDINGS LLC

Entity Kind:  Limited Liability Company

Entity Type:  General

Residency:  Domestic

State:  DELAWARE

Status:  Good Standing

Status Date:  10/30/2019

**Registered Agent Information**

Name:  HARVARD BUSINESS SERVICES, INC.

Address:  16192 COASTAL HWY

City:  LEWES

Country:

State:  DE

Postal Code:  19958

Phone:  302-645-7400

Resolution ID: 51222-1

# Corporate Resolution of
# UIU Holdings, LLC

### Banking Resolution

I, Jason Anderson, being the only Member of UIU Holdings, Limited Liability Company consent and agree that the following corporate resolution was made on May 11, 2022.

**WHEREAS**, the Member has determined it to be in the best interest of UIU Holdings, LLC to establish a banking account with Washington Federal (WAFD) Bank with Jacob Anderson as a signer.

**NOW, THEREFORE, BE IT RESOLVED**: Jacob Anderson has the authority to transact business, including but not limited to the maintenance of savings, checking, wiring funds, or other transactions for the benefit of UIU Holdings, LLC business at Washington Federal (WAFD).

The undersigned Member of the LLC is authorized to perform the acts to carry out this corporate resolution and said resolution was submitted to and approved and adopted by the member on May 11, 2022, and that said resolution is now in full force and effect without modification or recession as permitted under the bylaws.

*Jason Anderson*
Jason Anderson (May 12, 2022 11:56 MDT)

Jason Anderson

May 12, 2022

Date

# UIU Corporate Resolution 51222-1 Banking Resolution

Final Audit Report                                                    2022-05-12

| | |
|---|---|
| Created: | 2022-05-12 |
| By: | Jason Anderson (loans@bloxlending.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAALEPnG7r9YjnkT64aAeOwlGh_RrTP0jgV |

## "UIU Corporate Resolution 51222-1 Banking Resolution" History

📄 Document created by Jason Anderson (loans@bloxlending.com)
   2022-05-12 - 3:58:33 PM GMT- IP address: ▉4.116

📧 Document emailed to jason@bloxlending.com for signature
   2022-05-12 - 3:59:26 PM GMT

📝 Jason Anderson (loans@bloxlending.com) replaced signer jason@bloxlending.com with Jason Anderson (jake@bloxlending.com)
   2022-05-12 - 5:44:20 PM GMT- IP address: ▉4.116

📧 Document emailed to Jason Anderson (jake@bloxlending.com) for signature
   2022-05-12 - 5:44:20 PM GMT

📄 Email viewed by Jason Anderson (jake@bloxlending.com)
   2022-05-12 - 5:55:30 PM GMT- IP address: ▉43.66

✍️ Document e-signed by Jason Anderson (jake@bloxlending.com)
   Signature Date: 2022-05-12 - 5:56:31 PM GMT - Time Source: server- IP address: ▉43.66

✅ Agreement completed.
   2022-05-12 - 5:56:31 PM GMT

**Adobe Acrobat Sign**

# Exhibit 24

## DIVISION OF CORPORATIONS AND COMMERCIAL CODE
## BUSINESS SEARCH

## UIU HOLDINGS LLC

Update this Business

**Entity Number:** 13164076-0161
**Company Type:** LLC - Foreign
**Address:** 16192 Coastal Hwy Lewes, DE 19958
**State of Origin:** DE
**Registered Agent:** Jason Anderson
**Registered Agent Address:**

1086 Skyler Dr
Draper, UT 84020

View Management Team

Status: Active

Purchase Certificate of Existence

**Status:** Active ● *as of 12/14/2022*
**Renew By:** 12/31/2023
**Status Description:** Current
The "Current" status represents that a renewal has been filed, within the most recent
renewal period, with the Division of Corporations and Commercial Code.
**Employment Verification:** <u>Not</u> Registered with Verify Utah

History

View Filed Documents

**Registration Date:** 12/14/2022
**Last Renewed:** N/A

<< Back to Search Results

Business Name:

# Exhibit 25

# WaFd Bank

**Master Business Deposit Account Signature Card**

## I. ACCOUNT INFORMATION

Select One:  ☐ New Account  ☑ Replace Existing Signature Card

Primary Account Owner Name:  UIU Holdings LLC

Account Owner Address:  16192 Costal Hwy

Lewes, DE, 19958

Account Owner Phone: ▉▉▉▉▉▉    ☑ Accounts on attached **Exhibit A**

Primary Account Owner TIN: ▉▉7466    ☐ Shared TIN

## II. AFFILIATED ENTITY

| Affiliated Entity Account Owner Name | TIN |
|---|---|
| | |
| | |
| | |
| | |

☐ Additional affiliated entities listed on attached **Exhibit B**

## III. ACCOUNT OWNER AUTHORIZATION AND AGREEMENT

By signing below, the account owner(s) listed above, including any affiliated entities listed in Section II and any attached Exhibit B ("Client") authorizes WaFd Bank ("Bank"), at its discretion, to open one or more business or non-personal deposit accounts owned by Client and with the Authorized Signers specified the Section V list of Authorized Signers ("Authorized Signers"), and upon receipt of electronic, written or oral instructions from Client without obtaining an additional Signature Card ("Accounts"). Accounts opened hereunder are listed above and on the attached Exhibit A, which is made a part of this Signature Card, as such Exhibit A may be amended or supplemented by Client from time to time. Addition of a new account to Exhibit A or new entity to Exhibit B will only be effective when Bank receives an amendment to Exhibit A or B in a form acceptable to Bank in its sole discretion. Changes to Authorized Signers will only be effective when Bank receives an amendment to Section V in a form acceptable to Bank in its sole discretion. Client acknowledges and agrees that all Accounts opened under this Signature Card are governed by the terms and conditions of the Business Deposit Account Agreement and Disclosures ("Agreement") and fee schedules ("Fee Schedules") governing the Accounts, and any agreements and disclosures covering banking services used by Client, all as may be amended by Bank. By signing below, Client acknowledges receipt of the Agreement and Fee Schedules.

Client authorizes Bank to operate all current and future Accounts opened under this Signature Card. The authority to operate each Account includes: (i) to act upon instructions from any Authorized Signers to deposit, withdraw or transfer funds to or from any other Accounts; (ii) to recognize and honor the signature of any of the Authorized Signers on checks (if withdrawal by check is permitted) and withdrawal slips and honor any other electronic, written or oral requests for withdrawals or transfers of funds; and (iii) to act upon instructions from any Authorized Signer for the transaction of any business on any Accounts covered by this Signature Card.  Bank may rely on this authorization for the Accounts opened under this Signature Card until Bank receives written notice revoking the authorization and has reasonable time to act upon it. Until such notice is actually received, the authority conferred herein to the Authorized Signers will remain in full force.

The individual signing below certifies that he or she is authorized to act on behalf of Client and that any resolutions, agreements, or other documents provided to Bank as evidence of the authority of Client or its Authorized Signers to act on behalf of Client are true and correct copies and are still in full force and effect.

| | | |
|---|---|---|
| _Signature_ | 5-12-22 <br> Date | Jason Anderson , Managing Member <br> Printed Name and Title |

© 2022 WaFd Bank. All rights reserved.

## IV. BACKUP WITHHOLDING CERTIFICATION

☐ W9 on File    ☐ W-8BENE on File (Foreign entity only)

**Or**

Under penalties of perjury I certify that:
☒ The employer identification number or social security number shown on this form for this account owner is correct (or the account owner is waiting for a number to be issued)
☒ The account owner is not subject to backup withholding because (a) the account holder is exempt from backup withholding, (b) the account holder has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified the account owner that it is no longer subject to backup withholding;
☒ The account owner is a United States entity/person

The term "United States person" means a citizen or resident of the United States, a partnership, corporation, company or association created or organized in the United States or under the laws of the United States, or any estate or trust other than a foreign estate or trust.

| _____ | 5-12-22 | Jason Anderson, Managing Member |
| Signature | Date | Printed Name and Title |

*Attention New Customers: The information you provide to open a new Account is subject to the Bank's review and verification. Bank reserves the right to close an Account in the event we are unable to verify the information that you have provided.*

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT — To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. In addition, authorized account signers may be asked to provide identification to verify their identity.

## FOR BANK USE ONLY

Date: 05/12/2022 _____    Branch #: 1151 _____    Employee Initials: ME _____

© 2022 WaFd Bank. All rights reserved.

**WaFd Bank**

**Master Business Deposit Account
Signature Card**

Primary Account Owner:  UIU Holdings LLC

## V. AUTHORIZED SIGNERS

Authorized Signer Name and Title:  Jason Anderson- Managing Member

Update:  ☑ Add  ☐ Delete

*Entity Name and/or Account Numbers:  ☑ All Entities  ☐ List Entities: _____
☑ All Accounts  ☐ List Accounts: _____

**Authority: E _____  Signature: _____

---

Authorized Signer Name and Title:  Jacob Anderson- Member *Authorized Signer*

Update:  ☑ Add  ☐ Delete

*Entity Name and/or Account Numbers:  ☑ All Entities  ☐ List Entities: _____
☑ All Accounts  ☐ List Accounts: _____

**Authority: E _____  Signature: _____

---

Authorized Signer Name and Title:  _____

Update:  ☐ Add  ☐ Delete

*Entity Name and/or Account Numbers:  ☐ All Entities  ☐ List Entities: _____
☐ All Accounts  ☐ List Accounts: _____

**Authority: _____  Signature: _____

---

Authorized Signer Name and Title:  _____

Update:  ☐ Add  ☐ Delete

*Entity Name and/or Account Numbers:  ☐ All Entities  ☐ List Entities: _____
☐ All Accounts  ☐ List Accounts: _____

**Authority: _____  Signature: _____

---

Authorized Signer Name and Title:  _____

Update:  ☐ Add  ☐ Delete

*Entity Name and/or Account Numbers:  ☐ All Entities  ☐ List Entities: _____
☐ All Accounts  ☐ List Accounts: _____

**Authority: _____  Signature: _____

---

☐ *Check box if additional signatures are on an additional page.*

*    Note whether individual is Authorized Signer for all named business entities or only for specified business entities.

**   Description of Authority:  **A** - Open deposit accounts in name of Client; **B** - Endorse checks and other payment orders; **C** - Withdraw or transfer funds from Client accounts; **D** - Enter into agreements for treasury services ; and **E** - all authority under **A**, **B**, **C**, and **D**.

☑ *Check box if this Section V. Authorized Signers amends a prior Section V. Authorized Signers and sign below.*

Date of Original Signature Card:  08/26/2021     Effective Date of Amendment:  05/12/2022

Signature

Jason Anderson, Managing Member
Printed Name and Title

Updated 4.8.22

© 2022 WaFd Bank. All rights reserved.


**WaFd** Bank

---

**WaFd** Bank

**Business Deposit Account**
**Signature Card**

## I. ACCOUNT INFORMATION

Select One:   ☒ New Account   ☐ Replace Existing Signature Card

Primary Account Owner Name:   UIU Holdings LLC

Account Owner Address:   16192 Coastal Hwy

Lewes, DE 19958

Account Owner Phone:   ███████   ☒ Accounts on attached **Exhibit A**

Primary Account Owner TIN:   ██ 7466

## II. AFFILIATED ENTITY

| Affiliated Entity Account Owner Name | TIN |
|---|---|
| | |
| | |
| | |
| | |

☐ Additional affiliated entities listed on attached **Exhibit B**

## III. ACCOUNT OWNER AUTHORIZATION AND AGREEMENT

By signing below, the account owner(s) listed above, including any affiliated entities listed in Section II and any attached Exhibit B ("Client") authorizes WaFd Bank ("Bank"), at its discretion, to open one or more business or non-personal deposit accounts owned by Client and with the Authorized Signers specified the Section V list of Authorized Signers ("Authorized Signers"), and upon receipt of electronic, written or oral instructions from Client without obtaining an additional Signature Card ("Accounts"). Accounts opened hereunder are listed above and on the attached Exhibit A, which is made a part of this Signature Card, as such Exhibit A may be amended or supplemented by Client from time to time. Addition of a new account to Exhibit A or new entity to Exhibit B will only be effective when Bank receives an amendment to Exhibit A or B in a form acceptable to Bank in its sole discretion. Changes to Authorized Signers will only be effective when Bank receives an amendment to Section V in a form acceptable to Bank in its sole discretion. Client acknowledges and agrees that all Accounts opened under this Signature Card are governed by the terms and conditions of the Business Deposit Account Agreement and Disclosures ("Agreement") and fee schedules ("Fee Schedules") governing the Accounts, and any agreements and disclosures covering banking services used by Client, all as may be amended by Bank. By signing below, Client acknowledges receipt of the Agreement and Fee Schedules.

Client authorizes Bank to operate all current and future Accounts opened under this Signature Card. The authority to operate each Account includes: (i) to act upon instructions from any Authorized Signers to deposit, withdraw or transfer funds to or from any other Accounts; (ii) to recognize and honor the signature of any of the Authorized Signers on checks (if withdrawal by check is permitted) and withdrawal slips and honor any other electronic, written or oral requests for withdrawals or transfers of funds; and (iii) to act upon instructions from any Authorized Signer for the transaction of any business on any Accounts covered by this Signature Card.  Bank may rely on this authorization for the Accounts opened under this Signature Card until Bank receives written notice revoking the authorization and has reasonable time to act upon it. Until such notice is actually received, the authority conferred herein to the Authorized Signers will remain in full force.

The individual signing below certifies that he or she is authorized to act on behalf of Client and that any resolutions, agreements, or other documents provided to Bank as evidence of the authority of Client or its Authorized Signers to act on behalf of Client are true and correct copies and are still in full force and effect.

| Signature | 8/26/2021 | Jason Anderson Managing Member |
|---|---|---|
| | Date | Printed Name and Title |

© 2020 WaFd Bank. All rights reserved.

 **WaFd** Bank

## IV. BACKUP WITHHOLDING CERTIFICATION
(if foreign entity, leave blank and use IRS Form W-8)

Exemptions:  n/a                          Exempt Payee Code:  n/a

Exemption from
FATCA reporting Code:  n/a

Under penalties of perjury I certify that:

1. The employer identification number or social security number shown on this form for this account owner is correct (or the account owner is waiting for a number to be issued)
2. The account owner is not subject to backup withholding because (a) the account holder is exempt from backup withholding, (b) the account holder has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified the account owner that it is no longer subject to backup withholding;
3. The account owner is a United States person
4. Any FATCA code(s) entered on this form indicating that the account owner is exempt from FATCA reporting is correct.

Instructions: Line out and initial item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.
The term "United States person" means a citizen or resident of the United States, a partnership, corporation, company or association created or organized in the United States or under the laws of the United States, or any estate or trust other than a foreign estate or trust.

_____          8/26/2021          Jason Anderson Managing Member
Signature                            Date                Printed Name and Title

*Attention New Customers: The information you provide to open a new Account is subject to the Bank's review and verification. Bank reserves the right to close an Account in the event we are unable to verify the information that you have provided.*

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT — To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. In addition, authorized account signers may be asked to provide identification to verify their identity.

## FOR BANK USE ONLY

Date:  8/26/2021          Branch #:  1151          Employee Initials:  RH

© 2020 WaFd Bank. All rights reserved.



**WaFd** Bank

| | **Business Deposit Account** |
|---|---|
| | **Signature Card** |

Primary Account Owner:  UIU Holdings LLC

### V. AUTHORIZED SIGNERS

Authorized Signer Name and Title:   Jason Anderson- Managing Member

Update:  ☑ Add   ☐ Delete

*Entity Name and/or Account Numbers:   ☑ All Entities   ☐ List Entities:   ☑ All Accounts   ☐ List Accounts:

**Authority: E    Signature:

Authorized Signer Name and Title:

Update:  ☐ Add   ☐ Delete

*Entity Name and/or Account Numbers:   ☐ All Entities   ☐ List Entities:   ☐ All Accounts   ☐ List Accounts:

**Authority:    Signature:

Authorized Signer Name and Title:

Update:  ☐ Add   ☐ Delete

*Entity Name and/or Account Numbers:   ☐ All Entities   ☐ List Entities:   ☐ All Accounts   ☐ List Accounts:

**Authority:    Signature:

Authorized Signer Name and Title:

Update:  ☐ Add   ☐ Delete

*Entity Name and/or Account Numbers:   ☐ All Entities   ☐ List Entities:   ☐ All Accounts   ☐ List Accounts:

**Authority:    Signature:

Authorized Signer Name and Title:

Update:  ☐ Add   ☐ Delete

*Entity Name and/or Account Numbers:   ☐ All Entities   ☐ List Entities:   ☐ All Accounts   ☐ List Accounts:

**Authority:    Signature:

☐ Check box if additional signatures are on an additional page.

\*   Note whether individual is Authorized Signer for all named business entities or only for specified business entities.

\*\*  Description of Authority:  **A** - Open deposit accounts in name of Client; **B** - Endorse checks and other payment orders; **C** - Withdraw or transfer funds from Client accounts; **D** - Enter into agreements for treasury services ; and **E** - all authority under **A**, **B**, **C**, and **D**.

☐ Check box if this Section V. Authorized Signers amends a prior Section V. Authorized Signers and sign below.

Date of Original Signature Card:    Effective Date of Amendment:

Signature    Printed Name and Title

© 2020 WaFd Bank. All rights reserved.

**WaFd** Bank

## V. AUTHORIZED SIGNERS CONTINUED

Authorized Signer Name and Title: _____

Update: ☐ Add ☐ Delete

*Entity Name and/or Account Numbers:    ☐ All Entities ☐ List Entities: _____

☐ All Accounts ☐ List Accounts: _____

**Authority: _____ Signature: _____

---

Authorized Signer Name and Title: _____

Update: ☐ Add ☐ Delete

*Entity Name and/or Account Numbers:    ☐ All Entities ☐ List Entities: _____

☐ All Accounts ☐ List Accounts: _____

**Authority: _____ Signature: _____

---

Authorized Signer Name and Title: _____

Update: ☐ Add ☐ Delete

*Entity Name and/or Account Numbers:    ☐ All Entities ☐ List Entities: _____

☐ All Accounts ☐ List Accounts: _____

**Authority: _____ Signature: _____

---

Authorized Signer Name and Title: _____

Update: ☐ Add ☐ Delete

*Entity Name and/or Account Numbers:    ☐ All Entities ☐ List Entities: _____

☐ All Accounts ☐ List Accounts: _____

**Authority: _____ Signature: _____

---

Authorized Signer Name and Title: _____

Update: ☐ Add ☐ Delete

*Entity Name and/or Account Numbers:    ☐ All Entities ☐ List Entities: _____

☐ All Accounts ☐ List Accounts: _____

**Authority: _____ Signature: _____

---

Authorized Signer Name and Title: _____

Update: ☐ Add ☐ Delete

*Entity Name and/or Account Numbers:    ☐ All Entities ☐ List Entities: _____

☐ All Accounts ☐ List Accounts: _____

**Authority: _____ Signature: _____

---

Authorized Signer Name and Title: _____

Update: ☐ Add ☐ Delete

*Entity Name and/or Account Numbers:    ☐ All Entities ☐ List Entities: _____

☐ All Accounts ☐ List Accounts: _____

**Authority: _____ Signature: _____

© 2020 WaFd Bank. All rights reserved.

## Exhibit A – Accounts Listing

| **WaFd** Bank | **Business Deposit Account**<br>**Signature Card**<br>**Exhibit A – Accounts Listing** |
|---|---|

Primary Account Owner: ___UIU Holdings LLC_____

**Accounts Listing**

| Account Number | Update | Account Number | Update |
|---|---|---|---|
| ████0589 | ☑ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |
| | ☐ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |
| | ☐ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |
| | ☐ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |
| | ☐ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |
| | ☐ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |
| | ☐ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |
| | ☐ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |
| | ☐ Add<br>☐ Delete | | ☐ Add<br>☐ Delete |

☐ *Check box if Exhibit A – Multiple Accounts amends a prior Exhibit A.*

| **FOR BANK USE ONLY** |
|---|
| Date: ___09/10/2021___   Branch #: ___1151___   Employee Initials: ___ME___ |

© 2018 Washington Federal Bank. All rights reserved.



BANK OF AMERICA

**Business Resolution or Authorization for**
**Opening and Maintaining Banking**
**Relationship**

**Name of Business**  UIU HOLDINGS LLC

**Account Number** █████ 0882

**State where Organized/Registered/Principal Place of Business**  DE

**TIN** ████ 7466

**Business Type:**

[ ] **Sole Proprietor**    [ ] **Corporation**    [X] **Limited Liability Company**

[ ] **Partnership**    [ ] **Unincorporated Association**    [ ] **Other**

**1. Resolved,** that (the "Bank") is hereby designated as a depository of the Business and that deposit accounts and/or time deposits (CDs) be opened and maintained in the name of this Business with the Bank in accordance with the terms of the Bank's Deposit Agreement and Disclosures and the applicable rules and regulations for such accounts; that any one of the following authorized representatives, officers, employees, partners, members, managers, as applicable ("Authorized Person"):

**Name** JASON RICHARD ANDERSON          **Title/Status** MANAGING MEMBER

**Name** _____          **Title/Status** _____

**Name** _____          **Title/Status** _____

**Name** _____          **Title/Status** _____

is hereby authorized, on behalf of this Business and in its name, to execute and to sign any application, deposit agreement-related, signature card and any other documentation required by the Bank to open said accounts; to sign checks, drafts, notes, bills of exchange, acceptances, time deposits (CDs) or other orders for payment of money; to endorse checks, drafts, notes, bills, time deposits (CDs) or other instruments owned or held by this Business for deposit with Bank or for collection or discount by the Bank; to accept drafts, acceptances, and other instruments payable at the Bank; to place orders with the Bank for the purchase and sale of foreign currencies on behalf of this Business; to execute and deliver an electronic fund transfers agreement and to make transfers or withdrawals by electronic transfer on behalf of the Business; to obtain an access device (including but not limited to a card, code, or other means of access to the Business's accounts) that may be used for the purpose of initiating electronic fund transfers [Business agrees and acknowledges that neither the Electronic Funds Transfer Act (15 U.S.C. 1693 et seq.) nor Regulation E (12 C.F.R. Part 205) are applicable to any such access device]; to establish and maintain a night deposit relationship; to execute and deliver a wire transfer agreement and to request, or to appoint or delegate from time to time, such persons who may request wires of funds; to enter into any agreements with the Bank for the provision by the Bank of various Treasury Management services to this Business as such Authorized Person may determine, in his or her sole discretion, and to sign any and all documents and take all actions required by Bank relative to such Treasury Management services or the performance of the Business's obligations thereunder, and that any such Treasury Management agreement(s) shall remain in full force and effect until written notice to terminate given in accordance with the terms of any such agreement shall have been received by the Bank and that such termination shall not affect any action taken by the Bank prior to such termination; to rent or lease a safe deposit box from the Bank, to execute the rental agreement or lease, to enter the safe deposit box and to terminate the rental agreement or lease; to take whatever other actions or enter into whatever other agreements relating to the accounts or investment of funds in such accounts with the Bank and to execute, amend, supplement and deliver to Bank such agreements on behalf of the Business upon such terms and conditions as such Authorized Person may deem appropriate and to appoint and delegate, from time to time, such person(s) who may be authorized to enter into such agreements and take any other actions pursuant to such agreements in connection with said accounts that the Authorized Person deems necessary; and to waive presentment, demand, protest, and notice of protest or dishonor of any check, note, bill, draft, or other instrument made, drawn or endorsed by this Business; and

**2. Further Resolved,** that the Bank be and is hereby authorized to honor, receive, certify, pay or exchange for another instrument all instruments signed in accordance with the foregoing Resolution or Authorization, as applicable, even though such payment may create an overdraft or even though such instruments may be drawn, signed or endorsed to the order of any Authorized Person signing the same or tendered by such Authorized Person or a third party for exchange or cashing, or in payment of the individual obligation of such Authorized Person, or for deposit to such Authorized Person personal account and Bank shall not be required or be under any obligation to inquire as to the circumstances of the issuance or use of any instrument signed in accordance with the foregoing Resolution or Authorization, as applicable, or the application or disposition of such instrument or the proceeds thereof; and, further, that the Bank is authorized to honor any instructions regarding withdrawals, orders for payment or transfer of funds whether oral, by telephone or electronic means if such withdrawal, orders or transfer are initiated by an Authorized Person; and

**3. Further Resolved,** that the Bank be and is hereby requested, authorized and directed to honor and to treat as authorized, checks, drafts or other orders for the payment of money drawn or purportedly drawn in this Business's name, including those payable to the individual order of any person

NID
00-14-9120M  09-2017



Page 1 of 3

CONFIDENTIAL TREATMENT REQUESTED BY BANK OF AMERICA, N.A. UNDER FOIA

BANA_SEC_Digital Licensing_000325

Account Number: 0882

whose name appears thereon as signer thereof, when bearing or purporting to bear the facsimile signature of an Authorized Person authorized in the foregoing Resolution or Authorization, as applicable and Bank shall be entitled to honor, to treat as authorized, and to charge this Business for such checks, drafts, or other orders regardless of by whom or by what means the actual or purported facsimile signature thereon may have been affixed thereto, if such signature resembles the facsimile specimen duly certified to or filed with the Bank by the appropriate Authorized Person or if such facsimile signature resembles any facsimile signature previously affixed to any check, draft, or other order drawn in the Business's name, which check, draft, or other order was accepted and paid without timely objection by the Business, thereby ratifying the use of such facsimile signature; and the Business hereby indemnifies and holds the Bank harmless against any and all loss, cost, damage or expense suffered or incurred by the Bank arising out of or in any way related to the misuse or unlawful or unauthorized use by a person of such facsimile signature; and

**4. Further Resolved,** that endorsements for deposit may be evidenced by the name of the Business being written or stamped on the check or other instrument deposited, without designation of the party making the endorsement, and the Bank is authorized to supply any endorsement on any instrument tendered for deposit or collection; and

**5. Further Resolved,** that the appropriate Authorized Person of this Business shall certify to the Bank names and signatures of persons authorized to act on behalf of this Business under the foregoing Resolution or Authorization, as applicable, and in the event a change occurs in the identity of the Authorized Person, the undersigned shall immediately report, furnish and certify such changes to Bank and shall submit to the Bank a new account signature card reflecting such change(s) in order to make such changes effective and the Bank shall be fully protected in relying on such certifications and shall be indemnified and saved harmless from any claims, demands, expenses, losses, or damages resulting from, or growing out of, honoring the signature of any Authorized Person so certified, or refusing to honor any signature not so certified; and

**6. Further Resolved,** that the foregoing Resolution or Authorization, as applicable, shall remain in full force and effect and the authority herein given to all of said persons shall remain irrevocable as far as the Bank is concerned until three (3) business days after Bank is notified in writing of the revocation of such authority and that receipt of such notice shall not affect any action taken by the Bank prior thereto; and

7. **Further Resolved,** that all transactions by the undersigned, or any Authorized Person on its behalf and in its name with the Bank prior to the delivery to Bank of a certified copy of the foregoing Resolution or Authorization, as applicable, are, in all respects, hereby ratified, confirmed, approved and adopted; and

**8. Further Resolved,** that the appropriate Authorized Person be and hereby is, authorized and directed to certify these Resolutions or Authorizations, as applicable, to the Bank and that the provisions hereof are in conformity with the Business's Articles of Incorporation, Articles of Association, Articles of Organization, Charter, Rules, Agreement, Operating Agreement (or other Agreement), and/or Bylaws, as applicable,  and that the appropriate Authorized Person be, and hereby is, authorized and directed to certify, from time to time hereafter, the names of the holders of the above authorized titles and their signatures on any signature card or other documentation required by said Bank.

**Sections 9, 10, 11 are applicable only if Partnership is checked on Page 1**

**9.** That the undersigned shall certify to Bank the names and signatures of the Authorized Person authorized to act on behalf of this Business under the foregoing instructions and notwithstanding any modifications or termination of any of the power of any of the above-named  Authorized Persons to represent said Business, whether by expiration of the Partnership Agreement, by death or retirement of any, or by the accession of one or more new Partners, or otherwise, and notwithstanding any other notice thereof Bank may receive, this authority shall continue to be binding upon each of the undersigned individually and upon our legal representatives, and upon said Partnership and its successors, until written notice to the contrary, signed by one of the undersigned or on his/her behalf by his/her duly authorized agent or representative, shall have been received by the Bank; provided, however that the foregoing instructions shall remain in full force and effect and the authority herein given to all of said persons shall remain irrevocable as far as Bank is concerned until Bank has a reasonable time to act upon such notice to the contrary and such reasonable time cannot be less than three (3) business days after the Bank is notified in writing of the revocation of such authority and that receipt of such notice shall not affect any action taken by the Bank prior thereto; and

**10.** That if any other persons become interested in the Partnership as a Partner or other interested party in the business dealings of the Partnership, or if there is any change in the Partnership that might change the relationship of the Partners or the depository relationship with the Bank, or if said business shall become incorporated, the undersigned shall notify the Bank promptly; and

**11.** That it is expressly understood and agreed that each Partner is and shall be personally liable for the actions taken pursuant to authority granted herein and that the rights evidenced by or contained in this Business Resolution or Authorization, as applicable, are in addition to, and not in limitation of the rights inherent in a Partner; and

**Sections 12, 13, 14 are applicable only if Sole Proprietor is checked on Page 1**

**12.** That if any other person, firm or corporation acquires any right, title or interest in the Business or if my relationship thereto as sole owner be altered in any way, or if said Business shall become incorporated, the undersigned shall notify the Bank promptly; and

**13.** That in consideration of your acceptance of the accounts of said Business under the foregoing name and style, I agree to protect and indemnify Bank against all loss or liability, including court costs and attorney fees, arising from or growing out of the acceptance by said Bank for payment of credit of checks, drafts, notes, bills of exchange, acceptances, certificates of deposits or other orders and instruments drawn to the order of and endorsed in my name and/or in the name of said Business; and

NID
00-14-9120M   09-2017



Page 2 of 3

CONFIDENTIAL TREATMENT REQUESTED BY BANK OF AMERICA, N.A. UNDER FOIA

BANA_SEC_Digital Licensing_000326

Account Number: ████0882

14. That the undersigned has signed, acknowledged and filed in the proper office of the state of the Business's principal place of business any document(s) which may be required by the laws of said state to be filed by a person doing business under a fictitious or assumed name, if applicable.

**In Witness Whereof,** I certify that I am duly authorized to execute this Resolution or Authorization, as applicable, on behalf of the Business, and intending to bind the Business, I have hereunto subscribed my name, in my capacity to certify the adoption of the Resolution or Authorization, this _13_ day of _Nov_ _2019_ _____

_____     _Managing Member._
Signature of Authorized Business Representative / Title

---

### Bank Information

| | |
|---|---|
| Date | 11/13/2019 |
| Financial Center Name | Draper |
| Employee's Name | ███████ |
| Employee's Phone Number | ██████ |



CONFIDENTIAL TREATMENT REQUESTED BY BANK OF AMERICA, N.A. UNDER FOIA

BANA_SEC_Digital Licensing_000327

**Business Signature Card
with Substitute Form W-9**

## BANK OF AMERICA

BANK OF AMERICA, N.A. (THE "BANK")

**Account Number:** ████0882

**Account Type:**  [X] Checking       [ ] Savings       [ ] Certificate of Deposit

**Account Title:** UIU HOLDINGS LLC

---

**Legal Designation**

[X] Individual Owner/Sole Proprietor/Single Member LLC       [ ] C Corporation    [ ] S Corporation    [ ] Trust/Estate

[ ] Partnership (Enter type of partnership): General, LP, LLP or LLLP _____

[ ] Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership) _____
Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

[ ] Other (Defined in W-9 instructions) _____

Exemptions (codes apply only to certain entities, not individuals;
see IRS instructions for Form W-9)
*(Applies to accounts maintained outside the U.S.)*

Exempt payee code (if any) _____
Exemption from FATCA reporting code (if any) _____

Employer Identification Number  ███7466       (or)  Social Security Number _____

---

**By signing below, I/we acknowledge, agree and consent:**

- To open this account and understand this does not change or replace any existing accounts I/we may have with Bank of America.
- This account is and will be governed by the terms and conditions set forth in the account opening documents, including the Deposit Agreement and Disclosures and the Business Schedule of Fees and I/we are in receipt of these documents.
- The Bank may change these documents at any time by adding new terms, or deleting or amending existing terms. The Deposit Agreement includes a provision for alternative dispute resolution.
- The signature(s) will serve as verification for any transaction in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which I/we want interest reported.
- Failure to fully complete and return the signature card may impact the ability to receive full FDIC deposit insurance coverage.

[ ] **Nonresident Alien (NRA) Status:** Check this box if the account holder of this account is a non U.S. entity/person (NRA) for U.S. tax purposes. Have them complete and sign the applicable Form(s) W-8.

**Substitute Form W-9:** Certification – Under penalties of perjury, I certify that:
1. The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (Defined in the W-9 instructions); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification Instructions: You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. (Please refer to the IRS instructions for Form W-9).

**The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

| Printed Name | Title (if applicable) | Signature | Date |
|---|---|---|---|
| JASON RICHARD ANDERSON | MANAGING MEMBER | *(signature)* | Nov 13 2019 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

00-14-9297M 11-2018
NID
© 2018 Bank of America, N.A. All Rights Reserved

Associate Name: Edward Navarrete
Financial Center: Draper

Bank Number: 343
Date: 11/13/2019



# Exhibit 26

  

**UNITED ARAB EMIRATES**
**MINISTRY OF ECONOMY**

الإمارات العربية المتحدة
وزارة الاقتصاد

## تفاصيل الرخصة الاقتصادية / Business License Details

| | | | | |
|---|---|---|---|---|
| 23108 | رقم الرخصة المحلي / BL Local No | 11885985 | رقم السجل الاقتصادي / CBLS No | |
| | | دیجیتال کوموديتي سوفتوير هاوس | الاسم الاقتصادي-عربي / Business Name Arabic | |
| | | DIGITAL COMMODITY SOFTWARE HOUSE | الاسم الاقتصادي-انجليزي / Business Name English | |
| | | مؤسسة منطقة حرة | الشكل القانوني / Legal Type | |
| | رقم المنشأة الأم / Parent BL No | لا | فرع / Is Branch | |
| 30/05/2023 | تاريخ الانتهاء / Expiry Date | 31/05/2022 | تاريخ التأسيس / Est. Date | |
| | | منتهي / Expired | حالة / Status | |
| | | 01/08/2022 | تاريخ التعديل / Modify Date | |
| | | تصميم نظم الحاسب الآلي وأجهزة الإتصال : | اسم النشاط-عربي / BA Desc. Arabic | |
| | | : Software House, | اسم النشاط -انجليزي / BA Desc. English | |
| | | المنطقة الحرة لمطار الشارقة الدولي | مكان الاصدار- امارة / Economic Department | |
| | | | تسجيل فرع/Registration ED Branch | |
| | | 00971503678660 | رقم الهاتف المحمول / Mobile No | |
| | فاكس / Fax No | | رقم الهاتف / Phone No | |
| 6patrick8@gmail.com | البريد الالكتروني / eMail | | رقم صندوق البريد / PO. Box | |
| | | | الموقع الالكتروني / Web Site URL | |
| | | Saif Office Q1-08-049/C Sharjah - U.A.E | العنوان الكامل / Full Address | |





UNITED ARAB EMIRATES
MINISTRY OF ECONOMY

الإمارات العربية المتحدة
وزارة الاقتصاد

## تفاصيل الرخصة الاقتصادية / Business License Details

| | | | |
|---|---|---|---|
| 22922 | رقم الرخصة المحلي / BL Local No | 11997556 | رقم السجل الاقتصادي / CBLS No |
| | | ديجيتال كوموديتي هاوس - ش م ح | الاسم الاقتصادي-عربي / Business Name Arabic |
| | | DIGITAL COMMODITY HOUSE - FZCO | الاسم الاقتصادي-انجليزي / Business Name English |
| | | شركة منطقة حرة | الشكل القانوني / Legal Type |
| | رقم المنشأة الأم / Parent BL No | لا | فرع / Is Branch |
| 14/11/2023 | تاريخ الانتهاء / Expiry Date | 15/11/2022 | تاريخ التأسيس / Est. Date |
| | | Active / فعال | حالة / Status |
| | | 12/06/2023 | تاريخ التعديل / Modify Date |
| | | Simulation Equipment &amp; Systems Trading &amp; Maintenance, : | اسم النشاط-عربي / BA Desc. Arabic |
| | | Simulation Equipment &amp; Systems Trading &amp; Maintenance, : | اسم النشاط -انجليزي / BA Desc. English |
| | | DSO - واحة دبي للسيليكون | مكان الاصدار- امارة / Economic Department |
| | | | تسجيل فرع/Registration ED Branch |
| | | | رقم الهاتف المحمول / Mobile No |
| | فاكس / Fax No | | رقم الهاتف / Phone No |
| | البريد الالكتروني / eMail | | رقم صندوق البريد / PO. Box |
| | | | الموقع الالكتروني / Web Site URL |
| | | DSO | العنوان الكامل / Full Address |

# Exhibit 27

# Wallets In Question



No. Address

| No. | Address | | Group | Label |
|-----|---------|---|-------|-------|
| 1 | d6D0 | | DEBT | EGI POOL |
| 2 | 38f0 | | | DEBT COUNCIL |
| 3 | 94B2 | | | PIGGY BANK |
| 4 | EF45 | | | PAYMENT WALLET |
| 5 | FcD8 | | BGLD | EGI POOL |
| 6 | 9d03 | | | DEBT COUNCIL |
| 7 | 5Ad7 | | | PIGGY BANK |
| 8 | 3536 | | | PAYMENT WALLET |
| 9 | 3536 | | | PAYMENT WALLET |
| 10 | 1c7f | | GROW | EGI POOL |
| 11 | 9058 | | | DEBT COUNCIL |
| 12 | 4054 | | | PIGGY BANK |
| 13 | 7844 | | | PAYMENT WALLET |
| 14 | B534 | | NATG | EGI POOL |
| 15 | 102E | | | DEBT COUNCIL |
| 16 | FA6e | | | PIGGY BANK |
| 17 | d456 | | | PAYMENT WALLET |
| 18 | fBc1 | | XPLR | EGI POOL |
| 19 | cbE1 | | | TREASURY WALLET |
| 20 | 116E | | | PIGGY BANK |
| 21 | 5189 | | | BUY & BURN |
| 22 | 1176 | | DLG | EGI POOL |
| 23 | 55A3 | | | DEBT COUNCIL |
| 24 | C20e | | | PIGGY BANK |
| 25 | 828E | | | PAYMENT WALLET |
| 26 | 2FD8 | | ALUM | EGI POOL |
| 27 | 7ae4 | | | TREASURY WALLET |
| 28 | E203 | | | PIGGY BANK |
| 29 | 6e58 | | | BUY & BURN |
| 30 | E2aC | | BEV | EGI POOL |
| 31 | E98c | | | BUY & BURN |
| 32 | E98c | | | BUY & BURN |
| 33 | 3C88 | | | PIGGY BANK |
| 34 | 384B | | | PAYMENT WALLET |
| 35 | bb2d | | BLOX | EGI POOL |
| 36 | Cf75 | | | PIGGY BANK |
| 37 | 6147 | | | PAYMENT WALLET |
| 38 | B9F8 | | DRIP | EGI POOL |
| 39 | 5B0a | | | AIR DROP |
| 40 | e70d | | | PIGGY BANK |
| 41 | A42E | | | PAYMENT WALLET |
| 42 | De99 | | | TREASURY WALLET |
| 43 | CBFb | | | EGI POOL |



| 44 | ████████████ 60AC | | PIGGY BANK |
| 45 | ████████████ 590B | DCM | BUY & BURN |
| 46 | ████████████ dA83 | | TREASURY WALLET |
| 47 | ████████████ Ffd0 | | AIR DROP |
| 48 | ████████████ 7D7B | REV | EGI POOL |
| 49 | ████████████ 3461 | | BUY & BURN |
| 50 | ████████████ E74e | | |
| 51 | ████████████ FF3E | DCH ASSET | |
| 52 | ████████████ 3684 | | |
| 53 | ████████████ 6e22 | XPLR | LIQUIDITY WALLET |
| 54 | ████████████ a9b8 | GROW | TREASURY WALLET |
| 55 | ████████████ e206 | BGLD | LIQUIDITY WALLET |
| 56 | ████████████ 1BcE | NATG | LIQUIDITY WALLET |
| 57 | ████████████ 69ED | ALUM | LIQUIDITY WALLET |
| 58 | ████████████ 48ek | DCH ASSET | |

Duplicates

Duplicates

# Exhibit 28



# PURCHASE AND LICENSE TERMS OF SALE

Last Modified: April 13, 2022

These DEBT Box Purchase and License Terms of Sale ("**Terms**") are entered into by and between you (" **you**" and " **your**") and Digital Licensing, Inc. and its affiliates, including DEBT Box (collectively " **DEBT** ,"" **we** ," or " **us**"), and govern the purchase and use of hardware and software purchased from us through the Website and the use of the Portal provided by us. When you make a purchase on our Website, these terms are incorporated with the Website Terms and Conditions and collectively form the agreement between you and DEBT. By accepting these Terms you further acknowledge and accept the Website Terms of Use.

**PLEASE READ THESE TERMS CAREFULLY**! THEY INCLUDE AN ARBITRATION PROVISION REQUIRING INDIVIDUAL ARBITRATION OF DISPUTES INSTEAD OF JURY TRIALS OR CLASS ACTIONS. By submitting your order or accepting or using products offered through the Website, you acknowledge that you agree to these Terms in their entirety as further provided in Section 1 below.

1. **Acceptance**

   BY CLICKING THE "I ACCEPT" BUTTON OR SIMILAR ATTESTATION WHEN SUCH OPTION IS MADE AVAILABLE TO YOU WHEN PURCHASING THE HARDWARE AND/OR ANY LICENSE TO SOFTWARE, OR FOR APPLICABLE PROJECTS, OR OTHERWISE REGISTERING FOR THE PORTAL, YOU ACCEPT AND AGREE TO BE BOUND BY THESE TERMS OF USE EFFECTIVE AS OF THE DATE OF SUCH ACTION. YOU EXPRESSLY ACKNOWLEDGE AND REPRESENT

THAT YOU HAVE CAREFULLY REVIEWED THESE TERMS AND CONDITIONS AND FULLY UNDERSTAND THE RISKS, COSTS, AND BENEFITS RELATED TO THE HARDWARE, SOFTWARE, AND ANY APPLICABLE PROJECTS. IF YOU ARE ENTERING INTO THESE TERMS OF USE ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT THAT YOU HAVE THE AUTHORITY TO BIND SUCH ENTITY AND ITS AFFILIATES TO THESE TERMS, IN WHICH CASE THE TERMS "YOU" OR "YOUR" SHALL REFER TO SUCH ENTITY AND ITS AFFILIATES. IF YOU DO NOT AGREE WITH ALL OF THE TERMS SET FORTH HEREIN, THEN YOU ARE EXPRESSLY PROHIBITED FROM MAKING ANY PURCHASE AND USING THE HARDWARE AND SOFTWARE☐YOU MUST DISCONTINUE ANY RESPECTIVE USE IMMEDIATELY.

The Hardware, Software and Portal is intended for users who are at least eighteen (18) years old. Persons under the age of eighteen (18), as well any Disqualified Persons, are not permitted to use the Hardware, Software or Portal.

You are not authorized to use the Hardware, Software or Portal if there are applicable legal restrictions in your country of residence that would make the participation in Projects illegal. It is your sole responsibility to ensure that your use of the Hardware, Software, and/or Portal, including with respect to any applicable Project, is not prohibited, restricted, curtailed, hindered, impaired or otherwise adversely affected in any way by any applicable Law in your country of residence or domicile. In addition, you are not authorized to use the Hardware, Software or Portal if you are:

2. a citizen, domiciled in, resident of, or physically present / located in Iran, North Korea, Cuba, Syria, China, Afghanistan, Central African Republic (the), Congo (the Democratic Republic of the), Libya, Mali, Somalia, Sudan, and Yemen (each an " **Excluded Jurisdiction**").

3. where you are a corporate body: (i) which is incorporated in, or operates out of, an Excluded Jurisdiction, or (ii) which is under the control of one or more individuals who is/are citizens of, domiciled in, residents of, or physically present / located in, an Excluded Jurisdiction;

4. an individual or body corporate: (i) included in the consolidated list published by the United Nations Security Council of individuals or entities subject to measures imposed by the United Nations Security Council accessible at https://www.un.org/securitycouncil/content/un-sc-consolidated-list; or (ii) included in the United Nations Lists (UN Lists) or within the ambit of regulations relating to or implementing United Nations Security Council Resolutions listed by MAS and accessible by https://www.mas.gov.sg/regulation/anti-money-laundering/targeted-financial-sanctions/lists-of-designated-individuals-and-entities and https://www.mas.gov.sg/regulation/anti-money-laundering/targeted-financial-sanctions/regulations-for-targeted-financial-sanctions; or

5. an individual or corporate body who is otherwise prohibited or ineligible in any way, whether in full or in part, under any law applicable to such individual or corporate body from participating in any part of any Projects.

If you are not authorized to use the Hardware, Software, or Portal under this Section 1, you are deemed a "**Disqualified Person**" under these Terms.

6. **Definitions**. Any capitalized terms not otherwise defined in these Terms shall have the meaning set forth in the Website Terms and Conditions

   1. "**Action**" has the meaning set forth in Section 12.1.
   2. "**Customer Data**" means information, data, and other content, in any form or medium, that is collected, downloaded, or otherwise

received, directly or indirectly, from you by or through the Hardware, Software, and/or Portal. Customer Data does not included Resultant Data.

3. "**Disputes**" has the meaning set forth in Section 15.

4. "**Disqualified Person**" has the meaning set forth in Section 1 above.

5. "**Documentation**" means DEBT's end-user documentation relating to the Hardware, Software and/or Portal that DEBT provides or makes available to you in any form or medium which describes the functionality, components, features, or requirements of the Software, including any aspect of the installation, configuration, integration, operation, or use of the Hardware, Software and/or Portal with any applicable Project.

6. "**Excluded Jurisdictions**" has the meaning set forth in Section 1 above.

7. "**Fees**" has the meaning set forth in Section 3.3 below.

8. "**Hardware**" means the devices manufactured by Raspberry Pi Ltd. "(**Raspberry Pi**"), purchased by DEBT for resale under Raspberry Pi's standard Terms and Conditions of Sale found at https://www.raspberrypi.com/terms-conditions-sale/

9. "**Harmful Code**"means any software, hardware, or other technology, device, or means, including any virus, worm, malware, or other malicious computer code, the purpose or effect of which is to (a) permit unauthorized access to, or to destroy, disrupt, disable, distort, or otherwise harm or impede in any manner any (i) computer, software, firmware, hardware, system, or network; or (ii) any application or function of any of the foregoing or the security, integrity, confidentiality, or use of any data processed thereby; or (b) prevent any customer of DEBT from accessing or using

the Portal, Hardware, Software, or any Project as intended by these Terms.

10. "**Indemnitee**" has the meaning set forth in Section 12.3.

11. "**Indemnitor**" has the meaning set forth in Section 12.3.

12. "**Intellectual Property Rights**" means any and all registered and unregistered rights granted, applied for, or otherwise now or hereafter in existence under or related to any patent, copyright, trademark, trade secret, database protection, or other intellectual property rights Laws, and all similar or equivalent rights or forms of protection, in any part of the world.

13. "**JAMS**" has the meaning set forth in Section 15.

14. "**Law(s)**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, or other requirement of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

15. "**Losses**" means any and all losses, damages, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the costs of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

16. "**Maintenance Release(s)**" means any update, upgrade, release, or other adaptation or modification of the Software, including any updated Documentation, that DEBT may provide to you from time to time, which may contain, among other things, error corrections, enhancements, improvements, or other changes to the user interface, functionality, compatibility, capabilities, performance, efficiency, or

quality of the Software, but does not include any new version of the Software.

17. "**Open Source Components**" means any software component that is subject to any open source license agreement, including any software available under the GNU Affero General Public License (AGPL), GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), Apache License, BSD licenses, or any other license that is approved by the Open Source Initiative.

18. "**Open Source Licenses**" has the meaning set forth in Section 4.2.

19. "**Portal**" has the meaning set forth in Section 7.1.

20. "**Projects**" partner projects compatible with the Software that are selectable by you to participate through the purchase of a license to such respective project, as provided on the Website.

21. "**Raspberry Pi**" has the meaning set forth in Section 2.7.

22. "**Resultant Data**" means data and information related to your use of the Hardware, Software and/or Portal that is used by DEBT in an aggregate and/or anonymized manner, including to compile statistical and performance information related to the provision and operation of the Hardware, Software and/or Portal.

23. "**Software**" means the executable, object code version of the software pre-loaded on the Hardware, and any Maintenance Releases provided to you pursuant to these Terms and which allow up to the selection of twenty (20) Projects to run on the Hardware and generate Tokens.

24. "**Terms**" has the meaning set forth in Section 14.

25. "**Tokens**" means the cryptocurrency generated as a result of the participation in any specific project utilizing the Software

and Hardware in accordance with these Terms.

26. "**Warranty Period**" has the meaning set forth in Section 10.1 below.

7. **Purchase Terms**

1. Orders and Acceptance. You agree that any order to purchase Hardware and any license to Software and respective Projects are an offer, under these Terms. All orders must be accepted by us or we will not be obligated to sell the Hardware or Software licenses to you. We may choose not to accept orders at our sole discretion, even after we send you a confirmation email with your order number and details of your order.

2. Purchase Restrictions. The following purchase restrictions apply:

   1. *Hardware Purchase Restrictions*. Upon your initial purchase of the Software license, you will receive the necessary Hardware to run the Software at no additional charge. This right to free Hardware with the purchase of Software is limited to your first purchase only at a limit of one per customer. Any additional Hardware desired by you or otherwise required to run additional Projects licensed with the Software must be purchased at the then current Fee price (as further provided in Section 3.3 below). You may not obtain any additional Hardware for free under any circumstances. You agree that you will not create any secondary accounts, or use other third parties as a proxy to obtain any additional free Hardware.

   2. *Software and Underlying Project License Purchase Restrictions*. The price of the Software license is dependent upon the number of Projects you select and purchase a license to. Each Hardware device with the Software can run up to twenty (20)

Projects. Please refer to Section 3.3 for more information about Fees and how to determine the current Fee price of any respective Project. If you purchase more than twenty (20) Projects, you will need to purchase additional Hardware as necessary to support the additional Projects exceeding the allotted twenty (20) Projects per device.

3. Payment Terms. We accept payment for Hardware, Software and Project Licenses using the following Methods:

   1. **Cryptocurrency Payment** – You may make payments using cryptocurrencies through our third-party payment processor CoinPayments. The cryptocurrencies accepted by CoinPayments are not controlled by the DEBT Box or DLI. Payment of accepted cryptocurrencies will be at the rates equivalent to the comparative U.S. Dollar value of such cryptocurrency at the time of the purchase.

   2. **Credit Card Payment** – Payment using a credit card through our third-party payment processor Signature Bank. DEBT does not control which credit cards are accepted by Signature Bank.

You represent and warrant that (a) the payment information (including any related digital wallet information for cryptocurrency transactions or credit card numbers you supply to us are true, correct and complete, (b) you are duly authorized to use such payment information to make a purchase, (c) where applicable, charges incurred by you will be honored by your credit card company, and (d) you will pay charges incurred by you at the posted Fee prices, including shipping and handling charges and all applicable taxes, if any, incurred at the time of your order. The information collected by third-party payment processors, including Bitpay and Signature Bank, are subject to their respective terms and conditions and privacy policy. DEBT is

not responsible for the actions of any third-party
Case 2:23-cv-00482-RJS   Document 125-3   Filed 09/01/23   PageID.2120   Page 75 of 119
payment processor.

8. **Licenses; Security Measures Intellectual Property Rights**

   1. License Grant. Subject to and conditioned on your payment of the applicable Fees with respect to the Hardware, Software and applicable Projects, and further conditioned upon the compliance with these Terms, DEBT hereby grants to you a non-exclusive, non-sublicensable, and non-transferable license to use the Software and Documentation to run the applicable Projects you selected and paid Fees to participate in, on the purchased Hardware and solely in accordance with the requirements set forth in the Documentation.

   2. Open Source Licenses. The Software includes Open Source Components licensed for use with the Software. Any use of the Open Source Components by you is governed by, and subject to, the terms and conditions of the applicable open source license(s).

   3. Security Measures. The Hardware, Software, and Portal may contain technological measures designed to prevent unauthorized or illegal use. You acknowledges and agrees that DEBT may use these technological measures and other lawful measures to verify your compliance with these Terms and enforce DEBT's rights, including all Intellectual Property Rights, in and to the Software and Portal.

   4. License and Use Restrictions for the Portal and Software. Except as these Terms expressly permits, and subject to Section 4.2 with respect to Open Source Components, you shall not:

9. copy the Software or Portal, in whole or in part;

10. modify, correct, adapt, translate, enhance, or otherwise prepare derivative works or improvements of any Software or Portal;

11. rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Software or Portal to any third party;

12. reverse engineer, disassemble, decompile, decode, or adapt the Software or Portal, or otherwise attempt to derive or gain access to the source code of the Software or Portal, in whole or in part;

13. bypass or breach any security device or protection used for or contained in the Software, Portal, or Documentation;

14. remove, delete, efface, alter, obscure, translate, combine, supplement, or otherwise change any trademarks, terms of the Documentation, warranties, disclaimers, or Intellectual Property Rights, proprietary rights or other symbols, notices, marks, or serial numbers on or relating to any copy of the Software, Portal, or Documentation;

15. use the Software or Portal in any manner or for any purpose that infringes, misappropriates, or otherwise violates any Intellectual Property Right or other right of any person, or that violates any applicable Law;

16. use the Software or Portal for purposes of: (i) benchmarking or competitive analysis of the Software or Portal; (ii) developing, using, or providing a competing software product or service; or (iii) any other purpose that is to DEBT's detriment or commercial disadvantage; and

17. use the Software, Portal, or Documentation in any manner or for any purpose or application not expressly permitted under these Terms.

1. Intellectual Property Rights. You acknowledge that:

18. the Software, rights to use the Portal, and Documentation are licensed, not sold, to you by DEBT and you do not have under or in

connection with these Terms any ownership interest in or to the Software or Documentation, or in any related Intellectual Property Rights therein.

19. DEBT and its applicable licensors are the sole and exclusive owners of all right, title, and interest in and to the Software, Portal, and Documentation, including all Intellectual Property Rights relating thereto, subject only to the rights of third parties in Open Source Components and the limited license granted to you under these Term; and

20. you hereby unconditionally and irrevocably assign to DEBT or DEBT's designee, your entire right, title, and interest in and to any Intellectual Property Rights that you may now or hereafter have in or relating to the Software, Documentation, and Resultant Data (including any rights in derivative works or patent improvements), whether held or acquired by operation of Law, contract, assignment or otherwise.

1. No Implied Rights. Except for the limited rights and licenses expressly granted under these Terms, nothing in these Terms grants, by implication, waiver, estoppel or otherwise, to you or any third party, any Intellectual Property Rights or other right, title, or interest in or to any of the Software, Portal, or Documentation.

21. **Maintenance Releases**. During the Warranty Period, and at DEBT's sole discretion following the Warranty Period, DEBT will provide you with all Maintenance Releases (including updated Documentation) that we may, in our sole discretion, make generally available to its licensees at no additional charge. All Maintenance Releases provided by DEBT to you are deemed Software. You will install all Maintenance Releases as soon as practicable after receipt. You do not have any right hereunder to receive any new versions of the

Software that DEBT may, in its sole discretion, release from time to time.

22. **Digital Wallet**. The digital wallet used in the Software is an Open-Source Component. Such digital wallet has a public key and a private key. You will be provided the private key and will alone have access to such private key. DEBT does not store your private key in any reasonably accessible manner and cannot help you retrieve your private key if you lose such private key. You have the sole responsibility to maintain, in your fully secure possession, the credentials for accessing your digital wallet, including the private key for your digital wallet.

23. **DEBT Portal**.

    1. Portal. Use of theHardware and participation in any Projects further requires the creation and maintenance of an account for our DEBT dashboard to keep track of respective Projects licensed, the performance of Projects, and other related information associated with your use of the Hardware and Software (such dashboard herein referred to as the " **Portal**"). DEBT hereby grants you a non-exclusive, non-transferable right to access and use the Portal during the Term in accordance with the terms and conditions herein. Such use is limited to your internal use with your Hardware, Software and applicable Projects.

    2. Changes to the Portal. DEBT reserves the right, in its sole discretion, to make any changes to the Portal that it deems necessary or useful to: (a) maintain or enhance: (i) the quality or delivery of the Portal and its related services to its customers; or (ii) the Portal's cost efficiency or performance; or (b) to comply with applicable Law.

    3. Portal Use Restrictions. Use restrictions of the Portal are set forth ins Section 4.4 above.

    4. Portal Account. To make use of any purchased license, you will need to create an account, including providing a verifiable

email address and creating a unique password. You are responsible for your account activity, including unauthorized activity. You must safeguard the confidentiality of your account credentials, including your username and password. If you become aware of unauthorized access to your account, you must change your password and notify us immediately.

5. Customer Data. The Portal, connected through your established account and connected Hardware, Software and associated Projects, will process Customer Data. As between you and DEBT, you are and will remain the sole and exclusive owner of all right, title, and interest in and to all Customer Data, including all Intellectual Property Rights relating thereto, subject to the rights and permissions granted herein. You represent, warrant, and covenant to DEBT that you own or otherwise have and will have the necessary rights and consents in and relating to the Customer Data so that, as received by DEBT and processed in accordance with these Terms, they do not and will not infringe, misappropriate, or otherwise violate any Intellectual Property Rights, or any privacy or other rights of any third party or violate any applicable Law. You hereby irrevocably grant all such rights and permissions in or relating to Customer Data as necessary or useful to DEBT to enforce these Terms and exercise DEBT's rights and perform DEBT's obligations hereunder. Any Customer Data collected or otherwise processed by DEBT will be processed in accordance with DEBT's privacy policy thedebtbox.com/privacy.

24. **Shipment; Title and Risk of Loss**

1. Shipment. We will arrange for shipment of the products to you. You will pay all shipping and handling charges specified during the ordering process. Shipping and handling charges are reimbursements for

the costs we incur in the processing, handling, packing, shipping, and delivery of your order.

2. Title and Risk of Loss. Title and risk of loss passes to you upon our transfer of the products to the shipping carrier. Shipping and delivery dates are estimates only and cannot be guaranteed. We are not liable for any delays in shipments.

25. **No Returns or Refunds**.The Fees paid with respect to the Hardware, Software, and any applicable Projects are non-refundable, and we do not accept any returns of Hardware for any reason, except as otherwise may be required under applicable Law.

26. **Limited Hardware Warranty; Disclaimers**.

1. Limited Hardware Warranty. DEBT warrants to you that, for a period of twelve (12) months from the date of shipment of the Hardware (" **Warranty Period**"), such Hardware shall be free from material defects in material and workmanship. Our responsibility for defective Hardware is limited to repair or replacement as described in Section 10.2 below.

2. Limited Hardware Warranty Remedy. With respect to any defective Hardware during the Warranty Period, we will, in our sole discretion, either repair or replace such Hardware (or the defective part) free of charge. We will also pay for shipping and handling fees to return the repaired or replaced Hardware to you. To obtain warranty service, you must email our customer service department at support@thedebtbox.com during the Warranty Period. The remedies described above are your sole and exclusive remedies and our entire liability for any breach of the limited warranty provided in Section 10.1 above.

3. Disclaimer Warranties. EXCEPT AS EXPRESSLY SET FORTH IN SECTION 10.1

ABOVE, ALL HARDWARE AND SOFTWARE OFFERED ON THE WEBSITE, INCLUDING THE PORTAL ARE PROVIDED "AS IS" WITHOUT ANY WARRANTY WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; OR (C) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER EXPRESS OR IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. SOME JURISDICTIONS LIMIT OR DO NOT ALLOW THE DISCLAIMER OF IMPLIED OR OTHER WARRANTIES, IN WHICH CASE, THE DISCLAIMER IN THIS SECTION 10.3 MAY NOT APPLY TO YOU. DEBT SHALL NOT BE LIABLE OR OTHERWISE RESPONSIBLE FOR ANY DATA LOSS RELATING TO ANY CUSTOMER DATA, AND SHALL HAVE NO OBLIGATION TO BACK-UP ANY SUCH CUSTOMER DATA.

4. PROJECT DISCLAIMER. DEBT IS NOT AFFILIATED WITH, NOR DOES IT RECOMMEND ANY SPECIFIC PROJECT FOR YOU TO CHOOSE TO PARTICIPATE IN USING THE SOFTWARE. DEBT SOFTWARE ALLOWS YOU TO ACT AS A NODE FOR ANY OF YOUR CHOSEN PROJECTS, BUT THE SUCCESS OF ANY SUCH PROJECT, UNDERLYING TRANSACTIONS, AND TOKENS GENERATED IS NOT CONTROLLED IN ANY WAY BY DEBT. YOU AGREE THAT DEBT SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY FOR, ARISING OUT OF, RELATING TO, ASSOCIATED WITH OR RESULTING FROM YOUR PARTICIPATION IN ANY PROJECT. YOU BEAR FULL RESPONSIBILITY FOR VERIFYING THE LEGITIMACY AND AUTHENTICITY PROJECTS YOU PARTICIPATE IN USING THE SOFTWARE.

5. DIGITAL WALLET DISCLAIMER. DEBT HAS NO CONTROL OVER YOUR DIGITAL WALLET AND CANNOT GUARANTEE THE SECURITY OF ANY SUCH DIGITAL WALLET. CONTINUED STORAGE OF ANY TOKENS OR OTHER DIGITAL ASSETS ON THE DIGITAL WALLET PROVIDED WITH THE HARDWARE OR ANY OTHER DIGITAL WALLET YOU MAY TRANSFER TOKENS OR DIGITAL ASSETS TO, IS DONE SO AT YOUR OWN RISK. IN THE EVENT OF ANY LOSS, HACK OR THEFT OF ANY TOKENS OR OTHER DIGITAL ASSETS FROM YOUR DIGITAL WALLET, YOU ACKNOWLEDGE AND AGREE THAT YOU SHALL HAVE NO RIGHT(S), CLAIM(S) OR CAUSES OF ACTION IN ANY WAY WHATSOEVER AGAINST DEBT FOR SUCH LOSS, HACK OR THEFT OF ANY SUCH DIGITAL ASSET.

6. Inherent Risk of Cryptographic Systems. You hereby acknowledge and assume the risk of using the Hardware and Software with respect to Projects and the inherent risks of blockchain technologies and mining tokens, including:

27. **Many market, technological and legal forces are outside the exclusive control of Management Company.** Cryptocurrencies such as Tokens, blockchain technology, and other associated and related technologies are not exclusively controlled by DEBT and adverse changes in market forces, including but not limited to, amendments to regulatory or intellectual property law, technological advancements, decreases in token or cryptocurrency or cryptographic token utility, social or economic reforms, the failure of commercial relationships, or the malfunction, breakdown or abandonment of the cryptocurrency protocols may affect the performance of any Project.

28. **The application of blockchain technology is novel and untested and may contain**

**inherent flaws or limitations.** Blockchain is an emerging technology that offers new capabilities which are not fully proven in use. Risks associated with the blockchain technology could affect the performance of any Project, including the market for blockchain assets generally.

29. **The success of any respective Project requires interest from a large number of validators and/or other network participants.** The success of any applicable Project relies on a significant number of parties willing to act as validators and/or miners, supporters or other participants of the network. There is no guarantee however, that a sufficient number of individuals will continue participate in any respective Project. No one is contractually or legally obligated to continue to participate in any applicable Project and may cease participation if they determine that such participation is no longer profitable, if they are prevented from doing so by government or regulatory agencies, or for any other reason. If participants cease to continue supporting the a respective Project, such Project may be unable to function and the value of underlying Tokens may decline or decrease to zero.

30. **Tokens are not insured.** Tokens are not insured by any governmental or regulatory entity. In the event of loss, or the loss of the utility value of Tokens, you will have no recourse (and shall never have recourse against DEBT in accordance with these Terms) unless you have obtained private insurance for such respective Tokens.

31. **There is no guarantee that any Tokens will hold value or increase in value.** Tokens and other cryptocurrencies are highly speculative, and any increase in value of respective Tokens is contingent upon numerous circumstances, many of which (including legal and regulatory conditions) are beyond DEBT's control. There is no assurance that any Token will increase in

value, or that applicable Tokens will have any value or liquidity when you acquire them.

32. **The tax treatment of the tokens is uncertain and there may be adverse tax consequences.** The tax characterization of Tokens is uncertain, and holding Tokens may result in adverse tax consequences.

33. **Regulatory Uncertainty**. The regulatory regime governing blockchain technologies, cryptocurrency, and other crypto-based items is uncertain, and new regulations or policies may materially adversely affect the value of any Project and/or Tokens generated using the Hardware and Software.

34. **Distributed Ledger Technology risk**. There are risks associated with using Internet and distributed-ledger or other blockchain based products, including, but not limited to, the risk associated with hardware, software, and Internet connections, the risk of malicious software introduction, and the risk that third parties may obtain unauthorized access to your digital wallet or account.

35. **Third-Party Services**. We do not control third-party services or products like the underlying blockchains that the respective Projects run on, the digital wallets, or other third-party products that you may be interacting with that may be integral to your ability to participate in Projects and generate and store Tokens. Such third parties may experience system outages or other technological events that disrupt your ability to participate in a respective Project during such disruption.

1. No Investment Advice. DEBT is acting solely as a technology services provider and does not provide any investment, tax or other advisor services regarding Tokens, Projects, or otherwise.

2. Applicable Law. The use of the Hardware and Software to participate in applicable Projects are subject to all applicable Laws. DEBT reserves the right to make changes to

its policies, operational guides, procedures, and protocols, including any changes to Documentation and/or Software, as necessary to comply with Law.

36. **Limitation of Liability**, IN NO EVENT SHALL WE BE LIABLE TO YOU OR ANY THIRD PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF, OR RELATING TO, AND/OR IN CONNECTION WITH ANY BREACH OF THESE TERMS, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT WE WERE ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED. OUR SOLE AND ENTIRE MAXIMUM LIABILITY AND YOUR SOLE AND EXCLUSIVE REMEDY FOR ANY CAUSE WHATSOEVER, SHALL BE LIMITED TO THE ACTUAL AMOUNT PAID BY YOU FOR THE PRODUCTS AND SERVICES YOU HAVE ORDERED THROUGH OUR WEBSITE.

37. **Indemnification**

   1. DEBT Indemnification of You. DEBT shall indemnify, defend, and hold you harmless from and against any and all Losses incurred by you resulting from any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or other, whether at law, in equity, or otherwise, (" **Action**") by a third party that the Software or Documentation, or any use of the Software or Documentation in accordance with these Terms, infringes or misappropriates such third party's US Intellectual Property Rights. This Section 12.1 does not apply to

the extent that the alleged infringement arises from:

38. combination, operation, or use of the Software in or with, any technology (including any software, hardware, firmware, system, or network) or service not provided by DEBT or specified for your use in the Documentation;

39. modification of the Software other than: (a) by DEBT in connection with these Terms; or (b) with DEBT's express written authorization and in strict accordance with DEBT's written directions and specifications;

40. use of any version of the Software other than the most current version or failure to timely implement any Maintenance Release, modification, update, or replacement of the Software made available to you by DEBT;

41. use of the Software after DEBT's notice to you of such activity's alleged or actual infringement, misappropriation, or other violation of a third party's rights;

42. negligence, abuse, misapplication, or misuse of the Hardware, the Software or Documentation by or on behalf of you, your representatives, or a third party;

43. use of the Hardware, Software or Documentation by or on behalf of you that is outside the purpose, scope, or manner of use authorized by these Terms or in any manner contrary to DEBT's instructions;

44. events or circumstances outside of DEBT's commercially reasonable control (including any third-party hardware, software, or system bugs, defects, or malfunctions); or

45. third-party claims or Losses for which you are obligated to indemnify DEBT pursuant to Section 12.2 .

  1. Your Indemnification of DEBT. You agree that you shall indemnify, defend, and hold harmless DEBT and its affiliates, and each of its and their respective officers, directors, employees, agents, subcontractors,

successors and assigns from and against any and all Losses incurred by you resulting from any Action by a third party:

46. that any Intellectual Property Rights is or will be infringed, misappropriated, or otherwise violated by any use or combination of the Software and/or Portal by you with any hardware, software, system, network, service, or other matter whatsoever that is neither provided by DEBT nor authorized by DEBT under these Terms and the Documentation; and

47. relating to facts that, if true, would constitute a breach by you of any representation, warranty, covenant, or obligation under these Terms;

48. relating to your negligence, abuse, misapplication, misuse or more culpable act or omission (including recklessness or willful misconduct) with respect to the Software, Portal, or Documentation or otherwise in connection with these Terms; or

49. relating to your use of the Software or Portal that is outside the purpose, scope or manner of use authorized by these Terms or the Documentation, or in any manner contrary to DEBT's instructions.

1. Indemnification Procedures. Each party shall promptly notify the other party in writing of any Action for which such party believes it is entitled to be indemnified pursuant to Section 12.1 or Section 12.2. The party seeking indemnification (the "**Indemnitee**") shall cooperate with the other party (the "**Indemnitor**") at the Indemnitor's sole cost and expense. The Indemnitor shall promptly assume control of the defense and investigation of such Action and shall employ counsel of its choice to handle and defend the same, at the Indemnitor's sole cost and expense. The Indemnitee may participate in and observe the proceedings at its own cost and

expense with counsel of its own choosing. The Indemnitor shall not settle any Action on any terms or in any manner that adversely affects the rights of any Indemnitee without the Indemnitee's prior written consent, which shall not be unreasonably withheld or delayed. The Indemnitee's failure to perform any obligations under this Section 12.3 will not relieve the Indemnitor of its obligations under this Section 12, except to the extent that the Indemnitor can demonstrate that it has been materially prejudiced as a result of such failure.

50. **Goods Not for Resale or Export**. You represent and warrant that you are buying the Hardware and respective Software and Project licenses from the Website for your own personal or household use only, and not for resale or export. You further represent and warrant that all purchases are intended for final delivery to locations outside the Excluded Jurisdictions and will not be provided to any Disqualified Person.

51. **Term**. This agreement shall commence on the day you accept these terms and shall continue for so long as you use the Hardware and/or Software (the "**Term**").

52. **Dispute Resolution**. PLEASE READ THIS SECTION CAREFULLY BECAUSE IT IS AN AGREEMENT TO ARBITRATE DISPUTES AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF.

In consideration for our provision of the Hardware, Portal, and Software to you, you and DEBT each agree that any and all disputes or claims arising under, out of, in connection with, or related to your use of the Hardware, Portal, Software, or these Terms in any fashion, or the subject matter, negotiation, performance, termination, interpretation, or formation of the agreement resulting from your acceptance of these Terms, (a "**Dispute**") must be resolved exclusively in binding arbitration. However, a

party may assert a claim in small claims court, if the asserted claim qualifies and so long as the matter remains in such court and advances only on an individual (non-class, non-representative) basis. These Terms, including the right to Arbitrate, is intended to be broadly interpreted and the Federal Arbitration Act governs the enforcement of these Terms to arbitrate.

For any Dispute with DEBT, you agree first to contact us at support@thedebtbox.com and attempt to resolve the Dispute with us informally. In the event that we do not resolve a Dispute informally, we each agree to resolve any Dispute (excluding any claims for injunctive or other equitable relief) arising out of or in connection with or relating to these Terms, or the breach or alleged breach thereof, by binding arbitration by the Judicial Arbitration and Mediation Services (**JAMS**") pursuant to its Comprehensive Arbitration Rules and Procedures and shall be conducted in Wyoming, unless otherwise agreed to in writing by the parties. Each party will be responsible for paying any JAMS filing, administrative and arbitrator fees in accordance with JAMS rules. The award rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses, and any judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Nothing in this Section shall prevent either party from seeking injunctive or other equitable relief from the courts as necessary to prevent the actual or threatened infringement, misappropriation, or violation of that party's data security, intellectual property rights, or other proprietary rights.

No Class Action; No Jury Trial.ALL CLAIMS MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY, AND NO CLASS ACTION OR REPRESENTATIVE OR PRIVATE ATTORNEY

GENERAL THEORIES OF LIABILITY OR PRAYERS FOR RELIEF MAY BE MAINTAINED IN ANY ARBITRATION OR OTHER PROCEEDING UNDER THESE TERMS. UNLESS WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS. YOU AGREE THAT, BY ENTERING INTO THESE TERMS, YOU AND WE ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.

53. **Miscellaneous**

   1. Severability. Every provision of these Terms will be construed, to the extent possible, so as to be valid and enforceable. If any provision of these Terms is construed or held by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, such provision will be deemed severed from these Terms, and all other provisions will remain in full force and effect.

   2. Governing Law.These Terms and any dispute arising out of these Terms, shall be governed by and construed in accordance with the laws of the State of Wyoming, without giving effect to any choice or conflict of law provision or rule (whether of the State of Wyoming or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than those of the State of Wyoming.

   3. Entire Agreement. These Terms, together with the Terms of Use, our Privacy Policy, and any amendments and any additional agreements you may enter with us in connection with the use of the Website, Hardware, Software, or Portal, constitute the entire agreement between you and us.

   4. Waiver. Our failure at any time to enforce any of the provisions of these Terms or any right or remedy available hereunder or at law or in equity, or to exercise any option herein provided, will not constitute a waiver of such provision, right, remedy or option or

in any way affect the validity of these Terms. Our waiver of any default will not be deemed a continuing waiver, but will apply solely to the instance to which such waiver is directed.

5. Headings; Summaries. The section headings and any plain English summaries appearing in these Terms are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or extent of such section or in any way affect such section.

6. No Assignment. These Terms, and any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by us without restriction. Any attempted transfer or assignment in violation hereof shall be null and void.

7. No Third-Party Beneficiaries. Other than as expressly provided in these Terms, no third-party beneficiaries are intended or will be construed as created by these Terms.

8. Survival. All Sections which by their nature should survive the termination of these Terms shall continue in full force and effect, notwithstanding any termination of these Terms.

9. Notices; Electronic Communications. DEBT may provide notifications, whether such notifications are required by law or are for marketing or other business-related purposes through posting of such notice on the Website. You agree that all agreements, notices, disclosures, and other communication we provide to you via the Website to satisfy any legal requirement that such communications be in writing. We reserve the right to determine the form and means of providing notification to our users.



TOKEN

PROJECTS

SPECIFICATIONS

PRIVACY POLICY

TERMS AND CONDITIONS

STORE



© 2022 DEBT. All rights reserved.

# Exhibit 29

Last Modified: June 12, 2023

These D.E.B.T. Purchase and License Terms of Sale ("**Terms**") are entered into by and between you ("**you**" and "**your**") and Digital Commodity House, FZCO and its affiliates, (collectively "**D.E.B.T.**," "**we**," "**our**" or "**us**"), and govern (1) the purchase and use of our hardware and software, and services purchased from us or through an authorized reseller, and (2) the use of our Portal and services (collectively, the "**Services**")

**PLEASE READ THESE TERMS CAREFULLY** THEY INCLUDE AN ARBITRATION PROVISION REQUIRING INDIVIDUAL ARBITRATION OF DISPUTES INSTEAD OF JURY TRIALS OR CLASS ACTIONS. By submitting your order or accepting or using products offered through the Website, you acknowledge that you agree to these Terms in their entirety as further provided in Section 1 below.

# 1. Acceptance

BY CLICKING THE "I ACCEPT" BUTTON OR SIMILAR ATTESTATION WHEN SUCH OPTION IS MADE AVAILABLE TO YOU WHEN MAKING ANY PURCHASE, REGISTERING FOR THE PORTAL, OR USING THE SERVICES, YOU ACCEPT AND AGREE TO BE BOUND BY THESE TERMS OF USE EFFECTIVE AS OF THE DATE OF SUCH ACTION. YOU EXPRESSLY ACKNOWLEDGE AND REPRESENT THAT YOU HAVE CAREFULLY REVIEWED THESE TERMS AND CONDITIONS AND FULLY UNDERSTAND THE RISKS, COSTS, AND BENEFITS RELATED TO THE HARDWARE, SOFTWARE, SERVICES, AND ANY APPLICABLE PROJECTS ASSOCIATED WITH A PROJECT MINING LICENSE. IF YOU ARE ENTERING INTO THESE TERMS OF USE ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT THAT YOU HAVE THE AUTHORITY TO BIND SUCH ENTITY AND ITS AFFILIATES TO THESE TERMS, IN WHICH CASE THE TERMS "YOU" OR "YOUR" SHALL REFER TO SUCH ENTITY AND ITS AFFILIATES. IF YOU DO NOT AGREE WITH ALL OF THE TERMS SET FORTH HEREIN, THEN YOU ARE EXPRESSLY PROHIBITED FROM (1) MAKING ANY PURCHASE, (2) USING THE HARDWARE AND SOFTWARE, AND (3) USING AND ACCESSING THE SERVICES.YOU MUST DISCONTINUE ANY RESPECTIVE USE IMMEDIATELY.

The Hardware, Software and Services are intended for users who are at least eighteen (18) years old. Persons under the age of eighteen (18), as well as any Disqualified Persons, are not permitted to use the Hardware, Software or Service.

You are not authorized to use the Hardware, Software or Services if there are applicable legal restrictions in your country of residence that would make the (1) operation of the Hardware or Software illegal, or (2) the access and/or use of the Services illegal. It is your sole responsibility to ensure that your use of the Hardware, Software, and/or Services, is not prohibited, restricted, curtailed, hindered, impaired or otherwise adversely affected in any way by any applicable Law in your country of residence or domicile. In addition, you are not authorized to use the Hardware, Software or Services if you are:

1. a citizen, domiciled in, resident of, or physically present / located in Afghanistan, the Balkan Region, Belarus, Burma, Cuba, Democratic Republic of Congo, Iran, Iraq, North Korea, Sudan and South Sudan, Syria, Zimbabwe,

Central African Republic, Lebanon, Mali, Nicaragua, Somalia, Venezuela, Yemen, Russia, or the Crimea, Donetsk and Luhansk region (each an "Excluded Jurisdiction").

2. where you are a corporate body: (i) which is incorporated in, or operates out of, an Excluded Jurisdiction, or (ii) which is under the control of one or more individuals who is/are citizens of, domiciled in, residents of, or physically present / located in, an Excluded Jurisdiction;

3. an individual or corporate body: (i) included in the consolidated list published by the United Nations Security Council of individuals or entities subject to measures imposed by the United Nations Security Council accessible at https://www.un.org/securitycouncil/content/un-sc-consolidated-list; or (ii) included in the United Nations Lists (UN Lists) or within the ambit of regulations relating to or implementing United Nations Security Council Resolutions listed by MAS and accessible by https://www.mas.gov.sg/regulation/anti-money-laundering/targeted-financial-sanctions/lists-of-designated-individuals-and-entities and https://www.mas.gov.sg/regulation/anti-money-laundering/targeted-financial-sanctions/regulations-for-targeted-financial-sanctions; or

4. an individual or corporate body who is otherwise prohibited or ineligible in any way, whether in full or in part, under any Law applicable to such individual or corporate body from possessing, operating, or accessing the Hardware, Software, or Services.

If you are not authorized to use the Hardware, Software, or Services under this Section 1, you are deemed a "**Disqualified Person**" under these Terms.

# 2. Definitions

Any capitalized terms provided herein has the following meanings:

1. "**Action**" has the meaning set forth in Section 14.1.
2. "**Customer Data**" means information, data, and other content, in any form or medium, that is collected, downloaded, or otherwise received, directly or indirectly, from you by or through the Hardware, Software, and/or Portal. Customer Data does not include Resultant Data.
3. "**D.E.B.T. Hosting Credits**" means hosting credits purchased by You on an ad hoc basis and redeemable for D.E.B.T. hosting your Software and Project Mining Licenses. D.E.B.T. Hosting Credits do not require the purchase of a VBOX.
4. "**Disputes**" has the meaning set forth in Section 17.
5. "**Disqualified Person**" has the meaning set forth in Section 1 above.
6. "**Documentation**" means D.E.B.T.'s end-user documentation relating to the Hardware, Software, Hosting and/or Portal that D.E.B.T. provides or makes available to you in any form or medium which describes the functionality, components, features, or requirements of the Software, including any aspect of the installation, configuration, integration, operation, or use of the Hardware, Software, Hosting and/or Portal with any applicable Project Mining License.
7. "**Excluded Jurisdictions**" has the meaning set forth in Section 1 above.
8. "**Fees**" has the meaning set forth in Section 3.3 below.
9. "**Hardware**" means a physical electronic hardware device, capable of running Software and operating up to twenty (20) Project Mining Licenses.
10. "**Harmful Code**"means any software, hardware, or other technology, device, or means, including any virus, worm, malware, or other malicious computer code, the purpose or effect of which is to (a) permit unauthorized access to, or to destroy, disrupt, disable, distort, or otherwise harm or impede in any manner any (i) computer, software, firmware, hardware, system, or network; or (ii) any application or function of any of the foregoing or the security, integrity, confidentiality, or use of any data processed thereby; or (b)

prevent any customer of D.E.B.T. from accessing or using the Portal, Hardware, or Software as intended by these Terms.

11. "**Indemnitee**" has the meaning set forth in Section 14.3.

12. "**Indemnitor**" has the meaning set forth in Section 14.3.

13. "**Intellectual Property Rights**" means any and all registered and unregistered rights granted, applied for, or otherwise now or hereafter in existence under or related to any patent, copyright, trademark, trade secret, database protection, or other intellectual property rights Laws, and all similar or equivalent rights or forms of protection, in any part of the world.

14. "**JAMS**" has the meaning set forth in Section 17.

15. "**Law(s)**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, or other requirement of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

16. "**Losses**" means any and all losses, damages, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the costs of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

17. "**Maintenance Release(s)**" means any update, upgrade, release, or other adaptation or modification of the Software, including any updated Documentation, that D.E.B.T. may provide to you from time to time, which may contain, among other things, error corrections, enhancements, improvements, or other changes to the user interface, functionality, compatibility, capabilities, performance, efficiency, or quality of the Software, but does not include any new version of the Software.

18. "**Open Source Component(s)**" means any software component that is subject to any open source license agreement, including any software available under the GNU Affero General Public License (AGPL), GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), Apache License, BSD licenses, or any other license that is approved by the Open Source Initiative.

19. "**Open Source Licenses**" has the meaning set forth in Section 4.3.

20. "**Portal**" has the meaning set forth in Section 9.1.

21. "**Project Mining License**" means a license to mine tokens, and earn rewards, associated with a specific project.

22. "**Resultant Data**" means data and information related to your use of the Hardware, Software and/or Portal that is used by D.E.B.T. in an aggregate and/or anonymized manner, including to compile statistical and performance information related to the provision and operation of the Hardware, Software and/or Portal.

23. "**Services**" has the meaning set forth in the Preamble.

24. "**Software**" means the executable, object code version of the software (A) pre-loaded on the Hardware, (B) the software made available to you to install on your personal computer or laptop, or otherwise on a third-party server (e.g., AWS), (C) any Project Mining License; (D) the VBOX, and (E) any Maintenance Releases provided to you pursuant to these Terms.

25. "**Terms**" has the meaning set forth in Section 16.

26. "**Tokens**" means the cryptocurrency generated as a result of utilizing the Software and Hardware in accordance with these Terms.

27. "**VBOX**" means the virtual machine hosted by D.E.B.T., available for purchase by You, solely for the operation of your purchased Software and Project Mining Licenses. Each VBOX is capable of operating up to twenty (20) Project Mining Licenses per purchased VBOX access right.

28. "**VBOX Credits**" means the credits provided to you by D.E.B.T. on a monthly basis with your purchase of access and use rights to a VBOX, which are necessary to run an applicable Project Mining License on a VBOX.

29. "**Warranty Period**" has the meaning set forth in Section 12.1 below.

30. "**Website**" means a website offered by us or our authorized resellers that link to or otherwise require the agreement with these Terms.

# 3. Purchase Terms

1. *Orders and Acceptance.* You agree that any order to purchase Hardware, Software, or services is an offer under these Terms. All orders must be accepted by us or we will not be obligated to complete the sale. We may choose not to accept orders at our sole discretion, even after we send you a confirmation email with your order number and details of your order.

2. *Hardware Purchases and Restrictions.* If You purchased a license before January 1, 2023 are entitled, upon written request, and subject to availability and regulatory compliance, and legal approval, to receive Hardware capable of running applicable Software at no additional charge. This right to free Hardware with the purchase of Software is limited to a Licensee's first purchase only, at a limit of one per individual. Any additional Hardware desired by you or otherwise required to run additional Project Mining Licenses must be purchased at the then current Fee price (as further provided in Section 3.3 below). You may not obtain any additional Hardware for free under any circumstances. You agree that you will not create any secondary accounts, or use other third parties as a proxy to obtain any additional free Hardware.

3. *Fees.* The current price of applicable Hardware, rights to VBOX, and respective Project Mining License are set forth in the Order section of the D.E.B.T. Portal.

4. *Payment Terms.* We accept payment for Hardware, Software and Project Mining Licenses using only the accepted cryptocurrencies or tokens identified in the Order section of the Portal.:

   1. **Cryptocurrency Payment** – Payment of accepted cryptocurrencies and project Tokens will be at the rates equivalent to the comparative U.S. Dollar value of such cryptocurrency, or project Token, at the time of the purchase.

   2. **Accuracy of Payment Information** –You represent and warrant that (a) the payment information, including any related digital wallet information for transactions you supply to us are true, correct and complete; (b) you are duly authorized to use such payment information to make a purchase; and (c) you will pay charges incurred by you at the posted Fee prices, including shipping and handling charges and all applicable taxes, if any, incurred at the time of your order.

# 4. Licenses; Security Measures Intellectual Property Rights

1. License Grant to Software. Subject to and conditioned on your payment of the respective Fees for the applicable Software, and further conditioned upon the compliance with these Terms, D.E.B.T. hereby grants to you a non-exclusive, non-sublicensable, and non-transferable license to use the Software and Documentation to run Project Mining Licenses you selected and paid Fees to participate in, on the purchased Hardware, purchased rights to VBOX, and/or in order to run the Software on your personal computer, personal laptop, or a third-party server.

2. D.E.B.T. Hosting Access Rights. Subject to your compliance with these Terms, if you purchased VBOX or have a balance of D.E.B.T. Hosting Credits, D.E.B.T. hereby grants to you a limited, non-exclusive, revocable, non-transferrable, non-assignable, right to access the Services in accordance with this Section 4.2. in accordance with this Section 4.2. D.E.B.T. hosting of your Project Mining Licenses requires a VBOX with sufficient VBOX Credits or D.E.B.T. Hosting Credits.

   1. *VBOX Credits*. Credits (each a "**VBOX Credit**") are required to operate the Software on a VBOX. Each VBOX is capable of operating up to

twenty (20) Project Mining Licenses. With your purchase of VBOX, D.E.B.T. will, on a monthly basis, provide you with enough VBOX Credits to host up to twenty licenses for the respective month. VBOX Credits can be managed in the hosting section of your account.

2. *D.E.B.T. Hosting Credits.* You may purchase D.E.B.T. Hosting Credits on an individual basis. Each D.E.B.T. Hosting Credit is entitles you to a month of D.E.B.T. hosting of one (1) Project Mining License. D.E.B.T.

3. VBOX Credits and D.E.B.T. Hosting Credits are non-refundable and non-transferrable and are NOT forms of digital currency.

3. *Open Source Licenses.* The Software includes Open Source Components licensed for use with the Software. Any use of the Open Source Components by you is governed by, and subject to, the terms and conditions of the applicable open source license(s).

4. *Security Measures.* The Hardware, Software, and Services may contain technological measures designed to prevent unauthorized or illegal use. You acknowledge and agree that D.E.B.T. may use these technological measures and other lawful measures to verify your compliance with these Terms and enforce D.E.B.T.'s rights, including all Intellectual Property Rights, in and to the Software and Services.

5. *License and Use Restrictions for the Services and Software.* Except as these Terms expressly permit, and subject to Section 4.3 with respect to Open Source Components, you shall not:

   1. Subject to 4.6 below, copy the Software or Services, in whole or in part;

   2. modify, correct, adapt, translate, enhance, or otherwise prepare derivative works or improvements of any Software or Services;

   3. rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Software or Services to any third party;

   4. reverse engineer, disassemble, decompile, decode, or adapt the Software or Portal, or otherwise attempt to derive or gain access to the source code of the Software or Services, in whole or in part;

   5. bypass or breach any security device or protection used for or contained in the Software, Services, or Documentation;

   6. input, upload, transmit, or otherwise provide, any information or materials that are unlawful or injurious, or contain, transmit, or activate any Harmful Code;

   7. remove, delete, efface, alter, obscure, translate, combine, supplement, or otherwise change any trademarks, terms of the Documentation, warranties, disclaimers, or Intellectual Property Rights, proprietary rights or other symbols, notices, marks, or serial numbers on or relating to any copy of the Software, Portal, or Documentation;

   8. use the Software or Portal in any manner or for any purpose that infringes, misappropriates, or otherwise violates any Intellectual Property Right or other right of any person, or that violates any applicable Law;

   9. use the Software or Portal for purposes of: (i) benchmarking or competitive analysis of the Software or Portal; (ii) developing, using, or providing a competing software product or service; or (iii) any other purpose that is to D.E.B.T.'s detriment or commercial disadvantage; and

   10. use the Software, Portal, or Documentation in any manner or for any purpose or application not expressly permitted under these Terms.

6. *Limited right to make copies of the Software for applicable licenses to run on a personal computer, personal laptop, or third-party server.* If you did not purchase Hardware or a VBOX, and intend to instead run the respective Software licenses independently using a personal computer, personal laptop, or third-party server, D.E.B.T. hereby grants you a limited right to make a single copy of each held Software license as necessary to run such

Software license on the applicable personal computer, personal laptop, or third-party server.

7. *Intellectual Property Rights.* You acknowledge that:

   1. the Software, rights to use the Portal, and Documentation are licensed, not sold, to you by D.E.B.T. and you do not have under or in connection with these Terms any ownership interest in or to the Software or Documentation, or in any related Intellectual Property Rights therein.

   2. D.E.B.T. and its applicable licensors are the sole and exclusive owners of all right, title, and interest in and to the Software, Portal, and Documentation, including all Intellectual Property Rights relating thereto, subject only to the rights of third parties in Open Source Components and the limited license granted to you under these Term; and

   3. you hereby unconditionally and irrevocably assign to D.E.B.T. or D.E.B.T.'s designee, your entire right, title, and interest in and to any Intellectual Property Rights that you may now or hereafter have in or relating to the Software, Documentation, and resultant Data (including any rights in derivative works or patent improvements), whether held or acquired by operation of Law, contract, assignment or otherwise.

8. *No Implied Rights.* Except for the limited rights and licenses expressly granted under these Terms, nothing in these Terms grants, by implication, waiver, estoppel or otherwise, to you or any third party, any Intellectual Property Rights or other right, title, or interest in or to any of the Software, Portal, or Documentation.

# 5. Community Guidelines

Users of D.E.B.T. are a community, and certain third-party services like Discord, Telegram, and others are used to help our users connect and engage in discussions. These guidelines provided in this Section 5 explain what is and isn't allowed when engaging with our community through any such third-party services. Without limiting the foregoing, such third-party services may have their own community guidelines or acceptable use policies, which shall in no way supersede these guidelines applicable to your use of Hardware, Software, and Services.

1. *Respecting Users.*
   - Do not harass others or organize, promote, or participate in harassment.
   - Do not organize, promote, or participate in hate speech or hateful conduct.
   - Do not make threats of violence or threaten to harm others.
   - Do not use Discord for the organization, promotion, or support of violent extremism.
   - Do not share content that violates anyone's intellectual property or other rights.
   - Do not disparage D.E.B.T. or our partners, vendors or affiliates.

2. *Honesty; No Misrepresentations.*
   - Do not share false or misleading information (otherwise known as misinformation).
   - Do not coordinate or participate in malicious impersonation of an individual or an organization (including D.E.B.T.).
   - Do not make threats of violence or threaten to harm others.

# 6. Suspension and Termination Rights

D.E.B.T. may, directly or indirectly, suspend, terminate, or otherwise deny your access to the Services, including the Portal, and ability to mine any project Tokens, without incurring any resulting obligation or liability, if: (i) D.E.B.T. receives a judicial or other governmental demand or order, subpoena, or law enforcement request that expressly or by reasonable implication requires D.E.B.T. to do so, or (ii) D.E.B.T. believes, in its sole discretion, that (A) you have failed to comply with any part of these Terms, or (B) you are, have been, or are likely to be involved in any fraudulent, misleading, or unlawful activities related to or in connection with the use of the Software. This Section 6 does not limit any of D.E.B.T.'s other rights or remedies, whether at Law, in equity or under these Terms.

# 7. Maintenance Releases

During the Warranty Period, and at D.E.B.T.'s sole discretion following the Warranty Period, D.E.B.T. will provide you with all Maintenance Releases (including updated Documentation) that we may, in our sole discretion, make generally available to its licensees at no additional charge. All Maintenance Releases provided by D.E.B.T. to you are deemed Software. You will install all Maintenance Releases as soon as practicable after receipt. You do not have any right hereunder to receive any new versions of the Software that D.E.B.T. may, in its sole discretion, release from time to time.

# 8. Digital Wallet

The digital wallet used in the Software is an Open-Source Component. Such digital wallet has a public key and a private key. You will be provided the private key and will alone have access to such private key. D.E.B.T. does not store your private key in any reasonably accessible manner and cannot help you retrieve your private key if you lose such private key. You have the sole responsibility to maintain, in your fully secure possession, the credentials for accessing your digital wallet, including the private key for your digital wallet.

# 9. D.E.B.T. Portal

1. Portal. Use of the Hardware, mining of any project Tokens, and earning any rewards further requires the creation and maintenance of an account for our D.E.B.T. dashboard (such dashboard herein referred to as the "**Portal**"). D.E.B.T. hereby grants you a non-exclusive, non-transferable right to access and use the Portal during the Term in accordance with the terms and conditions herein. Such use is limited to your internal use with your Hardware and Software.

2. Changes to the Portal. D.E.B.T. reserves the right, in its sole discretion, to make any changes to the Portal that it deems necessary or useful to: (a) maintain or enhance: (i) the quality or delivery of the Portal and its related services to its customers; or (ii) the Portal's cost efficiency or performance; or (b) to comply with applicable Law.

3. Portal Use Restrictions. Use restrictions of the Portal are set forth in Section 4.5 above.

4. Portal Account. To make use of any purchased license, you will need to create an account, including providing a verifiable email address and creating a unique password. You are responsible for your account activity, including unauthorized activity. You must safeguard the confidentiality of

your account credentials, including your username and password. If you become aware of unauthorized access to your account, you must change your password and notify us immediately.

5. Customer Data. The Portal, connected through your established account and connected Hardware, Software and will process Customer Data. As between you and D.E.B.T., you are and will remain the sole and exclusive owner of all right, title, and interest in and to all Customer Data, including all Intellectual Property Rights relating thereto, subject to the rights and permissions granted herein. You represent, warrant, and covenant to D.E.B.T. that you own or otherwise have and will have the necessary rights and consents in and relating to the Customer Data so that, as received by D.E.B.T. and processed in accordance with these Terms, they do not and will not infringe, misappropriate, or otherwise violate any Intellectual Property Rights, or any privacy or other rights of any third party or violate any applicable Law. You hereby irrevocably grant all such rights and permissions in or relating to Customer Data as necessary or useful to D.E.B.T. to enforce these Terms and exercise D.E.B.T.'s rights and perform D.E.B.T.'s obligations hereunder. Any Customer Data collected or otherwise processed by D.E.B.T. will be processed in accordance with D.E.B.T.'s privacy policy theD.E.B.T.box.com/privacy.

# 10. Shipment; Title and Risk of Loss

1. Shipment. We will arrange for shipment of purchased Hardware to you. You will pay all shipping and handling charges specified during the ordering process. Shipping and handling charges are reimbursements for the costs we incur in the processing, handling, packing, shipping, and delivery of your order.

2. Title and Risk of Loss. Title and risk of loss passes to you upon our transfer of the products to the shipping carrier. Shipping and delivery dates are estimates only and cannot be guaranteed. We are not liable for any delays in shipments.

# 11. No Returns or Refunds

The Fees paid with respect to the Hardware, Software, including any applicable Project Mining Licenses are non-refundable, and we do not accept any returns of Hardware for any reason, except as otherwise may be required under applicable Law.

# 12. Limited Warranty; Disclaimers

1. *Limited Hardware Warranty.* D.E.B.T. warrants to you that, for a period of twelve (12) months from the date of shipment of the Hardware ("**Warranty Period**"), such Hardware shall be free from material defects in material and workmanship. Our responsibility for defective Hardware is limited to repair or replacement as described in Section 12.2 below.

2. *Limited Hardware Warranty Remedy.* With respect to any defective Hardware during the Warranty Period, we will, in our sole discretion, either repair or replace such Hardware (or the defective part) free of charge. We will also pay for shipping and handling fees to return the repaired or replaced Hardware to you. To obtain warranty service, you must email our customer service department at support@thedebtbox.com during the Warranty Period. The remedies described above are your sole and exclusive

remedies and our entire liability for any breach of the limited warranty provided in Section 12.1 above.

3. *Project Mining License and Associated Project Disclaimer.* A PROJECT MINING LICENSE IS A MINING LICENSE THAT ALLOWS YOU TO ACT AS A PARTICIPATING NODE. THE SUCCESS OF ANY PROJECT RELATED TO THE PROJECT MINING LICENSE, THE UNDERLYING TRANSACTIONS, AND TOKENS GENERATED, AND THEIR VALUE, ARE NOT CONTROLLED IN ANY WAY BY D.E.B.T. D.E.B.T. SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY FOR, ARISING OUT OF, RELATING TO, ASSOCIATED WITH OR RESULTING FROM YOUR MINING OF ANY TOKENS ASSOCIATED WITH A PROJECT. YOU BEAR FULL RESPONSIBILITY FOR VERIFYING THE RISKS AND EVALUATING THE PROJECT A PROJECT MINING LICENSE IS ASSOCIATED WITH.. FOR BASIC INFORMATION ABOUT POTENTIAL RISKS, PLEASE REVIEW SECTION 12.7 BELOW.

4. *Disclaimer Warranties.* EXCEPT AS EXPRESSLY SET FORTH IN SECTION 12.1 ABOVE, ALL HARDWARE, SOFTWARE, AND SERVICES OFFERED BY US, INCLUDING ANY HOSTING AND THE PORTAL ARE PROVIDED "AS IS" WITHOUT ANY WARRANTY WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; OR (C) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER EXPRESS OR IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. SOME JURISDICTIONS LIMIT OR DO NOT ALLOW THE DISCLAIMER OF IMPLIED OR OTHER WARRANTIES, IN WHICH CASE, THE DISCLAIMER IN THIS SECTION 12.4 MAY NOT APPLY TO YOU. D.E.B.T. SHALL NOT BE LIABLE OR OTHERWISE RESPONSIBLE FOR ANY DATA LOSS RELATING TO ANY CUSTOMER DATA, AND SHALL HAVE NO OBLIGATION TO BACK-UP ANY SUCH CUSTOMER DATA.

5. DIGITAL WALLET DISCLAIMER. D.E.B.T. HAS NO CONTROL OVER YOUR DIGITAL WALLET AND CANNOT GUARANTEE THE SECURITY OF ANY SUCH DIGITAL WALLET. CONTINUED STORAGE OF ANY TOKENS OR OTHER DIGITAL ASSETS ON THE DIGITAL WALLET PROVIDED WITH THE HARDWARE OR ANY OTHER DIGITAL WALLET YOU MAY TRANSFER TOKENS OR DIGITAL ASSETS TO, IS DONE SO AT YOUR OWN RISK. IN THE EVENT OF ANY LOSS, HACK OR THEFT OF ANY TOKENS OR OTHER DIGITAL ASSETS FROM YOUR DIGITAL WALLET, YOU ACKNOWLEDGE AND AGREE THAT YOU SHALL HAVE NO RIGHT(S), CLAIM(S) OR CAUSES OF ACTION IN ANY WAY WHATSOEVER AGAINST D.E.B.T. FOR SUCH LOSS, HACK OR THEFT OF ANY SUCH DIGITAL ASSET.

6. Inherent Risk of Cryptographic Systems. You hereby acknowledge and assume the risk of using the Hardware and Software and the inherent risks of blockchain technologies and mining Tokens, including:

    1. **Many market, technological and legal forces are outside the exclusive control of D.E.B.T..** Cryptocurrencies such as Tokens, blockchain technology, and other associated and related technologies are not exclusively controlled by D.E.B.T. and adverse changes in market forces, including but not limited to, amendments to regulatory or intellectual property Law, technological advancements, decreases in token or cryptocurrency or cryptographic token utility, social or economic reforms, the failure of commercial relationships, or the malfunction, breakdown or abandonment of the cryptocurrency protocols may affect the value of any project Token.

    2. **The application of blockchain technology is novel and untested and may contain inherent flaws or limitations.** Blockchain is an emerging technology that offers new capabilities which are not fully proven in use. Risks associated with the blockchain technology could affect the financial performance of any project token, including the market for blockchain assets generally.

3. **The success of any respective project Token requires interest from a large number of validators and/or other network participants.** The success of any applicable project Token relies on a significant number of parties willing to act as validators and/or miners, supporters or other participants of the network. There is no guarantee however, that a sufficient number of individuals will continue participate in the blockchain associated with a specific project Token. No one is contractually or legally obligated to continue to participate in any applicable blockchain and may cease participation if they determine that such participation is no longer profitable, if they are prevented from doing so by government or regulatory agencies, or for any other reason. If participants cease to continue supporting the respective blockchain for a certain project Token, such blockchain may be unable to function and the value of underlying Tokens may decline or decrease to zero.

4. **Tokens are not insured.** Tokens are not insured by any governmental or regulatory entity. In the event of loss, or the loss of the utility value of Tokens, you will have no recourse (and shall never have recourse against D.E.B.T. in accordance with these Terms) unless you have obtained private insurance for such respective Tokens.

5. **There is no guarantee that any Tokens will hold value or increase in value.** Tokens and other cryptocurrencies are highly speculative, and any increase in value of respective project Tokens is contingent upon numerous circumstances, many of which (including legal and regulatory conditions) are beyond D.E.B.T.'s control. There is no assurance that any project Token will increase in value, or that applicable project Tokens will have any value or liquidity when you acquire them.

6. **The tax treatment of the tokens is uncertain and there may be adverse tax consequences.** The tax characterization of project Tokens is uncertain, and holding Tokens may result in adverse tax consequences.

7. **Regulatory Uncertainty.** The regulatory regime governing blockchain technologies, cryptocurrency, and other crypto-based items is uncertain, and new regulations or policies may materially adversely affect the value of any Project Mining License and/or project Tokens generated using the Hardware and Software.

8. **Distributed Ledger Technology risk.** There are risks associated with using Internet and distributed-ledger or other blockchain based products, including, but not limited to, the risk associated with hardware, software, and Internet connections, the risk of malicious software introduction, and the risk that third parties may obtain unauthorized access to your digital wallet or account.

9. **Third-Party Services.** We do not control third-party services or products like the underlying blockchains that the greater D.E.B.T. ecosystem runs on, the digital wallets, or other third-party products that you may be interacting with that may be integral to your ability mine and store Tokens. Such third parties may experience system outages or other technological events that disrupt your ability to use the Software, including mine Tokens, during such disruption.

7. No Investment Advice. D.E.B.T. is acting solely as a technology services provider and does not provide any investment, tax or other advisor services regarding Tokens, projects, or otherwise.

8. Applicable Law. The use of the Hardware and Software are subject to all applicable Laws. D.E.B.T. reserves the right to make changes to its policies, operational guides, procedures, and protocols, including any changes to Documentation and/or Software, as necessary to comply with Law.

# 13. Limitation of Liability

IN NO EVENT SHALL WE BE LIABLE TO YOU OR ANY THIRD PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF, OR RELATING TO, AND/OR IN CONNECTION WITH ANY BREACH OF THESE TERMS, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT WE WERE ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED. OUR SOLE AND ENTIRE MAXIMUM LIABILITY AND YOUR SOLE AND EXCLUSIVE REMEDY FOR ANY CAUSE WHATSOEVER, SHALL BE LIMITED TO THE ACTUAL AMOUNT PAID BY YOU FOR THE PRODUCTS AND SERVICES YOU HAVE ORDERED THROUGH OUR WEBSITE.

# 14. Indemnification

1. D.E.B.T. Indemnification of You. D.E.B.T. shall indemnify, defend, and hold you harmless from and against any and all Losses incurred by you resulting from any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or other, whether at Law, in equity, or otherwise, ("**Action**") by a third party that the Software or Documentation, or any use of the Software or Documentation in accordance with these Terms, infringes or misappropriates such third party's US Intellectual Property Rights. This Section 14.1 does not apply to the extent that the alleged infringement arises from:

   1. combination, operation, or use of the Software in or with, any technology (including any software, hardware, firmware, system, or network) or service not provided by D.E.B.T. or specified for your use in the Documentation;
   2. modification of the Software other than: (a) by D.E.B.T. in connection with these Terms; or (b) with D.E.B.T.'s express written authorization and in strict accordance with D.E.B.T.'s written directions and specifications;
   3. use of any version of the Software other than the most current version or failure to timely implement any Maintenance Release, modification, update, or replacement of the Software made available to you by D.E.B.T.;
   4. use of the Software after D.E.B.T.'s notice to you of such activity's alleged or actual infringement, misappropriation, or other violation of a third party's rights;
   5. negligence, abuse, misapplication, or misuse of the Hardware, the Software or Documentation by or on behalf of you, your representatives, or a third party;
   6. use of the Hardware, Software, Services, or Documentation by or on behalf of you that is outside the purpose, scope, or manner of use authorized by these Terms or in any manner contrary to D.E.B.T.'s instructions;
   7. events or circumstances outside of D.E.B.T.'s commercially reasonable control (including any third-party hardware, software, or system bugs, defects, or malfunctions); or
   8. third-party claims or Losses for which you are obligated to indemnify D.E.B.T. pursuant to Section 14.2.

2. Your Indemnification of D.E.B.T.. You agree that you shall indemnify, defend, and hold harmless D.E.B.T. and its affiliates, and each of its and their respective officers, directors, employees, agents, subcontractors, successors and assigns from and against any and all Losses incurred by you resulting from any Action by a third party:

1. that any Intellectual Property Rights is or will be infringed, misappropriated, or otherwise violated by any use or combination of the Software and/or Portal by you with any hardware, software, system, network, service, or other matter whatsoever that is neither provided by D.E.B.T. nor authorized by D.E.B.T. under these Terms and the Documentation; and

2. relating to facts that, if true, would constitute a breach by you of any representation, warranty, covenant, or obligation under these Terms;

3. relating to your negligence, abuse, misapplication, misuse or more culpable act or omission (including recklessness or willful misconduct) with respect to the Software, Portal, or Documentation or otherwise in connection with these Terms; or

4. relating to your use of the Software or Portal that is outside the purpose, scope or manner of use authorized by these Terms or the Documentation, or in any manner contrary to D.E.B.T.'s instructions.

3. Indemnification Procedures. Each party shall promptly notify the other party in writing of any Action for which such party believes it is entitled to be indemnified pursuant to Section 14.1 or Section 14.2. The party seeking indemnification (the "**Indemnitee**") shall cooperate with the other party (the "**Indemnitor**") at the Indemnitor's sole cost and expense. The Indemnitor shall promptly assume control of the defense and investigation of such Action and shall employ counsel of its choice to handle and defend the same, at the Indemnitor's sole cost and expense. The Indemnitee may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing. The Indemnitor shall not settle any Action on any terms or in any manner that adversely affects the rights of any Indemnitee without the Indemnitee's prior written consent, which shall not be unreasonably withheld or delayed. The Indemnitee's failure to perform any obligations under this Section 14.3 will not relieve the Indemnitor of its obligations under this Section 14, except to the extent that the Indemnitor can demonstrate that it has been materially prejudiced as a result of such failure.

# 15. Goods Not for Resale or Export

You represent and warrant that you are buying the Hardware, Software, and Services from Us for your own personal or household use only, and not for resale or export. You further represent and warrant that all purchases are intended for final delivery to locations outside the Excluded Jurisdictions and will not be provided to any Disqualified Person.

# 16. Term

This agreement shall commence on the day you accept these terms and shall continue for so long as you use the Hardware, Software, and/or Services (the "**Term**").

# 17. Dispute Resolution

PLEASE READ THIS SECTION CAREFULLY BECAUSE IT IS AN AGREEMENT TO ARBITRATE DISPUTES AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF.

In consideration for our provision of the Hardware, Portal, and Software to you, you and D.E.B.T. each agree that any and all disputes or claims arising under, out of, in connection with, or related to your use of the Hardware, Portal, Software, or these Terms in any fashion, or the subject matter,

negotiation, performance, termination, interpretation, or formation of the agreement resulting from your acceptance of these Terms, (each a Dispute) must be resolved exclusively in binding arbitration. However, a party may assert a claim in small claims court, if the asserted claim qualifies and so long as the matter remains in such court and advances only on an individual (non-class, non-representative) basis. These Terms, including the right to Arbitrate, is intended to be broadly interpreted and the Federal Arbitration Act governs the enforcement of these Terms to arbitrate.

For any Dispute with D.E.B.T., you agree first to contact us at support@thedebtbox.com and attempt to resolve the Dispute with us informally. In the event that we do not resolve a Dispute informally, we each agree to resolve any Dispute (excluding any claims for injunctive or other equitable relief) arising out of or in connection with or relating to these Terms, or the breach or alleged breach thereof, by binding arbitration by the Judicial Arbitration and Mediation Services ("**JAMS**") pursuant to its Comprehensive Arbitration Rules and Procedures and shall be conducted in Wyoming, unless otherwise agreed to in writing by the parties. Each party will be responsible for paying any JAMS filing, administrative and arbitrator fees in accordance with JAMS rules. The award rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses, and any judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Nothing in this Section shall prevent either party from seeking injunctive or other equitable relief from the courts as necessary to prevent the actual or threatened infringement, misappropriation, or violation of that party's data security, Intellectual Property Rights, or other proprietary rights.

# 18. No Class Action; No Jury Trial

ALL CLAIMS MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY, AND NO CLASS ACTION OR REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL THEORIES OF LIABILITY OR PRAYERS FOR RELIEF MAY BE MAINTAINED IN ANY ARBITRATION OR OTHER PROCEEDING UNDER THESE TERMS. UNLESS WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS. YOU AGREE THAT, BY ENTERING INTO THESE TERMS, YOU AND WE ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.

# 19. Miscellaneous

1. Severability. Every provision of these Terms will be construed, to the extent possible, so as to be valid and enforceable. If any provision of these Terms is construed or held by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, such provision will be deemed severed from these Terms, and all other provisions will remain in full force and effect.

2. Governing Law. These Terms and any dispute arising out of these Terms, shall be governed by and construed in accordance with the Laws of the State of Wyoming, without giving effect to any choice or conflict of Law provision or rule (whether of the State of Wyoming or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than those of the State of Wyoming.

3. Entire Agreement. These Terms, together with the Terms of Use, our Privacy Policy, and any amendments and any additional agreements you may enter

with us in connection with the use of the Website, Hardware, Software, or Portal, constitute the entire agreement between you and us.

4. Waiver. Our failure at any time to enforce any of the provisions of these Terms or any right or remedy available hereunder or at Law or in equity, or to exercise any option herein provided, will not constitute a waiver of such provision, right, remedy or option or in any way affect the validity of these Terms. Our waiver of any default will not be deemed a continuing waiver, but will apply solely to the instance to which such waiver is directed.

5. Headings; Summaries. The section headings and any plain English summaries appearing in these Terms are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or extent of such section or in any way affect such section.

6. No Assignment. These Terms, and any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by us without restriction. Any attempted transfer or assignment in violation hereof shall be null and void.

7. No Third-Party Beneficiaries_._ Other than as expressly provided in these Terms, no third-party beneficiaries are intended or will be construed as created by these Terms.

8. Survival. All Sections which by their nature should survive the termination of these Terms shall continue in full force and effect, notwithstanding any termination of these Terms.

9. Notices; Electronic Communications. D.E.B.T. may provide notifications, whether such notifications are required by law or are for marketing or other business-related purposes through posting of such notice on the Website. You agree that all agreements, notices, disclosures, and other communication we provide to you via the Website to satisfy any legal requirement that such communications be in writing. We reserve the right to determine the form and means of providing notification to our users.

**D.E.B.T.**

PROJECTS
HOSTING
SPECIFICATIONS
PRIVACY POLICY
TERMS AND CONDITIONS
STORE





Copyright ©2021-2023 DEBT. All rights reserved.

# Exhibit 30

# Digital Licensing, Inc. is now Digital Commodity House LLC

You will be forwarded in 13 seconds to our new website or you can click here.

# Exhibit 31



Privacy Policy | D.E.B...

PROJECTS          HOSTING          LOGIN

# PRIVACY POLICY

Digital Commodity House, FZCO, and its affiliates, including D.E.B.T. Box ("we", "our", and/or "us"), values the privacy of individuals who use our websites, platforms, ecosystems, and related services (collectively, our "Services"). This privacy policy (the "Privacy Policy") explains how we collect, use, and share information from users of our Services ("Users"). By using our Services, you agree to the collection, use, disclosure, and procedures this Privacy Policy describes. Beyond the Privacy Policy, your use of our Services is also subject to our Terms of Service, which can be found at: www.thedebtbox.com/terms-and-conditions.

## Information We Collect

We may collect a variety of information from or about you or your devices from various sources, as described below. If you do not provide your information when requested, you may not be able to use our Services if that information is necessary to provide you with our Services or if we are legally required to collect it.

### A. Information You Provide to Us.

**User-provided Information**. If you sign up for an account, use our website, or use our Services, you may provide us with your full name, email address, phone number, driver's license, cryptocurrency wallet IDs, transaction details, and associated transactional data.

**Communications**. If you contact us directly, we may receive additional information about you. For example, when you contact our Customer Support Team, we will receive your name, email address, phone number, the contents of a message or attachments that you may send to us, and other information you choose to provide.When we send you emails, we may track whether you open them to learn how to deliver a better customer experience and improve our Services. If you contact us through social media channels, such as Discord, Reddit, LinkedIn, etc., we will receive your username and your public profile information, as well as any information you send to us through those channels.

**Careers.** If you decide that you wish to apply for a job with us, you may submit your contact information and your resume online. We will collect the information you choose to provide on your resume, such as your education and employment experience. You may also apply through third parties such as Indeed, etc. If you do so, we will collect the information you make available to these third parties.

**Payment Information.** If you make a purchase through our Services, we receive your payment-related information, such as payment card, bank account, cryptocurrency wallet ID, and associated financial and transaction details needed to complete the transaction, which may be collected as applicable by a third-party payment processor on our behalf.

### B. Information We Collect When You Use Our Services.

**Location Information**. When you use our Services, we collect internet protocol (IP) address, which may infer your general physical location.We may also collect the location of your device when your device is running in the foreground or background / when our website is closed. An IP address is a series of numbers that identifies any device, such as a computer or mobile phone, on an internet network. Devices use IP addresses to communicate with each other both over the internet as well as on other networks. IP addresses can change.

**Device Information**. We receive information about the device and software you use to access our Services, including IP address, MAC (media access control), web browser type, operating system version, phone carrier and manufacturer, application installations, device identifiers, mobile advertising identifiers, and push notification tokens.

**Usage Information**. To help us understand how you use our Services and to help us improve our Services, we automatically receive information about your interactions with our Services, like the pages or other content you view, the searches you conduct, the transactions you make, and any content you make public related to our Services. If you are using our Services to mine cryptocurrency, then we will collect information in order

to ensure you are receiving appropriate rewards.

**Software Updates**. We from time to time update the software used to run our Services, which may include software upgrades, bug fixes, patches and other error corrections and/or new features (collectively, "Updates"). When we install Updates, we may have access to any information on or transiting the device. We use this information only for the limited purpose of completing the Updates, troubleshooting, and improving our Services.

**Information from Cookies and Similar Technologies.** We and third-party partners collect information using cookies, pixel tags, or similar technologies. Cookies are small text files containing a string of alphanumeric characters. We may use both session cookies and persistent cookies. A session cookie disappears after you close your browser. A persistent cookie remains after you close your browser and may be used by your browser on subsequent visits to our Services. Please review your web browser's "Help" file to learn the proper way to modify your cookie settings. Please note that if you delete or choose not to accept cookies from our Services, you may not be able to fully utilize the features of our Services.

### C. Information We Receive from Third Parties.

**Information from third party services.** If you choose to link our Services to a third-party account such as a separate trading platform or cryptocurrency wallet, we may receive information about you, including your wallet IDs, assets held, and transaction details. If you wish to limit the information available to us, you should visit the privacy settings of your third-party accounts to learn about your options.

**Use of Blockchain Technology**. Our Services utilize blockchain technology, which involve distributed ledgers that utilize decentralized or third-party networks to permanently record transactions across wide networks of computer systems. As such, any information that is published on the blockchain is generally public and incapable of deletion. Many blockchains are open to forensic analysis which can lead to deanonymization and the unintentional revelation of personal information, especially when blockchain data is combined with other data. We cannot control the actions of any third parties and how they may correlate any information that may be published on a respective blockchain with other information of such third-party. To the extent we are required to correlate any of your information published on the blockchain with information you provide directly to us through your use of the Services, we will only use such information as provided in this Privacy Policy.

## How We Use the Information We Collect

We use the information we collect:

- To provide, maintain, improve, and enhance our Services;
- To provide you with earned rewards;
- To understand and analyze how you use our Services and develop new products, services, features, and functionality;
- To communicate with you, provide you with updates and other information relating to our Services, provide information that you request, respond to comments and questions, and otherwise provide customer support;
- To facilitate the connection of authorized third-party services or applications;
- To send you push notifications;
- To facilitate transactions and payments;
- To find and prevent fraud, and respond to trust and safety issues that may arise;
- For marketing and advertising purposes, such as developing and providing promotional and advertising materials that may be relevant, valuable or otherwise of interest to you;
- For compliance purposes, including enforcing our Terms of Services or other legal rights, or as may be required by applicable laws and regulations or requested by any judicial process or governmental agency; and
- For other purposes for which we provide specific notice at the time the information is collected or which you direct or otherwise consent.

## How We Share the Information We Collect

We do not share or otherwise disclose information we collect from or about you except as described within this Privacy Policy or otherwise disclosed to you at the time of the collection.

**Affiliates.** We may share any information we receive with our affiliates for any of the purposes described in this Privacy Policy.

**Vendors and Service Providers.** We may share any information we receive with vendors and service providers retained in connection with the provision of our Services.

**Third Party App Integrations**. If you connect a third-party application to our Services, like your wallet, we may share information such as your transaction and asset information with that third party.

**As Required By Law and Similar Disclosures.** We may access, preserve, and disclose your information if we believe doing so is required or appropriate to: (a) comply with law enforcement requests and legal process, such as a court order or subpoena; (b) respond to your requests; or (c) protect your, our, or others' rights, property, or safety.

**Merger, Sale, or Other Asset Transfers.** We may transfer your information to service providers, advisors, potential transactional partners, or other third parties in connection with the consideration, negotiation, or completion of a corporate transaction in which we are acquired by or merged with another company, or we sell, liquidate, or transfer all or a portion of our assets. The use of your information following any of these events will be governed by the provisions of this Privacy Policy in effect at the time the applicable information was collected.

**Consent.** We may also disclose your information with your permission.

**Aggregate and De-Identified Information.** We may share aggregate or de-identified information about users and their use of the Services with third parties and publicly for marketing, advertising, research or similar purposes.

**Marketing.** We do not rent, sell, or share information about you with nonaffiliated companies for their direct marketing purposes, unless we have your permission.

**Analytics Partners.** We use analytics services such as Google Analytics to collect and process certain analytics data. These services may also collect information about your use of other websites, apps, and online resources.

**Advertising Partners.** We work with third party advertising partners to show you ads that we think may interest you. Some of our advertising partners are members of the Network Advertising Initiative (http://optout.networkadvertising.org/?c=1#!/) or the Digital Advertising Alliance (http://optout.aboutads.info/?c=2&lang=EN). If you do not wish to receive personalized ads, please visit their opt-out pages to learn about how you may opt out of receiving web-based personalized ads from member companies. You can access any settings offered by your mobile operating system to limit ad tracking, or you can install the AppChoices mobile app to learn more about how you may opt out of personalized ads in mobile apps.

**Your Choices**

**Location Information.** You can prevent your device from sharing precise location information at any time through your device's operating system settings. However, location is core to our Services and without it, you may not be able to successfully use our Services or earn rewards.

**Marketing Communications.** You can unsubscribe from our promotional emails via the link provided in the emails. Even if you opt-out of receiving promotional messages from us, you will continue to receive administrative messages from us.

**Do Not Track.** There is no accepted standard on how to respond to Do Not Track signals, and we do not respond to such signals. If you choose not to provide us with information we collect, some features of our Services may not work as intended.

# Third Parties

Our Services may contain links to other websites, products, or services that we do not own or operate. We are not responsible for the privacy practices of these third parties. Please be aware that this Privacy Policy does not apply to your activities on these third-party services or any information you disclose to these third parties. We encourage you to read their privacy policies before providing any information to them.

# Security

We make reasonable efforts to protect your information by using physical, organizational, and technical safeguards designed to improve the security of the

information we maintain. However, as no electronic transmission of information can be entirely secure, we can make no guarantees as to the security or privacy of your information.

## Children's Privacy

We do not knowingly collect, maintain, or use personal information from children under 13 years of age, and no part of our Services are directed to children. If you learn that a child has provided us with personal information in violation of this Privacy Policy, then you may alert us at: support@thedebtbox.com.

## Your California Privacy Rights

If you reside in California and have provided your personal information to us, you may request information once per calendar year about our disclosures of certain categories of personal information to third parties for their direct marketing purposes. Such requests must be submitted to us in writing at the following: support@thedebtbox.com.

## International Visitors

Our Services are hosted in the United States and intended for visitors located within the United States. If you choose to use our Services from the European Union or other regions of the world with laws governing data collection and use that may differ from U.S. law, then please note that you are transferring your personal information outside of those regions to the United States for storage and processing. Also, we may transfer your data from the U.S. to other countries or regions in connection with storage and processing of data, fulfilling your requests, and operating our Services. By providing any information, including personal information, on or to our website or Services, you consent to such transfer, storage, and processing.

## Update Your Information or Pose a Question

You can update your account and profile information, or close your account, through your profile settings. If you have questions about your privacy on our Services, the data we maintain, or this privacy policy, please contact us at support@thedebtbox.com.

## Changes to this Privacy Policy

We will post any adjustments to the Privacy Policy on this page, and the revised version will be effective when it is posted. If we materially change the ways in which we use or share personal information previously collected from you through our Services, we will notify you through our website, email, or other communication.

## Contact Information

Digital Commodity House, FZCO is responsible for processing your information. If you have any questions, comments, or concerns about our processing activities, please email us at support@thedebtbox.com or write to us at Capital Plaza Complex - Corniche Rd E - Al Danah - Zone 1 - Abu Dhabi - United Arab Emirates.

**Last Updated:** June 12, 2023

### D.E.B.T.

PROJECTS
HOSTING
SPECIFICATIONS
PRIVACY POLICY
TERMS AND CONDITIONS
STORE

  

Copyright ©2021-2023 DEBT. All rights reserved.

2023-08-25_12-04-25

# **Exhibit 32**

**Englander, Alex M (WPB - X28339)**

| | |
|---|---|
| **From:** | Ross, David E. <dross@morrisoncohen.com> |
| **Sent:** | Tuesday, August 22, 2023 10:32 PM |
| **To:** | Mascianica, Scott (DAL - X62106); Englander, Alex M (WPB - X28339); ayarm |
| **Cc:** | jgottlieb; Magee, Jessica B (DFW - X61375) |
| **Subject:** | RE: SEC v. Digital Licensing - Urgent Call |

*[External email]*
Scott, Jessica and Alex,

Further to my email below, and to correct the record, we reject your mischaracterization that our clients failed to identify three DLI hardware wallets. As we previously stated to you, the hardware wallets belong to *DCH*, not *DLI*. DCH and DLI are separate entities with separate assets and we accordingly find your attempt to refer to them interchangeably both inappropriate and factually incorrect. Our clients provided information to the Receiver concerning DCH in the interest of full disclosure and cooperation – and without prejudice to all of their rights and remedies.

At bottom, this is a collaborative process that deals with, among other things, a complex set of assets, and your inaccurate accusations and purported allegations of "acknowledgment" of malfeasance are unwarranted and unhelpful.

To be clear, our clients in no way acknowledge that DCH or its assets are subject to the receivership order and they expressly reserve their rights in this and all other respects.

Thank you.

-Dave


**David E. Ross**
*Partner*
T: 212.735.8841 | F: 917.522.9941

dross@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**

909 Third Avenue

27th Floor

New York, NY 10022

www.morrisoncohen.com


-------- Original message --------
From: "Ross, David E." <dross@morrisoncohen.com>
Date: 8/22/23 6:31 PM (GMT-05:00)

# Exhibit 33

DocuSign Envelope ID: 9C8F6845-33CD-4B84-A901-4B8CE7E229C9

**CORPORATE BOARD RESOLUTION**

AT A MEETING OF THE BOARD OF DIRECTORS OF [ Digital Commodity Software House, FZE ] ("**the Company**") held at [ conference call ] on [ the 22nd ] day of [ June 2022 ], the following matter was noted, documents tabled and resolutions duly passed:

Present:

[ Roy Nelson ] _____ (Signature) ("**Chairman**")

[ Schad Brannon ] _____ (Signature)

[ Emily Tabor Eads ] _____ (Signature)

[ ] _____ (Signature)

Absent:

[ ]

1   [ Roy Nelson ] was selected Chairman of the board.

2   The Chairman declared the meeting open.

3   **THE CHAIRMAN STATED THAT** formal notice of the meeting has been sent to all directors, a quorum is formed and, accordingly, the meeting could proceed to business.

4   **THE CHAIRMAN NOTED THAT** the Company intends to make an application to open an institutional digital assets trading account (the "**Account**") on BitMart.com ("**BitMart**") in order to purchase, sell, transfer and withdraw digital assets and utilize applicable services on BitMart.

5   **TABLED BEFORE** the meeting are the relevant documentation, as required by BitMart at this date, which includes but is not limited to, the BitMart Institutional Account Due Diligence Questionnaire, the applicable terms and conditions and all documentation from BitMart (hereinafter referred to as "**Account Opening Documents**").

6   Upon a motion duly made and passed, **IT WAS RESOLVED THAT**:
   a)  The Account shall be opened and maintained with BitMart in accordance with the terms and conditions as may be supplemented and amended by BitMart from time to time;
   b)  the following persons are hereby designated as the "Authorized Account Signers" for and on behalf of the Company to conduct the following acts:
      (i)   to execute, complete and deliver to BitMart the Account Opening Documents and any other documents contemplated by or incidental to the Account Opening Documents;
      (ii)  to execute, complete and deliver to BitMart any agreement, consents, instructions, notice or other any document as may be required from time to time;
      (iii) in his/her discretion, to substantially manage and operate the Account, and sub-accounts if any, and to engage in all relevant digital assets trading activities which shall include but not limited to:
         i.   purchase digital assets on BitMart;
         ii.  sell digital assets on BitMart;

DocuSign Envelope ID: 9C8E6845-33CD-4B84-A901-4B8CE7E22DC9

    iii.     transfer digital assets into the Account(s);

    iv.     withdrawal the digital assets from the Account(s);

    v.     manage digital assets exchange transactions;

    vi.     change the password and other information of the Account(s);

    vii.     perform telephone and/or video verification; and

    viii.     any other acts which may reasonably be performed by the Authorized Account Signers in fulfilling his/her respective duties in managing and operating the Accounts (together, "**Instructions**").

| Information of Authorized Account Signers: | | | |
|---|---|---|---|
| NAME | Nationality | Identity Card/Passport No. | Address |
| Roy Nelson | USA | UT DL/ ███ 7126 | ████████ |
| Schad Brannon | USA | Passport/ ███ 9869 | ████████ |
| Any **one** of the above Authorized Account Signers may sign and give effect to Instructions. | | | |

c)   the Company will, from time to time, notify BitMart in writing of any change of Authorized Account Signers as outlined under this resolution, and to deliver to BitMart a certified true copy of the resolution or any type of institutional documents that validate such change;

d)   the Company should provide BitMart any documents as may reasonably be requested by BitMart for opening and operation of the Accounts.

7   **IT WAS RESOLVED THAT** any and all actions of the Company, or of any Director or officer or any Attorney or Authorized Account Signers, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof are hereby ratified, confirmed, approved and adopted in all respects as if such action(s) had been presented to for approval and approved by the Directors of the Company prior to such action being taken.

8   There being no further business, the Chairman announced the meeting adjourned.

Chairman: Roy Nelson

Date: 06/22/2022

Secretary: Emily Tabor Eads

Date: 06/22/2022