Matthew R. Lewis (7919)
Taylor J. Smith (17537)
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, 10th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
mlewis@kba.law
tsmith@kba.law

Jason P. Gottlieb (admitted *pro hac vice*)
David E. Ross (admitted *pro hac vice*)
Alexander R. Yarm (admitted *pro hac vice*)
**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10022
Telephone: (212) 735-8600
jgottlieb@morrisoncohen.com
dross@morrisoncohen.com
ayarm@morrisoncohen.com

*Attorneys for Defendants Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, Roydon B.*
*Nelson, and Relief Defendants Business Funding Solutions, LLC; Blox Lending, LLC; The Gold*
*Collective LLC; and UIU Holdings, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENAJMIN F. DANIELS, an | **DEFENDANTS JASON R. ANDERSON, JACOB S. ANDERSON, SCHAD E. BRANNON, AND ROYDON B. NELSON AND RELIEF DEFENDANTS BUSINESS FUNDING SOLUTIONS, LLC, BLOX LENDING, LLC, THE GOLD COLLECTIVE LLC, AND UIU HOLDINGS, LLC'S MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER AND MODIFY TEMPORARY RECEIVERSHIP ORDER TO APPOINT A NEW RECEIVER; AND MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>**EXPEDITIOUS CONSIDERATION REQUESTED**<br><br>Case No. 2:23-cv-00482-RJS<br><br>Chief Judge Robert J. Shelby |

individual; MARK W. SCHULER, an
individual; B & B INVESTMENT GROUP,
LLC (d/b/a "CORE 1 CRYPTO"), a Utah
limited liability company; TRAVIS A.
FLAHERTY, an individual; ALTON O.
PARKER, an individual; BW HOLDINGS,
LLC (d/b/a the "FAIR PROJECT"), a Utah
limited liability company; BRENDAN J.
STANGIS, an individual; and MATTHEW D.
FRITZSCHE, an individual;

       Defendants,

ARCHER DRILLING, LLC, a Wyoming
limited liability company; BUSINESS
FUNDING SOLUTIONS, LLC, a Utah limited
liability company; BLOX LENDING, LLC, a
Utah limited liability company; CALMFRITZ
HOLDINGS, LLC, a Utah limited liability
company; CALMES & CO, INC., a Utah
corporation; FLAHERTY ENTERPRISES,
LLC, an Arizona limited liability company; IX
VENTURES FZCO, a United Arab Emirates
company; PURDY OIL, LLC, a Nebraska
limited liability company; THE GOLD
COLLECTIVE LLC, a Utah limited liability
company; and UIU HOLDINGS, LLC, a
Delaware limited liability company,

       Relief Defendants.

## TABLE OF CONTENT

**Page(s)**

MOTION TO DISSOLVE TRO AND MODIFY TEMPORARY RECEIVERSHIP ORDER ..... 1

MEMORANDUM OF LAW IN SUPPORT OF THE MOTION ................................................. 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................................................ 5

ARGUMENT ............................................................................................................................... 8

    I.    THE TRO SHOULD BE DISSOLVED AND A NEW TEMPORARY RECEIVER FROM UTAH SHOULD BE APPOINTED ................................................................. 8

    II.   THE SEC IMPROPERLY OBTAINED THE *EX PARTE* TRO BY PROVIDING FALSE AND MISLEADING INFORMATION TO THE COURT. ......................... 10

        A.    The SEC Failed to Present Any Evidence of Irreparable Harm. ..................... 10

        B.    The SEC Failed to Make a Clear Showing of Substantial Likelihood of Prevailing on the Merits. ................................................................................. 13

        C.    The SEC Failed to Show that the Threatened Injury Outweighs the Harm that the TRO May Cause the Opposing Party. ....................................... 20

        D.    The SEC Failed to Show that the Injunction, if Issued, Would Not Adversely Affect the Public Interest. ............................................................. 21

    III.   THE SEC ALSO IMPROPERLY ISSUED NUMEROUS *EX PARTE* ADMINISTRATIVE INVESTIGATIVE SUBPOENAS AFTER INSTITUTING THIS ACTION IN FEDERAL COURT ................................................................. 22

    IV.   THE OUT-OF-TOWN TEMPORARY RECEIVER SHOULD BE REMOVED FOR AILING TO MANAGE DLI'S ASSETS AND FOR FAILING TO DISCLOSE A POTENTIAL CONFLICT OF INTEREST. ...................................... 23

CONCLUSION ......................................................................................................................... ..25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Brundidge v. Brim Properties, LLC*,
  No. 2:19-cv-291, 2019 WL 13260424 (D. Utah May 8, 2019) ........................................9, 10

*Dine Citizens Against Ruining Our Env't v. Jewell*,
  839 F.3d 1276 (10th Cir. 2016) ...............................................................................6, 9

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No.*
  *70 of Alameda Cnty*.,
  415 U.S. 423 (1974).................................................................................................9

*KDH Consulting Grp. LLC, v. Iterative Cap. Mgmt. L.P., et al.*,
  No. 20 Civ. 3274 (VM), 2020 WL 2554382, at *5 (S.D.N.Y. May 20, 2020)..................9, 10

*Myers v. Frontier PMS and SN Servicing Corp.*,
  No. 4:21-cv-436-ALM-KPJ, 2021 WL 2906065 (E.D. Tex. June 15, 2021) ..........................9

*SEC v. Life Partners, Holdings, Inc.*,
  No. 1:12-CV-00033-JRN, 2012 WL 12850253 (W.D. Tex. Aug. 17, 2012) ........................23

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946).................................................................................................4

*Sierra Club v. U.S. Army Corps of Engineers*,
  732 F.2d 253 (2d Cir. 1984)......................................................................................9

*Smith & Nephew, Inc. v. Stryker Sales, LLC*.,
  No. 2:23-cv-02344-SHL-cgc, 2023 WL 3975452 (W.D. Tenn. June 13, 2023) ...................13

*Total Quality Logistics, LLC v. III's Hotshot, Inc*.,
  No. 1:17-cv-352, 2017 WL 5972001 (S.D. Ohio Dec. 1, 2017)............................................13

*Wilderness Workshop v. United States BLM*,
  531 F.3d 1220 (10th Cir. 2008) .................................................................................9

**Statutes**

Federal Rules of Civil Procedure 45 .......................................................................22, 23

Federal Ruls of Civil Procedure Rule 65 .................................................................1, 6, 9, 10, 20

**Other Authorities**

*U.S. FDIC tells Signature Bank's crypto clients to close accounts, by April 5,*
  Reuters, (March 28, 2023*), www.reuters.com/markets/us/us-fdic-tells-
  signature-banks-crypto-clients-close-accounts-by-april-5-2023-03-28
  .......................................................................................................................................11

Emily Parker, *Keeping Crypto in America,*
  CoinDesk (March 2, 2023), www.coindesk.com/consensus-
  magazine/2023/03/02/lack-of-regulatory-clarity-puts-crypto-in-the-united-
  states-at-risk/)............................................................................................................12

SEC's Investor Alert, *Ten Things to Know About Receivers* (Aug. 27, 2015)
  (https://www.sec.gov/oiea/investor-alerts-bulletins/ib_receivers) ........................................24

WLOX Staff, *Lazy Magnolia announces new ownership after nearly 20 years in
  business
  (April 26, 2023), https://www.wlox.com/2023/04/06/lazy-magnolia-
  announces-new-ownership-after-nearly-20-years-
  business/%3foutputType=amp)* ............................................................................18

## MOTION TO DISSOLVE TRO AND MODIFY TEMPORARY RECEIVERSHIP ORDER

Pursuant to Rule 65(b)(4) of the Federal Rules of Civil Procedure, Defendants Jason R. Anderson ("Jason Anderson"), Jacob S. Anderson ("Jacob Anderson"), Schad E. Brannon ("Brannon"), and Roydon B. Nelson ("Nelson") (collectively "Defendants") and Relief Defendants Business Funding Solutions, LLC ("BFS"), Blox Lending, LLC ("Blox"), The Gold Collective LLC ("TGC"), and UIU Holdings, LLC ("UIU") ("Relief Defendants"), by and through undersigned counsel, hereby move to dissolve the renewed Temporary Restraining Order ("TRO"), including an asset freeze, originally issued *ex parte* on July 28, 2023 and last renewed on August 29, 2023   (ECF Nos. 9, 121), and to modify the Temporary Receivership Order ("Receivership Order"), issued on July 28, 2023 (ECF No. 10), so that a new receiver from Utah may be appointed by the Court.

The grounds for this Motion are fully set forth in the following Memorandum of Law.

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION

The SEC got this case wrong.  Badly wrong.

This is not a fraud case.  The SEC claims that Defendants made outrageous misrepresentations to investors in connection with Defendant Digital Licensing Inc.'s ("DLI") sales of "node" software licenses and engaged in sham businesses so that Defendants could further line their pockets at the expense of investors.  That narrative, common in securities fraud cases, does not fit here.

Had the SEC done a full and fair investigation before rushing headlong to procure an *ex parte* Temporary Restraining Order ("TRO") on the afternoon of Friday, July 28, 2023, it would have discovered the truth:  that there were *real* operating businesses associated with the "node" software licensing sales at issue, with *real* people working for those businesses, and that

appropriate disclosures--not misrepresentations--were made for the businesses. Indeed, as shown below, the SEC presented insufficient "evidence," which includes inadmissible hearsay-based speculations, to warrant a TRO under the Supreme Court and Tenth Circuit case law.

But what makes this case particularly unusual, and worthy of further immediate intervention by this Court, and we do not say this lightly, is that the SEC improperly obtained the *ex parte* TRO by misrepresenting the exigency with respect to Defendants and Relief Defendants. The SEC also requested appointment of its self-selected receiver from Florida, who has grossly mismanaged DLI's valuable assets in this case while also charging exorbitant rates.

The transcript of the July 28, 2023 *ex parte* TRO hearing, which was obtained by Defendants on August 25, 2023, shows that the SEC confronted a court focused on the enormous harm that can be inflicted by an *ex parte* TRO and correctly questioned whether the SEC had satisfied the rigorous standard of irreparable harm as well as other required factors for a TRO. In response, the SEC claimed that "even in the last 48 hours [as of July 28, 2023] defendants have closed additional bank accounts," and that "around 33 bank accounts have been closed," further asserting, beyond what was alleged in the SEC's Complaint and TRO application, that the SEC had caught Defendants dead to rights: discovering, in real time, that Defendants were moving their monies and assets and dissipating them. That proffer by the SEC was demonstrably false and misleading.

There was no need for a TRO against Defendants and Relief Defendants. There were no bank account closures involving DLI, Defendants or Relief Defendants in July 2023. Nor did DLI, Defendants, or Relief Defendants close any bank accounts in 2023; as shown below, any decision to close the accounts was *made by the banks themselves* in 2021 and 2022. Moreover, Defendants and Relief Defendants did not dissipate any assets of DLI.

To be sure, because of the regulatory uncertainty surrounding crypto assets in the United States, and like many other crypto entities, DLI left the United States for the United Arab Emirates ("UAE").  But importantly, DLI moved its operations to UAE *some 14 months before* the SEC made its *ex parte* TRO application with the Court.

Instead of attempting to understand Defendants' complex set of legitimate operating businesses in the United States, UAE, and Ghana, the SEC saw some hints of what it believed to be suspicious activities, assumed the worst, without a full and fair investigation, and lumped together all 18 defendants in the Complaint into one "bucket" of culpability.  The SEC then shoe-horned a false and misleading narrative to fit its desired story that the SEC is providing "real-time" enforcement of alleged crypto scofflaws.

The adverse, disruptive effects of the SEC's reckless failure to investigate this matter fully and fairly cannot be overstated.  The TRO has not maintained the status quo. Rather, for Defendants and Relief Defendants, who knew nothing of the SEC's investigation, their lives (personal and business), have been completely upended without due process:  Because of the draconian TRO/asset freeze, which froze all bank accounts without exception and which contemplated no allowance besides the IRS-mandated minimum living expenses, Defendants had to resort to borrowing petty cash from friends and family to get through these past weeks. Defendants and Relief Defendants' businesses have been indiscriminately shut down by U.S. Marshals and others, forcing them to miss payments of ordinary-course expenses, including payroll, leaving more than 50 (now former) employees and contractors in limbo. Valuable equipment, such as the four oil drilling rigs of DLI, worth several million dollars, have been left unattended and without security in Nevada and Nebraska for weeks, subjecting them to an ongoing

risk of theft, loss, and vandalism.   Indeed, even collateral damage has occurred: one of the operators of Relief Defendant Purdy Oil, LLC, has received a death threat.

For the public, there has been a catastrophic disruption to the DEBT Box community in over 130 countries and for approximately 300,000 system users—many of whom have never touched a single node software license (a vast majority of the users are from outside the United States).   Not only was the DEBT Box shut down, but the market value for the native token associated with DEBT Box took a free-fall:  approximately 71% of the market value (more than $428 million) evaporated within days of the SEC's unsealing of the Complaint.

At best for the SEC, this case is another unregistered securities offering matter involving crypto assets. That, however, is not a fraud case under the federal securities law. And an unregistered offering case does not require a TRO or any expedited scheduling.  Moreover, as recent case law and litigations show, that type of a case is fraught with litigation risks for the SEC.

For one, no U.S. Court of Appeals--let alone the Tenth Circuit--has had the occasion to consider whether any crypto asset may be considered an "investment contract," and thereby a "security," under the Supreme Court ruling in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  Here, one of the largest law firms in the world extensively vetted the software licensing sales at issue—including on the question of whether the sales may be considered an "investment contract" under *Howey*.

Finally, adding to the enormous harm suffered by Defendants, Relief Defendants and the public, the SEC requested in a sealed hearing, and this Court granted, an appointment of a temporary receiver in this matter.  The Receiver has failed to manage and operate the on-going, legitimate businesses of Defendants by, among other things, firing or removing key employees who could have continued to manage the businesses; failing to make requested ordinary-course

expenses for the immediate business needs; failing to secure DLI's four oil drilling rigs, subjecting them to the risk of potential theft, loss and vandalism; and demanding imprudent transfers of crypto assets from the trading pools in the secondary exchanges that would effectively drain all value for the token holders. In addition, the Receiver has declined to provide to Defendants any information regarding whether it may have an undisclosed conflict-of-interest through a 2022 transaction involving DLI and other defendants.

This nightmare must end. Defendants and Relief Defendants respectfully request that the Motion be granted, that the TRO, at least as to Defendants and Relief Defendants, be dissolved, and that the Temporary Receiver be removed, with an appointment of a new local (Utah) receiver by this Court. We respectfully request expeditious consideration.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 26, 2023, the SEC filed a sealed Complaint naming18 defendants and 10 relief defendants, including Defendants Jason Anderson, Jacob Anderson, Brannon, and Nelson and Relief Defendants BFS, Blox, TGC, and UIU, for various alleged federal securities violations in connection with DLI's (a Wyoming corporation's) sales of node software licenses that would allow the purchasers to obtain, through mining, crypto tokens on the "DEBT Box" platform.[1] (ECF No. 1) According to the SEC, a sale of the software license is an "investment contract," and thereby a "security" under the federal securities laws.

The SEC also applied for an *ex parte* TRO. And to support that application, the SEC alleged in the Complaint that:

> in the past two months, certain defendants have taken steps to evade law
> enforcement. DEBT Box has stated that it is in the process of moving its operations

---

[1] DEBT Box disclosed its mining and reward process in its "Lite Paper." Under the "TOKENOMICS" section, DEBT Box explained that "tokens are mined to license holders based on a synthetic mining algorithm that functions like other proof of work algorithms, without excessive energy and hardware costs." Ex. 1 (DEBT Token Lite paper) (attached hereto).

to the United Arab Emirates for the express purpose of evading the federal securities laws.  In a June 14, 2023 promotional video posted on YouTube, Defendant Jacob ("Jake") Anderson stated that "we have moved all of [DEBT Box's] operations to Abu Dhabi" and claimed that DEBT Box is "under jurisdictional control of Abu Dhabi, not the SEC."

Complaint ¶6.

In the application for the *ex parte* TRO, the SEC again claimed, in a conclusory manner, that Defendants, all residents of Utah and California, were attempting to liquidate and relocate assets.  SEC TRO Application at 11 (ECF No. 3). The SEC repeated that the "DEBT Box principals claim DEBT Box is in the process of moving its operations to the UAE for the express purpose of evading federal securities laws."  *Id*. Counsel for the SEC similarly certified that "Defendants are currently in the process of attempting to relocate assets and investor funds overseas, where at least Defendant Jacob Anderson has contended that those assets will be outside the reach of U.S. regulators."  Rule 65(b)(1)(B) Attorney Certification (of Michael E. Welsh) ¶ 4.  (ECF No. 3-2)

The SEC further proclaimed that the SEC "made no efforts to give notice to the Defendants of the filing of this action or the TRO Motion" because "notice would potentially disrupt the status quo and give Defendants and Relief Defendants the opportunity to move, hide, dissipate, or place outside the Court's jurisdiction assets that should be preserved for eventual distribution to defrauded investors."  *Id*. ¶¶ 10, 11.

On July 28, 2023, this Court held a sealed *ex parte* TRO hearing.  Minute entry of the *ex parte* TRO Hearing (ECF No. 11) (Hearing Transcript or "Tr," attached as Exhibit 2).  At the outset, the Court expressed its view that the Tenth Circuit precedent in *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016), required the SEC to show more than just the likelihood of success on the merits for issuance of a TRO.  Tr. at 5 ("There [in *Dine*] the 10th Circuit said following *Winter* [a Supreme Court decision] that:  Any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is

impermissible…."). And, given that view, the Court advised the SEC that it had failed to make the required showing in its application for the TRO: "I've prepared a short oral ruling that I think lays out what I think the standard is and why I think that is the standard that governs, what I think is missing in the [SEC's] application." Tr. at 6.

After the SEC sought guidance from the Court on "which of the elements of facts that you consider that you believe that we did not adequately address in the hearing," Tr. at 7, the Court explained that the SEC had failed to address the last three elements in the pleadings; that is, the SEC failed to show that there would be irreparable harm unless the injunction is issued; that the threatened injury outweighs the harm that the injunction may cause the opposing party; and that the injunction, if issued, will not adversely affect the public interest. *Id*. at 9.

In response, the SEC acknowledged that its pleadings did not contain much discussion regarding the last three elements. Tr. at 9. The SEC then attempted to remedy the deficiency by reviewing and supplementing what was alleged in the Complaint and in its TRO application, including the allegations that the "defendants are moving assets overseas," that "they have said in videos that the reason they are doing this is to avoid SEC jurisdiction," and that "[t]hey have dissipated funds both in closing known accounts …." Tr. at 9-10.

The Court still appeared to be reluctant to issue an *ex parte* TRO, and expressed concerns:

> I'll just tell you every time I sign one of these orders it takes my breath away. It is a profound and extraordinary invocation of the power of the federal judiciary. And it affects citizens in a direct way without notice or opportunity to be heard.

Tr. at 12. The Court then reminded the SEC that the "10th Circuit requires a clear showing of entitlement to this relief because of the nature of the relief that's sought." *Id*. The Court thereafter took a recess to consider what it wanted to do. *Id*. at 15.

Upon return, the Court set forth the Tenth Circuit standard for injunctions, and found that the SEC had only met the first prong regarding the likelihood of prevailing on the merits, and invited further discussion on the remaining elements.  Tr. at 16-20.  In response, counsel for the SEC made the following claim to bolster the irreparable harm assertion:

> This is – the decision to bring this TRO is not a decision we take lightly, either.  Just as we were on break I was reminded by investigative staff with respect to the investigation which remains ongoing that *even in the last 48 hours defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed*.

Tr. at 20 (emphasis supplied).

> Next, counsel for the SEC made the following additional claim:

> Now, we have been covert, and in a short time where our investigation teams ongoing, even in that short time *we have had affidavits verifying multiple instances where the key businesses underlying their operations are fraudulent*.

*Id*. at 22 (emphasis supplied).

Accepting the SEC's claims, the Court finally issued an *ex parte* TRO and appointed a receiver from out-of-state.  Tr. at 24-26.  On August 2, 2023, after the unsealing of the Complaint, Defendants learned of this action through the U.S. Marshals' seizure of assets.

## <u>ARGUMENT</u>

## I.    **THE TRO SHOULD BE DISSOLVED AND A NEW TEMPORARY RECEIVER FROM UTAH SHOULD BE APPOINTED.**

As the Supreme Court explained, *ex parte* temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."  *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).  To be sure, any TRO or preliminary injunction "is an extraordinary remedy,

[and] the [movant's] right to relief must be clear and unequivocal." *Wilderness Workshop v. United States BLM,* 531 F.3d 1220, 1224 (10th Cir. 2008). 'When considering a motion for a preliminary injunction, unlike a motion to dismiss, the Court need not accept as true the well-pleaded allegations in Plaintiff['s] complaint." *KDH Consulting Grp. LLC, v. Iterative Cap. Mgmt. L.P.*, et al., No. 20 Civ. 3274 (VM), 2020 WL 2554382, at *5 (S.D.N.Y. May 20, 2020) (internal quotations and citation omitted).

As this Court explained,

> a party seeking a temporary restraining order must demonstrate: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest."

*Brundidge v. Brim Properties, LLC*, No. 2:19-cv-291, 2019 WL 13260424, at *1 (D. Utah May 8, 2019) (Shelby, C.J.) (quoting *Dine Citizens Against Ruining Our Env't,* 839 F.3d at 1281.

Rule 65(b)(4) of the Federal Rules of Civil Procedure provides that a party may move to dissolve or modify a TRO. *See* Fed. R. Civ. P. 65(b)(4); *Myers v. Frontier PMS and SN Servicing Corp.*, No. 4:21-cv-436-ALM-KPJ, 2021 WL 2906065, at * 6 (E.D. Tex. June 15, 2021). "A district court need not find proof of changed circumstances in modifying a temporary restraining order or preliminary injunction, but rather applies its discretion in exercising the trial court's inherent power to modify its orders." *Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253, 256-57 (2d Cir. 1984). Courts "can dissolve the TRO if the party who obtained it did not show a substantial likelihood of success on the merits, if the TRO was not issued in accordance with applicable procedural law, or otherwise improperly issued." *Id*. (collecting cases); *see KDH Consulting Grp.* LLC, 2020 WL 2554382, at *5 ("A court may grant a motion to dissolve a TRO pursuant to Rule 65(b)(4) if the TRO was improperly issued.").

## II.   THE SEC IMPROPERLY OBTAINED THE *EX PARTE* TRO BY PROVIDING FALSE AND MISLEADING INFORMATION TO THE COURT.

### A.   The SEC Failed to Present Any Evidence of Irreparable Harm.

The *ex parte* TRO should be dissolved because the SEC improperly obtained the emergency relief against Defendants and Relief Defendants.  Contrary to the SEC's representations, there was no risk of "immediate and irreparable injury, loss, or damage" that required an injunction before Defendants and Relief Defendants could be heard in opposition, and the SEC had no legitimate reason to forego the advance notice to the Defendants and Relief Defendants required by Rule 65(b)(1).  *See Brundidge*, 2019 WL 13260424, at *1 (setting forth the standard under Rule 65(b)(1)).  *See also* 11A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURES § 2948.1 (3d ed. 2023) (Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction ...").

The SEC made two sweeping claims of exigency to the Court, indiscriminately grouping all 28 defendants and relief defendants, to support its *ex parte* TRO application against Defendants and Relief Defendants.  The SEC got it wrong: neither of the claims were true.

**SEC's Claim No. 1**:  The SEC claimed that Defendants were, in real time, attempting to "relocate assets and investor funds overseas."  Rule 65(b)(1)(B) Attorney Certification ¶ 4.  To that end, the SEC's counsel asserted that:  "[E]ven in the last 48 hours [as of July 28, 2023] defendants have closed additional bank accounts, and I believe the number … was around 33 bank accounts have been closed."  Tr. at 20.

**The Facts**:  The SEC's claim is baseless.  There were no bank account closures involving DLI, Defendants or Relief Defendants in July 2023.  Even the SEC's own accountant, Karaz S. Zaklin, did not identify any account of Defendants and Relief Defendants that was closed in July 2023.  *See* Declaration of Karaz S. Zaklin in Support of SEC's TRO Application Complaint ¶ 20

10

(ECF No. 3-10).  In fact, DLI, Defendants, and Relief Defendants themselves did not close any bank accounts in 2023.  Rather, various banks themselves decided to close certain of DLI, Defendants, and Relief Defendants' accounts in 2021 and 2022, and informed DLI, Defendants, and Relief Defendants of their decision.  *See* Ex. 3 (containing 15 bank closure notice letters, including for DLI, and statements indicating closures in 2021 and 2022).

To this date, Defendants and Relief Defendants' former banks have not advised them of the exact reason(s) for the banks' decision to close their accounts.  However, it appears that banks, under at least one U.S. regulator's demand, have closed accounts of crypto clients for regulatory concerns.  *See, e.g.*, *U.S. FDIC tells Signature Bank's crypto clients to close accounts by April 5*, Reuters, March 28, 2023 (available at:   www.reuters.com/markets/us/us-fdic-tells-signature-banks-crypto-clients-close-accounts-by-april-5-2023-03-28/).

In short, the SEC's assertion to the Court that "even in the last 48 hours [as of July 28, 2023] defendants have closed additional bank accounts," suggesting that Defendants and Relief Defendants were caught dead to rights, and would cause irreparable harm is false and misleading.

**SEC's Claim No. 2**:  The SEC also claimed that "DEBT Box has stated that it is in the process of moving its operations to the United Arab Emirates for the express purpose of evading the federal securities laws."  SEC TRO Application at 11.  For support, the SEC claimed that in a June 14, 2023 promotional video posted on YouTube, Jacob Anderson stated that "we have moved all of [DEBT Box's] operations to Abu Dhabi" and claimed that DEBT Box is "under jurisdictional control of Abu Dhabi, not the SEC."  SEC TRO Application at 11-12.

**The Facts**:  Highly misleading.  In a public YouTube video, which lasted almost one hour and 15 minutes, Jacob Anderson was interviewed by Defendant iX Global, LLC (Defendant Joseph

Martinez) ("Martinez").  Most of the video focused on developing "Layer 1 blockchains." The video is available at https://www.youtube.com/watch?v=bvP78-I-Jv0.

The SEC relies upon a three-minute snippet of this video.  Starting at 46:40 mark of the video, Martinez read a question from the chat box for Jacob Anderson; the question concerned "SEC's squeeze on crypto and how this affects DEBT Box." In response, Jacob Anderson explained that "it is very, very hard to build something when you don't even understand the laws that you are under… and that is all jurisdiction based…."  Thus, Jacob Anderson stated that DEBT Box, not unlike other crypto entities, "ha[s] moved all the operations currently to Abu Dhabi" and was "under the jurisdictional control of Abu Dhabi, not the SEC."

Moving a company's operations from the United States to foreign soil, of course, is (unfortunately) not uncommon these days—but it also is not a securities fraud or crime.  Many crypto companies have been expressly advised to do so given the regulatory uncertainty in the United States. *See* Emily Parker, *Keeping Crypto in America*, CoinDesk, March 2, 2023 ("I can tell you from firsthand experience, as a crypto founder myself, every single lawyer we have met with has advised us against considering the U.S. due to the regulatory uncertainty," Boyd Cohen, CEO and co-founder of video-game developer Iomob) (www.coindesk.com/consensus-magazine/2023/03/02/lack-of-regulatory-clarity-puts-crypto-in-the-united-states-at-risk/).   Jacob Anderson further explained that Abu Dhabi has a "crystal clear" framework.

In fact, DLI had started to discuss the move to UAE in March 2022, and after discussion with counsel, moved its operations to UAE in May 2022, "primarily because of regulatory clarity in the UAE and the ability to leverage strategic business partnerships unavailable in the United States," Declaration of Emily Tabor-Eads ("Tabor-Eads Decl.") (attached as Exhibit 4)--more than a year before the YouTube video interview and more than 14 months before the *ex parte* TRO

application was filed by the SEC.  *See* Ex. 5 (DLI and UAE corporate documents showing that it had moved its operations to UAE on May 31, 2022 and appointed a special consultant/manager in UAE).  Indeed, the SEC itself recognized this fact, as it quoted Jacob Anderson as saying that "*we have moved* all of [DEBT Box's] operations to Abu Dhabi."  TRO Application at 11 (emphasis supplied). The fact that the move had already happened -- more than a year before the SEC's TRO application -- undercuts the alleged risk of irreparable harm proffered by the SEC.  *See Smith & Nephew, Inc. v. Stryker Sales, LLC*., No. 2:23-cv-02344-SHL-cgc, 2023 WL 3975452, at *5 (W.D. Tenn. June 13, 2023) ("[I]n some cases a long delay in seeking a TRO will undermine a showing of irreparable harm") (citing *Total Quality Logistics, LLC v. III's Hotshot, Inc*., No. 1:17-cv-352, 2017 WL 5972001, at *4-5 (S.D. Ohio Dec. 1, 2017) (finding that applicant's eleven-month delay in bringing its claims severely undermined its request for a TRO)).

Nonetheless, the SEC attempts to draw a nefarious inference from the video snippet.  That is, according to the SEC, the snippet shows that Defendants were attempting to "relocate assets and investor funds overseas" in June or July 2023.  Nothing in the video supports such a strained inference.  As shown above, DLI, Defendants and Relief Defendants themselves did not close any bank accounts in 2023. This, of course, is because there was no plan to relocate "assets and investor funds overseas" at that time.  The video provides not even a hint that Jacob Anderson or anyone associated with DEBT Box was evading any law enforcement.  In short, the YouTube video provides no support to the SEC's claim about the risk of irreparable harm.

**B.     The SEC Failed to Make a Clear Showing of Substantial Likelihood of Prevailing on the Merits.**

When this Court provided the SEC a second chance to meet the required prongs of the Tenth Circuit's TRO/injunction test at the *ex parte* TRO hearing, the SEC made the following claim relating to the likelihood of success:  "[E]ven in that short time [that the SEC has been

investigating] we have had affidavits verifying multiple instances where the key businesses underlying their operations are fraudulent." Tr. at 22.  This is also false and misleading.

The SEC submitted the following four declarations in the *ex parte* TRO application to support the claim that "the key businesses underlying [Defendants'] operations are fraudulent": (1) Declaration of Joseph D. Watkins ("Watkins Declaration" or "Watkins Decl."); (2) Declaration of Flava Tat Nardini ("Nardini Declaration" or "Nardini Decl."); (3) Declaration of Andrew Michael Johnson ("Johnson Declaration" or "Johnson Decl."); and (4) Declaration of Rick Lee Serna ("Serena Declaration" or "Serena Decl."). Contrary to the SEC's assertions, these declarations do not "verify[] multiple instances where the key businesses underlying their operations are fraudulent." Tr. at 22.

*First*, the Watkins Declaration is nothing more than a descriptive list of documents and videos that an SEC staff attorney searched, read, and/or watched during the investigation of this matter. Careful review of this attorney declaration shows that Mr. Watkins interviewed none of the other declarants, and, notwithstanding his claim of "personal knowledge," he lacks any personal, direct, or real-time knowledge of the underlying events.  *See generally* Watkins Decl. ¶¶ 5, 7-63; 40-43 (showing that other unnamed SEC attorneys obtained the declarations).  To put it another way, the Watkins Declaration is purely derivative.  Thus, the Watkins Declaration do not show that "the key businesses underlying their [Defendants'] operations are fraudulent." Tr. at 22.

*Second*, the Nardini Declaration, which contains the statements of CEO Nardini of Fleet Space Technology Pty Ltd. ("Fleet Space"), also does not show that "the key businesses underlying their [Defendants'] operations are fraudulent." Tr. at 22.

The Declaration confirms that there exists "a solution for the mineral exploration industry providing fast, highly scalable 3D mapping solutions to pinpoint minerals and increase accuracy

14

in drilling targets" and that Fleet Space developed a technology called "ExoSphere," which uses proprietary "seismic sensors with edge processing and satellite connectivity directly from each device." Nardini Decl. ¶¶ 3-4.  The Declaration further confirms that Fleet and Brannon, on behalf of his company, Resonance Frequency Exploration Group LLC ("RFEG"), entered into an agreement whereby Fleet Space would provide "3D shear velocity models generated through the ExoSphere portal." *Id*. ¶¶ 13-14.

Indeed, on January 11, 2023, Fleet Space itself issued a press release making the following announcement about its contract with Brannon's company:

> (1) "Fleet Space signs new contract to provide ExoSphere satellite-based mineral exploration technology to Resonance Frequency Exploration Group (RFEG)"; (2) "Licensing and technology cooperation agreement enhances RFEG's proprietary XPLR"; (3) "Combines ExoSphere's 3D rendering of subsurface topography with RFEG's nuclear magnetic resonance (NMR) technology and mapping-analysis algorithms"; (4) "Enables faster, more environmentally-friendly sub-surface mineral exploration across key public- and private-sector projects-starting with initiatives in Ghana, West Africa"; and (5) "Accelerates prospecting for minerals including bauxite, gold, iron ore and lithium, under technical supervision from the Ghana Geological Survey Authority."

Ex. 6 ("Fleet Space Announces First Exosphere Deployment in Africa" press release) (attached hereto).

*Mining Magazine*, an industry publication, soon followed.  *Mining Magazine* published an article about the contract on the same day, January 11, 2023.  *See* Ex. 7 (*Mining Magazine* article headlined: "Fleet Space wins Africa satellite contract") (attached hereto).  *Mining Magazine* reported that "Fleet Space has announced the first deployment of its ExoSphere satellite-based mineral exploration system in Africa in a new partnership with Resonance Frequency Exploration Group (RFEG), based in the US, with operations in Accra, Ghana."  *Id*.  *Mining Magazine* continued:

> Fleet Space said its Exosphere system brings a "powerful new dimension" to the ongoing Mineral Resource Estimate projects RFEG is conducting, in particular in the Oti Region of Ghana. Under the auspices of the Ghana Geological Survey Authority (GGSA), with implementation by RFEG's team, *ExoSphere will complement RFEG's own XPLR remote-sensing mapping-analysis technology*. This is achieved by cross-referencing the data from both sources, thereby significantly increasing the likelihood of finding new mineral deposits more quickly and with much greater accuracy.

*Id*. (emphasis supplied).

In the other parts of the Nardini Declaration, however, it complains about certain misrepresentations made in promotional YouTube videos regarding Fleet Space's satellites, ExoSphere technology, and DEBT Box's business relationship with Fleet Space. Nardini Decl. ¶¶ 19-23. Importantly, though, the Declaration does not state that RFEG, its underlying mining explorations, or the scanning technology it was employing were fake. And as Ms. Nardini explains, these promotional videos were prepared by unidentified "DEBT Box promoters" and other defendants, except one (for the YouTube video published on January 19, 2023), allegedly involving certain statements by Jason Anderson about Fleet Space's satellites. That video, however, cannot be accessed by the public (including Defendants) to confirm whether there were any alleged material misstatements and who may have made them. *See id*. ¶¶ 19-23. (Notably, in the descriptive list of the Watkins Declaration, which discusses the same January 19, 2023 YouTube video, Mr. Watkins does not identify any statements made by Jason Anderson regarding any scanning technology or Fleet Space's satellites. *See* Watkins Decl. ¶26.)

In any event, the exhibits to the Nardini Declaration confirm that upon learning of Fleet Space's concerns, Brannon immediately worked with Fleet Space to remove any misstatements regarding Fleet Space, and Jason Anderson did the same with the iX Global sales partners. *See* Exhibits E-G to the Nardini Declaration. In fact, Fleet Space's Head of Operations/Acting General Counsel expressly thanked Brannon for his efforts to remediate. *See* Exhibit H to the Nardini

Declaration (February 5, 2023 email). Such contemporaneous, diligent efforts to correct and remediate any alleged mistakes, to be sure, are inconsistent with fraudulent intent.

Finally, Fleet Space's cancellation of its contract with RFEG did not end the underlying mining explorations or the use of any scanning technology to conduct such explorations.  As discussed in Fleet Space's press release and *Mining Magazine*, and as set forth above, RFEG already had access to its own "nuclear magnetic resonance (NMR) technology and mapping-analysis algorithms" or "XPLR remote-sensing mapping-analysis technology."  Further, Brannon quickly found an alternative provider for Fleet Space which provided Ambient Noise Tomography ("ANT") that "provides passive seismic subsurface imaging and monitoring capabilities."  Ex. 8 (Brannon's January 17, 2023 internal Memorandum re Fleet Space Contract) (attached hereto).

*Third*, the Johnson Declaration--which is chock-full of inadmissible and irrelevant double hearsay, innuendos, and speculations--should be given no weight for any TRO.  The gist of this Declaration is that Mr. Johnson signed up with promoter iX Global, purchased node software licenses, earned tokens through mining, and, as he saw the value of his tokens go up, he began to harbor concerns about DEBT Box and the underlying projects.  Johnson Decl. ¶¶ 15, 25, 31-32, 34, 41.  Mr. Johnson then "decided to consult with his uncle, who is a geologist," who provided his arm-chair, personal opinions about scanning technology.  *Id*. ¶ 42.  Mr. Johnson also spoke with a friend (Burt Hoagland) who also allegedly purchased the licenses and who knew, and had consulted with two other unidentified "people with experience in the extraction and drilling industry" who provided their personal opinions of what certain YouTube videos of an oil drilling site looked like to them.  *Id*. ¶ 44.  Based on Mr. Johnson's conversations with his unnamed uncle and Mr. Hoagland (more precisely, Mr. Hoagland's rendition of his private conversation with two unidentified people, which Mr. Johnson was not part of), Mr. Johnson attempted to withdraw his

tokens and later succeeded in withdrawing some of them. *Id.* ¶¶ 42-47.  Subsequently, Mr. Johnson decided to record a phone call with another iX Global promoter (Defendant Mark Williams Schuler, a.k.a. "Billy Beach") and various speaking presentations at an event for "Fair Project," *id.* ¶¶ 48-65.

The Johnson Declaration has no evidentiary value as to Defendants and Relief Defendants, and should be stricken or disregarded as to them. As discussed above, the Declaration, which is the SEC's only declaration from a purchaser of any node software licenses, does not show that "the key businesses underlying [Defendants'] operations are fraudulent."  Tr. at 22.

*Fourth*, the Serena Declaration is equally flawed for three reasons: it is irrelevant, speculative, and wrong.  It has no evidentiary value.

The Serena Declaration generally recounts a business relationship that went sour between Jason Anderson and Defendant Ryan Bowen ("Bowen") and the Renegade Manufacturing Group ("Renegade"), of which Mr. Serena was then Vice President of Operations.  The dispute was over the running of the oldest microbrewery in Mississippi, Lazy Magnolia Brewing Company ("Lazy Magnolia"), which Jason Anderson and Bowen had acquired.  Serena Declaration ¶¶ 14-40; WLOX Staff, *Lazy Magnolia announces new ownership after nearly 20 years in business*, WLOX, April 6, 2023 (local Mississippi TV news station's article of the history of Lazy Magnolia and Jason Anderson and Bowen's new ownership of Lazy Magnolia) (available at: https://www.wlox.com/2023/04/06/lazy-magnolia-announces-new-ownership-after-nearly-20-years-business/%3foutputType=amp).  This is irrelevant to this case.

Earlier in 2022, prior to any souring of their business relationship, Mr. Serena and others from Renegade invited Jason Anderson and Bowen to invest in Lazy Magnolia.  *See* Serena Decl. ¶¶ 13-15.  During the business courtship, Renegade presented a "pitchbook."  Ex. 9 (2022

Renegade Business Consulting Service pitchbook) (attached hereto).  In the pitchbook, Renegade provided the following new business model and forecast:  that even a modest increase in the utilization of the available capacity of the brewery (for canning and bottling) would significantly increase its profit.  *See id*. at 13.  In the pitchbook, Renegade and Serena stated that Lazy Magnolia has "already established relationships with stores (Walmart, Costco, Target and Kroger) and distributors in the area" and that "utilizing available capacity" would bring additional revenue and profit of $25,464,090 and $12,222,764, respectively.  *Id*. at 12-13.

In his Declaration, Serena, who admittedly left Lazy Magnolia in March 2023, Serena Decl. ¶¶ 39-40, now claims that "it is my understanding that to date, Lazy Magnolia has not expanded its business beyond what it already had when the Andersons and Bowen purchased the brewery in December 2022."  Serena Decl. ¶ 43.  Not true.  *See* Ex. 10 (Declaration of Derrick Hope) ¶¶ 4-7 (discussing Lazy Magnolia's upgrades and improvements since January 2023).

Next, without identifying any specific representation, any person making such representation, or what personal knowledge Serena may have of such representation or of the person who made such representation, Serena makes a sweeping, speculative comment that "[a]ny representations that the Andersons, Bowen, or other affiliates of Debt Box have made that Lazy Magnolia is making millions of dollars in profits are false."  Serena Decl. ¶ 43. There is no evidentiary value in this speculation.

In any event, Mr. Serena's suggestion of a misrepresentation, which appears in the SEC's Complaint (at ¶¶ 80-81), is factually wrong:  None of Defendants (or Bowen) stated that Lazy Magnolia has "generated 'over '12 million dollars a month in revenue at any point during the relevant time period [of this case]."  Rather, Lazy Magnolia helped Richard's Rainwater, a

different company, which Lazy Magnolia bottled for, reach its revenue mark to over $12 million a month in revenue.  The SEC again got it wrong.

### C. The SEC Failed to Show that the Threatened Injury Outweighs the Harm that the TRO May Cause the Opposing Party.

The SEC argued that the threatened injury of dissipation of investor funds outweighed the harm that the TRO may cause Defendants and Relief Defendants.  Tr. at 21.  But the SEC's factual premise supporting the SEC's request for a TRO was wrong; as discussed above, Defendants and Relief Defendants were not in the process of "relocat[ing] assets and investor funds overseas." Rule 65(b)(1)(B) Attorney Certification ¶ 4.  There was no threated harm from Defendants and Relief Defendants.

By contrast, the TRO has not maintained the status quo.  The harm that the TRO caused Defendants and Relief Defendants have been actual, substantial and devastating. As discussed above, without due process guaranteed to them as American citizens, their lives (personal and business) have been completely (and perhaps irretrievably) upended:  Because of the draconian TRO/asset freeze, which froze all bank accounts without exception and which contemplated no allowance besides the IRS-mandated minimum living expenses, Defendants had to resort to borrowing petty cash from friends and family to get through these past weeks.

Similarly, Defendants and Relief Defendants' businesses that were not involved in or connected to selling anything that could be considered crypto assets have been indiscriminately shut down, forcing them to miss payments of ordinary-course expenses, including payroll, and leaving more than 50 employees and contractors of these businesses to make a Hobson's choice: walk off their jobs or be laid off.  Indeed, the SEC has failed to provide a real response to Defendants' request for payment of ordinary-course expenses.  *See* Ex. 11 (Defendants' Letter to SEC, dated August 23, 2023 requesting allowance for ordinary-course expenses) (attached hereto).

Moreover, valuable equipment, such as four oil drilling rigs of DLI, worth several million dollars, have been left unattended and without security in Nevada and Nebraska for weeks, subjecting them to ongoing risk of theft, loss, and vandalism.  *See* Ex. 12 (Declaration of Jason Saetrum) ("Saetrum Decl.") ¶¶ 5-11 (attached hereto).  Even collateral damage has occurred:  police reports have been submitted earlier last week for theft of various equipment, including Ford F250 and F150 trucks, trailers, and heavy equipment, worth more than $100,000 in estimated losses, for one of the Defendant's companies which could no longer operate because of the TRO.  *Id*. ¶ 12.

Finally, and sadly, one of the principals of Relief Defendant Purdy Oil, LLC, Gene Purdy, recently received a death threat.  Ex. 13 (farewell card, postmarked September 1, 2023, from Charlotte, NC:  "you miserable piece of sh*t, I am coming for you and your pathetic family.  You are a fat piece of sh*t, I would get your will in order if I were you.") (attached hereto).

### D.     The SEC Failed to Show that the Injunction, if Issued, Would Not Adversely Affect the Public Interest.

The SEC appeared to claim that an injunction would protect the public from a fraudulent scheme that "is continuing to grow" and that would "greatly harm" the "investors that have already put their capital into this project."  Tr. at 23.  The SEC presented no evidence to support such a claim at the *ex parte* TRO hearing. Instead, as discussed above, the SEC presented false and misleading information about the exigency as to Defendants and Relief Defendants.

The TRO has been a catastrophic disruption to the DEBT Box community in over 130 countries (a large majority of the DEBT Box Community reside outside the United States) and for approximately 300,000 system users—many of whom have never touched a node software license, but bought the tokens utilizing trading algorithms on digital asset exchanges via a blind bid/ask transaction.  (Indeed, all token transactions have always taken place on a 3rd-party exchanges via this method.)  Tabor-Eads Decl. ¶ 2.  As noted above, the native token of DEBT Box plummeted

approximately 71% of its market value (or approximately $428,435,000) within days of the SEC's unsealing of its Complaint.  Ex. 14 (showing DEBT Token market capitalization calculations, using Dexscreener).  In short, the TRO did not preserve the status quo.  Rather, the TRO has caused massive havoc to the public.

## III.    THE SEC ALSO IMPROPERLY ISSUED NUMEROUS *EX PARTE* ADMINISTRATIVE INVESTIGATIVE SUBPOENAS AFTER INSTITUTING THIS ACTION IN FEDERAL COURT.

After commencing this civil action, the SEC issued numerous *ex parte* administrative investigative subpoenas related to this action, instead of serving Fed. R. Civ. P. 45 subpoenas that this Court had authorized in the *ex parte* TRO. *See* Ex. 15 (SEC 8/10/2023 administrative investigative subpoena issued to Gordon Larry Anderson) (attached hereto). The SEC's issuance of administrative investigative subpoenas in this civil action was improper.

Unless an administrative agency like the SEC is conducting a purely administrative investigation *unrelated* to a civil action, the administrative agency is "unquestionably bound by the [Federal Rules of Civil Procedure] when they are parties in civil actions." *SEC v. Life Partners, Holdings, Inc.*, No. 1:12-CV-00033-JRN, 2012 WL 12850253, *2 (W.D. Tex. Aug. 17, 2012). Therefore, the SEC must use Rule 45 subpoenas in a civil action like this one, instead of using secret (non-public) administrative investigative subpoenas, and provide forthwith notice and all documents and materials that the SEC obtains from the recipients of the subpoenas in the civil action.

Here, the SEC issued an administrative investigative subpoena to, for example, Gordon Larry Anderson on or about August 10, 2023 when this civil action was pending.  *See* Ex. 15 at 1 (SEC cover letter mentioning an investigation).  The SEC's cover letter for the administrative investigative subpoena, which was signed by Mr. Watkins, the same SEC staff attorney as discussed above, reveals that it concerns an investigation in *In the Matter of Digital Licensing Inc.*,

SL-02891, the same investigative matter name and number from which this civil action arose. *Id*. Indeed, the subpoena signed by Mr. Watkins requests information relating to DEBT Box and Fair Project and to many individuals and entities, including Defendants and Relief Defendants, already sued by the SEC in this action. *See id*. at 6-8 ("Documents to be Produced"). Nonetheless, in an apparent effort to circumvent the federal rules, the SEC failed to provide any notice of this subpoena (and other subpoenas), and produced no documents from any response(s) of this or other subpoenas that the SEC issued.

Accordingly, besides dissolving the TRO, we respectfully request that this Court prohibit the SEC from serving secret administrative investigative subpoenas in this civil action, and order all documents and other materials that the SEC received from all prior administrative investigative subpoena recipients to be produced to the parties forthwith.

## IV.   THE OUT-OF-TOWN TEMPORARY RECEIVER SHOULD BE REMOVED FOR FAILING TO MANAGE DLI'S ASSETS AND FOR FAILING TO DISCLOSE A POTENTIAL CONFLICT OF INTEREST.

In addition, the SEC, in a sealed hearing, requested, and this Court granted, an appointment of the Temporary Receiver from Florida (Josias N. Dewey) in this matter. Instead of fairly serving the mandates of this Court as a court-appointed receiver, the Receiver has become a deputized agent of the SEC assisting in what appears to be an apparent on-going administrative investigation of this action, while neglecting his fiduciary duties as a receiver and amassing six-figure legal fees as an out-of-state receiver.

As provided in the SEC's guidance on receivership, "[a] receiver has a fiduciary duty to stakeholders and the court," and "[t]he SEC is more likely to appoint a receiver in frauds when there is a danger of property being lost, concealed or squandered." SEC's Investor Alert, *Ten Things to Know About Receivers* (Aug. 27, 2015) (https://www.sec.gov/oiea/investor-alerts-bulletins/ib_receivers). The guidance further explains that:

the SEC may provide the names of several qualified candidates for a court to consider in determining who should serve as a receiver in a particular case. The receiver is an officer of the court, <u>not</u> an employee of the SEC, and ultimately answers to the judge.

*Id*. (emphasis in original)  In addition, an SEC receiver "must act in 'good faith' and perform his or her duties with 'reasonable diligence.'" *Id*.

In this case, the SEC presented to the Court a single candidate, the current Receiver, who appears to have a potential undisclosed conflict of interest discussed below. *See* SEC's *Ex Parte* Application for a Temporary Receivership at 2-3 (ECF No. 3) (discussing the candidate without mentioning any potential conflict).  Also, Defendants and Relief Defendants respectfully submit that the Receiver has neither acted in good faith nor performed his duties with reasonable diligence.

Despite numerous requests by Defendants, the Receiver has failed in his obligations to properly manage and operate the on-going businesses of Defendants by, among other things:

- removing key employees who could have continued to manage the ongoing operating businesses, *see* Ex. 12 (Saetrum Decl.); Ex. 16 (removal letter from receiver's counsel to Saetrum) (attached hereto);

- failing to make any ordinary-course expenses for the immediate business needs, *see* Ex. 11 (unanswered Defendants and Relief Defendants' August 23, 2023 Letter to SEC requesting allowance for payments of ordinary-course expenses);

- failing to secure DLI's four oil drilling rigs (which the Receiver dismissed as sham) to potential theft, loss and vandalism, even though the Receiver was provided the requested GPS coordinates for the rigs and was repeatedly advised of the security concerns regarding them, *see* Exs. 17, 18 (unanswered August 14, 20232 email and August 17, 2023 letter sent by Defendants' counsel to the Receiver regarding security concerns for the four oil drilling rigs);

- failing to understand blockchain by demanding imprudent transfers of crypto assets-- that is, demanding Defendants to withdraw all the liquidity from the trading pools in the secondary exchanges without realizing that such a withdrawal would amount to a "rug pull," effectively causing all tokens to lose all or substantial value, *see* Ex. 19 (August 29, 2023 email regarding Digital Asset Transfers – Wallet 3 (Cake LP). noting how withdrawal from certain wallets could raise significant issues in liquidity); and

24

- failing to respond to Defendants' multiple requests for a "claw back" agreement in which Defendants would be provided copies of potentially privileged documents of the Defendants that DLI's former counsel may have produced at the request of the Receiver. *See* Ex. 20 (unanswered email thread containing August 21, 2023 email from defense counsel David Ross regarding the "claw back" arrangement); Ex. 19 (August 29, 2023 email regarding "Other Items": "Finally, we have not heard back from you on the claw back agreement or conflict issues following your discussion with David Ross last week.").

Indeed, we respectfully submit that it appears that the Receiver is engaging in a calculated effort to extinguish Defendants' legitimate, operating businesses so that the Receiver could somehow validate the SEC's incorrect view that "the key businesses underlying their [Defendants'] operations [were] fraudulent." Tr. at 22.

In addition, the Receiver has declined to provide, after multiple requests, any information regarding whether it may have an undisclosed conflict-of-interest, as it previously represented an interested party (GSSR) in a 2022 transaction involving that party and Defendants DLI, Western Oil Exploration Company, and James Franklin. *See* Exs. 21, 22 (emails providing a document that raised a potential conflict issue and inquiring about it in August 25, 2023 12:53 PM email).

Given the litigation posture, Defendants and Relief Defendants recognize a need for a temporary receivership. But under the circumstances, we respectfully request that the Temporary Receivership Order be modified, that the Receiver from Florida be removed, and that a new slate of qualified, local (Utah) temporary receiver candidates be considered by the parties for final selection of a new receiver by this Court.

## **CONCLUSION**

For the foregoing reasons, Defendants and Relief Defendants' Motion should be granted.

Respectfully submitted,

**KUNZLER BEAN & ADAMSON, PC**
Matthew R. Lewis
Taylor J. Smith

25

**MORRISON COHEN LLP**

/s/ Jason P. Gottlieb
Jason P. Gottlieb (admitted pro hac vice)
David E. Ross (admitted pro hac vice)
Alexander R. Yarm (admitted pro hac vice)

*Attorneys for Defendants Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, Roydon B. Nelson, and Relief Defendants Business Funding Solutions, LLC; Blox Lending, LLC; The Gold Collective LLC; and UIU Holdings, LLC*

***SEC v. Digital Licensing Inc.***

**(Index )**

Case No. 2:23-cv-00482-RJS (D. Utah)

| Exhibits | Description |
|----------|-------------|
| 1 | DEBT Token Lite Paper |
| 2 | *Ex Parte* TRO Hearing Transcript (7.28.23) |
| 3 | Bank Closure Documents |
| 4 | Declaration of Emily Tabor-Eads |
| 5 | DLI Corporate Documents (3 documents) |
| 6 | Fleet RFEG Press Release |
| 7 | Mining Magazine Article on Fleet/RFEG |
| 8 | Brannon Internal Memo regarding Fleet Replacement |
| 9 | Renegade Pitchbook |
| 10 | Declaration of Derrick Hope |
| 11 | Defendants' Letter to SEC re Ordinary-Course Payments |
| 12 | Declaration of Jason Saetrum |
| 13 | Farewell Card with Handwritten Threat (Redacted) |
| 14 | DEBT Market Capitalization Calculations |
| 15 | SEC Subpoena and attachments to Gordon Larry Anderson |
| 16 | 2023-8-23 Letter from Receiver to Jason Saetrum |
| 17 | Email from D. Ross to J. Magee re: security concerns of DLI's 4 oil drilling rigs, dated August 14, 2023 |

| Exhibits | Description |
|---|---|
| 18 | Defendants' Letter to Receiver, dated August 17, 2023 regarding DLI, Ignis Energy and DLI's Ecosystem/Tokenomics |
| 19 | Email thread A. Yarm to J. Magee re outstanding issues, digital asset transfers and other issues (8.29.23) |
| 20 | Email thread including August 21, 2023 email from D. Ross re clawback agreement |
| 21 | Email thread including an email from D. Ross to J. Magee re attached agreement (8.24.23) |
| 22 | Email thread including an email regarding a potential conflict-of-interest (8.25.23) |