# Exhibit 21

| From: | Ross, David E. |
|---|---|
| To: | Magee, Jessica B (DFW - X61375); Englander, Alex M (WPB - X28339); Mascianica, Scott (DAL - X62106); Yarm, Alexander R. |
| Cc: | Gottlieb, Jason |
| Subject: | RE: SEC v. Digital Licensing - Urgent Call |
| Date: | Thursday, August 24, 2023 5:53:18 PM |
| Attachments: | image001.png |
| | 12. RFP 12 Assignment of interest in Purdy Farms #1 Well (PU-RPD-#12-001-0035).pdf |

Thanks. We need to discuss this document.

**David E. Ross**
*Partner*
T: 212.735.8841 | F: 917.522.9941
dross@morrisoncohen.com

vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

-------- Original message --------
From: "Magee, Jessica B (DFW - X61375)" <Jessica.Magee@hklaw.com>
Date: 8/24/23 5:29 PM (GMT-05:00)
To: "Englander, Alex M (WPB - X28339)" <Alex.Englander@hklaw.com>, "Ross, David E."
<dross@morrisoncohen.com>, "Mascianica, Scott (DAL - X62106)"
<Scott.Mascianica@hklaw.com>, "Yarm, Alexander R." <ayarm@morrisoncohen.com>
Cc: "Gottlieb, Jason" <jgottlieb@morrisoncohen.com>
Subject: RE: SEC v. Digital Licensing - Urgent Call

> **CAUTION:** External sender. Verify before continuing.

Thank you Alex and David—Scott and I will monitor in the background this evening as you/your clients proceed with test and—hopefully, if successful—substantive transfer transactions.

**From:** Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>
**Sent:** Thursday, August 24, 2023 4:27 PM
**To:** Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>; dross
<dross@morrisoncohen.com>; Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>;
ayarm <ayarm@morrisoncohen.com>
**Cc:** jgottlieb <jgottlieb@morrisoncohen.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

We are available. Thank you, David.

**Alex Englander** | **Holland & Knight**
Associate
Holland & Knight LLP
777 South Flagler Drive, Suite 1900, West Tower | West Palm Beach, Florida 33401
Phone 561.650.8339 | Fax 561.650.8399
alex.englander@hklaw.com | www.hklaw.com

Add to address book | View professional biography

---

**From:** Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>
**Sent:** Thursday, August 24, 2023 5:07 PM
**To:** dross <dross@morrisoncohen.com>; Mascianica, Scott (DAL - X62106)
<Scott.Mascianica@hklaw.com>; Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>;
ayarm <ayarm@morrisoncohen.com>
**Cc:** jgottlieb <jgottlieb@morrisoncohen.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

David, please stand by and we will let you know if 6pm ET today will work.  If so, and assuming tests
succeed, can we follow this evening with the substantive transfers?  Will get back with you
momentarily.

---

**From:** Ross, David E. <dross@morrisoncohen.com>
**Sent:** Thursday, August 24, 2023 4:02 PM
**To:** Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>; Englander, Alex M (WPB -
X28339) <Alex.Englander@hklaw.com>; ayarm <ayarm@morrisoncohen.com>
**Cc:** jgottlieb <jgottlieb@morrisoncohen.com>; Magee, Jessica B (DFW - X61375)
<Jessica.Magee@hklaw.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

*[External email]*
Thanks Scott! Can we either do 6:00 pm my time or tomorrow after 12:45?

**David E. Ross**
*Partner*
T: 212.735.8841 | F: 917.522.9941
dross@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022

www.morrisoncohen.com

-------- Original message --------
From: "Mascianica, Scott (DAL - X62106)" <Scott.Mascianica@hklaw.com>
Date: 8/24/23 2:40 PM (GMT-05:00)
To: "Ross, David E." <dross@morrisoncohen.com>, "Englander, Alex M (WPB - X28339)"
<Alex.Englander@hklaw.com>, "Yarm, Alexander R." <ayarm@morrisoncohen.com>
Cc: "Gottlieb, Jason" <jgottlieb@morrisoncohen.com>, "Magee, Jessica B (DFW - X61375)"
<Jessica.Magee@hklaw.com>
Subject: RE: SEC v. Digital Licensing - Urgent Call

---

> **CAUTION:** External sender. Verify before continuing.

---

Thanks, David. Good luck with the scrambling.  We'll be on standby.

---

**From:** Ross, David E. <dross@morrisoncohen.com>
**Sent:** Thursday, August 24, 2023 1:32 PM
**To:** Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>; Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>; ayarm <ayarm@morrisoncohen.com>
**Cc:** jgottlieb <jgottlieb@morrisoncohen.com>; Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

*[External email]*
Scott,
Be back to you shortly with a time. Apologies for the delay buy my wife is away for the day and our babysitter canceled so I am scrambling!

**David E. Ross**
*Partner*
T: 212.735.8841 | F: 917.522.9941
dross@morrisoncohen.com
vCard | Bio | LinkedIn

**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

-------- Original message --------
From: "Mascianica, Scott (DAL - X62106)" <Scott.Mascianica@hklaw.com>
Date: 8/24/23 12:56 PM (GMT-05:00)
To: "Ross, David E." <dross@morrisoncohen.com>, "Englander, Alex M (WPB - X28339)" <Alex.Englander@hklaw.com>, "Yarm, Alexander R." <ayarm@morrisoncohen.com>
Cc: "Gottlieb, Jason" <jgottlieb@morrisoncohen.com>, "Magee, Jessica B (DFW - X61375)" <Jessica.Magee@hklaw.com>
Subject: RE: SEC v. Digital Licensing - Urgent Call

> **CAUTION:** External sender. Verify before continuing.

---

David-

Hope you are well.  Regarding the transfer process below, can you confirm a time for today to execute the test transaction?  Once those are completed, we can move to the complete transfers.

Many thanks.

**Scott Mascianica** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2106 | Fax 214.964.9501
scott.mascianica@hklaw.com | www.hklaw.com

Add to address book | View professional biography

---

**From:** Ross, David E. <dross@morrisoncohen.com>
**Sent:** Tuesday, August 22, 2023 5:31 PM
**To:** Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>; Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>; ayarm <ayarm@morrisoncohen.com>
**Cc:** jgottlieb <jgottlieb@morrisoncohen.com>; Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

*[External email]*
Scott,
Thank you. As always, we will be diligently and expeditiously back to you concerning your requests and, *inter alia,* the additional information/handoff process/executions you are seeking below. In that regard, we are simultaneously in the process of working with you on those points while diligently providing granular, detailed information to both you and counsel for the SEC. We will continue to do so as quickly as possible.  I do note that we do not necessarily agree with some of your characterizations below but appreciate us continuing to work together amicably.

Be back to you shortly,
-Dave

**David E. Ross**
*Partner*
T: 212.735.8841 | F: 917.522.9941
dross@morrisoncohen.com
vCard | Bio | LinkedIn
**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

---

**From:** Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>
**Sent:** Tuesday, August 22, 2023 6:04 PM
**To:** Ross, David E. <dross@morrisoncohen.com>; Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>; Yarm, Alexander R. <ayarm@morrisoncohen.com>
**Cc:** Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

> **CAUTION:** External sender. Verify before continuing.

---

David,

Our team has reviewed the list of digital asset address disclosures provided by your clients.  The outline below sets forth the protocol to transfer the assets into the Receiver's control. This protocol was designed to be secure (removing the need to share private keys at this time) and to be as respectful of your clients' time as possible while allowing them flexibility in the handoff. More specifically, this follows the process previously outlined but for some additional facets that should make transfer easier for your clients.

1.      The attached manifest includes the addresses that were disclosed by your clients and the digital assets we are ready to receive. Please note that, at this time, we are not seeking turnover of the tokens native to the DEBT ecosystem. For this reason, private keys do not need to be turned – only the assets on the manifest.

2.      Listed on the manifest are the addresses to which each asset should be sent.

3.      We need a test transaction be completed for *each* blockchain.  Once we confirm receipt, the transfer can proceed.

4.      For the exchanges, in addition to the turnover, we request the log-in information be

provided in the file located in this secure data room: ☐ Morrison Cohen - H&K Data Room

5.        At this time, because we are not seeking the transfer of any DEBT ecosystem tokens, transfer of the domestic hardware keys is not necessary.

6.        Upon conclusion of the transfers, BDO will provide a receipt/inventory of the assets.

7.        For NDAU, we will have a custody solution shortly.

Regarding the hardware you reference in your email below, we appreciate your acknowledgement that your clients failed to identify these DLI wallets, which currently contain approximately $2.4 million in USD equivalent.  We are prepared to execute a transfer of the hardware and associated pins to the Receiver's custody later this week or next in Abu Dhabi.  Please let us know some dates later this week or next so we can execute.  To obviate the need for this type of back-and-forth going forward, we (again) request identification of **all** wallets in your clients' possession, custody, or control as required by the court's order in the updated inventory.

Finally, we appreciate the log-in credentials to access the coding.  We are reviewing and will follow-up.  More broadly, on Saturday, we provided a list of outstanding information we need to receive from your clients.  We separately followed up yesterday (see attached).  We have not heard back. Please advise on a proposed timeline for your clients to comply with these requests.

Thanks.

**Scott Mascianica** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2106 | Fax 214.964.9501
scott.mascianica@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Ross, David E. <dross@morrisoncohen.com>
**Sent:** Monday, August 21, 2023 6:17 PM
**To:** Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>; Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>; Yarm, Alexander R. <ayarm@morrisoncohen.com>
**Cc:** Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

*[External email]*
Scott, Jessica and Alex,
Thank you for the call earlier this afternoon.  We have investigated your allegations of malfeasance, and we believe that they are incorrect.

Specifically, it is our understanding that our clients have not moved or caused to be moved any tokens and therefore the recent transactions you raised on our call today are not attributable to them. While you did not provide specific information that would allow us to further investigate the circumstances surrounding these transactions, other than that they do not involve our clients, it is our firm belief that any and all sells to Binance or any other exchanges to cash out liquidity are attributable to third parties as standard *status quo*.

As to the additional wallets you raised on our call today, as you noted, numerous wallets are disclosed in the lite papers, which are public and well-announced. These are automated wallets that are part of the ecosystem and function pursuant to code associated with the smart contracts that has been in place well before the TRO. These internal wallets have no seed phrases and are part of the "tokenomics"m NOT a value of assets that can be sold. A flow chart is attached (*first attachment*) further describing these wallets and how they automatically function within the ecosystem. Included in the flow chart are login credentials for AWS, the software hosting the code for these programmable wallets, so you can verify the same. We have also included the login credentials below for your convenience.

Sign-in URL: https://282669548153.signin.aws.amazon.com/console

User name: receiver

Password: v{We7}Pr

I also attach a response to Alex Englander's request from 3:40 p.m. concerning the wallets at issue (*second attachment)*. As you will see, all but four of the fifty eight wallet addresses are associated with automated wallets described above. As to the other four addresses, after investigation by our clients, it appears they are associated with three hardware wallets belonging to DCH (one is a multifunctional wallet with two IDs, hence the four addresses). These hardware wallets are currently located in Abu Dhabi and will need to be physically retrieved and turned over along with the PINs allowing access to the same. Our clients are of course willing to work with the receiver to coordinate logistics for a turnover in compliance with the TRO. In addition, it is our understanding that, like all other wallets controlled by our clients (i.e., not programmed wallets operating automatically under pre-existing code), no assets have been transferred to or from these hard wallets since the TRO went into effect. Our clients are updating the inventory previously provided to include these wallets.

To be crystal clear:  (1) none of the transactions you raised are being or were initiated by or on behalf of our clients; (2) none of the assets involved in these transactions belong to our clients; and (3) these assets have not nor will they be distributed to our clients, their family, or anyone else for our clients' benefit.

At bottom, your allegations of malfeasance are meritless and belied by the facts and the documentary evidence.

We will be happy to discuss as soon as you have a moment.

Thanks,

-Dave


**David E. Ross**

*Partner*

T: 212.735.8841 | F: 917.522.9941

dross@morrisoncohen.com

vCard | Bio | LinkedIn

**Morrison Cohen LLP**

909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

---

**From:** Ross, David E.
**Sent:** Monday, August 21, 2023 5:37 PM
**To:** 'Mascianica, Scott (DAL - X62106)' <Scott.Mascianica@hklaw.com>; Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>; Yarm, Alexander R. <ayarm@morrisoncohen.com>
**Cc:** Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

Scott,
You will have a written response very shortly. We believe that this response will show that your allegations of malfeasance are unwarranted.
Thanks,
-Dave

**David E. Ross**
*Partner*
T: 212.735.8841 | F: 917.522.9941
dross@morrisoncohen.com
vCard | Bio | LinkedIn
**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com

---

**From:** Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>
**Sent:** Monday, August 21, 2023 5:05 PM
**To:** Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>; Ross, David E. <dross@morrisoncohen.com>; Yarm, Alexander R. <ayarm@morrisoncohen.com>
**Cc:** Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

> **CAUTION:** External sender. Verify before continuing.

---

David/Jason-

Please update.  As noted during the call, time is of the essence here.

Thank you.

**Scott Mascianica** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2106 | Fax 214.964.9501
scott.mascianica@hklaw.com | www.hklaw.com

Add to address book | View professional biography

---

**From:** Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>
**Sent:** Monday, August 21, 2023 2:39 PM
**To:** Ross, David E. <dross@morrisoncohen.com>; Yarm, Alexander R. <ayarm@morrisoncohen.com>
**Cc:** Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>; Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

David and Alex,

Thank you for speaking with us earlier. Attached, please find a chart of some of the addresses known to belong to your clients that were not disclosed.

We do not require your clients' inventory on the contents of addresses as they provided in the prior disclosure.

Thank you,

**Alex Englander** | **Holland & Knight**
Associate
Holland & Knight LLP
777 South Flagler Drive, Suite 1900, West Tower | West Palm Beach, Florida 33401
Phone 561.650.8339 | Fax 561.650.8399
alex.englander@hklaw.com | www.hklaw.com

Add to address book | View professional biography

---

**From:** Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>
**Sent:** Monday, August 21, 2023 12:21 PM
**To:** Ross, David E. <dross@morrisoncohen.com>; Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>; Gottlieb, Jason <jgottlieb@morrisoncohen.com>
**Cc:** Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>; Yarm, Alexander R. <ayarm@morrisoncohen.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

I would appreciate it, Jason, if you adjust your schedule to attend this meeting.  We need to provide you important information about digital asset wallets and immediate next steps.  Time is of the

essence and your familiarity will be helpful.  If not, David and Alex please be prepared to take detailed notes so you can take prompt action without delay after we speak.

Thanks,
JM

---

**From:** Ross, David E. <dross@morrisoncohen.com>
**Sent:** Monday, August 21, 2023 11:10 AM
**To:** Mascianica, Scott (DAL - X62106) <Scott.Mascianica@hklaw.com>; Gottlieb, Jason <jgottlieb@morrisoncohen.com>
**Cc:** Magee, Jessica B (DFW - X61375) <Jessica.Magee@hklaw.com>; Englander, Alex M (WPB - X28339) <Alex.Englander@hklaw.com>; Yarm, Alexander R. <ayarm@morrisoncohen.com>
**Subject:** RE: SEC v. Digital Licensing - Urgent Call

*[External email]*
I can join. Jason unfortunately cannot. I believe Alex can join.


**David E. Ross**
*Partner*
T: 212.735.8841 | F: 917.522.9941
dross@morrisoncohen.com
vCard | Bio | LinkedIn
**Morrison Cohen LLP**
909 Third Avenue
27th Floor
New York, NY 10022
www.morrisoncohen.com


-------- Original message --------
From: "Mascianica, Scott (DAL - X62106)" <Scott.Mascianica@hklaw.com>
Date: 8/21/23 12:01 PM (GMT-05:00)
To: "Gottlieb, Jason" <jgottlieb@morrisoncohen.com>, "Ross, David E." <dross@morrisoncohen.com>
Cc: "Magee, Jessica B (DFW - X61375)" <Jessica.Magee@hklaw.com>, "Englander, Alex M (WPB - X28339)" <Alex.Englander@hklaw.com>
Subject: SEC v. Digital Licensing - Urgent Call

> **CAUTION:** External sender. Verify before continuing.

---

Jason and David-

We have an urgent matter to discuss with you.  We will circulate a dial-in for 1 PM ET/12 PM CT. Given the time sensitive nature, we request that at least one of you (preferably both) join.

Many thanks.

**Scott Mascianica** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2106 | Fax 214.964.9501
scott.mascianica@hklaw.com | www.hklaw.com

Add to address book | View professional biography

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com



(Above Space for Recorder's Use)

# FIRST AMENDMENT TO
# CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST

Return Recorded Copy to:

Jerry Sanders
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201

PU-RPD-#12-001

## FIRST AMENDMENT TO CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST

This First Amendment to Conveyance of Net Profits Overriding Royalty Interest (this "Amendment") dated for reference purposes as of June 1, 2022, is made by and between Western Oil Exploration Company, a Nevada corporation ("WOEC"), Western Gold, a Nevada general partnership ("WG") and Purdy Oil, LLC, a Nebraska limited liability company ("Purdy"; WOEC, WG and Purdy are sometimes collectively called "Grantor") and Great South Silver River LLC, a Delaware limited liability company (herein called "Grantee"). Grantor and Grantee are sometimes collectively referred to herein as the "Parties" and each individually, a "Party".

### RECITALS

A.      WOEC and WG entered into that certain Conveyance of Net Profits Overriding Royalty Interest dated for reference purposes as of October 20, 2020 (the "Original Conveyance"), recorded in White Pine County, Nevada, as Instrument No. 2020-386981, pursuant to which WOEC and WG conveyed to Grantee an overriding royalty interest measured by the Net Profits from and affecting the Subject Interests.

B.      Grantor and Grantee desire to amend the Original Conveyance to add Purdy as a grantor and to include the lands described on Annex A attached hereto as Subject Interests.

NOW THEREFORE, for and in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

Section 1.      Definitions.

(a)      Any capitalized term used and not otherwise defined herein has the meaning given it in the Original Conveyance.

(b)      When used in this Amendment, the following terms have the respective meanings assigned to them in this Section 1:

"Additional Subject Interests" shall mean Grantor's undivided interest in and to the following:

(a)      the properties described in Annex A attached hereto;

(b)      all other rights, titles, interests and estates of Grantor of whatever kind and character (including without limitation leasehold interests under oil, gas and/or mineral leases (whether or not such leases are described on Annex A attached hereto), fee mineral interests, fee royalty interest, overriding royalties, reversionary interests (whether leasehold or otherwise) and other interests) in and to the lands described in Annex A attached hereto (or otherwise described, identified or referred to in any of the leases or

other instruments described in Annex A attached hereto) even though such interest of Grantor may be incorrectly described in, or omitted from, Annex A attached hereto; and

(c)  all rights, titles and interests of Grantor in and to all presently existing (or hereafter created) oil, gas and/or mineral unitization, pooling, and communitization agreements, declarations and orders (including without limitation all amendments or modifications thereto) relating to the properties described in subsections (a) and (b) above, and in and to the properties covered and the units created thereby (including all units formed under orders, regulations, rules, or other official acts of any governmental agency having jurisdiction, and including so called "working interest units" created under operating or similar agreements).

NOTWITHSTANDING THE GENERALITY OF THE FOREGOING, the Additional Subject Interests shall not include any interest that Grantor is obligated to assign to any third party that is not an Affiliate of Grantor pursuant to an Exploration Agreement; provided that the aggregate working interests to be assigned by Grantor pursuant to such Exploration Agreements and to be excluded from the Additional Subject Interests shall not exceed fifty percent (50%) of an undivided 100% working interest.

"Additional Subject Minerals" shall mean that portion of the gold, silver, aluminum, platinum, palladium, ruthenium, iridium, rhodium, copper, uranium, vanadium, thorium, molybdenum, plutonium, or other fissionable minerals or materials and ores containing the same, or any other similar minerals, and all iron ore, sand, gravel, rock, caliche, coal, lignite, shale, ore, sulphur, helium, oil, gas and other minerals in and under and that may be produced, saved and marketed from and after June 1, 2022, from the lands and depths covered by the Additional Subject Interests and which are attributable to the Additional Subject Interests, after deducting all royalties and any overriding royalties (except the Net Profits Overriding Royalty Interest), production payments and other similar charges burdening the Additional Subject Interests. There shall not be included in the Additional Subject Minerals any oil, gas or other minerals attributable to nonconsent operations conducted with respect to the Additional Subject Interests (or any portion thereof) as to which Grantor is a nonconsenting party and dedicated to the recoupment or reimbursement of costs and expenses of the consenting parties by the terms of the relevant agreement, provided Grantor's election not to participate is made in conformity with Section 3.7(c) of the Original Conveyance.

"Conveyance" shall mean the Original Conveyance, as amended by this Amendment.

"Exploration Agreement" shall mean those certain Exploration Agreements entered into between Grantor and one or more third parties prior to June 1, 2022, pursuant to which (i) such third parties agreed to purchase working interests in wells to be drilled on the lands described on Annex A and (ii) Grantor agreed to assign working interests to such third parties upon completion of the wells.

Section 2.     Grant.   Grantor, on behalf of itself and its Affiliates, hereby GRANTS, BARGAINS, SELLS, CONVEYS, ASSIGNS, TRANSFERS, SETS OVER AND DELIVERS unto Grantee as a net profits overriding royalty interest, in and to all of the Additional Subject Minerals equal to the NPI Percentage (as the same may be adjusted under the Conveyance) of the Net Profits, if any, calculated in the manner provided for in the Conveyance, that are realized from the gold, silver, aluminum, copper, uranium, vanadium, thorium, molybdenum, plutonium, or other fissionable minerals or materials and ores containing the same, or any other similar minerals, and all iron ore, sand, gravel, rock, caliche, coal, lignite, shale, ore, sulphur, helium, oil, gas and any other minerals produced saved and marketed from the lands and depths covered by the Additional Subject Interests from and after June 1, 2022.

Section 3.     Amendments.

(a)     All references to "Grantor" in the Original Conveyance shall be deemed to be a reference to WOEC, WG and Purdy collectively.

(b)     All references to the "Subject Minerals" in the Original Conveyance shall be deemed to include the Additional Subject Minerals.

Section 4.     Effect of Amendment.   Except as expressly amended hereby, the Original Conveyance shall remain in full force and effect. Nothing in this Amendment releases any right, claim, or entitlement of Grantee created by or contained in the Original Conveyance or releases Grantor from any covenant, warranty or obligation created by or contained in the Original Conveyance, and all covenants, warranties, obligations and other terms of the Original Conveyance, as amended hereby, are applicable to all Subject Minerals.

Section 5.     Counterparts.   This Amendment may be executed in several counterparts, all of which are identical.   Complete copies of this instrument have been retained by Grantor and Grantee.   A copy of the Original Conveyance is attached hereto as Appendix A so that a complete copy of the Conveyance will be of record in the real property records of Kimball County, Nebraska.

Section 6.     Ratification.   The Conveyance is hereby ratified and confirmed.   Purdy agrees that it is subject to, and fully bound by, all covenants, warranties, obligations and other terms of the Conveyance.

Section 7.     Binding Effect.   All of the covenants and agreements of Grantor herein contained shall be deemed to be covenants running with Grantor's interest in the Additional Subject Interests and the lands affected thereby.   All of the provisions hereof shall insure to the benefit of Grantee and its successors and assigns and shall be binding upon Grantor and its successors and assigns and all other owners of the Subject Interests or any part thereof or any interest therein, including without limitation, any Affiliate of Grantor.

Section 8.     Governing Law.   **THE VALIDITY, EFFECT AND CONSTRUCTION OF THIS AMENDMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEVADA.**

**[SIGNATURE PAGE FOLLOWS]**

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                )

County of _____ San Diego _____ )

Sept. D???

On June 27, 2022, before me, _____ Dana Picavelli _____

(insert name of Notary Public)

personally appeared James E. Franklin II, as Managing GP of Purdy Oil, LLC, a Nevada limited liability company, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ Dana Picavelli _____       (Seal)

DANA PICARELLI
Notary Public - California
San Diego County
Commission # 2388882
My Comm. Expires Dec 31, 2025

PU-RPD-#12-005

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California ———————  )

County of _San Diego_ )

Sep DP

On ~~June~~ 22, 2022, before me, _Dana Picarelli_
(insert name of Notary Public)

personally appeared James E. Franklin II, as General Partner of Western Gold, a Nevada general partnership, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Dana Picarelli_               **(Seal)**

DANA PICARELLI
Notary Public - California
San Diego County
Commission # 2388882
My Comm. Expires Dec 31, 2025

PU-RPD-#12-006

IN WITNESS WHEREOF, Grantor and Grantee have executed this Amendment on the dates set forth in their respective acknowledgments below.

GRANTOR:

WESTERN OIL EXPLORATION COMPANY

By: _____
        Name:  James E. Franklin II
        Title:

WESTERN GOLD

By: _____
        Name:  James E. Franklin II
        Title:    General Partner

PURDY OIL, LLC

By: _____
        Name:  James E. Franklin II
        Title:  Exploration Manager

Grantor Address:
848 Rainbow Blvd., Suite 2828
Las Vegas, Nevada 89107
Attention:  James Franklin

PU-RPD-#12-007

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                             )

County of _San Diego_                      )

On June 22, 2022, before me, _Dana Picarelli_ _____

(insert name of Notary Public)

personally appeared James E. Franklin II, as ___CEO___ of Western Oil Exploration Company, a Nevada corporation, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____   **(Seal)**

DANA PICARELLI
Notary Public - California
San Diego County
Commission # 2388882
My Comm. Expires Dec 31, 2025

PU-RPD-#12-008

GRANTEE:

GREAT SOUTH SILVER RIVER, LLC

By: _____
                Name:  Brett Platt
                Title:   Authorized Representative

Grantee Address:
P.O. Box 3075
Hilton Head Island, South Carolina  29928
Attention:  Brett Platt

ACKNOWLEDGMENT

STATE OF _____      §
                         §
COUNTY OF _____   §

      The foregoing instrument was acknowledged before me this June _____, 2022, by Brett Platt, the Authorized Representative of Great South Silver River, LLC, a Delaware limited liability company, on behalf of said limited liability company.

                    _____
                    NOTARY PUBLIC, State of _____

My commission expires:

_____

**APPENDIX A**

Lease dated November 29, 2021, recorded in Book OG 232, Page 555 in the Kimball County Recorder's Office

Lease included in Purdy Prospects, covering T13N, R58W, S24, containing 480 acres in Kimball County, Nebraska.

All portions of lands included in Township 13N, R58W Section 24 N/2/; SW4 in Kimball County, Nebraska

<u>ASSIGNMENT</u>

KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, Purdy Oil, LLC, organized and existing under the laws of the State of Nebraska, hereinafter called Assignor (whether one or more), for and in consideration of One Dollar ($1.00) the receipt and sufficiency whereof is hereby acknowledged, does hereby assign, transfer and set over unto Monte L. Neilan (hereinafter called Assignee), his heirs and assigns, an undivided 5% Carried Working Interest (defined as carried to the tank or pipeline, and tantamount to royalties), with a minimum net revenue interest of 5 % of 75%, in and to the well bearing API No. 26-105-22769-00-00 which is situated within and upon the following described Oil and Gas Lease:

> Oil and Gas Mineral Lease from Gene Purdy aka Purdy Farms, to Purdy Oil, LLC, executed November 29, 2021, and filed November 29, 2021, and recorded in Book OG 232, pages 555-559 in the public records of Kimball County, Nebraska;

> LEASED PREMISES:  **T13N R58W Section 24 N2; SW4** in the County of Kimball, State of Nebraska, containing 480 gross acres, more or less, including all riparian rights and any interests therein which Lessor may hereafter acquire by reversion, accretion, prescription or otherwise.  Area of mutual interest (AMI) of the land so covered is more completely and accurately described in Appendix A, attached to the aforesaid Lease and made a part thereof.

together with the rights incident thereto and the personal property thereon, appurtenant thereto, or used or obtained in connection therewith.  This Assignment is in addition to, and separate from, that certain assignment filed for record with the State of Nebraska, Kimball County on the 28th day of November, 2022 at 11:17 a.m. in Book OG 233, Page 159-160.

And for the same consideration: the Assignor covenants and warrants with the Assignee, his successors or assigns:  That the Assignor is the lawful owner of and has good title to the Interest above assigned in and to said leases, estates, rights and property, free and clear from all liens, encumbrances or adverse claims; That said lease is a valid and subsisting lease on the land above described, and all rentals and royalties due thereunder have been paid and all conditions necessary to keep the same in full force have been duly performed; That Assignor shall purchase from Assignee not less than 3/5ths of the interest herein assigned, from the next financing of any sort received by Assignor, for the price of one hundred, eighty thousand dollars ($180,000.00) and Assignor shall, as a part of that same transaction, at the sole discretion and option of the Assignee, and if Assignee so demands, further purchase from Assignee the remaining 2/5ths of the interest herein assigned, for the further and additional sum of one hundred, twenty thousand dollars ($120,000).

EXECUTED this __*3rd*__ day of __*Jan*__, 202*3*.

PURDY OIL, LLC

By: _____
James E. Franklin, Managing Member

STATE OF _____ )
                                  ) ss:
COUNTY OF _____ )

The foregoing instrument was acknowledged before me on this _____ day of _____, 202__, by James E. Franklin, Managing Member of Purdy Oil, LLC, a Nebraska Limited Liability Company, on behalf of the Company.

_____
Notary Public

My Commission Expires: _____

*Please see CA Acknowledgment.*

PU-RPD-#12-012

**WELLS FARGO**

# All-purpose Acknowledgment   California

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____ San Diego _____

BL
On 12 | 3/2023 _____ before me, Britney Andrea Lundgren, Notary Public _____ (here insert name and title of the officer),

personally appeared _____ James E. Franklin _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Notary Seal

WITNESS my hand and official seal.

Signature _____

**For Bank Purposes Only**

Description of Attached Document

Type or Title of Document _____ Assignment _____

Document Date | 3/2023 _____ Number of Pages 3 including CA Acknowledgment

Signer(s) Other Than Named Above _____ n/a _____

Account Number (if applicable) _____ n/a _____

F O 0 1 − 0 0 0 D S G 5 3 5 0 C A − 0 1

DSG5350CA/595577 (Rev 05 - 05/21)
PU-RPD-#12-013

# FORM OF CONVEYANCE OF OVERRIDING ROYALTY INTEREST

### Conveyance of Overriding Royalty Interest

Effective [ 9/22/22 ] (the "Effective Date"), Purdy Oil LLC [ ] ("Assignor") for and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer, grant and convey to [ James E. Franklin ] ("Assignee"), its successors and assigns, as of the Effective Date at 12:01 a.m. (local time), an overriding royalty interest (the "Overriding Royalty Interest") in and to each of the interests described on Exhibit "A" attached hereto and made a part hereof (the "Interests") equal to [ TEN ] percent ([10]%) of Assignor's right, title and interest in the Interests which were acquired by Assignor by virtue of the assignments and/or agreements set forth on Exhibit "A" attached hereto and by this reference made a part hereof (the "Conveyances"). This Conveyance of Overriding Royalty Interest is subject to the terms and conditions of the Purdy Oil, LLC, Exploration Agreement. In the event of a conflict between the terms of this Conveyance of Overriding Royalty Interest and the terms of the Exploration Agreement, the terms of the Exploration Agreement shall control.

Assignor is entitled, through the assignments and agreement identified in Exhibit "A" hereto, to a portion of the overriding royalty interest transferred by the instrument identified on Exhibit "B" hereto, but Assignor has not acquired record title to that interest. Any record title which Assignor hereafter acquires in a portion of the overriding royalty interest transferred by the instrument identified on Exhibit "B", to which Assignor becomes entitled through the assignments or agreement identified in Exhibit "A", shall be considered an Interest for the purpose of this Conveyance of Overriding Royalty Interest, and the Overriding Royalty Interest herein assigned shall extend to any such subsequently acquired Interest.

The Overriding Royalty Interest shall be paid in accordance with and in the same manner as the terms and provisions of the assignments and conveyances in the chain of title out of which the Overriding Royalty Interest arises. Assignee shall be responsible for and bear all ad valorem, production, and severance taxes chargeable against the Overriding Royalty Interest, provided that all such taxes shall be paid for Assignee by Assignor out of production attributable to Assignee's Overriding Royalty Interest.

If Assignor owns a working interest, or similar interest, in any properties out of which the Interests or Overriding Royalty Interest are derived, Assignor may conduct and carry on, or may contract for, the exploration, development, maintenance and operation of any such properties, in any manner it so desires, without regard to the Overriding Royalty Interest and without any liability to Assignee. In addition, Assignor may transfer and dispose of, and may take or omit to take any other action with respect to, all or any of its Interests from time to time in any such manner. For the avoidance of doubt, (a) Assignor shall have no obligation to conduct any drilling operations or take any other action upon or with respect to any property subject to the Overriding Royalty Interest or lands pooled therewith, or to continue to operate any well or to operate or maintain in force or attempt to maintain in force any lease thereon, including by payment of delay rentals, shut-in royalties, compensatory royalties or other payments or by the drilling of any wells upon any such lease, or in any other manner, and the extent and duration of all operations, as well as the preservation of any such lease by delay rental payments or otherwise, shall be at the sole discretion of Assignor, and (b) Assignor shall have the right at any time to surrender, abandon or otherwise terminate any such lease in whole or in part without any liability to Assignee.

Assignor shall make all determinations with respect to the exploration, development, maintenance and operation of any property subject to the Overriding Royalty Interest using the same criteria (or criteria less favorable to the property subject to the Overriding Royalty Interest) as it would use were such property not subject to the Overriding Royalty Interest (that is, Assignor shall not favor properties subject to the Overriding Royalty Interest over properties not subject to the Overriding Royalty Interest when allocating Assignor's resources in the exploration, development, maintenance and operation of its properties).

Assignee grants Assignor the right, without further approval by Assignee, to pool the Overriding Royalty Interest, or portions thereof, with other lands or leases to form one or more pooled units. As to each pooled unit so created, the overriding royalty interest assigned to Assignee shall be reduced in accordance with the terms of any applicable lease, pooling agreement or unit agreement.

This Conveyance of Overriding Royalty Interest shall inure to the benefit of and be binding on the parties and their respective heirs, legal representatives, successors and permitted assigns. Except as provided below, Assignee may only transfer or dispose of all or any portion of the Overriding Royalty Interest (1) with the prior written consent of Assignor, which it may withhold in its sole discretion, and (2) after allowing Assignor a preferential purchase right on the following terms. If at any time Assignee desires to transfer or dispose of all or any portion of the Overriding Royalty Interest, Assignee must first give to Assignor written notice thereof stating: (a) the amount of the Overriding Royalty Interest offered by Assignee; (b) the form of consideration (which shall be either cash or a promissory note containing reasonable and customary terms) at which such Overriding Royalty Interest is offered (the "Offered Price"); (c) the name and address of the proposed transferee from which Assignee has a bona fide offer to purchase the Overriding Royalty Interest; (d) the proposed time of closing and payment for the Overriding Royalty Interest; and (e) any other relevant material terms of the proposed sale. Upon receipt of such notice, Assignor will have a right to purchase all or any portion of the offered Overriding Royalty Interest within 30 days of receipt of such notice at a purchase price equal to the Offered Price or such other price as may be agreed upon by Assignor and Assignee.

The restrictions contained in the preceding paragraph shall not apply to Assignee's transfer of 100% of the Overriding Royalty Interest to (1) any member of the immediate family of Assignee or (2) any trust or other estate planning entity whose principal beneficiary or beneficiaries are Assignee and/or one or more members of the immediate family of Assignee; provided that, prior to such transfer, the transferee agrees to be bound in writing by the restrictions contained herein or in any assignment, conveyance or other instrument or document executed by Assignee in connection with Assignee's purchase of the Overriding Royalty Interest, and that any transfers of interests in such trust or estate planning entity holding the Overriding Royalty Interest shall be subject to the same transfer restrictions as the Overriding Royalty Interest. Assignee's heirs, legal representatives, successors and permitted assigns shall be bound by and comply with said transfer restrictions.

**Assignor makes no, and disclaims any, warranty of title or otherwise as to the Overriding Royalty Interest. Assignee accepts the Overriding Royalty Interest without warranty of title or otherwise. Assignor makes no, and disclaims any, warranty of any kind, express or implied, as to the accuracy or completeness of any data, information or estimates provided to Assignee by Assignor. Assignor makes no, and disclaims any, warranty of any kind, express or implied, as to the condition of any equipment, materials or facilities associated with the Interests (or with any properties out of which the Interests or the Overriding Royalty Interest are derived), including without limitation any warranty as to merchantability or fitness for a particular purpose. Assignee acknowledges such disclaimers.**

This Conveyance of Overriding Royalty Interest shall be construed in accordance with, and enforced under, the laws of the State of [Nebraska], without regard to choice of law rules of any jurisdiction, including [Nebraska].

Assignor and Assignee have executed this Conveyance of Overriding Royalty Interest as of the Effective Date.

ASSIGNOR                                    ASSIGNEE

By: _____        By: _____
Name: _James Franklin_____         Name: _James E. Franklin___
Title: _Managing General Partner_

Conveyance of Overriding Royalty Interest
PU-RPD-#12-015

ALL-PURPOSE ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _San Diego_ } SS.

On _Sept. 77, 2027_, before me, _Dana Picarelli_, Notary Public;
DATE

personally appeared _James E. Franklin_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

DANA PICARELLI
Notary Public - California
San Diego County
Commission # 2388882
My Comm. Expires Dec 31, 2025

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

PLACE NOTARY SEAL IN ABOVE SPACE                    NOTARY'S SIGNATURE

━━━ **OPTIONAL INFORMATION** ━━━

The information below is optional. However, it may prove valuable and could prevent fraudulent attachment of this form to an unauthorized document.

**CAPACITY CLAIMED BY SIGNER (PRINCIPAL)**

☐ INDIVIDUAL
☐ CORPORATE OFFICER _____
☐ PARTNER(S)                    TITLE(S)
☐ ATTORNEY-IN-FACT
☐ GUARDIAN/CONSERVATOR
☐ SUBSCRIBING WITNESS
☐ OTHER: _____

**SIGNER (PRINCIPAL) IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)

**DESCRIPTION OF ATTACHED DOCUMENT**

_Conveyance of Overriding Royalty Interest_
TITLE OR TYPE OF DOCUMENT

_21_
NUMBER OF PAGES

_09/27/2022_
DATE OF DOCUMENT

OTHER

RIGHT
THUMBPRINT
OF
SIGNER

Top of thumbprint here

PU-RPD-#12-016

**Exhibit "A"**
**to**
**Conveyance of Overriding Royalty Interest**

555

State of Nebraska, Kimball County, as filed for record
on the 27th day of _November_, 20 21 at 1:31 pm
Book 06 232          Page 555 - 559
Cathleen A. Sibal, Kimball County Clerk
By _HP_

| F | N | A |
|---|---|---|
| HP |   |   |

Return to:
Gene Purdy
P.O. Box 94
Pine Bluffs, WY 82082

THIS PAGE IS FOR INDEXING PURPOSES ONLY

OIL, GAS AND MINERAL LEASE

 COPY

Conveyance of Overriding Royalty Interest
PU-RPD-#12-018

*556*

# OIL, GAS AND MINERAL LEASE

### Nebraska

THIS AGREEMENT and including the addendum attached hereto mad a part hereof and agreed hereto made this 22ⁿᵈ day of November, 2021, between Gene Purdy aka Purdy Farms, Lessor (whether one or more), whose address is **P.O. Box 94, Pine Bluffs, Wyoming, 82082**, and **PURDY OIL, LLC Lessee**, whose address is: **P.O. Box 94, Pine Bluffs, Wyoming, 82082**.

1. GRANT. Lessor, in consideration of a cash payment and other good and valuable consideration in hand paid, of the royalties herein provided for, and of the agreements of Lessee herein contained, hereby grant, leases and lets exclusively unto Lessee the land described in paragraph 2 below, hereinafter referred to as leased premises, for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas (the term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gases), sulphur, fissionable materials, and all other minerals, conducting exploration, geological and geophysical surveys, core tests, gravity and magnetic surveys, for introducing or injecting fire, air, gas, steam, water, salt water, chemicals, and fluids or substances into any subsurface stratum or strata which is not productive of fresh water for primary, secondary and other enhanced recovery operations

2. LEASED PREMISES. (Description) _____ **T13N R58W Section 24  N2; SW4** in the County of _____ **Kimball** _____, State of Nebraska, containing _____ **480** _____ gross acres, more or less, including all riparian rights and any interests therein which Lessor may hereafter acquire by reversion, accretion, prescription or otherwise. Area of mutual interest (AMI) of the land so covered is more completely and accurately described in Appendix A, attached hereto and made a part hereof. For the purpose of determining the amount of any rentals or shut-in payments hereunder, the number of gross acres above specified shall be deemed correct, whether actually more or less.

3. TERM. Subject to the other provisions herein contained, this Lease shall be for a term of _____ **Three (3)** years from the date hereof (called "primary term") and as long thereafter as oil, gas, sulphur, fissionable materials or other mineral is produced in paying quantities from the leased premises or land pooled therewith, or this lease is otherwise maintained in force and effect pursuant to other provisions herein contained.

4. RENTAL PAYMENT. Subject to the other provisions herein contained, if production of oil and gas from drilling or mining operations is not present on said land, or on acreage pooled therewith as hereinafter provided for, on or before one year from the date hereof, Lessee shall pay or tender, or make a bona fide attempt to pay or tender, to Lessor, or to the credit of Lessor , which depository and its successors shall be Lessor's agents and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or rentals, the sum of **Nine Hundred Sixty Dollars ($ 960.00 ), X 3 Years = $2,880.00** pre-paid by Cashier's Check No. **0073805704 on December 18ᵗʰ, 2020** hereinafter called rentals, which shall cover the privilege of deferring commencement of drilling or mining operations for a period of twelve (12) months. In like manner and upon like payment or tenders in advance for Three years from the commencement of drilling or mining operations may be further deferred for successive periods of twelve (12) months each during the primary term of THREE years. All payments or tenders may be made in currency, or by check or by draft, and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails on or before the rental due date in a stamped envelope addressed to the depository or to the Lessor at the last address known to Lessee shall constitute proper payment.

5. ROYALTY PAYMENT. The royalties to be paid to the Lessor are: (a) On oil, 12.5% of that produced and saved from said land, the same to be delivered at the wells or to the Lessor's credit into the pipelines to which the wells may be connected. Lessee shall have the continuing right to purchase such production at the wellhead market price then prevailing in the same field (or if there is no such price then prevailing in the same field, then the nearest field in which there is such a prevailing price) for production of similar grade and gravity. Lessee may sell any royalty oil in its possession and pay Lessor the price received by Lessee for such oil computed at the well; (b) For gas (including casinghead gas) and all other substances covered hereby (i) if used off the leased premises or used in the manufacture of gasoline or other products, the market value at the well of one-eighth (1/8) of the gas so used, or (ii) if sold on or off the leased premises, 12.5% of the amount realized from such sale, provided the amount realized from the sale of gas on or off the leased premises shall be the price established by the Gas Sales Contract entered into in good faith by Lessee and gas purchaser, provided that on gas sold by Lessee the market value shall not exceed the amount received by Lessee for such gas computed at the mouth of the well; (c) If a well on the leased premises or lands pooled therewith is capable of producing oil or gas or any other substance covered hereby but such well is either shut-in or production therefrom is not being sold or purchased by Lessee or royalties on production therefrom are not otherwise being paid to Lessor, and if this lease is not otherwise maintained in effect, such well shall nevertheless be considered as though it were producing for the purpose of maintaining this lease, whether during or after the primary term, and Lessee shall tender a shut-in payment of One Dollar per acre then covered by this lease, such payment to be made to Lessor or to Lessor's credit in the depository designated above, on or before 90 days after the next ensuing anniversary date of this lease, and thereafter on or before each anniversary date hereof while the well is shut-in or production therefrom is not being sold or purchased by Lessee or royalties on production therefrom are not otherwise being paid to Lessor. This lease shall remain in force so long as such well is capable of producing and Lessee's failure to properly pay shut-in payment shall render Lessee liable for the amount due but shall not operate to terminate this lease. The intermittent production from any well during such year shall not render necessary any new or additional shut-in payments with respect to such well or the acreage ascribed thereto.

6. POOLING. Lessee shall have the right but not the obligation during or after the primary term while this lease is in effect to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all depths or horizons, and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it necessary or proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The unit formed by such pooling for an oil well shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a gas well shall not exceed 640 acres plus a minimum acreage tolerance of 10%, except that larger units may be formed for oil wells or gas

*557*

having jurisdiction. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit production produced and saved which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit. Pooling in one or more instances shall not exhaust Lessee's pooling rights hereunder, and Lessee shall have the recurring right but not the obligation to revise any unit formed hereunder by expansion or contraction, or both, either before or after commencement of production, in order to conform to the well spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are payable hereunder shall thereafter be adjusted accordingly. In the absence of production from a unit, or upon permanent cessation thereof, Lessee may terminate the unit by filing of record a written declaration describing the unit and stating the date of termination.

7. OPERATIONS. If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled therewith, or if all production (whether or not in paying quantities) ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences operations for reworking an existing well or for drilling an additional well on the leased premises or lands pooled therewith within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production, or, should the lease be within the primary term, if Lessee tenders rentals on or before the next rental payment date (if any) next ensuing after the expiration of said 90-day period; provided that should completion of operations on the dry hole or cessation of all production occur less than 90 days before the last rental payment date, no rental payments or further operations shall be required to maintain this lease for the remainder of the primary term. If at the end of the primary term or any time thereafter, oil, gas or other substances covered hereby are not being produced in paying quantities from the leased premises or lands pooled therewith, but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or restore production therefrom, this lease shall remain in force so long as such operations are prosecuted with no cessation of more than 90 consecutive days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to formations then capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) protect the leased premises from uncompensated drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells except as expressly provided herein.

8. LESSER INTEREST. Should Lessor own less than the full mineral estate in all or any part of the leased premises, the royalty and shut-in payments, payable hereunder for any well on any part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's mineral interest in such part of the leased premises bears to the full mineral estate in such part of the leased premises.

9. ANCILLARY RIGHTS. Lessee may use in its operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds, unless otherwise granted. The right of ingress and egress granted hereby shall apply to the entire leased premises described in Paragraph 2 above, notwithstanding any partial release or other termination of this lease with respect thereto. If expressly negotiated in writing by the surface owner, Lessee agrees to bury pipelines across cultivated land below ordinary plow depth, as such depth may be determined at the time of burial. After the pipeline has once been laid below such depth, Lessee shall not thereafter be required to restore the ground cover, or to lower, or to remove such pipeline unless the surface owner first agrees in writing to bear the entire cost thereof, and advances to Lessee the estimated cost thereof. No well shall be located less than 200 feet from any house or barn now on the leased premises without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises, and to timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises during the term of this lease or within a reasonable time thereafter. Lessee may lay pipelines, build roads, tanks, power stations, erect telephone and power lines, and construct other facilities deemed necessary by Lessee on and over and across the leased premises and other lands owned or claimed by Lessor adjacent and contiguous thereto to produce, save, take care of, treat, transport and own products granted by this lease.

10. OWNERSHIP CHANGES. The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or horizon, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors, and assigns. No change in Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessee's usual form of division order. In the event the death of any person entitled to shut-in payments hereunder, Lessee may pay or tender such shut-in payments to the credit of decedent or decedent's estate in the depository designated above. If at any time two or more persons are entitled to shut-in payments hereunder, Lessee may pay or tender such shut-in payments to such persons or to the credit in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area

*558*

respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in payments hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

11. BREACH OR DEFAULT. No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after such judicial determination to remedy the breach or default and Lessee fails to do so. This Paragraph 11 shall not apply to erroneous payment of rental

12. WARRANTY OF TITLE. Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessee's option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties, or shut-in payments otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in payments hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved Lessee shall have the right to accept leases or conveyances from others owning or claiming to own interests in the leased premises or minerals covered hereby adverse to the rights of Lessor herein. Should Lessee become involved in any dispute or litigation arising out of any claim adverse to the title of Lessor to said leased premises, Lessee may recover from Lessor its reasonable and necessary expenses and attorney fees incurred in such dispute or litigation, with the right to apply royalties accruing hereunder toward satisfying said expenses and attorney fees.

13. REGULATION AND DELAY. Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, re-working, production or other operations are prevented or delayed or interrupted by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike, or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this lease shall not terminate because of such prevention, delay or interruption, and shall be maintained in force and effect for so long as such force majeure continues, and for 60 days thereafter, or so long as this lease is maintained in force by some other provisions thereof, whichever is the later date. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so prevented, delayed or interrupted.

14. EXECUTION. This lease may be signed in any number of counterparts, each of which shall be binding upon all who execute same, whether or not all parties named in the caption hereof execute this lease Should any one or more of the parties named herein as Lessor fail to execute this lease, it shall nevertheless be binding on the party or parties who execute the same, and additional parties may execute this lease as Lessor, and this lease shall be binding on each party executing the same notwithstanding that such party is named herein as Lessor, and all of the provisions of this lease shall inure to the benefit of and be binding on the parties hereto and their respective heirs, legal representatives, successors and assigns. IN WITNESS WHEREOF, this lease is executed to be effective as of the date first written above, but upon execution shall be binding on the signatory and the signatory's heirs, devisees, executors, administrators, successors and assigns, whether or not this lease has been executed by all parties hereof named as Lessor

See Addendum attached hereto and made a part of for additional provisions.

LESSOR (WHETHER ONE OR MORE)          SS NO. OR TAX ID
**Gene G. Purdy aka Purdy Farms**
P.O. Box 94, Pine Bluffs, WV 82082

_[signature]_                          Date  11-29-21

Gene Purdy

STATE OF _Nebraska_

COUNTY OF _Kimball_          } SS

The foregoing instrument was acknowledged before me this _November 29_, 20_21_, by _Gene Purdy_

_Christine D Berger_

My Commission Expires:          Notary Public in and for
_March 18th 2025_            _Kimball_     County,_

GENERAL NOTARY-State of Nebraska
**CHRISTINE D. BERGER**
My Comm. Exp. March 18, 2025

Conveyance of Overriding Royalty Interest

PU-RPD-#12-021

559

LESSEE (WHETHER ONE OR MORE)          SS NO. OR TAX ID
Purdy Oil, LLC                                        86-1362933
1100 Harrison Drive
P.O. Box 94
Pine Bluff, WY  82082
308-235-7301

*[signature]*          11-29-21
Gene G. Purdy   Manager

STATE OF *Nebraska*

COUNTY OF *Kimball*   } ss.

The foregoing instrument was acknowledged before me this *November 29th 20 21*, by *Gene Purdy*
*Purdy Oil*                                    , of *Nebraska*,
a _____          partnership, on behalf of the partnership.

*March 18th, 2025*          *Christine D Berger*
My Commission Expires:          Notary Public in and for
                              *Kimball*   County.

GENERAL NOTARY-State of Nebraska
CHRISTINE D. BERGER
My Comm. Exp. March 18, 2025

Conveyance of Overriding Royalty Interest
PU-RPD-#12-022

## ADDENDUM

1. Lessee or assigns will pay damages in the amount of $2,000.00 per location if said location is on irrigated land or $1,500.00 per location if said location is on dry land or pasture land before drilling rig moves on. In the event additional surface, crop or other damages are sustained over and above the amount paid as set forth above, Lessee will pay the same upon abandoning location or upon the completion of a well.

2. Upon written request of Lessor, Lessee shall surround its pumper jacks and all production equipment and/or pits with fences sufficient to exclude livestock.

3. Lessee shall remove all surface dirt and topsoil and save it and replace it in its original condition upon abandonment of location.

4. The production of oil and/or gas under this lease shall not operate to maintain this lease in force for more than three years after expiration of the primary term, except as to the formation from which said oil or gas is being produced.

5. The shut-in gas clause shall not maintain this lease in force more than three years after the expiration of the primary term.

6. Only roadways mutually agreed upon by Lessor and Lessee will be used for ingress and egress for drilling and/or production, and in the event production is established, Lessee shall pay rent for the location of the production equipment in the sum of $500.00 per year per well. It is further agreed that any holding tanks or treaters for such equipment shall be located in areas mutually agreed upon by the parties.

7. Lessee shall fill in all pits constructed by Lessee and remove from the premises all dumped material including but not limited to machinery, parts, cable and trash, and the surface shall be restored to its original condition upon abandonment of a location. No material, machinery, parts or trash shall be dumped in any abandoned well.

8. The right to use, free of cost, water found on said land shall be limited to drilling operations only.

9. Lessor shall have the right to have excess gas, free of cost, from any well, for use upon any land owned or leased by Lessor for any purposes other than resale. It is the understanding between the parties that all appropriate agreements and documents concerning connections and operations regarding the use of excess gas shall be formulated and prepared at such time as is warranted. Excess gas shall be all gas not sold or used to operate production equipment.

10. As used herein, plow depth shall mean three feet. Pipelines and electrical lines shall be maintained at or below plow depth.

11. Royalty payments under said lease shall be made within four months after the completion of a producing well. In the event said payments are not made within said four months, unpaid amounts shall draw interest at a rate of 2-1/2% per annum above the base rate of FirsTier Bank, Kimball, Nebraska, adjusted prospectively on the dates of change of such prime rate.

12. In the event Lessee or its assigns owns any interest in any oil, gas or other minerals, be it working interest, royalty interest, or overriding royalty interest, adjoining or cornering the land described in this lease, and a well is drilled upon any adjoining or cornering 40 acre legal subdivision, this lease shall be terminated nine months from the date of the completion of such adjoining well unless a well is drilled in the adjoining or cornering legal 40 acre subdivision of the land described in this lease.

13. No drilling under this lease shall take place that causes a cessation of operation of any irrigation system. In making repairs on any well or its facilities or for a work over of a well that is located on any irrigated parts of this land, lessee shall not cause a cessation of operation of the irrigation system for a period in excess of 3 days without first obtaining permission from the lessors.

14. Assignment of this lease shall not be made by Lessee without first obtaining consent of Lessor. Lessor shall not unreasonably withhold such consent.

15. Lessee waives notice of any breach of this lease by Lessee or its assigns, whether such breach is of a stated or implied covenant.

16. This lease is made without warranty of title or peaceable possession, except as to Lessors own acts, and Lessor shall not be liable for the return of any bonus, rentals, royalties or other moneys paid hereunder. Lessee shall not acquire, by lease or otherwise, any interest adverse to Lessor's title, prior to recognition of such interest by Lessor in writing, or by a judgment of court. Any adverse title information in Lessee's possession will be furnished to Lessor upon request.

17. Rentals payable under this lease shall not be reduced by virtue of any partial release or releases of this lease.

18. In the event Lessee fences its area of operations and places locked gates across any access roads, Lessee shall give to Lessor keys to said locked gates or shall otherwise afford access to all locked areas at all times.

19. After the discovery and production of oil, gas or other hydrocarbons in paying quantities, Lessee shall fully and completely develop the leased premises, both horizontally and vertically, for the production of all such minerals discovered or, upon default, surrender the area of horizons not developed.

20. Royalties shall be paid under this lease to whomever is entitled to receive them, free from all costs of operation, production, gathering, treatment, extraction, compression, transportation, delivery, cleaning, dehydration or processing, or any other deduction or charge, except for severance taxes, unless agreed to in writing by the parties.

21. Upon termination of this lease, Lessee shall have 120 days to remove all of its property, and in default thereof, title to the same, at Lessor's option, shall belong to Lessor. After termination of the lease, at Lessor's option, he may require the Lessee to remove all or any part of the property, including the right to demand the plugging and abandoning of any well, and upon failure of the Lessee to respond, Lessor may effect removal at Lessee's expense.

22. Lessee will reimburse Lessor for any penalties, reimbursements, reseeding expenses or other losses suffered by Lessor as a result of Lessee's operations on any portion of the premises covered by a Conservation Reserve Program contract. To the extent reasonably possible, Lessee agrees to minimize operations on the premises which may violate any such contract.

23. Lessee will set a minimum of 500 feet of surface casing in any producing well, but in no event shall surface pipe be set at a depth less than required by the Nebraska Oil and Gas Conservation Commission or other regulating bodies.

24. Lessor may, at Lessor's expense and risk, at his option, be present or have a representative on the premises during operations, with the right to examine all cores, logs and other well data, and the Lessee shall provide all pertinent information necessary for verification of the accuracy of Lessee's production reports and royalty payments. Lessee shall furnish Lessor, upon written request, within 10 days after said request or after Lessee shall have obtained the same, copies of all logs made, including a processed stack section, of wells drilled on the leased premises or on premises with which the surveys, core date completion data bottom hole pressure data, and all date and information as may be reasonably necessary fully to apprise Lessor of Lessee's operations and the results thereof, but not including geologic interpretations.

25. Lessor reserves all rights to grant, lease, mine and/or produce any minerals from said land except interests in gas and oil and their constituent products herein leased to Lessee.

26. a) It is expressly agreed, notwithstanding anything to the contrary herein, if this lease be in force and effect at the expiration of the primary term, this lease shall thereupon terminate as to all formations not penetrated by the drilling of a test well or wells on the leased premises or land pooled or consolidated therewith, except if drilling is in progress at the end of the extended primary term.

b) Seven (7) years after the expiration of the primary term of this lease, formations on the leased premises not included in any unit and not producing oil or gas in paying quantities shall revert to Lessor. Lessee shall be obligated, subject to the other terms of this paragraph, to file of record in the courthouse a release of the lease covering such nonproducing zones or formations within sixty (60) days following written demand therefore. If such release is not filed within said sixty (60) day period, then Lessee shall be subject to damages and for any attorney's fees incurred by Lessor in obtaining such release.

27. NO DEDUCTION CLAUSE: It is also agreed between the Lessor and the Lessee that, not withstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder. Lessee shall directly reimburse Lessor for any such charges or expenses withheld by a purchaser, by Lessee or by others.

28. ROYALTY: Lessor's royalty base, in addition to all substances produced and sold or used, shall specifically include the value of any

product, such as tank bottoms, recharged for the expenses of exploration, production, maintenance or marketing, for which he is not otherwise fully compensated.

29. Land Use Restrictions.  To the maximum extent feasible, Lessee will eliminate the use of surface pits and hazardous materials in drilling operations on the Leased Land.  Any pits, ponds, or other surface impoundments used in connection with the development or operation of the Leased Land shall comply with all applicable local, state, and federal standards and in any case shall meet or exceed the standards for such structures located within a wellhead protection or critical aquifer protection area as defined by the federal Safe Drinking Water Act or any state law counterpart.  Any pit or other surface disruption associated with drilling operations on the Leased Land will be fully reclaimed and restored to its natural condition immediately following the completion of drilling operations.  All substances brought onto the Leased Land, and wastes generated as part of the exploration, development, or production process, will be removed from the Leased Land immediately following the completion of drilling operations.  No pipe, chemicals, or other material or equipment will be placed on the Leased Land except items that are onsite for immediate use in operations.  Equipment or material placed on site and not actively used for ten consecutive days will be deemed not to be for immediate use in operations.  Within five days after a development or production operation is completed, all the associated development structures, equipment, and any other material brought to or generated at the site will be removed from the site.  If any topsoil has been disturbed by the operation, the area will be graded to its original contour, and the topsoil replaced, properly seeded, fertilized, and maintained until the original cover in the affected area is reestablished.

30. Assumption of Liability.  Lessee assumes the following liabilities associated with the Leased Land:  Lessee acknowledges that it is entering into this Lease without relying on any representations by Lessor concerning the condition, environmental or otherwise, of the Leased land.  Instead, Lessee is relying solely upon its independent investigation to determine the status of the Leased Land.  As partial consideration for this Lease, Lessee agrees to assume all liabilities it may incur as an owner or operator of the Leased Land, including any environmental cleanup obligations that may be imposed under any local, state, or federal law, including the common law. Lessee further agrees to hold Lessor harmless from any claim Lessee may have or acquire, in contribution or otherwise, associated with the condition of the property or Lessee's liability as an owner or operator.  This includes, without limitation, any claim or cause of action Lessee may have at common law or under any local, state, or federal statute such as the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) or a state or local counterpart.  Lessee agrees to assume all liabilities associated with any activity conducted on the Leased Land, by Lessee, its contractors, and any other person or entity exercising or purporting to exercise rights through Lessee or on Lessee's behalf.

31. Agreement to Remedy Environmental Problems.  Lessee agrees to remedy any Environmental Problem resulting from, arising out of, or in any manner associated with any activity by Lessee, its contractors, and any other person or entity exercising or purporting to exercise rights through Lessee or on Lessee's behalf, that presently impacts, or is likely to impact, the Leased Land.  In the event an Environmental Problem is identified, Lessor will give Lessee notice of the Environmental Problem and Lessee will, at its sole risk and expense, take the necessary action to define and remedy the Environmental Problem.  For purposes of this section, "Environmental Problem" means any situation which:  violates any local, state, or federal requirement, is reportable under any environmental law, gives rise to a cleanup, sampling, testing, monitoring, assessment, or similar obligation under any common law, statutory, or regulatory theory, concerns conditions, structures, or substances that require special environmental handling for their proper renovation, demolition, or disposal, or exposes Lessor to a substantial threat of liability associated with the health, safety, and welfare of the public, workers, or the environment.

32. Agreement to indemnify.  Lessee will protect, indemnify, hold harmless, and defend Lessor against any claim, demand, cost, liability, loss, or damage suffered by Lessor (including Lessor's reasonable attorney fees and litigation costs) resulting from, arising out of, or associated with one or more of the following events:  Lessee's breach of any covenant, obligation, or duty created by the terms of this Lease; Lessee's failure to comply with the Lessor's retained rights under this Lease; Any matter encompassed by Lessee's assumption of liabilities, including environmental liabilities,

Conveyance of Overriding Royalty Interest

under the terms of this Lease; any activity expressly or impliedly authorized or required by this lease; any matter associated with producing wells, nonproducing wells, existing well bores, unplugged wells, or previously plugged well bores,; any matter associated with the management, use, and disposal of produced water and wastes or substances associated with the development or operation of the Leased Land; any matter associated with this Lease relating to the generation, processing, handling, transportation, storage, treatment, recycling, marketing, use, disposal, release or discharge, or threatened release or discharge, of oil, natural gas, natural gas liquids, all other petroleum substances, any waste materials, or any "hazardous substance" or "pollutant or contaminant" as those terms are defined (Now or in the future) under CERCLA and its state counterpart. Any matter relating to Lessee's ownership, use, or occupancy of the Leased Land or any area impacting the Leased Land. Lessee's obligations created by this Section are continuing obligations which will remain in effect, and be enforceable by Lessor, even after the Lease terminates or otherwise ceases to burden the Leased Land. In the event Lessor conveys or assigns all or any part of its interest in the Leased Land, Lessor will nevertheless continue to be covered by Lessee's indemnity. However, Lessor's grantees or assignees will also be covered by Lessee's indemnity to the extent of the interest they receive in the Leased Land. Lessee's indemnity obligation will apply even though the basis for Lessor's liability arises out of Lessor's statutory or common law strict liability, sole or concurrent negligence, or any other statutory, tort, or contract theory.

33. If any roads are constructed under this lease that have gravel or stone placed on it, Lessee and its assigns will not cause of any said gravel or rock to get onto the cultivated fields. If gravel or rock does encroach on cultivated fields, Lessee or its assigns, at their sole expense, will remove that gravel and rock. Lessee shall not conduct any grading or other operations off of any road established under this lease and if grading or other operations are conducted off of the road, Lessee or its assigns will replace any grass or crops impacted by that operation. Lessee or its assigns also agree to remove all rock and gravel placed on the premises at the time lease terminates, and not later than 120 after the termination of said lease.

Lessor: _Smfurdy_ 11-29-21

Conveyance of Overriding Royalty Interest

PU-RPD-#12-026

Exhibit "B"
to
**Conveyance of Overriding Royalty Interest**

**PURDY OIL, LLC EXPLORATION AGREEMENT**

**NAME**

ADDRESS_____

_____

Re:     Exploration Program Kimball County, Nebraska, USA

Dear **NAME**

This letter will evidence the understanding whereby Purdy Oil, LLC hereinafter referred to as "PURDY" and/or "PURDY Oil" located at 1100 Harrison Drive, Box 94 Pine Bluff's, NE 82082, a Nebraska Limited Liability Company and hereinafter ("GENERAL PARTNER") and _____ hereinafter, ("PARTNER") agree to explore and develop the first exploratory drilling locations and all offsetting wells in on the Purdy Lease consisting of 480 acres located in Kimball County, Nebraska, as more fully described in Exhibit I, attached hereto and made a part hereof. PURDY Oil, LLC was specifically formed to operate for and oversee the assignment of working interests to the qualified partner for the Phase 1 drilling of wells in Kimball County, Nebraska. Upon completion of each well, the Phase 1 partner will receive up to 50% share of the working interest in all depths drilled on each well for 100% of the total costs for each well for 50% before Payout and 25% WI after Payout defined as 100% of the completed well costs.

PURDY represents that it has entered into a Farmout Agreement of an undivided one hundred percent (100%) Working Interest (WI) and Operating Rights in and to the oil and gas lease subject to State and Federal Royalties of Twelve and One-Half Percent (12.5%) and a Leaseholder Over-riding Twelve and One-Half Percent (12.5%) Royalty resulting in Seventy-Five Percent (75%) Net Revenue Interest (NRI) available in and to the Purdy Oil Lease dated Nov 22nd, 2021   (hereinafter referred to as "oil and gas lease") described in Exhibit I, and PARTNER desires to acquire a certain portion of PURDY's WI and NRI interest in the wellbore located upon the oil and gas lease under the following terms:

SECTION I

CASH PAYMENT/ASSIGNMENT

1.     As consideration hereunder, PARTNER shall, upon execution of this agreement, wire unto the bank account of Purdy Oil, LLC Account No. 1001509 First Tier Bank 115 S. Walnut Street P.O. Box 730 Kimball, NE 69145 Phone: 308.235.4633 Fax: 308.235.3499 the amount of _____Thousand Dollars ($360,000) as may be adjusted for costs incurred for each 1% working interest (PARTNER'S share) of the wells to be drilled. The working interest earned is equal to the total costs for exploration drilling and completion to production of each well divided by 25. This would include working interest in wells drilled and the allotted 40 acres for each well within the 480-acre leasehold in this field. This interest shall be assigned as follows: The WI in the 75% NRI to the PARTNER'S consideration paid upon completion of the initial discovery well.  Assignments of WI and NRI shall be made within 30 days of completion of each well. Production from the wells is subject to 12.5% lease owner royalties and 12.5% Over- riding royalties (ORR) totaling 25% leaving 75% NRI available.

2.   As partial consideration hereunder, PURDY, or its assigns as Operator, shall enter a Drilling Contract and pay their portion of requisite mobilization and demobilization fees and costs including drilling and completion costs estimated to be $ 4,539,600 for each appraisal well and $177,000 of leasing, geology and geophysics expenses for each well. Subsequent wells will be drilled to optimize oil production and Drilling Contracts may be customized for these wells. This will be done by requesting bids by multiple drilling contractors to identify and develop an Authorization for Expenditure (AFE) that is the lowest price for the appropriate level of service.

3.   Said assignments shall be made subject to the terms, covenants, and conditions of the following:

      a.  The assigned Royalties and Over-riding royalties totaling 25%.

      b.  This Exploration Agreement; and

      c.   That certain Operating Agreement (hereinafter referred to as "Operating Agreement") attached hereto as Exhibit III.

4.   PARTNER shall have a preferential right of the first refusal to fund PURDY's drilling of the next well on the same terms as herein anywhere within the Area of Mutual Interest (AMI) which is within 3 miles of the initial well drilled in Kimball County, Nebraska.

5.   In the event PARTNER elects not to participate in future wells or defaults under the Agreements, their interest in any acreage not held by production reverts to PURDY free of encumbrances.

## SECTION II

### OPERATING AGREEMENT

Contemporaneously with the execution of this Exploration Agreement, the parties hereto shall execute the Operating Agreement, naming PURDY Oil Exploration Co. or its assigns as operator, attached hereto as Exhibit III. This Operating Agreement shall become effective as of the date thereof as to all operations and other activities conducted on the "Contract Area" described therein.  Notwithstanding anything contained to the contrary, in the event of conflict or inconsistency between the terms and provisions of this Exploration Agreement and those of the Operating Agreement, it is stipulated that the terms and provisions of this Exploration Agreement shall prevail.

## SECTION III

### INITIAL WELL COMMITMENT

PARTNER agrees to bear the cost, of its share of the costs to drill test and complete or plug each Appraisal well; following successful completion and production additional offsetting wells will be drilled both vertically and horizontally including into deeper horizons identified by our geophysics.

    1.   PURDY will provide copies of the actual invoices, and all related documents relating to expenditures of the test well to PARTNER via email from the drilling rig accounting system and from PURDY within 30 days of completion of each well.

    2.   PURDY may at its sole discretion move the location of the wells to be drilled and may add additional locations within the leasehold with

## SECTION IV

### MISCELLANEOUS

1.    Paragraph Headings:  The Section and paragraph headings inserted in this Exploration Agreement are utilized solely for reference purposes and do not constitute substantive matter to be considered in construing the terms contained herein.

2.    Entire Agreement: Any verbally made prior agreements, promises, negotiations or representations pertaining to the Contract Area described in the Operating Agreement, which is not expressly set forth in this Exploration Agreement or the Operating Agreement are of no force and effect.

3.    Binding Agreement:  The terms, covenants, and conditions of this Exploration Agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns, and such terms, covenants and conditions shall be deemed as covenants running with the lands and leases covered hereby and with each transfer or assignment of said lands or leases. PARTNER and PURDY shall each have the right to assign all or any portion of its rights, titles, and interests hereunder; provided, however, that any such assignment shall be null and void unless it specifically provides that it is made subject to the terms and provisions hereof and reference must be made hereto for all purposes.

4.    Information and Data: Notwithstanding anything to the contrary contained herein, it is agreed that PURDY shall furnish to PARTNER, when requested, to the extent permitted by law or contractual obligation, any and all information and data of every kind and character, including but not limited to seismic data, core reports, logs, well tests, production tests and reports, joint operations costs, and revenue data and reports, relative to the Area of Mutual Interest.  An outside Auditor will audit the complete operation annually and be mutually chosen and agreed upon by PURDY and PARTNER.

5.    Press/Media Releases:  No information, in any way related to the Prospect AMI, is to be released to the media and/or for publication without the express written consent of PURDY Oil.

6.    Acceptance: Unless and until signed by PURDY, PURDY is under no obligation to sell or assign any interest in the PURDY Oil Prospect or any portion of the oil and gas wells and its lease described in this Exploration Agreement or its attachments to PARTNER until PURDY receives from such PARTNER the following:

   a.    One (1) original of the Agreement which has been duly executed by PARTNER to indicate its acceptance thereof; and

   b.    the cash payment provided for in Section I.1.

This offer May be Withdrawn at any Time for any Reason until signed.

**Exploration drilling for oil and gas involves numerous risks including the risk of dry holes or failure to find commercial quantities of hydrocarbons. The costs of drilling, completing and operating wells have margins of uncertainty, and drilling operations may be unsuccessful as a result of a variety of factors, including unexpected drilling conditions, pressure or heterogeneities in formations, equipment failures, blowouts and other forms of accidents, and shortages or delays in the delivery of equipment.**

Please indicate your agreement with the above terms by executing and returning one original of this Exploration Agreement to PURDY Oil.

Sincerely,

Purdy Oil, LLC.

_____

By: James Franklin

Exploration Manager

Conveyance of Overriding Royalty Interest
PU-RPD-#12-029

Agreed and accepted this __th day of _____.

(Partner)

_____

By: _____

Title

 (Partner)

_____

By: _____

Title

EXHIBIT I

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil and PARTNER dated November 29, 2021.

Lease Dated this 29th day of November, recorded in book OG 232 & page number 555-559 serial listing from the Kimball County Recorder's Office.

EXHIBIT II

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil and PARTNER dated _____.

Leased Lands included in the Purdy Prospects located in Kimball County, Nebraska are described as follows: Lease: located in Township 13N  Range 58W Portions of Section 24 containing 480 acres.

The Area of Mutual Interest shall include all portions of lands included in Township 13N R. 58 W Section 24  N2; SW4.

See Attached Map.

EXHIBIT III

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil. and PARTNER dated _____.

The Operating Agreement by and between PURDY Oil, PURDY Oil Exploration Co. and PARTNER.

EXHIBIT IV

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil and PARTNER dated _____.

Authority for Expenditures (AFE) for the PURDY OIL Prospect.

Conveyance of Overriding Royalty Interest
PU-RPD-#12-034

EXHIBIT V

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil and PARTNER dated _____.

Bank Wiring Instructions for PURDY Oil.

Purdy Oil, LLC

Account No. 1001509

First Tier Bank

115 S. Walnut Street
PO Box 730
Kimball, NE 69145

Phone: 308.235.4633
Fax: 308.235.3499

Purdy Oil, LLC.
1100 Harrison Drive
P.O. Box 94
Pine Bluff, WY  82082
308-235-7301