Jason A. McNeill (9711)
 mcneill@mvmlegal.com
Eric K. Schnibbe (8463)
 schnibbe@mvmlegal.com
**McNeill | Von Maack**
236 South 300 East
Salt Lake City, Utah 84111
Telephone: 801.823.6464

Jessica B. Magee (*admitted pro hac vice*)
 jessica.magee@hklaw.com
Scott F. Mascianica (*admitted pro hac vice*)
 scott.mascianica@hklaw.com
Andrew W. Balthazor (*admitted pro hac vice*)
 andrew.balthazor@hklaw.com
**Holland & Knight**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214.969.1700

Attorneys for Josias N. Dewey,
Court-Appointed Temporary Receiver

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited | **TEMPORARY RECEIVER'S FIRST STATUS REPORT**<br><br><br>Case No. 2:23-cv-00482-RJS-DBP<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

| | |
|---|---|
| liability company; **BRENDAN J. STANGIS**, an individual; and **MATTHEW D. FRITZSCHE**, an individual,<br><br>   Defendants,<br><br>**ARCHER DRILLING, LLC**, a Wyoming limited liability company; **BUSINESS FUNDING SOLUTIONS, LLC**, a Utah limited liability company; **BLOX LENDING, LLC**, a Utah limited liability company; **CALMFRITZ HOLDINGS, LLC**, a Utah limited liability company; **CALMES & CO, INC.**, a Utah corporation; **FLAHERTY ENTERPRISES, LLC**, an Arizona limited liability company; **IX VENTURES FZCO**, a United Arab Emirates company; **PURDY OIL, LLC**, a Nebraska limited liability company; **THE GOLD COLLECTIVE LLC**, a Utah limited liability company; and **UIU HOLDINGS, LLC**, a Delaware limited liability company,<br><br>   Relief Defendants. | |

Josias Dewey, in his capacity as the Court-appointed Temporary Receiver ("Receiver") for Digital Licensing, Inc. ("DLI") and its affiliates and subsidiaries (collectively, "Receivership Entities") files this First Status Report ("FSR") summarizing operations and actions undertaken to date in accordance with this Court's Temporary Receivership Order ("Receivership Order") [ECF No. 10].

## I.
## BACKGROUND

1.  On July 26, 2023, the United States Securities and Exchange Commission filed a complaint against the above-named Defendants and Relief Defendants alleging, among other things, a fraudulent scheme to sell unregistered crypto asset securities to hundreds of U.S. investors. [ECF No. 1]. At the same time, the SEC applied for appointment of a temporary receiver

1

over the Receivership Entities. [ECF No. 4]. After reviewing the application, the Court concluded that appointment of a temporary receiver was necessary in order to, among other things, marshal and preserve all assets—tangible and intangible, and wherever located—owned, controlled, or possessed by the Receivership Entities.

2. On July 28, 2023, the Court entered the Receivership Order, appointing the Receiver and outlining his authority and duties. On the same day, the Court entered a Temporary Restraining Order [ECF No. 9] ("TRO")—which remains in effect [ECF Nos. 33, 78, 121, 136]—enjoining and restraining Defendants' allegedly violative conduct, freezing assets, and providing other emergency relief.

3. As described herein, the Receiver and his team of attorneys and professionals ("Receivership Team") have undertaken extensive efforts in the six weeks since appointment to identify, marshal, and secure information and assets belonging to the Receivership Entities. The scope of work has been expansive, encompassing real-world and digital assets located in multiple jurisdictions within and outside of the United States and numerous related parties purportedly acting in a variety of industries. These efforts have been aided, in part, by the cooperation of certain Defendants, Relief Defendants, and third parties.

4. However, several Defendants—primarily former DLI control persons Jason Anderson, Jacob Anderson, Schad Brannon, and Roydon Nelson ("DEBT Council Defendants")[1]—have failed to cooperate with the Receivership Team's efforts or otherwise fully comply with the TRO or Receivership Order. This has posed a significant and ongoing challenge

---

[1] As used herein, "DEBT Box" refers to the unincorporated purported umbrella of "projects" managed by the DEBT Council Defendants and through which they solicited the purchase of mining licenses or node licenses.

2

to the Receiver's efforts and made the work detailed herein more expensive and time consuming as a result. *See Temporary Receiver's Motion for Contempt and for Sanctions be Entered Against Defendants Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, and Roydon B. Nelson* ("Receiver's Motion for Contempt and for Sanctions"), filed contemporaneously herewith.

5. Notwithstanding the DEBT Council Defendants' conduct to date in this action, the Receiver has developed considerable evidence of the Receivership Entities' operations, the receipt and use of investor funds, the vast commingling of funds by and between entities and individuals, and the manner in which the Receivership Entities used funds before the Receiver's appointment.

6. Below we summarize the Receivership Entities' operations and observations from July 28, 2023 to date ("Reporting Period"). We also outline planned investigative and marshaling activities to be undertaken in accordance with the Receivership Order.

## II.
## RECEIVERSHIP OPERATIONS TO DATE

7. During the Reporting Period, the Receiver has focused on assessing the nature and scope of the Receivership Entities' operations and investigating, identifying, collecting or attempting to collect assets, and preparing an inventory of said assets and liabilities of the Receivership Entities.

**A.   Summary of Receivership Activities Undertaken During the Reporting Period**

8. As described in more detail below, the Receivership Team has taken several actions to date including, but are not limited to:

    a. Engaging attorneys and professionals to carry out the day-to-day work of the Receivership Entities at significantly discounted rates, including:

        (i) Holland & Knight, counsel to the Receiver;

3

    (ii) local counsel in various jurisdictions;

    (iii) accounting and asset tracing professionals; and

    (iv) a board-certified oil, gas, and mineral law expert;

b. Establishing a website for the Receivership Entities at www.DebtBoxReceiver.com, an email inbox at debtboxreceiver@hklaw.com, and a hotline at (305) 349-2134;

c. Receiving, reviewing, and responding to numerous contacts through the above channels from, among others, DEBT Box investors, non-investor potential creditors, and third-party investigative leads;

d. Securing the websites www.digitalcommodityhouse.com and www.digitallicensinginc.com and redirecting both to the Receivership Entities' website; notably, the DEBT Council Defendants have failed to turn over control of www.thedebtbox.com to the Receiver, the primary nexus through which DEBT Box license holders interact with the DEBT Box business;

e. Establishing fiat and digital asset accounts for the Receivership Entities, including accounts with qualified third-party custodians and multi-signature security for certain digital assets owned or otherwise managed or controlled by the Receivership Entities;

f. Identifying several other fiat and digital asset accounts owned, managed, or otherwise controlled by the Receivership Entities, including several million dollars of digital assets located in the United Arab Emirates;

g. Securing transfer of certain fiat assets owned by Receivership Entities and some—but not all—digital assets owned, managed, or otherwise controlled by them;

h. Initiating tracing of funds expended and received by the Receivership Entities' within, by, and between known and identified fiat and digital asset accounts;

i. Changing the registered agent for DLI to direct future service or other contacts to the Receivership Team;

4

    j.    Determining that several Receivership Entities and third parties conduct business or perform services from the same physical address in Draper, Utah, and visiting that address and interviewing one person on location;[2]

    k.    Redirecting and/or attempting to redirect or forward mail delivery for DLI to the Receivership Team;

    l.    Identifying, reviewing, and tracking various videos, social media accounts, data repositories, cloud storage, and mobile applications belonging or relating to the Receivership Entities;

    m.    Interviewing several Defendants, representatives of certain Relief Defendants, and knowledgeable third parties, and attempted to interview several current and former employees such as the DEBT Council Defendants, but such parties declined to sit for interviews;

    n.    Securing cooperation from certain Defendants, Relief Defendants, and third parties who are voluntarily providing information and documents to the Receivership Team;

    o.    Marshaling and analyzing documents and information collected to date;

    p.    Researching U.S. Patent and Trademark Office and Copyright Office information and, to date, not yet identifying any active registered patents, trademarks, or copyrights of the Receivership Entities;

    q.    Delivering copies of the SEC's Complaint, TRO, and Receivership Order to service providers, vendors, employees, and agents of the Receivership Entities and other stakeholders;

    r.    Identifying pending litigation involving the Receivership Entities and other parties in this action and notifying counsel and courts of this action and the Receivership Order, and endeavoring to stay such actions—or postpone pending deadlines—in which DLI is a named or interested party;

    s.    Researching the Receivership Entities' efforts to restructure or relocate operations or assets to the United Arab Emirates;

    t.    Assessing the Receivership Entities' taxpayer status and any obligations to, or outstanding issues with, the IRS and state and local tax authorities, and

---

[2] As reflected in ECF No. 125, Ex. A, Declaration of Receiver Josias N. Dewey ¶¶ 68–69, DLI and several entities are associated with the same physical address in Draper, Utah. However, based on available evidence, DLI is not the or a lessor in any suite or office at that address. Hence, the Receivership Team is not currently able to secure these premises or obtain any information or assets located there.

    beginning to analyze the Receivership's potential tax obligations with regard to administration of the Receivership, repatriation of assets, and the like;[3]

  u. Assessing the potential liabilities of the Receivership Entities through analyzing information provided by third parties, including among other things, contracts with, and invoices or obligations owed to and from, third parties;

  v. Identifying no less than fourteen jurisdictions where the Receivership Entities have, or in good faith are believed to have, a property interest and filing Notices of Receivership with same pursuant to 28 U.S.C. §754; and

  w. Minimizing Receivership Entities' expenses where appropriate—including terminating certain employees—to preserve assets and information, and mitigate against the risk of asset dissipation or concealment.

**B. Summary of Witness Interviews and Data Collection Conducted During the Reporting Period**

  9. On several occasions, the Receivership Team has requested that the DEBT Council Defendants, among other things:

  a. Submit to lawyer-monitored interviews with the Receivership Team;

  b. Disclose the identity of employees, contractors, agents, and service providers to the Receivership Entities;

  c. Turnover all Receivership Entities' books and records, assets, equipment, or property in their possession, custody, or control including, but not limited to, contracts, organizational documents, and documents identifying assets and liabilities;

  d. Provide all account identifying information, and current/last known login credentials, for every email or other communications channel; and

  e. Produce a complete investor or customer list.

---

[3] We do not yet have—and DEBT Council Defendants have not turned over—tax records for the Receivership Entities. Accordingly, the Receivership Team is working to determine whether and where any outstanding tax bills or other liabilities may exist.

6

10. As detailed more fully in the Receiver's Motion for Contempt and for Sanctions, despite repeated claims about compiling this information, the DEBT Council Defendants have provided fewer than twenty documents—largely related to oil and gas assets owned by other, affiliated parties—and they have refused to sit for interviews.

11. Moreover, certain non-parties/agents of DLI have not produced documents or provided information to the Receivership Team while continuing to work on matters relating to the Receivership Entities, including in conjunction with the DEBT Council Defendants to provide Declarations in their *Motion to Dissolve Temporary Restraining Order and Motion to Appoint New Receiver* [ECF No. 132]. *See id.* Ex. No. 4 (Declaration of Emily Tabor-Eads) & Ex. No. 12 (Declaration of Jason Saetrum).

12. As a result, the Receiver has been pressed to investigate the Receivership Entities' operations and use of funds without the benefit of documents or information from the parties most knowledgeable of the operations of the Receivership Entities. This has forced the Receivership Team to incur extensive costs uncovering information that otherwise should have been provided in accordance with the obligations outlined in the Receivership Order.

13. Nevertheless, through extensive research, interviews, and data collection efforts from a variety of other sources including cooperating parties in this matter and several other non-parties, the Receivership Team has compiled significant information about the operations of the Receivership Entities.

14. During the Reporting Period, the Receivership Team interviewed or otherwise substantively communicated with more than 30 individuals, such as:

    a. certain Defendant and Relief Defendant parties (or their counsel);

      b.      certain DEBT Box investors;

      c.      lawyers representing Receivership Entities, or parties opposed to the Receivership Entities, in prior, pending, and potential litigation matters;

      d.      former accountants and outside CFOs for the Receivership Entities;

      e.      cloud-based accounting software companies utilized by the Receivership Entities;

      f.      an IT Support Specialist utilized by the Receivership Entities and affiliates (defined as "Provider" in ECF No. 125, Ex. A, Declaration of Receiver Josias N. Dewey ¶ 11 ("Dewey Decl."));

      g.      cloud-based web platform providers who hosted or facilitated hosting of websites and web services relating to the Receivership Entities;

      h.      persons knowledgeable about the sale to, or takeover by, the Receivership Entities and DEBT Council Defendants of various businesses or business interests;

      i.      digital asset exchanges where the Receivership Entities custodied assets; and

      j.      purported vendors, service providers, and third-party creditors of the Receivership Entities.

15.    These discussions have covered, among other things, the Receivership Entities' operations and assets, including several individuals involved in purported business dealings controlled by the DEBT Council Defendants.

16.    Since his appointment, the Receiver has retained a vendor to collect and process more than 15,000 documents received from numerous sources, including a former electronic services provider for several of the Receivership Entities, former contractors and vendors, multiple law firms previously retained by the DEBT Council Defendants for legal services for the Receivership Entities, an outsourced CFO company that provided financial services, several

Defendants and Relief Defendants in this matter, and several non-parties who have cooperated with the Receiver.

17. Furthermore, as noted above, upon appointment of the Receiver, the Receivership Team established a website, email account, and hotline for the Receivership Entities. The website, which has been viewed by users both within and outside the United States, provides a "DEBT Box Investor Questionnaire" which investors may complete and voluntarily submit to the Receivership Team. To date, we have been contacted by approximately 150 investors across the world and have received scores of completed forms.

18. These efforts have informed the Receivership Team's work, and lead generation, in a number of ways, including, among other things:

    a. identifying potential claimants of the Receivership Entities;

    b. understanding when and how investments were made and what investors were told and promised;

    c. identifying wire transaction details and certain incoming and outgoing account details; and

    d. discovering certain communications with DEBT token promoters.

19. Although the Receivership Team's investigation is in its early stages, we have observed that several Defendants, Relief Defendants, and non-party entities operated under the consolidated management of, and control by, the DEBT Council Defendants as previously outlined in the Dewey Decl. ¶ 4 [ECF No. 125, Ex. A]. Among other things, the DEBT Council Defendants aggregated control over domains and emails, commingled assets by and between numerous entities including several not named in this action, often ignored entity distinctions for internal bookkeeping and when invoicing for services, routinely moved sums of money between and

among entities, and frequently used the same service providers—including lawyers—to carry out consolidated business operations.

C. **Summary of Asset Tracing Conducted During the Reporting Period**

20. With the aid of retained vendors, the Receiver has already engaged in extensive asset tracing activities. This work has, to date, focused on four primary categories of assets: (1) cryptocurrency transactions ("Digital Assets"); (2) fiat transactions through various bank and other accounts ("Fiat Assets"); (3) oil-and-gas assets ("O&G Assets"); and (4) real property and other assets.

21. Given the lack of cooperation from the DEBT Council Defendants, the Receiver has had to expend significant resources to identify many of these assets and liabilities. As noted above, the Receiver has filed notices of the Receivership Order in various jurisdictions across the country in connection with identification of these assets and has identified significant assets moved overseas.

   1. *Tracing Digital Assets*

22. The Receiver has performed several tasks concerning Digital Asset transactions, including (a) analyzing wallet addresses disclosed by Defendants and other third parties;[4] (b) examining DEBT Box-related smart contracts; (c) investigating the primary blockchain-based markets for DEBT Box-related tokens; (d) reviewing information made public by Defendants on thedebtbox.com and other sources; and (e) analyzing interactions between addresses associated

---

[4] We requested that the DEBT Council Defendants disclose all wallet addresses as required by the Receivership Order. The DEBT Council Defendants disclosed 12 wallet addresses and certain centralized exchange accounts. After providing them a list of 56 additional wallet addresses the Receivership Team identified as associated with the Receivership Entities, the DEBT Council Defendants confirmed their ownership and control of those previously undisclosed addresses and disclosed five (5) additional wallet addresses. The investigation to identify additional wallets and digital assets is ongoing.

with DLI and DEBT Box. *See*, *e.g.*, Dewey Decl. ¶ 25 [ECF No. 125, Ex. A]. Based on this analysis, the Receiver can confirm that investors provided more than $110 million in Digital Assets in connection with DEBT Box license sales.

23. To date, the Receiver has identified more than $5 million USD equivalent (*i.e.* Digital Assets currently valued at more than $5 million USD equivalent) presently located in various Digital Asset wallets related to the DEBT Box business, most of which are controlled by the DEBT Council Defendants.

24. During the Reporting Period, the Receiver established multiple secure wallets to safely custody and protect Digital Assets belonging to the Receivership Estate. To date, the DEBT Council Defendants—citing various difficulties and questions about tax consequences—have only transferred approximately $145,000 USD equivalent in Digital Assets to the Receiver.

### 2. *Tracing Fiat Assets*

25. As more thoroughly detailed in the Dewey Declaration (*see* ECF No. 125, Ex. A), the Receivership Team has reviewed bank records for 28 accounts. These records are not a comprehensive collection of the Fiat Asset transactions related to the Receivership Entities and the other conduct alleged in the SEC's complaint. However, they provide a detailed assessment of the flow of funds coming into DLI bank accounts, along with detailed transaction data for other parties. The SEC has frozen more than $5.9 million in Fiat Assets, including several million dollars the Receiver believes are part of the Receivership Estate.

26. As further detailed in the Dewey Declaration, the Receivership Team has observed extensive commingling of fiat assets originating from DEBT Box investors with various Relief Defendant entities. *See generally* Dewey Decl. ¶¶ 102–113 [ECF No. 125, Ex. A].

11

27. Moreover, the Receivership Team has determined that DEBT Box investors provided Fiat Assets that were used to finance the purchase of various oil & gas assets held in the name of other parties and non-parties. *See* Section 3 below.

28. The Receivership Team has also identified millions of dollars in Fiat Assets either transferred overseas or for purported overseas operations by Receivership Entities. Though the investigation is ongoing, the Receivership Team expect to provide more information to the court concerning these assets in the coming weeks.

### 3. *Tracing O&G Assets*[5]

29. The limited documentation provided by the DEBT Council Defendants solely relates to O&G Assets owned by affiliated parties Relief Defendant Archer Drilling, LLC ("Archer") and non-party Ignis Energy, LLC. ("Ignis").

30. Among the assets identified to date are:

    (i) several drilling rigs purportedly owned by Archer and purchased with funds provided by DLI, and over which DLI also filed UCC financing statements; and

    (ii) O&G Assets in Oklahoma purchased by Ignis following transfers to it from DLI.

31. Although the Receiver has obtained only limited information concerning the rigs, through extensive discussions with other parties and non-parties, along with documentation

---

[5] The Receivership Team notes that the Receivership Entities and DEBT Council Defendants publicly described operations and assets located overseas, including in Ghana. The Receivership Team is working to assess the veracity of these claims, the nature of any operations or assets in Ghana (or elsewhere), including through engagement of local counsel in these foreign jurisdictions. In connection with these efforts, the Receivership Team continues its search to identify any royalty interest, working interest, drilling or mining rights or other O&G assets of any kind and will update the Court if and when such assets are identified.

provided by the same, the Receiver has engaged in several discussions to assess current location, ownership, control, access, safety, and security of the rigs.

32. The Receiver is continuing discussions with several cooperating third parties to ensure these assets remain in their current state. These efforts are complicated by ongoing litigation in Nebraska state court—amongst parties to the instant SEC enforcement action—concerning ownership of Archer (the "Nebraska Litigation"). In the coming days, the Receivership Team will advise the Court of the Receiver's position with regard to these assets and the Nebraska Litigation.

33. Furthermore, concerning Ignis assets in Oklahoma, the Receiver is assessing the full scope of these assets and will update the Court in coming days regarding same.

    **4.**    *Summary of Real Property and Other Asset Tracing During the Reporting Period*

34. To date, the Receivership Team has identified approximately $9.5 million in Fiat transferred from Receivership Entities to escrow companies, all for the purchase of real property.

35. Additionally, the Receivership Team has identified ~ $1 million in Fiat transferred from Receivership Entities to luxury vehicle dealers and for other car purchases and services.

36. Furthermore, the Receivership Team has identified several million dollars transferred from Receivership Entities for the purchase the Lazy Magnolia brewery, located in Kiln, Mississippi. *See* Dewey Decl. ¶ 53 [ECF 125, Ex. A]. This analysis is ongoing and will be supplemented once more complete financial records are obtained and analyzed.

37. In the period leading up to this action, the DEBT Council Defendants were working to restructure and relocate operations and assets to the United Arab Emirates ("UAE") using entities like Digital Commodity House FZCO ("DCH") and Digital Commodity Software House FZE. Despite public representations and statements by the DEBT Council Defendants that DLI

and DCH are essentially one and the same, these Defendants have represented to the Receiver that DCH is entirely separate and, consequently, they have failed and refused to tender information and assets about DCH to the Receiver.

**D.      Summary of Recent and Pending Litigation Identified During the Reporting Period**

38.     The Receivership Team identified more than a dozen active and recently closed lawsuits involving numerous parties in this action, including cases involving DLI and several Defendants and Relief Defendants. The Receiver filed notices of the Receivership Order in all known pending actions involving DLI, and several motions to stay those proceedings have been filed. Additionally, the Receiver has achieved an extension of discovery deadlines or stays in certain other proceedings where potential Receivership Entities are involved.

39.     The DEBT Council Defendants did not provide to the Receiver a list of ongoing or closed litigation involving the Receivership Entities or assets in which they have any interest. As a result, the Receiver was required to invest significant time and expense to research and identify all actions and communicate with counsel in those actions to secure stays (or deadline extensions) to avoid, for instance, entry of default judgment, expiration of discovery deadlines, and missing other litigation milestones.[6]

**III.
PROPOSED PLAN FOR ONGOING ADMINISTRATION OF THE RECEIVERSHIP**

40.     The Receivership Team is in the process of identifying and securing assets of the Receivership Entities. The Receiver believes that there are additional assets of the Receivership

---

[6] This is an imperfect and potentially incomplete process, given that many state courts do not have online docketing and private dispute resolutions (*e.g.* foreclosure actions, mediation, arbitration, pre-suit negotiations) are not readily identifiable by researching public records.

Entities that he has not taken possession of and may need to file motions or lawsuits to secure collection.

41. Relatedly, because the DEBT Council Defendants and others with whom they closely work have not turned over the books, records, computers, private keys, and other property, information, and data belonging to the Receivership Entities, the Receivership Team has not yet been able to secure complete or validating information about these entities' investors, employees, assets, liabilities, or their sources and uses of funds.

42. Based on the information and evidence identified to date, the Receiver intends to continue his investigation in order to identify, marshal, and secure assets rightfully belonging to the Receivership Estate. In conjunction with those efforts and his duties as stated in the Receivership Order, the Receiver will provide future status reports to this Court and make recommendations to it regarding the recovery and handling of Receivership Entities' assets and liabilities, and how best to proceed for the benefit of investors or other creditors.

DATED this 13th day of September 2023.

**MCNEILL | VON MAACK**

/s/ Jason A. McNeill
Jason A. McNeill
Eric K. Schnibbe

**HOLLAND & KNIGHT**

Jessica B. Magee
Scott F. Mascianica
Andrew W. Balthazor

*Attorneys for Josias N. Dewey, Court-Appointed Temporary Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MCNEILL VON MAACK, and that pursuant to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the foregoing **TEMPORARY RECEIVER'S FIRST STATUS REPORT** was delivered to counsel of record this 13th day of September 2023, by filing of the same through the Court's CM/ECF System.

[ ]  Hand Delivery

[ ]  Depositing the same in the U.S. Mail, postage prepaid

[ ]  Electronic Mail

[X]  Submission to the U.S. District Court Electronic Case Filing System

/s/ Camille Coley