Jason A. McNeill (9711)
  mcneill@mvmlegal.com
Eric K. Schnibbe (8463)
  schnibbe@mvmlegal.com
**MCNEILL | VON MAACK**
236 South 300 East
Salt Lake City, Utah 84111
Telephone: 801.823.6464

Jessica B. Magee (*admitted pro hac vice*)
  jessica.magee@hklaw.com
Scott F. Mascianica (*admitted pro hac vice*)
  scott.mascianica@hklaw.com
Andrew W. Balthazor (*admitted pro hac vice*)
  andrew.balthazor@hklaw.com
**HOLLAND & KNIGHT**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214.969.1700

Attorneys for Josias N. Dewey, Court-Appointed
Temporary Receiver

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited liability company; BRENDAN J. STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual,<br><br>        Defendants, | **RECEIVER JOSIAS N. DEWEY'S SECOND DECLARATION IN SUPPORT OF RECEIVER'S MOTION TO CLARIFY TEMPORARY RECEIVERSHIP ORDER**<br><br><br>**Case No. 2:23-cv-00482-RJS-DBP**<br><br>**Judge Robert J. Shelby**<br><br>**Magistrate Judge Dustin B. Pead** |

**ARCHER DRILLING, LLC, a Wyoming limited liability company; BUSINESS FUNDING SOLUTIONS, LLC, a Utah limited liability company; BLOX LENDING, LLC, a Utah limited liability company; CALMFRITZ HOLDINGS, LLC, a Utah limited liability company; CALMES & CO, INC., a Utah corporation; FLAHERTY ENTERPRISES, LLC, an Arizona limited liability company; IX VENTURES FZCO, a United Arab Emirates company; PURDY OIL, LLC, a Nebraska limited liability company; THE GOLD COLLECTIVE LLC, a Utah limited liability company; and UIU HOLDINGS, LLC, a Delaware limited liability company,**

**Relief Defendants.**

## SECOND DECLARATION OF JOSIAS N. DEWEY

1.      My name is Josias N. Dewey ("Receiver"). I am over 18 years of age and competent to testify to the matters detailed in this declaration. I am a partner at Holland & Knight, LLP ("HK") in Miami, Florida.

2.      I have practiced law since 1998 and am a member in good standing of the State Bar of Florida. I previously served as the court-appointed Receiver for Titanium Blockchain Infrastructure Services, Inc. in *Securities and Exchange Commission v. Titanium Blockchain Infrastructure Services, Inc.*, No. 18-cv-4315 (C.D. CA 2018).

3.      On July 28, 2023, I was appointed as temporary receiver in the above captioned matter over Defendant Digital Licensing, Inc. and its affiliates and subsidiaries (hereinafter, "Receivership Entities" refers to Digital Licensing, Inc. together with its affiliates and subsidiaries, and "DLI" refers solely to Digital Licensing, Inc.). *See* Temporary Receivership Order, *SEC v. Digital Licensing, Inc.*, No. 23-cv-00482 (D. Utah), ECF No. 10 (hereinafter "Receivership Order"). The terms "affiliates" and "subsidiaries" are not defined in the Receivership Order.

1

4.      As explained in my first Declaration (*see* ECF No. 125 at Ex. A, and hereinafter "First Declaration"), each of the following entities is directly owned, managed, operated and/or controlled by one or more of Defendants Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, and Roydon B. Nelson (collectively, the "DEBT Council Defendants"):

      **A.** Relief Defendant Blox Lending, LLC ("Blox")

      **B.** Relief Defendant Business Funding Solutions, LLC ("BFS")

      **C.** Relief Defendant The Gold Collective, LLC ("Gold Collective")

      **D.** Relief Defendant UIU Holdings, LLC ("UIU")

      **E.** Digital Commodity House Entities

5.      Over the last several weeks, HK, its vendors, and I (collectively "Team") have uncovered documents and other evidence supporting that non-party Ignis Energy LLC ("Ignis") is also owned, managed, operated and/or controlled by one or more of the DEBT Council Defendants, received significant commingled proceeds traceable to DLI, and therefore, should be included within the scope of the Receivership Order's definition of "subsidiaries" and "affiliates".

**<u>SUMMARY OF RECEIVER'S EFFORTS TO DATE</u>**

6.      HK advises and assists me in carrying out my duties and responsibilities set forth in the Receivership Order.

7.      Since July 28, 2023, my Team and I have focused on assessing the nature and scope of the Receivership Entities' operations and investigating, identifying, collecting or attempting to collect assets, and preparing an inventory of said assets and liabilities of the Receivership Entities. *See* Receiver's First Status Report [ECF No. 139] for a detailed summary of Receiver's work to date.

8.      Although the Team's analysis continues, my personal observations herein are based on evidence obtained and verified since the date of my appointment. Where appropriate, I have attached exhibits to support the statements herein.

## IGNIS WEBSITES AND EMAILS LINKED TO RECEIVERSHIP ENTITIES

9.      On August 2, 2023, the Team interviewed Defendant Roydon Nelson. During that interview, Mr. Nelson volunteered certain information about Receivership Entities and informed the Team that a service provider (the "Provider") hosted several domains, websites, and data for numerous entities, including DLI.

10.     The same day, the Team contacted the Provider, shared a copy of the Receivership Order, and gave the Provider time to review that document, pose questions, and discuss and understand my role and responsibilities as Receiver for Receivership Entities.

11.     The Team communicated with Provider on numerous occasions that day and, among other things, the Provider informed the Team that he communicated with Mr. Nelson that morning, and Mr. Nelson encouraged the Provider to cooperate with me, as the Receiver, and the remainder of the Team. The Team requested access to all of Receivership Entities' information in the Provider's possession or control, and relied on the Provider to use his own discretion and experience in identify the data belonging to Receivership Entities. Among other things, the Provider produced an Excel spreadsheet identifying the various email domains he serviced for Receivership Entities at the direction of Mr. Nelson and Mr. Brannon, whom the Provider understood were involved in the operation and oversight of Receivership Entities. A copy of that spreadsheet is attached hereto as **Exhibit 1**.

12.     The domains Provider believed to be Receivership Entities', each with individual email accounts and data repositories, included, among others: (a) Igniseng.com; (c)

Digitallicensinginc.com; and (d) Digitalcommodityhouse.com. Notably, most email accounts associated with these domains were setup to forward to and consolidate in specific email accounts at universaldev.com. For example, for Mr. Nelson, email domains roy@igniseng.com and roy@digitallicensinginc.com had rules forwarding email correspondence to roy@universaldev.com. Similarly, for Mr. Brannon, schad@igniseng.com had rules forwarding emails to schad@universaldev.com.

**IGNIS ENERGY LLC**

13.     Ignis is an Oklahoma limited liability company registered on January 12, 2023. *See* **Exhibit 2**. Pursuant to a Form 1006B report filed with the Oklahoma Corporation Commission, Ignis' operator is Roy Nelson, and its principal office address is 1812 W Sunset Blvd., STE 1-345, St. George, UT 84770. *See* **Exhibit 3**. Additionally, in this operator listing, Mr. Nelson provided the email address roy@universaldev.com as his personal contact information. *See id.* This is the same email address that the Provider identified as the domain which was consolidating email correspondence across Receivership Entities' email accounts and data repositories. *See supra* ¶ 12.

*__Receivership Entities-Ignis Financial Transactions__*

14.     Following my appointment, the SEC provided the Team with bank statements and supporting source material for 28 bank accounts and payment processors owned or controlled by various Defendant and Relief Defendant entities. These records are not a comprehensive collection of the Fiat Asset transactions related to Receivership Entities and the other conduct alleged in the SEC's complaint. However, they provide a detailed assessment of the flow of funds coming into Digital Licensing, Inc. bank accounts, along with detailed transaction data for other parties.

15.     Specifically, from the period February 14, 2023, to May 16, 2023, one DLI account (ending in 2717) made eight (8) transfers to Ignis for a total sum of $465,001.00; however, the

bank records do not contain any transactions from Ignis to DLI. The authorized signatories and individuals with access to this DLI account (2717) are DEBT Council Defendants Roydon Nelson and Schad Brannon. An email supporting this account's creation and authorized users is attached hereto as **Exhibit 4**.

16.     As explained in more detail below, some of these funds appear to have been used by Ignis for the purchase of oil and gas systems.

17.     Although my Team has not received bank records for Ignis, we did identify notable banking relationships between DLI, the DEBT Council Defendants, and Ignis. On or around January and February 2023, Mr. Nelson and Mr. Brannon created three (3) bank accounts for Ignis at BancFirst. *See* **Exhibit 5**. The signature cards for these bank accounts were signed by both Mr. Nelson and Mr. Brannon in February 2023. *Id.* Additionally, they list the same mailing address for Ignis as the address provided to the Oklahoma Corporation Commission. *Compare id.* and *supra* ¶ 13.

18.     Also in February of 2023, Mr. Nelson and Mr. Brannon provided these same BancFirst signature cards to Mountain America Credit Union ("MACU") to create an additional bank account for Ignis. *See* **Exhibit 6**. Notably, their business banking application with MACU requested a primary account for DLI and asked that two "additional location" accounts be linked— one for Gold Collective (account ending in 4754), and the second for Ignis (account ending in 7865). *See* **Exhibit 7**. Mr. Nelson and Mr. Brannon signed this DLI account application requesting that all three of these accounts be linked and sharing signatory authority regarding the same. *See id.*

### *Morrison Cohen Letters from August 17 and 18*

19.     On August 17, 2023, an attorney from the law firm Morrison Cohen LLP ("DEBT Council's Attorneys") drafted a letter to my Team stating that it represents all four DEBT Council

Defendants. A copy of this letter is attached hereto as **Exhibit 8**, and hereinafter "August 17 Letter".

20.    The August 17 Letter further represents that Mr. Nelson operated Ignis through Gold Collective. Ignis purportedly purchased several oil and gas systems in Kay County, Oklahoma. *Id.*

21.    The DEBT Council's Attorneys claimed that Ignis's drilling equipment "need[s] to be immediately managed and maintained to ensure safety and security" because "[t]heft in this area is very high", they "have received open and consistent threats of equipment theft and vandalism", the assets "pose a potential environmental hazard", and the equipment is in need of regular maintenance. The DEBT Council's Attorneys "believe that the Receiver needs to quickly resume maintenance and operation of these assets" to best protect the assets. The August 17 Letter did not include any additional information concerning the type, location, or condition of the equipment. *See id.* This information has not been provided in the weeks following the letter.

22.    DEBT Council's Attorneys sent a second letter to my Team on August 18, 2023. A copy of this letter is attached hereto as **Exhibit 9**, and hereinafter "August 18 Letter".

23.    In the August 18 Letter, the DEBT Council's Attorneys reiterated their request that the Receiver intervene to protect the business interests of Ignis. *See id.* Specifically, they claimed that a trucking company was to deliver drill pipe to "DLI's Drilling Rig 2 Operations." *See id.* They then acknowledge the commingled nature of the Receivership Entities and Ignis, claiming that "***DLI*** would have made a timely payment for shipping such equipment. As we discussed yesterday, however, the TRO has halted ***DLI and Ignis Energy's*** business operations." *See id.*

### *Ignis Wells in Oklahoma*

24.    My Team identified an April 1, 2023 Assignment, Bill of Sale and Conveyance relating to Ignis oil and gas leases. This document was recorded with the Kay County Clerk of

Oklahoma, a copy of which is attached hereto as **Exhibit 10**.   This conveyance was referenced in the August 17 letter.

25.     Between February 14, 2023 and March 26, 2023, DLI (account ending in 2717) transferred $400,001.00 to an account in the name of Ignis Energy.

26.     The Team's investigation confirmed that, on April 18, 2023, Ignis purchased 150 gas wells and 127 miles of pipeline from Ganer Oil Company for approximately $400,000. *See id.*

27.     Additionally, one witness has advised the Team that Ignis has purchased additional oil and gas properties in Oklahoma, including an asset purportedly purchased using cryptocurrency.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 14th day of September, 2023 in Miami, Florida.

**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: 305-374-8500

/s/ Josias N. Dewey
joe.dewey@hklaw.com

*As Temporary Receiver for Digital Licensing, Inc.*

Exhibit "1"

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | | WEBSITE | DESCRIPTION | USER | ACCESS CLOSED |
| 2 | | argusVault.com | Document Repository on server | adevere | 8/2/2023 9:41am |
| 3 | | argusVault.com | Document Repository on server | bcook | 8/2/2023 9:41am |
| 4 | | argusVault.com | Document Repository on server | bryanscaffner | 8/2/2023 9:41am |
| 5 | | argusVault.com | Document Repository on server | emilyeads | 8/2/2023 9:41am |
| 6 | | argusVault.com | Document Repository on server | ███████ | 8/2/2023 9:41am |
| 7 | | argusVault.com | Document Repository on server | jakeanderson | 8/2/2023 9:41am |
| 8 | | argusVault.com | Document Repository on server | ajasonanderson | 8/2/2023 9:41am |
| 9 | | argusVault.com | Document Repository on server | joeln78 | 8/2/2023 9:41am |
| 10 | | argusVault.com | Document Repository on server | jsaetrum | 8/2/2023 9:41am |
| 11 | | argusVault.com | Document Repository on server | kcalmes | 8/2/2023 9:41am |
| 12 | | argusVault.com | Document Repository on server | sbrannon | 8/2/2023 9:41am |
| 13 | | argusVault.com | Document Repository on server | admin | 8/2/2023 9:41am |
| 14 | | | | | |
| 15 | | UniversalDev.com | GoogleWorkplace Email (Admin) | harold@universaldev.com | |
| 16 | | UniversalDev.com | GoogleWorkplace Email | roy@universaldev.com | 8/2/2023 9:47am |
| 17 | | UniversalDev.com | GoogleWorkplace Email | schad@universaldev.com | 8/2/2023 9:47am |
| 18 | | UniversalDev.com | GoogleWorkplace Email | Jason@universaldev.com | 8/2/2023 9:47am |
| 19 | | UniversalDev.com | GoogleWorkplace Email | Bryan@universaldev.com | 8/2/2023 9:47am |
| 20 | | UniversalDev.com | GoogleWorkplace Email | joseph@universaldev.com | 8/2/2023 9:47am |
| 21 | | | | | |
| 22 | | digitallicensinginc.com | GoogleWorkplace Email (Admin) | harold@digitallicensinginc.com | |
| 23 | | digitallicensinginc.com | GoogleWorkplace Email | roy@digitallicensinginc.com | 8/2/2023 9:49am |
| 24 | | digitallicensinginc.com | GoogleWorkplace Email | bgld@digitallicensinginc.com | 8/2/2023 9:49am |
| 25 | | digitallicensinginc.com | GoogleWorkplace Email | metals@digitallicensinginc.com | 8/2/2023 9:49am |
| 26 | | digitallicensinginc.com | GoogleWorkplace Email | jason@digitallicensinginc.com | 8/2/2023 9:49am |
| 27 | | | | | |
| 28 | | archer-drilling.com | GoogleWorkplace Email (Admin) | harold@archer-drilling.com | |
| 29 | | archer-drilling.com | GoogleWorkplace Email | jodi@archer-drilling.com | 8/2/2023 9:53am |
| 30 | | archer-drilling.com | GoogleWorkplace Email | roy@archer-drilling.com | 8/2/2023 9:53am |
| 31 | | archer-drilling.com | GoogleWorkplace Email | schad@archer-drilling.com | 8/2/2023 9:53am |
| 32 | | archer-drilling.com | GoogleWorkplace Email | gene@archer-drilling.com | 8/2/2023 9:53am |
| 33 | | archer-drilling.com | GoogleWorkplace Email | jason@archer-drilling.com | 8/2/2023 9:53am |
| 34 | | | | | |
| 35 | | theminingcollective.com | GoogleWorkplace Email (Admin) | harold@theminingcollective.com | |
| 36 | | theminingcollective.com | GoogleWorkplace Email | Roy@theminingcollective.com | 8/2/2023 9:56am |
| 37 | | theminingcollective.com | GoogleWorkplace Email | Schad@theminingcollective.com | 8/2/2023 9:56am |
| 38 | | theminingcollective.com | GoogleWorkplace Email | Bryan@theminingcollective.com | 8/2/2023 9:56am |
| 39 | | theminingcollective.com | GoogleWorkplace Email | jason@theminingcollective.com | 8/2/2023 9:56am |
| 40 | | | | | |
| 41 | | igniseng.com | GoogleWorkplace Email (Admin) | harold@igniseng.com | |
| 42 | | igniseng.com | GoogleWorkplace Email | roy@igniseng.com | 8/2/2023 9:58pm |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 43 | | igniseng.com | GoogleWorkplace Email | schad@igniseng.com | 8/2/2023 9:58pm |
| 44 | | igniseng.com | GoogleWorkplace Email | Jason@igniseng.com | 8/2/2023 9:58pm |
| 45 | | igniseng.com | GoogleWorkplace Email | Robbie@igniseng.com | 8/2/2023 9:58pm |
| 46 | | igniseng.com | GoogleWorkplace Email | Ronnie@igniseng.com | 8/2/2023 9:58pm |
| 47 | | | | | |
| 48 | | universalresourceestimate.com | GoogleWorkplace Email (Admin) | harold@universalresourceestimate.com | |
| 49 | | universalresourceestimate.com | GoogleWorkplace Email | roy@universalresourceestimate.com | 8/2/2023 10:01am |
| 50 | | universalresourceestimate.com | GoogleWorkplace Email | schad@universalresourceestimate.com | 8/2/2023 10:01am |
| 51 | | | | | |
| 52 | | AEMGhana | GoogleWorkplace Email (Admin) | ███████████████ | |
| 53 | | AEMGhana | GoogleWorkplace Email | trussell@aemghana.com | 8/2/2023 10:04am |
| 54 | | AEMGhana | GoogleWorkplace Email | jarhin@aemghana.com | 8/2/2023 10:04am |
| 55 | | AEMGhana | GoogleWorkplace Email | sbrannon@aemghana.com | 8/2/2023 10:04am |
| 56 | | AEMGhana | GoogleWorkplace Email | iobeng@aemghana.com | 8/2/2023 10:04am |
| 57 | | AEMGhana | GoogleWorkplace Email | sfrimpong@aemghana.com | 8/2/2023 10:04am |
| 58 | | AEMGhana | GoogleWorkplace Email | rnelson@aemghana.com | 8/2/2023 10:04am |
| 59 | | AEMGhana | GoogleWorkplace Email | dmcaffee@aemghana.com | 8/2/2023 10:04am |
| 60 | | AEMGhana | GoogleWorkplace Email | fagezo@aemghana.com | 8/2/2023 10:04am |
| 61 | | AEMGhana | GoogleWorkplace Email | soduro@aemghana.com | 8/2/2023 10:04am |
| 62 | | AEMGhana | GoogleWorkplace Email | kasamoah@aemghana.com | 8/2/2023 10:04am |
| 63 | | AEMGhana | GoogleWorkplace Email | shomenoo@aemghana.com | 8/2/2023 10:04am |
| 64 | | AEMGhana | GoogleWorkplace Email | ebartels@aemghana.com | 8/2/2023 10:04am |
| 65 | | AEMGhana | GoogleWorkplace Email | fkuss@aemghana.com | 8/2/2023 10:04am |
| 66 | | AEMGhana | GoogleWorkplace Email | yanokwa@aemghana.com | 8/2/2023 10:04am |
| 67 | | | | | |
| 68 | | resonancefrequencyexploration.com | GoogleWorkplace Email (Admin) | harold@resonancefrequencyexploration.com | |
| 69 | | resonancefrequencyexploration.com | GoogleWorkplace Email | roy@resonancefrequencyexploration.com | 8/2/2023 10:06am |
| 70 | | resonancefrequencyexploration.com | GoogleWorkplace Email | schad@resonancefrequencyexploration.com | 8/2/2023 10:06am |
| 71 | | resonancefrequencyexploration.com | GoogleWorkplace Email | anna@resonancefrequencyexploration.com | 8/2/2023 10:06am |
| 72 | | resonancefrequencyexploration.com | GoogleWorkplace Email | erin@resonancefrequencyexploration.com | 8/2/2023 10:06am |
| 73 | | | | | |
| 74 | | digitalcommodityhouse.com | Server Email | info@digitalcommodityhouse.com | 8/2/2023 10:09am |

# Exhibit "2"

 

Home  >  U.S.  >  Oklahoma  >  Oklahoma City

# IGNIS ENERGY LLC

Oklahoma Secretary Of State Business Registration · Updated 1/12/2023

Sponsored Links

PRICE DROP

Free Shipping & Installation
Alan's Factory Outlet

| Write Review | Upgrade | Claim |

IGNIS ENERGY LLC is an Oklahoma Domestic Limited-Liability Company filed on January 12, 2023. The company's filing status is listed as In Existence and its File Number is 3513278223.

The Registered Agent on file for this company is Northwest Registered Agent, LLC and is located at 9905 S Pennsylvania Ave Ste A, Oklahoma City, OK 73159.

Like

## Company Information

| | |
|---|---|
| Company Name: | IGNIS ENERGY LLC |
| Entity Type: | OKLAHOMA DOMESTIC LIMITED-LIABILITY COMPANY |
| File Number: | 3513278223 |
| Filing State: | Oklahoma (OK) |
| Filing Status: | In Existence |
| Filing Date: | January 12, 2023 |
| Company Age: | 7 Months |
| Registered Agent: | Northwest Registered Agent, LLC 9905 S Pennsylvania Ave Ste A Oklahoma City, OK 73159 |
| Governing Agency: | Oklahoma Secretary of State |

Sponsored Links

WORLD GOLD COUNCIL

Download the latest reports from World Gold Council

## Company Contacts

This company has not listed any contacts yet.

## Reviews

| Write Review |

There are no reviews yet for this company.

## Questions

| Post Question |

There are no questions yet for this company.

ADDITIONAL LINKS

Post Question For This Company

Contact Us Regarding Your Company Profile

All Companies Named IGNIS ENERGY LLC

Search All Oklahoma Companies

Learn About Our Pro Search Subscription Service

*The information on this page is being provided for the purpose of informing the public about a matter of genuine public interest.*

Copyright © 2012-2023 · Bizapedia.com · All rights reserved.

Pro Data    Pro Search    Pro API    Contact Us    Terms of Use    Privacy Policy    Sitemap

Desktop · Server 1

Exhibit "3"

# OKLAHOMA CORPORATION COMMISSION
## FORM 1006B - REPORT
## OPERATOR LISTING
## SORTED BY OPERATOR'S NAME

Run Date: Wednesday, July 19, 2023

Operator Number: 24860

HYDROCARB-EN LLC
KIRK KOLAR
PO BOX 6844
EDMOND, OK 73083
Office phone: (405) 203-5975
Emergency phone: Not on file.
email:  KKOLAR@HYDROCARB-EN.COM

Operator Number: 24314

IBEX RESOURCES COMPANY LLC
Don Rahmes
1021 NW GRAND BLVD
OKLAHOMA CITY, OK 73118-6039
Office phone: (405) 947-4322
Emergency phone: Not on file.
email:  STEPHENPLUNKETT@JMAENERGY.COM

Operator Number: 24854

IGNIS ENERGY LLC
ROY NELSON
1812 W SUNSET BLVD STE 1-345
ST GEORGE, UT 84770
Office phone: (801) 946-9881
Emergency phone: Not on file.
email:  ROY@UNIVERSALDEV.COM

Operator Number: 23962

IKE ENERGY LLC
Jon Cavanaugh
3910 W 6TH AVE STE 282
STILLWATER, OK 74074-1745
Office phone: (405) 385-4956
Emergency phone: Not on file.
email:  CONTACTUS@IKEENERGYUS.COM

Operator Number: 21349

IMHOFF DAVID
David Imhoff
820807 S 3500 RD
STROUD, OK 74079-9725
Office phone: (405) 760-3508
Emergency phone: Not on file.
email:  IMHOFFFARMS@COTC.NET

Exhibit "4"

| | |
|---|---|
| **From:** | Schad Brannon |
| **To:** | Brandon Stevens; Roy Nelson |
| **Cc:** | Schad Brannon |
| **Subject:** | Re: [ENCRYPT] DLI ACCOUNT INFO |
| **Date:** | Tuesday, February 7, 2023 3:52:30 PM |

You don't often get email from office365@messaging.microsoft.com. Learn why this is important

**[ External ]**

Brandon-

Do you mean use the last 8 digits of the account number?

Please use the LAST 8 digit account number "████2717"

The account number is 12 digits long "████████2717"

And then use the EIN number for DLI.

Schad

---

**From:** Brandon Stevens <bstevens@macu.com>
**Sent:** Tuesday, February 7, 2023 9:53:33 AM
**To:** Roy Nelson <roydog.nelson@gmail.com>; Schad Brannon <schadebrannon@gmail.com>
**Subject:** [ENCRYPT] DLI ACCOUNT INFO

Roy and Schad,
Attached is the account number and routing number information for Digital Licensing Inc. I will send a similar email for each additional account we open.
**Online Login:** To set up a new login online and on the mobile app, your will be prompted to register as a business, and provide both an account number, and tax ID number to look up your account. Please use the 8 digit account number ████2717 and EIN number for this registration. If you attempt to use the longer 12 digit account number, or your SSN, the system will be unable to find your account. We can also attach this account to your existing login(s) if applicable. ==Roy, this has been added to your existing login.== The login that you create at this point will be the master user. Sub-users can be created with custom permissions if needed.
**Opening Deposit:** The opening deposit can be made in a few different ways. You can take the deposit into a local branch, or transfer from another account online. Please make this opening deposit within 7 days of account opening to ensure the account is not closed out.
**Debit Card:** You can choose to either pick up a debit card at your local branch, where they can be printed on the spot, or have one mailed out. The cards usually arrive by mail within 7-10 business days. New cards can always be printed at any local branch if you were to need this service!
Thank you for your time and we look forward to your membership with Mountain America!



**Brandon Stevens**
*Business Services Portfolio Manager,* Business Services Team
+1 480-992-5216 *tel*
bstevens@macu.com
https://www.macu.com/

Exhibit "5"

## BancFirst.  **Signature Card**

| Product: | COMMERCIAL CHECKING | | | Account #: | ████6294 | | ☐ Check if Signature Card Addendum is attached. |
|---|---|---|---|---|---|---|---|
| Date: | 02/21/2023 | CEL | Phone: | 801-946-9881 | | | |
| Plan ID#: | | 000 | Phone: | | | | |
| New ☒ | Rev ☐ | CSR | DLBACKUS | | | | |

Account Owner(s) and Mailing Address:
IGNIS ENERGY LLC
MAIN ACCOUNT
1812 W SUNSET BLVD
ST GEORGE, UT 84770

Comments:

Account Ownership Description:

The undersigned acknowledges receipt of Bank's Deposit Agreement, Funds Availability Schedule, Electronic Funds Transfer Disclosure, Account Disclosure, and Privacy Disclosure and agrees to their terms. If not signed in the presence of a BancFirst employee, signatures must be notarized on the back of this card.

| Name of Signatory | | | Signature Specimens |
|---|---|---|---|
| 1.  ROYDON B NELSON | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: LLC Member | |
| 2.  SCHAD E BRANNON | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: LLC Member | |
| 3. | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: | |
| 4. | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: | |
| 5. | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: | |
| 6. | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: | |
| 7. | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: | |
| 8. | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: | |
| 9. | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: | |
| 10. | | Issuer: | |
| ID#: | | | |
| DOB: | TIN: | Relationship: | |

### Payor's Request for Taxpayer's Identification Number and Certification

Taxpayer Identification Number: ████0508

**Certification · Under penalties of perjury, I certify that:**
 (1) The number shown on this form is my correct taxpayer identification number and
 (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.
 (3) I am a U.S. Person (including a U.S. resident alien)
 (4) I am FACTA exempt.
**Certification Instructions** — You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, the acquisition or abandonment of security property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

Signature _____    Date: 2/21/2023

BFAO001 (9-20)

SEC-MACU-E-0000119

4.      Individuals designated as "Authorized Signers" herein soley for the purpose of conducting deposit and withdrawal transactions shall have no other authority on behalf of the Company, notwithstanding the provisions set forth herein, including, without limitation, the authority to open and close accounts held in the name of the Company.

It is further agreed by the Company that, subject to the provisions contained herein, if indicated, any one person listed below is authorized to:

1)      Open and close the above referenced account in the name of this Company.

2)      Endorse checks, drafts, bills, and other orders for the payment of money and withdraw cash and funds on deposit with **BancFirst**, and make deposits to the above referenced account on behalf of the Company.

3)      Stop payment of any check, draft, bill, or other order for payment of money on behalf of this Company.

4)      Enter into one or more written lease agreement(s) for the purpose of renting, leasing, and maintaining a Safe Deposit Box at one or more locations at BancFirst.  Number of authorized signatures required for this purpose: 1.

| Name | Title | Signature or Facsimile Signature (if applicable) |
|---|---|---|
| ROYDON B NELSON | MEMBER | |
| SCHAD E BRANNON | MEMBER | |
| | | |
| | | |
| | | |

D.      The undersigned certify that the genuine signature set opposite the respective name of each of the persons named above is true and correct in all respects.

E.      That this agreement is executed and delivered by the undersigned subsequent to the execution and delivery of the Company Agreement.  If any of the terms and provisions of the Company Agreement are in conflict with, contradict or are inconsistent with the terms and provisions of this agreement, the terms and provisions of this agreement will govern and control, and the Company Agreement is hereby deemed amended insofar as **BancFirst** might now or hereafter be affected.

IN WITNESS WHEREOF, the undersigned Member(s) have executed and delivered this agreement effective this _____ day of

(Majority of Managers/Members unless Operating Agreement states otherwise)

**ACKNOWLEDGEMENT**

STATE OF _____ )
                                                              ) SS:
COUNTY OF _____ )

The foregoing instrument was acknowledged before me on this _____ day of _____, _____,

by _____, Member(s) of _____, a limited liability company,

on behalf of said company.

My Commission Expires:

_____                    _____
          (SEAL)                                          Notary Public
                                                          Commission Number: _____

SEC-MACU-E-0000120

**ACKNOWLEDGEMENT**

STATE OF _California_ )
COUNTY OF _Los Angeles_ )     SS:

The foregoing instrument was acknowledged before me on this _30_ day of _March_ , _2023_ .

by _Schad Edward Brannon_, Member(s) of _____ , a limited liability company,

on behalf of said company.

My Commission Expires:

_Oct. 13, 2023_

_____(SEAL)_____

Notary Public _____

Commission Number: _____

---

**ACKNOWLEDGEMENT**

STATE OF _____ )
COUNTY OF _____ )     SS:

The foregoing instrument was acknowledged before me on this _____ day of _____ , _____ .

by _____ , Member(s) of _____ , a limited liability company,

on behalf of said company.

My Commission Expires:

_____

_____(SEAL)_____

Notary Public _____

Commission Number: _____

---

**ACKNOWLEDGEMENT**

STATE OF _____ )
COUNTY OF _____ )     SS:

The foregoing instrument was acknowledged before me on this _____ day of _____ , _____ .

by _____ , Member(s) of _____ , a limited liability company,

on behalf of said company.

My Commission Expires:

_____

_____(SEAL)_____

Notary Public _____

Commission Number: _____

---

BFAO025 (revised June 2017)

Page 3 of 3

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____*Los Angeles*_____ )

On ___*March 30, 2023*___ before me, _*Nargiza Babadjanova, Notary Public*_____
                                              (insert name and title of the officer)

personally appeared ___*Schad Edward Brannon*___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____ (Seal)

NARGIZA BABADJANOVA
COMM. # 2308649
LOS ANGELES COUNTY
NOTARY PUBLIC-CALIFORNIA
MY COMMISSION EXPIRES
OCTOBER 13, 2023

**BancFirst.**   **Signature Card**

| Product: COMMERCIAL CHECKING | | | | Account #: ▮▮6302 | ☐ Check If Signature Card Addendum is attached. |
|---|---|---|---|---|---|
| Date: 02/21/2023 | CEL | Phone: 801-946-9881 | | | |
| Plan ID#: | 000 | Phone: | | Account Owner(s) and Mailing Address: IGNIS ENERGY LLC OPERATING ACCOUNT 1812 W SUNSET BLVD ST GEORGE, UT 84770 | |
| New ☒ Rev ☐ | CSR | DLBACKUS | | | |
| Comments: | | | | | |
| Account Ownership Description: | | | | | |

The undersigned acknowledges receipt of Bank's Deposit Agreement, Funds Availability Schedule, Electronic Funds Transfer Disclosure, Account Disclosure, and Privacy Disclosure and agrees to their terms. If not signed in the presence of a BancFirst employee, signatures must be notarized on the back of this card.

| Name of Signatory | | Signature Specimens |
|---|---|---|
| 1. ROYDON B NELSON ID#: DOB: TIN: | Issuer: Relationship: LLC Member | |
| 2. SCHAD E BRANNON ID#: DOB: TIN: | Issuer: Relationship: LLC Member | |
| 3. RONNIE L CHENEY ID#: DOB: TIN: | Issuer: Relationship: Authorized Signer | |
| 4. ID#: DOB: TIN: | Issuer: Relationship: | |
| 5. ID#: DOB: TIN: | Issuer: Relationship: | |
| 6. ID#: DOB: TIN: | Issuer: Relationship: | |
| 7. ID#: DOB: TIN: | Issuer: Relationship: | |
| 8. ID#: DOB: TIN: | Issuer: Relationship: | |
| 9. ID#: DOB: TIN: | Issuer: Relationship: | |
| 10. ID#: DOB: TIN: | Issuer: Relationship: | |

**Payor's Request for Taxpayer's Identification Number and Certification**

Taxpayer Identification Number: ▮▮0508

Certification • Under penalties of perjury, I certify that:
   (1) The number shown on this form is my correct taxpayer identification number and
   (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.
   (3) I am a U.S. Person (including a U.S. resident alien)
   (4) I am FACTA exempt.
Certification Instructions – You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, the acquisition or abandonment of security property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

Signature: _____   Date: 2/21/2023

BFAO001 (9-20)

SEC-MACU-E-0000123

|||||||| ||||| |||| ||||| |||| ||| ||| ||||| |||| |||||||| |||| ||| |||| ||| |||| |||| |||| ||| ||| |||| ||| |||| ||||| ||| |||| ||| ||||| ||||| ||||| |||| ||||

4.      Individuals designated as "Authorized Signers" herein solely for the purpose of conducting deposit and withdrawal transactions shall have no other authority on behalf of the Company, notwithstanding the provisions set forth herein, including, without limitation, the authority to open and close accounts held in the name of the Company.

It is further agreed by the Company that, subject to the provisions contained herein, if indicated, any one person listed below is authorized to:

1)      Open and close the above referenced account in the name of this Company.

2)      Endorse checks, drafts, bills, and other orders for the payment of money and withdraw cash and funds on deposit with BancFirst, and make deposits to the above referenced account on behalf of the Company.

3)      Stop payment of any check, draft, bill, or other order for payment of money on behalf of this Company.

4)      Enter into one or more written lease agreement(s) for the purpose of renting, leasing, and maintaining a Safe Deposit Box at one or more locations at BancFirst.  Number of authorized signatures required for this purpose: 1.

| Name | Title | Signature or Facsimile Signature (if applicable) |
|---|---|---|
| ROYDON B NELSON | MEMBER | |
| SCHAD E BRANNON | MEMBER | |
| RONNIE L CHENEY | AUTHORIZED SIGNER | |
| | | |
| | | |
| | | |

D.      The undersigned certify that the genuine signature set opposite the respective name of each of the persons named above is true and correct in all respects.

E.      That this agreement is executed and delivered by the undersigned subsequent to the execution and delivery of the Company Agreement.  If any of the terms and provisions of the Company Agreement are in conflict with, contradict or are inconsistent with the terms and provisions of this agreement, the terms and provisions of this agreement will govern and control, and the Company Agreement is hereby deemed amended insofar as BancFirst might now or hereafter be affected.

IN WITNESS WHEREOF, the undersigned Member(s) have executed and delivered this agreement effective this _____ day of _____, _____.

(Majority of Managers/Members unless Operating Agreement states otherwise)

**ACKNOWLEDGEMENT**

STATE OF _____ )
                                                    ) SS:
COUNTY OF _____ )

The foregoing instrument was acknowledged before me on this _____ day of _____, _____.

by _____, Member(s) of _____, a limited liability company,

on behalf of said company.

My Commission Expires:

_____
                (SEAL)

Notary Public _____

Commission Number: _____

|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

## ACKNOWLEDGEMENT

STATE OF _California_ )
COUNTY OF _Los Angeles_ )   SS:

The foregoing instrument was acknowledged before me on this _30_ day of _March_ , _2023_ .

by _Sohad Edward Brannun_ Member(s) of _____ , a limited liability company,

on behalf of said company.

My Commission Expires:

_Oct. 13, 2023_

(SEAL)

Notary Public _____

Commission Number: _____

---

## ACKNOWLEDGEMENT

STATE OF _____ )
COUNTY OF _____ )   SS:

The foregoing instrument was acknowledged before me on this _____ day of _____, _____,

by _____ , Member(s) of _____ , a limited liability company,

on behalf of said company.

My Commission Expires:

_____
(SEAL)

Notary Public _____

Commission Number: _____

---

## ACKNOWLEDGEMENT

STATE OF _____ )
COUNTY OF _____ )   SS:

The foregoing instrument was acknowledged before me on this _____ day of _____, _____,

by _____ , Member(s) of _____ , a limited liability company,

on behalf of said company.

My Commission Expires:

_____
(SEAL)

Notary Public _____

Commission Number: _____

BFAO025 (revised June 2017)

Page 3 of 3

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____ **Los Angeles** _____ )

On _**March 30, 2023**_ _____ before me, **Nargiza Babadjanova, Notary Public** _____

(insert name and title of the officer)

personally appeared _**Schad Edward Brannon**_ _____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ **(Seal)**

NARGIZA BABADJANOVA
COMM. # 2308649
LOS ANGELES COUNTY
NOTARY PUBLIC-CALIFORNIA
MY COMMISSION EXPIRES
OCTOBER 13, 2023

## Signature Card for Certificate of Deposit Time Account

| Product: | 366 DAYS | | | | Account #: | ▓0144 |
|---|---|---|---|---|---|---|
| Date: | 02/22/2023 | CEL | Phone: | 801-948-9881 | Account Owner(s) and Mailing Address: | |
| Plan ID#: | | 000 | Phone: | | IGNIS ENERGY LLC | |
| New ☒ | | | CSR: | DLBACKUS | AND OKLAHOMA CORPORATION COMMISSION | |
| Comments: | | | | | OR OKLAHOMA CORPORATION COMMISSION | |
| | | | | | 1812 W SUNSET BLVD STE 1-345 | |
| | | | | | ST GEORGE, UT 84770 | |

The undersigned acknowledges receipt of Bank's Deposit Agreement, Funds Availability Schedule, Electronic Funds Transfer Disclosure, Account Disclosure, and Privacy Disclosure and agrees to their terms. If not signed in the presence of a BancFirst employee, signatures must be notarized on the back of this card.

| | Name | | | | Signature Specimens |
|---|---|---|---|---|---|
| 1. | SCHAD E BRANNON | | | | |
| | ID#: | | Issuer: | | |
| | DOB: | TIN: | | Relationship: LLC Member | |
| 2. | ROYDON B NELSON | | | | |
| | ID#: | | Issuer: | | |
| | DOB: | TIN: | | Relationship: LLC Member | |
| 3. | | | Issuer: | | |
| | ID#: | | | | |
| | DOB: | TIN: | | Relationship: | |
| 4. | | | Issuer: | | |
| | ID#: | | | | |
| | DOB: | TIN: | | Relationship: | |
| 5. | | | Issuer: | | |
| | ID#: | | | | |
| | DOB: | TIN: | | Relationship: | |
| 6. | | | Issuer: | | |
| | ID#: | | | | |
| | DOB: | TIN: | | Relationship: | |
| 7. | | | Issuer: | | |
| | ID#: | | | | |
| | DOB: | TIN: | | Relationship: | |
| 8. | | | Issuer: | | |
| | ID#: | | | | |
| | DOB: | TIN: | | Relationship: | |
| 9. | | | Issuer: | | |
| | ID#: | | | | |
| | DOB: | TIN: | | Relationship: | |
| 10. | | | Issuer: | | |
| | ID#: | | | | |
| | DOB: | TIN: | | Relationship: | |

**Payor's Request for Taxpayer's Identification Number and Certification**     Taxpayer Identification Number: ▓0508

Certification • Under penalties of perjury, I certify that:
(1) The number shown on this form is my correct taxpayer identification number and
(2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.
(3) I am a U.S. Person (including a U.S. resident alien)
Certification Instructions — You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, the acquisition or abandonment of security property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

Signature: _____   Date: 2/23/2023

### Account Term

| Interest Rate: 3.000% | APY: 3.05% | Rate Changer: Y | Opening Deposit: 25,000.00 |
|---|---|---|---|
| Opening Date: 02/22/2023 | Term: 12 Months | Maturity Date: 02/22/2024 | Signatures Required for Withdrawal: 1 |

Deposit Consisting Of:

### Account Options

| • Maturity | • Interest will be paid every 3 months |
|---|---|
| ☐ Single Maturity   ☒ Automatic Renewal | |

| • Interest will be paid by: | ☐ Check | ☐ Add it back to account principal |
|---|---|---|
| ☒ Transfer to checking/savings account #: ▓6294 | R/T #: | Account #: |
| ☐ Transfer to another financial institution: | | ACH trancode: |
| Bank Name: | | |

**THIS ACCOUNT IS NOT NEGOTIABLE AND IS NOT TRANSFERABLE**

BFAO002 (revised July 08)

SEC-MACU-E-0000119

4.       Individuals designated as "Authorized Signers" herein soley for the purpose of conducting deposit and withdrawal transactions shall have no other authority on behalf of the Company, notwithstanding the provisions set forth herein, including, without limitation, the authority to open and close accounts held in the name of the Company.

It is further agreed by the Company that, subject to the provisions contained herein, if indicated, any one person listed below is authorized to:

1)      Open and close the above referenced account in the name of this Company.

2)      Endorse checks, drafts, bills, and other orders for the payment of money and withdraw cash and funds on deposit with BancFirst, and make deposits to the above referenced account on behalf of the Company.

3)      Stop payment of any check, draft, bill, or other order for payment of money on behalf of this Company.

4)      Enter into one or more written lease agreement(s) for the purpose of renting, leasing, and maintaining a Safe Deposit Box at one or more locations at BancFirst.  Number of authorized signatures required for this purpose: 1.

| Name | Title | Signature or Facsimile Signature (if applicable) |
|---|---|---|
| OKLAHOMA CORPORATION COMMISSION | AND | |
| OKLAHOMA CORPORATION COMMISSION | OR | |
| SCHAD E BRANNON | MEMBER | |
| ROYDON B NELSON | MEMBER | |
| | | |
| | | |

D.       The undersigned certify that the genuine signature set opposite the respective name of each of the persons named above is true and correct in all respects.

E.       That this agreement is executed and delivered by the undersigned subsequent to the execution and delivery of the Company Agreement.  If any of the terms and provisions of the Company Agreement are in conflict with, contradict or are inconsistent with the terms and provisions of this agreement, the terms and provisions of this agreement will govern and control, and the Company Agreement is hereby deemed amended insofar as **BancFirst** might now or hereafter be affected.

IN WITNESS WHEREOF, the undersigned Member(s) have executed and delivered this agreement effective this _____ day of

(Majority of Managers/Members unless Operating Agreement states otherwise)

## ACKNOWLEDGEMENT

STATE OF _____ )
                                                        )  SS:
COUNTY OF _____ )

The foregoing instrument was acknowledged before me on this _____ day of _____, _____,

by _____, Member(s) of _____, a limited liability company.

on behalf of said company.

My Commission Expires:

Notary Public _____

_____         Commission Number: _____
             (SEAL)

BFAO025 (revised June 2017)                                                                                     Page 2 of 3

||||||| ||||| ||||| ||| |||| ||||| ||| ||| |||||| ||| |||||| |||||| ||||| ||| ||||| ||||| ||| ||| ||||| |||||| ||||||| ||| |||||| ||||| ||||| |||||| ||||| ||| ||||| |||

### ACKNOWLEDGEMENT

STATE OF _California_       )
                           )    SS:
COUNTY OF _los Angeles_    )

The foregoing instrument was acknowledged before me on this _30_ day of _March_ , _2023_ .
by _Schad Edward Brannon_ Member(s) of _____ , a limited liability company,
on behalf of said company.

My Commission Expires:

_Oct. 13, 2023_

_____                    Notary Public _____
        (SEAL)

                                          Commission Number: _____

---

### ACKNOWLEDGEMENT

STATE OF _____       )
                               )    SS:
COUNTY OF _____      )

The foregoing instrument was acknowledged before me on this _____ day of _____ , _____ .
by _____ , Member(s) of _____ , a limited liability company,
on behalf of said company.

My Commission Expires:

                                          Notary Public _____

_____
        (SEAL)                            Commission Number: _____

---

### ACKNOWLEDGEMENT

STATE OF _____       )
                               )    SS:
COUNTY OF _____      )

The foregoing instrument was acknowledged before me on this _____ day of _____ , _____ .
by _____ , Member(s) of _____ , a limited liability company,
on behalf of said company.

My Commission Expires:

                                          Notary Public _____

_____
        (SEAL)                            Commission Number: _____

BFAO025 (revised June 2017)                                        Page 3 of 3

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ **Los Angeles** _____ )

On ___ **March 30, 2023** ___ before me, **Nargiza Babadjanova, Notary Public**
(insert name and title of the officer)

personally appeared **Schad Edward Brannon**
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____   (Seal)

NARGIZA BABADJANOVA
COMM. # 2308649
LOS ANGELES COUNTY
NOTARY PUBLIC-CALIFORNIA
MY COMMISSION EXPIRES
OCTOBER 13, 2023

Exhibit "6"

| From: | Brandon Stevens |
|---|---|
| To: | Schad Brannon |
| Cc: | Roy Nelson |
| Subject: | RE: Adobe Scan 30 Mar 2023 |
| Date: | Thursday, March 30, 2023 9:10:07 PM |

Schad,

I suspect these may be the signature cards for Bancfirst.  Likely where you are opening the Certificate in Oklahoma, since we could not facilitate the special CD required for Ignis Energy.  All of the accounts that we were working on are open and have sufficient documentation.

Welcome back to country regardless!

**From:** Schad Brannon <schadebrannon@gmail.com>
**Sent:** Thursday, March 30, 2023 6:03 PM
**To:** Brandon Stevens <bstevens@macu.com>
**Cc:** Roy Nelson <roydog.nelson@gmail.com>
**Subject:** Fwd: Adobe Scan 30 Mar 2023

**[ External ]**

Brandon

As promised (see attached) are my notarized signature cards for Ignis Energy.  I just arrived back in the country.

Please let me know what else you or MACU may need.

Many thanks

Schad

---------- Forwarded message ---------
From: **Schad Brannon** <schadebrannon@gmail.com>
Date: Thu, Mar 30, 2023 at 5:58 PM
Subject: Adobe Scan 30 Mar 2023
To: Schad Brannon <schadebrannon@gmail.com>, Roy Nelson <roydog.nelson@gmail.com>

Created and shared using Adobe Scan.
Get the app: https://adobescan.app.link/ds9bLtxaPgb

--

Many thanks,

Schad E. Brannon
Founder/Group Chairman
Cell USA / WHATSAPP: +1 (818) 426-4280
Direct Email:   schadebrannon@gmail.com
Business Email: schad@universaldev.com

| Toll-Free One Number | Pass Code for outside the U.S. |
| --- | --- |
| USA +1 (351) 999-3359 | 329560 |

**Confidentiality Notice:** This email, including attachments, may include non-public, proprietary, confidential, or legally privileged information. If you are not the intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution, or copying of the information contained in or transmitted with this email is unauthorized and strictly prohibited. If you have received this email, in error, please notify the sender by replying to this message and permanently delete this email, its attachments, and any copies of it immediately. You should not retain, copy or use this email, or any attachment for any purpose, nor disclose all or any part of the contents to any other person.



**Brandon Stevens**
*Business Services Portfolio Manager,* Business Services Team
+1 480-992-5216 *tel*
bstevens@macu.com
https://www.macu.com/

Exhibit "7"



**MOUNTAIN AMERICA**
CREDIT UNION

Online Business Banking
Optional Services Analysis

Account # ▮2717

Analyst JAMES WUEST

## General Business Information

| | |
|---|---|
| Business Name | **DIGITAL LICENSING INC** |
| Date of Organization | 3/18/2021 |
| EIN | ▮8670 |
| MACU Open Date | 2/7/2023 |
| 90 Day Average Balance | $ 350,360.54 |
| NSF Activity | ○ Yes ● No |
| Gross Annual Sales Volume | $ 22,168,605.00 |
| Balance Sheet Equity $ | |
| Biz Chex Recommendation | Accept |

☐ Public Entity or Non-Profit Organization
☐ Unacceptable Business for Debits

Other Accts: ▮4754 ▮7865
Path:

Primary Nature/Function of this business — Software Licensing and Management

## Requested Credit Limits

**Single Day Limit**

| | |
|---|---|
| ☐ Payroll | |
| ☑ ACH Credit | $ 400,000 |
| ☑ Domestic Wire | $ 1,200,000 |
| ☑ International Wire | $ 400,000 |

## Requested Debit Limits

| | Single Day Limit | Frequency | 2-Day Return Rate | Unauth Return Rate |
|---|---|---|---|---|
| ☐ ACH Debit | | Daily ▼ | $ 0 | $ 0 |

## Purpose for ACH Origination Services

## Owners, General Partners, Managing Members or Officers

| Name | FICO | Bankruptcy Watch | Credit History Since | Chex-Systems |
|---|---|---|---|---|
| ROYDON NELSON | 750 | 700 | Feb-00 | ☐ Yes, Record |
| | | | | ☐ Yes, Record |
| | | | | ☐ Yes, Record |

## Notes and Comments:

JAKE C IS THE BA

THIS MEMBER IS GOING TO USE ONE ALKAMI USER NAME DigitalLicensing, 2 additional locations
They will have access to ACH PAYMENT AND DOMESTIC WIRES: ▮4754 AND ▮7865
Member will also have Check and ACH Positive Pay added to all 3 accounts.

2/23/2023 5:16 PM



**MOUNTAIN AMERICA**
CREDIT UNION

Online Business Banking
Optional Services  Analysis

Account     ▮2717

Analyst     JAMES WUEST

| Business Name | **DIGITAL LICENSING INC** |
|---|---|
| Date of Organization | 3/18/2021 |
| EIN | ▮8670 |

**Exposure Risk**

| | Expected 60 Day Volume | Total Exposure |
|---|---|---|
| ACH Debit | $ 0 | $ – |

**Calculated Processing Limits**

| | Daily | Monthly |
|---|---|---|
| Payroll | $ – | |
| ACH Credit | $ 400,000 | |
| Domestic Wire | $ 1,200,000 | |
| International Wire | $ 400,000 | |
| ACH Debit | $ – | $ 0 |

**Warnings**

**Additional Requirements**

| Exposure exceeds Balance Sheet Equity | ☐ Check if Req'd by Committee |
|---|---|
| | ☐ Check if Req'd by Committee |
| | ☐ Check if Req'd by Committee |
| | ☐ Check if Req'd by Committee |
| | ☐ Check if Req'd by Committee |

**This application requires ONE signature**

DocuSigned by:

*James Wuest*

2/23/2023

Business Services Signature      Date

**Approved Processing Limits**

Daily Payroll Limit

Daily ACH Credit Limit     $400,000.00

Daily Domestic Wire Limit     $1,200,000.00

Daily Int'l Wire Limit     $400,000.00

Monthly ACH Debit Limit

2/23/2023 5:16 PM



**MOUNTAIN AMERICA**
CREDIT UNION

Business Services Cash
Management Application

## I. GENERAL BUSINESS/ORGANIZATION INFORMATION
(Please print in black ink or type)

Business/Organization Name DIGITAL LICENSING INC       Email Address ROYDOG.NELSON@GMAIL.COM

DBA Name (for LLCs or Corporations using different DBA name than listed above)

_____  Business TIN (SSN/EIN) ____3670

Street Address 1812 W SUNSET BLVD STE 1-345  City ST GEORGE        State UT    Zip 84770

Mailing Address (if different) _____  Office Phone ( 801 ) 946-9881

What is the primary nature (function) of this business? SOFTWARE LICENSING AND MANAGEMENT  Date of Organization 03 / 18 / 2021

Self-Certification: Each person certifies that the previous years Annual Gross Sales for this company were $ 22,168,605
This business/organization has a # 0 of employees, and is a (check one) [X] Wholesale Retail/Service [ ] Construction/Real
Estate [ ] Manufacturing [ ] Non Profit

### I.a. Owner(s), General Partner(s), Managing Member(s), or Officer(s)

1) First Name ROYDON       M.I. _____ Last Name NELSON       SSN 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    DOB 09 / 13 / 72

Title SECRETARY            Years of experience 25

Residence Address 1615 NORTH RAVEN LANE        City ST GEORGE       State UT    Zip 84770

Phone ( 801 ) 946-9881

2) 1) First Name _____ M.I. _____ Last Name _____ SSN _____ DOB ___/___/___

Title _____ Years of experience _____

Residence Address _____ City _____ State _____ Zip _____

Phone ( _____ ) _____

## II. ADDITIONAL SERVICES REQUESTED (check all that apply)
[ ] ACH Payroll [✓] ACH Payments [ ] ACH Receipts [✓] Domestic Wires [✓] Intl Wires [ ] Check Positive Pay - Basic
[X] Check Positive Pay [X] ACH Positive Pay [ ] Remote Deposit [ ] Sweep [ ] ZBA [ ] Mobile Remote Deposit

## IV. AGREEMENT AND CERTIFICATION
Each person signing below certifies that such person is at least eighteen (18) years of age, and is additionally an owner, shareholder, officer, director, member, manager, or partner of the Company with the authority to bind the Company to the terms of the Cash Management Services Agreement or other similar documents. Each of such persons certifies that the information provided on this application is true and correct and authorizes Mountain America Federal Credit Union ("Credit Union") to obtain business and consumer credit bureau reports about the Company and such person in connection with increases and extensions of processing limits or the review of Company's processing limits. If any of the persons signing below asks for such information in writing, Credit Union will provide the name and address of each credit bureau from which Credit Union obtained credit reports. A Cash Management Services Agreement has been provided, online at www.business.macu.com, with respect to using the Cash Management Services. Each person signing below acknowledges reading such agreement, including provisions relating to potential liability.

Security Features: Mountain America Federal Credit Union offers additional security to protect your company from fraudulent transactions. We recommend implementing these features including dual authorization on ACH and Wires. Full access to these functions are available in the Business Admin menu of online banking. Please initial to certify you understand that these features are available and that the Credit Union recommends activating them ___.

DocuSigned by:

ROYDON NELSON    2/21/2023
1) Signature (corresponds to person # 1)    Date       2) Signature (corresponds to person # 2)    Date

Settlement Account Number [REDACTED]2717

## Business Services Cash Management Application (continued)

If you have previously originated ACH transactions with another institution, please
provide the originator ID you used with them. _____ .

**Request for Additional Information**

If you process files for companies other than your own you are a Third Party Sender/Processor. There are additional
requirements for TPS processing with MACU. Are you a Third Party Sender/Processor? ☐ Yes ☑ No

### For ACH Services:
How often will the company transmit **payroll** from the company account?
☐ Weekly, ☐ Bi-Weekly ☐ Monthly
Please specify the required single entry, and daily payroll processing limit requested.
$ _____ (Entry)$ _____ (Daily)

Please describe the purpose for ACH Payments or Receipts Origination. (What does the company plan to
do with the service?) Vendor and Machine purchases for business, other misc payments as needed. PPD and CCD payments

Please specify the required single entry, and daily, **payments** processing limit requested.
$ 100,000 (Entry)$ 100,000 (Daily)
Please specify the required single entry, and daily, **receipts** processing limit requested.
$ _____ (Entry)$ _____ (Daily) for PPD receipts only $_____ (Monthly)

### For Domestic Wire Transfer Services:
Please specify the maximum daily wire limit requested.
$ 400,000 (Daily)
### For International Wire Transfer Services:
Please specify the maximum daily wire limit requested.
$ 400,000 (Daily)

### For Positive Pay Service:
Exception processing must be performed daily before 11:00 AM MT. Will a designated person be available
each day to perform the required exception process? ☒ Yes ☐ No

Please confirm that your accounting software is capable of exporting your issued check numbers, and
amounts or that you are willing to utilize the system to input the items. ☒ Yes ☐ No (**Issue files not
required for Basic).**

### For Remote Deposit:
Has another financial institution involuntarily cancelled or denied remote deposit
capture services for your company? ☐ No ☐ Yes

What is the average number of checks deposited per day by this company? _____

What is the average daily deposit? $ _____ .

What is the average dollar amount per check deposited? $_____ .

How many business locations are maintained by this company? _____ .

Is this business a home based business? ☐ No ☐ Yes

For Businesses operating an internet website: What is your company Universal Resource Locator (URL)
website address? _____ .

**DocuSign**

### Certificate Of Completion

Envelope Id: 3D2D8F03E64049B19821AE830B534A39                                    Status: Completed
Subject: Complete with DocuSign: Cash Management Applications - TGC, DLI, Ignis
Source Envelope:
Document Pages: 38                    Signatures: 4                              Envelope Originator:
Certificate Pages: 5                  Initials: 3                               Brandon Stevens
AutoNav: Enabled                                                                bstevens@macu.com
EnvelopeId Stamping: Enabled                                                    IP Address: 63.228.212.200
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

### Record Tracking

Status: Original                      Holder: Brandon Stevens                   Location: DocuSign
    2/14/2023 4:02:37 PM                  bstevens@macu.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| ROYDON NELSON | *ROYDON NELSON* (DocuSigned by, D2ECADDE95A040B...) | Sent: 2/14/2023 4:16:04 PM |
| ROYDOG.NELSON@GMAIL.COM | | Resent: 2/21/2023 8:40:29 AM |
| Security Level: Email, Account Authentication (None), Access Code | Signature Adoption: Pre-selected Style Using IP Address: 12.207.176.4 | Viewed: 2/21/2023 10:31:35 AM |
| | | Signed: 2/21/2023 10:40:53 AM |

**Electronic Record and Signature Disclosure:**
    Accepted: 2/14/2023 9:38:07 PM
    ID: c1c26970-683b-426c-8985-d2d2916ba974

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Jake Carlen | **COPIED** | Sent: 2/14/2023 4:16:04 PM |
| jcarlen@macu.com | | |
| BAE | | |
| Mountain America Credit Union | | |
| Security Level: Email, Account Authentication (None) | | |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/14/2023 4:16:04 PM |
| Envelope Updated | Security Checked | 2/15/2023 9:15:19 AM |
| Envelope Updated | Security Checked | 2/15/2023 9:15:19 AM |
| Certified Delivered | Security Checked | 2/21/2023 10:31:35 AM |
| Signing Complete | Security Checked | 2/21/2023 10:40:53 AM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 2/21/2023 10:40:53 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**



**MOUNTAIN AMERICA**
CREDIT UNION

**Account Number**  ▮2717

**Account Exec**  JAKE CARLEN

**Business Name**  DIGITAL LICENSING INC

Have you been out to the member's location of business?  ◯ **Yes**   ◯ **No**

Please describe the nature of the business.

Digital Licensing Inc is the permissioned administrator and software licensing management that works to digitize physical commodities.

**Explain why you feel this company should receive the limit applied for. (Members Story)**
**Note any significant differences between limit requested and past account transaction activity**

BUSINESS MOVED FROM ZIONS BANK.  BUSINESS WILL BE USING ACH AND WIRES TO PURCHASE SOFTWARE, MACHINERY, FUND ADDITIONAL PROJECTS, AND PAY CONTRACTORS.  ACH PAYMENTS UP TO $100K WILL OCCUR OCCASIONALLY, AND LARGE WIRES FOR MACHINERY.

Revenues are primarily generated through the sales and management of software licenses. This company frequently interacts with The Gold Collective, Business Funding Solutions (a sales and marketing company), Blox (a commercial lending organization) and Menxons (a joint venture partner in Africa).

ALKAMI: DigitalLicensing
ADDITIONAL LOCATIONS without international wires: ▮4754 and ▮7865

**Additional information that isn't included in the application**
**Who will we be contacting for training?**

TRAINING WILL BE WITH ROY NELSON

# BizChex Response

**Business:**
DIGITAL LICENSING INC
30 N GOULD ST STE N, SHERIDAN, WY 82801
Federal Tax ID: ▓▓7867

**Principal / Owner:**
ROYDON NELSON
1615 NORTH RAVEN LANE, ST GEORGE, UT 84770
SSN / ITIN: XXX-XX-XXXX

**Identity Risk Summary Response**

|  | **CIP** | **OFAC** |
|---|---|---|
| **Business Entity** | Partially Verified | Not Available |

| **Business Entity Input Data** |  | **Verified Data** |
|---|---|---|
| **Federal tax ID** | ▓▓7867 | X |
| **Business name** | DIGITAL LICENSING INC | ✓ |
| **Address** | 30 N GOULD ST STE N | ✓ |
| **City** | SHERIDAN | ✓ |
| **State** | WY - Wyoming | ✓ |
| **Postal code** | 82801 | ✓ |
| **Phone number** |  |  |
| **Country** |  |  |
| **OFAC Watch** |  | NA |

| **Supplemental Data Found** |
|---|
| Alternative business information found: |
| DIGITAL LICENSING, INC.<br>30 N GOULD ST STE N<br>SHERIDAN, WY 82801-6362<br>Phone number: (864) 256-7337 |

|  | **CIP** | **OFAC** |
|---|---|---|
| **Principal / Owner** | Not Available | Not Available |

**Behavioral Risk Summary Response**

**Recommended Decision:**   **Accept**

**Recommended Actions:**

LOW BEHAVIORAL RISK
FOR BUSINESS ENTITY
SOS STATUS IS ACTIVE
*****
Note: Business was verified
on multiple public records.

**Recommended Product Offers:**

| Product | Limits | A.P.R. |
|---|---|---|
| OPEN ACCOUNT |  |  |

**BizChex Score and Reason Codes**

**Business Behavioral Risk Score:**   **722**

| HIGH RISK | ... | MODERATE RISK | ... | LOW RISK | ... | UNKNOWN |
|---|---|---|---|---|---|---|

**Reason Codes:**

**P7** PUBLIC RECORD TIME AT BUSINESS INQUIRY ADDRESS

**P4** PUBLIC RECORD LOCATION ON BUSINESS

**View Business Report and Event Summary**

## Business Report Summary

**Date first seen on public record:**                          04/01/2021

DIGITAL LICENSING, INC.

**Secretary of State (SOS) filing name:**

Secretary of State (SOS) filing name:

Principal / owner relationship to the business: Principal is found in the Business contact data

Standard Industrial Classification (SIC) code: 7389
SIC industry description: Business Services, Nec

North American Industry Classification System (NAICS) code: 541511
NAICS industry description: Custom Computer Programming Services

Business phone number alerts:

Business address alerts: HARDSET, DESK AND OFFICE RENTAL

Business private hot list alert match(es):

## Business Event Summary

**Business Demand Deposit Account (DDA) Inquiries**
No data found

**Business Demand Deposit Account (DDA) Closures**
No data found

**Business Demand Deposit Account (DDA) Purchased Debt**
No data found

**Business Check Printing History**
No data found

**View Additional Business Entity Details**

**Business Demand Deposit Account (DDA) Inquiries**
No business demand deposit account inquiries found

**Business Demand Deposit Account (DDA) Closures**
No business demand deposit account closures found

**Business Demand Deposit Account (DDA) Purchased Debt**
No business demand deposit account purchased debt found

**Business Check Printing History**
No business demand deposit account check printing data found

**Special Messages**

Government Number Validation Message:   Invalid IRS Match

**BizChex Strategy Reference Codes**

A0100002A0100003AC100001

**Reference Details**

| | | | |
|---|---|---|---|
| Date and Time of Transaction: | 02/23/2023 @ 16:42 | Strategy Type ID: | BZ001 |
| BizChex Reference Number: | 3011 | User ID: | CHENINGER@MACU.COM |
| FIS Transaction Tracking ID: | 1325 | Inquiry ID: | 6815 |
| Third Party Tracking ID: | 7064 | | |

| | | | |
|---|---|---|---|
| Business OFAC Reference #: | | Customer ID: | 4739 |

| | | |
|---|---|---|
| Principal / Owner OFAC Reference #: | | Principal / Owner IDV Reference #: |

**Important Disclosure Information**

This service is for identity verification purposes only, as required by the USA Patriot Act of 2001, and is not intended to be a consumer report as defined in the Fair Credit Reporting Act, 15 USC section 1681 et seq. (FCRA). The scores and other information provided with this service may not be used as a factor in establishing a consumer's

eligibility for credit, insurance, employment or any other purposes identified under the FCRA. Furthermore, the information provided may not be used to take adverse action, as defined in the FCRA, with respect to any consumer.



## MOUNTAIN AMERICA
### CREDIT UNION

# <u>Verification Of Deposit</u>

Mountain America Credit Union
9800 S Monroe Street
Sandy, UT 84070
(801) 325-6228 * (800) 310-6225

Account Number: 2717

Account Holders: Digital Licensing Inc (Primary)

Roydon Nelson

Schad E Brannon

Roydon Nelson

| Share ID | Description | Open Date | Current Balance | 90 Day Avg Balance | Current Interest Rate |
|---|---|---|---|---|---|
| 01 | Dli Savings | 02/07/2023 | $ 1,001.00 | $ 133.50 | 000.050% |
| 07 | Dli Money Market | 02/09/2023 | $ 750,000.00 | $ 93,533.26 | 003.200% |
| 50 | Dli Checking | 02/07/2023 | $ 1,060,181.41 | $ 256,693.78 | 000.000% |

| Loan ID | Description | Current Balance | Current Payment | Original Balance | Deq Hist | Open Date | Current Interest Rate |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Dated: 02/23/2023 03:49 PM

Caitlyn Heninger

# STATE OF WYOMING ∗ SECRETARY OF STATE
# BUSINESS DIVISION

Herschler Bldg East, Ste.100 & 101, Cheyenne, WY 82002-0020
Phone: 307-777-7311 · Website: https://sos.wyo.gov · Email: business@wyo.gov

## Filing Information

 **Please note that this form CANNOT be submitted in place of your Annual Report.**

| Name | **Digital Licensing, Inc.** | | | |
|---|---|---|---|---|
| **Filing ID** | **2021-000989687** | | | |
| Type | Profit Corporation | | Status | Active |

## General Information

| | | Sub Status | Current |
|---|---|---|---|
| Old Name | | Standing - Tax | Good |
| Fictitious Name | | Standing - RA | Good |
| | | Standing - Other | Good |
| Sub Type | | | |
| Formed in | Wyoming | Filing Date | 03/18/2021 4:39 PM |
| Term of Duration | Perpetual | Delayed Effective Date | |
| | | Inactive Date | |

### Share Information

| Common Shares | 1,000 | Preferred Shares | 0 | Additional Stock | N |
|---|---|---|---|---|---|
| Par Value | 0.0100 | Par Value | 0.0000 | | |

### Principal Address

30 N Gould St
Ste N
Sheridan, WY 82801

### Mailing Address

30 N Gould St
Ste N
Sheridan, WY 82801

### Registered Agent Address

Northwest Registered Agent Service Inc
30 N Gould St Ste N
Sheridan, WY 82801

### Parties

| Type | Name / Organization / Address |
|---|---|
| Incorporator | Northwest Registered Agent Service, Inc. 30 N Gould St Ste N, Sheridan, WY 82801 |

### Notes

| Date | Recorded By | Note |
|---|---|---|

# Filing Information

 **Please note that this form CANNOT be submitted in place of your Annual Report.**

| Name | **Digital Licensing, Inc.** | | | |
|---|---|---|---|---|
| **Filing ID** | **2021-000989687** | | | |
| Type | Profit Corporation | | Status | Active |

## Most Recent Annual Report Information

| Type | Original | | | AR Year | 2023 |
|---|---|---|---|---|---|
| License Tax | $60.00 | AR Exempt | N | AR ID | 07929283 |
| AR Date | 12/9/2022 11:39 AM | | | | |
| Web Filed | Y | | | | |

**Officers / Directors**

| Type | Name / Organization / Address |
|---|---|
| Director | Roy Nelson  1812 W. Sunset Blvd, #1-345 St. Georg, Utah United States 84770 |
| President | Schad Brannon  1812 W. Sunset Blvd. Suite 1-345 St. George, Utah United States 84770 |
| Secretary | Roy Nelson  1812 W. Sunset Blvd, #1-345 St. Georg, Utah United States 84770 |
| Treasurer | Roy Nelson  1812 W. Sunset Blvd, #1-345 St. Georg, Utah United States 84770 |

**Principal Address**

30 N Gould St
Ste N
Sheridan, WY 82801

**Mailing Address**

30 N Gould St
Ste N
Sheridan, WY 82801

## Annual Report History

| Num | Status | Date | Year | Tax |
|---|---|---|---|---|
| 07053237 | Original | 02/01/2022 | 2022 | $60.00 |
| 07929283 | Original | 12/09/2022 | 2023 | $60.00 |

## Amendment History

| ID | Description | Date |
|---|---|---|
| See Filing ID | Initial Filing | 03/18/2021 |

## ChexSystems<sup>SM</sup> Suite Response

Consumer Information Response - Episys Account #█████2717 - Request #1

=================================================================================
Consumer Information (As Entered)
=================================================================================

ROYDON  NELSON                            SSN/ITIN: ████████0396
1615 NORTH RAVEN LANE                     DOB: 09/13/1972
ST GEORGE UT 84770                        DL#: 152627126
                                          DL STATE: UT

Home Phone: (801)946-9881
Country:

=================================================================================
Account Actions
=================================================================================

Action:                      ACCEPT
Recommended Actions:                      OPEN ACCOUNT
                                          TRI-BUREAU ID THEFT ALERT
                                          NOT FOUND

=================================================================================
QualiFile Detail
=================================================================================
                                          Code    Text
Qualifile Score: 0587        Reason:      AW      ASSET OWNERSHIP HISTORY
                                          AG      TIME SINCE NON-DDA INQUIRY ACTIVITY
                                          AO      NON-DDA INQUIRY OR RETAIL ITEM HISTORY
                                          AB      DDA HISTORY

=================================================================================
Non FCRA
=================================================================================

   Identification Information

     SSN Validation: BECAME AVAILABLE FOR ISSUANCE IN 1987 IN AL            SSN:Y

     DL Format: VALID DRIVERS LICENSE FORMAT

=================================================================================
ChexSystems History
=================================================================================

Total Closures:         0        Total Purchased Debt:      0
  Disputed:             0          Disputed:                0
  Paid:                 0          Paid:                    0
  Unpaid:               0          Unpaid:                  0
  Partially Paid:       0          Partially Paid:          0
  Sold:                 0          Sold:                    0

Retail: NOTE * THERE IS NO RETAIL INDICATOR

=================================================================================
Closure Details
=================================================================================
No Closures Found

=================================================================================
Purchased Debt Details
=================================================================================
No Purchased Debt Found

=================================================================================
DDA Inquiry Details
=================================================================================

```
Total Number of Inquiries:          4      Number of Inquiring FI's:   3

Inquiry Date       Consumer Name            Inquirer Name
======================================================================================
02/10/2023         ROYDON  NELSON           MOUNTAIN AMERICA CREDIT UNION
01/27/2023         ROYDON  NELSON           MOUNTAIN AMERICA CREDIT UNION
07/12/2022         ROYDON B NELSON          SIGNATURE BANK
11/23/2021         ROYDON  NELSON           MOUNTAIN AMERICA CREDIT UNION


--------------------------------------------------------------------------------------
Inquiry 1 of 4

Inquiry Date :02/10/2023                    Inquiry ID:    4381
INQUIRY PERFORMED BY                        CONSUMER INQUIRED UPON
MOUNTAIN AMERICA CREDIT UNION                   0396
ONLINE BANKING                              ROYDON  NELSON
735 S STATE STREET #300                     1615 N RAVEN LN
SALT LAKE CITY, UT  84111                   ST GEORGE, UT 84770-6159


Inquiry 2 of 4

Inquiry Date :01/27/2023                    Inquiry ID:    8590
INQUIRY PERFORMED BY                        CONSUMER INQUIRED UPON
MOUNTAIN AMERICA CREDIT UNION                   0396
ONLINE BANKING                              ROYDON  NELSON
735 S STATE STREET #300                     1615 N RAVEN LN
SALT LAKE CITY, UT  84111                   ST GEORGE, UT 84770-6159


Inquiry 3 of 4

Inquiry Date :07/12/2022                    Inquiry ID:    2703
INQUIRY PERFORMED BY                        CONSUMER INQUIRED UPON
SIGNATURE BANK                                  0396
PRIVATE CLIENT GROUP #293                   ROYDON B NELSON
68 S SERVICE RD                             1615 N RAVEN LN
MELVILLE, NY  11747                         ST GEORGE, UT 84770-6159


Inquiry 4 of 4

Inquiry Date :11/23/2021                    Inquiry ID:    5905
INQUIRY PERFORMED BY                        CONSUMER INQUIRED UPON
MOUNTAIN AMERICA CREDIT UNION                   0396
ST GEORGE SUNSET BLVD #76                   ROYDON  NELSON
2104 WEST SUNSET BLVD                       1615 N RAVEN LN
SAINT GEORGE, UT  84770                     ST GEORGE, UT 84770-6159


======================================================================================
Inquiry ID
======================================================================================
    4080

======================================================================================
Reference Detail
======================================================================================
Debit Bureau Reference#:                        6674
Transaction Tracking ID:                    1677191886260:79282:BDC1RNARDISAP05.FNFIS.COM:
Location ID:                                4266

--------------------------------------------------------------------------------------
IMPORTANT INFORMATION FOR CONSUMER REPORT & IDENTITY VERIFICATION SERVICES
======================================================================================
```

This consumer/business data is being furnished in connection with a transaction initiated by the
consumer, and / or in accordance with the written instructions of the consumer, to whom the information
relates as provided for under the federal Fair Credit Reporting Act (FCRA) or the Gramm Leach Bliley
Act (GLBA); or is being used in connection with account review as provided for under the FCRA. The data
contained in this report may be viewed or printed for no other purpose.  Information returned in
Consumer Report services may not be viewed or printed in connection with making a pre-approved firm
offer of credit (prescreen).

DocuSign Envelope ID: 131B40DE-E161-40F5-9009-B24599A626F8

All services are provided by Chex Systems, Inc. or Penley, Inc., indirect wholly-owned subsidiaries of
Fidelity National Information Services, Inc

DocuSign Envelope ID: 2A1B40D5-E461-4955-8090-B34599A628F8

Accounts:
2717
4754
7865



**MOUNTAIN AMERICA**
CREDIT UNION

"Check and ACH Positive Pay" Subscriber Agreement

Check Positive Pay is an optional add on service available to Mountain America Credit Union (hereafter referred to as Credit Union) business members (hereafter Subscribers). By signing this agreement Subscribers agree to all terms within this agreement, which will also be governed by the Membership Agreement. All terms not defined in this Agreement shall use the definitions included in the Membership Agreement. The Membership Agreement shall be controlling should any terms between the two Agreements be in conflict.

Subscribers will access the system through a secure link and credentials provided once the service is applied for and approved. Subscribers hereby consent to receive text messages regarding the Check Positive Pay and to allow for these services. Subscribers may opt out of this Messaging Service by calling 801-325-6504 and choosing email as their preferred option. OTHER CHARGES MAY APPLY for this service, in particular standard SMS Message rates from your cellular carrier. Should Subscribers have any questions they may reach the Credit Union's Customer Service at 801-325-6504 or 888-845-1850. Subscribers may opt for email notifications in lieu of SMS.

The system will provide an interface allowing uploading and/or inputting through templates on the service, issued and voided checks. The system will maintain a database of these issued/voided items. Each business day the Credit Union will match the posted checks for the day against the Subscriber provided database of issue/voided items. Items that do not match, i.e. serial number and/or amount, will be listed as an exception. The Subscriber will receive an email or text message notifying them that they have exceptions to review. The Subscriber will be expected to perform this review by the time listed in the accompanying table. The review will include making pay or return decisions on the exception items. Should the review not be completed by the prescribed time then the exception items will be returned or paid based on the default selected in this agreement. The Subscriber will be responsible for contacting payees on items that were legitimately issued and returned. This may require a new check be issued and could cause not only fees for the Subscriber, but also for the payee on the legitimate check.

Exception items will create a fee for the participating Subscriber as per the Cash Management Fee Schedule.

Default selection: ☐ Pay  ☑ Return

ACH (Automated Clearing House) Positive Pay is an optional service available to Credit Union Subscribers.
Subscribers will access the system through a secure link and credentials provided once the service is applied for and approved.

The system will provide an interface allowing review of any ACH debits posted to the account during the last two posting windows of the previous day and the morning posting window of the current day. The

system will compare the incoming ACH transactions against a white listed data base of approved merchants (allowed by the Subscriber to debit the Subscribers business account). The Subscriber will receive an email or text notifying them if there are ACH transactions that do not match against the approved white listed recipients. The Subscriber will then be required to log into the system and determine if the recipient has been authorized. If they have been authorized the Subscriber will be able to add the recipient to the white list for future transactions and confirm payment of the item. If they have not authorized the recipient, then the Subscriber will have the opportunity to submit a return for the items.

Subscribers hereby agree that they are responsible for the accuracy of all data entered into the system. Subscribers hereby agree that they will promptly notify the Credit Union of any error in the data. Subscribers shall abide by all policies, requirements and restrictions of The NACHA Operating Rules and Guidelines, which may be found at https://www.achrulesonline.org/. To fail to do so shall be considered a material breach of this agreement and Subscriber shall be liable for any damages of the Credit Union. These policies may change and any such change shall be communicated to Subscriber through the Messaging system. All substantial changes to this service will be similarly communicated to Subscriber through the Messaging system.

Subscribers hereby agree to indemnify and hold harmless Credit Union for any claims under this Agreement. In the event of any suit under this Agreement the prevailing party shall be held responsible for any costs or reasonable attorney's fees of the non-prevailing party.

Exception items will create a fee for the Subscriber as per the Cash Management Fee Schedule.

DocuSigned by:

*ROUDON NELSON*

Accepted by: Principal for Company

| Check Posting and Cutoff Times | | |
|---|---|---|
| Day | Check transactions available | Exception Input Due |
| Monday | 6:00 AM | 11:00 AM |
| Tuesday | 6:00 AM | 11:00 AM |
| Wednesday | 6:00 AM | 11:00 AM |
| Thursday | 6:00 AM | 11:00 AM |
| Friday | 6:00 AM | 11:00 AM |

| ACH Posting and Cutoff Times | | |
|---|---|---|
| Day | ACH Posting Windows | Exception Input Due |
| Monday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Tuesday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Wednesday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Thursday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Friday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |

No processing on Federal Reserve holidays
All times Mountain Time

Accounts:
2717
4754
7865





**MOUNTAIN AMERICA**
CREDIT UNION

"Check and ACH Positive Pay" Subscriber Agreement

Check Positive Pay is an optional add on service available to Mountain America Credit Union (hereafter referred to as Credit Union) business members (hereafter Subscribers). By signing this agreement Subscribers agree to all terms within this agreement, which will also be governed by the Membership Agreement. All terms not defined in this Agreement shall use the definitions included in the Membership Agreement. The Membership Agreement shall be controlling should any terms between the two Agreements be in conflict.

Subscribers will access the system through a secure link and credentials provided once the service is applied for and approved. Subscribers hereby consent to receive text messages regarding the Check Positive Pay and to allow for these services. Subscribers may opt out of this Messaging Service by calling 801-325-6504 and choosing email as their preferred option. OTHER CHARGES MAY APPLY for this service, in particular standard SMS Message rates from your cellular carrier. Should Subscribers have any questions they may reach the Credit Union's Customer Service at 801-325-6504 or 888-845-1850. Subscribers may opt for email notifications in lieu of SMS.

The system will provide an interface allowing uploading and/or inputting through templates on the service, issued and voided checks. The system will maintain a database of these issued/voided items. Each business day the Credit Union will match the posted checks for the day against the Subscriber provided database of issue/voided items. Items that do not match, i.e. serial number and/or amount, will be listed as an exception. The Subscriber will receive an email or text message notifying them that they have exceptions to review. The Subscriber will be expected to perform this review by the time listed in the accompanying table. The review will include making pay or return decisions on the exception items. Should the review not be completed by the prescribed time then the exception items will be returned or paid based on the default selected in this agreement. The Subscriber will be responsible for contacting payees on items that were legitimately issued and returned. This may require a new check be issued and could cause not only fees for the Subscriber, but also for the payee on the legitimate check.

Exception items will create a fee for the participating Subscriber as per the Cash Management Fee Schedule.

Default selection: ☐ Pay ☑ Return

ACH (Automated Clearing House) Positive Pay is an optional service available to Credit Union Subscribers.
Subscribers will access the system through a secure link and credentials provided once the service is applied for and approved.

The system will provide an interface allowing review of any ACH debits posted to the account during the last two posting windows of the previous day and the morning posting window of the current day. The

system will compare the incoming ACH transactions against a white listed data base of approved merchants (allowed by the Subscriber to debit the Subscribers business account). The Subscriber will receive an email or text notifying them if there are ACH transactions that do not match against the approved white listed recipients. The Subscriber will then be required to log into the system and determine if the recipient has been authorized. If they have been authorized the Subscriber will be able to add the recipient to the white list for future transactions and confirm payment of the item. If they have not authorized the recipient, then the Subscriber will have the opportunity to submit a return for the items.

Subscribers hereby agree that they are responsible for the accuracy of all data entered into the system. Subscribers hereby agree that they will promptly notify the Credit Union of any error in the data. Subscribers shall abide by all policies, requirements and restrictions of The NACHA Operating Rules and Guidelines, which may be found at https://www.achrulesonline.org/. To fail to do so shall be considered a material breach of this agreement and Subscriber shall be liable for any damages of the Credit Union. These policies may change and any such change shall be communicated to Subscriber through the Messaging system. All substantial changes to this service will be similarly communicated to Subscriber through the Messaging system.

Subscribers hereby agree to indemnify and hold harmless Credit Union for any claims under this Agreement. In the event of any suit under this Agreement the prevailing party shall be held responsible for any costs or reasonable attorney's fees of the non-prevailing party.

Exception items will create a fee for the Subscriber as per the Cash Management Fee Schedule.

DocuSigned by:

*ROYDON NELSON*

Accepted by: Principal for Company

| Check Posting and Cutoff Times | | |
|---|---|---|
| Day | Check transactions available | Exception Input Due |
| Monday | 6:00 AM | 11:00 AM |
| Tuesday | 6:00 AM | 11:00 AM |
| Wednesday | 6:00 AM | 11:00 AM |
| Thursday | 6:00 AM | 11:00 AM |
| Friday | 6:00 AM | 11:00 AM |

| ACH Posting and Cutoff Times | | |
|---|---|---|
| Day | ACH Posting Windows | Exception Input Due |
| Monday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Tuesday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Wednesday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Thursday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Friday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |

No processing on Federal Reserve holidays
All times Mountain Time

Accounts:
2717
4754
7865





"Check and ACH Positive Pay" Subscriber Agreement

Check Positive Pay is an optional add on service available to Mountain America Credit Union (hereafter referred to as Credit Union) business members (hereafter Subscribers). By signing this agreement Subscribers agree to all terms within this agreement, which will also be governed by the Membership Agreement. All terms not defined in this Agreement shall use the definitions included in the Membership Agreement. The Membership Agreement shall be controlling should any terms between the two Agreements be in conflict.

Subscribers will access the system through a secure link and credentials provided once the service is applied for and approved. Subscribers hereby consent to receive text messages regarding the Check Positive Pay and to allow for these services. Subscribers may opt out of this Messaging Service by calling 801-325-6504 and choosing email as their preferred option. OTHER CHARGES MAY APPLY for this service, in particular standard SMS Message rates from your cellular carrier. Should Subscribers have any questions they may reach the Credit Union's Customer Service at 801-325-6504 or 888-845-1850. Subscribers may opt for email notifications in lieu of SMS.

The system will provide an interface allowing uploading and/or inputting through templates on the service, issued and voided checks. The system will maintain a database of these issued/voided items. Each business day the Credit Union will match the posted checks for the day against the Subscriber provided database of issue/voided items. Items that do not match, i.e. serial number and/or amount, will be listed as an exception. The Subscriber will receive an email or text message notifying them that they have exceptions to review. The Subscriber will be expected to perform this review by the time listed in the accompanying table. The review will include making pay or return decisions on the exception items. Should the review not be completed by the prescribed time then the exception items will be returned or paid based on the default selected in this agreement. The Subscriber will be responsible for contacting payees on items that were legitimately issued and returned. This may require a new check be issued and could cause not only fees for the Subscriber, but also for the payee on the legitimate check.

Exception items will create a fee for the participating Subscriber as per the Cash Management Fee Schedule.

Default selection: [ ] Pay  [✓] Return

ACH (Automated Clearing House) Positive Pay is an optional service available to Credit Union Subscribers.
Subscribers will access the system through a secure link and credentials provided once the service is applied for and approved.

The system will provide an interface allowing review of any ACH debits posted to the account during the last two posting windows of the previous day and the morning posting window of the current day. The

DocuSign Envelope ID: 231B40D5-E461-4955-8093-B345991628F8

system will compare the incoming ACH transactions against a white listed data base of approved merchants (allowed by the Subscriber to debit the Subscribers business account). The Subscriber will receive an email or text notifying them if there are ACH transactions that do not match against the approved white listed recipients. The Subscriber will then be required to log into the system and determine if the recipient has been authorized. If they have been authorized the Subscriber will be able to add the recipient to the white list for future transactions and confirm payment of the item. If they have not authorized the recipient, then the Subscriber will have the opportunity to submit a return for the items.

Subscribers hereby agree that they are responsible for the accuracy of all data entered into the system. Subscribers hereby agree that they will promptly notify the Credit Union of any error in the data. Subscribers shall abide by all policies, requirements and restrictions of The NACHA Operating Rules and Guidelines, which may be found at https://www.achrulesonline.org/. To fail to do so shall be considered a material breach of this agreement and Subscriber shall be liable for any damages of the Credit Union. These policies may change and any such change shall be communicated to Subscriber through the Messaging system. All substantial changes to this service will be similarly communicated to Subscriber through the Messaging system.

Subscribers hereby agree to indemnify and hold harmless Credit Union for any claims under this Agreement. In the event of any suit under this Agreement the prevailing party shall be held responsible for any costs or reasonable attorney's fees of the non-prevailing party.

Exception items will create a fee for the Subscriber as per the Cash Management Fee Schedule.

DocuSigned by:

*ROYDON NELSON*

Accepted by: Principal for Company

| Check Posting and Cutoff Times | | |
| --- | --- | --- |
| Day | Check transactions available | Exception Input Due |
| Monday | 6:00 AM | 11:00 AM |
| Tuesday | 6:00 AM | 11:00 AM |
| Wednesday | 6:00 AM | 11:00 AM |
| Thursday | 6:00 AM | 11:00 AM |
| Friday | 6:00 AM | 11:00 AM |

| ACH Posting and Cutoff Times | | |
| --- | --- | --- |
| Day | ACH Posting Windows | Exception Input Due |
| Monday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Tuesday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Wednesday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Thursday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |
| Friday | 7:00, 11:00 AM, 3:00, 5:00 PM | 11:00 AM |

No processing on Federal Reserve holidays
All times Mountain Time

## James Wuest

| | |
|---|---|
| **From:** | Mountain America Credit Union |
| **Sent:** | Wednesday, February 22, 2023 10:54 AM |
| **To:** | James Wuest |
| **Subject:** | FW: DLI, TGC, IGNIS - CM APPLICATIONS |
| **Attachments:** | FULL CM APP - DLI.pdf; FULL CM APP - IGNIS.pdf; FULL CM APP - TGC.pdf |

**From:** Brandon Stevens <bstevens@macu.com>
**Sent:** Wednesday, February 22, 2023 10:12 AM
**To:** Mountain America Credit Union <business@macu.com>
**Cc:** Jake Carlen <jcarlen@macu.com>
**Subject:** DLI, TGC, IGNIS - CM APPLICATIONS

Hey team!
A little info on these to go along with them for quick reference.

2717 Digital Licensing Inc – (Primary Location) *ACH PAY – DOM + INTL WIRE – CHECK AND ACH POS PAY*
4754 The Gold Collective LLC – Addl. Location *ACH PAY – DOM WIRE ONLY – CHECK AND ACH POS PAY*
7865 Ignis Energy LLC – Addl. Location *ACH PAY – DOM  WIRE ONLY – CHECK AND ACH POS PAY*

Please let Jake or myself know if there are any questions!



**Brandon Stevens**
*Business Services Portfolio Manager,* Business Services Team
+1 480-992-5216 *tel*
bstevens@macu.com
https://www.macu.com/

# James Wuest

| | |
|---|---|
| **From:** | Brandon Stevens |
| **Sent:** | Thursday, February 23, 2023 11:41 AM |
| **To:** | Caitlyn Heninger |
| **Cc:** | James Wuest |
| **Subject:** | RE: DLI, TGC, IGNIS - CM APPLICATIONS |

As a clarification, the member would like DLI as the primary location.  The requested limits were for individual accounts.  As combined figures, can we request $400k ACH, and $1.2mm Wires limit.  This will be enough for current usage, and allow for additional locations in the future if needed.

Thank you,

**From:** Caitlyn Heninger <cheninger@macu.com>
**Sent:** Thursday, February 23, 2023 11:03 AM
**To:** Brandon Stevens <bstevens@macu.com>
**Subject:** FW: DLI, TGC, IGNIS - CM APPLICATIONS

**From:** Brandon Stevens <bstevens@macu.com>
**Sent:** Wednesday, February 22, 2023 10:12 AM
**To:** Mountain America Credit Union <business@macu.com>
**Cc:** Jake Carlen <jcarlen@macu.com>
**Subject:** DLI, TGC, IGNIS - CM APPLICATIONS

Hey team!
A little info on these to go along with them for quick reference.

2717 Digital Licensing Inc – (Primary Location) *ACH PAY – DOM + INTL WIRE – CHECK AND ACH POS PAY*
4754 The Gold Collective LLC – Addl. Location *ACH PAY – DOM WIRE ONLY – CHECK AND ACH POS PAY*
7865 Ignis Energy LLC – Addl. Location *ACH PAY – DOM  WIRE ONLY – CHECK AND ACH POS PAY*

Please let Jake or myself know if there are any questions!



**Brandon Stevens**
*Business Services Portfolio Manager*, Business Services Team
+1 480-992-5216 *tel*
bstevens@macu.com
https://www.macu.com/



**James Wuest**
*Business Services Relations Coordinator*, Business Services Team
+1 801-366-6935 *tel*
jwuest@macu.com
https://www.macu.com/

1



**Caitlyn Heninger**
*Business Services Relations Coordinator*, Business Services Team
+1 801-325-0461 *tel*
cheninger@macu.com
https://www.macu.com/



**Brandon Stevens**
*Business Services Portfolio Manager*, Business Services Team
+1 480-992-5216 *tel*
bstevens@macu.com
https://www.macu.com/

**DocuSign**

## Certificate Of Completion

Envelope Id: 131B40DEE1C140F59009B24599A626F8  
Subject: Digital Licensing Inc New CM PP UW PKG  
Source Envelope:  
Document Pages: 25  
Certificate Pages: 4  
AutoNav: Enabled  
EnvelopeId Stamping: Enabled  
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 1  
Initials: 0

Status: Completed

Envelope Originator:  
James Wuest  
jwuest@macu.com  
IP Address: 63.228.212.200

## Record Tracking

Status: Original  
    2/23/2023 4:18:40 PM

Holder: James Wuest  
    jwuest@macu.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| James Wuest<br>jwuest@macu.com<br>Business Services Relations Coordinator<br>Mountain America Credit Union<br>Security Level: Email, Account Authentication<br>(None)<br><br>**Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | *James Wuest*<br>Signature Adoption: Pre-selected Style<br>Using IP Address: 63.228.212.200 | Sent: 2/23/2023 4:20:27 PM<br>Viewed: 2/23/2023 4:20:45 PM<br>Signed: 2/23/2023 4:21:19 PM |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Business Services<br>business@macu.com<br>Security Level: Email, Account Authentication<br>(None)<br>**Electronic Record and Signature Disclosure:**<br>  Accepted: 11/17/2022 1:08:32 PM<br>  ID: b561ada7-e6d8-42db-91b2-16ae1e5b9a5e | **COPIED** | Sent: 2/23/2023 4:21:21 PM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/23/2023 4:20:27 PM |
| Certified Delivered | Security Checked | 2/23/2023 4:20:45 PM |
| Signing Complete | Security Checked | 2/23/2023 4:21:19 PM |
| Completed | Security Checked | 2/23/2023 4:21:21 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Mountain America Credit Union - Business Services (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Mountain America Credit Union - Business Services:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: swimmer@macu.com

**To advise Mountain America Credit Union - Business Services of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at swimmer@macu.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Mountain America Credit Union - Business Services**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to swimmer@macu.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Mountain America Credit Union - Business Services**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to swimmer@macu.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.


**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Mountain America Credit Union - Business Services as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Mountain America Credit Union - Business Services during the course of your relationship with Mountain America Credit Union - Business Services.

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020

Ph. 307-777-7311

For Office Use Only

**WY Secretary of State**

**FILED: Mar 18 2021  4:39PM**

**Original ID: 2021-000989687**

# Profit Corporation
## Articles of Incorporation

**I.  The name of the profit corporation is:**

Digital Licensing, Inc.

**II.  The name and physical address of the registered agent of the profit corporation is:**

Northwest Registered Agent Service, Inc.

30 N Gould St Ste N

Sheridan, WY 82801

**III.  The mailing address of the profit corporation is:**

30 N Gould St

Ste N

Sheridan, WY 82801

**IV.  The principal office address of the profit corporation is:**

30 N Gould St

Ste N

Sheridan, WY 82801

**V.  The number, par value, and class of shares the profit corporation corporation will have the authority to issue are:**

| | | | |
|---|---|---|---|
| Number of Common Shares: | 1,000 | Common Par Value: | $0.0100 |
| Number of Preferred Shares: | 0 | Preferred Par Value: | $0.0000 |

**VI.  The name and address of each incorporator is as follows:**

Northwest Registered Agent Service, Inc.

30 N Gould St Ste N, Sheridan, WY 82801

**Signature:** *Morgan Noble*          Date: **03/18/2021**

Print Name:      **Morgan Noble**

Title:      **Authorized individual**

Email:      **compliance@northwestregisteredagent.com**

Daytime Phone #:      **(509) 768-2249**

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Business Corporation Act, (W.S. 17-16-101 through 17-16-1804) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Incorporation that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

☑ I affirm, under penalty of perjury, that I have received actual, express permission from each of the following incorporators to add them to this business filing: Northwest Registered Agent Service, Inc.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

---

**W.S. 6-5-308. Penalty for filing false document.**

(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:

(i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;

(ii) Makes any materially false, fictitious or fraudulent statement or representation; or

(iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

---

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**  ☐ An Individual   ☑ An Organization

The Wyoming Secretary of State requires a natural person to sign on behalf of a business entity acting as an incorporator, organizer, or partner. The following individual is signing on behalf of all Organizers, Incorporators, or Partners.

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Incorporation.**

| | | |
|---|---|---|
| Signature: | *Morgan Noble* | Date: **03/18/2021** |
| Print Name: | **Morgan Noble** | |
| Title: | **Authorized individual** | |
| Email: | **compliance@northwestregisteredagent.com** | |
| Daytime Phone #: | **(509) 768-2249** | |



Secretary of State

## Consent to Appointment by Registered Agent

**Northwest Registered Agent Service, Inc.**, whose registered office is located at **30 N Gould St Ste N, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **Digital Licensing, Inc.** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature:    *Morgan Noble*                    Date:   **03/18/2021**

Print Name:    **Morgan Noble**

Title:    **Authorized individual**

Email:    **compliance@northwestregisteredagent.com**

Daytime Phone #:    **(509) 768-2249**

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF INCORPORATION

**Digital Licensing, Inc.**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **18th** day of **March**, **2021** at **4:39 PM.**

Remainder intentionally left blank.



Filed Date: 03/18/2021


Secretary of State

Filed Online By:

Morgan Noble

on 03/18/2021

Business Center

# DETAIL

RETURN TO YOUR SEARCH          FILE YOUR ANNUAL REPORT

Digital Licensing, Inc.

This detail reflects the current data for the filing in the system.

Print

Name
Digital Licensing, Inc.

Filing ID
2021-000989687

Type
Profit Corporation - Domestic

Status
Active

Sub Status
Current

Initial Filing
03/18/2021

Filing Done Name

Standing - Tax
Good

Standing - RA
Good

Standing - Other
Good

Term of Duration
Perpetual

Formed In
Wyoming

Principal Office
30 N Gould St
Ste N
Sheridan, WY 82801
USA

Mailing Address
30 N Gould St
Ste N
Sheridan, WY 82801
USA

## Additional Details

Registered Agent:
Northwest Registered Agent Service Inc
30 N Gould St Ste N
Sheridan, WY 82801 USA

Latest AR/Year
07929283 / 2023

AR Exempt
No

License Tax Paid
$60.00

Common Shares
1,000

Common Par Value
$0.01

Preferred Shares
0

Preferred Par Value

## History

| | |
|---|---|
| 2023 Original Annual Report - 07929283 | Date: 12/09/2022 |
| 2022 Original Annual Report - 07053237 | Date: 02/01/2022 |
| Initial Filing - See Filing ID | Date: 03/18/2021 |

Public Notes

No Public Notes Found...

Parties

Roy Nelson (Director)
Address 1812 W. Sunset Blvd. #1-345 St. Georg, Utah United States 84770                    Organization

Schad Brannon (President)
Address 1812 W. Sunset Blvd. Suite 1-345 St. George, Utah United States 84770                    Organization

Roy Nelson (Secretary)
Address 1812 W. Sunset Blvd. #1-345 St. Georg, Utah United States 84770                    Organization

Roy Nelson (Treasurer)

Organization:

Address: 1812 W. Sunset Blvd, #1-345 St. Georg, Utah United States 84770

**VERAFIN**

Search Verafin



ACCOUNT HOLDER

**CUSTOMER TYPE**

# Customer Due Diligence Questionnaire

Edit    Add New

Organization Name:
DIGITAL LICENSING, INC.

Employer Identification Number (EIN):
████9670        No EIN

**DECLARED BEHAVIOR**

Which of the following types of transactions will you perform?

Cash Deposits
No

Cash Withdrawals
No

Incoming Wire Transfers
Yes

> What is the monthly total that you expect to receive?
> $10,000 - $20,000
>
> Will you receive wire transfers from non-US locations?
> Yes
>
> From which countries do you expect these wires will be received?
> SOUTH AFRICA

Outgoing Wire Transfers
No

Incoming (Non-Wire) Electronic Transfers ⓘ
Yes

> What is the monthly total of incoming electronic transfers that you expect?
> $20,000 - $50,000
>
> Will these transfers be received from non-US locations?
> No

Outgoing (Non-wire) Electronic Transfers ⓘ
No

Check Deposits
No

Check Withdrawals ⓘ
No

Monetary Instrument Purchases ⓘ
No

ATM Deposits
No

ATM Withdrawals
No

**GENERAL INFORMATION**

What is the business structure of your organization?

Corporation

Is this a publicly-traded company?

No

Is the company at least 51% owned by an entity listed on the New York, American or NASDAQ stock exchange?

No

Is your business headquartered in the US?

Yes

Are you registered to do business in this state?

Yes

What type of business is this?

software licensing

NAICS Code:

Software Publishers (51321)

Which of the following will your account(s) be used for?

- ☑ General operating funds
- ☐ Payroll
- ☐ Savings
- ☐ Credit card processing
- ☐ IOLTA/IOLA
- ☐ Lottery
- ☐ MSB Activity
- ☐ Private banking
- ☐ Private-label credit card account
- ☐ Postage remittance
- ☐ Equipment purchase or lease
- ☐ Insurance premiums
- ☐ Pooled investment vehicle
- ☐ Other

## MARIJUANA-RELATED BUSINESS

Is this a marijuana-related business?

No

## HEMP-RELATED BUSINESS

Is this a hemp-related business?

No

## CBD-RELATED BUSINESS

Is this a CBD-related business?

No

## PROFESSIONAL SERVICE PROVIDERS

Do you act as an intermediary between your clients and the bank, performing services or arranging for services to be performed on your client's behalf? ⓘ

No

## MONEY SERVICES BUSINESSES (MSB)

Does your business involve any of the following? ⓘ

- ☐ Foreign currency exchange in amounts greater than $1,000 for any one person in any one day
- ☐ Cash checks in amounts greater than $1,000 for any one person in any one day
- ☐ Issue or sell money orders in amounts greater than $1,000 to any one person in any one day
- ☐ Transmit money on your customer's behalf electronically from one location to another
- ☐ Administer or exchange virtual currency
- ☐ Provide or sell prepaid access to funds, such as gift cards or other devices used to transfer value
- ☑ None of the above

## CHARITIES AND NONPROFIT ORGANIZATIONS

Do you depend, in whole or in part, on charitable donations and voluntary service for support?

No



**PRIVATELY-OWNED ATM**

Do you own, operate or replenish an ATM?

No

Notes (0)                                                                   View All

There are no entries.

Audit Log (2) ⌄                                                                  ⤢

| Subject | Username | Date ⌄ |
| --- | --- | --- |
| Questionnaire viewed. | bstevens@macu.com | 6-Feb-2023 14:57:18 |
| Questionnaire created. | bstevens@macu.com | 6-Feb-2023 14:57:16 |

# Congratulations!

# Digital Licensing, Inc.

**is now formed and you are now permitted to do business!**

State of formation: __Wyoming__    Formation date: __03/18/2021__

As part of the incorporation process we have placed the official state documents in your account. This will show you are registered to do business in your state. Also included are the Initial Resolutions which release all power to the officers and show the incorporation details of your company.   Bylaws are also included which provides a guideline on how your corporation will operate. Other documents such as stock certificates and banking resolutions are included as well which will evidence who has stake in the corporation and who has authority to sign on behalf of the company. If you are opening a business bank account the bank may want  to see all of these documents so it is a good to print them out and take them with you.

The documents placed in your online account are always available to view.  In addition to the Documents section you may always add additional services under the Services tab should you need our assistance with further state registrations, ongoing state compliance and registered agent services.

Thank you for letting us help form your corporation. The best part of our job is meeting different people from various business backgrounds and helping them launch their companies. Please do not hesitate to contact us further should have any questions regarding your company or our services.

Thanks,

Filings Team

# INCORPORATOR INITIAL RESOLUTIONS

I, Morgan Noble        , of Northwest Registered Agent Service, Inc. , being the Incorporator of Digital Licensing, Inc.   , a Wyoming        corporation, hereby resolve to relinquish signing authority to the newly appointed officers and directors and adopt the following resolutions:

1.    **Resolved**, that the following named officer(s) and director(s) of the corporation are hereby appointed and directed to serve until the first annual meeting of stockholders, and/or until their successors are elected and appointed, or they are re-elected at their annual meeting.

President:    Schad Brannon

Treasurer:    Roy Nelson

Secretary:    Roy Nelson

Director:    Schad Brannon, Roy Nelson

2.    **Resolved**, that Digital Licensing, Inc.   was incorporated in Wyoming on 03/18/2021 with assigned filing number 2021-000989687 .

3.    **Resolved**, that the copy of the Articles of Incorporation of the above named corporation is complete, and be inserted into the official corporate record book.

4.    **Resolved**, that the bylaws be adopted as the bylaws for the corporation, and be inserted into the minute book of the corporation record book.

5.    **Resolved**, that if the stockholders fail to hold their initial and/or annual meetings, that the above named directors will remain in their appointment until the stockholders hold their meeting, and that the corporation will stay active pursuant to state statute.

03/18/2021

# BYLAWS

of

# Digital Licensing, Inc.

## ARTICLE I

### Offices

1.1 **Registered Office and Registered Agent**: The Corporation's registered office is located in the State of ___Wyoming_____. The registered office is as stated in the Articles of Incorporation or as agreed by the Board of Directors.

1.2 **Other Offices**: The Corporation may have other offices as selected by the Board of Directors.

## ARTICLE 2

### Shareholders' Meetings

2.1 **Meeting Place**: All shareholder meetings must be held at the corporation's principal office or other place determined by the Board of Directors.

2.2 **Annual Meeting Time**: The annual shareholder meeting for the election of directors and the transaction of such other business properly before the meeting, must be held each year on May 15 at the hour of 4:00 PM. If that date is a legal holiday, then the meeting must be held on the day following, at the same hour.

2.3 **Annual Meeting - Order of Business**: The order of business at the annual shareholder meeting is as follows:

   (a)  Calling the meeting to order.
   (b)  Proof of notice of meeting (or filing of waiver).
   (c)  Reading of minutes of last annual meeting.
   (d)  Officer reports.
   (e)  Committee reports.
   (f)  Election of directors.
   (g)  Miscellaneous business.

2.4 **Special Meetings**: Special shareholder meetings, for any purpose, may be called at any time by the President, Board of Directors, or the holders of at least one-tenth of all shares entitled to vote at the meeting.

2.5 **Notice**: Each shareholder of record entitled to vote at an annual or special meeting must be given written notice of the time and place the meeting by

mail or personal delivery. Notice of an annual or special meeting must be mailed or delivered at least ten days, and not more than fifty days, prior to the meeting.

Notice of a special meeting must also include the purpose(s) for which the meeting is called.

**2.6** **Voting Record**: At least ten days before each shareholder meeting, a complete record of the shareholders entitled to vote at the meeting must be made. This list must be arranged in alphabetical order and include the address of and number of shares held by each shareholder. This record must be kept on file at the Corporation's principal office for a period of ten days prior to the meeting. The records must also be kept open for inspection at shareholder meetings.

**2.7** **Quorum**: Except as otherwise required by law:

(a) A quorum at any annual or special shareholder meeting consists of shareholders representing, either in person or by proxy, a majority of the Corporation's outstanding capital stock, entitled to vote at such meeting.

(b) A quorum of voters, as defined in this paragraph, must be present to transact business at any properly called meeting or adjourned shareholder meeting.

**2.8** **Closing of Transfer Books and Fixing Record Date**: In order to determine which shareholders are entitled to notice of or to vote at any shareholder meeting, or any adjournment thereof, or entitled to receive payment of any dividend, the Board of Directors may require that the stock transfer books must be closed for at least ten and not more than fifty days prior to the meeting. Instead of closing the stock transfer books, the Board of Directors may fix in advance a record date for determination of such shareholders. The record date must not be more than fifty or less than ten days prior to the date of the meeting, adjournment, or payment.

**2.9** **Proxies**: A shareholder may vote either in person or by proxy, signed in writing by the shareholder or the shareholder's duly authorized attorney-in-fact. No proxy is valid after eleven months from the date signed, unless the proxy states otherwise.

**2.10** **Action by Shareholders Without a Meeting**: Any action which may be taken at any annual or special shareholder meeting may be taken without a meeting if all of the shareholders entitled to vote on the subject consent to the action in writing. Such consent has the same force and effect as a unanimous vote of the shareholders.

**2.11** <u>**Waiver of Notice**</u>: If a shareholder who is entitled to notice signs a written waiver of the required notice, before or after the stated meeting time, the waiver is the equivalent to the giving of the required notice.

**ARTICLE 3**

**Stock**

**3.1** <u>**Certificates**</u>: Certificates of stock must be issued in numerical order. Each shareholder is entitled to a certificate signed by the President or a Vice President and the Secretary or Assistant Secretary. The certificate may be sealed with the Corporation's seal or a facsimile thereof. If an officer who has signed or whose facsimile signature appears on any stock certificate ceases to be an officer before the certificate is used, it may be issued by the Corporation and is valid as if the person were an officer on the date of issue.

**3.2** <u>**Transfer**</u>: Transfers of stock must be made upon the corporation's stock transfer books. Stock transfer books must be kept at the Corporation's registered office, its principal place of business, or the office of its transfer agent or registrar. Before a new certificate is issued, the old certificate must be surrendered for cancellation. The Board of Directors may, by resolution, open a share register in any state of the United States, and may employ an agent or agents to keep such register, and to record transfers or shares therein.

**3.3** <u>**Registered Owner**</u>:  Shareholders will be treated by the corporation as the holders in fact of the stock registered in his or her name. The Corporation is not bound to recognize any equitable or other claim to or interest in any share on the part of any other person, except as expressly provided below or by the laws of the State of __Wyoming_____. The Board of Directors may resolve to adopt a procedure by which a shareholder of the Corporation may certify in writing to the Corporation that all or a portion of the shares registered in the shareholder's name are held for the account of a specified person or persons. The resolution must set forth:

    (a)  The classification of shareholder who may certify;
    (b)  The purpose or purposes for which the certification may be made;
    (c)  The form of certification and information to be contained therein;
    (d)  If the certification is with respect to a record date or closing of the stock transfer books, the date within which the certification must be received by the Corporation; and
    (e)  Other provisions with respect to the procedure as are deemed necessary or desirable.

Upon receipt of a certification complying with this procedure, the Corporation must treat the persons specified in the certification as the

holders of record of the number of shares specified in place of the shareholder making the certification.

**3.4** **Mutilated, Lost, or Destroyed Certificates**: In case of any mutilation, loss or destruction of any stock certificate, another may be issued in its place on proof of such mutilation, loss or destruction. The Board of Directors may impose conditions on such issuance and may require the giving of a satisfactory bond or indemnity to the Corporation or the board may establish other procedures as they deem necessary.

**3.5** **Fractional Shares or Scrip**: The Corporation may:

    (a)  Issue fractions of a share which entitle the holder to exercise voting rights, to receive dividends, and to participate in any of the Corporation's assets in the event of liquidation;

    (b)  Arrange for the disposition of fractional interests by those entitled thereto;

    (c)  Pay the fair market value, in cash, of fractions of a share as of the time when those entitled to receive such shares are determined; or

    (d)  Issue script in registered or bearer form which entitles the holder to receive a certificate for the full share upon surrender of such script aggregating a full share.

**3.6** **Shares of Another Corporation**: Shares owned by the Corporation in another corporation, domestic or foreign, may be voted by officer, agent or proxy chosen by the Board of Directors or, in the absence of such determination, by the President of the Corporation.

## ARTICLE 4
## Board of Directors

**4.1** **Numbers and Powers**: The management of all the Corporation's affairs, property, and interests is vested in the Board of Directors.  The Board of Directors consists of a person or persons who are elected for a term of one year, and hold office until their successors are elected and qualified. Directors need not be shareholders or residents of the State of Wyoming .In addition to the powers and authorities expressly granted by these Bylaws and the Articles of Incorporation, the Board of Directors may exercise all powers of the Corporation and do any lawful acts that is not directed or required to be done by the shareholders under statute, the Articles of Incorporation, or these Bylaws.

**4.2** **Change of Number**: The number of directors may be increased or decreased at any time by amendment of these Bylaws. A decrease in

           Corporate Bylaws

number does not have the effect of shortening the term of any incumbent director.

4.3 **Vacancies**: All vacancies in the Board of Directors may be filled by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors. A director elected to fill any vacancy will hold office for the unexpired term of his or her predecessor and until a successor is elected and qualified. Any vacancy to be filled due to an increase in the number of directors may be filled by the Board of Directors for a term lasting until the next election of directors by the shareholders.

4.4 **Removal of Directors**: At a shareholder meeting called expressly for that purpose, the entire Board of Directors, or any member of the Board, may be removed by a vote of the holders of a majority of shares entitled to vote at an election of shareholders.

4.5 **Regular Meetings**: Annual and other regular meetings of the Board of Directors or any committee may be held without notice at the corporation's principal office or at any other place designated by the board of directors or a committee thereof. The annual meeting of the Board of Directors will be held without notice immediately after the adjournment of the annual meeting of shareholders. Other regular meetings of the Board of Directors may be at dates and times chosen by the board.

4.6 **Special Meetings**: Special meetings of the Board of Directors may be held at any place and at any time and may be called by the Chairman of the Board, the President, Vice President, Secretary or Treasurer, or any two or more directors.

4.7 **Notice of Meetings**: Unless the Articles of Incorporation provide otherwise, regular meetings of the Board of Directors may be held without notice of the date, time, place, or purpose of the meeting. Any special meeting of the Board of Directors must be preceded by at least two days' notice of the date, time, and place of the meeting, unless the Articles of Incorporation or these Bylaws require otherwise. Notice may be given personally, by facsimile, by mail, or in any other lawful manner. Oral notification is sufficient only if a written record of the notice is included in the Corporation's minute book. Notice is effective at the earliest of
(a) Receipt;
(b) Delivery to the proper address or telephone number of the director(s) as shown in the Corporation's records; or
(c) Five days after its deposit in the United States mail, as evidenced by the postmark, if correctly addressed and mailed with first-class postage prepaid.

**4.8**   <u>**Quorum**</u>:  A majority of the whole Board of Directors is necessary at all meetings to constitute a quorum to transact business.

**4.9**   <u>**Waiver of Notice**</u>: Attendance or participation of a meeting by a director constitutes a waiver of notice of the meeting, unless a director attends for the express purpose of promptly objecting to the transaction of any business because the meeting was not lawfully called or convened. A director may waive notice by a signed writing, delivered to the Corporation for inclusion in the minutes before or after the meeting.

**4.10**   <u>**Registering Dissent**</u>: A director who is present at a board meeting, at which action on a corporate matter is taken, is presumed to have assented to the action, unless the director expressly dissents to the action. A valid dissent must be entered in the meeting's minutes, filed with the meeting's acting Secretary before its adjournment, or forwarded by registered mail to the Corporation's Secretary immediately after the meeting's adjournment. These options for dissent do not apply to a director who voted in favor of the action.

**4.11**   <u>**Executive and Other Committees**</u>: Standing or special committees may be appointed by the Board of Directors from among its members. These committees are invested with powers and subject to conditions as the Board sees fit. An Executive Committee may be appointed by a resolution passed by a majority of the full Board of Directors. The Executive Committee will have and exercise all of the authority of the Board of Directors, except that it may not amend the Articles of Incorporation or Bylaws, adopt a plan of merger or consolidation, recommend the sale, lease, exchange, or other disposition of all or substantially all the Corporation's property and assets (other than in the equal and regular course of business), or recommend a voluntary dissolution or revocation. All committees must record regular minutes of their meetings and keep the minute book at the corporation's office. The delegation of authority to any committee does not relieve the Board of Directors, or any member thereof, of any responsibility imposed by law.

**4.12**   <u>**Remuneration**</u>: Directors are not paid a stated salary for their service, except by resolution of the Board of Directors. Directors may also be paid a fixed sum and expenses, if any, for attendance at each regular or special meeting of such Board. Nothing herein contained precludes any director from receiving compensation for serving the Corporation in any other capacity. Members of standing or special committees may be allowed like compensation for attending committee meetings.

**4.13**   <u>**Loans**</u>: The Corporation may not make loans to the directors, unless first approved by the holders of two-thirds of the voting shares. The Corporation may not make loans secured by its own shares.

**4.14** **Action by Directors Without a Meeting**: Any action which may be taken at a meeting of the Directors, or of a committee thereof, may be taken without a meeting if all of the Directors or members of the committee sign a written consent which sets forth the action taken. Such consent has the same effect as a unanimous vote.

**4.15** **Action of Directors by Communications Equipment**: Any action which may be taken at a meeting of Directors, or of a committee thereof, may be taken by means of a conference telephone or similar communications equipment which allows all persons participating in the meeting to hear each other at the same time.

**ARTICLE 5**

**Officers**

**5.1** **Designations**: The Corporation's officers will be a President, one or more Vice-Presidents (one of more of whom may be Executive Vice-President), a Secretary and a Treasurer, and Assistant Secretaries and Assistant Treasurers as the Board may designate, who will be elected by the directors at their first meeting after the annual shareholder meeting. An elected officer will hold office for one year or until a successor is elected and qualified. The same person may hold any two or more office, except the offices of President and Secretary.

**5.2** **The President**: The President will preside at all meetings of shareholders and directors, have general supervision of the Corporation's affairs, and perform all other duties as are incident to the office or are properly required of him or her by the Board of Directors.

**5.3** **Vice President**: During the absence or disability of the President, the Executive Vice-Presidents, in the order designated by the Board of Directors, may exercise all functions of the President. Each Vice-President may have such powers and fulfill such duties as may be assigned to him or her by the Board of Directors.

**5.4** **Secretary and Assistant Secretaries**: The Secretary must:
**a)** Issue notices for all meetings, except for notices for special meetings of shareholders and special meetings of the Directors which are called by the requisite number of shareholders or Directors;
**b)** Keep the minutes of all meetings;
**c)** Have charge of the corporate seal and books;
**d)** Make reports and perform duties as are incident to the office, or are properly required of him or her by the Board of Directors.
The Assistant Secretary, or Assistant Secretaries in the order designated by the Board of Directors, will perform all of the duties of the Secretary

during the absence or disability of the Secretary, and at other times may perform such duties as are directed by the President or the Board.

**5.5** **The Treasurer**: The Treasurer will:
**a**) Have custody of all the Corporation's monies and securities and keep regular books of account;
**b)** Disburse the Corporation's funds in payment of the just demands against the Corporation or as may be ordered by the Board of Directors, taking proper vouchers for such disbursements; and
**c)** Provide the Board with an account of all his or her transactions as Treasurer and of the financial conditions of the office properly required of him or her by the Board of Directors. The Assistant Treasurer, or Assistant Treasurers in the order designated by the Board of Directors, must perform all of the duties of the Treasurer in the absence or disability of the Treasurer, and at other times may perform such other duties as are directed by the President or the Board of Directors.

**5.6** **Delegation**: In the absence or inability to act of any officer and of any person authorized to act in his or her place, the Board of Directors may delegate the officer's powers or duties to any other officer, director, or other person.

**5.7** **Vacancies**: Vacancies in any office arising from any cause may be filled by the Board of Directors at any regular or special board meeting.

**5.8** **Other Officers**: Directors may appoint other officers and agents as they deem necessary or expedient. The term, powers, and duties of such officers will be determined by the Board of Directors.

**5.9** **Loans**: No loans may be made by the Corporation to any officer, unless first approved by the holders of two-thirds of the voting shares.

**5.10** **Term - Removal**: The Corporation's officers hold office until their successors are chosen and qualify. Any officer or agent elected or appointed by the Board of Directors may be removed at any time, without cause, by the affirmative vote of a majority of the whole Board of Directors. Such removal does not impact the removed officer's contract rights, if any.

**5.11** **Bonds**: The Board of Directors may resolve to require any officer to give bonds to the Corporation, with sufficient surety or sureties, conditioned upon the faithful performance of the duties of their offices and compliance with other conditions as required by the Board of Directors.

**5.12** **Salaries**: Officers' salaries will be fixed from time to time by the Board of Directors. Officers are not prevented from receiving a salary by reason of the fact that he or she is also a director of the Corporation.

# ARTICLE 6
## Dividends and Finance

6.1   **Dividends**: Dividends may be declared by the Board of Directors and paid by the Corporation out of the unreserved and unrestricted earned surplus of the Corporation, or out of the unreserved and unrestricted net earnings of the current fiscal year, or in treasury shares of the Corporation, subject to the conditions and limitations imposed by the State of __Wyoming__. The stock transfer books may be closed for the payment of dividends during periods not to exceed fifty days, as fixed by the Board of Directors. The Board of Directors, without closing the Corporation's books, may declare dividends payable only to holders of record at the close of business on any business day not more than fifty days prior to the date on which the dividend is paid.

6.2   **Reserves**: The Directors may, in their absolute discretion, set aside out of the Corporation's earned surplus, such sum or sums as they deem expedient for dividend, maintaining any corporate property, or any other purpose, before making any distribution of earned surplus.

6.3   **Depositories**: The Corporation's moneys must be deposited in the Corporation's name in a bank or trust company or trust companies designated by the Board of Directors. Corporate monies may be drawn out only by check or other order for payment signed by such persons and in such manner as may be determined by resolution of the Board of Directors.

# ARTICLE 7
## Notices

Except as may otherwise be required by law, any notice to any shareholder or director may be delivered personally or by mail. If mailed, the notice will be deemed to have been delivered when deposited in the United States mail, addressed to the shareholder or director at his or her last known address in the records of the Corporation, with postage prepaid.

# ARTICLE 8
## Seal

The Board of Directors may adopt a corporate seal with the form and inscription of their choosing. The adoption and use of a corporate seal is not required.

# ARTICLE 9
## Books and Records

The Corporation must keep a complete and accurate accounting and minutes of the proceedings of its shareholders and Board of Directors. The Corporation must keep a list of its shareholders, including the names and addresses of all shareholders and the number and class of the shares held by each at its registered office or principal place of business, or at the office of its transfer agent or registrar. Any books, records, and minutes may be in written form or any other form capable of being converted into written form within a reasonable time.

## ARTICLE 10
### Special Corporate Acts

**10.1  Execution of Written Instruments**:  Contracts, deeds, documents, and instruments must be executed by the President alone unless the Board of Directors designates another procedure.

**10.2  Signing of Checks or Notes**: Checks, notes, drafts, and demands for money must be signed by an officer(s) designated by the Board of Directors.

**10.3  Indemnification of Directors and Officers**: The Corporation will indemnify any and all current or former Directors or officers or any person who may have served at its request as a director or officer of the Corporation or of any other corporation in which it is a creditor, against expenses actually or necessarily incurred by them in connection with the defense or settlement of any action, suit, or proceeding brought or threatened in which they, or any of them, are or might be made party, by reason of being or having been directors or officers or a director or an officer of the Corporation, or of such other corporation. This indemnification will not apply, however, to any matter as to which such Director or officer or former Director or officer or person be adjudged in such action, suit, or proceeding to be liable for negligence or misconduct in the performance of duty.  Such indemnification shall not be deemed exclusive of other rights to which the indemnified person may be entitled, under any law, bylaw, agreement, vote of shareholders, or otherwise.

## ARTICLE 11
### Amendments

**11.1  By Shareholders**: These Bylaws may be altered, amended or repealed by the affirmative vote of a majority of the voting stock issued and outstanding at any regular or special shareholder meeting.

**11.2  By Directors**: The Board of Directors has the power to make, alter, amend and repeal the Corporation's Bylaws. Any alteration, amendment, or repeal of the Bylaws, may be changed or repealed by the holders of a majority of the stock entitled to vote at any shareholders meeting.

**11.3  Emergency Bylaws**: The Board of Directors may adopt emergency Bylaws, subject to repeal or change by the shareholders, which operate during any emergency in the Corporation's conduct of business resulting from an attack on the United States or a nuclear or atomic disaster.

Adopted by resolution of the Corporation's Board of Directors or incorporator on this ___18th___ day of __March__ , 20 _21_

_____
Director(s) or Incorporator(s)

# Corporate Resolution to Open a Bank Account

Account
Holder:   __Digital Licensing, Inc.__

Address:  __13894 S. Bangerter Parkway STE 100__
__Draper, Utah 84020__

Bank:   __MACU__

Address:  __2104 W. Sunset Blvd__
__St. George, Utah 84770__

Acct #:

As the Secretary of the Corporation named above, I certify that the corporation has been organized within the bounds of state law as a for-profit corporation with its principal office located at:  __13894 S Bangerter Parkway STE 100 Draper, Utah 84020__ .

I further attest that at the initial meeting of corporation's board of directors held on __February 1st, 2023__ , a quorum was present and voting and adopted the following resolutions:

**Resolved**, that the financial institution named above is designated as a depository for the funds of this corporation, which may be withdrawn on checks, drafts, advices of debit, notes, or other orders for payments bearing any officer or authorized employee of this corporation.

**Further Resolved**, that the financial institution will accept and pay on, without further inquiry, any checks or debits drawn against any of the corporation's accounts. The checks or debits will be honored by the financial institution whether the item has been drawn or endorsed to the order of any authorized officer or employee signing; tendered by the authorized officer or employee for the purpose of cashing or payment; or for deposit to the officer's or employee's personal account. The financial institution will not be required to inquire as to the use of any check or debit signed in accordance with the resolutions contained herein.

**Further Resolved**, that the officers or authorized employees may execute other agreements, including, but not limited to, special depository agreements, and arrangements concerning the manner, condition, and/or purposes for which funds, checks, debits, or items of the corporation may be deposited, collected, or withdrawn, as long as these other agreements are not contrary to the provisions contained in this resolution.

**Further Resolved**, that the power granted to the corporation's officers or authorized employees will remain in full force and effect until written notice has been delivered and received by the financial institution at each location where an account is maintained. The financial institution will be indemnified and held harmless from any losses suffered or liabilities incurred by continuing to act in accordance with this resolution.

**I Further Attest** that the persons named below occupy the stated positions, as indicated by their signatures, and that the resolutions contained in this document are recorded on the books of the corporation, and these resolutions are in full force and effect and have not been altered in any way.

**I Agree** to all of the above on this __1st__ day of ____February_____, 20_23_____.

**CERTIFIED TO AND ATTESTED BY:**

X _____

X _____
**Co-Secretary or Assistant Secretary**



## MOUNTAIN AMERICA
### CREDIT UNION

P.O. BOX 2331 • SANDY, UT • 84091

# BUSINESS DEPOSITORY ACCOUNTS
# DEPOSITORY RESOLUTION & AGREEMENT

**GENERAL BUSINESS/ORGANIZATION INFORMATION**
(Please print in black ink or type)

Application ID: _____3748

Proprietor/Business/Organization Name  DIGITAL LICENSING, INC.    (the "Company") Email Address  roydog.nelson@gmail.com

DBA Name (for all Proprietors and for LLCs or Corporations using a DBA name) _____

Street Address  30 N Gould St Ste N    Business Taxpayer Identification Number (SSN/EIN) _____8670

City  SHERIDAN    State  WY    Zip  82801    Office Phone  801-946-9881

Mailing Address (if different)  1812 W SUNSET BLVD STE #1-345  ST GEORGE, UT  8477  Date of Organization  3/18/2021

What is the primary nature (function) of this business?  SOFTWARE LICENSING AND MANAGEMENT

Business Type (Check only one)

☐ **Sole Proprietorship** (one owner)    ☐ **Partnership**    ☐ **Limited Liability Company**    ☑ **Corporation** (including S-Corp & Government)

☐ **Incorporated Non-Profit Organization**    ☐ **Unincorporated Association** (e.g. associations, clubs, groups, etc.)

Check here if this is a change to an existing account. ➔ ☐

Check here if this business is 50% or more women owned. ➔ ☐

How does this business/organization qualify for membership? (Check One)
☐ Entity is SEG sponsor, or
☑ All owners are eligible for membership

Each person signing this document certifies that he/she is a duly elected, qualified and acting Secretary (for Corporations and Associations), Manager or Managing Member (for LLCs), General Partners (for Partnerships), or an Owner (for Proprietorships), empowered to act on behalf of the Company named above, which Company is organized and existing under the laws of the state of _____WY_____ and that the following is a true and accurate copy of a resolution adopted by the legal entity on the _06_ day of _February_ , _2023_ , and that such resolutions are now in full force and effect.

"RESOLVED, that Mountain America Federal Credit Union, of West Jordan, Utah ("Credit Union") is hereby designated as a depository in which the funds of the Company may, from time to time, subject to the membership agreements, regulations and by-laws of the Credit Union, be deposited by any of its officers, agents or employees; and that any officer, agent or employee of this Company is hereby authorized on behalf of the Company, which endorsement may be in writing, by stamp, or otherwise, with or without designation or signature of the person so endorsing, it being understood that on all such items all prior endorsements are guaranteed by the Company, irrespective of the lack of an express guarantee in the endorsement of the Company. The Credit Union may accept any instrument for deposit to any depository account of the Company without endorsement or may supply the endorsement.

FURTHER RESOLVED, that the Credit Union is hereby authorized to pay or otherwise honor and pay and charge to the accounts of the Company any checks, notes, or other orders for the payment, or withdrawal of any such funds when executed in the name of the Company and signed by any authorized signatory ("Authorized Signer") designated by the Company on any of the Business Account Authorized Signer Signature Cards. Authorized Signers shall have authority to conduct transactions on any of the individual depository shares associated with the account where normal deposits and withdrawals are allowed. The Credit Union is also authorized to honor instructions for the internal transfer of funds between different accounts of the Company without written authorization.

FURTHER RESOLVED, that the disposition of the account, or any of the associated individual depository shares including adding or deleting Authorized Signers must be authorized by one of the principals, designated in this resolution. A principal ("Principal") is an Officer (for Corporations or Associations), a Manager or Managing Member (for LLCs), a General Partner (for Partnerships), or an Owner (for Proprietorships). Principals must also be Authorized Signers on the account. The Secretary, Manager, Managing Member, Proprietor or General Partner, as the case may be is hereby authorized and directed from time to time to furnish the Credit Union statements of the names of the then Principals of the Company who are authorized to act under this resolution and Credit Union shall be entitled to rely upon such statement until it receives a later statement of such person or persons changing such names. The Company will provide a certification to the current Principals and/or additional documentation at any time prior to the Credit Union allowing changes to the account or the involuntary removal of equity owners as Principals.

FURTHER RESOLVED, that Credit Union be and is hereby authorized to comply with any process, summons, order, injunction, execution, distraint, levy, lien, or notice of any kind (hereinafter called "Process") received by or served upon Credit Union, which in Credit Union's opinion affects any and all of the Company's deposit accounts with Credit Union, and Credit Union may, at its option and without liability, thereupon refuse to honor orders to pay or withdraw sums from any and all of the Company's deposit accounts and may either hold the balance therein until Process is disposed of to Credit Union's satisfaction, or to pay the balance over to the source of the Process.

FURTHER RESOLVED, that the Company assumes full responsibility and holds harmless Credit Union for any and all payments made or any other actions taken by Credit Union in reliance upon the signatures, including facsimiles thereof, of any person or persons identified as an Authorized Signer on any signature card(s) delivered by the Company to Credit Union from time to time, regardless of whether or not the facsimile signature was unlawful or unauthorized and regardless of by whom or by what means the purported signature or facsimile signature may have been affixed to the instrument if such signatures reasonably resemble the specimen or facsimile signatures as provided to Credit Union, or for refusing to honor any signatures not provided to Credit Union, and that the Company agrees to indemnify Credit Union against any and all claims, demands, losses, costs, damages or expenses suffered or incurred by Credit Union resulting or arising out of any such payment or other action.

FURTHER RESOLVED, that the Company authorizes the issuance of Visa Check (Debit) Cards in the name of the Company which will be provided to the Authorized Signers. You agree to notify the Credit Union immediately upon the termination of any person who has been issued a Visa Check Card. The Company will be fully obligated for the payment of all authorized transactions conducted by the cardholders and any related fees.

FURTHER RESOLVED, that the Credit Union shall not be liable for any direct or consequential loss (including damages, claims, lawsuits, costs, expenses, and attorney fees), the Company may incur as a result of any improper, unlawful or dishonest act by Authorized Signers or Principals, except as may be caused by Credit Union's gross negligence or unlawful act.



**MOUNTAIN AMERICA**
CREDIT UNION

P.O. BOX 2331 • SANDY, UT • 84091

# BUSINESS DEPOSITORY ACCOUNTS
# DEPOSITORY RESOLUTION & AGREEMENT

FURTHER RESOLVED, this resolution shall continue in full force and effect until written notice of revocation has been duly received by Credit Union and Credit Union has had reasonable opportunity to act thereon."

IN WITNESS WHEREOF, each person signing below further certifies that he/she has received authority to engage in such action for the Company and that there are no provisions in the Articles of Incorporation, as amended to date, or the Operating Agreement, as amended to date, or the by-laws of the Company limiting the power of the undersigned to enact the foregoing resolution and that the same is in conformity with the provisions of said Articles of Incorporation, Operating Agreement, or By-laws.

Each such person hereby makes application for a business/organization account and membership in the Credit Union and certifies that as applicable, that the Company meets the requirements for membership at the Credit Union and that the Company does not engage in internet gambling activities, is not a prohibited business, listed on the Credit Union's Restricted Business List, and is not a Money Service Business (MSB). Each such person certifies that all steps necessary to formally establish the Company referenced have been executed. Each such person agrees to provide Credit Union with a copy of documents, supporting entity creation, prior to opening the account.

The undersigned further certifies that the following are the names and signatures of the present Principals of said Company. Principals not listed on this resolution, or any amendments, will not be recognized as Principals for the purposes permitted in this resolution. Amendments may require additional documentation to substantiate involuntary removal of equity owner Principals.

List only officers (for Corporations or Associations), Managers or Managing Members (for LLCs), General Partners (for Partnerships), or an Owner (for Proprietorships). Only Principals may authorize the addition or deletion of Authorized Signers. Authorized Signers shall be designated on additional documents:

| Name | Title | |
|---|---|---|
| ROYDON  NELSON | Secretary | ☑ Check if Equity Owner |
| SCHAD E BRANNON | President/CEO | ☑ Check if Equity Owner |
| | | ☐ Check if Equity Owner |
| | | ☐ Check if Equity Owner |
| | | ☐ Check if Equity Owner |
| | | ☐ Check if Equity Owner |
| | | ☐ Check if Equity Owner |
| | | ☐ Check if Equity Owner |

---

### SUBSTITUTION of IRS FORM W-9

**TAXPAYER IDENTIFICATION NUMBER (TIN)**

Social Security Number

Enter your TIN in the appropriate box.  For individuals, this is your social security number (SSN).

**OR**

For most other entities, it is your employer identification number (EIN). If you do not have a TIN you may write "Applied For" in the space for the TIN.  "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Employer Identification Number
8670

### CERTIFICATION

Under penalties of perjury, I certify that:

☐ Check if Exempt from backup Withholding

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me) and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien)
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification Instructions.  You must check here ☐ and cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHOLDING.

Signature of U.S. Person → *ROYDON NELSON*

Date → 2/6/2023

---



**MOUNTAIN AMERICA**
CREDIT UNION

P.O. BOX 2331 • SANDY, UT • 84091

## BUSINESS DEPOSITORY ACCOUNTS
## DEPOSITORY RESOLUTION & AGREEMENT

Given under my hand this _06_ day of _February_ 20 _23_ .

**For Corporations or Unincorporated Associations:**

DocuSigned by:

_ROYDON NELSON_
Signature Secretary

ROYDON NELSON
Name of Secretary

**For an LLC or Sole Proprietorship:**

Signature Manager, Managing Member, or Proprietor/Owner

Name of Manager, Managing Member, or Proprietor

**For a Partnership:** (all general partners must sign)

Signature General Partner

Name of General Partner

Signature General Partner

Name of General Partner

Signature General Partner

Name of General Partner

Signature General Partner

Name of General Partner

Signature General Partner

Name of General Partner

Signature General Partner

Name of General Partner

Signature General Partner

Name of General Partner

Signature General Partner

Name of General Partner

DocuSign Envelope ID: 3783E896-9AFE-419B-AAC6-8BAC5A25C7CC



**MOUNTAIN AMERICA**
CREDIT UNION

# BUSINESS DEPOSITORY ACCOUNTS
## AUTHORIZED SIGNER (SIGNATURE CARD)

**P.O. BOX 2331 • SANDY, UT • 84091**

This Signature Card is incorporated with a previously executed Depository Resolution and Agreement for the Company

(Please print in black ink or type)

| | |
|---|---|
| Business/Organization Name **DIGITAL LICENSING, INC.** | Application ID: **3748** |

Name **ROYDON NELSON**   SSN ▮**0396**   Date of Birth **9/13/1972**   Home Phone **801-946-9881**

Home Address **1615 North Raven Lane**   Email Address **roydog.nelson@gmail.com**
No P.O. Boxes or mail services, please

City **St George**   State **UT**   Zip **84770**   ID Type **State Driver's License**   ID Issuer **UT**

Title **Secretary**   ID Number ▮**7126**

Mobile/Work Phone **801-946-9881**   ID Issue Date **8/22/2018**   ID Expiration **9/13/2023**

## AGREEMENT AND CERTIFICATION:

By signing below you certify that this business/organization does not engage in internet gambling activities. You authorize Mountain America Federal Credit Union ("Credit Union") to obtain reports from consumer reporting agencies and other information it considers appropriate from time to time. You agree that the Credit Union may retain this form, the additional documentation provided as required by the Credit Union, and any other information the Credit Union receives. Signing below constitutes an agreement to conform to the Credit Union bylaws as well as all applicable terms and conditions set forth in the Membership Agreement, together with any schedules or addendums, receipt of which is hereby acknowledged, and which is incorporated by this reference.

A completed Depository Resolution and Agreement ("Resolution") will be required for all entities or organizations in connection with establishing an account. Each person signing below agrees that the incorporated Resolution, and amendments if applicable, in connection with this Signature Card, shall only govern the account set forth above.

## AUTHORIZED SIGNATURE:

You acknowledge that you are duly authorized to act with respect to the account, and the Credit Union is authorized to act in those matters as specified in the incorporated Resolution relating to the account until the Credit Union receives written instructions to the contrary from a Principal identified on the incorporated Resolution. Your authority to act with regard to the account may be revoked at any time by the Company. This Signature Card shall apply to all depository services obtained on this account now or in the future.

DocuSigned by:

*ROYDON NELSON*   **2/6/2023**

Signature of Authorized Signer (person named above)   Date

The Company Authorization below must be signed by a Principal in the presence of a Credit Union employee or Notary Public.
**DO NOT SIGN THE COMPANY AUTHORIZATION UNTIL INSTRUCTED BY THE CREDIT UNION EMPLOYEE OR NOTARY!**

COMPANY AUTHORIZATION: (to be signed by a current Principal as recorded on the Resolution previously executed by the Company)

By signing below you certify that the person listed above is authorized by the Company to conduct transactions on the account designated and in accordance with Resolution previously executed by the Company and that you witnessed the person sign this document.

DocuSigned by:

*ROYDON NELSON*   **2/6/2023**   ROYDON NELSON

Signature of Principal (corresponds to a Principal listed on Resolution)   Date   Name of Principal

State of _____

County of _____

On this _____ day of _____, 20 ___, personally appeared before me, _____, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed as Principal above, and acknowledged that he/she executed the same.

S
E
A
L

Notary Public _____

My Commission Expires _____

CREDIT UNION AUTHORIZATION: (to be signed by a Credit Union employee)

I have personally reviewed the most recent Depository Resolution and Agreement or subsequent Change Current Principals dated _____ and verified that the person authorizing this Signature Card is named by the Company on that document as a Principal. I authorize the addition of the Authorized Signer on behalf of the Credit Union. If not notarized, I have verified the identity and witnessed the Principal sign this card to allow the addition of the Authorized Signer.

Signature of Credit Union Employee   Date   Teller #   ☑ ChexSystems Verified (new signers)

Rev10/2018. Federally insured by NCUA.   Page 1 of 1


**MOUNTAIN AMERICA**
CREDIT UNION

# BUSINESS DEPOSITORY ACCOUNTS
# AUTHORIZED SIGNER (SIGNATURE CARD)

**P.O. BOX 2331 • SANDY, UT • 84091**

This Signature Card is incorporated with a previously executed Depository Resolution and Agreement for the Company

(Please print in black ink or type)

Business/Organization Name **DIGITAL LICENSING, INC.**                 Application ID: **3748**

Name **SCHAD E BRANNON**        SSN **7397**    Date of Birth **1/16/1973**    Home Phone **818-426-4280**

Home Address **5818 WISH AVE**                          Email Address schadebrannon@gmail.com
    No P.O. Boxes or mail services, please

City **ENCINO**        State **CA**    Zip **91316**    ID Type **US Passport**        ID Issuer

Title **President/CEO**                        ID Number **9869**

Mobile/Work Phone **818-426-4280**                ID Issue Date **7/21/2016**    ID Expiration **7/20/2026**

## AGREEMENT AND CERTIFICATION:

By signing below you certify that the business/organization does not engage in internet gambling activities. You authorize Mountain America Federal Credit Union ("Credit Union") to obtain reports from consumer reporting agencies and other information it considers appropriate from time to time. You agree that the Credit Union may retain this form, the additional documentation provided as required by the Credit Union, and any other information the Credit Union receives. Signing below constitutes an agreement to conform to the Credit Union bylaws as well as all applicable terms and conditions set forth in the Membership Agreement, together with any schedules or addendums, receipt of which is hereby acknowledged, and which is incorporated, by this reference.

A completed Depository Resolution and Agreement ("Resolution") will be required for all entities or organizations in connection with establishing an account. Each person signing below agrees that the incorporated Resolution, and amendments if applicable, in connection with this Signature Card, shall only govern the account set forth above.

## AUTHORIZED SIGNATURE:

You acknowledge that you are duly authorized to act with respect to the account, and the Credit Union is authorized to act in those matters as specified in the incorporated Resolution relating to the account until the Credit Union receives written instructions to the contrary from a Principal identified on the incorporated Resolution. Your authority to act with regard to the account may be revoked at any time by the Company. This Signature Card shall apply to all depository services obtained on this account now or in the future.

DocuSigned by:

Signature of Authorized Signer (person named above)        **2/6/2023**
                                    Date

The Company Authorization below **must be signed by a Principal in the presence of a Credit Union employee or Notary Public.**
**DO NOT SIGN THE COMPANY AUTHORIZATION UNTIL INSTRUCTED BY THE CREDIT UNION EMPLOYEE OR NOTARY!**

COMPANY AUTHORIZATION: (to be signed by a current Principal as recorded on the Resolution previously executed by the Company)

By signing below you certify that the person listed above is authorized by the Company to conduct transactions on the account designated and in accordance with Resolution previously executed by the Company and that you witnessed the person sign this document.

DocuSigned by:

**ROYDON NELSON**        **2/6/2023**        ROYDON NELSON
Signature of Principal (corresponds to a Principal listed on Resolution)    Date    Name of Principal

State of _____

County of _____

On this _____ day of _____, 20 ___, personally appeared before me, _____, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed as Principal above, and acknowledged that he/she executed the same.

S
E        Notary Public _____
A
L        My Commission Expires _____

CREDIT UNION AUTHORIZATION: (to be signed by a Credit Union employee)

I have personally reviewed the most recent Depository Resolution and Agreement or subsequent Change Current Principals dated _____ and verified that the person authorizing this Signature Card is named by the Company on that document as a Principal. I authorize the addition of the Authorized Signer on behalf of the Credit Union. If not notarized, I have verified the identity and witnessed the Principal sign this card to allow the addition of the Authorized Signer.

Signature of Credit Union Employee        Date        Teller #        ☑ ChexSystems Verified (new signers)



**MOUNTAIN AMERICA**
CREDIT UNION

# CERTIFICATION OF BENEFICIAL OWNERS

**P.O. BOX 2331 • SANDY, UT • 84091**

This Certification is incorporated with a previously executed Depository Resolution and Agreement for the Company
Persons opening an account on behalf of a legal entity must provide the following information:

## A: NAME & TITLE OF NATURAL PERSON OPENING ACCCOUNT
(Please print in black ink or type)

Name ROYDON NELSON          Title Secretary

## B: NAME & ADDRESS OF LEGAL ENTITY FOR WHICH THE ACCOUNT IS BEING OPENED

Proprietor/Business/Organization Name DIGITAL LICENSING, INC.

DBA Name (for all Proprietors and for LLCs or Corporations using a DBA name) _____

Street Address 30 N Gould St Ste N          City SHERIDAN          State WY          Zip 82801

## C: OWNERSHIP INFORMATION
(The following information for each individual, if any, who directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, owns 25 percent or more of the equity interests of the legal entity above. If no individual meets this definition, please write "Not Applicable.")

| Name | Date of Birth | Address (Residential or Business Street Address) | Tax ID Number: Social Security or ITIN | ID Type, Issuer, Number, Issue Date, and Expiration Date |
|------|---------------|-----------------|-----------------|-----------------|
| ROYDON NELSON | 9/13/1972 | 1615 North Raven Lane St George, UT 84770 | 0396 | State Driver's License UT 7126 8/22/2018   9/13/2023 |
| SCHAD E BRANNON | 1/16/1973 | 5818 WISH AVE ENCINO, CA 91316 | 7397 | US Passport 9869 7/21/2016   7/20/2026 |
| | | | | |
| | | | | |

## D: INDIVIDUAL WITH SIGNIFICANT RESPONSIBILTY FOR MANAGING THE LEGAL ENTITY
- An executive officer or senior manager (e.g. Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer); or
- Any other individual who regularly performs similar functions.

| Name | Date of Birth | Address (Residential or Business Street Address | Tax ID Number: Social Security or ITIN | ID Type, Issuer, Number, Issue Date, and Expiration Date |
|------|---------------|-----------------|-----------------|-----------------|
| ROYDON NELSON | 9/13/1972 | 1615 North Raven Lane St George, UT 84770 | 0396 | State Driver's License UT 7126 8/22/2018   9/13/2023 |

I, ROYDON NELSON (name of natural person opening account), hereby certify, to the best of my knowledge, that the information provided is complete and correct.

Should any of the beneficial ownership information change it is required for the current ownership to provide updates to Mountain America Federal Credit Union.

Signature *ROYDON NELSON* ——DocuSigned by:—— D2ECADDEB0A040B   Date: 2/6/2023

CREDIT UNION AUTHORIZATION: (to be signed by a Credit Union employee)
I have personally reviewed the most recent Depository Resolution and Agreement or subsequent Change Current Principals dated 2/6/2023 and verified that the person authorizing this Certification is named by the Company on that document as a Principal.

_____ / /_____   _____
Signature of Credit Union Employee          Date          Teller #

# TRUTH IN SAVINGS

## Savings Accounts

**For primary, secondary, money market, IRA money market, youth, teen, student and Coverdell Education Savings Accounts (CESAs), the following conditions apply:**

**Rate Information.** The dividend rate and annual percentage yield (APY) on your accounts are set forth herein. Dividend rates are variable and subject to change at any time without notice at the Credit Union's discretion.

**Compounding and Crediting.** Dividends will be credited to your account every month. If dividends remain in the account, they will be compounded. If you close your account or make a withdrawal before dividends are credited, you will not receive the uncredited or unpaid dividends.

**Balance Computation Method.** Dividends are calculated by the daily balance method which applies a daily periodic rate to the principal balance in the account each day.

**Dividend Period.** The dividend period is monthly. For example, the beginning date of the first dividend period of the calendar year is January 1, and the ending date of such dividend period is January 31. All other dividend periods follow the same pattern.

**Transaction Limitations.** Transaction limitations apply to all savings accounts as stated in the Membership Agreement.

**Money Market, IRA Money Market and CESA Accounts.** The dividend rate and APY are tiered and depend on the balance ranges set forth herein. Once a balance range is met, the dividend rate and APY for that range will apply to the full balance of your account.

**Youth/Teen/Student Savings Accounts.** Savings accounts opened by a member between the ages of 0 through 12 are considered youth savings accounts. When the member turns 13, these accounts will automatically convert to a teen savings account. Savings accounts opened by a member between the ages of 13 through 17 are considered teen savings accounts. When the member turns 18, these accounts will automatically convert to a student savings account. Savings accounts opened by a member between the ages of 18 through 25 are considered student savings accounts.

**Primary Savings Accounts.** When the member turns 26, these savings accounts will automatically convert to a primary savings account

### Minimum Balance Requirements per Savings Account Type

**Primary Savings Accounts** require a minimum of $1 to open. You must maintain a balance of $1. If your account balance on the last day of the month is below the $1 minimum balance, your account may be charged a $2 low-balance fee. If your balance is at least $1 on every day in the month but falls below $100 on any day during the month, your account will be charged a service fee of $5 once during the statement cycle. This fee will be waived if you have share savings, checking or active (within 12 months) loan products with the same account number. You must maintain a minimum daily balance of $100 in your account each day to obtain the disclosed APY.

**Teen/Youth/Student Savings Accounts** require a minimum deposit of $1. You must maintain a balance of $1. If your account on the last day of the month is below the minimum $1 balance, your account will be charged a single service fee of $5. This fee will be waived if you have share savings, checking or active (within 12 months) loan products with the same account number. You must maintain a minimum daily balance of $25 in your account each day to obtain the disclosed APY.

**Secondary Savings, Money Market, IRA Money Market and CESA Accounts** do not require a minimum balance to open.

## Certificates

**For standard, growth, Christmas Club, bump option, youth and IRA certificate accounts, the following conditions apply:**

**Compounding and Crediting.** Dividends may be credited to the certificate account monthly, becoming part of the principal balance, and are not eligible for withdrawal. Alternatively, at the time of opening, you may request to have dividends paid to you in the form of a transfer to another non-certificate share on the same account, rather than credited to this certificate account. Choosing to have dividends paid to you monthly will reduce earnings. The APY is based on the assumption that dividends will remain in the certificate account until maturity. If you close your account or make a withdrawal before dividends are credited, you will not receive uncredited or unpaid dividends.

**Balance Computation Method.** Dividends are calculated by the daily balance method which applies a daily periodic rate to the principal balance in the account each day.

**Early Withdrawal Penalties.** Early withdrawal penalties apply as stated in the Membership Agreement.

**Dividend Period.** The dividend period is monthly and follows the same dividend payment period as personal savings accounts.

**Renewal Policy.** Standard, growth, youth, and IRA certificates will adhere to the renewal policy as stated in the Membership Agreement. Youth certificates renew as a standard certificate when the youth reaches the age of 28. Christmas Club certificates do not renew automatically at maturity. All Christmas Club certificates mature on November 1, regardless of the open date, and convert to a secondary savings at maturity.

**Minimum Balance Requirements.** The minimum balance required to open a standard and IRA Certificates is $500. The minimum balance to open growth, youth and Christmas Club certificates is $5.

**Transaction Limitations.** Transaction limitations apply to all certificate types as stated in the Membership Agreement. Additional limitations are specified in the Unique Certificate Features section below.

### Unique Certificate Features

**Growth Certificate.** After opening, you can make additional deposits at any time within a maximum of $100,000 on deposit in any one, or combination, of growth certificate accounts per primary accountholder. An automated monthly deposit of at least $10 is set up at account opening. Upon meeting the $100,000 aggregate deposit limit, automated monthly deposits may be canceled by the Credit Union and no additional deposits will be allowed in any growth certificate for that member. In addition, the Credit Union reserves the right not to allow additional deposits into this certificate if you

fail to make the required $10 minimum deposit each month. When additional deposits are no longer allowed, this will not change the dividend rate, maturity date or other terms.

**Christmas Club Certificate.** After opening, you may continue to make deposits at any time with a maximum of $10,000 on deposit, in any one or combination of, Christmas Club certificates per primary accountholder. During the term, you may not make withdrawals until the maturity date.

**Bump Option.** By requesting the bump rate as an option on your standard or IRA certificate, you will agree to take a 0.25% reduction from the standard certificate rate in order to qualify for a potential rate increase later. You may choose to increase the dividend rate one time to the dividend rate currently offered for standard certificates of the same original maturity. Rate increases (bumps) must be initiated by you during the term of the certificate. You can only request one rate bump during the term. The new dividend rate will not be applied retroactively. The bump certificate is not automatically renewable. At maturity, the bump certificate will renew as a standard certificate without a bump option.

**Youth Certificate.** The owner of this account must be a qualified youth, which is defined as a person who is **27 years** of age or younger at the opening date. After opening, additional deposits of up to $10,000 are allowed annually through the age of 27 with a maximum of $100,000 on deposit in any one, or combination of, youth certificates per primary accountholder. Annually is defined as one year from the original opening date (anniversary date) of the certificate account. After opening, you may not make withdrawals until the maturity date. When you turn 28, the youth certificate will renew as a standard certificate.

## Personal Checking Accounts

**Minimum Balance Requirements.** There is no minimum balance required to open or maintain a personal checking account.

**Transaction Limitations.** No transaction limitations apply to checking accounts unless otherwise stated in the Membership Agreement.

**MyFree Checking℠.** (Business accounts not eligible. Share draft.) This checking account does not pay dividends. There is no monthly service fee, but fees for special services still apply (see Fee Schedule for details).

**MyStyle Checking℠.** (Trust accounts with an EIN number and Business accounts not eligible. Share draft.) This checking account does not pay dividends and is subject to a $7 maintenance fee once per calendar month. This fee will be waived if you make 20 debit and/or credit card purchases (ATM withdrawals do not count) during the previous month or maintain an average daily balance of $10,000 or more in your checking account. Members 24 years of age or younger or 60 years of age and older will not be charged the fee. For information regarding eligible products, services, and rewards, please visit **macu.com/mystyle**. Reward values may change without notice.

**MyExpress℠ Account.** (Business accounts are eligible.) This checking account does not pay dividends. There is no monthly service fee, but fees for special services apply (see Fee Schedule for details). No automatic transfers are allowed, and overdraft protection is not available. Access is limited to debit card use, and the account cannot be used for payroll purposes. Checks will not be issued. ATM and mobile deposits will be accepted.

## Business Accounts

*Certain business accounts will accrue dividends. Business Growth Checking (with dividends) and business sweep accounts will adhere to the same compounding and crediting and dividend periods as our other savings accounts.*

**Basic Organization Checking** (Non-profit organizations only.)

**Minimum Balance Requirements.** The minimum balance required to open a business account is $100.

**Transaction Limitations.** No transaction limitations apply unless otherwise stated in the Membership Agreement.

**Business Essentials Checking**

**Minimum Balance Requirements.** The minimum balance required to open is $100.

**Transaction Limitations.** If, during any two consecutive statement cycles, your total checks deposited and clearing the account exceed 300 items combined per statement cycle, or your total combined currency deposited and withdrawn exceeds $10,000 per statement cycle, your checking account will be converted to Business Growth Checking with Earnings Credit. No other transaction limitations apply unless otherwise stated in the Membership Agreement.

**Monthly Charge.** Your account will be subject to a monthly checking fee of $5 once during the statement cycle. This fee is waived if you opt out of paper account statements and elect to receive electronic statements.

**Business Growth Checking with earnings credit**

**Minimum Balance Requirements.** The minimum balance required to open is $100.

**Transaction Limitations.** Your account will be subject to a per-item fee of 10 cents per check deposited or clearing the account. Check counts will be aggregated for deposited and cleared checks. There is no charge for the first 300 aggregated checks per statement cycle. No other transaction limitations apply unless otherwise stated in the Membership Agreement.

**Monthly Charge.** Your account will be subject to a monthly checking fee of $15 once during the statement cycle. This fee may be offset by an earnings credit.

**Earnings Credit.** This account is entitled to an earnings credit to offset fees. An earnings credit will be calculated on the average daily balance during the statement cycle. The earnings rate is determined monthly by the Credit Union. Fees are subtracted from the earnings credit. A negative net difference will result in a net fee charge for that statement cycle. A positive net difference will result in no fee charged for that statement cycle. Positive net differences are not paid to the account or carried forward to the next statement cycle. However, if you notify us in advance, positive or negative net differences may be applied to the charges of another checking account of your business.

**Business Growth Checking with dividends**

**Compounding and Crediting.** Dividends will be credited to your account every month. If dividends remain in the account, they will be compounded. If you close your account or make a withdrawal before dividends are credited, you will not receive uncredited or unpaid dividends.

**Dividend Period.** The dividend period is monthly. For example, the beginning date of the first dividend period of the calendar year is January 1, and the ending date of such dividend period is January 31. All other dividend periods follow the same pattern.

**Minimum Balance Requirements.** The minimum balance required to open is $100, and the minimum balance required to earn dividends is $1,000. You must maintain an average daily balance of $5,000 to avoid a monthly checking fee. If, during any monthly statement cycle, your average daily balance is below the required minimum, your account will be subject to a monthly checking maintenance fee of $15 once during the statement cycle.

**Transaction Limitations.** Your account will be subject to a per-item fee of 10 cents per check deposited or clearing the account. Check counts will be aggregated for deposited and cleared checks. There is no charge for the first 300 aggregated checks. No other transaction limitations apply unless otherwise stated in the Membership Agreement.

**Business Sweep**

**Compounding and Crediting.** Dividends will be credited to your account every month. If dividends remain in the account, they will be compounded. If your account is closed or you make a withdrawal during a dividend period before dividends are credited, you will not receive the accrued but uncredited dividends.

**Dividend Period.** The dividend period is monthly. For example, the beginning date of the first dividend period of the calendar year is January 1, and the ending date of such dividend period is January 31. All other dividend periods follow the same pattern.

**Minimum Balance Requirements.** The minimum balance required to open is $50,000.

**Transaction Limitations.** Transaction limitations apply as stated in the Membership Agreement.

**Monthly Charge.** Your account will be subject to a monthly fee of $35 once during the statement cycle. This fee will be added to the analysis of your business checking account.

**Interest on Lawyers' Trust Accounts (IOLTAs) and Utah Association of Realtors Housing Opportunity Fund (UARHOF)[*]**

**Minimum Balance Requirements.** The minimum balance required to open is $0.

**Transaction Limitations.** No other transaction limitations apply unless otherwise stated in the Membership Agreement.

**Monthly Charge.** Your account will not be subject to a monthly checking fee (operating account is required).

*UARHOF accounts are available in Utah, Idaho, and Arizona.

**Real Estate Trust**

**Minimum Balance Requirements.** The minimum balance required to open is $100.

**Transaction Limitations.** If, during any two consecutive statement cycles, your total checks deposited and clearing the account exceed 300 items combined per statement cycle, or your total combined currency deposited and withdrawn exceeds $10,000 per statement cycle, your checking account will be converted to Business Growth Checking with Earnings Credit. No other transaction limitations apply unless otherwise stated in the Membership Agreement.

**Monthly Charge.** Your account will not be subject to a monthly checking fee (operating account is required).

**Organizational Representative Payee**

**Minimum Balance Requirements.** The minimum balance required to open is $0.

**Transaction Limitations.** No other transaction limitations apply unless otherwise stated in the Membership Agreement.

**Monthly Charge.** Your account will not be subject to a monthly checking fee (operating account is required).

**Dividend Rate.** This checking account does not pay dividends.

## Overdraft Privilege

Mountain America Credit Union charges a fee of $25 for each item posted to your account when the available balance is insufficient to pay the transaction, whether that item is paid or returned. This fee will be imposed for overdrafts or insufficiencies created by checks, ACH payments, debit card payments (if you opt-in to overdraft privilege for debit card transactions), or other electronic payments. An overdrawn balance must be repaid within 30 days. For more information on overdrafts and our overdraft protection and privilege programs, refer to the Overdraft section of your Membership Agreement.

If a consumer account (primarily used for personal and household purposes) has been open for at least 30 days, or if a business account has been open for at least 60 days, and thereafter the account is maintained in good standing, which includes at least: (1) bringing the account balance to a positive balance within every 30-day period, (2) not being in default on any loan or other obligation to the Credit Union, and (3) not being subject to any legal or administrative order or levy, the Credit Union will have the discretion to pay overdrafts within the overdraft privilege limits, but payment by the Credit Union is a discretionary courtesy and not a right of the accountholder or an obligation of the Credit Union.

Transactions may not be processed in the order in which they occurred, and the order in which transactions are received and processed may impact the total amount of fees incurred on the account.

## Fee Schedule

*The following fees may be assessed against your account, and the following transaction limitations, if any, apply to your account. All charges are per item, unless otherwise indicated on this schedule.*

| | |
|---|---|
| Account closed within 180 days of opening | $5 |
| Account research per hour ($15 minimum) | $25 |
| ATM research per hour ($15 minimum) | $25 |
| Transactions/inquiries for ATMs not owned by the Credit Union* | $1.50 |
| *Other third-party charges may apply. Transactions and inquiries will be charged separately. | |
| Bad address | $5 |
| Bill pay, monthly | No fee |
| Bill pay, per item | No fee |
| Check printing | Varies based on style selected |
| Collection item (incoming or outgoing) * | $10 |
| *For the first $1,000, plus $1 for each additional $100. | |
| Copy of check | $3 |
| Deposited check item returned unpaid | $5 |
| Dormant account, annually | $30 |
| Legal processing fee (i.e., garnishments, etc.) | Up to $100 |
| MyStyle Checking Account (if not offset) | $7 |
| Unpaid fee (NSF) | $25 |
| Overdraft | $25 |
| Mailed paper statement (free to members over 60 with checking) | $2 |
| Phone payment by credit card | $3.95 |
| Safe deposit box rental, annually* | $8–$60 |
| *Prices vary according to box size and member age. | |
| Safe deposit box, drilling | $150 |
| Safe deposit box, lock change | $135 |
| Single service fee | $20 |
| Stop payment item | $20 |
| Return ACH | $25 |
| Revoke ACH order | $20 |
| Visa® gift card | $2.50 |
| Replacement/additional card | $5 |
| Wire transfer, inbound* | $10 |
| Wire transfer, outbound* | $15 |
| Wire transfer, international* | $30 |

*Inbound wire transfers are received until the Fed. cut-off time of 5 p.m., Monday–Friday Outbound wire transfer cut-off time for personal accounts is 3 p.m., Monday–Friday

**Business Account Fees**

(Applies to business and non-profit organization accounts.)

**The following fees are in place of or in addition to those listed above.**

| | |
|---|---|
| Business sweep, monthly | $35 |
| Cumulative cash handling (deposits/withdrawals) * | |
| *No fee for first $10,000 per month. 35 cents for each additional $1,000. | |
| Deposit correction (unbalanced deposit) | $5 |
| Endorsement stamp | Varies based on style ordered |
| Merchant services | Varies based on transactions |
| Special handling of return deposits (collection agency) | $3 |
| Loose coin handling | 3% |

Additional service fees may apply as disclosed in business product and service agreements.

## Contact Information

**Mailing Address**
Mountain America Credit Union
P.O. Box 2331
Sandy, UT 84091

Mountain America Corporate Offices
9800 South Monroe Street
Sandy, UT 84070

**Website**
macu.com

**Phone**
801-325-6228 or toll-free 1-800-748-4302
To report a lost or stolen card, call 1-800-682-6075.

**Business Days**
Monday through Friday, except state and federal holidays
More detailed information is available upon request.

| **FACTS** | **WHAT DOES MOUNTAIN AMERICA CREDIT UNION DO WITH YOUR PERSONAL INFORMATION?** |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>■ Name, address, Social Security number and income<br>■ Credit history and credit scores<br>■ Account balances and transaction history<br><br>When you are no longer our member, we will only continue to share your information as permitted or required by law as described in this notice. |
| **How?** | All financial companies need to share members' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their members' personal information; the reasons Mountain America Credit Union chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Mountain America Credit Union share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes—** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes—** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes—** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes—** information about your creditworthiness | No | We don't share |
| **For our affiliates to market to you** | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |

| **Questions?** | Call 1-800-748-4302, go to www.macu.com or write to us at Mountain America Credit Union, P.O. Box 2331, Sandy, UT 84091. |
|---|---|

DocuSign Envelope ID: 2383E899-24EE-119B-AAC0-95AC5425C7CC

| Who we are | |
|---|---|
| **Who is providing this notice?** | Mountain America Credit Union |

| What we do | |
|---|---|
| **How does Mountain America Credit Union protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.<br><br>Additionally, we restrict access to nonpublic personal information to our employees, employees of our affiliates and those who need information in order to provide products or services to you. |
| **How does Mountain America Credit Union collect my personal information?** | We collect your personal information, for example, when you<br><br>■ Open an account or deposit/withdraw money<br>■ Apply for any credit union service(s)<br>■ Pay your bills or apply for a loan<br>■ Use your credit or debit card(s)<br>■ Obtain Information from our website<br>■ Obtain a product or service from Mountain America Financial Services, LLC or Mountain America Insurance Services, LLC<br><br>We also collect personal information about you from others including credit bureaus and other companies |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br><br>■ Sharing for affiliates' everyday business purposes—information about your creditworthiness<br>■ Affiliates from using your information to market to you<br>■ Sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>■ *Our affiliates are Mountain America Financial Services & Mountain America Insurance Services* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>■ *Mountain America Credit Union does not share with non-affiliates so they can market to you.* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>■ *Our joint marketing partners include investment and financial service providers and insurance companies.* |

DocuSign Envelope ID: D783E880-2455-446B-AAC9-D5AC5A25C7CC



# MEMBERSHIP AGREEMENT

# MOUNTAIN AMERICA FEDERAL CREDIT UNION

# MEMBERSHIP AGREEMENT

- INTRODUCTION

- MEMBERSHIP, ACCOUNT AND ACCOUNT SERVICES

- ELECTRONIC SIGNATURES, ELECTRONIC CONTRACTS AND ELECTRONIC RECORDS

- ELECTRONIC FUNDS TRANSFERS & AGREEMENT

- FUNDS AVAILABILITY

- TRUTH-IN-SAVINGS DISCLOSURE

- UNIFORM COMMERCIAL CODE FUNDS TRANSFERS

**Notice to Members:** The laws and regulations governing the financial services we provide are complex. To ensure you understand our relationship with you, we provide this detailed agreement that explains both your responsibilities and ours. **This Membership Agreement includes an Arbitration and Waiver of Class Action, which substantially limits your right to bring a legal action in a judicial forum or to bring an action as part of a class.** Please read this document carefully, and feel free to ask any questions regarding these terms and conditions.

**The English language version of this Agreement shall be controlling in all respects and shall prevail in case of any inconsistencies with the translated version or mistranslation, if any. Any translated version of this Agreement is provided only as a convenience to our members and shall not govern.**

DocuSign Envelope ID: D783F890-2455-416B-AA5B-B5AC5A25C7CC

## INTRODUCTION

This document and any other documents we give you pertaining to your account(s) explains the rules that govern your account(s) and account services with us. Please read all documents carefully and keep them in a safe and convenient place.

Your relationship with the Credit Union is also governed by state and federal laws, which may change from time to time. The body of law is too large and complex to be reproduced here. The purpose of this document is to: (1) summarize the rules applicable to common Transactions, (2) establish rules to govern Transactions not regulated by state or federal law, (3) establish variations to certain events or Transactions permitted by applicable law, and (4) provide you with certain disclosures and information regarding our policies as required by law. By signing a Membership Application or your use or continued use of any account or account services after receiving this document, notice of its availability or notification of any change in terms, you, jointly and severally, acknowledge that you understand and agree to the terms and conditions stated in this document, as amended from time to time. If you have any questions regarding any term or condition in this document, please ask us before signing the Membership Application or using any of our services.

### MEMBERSHIP, ACCOUNT AND ACCOUNT SERVICES AGREEMENT—GENERAL TERMS AND CONDITIONS

**Terms, Conditions and Limitations of Your Relationship with the Credit Union.** The purpose of this Section is to state the terms and conditions that apply to all of your accounts, account services or other relationships with us, including without limitation loan, safe deposit and other services. You understand that the agreements, terms, conditions, rules and regulations applicable to your loans, and any other applicable account(s) or service(s) remain in full force and effect and continue to be applicable, except as specifically modified by this Agreement. Further, to the extent that the terms of a specific Subsection of this Agreement vary from the terms set forth in this Section, the specific terms and conditions of the Subsection will govern our relationship with you.

**General Definitions.** In this document, the words "you," "your(s)," or "my" means everyone that signs any Membership Application or is authorized to make Transactions regarding your account(s) as provided herein or by governing law, including any account service(s). "We," "us," or "our" means the Credit Union. The following capitalized terms when used in this Account Agreement shall have the meaning as set forth below:

> **Access Device** means any card, electronic Access Device and/or any codes, passwords or personal identification numbers (PINs) that we issue to allow you to access and/or use any account or other services.

> **Authorized User** means any person who has actual, implied or apparent authority, or any Owner who has at any time given any information, Access Device or documentation that enables such a person to access, withdraw, make Transactions to or from your accounts, or use any of your account services. If you authorize anyone to use your Access Devices, the authority shall continue until you specifically revoke such authority by notifying the Credit Union. If you fail to maintain the security of these access codes and the Credit Union suffers a loss, we may terminate any or all of your account services immediately. This definition is intended to be construed broadly and includes without limitation all Authorized Users acting under a written document, such as a power of attorney, as well as any person or entity that is authorized to make deposits or debits to or from your accounts with us.

> **Check** means an acceptable written Instrument on your account(s) and includes the term **Share draft**.

> **Instrument** means a written order as defined by Articles 3 and 4 of the Utah Uniform Commercial Code.

> **Member** means the person(s) or entities that have established their Membership with us as set forth in this Agreement and applicable law. Each person or entity must deposit and maintain the par value of the required Shares to be a Member.

> **Membership Application** means any signature card, account change form or other form required to open or change an account or obtain an account service with us.

> **Owner** means the person(s) or entities that have a present ownership interest in the sums on deposit in single or in multiple-party (joint) accounts with the Credit Union, subject to the Credit Union's lien rights or any security interest. A person or entity is not an Owner unless specifically designated as such in a completed and signed Membership Application.

2

**Shares.** For the purpose of your pledge to secure your obligations to the Credit Union, our common law right of setoff, and otherwise, Share(s) means all deposits in any savings, checking, club, money market, certificate, P.O.D., revocable trust or custodial account(s), whether jointly or individually held—regardless of contribution—that you have on deposit now or in the future, all of which are deemed general deposits. Your pledge does not include any I.R.A., Keogh, tax escrow, irrevocable trust or fiduciary account in which you do not have a vested ownership interest.

**Share Drafts** include checks and other Instruments drawn on your account(s) or submitted for deposit or collection.

**Transaction** means any deposit, order, transfer, payment, purchase via Point-of-Sale Transaction or otherwise, withdrawal or other instruction relating to any account or account service provided by the Credit Union.

**Your Agreement with the Credit Union.** All accounts and account services are governed by the terms and conditions in this document; your Membership Application(s), account receipts, statements and certificate; any other application or agreement we require; together with the Credit Union's Bylaws, policies and procedures, which are herein collectively referred to as **Agreement**. This Membership and Account Agreement governs all your accounts and services, including, but not limited to, loan services, whether opened now or in the future, except as otherwise specifically provided in this document or other agreement(s) with us. This Agreement may be amended or revised by us at any time, and any change in the Agreement shall be effective at the earliest time allowed by law. This Agreement is binding upon all parties hereto and their heirs, successor, assigns and any other person claiming any right or interest under or through said parties.

**Inappropriate Transactions.** You warrant and agree that you will not use any Credit Union account(s) or Services, including, but not limited to, loans to make or facilitate any illegal Transaction(s) as determined by applicable law; and that any such use, including any such authorized use, will constitute a breach of this Agreement. The Credit Union may decline to accept, process or pay any Transaction that we believe to be illegal or unenforceable (regarding your obligation to pay us) under applicable law, including, but not limited to, any Transaction involving or relating to any gambling activity. You agree that the Credit Union will not have any liability, responsibility or culpability whatsoever for any such use by you or an Authorized User(s); or for declining to accept, process, or pay any such Transaction. You further agree to indemnify and hold the Credit Union harmless from any suits, liability, damages or adverse action of any kind that results directly or indirectly from such illegal use.

**Limitation of Services and Facility Access.** The availability of Member services and/or access to Credit Union facilities for Members who engage in threatening, abusive, disruptive, obscene, harassing or illegal behavior or otherwise injure any person or damage property while on Credit Union premises or at any Credit Union function may be limited. The Credit Union reserves the right to deny services or onsite access, or to expel from its Membership any Member who verbally or physically harasses Credit Union employees in any manner, in accordance with the Policies and Bylaws of the Credit Union.

**Unlawful Internet Gambling Enforcement Act.** The Unlawful Internet Gambling Enforcement Act of 2006 prohibits businesses from disbursing payments in connection with unlawful internet gambling. Under the Act, any person engaged in the business of betting or wagering (as defined by the statute) is prohibited from completing restricted Transactions or knowingly accepting payments in connection with the participation of another in unlawful internet gambling. The credit union will not open accounts for any business involved in this type of activity. However, as required by law, we monitor all account activity and will restrict any Transactions connected with unlawful internet gambling. If unlawful internet gambling activity is detected, the account may be restricted or closed.

**Controlled Substances Act.** The Credit Union will not open any business accounts involving dispensaries, agents, businesses (including companies maintaining a material vendor relationship with such companies) supporting the use or distribution of any Schedule I controlled substance listed under the Controlled Substances Act (21 U.S.C.A § 812), including, but not limited to, medical or recreational marijuana and synthetic marijuana (spice). As required by law, the Credit Union will monitor all account activity and will restrict any business account Transactions connected with controlled substances. If controlled substance activity is detected, the account may be restricted or closed.

**Taxpayer Identification Numbers and Certification.** Pursuant to the Membership Application used to establish your Membership with us, you provided a certification regarding the accuracy of your taxpayer identification number (usually your Social Security number) and whether your account is subject to backup withholding under the Internal Revenue Code. You acknowledge and agree that this certification applies to any and all accounts you have with us now or in the future, unless you provide written notification to us that specifically provides otherwise.

**Transaction Limitations and the Credit Union's Business Days.** Except as may be otherwise specifically provided herein or our other specific written agreements with you, all Transactions after our daily cut-off time and on days that are not our business days as set forth in the Fee Schedule will be treated, transmitted, recorded, etc., as applicable and appropriate as if received on the next business day we are open. Deposits, orders, instructions, requests, etc., received by mail, electronically, at an unstaffed facility or outside depository will be processed and credited only when actually received by us, and we shall have no responsibility until we actually receive the item.

**Membership Benefits and Obligations.** Upon approval of your application and the deposit of any required Shares, you become a Member-Owner of this Credit Union. As a Member-Owner, you are eligible to apply for all Credit Union deposit, loan and other financial services. You have an obligation to the Credit Union and all other Member-Owners to follow the rules established from time to time for the use of these services, and not to cause the Credit Union any loss. This includes, but is not limited to, your obligation to repay all debts, loans and credit advances as well as other contractual, equitable and statutory obligations that may be payable by you to us.

3

**CROSS-COLLATERALIZATION. To reduce the possibility of loss, Members grant to the Credit Union a lien on all Shares and agree that all collateral pledged to secure any loan obligation owed to us will also secure payment of your other obligations. This pledge will secure all obligations owed at the time of the pledge or which arise thereafter. This cross-collateralization of your obligations applies to all debts regarding your accounts, loans or otherwise, including, but not limited to, each closed-end loan obligation, each advance under any open-end loan plan, all obligations under any credit card agreement with us and overdrafts. Unless a contrary intent is evidenced in writing, obligations secured by a primary residence are not included in the cross-collateralization of your obligations to us.**

**Membership Eligibility and Future Services.** To open or maintain any account(s) or service(s) with us, you must qualify for Membership and deposit and maintain the par value of the required Shares as provided by the Credit Union's Bylaws and other applicable laws. To verify your eligibility for any account(s), service(s) or loan products, now and in the future, and to provide you with marketing communications related to the same, you agree that we are authorized to verify financial information, data and employment history by any means. This information is obtained from multiple data sources, including obtaining a consumer report by a consumer reporting agency. You agree that this authority applies to any account, account-related service, loan or other financial products you request or that we may offer or make available to you. We may also report information concerning your account(s) and credit to others as allowed by law.

**Deposits to Your Account(s) and Instruments Cashed.** Funds may be deposited to any account, in any manner that is acceptable to us. Deposits may be made by mail, in person at any of our offices having facilities to accept deposits, or by direct deposit or other electronic funds transfer allowed by us.

**Endorsements.** You authorize us, at our discretion, to accept transfers, checks, drafts and other items for deposit into any of your accounts if they are made payable to, or to the order of any one or more Owners on the account, whether or not endorsed by all payees. All Owners are deemed to receive the benefit of all deposits and the proceeds of such deposits; and we may give cash back to any payee. You authorize us to supply missing endorsements of any Owners. If an insurance, government or other check or draft requires an endorsement as set forth on the back of the check or draft, we may require endorsement as set forth on the item. Endorsements must be placed in the space on the back of the Share draft or check between the top edge and 1.5 inches from the top edge. We may accept drafts or checks with endorsements outside this space. However, if any such endorsement or any other markings you or any prior endorser has made on the draft or check cause any delay or error in processing the item for payment, you will be responsible for any loss incurred by us due to the delay or error.

**Bulk Deposits.** We may require multiple deposited checks (more than 10 items) to be prepared in bulk (batch) before accepting the deposit. This is done by providing two adding machine tapes that itemize and total your individual checks within the deposit. We may, but are not obligated to, initially accept the batch for its face value without verifying the value of each item in the batch. Verification of the items will occur in the check proof process. We reserve the right to adjust your balance to correct any differences between the initial posted deposit amount and the subsequent item verified deposit amount. The Credit Union may charge a fee for deposit corrections as set forth in the Fee Schedule.

**Collection of Deposits.** In handling deposits to your account, we act only as your agent for collection and assume no responsibility beyond the exercise of ordinary care. By signing the Membership Application or using any accounts or services, you specifically waive your rights to notice of non-payment, dishonor or protest regarding all items presented for collection. We have the right to refuse any order, transfer or deposit, limit the amount that may be offered for deposit and return all or any part of a deposit. Special instructions for handling an item are effective only if made in writing and given to us separately along with the item in question. We will not be liable for any default or negligence of correspondents or for loss in transit, and each correspondent will only be liable for its own negligence. Items and their proceeds may be handled in accordance with applicable Federal Reserve and Clearing House rules. Without prior notice to you, we may charge back any item at any time before final payment, whether returned or not, and may also charge back any item drawn on us if, within the normal handling period for such item, the item cannot be honored against the drawer's account. We are authorized to pursue collection of previously dishonored items (including re-presentment), and in so doing, we may permit the payer bank to hold an item beyond the midnight deadline. Items that we present or re-present may be truncated or converted to an electronic or other format.

**Direct Deposits.** We may offer a direct deposit option allowing you to preauthorize deposits (e.g., payroll checks, Social Security or retirement checks, or other government checks) or preauthorize transfers from other accounts with us. You must authorize any direct deposits to your accounts by a separate authorization form. If applicable, you must notify us at least 30 days prior to any direct deposit or preauthorized transfer if you wish to cancel or change the direct deposit or direct transfer option. You agree that you have an obligation to notify us immediately regarding the death of any person that receives any federal or state retirement, welfare, benefits or other payments via electronic or other deposit. If we are required to reimburse the federal or any state government, agency or authority for any payment deposited into your account for any reason, you agree that we may deduct the amount returned from any of your accounts, unless prohibited by law, and that you will be obligated to repay to us on demand any such sums.

**Direct Deposit or Transfer Authorization/Bankruptcy.** If you file bankruptcy and fail to cancel any instructions in your direct deposit or transfer authorization, then you hereby instruct us to continue to make and apply deposits, make loan payments in order to avoid delinquency and perform other transfers in accordance with your authorization until written notification is received by us to discontinue any payments or transfers.

**Deposit at ATM and Night Deposit Facilities.** All deposits and payments made at a designated ATM or at one of our night deposit facilities are subject to the provisions and Check collection procedures as disclosed to you in our **Funds Availability Policy.**

DocuSign Envelope ID: D783E890-2455-416B-AAC9-D5AC5A25C7CC

Deposit Transactions of cash and other items to your account(s) can only be accepted at specifically designated ATMs. Not all of our ATMs can process deposit Transactions. If you make a deposit or payment at an ATM, you agree that in the event of a discrepancy, whether the deposit or payment was made with or without an envelope, that amount verified by the Credit Union using all records available, whether it be an envelope, written receipt, deposit slip or electronic receipt, is the correct amount. You further agree that the credit to account(s) for non-cash items will be conditional until we can collect the item. If we cannot collect the amount of a non-cash item, the amount will be deducted from your account.

**Final Payment.** All items, deposits, automated clearing house (ACH) transfers or other transfers credited to your account are provisional and subject to our receipt of final payment. If final payment is not received, we reserve the right to charge your account for the amount of such items or ACH transfers or both and impose a return item charge on your account. The effective date of the return item might be the date your account was credited with the amount(s) of the provisional item(s). If we incur any fee collecting any item, we may charge such fee to any of your accounts with us. We reserve the right to refuse or to return all or any item or funds transferred. We also have the right to charge back against any of your accounts with us all deposits, transfers or collection items, including checks presented for payment of cash, that are returned to us due to non-payment, as a reclamation by the United States Treasury, or if we are required to repay any amounts previously collected for any reason whatsoever. These rights apply regardless of whether the amount of the item has been available for your use or the amount of time that has passed since the date of the deposit.

If, for any reason, you do not have sufficient funds in your accounts to satisfy our charge back, then all joint Owners agree to pay us the amount charged back on demand, together with all fees and costs as set forth herein.

We may debit your account into overdraft on a charge-back situation and not be liable for damages to you as a result of the charge-back. Nothing in this Agreement shall be construed to require us to debit the account into overdraft or to create an arrangement for the extension of credit by means of overdrafts.

**Transactions from Your Account(s).** Generally, you may withdraw and/or transfer funds from your account(s) at any time subject to the limitations set forth in this section and the Funds Availability Disclosure in effect at the time of the deposit. Except as otherwise specifically provided in this document or other written agreement(s) with us, all withdrawals shall be made in person or by written order, duly executed or by power of attorney upon a form acceptable to us and duly authenticated. Payments upon your order may be made in coin, bills or checks at our option. You also agree that your account(s) are not assignable or transferable except to us, unless specifically authorized by the Credit Union in writing.

**Restrictions on Withdrawals from All Accounts.** In accordance with applicable law, we reserve the right to require you to provide written notice of any intended withdrawals from any account(s) of not less than 7 but not more than 60 days before the intended date of withdrawal. We will pay your withdrawal orders in any order we choose. We may refuse to allow a withdrawal and will advise when required by applicable law if, for example: (1) there is a dispute between account Owners, (2) a legal garnishment, attachment or levy is served on us, (3) the account(s) secures any obligation owed to us, (4) any required documentation has not been provided to us, or (5) you are delinquent or fail to pay a loan or any other obligation owed to us when due.

**Transaction Limitations for All Share Savings and Money Market Savings Accounts.** During any calendar month, you may not make more than 6 withdrawals or transfers to another Credit Union account of yours or to a third party by means of a preauthorized, automatic, telephonic, home banking or audio response transfer or instruction. A preauthorized transfer includes any arrangement with us to pay a third party from your account upon oral or written orders, including orders received through ACH. If you exceed the transfer limitations set forth above in any statement period, we may reverse or refuse to make the transfer.

If payment is made directly to the depositor, you may make an unlimited number of withdrawals from these accounts in person, by mail, at an ATM or by telephone if the withdrawal is mailed to you in a check. There is also no limit on the number of transfers you may make to any loan account(s) with us.

**Certificate.** Any certificate account offered by the Credit Union is subject to the terms of this Agreement and any account receipt or documentation that are incorporated herein by reference. Individual Retirement Account (IRA) certificate accounts are also subject to the limitations imposed by federal law and regulations and to any limitations set forth in your Credit Union IRA Agreement, the terms of which are also incorporated herein by reference.

**Individual Retirement Accounts (IRAs).** IRA deposit accounts offered by the Credit Union are subject to the limitations imposed by federal laws and regulations and to any limitations set forth in your IRA Credit Union Agreement/Disclosure, the terms of which are also incorporated herein by reference.

IRAs cannot be pledged as security for loans. You are solely responsible for complying with any requirements, including Transaction limitations and penalties for early withdrawal under the Internal Revenue Code or other applicable Federal or State law governing any IRA or other Credit Union accounts. Deposits are not limited. Transfers to a Credit Union IRA account are allowed, subject to applicable law and the minimum balance requirements and other restrictions applicable to the account.

**Idaho Medical Savings Account (State Tax-Deductible Savings).** Eligibility requirements, contributions to and payments from your MSA are subject to the rules determined by the Idaho State Tax Commission. A primary Share is required to open this secondary account. There are no

5

DocuSign Envelope ID: D783E890-2455-416B-AAC9-B5AC5A25C7CC

special documents to complete, and the Credit Union is not required to monitor or report to the Internal Revenue Service other than dividends earned on this account. MSA funds cannot be pledged as security for loans. Funds in this Account are not available for overdraft protection to other accounts.

**Checking Accounts.** The Credit Union may refuse any check or other item drawn against your account or used to withdraw funds from your account if it is not on a form approved by us. We also reserve the right to refuse any check or other item drawn against your account or used to withdraw funds from your account if made in a manner not specifically authorized for your account, if made more frequently or in a greater number than specifically permitted for your account, or if made in an amount less than the minimum withdrawal or transfer specifically permitted for your account. If we accept a check or other item not on a form approved by us, you will be responsible for any loss by us in handling the item.

Because of the nature of the Credit Union check program, neither the Credit Union nor any other processing entities shall be responsible for the authenticity of the checks with regard to the signature or alterations; and checks, when presented, shall be paid without verification. We may disregard all information on or any writing or memorandum attached to any check or item except for your signature, the amount and the information that is magnetically encoded. You agree that we do not fail to use ordinary care because our procedures do not provide for sight examination.

**Business Sweep.** The business sweep is a repository for excess business checking funds. If you have a business sweep account, you agree to maintain a business checking account on the same account number at all times. If you close your business checking account, your business sweep will be closed. You may have unlimited transfers, subject to available balance, between your business checking and business sweep accounts. Transfers will occur automatically on your behalf to maintain preset balances or to clear items presented against your business checking account. Your business sweep account may be linked to more than one checking account of your business, at no additional charge, provided that all linked accounts are titled the same. The business sweep account is subject to the following Transaction limitations: (1) all Transactions must occur as transfers between the sweep account and business checking account, (2) ATM Transactions are not permitted, (3) cash, checks, cashier's checks, ACH or other items may not be directly drawn against the business sweep account, and (4) cash or other items may not be deposited directly to the sweep account.

**Account Rates and Fees.** Our payment of dividends on your account(s) is subject to the account rates, fees, compounding and crediting policies and balance requirements set forth in this Agreement or the Fee Schedule.

Fees applicable to all accounts and account services are set forth in this Agreement or the Fee Schedule. We may transfer from any of your account(s) any charges or costs in connection with the operation and maintenance of account(s) as stated in this Agreement or the Fee Schedule. You agree that we may change this Agreement or the Fee Schedule at any time upon proper notice as required by law.

**Authorized Signature.** We are authorized to recognize any signature on a Membership Application or document but will not be liable for refusing any order or item if we believe in good faith that the signature on any order or item is not genuine. We are authorized to honor any Transactions initiated by a third person if you provide your Access Device or other information to a third person. Also, if you authorize the use of a facsimile signature, we shall not be liable for honoring any Instrument that appears to bear your facsimile signature, even if made by an unauthorized person.

**Account Access.** You may make deposits, withdrawals, transfers and other authorized Transactions from your account(s) in any manner specifically permitted by us, subject to the limitations and restrictions set forth in this Agreement or as otherwise provided for by applicable law.

**Authorized User(s).** You should exercise caution in providing authority, information, documentation or Access Devices to others. All withdrawals, transfers and Transactions made by any person to whom you have at any time provided authority or the means to access your accounts or other services shall be deemed authorized by you, and the Credit Union will not have any responsibility or liability whatsoever for such withdrawals, transfers or other Transactions. You and the person authorized (as defined herein) shall be jointly and severally responsible to the Credit Union for all such access or use of your accounts and services with us.

**Access to Account Information.** You agree that all Owners, borrowers and Authorized Users, may have access to all of the information you provide to us, or which we gather and maintain regarding our relationships with you. This includes, but is not limited to, information regarding Transactions, account history, your loan relationships with us, and other information relating to or arising with regard to any of your accounts, loans or other services with us. You acknowledge and agree that any Owner of a joint account or service, or any co-borrower, may provide authority to others, who will have access to all such information as to all Owners and/or co-borrowers. Further, you understand that we utilize a consolidated statement for each account, including account services, loans and all other services. You understand and agree that we are authorized to send jointly and/or provide to any individual Owner or borrower a statement that includes all of the information on the consolidated statement even though all parties receiving the statement may not be Owners or borrowers as to all of the accounts or services addressed in the statement.

**Sharing Information with Co-Borrowers, Co-Signers, Owners of Collateral Pledged and Other Lienholders.** You hereby consent and agree that we may share any information regarding your obligations with us or collateral pledged to secure any obligations you owe to the Credit Union with the persons listed in this subsection.

**Power of Attorney.** The Credit Union may allow a third person acting as your attorney-in-fact to make Transactions regarding your account(s), pursuant to a Power of Attorney, but has no obligation to do so. You agree that we have no obligation to verify the scope, authenticity and validity of any Power of Attorney presented to us. If we accept the Power of Attorney, the Credit Union has no duty to inquire as to the use or purpose of any Transaction(s) by your attorney-in-fact and may restrict or refuse account access, withdrawals and transfers. Further, you agree to reimburse the Credit Union for all costs and expenses, including attorneys' fees, we incur and agree to indemnify us for any loss or other expense we incur from our acceptance of your Power of Attorney.

**Payment Order of Items.** The law permits us to pay items (such as checks or drafts) drawn on your account in any order. To assist you in handling your account with us, we are providing you with the following information regarding how we process the items presented to your account for payment.

> **Checks.** Each day, checks drawn on your account and presented to us for payment will be processed in lowest to highest check serial number order. A check presented for payment in a branch may have funds held until the check is processed through the Federal Reserve.

> **ACH Payments.** Each day, the Federal Reserve sends us files with ACH payments. These include, for example, automatic bill payments and other electronic payments. We will process ACH payments from the lowest to highest dollar amount order by Transaction type. A written stop payment order (SPO) will remain in effect until either: (a) you withdraw the SPO; or (b) the debit Transaction is returned, or if the SPO applies to more than one debit Transaction from a specific originating party, all such debit Transactions are returned.

> **Point-of-Sale (POS) Debit Card Transactions.** POS Transactions occur when you use your debit card to purchase goods and services. There are two types of POS Transactions: PIN and Signature. In a PIN Transaction, you use your debit card and enter your PIN at the time of the sale. They are similar to ATM withdrawals because money is usually deducted from your account immediately at the time of the Transaction. In a Signature Transaction, you make a purchase with your debit card and do not enter your PIN, but you are instead asked to sign for the purchase. In these situations, the merchant may seek prior authorization for the Transaction. When that happens, the Credit Union will place a temporary hold against the available funds in your account. We refer to this temporary hold as an authorization hold, and the amount of the authorization hold will be subtracted from your available balance. Authorizations are deducted from your available balance but not your current balance as they are received by us throughout each day. At some point after you sign for the Transaction, it is processed by the merchant and submitted to us for payment. This can happen hours or sometimes days after you signed for it, depending on the merchant and its processing company. These payment requests are received in real time throughout the day and are posted to your account as they are received.

> **ATM and other cash withdrawals** are processed as they occur.

**Overdrafts.** An overdraft occurs if the available balance in your account is not sufficient to cover a Transaction or multiple Transactions. Overdraft Transactions may be paid or returned unpaid for nonsufficient funds depending on whether or not your account has Overdraft Protection, Overdraft Privilege or Overdraft Privilege Opt-In for debit card Transactions. Your account may be subject to a charge for the item, whether paid or returned as set in our Fee Schedule. More than one overdraft fee may be charged against the account per day, depending on the Transactions that are submitted to the Credit Union for payment. The Credit Union will not charge more than five overdraft fees per day. If an item is returned to a payee for insufficient funds that results in a non-sufficient funds (NSF) fee and the payee resubmits the item for payment, additional fees may be assessed for that same item. Except as otherwise agreed in writing, the Credit Union, by covering one or any overdraft, does not agree to cover overdrafts in the future and may discontinue covering overdrafts at any time. If the Credit Union pays a check or draft that would otherwise overdraw your account, you agree to pay the overdraft amount immediately. The Credit Union reserves the right to pursue collection of previously dishonored items at any time.

> **Overdraft Protection.** If the Credit Union has approved an overdraft protection plan for your account, the credit union may honor drafts drawn on insufficient funds by transferring funds from a Share account, another deposit account, or loan account as you have directed. No more than 6 transfers from deposit Shares may be permitted in any calendar month. Once the transfer total for the month has reached 6, any overdraft items may be returned or may be paid if Overdraft Privilege applies to your account. There is no fee if overdrafts are paid with a share or loan account.

> **Overdraft Privilege.** If there is not enough money in the available balance of your account to cover a Transaction at the time it is presented for payment and Overdraft Protection is not available, then the Credit Union may pay the item on your behalf if you are eligible for Overdraft Privilege. Overdraft Privilege covers ACH and account drafts, but excludes debit card Transactions, except as set forth herein. Overdraft Privilege can cover debit card Transactions if you choose to **Opt-In** by providing affirmative consent online, in the branch or over the phone. If an overdraft item is paid with Overdraft Privilege, then the Credit Union will charge a fee to your account in accordance with our Fee Schedule.

> **Overdraft Privilege Eligibility.** If a consumer account (primarily used for personal and household purposes) has been open for at least 30 days, or if a business account has been open for at least 60 days, and thereafter the account is maintained in good standing, which includes at least: (1) Bringing the account balance to a positive balance within every thirty (30) day period for a minimum period of 24 hours; (2) not being in default on any loan or other obligation to the Credit Union, and (3) not being subject to any legal

or administrative order or levy. The Credit Union will have the discretion to pay overdrafts within the Overdraft Privilege limits, but payment by the Credit Union is a discretionary courtesy and not a right of the accountholder or an obligation of the Credit Union.

Overdraft Privilege applies to all Transactions for business accounts. For consumer accounts, Overdraft Privilege applies to check and ACH payments unless you tell us you don't want it. Overdraft Privilege does not apply to everyday debit card Transactions unless you **Opt-In.** If an overdraft item is paid with Overdraft Privilege, then the Credit Union will charge a fee to your account in accordance with our Fee Schedule.

**Important Information Regarding Available Balance.** Your checking account has two kinds of balances: the current balance and the available balance. Both can be checked when you review your account online, at an ATM, by phone or at a branch. The Credit Union authorizes and pays Transactions using the available balance in your account. Thus, if your available balance is not sufficient to cover a Transaction at the time it is presented to us for payment, any available Overdraft Protection and/or the amount of the Overdraft Privilege limit, may be used to authorize and pay it. Overdraft fees for Overdraft Privilege will be assessed based on the available balance at the time Transactions are posted to your account, not when Transactions are authorized. Therefore, it is important to understand how the two balances work so that you know how much money is in your account at any given time. This section explains current and available balances and how they work.

Your **current balance** is the amount of money that is in your account at any given time. It reflects payment Transactions that have posted to your account, but not payment Transactions that have been authorized and are pending. It also reflects the full amount of all deposits, even though some portion of a deposit may be on hold and may not be available to you (see the Funds Availability Policy of this Membership Agreement).

Your **available balance** is the amount of money in your account that is available for you to use. The available balance will account for holds placed on deposits (see the Funds Availability Policy) and pending Transactions (such as pending Signature debit card purchases) that the Credit Union has authorized but that have not yet posted to your account.

The following example illustrates how available balance works with Signature debit card Transactions:

Assume a Member has $100 in their available and current balances. The Member uses their debit card to buy a shirt for $95. The merchant seeks authorization for the Transaction, and an authorization hold is placed on the account for $95. The available balance is reduced to $5 but the current balance is still $100. On the way out of the store, the Member uses their debit card to buy a pair of pants for $30. Another authorization hold is placed on the account for $30, so the available balance is reduced to -$25, but the current balance is still $100. Assume the Transactions post the next day and there were no intervening Transactions. The Member will be charged two fees. When the $95 Transaction posts, the hold for the $30 pants purchase is still in place, so even though the current balance was $100 prior to the $95 Transaction posting, the available balance is not sufficient, resulting in an overdraft fee. **Note: This fee will be assessed even though the available balance was sufficient to cover the $95 payment at the time the Transaction was authorized, because overdrafts are assessed based on available balance at the time a Transaction is posted to the account.** When the $30 payment is posted, the available balance will not be sufficient to cover it, so another overdraft fee will be assessed.

It is very important to understand you may still overdraw your account even though the available balance appears to show there are sufficient funds to cover a Transaction you want to make. This is because your available balance may not reflect all your outstanding checks and automatic bill payments you have authorized, or other outstanding Transactions that have not been paid from your account.

In addition, your available balance may not reflect all your debit card Transactions. For example, if a merchant obtains our prior authorization for a payment but does not submit the Transaction within 3 days (or the time specified by law), the authorization hold will be removed and your available balance will not reflect the amount of the pending Transaction.

In addition, the amount of an authorization hold may differ from the actual payment because the final Transaction amount may not yet be known to the merchant when the authorization request is submitted. For example, if you use your card at a restaurant, a hold will be placed in the amount of the bill presented to you, but when the Transaction posts, it will include any tip you may have added to the bill. This may also be the case when you swipe your debit card at gas stations, hotels and other retail establishments. We cannot control how much a merchant asks us to authorize or when a merchant submits a Transaction for payment.

We encourage you to make careful records and practice good account management, which may help you avoid these fees.

**Postdated and Stale Dated Drafts.** We may pay any draft without regard to its date unless you notify us in writing of a postdating. The notice must be given to us in time so that we can notify our employees and reasonably act upon the notice, and you must accurately describe the draft, including the exact number, date and amount. You understand that the exact information is necessary for the Credit Union's computer to identify the draft. We are not responsible if you give us an incorrect or incomplete description or untimely notice. You may make an oral notice

DocuSign Envelope ID: D783E880-2455-416B-AAC9-B5AC5A25C7CC

that lapses in 14 calendar days unless confirmed in writing. You agree not to deposit checks, drafts or other items before they are properly payable. We are not obligated to pay any check or draft drawn on your account that is presented more than 6 months past its date; however, we have no obligation or liability to you or any other party to the Instrument or in the chain of the collection process if we do so.

**Stop Payment Orders.** If you don't want us to pay a specific written Instrument such as a personal check, you can ask us to place a SPO on the Instrument. You can notify us by mail, telephone, electronically or in person. Your SPO will take effect when we record it on your account unless the check is in transit.

An SPO will not be valid and binding on us unless your SPO includes your account number, check number and as required, other identifying information. If this is a multiple-party account, we will accept an SPO from any Owner regardless of who signed the Instrument or otherwise authorized the Transaction. An SPO may be released by any account Owner.

We will charge you a service charge for any SPO as set forth in the Fee Schedule, which may be transferred by us from any Owner's account(s) or paid directly to the Credit Union.

If you give an oral SPO that is not confirmed in writing by you or us within 14 days, your SPO will expire and the Instrument may thereafter be paid by us. If you provide written confirmation, your SPO will be effective for a period of 6 months. Further, you agree that the Credit Union, in its sole discretion, may confirm any SPO in writing by sending a notice to the address shown in our records, but has no obligation to do so. Such written confirmation by us will also be effective for a period of 6 months. To extend the SPO for an additional 6 months, you must deliver to us an additional written request that provides all the information required for an initial SPO as described above in this paragraph.

The Credit Union will not be responsible for any loss as a result of honoring a check: (1) more than 14 days after receipt of your oral order to stop payment, (2) more than 6 months after your written order to stop payment or our written confirmation, or more than 6 months after a written extension as provided herein, (3) through inadvertence, oversight or accident, we honor any postdated check, or (4) if you fail to provide us with complete or accurate information. We have no obligation to accept any order to stop payment on any certified check, cashier's check, teller's check or other Instrument guaranteed by us. You will be responsible to the Credit Union if any claim or demand is made against us as a result of our acting in accordance with your SPO. This means you are required to reimburse us for any loss or damages and reasonable costs, expenses or attorneys' fees that we incur in defending the Credit Union against any Claims or demands made against us as a result of following your SPO. If available, any SPO we receive by electronic mail or by similar means shall be treated as an oral order.

**Legal Process and Other Adverse Claims.** Should we receive any legal process, including any summons, order, injunction, execution, distraint, levy or lien (hereafter called **Process**), or other adverse claim which in the Credit Union's opinion affects your account(s), we may, at our option and without liability, refuse to honor orders to pay or withdraw sums from the account(s) and either hold the balance in the subject's account(s) until the Process or adverse claim is disposed of to the Credit Union's satisfaction or pay the balance over to the source of the Process. We may also refuse to allow a withdrawal if there is a dispute between Owners about the account or if the account secures any obligations owed to the Credit Union. Any Process or adverse claim is subordinate to our lien and security interest in all funds in your account(s).

**Statements.** You will receive a periodic statement from us, or notice of the availability of your statement, describing all activity on your account(s) during the statement period as required by law. The periodic statement will list all account and/or loan information as described in this Agreement. If you have a multiple-party account, we are only required to provide one periodic statement to any of the account Owners identified on the Membership Application. If provided electronically, statements will be emailed to you as an attachment, or you will be sent an email notice that will direct you to a site we maintain or cause to be maintained where you may access, review, print and otherwise copy/download your periodic statements using procedures that we authorize. Emails from us will be sent to the email address provided by any Owner.

For checking accounts, you understand and agree that, when processed by us or our agent(s), the original check or other Instrument becomes our property and will not be returned to you. We have no obligation to retain the originals of any checks or other documentation. Copies may be retained by us, our agent or another financial institution, which may be available to you for a fee as set forth in the Fee Schedule.

**Your Duty of Examination.** (Consumer Accounts) You understand and agree that periodic statements are made available to you on the date mailed by us or our agent or otherwise made available to you. You acknowledge and agree that checks and other Instruments are also made available to you for review on the date the periodic statement is mailed or otherwise made available to you, even though they do not accompany the statement. You further agree that it is your duty and obligation to carefully and promptly review each periodic statement to verify that each Transaction is authorized and accurate. We will have no responsibility or liability whatsoever for any forged, altered, unauthorized, unsigned, improperly endorsed, improperly encoded or inaccurate Transaction or item if: (1) you do not notify us in writing within 60 days of the mailing date or otherwise made available of the earliest periodic statement containing information about or indicating any forgery, alteration, unauthorized signature or Transaction, missing signature, improper or missing endorsement, encoding error or other inaccuracy, or (2) any checks or Instruments are forged or altered in a manner not detectable by a reasonable person, including the unauthorized use of a facsimile signature.

**Your Duty to Notify Us.** You agree that the information in each statement will be considered correct for all purposes and we will have no liability whatsoever unless you notify us in writing within the time described in this section. If you do not receive a periodic statement, you

9

agree to notify us in writing within 14 days of the date that the statement is usually sent by us. If you do not so notify us, you will be deemed to have received the statement for all purposes.

**Business Liability for Business to Business ACH Transactions.** The National Automated Clearing House Association (hereafter referred to as NACHA) sets rules regarding liability and reporting requirements on ACH Transactions submitted through their network.

We follow these rules when determining liability and the time periods in which a Transaction can be disputed. When a Transaction is a business-to-business Transaction, and is determined to be fraudulent, the business must report the Transaction to Mountain America within two (2) business days. Transactions reported after two days may not be considered for reimbursement by Mountain America and other means available to the business will need to be explored.

**Business Liability for Unauthorized Drafts.** A business must report the draft as fraudulent within one (1) business day of the item posting to the account. Items reported after this time may not be considered as a reimbursable event by us and must be recovered by other means if possible.

**Commercially Reasonable Security Features Available on Business Accounts.** We provide business members with several different options to add to the security of your business account. All transmissions of payment orders via digital banking are encrypted. Out of band authentication codes are sent for sensitive Transaction types. The codes must be entered back into the system to complete the function.

We offer extensive access controls for those who have been given access through a "sub user" login. These controls include the ability to block many functions, set Transaction limits and require approval from another company employee. Positive Pay is available on all business accounts. We offer ACH debit and check positive pay services. By using these services, you can make return decisions on checks or ACH Transactions that may not be authorized. By informing us of the checks issued and maintaining a list of companies authorized to debit the account, business members have the capability to greatly reduce the risk of payment fraud on your account. These services are available upon request.

You understand the importance of your role in preventing misuse of your accounts through digital banking. You agree to promptly review Transactions either through online account activity or through our positive pay products. You agree to protect the confidentiality of your account and account number, login and passwords. Your password and login ID are intended to provide security against unauthorized entry and access to your accounts.

Notwithstanding our efforts to ensure the services are secure, you acknowledge that the internet is inherently insecure and that all data transfers, including electronic mail, occur openly on the internet and potentially can be monitored and read by others. We cannot and do not warrant that all data transfers utilizing digital banking, or email transmitted to and from us will not be monitored or read by others. You agree to notify us immediately if you believe any login IDs and/or passwords have been lost, stolen, used with or without your permission or otherwise compromised. To make this notification, call our service center immediately.

**Fiduciary Accounts.** Statements will be provided to the fiduciary upon any trust, custodial or other fiduciary or representative account, and the requirements of this paragraph will be binding on all parties in interest with regard to such accounts pursuant to such delivery.

**Change of Name or Address.** You will promptly notify us in writing of any change of address or your name, including your email or other electronic address. In the absence of such written notice, mail sent to you at any address, forwarding address provided to us by the U.S. Postal Office, email address shown by our records or any communication received from you will be deemed properly addressed and, unless otherwise provided by applicable law, constitute effective delivery of any notice we may be required to provide, regardless of receipt by you. If the address you provide to us is not correct, or has changed without written notice to us, and we attempt to determine your new name or address, then the Credit Union may charge a fee as set forth in the Fee Schedule.

**Inactive/Dormant Accounts.** If your account falls below any applicable minimum balance or you have not made any Transactions within a one-year period, we may classify your account(s) as inactive or dormant. Although having no obligation to do so, we reserve the right to not classify a particular account as dormant if any Owner thereof has other active accounts or services with us. Unless prohibited by applicable law, we reserve the right to suspend any further account statements. If a deposit or withdrawal has not been made on the account and we have had no other sufficient contact with you within the period specified by state law, the account will be presumed to be abandoned. Funds in abandoned accounts will be reported and remitted in accordance with applicable state law. Once funds have been turned over to the state, we have no further liability to you for such funds and, if you choose to reclaim such funds, you must apply to the appropriate state agency.

**Termination of Account(s) and Service(s).** You may terminate an account or service at any time by notifying us in writing. We have the right to require the written consent of all parties to a multiple-party account for termination. We are not responsible for any draft, withdrawal, item or Transaction after your account is terminated. However, if we pay any item after termination, you agree to reimburse us upon demand.

**Residence Outside the U.S., Its Possessions or Territories.** We may require that all checking accounts and related services be closed or deactivated if you move your residence to a country or place outside the U.S., its possessions or territories. You will have a period of 30 days from the date you move to close or deactivate your checking account(s). Thereafter, the Credit Union may close your checking account(s) and related services as set forth herein.

DocuSign Envelope ID: D783E880-2455-416B-AAC9-D5AC5A25C7CC

**Duty to Cooperate.** You have a duty to cooperate with us and any law enforcement or government agent or agency with regard to any claim of fraud, forgery, unauthorized access or any other adverse claim(s).

**Par Value Requirement.** If your Membership account balance falls below the required par value for Membership, then your Membership may be terminated by us pursuant to the Credit Union's Bylaws. Upon termination, the Credit Union may charge a fee as set forth in the Fee Schedule.

**Membership Termination.** You may terminate your Membership by giving us notice and complying with the policies and procedures of the Credit Union. Termination will not release you from any fees or obligations you owe us, those incurred in the process of closing your accounts or services, or your liability on outstanding items or Transactions. You further agree that we can terminate your Membership for cause based on any of the circumstances defined in this Agreement without notice or further action. Upon termination, no Transaction(s) will be allowed.

**Death of Account Owner.** We may continue to honor all Transactions on your account(s) until we receive actual notice of your death. After receiving actual notice, we may honor all Transactions you authorized. We can require any person claiming the funds in your account(s) to indemnify us for any losses we may incur as a result of honoring their order. Upon the death of an individual accountholder, all funds on deposit shall be paid according to the express instructions in the Membership Application (e.g., Payable on Death Beneficiary). If no express beneficiary(ies) is provided, then all funds on deposit will be paid to the estate of the accountholder. If there is no estate, then the Credit Union may, but has no obligation to, pay the funds to any heir, who will be solely responsible for any further distribution of said funds. The Credit Union may require satisfactory documentation to be provided regarding any right, claim or fact regarding any matter related or arising from the payment of funds hereunder. The Credit Union will have no further obligation or responsibility, and you agree that we shall have no liability to you, your estate or any heir, successor or assign relating to the distribution of such funds pursuant to this Agreement. The payment of any funds is subject to our lien or other security interest and all debts you owe to the Credit Union will be paid from the funds in your accounts before any payment is made. In case of the death of a joint account Owner, the deposits will be subject to additional provisions of this Agreement.

**Statutory and Consensual Liens on Shares.** By signing a Membership Application or other agreement conveying a pledge or security interest in Shares, or your use of any accounts or services, you grant us and we impress a lien on any and all funds (Shares) in all joint and individual Share accounts, regardless of the source of the Shares or any Owner's contributions. This lien secures any account Owner's joint and individual obligations to us now or in the future, whether direct, indirect, contingent or secondary. Payment of any sums to a joint Owner, beneficiary or other party will be subject to payment of all outstanding obligations owed to us.

You agree that this lien is impressed as of the first date that any applicable account is opened with us. This lien secures all debts you owe us pursuant to any loan agreements, under this Agreement arising from any insufficient funds item, fees, costs, and expenses or otherwise. You authorize us to apply Shares to any obligations owed to us if you default or fail to pay or satisfy any obligation to us without any notice to any account Owner or other party.

**Administrative Freeze.** You specifically agree that we have the right to place an administrative freeze on any joint or individual accounts to preserve the Credit Union's lien rights, to preserve our right of set off, to comply with legal process or otherwise without notice to any Owner. Such action by the Credit Union shall not violate 11 USC §362 or other applicable law.

**Right of Offset.** If you owe us money as a borrower, guarantor and endorser or otherwise, we have a statutory lien on the account funds in any account in which you have an ownership interest, regardless of their source, unless prohibited by law. We may apply these funds without further notice to you, in any order, to pay off your indebtedness. By not enforcing a lien, we do not waive our right to enforce it later. In addition, you grant the Credit Union a consensual security interest in your accounts, and we may use the funds from your accounts to pay any debt or amount now or hereafter owed the financial institution, except for obligations secured by your residence, unless prohibited by applicable law. All accounts are nonassignable and nontransferable to third parties. If any legal action is brought against your account, we may pay out funds according to the terms of the action or refuse any payout until the dispute is resolved. Any expenses or attorney fees we incur responding to legal process may be charged against your account without notice, unless prohibited by law. Any legal process against your account is subject to our lien and security interest.

**General Limitation on Credit Union Liability.** If we do not properly complete a Transaction according to this Agreement, we will be liable for your losses or damages not to exceed the amount of the Transaction, except as otherwise provided by law. We will not be liable if: (1) through no fault of ours, your account does not contain enough money to make the Transaction, (2) circumstances beyond our control prevent the Transaction, (3) your loss is caused by your negligence or another financial institution, or (4) the money in your account is subject to a legal process or other claim. We will not be liable for consequential damages, except liability for wrongful dishonor. Our actions will constitute the exercise of ordinary care if such actions or non-actions are consistent with applicable state law, Federal Reserve regulations and operating letters, clearinghouse rules, and general banking practices followed in the area served by us. You grant us the right, in making payments of deposited funds, to rely exclusively on the form of the account and the terms of this Agreement. Any conflict between oral representations by you or Credit Union employees and any written form will be resolved by reference to this Agreement and applicable written form. You agree that the person(s) establishing any account with us are solely responsible for the structure and information provided for the account (i.e., Owner(s) name(s), Social Security or other Tax ID number, trustee(s), custodian(s), etc.), and we provide no advice and make no representations regarding the structure of any account(s) or other services. The Credit Union will not have any responsibility or liability to you or others relating

11

to the dishonor or other return of any check, draft, ACH Transaction or other order occurring as a result of our exercising our lien rights or freezing any accounts in order to protect or preserve such rights, insufficiency of funds or otherwise.

**ARBITRATION AND WAIVER OF CLASS ACTION. You and the Credit Union agree that we shall attempt to informally settle any and all disputes arising out of, affecting, or relating to your accounts, or the products or services the Credit Union has provided, will provide or has offered to provide to you, and/or any aspect of your relationship with the Credit Union (hereafter referred to as the Claims). If that cannot be done, then you agree that any and all Claims that are threatened, made, filed or initiated after the Effective Date (defined below) of this Arbitration and Waiver of Class Action provision (Arbitration Agreement), even if the Claims arise out of, affect or relate to conduct that occurred prior to the Effective Date, shall, at the election of either you or us, be resolved by binding arbitration administered by the American Arbitration Association (AAA) in accordance with its applicable rules and procedures for consumer disputes (Rules), whether such Claims are in contract, tort, statute or otherwise. The Rules can be obtained on the AAA website free of charge at www.adr.org, or a copy of the Rules can be obtained at any Credit Union branch upon request. Either you or we may elect to resolve a particular Claim through arbitration, even if one of us has already initiated litigation in court related to the Claim, by: (1) making written demand for arbitration upon the other party, (2) initiating arbitration against the other party, or (3) filing a motion to compel arbitration in court. AS A RESULT, IF EITHER YOU OR WE ELECT TO RESOLVE A PARTICULAR CLAIM THROUGH ARBITRATION, YOU WILL GIVE UP YOUR RIGHT TO GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS (EXCEPT FOR CLAIMS BROUGHT INDIVIDUALLY WITHIN SMALL CLAIMS COURT JURISDICTION AND ANY APPEAL THEREFROM). This Arbitration Agreement shall be interpreted and enforced in accordance with the Federal Arbitration Act set forth in Title 9 of the U.S. Code to the fullest extent possible, notwithstanding any state law to the contrary, regardless of the origin or nature of the Claims at issue. This Arbitration Agreement does not prevent you from submitting any issue relating to your accounts for review or consideration by a federal, state or local governmental agency or entity, nor does it prevent such agency or entity from seeking relief on your behalf.**

> **Selection of Arbitrator.** The Claims shall be resolved by a single arbitrator. The arbitrator shall be selected in accordance with the Rules and must have experience in the types of financial Transactions at issue in the Claims. In the event of a conflict between the Rules and this Arbitration Agreement, this Arbitration Agreement shall supersede the conflicting Rules only to the extent of the inconsistency. If AAA is unavailable to resolve the Claims, and if you and we do not agree on a substitute forum, then you can select the forum for the resolution of the Claims.
>
> **Effective Date.** This Arbitration Agreement is effective immediately upon opening of any account at the Credit Union.
>
> **Arbitration Proceedings.** The arbitration shall be conducted within 50 miles of your residence at the time the arbitration is commenced. Any Claims and defenses that can be asserted in court can be asserted in the arbitration. The Arbitrator shall be entitled to award the same remedies that a court can award. Discovery shall be available for non-privileged information to the fullest extent permitted under the Rules. The Arbitrator's award can be entered as a judgment in court. Except as provided in applicable statutes, the arbitrator's award is not subject to review by the court and it cannot be appealed. The Credit Union shall pay for any filing, administration and arbitrator fees imposed on you by the AAA.
>
> Any determination as to whether this Arbitration Agreement is valid or enforceable in part or in its entirety will be made solely by the arbitrator, including without limitation any issues relating to whether a Claim is subject to arbitration; provided, however, the enforceability of the Class Action Waiver set forth below shall be determined by the Court.
>
> **Class Action Waiver.** ANY ARBITRATION OF A CLAIM WILL BE ON AN INDIVIDUAL BASIS. YOU UNDERSTAND AND AGREE THAT YOU ARE WAIVING THE RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER IN A CLASS ACTION LAWSUIT.
>
> **Severability.** In the event the Class Action Waiver in this Arbitration Agreement is found to be unenforceable for any reason, the remainder of this Arbitration Agreement shall also be unenforceable. If any provision in this Arbitration Agreement, other than the Class Action Waiver, is found to be unenforceable, the remaining provisions shall remain fully enforceable.
>
> If you have questions about AAA procedures, check AAA's website (www.adr.org) OR call AAA at 1-800-778-7879.

**Telephone Requests.** You agree that funds in any account(s) with us can be transferred, upon the telephone request of any signer on the account, to another account with us or to any other financial institution. We shall not be responsible for any loss incurred as a result of our acting upon or executing any request, order or instruction we believe to be genuine. Furthermore, we reserve the right to refuse to execute any telephone request or order.

**Recording Conversations.** You understand and agree, for the mutual protection of the parties to this Agreement, we may record any of our telephone conversations with you or any other person.

**Indemnity.** If you ask us to follow instructions we believe might expose us to Claims, suits, losses, expenses, liabilities or damages, whether directly or indirectly, we may refuse to follow your instructions or may require a bond or other protections. An example of the kind of protection asked for would be your promise to protect the Credit Union against any Claims (an indemnity).

**Miscellaneous.** In this Agreement, except as otherwise indicated, the singular includes the plural, and the masculine includes the feminine and the neuter. Further, this Agreement or any Claim or dispute arising hereunder shall be construed in accordance with and governed by the Laws

of the State of Utah, unless specifically applicable law expressly requires otherwise. The terms and conditions of any account, including the method of determining dividends, may be changed by the Credit Union upon written notice, or as required by applicable law. Section headings in this Agreement are for convenience of reference only and shall not govern the interpretation of any provision of this Agreement. If any law or judicial ruling renders any term or condition of this Agreement unenforceable, the remaining terms and conditions shall remain in full force and effect. We reserve the right to waive enforcement of any of the terms set forth in this document regarding any Transaction or series of Transactions. Any such waiver will not affect our right to enforce any of our rights with respect to our Members or to enforce any of our rights with respect to other Transactions with you. Any such waiver is not sufficient to modify the terms and conditions of this Agreement. Transactions involving a loan will not alter the terms or conditions of the loan agreement(s) but will remain subject to the terms and conditions of this Agreement when not inconsistent with the loan agreement. In the case of any conflict, the loan agreement will govern.

If there is a dispute between Owners or any other parties claiming an interest in any account(s) or Transaction(s); if there is any dispute regarding ownership, entitlement, payment, an Owner's intent or instructions, or otherwise with regard to any account or any Transaction; or if we receive inconsistent instructions or Claims, we can in our sole discretion: (1) suspend or terminate the account(s) and require a court order, (2) require an agreement in writing that we deem sufficient, (3) file an interpleader or similar action and pay any sums in dispute into a court or other appropriate entity, or (4) take such other action as we deem appropriate.

**Amendments and Changes.** Changes to any account or account service requested by any Member or account Owner can only be made with the express consent of the Credit Union. If a change to a multiple-party account or service is requested, we may require that all multiple Owners indicate their consent by signing our document evidencing the change. As set forth herein, the Credit Union, in its sole discretion, may change any term or condition of this Agreement, including the method for determining dividends, at any time without notice except as expressly required by applicable law, and any change in the Agreement shall be effective at the earliest time allowed by law.

**Member Organization or Business Accounts.** Accounts held in the name of a Member, organization, or association for business purposes are subject to the same terms set forth in this Agreement and the following additional rules. The account Owners agree to inform us of the persons authorized to transact business on behalf of the business or organization on our depository resolution form. The parties identified in the resolution will be the only parties authorized to contract and otherwise act on behalf of the entity identified. We may rely on the resolution, as applicable, and corresponding Membership Application until such time as we are informed of changes to authorized officers or signers. The changes must be executed on our paperwork by a current principal of the organization, designated on our resolution. Should the current principals no longer be available, then we will review other supporting documentation, and at our discretion, choose whether to accept it as valid. Any changes are not valid until the new resolution has been fully executed by the new principals and received by us. We may require that third-party checks payable to an organization not be cashed and be deposited to a business account. Further, if a resolution or Membership Application identifies the Member/Owner as an organization of any type, or if the Credit Union determines that any account is used for any business or organizational purpose, such account is deemed to be a business account and may be subject to additional fees or other requirements. Real Estate Trust accounts and accounts under the Interest on Lawyer Trust account and Utah Association of Realtors Housing Opportunity Fund Programs require a primary business account relationship. Except as set forth below, Payable on Death (POD) beneficiary designation or other designation shall not apply to the accounts of organizations or businesses. Proprietors and single-member LLCs may designate a beneficiary.

**Multiple-Party Accounts.** Any or all Owners can make deposits or withdrawals regardless of contributions. To make withdrawals, an Owner must have his or her signature on file with us. If only one Owner has signed a Membership Application, the account may be treated as an individual account. Each Owner guarantees the signature of all other Owners. We may accept orders, instructions and requests for future services from any account Owner. Any account Owner may withdraw funds, stop payment of items, transfer or pledge to us all or any part of the Shares in any account, and block, terminate, discontinue or close any Transaction or service without the consent of the other Owner(s). We have no obligation to notify the other account Owner(s) of any pledge or other actions, orders or instructions by any Owner. If there is a dispute between Owners regarding ownership of an account or any deposit to an account by an owner or a party who we in good faith believe has a right to assert a Claim or dispute (such as a personal representative of an Owner); or if we receive inconsistent instructions, we can suspend or terminate the account(s) and require a court order or an agreement in writing concerning any Transaction on the account(s). Each Owner is jointly and severally liable for all returned items, overdrafts or any other obligations owed to the Credit Union as a result of any Transaction(s) on a multiple-party account, regardless of the drawer, user or Authorized User who orders or causes said Transaction(s).

We have the right to endorse any drafts, checks or other orders for the payment of money made out to any of the Owners. Once endorsed, we can deposit them in the multiple-party account, or we can endorse them for deposit by using a stamp to show a general endorsement for the account. Each Owner appoints the others as his or her agent to endorse, deposit, withdraw, cash and conduct business for the account. Acting as an agent, any Owner(s) can endorse a draft, check or other payment order made out to any other Owner or Owners of the account, and any Owner may pledge to us the funds in any account to secure any joint or individual obligation to us. Once endorsed, the money can be taken in cash or deposited into the multiple-party account. You agree that any money in this account can be paid to any one or more of the Owners. This payment can be made on the orders or instructions of any of the Owners, whether or not the other Owners are alive at the time of the payment. If we make a payment following these rules, you release us from liability.

We reserve the right at any time to require written consent of all account owners for a change of ownership or termination of a multiple-party account. If any account owner is indebted to us, we may enforce our rights against any or all funds in the multiple-party account, regardless of who contributed the funds to the account.

**Rights of Survivorship.** Unless your Membership Application specifically indicates otherwise, you agree that it's your intention to create a joint tenancy with the right of survivorship (a form of ownership) in any multiple-party account, and if one or more of the multiple-party Owners dies, his or her interest in the account passes to the remaining Owners, unless subject to our right of setoff or a pledge of the funds in the account(s), in which case all sums in the account(s) will belong to us regardless of contributions, up to the amount of the obligation(s) owed. We may not release any funds to a survivor until all required legal documents are delivered to us. Once a multiple-party account is opened, an owner may only be removed by written consent of all account owners. Further, the Credit Union reserves the right to require any changes to the account be made in writing and signed by all account Owners.

**Payable on Death.** Payable on Death (POD accounts are governed by your agreements with the Credit Union and applicable state law. A POD account instructs us that the designated account is payable to the Owner(s) during their lifetimes, and upon death of the last account Owner, is payable to the beneficiary(ies) designated by your Membership Application or other documentation. Either Owner, during their lifetime, may change any designated beneficiary by written direction to us. Accounts payable to more than one beneficiary are to be treated as joint tenancies without rights of survivorship. This means the sums in the account will be paid to any surviving beneficiaries individually or otherwise. However, no amount will be paid to any beneficiary, their heirs or successors who are not living at the time the account becomes payable to beneficiaries.

**Uniform Transfer to Minor Act/Uniform Gift to Minor Act (UTMA/UGMA).** All grantors, custodians and beneficiaries agree to the terms of this paragraph. If you have signed an account as custodian for a beneficiary under an applicable UTMA/UGMA, your rights and duties are governed by that Act. You must include the beneficiary's Social Security number on the Membership Application. A custodian will not be allowed to pledge the account as collateral for a loan to the custodian. We have no duty to inquire into the use of any funds or purpose of any Transaction by the account custodian. Upon the death of the account custodian, we may place an administrative freeze on the account until we receive an appropriate court order or instructions from a person authorized by law to withdraw funds. We may require that any successor custodian provide any documentation required to evidence compliance with applicable law(s) to our satisfaction. It is understood and agreed that a successor custodian may be the minor's legal guardian. If there is more than one legal guardian, the Credit Union can accept any such guardian as custodian. Upon acceptance of a successor custodian, no instruction from any other guardian will be accepted. It is agreed that funds deposited into such an account belong to the beneficiary. Upon the requirements of the appropriate state's governing statute, the custodian shall transfer in an appropriate manner the custodial property to the minor or minor's estate. If the beneficiary wishes to retain an account with us, the beneficiary can execute a new Membership Application. Any authority to make Transactions will then be governed by the new Membership Application, and the authority of any custodian(s) will be terminated.

**Minor Accounts.** For any account established by or for a minor, we reserve the right to require the minor account to be a multiple-party account with an Owner who has reached the age of majority under state law and who shall be jointly and severally liable to us for any returned item, overdraft or unpaid charges or amounts on such account. We may require that a minor sign the Membership Application if the minor can sign his or her own name, but may accept the representative signature of the minor's apparent guardian or parent (e.g., "Mary Doe by John Doe, Father"). All parties to such an account acknowledge and agree that the minor's apparent legal guardian may make any and all Transactions we allow on behalf of a minor. If divorced, separated, etc., only the parent who has been appointed the minor child's legal guardian will have these rights. We may require a minor's signature on the Membership Application before a minor can make an individual withdrawal on any account, but we are not required to do so. We may make payments of funds directly to the minor without regard to his or her minority. Unless a guardian or parent is an account Owner, the guardian or parent shall not have any right to access the account other than in a custodial capacity. We have no duty to inquire of the use or purpose of any Transaction by the minor or any account Owner.

**Custodial and Other Fiduciary Accounts.** The Credit Union may open other accounts pursuant to a court order or to facilitate your request for a trust, custodial, probate or other acceptable purposes. We make no representations and give no advice concerning any such accounts and may refuse to open any account or refuse to follow any instruction that may expose us to any expense or liability.

Any individual acting as an agent, guardian, personal representative, trustee, custodian or in some other fiduciary capacity must be designated to us as such on the Membership Application, as well as any other documentation we may require. We are authorized to follow the directions of any such agent/fiduciary until we receive written notice that the agency is terminated and have had a reasonable time to act upon the notice. Further, you specifically agree that we are not liable for the misapplication of funds by your agent/fiduciary.

### TERMS AND CONSENT APPLICABLE TO ELECTRONIC SIGNATURES, ELECTRONIC CONTRACTS, ELECTRONIC RECORDS, ELECTRONIC MAIL (EMAIL) FACSIMILE AND OTHER ELECTRONIC SERVICES AND COMMUNICATIONS

**Agreement.** You specifically consent and agree that we may provide all disclosures, agreements, contracts, periodic statements, receipts, notices, modifications, amendments and all other evidence of our Transactions with you or on your behalf electronically (hereinafter all such documentation is referred to as **electronic records**). To access these records, you must have a file reader, such as Adobe Acrobat®. You have a right to receive a paper copy of any of these electronic records if applicable law specifically requires us to provide such documentation. A fee for a statement reprint or check copy may be imposed. Also, you may withdraw your consent and revoke your agreement to receive records

DocuSign Envelope ID: D783F880-2455-416B-AAC9-D5AC5A25C7CC

electronically. To request a paper copy or to withdraw your consent and agreement to receive electronic records, call, write or email us as set forth in the Fee Schedule.

**Equipment and Software Requirements.** To receive electronic records and to access our home banking services, you need a computer with internet access and a web browser (such as Internet Explorer, Chrome, Safari, Firefox or equivalent). Use and access to our online/electronic banking services requires the use of a browser that supports 128-bit encryption. You are responsible for the setup and maintenance of your home computer and internet service provider, which support the encryption requirements of our home banking systems. Contact the Credit Union to see if your equipment is compatible.

By requesting any electronic funds transfer, home banking, other electronic services or Transactions; by submitting any application or agreement to us electronically; or by emailing us, you represent you have such equipment and software and you can download, access, read, review, print and store the electronic records we provide to you.

**Performance of Electronic Service and Warranty Disclaimer.** In no event will we be liable to you for any consequential, incidental or indirect damages arising out of the use, misuse or inability to use our services, or for any loss of any data, even if we have been informed of the possibility of such damages. Further, we make no warranty, express or implied, to you regarding your equipment, including any warranty of merchantability or fitness for a particular purpose, including, but not limited to, any online banking services provided to you under this or any other agreement with us.

We do not and cannot warrant that online banking will operate without errors, or that any or all online banking services will be available and operational at all times. Except as specifically provided in this Agreement, or otherwise required by law, you agree that our officers, directors, employees, agents or contractors are not liable for any indirect, incidental, special or consequential damages under or by reason of any services or products provided under this Agreement or by reason of your use of or access to online banking, including loss of profits, revenue, data or use by you or any third party, whether in an action in contract or tort or based on a warranty. Further, in no event shall the liability of the Credit Union and its affiliates exceed the amounts paid by you for the services provided to you through online banking.

**Virus Protection.** We are not responsible for any electronic virus or viruses you may encounter. The Credit Union suggests you routinely scan your personal computer (PC) using a reliable virus protection software product to detect and remove any viruses found. An undetected or unrepaired virus may corrupt and/or destroy your programs, files and even your hardware.

**Electronic Signature.** You consent and agree that your use of a keypad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service we offer or in accessing or making any Transactions regarding any agreement, acknowledgment, consent, terms, disclosures or conditions constitutes your signature, acceptance and agreement as if actually signed by you in writing. Further, you agree that no certification authority or other third-party verification is necessary to the validity of your electronic signature, and the lack of such certification or third-party verification will not in any way affect the enforceability of your signature or any resulting contract between you and the Credit Union.

**Electronic Records.** To facilitate electronic commerce, to reduce the expense of records storage and to obtain the benefits of faster access to records, you acknowledge and agree we may in our discretion store all records electronically, and we will not retain and have no obligation to retain any original documents for any period of time. This applies to all documentation including, but not limited to, checks, Transaction records, notes, mortgages, deeds of trust and other loan and/or security documentation. You further acknowledge and understand we will routinely destroy all original documentation. We may store records electronically via imaging, scanning, filming or other technology used in the financial services industry for the storage of documentation via internal processes or third-party processors we approve for these services. You agree that such storage shall be secure and further agree that such records shall for all purposes be recognized and admissible in evidence or otherwise to prove the agreements, rights and obligations of the parties pursuant to any such records.

**Email and Facsimile Communications.** You acknowledge and agree the internet is considered inherently insecure. Therefore, you agree we have no liability to you whatsoever for any loss, Claim or damages arising or in any way related to our response(s) to any email or other electronic communication, which we in good faith believe you have submitted to us. We have no duty to investigate the validity or to verify any email or other electronic communication and may respond to an email at either the address provided with the communication, the email address in your Membership Application or any other application or written communication actually received by us.

Any account Owner, co-borrower or Authorized user may change the email address for statements or other information from us at any time. Although having no obligation to do so, we reserve the right to require authentication of emails or electronic communications. The decision to require authentication is in the sole discretion of the Credit Union. We will have no obligation, liability or responsibility to you or any other person or company if we do not act upon or follow any instruction given to us if a communication cannot be authenticated to our satisfaction.

Further, the Credit Union may not immediately receive email communications you send. Also, we will not take action based on email requests until we actually receive your message and have a reasonable opportunity to act. We reserve the right to require any notices from you be submitted to us in writing, and we may refuse to send certain information through email communications. If you need to contact the Credit Union immediately regarding an unauthorized Transaction, stop payment request or otherwise, you may call the Credit Union at the telephone number in the Fee Schedule.

**Links to Other Sites.** Our website may contain links to third-party websites. These links are provided solely as a convenience to you and not as an endorsement by the Credit Union of the contents on such third-party websites. The Credit Union is not responsible for the content or support of linked third-party sites and does not make any representations regarding the content or accuracy of materials on such third-party websites. If you decide to access linked third-party websites, you do so at your own risk.

**Controlling Law and Users' Responsibilities.** Our website and the electronic services we provide (excluding linked sites) are controlled by the Credit Union and/or our access service provider (ASP). The Credit Union's principal office is located in the State of Utah, which law governs this Agreement. You may choose to access our website and electronic services from any location. We make no representation that any information, materials or functions included in our website or via our electronic services are appropriate or authorized for use in all jurisdictions. Your access from other locations is made on your own initiative, and you are solely responsible for compliance with any applicable local laws and regulations.

ELECTRONIC FUNDS TRANSFERS AGREEMENT AND DISCLOSURES

**Purpose of This Agreement.** This Agreement defines your and the Credit Union's rights and responsibilities with respect to Transactions. You understand all agreements, rules and regulations applicable to your accounts and account services, as set forth in this document and otherwise, remain in effect and apply to this Agreement, except as specifically modified in this Section. You agree to abide by this Agreement and all rules, regulations and instructions of the Credit Union and the networks relating to the use of any Card and/or Access Device, as amended, modified or revoked.

**Types of Electronic Funds Transactions.** The Electronic Funds Transactions we are or may be capable of handling in the future are indicated below. Some of these services may not apply to your account(s) and/or some of these services may not be available at all terminals.

We may honor overdrafts of electronic Transaction types such as, but not limited to, debit card, ACH, POS or online banking Transactions.

**Automated Teller Machines (ATMs).** The Credit Union may issue to you an ATM card and Personal Identification Number (PIN) to be used to make Transactions. You can use your ATM card at the Credit Union's ATMs to:
- Withdraw cash from your account(s) up to $500.
- Check the balances in your account(s).
- Transfer funds between your account(s).
- Make deposits/payments at designated ATMs.

**Debit/Point-of-Sale (POS) Transactions.** If we approve your Application for an ATM debit/POS, Visa® Check Card or other electronic Access Device, you may use your Card/Access Device to purchase goods and services at POS terminals designated by the Credit Union and anywhere participating merchants honor your Card/Access Device. Transactions hereunder will be covered by funds deducted from your checking account. Subject to the limitations in this document and any other documents, you may pay for goods and services (or make certain other transfers if the merchant is a financial institution) at applicable terminals up to $9,500 or the available balance in your designated checking account and any available credit under your applicable overdraft line of credit and/or any other overdraft protection or your overdraft protection limit, whichever is less, and cause that account to be debited for the amount of those purchases. Your available balance in that account may be reduced by the amount of any Transaction as soon as the merchant has received authorization from us, even if the documentation evidencing the Transaction has not yet been received and processed by us. A merchant is not required to receive prior authorization from us on every Transaction. When the documentation has cleared through us, any hold placed on your account for the amount of the purchase or other Transactions will be released and your account debited for that amount. NOTE: Cards designated as ATM may not be used at POS or other non-ATM terminals.

**Preauthorized Transfer Services.** You can authorize the following Transactions without the use of an Access Device issued by the Credit Union:

- **Payments.** You can make payments on your loans with the Credit Union directly from your savings or checking accounts.
- **Within Credit Union Transfers.** You can arrange to transfer funds between your savings and checking accounts.
- **Direct Deposits and Payments.** You can authorize persons or companies to make direct deposits or withdrawals to or from your savings or checking accounts for payroll, pension, Social Security and other types of deposits or payments. You may give other persons or companies written or oral permission to transfer payments from your Credit Union accounts through ACH or other electronic means. Such agreements or arrangements are solely between you and the other person or company. The Credit Union shall have no responsibility or liability to you for any such Transactions. Thus, you should exercise caution in providing such authority and/or information to access your accounts to others. The authority or information you give to others hereunder applies to all ACH or other electronic Transactions, whether evidenced by any type or writing or converted to a written Instrument by the other person (and/or their agents). All such Transactions are deemed to be authorized by you.

**Business-to-Business Account Transfers.** We may allow Members to set up online electronic transfer access between their business account and other various personal or business accounts. This service is provided as a convenience to our Members. Transfers between multiple business and personal accounts may subject the business and individual to greater IRS audit scrutiny. Transfers

16

can have the appearance of co-mingling of business and personal funds. If not handled properly, such transfers may jeopardize the legal barrier established to protect the individual assets of organization and LLC Members, Limited Partners or Stockholders against lawsuits. At a minimum, the credit union recommends keeping a well-documented audit trail with proper accounting to explain the purpose of a transfer. Consider the tax and legal issues carefully before transferring funds between separate businesses you own.

**Telephone Transactions.** You may access your accounts through our telephone banking system. You must use your Access Device and account number to access your accounts. You may use the telephone banking system to:

- Change your access code.
- Obtain account information related to any of your savings, checking and loan accounts regarding current balance, checking history, savings dividends and rates, loan interest and payoff amounts, payroll and automatic deductions.
- Make transfers to or from your savings and checking.
- Request advances on your personal or home equity line of credit loans, deposit the proceeds in any of your accounts or have the proceeds mailed directly to you at the mailing address listed for your account.
- Withdraw funds from savings, checking and line of credit accounts by check made payable to you and mailed to you at your mailing address.
- Make loan payments from any savings or checking account to any loan account of yours (except mortgage loans).

Telephone services are provided by our service center staff during business hours. Verification of account ownership will be requested before account information is released. To ensure courteous and efficient service, supervisory personnel in our service center may monitor calls randomly.

**Electronic Check Conversion—Types of Transfers.** Your check or information you convey to a third party can result in an electronic funds transfer. This can happen in several ways. For example:

- You can purchase goods or pay for services and authorize a merchant or service provider to convert your check into an electronic funds transfer.
- At the time you offer a check to a merchant or service provider, you may be asked to authorize the merchant or service provider to electronically collect a charge in the event that the check is returned for insufficient funds. Paying such a fee electronically is an electronic funds transfer.
- Your authorization to make these types of electronic funds transfers may be expressed in writing or implied through the posting of a sign.
- This can also happen when you provide information from your check or an account to another by telephone, internet or otherwise, who then converts the information given to an electronic Transaction, ACH or otherwise.
- You agree that any such Transaction is subject to all applicable terms and conditions set forth in this Electronic Transfers Section of your Membership Agreement.

**Online Banking (Internet Network Connection).** You may access your accounts through the online banking service with a PC. You must use your access code along with your account number to access your accounts. You may use online banking to:

- Change your access code.
- Obtain account information related to any of your savings and loan accounts regarding current balance, checking history, savings dividends and rates, loan interest and payoff amounts, payroll and automatic deductions.
- Make transfers to or from your savings and checking.
- Request advances on your personal or home equity line of credit loans, deposit the proceeds in any of your accounts, or have the proceeds mailed directly to you at the mailing address listed for your account.
- Withdraw funds from savings, checking and line of credit accounts by check made payable to you and mailed to you at your mailing address.
- Make loan payments from any savings or checking account to any loan account of yours (except mortgage loans).
- Issue third-party payable checks using Bill Pay.
- Make external account-to-account (A2A) transfers from your savings and checking to or from another financial institution.

**Insufficient Funds Transactions.** If your account balance is insufficient to cover any Transaction(s), we may treat these Transactions as insufficient funds Transactions. The Credit Union reserves the right to refuse any Transaction, and the decision shall be at the Credit Union's sole discretion.

**Electronic Processing and Transactions.** Due to the processing systems for electronic Transactions used in the United States and by us, a payment or other Transaction may be effectively posted before we are open for business on the date scheduled for the payment or other Transaction. Therefore, you are responsible for ensuring that your account(s) have sufficient balances as applicable for the scheduled payment Transaction one business day prior to the date scheduled. If a payment is due on a Saturday, Sunday or federal holiday, the payment may occur on either the first business day after the due date or the business day prior to the due date. In these cases, you should plan to have the payment initiated on the last business day before any of these days in order to ensure your payment is made on time. You may not make payments and/or Transactions to a federal, state or local governmental or tax unit, or pay child support or alimony, or to make payments to other categories of payees that we establish from time to time using our electronic services.

17

**General Rules for Using Your Access Devices.** You acknowledge and agree to the following:

- Your Access Devices are for personal use only. You agree not to allow another person to use your Access Devices.
- You agree not to reveal your PIN/Password(s) to another person and WILL NOT write your PIN/Password(s) on any Access Device. You are responsible for all Transactions made by you or anyone else who uses your Access Devices with your knowledge and consent. You are also responsible for unauthorized use of your Access Devices to the full extent allowed by applicable law. In addition, any person other than yourself who uses your Access Devices is responsible for all Transactions they make and for all Transactions made by others with their permission. This does not limit your own responsibility. You agree to be responsible to maintain your Access Devices with maximum security.
- You authorize the Credit Union to debit/credit your accounts for all Transactions as if each Transaction were signed by you. Further, you agree that, by acceptance or use of your Access Devices, the Credit Union is authorized to pay from any account necessary to satisfy any Transaction, fee or service charge that results from the use or misuse of your Access Devices.
- You acknowledge that your Access Devices remain the Credit Union's property and agree to surrender your Access Devices to the Credit Union or its agent upon demand or through retrieval by any other method.
- You agree to use caution when using any ATM or other electronic terminal or device to complete any Transaction set forth in this Agreement. You further agree that the Credit Union shall have no responsibility to you or any user or be liable for any personal injury or property damage which may occur as a result of any act before, during or after a Transaction or other visit to any ATM or other electronic terminal location. You or any user assume the risk of nighttime use of any ATM, other electronic terminal location or electronic banking device.
- An Access Device may be issued to any Member or joint Owner of legal age when qualified under the rules, regulations and Bylaws of the Credit Union. Only one Access Device may be issued to each Member or joint Owner.
- If your Access Device is lost or stolen, you agree to notify the Credit Union immediately upon discovery of such loss or theft. Replacement of an Access Device may be issued by us at the cost set forth in the Fee Schedule. You agree to pay the Credit Union the fee in effect at the time for all copies you request from us.
- The Credit Union shall not be responsible for the use or condition of any ATM or other electronic banking terminal or device it does not own. Further, the Credit Union will not be responsible for any failure of an ATM or other electronic banking terminal or device to function except as specifically provided for by law.
- The Credit Union reserves the right to add or remove ATMs, other electronic terminal locations or electronic banking devices as it deems necessary.
- You agree to hold the Credit Union harmless in its pursuit to locate, apprehend and prosecute unauthorized use of any Access Device issued by the Credit Union, and you agree to assist the Credit Union in these efforts.
- The Credit Union reserves the right to make any changes in the daily withdrawal limits it deems necessary.
- The Credit Union is not liable for any Claims you may have against a merchant, company or other financial institution arising from use of your Access Device.
- The Credit Union cannot stop payment on any POS Transaction.
- If you incur a charge in foreign currency, the charge will be converted by Visa International into a United States dollar amount, using the procedures and the operating regulations in effect at the time the Transaction is processed. Those procedures currently provide for either a wholesale market rate or the government-mandated rate in effect one day prior to the processing date, increased by 1%. Because of the fluctuations in foreign currency exchange rates, the conversion rate in effect on the processing date may differ from the rate in effect on the Transaction date or the posting date.
- You agree that by acceptance or use of an Access Device or other Electronic Funds Transfer Services, the Credit Union is authorized to pay from any account you have, jointly or otherwise, with the Credit Union any amount necessary to satisfy any Transaction, fee or service charge that results from your use or misuse of such services.
- You will not obtain any Access Device(s) to make Transactions on your accounts with us that is not issued or approved by us.
- Merchants and others who honor the Check Card or related Access Device(s) may give credit for returns and adjustments. They will do so by initiating a credit with us, and we will credit that amount to your account.
- You understand that you must keep your savings and checking account open in order for your applicable electronic services to remain valid. You agree to return all Access Devices if you close your account(s), or upon our request.

**Making ATM Transactions.** Your PIN will allow you to identify yourself when making an ATM Transaction. The presentation of your ATM card together with the input of your PIN constitutes your authorization to the Credit Union to make Transactions. You agree to follow all instructions for use of ATMs accessible by your ATM card. Difficulties or complaints concerning the use or condition of any ATM should be reported directly to the Credit Union. Security or safety measures should be reported directly to the Owner of any ATM not owned by the Credit Union.

**Termination and Amendment.** The Credit Union reserves the right at any time to terminate your right to make Transactions and to retrieve or ask for the immediate return of any Access Device it deems necessary without prior notice to you. If notification is required by law, notice will be mailed to you at the address shown on the Credit Union's account records. It is the obligation of each Member to provide new addresses to the Credit Union.

**Access Device Revocation.** Any Access Device issued by the Credit Union may be revoked without notice to you in the event that any of the following conditions occur:

- Overdrafts that occur as a result of insufficient or uncollected funds on an account.
- Any Transaction that occurs on your account(s) that results in a monetary loss to the Credit Union.

18

- Loan, Visa or other delinquency with the Credit Union.
- Forced closure of a savings or checking account at the Credit Union due to misuse.
- Special balance requirements, if any, that are not maintained by you.
- Any other situation in which the Credit Union deems revocation to be in its best interest.

**Transaction Fees.** You are allowed to initiate Transactions at any terminal, ATM or other access means owned by the Credit Union or any Network with which the Credit Union has established a relationship. You may be charged certain Transaction and other fees as set forth in the Fee Schedule, which will be automatically debited from your savings or checking account(s). The Credit Union reserves the right to establish and maintain Transaction fees and charges, which may be modified from time to time. Note: Owners of non-Credit Union ATMs may charge fees in addition to any fees disclosed in the Fee Schedule. These fees are generally called a surcharge. This is not a fee charged by your Credit Union; however, any such fee will be paid from your account(s).

**Service Limitations, Limitation or Frequency and Dollar Amounts of Transactions**

**Transfer Limitations.** General limitations governing the amount and number of Transactions are set forth in this and other documents. In addition, the following limitations also govern your use of these services:

**General Limitations—Applicable Accounts.** For savings and money market accounts, if applicable, you may make up to 6 preauthorized, automatic, telephonic or audio response transfers to another account of yours or to a third party during any statement period. A preauthorized transfer includes any arrangement with the Credit Union to pay a third party from the Member's account upon oral or written orders, including orders received through the automated clearing house (ACH. There is no limit on the number of Transactions you may make in the following manner: (1) transfers to any loan account with the Credit Union or (2) transfers to another Credit Union account or withdrawals (checks mailed directly to you) when such transfer or withdrawal is initiated in person, by mail or at an ATM. If a transfer request would exceed the transfer limitations set forth above in any statement period, the Credit Union may impose a charge, refuse or reverse the transfer and your account will be subject to suspension or closure by the Credit Union.

Further, we may reduce the limit for point-of-sale Transactions during any interruption in the electronic connection between the Credit Union and the retail outlet. We may at any time limit or reduce the number or dollar amount of Transactions when we, in our sole discretion, deem it in the best interest of the Credit Union.

**Card/Access Device Acceptance.** We do not promise everyone will honor your Card or other Access Device, and we have no obligation to you if anyone refuses to accept your Card/Access Device. We are not liable if any merchant, bank, financial institution or other party refuses to honor your Card/Access Device or otherwise fails to provide any services made available to you by the Credit Union.

**POS/Debit/Visa Check Card Purchases.** Limits defined in the Fee Schedule are in addition to any ATM withdrawals.

**ATM Transactions.** Because of the servicing Fee Schedule and processing time required in ATM operations, there may be a delay between the time a deposit (either cash or check) is made and when it will be available for withdrawal. You should review the Credit Union's Funds Availability Policy to determine the availability of funds deposited at ATMs.

**Telephone Banking System.** Your accounts can be accessed through our telephone banking system, which is available at any time 7 days per week. There may be some down time. Except as is otherwise provided in the Fee Schedule or limits under other agreements with us, you may make funds transfers to your accounts or other accounts you authorize as often as you like; however, there are certain limitations on transfers from savings accounts, as discussed herein and above. Account balance and Transaction history information may not show all activity involving your accounts. You may not obtain account information related to accounts other than your accounts to which you have requested a transfer.

**Online Banking (Internet Network Connection).** You may make Online Banking Transactions at any time 7 days per week. There may be some down time. Except as is otherwise provided in the Fee Schedule or limits under other agreements with us, you may make funds transfers to your accounts or other accounts you authorize as often as you like; however, there are certain limitations on transfers from savings accounts, as discussed herein and above. Account balance and Transaction history information may not show all activity involving your accounts. You may not obtain account information related to accounts other than your accounts to which you have requested a transfer.

**Bill Payment Service (Online Banking).** You may make Bill Pay Transactions subject to the limitations in the Bill Payment Terms and Conditions and this document. The Credit Union will not process any Bill Pay transfer if the required Transaction information is incomplete. The Credit Union will withdraw the designated funds from your account on or after the date you schedule for payment. We will have no obligation to initiate any payment if there are not sufficient funds in your designated account but the payment may be initiated at our discretion. You must allow sufficient time for vendors to process your payment after they receive a transfer from the Credit Union. The Credit Union cannot guarantee the time any payment will be credited to your account by the vendor and will not be liable for any service fee, late charge or finance charge. You agree to follow the requirements of the Bill Payment Terms and Conditions, which are incorporated herein by reference. The Bill Payment Terms and Conditions can be found on the Credit Union's website. The Credit Union may set other limits on the amount of any Transaction(s), and you will be notified of those limits.

19

DocuSign Envelope ID: D783E880-24E5-416B-AAC9-B5AC5A25C7CC

**Online Bill Payment Transactions.** You may cancel, stop or change a scheduled online bill payment as set forth in the Bill Payment Terms and Conditions. After the time period set forth in the Bill Payment Terms and Conditions has passed, it is not possible to stop or cancel a payment. Some types of payments cannot be stopped. Stop fees may apply, please refer to the rate and fee schedule for additional details.

**Preauthorized Transactions.** If you have arranged in advance to make regular electronic fund transfers out of your account(s) for money you owe others, you may stop payment of preauthorized transfers from your account. You must notify the Credit Union orally or in writing in time for us to receive your request three business days or more before the scheduled date of the transfer. Certain Transactions may require written confirmation of the SPO to be made within 14 days of any oral notification. If we do require written confirmation, the oral SPO shall cease to be binding 14 days after it has been made. This means the preauthorized payment and future preauthorized payments to the payee you identify may be paid by us from your account(s) after the 14th day until written notice is received.

A written SPO will remain in effect until either: (a) you withdraw the SPO; or (b) the debit transfer is returned, or if the SPO applies to more than one debit transfer from a specific authorization, all such debit transfers are returned.

If you order us in writing to stop a preauthorized transfer 3 business days or more before the transfer is scheduled and the stop payment order is made according to the terms and conditions of the account and this Agreement, including the requirement that you give us the exact amount of the debit, the next date of the debit and the exact name of the payee, and we do not do so, we will be liable for your losses or damages proximately caused by our failure.

**Other Transactions.** Other Transactions hereunder are considered contemporaneous. Therefore, you have no right and we have no obligation to stop or to attempt to stop any other Transactions.

**Right to Documentation.**
- **Terminal Transactions.** You can get a receipt at the time you make any transfer to or from your account using any ATM or a POS terminal.
- **Direct Deposits.** You can call or write us at the telephone number or address listed in the Fee Schedule to find out whether a deposit has been made. If the only possible transfers to your accounts are direct deposits, you will get a statement from us at least quarterly.
- **Periodic Statements.** Transfers and withdrawals transacted through an ATM, POS terminal, online banking or debit card purchase will be recorded on your periodic statement. You will receive a statement monthly unless there is no Transaction in a particular month. In any case, you will receive a statement at least quarterly.

**Notice When Amount of Preauthorized Payment(s) Vary.** If you preauthorize the Credit Union to make payments to persons or companies other than the Credit Union that vary in amount, then the person or company you are going to pay has the obligation to notify you 10 days before each such payment and provide the total amount due.

**Liability for Failure to Make a Transaction.** If the Credit Union does not complete a Transaction to or from your account on time or in the correct amount according to our agreement with you, the Credit Union may be liable for your losses or damages. However, there are some exceptions to this, which include the following:
- You do not have enough money in your account to make the Transaction through no fault of ours.
- The Transaction goes over the credit limit on your overdraft line.
- The terminal where you were making the Transaction does not have enough cash.
- The terminal or other system was not working properly.
- Circumstances beyond our control (such as fire, flood or electrical failure) prevent the Transaction, despite reasonable precautions we have taken.
- You have not properly followed instructions for operation of the ATM or system.
- The funds in your account are subject to legal process or another similar encumbrance.
- The Transaction would exceed one of the established limits contained in this Agreement or by other Credit Union agreements.
- Access to your account has been blocked after you have reported your Access Device lost or stolen or you use a damaged or expired Access Device.

**Information Disclosure.** We will disclose information to third parties about your account or the Transactions you make: (1) when it is necessary for completing Transactions, (2) in order to verify the existence and condition of your account for a third party, such as a credit bureau or merchant, (3) in order to comply with government agency or court orders, or (4) if you give us your written permission.

**Business Day Disclosure.** Our business days are set forth in the Fee Schedule.

**In Case of Errors or Questions about Transactions.** (Consumer Accounts) In case of errors or questions about your electronic transfers, call us at the phone number or write us at the address listed in the Fee Schedule as soon as you can. (For any errors involving a line of credit account, you must review your Loan Agreement and Disclosure and/or Visa Credit Card Agreement for a description of your rights.) We must hear from you no later than 60 days after we sent the first statement on which the problem appears. You should provide the following information:
- Tell us your name and account number.
- Describe the transfer you are unsure about and include to the extent possible, the type and date, and explain as clearly as you can why you believe it is an error or why you need more information.

- Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days to the address listed in the Fee Schedule.

We will tell you the results of our investigation within 10 business days after we hear from you and will correct the error within 1 business day after determining an error occurred.

If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will re-credit your account within 10 business days of receiving the error notice and inform you within 2 business days after providing the provisional credit with the amount you think is in error, and the date, so that you will have use of the money during the time it takes for us to complete our investigation. We will correct the error, if any, within 1 business day after determining an error occurred. A report of our results will be delivered or mailed to you within 3 business days after the conclusion of the investigation (including, if applicable, notice that a provisional credit has been made final).

For Transactions initiated outside the United States or resulting from a POS debit card Transaction, we will have 90 calendar days instead of 45 business days, unless otherwise required by law, to investigate your complaint or question. For Transactions on accounts that have been opened less than 30 calendar days, we will have 20 business days instead of 10 business days to credit your account and 90 calendar days instead of 45 business days, unless otherwise required by law, to investigate your complaint or question.

**Special Rules for Time Period Adjustment for Withdrawals by Cash or Similar Means.** If you believe a Visa Check Card Transaction was unauthorized, we will recredit your account within 5 business days for the amount you think is in error so you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint in writing, we need not recredit your account, or we may reverse any credit previously made to your account, until we have received it. We may withhold provisional credit, to the extent allowed under applicable law, if the delay is warranted by the circumstances or your account history.

**Your Liability for Unauthorized Transactions.** Tell us AT ONCE if you believe your Access Device has been lost or stolen. Calling is the best way to minimize possible losses. You are responsible for all transfers you authorize using an electronic funds transfer service under this Agreement. If you permit other people to use an electronic funds transfer service or your Access Device, you are responsible for any Transactions they authorize or conduct on any of your accounts.

**Special Notice to Visa Check Cardholders.** If there is an unauthorized use of your Visa Check Card or an internet Transaction and the Transaction takes place on the Visa network, then your liability will be zero ($0). This provision limiting your liability does not apply to either Visa commercial cards or ATM cash disbursements. Additionally, your liability with respect to unauthorized Transactions may be greater than the zero ($0) liability limit, to the extent allowed under applicable law, if the Credit Union reasonably determines, based on substantial evidence, that you were grossly negligent or fraudulent in the handling of your account or card. In any case, to minimize your potential liability, you should notify us of any unauthorized use no later than 60 days after your statement posting date.

For all other EFT Transactions that require the use of a PIN or access code, if you tell us within 2 business days, you can lose no more than $50 if someone uses your card and PIN or access code without your permission. If you do not tell us within 2 business days after you learn of the loss or theft of your card, PIN or access code, and we can prove we could have prevented the unauthorized Transaction if you had told us in time, you could lose as much as $500. In no event will you be liable for more than $50 for any unauthorized line of credit Transaction.

Also, if your statement shows transfers you did not make, tell us at once. If you do not tell us within 60 days after the statement was mailed to you, you may not get back any money lost after the 60 days if we can prove we could have stopped someone from making the transfers if you had told us in time. If a good reason (such as a hospital stay) kept you from telling us, we will extend the time periods. If you believe your card or access code has been lost or stolen or that someone has transferred or may transfer money from your account without your permission, you must call us at the phone number or write us at the address or email address set forth in the Fee Schedule. You can also notify us via card manager in the mobile app or online banking. If a good reason (such as extended travel or hospitalization) kept you from telling us, we may extend these time periods.

**Reporting a Lost Card, Access Device or PIN.** If you believe any Access Device has been lost or stolen or that someone has withdrawn or may withdraw money from your account without your permission, you agree to immediately notify us. You can call the Credit Union at the phone number or write us at the address listed in the Fee Schedule. You can also notify us via card manager in the mobile app or online banking. If you recover your card/Access Device after you have notified us, DO NOT USE IT.

**Foreign Transaction/International Service Assessment Fee (ISA Fee).** Non-U.S. dollar Transactions made in foreign countries (a.k.a. multi-currency Transactions) or with merchants located in, or processing Transactions, in foreign countries (including online Transactions, even if they are initiated in the United States) will be billed to you in U.S. dollars. Conversion to U.S. dollars is determined by a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable central processing date. This rate may vary from the rate Visa itself receives or the government-mandated rate in effect for the applicable central processing date.

U.S. dollar Transactions made in foreign countries (a.k.a. single-currency Transactions) or with merchants located in, or processing Transactions in, foreign countries (including online Transactions, even if they are initiated in the United States) will be billed to you in U.S. dollars.

You will be charged an ISA fee of 1% of the Transaction amount for all card Transactions made in or with merchants located in, or processing Transactions in, foreign countries (including online Transactions, even if they are initiated in the United States). The ISA fee will appear as a separate line on your statement for each applicable Transaction.

Transactions conducted in a U.S. Territory, on a U.S. military base, or within a U.S. Embassy or Consulate will not incur an ISA fee. Credit Vouchers (also known as Returns) and Cash Reversals are not subject to a foreign Transaction fee or ISA fee.

## FUNDS AVAILABILITY DISCLOSURE

### WHEN YOUR FUNDS ARE AVAILABLE FOR WITHDRAWAL

The following funds availability policy establishes when funds from your deposits (of cash, electronic deposit, or negotiable instrument) will be available for withdrawal.

For determining the availability of your deposits, in the chart below the term business day includes every day, except Saturdays, Sundays, and federal and state holidays.

In some cases, we will not make all the funds you deposit by check available on the same day as the day of your deposit. If we are not going to make all the funds from your deposit available on the same business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to delay availability of your funds after you have left the premises; we will provide notice to you no later than one day after we delayed availability of your funds.

**Foreign Checks.** The Credit Union does not process checks drawn on financial institutions located outside the U.S. (foreign checks). Foreign checks are exempt from the policies outlined in this disclosure.

Funds Availability schedule applies to funds deposited into a checking account. The schedule does not apply to deposits into certificate or savings accounts. The following chart is provided as a guideline only. Any reasonable cause to doubt collectability, emergency conditions, and repeat overdrafts may result in longer holds.

### Funds Availability Chart

| When the deposited item is... | And the deposit is... | Then the availability is... |
|---|---|---|
| Cash<br>On-Us Items<br>Electronic Payments<br>U.S. Treasury<br>U.S. Postal Money Orders<br>State or Local Government checks<br>Federal Reserve Bank Check<br>Certified/Cashier's check | Deposited in person, and into the named payee's account<br>or<br>Verified On-Us items<br>or<br>Pre-authorized (Direct Deposit) | Same or Next Business Day |
| U.S Treasury check<br>U.S. Postal Money Order<br>State or Local Government checks | Deposited into account other than named payee<br>Or<br>Not Deposited in person by the payee | 2nd Business Day |
| Local Checks | Amounts up to $5,525 deposited in person; and deposited into the named payee's account | First $225 available Next Business Day. Remainder available 2nd Business Day |
| | Amounts over $5,525 | See Large Deposit Exception Hold |

| ATM Deposits<br>Large Deposit- Total amounts over $5,525 | Deposits at a MACU ATM | 2nd Business Day |
| | Deposits at a non-MACU ATM | 5th Business Day |
| Large Deposit- Total amounts over $5,525 | Total amount over $5,525 | First $225 available next business day $5,000 available 2nd business day. Remainder available 7th business day |
| | Verified On-Us Items- total amounts over $5,525 | First $225 available next business day. Remainder available 2nd business day. |

| New Accounts-During the First 30 Calendar Days | | |
|---|---|---|
| When the deposited item is... | And the deposit is... | Then the availability is... |
| Cash<br>On-Us Items<br>Electronic Payments | Deposited in person<br><br>Verified On-Us items<br><br>Pre-authorized (Direct Deposit) | Same or Next Business Day |
| Cashier's checks<br>Local Checks<br>certified checks<br>checks drawn on Federal Reserve System or Federal Home Loan Banks<br>state and local government checks<br>U.S. Treasury checks<br> traveler's checks | Amounts up to $5,525 Deposited in person; and Deposited into the named payee's account | Next Business Day |
| | Amounts up to $5,525 Not deposited in person; and deposited into named payee's account | 2nd Business Day |
| | Amounts over $5,525 | 9th Business Day |

**Remote Deposit checks for business.**

Once approved for the Remote Deposit Capture program, you may use the services to deposit checks into your account(s) with the Credit Union subject to the terms of the RDC Agreement. Deposits made during the service normally post to your account an hour after they are processed. Deposits made after 3:00 pm MT may not post until the next business day. Discretionary holds may occur on new accounts or based on credit union discretion up to 7 days.

**Mobile Deposit on personal accounts.** For checks deposited through mobile deposit, some or all funds will generally be made available the second business day after the day of deposit, except in the case of a discretionary hold described herein.  Discretionary holds may occur on new accounts or based on credit union discretion up to 7 days.

**TRUTH-IN-SAVINGS ACT DISCLOSURE**
**Savings, Checking and Sweep Accounts**

**Account Rules and Regulations for Checking Accounts.** Checking accounts consist of a Transaction sub account and a savings sub account. Funds not routinely needed to pay debits may be transferred to a savings sub account. We may periodically transfer funds between these two sub accounts. If your checking account is a type on which dividends are paid, your dividend calculation will remain the same. Otherwise, the type savings sub account will be non-dividend bearing. The savings sub account will be governed by the rules governing our other savings account indicated within the Withdrawals section of the Membership Agreement. This process will not affect your available balance, the dividend you may earn, NCUA protection, your monthly statement, or any other features of this account.

**Rate Information.** The dividend rate and Annual Percentage Yield (APY) on your accounts are set forth in the Fee Schedule provided with this document. The dividend rate and APY may change at any time, as determined by the Credit Union and approved by the Credit Union's Board of Directors.

**Compounding and Crediting.** Dividends will be compounded and will be credited as set forth in the Fee Schedule. The Dividend Period (Period) for each of your accounts is set forth in the Fee Schedule. The dividend Period begins on the first calendar day of the Period and ends on the last calendar day of the Period. If your account is closed or you make a withdrawal during a dividend Period before dividends are credited, you will not receive the accrued or uncredited dividends.

**Balance Information.** Any minimum deposit to open an account, and the minimum average daily balance you must maintain to avoid service fees and to earn the annual percentage yield (APY), stated for your account, is set forth in the Fee Schedule. Dividends are calculated by the average daily balance method that applies a periodic rate to the average daily balance in your account for the Period. The average daily balance is calculated by adding the balance in your account for each day of the Period and dividing that figure by the number of days in the Period.

**Accrual of Dividends.** Dividends will begin to accrue on the business day we receive provisional credit for the deposit of noncash items (e.g., checks) to your account. Dividends will begin to accrue on cash deposits on the business day you make the deposit to your account.

**Transaction Limitations for All Savings and Sweep Accounts.** Limitations are set forth in the first Section of this document entitled Membership, Accounts and Account Services Agreement.

**Additional Limitations for IRA Money Market Accounts.** You are solely responsible for complying with any requirements including Transaction limitations and penalties for early withdrawal under the Internal Revenue Code or other applicable federal or state law governing any IRA or other Credit Union accounts. Deposits are not limited. Transfers to a Credit Union IRA account are allowed subject to applicable law, and the minimum balance requirements and other restrictions applicable to the account.

**Certificate Accounts (Standard Certificates, Growth Certificates, Christmas Club Certificates, Youth Certificates and IRAs)**
**Rate Information.** The dividend rate and APY on your account are stated in the Fee Schedule and/or your certificate documentation. The APY reflects the dividends to be paid on your account based on the dividend rate and the frequency of compounding for an annual period. For fixed-rate certificate and fixed-rate IRA certificate accounts, the dividend rate and APY are fixed and will be in effect for the term of the account. For variable-rate certificate and variable-rate IRA deposit accounts, the dividend rate and APY are variable and may change each dividend period based on the determination of the Credit Union and approved by the Credit Union's board of directors. The APY assumes that dividends will remain on deposit until maturity.

**Compounding and Crediting.** Dividends will be compounded and credited as set forth in the Fee Schedule. The Dividend Period (Period) for each account is set forth in the Fee Schedule. The Period begins on the first calendar day of the Period and ends on the last calendar day of the Period.

**Minimum Balance Requirements.** The minimum deposit required to open any certificate account is set forth in the Fee Schedule. You must maintain an average daily balance equal to or greater than the minimum opening deposit to earn the APY and avoid any service charges set forth in the Fee Schedule.

**Balance Computation Information.** Dividends are calculated by the average daily balance method, which applies a periodic rate to the average daily balance in your account for the Period. The average daily balance is calculated by adding the balance in your account for each day of the Period and dividing that figure by the number of days in the Period.

**Accrual of Dividends.** Dividends will begin to accrue on the business day you receive provisional credit for the deposit of noncash items (e.g., checks) to your account. Dividends will begin to accrue on cash deposits on the business day you make the deposit to your account. If you close your certificate account before dividends are credited, you will not receive the uncredited or unpaid dividends.

**Transaction Limitations.** In addition to any other applicable limitations described in this document, after a certificate account is opened, you may not make deposits into or withdrawals from this certificate account before the maturity date disclosed on the certificate agreement. Exception on deposits apply to Youth, Growth and Christmas Club certificate accounts (refer to the Truth in Savings Fee Schedule).

**Maturity Date.** Your account will mature on the date stated in your certificate documentation or any Renewal Notice the Credit Union provides to you.

**Early Withdrawal Penalties.** You have agreed to leave the principal of this account on deposit for the full term stated in your certificate agreement. Dividends deposited to the certificate account become part of the principal balance and are not eligible for withdrawal prior to the maturity date. If all or part of the principal balance is withdrawn before the maturity date, the Credit Union may charge you a penalty. Penalties for early withdrawal will be provided to you in the certificate agreement given at the initiation of the certificate and are as follows:

- If your certificate has an original maturity of 12 months or less, the penalty may equal 90 days' dividends on the amount withdrawn.
- If your certificate has an original maturity of more than 12 months and less than 48 months, the penalty may equal 180 days' dividends on the amount withdrawn.
- If your certificate has an original maturity of 48 months or greater, the penalty may equal 365 days' dividends on the amount withdrawn.

The penalty will be calculated based on the dividend rate of the certificate. The penalty will, if necessary, be taken from the principal amount of the certificate. The Credit Union may grant a premature withdrawal request without penalty or with a reduced penalty in the event of the Owner's death or legal incompetence, or if your account is an IRA account and the account is revoked within seven days after the IRA Disclosure Statement is received, or when the account is an IRA account and the Owner qualifies pursuant to applicable law.

**Renewal Policy.** Unless you instruct the Credit Union otherwise, your certificate account will automatically renew at maturity. You will have a grace period of 10 calendar days after the maturity date to withdraw the funds in the account without being charged an early withdrawal penalty. However, the Credit Union reserves the right to give the Owner written notice that the account will not be renewed. In the latter case, upon maturity, the account will be converted to a regular Share account and receive earnings at the rate then paid on regular Share deposits. The rate of earnings for any renewal terms shall be at the rate the Credit Union is then offering on the same accounts in this class. If you instruct us not to renew your account, then no dividends will be paid after the stated maturity date.

**Common Features on All Accounts**

**Nature of Dividends.** The Credit Union pays dividends from current income and available earnings, after required transfers to reserves at the end of the dividend Period, thus dividends are not guaranteed. The Dividend Rate and APY set forth in the Fee Schedule are prospective rates and yields the Credit Union anticipates paying for the applicable dividend Period.

**National Credit Union Share Insurance Fund.** Member accounts in this Credit Union are federally insured by the National Credit Union Share Insurance Fund.

**Transfer and Assignment.** Ownership of an account is not transferable without the written consent of the Credit Union. The Credit Union may, before giving its consent, use any of the funds in this account to repay any debt due it from any named account Owner. Your accounts may be pledged to secure your existing or future obligations owed to this Credit Union.

**Fees and Charges.** The fees and charges set forth in the Fee Schedule may be assessed against your account(s).

**Par Value Requirements.** The par value of a Membership Share, which must be fully paid to become a Member or maintain Membership or to receive and maintain any accounts or services with us is set forth in the Fee Schedule. The sum of your Membership Share shall be paid into and retained in your savings or other appropriate account.

**Transaction Limitation on All Accounts.** No Member may withdraw any amount on deposit below the amount of their primary or contingent liability to the Credit Union if they are delinquent as borrower, co-maker or guarantor, without the Credit Union's written permission. Further, if your account(s) are pledged to us to secure any loan obligation, then you must pay or, with our permission, renew the loan before any principal or dividends may be withdrawn or transferred. If we allow you to renew a loan secured by such a pledge, you may be required to renew any pledged account or leave the funds on deposit with us until the loan is paid or we specifically release the funds.

### UNIFORM COMMERCIAL CODE FUNDS TRANSFERS AGREEMENT AND DISCLOSURE

**Summary and Definitions.** This Agreement governs the movement of funds by means of funds transfers defined in Article 4A of the Uniform Commercial Code, Subpart B of Regulation J of the Board of Governors of the Federal Reserve System (generally referred to as Fedwire or wholesale wire transfers) and as may be applicable, the operating rules for the NACHA. This Agreement does not apply to any Transaction or any part of any Transaction governed by the Electronic Funds Transfer Act and Regulation E. To the extent that the terms of this Agreement vary from the other agreements or disclosures in this Agreement, this Agreement shall govern. Further, to the extent that this Agreement varies, any provision of Article 4A, Regulation J or the operating rules of NACHA, this Agreement shall govern, except where specifically prohibited by applicable law.

**Services Available.** You authorize us to transfer funds in accordance with your request(s) to and from your account(s) with us, or to and from another institution. Transfers shall be made according to any security procedures we deem appropriate or as specifically agreed upon as provided herein. We may debit any of the accounts you designate as a source of payment for funds transfers and any related fees and service charges. We will have no obligation to accept or execute any payment order if: (1) the account(s) from which it is to be made does not contain sufficient available collected funds, (2) the payment order is not authorized or does not comply with applicable security procedures, or (3) acting in good faith we have reasonable cause to reject the payment order.

**Person(s) Authorized to Make Transfers.** You agree that you, any joint Owner of an account or any person authorized by a written Instrument by you or any joint Owner, that is acceptable to us, may initiate, request, cancel, amend or verify transfers on your account(s). We may rely on the authority of any person(s) designated by you or any joint Owner until we receive written notice revoking or modifying that authority.

**Security Procedure(s).** We may establish security procedures to verify the authenticity of a payment order. You agree that the authenticity of payment orders may be verified using that security procedure unless you notify us in writing that you do not agree to that security procedure. In that event, we shall have no obligation to accept any payment order from you or other authorized parties on the account until you and the Credit Union agree in writing to an alternate security procedure. You authorize us to record any telephone communications regarding any transfer order, which we may maintain for any time period we deem appropriate.

**Time Limitations for Acceptance of Orders.** We may establish and change cut-off times for the receipt and processing of funds transfer orders, amendments or cancellations. Our transfer business days and cut-off times are set forth in the Fee Schedule, as amended from time to time. Transfer orders, cancellations or amendments received after the cut-off time may be treated as received on the next business day following the funds transfer and processed accordingly. Your request for transfer(s), amendment(s) and cancellation(s) is considered accepted when executed by us.

**Cancellation or Amendment of Transfer Request(s).** You may not be able to cancel or amend a request after it is received by us. However, we may, in our sole discretion, use reasonable efforts to act on your request for cancellation or amendment. Any request for cancellation or amendment is subject to applicable security procedure(s). We shall have no liability if such cancellation or amendment is not put into effect. Furthermore, you agree to indemnify and hold us harmless from any and all liabilities, costs and expenses we may incur in attempting to cancel or amend any transfer.

**Member Instructions Identifying Beneficiary or Financial Institution.** You acknowledge and agree that when you provide us with the name and account number when requesting a transfer, that payment may be made solely on the basis of the account number, even if the account number identifies a beneficiary different from the beneficiary named by us. Further, payment instructions identifying a beneficiary's financial institution name, routing and transit number may result in payment solely on the basis of the routing and transit number, even if the name of the institution does not correspond to said numbers. You further agree that your obligation to pay the amount of the wire transfer to us is not excused in such circumstances. Likewise, wire transfers received by us for your benefit may be paid by us solely on the basis of account number.

**Account Statements and Notices.** All transfers subject to this Agreement will be reflected on your periodic account statement(s). Notification of receipt of all such transfers will be provided, including such item in the periodic account statement(s) we provide to you. You may inquire whether a specific transfer has been received at any time during your normal business hours.

You agree to review each statement or other notice for any discrepancies in connection with transfers. If you think a transfer is not authorized or wrong, or if you need more information about a transfer, you must contact us in writing upon discovery of the error or within 30 days after you receive the first notice or statement that reflects the discrepancy you allege, whichever is earlier. Failure to do so will relieve us of any obligation to pay dividends or otherwise compensate you for the amount of any unauthorized or erroneous transfer.

**Method Used to Make the Wire Transfer.** We may select any means for the transmission of funds we consider suitable, including, but not limited to, the Credit Union's own internal systems or Fedwire. Any subsequent financial institution may also use Fedwire. Any use of Fedwire shall be governed by applicable Fedwire regulations. The Credit Union is not responsible for performance failure as a result of an interruption in transfer facilities, labor disputes, power failures, equipment malfunctions, suspension of payment by another party, refusal or delay by another financial institution to accept the transfer, war, emergency conditions, fire, earthquake or other circumstances not within our control.

**Limitation of Credit Union's Liability.** In addition to any defense or exception from liability provided in this Agreement or applicable law, the Credit Union shall not be liable in any case for any special, indirect, exemplary, consequential or punitive damages (including lost profits). Further, we shall in no case be responsible for the payment of any attorneys' fees or other legal expenses whatsoever. If we become obligated

to pay dividends to you under applicable law, you agree that the dividend rate shall be equal to the dividend rate applicable to the account on which the transfer was made.

**Notice of Receipt of ACH Items.** Under the operating rules of the NACHA which are applicable to ACH Transactions involving your account, we are not required to give next day notice to you of receipt of an ACH item, and we will not do so. However, we will continue to notify you of the receipt of payments in the periodic statements we provide to you.

**Provisional Payment.** We may in our sole discretion give you a credit for ACH payments or wire transfers before we receive final settlement of the funds transfer. We reserve the right to reject any such payment or transfer without liability to you. Any such credit is provisional until we receive final settlement. If we do not receive such settlement, we are entitled to a refund from you in the amount provisionally credited, and the originator will not be considered to have paid the amount of the credit entry to you.

**Choice of Law.** We may accept on your behalf payments to your account which have been transmitted through one or more ACHs and are not subject to the Electronic Fund Transfer Act and your rights and obligations with respect to such payments shall be construed in accordance with Utah law and as provided in the operating rules of the NACHA.

Revised 12.1.2022



**MOUNTAIN AMERICA**
CREDIT UNION

# BUSINESS FRAUD PREVENTION CHECKLIST

In the digital age, fraudulent activities are more common, and often more severe, than they have ever been. It's imperative you take preventative measures to protect your business finances and sensitive information. The following best practices can help you do that.

## Establish internal controls and operations

A strong fraud prevention strategy starts with creating and maintaining strong internal systems.

### ❏ Create formal policies and procedures:
- ▶ Determine how payment instructions are verified internally.
- ▶ Create a process for changing a vendor's address and/or banking information to ensure accurate invoicing.
- ▶ Verify emailed payment information directly with the payee through a known good channel—for example, over the phone with a known good number.

### ❏ Understand unauthorized transaction recovery timeframes:
- ▶ 48 hours for unauthorized ACH debits.
- ▶ 24 hours for suspicious or fraudulent checks.

### ❏ Give employees the tools they need to:
- ▶ Follow established policies and procedures.
- ▶ Safely conduct business online by keeping systems up to date, utilizing antivirus software and following strong cyber security practices.
- ▶ Protect user data by setting strong passwords and never leaving workstations unattended.
- ▶ Recognize fraud attempts, including phishing emails and social engineering phone calls.
- ▶ Enable and enforce Multi-Factor Authentication (MFA) on all internet-accessible accounts. Authentication apps like Google Authenticator or Duo provide the strongest security, while emailed codes can be a good alternative. Avoid phone- or SMS-based codes for important accounts unless it is the only MFA option.

### ❏ Manage system access:
- ▶ Limit access to a need-to-know basis.
- ▶ Remove access when an employee leaves the company.
- ▶ Conduct daily and monthly reconciliations, as well as regular account audits.
- ▶ Do not share or reshare passwords.

### ❏ Segregate duties:
- ▶ Have separate accounts payable and accounts receivable departments.
- ▶ Require different individuals to process collections, disbursements and reconciliations.
- ▶ Have employees work on different stations with different login credentials.

DocuSign Envelope ID: D4-33E89C-24F5-4C6B-A0D9-D9FD57A25C40



❏ **Stay vigilant:**
- ▶ For ACH, always have dual initiation approval and reconcile expenses daily.
- ▶ For wire transfers, utilize dual authorization and be wary of high amounts, international requests and new or non-approved partners.
- ▶ For checks, preapprove high amounts before issuance, use a secure check stock and limit access to check stock.

## Take advantage of external services

Mountain America offers a variety of fraud prevention tools to protect your business.

❏ **Monitor your accounts regularly using online and mobile banking.**

❏ **Have paper or electronic statements sent to multiple employees for review.**

❏ **Set up account alerts:**
- ▶ Be notified of suspicious activity.
- ▶ Receive notifications about balance thresholds, processed payments and cleared transactions.

❏ **Sign up for Positive Pay:**
- ▶ Check Positive Pay will verify your checks and notify you if any records do not match.
- ▶ ACH Positive Pay allows you to whitelist approved companies, and we'll let you know if an unapproved company debits your account.



**To learn more about Mountain America's fraud prevention services, including Positive Pay, contact a business advisor at 1-888-845-1850.**

**Insured by NCUA.**
Membership required—based on eligibility.

**DocuSign**

## Certificate Of Completion

Envelope Id: D783E89024FE416BAAC9D5AC5A25C7CC
Subject: Complete with DocuSign: DIGITAL LICENSING INC. BUSINESS ACCOUNT DOCUMENTS
Source Envelope:
Document Pages: 40
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 7
Initials: 0

Status: Completed

Envelope Originator:
Brandon Stevens
bstevens@macu.com
IP Address: 63.228.212.200

### Record Tracking

Status: Original
    2/6/2023 3:45:25 PM

Holder: Brandon Stevens
    bstevens@macu.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| ROYDON NELSON<br>ROYDOG.NELSON@GMAIL.COM<br>Security Level: Email, Account Authentication<br>(None), Access Code | *ROYDON NELSON*<br>DocuSigned by:<br>D5ECA0DE95A0406...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 69.128.230.91 | Sent: 2/6/2023 3:50:58 PM<br>Resent: 2/6/2023 4:19:01 PM<br>Viewed: 2/6/2023 6:08:55 PM<br>Signed: 2/6/2023 6:09:11 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 2/6/2023 6:08:55 PM<br>  ID: ce6d6b44-fcb0-45ae-b9da-65be448aeb67 | | |
| SCHAD E BRANNON<br>schadebrannon@gmail.com<br>President-CCO<br>UCAP,LLC<br>Security Level: Email, Account Authentication<br>(None), Access Code | DocuSigned by:<br>*S B...*<br>1B154E267995F405...<br><br>Signature Adoption: Uploaded Signature Image<br>Using IP Address: 102.176.94.4<br>Signed using mobile | Sent: 2/6/2023 3:50:59 PM<br>Viewed: 2/6/2023 4:20:37 PM<br>Signed: 2/6/2023 4:21:23 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 2/6/2023 4:20:37 PM<br>  ID: 0538ae02-5c10-47ad-97ab-ea46df45bec0 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/6/2023 3:50:59 PM |
| Certified Delivered | Security Checked | 2/6/2023 4:20:37 PM |
| Signing Complete | Security Checked | 2/6/2023 4:21:23 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 2/6/2023 6:09:11 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 10/4/2018 9:00:24 AM
Parties agreed to: ROYDON NELSON, SCHAD E BRANNON

Case 2:23-cv-00482-RJS-DBP   Document 144-1   Filed 09/14/23   PageID.3053   Page 132 of 215

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Mountain America Credit Union - Business Services (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Mountain America Credit Union - Business Services:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: swimmer@macu.com

**To advise Mountain America Credit Union - Business Services of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at swimmer@macu.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Mountain America Credit Union - Business Services**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to swimmer@macu.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Mountain America Credit Union - Business Services**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to swimmer@macu.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.


**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Mountain America Credit Union - Business Services as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Mountain America Credit Union - Business Services during the course of your relationship with Mountain America Credit Union - Business Services.

Exhibit "8"

**Morrison**Cohen LLP

David E. Ross
Partner
(212) 735-8841
dross@morrisoncohen.com

August 17, 2023

**VIA E-MAIL & FEDEX**
Jessica Magee, Esq.
Scott Mascianica, Esq.
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street
Suite 1500
Dallas, Texas 75201

Re:   ***SEC v. DLI, et al.,* Case No: 23-CIV-482 (D. Utah)**

Dear Scott and Jessica,

As you know, we represent Jason Anderson, Jacob Anderson, Schad Brannon, and Roydon Nelson in the above-captioned matter. As you also know, from the inception, to wit, the very first time that we learned of the *ex parte* Temporary Receivership Order (the "TRO"), we have have been cooperating with the greatest of diligence with the Receiver. Indeed, as you know from our many calls and e-mails, in accordance with the TRO, we have been ready, willing and able to, among other things, provide the Receiver with all relevant information related to and control of, *inter alia,* all of our clients' "digital assets" preserve same, ensure they are not dissipated and otherwise maintain the *status quo*. Notwithstanding same, as of the date of this letter, we are still awaiting the Receiver's written instructions and protocol as to how you wish to accomplish the "handoff" of those assets.

 Separately, while we have every intention of continuing our diligent cooperation, we are also constrained to raise concerns about the adverse effects of the Receivership, including serious business interruptions, affecting employees and contractors, security issues and environmental concerns. To that end, as discussed at length below, we initially outline major concerns that we have with three (3) of our clients' existing businesses.

**DLI'S FOUR OIL DRILLING RIGS**

As we showed you on Monday, August 14, 2023, DLI owns four (4) oil drilling rigs in Nebraska, Nevada, and Oklahoma. And we provided you the GPS coordinates to locate the rigs.

Our clients have advised us that these four drilling rigs are worth approximately $6 million. These rigs rent for $18,000 -$26,000 per day each, depending upon location. And prior to the imposition of the Receivership, DLI was in negotiations for a contract to provide rigs for the drilling of 11 third-party wells, which would have generated a significant revenue. The Receivership quashed any chance of realizing such revenue.

**Morrison**Cohen LLP

August 17, 2023
Page 2

In addition, because DLI's accounts are frozen and could no longer operate to pay its personnel, including its security detail, they unsurprisingly decided to leave the work sites; thus, the rigs are no longer being monitored and are exposed to theft.  As we discussed in our Monday's email regarding the oil rigs, a reported theft and recovery has already occurred last month in Nevada (see incident report from White Pine County Sheriff's Department, see Exhibit 1). Because security was available to report the theft early, however, the Sheriff's Department was able to recover the equipment. That is no longer the case.  Again, we respectfully ask that the Receiver take all necessary actions to secure and protect DLI's rigs.

**OKLAHOMA OIL AND GAS ASSETS OF IGNIS ENERGY**

One of our clients, Roy Nelson, through Relief Defendant The Gold Collective LLC, had operated Ignis Energy LLC ("Ignis Energy") in Oklahoma.  The SEC does not mention Ignis Energy anywhere in its Complaint.

Through a purchase of several gas systems in Kay County, Oklahoma (the Kay gas system, the Frantze gas system, the Coronado gas system and their associated easements and gas wells), Ignis Energy was assigned these oil and gas assets.  See Oklahoma, Kay County Recorder's Office, Book 1933, pages 0894-0963 (record of assignment); see also Book 1620, pages 0244-0339 (record of purchase of the foregoing gas systems, easements and gas wells).  These gas systems (including the tanks and pipelines) and their associated easements and gas wells span the majority of Kay County (estimated to be just over 127 miles).

These assets need to be immediately managed and maintained to ensure safety and security--not only of the assets but also for the community. Theft in this area is very high, due to the fact that many roughnecks who live in the area and work in the industry have access and ability to move equipment easily. We have already received open and consistent threats of equipment theft and vandalism. Beyond theft and vandalism, these assets, if not regularly maintained, pose a potential environmental hazard; for example, the pipelines or wells could have a leakage and could adversely affect their surrounding areas and cause a public health issue.

Ignis Energy's current workforce of more than ten workers left the job site after learning of the SEC's lawsuit.  Thus, the pipeline, tanks and wells are now exposed to unrectified maintenance issues and oil and gas reserves are extremely vulnerable to theft.  We note that due to the loss of workforce, many of these wells are being "shut-in" to mitigate loss, safety and environmental concerns.  However, having the wells shut-in could cause also significant problems, as saline intrusion to the formations occurs when wells are shut-in.

In light of the TRO and the Temporary Receivership Order, Ignis Energy, in excess of caution, has not operated, managed, or maintained the oil and gas assets.  We believe that the Receiver needs to quickly resume maintenance and operation of these assets, as well as transport and

MorrisonCohen LLP

August 17, 2023
Page 3

ensure the delivery of natural gas and oil from these sites to avoid contamination, oil spills, theft or other environmental hazards. Please advise us forthwith what the Receiver plans to do regarding operating, managing, or maintaining these oil and gas assets in Oklahoma.

**DLI's ECOSYSTEM / TOKENOMICS**

In compliance with the TRO, our clients have done nothing to affect the status quo in DLI's ecosystem/tokenomics. Contrary to the suggestion that the Receiver made recently, there has been no transfer or dissipation of any crypto assets that our clients possess or control. However, we also want to advise you that DLI is contractually obligated to purchase tokens out of the ecosystem with any revenues. Under the lite papers available on the DEBT Box website, the tokens purchased must then be burned.

In addition, as we discussed, our clients, once the receiver provides the protocol for transfer of crypto assets, will, in turn, provide the Receiver with the keys to the treasury wallets. The tokens in the treasury, however, are not intended to ever be released. The release of any of these tokens into the open market could result in catastrophic loss for node holders, by diluting the market. Please be mindful of the potential deleterious market impact that an error could cause.

In closing, we respectfully submit that as the Receiver is stepping into the shoes of DLI, the Receiver must take all necessary actions to maintain the ongoing businesses discussed above. In our view, any failure to do so would constitute an act of gross negligence by the Receiver.

We are happy to discuss further or answer any questions.

Sincerely,

/s David E. Ross
David E. Ross

White Pine County Sheriff's Department
Ely Nevada
Incident# 2307080041

PAGE 1 OF 2.

STATEMENT BY:
☑ Witness  ☐ Suspect
☐ Victim

WHITE PINE COUNTY
SHERIFF'S DEPARTMENT
ELY, NEVADA
STATEMENT FORM

DR. NUMBER:
DATE:
TIME:

FULL NAME: JEFFREY ROWALD BOUTCHERE   DATE: JULY 10/23   TIME: ☐ AM ☐ PM

RESIDENCE ADDRESS: OIL RIG off co RD 1   CITY:   STATE: NV   ZIP CODE:   HOME TELEPHONE:

MAILING ADDRESS: WHITE PINE CO   CITY:   STATE:   ZIP CODE:   WORK TELEPHONE: 310-774653

DATE OF BIRTH: 6/   AGE: 62   SOCIAL SECURITY NUMBER: 0810   SEX: M   RACE: W   HGT: 5'6"   WGT: 140   HAIR: GRAY   EYES: BLUE

I WORK FOR ROY NELSON (DCI/IG NWS ENERGY)
PROFORMING SECURITY ON HIS OIL RIG OFF WHITE PINE
COUNTY RD 1 IN THE NEWMARK VALLEY. On SATURDAY
JULY 8TH AT APPROXITLY 5:00PM I HEAN A BANG
AND THE SOUND OFF METTAL SCRAPPING. I OPENED
THE DOOR OF MY SHEDDER TO SEE A HEAVE SET
WHITE WOAMANS STANDING BY THE THREE CONTAINERS
BY THE RIG ABOUT 50 YARDS AWAY. SHE WAS BLOND
WARING A BLUE FLOWER PRINT SHIRT AND BLUE PANTS
I GOT MY PISTOLE AND WENT TO CONFRONT HER.
AS I APPROACHED I HEAN A TRUCK START UP. A DARK
GRAY DODGE RAM 250 4 DOOR PULLED OUT WITH THE
PASSENGE WINDOW OPEN. I SAW THE DRIVERS
FACE. WHITE MALE ROUND FACE W/ DARK BEARD
BASEBALL CAP, SUN GLASSES, HE WAS MOVEING AWAY
FROM ME QUICKLY. I SHOUTED STOP, STOP, STOP
BE DROVE OFF AND TURNED NORTH ON CORD 1
TOWARDS THE SO.

SIGNATURE OF PERSON WRITING STATEMENT:   WITNESS SIGNATURE:

WPCSO (Rev 10/90)

PAGE 2 OF 2

STATEMENT BY:
☑ Witness ☐ Suspect
☐ Victim

**WHITE PINE COUNTY**
**SHERIFF'S DEPARTMENT**
ELY, NEVADA

**STATEMENT FORM**

DR NUMBER:
DATE:
TIME:

FULL NAME: JEFFREY ROWACH ROUTLEDGE   DATE July 10 /23   TIME: ☐ AM ☐ PM

RESIDENCE ADDRESS: ███████   CITY:   STATE:   ZIP CODE:   HOME TELEPHONE:

MAILING ADDRESS: WASHINGTON UT.   CITY: 84780   STATE:   ZIP CODE:   WORK TELEPHONE:

DATE OF ███/61/ AGE 62   SOCIAL SECURITY NUMBER: ███ 0410   SEX M   RACE W   HGT 5'6"   WGT 140   HAIR GR   EYES BL.

I TURNED TO MY LEFT AND SAW THAT OUR
LIGHT PLANT WAS GONE. IT IS ABOUT 40'
LONG BY 12"X10". I CALLD ROY NELSON
(801) 946-9881 TO REPORT THE THEFT AND WHAT
I JUST WITNESSED. I THEN CALLED 911
TO REPORT THE THEFT. APPERENTLY THEY
CAUGHT THE RIG EQUIPMENT ON HWHY SO AS
WELL AS THE PICKUP TRUCK WITH THE MAN
AND WOMAN IN THE TRUCK.

SIGNATURE OF PERSON WRITING STATEMENT:   WITNESS SIGNATURE:

# Exhibit "9"

# MorrisonCohen LLP

David E. Ross
Partner
(212) 735-8841
dross@morrisoncohen.com

August 18, 2023

**VIA E-MAIL & FEDEX**
Jessica Magee, Esq.
Scott Mascianica, Esq.
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street
Suite 1500
Dallas, Texas 75201

Re:   ___SEC v. DLI, et al.,___ **Case No: 23-CIV-482 (D. Utah)**

Dear Scott and Jessica,

As you know, we represent Jason Anderson, Jacob Anderson, Schad Brannon and Roydon Nelson in the above-captioned matter. Yesterday, I sent you a letter outlining major concerns that we have with three (3) of our clients' existing businesses, including Ignis Energy.

Because of the TRO, we continue to observe adverse impacts on our clients' ongoing businesses. Last night, we learned that a trucking company, Triple G Drive-Away ("Triple G"), of Newalla, Oklahoma, which was scheduled to ship two loads of drill pipes for DLI's Oil Drilling Rig 2, advised that Triple G will not be shipping the two loads of drill pipes. They will be holding them until a payment of $7,200 is made.  *See* Exhibit 1 (email thread between owner of Triple G Drive-Away and Jason Saetrum of Ignis Energy).

Ordinarily, DLI would have made a timely payment for shipping such equipment.  As we discussed yesterday, however, the TRO has halted DLI and Ignis Energy's business operations. Thus, we respectfully request that the Receiver pay or make arrangements to address the outstanding invoices so that DLI can take delivery of the necessary drill pipes for oil production.  We plan to provide your contact information to Triple G.

We are happy to discuss further or answer any questions.

Sincerely,

/s David E. Ross

David E. Ross

**Ross, David E.**

**Subject:** FW: Report from Triple G Drive-Away

---------- Forwarded message ---------
From: **Jason Saetrum** <                                    >
Date: Thu, Aug 17, 2023 at 8:44 PM
Subject: Fwd: Report from Triple G Drive-Away
To: Roy Nelson <                                    >

---------- Forwarded message ---------
From: **Dolores Gibson** <DeeGibson@triplegdriveaway.com>
Date: Thu, Aug 17, 2023, 8:01 PM
Subject: Re: Report from Triple G Drive-Away
To: Jason Saetrum <thesolutionprovider@gmail.com>
Cc: Pat Gibson <PatGibson@triplegdriveaway.com>, **Jason Saetrum** <thesolutionprovider         >

This is Pat the owner of Triple G Driveaway. There was NEVER a threat of us stealing any pipe , the statement that was made was I will hold 2 loads of pipe until I get paid , there was so much uncertainty going around and i heard I wasn't getting paid. I had permission from the land owner where the pipe was stored, to load and hold the 2 loads. That isn't stealing anything. Why is everyone getting paid except us? We are only doing what we were hired to do by Ron and Kasey. I will  consult with my attorney on the legals of this matter . Quickest way to get rid of me is to pay me .

Respectfully,
Patrick Gibson

Get Outlook for iOS

---

**From:** Jason Saetrum <thesolutionprovider@gmail.com>
**Sent:** Thursday, August 17, 2023 8:29 PM
**To:** Dolores Gibson <DeeGibson@triplegdriveaway.com>
**Cc:** Pat Gibson <PatGibson@triplegdriveaway.com>; **Jason Saetrum** <thesolutionprovider@gmail.com>
**Subject:** Re: Report from Triple G Drive-Away

Hello Dolores -

These invoices have been received and submitted for approval and payment this .

Ignis Energy hasn't had any payment delays with Triple G until August when new administration took over.
Ignis, its payments, and any requests are currently being handled by a new administrator.
As soon as we get a phone number / contact info you can contact directly for payment we will send it over to you.

1

In addition, we have received a threat from the apparent owner of Triple G that they intend on stealing the pipe from the yard they are being kept in. Should any such theft occur, we will call the police, etc.


Jason


The information contained in this e-mail transmission is intended only for the personal and confidential use of the recipient(s) named above. If this message has been received in error, you are hereby notified that any review, dissemination or copying of this message and its attachments, is strictly prohibited. If you received this e-mail in error, please immediately notify the sender by return e-mail and delete this message and any attached materials from your system.


On Wed, Aug 16, 2023 at 10:24 AM Dolores Gibson <                              > wrote:

Good morning,

I was given your name by Kasey Parker. We were hired to haul pipe from Bushnell, NE to Blackwell, OK. The agreement was payment each week for invoices submitted. Your invoices are past due and we need payment remitted today. Please advise.

Thank you.

Exhibit "10"

I-2023-002692     **Book 1933 Pg 894**
04/20/2023 2:48pm    Pg 0894-0963
Fee: $156.00  Doc: $0.00
Tammy Reese - Kay County Clerk
State of OK

## ASSIGNMENT, BILL OF SALE AND CONVEYANCE

This Assignment, Bill of Sale and Conveyance (this "***Assignment***") executed April 18th, 2023, but effective as of April 1, 2023 (the "***Effective Date***"), is from Ganer Oil Company (Mark Ganer, dba a sole proprietorship) with its principal office at 805 Woodlawn, Blackwell, OK 74631 ("***Assignor***") to Ignis Energy, LLC with its principal office at 1812 W. Sunset Blvd, Ste 1-345, St. George, UT 84770 ("***Assignee***").

      1.    Subject Properties.  "***Subject Properties***" shall mean all of Assignor's right, title and interest in and to the following:

    (a)    All easements, rights-of-way, gathering systems, and pipelines described in Exhibit "A" hereto ("***Gas Systems***");

    (b)    all oil and gas leaseholds, oil, gas and other minerals, including working interests, carried working interests, net revenue interests, and all other interests under or in the lands and oil, gas or mineral leases, and interests which are described in Exhibit "A" hereto (the "***Leases***");

    (c)    All producing, non-producing and shut-in oil and gas wells and saltwater disposal or injection wells located upon the lands to which the Leases apply, which wells include, but are not limited to, those wells described on Exhibit "A" attached hereto ("***Wells***").

    (d)    All unitization, communitization and pooling agreements and orders relating to the lands covered by the Leases, or any part thereof, and the pooled or communitized areas created thereby affecting the Leases, the Wells or any of the lands described in Exhibit "A" hereto;

    (e)    All of the product purchase and sale contracts, surface and other leases, permits, rights-of-way, easements, licenses, options, orders, farmout or farmin agreements, and all other contracts or agreements of whatever kind or character relating to the interests that collectively constitute the Subject Properties; and

    (f)    All other assets and contract rights related thereto owned or claimed by Assignor in the State of Oklahoma in addition to the Subject Properties described in Exhibit "A" hereto ("***Assignor's Additional Assets***").

      2.    Assignment.  For Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby transfers, grants, conveys and assigns to Assignee, effective as of the Effective Date, the Subject Properties, including the Additional Assets

BOOK 1933 PAGE 0894

3.   Further Assurances.  Assignor agrees to execute and deliver such other and further instruments and will do such other and further acts as may be necessary or desirable to carry out more effectively the intents and purposes of this Assignment, including, but not limited to assignments of Assignor's Additional Assets as may be necessary from time to time to properly reflect the ownership of Assignor's Additional Assets in Assignee.  Furthermore, in the event that, under applicable federal or state statutes or regulations or by virtue of contractual obligations, a separate assignment of any of the Subject Properties is required to be executed by Assignor on an approved form or on a separately executed instrument, such separate assignment shall be so executed on such approved forms or on such separate assignment in sufficient counterparts to satisfy any such statutory, regulatory or contractual requirements.

4.   Substitution and Subrogation.  This Assignment is made with full substitution and subrogation of Assignee, its successors and assigns, in and to all covenants and warranties heretofore given or made in respect of any of the Subject Properties, and Assignor hereby assigns and conveys to Assignee all such covenants and warranties and all of Assignor's rights thereunder.

5.   Warranties.  With respect to all persons who may claim by, through or under Assignor, but not otherwise, Assignor warrants that (i) Assignor is the lawful owner of the Subject Properties; and (ii) the Subject Properties are free and clear of all liens, claims or encumbrances. To the extent that this Assignment constitutes an assignment of personal property or fixtures, Assignor expressly disclaims and negates (a) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (b) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, and (c) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIAL.

6.   Successors and Assigns.  This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

TO HAVE AND TO HOLD the Subject Properties unto Assignee, its successors and assigns forever.

[*Signature pages follow*]

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM
BOOK 1 9 3 3 PAGE 0 8 9 5

US_ACTIVE\123541482\V-2

EXECUTED AND EFFECTIVE as of the date set out above.

**ASSIGNOR**:

Ganer Oil Company (Mark Ganer, dba a sole proprietorship)

By:

Name: Mark Ganer
Title: Sole Proprietor

STATE OF _Oklahoma_ )

)  SS.

COUNTY OF _Cleveland_ )

Personally came before me this _28th_ day of April 2023, Mark Ganer who executed the foregoing instrument in his capacity as sole proprietor of Ganer Oil Company and acknowledged the same and acknowledged the same as the act and deed of Ganer Oil Company.

> NOTARY
> PUBLIC
> OKLAHOMA
> **OFFICIAL SEAL**
> **JEFF F. RALEY**
> Commission # 23001299
> Expires January 26, 2027

Name:

Notary Public, State of _Oklahoma_

My Commission Expires: _01-26-2027_

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM
BOOK 1933 PAGE 0896

17

US_ACTIVE\123541482\V-2

**EXHIBIT "A"**
**ATTACHED TO AND MADE A PART OF THE**

**ASSIGNMENT & BILL OF SALE DATED APRIL 18th 2023**

(Subject Properties Description to be Inserted)

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

BOOK 1 9 3 3 PAGE 0 8 9 7

18

# EXHIBIT D

**Wells**

**(Descriptions Attached)**

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

| API | WELL NAME | WELL# | TYPE | SECTION | TOWNSHIP | RANGE | Q | Q | Q | Q |
|---|---|---|---|---|---|---|---|---|---|---|
| 35071244030000 | HERCYK | 1-3 | OG | 2 | 26N | 1E | W2 | SW | SE | NE |
| 35071244030000 | HERCYK | 1-3 | OG | 2 | 26N | 1E | W2 | SW | SE | NE |
| 3507101227 | DAN & LETA MAE GODBEHERE | 2 | GAS | 5 | 26N | 1E | C | SE | SW | SW |
| 3507124100 | CARMICHALE | CC-8B | GAS | 7 | 26N | 1E | | CNE4 | SW4 | SE4 |
| 3507124101 | CARMICHALE | CC-5B | GAS | 7 | 26N | 1E | | | CE2 | NE4 |
| 3507124104 | CARMICHALE | CC-6B | GAS | 7 | 26N | 1E | N2 | N2 | NW4 | NE4 |
| 3507124108 | CARMICHALE | CC-7B | GAS | 7 | 26N | 1E | S2 | N2 | SW4 | NE4 |
| 3507124129 | CARMICHALE | CC-9B | GAS | 7 | 26N | 1E | | CSW4 | SW4 | SE4 |
| 3507124061 | P STREET | 1A | GAS | 7 | 26N | 1E | SW4 | NW4 | NW4 | NW4 |
| 3507124089 | CARMICHALE | CC1B | GAS | 8 | 26N | 1E | | | CNW4 | NW4 |
| 3507124090 | CARMICHALE | CC-2B | GAS | 8 | 26N | 1E | | | CE2 | NW4 |
| 3507124091 | CARMICHALE | CC3B | GAS | 8 | 26N | 1E | | | CS2 | NW4 |
| 3507124092 | CARMICHALE | CC-4B | GAS | 8 | 26N | 1E | | | CW2 | NW4 |
| 35071240900001 | CARMICHALE | CC-2B | GAS | 8 | 26N | 1E | | | CE2 | NW |
| 3507123771 | SMITH | 2-15 | GAS | 15 | 26N | 1E | S2 | N2 | SW4 | SW4 |
| 3507124031 | URBAN | 1A | GAS | 12 | 26N | 1W | NW4 | NE4 | SE4 | SE4 |
| 3507124049 | URBAN | 2A | GAS | 12 | 26N | 1W | NE4 | NE4 | NE4 | SE4 |
| 3507124050 | URBAN | 3A | GAS | 12 | 26N | 1W | NE4 | SW4 | SE4 | SE4 |
| 3507124062 | URBAN | 4A | GAS | 12 | 26N | 1W | SE4 | SW4 | SE4 | SE4 |
| 3507124064 | URBAN | 5A | GAS | 12 | 26N | 1W | SE4 | NE4 | SE4 | SE4 |
| 3507124083 | URBAN | 6A | GAS | 12 | 26N | 1W | SE4 | NW4 | NE4 | SE4 |
| 35071240490001 | URBAN | 2A | GAS | 12 | 26N | 1W | NE4 | NE4 | NE4 | SE4 |
| 3507121514 | M C WOOD | 1-1 | GAS | 1 | 27N | 1E | | NE | NE | SE |
| 3507121273 | HONICK/CEC-L2 | 2-3 | GAS | 3 | 27N | 1E | | CSE/4 | SE/4 | |
| 3507121164 | SCHULZ/AMA-Yetta | 1-3 | GAS | 3 | 27N | 1E | SW/4 | SW/4 | SW/4 | |
| 3507121274 | SCHULZ/CEC-L2 | 2-3 | GAS | 3 | 27N | 1E | | CNE/4 | SW/4 | |
| 3507122645 | CLAYBAKER | 2 | GAS | 5 | 27N | 1E | | | SW4 | SE4 |
| 3507123912 | MULLINS | 1 | | 5 | 27N | 1E | | CSE4 | SE4 | SW4 |
| 3507121546 | SPIRES | 1 | GAS | 5 | 27N | 1E | | | CNW4 | NW4 |
| 3507120817 | BRUCE | 1-6 | GAS | 6 | 27N | 1E | | | CSW4 | NW/4 |
| 3507120934 | BRUCE | 1 | DRY | 6 | 27N | 1E | | | CNW/4 | NW/4 |
| 3507121886 | FRYE | 1 | GAS | 7 | 27N | 1E | | | CSW4 | NW4 |
| 3507121875 | JIM MCKEE #2 | 2 | DRY | 7 | 27N | 1E | | | C | SW | SW |
| 3507121408 | LARRY SHIELDS | 1-10 | GAS | 10 | 27N | 1E | | | C | NW | NW |
| 3507123138 | OTTO | 2 | OIL | 12 | 27N | 1E | NW/4 | SE/4 | | |
| 3507121410 | OTTO | 1-12 | GAS | 12 | 27N | 1E | | C | SW | NW |
| 3507121409 | WAYNE F MURET | 1-A-12 | GAS | 12 | 27N | 1E | | C | SW | SW |
| 3507102495 | STATE #1 | 3 | OIL | 13 | 27N | 1E | | SE4 | NE4 | SW4 |
| 3507121856 | E M KAHLE | 1-15 | GAS | 15 | 27N | 1E | | | NW4 | SW4 |
| 3507121857 | E M KAHLE | 2 | GAS | 15 | 27N | 1E | | | CSE4 | SW4 |
| 3507122272 | MAYER | 2 | DRY | 18 | 27N | 1E | | | NE4 | NW4 |
| 3507105254 | KELLE | 2 | | 23 | 27N | 1E | | NE | NW | SE |
| 3507121860 | KELLE | 1-23 | OIL | 23 | 27N | 1E | | | CNW4 | SE4 |

| | | | 2DNC | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3507124552 | SNEATH | 1 | | 24 | 27N | 1E | SE | SW | SE | SE |
| 3507120724 | BOB SMITH | 1 | DRY | 17 | 27N | 1W | | | CSW4 | SE4 |
| 3507120721 | HUTCHISON | 1 | GAS | 20 | 27N | 1W | N2 | SE4 | SE4 | NE4 |
| 3507121916 | WILDEGRUBE | 1 | GAS | 6 | 27N | 2E | | C | NE | SW |
| | J. NEAL & JOAN OTTO | 2 | | 26 | 27N | 2E | | | | |
| 3507123482 | LEO | 1 | GAS | 26 | 27N | 2E | | SE | SW4 | NE |
| | LEONARD J. & LUCILLE F. HORINEK | 4 | | 26 | 27N | 2E | NE/4 | | | |
| 3507121736 | STATE TRACT | 1-13 | GAS | 13 | 28N | 1E | | CNE/4 | NE/4 | |
| 3507121167 | HAHN | 1-14 | GAS | 14 | 28N | 1E | | | CNE/4 | SW/4 |
| 3507121603 | HAHN | 2-14 | GAS | 14 | 28N | 1E | | | CSW/4 | SW/4 |
| 3507120887 | PIERCE | 1-22 | GAS | 22 | 28N | 1E | C | SW | NE | |
| 3507121955 | PIERCE | 2-22 | GAS | 22 | 28N | 1E | | C | NE | NE |
| 3507121502 | PEREZ/HUMBY | 2-23 | GAS | 23 | 28N | 1E | | CSW/4 | NE/4 | |
| 3507121606 | JOHNS/51PROG. | 2-24 | GAS | 24 | 28N | 1E | | CNW/4 | NW/4 | |
| 3507121334 | BROWN/COHEN | 4-26 | GAS | 26 | 28N | 1E | | CNE/4 | NW/4 | |
| 3507120972 | SCHMIDT/Wa2a/SR | 1-26 | GAS | 26 | 28N | 1E | | CNE/4 | NE/4 | |
| 3507121982 | B BRAZELTON | 3-29 | GAS | 29 | 28N | 1E | | | CSW4 | SE4 |
| 3507120819 | HAHN | 1-31 | GAS | 31 | 28N | 1E | | CSW/4 | SW/4 | SW/4 |
| 3507121028 | HAHN | 2-31 | GAS | 31 | 28N | 1E | | CNE/4 | SW/4 | |
| 3507121740 | JIM MCKEE #1 | 1 | GAS | 31 | 28N | 1E | | C | SE | SE |
| 3507120811 | NAYLOR | 1-31 | GAS | 31 | 28N | 1E | NE/4 | NE/4 | NE/4 | |
| 3507121174 | NAYLOR | 2 | | 31 | 28N | 1E | | | CSE4 | NE4 |
| 3507121642 | ROWE | 2-34 | GAS | 34 | 28N | 1E | | CSW/4 | NW/4 | |
| 3507104815 | STATE #2 | 3 | | 16 | 28N | 1W | | NW | NW | SW |
| 3507120841 | MILLER | 2-24 | GAS | 24 | 28N | 1W | C | SE | SE | |
| 3507121022 | MILLER | 3-24 | GAS | 24 | 28N | 1W | C | SW | NE | |
| 3507120809 | COOLEY HAHN | 1-25 | GAS | 25 | 28N | 1W | SE/4 | SE/4 | SE/4 | |
| 3507102389 | HORINEK | 1 | GAS | 26 | 28N | 1W | | NW/4 | SE/4 | |
| 3507120825 | HORINEK | 1-26 | GAS | 26 | 28N | 1W | | CS/2 | SE/4 | |
| 3507120810 | SEABOCH | 1-26 | GAS | 26 | 28N | 1W | SE/4 | SE/4 | NE/4 | |
| 3507121024 | SEABOCH | 2-26 | GAS | 26 | 28N | 1W | | CNW/4 | NE/4 | |
| 3507121824 | ELLIOTT/59PROG | 2-17 | GAS | 17 | 28N | 2E | | CNE/4 | NW/4 | |
| 3507121608 | JANTZ/51 PROGRAM | 2-20 | GAS | 20 | 28N | 2E | | CSW/4 | SE/4 | |
| 3507121119 | JANTZ/WA#4 | 1-20 | GAS | 20 | 28N | 2E | | CNE/4 | SE/4 | |
| 3507121336 | FITCH/CO | 2-30 | | 30 | 28N | 2E | | CSW/4 | SE/4 | |
| 3507121172 | FITCH/WA#5 | 1-30 | | 30 | 28N | 2E | | CNE/4 | SE/4 | |
| 3507121476 | VOEGELE/MALC LA | 1-30 | GAS | 30 | 28N | 2E | | CNW/4 | NE/4 | |
| 3507121583 | MILLER | 1 | | 17 | 29N | 1E | | | CNE4 | NE4 |
| 3507100865 | JOHN COURTNEY | 1 | GAS | 21 | 29N | 1E | | NW4 | NW4 | SE4 |
| 3507100868 | NORTH COURTNEY | 4 | TM | 21 | 29N | 1E | | SW4 | NE4 | SE4 |
| 3507121050 | KAHLE | 1-24 | GAS | 24 | 29N | 1E | | CNE/4 | SE/4 | |
| 3507121123 | KAHLE | 3-24 | GAS | 24 | 29N | 1E | | CSE/4 | SE/4 | |
| 3507122808 | KAHLE | 5-24 | | 24 | 29N | 1E | SW/4 | SW/4 | SW/4 | |
| 3507121955 | KAHLE/COHEN-WOLENS | 4-24 | GAS | 24 | 29N | 1E | | CSE/4 | SW/4 | |
| 3507121122 | KAHLE/WA#4 | 2-24 | | 24 | 29N | 1E | | CNE/4 | SW/4 | |

| API | Name | Well# | Type | Sec | Twp | Rng | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3507100927 | SMITH | 1 | DRY | 24 | 29N | 1E | | NW4 | NW4 | NE4 |
| 3507122356 | HYND | 2-25 | GAS | 25 | 29N | 1E | | CNW/4 | NE/4 | |
| 3507122785 | HYND | 3-25 | | 25 | 29N | 1E | NW/4 | NE/4 | NE/4 | |
| 3507121152 | MEYERS(FF #2) | 1-25 | GAS | 25 | 29N | 1E | | CNW/4 | SE/4 | |
| 3507121688 | ROUSE(ROUSE/57 PROGRAM) | 2-26 | GAS | 26 | 29N | 1E | | NW/4 | NE/4 | |
| 3507121876 | ARNOLD | 1 | INJ | 35 | 29N | 1E | CNW/4 | NW/4 | SE/4 | |
| 3507121877 | ARNOLD | 2 | GAS | 35 | 29N | 1E | CSE/4 | SE/4 | NW/4 | |
| 3507122216 | ARNOLD | 3 | GAS | 35 | 29N | 1E | S2 | NE4 | NW4 | SE4 |
| 3507123149 | ARNOLD | 5-86 | GAS | 35 | 29N | 1E | | | CW2 | SE4 |
| 3507123150 | ARNOLD | 6-86 | GAS | 35 | 29N | 1E | | | CE2 | SE4 |
| 3507123166 | ARNOLD | 7-86 | GAS | 35 | 29N | 1E | | NW4 | SW4 | SE4 |
| 3507123167 | ARNOLD | 8-86 | GAS | 35 | 29N | 1E | NW4 | NW4 | NE4 | SE4 |
| 3507122217 | ARNOLD 4 | 4-35 | GAS | 35 | 29N | 1E | | | | SE/4 |
| 3507120959 | TURVEY TAYLOR/WA#1 | 2-22 | GAS | 22 | 29N | 1W | | CSW/4 | SW/4 | |
| 3507121547 | BOESCH | 1-25 | GAS | 25 | 29N | 1W | | CSE/4 | SE/4 | |
| 3507121487 | KAHLE | 4-18 | GAS | 18 | 29N | 2E | | CSE/4 | SW/4 | |
| 3507121170 | KAHLE/AMA-YETTA | 3-18 | GAS | 18 | 29N | 2E | | CNW/4 | SW/4 | |
| 3507122024 | KAHLE/ROSENTHAL #2 | 5-18 | GAS | 18 | 29N | 2E | | CNE/4 | SW/4 | |
| 3507121124 | KAHLE/WA #4 | 1-18 | GAS | 18 | 29N | 2E | | CSW/4 | NW/4 | |
| 3507121125 | KAHLE/WA #4 | 2-18 | GAS | 18 | 29N | 2E | | CSW/4 | SW/4 | |
| 3507122056 | MEYER | 2-30 | GAS | 30 | 29N | 2E | | CNW/4 | SW/4 | |
| 3508120761 | WOLFF | 3 | OIL | 2 | 16N | 5E | | NE4 | SE4 | SW4 |
| 3508101443 | MARIE (OESTMANN #1) | 0 | OIL | 10 | 16N | 5E | | CSE4 | NE4 | NW4 |
| 3508101422 | BISWELL | 2 | GAS | 11 | 16N | 5E | | NW4 | SW4 | SW4 |
| 3508120510 | WOLFF | 2 | OIL | 11 | 16N | 5E | | NE4 | NE4 | NW4 |
| 3508120586 | O.C.WOLFF | 1 | GAS | 12 | 16N | 5E | | NE4 | SW4 | SW4 |
| | LEITZIG | 3 | | | | | | | | |
| | RL MCKEE #1 | 3 | | | | | | | | |
| | RL MCKEE #2 | 2 | | | | | | | | |

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM
BOOK 1933 PAGE 0901

## EXHIBIT E

**Easements**

**(Descriptions Attached)**

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

US_ACTIVE\123541482\V-2

## EASEMENTS

| BOOK 1620 PAGE 248 | |
|---|---|
| | |
| GRANTOR: | Alma Sanford |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Sep 04, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 246/18 |
| LAND: | |
| QTR: | S/2, SW/4, SW/4 |
| SECTION | 2 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | L.L. Bellinghausen & Martha S. Bellinghausen |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Aug 02, 1960 |
| FILING DATE: | Dec 21, 1967 |
| RECORDED: | 301/601 |
| LAND: | A four inch pipe line to be laid across the S/2, SW/4, beginning 100 ft. west of the SE/C and ending 100 ft west of the NW/C of the SE/4, SW/4 '-ec; 5 Twp: 25N Rng: 1E |
| QTR: | |
| SECTION | 5 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | Katie Schlitz |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Aug 02, 1960 |
| FILING DATE: | Dec 21, 1967 |
| RECORDED: | 301/596 |
| LAND: | A four or six inch pipeline to be laid across the N/2, SW/4, beginning at the tank battery location and ending 100 feet west of the NW/C of the SE/4, SW/4 |
| QTR: | |
| SECTION | 5 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | Marvin C. Blubaugh & Theda M. Blubaugh |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Dec 29, 1959 |
| FILING DATE: | Dec 21, 1967 |

| RECORDED: | 301/608 |  |
|---|---|---|
| LAND: | 6" Gas Line crossing the E/2, NW/4; beginning at 33.32 rods north on the east line from the SE/C of said 80; thence in a sw'ly direction to where it intersects the South line of said 80 approx. 26.64 rods west on south line from the SE/C of said 80 |  |
| QTR: | |  |
| SECTION | 5 |  |
| TOWNSHIP | 25N |  |
| RANGE | 1E |  |
| | |  |
| GRANTOR: | Audrey Blubaugh & Ed Blubaugh |  |
| GRANTEE: | Wunderlich Development Co. |  |
| DATE: | Dec 29, 1959 |  |
| FILING DATE: | Dec 21, 1967 |  |
| RECORDED: | 301/606 |  |
| LAND: | 6" gas pipe line beginning 13.32 rods north of the SE/C of the NW/4, NE/4, thence in a sw'ly direction to where it intersects the south line of said 40 approx. 13.32 rods west of the SE/C of said 40 |  |
| QTR: | |  |
| SECTION | 5 |  |
| TOWNSHIP | 25N |  |
| RANGE | 1E |  |
| | |  |
| GRANTOR: | Maxine Farris & Neil Farris |  |
| GRANTEE: | Wunderlich Development Co. |  |
| DATE: | Dec 29, 1959 |  |
| FILING DATE: | Dec 21, 1967 |  |
| RECORDED: | 301/607 |  |
| LAND: | 6" gas pipe line across the S/2 NE/4, beginning 13.32 rods in from the NE/C of the SW/4 of said 80; thence in a sw'ly direction to where it intersects the west line of said 80 33.30 rods north of the SW/C of same. More exactly, beginning 13.32 rods west of the NE/C of the SW/4 of said eighty. Thence sw'ly as above. |  |
| QTR: | |  |
| SECTION | 5 |  |
| TOWNSHIP | 25N |  |
| RANGE | 1E |  |
| | |  |
| BOOK 1620 PAGE 249 | | |
| | |  |
| GRANTOR: | Maxine Farris & Neil Farris |  |
| GRANTEE: | Wunderlich Development Co. |  |
| DATE: | Jan 08, 1960 |  |
| FILING DATE: | Dec 21, 1967 |  |
| RECORDED: | 301/619 |  |
| LAND: | 6" gas pipe line across the S/2 NE/4, beginning 40 rods in from the NW/C of said 80, thence in a SW'ly direction to where it intersects the west line of said tract 26 rods south of the NW/C of same (Note says this ROW is superseded by 301/607) |  |

OKCOUNTYRECORDS.COM

| QTR: | |
| --- | --- |
| SECTION | 5 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | Erma B. Alshie |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Dec 29, 1959 |
| FILING DATE: | Dec 21, 1967 |
| RECORDED: | 301/605 |
| LAND: | 6" pipe line across the NE/4 NE/4; commencing at the NE/C of same; thence in sw'ly direction to where it intersects the west line of said forty; approx'ly 13.32 rods north of the SW/C of said 40 |
| QTR: | |
| SECTION | 5 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | Joseph C. Steichen & Ruth H. Steichen |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Feb 16, 1959 |
| FILING DATE: | May 18, 1959 |
| RECORDED: | 249/497 |
| LAND: | Beginning at a point 530 feet north of the SW/C of the S/2 SE/4 of Sec 11, thence east 725 feet; thence North 25 feet; thence west 725 feet; thence south 25 feet to the pob. |
| QTR: | |
| SECTION | 11 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | Joe C. Steichen & Mrs. Joe C. Steichen |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Oct 08, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 246/04 |
| LAND: | ROW 12" pipe line running N & S along east side of NE/4 SW/4 |
| QTR: | |
| SECTION | 11 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | John Mathew Steichen & Maude Celestine Steichen |
| GRANTEE: | Wunderlich Development Co. |

BOOK 1933 PAGE 0905

| DATE: | Oct 08, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/03 | |
| LAND: | A right of way grant for 12" pipe line running diagonally northwest to southeast across the NW/4 NW/4 | |
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | L. L. Bellinghausen & Martha S. Bellinghausen | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 08, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/05 | |
| LAND: | A right of way grant for 12" pipe line running diagonally Northwest to Southeast across the SE/4 NW/4 approximately 20 feet wide: Same grant as above running to your NE/C of the above, connecting with the above pipe line. | |
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | John Mathew Steichen | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | May 24, 1965 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/583 | |
| LAND: | E/2 NE/4 Beginning in the NW/C thence SE to a point 350 ft. west and 350 ft. North of the SE/C thence east to the property line and south to the property line. | |
| QTR: | | |
| SECTION | 12 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| **BOOK 1620 PAGE 250** | | |
| | | |
| GRANTOR: | Marvin Blubaugh & Theda M. Blubaugh | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Dec 13, 1966 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 302/02 | |
| LAND: | SE/4 Beginning 350 ft. West of the NE/cor and running south to a point 350 ft. West of the SE/C. | |

US_ACTIVE\123541482\V-2

| QTR: | |
|---|---|
| SECTION | 12 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | Marvin Blubaugh & Theda M. Blubaugh |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Dec 13, 1966 |
| FILING DATE: | Dec 21, 1967 |
| RECORDED: | 301/602 |
| LAND: | SE/4 Beginning at a point 775 ft. south of the NE/C and running for 28 rods parallel to the north property line. |
| QTR: | |
| SECTION | 12 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | Joe Steichen & Ruth Steichen |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Sep 04, 1959 |
| FILING DATE: | Dec 21, 1967 |
| RECORDED: | 301/592 |
| LAND: | E/2 NE/4 6" pipe line to be laid across the above entering the west line of said eighty approx'ly 106 rods from the NW/C of said eighty and running SE'ly to where it intersects the South line of said eighty 66 rods east from SW/C. |
| QTR: | |
| SECTION | 14 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | E. M. Wetmore |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Sep 04, 1959 |
| FILING DATE: | Dec 21, 1967 |
| RECORDED: | 301/591 |
| LAND: | NE/4 SW/4 and the NW/4 SE/4 4" gas pipe line to be laid across the above beginning approx. 20 rods in from the NE/C of the NE/4 SW/4 thence south across said forty approx. in a straight line |
| QTR: | |
| SECTION | 14 |
| TOWNSHIP | 25N |
| RANGE | 1E |
| | |
| GRANTOR: | P. R. Harris & Emily A. Harris |

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0907

US_ACTIVE\123541482\V-2

| GRANTEE: | Wunderlich Development Co. | |
|---|---|---|
| DATE: | Sep 04, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/593 | |
| LAND: | W/2 NE/4 6" pipe line to be laid beginning at the NW/C of the above eighty intersecting the east line approximately 106 rods from the NE/C of the said 80 on the east line | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Ruby E. Leathers | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 07, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/02 | |
| LAND: | A right of way grant for a 6" pipe line to be laid 20 ft. in running north and south along the east side parallel thereto on the E/2 NW/4 and the same kind of grant for same size pipe running east and west thru the middle of SE/4 NW/4 | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | P. R. Harris & Emily A. Harris | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 07, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/06 | |
| LAND: | A right of way grant for a 6" pipe line running east and west thru approximately the middle of SW/4 NE/4 | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 251 | | |
| | | |
| GRANTOR: | Walter A. Deffner & Emma H. Deffner | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 22, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/594 | |

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

30          BOOK 1933 PAGE 0908

US_ACTIVE\123541482\V-2

| LAND: | 6" pipe line to be laid across the E/2 SE/4; entering said eighty approximately 52 rods in on said 80 from the NW/C and intersecting the East line approximately 26 rods south from the NE/C of said 80 on the East line. | |
| QTR: | | |
| SECTION | 24 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| | TOWNSHIP 25 NORTH, RANGE 2 EAST | |
| | | |
| GRANTOR: | Bert B. Blumer & Adella Blumer | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Apr 18, 1962 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/627 | |
| LAND: | NW/4 & NE/4 Beginning 155' north of the SW/C of the SE/4 NW/4 and ending 1100' south of the NW/C of the NE/4 NE/4 | |
| QTR: | | |
| SECTION | 19 | |
| TOWNSHIP | 25N | |
| RANGE | 2E | |
| | | |
| GRANTOR: | J. B. Hardin & Mary O. Hardin | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Apr 18, 1962 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/584 | |
| LAND: | SW/4 & NW/4 Beginning 516' south of the NW/C of the SW/4 and ending 155' north of the SW/C of the SE/4 NW/4 | |
| QTR: | | |
| SECTION | 19 | |
| TOWNSHIP | 25N | |
| RANGE | 2E | |
| | | |
| GRANTOR: | J. B. Hardin & Mary C. Hardin | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 22, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/600 | |
| LAND: | 6" pipe line across NW/C of SW/4 approximately 40 rods | |
| QTR: | | |
| SECTION | 19 | |
| TOWNSHIP | 25N | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

BOOK 1 9 3 3 PAGE 0 9 0 9

US_ACTIVE\123541482\V-2

| RANGE | 2E | |
| --- | --- | --- |
| | | |
| GRANTOR: | Alvin Dent & Alma Dent | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 04, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/595 | |
| LAND: | S/2 SW/4 & S/2 NW/4 SW/4 & S/2 NE/4 SW/4 6" pipe line to be laid across the above land entering same approx. 118 rods north on the west line from the SW/C of same, thence in a SE'ly direction to where it intersects the SL approx. 106 rods east on it from SW/C of said tr. | |
| QTR: | | |
| SECTION | 19 | |
| TOWNSHIP | 25N | |
| RANGE | 2E | |
| | | |
| GRANTOR: | M. W. Alexander & Sylvia Alexander | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 04, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/597 | |
| LAND: | N/2 NW/4 & a tract in the NE/4 4" pipe line to be laid across the above starting approx. at the tank battery on the above property in a SE'ly direction to the tank battery of J. H. Burnett which crosses the above Alexander land 25 yds; thence in another direction SW to the tank battery of Mr. Wahl which is approximately 70 yards | |
| QTR: | | |
| SECTION | 30 | |
| TOWNSHIP | 25N | |
| RANGE | 2E | |
| | | |
| BOOK 1620 PAGE 252 | | |
| | | |
| | TOWNSHIP 26 NORTH, RANGE 1 EAST | |
| | | |
| GRANTOR: | Clarence M. Gingerich & Edith L. Gingerich | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 17, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/39 | |
| LAND: | S/2 SW/4 (6" pipe line to be laid approx 20 feet in, parallel to West property line). | |
| QTR: | | |
| SECTION | 2 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0910

US_ACTIVE\123541482\V-2

| GRANTOR: | Alton Howard Davis & Ruth C. Davis | |
| --- | --- | --- |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 18, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 245/637 | |
| LAND: | NW/4 & N/2 SW/4 (6" pipe line to be laid approx. 20ft. In, parallel to West property line.) | |
| QTR: | | |
| SECTION | 2 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Al A. Steichen & Julia Rose Steichen | |
| GRANTEE: | Clinton Oil Company | |
| DATE: | Jun 03, 1969 | |
| FILING DATE: | Apr 22, 2981 | |
| RECORDED: | 322/142 | |
| LAND: | E/2 12" pipeline to be laid, beginning at the SW/c of the above described half section, thence in a NE'ly direction to the NE/4 of said section. | |
| QTR: | | |
| SECTION | 2 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Ethel Wolfe, L. B. Brawner, & Roy L. Miller | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Mar 30, 1962 | |
| FILING DATE: | Apr 10, 1962 | |
| RECORDED: | 269/404 | |
| LAND: | Part of the NE/4, beginning at a point of 890.5 ft, East of the SW/c, thence in a NE'ly direction a distance of 2,750 ft. to a point in the NBL of said qtr located 896.5 ft West of the NE/cor of said qtr, thence East 33 ft., thence SW'ly 2,750 ft. to a distance of 33 feet to the pob. | |
| QTR: | | |
| SECTION | 4 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | George R. Turvey & Tonya N. Turvey | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Jan 15, 1962 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/586 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0911

US_ACTIVE\123541482\V-2

| LAND: | N 50 ac. of SE/4 A pipeline R/W beginning at the South property line 605 feet east of the SW/c and ending at the north property line 907 ft. east of the NW/c. | |
|---|---|---|
| QTR: | | |
| SECTION | 4 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Mrs. H.M. Oldham | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Nov 29, 1961 | |
| FILING DATE: | Dec 21. 1967 | |
| RECORDED: | 301/588 | |
| LAND: | S 110 ac. of SE/4 A pipeline right of way beginning in the SW/c and ending 605 feet east of the NW/ cor. | |
| QTR: | | |
| SECTION | 4 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 253 | | |
| | | |
| GRANTOR: | Herbert Hardin & Ruth Hardin | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Nov 29, 1961 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/587 | |
| LAND: | NW/4 A pipeline right of way beginning in the NE/c and running south, parallel to the east property line, to connect with a right of way previously bought by this company, across a part of this quarter | |
| QTR: | | |
| SECTION | 9 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Herbert Hardin & Ruth Hardin | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Jul 15, 1960 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/604 | |
| LAND: | A four inch pipeline to be laid across the south end of the NW/4 of Sec 9, beginning in the SE/c and ending in the SW/c. | |
| QTR: | | |
| SECTION | 9 | |
| TOWNSHIP | 26N | |

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

34 BOOK 1933 PAGE 0912

| RANGE | 1E | |
| | | |
| GRANTOR: | Herbert Hardin & Ruth Hardin | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Feb 05, 1960 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/599 | |
| LAND: | 6" Gas line across the W/2: beginning 26.69 rods west on the SL from the SE/c of said half section, thence in a NE'ly direction approximately 59.94 rods to a tank battery. | |
| QTR: | | |
| SECTION | 9 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Herbert Hardin & Ruth Hardin | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Apr 07, 1960 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/603 | |
| LAND: | 6" Gas pipeline beginning at tank battery in SE/4 to tank battery In NE/4 running along east side | |
| QTR: | | |
| SECTION | 9 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Milton Service & Mrs. Milton Service | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 08, 1958 | |
| FILING DATE: | Nov 25, 1968 | . |
| RECORDED: | 246/38 | |
| LAND: | SW/4 (6" pipeline to be laid approximately 20 feet in, parallel to west property line) | |
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Dora Goodson | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 04, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/16 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

| LAND: | A strip 20' wide running north and south alongside the west boundary line of the NW/4 | |
|---|---|---|
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Milton Service & Mrs. Milton Service | |
| GRANTEE: | Clinton Oil Company | |
| DATE: | Jun 03, 1969 | |
| FILING DATE: | Apr 22, 1981 | |
| RECORDED: | 322/141 | |
| LAND: | SW/4 (12" pipe line to be laid approximately 20 ft in, parallel to west property line). | |
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |

**BOOK 1620 PAGE 254**

| | | |
|---|---|---|
| GRANTOR: | Joe D. Onstot & Arthur Onstot | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 09, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/32 | |
| LAND: | SW/4 (6" pipeline to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Joe D. Onstot & Nora May Onstot, et al | |
| GRANTEE: | Clinton Oil Company | |
| DATE: | Jun 18, 1969 | |
| FILING DATE: | Apr 22, 1981 | |
| RECORDED: | 322/140 | |
| LAND: | SW/4 (12" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

36

BOOK 1933 PAGE 0914

| GRANTOR: | Commissioners of Land Office | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Dec 16, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/625 | |
| LAND: | W/2 for the transportation of Natural Gas only (Plat attached) | |
| QTR: | | |
| SECTION | 16 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Commissioners of Land Office | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Dec 16, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/611 | |
| LAND: | W/2 for the transportation of Natural Gas only (Plat attached) | |
| QTR: | | |
| SECTION | 16 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | W. C. Vincent | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 04, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/598 | |
| LAND: | 6" pipe line to be laid approx. 20 feet in, parallel to the west property line of the S/2 SW/4 | |
| QTR: | | |
| SECTION | 21 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Mildred E. Ready, Ruth Barnes, Lloyd W. McKnight & Doris Miles | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 16, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/614 | |
| LAND: | 80 rods along the west side of the N/2 SW/4 | |
| QTR: | | |
| SECTION | 21 | |

BOOK 1933 PAGE 0915

US_ACTIVE\123541482\V-2

| TOWNSHIP | 26N | |
|---|---|---|
| RANGE | 1E | |
| | | |
| GRANTOR: | Evelyn M. McKelvy & W. S. McKelvy | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | May 09, 1960 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/624 | |
| LAND: | 8" natural gas line crossing the NW/4; commencing at the SE/c of said quarter, thence in a NW'ly direction to where it joins a pecan grove on the south and the west side of said quarter. | |
| QTR: | | |
| SECTION | 21 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |

**BOOK 1620 PAGE 255**

| | | |
|---|---|---|
| GRANTOR: | Evelyn M. McKelvy & W. S. McKelvy | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 16, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/613 | |
| LAND: | 6" Natural gas pipe line across the west side, inside or on the east side of the canal in Duck Creek, on the NW/4, running parallel to west side or alongside thereto. | |
| QTR: | | |
| SECTION | 21 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Charles V. Stall & Mabel E. Stall | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 09, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/36 | |
| LAND: | NW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Mrs. G. W. Schumacher & G. W. Schumacher | |
| GRANTEE: | Wunderlich Development Co. | |

38

| | |
|---|---|
| DATE: | Sep 18, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 245/633 |
| LAND: | W/2 SW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line) |
| QTR: | |
| SECTION | 26 |
| TOWNSHIP | 26N |
| RANGE | 1E |
| | |
| GRANTOR: | Melo Lebeda |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Sep 04, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 246/34 |
| LAND: | NW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line) |
| QTR: | |
| SECTION | 26 |
| TOWNSHIP | 26N |
| RANGE | 1E |
| | |
| GRANTOR: | Melo Lebeda & Rosie Lebeda |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Feb 14, 1959 |
| FILING DATE: | Dec 26, 1967 |
| RECORDED: | 302/04 |
| LAND: | 6" Gas pipe line parallel to west line approx'ly 20 ft. in from said line, beginning at the SW/c of said half section, running north along said west property line approx. 130 rods, thence in a NE'ly direction to where it intersects the NL of said half section, approx 20 rods east of the NW/c of said half section. |
| QTR: | |
| SECTION | 26 |
| TOWNSHIP | 26N |
| RANGE | 1E |
| | |
| GRANTOR: | Velma D. Schumacher & George D. Schumacher |
| GRANTEE: | Clinton Oil Company |
| DATE: | Jun 02, 1969 |
| FILING DATE: | Apr 22, 1981 |
| RECORDED: | 322/139 |
| LAND: | W/2 SW/4 (12" pipe line to be laid approximately 20 feet in, parallel to west property line) |
| QTR: | |
| SECTION | 26 |

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM BOOK 1933 PAGE 0917

US_ACTIVE\123541482\V-2

| TOWNSHIP | 26N | |
|---|---|---|
| RANGE | 1E | |
| | | |
| GRANTOR: | W. E. Emerick, Katie Emerik, L.J. Snyder | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Dec 10, 1958 | |
| FILING DATE: | Dec 26, 2967 | |
| RECORDED: | 302/3 | |
| LAND: | NW/4 6 inch pipeline to be laid approx. 20 feet in, running parallel to the west line of said quarter section. | |
| QTR: | | |
| SECTION | 28 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 256 | | |
| | | |
| GRANTOR: | Joe N. Schiltz and Lucia M. Schiltz | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Dec 10, 1958 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/617 | |
| LAND: | 6" pipeline to be laid approx. 20 feet in, running parallel to west line of said quarter on NW/4 SW/4. (4 inch lateral to tank battery.) We enter approx. 24 rods south of NW/c of said 40 with 6 inch pipeline. | |
| QTR: | | |
| SECTION | 28 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| . | | |
| GRANTOR: | Clara Laurancy Williams | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Dec 20, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/618 | |
| LAND: | From the east property line west to the Shell Tank Battery located N/2 SE/4. | |
| QTR: | | |
| SECTION | 29 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Ethel P. West and B.C. West | |
| GRANTEE: | Wunderlich Development Co. | |

NOT AN OFFICIAL COPY
VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM
BOOK 1933 PAGE 0918

US_ACTIVE\123541482\V-2

| DATE: | Dec 10, 1958 | |
|---|---|---|
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/616 | |
| LAND: | 4 inch gas line across E/2 NE/4 | |
| QTR: | | |
| SECTION | 29 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Commissioners of the Land Office | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Dec 21, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/609 | |
| LAND: | SE/4 Not to exceed 179.30 rods in length for transportation of natural gas only. 8" pipe line. | |
| QTR: | | |
| SECTION | 33 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Commissioners of the Land Office | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Dec 21, 1959 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/620 | |
| LAND: | SE/4 and not to exceed 179.30 rods in length for the transportation of gas only. | |
| QTR: | | |
| SECTION | 33. | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Michael Schiltz & Alma C. Schiltz | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 07, 1960 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/590 | |
| LAND: | 6" natural gas pipe line, entering the W/2 SW/4 approx. 40 rods north from the SE/c of said eighty on the East line, thence in a Sw'ly direction to the SW/c of same | |
| QTR: | | |
| SECTION | 33 | |
| TOWNSHIP | 26N | |

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

| RANGE | 1E | |
| | | |
| GRANTOR: | J. B. Harden | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Jan 04, 1966 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/858 | |
| LAND: | NE/4 Beginning at a point 170 ft. north of the SE/c, thence west for 470 ft., thence south to the property line. | |
| QTR: | | |
| SECTION | 33 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 257 | | |
| | | |
| GRANTOR: | Richard L. Detton & Mary C. Detton | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Jan 07, 1960 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/628 | |
| LAND: | 6" natural gas pipe line entering the East line 73 rods south of the NE/c of said quarter, thence in a Sw'ly direction in a straight line to the SW/c of the SW/4. This right of way covers only the E/2 of said quarter. | |
| QTR: | | |
| SECTION | 33 | |
| TOWNSHIP | 26N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Commissioners of Land Office | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Nov 17, 1958 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/622 | |
| LAND: | ROW across the NW/4 | |
| QTR: | | |
| SECTION | 13 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Commissioners of Land Office | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Nov 17, 1958 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

| FILING DATE: | Dec 01, 1958 | |
|---|---|---|
| RECORDED: | 246/81 | |
| LAND: | ROW across the NW/4 | |
| QTR: | | |
| SECTION | 13 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Ida Wildgrube | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 03, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/10 | |
| LAND: | SW/4 A strip of land 20 ft wide running east and west alongside and adjacent to the north side of the above property. Size of pipe to be 6" | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Ida Wildgrube | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 03, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/19 | |
| LAND: | A strip of land 20 ft. wide running north and south alongside the west boundary line of the following property (SW/4) | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | A. R. Kamnitz & Emma A. Kamnitz | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Nov 03, 1958 | |
| FILING DATE: | Apr 22, 1981 | |
| RECORDED: | 322/143 | |
| LAND: | SE/4 6" pipe line approx. 20 feet in from the North line running parallel | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

43

BOOK 1933 PAGE 0921

| GRANTOR: | A. Wildgrube & Alma Wildgrube | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 03, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/09 | |
| LAND: | A tract of land 20 feet wide running north and south alongside and adjacent to the east side of the above property. Size of the pip to be 6" | |
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

BOOK 1620 PAGE 258

| GRANTOR: | A. A. Wildgrube & Alma C. Wildgrube | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 03, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/21 | |
| LAND: | A strip of land 20 feet wide running north and south alongside the west boundary line of the following property: N/2 of SW/4 | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

| GRANTOR: | A. A. Wildgrube & Alma C. Wildgrube | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 03, 1958 | |
| FILING DATE: | Nov 25, 2959 | |
| RECORDED: | 246/20 | |
| LAND: | A strip of land 20 feet wide running north and south alongside the west boundary line of the following property; NW/4 | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

| GRANTOR: | Elijah H. Van Hatta and Icie P. Van Hatta | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Aug 29, 1958 | |

OKCOUNTYRECORDS.COM

VIEW ADDITIONAL LAND RECORDS AT

BOOK 1933 PAGE 0922

44

| FILING DATE: | Nov 25, 1958 | |
|---|---|---|
| RECORDED: | 246/28 | |
| LAND: | S/2 SW/4 (6 inch pipeline to be laid approx. 20 feet in, parallel to west property line.) | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Vern B. Guyer and Alameda I. Guyer | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 05, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/31 | |
| LAND: | NW/4 (6 inch pipeline to be laid approx. 20 feet in, parallel to west property line.) | |
| QTR: | | |
| SECTION | 26 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Herbert L. Overman and Cora H. Overman | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 04, 1958 | |
| FILING DATE: | Nov 25, 2958 | |
| RECORDED: | 246/15 | |
| LAND: | SW/4 (6 inch pipeline to be laid approx. 20 feet in, parallel to west property line.) | |
| QTR: | | |
| SECTION | 26 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Vida H. Trapp and Raymond A Trapp | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Jan 10. 1962 | |
| FILING DATE: | Jan 22, 1962 | |
| RECORDED: | 267/637 | |
| LAND: | A strip of land 2 rods wide over the SE/4 | |
| QTR: | | |
| SECTION | 33 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0923

45

| GRANTOR: | W.C. Vincent | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 11, 1962 | |
| FILING DATE: | Dec 21, 1967 | |
| RECORDED: | 301/589 | |
| LAND: | A pipeline right of way, beginning in SW/c and running North parallel to and 20 feet East of the West property line for 2000 feet, thence NE/4 to the North property line 430 feet East of the NW/c. | |
| QTR: | | |
| SECTION | 34 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

BOOK 1620 PAGE 259

| GRANTOR: | Viva M. Boger and Ernest Boger | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Jul 16, 1962 | |
| FILING DATE: | Jan 24, 1968 | |
| RECORDED: | 302/423 | |
| LAND: | A pipeline right of way, beginning at the NW/c, thence SE/4 to a point approx. 600 feet south of the NE/c | |
| QTR: | | |
| SECTION | 34 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

| GRANTOR: | Charles Bowman | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 02, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/17 | |
| LAND: | NW/4 (6" pipe line to be laid approx. 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 35 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

| GRANTOR: | Elisabeth Thiele & Albert Thiele | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 04, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/14 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0924

| LAND: | W/2 SW/4 (6" pipe line to be laid approximately 20 feet only in, parallel to west property line) | |
| QTR: | | |
| SECTION | 35 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| | TOWNSHIP 28 NORTH, RANGE 1 EAST | |
| | | |
| GRANTOR: | Samuel W. Franklin & Hester Franklin | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 20, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 245/640 | |
| LAND: | SW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 2 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Earl H. Trenary and Floyd Lester Trenary | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 13, 1955 | |
| FILING DATE: | Mar 22, 1966 | |
| RECORDED: | 222/124 | |
| LAND: | Starting at point approx. 20 rods east of the NW/c of NE/4 and thence running in a SE'ly direction to a point approx. 40 rods east of the SW/c of said quarter direction. | |
| QTR: | | |
| SECTION | 5 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Melvin A. DeBoard & Bettuy Jean DeBoard | |
| GRANTEE: | Oamar Energy, Inc. | |
| DATE: | Feb 2, 1984 | |
| FILING DATE: | Mar 5, 1984 | |
| RECORDED: | 453/253 | |
| LAND: | SE/4 (160 rods) | |
| QTR: | | |
| SECTION | 6 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

BOOK 1 9 3 3 PAGE 0 9 2 5

47

US_ACTIVE\123541482\V-2

| GRANTOR: | George DeBoard | |
|---|---|---|
| GRANTEE: | Charles Nesbitt, Trustee for Eafaula Enterprises, Inc. | |
| DATE: | Mar 14, 1979 | |
| FILING DATE: | Jun 25, 1979 | |
| RECORDED: | 226/134 | |
| LAND: | Row 5 feet on either side of center line described as follows: Beginning at the NW/c of Sec 8, thence South along the West line of said section a distance of 66 ft. to the TRUE PO8: Thence East & parallel to the North line of said section a distance of 240 rod. | |
| QTR: | | |
| SECTION | 8 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |

### BOOK 1620 PAGE 260

| Emilie Kahle, et al, | 15, thence west a distance of 600'; thence in a southwesterly direction a distance of 300'; thence west a distance of 200'; thence in a northwesterly direction to a point on the west line of the SE/4 120' south of the NW corner thereof.<br><br>Along a route 10' either side of a line beginning 10' north of the highway right-of-way of State Highway 11, at the SW Corner of the SE/4 of the SW/4 of Section 15-T27N-R1E of the I/M., Kay County, State of Oklahoma and thence east a distance of 41 rods along the line parallel and adjacent to the highway right-of-way of State Highway 11l thence north a distance of 39 rods to that one certain gas well known as the Kahle 2-15; thence 123 rods in a northeasterly direction from the Kahle 2-15 well to a point on the east boundary line on the SW/4 of Section 15-T27N-R1e. | Book 350, pa 39 |

### BOOK 1620 PAGE 261

| GRANTOR: | T. E. Molacek | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 29, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/11 | |
| LAND: | NW/4 Except RR R/W (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |

| GRANTOR: | Enos H. Svitak & Theresa Svitak | |
|---|---|---|
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 8, 1958 | |
| FILING DATE: | Nov 25, 1958 | |

| RECORDED: | 246/37 | |
|---|---|---|
| LAND: | SW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Godfrey Hahn & Elizabeth Hahn | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 19, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 245/638 | |
| LAND: | SW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). Except RR R/W | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Wayne A. Shoffner, et al; I. A. Shoffner, et al. | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Aug 30, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/27 | |
| LAND: | NW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Delorous Welsh | |
| GRANTEE: | Abacus Pipeline Company | |
| DATE: | Jun 9, 1987 | |
| FILING DATE: | Jun 30, 1988 | |
| RECORDED: | 661/79 | |
| LAND: | Along west side of the following property: SW/4 | |
| QTR: | | |
| SECTION | 17 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Dennis W. Sherman | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

| GRANTEE: | Abacus Pipeline Company |  |
|---|---|---|
| DATE: | Jun 24, 1987 |  |
| FILING DATE: | 6/380/88 |  |
| RECORDED: | 661/61 |  |
| LAND: | Along west side of the following property: SW/4 |  |
| QTR: |  |  |
| SECTION | 17 |  |
| TOWNSHIP | 28N |  |
| RANGE | 1E |  |
|  |  |  |
| GRANTOR: | Blanche M. Arnold |  |
| GRANTEE: | Abacus Pipeline Company |  |
| DATE: | Jun 8, 1987 |  |
| FILING DATE: | Jun 30, 1988 |  |
| RECORDED: | 661/69 |  |
| LAND: | Along west side of the following property: SW/4 |  |
| QTR: |  |  |
| SECTION | 17 |  |
| TOWNSHIP | 28N |  |
| RANGE | 1E |  |
|  |  |  |
| GRANTOR: | Dave Morgan Trust; Bill Seymour, Trustee |  |
| GRANTEE: | Abacus Pipeline Company |  |
| DATE: | May 21, 1987 |  |
| FILING DATE: | Jun 30, 1988 |  |
| RECORDED: | 661/64 |  |
| LAND: | Along west side of the following property: NW/4 |  |
| QTR: |  |  |
| SECTION | 17 |  |
| TOWNSHIP | 28N |  |
| RANGE | 1E |  |
|  |  |  |

**BOOK 1620 PAGE 262**

| GRANTOR: | Thelma L. Welsh Gearhard |  |
|---|---|---|
| GRANTEE: | Abacus Pipeline Company |  |
| DATE: | May 26, 1987 |  |
| FILING DATE: | Jun 30, 1988 |  |
| RECORDED: | 661/66 |  |
| LAND: | Along west side of the following property: SW/4 |  |
| QTR: |  |  |

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

| SECTION | 17 | |
|---|---|---|
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Vera W. Fisher | |
| GRANTEE: | Abacus Pipeline Company | |
| DATE: | May 28, 1987 | |
| FILING DATE: | Jun 30, 1988 | |
| RECORDED: | 661/68 | |
| LAND: | Along west side of the following property: SW/4 | |
| QTR: | | |
| SECTION | 17 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Dave Morgan Trust, Bill Seymour, Trustee | |
| GRANTEE: | Abacus Pipeline Company | |
| DATE: | May 21, 1987 | |
| FILING DATE: | Jun 30, 1988 | |
| RECORDED: | 661/63 | |
| LAND: | Along west side of the following property: NW/4 | |
| QTR: | | |
| SECTION | 20 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Florence O. Muret | |
| GRANTEE: | Abacus Pipeline Company | |
| DATE: | May 19, 1987 | |
| FILING DATE: | Jun 30, 1988 | |
| RECORDED: | 661/65 | |
| LAND: | Along west side of the following property: SW/4 | |
| QTR: | | |
| SECTION | 20 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | M.E. Fester, M.O. Fester, Carolyn Fester Latta | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Jun 20, 1961 | |
| FILING DATE: | Feb 23, 1961 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

| RECORDED: | 261/468 | |
|---|---|---|
| LAND: | NW/4, except railroad right of way. (6 inch pipeline to be laid approx'ly 20 feet in parallel to west property line.) | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Tula Fester | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 6, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/35 | |
| LAND: | NW/4, except railroad right of way. (6 inch pipeline to be laid approx'ly 20 feet in parallel to west property line.) | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Louis Kahle and Esther H. Kahle | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 2, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/23 | |
| LAND: | SW/4; (6 inch pipeline to be laid approx. 20 feet in. parallel to west property line.) | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Harold B. Crawford | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Aug 30, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/25 | |
| LAND: | W/2 SW/4; (6 inch pipeline to be laid approx. 20 feet in. parallel to west property line.) | |
| QTR: | | |
| SECTION | 26 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

52

BOOK 1933 PAGE 0930

**BOOK 1620 PAGE 263**

| | |
|---|---|
| GRANTOR: | C.K. Thain and Wanda F. Thain |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Sep 25, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 245/639 |
| LAND: | SE/4; (6 inch pipeline to be laid approx. 20 feet in. parallel to your east property line.) |
| QTR: | |
| SECTION | 27 |
| TOWNSHIP | 28N |
| RANGE | 1E |
| | |
| GRANTOR: | Hollis F. Miller and Julia A. Miller |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Sep 24, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 246/12 |
| LAND: | NE/4; (6 inch pipeline to be laid approx. 20 feet in. parallel to east property line.) |
| QTR: | |
| SECTION | 27 |
| TOWNSHIP | 28N |
| RANGE | 1E |
| | |
| GRANTOR: | Wayne Adams |
| GRANTEE: | Abacus Pipeline Company |
| DATE: | May 19, 1987 |
| FILING DATE: | Jun 30, 1988 |
| RECORDED: | 661/62 |
| LAND: | Along west side of the following property: N2 NW/4 |
| QTR: | |
| SECTION | 29 |
| TOWNSHIP | 28N |
| RANGE | 1E |
| | |
| GRANTOR: | Bertie H. Brazelton |
| GRANTEE: | Abacus Pipeline Company |
| DATE: | May 27, 1987 |
| FILING DATE: | Jun 30, 1988 |
| RECORDED: | 661/67 |
| LAND: | Along west side of the following property: SW/4 |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0931

53

| QTR: | |  |
|---|---|---|
| SECTION | 29 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
|  | | |
| GRANTOR: | Faye Ford | |
| GRANTEE: | Abacus Pipeline Company | |
| DATE: | Jun 8, 1987 | |
| FILING DATE: | Jun 30, 1988 | |
| RECORDED: | 661/70 | |
| LAND: | Along west side of the following property: S/2 NW/4 | |
| QTR: | | |
| SECTION | 29 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
|  | | |
| GRANTOR: | Henry J. Hansz and Lillie J. Hansz | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 3, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/7 | |
| LAND: | NE/4 SE/4; (6 inch pipeline to be laid approx. 20 feet in. parallel to your east property line on the above.) | |
| QTR: | | |
| SECTION | 34 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
|  | | |
| GRANTOR: | Arthur Sheik and Mabel Sheik | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 25, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/1 | |
| LAND: | E/4 NE/4; (6 inch pipeline to be laid approx. 20 feet in. parallel to your east property line.) | |
| QTR: | | |
| SECTION | 34 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
|  | | |
| GRANTOR: | William A. Hansz and Maude Hansz | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 3, 1958 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0932

| FILING DATE: | Nov 25, 1958 | |
|---|---|---|
| RECORDED: | 246/8 | |
| LAND: | SE/4 SE/4; (6 inch pipeline to be laid approx. 20 feet in. parallel to your east property line on the above.) | |
| QTR: | | |
| SECTION | 34 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 264 | | |
| | | |
| GRANTOR: | W.H. Kreutzer and Louise M. Kreutzer | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Aug 28, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/30 | |
| LAND: | S/2 SW/4; (6 inch pipeline to be laid approx. 20 feet in, parallel to west property line.) | |
| QTR: | | |
| SECTION | 35 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Stephen Lute, Guargian for Merry & Bertha Lute; Kathryn E. Etzel & A. J. Etzel; Daisy Casey, George D. Casey, Geroge Lute & Wilma Lute; Ida Belle Dice & Lee Dice | |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | Not Recorded | |
| LAND: | | |
| QTR: | | |
| SECTION | 35 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| | TOWNSHIP 29 NORTH, RANGE 1 EAST | |
| | | |
| GRANTOR: | Isaac Niblack | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Aug 8, 1955 | |
| FILING DATE: | Mar 22, 1956 | |
| RECORDED: | 220/122 | |
| LAND: | Starting at point on the East line where the 8" line crosses at about 75 rods south of the NE/c and thence running to north for 75 rods to the Ne/c. | |

| QTR: | |
|------|--|
| SECTION | 14 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | A. O. Stalmaker & Iva Stalmaker |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Sep 18, 1954 |
| FILING DATE: | Mar 22, 1956 |
| RECORDED: | 220/123 |
| LAND: | Starting at a point on the west line about 30 rods north of the SW/c thence east to the east line of the NE/4; also another line starting on pipe line in said quarter section, and running north to the north line of said quarter section |
| QTR: | |
| SECTION | 14 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Isaac Niblack |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Nov 13, 1954 |
| FILING DATE: | Mar 22, 1956 |
| RECORDED: | 220/121 |
| LAND: | Beginning at a point in the center of the west line, thence running in a NE'ly direction to a point 60 rods south of the NE/c. Also, beginning at a point 20 rods from the SW/c, thence running in a NE'ly direction to a point 15 rods East of the NW/4 |
| QTR: | |
| SECTION | 14 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | J. R. Deibel, Imogene Deibel & Imogene Deibel, Gdn |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Apr 30, 1954 |
| FILING DATE: | Mar 22, 1956 |
| RECORDED: | 220/116 |
| LAND: | S/2 SW/4 Starting at a point about 20 rods north of the SW/c thence to a point in the SE/c of said tract. |
| QTR: | |
| SECTION | 14 |
| TOWNSHIP | 29N |
| RANGE | 1E |

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

| BOOK 1620 PAGE 265 | | |
|---|---|---|
| GRANTOR: | Sally Murdock | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Feb 17, 1956 | |
| FILING DATE: | | |
| RECORDED: | 220/549 | |
| LAND: | Tract in NE/c of SW/4, including rights to lay pipeline across the SW/4 [This agreement has been extended by instruments (302/574 & 350/227) until 4-1-2004.] | |
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Dan P. McCorgary & May McCorgary | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Jun 15, 1955 | |
| FILING DATE: | Mar 24, 1956 | |
| RECORDED: | *10/306 | |
| LAND: | Starting at a point 30 rods south of the NW/c and thence running in a SE'ly direction to the SE/c of SE/4 *(Actual instrument is recorded in Sumner Co., KS) | |
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Dan P. McCorgary and May McCorgary | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Nov 13, 1959 | |
| FILING DATE: | Nov 23, 1959 | |
| RECORDED: | 253/239 | |
| LAND: | This grant is given to confirm a previous grant dated 9/6/55 and for the purpose of confirming the easement as covering the original pipeline, as laid, and the additional pipeline, as laid, but does not otherwise extend or change the provisions of said previous esmt. covering SE/4 | |
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Dan P. McCorgary and May McCorgary | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 6, 1955 | |
| FILING DATE: | Nov 23, 1959 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

| RECORDED: | 253/235 |
| LAND: | Starting at a point about 30 rods south of the NW/c of the SE/4 and thence running in SE'ly direction to the SE/c of SE/4 |
| QTR: | |
| SECTION | 15 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Fred A. Mueller and Bessie May Mueller |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Feb 5, 1957 |
| FILING DATE: | Feb 18, 1957 |
| RECORDED: | 230/565 |
| LAND: | Starting at the NW/c, thence running in a 5E direction for 200 rods across the NW/4 |
| QTR: | |
| SECTION | 15 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Fred Mueller and Bessie May Mueller |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Nov 24, 1954 |
| FILING DATE: | Mar 22, 1956 |
| RECORDED: | 220/120 |
| LAND: | Starting at a point, 20 rods from the SE/c, thence running due north crossing north line 20 rods from the NE/c of the NW/4 |
| QTR: | |
| SECTION | 15 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Fred A. Mueller and Bessie May Mueller |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Nov 2, 1955 |
| FILING DATE: | Mar 22, 1956 |
| RECORDED: | 220/119 |
| LAND: | From a point 54 rods West of the SE/c of the NW/4 and thence Westerly to the SW/c of NW/4 |
| QTR: | |
| SECTION | 15 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

**BOOK 1620 PAGE 266**

| | |
|---|---|
| GRANTOR: | J.R. Deibel & Imogene Diebel as Guardians of Roberta & Dorothy Jones |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Apr 30, 1954 |
| FILING DATE: | Mar 22, 1956 |
| RECORDED: | 220/117 |
| LAND: | The S/2 NE/4, Starting at a point in SW/c, thence running to a point in the NE/c |
| QTR: | |
| SECTION | 15 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Martin E. McCorgary & Ava F. McCorgary |
| GRANTEE: | Charles Nesbitt, Trustee for Eufaula Enterprise, Inc. |
| DATE: | Nov 24, 1980 |
| FILING DATE: | Dec 22, 1980 |
| RECORDED: | 307/87 |
| LAND: | ROW for pipe line across the NE/4 SW/4 from a point 464 ft. West of SE/c of NW/c, thence W'ly 2176 ft, thence South 30 feet, thence E'ly 2176 feet, thence North 30 feet to the pob. |
| QTR: | |
| SECTION | 15 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Martin E. McCorgary & Ava F. McCorgary |
| GRANTEE: | Damar Energy, Inc. |
| DATE: | Nov 6, 1983 |
| FILING DATE: | Feb 24, 1984 |
| RECORDED: | 452/187 |
| LAND: | ROW for pipe line across the NE/4 SW/4 from a point 464 ft. West of SE/c of NW/c, thence W'ly 2176 ft, thence South 30 feet, thence E'ly 2176 feet, thence North 30 feet to the pob. |
| QTR: | |
| SECTION | 15 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Martin E. McCorgary & Ava F. McCorgary |
| GRANTEE: | Douglas Foshee, as Trustee |
| DATE: | Apr 3, 1985 |
| FILING DATE: | Apr 3, 1985 |
| RECORDED: | 508/329 |

US_ACTIVE\123541482\V-2

BOOK 1933 PAGE 0937

| LAND: | ROW for pipe line across the NE/4 SW/4 from a point 464 ft. West of SE/c of NW/c, thence North 30 feet to the pob. | |
|---|---|---|
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Edna Lorraine Walker & George Walker, Jr. | |
| GRANTEE: | Damar Energy Receivership | |
| DATE: | Mar 31, 1984 | |
| FILING DATE: | Apr 3, 1984 | |
| RECORDED: | 457/394 | |
| LAND: | NW/4 | |
| QTR: | | |
| SECTION | 17 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Ronald M. Aupperle & Marilyn K. Aupperle | |
| GRANTEE: | Damar Energy Receivership | |
| DATE: | Apr 3, 1984 | |
| FILING DATE: | Apr 3, 1984 | |
| RECORDED: | 457/395 | |
| LAND: | SE/4 | |
| QTR: | | |
| SECTION | 17 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Eva B. Christianson & Albert B. Christianson | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Apr 29, 1954 | |
| FILING DATE: | Mar 22, 1956 | |
| RECORDED: | 220/115 | |
| LAND: | S/2 SE/4, starting at the NE/c and going to a Southwesterly direction to a point on the road about 40 rods from the SW/c | |
| QTR: | | |
| SECTION | 21 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |

NOT AN OFFICIAL COPY

BOOK 1620 PAGE 267

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0938

US_ACTIVE\123541482\V-2

| | |
|---|---|
| GRANTOR: | Phil Hinton & Carolyn A. Hinton |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Aug 29, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 245/634 |
| LAND: | SW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). |
| QTR: | |
| SECTION | 23 |
| TOWNSHIP | 29N |
| RANGE | 58 |
| | |
| GRANTOR: | Stella E. Thompson & J. W. Thompson |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Aug 29, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 246/26 |
| LAND: | S/2 NW/4 (6" pipe line to be laid approximately 20 feet, in parallel to west property line). |
| QTR: | |
| SECTION | 23 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Harold J. Peterson, Gdn of Sarah Peterson |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Sep 17, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 245/636 |
| LAND: | 6" pipe line approximately 20 feet in from the west property line (N/2 NW/4) |
| QTR: | |
| SECTION | 26 |
| TOWNSHIP | 29N |
| RANGE | 1E |
| | |
| GRANTOR: | Phil Hinton & Carolyn A. Hinton |
| GRANTEE: | Wunderlich Development Co. |
| DATE: | Aug 29, 1958 |
| FILING DATE: | Nov 25, 1958 |
| RECORDED: | 245/635 |
| LAND: | NW/4 6" pipe line to be laid approximately 20 feet in, parallel to west property line. |
| QTR: | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0939

61

| SECTION | 26 | |
|---------|----|----|
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Virgil Roy Lockhart, et al | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 4, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/33 | |
| LAND: | SW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 26 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | John Bradley & Belva Bradley | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Aug 30, 1957 | |
| FILING DATE: | Sep 5, 1957 | |
| RECORDED: | 236/01 | |
| LAND: | Starting at a point 300 ft. west of the NE/c and thence running in a S & W direction for 176 rods, across the NW/4 | |
| QTR: | | |
| SECTION | 30 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | W. L. Hobaugh | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Oct 21, 1954 | |
| FILING DATE: | Mar 22, 1956 | |
| RECORDED: | 220/118 | |
| LAND: | Beginning at a point on the SL in the center of the West 40 of the N/2 SW/4 known as the W. L. Hobaugh farm thence running 54 rods to the North. | |
| QTR: | | |
| SECTION | 30 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |

BOOK 1620 PAGE 268

| | | |
|---------|----|----|
| GRANTOR: | I. H. Avery | |

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM
BOOK 1933 PAGE 0940

| GRANTEE: | Wunderlich Development Co. | |
|---|---|---|
| DATE: | Jul 28, 1954 | |
| FILING DATE: | Mar 22, 1956 | |
| RECORDED: | 220/114 | |
| LAND: | ROW for pipeline beginning at the NE/c & continuing on a line to a point at about the center of the South side of the E/2 NW/4 | |
| QTR: | | |
| SECTION | 32 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Mary Phipps, a widow | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Aug 30, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/24 | |
| LAND: | NW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 35 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | M. L. Sappington & Lena Sappington | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Sep 3, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/22 | |
| LAND: | N/2 SW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 35 | |
| TOWNSHIP | 29N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Maggie Fender & Lennie L. Fender | |
| GRANTEE: | Wunderlich Development Co. | |
| DATE: | Aug 29, 1958 | |
| FILING DATE: | Nov 25, 1958 | |
| RECORDED: | 246/ 29 | |
| LAND: | S/2 SW/4 (6" pipe line to be laid approximately 20 feet in, parallel to west property line). | |
| QTR: | | |
| SECTION | 35 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0941

| TOWNSHIP | 29N |
| --- | --- |
| RANGE | 1E |
| | |
| | KAY COUNTY CONDEMNATION CASES |
| | |
| PLAINTIFF: | Wunderlich Development Co. |
| DEFENDANT: | Marvel Rullman Gage and F. Wallace Gage, Sr. |
| CASE NO: | 24,448 |
| DATE: | Mar 6, 1959 |
| LEGAL: | Part of the NW/4, Beginning at a point 33 ft. east of the NW/c, thence East 25 ft. along the North line of said NW/4; thence South parallel to West line to a point in the South line; thence North parallel to the West line of said NW/4 to the pob. |
| LAND: | |
| QTR: | |
| SECTION | 14 |
| TOWNSHIP | 26N |
| RANGE | 1E |
| | |
| PLAINTIFF: | Wunderlich Development Co. |
| DEFENDANT: | E. E. Waggoner, Gertrude V. White & R. E. Wagoner |
| CASE NO: | 24,449 |
| DATE: | Mar 6, 1959 |
| LEGAL: | Beginning at a point 33 ft. East of the NW/c of the SW/4, thence 25 ft. along the North line, thence South parallel to the West line to a point in the South line, thence West 25 ft. thence North parallel to the West line of said SW/4 to the pob. |
| LAND: | |
| QTR: | |
| SECTION | 3 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| PLAINTIFF: | Wunderlich Development Co. |
| DEFENDANT: | Dr. Gerald L. Honick |
| CASE NO: | 24,444 |
| DATE: | Mar 6, 1959 |
| LEGAL: | Part of the NE/4: Beginning at a point 33 feet West of the NE/c of S/2 NE/4, thence West 25 ft, thence South parallel to the East line of said NE/4, thence West 25 ft., thence South parallel to the East line of said NE/4. |
| LAND: | |
| QTR: | |
| SECTION | 3 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |

64

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0942

BOOK 1620 PAGE 269

| | |
|---|---|
| PLAINTIFF: | Wunderlich Development Co. |
| DEFENDANT: | Clifford S. Honick & Fannie May Honick |
| CASE NO: | 24,443 |
| DATE: | Mar 6, 1959 |
| LEGAL: | Tr. 1: Part of the N/2 NE/4: Beginning at a point 33 ft. West of NE/c of said Section, thence West 25 ft. to a point, thence South parallel to the East line to a point in the South line of N/2 NE/4, thence East 25 ft., thence North parallel to the East line to the pob. Tr. 2: Part of the SE/4: Beginning at point 33 ft. West of NE/c of said SE/4, thence West 25 ft., thence South and parallel to the East line to a point in the South line of said SE/4, thence East 25 ft., thence North parallel to the East line to the pob. |
| LAND: | |
| QTR: | |
| SECTION | 3 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| PLAINTIFF: | Wunderlich Development Co. |
| DEFENDANT: | Grace Seabach |
| CASE NO: | 24,442 |
| DATE: | Mar 6, 1959 |
| LEGAL: | Part of the NE/4: Beginning at a point 33 feet West of the NE/c of S/2 NE/4, thence West 25 ft, thence South parallel to the East line of said NE/4 to a point in the South line of said NE/4, thence East 25 ft. thence North parallel to the East line to the pob. |
| LAND: | |
| QTR: | |
| SECTION | 10 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| PLAINTIFF: | Wunderlich Development Co. |
| DEFENDANT: | W. J. Schulz |
| CASE NO: | 24,445 |
| DATE: | Mar 6, 1959 |
| LEGAL: | Part of the NE/4: Beginning at a point 33 feet West of the NE/c of S/2 SE/4, thence West 25 ft, thence South parallel to the East line of said SE/4 to a point in the South line of said SE/4, thence East 25 ft. thence North parallel to the East line to the pob. |
| LAND: | |
| QTR: | |
| SECTION | 10 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| PLAINTIFF: | Wunderlich Development Co. |

OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

65

BOOK 1933 PAGE 0943

| DEFENDANT: | John P. Gartner & Rosa M. Gartner | |
|---|---|---|
| CASE NO: | 24,441 | |
| DATE: | Mar 13, 1959 | |
| LEGAL: | Beginning at a point 33 ft. East of the NW/c of the NW/4; thence East 25 ft. along the North line of said NW/4; thence South parallel to the West line, to a point in the South line; thence West 25 ft along the South line; thence North parallel to the West line to the pob. | |
| LAND: | | |
| QTR: | | |
| SECTION | 2 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| | GRANTS COVERING INDIAN LANDS | |
| | | |
| GRANTOR: | Gilda Four Bear | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | SE/4 SW/4 | |
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Ponca Indian Reservation | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | S/2 SW/4 SE/4 & SE/4 SW/4 | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 270 | | |
| | | |
| GRANTOR: | Lucy Little Hole | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM   BOOK 1933 PAGE 0944

US_ACTIVE\123541482\V-2

| FILING DATE: | |  |
|---|---|---|
| RECORDED: | Anadarko Area Office | |
| LAND: | E/2 SE/4 | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Kay H. C. Eagle | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | E/2 SE/4 | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Thurman Rhodd | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | W/2 SW/4 | |
| QTR: | | |
| SECTION | 13 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | William Collins | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | SE/4 SW/4 | |
| QTR: | | |
| SECTION | 13 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

US_ACTIVE\123541482\V-2

| GRANTOR: | Nellie King |  |
|---|---|---|
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | NW/4 NE/4 | |
| QTR: | | |
| SECTION | 24 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Nellie King | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | SE/4 NE/4 | |
| QTR: | | |
| SECTION | 24 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Nellie King | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | SW/4 NE/4 | |
| QTR: | | |
| SECTION | 24 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Caude Collins | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | NE/4 NW/4 | |
| QTR: | | |
| SECTION | 24 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

US_ACTIVE\123541482\V-2

BOOK 1933 PAGE 0946

| TOWNSHIP | 25N | |
|---|---|---|
| RANGE | 1E | |
| | | |
| **BOOK 1620 PAGE 271** | | |
| | | |
| | APPLICATION ONLY: NO APPROVAL | |
| | | |
| GRANTOR: | Judith Mean Bear | |
| GRANTEE: | | |
| DATE: | Apr 10, 1960 | |
| FILING DATE: | | |
| RECORDED: | Anadarko Area Office | |
| LAND: | Lots 3 & 4 & W/2 SW/4 | |
| QTR: | | |
| SECTION | 7 | |
| TOWNSHIP | 25N | |
| RANGE | 1E | |
| | Including permits, grants, licenses, etc. from the County Commissioners of Kay County, Oklahoma, to install, maintain, operate, and remove pipeline(s) in County rights-of-way, whether said rights are recorded or otherwise. | |
| | | |
| | KAY COUNTY ROADWAY RIGHT OF WAY | |
| | THAT certain Right of Way Grant granted to John J. Sullivan, as Trustee, from Douglas L. Foshee, Trustee, who acquired same from Martin E. McCorgary and Ava F. McCorgary dated April 3, 1985, recorded in Book 508, Page 329, of the records of Kay County, Oklahoma, being the right of way to build, construct, maintain, and use a roadway for access by motor vehicles including trucks to the gasoline plant situated in the Northwest Quarter of the Southwest Quarter, Section 15, Township 29 North, Range 1 East, Kay County, Oklahoma, across the following described lands, to-wit: From a point 464 feet West of the Southeast corner of the Northwest Quarter of Section 15, Township 29 North, Range 1 East, Kay County, Oklahoma, thence Westerly 2176 feet, thence North 30 feet, thence Easterly 2176 feet, thence South 30 feet to the place of beginning. | |
| | | |
| | TOWNSHIP 27 NORTH, RANGE 1 EAST CORONADO | |
| | | |
| GRANTOR: | Glen E. Craft and Eda J. Craft | |
| GRANTEE: | Oklahoma Conveyance Corporation | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | 547/265 | |
| LAND: | Compressor site lease (150 feet X 300 feet) | |
| QTR: | | |
| SECTION | 4 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

BOOK **1933** PAGE **0947**

| GRANTOR: | M. T. Carriger |
|---|---|
| GRANTEE: | Western Continent Oil Corp. |
| DATE: | Dec 18, 1979 |
| FILING DATE: | Dec 31, 1979 |
| RECORDED: | 248/382 |
| LAND: | ROW 20 feet in width across the NE/4 |
| QTR: | |
| SECTION | 5 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| GRANTOR: | Clifford Honick, Agent for Carolyn Spires & Wave S. Elliott |
| GRANTEE: | Western Continent Oil Corp. |
| DATE: | Dec 18, 1979 |
| FILING DATE: | Dec 31, 1979 |
| RECORDED: | 248/379 |
| LAND: | ROW across N/2 NW/4 along any fence line leading to well |
| QTR: | |
| SECTION | 5 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |

**BOOK 1620 PAGE 272**

| | |
|---|---|
| GRANTOR: | Everett Brazelton & Bertie Brazelton |
| GRANTEE: | Western Continent Oil Corp. |
| DATE: | Dec 18, 1979 |
| FILING DATE: | Dec 31, 1979 |
| RECORDED: | 248/376 |
| LAND: | ROW 20' in width across SW/4 |
| QTR: | |
| SECTION | 5 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| GRANTOR: | Jim McKee |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Aug 7, 1980 |
| FILING DATE: | Aug 27, 1980 |
| RECORDED: | 289/415 |
| LAND: | ROW 10 feet either side of center line as installed across the NE/4 |

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0948

| QTR: | |
|---|---|
| SECTION | 6 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| GRANTOR: | M. J. Courtney, Jr. |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Mar 20, 1981 |
| FILING DATE: | Apr 1, 1981 |
| RECORDED: | 320/15 |
| LAND: | ROW across NE/4 |
| QTR: | |
| SECTION | 6 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| GRANTOR: | James D. McKee |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Mar 20, 1981 |
| FILING DATE: | Apr 1, 1981 |
| RECORDED: | 320/13 |
| LAND: | ROW across the NE/4 |
| QTR: | |
| SECTION | 6 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| GRANTOR: | Alta Mae Frye |
| GRANTEE: | Western Continent Oil Corp. |
| DATE: | Dec 7, 1979 |
| FILING DATE: | Dec 31, 1979 |
| RECORDED: | 248/370 |
| LAND: | ROW 20 feet in width across S/2 NW/4 |
| QTR: | |
| SECTION | 7 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| GRANTOR: | R. L. McKee |
| GRANTEE: | Western Continent Oil Corp. |
| DATE: | Mar 10, 1980 |

| FILING DATE: | May 1 80 |
|---|---|
| RECORDED: | 268/290 |
| LAND: | ROW 20 ft. in width across S/2 |
| QTR: | |
| SECTION | 7 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| GRANTOR: | R. L. McKee |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Sep 4, 1981 |
| FILING DATE: | Oct 30, 1981 |
| RECORDED: | 347/70 |
| LAND: | ROW covering 6" pipe line 10' either side of a line 43 ft. West of parallel to the East line of SE/4; & 10 ft. either side of a line 43 feet North of, and parallel to, the South line of SE/4 |
| QTR: | |
| SECTION | 7 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| GRANTOR: | John H. Courtney & Loreta G. Courtney |
| GRANTEE: | Western Continent Oil Corp. |
| DATE: | Dec 18, 1979 |
| FILING DATE: | Dec 31, 1979 |
| RECORDED: | 248/372 |
| LAND: | ROW across the NW/4 |
| QTR: | |
| SECTION | 8 |
| TOWNSHIP | 27N |
| RANGE | 1E |
| | |
| BOOK 1620 PAGE 273 | |
| | |
| | TOWNSHIP 28 NORTH, RANGE 1 EAST |
| | |
| GRANTOR: | Thais M. Naylor |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Aug 1, 1980 |
| FILING DATE: | Aug 1, 1980 |
| RECORDED: | 286/06 |
| LAND: | ROW for pipeline across NE/4 |

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

| QTR: | |
|---|---|
| SECTION | 31 |
| TOWNSHIP | 28N |
| RANGE | 1E |
| | |
| GRANTOR: | Paul Leitzig |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Aug 8, 1980 |
| FILING DATE: | Aug 12, 1980 |
| RECORDED: | 287/169 |
| LAND: | ROW for pipe line across the NW/4 |
| QTR: | |
| SECTION | 31 |
| TOWNSHIP | 28N |
| RANGE | 1E |
| | |
| GRANTOR: | Robert A. Smith |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Apr 22, 1980 |
| FILING DATE: | Apr 22, 1980 |
| RECORDED: | 266/399 |
| LAND: | ROW for pipeline across E/2 |
| QTR: | |
| SECTION | 32 |
| TOWNSHIP | 28N |
| RANGE | 1E |
| | |
| GRANTOR: | Bob Smith |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Aug 1, 1980 |
| FILING DATE: | Aug 1, 1980 |
| RECORDED: | 286/08 |
| LAND: | ROW for pipeline across E/2 |
| QTR: | |
| SECTION | 32 |
| TOWNSHIP | 28N |
| RANGE | 1E |
| | |
| GRANTOR: | Grace Bilyeu, by O. Alexander, Attorney-in-fact |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Jul 30, 1980 |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

US_ACTIVE\123541482\V-2

BOOK 1933 PAGE 0951

| FILING DATE: | Aug 12, 1980 | |
|---|---|---|
| RECORDED: | 287/167 | |
| LAND: | ROW for pipeline South 20 feet of the North 53 feet of NW/4 | |
| QTR: | | |
| SECTION | 32 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Commissioners of Land Office | |
| GRANTEE: | Coronado Transmission Co. | |
| DATE: | Jul 15, 1980 | |
| FILING DATE: | Aug 1, 1980 | |
| RECORDED: | 286/10 | |
| LAND: | ROW covering 6" pipeline across SW/4 58 rods in length. 10' either side of a center line. Beginning 33' East & 33' North of SW/c, thence East 957 ft., thence North 20 ft., thence West 937 ft., thence 28.28 ft. SW'ly to pob. Said center line is 8' North $ parallel to S line | |
| QTR: | | |
| SECTION | 33 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Glen R. Johnson | |
| GRANTEE: | Coronado Transmission Co. | |
| DATE: | Apr 22, 1980 | |
| FILING DATE: | Aug 1, 1980 | |
| RECORDED: | 266/397 | |
| LAND: | ROW for pipe line across the NW/4 | |
| QTR: | | |
| SECTION | 33 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 274 | | |
| | | |
| | TOWNSHIP 27 NORTH, RANGE 1 WEST | |
| | | |
| GRANTOR: | Etta Smith | |
| GRANTEE: | Western Continent Oil Corp | |
| DATE: | Dec 19, 1979 | |
| FILING DATE: | Dec 31, 1979 | |
| RECORDED: | 248/374 | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

| LAND: | ROW for pipeline 20' in width across the SW/4 |
| QTR: | |
| SECTION | 1 |
| TOWNSHIP | 27N |
| RANGE | 1W |
| | |
| GRANTOR: | Fox Bell Farms |
| GRANTEE: | Kay Gathering Systems |
| DATE: | Sep 29, 1979 |
| FILING DATE: | Dec 31, 1979 |
| RECORDED: | 248/360 |
| LAND: | ROW for pipeline 20' in width across the SE/4 |
| QTR: | |
| SECTION | 12 |
| TOWNSHIP | 27N |
| RANGE | 1W |
| | |
| GRANTOR: | Loreta G. Courtney |
| GRANTEE: | Western Continent Oil Corp. |
| DATE: | Jan 17, 1980 |
| FILING DATE: | Jan 17, 1980 |
| RECORDED: | 251/45 |
| LAND: | ROW for pipeline across the NE/4 |
| QTR: | |
| SECTION | 12 |
| TOWNSHIP | 27N |
| RANGE | 1W |
| | |
| GRANTOR: | Aaron Seabach |
| GRANTEE: | Coronado Transmission Co. |
| DATE: | Mar 10, 1980 |
| FILING DATE: | Mar 10, 1980 |
| RECORDED: | 259/135 |
| LAND: | ROW for pipeline across the SW/4 |
| QTR: | |
| SECTION | 12 |
| TOWNSHIP | 27N |
| RANGE | 1W |
| | |
| GRANTOR: | Commissioners of Land Office |
| GRANTEE: | Coronado Transmission Co. |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

76

BOOK 1933 PAGE 0953

| DATE: | Jul 15, 1980 | |
| FILING DATE: | Aug 1, 1980 | |
| RECORDED: | 286/13 | |
| LAND: | ROW for pipeline in NW/4. 116 rods in length. 10' either side of a center line. Tract beginning 33' East & 33' South of NE/c, thence South1941 ft., thence East 20 ft., thence North 1941 ft., thence West 20 ft. to pob. Center line is 8 ft. E & parallel to West line. | |
| QTR: | | |
| SECTION | 13 | |
| TOWNSHIP | 27N | |
| RANGE | 1W | |
| | | |
| | TOWNSHIP 28 NORTH, RANGE 1 WEST | |
| | | |
| GRANTOR: | Jerry S. Johnson | |
| GRANTEE: | Coronado Transmission Co. | |
| DATE: | Aug 8, 1980 | |
| FILING DATE: | Aug 12, 1980 | |
| RECORDED: | 287/165 | |
| LAND: | ROW for pipeline across the NE/4 | |
| QTR: | | |
| SECTION | 35 | |
| TOWNSHIP | 28N | |
| RANGE | 1W | |
| | | |
| GRANTOR: | Commissioners of Land Office | |
| GRANTEE: | Coronado Transmission Co. | |
| DATE: | May 15, 1980 | |
| FILING DATE: | Jul 1, 1980 | |
| RECORDED: | 334/370 | |
| LAND: | ROW for pipeline in NE/4. Beginning 33 ft. West & 80 ft. South of the NE/c, thence South 20 ft., thence West to 1/2 Sec. line, thence North 20 ft., thence East to a point 33 ft. West of the East Sec. line. ROW line is 10' S & N of, & parallel to the North line of easement. | |
| QTR: | | |
| SECTION | 36 | |
| TOWNSHIP | 28N | |
| RANGE | 1W | |
| | | |
| BOOK 1620 PAGE 275 | | |
| | | |
| GRANTOR: | Commissioners of Land Office | |
| GRANTEE: | Coronado Transmission Co. | |
| DATE: | May 5, 1981 | |

BOOK 1933 PAGE 0954

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

| FILING DATE: | Jul 28, 1981 | |
|---|---|---|
| RECORDED: | 334/373 | |
| LAND: | ROW for pipeline in NW/4. Beginning 33 ft. East & 60 ft. South of NW/c thence East to 1/2 sec. line; thence South 20 ft., thence West to a point 33 ft. East of the West sec. line, thence North 20 ft. to pob. ROW line is 10 ft. S & N of, & parallel to, North line of Easement | |
| QTR: | | |
| SECTION | 36 | |
| TOWNSHIP | 28N | |
| RANGE | 1W | |
| | Including permits, grants, licenses, etc. from the County Commissioners of Kay County, Oklahoma, to install maintain, operate, and remove pipeline(s) in County rights-of-way, whether said rights are recorded or otherwise. | |
| BOOK 1620 PAGE 280 | | |
| | | |
| | RIGHT-OF-WAY DESCRIPTIONS AND RECORDING INFORMATION | |
| | | |
| GRANTOR: | Stephen Lutz | Book 271 Pag 289 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 12 1/2' either side of line 45' West of the East property line of the S/2 of the SE/4. | |
| QTR: | | |
| SECTION | 35 | |
| TOWNSHIP | 28N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Bill & Bob Wildgrube | Book 271 Pag 277 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 12 1/2' either side of a line 45' West of and parallel with the East property line 17 rods in length starting at the NE corner of the NE/4. | |
| QTR: | | |
| SECTION | 22 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Bill & Bob Wildgrube | Book 271 Pag 283 |
| GRANTEE: | | |

77

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0955

| DATE: | | |
|---|---|---|
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 20' in width parallel with and adjacent to the highway right-of-way on the North boundary line of the NW/4 with provisions to go around house and barns on said property. | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Alfred F. Kemnitz & Lucille Kemnitz | Book 271 Pag 286 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 20' in width parallel with and adjacent to the highway right-of-way on the North boundary line of NE/4 and along the East line of said quarter section adjacent to the county road right-of-way. | |
| QTR: | | |
| SECTION | 23 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Loris Keen and Pauline Keen | Book 271 Pag 295 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | The North 20' of the NW/4. | |
| QTR: | | |
| SECTION | 24 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | D.B. Godbehere | Book 249 Pag 132 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | NE/4 | |
| QTR: | | |

78

BOOK 1933 PAGE 0956

| SECTION | 24 | |
|---|---|---|
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Bill & Bob Wildgrube | Book 635 Pag 267 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | A pipeline right-of-way extending 20' on either side of a center line beginning at a point 120' South of the NE corner of the SE/4 of Section 15, thence West a distance of 600'; thence in a Southwesterly direction a distance of 300'; thence West a distance of 200'; thence in a Northwesterly direction to a point on the West line of the SE/4 120' South of the NW corner thereof. | |
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| **BOOK 1620 PAGE 281** | | |
| | | |
| GRANTOR: | Emilie Kahle, et al. | |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 10' either side of a line beginning 10' North of the highway right-of-way of State Highway 11, at the SW corner of the SE/4 of the SW/4 of Section 15-T27N-R1E of the I.M., Kay County, State of Oklahoma and thence East a distance of 41 rods along the line parallel and adjacent to the highway right-of-way of State Highway 11; thence North a distance of 39 rods to that one certain gas well known as the Kahle 2-15; thence 123 rods in a Northeasterly direction from the Kahle 2-15 well to a point on the East boundary line on the SW/4 of Section 15-T27N-R1E. | |
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| **BOOK 1620 PAGE 282** | | |
| | | |
| GRANTOR: | Esther Johnson Estate | Book 271 Pag 292 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

| LAND: | Along a route 12 1/2' either side of a line 45' South of the North property line of the NE/4. | |
|---|---|---|
| QTR: | | |
| SECTION | 2 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Bob & Bill Wildgrube | Book 271 Pag 280 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 12 1/2' either side of a line 45' South of the North property line of the NW/4. | |
| QTR: | | |
| SECTION | 2 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Park S. Brandon | Book Page 15 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 10' either side of a line approximately45' South and parallel to the North property line of the NW/4. | |
| QTR: | | |
| SECTION | 3 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Clifford G. Honick | Book 249 Pag 143 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 10' either side of a line 45' South of the North property line of the N/2 of the NE/4. | |
| QTR: | | |
| SECTION | 3 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

| GRANTOR: | Gerald L. Honick | Book 251 Pag 268 |
|---|---|---|
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 10' either side of a line 45' West of the East property line of the S/2 of the NE/4. | |
| QTR: | | |
| SECTION | 3 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Clifford G. Honick | Book 349 Pag 149 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 10' either side of a line 45' West of the East property line of the SE/4. | |
| QTR: | | |
| SECTION | 3 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Clifford G. Honick | Book 249 Pag 146 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 10' either side of a line 45' West of the East property line of the W/2 of the NE/4. | |
| QTR: | | |
| SECTION | 3 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 283 | | |
| | | |
| GRANTOR: | Glen E. Craft and Eda J. Craft | Book 258 Pag 440 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT

OKCOUNTYRECORDS.COM

US_ACTIVE\123541482\V-2

BOOK 1933 PAGE 0959

| RECORDED: | | |
|---|---|---|
| LAND: | Along a route 12 1/2' either side of a line approximately 45' South of and parallel to the North property line of the NE/4 with provisions for bypassing the existing tank battery. | |
| QTR: | | |
| SECTION | 4 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Glen E. Craft and | Book 258 Pag 449 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 12 1/2' either side of a line approximately 45' South of and parallel to the North property line commencing at the NE corner of the NW/4 and proceeding 81 rods West to compressor site. | |
| QTR: | | |
| SECTION | 4 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Bill A. Seaboch | Book 251 Pag 263 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 12 1/2' either side of a line 45' South of and parallel to the North property line of the NE/4. | |
| QTR: | | |
| SECTION | 10 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Bill A. Seaboch | Book 251 Pag 262 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 12 1/2' either side of a line 45' West of and parallel to the West property line of the NE/4. | |
| QTR: | | |
| SECTION | 10 | |
| TOWNSHIP | 27N | |

US_ACTIVE\123541482\V-2

| RANGE | 1E | |
|---|---|---|
| | | |
| GRANTOR: | Albert F. Turk, Jr. | Book 253 Pag 298 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | A pipeline right-of-way 25' in width along a route 12 1/2' either side of a line 45' East of and parallel to the West property line of the SW/4 as shown by plat of said pipeline attached hereto and by reference, made a part hereof. | |
| QTR: | | |
| SECTION | 11 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Sherman Otto and Evelyn Otto | Book 271 Pag 271 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 20' in width starting at the SW corner and proceeding NE to a point 446' West of the NE corner of the NE/4. | |
| QTR: | | |
| SECTION | 12 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| BOOK 1620 PAGE 284 | | |
| | | |
| GRANTOR: | Wayne F. Muret and Bessie June Muret | Book 253 Pag 295 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a route 25' in width starting at the SW corner and proceeding in a Northeasterly direction in relation to the existing contour and terraces to the NE corner of the SW/4. | |
| QTR: | | |
| SECTION | 12 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

US_ACTIVE\123541482\V-2

| GRANTOR: | Wayne F. Muret and Bessie June Muret | Book 253 Pag 302 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a line 12 1/2' either side of a line 45' South of and parallel to the North boundary line of the NE/4. | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

| | | |
|---|---|---|
| GRANTOR: | Elmer H. Kelle and Beatrice J. Kelle | Book 253 Pag 305 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a line 12 1/2' either side of a line 45' South of and parallel to the North boundary line of the NW/4 | |
| QTR: | | |
| SECTION | 14 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

| | | |
|---|---|---|
| GRANTOR: | Bill & Bob Wildgrube | Book 258 Pag 446 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a line 12 1/2' either side of a line approximately 45' West and parallel to the East property line of the NE/4. | |
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

| | | |
|---|---|---|
| GRANTOR: | Bill and Bob Wildgrube | Book 258 Pag 437 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT OKCOUNTYRECORDS.COM

| LAND: | Along a line 12 1/2' either side of a line approximately 45' West and parallel to the East property line of the N/2 of the SE/4. | |
|---|---|---|
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |
| | | |
| GRANTOR: | Phyllis G. Bart | Book 258 Pag 443 |
| GRANTEE: | | |
| DATE: | | |
| FILING DATE: | | |
| RECORDED: | | |
| LAND: | Along a line 12 1/2' either side of a line approximately 45' West and parallel to the East property line of the S/2 of the SE/4. | |
| QTR: | | |
| SECTION | 15 | |
| TOWNSHIP | 27N | |
| RANGE | 1E | |

NOT AN OFFICIAL COPY

VIEW ADDITIONAL LAND RECORDS AT
OKCOUNTYRECORDS.COM

BOOK 1933 PAGE 0963

85

US_ACTIVE\123541482\V-2