Jason A. McNeill (9711)
mcneill@mvmlegal.com
Eric K. Schnibbe (8463)
schnibbe@mvmlegal.com
**MCNEILL | VON MAACK**
236 South 300 East
Salt Lake City, Utah 84111
Telephone: 801.823.6464

Jessica B. Magee (*admitted pro hac vice*)
jessica.magee@hklaw.com
Scott F. Mascianica (*admitted pro hac vice*)
scott.mascianica@hklaw.com
Andrew W. Balthazor (*admitted pro hac vice*)
andrew.balthazor@hklaw.com
**HOLLAND & KNIGHT**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214.969.1700

Attorneys for Josias N. Dewey,
Court-Appointed Temporary Receiver

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    **Plaintiff,**<br><br>v.<br><br>**DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited** | **TEMPORARY RECEIVER'S INTERIM STATUS REPORT**<br><br><br>**Case No. 2:23-cv-00482-RJS-DBP**<br>**Judge Robert J. Shelby**<br>**Magistrate Judge Dustin B. Pead** |

**liability company; BRENDAN J.
STANGIS, an individual; and MATTHEW
D. FRITZSCHE, an individual,**

      **Defendants,**

**ARCHER DRILLING, LLC, a Wyoming
limited liability company; BUSINESS
FUNDING SOLUTIONS, LLC, a Utah
limited liability company; BLOX LENDING,
LLC, a Utah limited liability company;
CALMFRITZ HOLDINGS, LLC, a Utah
limited liability company; CALMES & CO,
INC., a Utah corporation; FLAHERTY
ENTERPRISES, LLC, an Arizona limited
liability company; IX VENTURES FZCO, a
United Arab Emirates company; PURDY
OIL, LLC, a Nebraska limited liability
company; THE GOLD COLLECTIVE LLC,
a Utah limited liability company; and UIU
HOLDINGS, LLC, a Delaware limited
liability company,**

      **Relief Defendants.**

## RECEIVER'S INTERIM STATUS REPORT

Josias Dewey, in his capacity as the Court-appointed Temporary Receiver ("Receiver") for Digital Licensing, Inc. ("DLI") and its affiliates and subsidiaries (collectively, "Receivership Entities") files this Interim Status Report ("Report") as a supplement to the Receiver's First Status Report ("FSR") [ECF No. 139] summarizing operations and actions undertaken to date in accordance with this Court's Temporary Receivership Order ("Receivership Order") [ECF No. 10] concerning Relief Defendant Archer Drilling, LLC ("Archer").

## BACKGROUND

1.     On July 26, 2023, the United States Securities and Exchange Commission filed a complaint against the above-named Defendants and Relief Defendants alleging, among other

things, a fraudulent scheme to sell unregistered crypto asset securities to hundreds of U.S. investors. [ECF No. 1]. At the same time, the SEC applied for appointment of a temporary receiver over the Receivership Entities. [ECF No. 4]. After reviewing the application, the Court concluded that appointment of a temporary receiver was necessary to, among other things, marshal and preserve all assets—tangible and intangible, and wherever located—owned, controlled, or possessed by the Receivership Entities.

2.     On July 28, 2023, the Court entered the Receivership Order, appointing the Receiver and outlining his authority and duties. On the same day, the Court entered a Temporary Restraining Order [ECF No. 9] ("TRO")—which remains in effect [ECF Nos. 33, 78, 121, 136]— enjoining and restraining Defendants' allegedly violative conduct, freezing assets, and providing other emergency relief.

3.     As more fully set forth in the Receiver's FSR [*see* ECF No. 139], the Receiver and his team of attorneys and professionals ("Receivership Team") have undertaken extensive efforts in the less than two months since appointment to identify, marshal, and secure information and assets belonging to the Receivership Entities.

4.     Over the last several weeks, the Receivership Team has uncovered documents and other evidence concerning Archer—including extensive evidence of DLI's connections to and funding of Archer's operations.  Additionally, despite several legal and logistical challenges detailed herein, the Receivership Team has undertaken several measures to assess the safety and security of four oil-and-gas drilling rigs ("Rigs") purportedly owned and/or controlled by Archer. All or part of three of the Rigs are located on private property owned by Gene Purdy, a non-party who is a member of both Relief Defendant Purdy Oil, LLC ("Purdy Oil") and Relief Defendant

Archer.  The remaining portion of one of those Rigs is located in a fenced-in yard owned by a third-party transportation company.  The final Rig is located on federal land subject to control by the Bureau of Land Management ("BLM").  As detailed further herein, the Receivership Team remains in continued contact with each of the stakeholders concerning these Rigs.

5.      In this Report, I summarize current fact finding relating to Archer, an entity that DLI and the DEBT Council Defendants assert is an affiliate (and thus a Receivership Entity) despite its ownership and control being the subject of pending litigation and competing claims.

## ARCHER DRILLING, LLC

6.      Archer is a Wyoming limited liability company organized by Defendant James Franklin on April 3, 2022, with a principal address of 1100 Harrison Dr., P.O. Box 94, Pine Bluffs, WY 82082.  Archer is a Relief Defendant in this action but, to the best of my knowledge, has not appeared.

7.      On February 7, 2023, Archer's principal address was changed to 1812 W Sunset Blvd, Ste 1-345 Saint George, UT 84770-6685, the same address as nonparty Ignis Energy LLC— which is believed to be an oil and gas affiliate of DLI and the subject of the Receiver's Motion to Clarify the Receivership Order [*see* ECF No. 144].

**A.      Kimball County Nebraska Lawsuit**

8.      On January 1, 2023, Archer, Purdy Oil, and Defendant James Franklin filed a complaint in Kimball County Nebraska against DLI, Defendant Schad Brannon, and non-parties Gene Purdy and Garret Purdy concerning, among other things, an ownership dispute over Archer. *See Purdy Oil, LLC, et al., v. Digital Licensing, Inc., et al.*, CI23-01 (Kimball Cnty. Ct. Neb. Jan.

1, 2023) (hereinafter "Control Lawsuit").  A true and correct copy of this pleading is attached hereto as **Exhibit 1**.[1]

9.      The plaintiffs in the Control Lawsuit submitted in that action a copy of the Archer Operating Agreement bearing an execution date of April 4, 2022 (hereinafter "Original Operating Agreement"). *See id.*, pgs. 86–100.

10.     The Original Operating Agreement reflected the following ownership percentages for Archer:

(a) Purdy Oil – 80%;

(b) James Franklin – 10.1%;

(c) Gene Purdy – 3.3%;

(d) Garrett Purdy – 3.1%; and

(e) Schad Brannon – 3.5%.  *Id.*, pg. 86.

11.     The plaintiffs in the Control Lawsuit alleged that Archer was formed to purchase and own oil and gas drilling rigs and related equipment.  *Id.*, pg. 6 ¶ 27.  The plaintiffs make allegations concerning three Rigs, hereinafter referred to as Rigs 1, 2 and 4 respectively.  *See generally id.*, pgs. 5–7 ¶¶ 23, 34.  Specifically, they allege that Purdy Oil purchased Rig 1 (formerly known as Nebco Rig 14) from Nebco Services for $125,000.  *Id.*, pg. 5 ¶ 23.  They also allege that "Purdy Oil, LLC caused [Archer] to purchase Drilling Rig Nos. 2 & 4 and related equipment in Nevada for the price of $960,000."  *Id.*, pg. 7 ¶ 34.

---

[1] As detailed further in the Receiver's Motion for Contempt and Sanctions [*see* ECF No. 138], the Receiver requested a list of ongoing litigation involving DLI and its affiliates and subsidiaries from Defendants Roy Nelson, Schad Brannon, Jason Anderson and Jacob Anderson (collectively, "DEBT Council Defendants").  The DEBT Council Defendants have not provided any information in response.  Accordingly, to the extent there is additional information related to this lawsuit beyond what is included in the public pleadings or other litigation related to ownership of Archer, the Receiver has not received this information.

12. On May 8, 2023, Control Lawsuit defendants DLI and Mr. Brannon filed their Answer, First Amended Counterclaims and, also purportedly on behalf of Archer, Crossclaims. A true and correct copy of this filing is attached hereto as **Exhibit 2** (hereinafter after "Answer," "Counterclaim," or "Crossclaim").

13. In their Control Lawsuit Answer, DLI and Mr. Brannon admit that "on or about June 2022 Drillings Nos. 2 & 4 were purchased by, or for the benefit of [Archer]." *Id.*, pg. 5 ¶ 34. Similarly, they admit that ***Archer—not DLI***—"is the legal owner of all of the personal property identified on the Equipment List." *Compare* **Ex. 1**, pg. 9 ¶ 49 and pgs. 102–11 <u>with</u> **Ex. 2**, pg. 7 ¶ 49. The items listed in the "Equipment List" are Rigs 2 and 4.

14. In their Control Lawsuit Counterclaim, DLI and Mr. Brannon allege that Archer was initially expected to be capitalized by Purdy Oil; however, James Franklin—Purdy Oil's majority member—purportedly failed to make the required contribution. **Ex. 2**, pg. 12 ¶ 3. As a result, DLI allegedly "provided all of the cash contributions (directly and indirectly) required by Archer Drilling to fund its operations and purchase of drilling rigs." *Id.*, pg. 13 ¶ 4. Additionally, DLI and Brannon allege that, on or about August 18, 2022, James Franklin and representatives of Purdy Oil [including Gene Purdy, a minority member] met with representatives of DLI "to discuss the inequity of [DLI's] financing Archer Drilling's operations and purchase of drilling rigs[.]" *Id.* ¶ 5 ("the August 18 Meeting").

15. At the August 18 Meeting, the parties allegedly agreed to enter into a new operating agreement for Archer "under which ***[DLI] would own a 51% interest***, and Franklin, Gene Purdy and Garrett Purdy would each own a 16.33% equity interest in Archer Drilling." *Id.* (emphasis added). A copy of the purported new operating agreement, sometimes referred to as the

"renegotiated" operating agreement, is attached to their Counterclaim ("New Operating Agreement"). *See* **Ex. 2**, pgs. 28–43. Notably, the New Operating Agreement bears the same April 4, 2022 execution date as the Original Operating Agreement though it was, purportedly, revised in or around August 2022.

16.     DLI and Mr. Brannon further allege in the Control Lawsuit Counterclaim that Rigs 1, 2, and 4 "were purchased 100% with funds provided, directly or indirectly, by DLI. Although DLI funds used to purchase the [Rigs] were initially deposited in a Purdy Oil account, those funds were always intended to be, and were in fact, advanced to [Archer] for the express purpose of purchasing, and owning, the [Rigs]." *Id.*, pg. 13 ¶ 7.

17.     Finally, DLI and Mr. Brannon are also asking the court (overseeing the Control Lawsuit) to declare ***Archer's*** ownership of Rigs 1, 2 and 4. *See id.*, pg. 16 ¶16 (emphasis added).

18.     The Receiver identified the Control Lawsuit during the week of August 8, 2023. The Receiver worked with DLI's previously retained counsel to ensure that notices of the Receivership Order were filed in the Control Lawsuit (and other litigation). The Kimball County clerk's office confirmed the filing but notified the Receiver that the notice of Receivership would not stay the Control Lawsuit. Rather, the Receiver would need to file a motion to stay the Control Lawsuit.

19.     During the week of August 14, 2023, the Receivership Team began correspondence—which remains ongoing—with counsel for Purdy Oil and James Franklin (hereinafter "Franklin Parties") in the Control Lawsuit. Over the ensuing days, the Receivership Team corresponded with counsel for the Franklin Parties and others in the Control Lawsuit concerning any opposition to the Receiver staying the Control Lawsuit.

20.     After securing agreements from all represented parties in the Control Lawsuit, on September 1, 2023, the Receivership Team moved to stay that action.  The motion has not yet been decided by the court.

**B.     Receiver Efforts to Secure the Rigs 1, 2 and 4**

21.     As detailed above, the Control Lawsuit alleges competing claims of ownership of Archer.  As further detailed in the various motions to clarify before this Court [ECF Nos. 125 and 144], the uncertain nature of the term "subsidiaries and affiliates" in the Receivership Order warrants clarification concerning the Receiver's current control over parties other than DLI.

22.     As detailed further below, evidence developed by the Receivership Team and confirmed by the DEBT Council Defendants reveals, at a minimum, that DLI has a purported security interest in Rigs 2 and 4 (along with Rig 3, discussed below).  *See infra* ¶¶ 25, 29–35.

23.     The DEBT Council Defendants assert that Archer is a DLI affiliate and, contrary to DLI's and Mr. Brannon's claims in the Control Lawsuit, that ***DLI—not Archer***—owns the Rigs. *Compare* **Exhibit 3** and **Exhibit 4** <u>*with*</u> *supra* ¶¶ 8–17.  DEBT Council Defendants acknowledged the Control Lawsuit, noting that "one of the issues in that case is the ownership interest of Archer Drilling…" **Ex. 3.**

24.     Given the lack of a direct order concerning the Receiver's control over Archer, the Receiver has had to coordinate with several parties concerning the safety and security of Rigs 1, 2 and 4.  This has been further complicated because, to my knowledge (a) James Franklin has neither been served with process in this matter nor has he otherwise appeared; and (b) Archer is not represented in this matter.

25.     On August 14, 2023, DEBT Council Defendants provided eight documents to the Receiver—encompassing the majority of their document production to date.  *See* **Ex. 3.**  This information included, among other things (a) the purported location of the Rigs by longitudinal and latitudinal coordinates; (b) UCC financing statements showing Archer as "Debtor" for three Rigs (purportedly Rigs 2, 3, and 4) with DLI holding a security interest in the same; and (c) a request that the Receiver secure the rigs.  *See id.*

26.     The next day, on August 15, 2023, the Receiver's retained counsel initiated contact with an oil-and-gas consultant ("Consultant") concerning a possible engagement to, among other things, advise counsel on certain oil-and-gas assets owned or controlled by the Receivership Entities.  The Receiver ultimately engaged Consultant at a discounted fee.

27.     Over the last several weeks, the Receiver has taken numerous actions concerning the safety and security of Rigs 1, 2, and 4, including:

a.   Identifying and communicating with numerous parties involved in the purchase, sale, and transportation of the Rigs;

b.   Requesting the DEBT Council Defendants and entities they control to provide the name and contact information for whomever had been providing security for all four of the Rigs plus any contracts or agreements with service providers to the Rigs. *See* **Exhibit 5.**  The DEBT Council Defendants did not respond to this request.

c.   Conducting several interviews with cooperating parties concerning the current location, security, and condition of Rigs 1, 2, and 4.

i.   For example, Mr. Purdy—who owns the property where Rigs 1, 4 and a portion of 2 are located—did not express any concern about the safety and

security of the Rigs given they are located on the interior part of his private property, which is located in a remote part of Kimball County, Nebraska. Additionally, counsel for the Franklin Parties initially indicated that these Rigs did not require any additional security measures given, among other things, their significant size and remote location on Mr. Purdy's private property.[2]

ii.   Notably, all of the Rig 2 components are not located on Mr. Purdy's property.   Instead, a portion of Rig 2 is located in Nevada with a transportation company. Based on interviews with the transportation company, the remaining portion of Rig 2 is secured behind a fence on the property.  The transportation company is currently charging $1,800/month to store the portion of Rig 2, an amount being drawn down from a prior $75,000 payment earlier in 2023.

d.   Despite the Control Lawsuit, securing agreement from the relevant stakeholders to take measures to secure and further protect such assets.  Through various discussions with Mr. Purdy and his counsel, the Receivership Team has secured an agreement in principle to take further measures to secure Rigs 1, 4, and the portion of Rig 2 on Mr. Purdy's property.  This agreement is contingent upon the Receiver taking such measures that would not damage or reduce the value of Mr. Purdy's farmland.

---

[2] Counsel for the Franklin Parties later expressed concern about the security of the Rigs based on a rumor that Defendant Roy Nelson was conspiring with others to sell certain Rig equipment.  Based on information uncovered to date, we have not found any support for this rumor.

> e. Although not disclosed to the Receiver by the DEBT Council Defendants, identifying possible video feed surveillance capabilities concerning the Rigs located on Mr. Purdy's property.  The Receivership Team is in discussions with counsel for the Franklin Parties and Mr. Purdy to understand the extent of prior video feed surveillance and potential ability to resume the same.

> f. Interviewing the initial seller of Rigs 2 and 4 (hereinafter "Seller") concerning, among other things, their condition, the parties involved in the initial sale and the source of funds for those transactions.

28.     The Receiver's outside counsel is working with Consultant to assess next steps.

## C.     Receiver Efforts to Identify and Secure Rig 3

29.     As part of the Receivership Team's investigation, we identified that the Seller also sold an additional rig—hereinafter "Rig 3"—to a third party (K&W International, LLC ("K&W")) in or around May 2022.[3]  As detailed further below, we have since identified several payments from DLI to K&W around the time of this transaction.  *See infra* ¶¶ 55–57.  As noted above, the DEBT Council Defendants have represented to the Receiver that one of the UCC statements covers DLI's security interest in Rig 3.  *See* **Ex. 3**; *supra* ¶ 25.

30.     On August 10, 2023, the Receivership Team reached out to a special agent ("Agent") with the Bureau of Land Management ("BLM") concerning, among other things, various issues associated with a now expired lease on BLM land in White Pine County, Nevada (hereinafter "Scott Federal Lease").

---

[3] The Receiver's attempts to interview personnel associated with K&W have thus far been unsuccessful given the Seller's primary point of contact for the transaction passed away earlier this year.

31.     As part of the Receivership Team's investigation and—confirmed by the DEBT Council Defendants—Rig 3 is located on BLM controlled land associated with the Scott Federal Lease.  My Receivership Team determined that the Scott Federal lease is now expired and there are no ongoing drilling or gathering operations on the property.

32.     Prior to connecting with the Agent, the Receivership Team reviewed several witness statements and documents related to purported instances of non-compliance concerning operations on the Scott Federal Lease.  According to those materials:

   a.  Defendant Western Oil Exploration ("Western Oil") began drilling operations on the Scott Federal lease on or around July 2020.

   b.  BLM issued a shut-down order on the lease three days later.  *See* **Exhibit 6**, pgs. 3, 5.

   c.  After Western Oil resumed drilling operations, BLM issued a Notice of Non-Compliance in late 2021 and drilling operations were suspended shortly thereafter. *See id.*, pgs. 2, 4.

   d.  No drilling activity occurred on the Scott Federal Lease in 2022.

   e.  On or about December 16, 2022, BLM issued a letter denying a drilling extension on the Scott Federal lease and provided notice that the lease expired.  *See* **Exhibit 7**.

33.     The Agent introduced the Receivership Team to two additional BLM officials concerning the condition, location, and security of Rig 3. Thereafter, the Receivership Team interviewed these BLM officials concerning Rig 3. In the course of these interviews, the Receivership Team learned the following:

a.  There are no current fines or penalties against Archer—or any other party—for Rig 3 remaining on BLM land.  However, if Rig 3 sits long enough without any activity, there is the possibility that it could be deemed abandoned.  The Receiver requested that Rig 3 not be deemed abandoned while we continue our investigation.

b.  According to the BLM officials with whom the Receivership Team spoke, Rig 3 is not near a main thoroughfare and is located in an isolated area.

c.  Additionally, the BLM officials represented to the Receivership Team that there are no known reports of vandalism on Rig 3 or surrounding property, and no reports of anyone out on the property.   However, the DEBT Council Defendants represented to the Receivership Team that a reported theft occurred on the property prior to the appointment of the Receiver.  The Receivership Team has obtained documents and information from the White Pine County, NV Sheriff's Office concerning this incident.

d.  DEBT Council Defendant Roy Nelson (and possibly one other individual) had discussions with personnel from White Pine County and BLM over the summer of 2023 about moving the rig. Given the large size of Rig 3, they were required to secure a road permit from White Pine County in order to move it.  Mr. Nelson decided against moving the rig at that time because the bid to do so was too expensive.

e.  On-site security for Rig 3 would be considered illegal habitation at this time, as there is no ongoing drilling activity.  As detailed above, the Scott Federal lease is expired and there has not been any activity on the property dating back to

November 2021.   Accordingly, the Receiver cannot retain on-site security personnel for the location.

f.   In order to build any sort of fencing around Rig 3, I would need to apply for and secure a permit from BLM, a process the BLM officials advised can be time consuming.   This process will involve completing and submitting a SF-299 Form to obtain a temporary right of way and wildlife grant, which is necessary because there is no active drilling.   This process could take approximately 60 days.

g.   Concerning moving Rig 3, starting November 1, 2023 there are certain wildlife restrictions which will prohibit retrieving the rig until June 2024.   Even if such restrictions did not exist, in the winter months, the roads to and from Rig 3 are nearly impassable.   If the Receivership Team determines to move Rig 3 at some point in time we will need to obtain a permit from White Pine County and comply with related BLM regulations.

34.   The Receivership Team has requested information relating to the security and service of Rig 3 from the DEBT Council Defendants, but have been unable to secure this information from them.  *See* **Ex. 5**; ECF No. 138, Receiver's Motion for Contempt and Sanctions, at Ex. 4.

35.   The Receiver's outside counsel is also working with the Consultant on this matter and is assessing next steps.

**D.   Archer Connections to DLI and Receivership Entities**

36.   On August 2, 2023, the Receivership Team interviewed Defendant Roydon Nelson. During that interview, Mr. Nelson volunteered certain information about Receivership Entities and

13

informed the Receivership Team that a service provider (the "Provider") hosted several domains, websites, and data for numerous entities, including DLI.

37.     The same day, the Receivership Team contacted the Provider, shared a copy of the Receivership Order, and gave the Provider time to review that document, pose questions, and discuss and understand my role and responsibilities as Receiver for the Receivership Entities.

38.     The Receivership Team communicated with Provider on numerous occasions that day and, among other things, the Provider informed the Receivership Team that he communicated with Mr. Nelson that morning, and Mr. Nelson encouraged the Provider to cooperate with me, as the Receiver, and the remainder of the Receivership Team. The Receivership Team requested access to all of the Receivership Entities' information in the Provider's possession or control, and relied on the Provider to use his own discretion and experience in identify the data belonging to the Receivership Entities. Among other things, the Provider produced an excel spreadsheet identifying the various email domains he serviced for the Receivership Entities at the direction of DEBT Council Defendants Mr. Nelson and Mr. Brannon, whom the Provider understood were involved in the operation and oversight of the Receivership Entities.

39.     The Provider believed the following domains to belong to the Receivership Entities, each with individual email accounts and data repositories, included, among others: (a) Archer-drilling.com; (b) Digitallicensinginc.com; and (c) Digitalcommodityhouse.com. Notably, most email accounts associated with these domains were setup to forward to and consolidate in specific email accounts at universaldev.com. For example, for Mr. Nelson, email domains roy@archer-drilling.com and roy@digitallicensinginc.com had rules forwarding email correspondence to those

addresses to forward to roy@universaldev.com. Similarly, for Mr. Brannon, schad@archer-drilling.com was set, by rule, to forward emails to schad@universaldev.com.

40.     Pursuant to the bank records provided by the SEC, the Receivership Team identified that, between September 20, 2022 and February 28, 2023, DLI transferred at least $1,610,578.16 to Archer across 20 transactions—many of which were for ongoing operational payments.

41.     For example, DLI made 9 payments to Archer totaling $623,461.06 with memo notations indicating "payroll." Similarly, DLI transferred $491,153.94 with memo notations indicating "operations."

42.     The bank records do not evidence any transactions from Archer to DLI.[4]

43.     The Receivership Team also traced DLI transfer of funds to—and through—various Relief Defendants in this action for the ultimate purpose of financing a real property purchase for Archer, as follows:



44.     Specifically, on or about May 12, 2022—before the New Operating Agreement purportedly provided DLI a 51% controlling interest in Archer (*see supra* ¶ 15)—Archer executed a mortgage with Relief Defendant Blox Lending, LLC ("Blox"), as lender, for the purchase of real property located at 6179 County Road 206, Pine Bluffs, WY 82082.  In return for a promissory

---

[4] On February 14, 2022, DLI sent Archer one transaction for $24,905.51, which Archer returned to DLI that same day. Given the resemblances of a refund, these two transactions were excluded from the analysis in this paragraph.

note in the principal amount of $504,900.00 for this purchase, Archer granted Blox a mortgage on this property.

45.     On August 22, 2023—after DLI purportedly secured a 51% controlling interested in Archer under the New Operating Agreement (*see supra* ¶ 15) and following this Court's appointment of the Receiver—Blox served Archer with a Notice of Default and Intent to Foreclose on this property, in violation of this Court's Temporary Restraining Order (*see* ECF No. 9).   *See* ECF No. 138, Receiver's Motion for Contempt and Sanctions, at pg. 9.

46.     Based on the bank records provided by the SEC, the Receivership Team identified a transaction on May 12, 2022 from Blox to First America Title Insurance Comp. for $454,410.00 with a transaction description including the Archer property address mentioned in paragraph 44. An excerpt of this transaction is provided below:

| Originator | Beneficiary Information |
|---|---|
| **Originator** | **Beneficiary** |
| Blox Lending LLC | First American Title Insurance Comp |
| D  8442 | D  3017890000 |
| 13894 S Bangerter Pkwy | 245 Stoney Blvd |
| Ste 200 | Cheyenne, WY 82009 |
| Draper UT 84020 | United States |
| United States | |
| **Originator To Beneficiary** | **Beneficiary Reference** |
| 6179 Road 206 | Blox Lending |
| Pine Bluffs, WY 82082 | |
| File No 4521-3902122 | |

*Figure 1: Excerpt of Transaction for Purchase of Archer Property*

47.     These funds provided by Blox for the purchase of this property for Archer appear to have originated from DLI. Specifically, the same day as the aforementioned transaction, Blox

received two deposits from Relief Defendant UIU Holdings, LLC ("UIU") for $500,000.00 each, or $1,000,000.00 total. Both transactions included the transaction description "Re Investment."

| 05/12/22 | 500,000.00 | | Transfer | UIU Holdings | | | Re Investment |
| 05/12/22 | 500,000.00 | | Transfer | UIU Holdings | | | Re Investment |

*Figure 2: Excerpt of Transaction from UIU to Blox*

48.     The Receivership Team reviewed the UIU bank records provided by the SEC. They found that the day before UIU's transactions to Blox, or May 11, 2022, UIU received a deposit from Relief Defendant Business Funding Solutions, LLC ("BFS") for $1,000,000.00. Prior to BFS's deposit, UIU had an account balance of approximately $112,399.06. Accordingly, UIU's transfer to Blox was predominantly funded by BFS' deposit.

| 05/11/22 | 1,000,000.00 | | Wire | Business Funding Solutions, LLC | | | Loan Paydown |

*Figure 3: Excerpt of Transaction from BFS to UIU*

49.     The Receivership Team also reviewed bank records provided by the SEC for BFS. These records indicated that BFS received a deposit from DLI for $2,000,000.00 on May 11, 2022. As previously detailed in my First Declaration, between November 4, 2021 to November 4, 2022, DLI contributed at least $10,042,761.04—or approximately 95%—of the funds deposited into BFS's bank account. *See* ECF No. 125 at Ex. A.

| 05/11/22 | $2,000,000.00 | | Wire In | DIGITAL LICENSING INC | | | Commissions |

*Figure 4: Excerpt of Transaction from DLI to BFS*

50.     Accordingly, funds originating from DLI on May 11, 2022 passed through BFS, UIU, and then to Blox within a day, and then those funds were used to fund a property purchase in the name of Archer, as further described above in paragraph 44 above.

51.     Furthermore, on June 17, 2022, DLI sent Purdy Oil $900,000.00 with the transaction description "Nebraska Low."

| 06/17/22 | $ | 900,000.00 | Wire Out | PURDY OIL | | NEBRASKA LOW |

*Figure 5: Excerpt of Transaction from DLI to Purdy Oil*

52.     Pursuant to Purdy Oil's bank records provided by Receivership Entities' previous attorneys, this Purdy Oil bank account had a balance of approximately $132,764.22 prior to DLI's $900,000 deposit. That same day, on June 17, 2022, Purdy Oil sent Archer $500,000.00, and six days later, or June 23, 2022, Purdy Oil sent Archer an additional $460,000.00.

| 00841504  INTERNET  TRANSFER  FROM ████████4458 ON 6/17/22 AT | 06/17 | 500,000.00 |
| 12:44 | | |
| TRANSFER  FROM****4458 PER GENE--CW | 06/23 | 460,000.00 |

*Figure 6: Excerpt of Purdy Oil to Archer*

53.     Archer's bank account had a balance of $985.00 prior to Purdy Oil's deposits for a total sum of $960,000.00. The same days it received each of Purdy Oil's deposits, Archer forwarded the funds to Seller for a total amount of $901,030.00 ($30 of which was for wire fees).



*Figure 7: Excerpt of Archer's Payments to Seller*

54.     According to invoices from Seller to Archer, the two payments referenced in paragraphs 52–53 made up 100% of Archer's equipment purchase for "Rocket Drilling Rig #2" and "Rocket Drilling Rig #4" for $901,000.00, referred to herein as Rigs 2 and 4.

55.     Furthermore, the Receivership Team reviewed the Seller invoices concerning the sale of Rig 3 to K&W. Specifically, Seller invoiced K&W for the following: "Rocket Drilling Rig #3" for $650,000.00 on April 29, 2022 ("First K&W Invoice") and drill pipes and equipment for $284,861.00 on June 9, 2022 ("Second K&W Invoice").

56.      Pursuant to the payment receipt attached to the First K&W Invoice, K&W paid Seller $400,000.00 on April 29, 2022 and an additional $250,000.00 on June 2, 2022. One day before K&W's first payment to Seller for $400,000.00, DLI sent K&W $500,000.00. Similarly, one day before K&W's second payment to Seller for $250,000.00, DLI sent K&W $250,000.00.

| 04/28/22 | $ 500,000.00 | Wire Out | K&W International Equipment |
| 06/01/22 | $ 250,000.00 | OUTGOING WIRE - BRANCH INITIAT | K & W INTERNATIONAL EQUIPMENT; |

*Figure 8: Excerpt of Transactions from DLI to K&W*

57.     Pursuant to the payment receipt attached to the Second K&W Invoice, K&W paid Seller $200,000.00 on June 9, 2022 and an additional $84,861.00 on July 7, 2022. Just two days before K&W's first payment to Seller for $200,000.00, DLI sent K&W $250,000.00.

| 06/07/22 | $ 250,000.00 | Wire Out | K & W INTERNATIONAL EQUIPMENT |

*Figure 9: Excerpt of Transaction from DLI to K&W*

## E.     DEBT Council Defendants' Claims to Rig Ownership

58.     On August 14, 2023, the DEBT Council Defendants provided eight documents to the Receivership Team (hereinafter "August 14 Production") concerning "***DLI's*** four oil drilling rigs." *See generally* **Ex. 3** (emphasis added).

19

59.     Specifically, in addressing the "ongoing litigation in Nebraska State Court" (*see supra* ¶¶ 8–17), the DEBT Council Defendants provided the Receivership Team with a bank wire on April 4, 2022 from DLI to Purdy Oil in the amount of $125,000.00.  *See* **Ex. 3.**  The DEBT Council Defendants represented that this wire was for the purchase of Rig 1, which they claim ***Archer*** owns.  *Id.*

60.     Additionally, the August 14 Production included three UCC-1 financing statements for "Rig 2, 3, and 4", which the DEBT Council claim were "financed by DLI for Archer Drilling LLC (which is an affiliate of Receivership Entities)[.]" *Id.*

61.     Then in reference to this August 14 Production, the DEBT Council Defendants again claimed in a letter on August 17, 2023 ("August 17 Letter") that "[a]s we showed you on Monday, August 14, 2023, ***DLI owns*** four (4) oil drilling rigs in Nebraska, Nevada, and Oklahoma." (emphasis added).  *See* **Ex. 4**.

62.     As detailed above, these claims are at odds with DLI's own assertions in the Control Lawsuit that ***Archer—not DLI itself***—owns the rigs. *See supra* ¶¶ 8–17.

DATED this 21st day of September 2023.

MCNEILL | VON MAACK

/s/ Jason A. McNeill
Jason A. McNeill
Eric K. Schnibbe

HOLLAND & KNIGHT

Jessica B. Magee
Scott F. Mascianica
Andrew W. Balthazor

*Attorneys for Josias N. Dewey, Court-Appointed Temporary Receiver*

20

**CERTIFICATE OF SERVICE**

I hereby certify that I am employed by the law firm of MCNEILL VON MAACK, and that

pursuant to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the foregoing

**TEMPORARY RECEIVER'S INTERIM STATUS REPORT** was delivered to counsel of

record this 21st day of September 2023, by filing of the same through the Court's CM/ECF

System.

[  ]     Hand Delivery

[  ]     Depositing the same in the U.S. Mail, postage prepaid

[  ]     Electronic Mail

[X]     Submission to the U.S. District Court Electronic Case Filing System

/s/ Camille Coley