# Exhibit 1

Filed in Kimball District Court
*** EFILED ***
Case Number: D71CI230000001
Transaction ID: 0019330824
Filing Date: 01/01/2023 10:23:59 AM MST

### IN THE DISTRICT COURT OF KIMBALL COUNTY, NEBRASKA

| | | |
|---|---|---|
| PURDY OIL, LLC,<br>A Nebraska Limited Liability Company, | ) ) ) | Case No. Ci 22-_____ |
| ARCHER DRILLING, LLC,<br>A Wyoming Limited Liability Company, | ) ) ) | |
| JAMES FRANKLIN, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| DIGITAL LICENSING, INC.,<br>A Wyoming Corporation, | ) ) ) | |
| SCHAD BRANNON, | ) ) | |
| GENE PURDY, | ) ) | |
| GARRET PURDY, | ) ) | |
| ALL PERSONS having or claiming any interest<br>in and to the mineral interests in, on, or<br>under the premises at T13N R58W §24 N2;<br>SW4 in the County of Kimball, State of<br>Nebraska, containing 480 acres +/-, real<br>names unknown, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COME NOW** the Plaintiffs, and each of them, and for their action against the

Defendants, and each of them, they do state and allege as follows:

### PARTIES & JOINDER

1. The Plaintiff, Purdy Oil, LLC, is a Nebraska limited liability company, in good standing, with a

   principal address of 4756 CR 46, Kimball County, Nebraska, as reflected in the official

   records of the Nebraska Secretary of State.

2. The Plaintiff, Archer Drilling, LLC, is a Wyoming limited liability company, in good standing, organized by the Plaintiff, James Franklin, with a principal address of 1100 Harrison Dr., PO Box 94, Pine Bluffs, Wyoming, as reflected in the official records of the Wyoming Secretary of State.

3. The Plaintiff, James Franklin, resides at 3510 Santoro Way, San Diego, California.

4. The Defendant, Digital Licensing, Inc., is a Wyoming corporation with a principal address of 30 N. Gould St., Ste N, Sheridan, Wyoming, as reflected in the official records of the Wyoming Secretary of State.

5. The Defendant, Schad Brannon, is a director of the Defendant, Digital Licensing, Inc., and resides at 5819 Wish Ave., Encino, California.

6. The Defendant, Gene Purdy, resides at 1100 Harrison Dr., Pine Bluffs, Wyoming.

7. The Defendant, Garret Purdy, resides at 1648 Rd 17W, Bushnell, Nebraska, upon information and belief.

8. The Plaintiffs in this action are joined pursuant to Neb. Rev. Stat. § 25-310 inasmuch as the Plaintiffs are persons who assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and questions of law or fact common to all of these persons will arise in the action although, in accordance with Neb. Rev. Stat. § 25-705, not every party may be interested in obtaining or defending against all the relief demanded.

### JURISDICTION & VENUE

9. The Plaintiffs, and each of them, respectfully submit to the personal jurisdiction of this Court.

10. The Court may exercise personal jurisdiction over the Defendants, and each of them, pursuant to Neb. Rev. Stat. § 25-536 inasmuch as each such Defendant is:

    a. Transacting business in Nebraska;

    b. Contracting to supply services or things in Nebraska;

    c. Causing tortious injury by act or omission in Nebraska;

    d. Regularly doing or soliciting business, engaging in a persistent course of conduct, and/or deriving substantial revenue from goods used or consumed or services rendered in Nebraska and causing tortious injury in Nebraska by an act or omission outside of Nebraska, and/or;

    e. Having an interest in, using, or possessing real property in Nebraska.

11. This Court has subject matter jurisdiction pursuant to Neb. Rev. Stat. § 24-302 and Neb. Const. Art. 5, § 9.

12. Venue is proper in Kimball County, Nebraska:

    a. Pursuant to Neb. Rev. Stat. § 25-403.01 because it is the county where the causes of action arose, and/or the county where the transaction or some part of the transaction occurred out of which the causes of action arose, and;

    b. Pursuant to Neb. Rev. Stat. § 25-401 because the mineral interests at issue herein are situated in Kimball County, Nebraska;

    c. Pursuant to Neb. Rev. Stat § 59-821 because it is the county in which the Defendant or Defendants reside or are found.

## FACTS COMMON TO ALL CLAIMS HEREIN

### Purdy Oil, LLC

13. At all times relevant hereto, all of the parties hereto have been engaged in the business of exploring for, drilling for, and producing oil, gas, and other minerals in the State of Nebraska.

14. A true and correct copy of the operating agreement of the Plaintiff, Purdy Oil, LLC, duly executed on or about January 7, 2021, is attached hereto as **Exhibit 1** and thereby incorporated herein by this reference. The same is hereinafter denominated the "Operating Agreement of Purdy Oil, LLC."

15. Pursuant to the Operating Agreement of Purdy Oil, LLC, the members of the Plaintiff, Purdy Oil, LLC, together with their respective ownership interests in the Plaintiff, Purdy Oil, LLC, are as follows:

    a. The Plaintiff, James Franklin--96.6544% ownership;

    b. The Defendant, Gene Purdy--3.3456%.

**Purdy Farms Lease**

16. The Plaintiff, Purdy Oil, LLC, has and holds and owns the entirety of a certain "Oil, Gas and Mineral Lease" upon T13N R58W Section 24 N2; SW4, in the County of Kimball, State of Nebraska, containing 480 gross acres, more or less, hereinafter denominated the "Purdy Farms Lease," and the same was duly filed of record with the State of Nebraska, County of Kimball at Book OG Page 555-559 on or about November 29, 2021.  A true and correct copy of the Purdy Farms Lease is attached hereto as **Exhibit 2** and thereby incorporated herein by this reference.

**Permit**

17. On or about December 2, 2021, the Nebraska Oil & Gas Conservation Commission duly approved and issued permit number 26-105-22769-00-00, hereinafter denominated the "Permit," to the Plaintiff, Purdy Oil, LLC, as Operator, to drill upon the Purdy Farms Lease the well bearing API # 26-105-22769-00-00, known as and hereinafter denominated the "Purdy 1 Well."  A true and correct copy of the Permit is attached hereto as **Exhibit 3** and thereby incorporated herein by this reference.

18. Pursuant to the Permit, the Plaintiff, Purdy Oil, LLC is the duly authorized Operator of the Purdy 1 Well.

**Exploration Agreement**

19. On or about March 17, 2022, the Plaintiff, Purdy Oil, LLC, and the Defendant, Digital Licensing, Inc., entered into the Purdy Oil, LLC Exploration Agreement and the same is hereinafter denominated the "Exploration Agreement." A true and correct copy of the Exploration Agreement is attached hereto as **Exhibit 4** and thereby incorporated herein by this reference.

20. Pursuant to the Exploration Agreement, and otherwise, the Plaintiff, Purdy Oil, LLC and the Defendant, Digital Licensing, Inc., agreed to an undertaking to explore and develop certain aspects of the Purdy Farms Lease of which they have a common interest, a common purpose

in performance, and an equal voice in the manner of its performance and control of the agencies used therein, though one may have entrusted performance to the other as by designating an Operator.

21. The Plaintiff, Purdy Oil, LLC, duly performed each of its obligations arising out of the Exploration Agreement.

22. Pursuant to the Exploration Agreement, the Plaintiff, Purdy Oil, LLC is the agreed upon operator as to the Purdy Farms Lease and as to the Purdy 1 Well.

23. On March 28, 2022, pursuant to the Exploration Agreement and as a measure to save the costs associated with the hiring the portion of the Purdy 1 Well drilling correlated to the shallow Authority for Expenditure, hereinafter denominated the "Shallow AFE", the Plaintiff, Purdy Oil, LLC purchased Rig No. 1, formerly known as Nebco Rig 14, from Nebco Services for the price of $125,000.  True and correct copies of the cancelled check and bill of sale related to the aforesaid transaction are attached hereto as **Exhibit 5** and thereby incorporated herein by this reference.


**Archer Drilling, LLC**

24. On April 3, 2022, the Plaintiff, James Franklin, duly filed Articles of Organization, with the Wyoming Secretary of State, and thereby received the Certificate of Organization pertaining to Archer Drilling, LLC.

25. On or about April 4, 2022, the members of Archer Drilling, LLC approved and adopted an operating agreement, hereinafter denominated the "Archer Drilling, LLC Operating Agreement," to govern the operations of the Defendant, Archer Drilling, LLC.  A true and correct copy of the Operating Agreement is attached hereto as **Exhibit 6** and thereby incorporated herein by this reference.

26. As reflected in the Archer Drilling, LLC Operating Agreement, the members of the Plaintiff, Archer Drilling, LLC, together with their respective ownership interests in the Plaintiff, Archer Drilling, LLC, are as follows:

    a.  The Plaintiff, Purdy Oil, LLC—80%;

    b.  The Plaintiff, James Franklin—10.1%;

    c.   The Defendant, Gene Purdy—3.3%;

    d.   The Defendant, Garret Purdy—3.1%;

    e.   The Defendant, Schad Brannon—3.5%.

27. At the time the Archer Drilling, LLC Operating Agreement was approved and adopted every member thereof knew and agreed that, going forward in time, the Plaintiff, Archer Drilling, LLC would be an entity used by the Plaintiff, Purdy Oil, LLC, to own and to purchase drilling rigs and associated equipment, in the furtherance of and pursuant to the goals outlined in the Exploration Agreement, to lawfully, ethically, and responsibly help to insulate the parties, and each of them, from liability that may arise from events causing damages.

28. The Plaintiffs, and each of them, have duly performed each of their obligations arising out of the Archer Drilling, LLC Operating Agreement including but not limited to the obligation to contribute $250,000 to the Defendant, Archer Drilling, LLC.

29. On or about May 10, 2022, the Plaintiff, James Franklin, became ill with Covid19 and was quarantined for 10 days at a motel in Kimball, Nebraska.

30. On May 29, 2022, the Plaintiff, James Franklin, suffered a detachment of the retina of his left eye while working at the rig and was rushed to the University Hospital in Denver Colorado for an emergency surgery on his left eye.  During his course of recovery from the aforesaid eye surgery, the Plaintiff, James Franklin, was medically required to lie on his side with his eyes closed for 14 days thereafter.

31. On or about June 17, 2022, the Defendant, Schad Brannon, and Roydon Nelson, who is another officer of the Defendant, Digital Licensing, Inc., informed the Plaintiff, James Franklin, via telephone, that the Defendant, Digital Licensing, Inc., was bringing in a cousin of Roydon Nelson named Jason Saetrum to help the Plaintiff, Purdy Oil, LLC and the Plaintiff, Archer Drilling, LLC, with "accounting."

**Equipment Purchasing**

32. On or about June 17, 2022, pursuant to the Exploration Agreement, the Plaintiff, Purdy Oil, LLC, transferred $1,000 of its funds to open the checking account for the Plaintiff, Archer Drilling, LLC.

33. On or about June 17, 2022, pursuant to the Exploration Agreement, the Defendant, Digital Licensing, Inc., deposited $900,000 into the bank account of the Plaintiff, Purdy Oil, LLC knowing and agreeing that:

    a.  The Plaintiff, Purdy Oil, LLC was obligated to make a $250,000 capital contribution to the Plaintiff, Archer Drilling, LLC, pursuant to the Operating Agreement of Archer Drilling, LLC;

    b.  The Plaintiff, Purdy Oil, LLC would make the aforesaid $250,000 capital contribution by using the aforesaid $900,000 deposit;

    c.  The Plaintiff, Purdy Oil, LLC, together with the Plaintiff, Archer Drilling, LLC, would use the aforesaid $900,000 deposit to purchase Drilling Rig Nos. 2 & 4 as set forth herein.

**Equipment List**

34. On or about June 17, 2022, pursuant to the Exploration Agreement and as a measure to save the drilling costs associated with hiring the portion of the Purdy 1 Well drilling work that is correlated to the deep Authority for Expenditure, hereinafter denominated the "Deep AFE", the Plaintiff, Purdy Oil, LLC caused Archer Drilling, LLC to purchase Drilling Rig Nos. 2 & 4, and related equipment, in Nevada, for the price of $960,000.  Those rigs and equipment are more particularly described and identified in equipment lists, from Excel Equipment Company, Inc., which are hereinafter singularly referred to as the "Equipment List."  A true and correct copy of the Deep AFE is attached hereto as **Exhibit 7** and thereby incorporated herein by this reference.  A true and correct copy of the Equipment List is attached hereto as **Exhibit 8** and thereby incorporated herein by this reference.

**Conflict**

35. Sometime in August of 2022, the Defendant, Schad Brannon, acting on behalf of the Defendant, Digital Licensing, Inc., began communicating and circulating messages to persons identified herein on the subject of "Archer Drilling" mentioning "housekeeping" and "the books" and "clean-up" and "accounting" and "Jason Saetrum."

7

36. On or about August 19, 2022, and thereafter, some but not all members of Archer Drilling, LLC, executed a proposed, new operating agreement intended to alter and change the membership and ownership of Archer Drilling, LLC, such that the Defendant, Digital Licensing, Inc., would become a member and have the controlling ownership interest while Purdy Oil, LLC would cease to be a member and would cease to have the controlling ownership interest.

37. On or about September 20, 2022, an officer of the Defendant, Digital Licensing, Inc., Roydon Nelson, signed and sent an Invoice for Services Rendered, in the amount of $2,262,000, to the Plaintiff, Purdy Oil, LLC, for 87 days of rent on the equipment owned by Archer Drilling, LLC.  The same is hereinafter denominated the "Multimillion Dollar Invoice."  A true and correct copy of the Multimillion Dollar Invoice is attached hereto as **Exhibit 9** and thereby incorporated herein by this reference.

38. On or about September 26th, the Plaintiff, James Franklin, underwent a second surgery of his left eye and was, again, medically required to lie on his side with his eyes closed for 14 days thereafter.

39. On or about October 7, 2022, the Defendant, Gene Purdy, notified the Plaintiff, James Franklin, via email, that the Defendant, Gene Purdy, had overdrawn the bank account of Purdy Oil, LLC, alleging that funds were therefore being debited from the account of Purdy Farms, and demanding that the Plaintiff, James Franklin, was obligated to pay $85,563.61 or else the Defendant, Gene Purdy, would "shut the company down."  That email is hereinafter denominated the "$85,000 Email."  A true and correct copy of the $85,000 Email is attached hereto as **Exhibit 10** and thereby incorporated herein by this reference.

40. On or about October 7, 2022, the Defendant, Gene Purdy, on behalf of "Gene Purdy, aka Purdy Farms," sent a letter to himself, as the registered agent of Purdy Oil, LLC, purporting to terminate the Purdy Farms Lease.  That letter is hereinafter denominate the "Lease Termination."  A true and correct copy of the Lease Termination is attached hereto as **Exhibit 11** and thereby incorporated herein by this reference.

41. On or about October 19, 2022, the Defendant, Gene Purdy, purporting to act on behalf of Purdy Oil, LLC, caused the Lease Termination to be filed for record with the State of Nebraska, Kimball County, at Book OG 233 Page 29-30.

42. The Defendant, Gene Purdy, intentionally failed to timely notify the Plaintiff, James Franklin, of the Lease Termination

43. On or about October 19, 2022, the Defendant, Gene Purdy, executed, on behalf of "Gene G. Purdy and/or Rhonda Purdy aka Purdy Farms, Lessor" an Oil, Gas and Mineral Lease, with the Defendant, Digital Licensing, Inc., as Lessee, and the same is hereinafter denominated the "Top Lease."  The leased premises of the Top Lease are functionally identical to the leased premises of the Purdy Farms Lease.  A true and correct copy of the Top Lease is attached hereto as **Exhibit 12** and thereby incorporated herein by this reference.

44. On or about October 19, 2022, the Defendant, Gene Purdy caused the Top Lease to be filed for record with the State of Nebraska, Kimball County, at Book OG 233 Page 31-43.

45. The Defendant, Gene Purdy, intentionally failed to timely notify the Plaintiff, James Franklin, of the Top Lease.

46. The Purdy 1 Well has now been drilled, cased to total depth, and is awaiting completion operations.

## FIRST CLAIM FOR RELIEF

### DECLARATORY RELIEF—OWNERSHIP, CONTROL, AND ASSETS OF ARCHER DRILLING, LLC

47. Each and every paragraph of the instant pleading is hereby incorporated in this claim as if set forth at length.

48. The parties hereto, and each of them, have been and are interested and/or involved in an ongoing effort to develop and produce oil & gas resources on the Purdy Farm lease.

49. The Plaintiff, Archer Drilling, LLC, is the legal owner of all of the personal property identified on the Equipment List.

50. The Plaintiff, Archer Drilling, LLC, is the legal owner of certain real property more particularly described as follows: 6179 Road 206 Pine Bluffs, WY, 82082 which is more particularly

described as follows: NW1/4 NE1/4, W1/2 NE1/4 NE1/4 §20 T13N R60W County of Laramie, State of Wyoming.

51. A controversy exists, as between the Plaintiffs, and each of them, and the Defendants, and each of them, regarding the membership and ownership and assets of Archer Drilling, LLC, to wit:

    a. The Plaintiffs, and each of them, agree that the members of Archer Drilling, LLC, together with their respective ownership interests in Archer Drilling, LLC, are correctly stated herein;

    b. Upon information and belief, the Defendants herein, and each of them, deny that the members of Archer Drilling, LLC, together with their respective ownership interests in Archer Drilling, LLC, are correctly stated herein;

52. The aforesaid controversy between the Plaintiffs, and each of them, and the Defendants, and each of them, belies an adversity of interests.

53. The Plaintiffs, and each of them, have a legally protectible interest or right in and to, Archer Drilling, LLC because pursuant to the Archer Drilling, LLC Operating Agreement:

    a. The Plaintiffs, and each of them, are members of Archer Drilling, LLC;

    b. The Plaintiffs, and each of them, have an ownership interest in Archer Drilling, LLC;

    c. The Plaintiffs, and each of them, have duly performed each and all obligations arising out of the Archer Drilling, LLC Operating Agreement including but not limited to the obligation of the Plaintiff, Purdy Oil, LLC, to contribute $250,000 to the Plaintiff, Archer Drilling, LLC.

54. The aforesaid issues regarding the membership and ownership of Archer Drilling, LLC, are capable of present judicial determination because the Court—by declaring that the ownership of Archer Drilling, LLC is correctly stated herein and that the Archer Drilling, LLC Operating Agreement governs the control of Archer Drilling, LLC—can produce an immediate, practical, beneficial effect that resolves those aforesaid issues.

55. The Plaintiffs, and each of them, have no equally serviceable remedy because the business of Archer Drilling, LLC, involving the Plaintiffs, and each of them, is immediate and ongoing and it will prove to be impractical and inefficient, for both the Court and the parties, to sue upon

each, discrete, current and future claim as the same ripen and without regard to whether the same sound in contract or tort or equity.

**WHEREFORE** the Plaintiffs, and each of them, pray for a Judgment against the Defendants, and each of them, declaring: that the membership and ownership of the Plaintiff, Archer Drilling, LLC, is correctly stated herein; that the Archer Drilling, LLC Operating Agreement governs the control of Archer Drilling, LLC; that the Plaintiff, Archer Drilling, LLC, owns the personal and real property as specifically alleged herein; and awarding to the Plaintiffs, and each of them, their attorney fees, the costs of this action as allowed by law, and for such other, further, and/or different relief as may be just and equitable in this instance.

## SECOND CLAIM FOR RELIEF

### QUIET TITLE TO PURDY FARMS LEASE

56. Each and every paragraph of the instant pleading is hereby incorporated in this claim as if set forth at length.

57. The Lease Termination constitutes a cloud upon the title of the Plaintiff, Purdy Oil, LLC to the mineral interests defined in the Purdy Farms Lease thereby impairing the beneficial use of such property by the Plaintiff, Purdy Oil, LLC and lessening the value of the Purdy Farms Lease and will, unless title to the Purdy Farms Lease is quieted in the Plaintiff, Purdy Oil, LLC, cause irreparable harm and damage for which the Plaintiff, Purdy Oil, LLC has no adequate remedy at law.

**WHEREFORE** the Plaintiff, Purdy Oil, LLC, prays for judgment: wherein the title to the mineral interests defined in the Purdy Farms Lease be quieted and confirmed in the Plaintiff, Purdy Oil, LLC, and against all persons having or claiming any interest therein, and that all such persons be enjoined forever from asserting any claim of interest therein, superior to those of the Plaintiff, Purdy Oil, LLC, unless and until there is first a judicial determination that the Purdy Farms Lease stands terminated, and awarding to the Plaintiff, Purdy Oil LLC, its attorney fees, the costs of this action as allowed by law, and for such other, further, and/or different relief as may be just and equitable in this instance.

**THIRD CLAIM FOR RELIEF**

**DECLARATORY RELIEF—OPERATIONAL CONTROL ON THE PURDY FARMS LEASE**

58. Each and every paragraph of the instant pleading is hereby incorporated in this claim as if set forth at length.

59. The parties hereto, and each of them, have been and are interested and/or involved in an ongoing effort to develop and produce oil & gas resources on the Purdy Farm lease.

60. A controversy exists, as between the Plaintiffs, and each of them, and the Defendants, and each of them, regarding operational control on the Purdy Farms Lease, to wit:

   a. The Plaintiffs, and each of them, agree that the Plaintiff, Purdy Oil, LLC, is entitled to the operational control on the Purdy Farms Lease pursuant to the Exploration Agreement.

   b. Upon information and belief, the Defendants herein, and each of them, deny that the Plaintiff, Purdy Oil, LLC is entitled to the operational control on the Purdy Farms lease;

61. The aforesaid controversy between the Plaintiffs, and each of them, and the Defendants, and each of them, belies an adversity of interests.

62. The Plaintiff, Purdy Oil, LLC, has a legally protectible interest or right in and to operational control on the Purdy Farms Lease because:

   a. The Plaintiff, Purdy Oil, LLC owns the Purdy Farms Lease;

   b. The Plaintiff, Purdy Oil, LLC is the duly permitted Operator of the Purdy 1 Well;

   c. The Plaintiff, Purdy Oil, LLC has not assigned but rather has retained the right to exercise operational control, as operator, pursuant to the Exploration Agreement;

   d. The Plaintiff, Purdy Oil, LLC has duly performed each and all obligations arising out of the Exploration Agreement.

63. The aforesaid issue regarding the right to exercise operational control, as operator, is capable of present judicial determination because the Court—by declaring that Purdy Oil, LLC is and shall be entitled to exercise operational control, as operator on the Purdy Farms Lease—can produce an immediate, practical, beneficial effect that resolves those aforesaid issues.

64. The Plaintiff, Purdy Oil, LLC has no equally serviceable remedy because the business of developing the Purdy Farms Lease is immediate and ongoing and it will prove to be

12

impractical and inefficient, for both the Court and the parties, to sue upon each, discrete, current and future claim as the same ripen and without regard to whether the same sound in contract or tort or equity.

**WHEREFORE** the Plaintiff, Purdy Oil, LLC prays for a Judgment against the Defendants, and each of them, declaring: that Purdy Oil, LLC is and shall be entitled to exercise operational control, as operator of the Purdy Farms Lease to include the Purdy 1 Well, and; awarding to the Plaintiff, Purdy Oil, LLC, its attorney fees, the costs of this action as allowed by law, and for such other, further, and/or different relief as may be just and equitable in this instance.

## FOURTH CLAIM FOR RELIEF

### CONSPIRACY TO RESTRAIN TRADE (NEB. REV. STAT. § 59-801 ET SEQ.)

65. Each and every paragraph of the instant pleading is hereby incorporated in this claim as if set forth at length.

66. In violation of Neb. Rev. Stat. § 59-801 to 59-831, the Defendants, and each of them, formed an agreement between themselves, to attempt to drive the Plaintiffs, and each of them, out of the business of exploring for, drilling for, and producing oil, gas, and other minerals in the State of Nebraska, by various concerted or combined actions--to the advantage of the Defendants, and each of them, and to the disadvantage of the Plaintiffs, and each of them—including but not limited to the following:

   a. The Defendant, Digital Licensing, Inc., has wrongfully attempted to convert to the sole possession and use of the Defendants, and each of them, the drilling rigs and personal property identified in the Equipment List, by wrongfully attempting to eliminate the membership and ownership interests of Purdy Oil, LLC in and to Archer Drilling, LLC;

   b. The Defendant, Garett Purdy, wrongfully, repeatedly brandished a handgun on the drilling site of the Purdy 1 Well to intimidate "unwelcome guests" who appeared on that drilling site and the Defendant, Gene Purdy, intentionally and specifically bragged about that intimidation technique to the Plaintiff, James Franklin;

13

c.  The Defendant, Digital Licensing Inc., by and through one of its officers, Roydon Nelson, threatened the Plaintiff, James Franklin, with arrest by the sheriff, and "worse," if he again appears on the drilling site of the Purdy 1 Well;

d.  The Defendant, Gene Purdy, and the Defendant, Digital Licensing, Inc., intentionally acted to overdraw the bank account of the Plaintiff, Purdy Oil, LLC and then demanded immediate repayment from the Plaintiff, James Franklin, via the $85,0000 Email.

e.  One of the officers of the Defendant, Digital Licensing, Inc., Roydon Nelson, purporting to act on behalf of the Plaintiff, Archer Drilling, LLC, wrongfully invoiced the Plaintiff, Purdy Oil, LLC, via the Multimillion Dollar Email, and demanded an immediate rent payment from the Plaintiff, Purdy Oil, LLC, for the use of Equipment List property in conjunction with operations on the Purdy 1 Well;

f.  The Defendant, Gene Purdy, has wrongfully attempted to terminate the Purdy Farms Lease which is owned by the Plaintiff, Purdy Oil, LLC;

g.  The Defendant, Gene Purdy, and the Defendant, Digital Licensing, Inc., have wrongfully attempted to transfer the mineral interests represented by the Purdy Farms Lease from the Plaintiff, Purdy Oil, LLC, to the Defendant, Digital Licensing, Inc., by means of the Lease Termination and the Top Lease;

h.  The Defendant, Gene Purdy, despite due demand, has wrongfully failed and refused to provide to either the Plaintiff, Purdy Oil, LLC, or the Plaintiff, James Franklin, relevant information regarding the status of the Purdy 1 Well in an attempt to curtail infusions of outside capital into the Plaintiff, Purdy Oil, LLC., which might be used by the Plaintiff, Purdy Oil, LLC or the Plaintiff, James Franklin, to complete and operate the Purdy 1 Well and to explore for, drill for, and produce oil, gas, and other minerals in the State of Nebraska.

67. Such illegal acts by the Defendants, and each of them, directly and proximately caused the Plaintiffs, and each of them, to be injured in their business or property in the following particulars, to wit:

a.  Delay in completing the Purdy 1 Well resulting in the loss of past production;

14

    b.   Extra expense in drilling the Purdy 1 Well;

    c.   Extra expense for completing the Purdy 1 Well;

    d.   Extra expense for operating the Purdy 1 Well;

    e.   Damage to the oil-bearing formations of the Purdy 1 Well resulting in the loss of present and future production;

    f.   Deprivation of the use of the Equipment List property which is reasonably necessary to explore for, drill for, and produce oil, gas, and other minerals in the State of Nebraska.

68. As a direct and proximate result of such injuries, the Plaintiffs, and each of them, have suffered damages recoverable from Defendants, and each of them, in the amount of $1,000,000 or such other amount as may be proven at trial.

**WHEREFORE** the Plaintiffs, and each of them, pray for judgment, against the Defendants, and each of them, for their damages in the amount of $1,000,000 or such other amount as may be proven at trial, awarding to the Plaintiffs, and each of them, their attorney fees, the costs of this action as allowed by law, and for such other, further, and/or different relief as may be just and equitable in this instance.

## FIFTH CLAIM FOR RELIEF

### RESTRAINT OF TRADE (NEB. REV. STAT. § 59-801 ET SEQ.)

69. Each and every paragraph of the instant pleading is hereby incorporated in this claim as if set forth at length.

70. The Defendants, and each of them, have individually acted to drive the Plaintiffs, and each of them, out of the business of exploring for, drilling for, and producing oil, gas, and other minerals, in the State of Nebraska, by a violation of sections 59-801 to 59-831.

71. Such illegal acts by the Defendants, and each of them, directly and proximately caused the Plaintiffs, and each of them, to be injured in their business or property in the following particulars, to wit:

    a.   Delay in completing the Purdy 1 Well resulting in the loss of past production;

    b.   Extra expense in drilling the Purdy 1 Well;

15

  c. Extra expense for completing the Purdy 1 Well;

  d. Extra expense for operating the Purdy 1 Well;

  e. Damage to the oil-bearing formations of the Purdy 1 Well resulting the loss of present and future production;

  f. Deprivation of the use of Equipment List property which is reasonably necessary to explore for, drill for, and produce oil, gas, and other minerals in the State of Nebraska.

72. As a direct and proximate result of such injuries, the Plaintiffs, and each of them, have suffered damages recoverable from Defendants, and each of them, in the amount of $1,000,000 or such other amount as may be proven at trial.

  **WHEREFORE** the Plaintiffs, and each of them, pray for judgment, against the Defendants, and each of them, for their damages in the amount of $1,000,000 or such other amount as may be proven at trial, awarding to the Plaintiffs, and each of them, their attorney fees, the costs of this action as allowed by law, and for such other, further, and/or different relief as may be just and equitable in this instance.

## SIXTH CLAIM FOR RELIEF

### BREACH OF CONTRACT—EXPLORATION AGREEMENT

### (FIDUCIARY DUTIES; IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

73. Each and every paragraph of the instant pleading is hereby incorporated in this claim as if set forth at length.

74. The Exploration Agreement entered into by the Plaintiff, Purdy Oil, LLC and the Defendant, Digital Licensing, Inc. is valid and enforceable under Nebraska law.

75. Inherent in every Nebraska contract is an implied covenant of good faith and fair dealing.

76. Pursuant to the Exploration Agreement, the Defendant, Digital Licensing, Inc., owed the Plaintiff, Purdy Oil, LLC certain fiduciary duties.

77. The Defendant, Digital Licensing, Inc. by its actions outlined herein, specifically including but not limited to those actions described in the Fourth and Fifth Claims For Relief herein,

breached its fiduciary duty to the Plaintiff, Purdy Oil, LLC and further breached the implied covenant of good faith and fair dealing with the Plaintiff, Purdy Oil, LLC.

78. As a direct and proximate result of the aforesaid breaches, and each of them, the Defendant, Digital Licensing, Inc., caused damages to the Plaintiff, Purdy Oil, LLC in excess of $1,000,000 or such other amount as may be proven at trial.

**WHEREFORE** the Plaintiff, Purdy Oil, LLC, prays for judgment, against the Defendants, Digital Licensing, Inc., for its damages in the amount of $1,000,000 or such other amount as may be proven at trial, awarding to the Plaintiff, Purdy Oil, LLC, its attorney fees, the costs of this action as allowed by law, and for such other, further, and/or different relief as may be just and equitable in this instance.

## SEVENTH CLAIM FOR RELIEF

### BREACH OF CONTRACT—OPERATING AGREEMENT OF PURDY OIL, LLC

79. Each and every paragraph of the instant pleading is hereby incorporated in this claim as if set forth at length.

80. The Operating Agreement of Purdy Oil, LLC, entered into by the Plaintiff, James Franklin, and the Defendant, Gene Purdy, is valid and enforceable under Nebraska law.

81. Inherent in every Nebraska contract is an implied covenant of good faith and fair dealing.

82. Pursuant to Operating Agreement of Purdy Oil, LLC, the Defendant, Gene Purdy, owed the Plaintiff, James Franklin, and the Plaintiff, Purdy Oil, LLC, certain fiduciary duties.

83. The Defendant, Gene Purdy by his actions outlined herein, specifically including but not limited to those actions described in the Fourth and Fifth Claims For Relief herein, breached his fiduciary duty to the Plaintiff, James Franklin, and to the Plaintiff, Purdy Oil, LLC, and further breached the implied covenant of good faith and fair dealing with the Plaintiff, James Franklin and with the Plaintiff, Purdy Oil, LLC.

84. As a direct and proximate result of the aforesaid breaches, and each of them, the Defendant, Gene Purdy., caused damages to the Plaintiff, James Franklin and to the Plaintiff, Purdy Oil, LLC in excess of $1,000,000 or such other amount as may be proven at trial.

**WHEREFORE** Plaintiff, James Franklin, and the Plaintiff, Purdy Oil, LLC, pray for judgment, against the Defendant, Gene Purdy, for their damages in the amount of $1,000,000 or such other amount as may be proven at trial, awarding to Plaintiff, James Franklin, and the Plaintiff, Purdy Oil, LLC, their attorney fees, the costs of this action as allowed by law, and for such other, further, and/or different relief as may be just and equitable in this instance.

## EIGHTH CLAIM FOR RELIEF

### NEGLIGENCE

85. Each and every paragraph of the instant pleading is hereby incorporated in this claim as if set forth at length.

86. The Defendants, and each of them, chose to conduct certain operations on the Purdy 1 Well, against the advice and without the permission of the Plaintiffs, and each of them, and thereby assumed the duty, owed to the Plaintiffs, and each of them, to operate according to the standards of a reasonable and prudent operator in the oil & gas industry.

87. The Defendants, and each of them, breached that duty in the following particulars:

    a. Failing to employ available de-silter/de-sander equipment, halting the rotation of the drill string, and shutting down the mud pumps, in order to perform an unnecessary deviation survey, in a sticky red bed commonly referred to as the "bubble gum" formation, knowing that for the preceding 12 hours, the well bore had begun collapsing, as evidenced by numerous, large rocks coming over the shaker; as a proximate result, the drill string became stuck in the well and ultimately twisted off.

    b. Sidetracking the Purdy 1 Well instead of simply skidding over and drilling a new well; as a proximate result, the drilling costs of the Purdy 1 Well have been inflated, the production costs of the Purdy 1 Well will be inflated, the Purdy 1 Well is less valuable than the new well would have been, and if a new well had been drilled, the Purdy 1 Well would have produced gas and oil in the formations above the twisted off drill stem.

88. As a direct and proximate result of the aforesaid negligence, the Plaintiffs, and each of them, have been damaged in the amount of $1,000,000 or such other amount as may be proven at trial.

WHEREFORE the Plaintiffs, and each of them, pray for judgment, against the Defendants, and each of them, for their damages in the amount of $1,000,000 or such other amount as may be proven at trial, awarding to the Plaintiffs, and each of them, their attorney fees, the costs of this action as allowed by law, and for such other, further, and/or different relief as may be just and equitable in this instance.

WHEREFORE the Plaintiffs, and each of them, respectfully reiterate each prayer for relief upon each of the above and foregoing claims for relief.

DATED: _____, 2022.

PURDY OIL, LLC, a Nebraska Limited Liability Company; ARCHER DRILLING, LLC, a Wyoming Limited Liability Company; JAMES FRANKLIN, Plaintiffs.

By:_____
        Monte L. Neilan, NSBA #21186
MONTE L. NEILAN, Attorney at Law
A Limited Liability Company
1721 Broadway, Suite 225
P.O. Box 1527
Scottsbluff, NE 69363
Telephone: (308) 633-3600
Fax: (308) 633-3650
e-mail: monte@neilan.law

19

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## Purdy Oil, LLC

This Multi-Member LLC Operating Agreement ("Agreement") represents Purdy Oil, LLC that was formed in the State of Nebraska on January 7th, 2021 ("Company").

The following represents the initial **2 Member(s)** of the Company and their respective ownership interest:

**James Franklin**, of 3510 Santoro Way, San Diego, California, 92130, and has 96.65% ownership in the Company and,

**Gene Purdy**, of 1100 Harrison Drive Box 94, Pine Bluffs, Nebraska, 82082, and has 3.3456% ownership in the Company.

("Member(s)")

WHEREAS the Member(s) desire to create a limited liability company under the laws of the State of Nebraska and set forth the terms herein of the Company's operation and the relationship between the Member(s).

THEREFORE, in consideration of the mutual covenants set forth herein and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Member(s) and the Company agree as follows:

1. Name and Principal Place of Business.

The name of the Company is Purdy Oil, LLC with a principal place of business at 1100 Harrison Drive Box 94, Pine Bluffs, Nebraska, 92082. The mailing address shall be the same address as the principal place of business.


EXHIBIT 1
16 pages
Page 1

## 2. Registered Agent.

The name of the Registered Agent is Gene Purdy with a registered office located at 1100 Harrison Drive Box 94, Pine Bluffs, Nebraska, 82082 for the service of process as of January 8 2021 ("Registered Agent"). The Registered Agent may change at any time by the Company filing an amendment with the Secretary of State, or respective office, in the State of Nebraska.

## 3. Formation.

The Company was formed on January, 7th, 2020, when the Member(s) filed the Articles of Organization with the office of the Secretary of State pursuant to the statutes governing limited liability companies in the State of Purdy Oil, LLC (the "Statutes").

## 4. Purpose.

The purpose of the Company is to engage in and conduct any and all lawful businesses, activities or functions, and to carry on any other lawful activities in connection with or incidental to the foregoing, as the Member(s) in their discretion shall determine.

## 5. Term.

The term of the Company shall continue in perpetuity commencing on the filing of the Articles of Organization of the Company while continuing until terminated under the provisions set forth herein.

## 6. Member(s) Capital Contributions.

Capital contributions to the Company shall be made by 2 Members:

James Franklin shall be contributing $250,000 The Capital Contribution made by the Member shall be paid back to the Member before any profits are distributed by the Company.

Page 2

GSSR shall be contributing $2,500,000 The Capital Contribution made by the Member shall be paid back to the Member before any profits are distributed by the Company.

Hereinafter known as the "Contributor(s)".

The Contributor(s) shall have no right to withdraw or reduce their contributions to the capital of the Company until the Company has been terminated unless otherwise set forth herein. The Contributor(s) shall have no right to demand and receive any distribution from the Company in any form other than cash, and Member(s) shall not be entitled to interest on their capital contributions to the Company.

The liability of the Contributor(s) for the losses, debts, liabilities, and obligations of the Company shall be limited to the amount of the capital contribution plus any distributions paid to such Contributor(s) individually, such as the Contributor's share of any undistributed assets of the Company; and (only to the extent as might be required by applicable law) any amounts previously distributed to such Contributor(s) by the Company.

7. Distributions.

For the purposes of this Agreement, "net profits" and "net losses" mean the profits or losses of the Company resulting from the conduct of the Company's business, after all expenses, including depreciation allowance, incurred in connection with the conduct of its business for which such expenses have been accounted.

The term "Cash Receipts" shall mean all Cash Receipts of the Company from whatever source derived, including without limitation capital contributions made by the Member(s); the proceeds of any sale, exchange, condemnation or other disposition of all or any part of the assets of the Company; the proceeds of any loan to the Company; the proceeds of any mortgage or refinancing of any mortgage on all or any part of the assets of the Company; the proceeds of any insurance policy for fire or other casualty damage payable to the Company; and the proceeds from the liquidation of assets of the Company following termination.

The term "Capital Transactions" shall mean any of the following: the sale of all or any part of the assets of the Company; the refinancing of mortgages or other liabilities of the Company; the receipt of insurance proceeds; and any other receipts or proceeds are attributable to capital.

Page 3

A "Capital Account" for the Member shall be maintained by the Company. The Member's Capital Account shall reflect the Member's capital contributions and increases for any net income or gain of the Company. The Member's Capital Account shall also reflect decreases for distributions made to the Member and the Member's share of any losses and deductions of the Company.

During each quarterly period the net profits and net losses of the Company (other than from Capital Transactions), and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be credited or charged, as the case may be, to the capital accounts of each Member in proportion to the Members' Percentage Interests. The net profits of the Company from Capital Transactions shall be allocated in the following order of priority: (a) to offset any negative balance in the capital accounts of the Member(s) in proportion to the amounts of the negative balance in their respective capital accounts, until all negative balances in the capital accounts have been eliminated; then (b) to the Member(s) in proportion to the Members' Percentage Interests. The net losses of the Company from Capital Transactions shall be allocated in the following order of priority: (a) to the extent that the balance in the capital accounts of any Member(s) are in excess of their original contributions, to such Member(s) in proportion to the excess balances until all such excess balances have been reduced to zero; then (b) to the Member(s) in proportion to the Members' Percentage Interests.

The Cash Receipts of the Company shall be applied in the following order of priority: (a) to the payment of interest or amortization on any mortgages on the assets of the Company, amounts due on debts and liabilities of the Company other than those due to any Member(s), costs of the construction of the improvements to the assets of the Company and operating expenses of the Company; (b) to the payment of interest and establishment of cash reserves determined by the Member(s) to be necessary or appropriate, including without limitation, reserves for the operation of the Company's business, construction, repairs, replacements, taxes and contingencies; and (c) to the repayment of any loans made to the Company by any Member(s). Thereafter, the Cash Receipts of the Company shall be distributed among the Member(s) as hereafter provided.

Except as otherwise provided in this Agreement or otherwise required by law, distributions of Cash Receipts of the Company, other than from Capital Transactions, shall be allocated among the Member(s) in proportion to the Members' Percentage Interests.

Except as otherwise provided in this Agreement or otherwise required by law, distributions of Cash Receipts from Capital Transactions shall be allocated in the following order of priority: (a) to the Member(s) in proportion to their respective capital accounts until each Member has received cash distributions equal to any positive balance in their capital account; then (b) to the Member(s) in proportion to the Members' Percentage Interests.

Page 4

It is the intention of the Member(s) that the allocations under this Agreement shall be deemed to have "substantial economic effect" within the meaning of Section 704 of the Internal Revenue Code and Treas. Reg. Section 1.704-1. Should the provisions of this Agreement be inconsistent with or in conflict with Section 704 of the Code or the Regulations thereunder, then Section 704 of the Code and the Regulations shall be deemed to override the contrary provisions thereof. If Section 704 or the Regulations at any time require that limited liability company operating agreements contain provisions which are not expressly set forth herein, such provisions shall be incorporated into this Agreement by reference and shall be deemed a part of this Agreement to the same extent as though they had been expressly set forth herein.

8. Books, Records, and Tax Returns.

The Member(s), or their designees, shall maintain complete and accurate records and books of the Company's transactions in accordance with generally accepted accounting principles.

The Company shall furnish each Member, within seventy-five (75) days after the end of each fiscal year, an annual report of the Company including a balance sheet, a profit and loss statement, a capital account statement; and the amount of such Member's share of the Company's income, gain, losses, deductions, and other relevant items for federal income tax purposes.

The Member(s) intends that the Company shall be taxed as a Partnership in accordance with the provisions of the Internal Revenue Code. The Company shall prepare all Federal, State, and local income tax and information returns for the Company and shall cause such tax and information returns to be timely filed. Within seventy-five (75) days after the end of each fiscal year, the Company shall forward to each person who was a Member during the preceding fiscal year a true copy of the Company's information return filed with the Internal Revenue Service for the preceding fiscal year.

All elections required or permitted to be made by the Company under the Internal Revenue Code, and the designation of a tax matters partner pursuant to Section 6231(a)(7) of the Internal Revenue Code for all purposes permitted or required by the Code, shall be made by the Company by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests.

Upon request, the Company shall furnish to each Member a current list of the names and addresses of all of the Member(s) of the Company, and any other persons or entities having any financial interest in the Company.

Page 5

9. Bank Accounts.

All funds of the Company shall be deposited in the Company's name in a bank account or accounts as chosen by the Member(s). Withdrawals from any bank accounts shall be made only in the regular course of business of the Company and shall be made upon such signature or signatures as the Member(s) from time to time may designate.

10. Management of the Company.

The business and affairs of the Company shall be conducted and managed by the Members in accordance with this Agreement and the laws of the State of Nebraska.

Except as expressly provided elsewhere in this Agreement, all decisions respecting the management, operation, and control of the business and affairs of the Company and all determinations made in accordance with this Agreement shall be made by a vote of over fifty percent (50%) of the Members' ownership-interest.

Notwithstanding any other provision of this Agreement, the Member(s) shall not sell, exchange, lease, assign or otherwise transfer all or substantially all of the assets of the Company; sell, exchange, lease (other than space leases in the ordinary course of business), assign or transfer the Company's assets; mortgage, pledge or encumber the Company's assets other than is expressly authorized by this Agreement; prepay, refinance, modify, extend or consolidate any existing mortgages or encumbrances; borrow money on behalf of the Company; lend any Company funds or other assets to any person; establish any reserves for working capital repairs, replacements, improvements or any other purpose; confess a Judgment against the Company; settle, compromise or release, discharge or pay any claim, demand or debt, including claims for insurance; approve a merger or consolidation of the Company with or into any other limited liability company, corporation, partnership or other entity; or change the nature or character of the business of the Company without a vote of over fifty percent (50%) of the Members' ownership-interest.

The Member(s) shall receive such sums for compensation as Member(s) of the Company as may be determined from time to time by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests.

11. Meetings of Member(s).

Page 6

The annual meeting of the Member(s) shall be held on the 1st of January (day/month) at the principal office of the Company or at such other time and place as the Member(s) determine, for the purpose of transacting such business as may lawfully come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day.

The Member(s) may by resolution prescribe the time and place for the holding of regular meetings and may provide that the adoption of such resolution shall constitute notice of such regular meetings.

Special meetings of the Member(s), for any purpose or purposes, may be called by any Member(s) (or such other number of Member(s) as the Member(s) from time to time may specify).

Written or electronic notice stating the place, date, and time of the meeting, the means of electronic video screen communication or transmission, if any, and describing the purposes for which the meeting is called, shall be delivered not fewer than ten (10) days and not more than sixty (60) days before the date of the meeting to each Member, by or at the direction of the Manager or the Member(s) calling the meeting, as the case may be.

At any meeting of the Member(s), the presence of Member(s) holding a majority of the Members' Percentage Interests, as determined from the books of the Company, represented in person or by proxy, shall constitute a quorum for the conduct of the general business of the Company. However, if any particular action by the Company shall require the vote or consent of some other number or percentage of Member(s) pursuant to this Agreement, a quorum for the purpose of taking such action shall require such other number or percentage of Member(s). If a quorum is not present, the meeting may be adjourned from time to time without further notice, and if a quorum is present at the adjourned meeting, any business may be transacted which might have been transacted at the meeting as originally notified. The Member(s) present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Member(s) to leave less a quorum.

At all meetings of the Member(s), a Member may vote by proxy executed in writing by the Member or by a duly authorized attorney-in-fact of the Member. Such proxy shall be filed with the Company before or at the time of the meeting.

A Member of the Company who is present at a meeting of the Member(s) at which action on any matter is taken shall be presumed to have assented to the action taken, unless the dissent of such Member shall be entered in the minutes of the meeting or unless such Member(s) shall file a written

Page 7

dissent to such action with the person acting as the secretary of the meeting before the meeting's adjournment. Such right to dissent shall not apply to Member(s) who voted in favor of such action.

Unless otherwise provided by law, any action required to be taken at a meeting of the Member(s), or any other action which may be taken at a meeting of the Member(s), may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Member(s) entitled to vote with respect to the subject.

Member(s) of the Company may participate in any meeting of the Member(s) by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matters to be voted upon. Participation in a meeting pursuant to this paragraph shall constitute presence in person at such meeting.

12. Assignment of Interests.

Except as otherwise provided in this Agreement, no Member(s) or other person holding interest in the Company may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of their interest in the Company, including without limitation, the capital, profits or distributions without the vote consisting of the majority Members' ownership percentage interest in the Company.

A Member may assign all or any part of such Member's interest in the allocations and distributions of the Company to any of the following (collectively the "permitted assignees"): any person, corporation, partnership or other entity as to which the Company has permitted to the assignment of such interest in the allocations and distributions of the Company in accordance with Section 14 of this Agreement. An assignment to a permitted assignee shall only entitle the permitted assignee to the allocations and distributions to which the assigned interest is entitled unless such permitted assignee applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

The Member(s) agree that Member(s) may voluntarily withdraw from the Company only with the approval, vote, or consent consisting of the majority Members' ownership percentage interest. Unless the withdrawing member's ownership interest was sold, it shall be transferred to the remaining Member(s) in the Company at the same ownership interest percentage ratio that exists at the time of withdrawal. After being removed from the Company, the withdrawing Member shall be unequivocally released from any legal or financial liability that is related to the Company unless otherwise agreed upon.

Page 8

An assignment, pledge, hypothecation, transfer, or other disposition of all or any part of the interest of a Member in the Company or other person holding any interest in the Company in violation of the provisions hereof shall be null and void for all purposes.

No assignment, transfer, or other disposition of all or any part of the interest of any Member permitted under this Agreement shall be binding upon the Company unless and until a duly executed and acknowledged counterpart of such assignment or instrument of transfer, in form and substance satisfactory to the Company, has been delivered to the Company.

No assignment or other disposition of any interest of any Member may be made if such assignment or disposition, alone or when combined with other transactions, would result in the termination of the Company within the meaning of Section 708 of the Internal Revenue Code or under any other relevant section of the Code or any successor statute. No assignment or other disposition of any interest of any Member may be made without an opinion of counsel satisfactory to the Company that such assignment or disposition is subject to an effective registration under, or exempt from the registration requirements of, the applicable Federal and State securities laws. No interest in the Company may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.

Anything herein contained to the contrary, the Company shall be entitled to treat the record holder of the interest of a Member as the absolute owner thereof and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Company the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Company to establish to the satisfaction of the Company that an interest has been assigned or transferred in accordance with this Agreement.

13. Right of First Refusal.

If a Member desires to sell, transfer or otherwise dispose of all or any part of their interest in the Company, such Member (the "Selling Member") shall first offer to sell and convey such interest to the other Member(s) of the Company before selling, transferring or otherwise disposing of such interest to any other person, corporation or other entity. Such offer shall be in writing, shall be given to every other Member, and shall set forth the interest to be sold, the purchase price to be paid, the date on which the closing is to take place (which date shall be not less than thirty nor more than sixty (60) days after the delivery of the offer), the location at which the closing is to take place, and all other material terms and conditions of the sale, transfer or other disposition.

Page 9

Within fifteen (15) days after the delivery of said offer, the other Member(s) shall deliver to the Selling Member a written notice either accepting or rejecting the offer. Failure to deliver said notice within said fifteen (15) days conclusively shall be deemed a rejection of the offer. Any or all of the other Member(s) may elect to accept the offer, and if more than one of the other Member(s) elects to accept the offer, the interest being sold and the purchase price, therefore, shall be allocated among the Member(s) so accepting the offer in proportion to their Members' Percentage Interests, unless they otherwise agree in writing.

If any or all of the other Member(s) elect to accept the offer, then the closing of title shall be held in accordance with the offer, and the Selling Member shall deliver to the other Member(s) who have accepted the offer an assignment of the interest being sold by the Selling Member, and said other Member(s) shall pay the purchase price prescribed in the offer.

If no other Member accepts the offer, or if the Member(s) who have accepted such offer default in their obligations to purchase the interest, then the Selling Member, within one-hundred and twenty (120) days after the delivery of the offer, may sell such interest to any other person or entity at a purchase price which is not less than the purchase price prescribed in the offer and upon the terms and conditions which are substantially the same as the terms and conditions set forth in the offer, provided all other applicable requirements of this Agreement are complied with. An assignment of such interest to a person or entity who is not a Member of the Company shall only entitle such person or entity to the allocations and distributions to which the assigned interest is entitled unless such person or entity applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

If the Selling Member does not sell such interest within said one-hundred and twenty (120) days, then the Selling Member may not thereafter sell such interest without again offering such interest to the other Member(s) in accordance with this Agreement.

## 14. Admission of New Member(s).

The Company may admit new Member(s) (or transferees of any interests of existing Member(s)) into by the purchase or transfer of another Member's ownership interest and a vote for adding the new Member consisting of the majority Members' ownership percentage interest in the Company.

As a condition to the admission of a new Member, such Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Company, as the Company may deem necessary or desirable to effectuate such admission and to confirm the agreement of such Member to be bound by all of the terms, covenants, and conditions of this Agreement, as the same may have

Page 10

been amended. Such new Member shall pay all reasonable expenses in connection with such admission, including without limitation, reasonable attorneys' fees and the cost of the preparation, filing or publication of any amendment to this Agreement or the Articles of Organization, which the Company may deem necessary or desirable in connection with such admission.

No new Member shall be entitled to any retroactive allocation of income, losses, or expense deductions of the Company. The Company may make pro-rata allocations of income, losses, or expense deductions to a new Member for that portion of the tax year in which the Member was admitted in accordance with Section 706(d) of the Internal Revenue Code and regulations thereunder.

In no event shall a new Member be admitted to the Company if such admission would be in violation of applicable Federal or State securities laws or would adversely affect the treatment of the Company as a partnership for income tax purposes.

15. Sale of Company.

The sale of the Company, either partially or in its entirety, shall only be approved by a vote of over fifty percent (50%) of the Members' ownership-interest. Any purchase agreement that is presented to the Company shall be reviewed by up to fifteen (15) days by the Member(s) and put up to a vote within a seven (7) day period thereafter. At the option of any Member, the vote may be delayed by up to thirty (30) days to review the details of the purchase.

If an agreement to sell the Company is approved by the Member(s), then all sale proceeds shall first be paid to the debt of the Company unless the Buyer is accepting some or all of the debt as part of the purchase. All remaining proceeds shall be dispersed in relation to each Member's percent ownership-interest in the Company.

16. Withdrawal Events.

In the event of the death, retirement, withdrawal, expulsion, or dissolution of a Member, or an event of bankruptcy or insolvency, as hereinafter defined, with respect to a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company pursuant to the Statutes (each of the foregoing hereinafter referred to as a "Withdrawal Event"), the Company shall terminate sixty (60) days after notice to the Member(s) of such withdrawal Event unless the business of the Company is continued as hereinafter provided.

Page 11

Notwithstanding a Withdrawal Event with respect to a Member, the Company shall not terminate, irrespective of applicable law, if within the aforesaid sixty-day period the remaining Member(s), by the unanimous vote or consent of the Member(s) (other than the Member who caused the Withdrawal Event), shall elect to continue the business of the Company.

In the event of a Withdrawal Event with respect to a Member, any successor in interest to such Member (including without limitation any executor, administrator, heir, committee, guardian, or other representative or successor) shall not become entitled to any rights or interests of such Member(s) in the Company, other than the allocations and distributions to which such Member is entitled unless such successor in interest is admitted as a Member in accordance with this Agreement.

An "event of bankruptcy or insolvency" with respect to a Member shall occur if such Member: (1) applies for or consents to the appointment of a receiver, trustee or liquidator of all or a substantial part of their assets; or (2) makes a general assignment for the benefit of creditors; or (3) is adjudicated a bankrupt or an insolvent; or (4) files a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or to take advantage of any bankruptcy, insolvency, readjustment of debt or similar law or statute, or an answer admitting the material allegations of a petition filed against them in any bankruptcy, insolvency, readjustment of debt or similar proceedings; or (5) takes any action for the purpose of effecting any of the foregoing; or (6) an order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall continue unstated and in effect for thirty (30) days.

## 17. Dissolution and Liquidation.

The Company shall terminate upon the occurrence of any of the following : (i) the election by the Member(s) to dissolve the Company made by a vote of over fifty percent (50%) of the Members' ownership-interest.; (ii) the occurrence of a Withdrawal Event with respect to a Member and the failure of the remaining Member(s) to elect to continue the business of the Company as provided for in this Agreement above; or (iii) any other event which pursuant to this Agreement, as the same may hereafter be amended, shall cause a termination of the Company.

The liquidation of the Company shall be conducted and supervised by a person designated for such purposes by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests (the "Liquidating Agent"). The Liquidating Agent hereby is authorized and empowered to execute any and all documents and to take any and all actions necessary or desirable to effectuate the dissolution and liquidation of the Company in accordance with this Agreement.

Promptly after the termination of the Company, the Liquidating Agent shall cause to be prepared and furnished to the Member(s) a statement setting forth the assets and liabilities of the Company as of the date of termination. The Liquidating Agent, to the extent practicable, shall liquidate the assets of the Company as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

The proceeds of sale and all other assets of the Company shall be applied and distributed in the following order of priority: (1) to the payment of the expenses of liquidation and the debts and liabilities of the Company, other than debts and liabilities to Member(s); (2) to the payment of debts and liabilities to Member(s); (3) to the setting up of any reserves which the Liquidating Agent may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Company, which reserves shall be paid over to a licensed attorney to hold in escrow for a period of two years for the purpose of payment of any liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as provided; (4) to the Member(s) in proportion to their respective capital accounts until each Member has received cash distributions equal to any positive balance in their capital account, in accordance with the rules and requirements of Treas. Reg. Section 1.704-1(b)(2)(ii)(b); and (5) to the Member(s) in proportion to the Members' Percentage Interests.

The liquidation shall be complete within the period required by Treas. Reg. Section 1.704-1(b)(2)(ii)(b).

Upon compliance with the distribution plan, the Member(s) shall no longer be Member(s), and the Company shall execute, acknowledge and cause to be filed any documents or instruments as may be necessary or appropriate to evidence the dissolution and termination of the Company pursuant to the Statutes.

18. Representation of Member(s).

Each of the Member(s) represents, warrants and agrees that the Member is acquiring the interest in the Company for the Member's own account for investment purposes only and not with a view to the sale or distribution thereof; the Member, if an individual, is of legal age; if the Member is an

Page 13

organization, such organization is duly organized, validly existing and in good standing under the laws of its State of organization and that it has full power and authority to execute this Agreement and perform its obligations hereunder; the execution and performance of this Agreement by the Member does not conflict with, and will not result in any breach of, any law or any order, writ, injunction or decree of any court or governmental authority against or which binds the Member, or of any agreement or instrument to which the Member is a party; and the Member shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any State or other governmental authorities, as the same may be amended.

### 19. Certificates Evidencing Membership.

Every membership interest in the Company shall be evidenced by a Certificate of Membership issued by the Company. Each Certificate of Membership shall set forth the name of the Member holding the membership interest and the Member's Percentage Interest held by the Member, and shall bear the following statement:

"The membership interest represented by this certificate is subject to, and may not be transferred except in accordance with, the provisions of the Operating Agreement of Purdy Oil, LLC dated effective as of January 7th, 2021 , as the same from time to time may be amended, a copy of which is on file at the principal office of the Company."

### 20. Notices.

All notices, demands, requests, or other communications which any of the parties to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been properly given if sent by courier or by registered or certified mail, return receipt requested, with postage prepaid, addressed as follows: (a) if to the Company, at the principal place of business of the Company designated by the Company; and (b) if to any Member, to the address of said Member first above written, or to such other address as may be designated by said Member by notice to the Company and the other Member(s) pursuant to this Agreement.

### 21. Arbitration.

Any dispute, controversy or claim arising out of or in connection with this Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled

Page 14

by, arbitration in the city in which the principal place of business of the Company is then located, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any other time or place or under any other form of arbitration mutually acceptable to the parties involved). Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in a court of competent jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence, and attorneys' fees, except that in the discretion of the arbitrator, any award may include the attorney's fees of a party if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or in bad faith.

22. Amendments.

This Agreement may not be altered, amended, changed, supplemented, waived, or modified in any respect or particular unless the same shall be in writing and agreed to by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests. No amendment may be made to Articles that apply to the financial interest of the Member(s), except by the vote or consent of all of the Member(s). No amendment of any provision of this Agreement relating to the voting requirements of the Member(s) on any specific subject shall be made without the affirmative vote or consent of at least the number or percentage of Member(s) required to vote on such subject.

23. Miscellaneous.

This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of Purdy Oil, LLC. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

The captions in this Agreement are for convenience only and are not to be considered in construing this Agreement. All pronouns shall be deemed to be masculine, feminine, neuter, singular, or plural as the identity of the person or persons may require. References to a person or persons shall include partnerships, corporations, limited liability companies, unincorporated associations, trusts, estates, and other types of entities.

This Agreement, and any amendments hereto, may be executed in counterparts all of which taken together shall constitute one agreement.

Page 15

This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof. It is the intention of the Member(s) that this Agreement shall be the sole agreement of the parties, and, except to the extent a provision of this Agreement provides for the incorporation of federal income tax rules or is expressly prohibited or ineffective under the Statutes, this Agreement shall govern even when inconsistent with, or different from, the provisions of any applicable law or rule. To the extent any provision of this Agreement is prohibited or otherwise ineffective under the Statutes, such provision shall be considered to be ineffective to the smallest degree possible in order to make this Agreement effective under the Statutes.

Subject to the limitations on transferability set forth above, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns.

No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

**IN WITNESS WHEREOF**, the Member(s) have executed this Agreement on January 8 2021.

Signature: _____   Date: January 7th, 2021

Print Name: James Franklin

Signature: _____   Date: 1-7-2021

Print Name: Gene Purdy

555

State of Nebraska, Kimball County, as filed for record
on the 27th day of November, 2021 at 1:21pm
Book OG 232        Page 555 – 559
Cathleen A. Sibal, Kimball County Clerk
By HP

| F | N | A |
|---|---|---|
| HP | | |

Return to:
Gene Purdy
P.O. Box 94
Pine Bluffs, WY 82082

THIS PAGE IS FOR INDEXING PURPOSES ONLY

OIL, GAS AND MINERAL LEASE



COPY

EXHIBIT 2
5 pages

556

# OIL, GAS AND MINERAL LEASE
## Nebraska

THIS AGREEMENT and including the addendum attached hereto mad a part hereof and agreed hereto made this **22ⁿᵈ** day of **November, 2021,** between **Gene Purdy aka Purdy Farms, Lessor** (whether one or more), whose address is **P.O. Box 94, Pine Bluffs, Wyoming, 82082,** and **PURDY OIL, LLC Lessee,** whose address is: **P.O. Box 94, Pine Bluffs, Wyoming, 82082**

1. GRANT. Lessor, in consideration of a cash payment and other good and valuable consideration in hand paid, of the royalties herein provided for, and of the agreements of Lessee herein contained, hereby grant, leases and lets exclusively unto Lessee the land described in paragraph 2 below, hereinafter referred to as leased premises, for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas (the term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gases); sulphur, fissionable materials, and all other minerals, conducting exploration, geological and geophysical surveys, core tests, gravity and magnetic surveys, for introducing or injecting fire, air, gas, steam, water, salt water, chemicals, and fluids or substances into any subsurface stratum or strata which is not productive of fresh water for primary, secondary and other enhanced recovery operations.

2. LEASED PREMISES. (Description) _____ **T13N R58W Section 24  N2; SW4** in the County of _____ **Kimball** _____, State of Nebraska, containing _____ **480** _____ gross acres, more or less, including all riparian rights and any interests therein which Lessor may hereafter acquire by reversion, accretion, prescription or otherwise.  Area of mutual interest (AMI) of the land so covered is more completely and accurately described in Appendix A, attached hereto and made a part hereof. For the purpose of determining the amount of any rentals or in payments hereunder, the number of gross acres above specified shall be deemed correct, whether actually more or less.

3. TERM. Subject to the other provisions herein contained, this Lease shall be for a term of _____ **Three (3)** years from the date hereof (called "primary term") and as long thereafter as oil, gas, sulphur, fissionable materials or other mineral is produced in paying quantities from the leased premises or land pooled therewith, or this lease is otherwise maintained in force and effect pursuant to other provisions herein contained.

4. RENTAL PAYMENT. Subject to the other provisions herein contained, if production of oil and gas from drilling or mining operations is not present on said land, or on acreage pooled therewith as hereinafter provided for, on or before one year from the date hereof, Lessee shall pay or tender, or make a bona fide attempt to pay or tender, to Lessor, or to the credit of Lessor , which depository and its successors shall be Lessor's agents and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or rentals, the sum of **Nine Hundred Sixty Dollars ($ 960.00 ), X 3 Years = $2,880.00** pre-paid by Cashier's Check No. 0073805704 on December 18ᵗʰ, 2020 hereinafter called rentals, which shall cover the privilege of deferring commencement of drilling or mining operations for a period of twelve (12) months. In like manner and upon like payment or tenders in advance for Three years the commencement of drilling or mining operations may be further deferred for successive periods of twelve (12) months each during the primary term of THREE years. All payments or tenders may be made in currency, or by check or by draft, and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails on or before the rental due date in a stamped envelope addressed to the depository or to the Lessor at the last address known to Lessee shall constitute proper payment.

5. ROYALTY PAYMENT. The royalties to be paid to the Lessor are: (a) On oil, 12.5% of that produced and saved from said land, the same to be delivered at the wells or to the Lessor's credit into the pipelines to which the wells may be connected. Lessee shall have the continuing right to purchase such production at the wellhead market price then prevailing in the same field (or if there is no such price then prevailing in the same field, then the nearest field in which there is such a prevailing price) for production of similar grade and gravity. Lessee may sell any royalty oil in its possession and pay Lessor the price received by Lessee for such oil computed at the well; (b) For gas (including casinghead gas) and all other substances covered hereby (i) if used off the leased premises or used in the manufacture of gasoline or other products, the market value at the well of one-eighth (1/8) of the gas so used, or (ii) if sold on or off the leased premises, 12.5% of the amount realized from such sale, provided the amount realized from the sale of gas on or off the leased premises shall be the price established by the Gas Sales Contract entered into in good faith by Lessee and gas purchaser, provided that oh gas sold by Lessee the market value shall not exceed the amount received by Lessee for such gas computed at the mouth of the well; (c) If a well on the leased premises or lands pooled therewith is capable of producing oil or gas or any other substance covered hereby but such well is either shut-in or production therefrom is not being sold or purchased by Lessee or royalties on production therefrom are not otherwise being paid to Lessor, and if this lease is not otherwise maintained in effect, such well shall nevertheless be considered as though it were producing for the purpose of maintaining this lease, whether during or after the primary term, and Lessee shall tender a shut-in payment of One Dollar per acre then covered by this lease, such payment to be made to Lessor or to Lessor's credit in the depository designated above, on or before 90 days after the next ensuing anniversary date of this lease, and thereafter on or before each anniversary date hereof while the well is shut-in or production therefrom is not being sold or purchased by Lessee or royalties on production therefrom are not otherwise being paid to Lessor. This lease shall remain in force so long as such well is capable of producing and Lessee's failure to properly pay shut-in payment shall render Lessee liable for the amount due but shall not operate to terminate this lease. The intermittent production from any well during such year shall not render necessary any new or additional shut-in payments with respect to such well or the acreage ascribed thereto.

6. POOLING. Lessee shall have the right but not the obligation during or after the primary term while this lease is in effect to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all depths or horizons, and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it necessary or proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The unit formed by such pooling for an oil well shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a gas well shall not exceed 640 acres plus a maximum acreage tolerance of 10%, except that larger units may be formed for oil wells or gas

*557*

having jurisdiction. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit production produced and saved which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit. Pooling in one or more instances shall not exhaust Lessee's pooling rights hereunder, and Lessee shall have the recurring right but not the obligation to revise any unit formed hereunder by expansion or contraction, or both, either before or after commencement of production, in order to conform to the well spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are payable hereunder shall thereafter be adjusted accordingly. In the absence of production from a unit, or upon permanent cessation thereof, Lessee may terminate the unit by filing of record a written declaration describing the unit and stating the date of termination.

      7. OPERATIONS. If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled therewith, or if all production (whether or not in paying quantities) ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences operations for reworking an existing well or for drilling an additional well on the leased premises or lands pooled therewith within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production, or, should the lease be within the primary term, if Lessee tenders rentals on or before the next rental payment date (if any) next ensuing after the expiration of said 90-day period; provided that should completion of operations on the dry hole or cessation of all production occur less than 90 days before the last rental payment date, no rental payments or further operations shall be required to maintain this lease for the remainder of the primary term. If at the end of the primary term or any time thereafter, oil, gas or other substances covered hereby are not being produced in paying quantities from the leased premises or lands pooled therewith, but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or restore production therefrom, this lease shall remain in force so long as such operations are prosecuted with no cessation of more than 90 consecutive days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to formations then capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) protect the leased premises from uncompensated drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells except as expressly provided herein.

      8. LESSER INTEREST. Should Lessor own less than the full mineral estate in all or any part of the leased premises, the royalty and shut-in payments, payable hereunder for any well on any part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's mineral interest in such part of the leased premises bears to the full mineral estate in such part of the leased premises.

      9. ANCILLARY RIGHTS. Lessee may use in its operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds, unless otherwise granted. The right of ingress and egress granted hereby shall apply to the entire leased premises described in Paragraph 2 above, notwithstanding any partial release or other termination of this lease with respect thereto. If expressly requested in writing by the surface owner, Lessee agrees to bury pipelines across cultivated land below ordinary plow depth, as such depth may be determined at the time of burial. After the pipeline has once been laid below such depth, Lessee shall not thereafter be required to restore the ground cover, or to lower, or to remove such pipeline unless the surface owner first agrees in writing to bear the entire cost thereof, and advances to Lessee the estimated cost thereof. No well shall be located less than 200 feet from any house or barn now on the leased premises without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises, and to timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises during the term of this lease or within a reasonable time thereafter. Lessee may lay pipelines, build roads, tanks, power stations, erect telephone and power lines, and construct other facilities deemed necessary by Lessee on and over and across the leased premises and other lands owned or claimed by Lessor adjacent and contiguous thereto to produce, save, take care of, treat, transport and own products granted by this lease.

      10. OWNERSHIP CHANGES. The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or horizon, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors, and assigns. No change in Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessee's usual form of division order. In the event the death of any person entitled to shut-in payments hereunder, Lessee may pay or tender such shut-in payments to the credit of decedent or decedent's estate in the depository designated above. If at any time two or more persons are entitled to shut-in payments hereunder, Lessee may pay or tender such shut-in payments to such persons or to the credit in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area

*558*

respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in payments hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

11. BREACH OR DEFAULT. No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after such judicial determination to remedy the breach or default and Lessee fails to do so. This Paragraph 11 shall not apply to erroneous payment of rental.

12. WARRANTY OF TITLE. Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessee's option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties, or shut-in payments otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in payments hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved. Lessee shall have the right to accept leases or conveyances from others owning or claiming to own interests in the leased premises or minerals covered hereby adverse to the rights of Lessor herein. Should Lessee become involved in any dispute or litigation arising out of any claim adverse to the title of Lessor to said leased premises, Lessee may recover from Lessor its reasonable and necessary expenses and attorney fees incurred in such dispute or litigation, with the right to apply royalties accruing hereunder toward satisfying said expenses and attorney fees.

13. REGULATION AND DELAY. Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed or interrupted by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike, or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this lease shall not terminate because of such prevention, delay or interruption, and shall be maintained in force and effect for so long as such force majeure continues, and for 60 days thereafter, or so long as this lease is maintained in force by some other provisions thereof, whichever is the later date. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so prevented, delayed or interrupted.

14. EXECUTION. This lease may be signed in any number of counterparts, each of which shall be binding upon all who execute same, whether or not all parties named in the caption hereof execute this lease. Should any one or more of the parties named herein as Lessor fail to execute this lease, it shall nevertheless be binding on the party or parties who execute the same, and additional parties may execute this lease as Lessor, and this lease shall be binding on each party executing the same notwithstanding that such party is named herein as Lessor, and all of the provisions of this lease shall inure to the benefit of and be binding on the parties hereto and their respective heirs, legal representatives, successors and assigns. IN WITNESS WHEREOF, this lease is executed to be effective as of the date first written above, but upon execution shall be binding on the signatory and the signatory's heirs, devisees, executors, administrators, successors and assigns, whether or not this lease has been executed by all parties hereof named as Lessor.

See Addendum attached hereto and made a part of for additional provisions.

LESSOR (WHETHER ONE OR MORE)
**Gene G. Purdy aka Purdy Farms**
**P.O. Box 94, Pine Bluffs, WY  82082**

SS NO. OR TAX ID

Gene Purdy

Date *11-29-21*

STATE OF *Nebraska*

COUNTY OF *Kimball*          } SS.

The foregoing instrument was acknowledged before me this *November 29*, 21 *21*, by *Gene Purdy*

*Christine D Berger*
Notary Public in and for
*Kimball* County.

My Commission Expires:
*March 16th 2025*

GENERAL NOTARY-State of Nebraska
CHRISTINE D. BERGER
My Comm. Exp. March 16, 2025

559

LESSEE (WHETHER ONE OR MORE)
Purdy Oil, LLC
1100 Harrison Drive
P.O. Box 94
Pine Bluff, WY  82082
308-235-7301

SS NO. OR TAX ID
86-1362933

*Gene G. Purdy   Manager*

11-29-21

STATE OF *Nebraska*

COUNTY OF *Kimball*     } SS.

The foregoing instrument was acknowledged before me this *November 29th 20 21* , by *Gene Purdy* ,
*Purdy Oil* , of *Nebraska*
a _____ partnership, on behalf of the partnership.

*March 16th, 2025*
My Commission Expires:

*Christine D Berger*
Notary Public in and for
*Kimball* County, _____

GENERAL NOTARY•State of Nebraska
CHRISTINE D. BERGER
My Comm. Exp. March 16, 2025

Nebraska Oil and Gas Conservation Commission
Form 2

## NOTICE OF INTENT TO DRILL OR RE-ENTER

**Instructions:** Notice must be given to the Director and approval obtained before proceeding with the work described herein. Submit the original of this form only.  The Commission will reproduce copies as required.

| TYPE OF WORK | Drill ☑ | Re-enter ☐ | Drill Horizontal or Directional Well ☐ |
|---|---|---|---|

| TYPE OF WELL | Oil ☑ | Gas ☐ | Injection ☐ |
|---|---|---|---|

| Operator<br>Purdy Oil, LLC | | Telephone Number<br>308-235-7301 |
|---|---|---|

**Address**
1100 Harrison Drive  P.O. Box 94 Pine Bluff, WY 82082

| Name of Lease<br>Purdy Farms | Well Number<br>#1 | Field and Reservoir (If wildcat, so state)<br>Wolfcamp,  Wildcat | Elevation (Ground)<br>5209' |
|---|---|---|---|

| Well Location<br>Qtr-Qtr  SE4/NW4 | Sec 24 | Twp 13N | Rng 58W | County<br>Kimball |
|---|---|---|---|---|

**Surface Location of Well - Footage (Report location from exterior section lines)**
1,418'   Feet from N ✔ S ___ line   1,701'   Feet from E ___ W ✔ line of the Section

**Bottom Hole Location if Well is Directionally Drilled – Footage (Report location from exterior section lines)**
1,418'   Feet from N ✔ S ___ line   1,701'   Feet from E ___ W ✔ line of the Section

| Latitude and Longitude of Surface Location - Decimal Degrees<br>41° 5'19.60"N 103°55'23.80"W   41.08878; -103.9235 | Nearest Distance from Proposed Location to Property or Lease Line - Footage<br>1,418' FNL |
|---|---|

| Number of Acres in Lease<br>480 | Distance from Proposed Location to Nearest Drilling, Completed, or Applied for Well, on the Same Lease  2,100' SW P&A | Number of Wells on Lease, Including This Well, Completed or in Drilling in this Reservoir<br>2, Including this one plus an old one |
|---|---|---|

| Proposed Measured Depth, Feet<br>9,500' | Proposed True Vertical Depth, Feet<br>9,500' | Deepest Formation to be Penetrated<br>Wolfcamp | Approximate Start Date<br>11-30-2021 | Drilling Contractor<br>True Drilling |
|---|---|---|---|---|

### PROPOSED CASING and CEMENTING PROGRAM

| Purpose of String | Hole Size Inches | Casing Size Inches | Weight LBS/Ft | Casing Grade | Setting Depth Top | Setting Depth Bottom | Cement Volume and Type Sacks and Class | Estimated Top of Cement, Feet |
|---|---|---|---|---|---|---|---|---|
| Surface | 11" | 8 5/8" | 24 | J-55 | Surf | 800' | 100 sx Class C | Surface |
| Production | 7 7/8" | 5 1/2" | 15.5 | J-55 | Surf | 7,500 | 250 sx Class G | 1,200' |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

| Status of Bond | $10,000 One Well Bond Attached ☑ | $100,000 Blanket Bond on File ☐ |
|---|---|---|

| NOGCC Approval<br>**26-105-22769-00-00**<br><br>Permit/API No. _____<br><br>Approved By  _Jddu. B_<br><br>Approval Date  _December 2nd, 2021_ | _(signature)_<br>Signature of Operator or Agent<br><br>Gene Purdy, Manager<br>Title<br><br>11/29/2021<br>Date |
|---|---|

| **Sample Cut Required by Nebraska Geological Survey**<br><br>Yes ☑     No ☐<br>Rev. 6/03 | Please include the requisite fee, survey plat for the location and Form 2A, Permit Application for a Temporary Earthen Reserve Pit, with this notice. |
|---|---|

EXHIBIT 3
1 page

**PURDY OIL, LLC**

**EXPLORATION AGREEMENT**

March 22, 2022

**Digital Licensing, Inc**
**30 N Gould St., Ste N**
**Sheridan, WY 82801**
**Attn: Schad E. Brannon**

Re:     Exploration Program Kimball County, Nebraska, USA

Dear Mr. Brannon

This letter will evidence the understanding whereby Purdy Oil, LLC hereinafter referred to as "PURDY" and/or "PURDY Oil" located at 1100 Harrison Drive, Box 94 Pine Bluff's, NE 82082, a Nebraska Limited Liability Company and hereinafter ("GENERAL PARTNER") and **Digital Licensing, Inc.,** hereinafter, ("PARTNER") agree to explore and develop the first exploratory drilling locations and all offsetting wells in on the Purdy Lease consisting of 480 acres located in Kimball County, Nebraska, as more fully described in Exhibit I, attached hereto and made a part hereof. PURDY Oil, LLC was specifically formed to operate for and oversee the assignment of working interests to the qualified partner for the Phase 1 drilling of wells in Kimball County, Nebraska. Upon completion of each well, the Phase 1 partner will receive up to 50% share of the working interest in all depths drilled on each well for 100% of the total costs for each well for 50% before Payout and 25% WI after Payout defined as 100% of the completed well costs.

PURDY represents that it has entered into a Farmout Agreement of an undivided one hundred percent (100%) Working Interest (WI) and Operating Rights in and to the oil and gas lease subject to State and Federal Royalties of Twelve and One-Half Percent (12.5%) and a Leaseholder Over-riding Twelve and One-Half Percent (12.5%) Royalty resulting in Seventy-Five Percent (75%) Net Revenue Interest (NRI) available in and to the Purdy Oil Lease dated Nov 22nd, 2021  (hereinafter referred to as "oil and gas lease") described in Exhibit I, and PARTNER desires to acquire a certain portion of PURDY's WI and NRI interest in the wellbore located upon the oil and gas lease under the following terms:

SECTION I
CASH PAYMENT/ASSIGNMENT

1.     As consideration hereunder, PARTNER shall, upon execution of this agreement, wire unto the bank account of Purdy Oil, LLC Account No.          First Tier Bank 115 S. Walnut Street P.O. Box 730 Kimball, NE 69145 Phone: 308.235.4633 Fax: 308.235.3499 the



EXHIBIT 4
41 pages

amount of Eighty-Eight Thousand Dollars ($88,000) for each 1% working interest (PARTNER'S share) of the wells to be drilled. This would include working interest in wells drilled and the allotted 40 acres for each well within the 480 acre leasehold in this field. This interest shall be assigned as follows: 1% WI in the 75% NRI to the PARTNER'S consideration paid upon completion of the initial discovery well.  Assignments of WI and NRI shall be made within 30 days of completion of each well.  Production from the wells are subject to 12.5% lease owner royalties and 12.5% Over- riding royalties (ORR) totaling 25% leaving 75% NRI available.

2.   As partial consideration hereunder, PURDY, or its assigns as Operator, shall enter into a Drilling Contract and pay their portion of requisite mobilization and demobilization fees and costs including drilling and completion costs estimated to be $ 2,000,000 for each appraisal well and $177,000 of leasing, geology and geophysics expenses for each well. Subsequent wells will be drilled to optimize oil production and Drilling Contracts may be customized for these wells. This will be done by requesting bids by multiple drilling contractors to identify and develop an Authorization for Expenditure (AFE) that is the lowest price for the appropriate level of service.

3.   Said assignments shall be made subject to the terms, covenants, and conditions of the following:

    a.  The assigned Royalties and Over-riding royalties totaling 25%;
    b.  This Exploration Agreement; and
    c.  That certain Operating Agreement (hereinafter referred to as "Operating Agreement") attached hereto as Exhibit III.

4.   PARTNER shall have a preferential right of the first refusal to fund PURDY's drilling of the next well on the same terms as herein anywhere within the Area of Mutual Interest (AMI) which is within 3 miles of the initial well drilled in Kimball County, Nebraska.

5.   In the event PARTNER elects not to participate in future wells or defaults under the Agreements, their interest in any acreage not held by production reverts to PURDY free of encumbrances.

SECTION II
OPERATING AGREEMENT

Contemporaneously with the execution of this Exploration Agreement, the parties hereto shall execute the Operating Agreement, naming PURDY Oil Exploration Co. or its assigns as operator, attached hereto as Exhibit III.  This Operating Agreement shall become effective as of the date thereof as to all operations and other activities conducted on the "Contract Area" described therein. Notwithstanding anything contained to the contrary, in the event of conflict or inconsistency between the terms and provisions of this Exploration Agreement and those of the Operating Agreement, it is stipulated that the terms and provisions of this Exploration Agreement shall prevail.

## SECTION III
## INITIAL WELL COMMITMENT

PARTNER agrees to bear the cost, up to EIGHTY-EIGHT THOUSAND (US $88,000) per 1% WI to drill test and complete or plug each Appraisal well; following successful completion and production additional offsetting wells will be drilled both vertically and horizontally including into deeper horizons identified by our geophysics.

1.      PURDY will provide copies of the actual invoices, and all related documents relating to expenditures of the test well to PARTNER via email from the drilling rig accounting system and from PURDY within 30 days of completion of each well.

2.      Digital Licensing, Inc shall provide EIGHTY-EIGHT THOUSAND (US $88,000) per 1% WI to drill test and complete or plug each Appraisal well; following successful completion and production additional offsetting wells will be drilled both vertically and horizontally including into deeper horizons identified by our geophysics, **for 12% WI or in exchange for (US $1,056,000).**

## SECTION IV
## MISCELLANEOUS

1.      Paragraph Headings:  The Section and paragraph headings inserted in this Exploration Agreement are utilized solely for reference purposes and do not constitute substantive matter to be considered in construing the terms contained herein.

2.      Entire Agreement: Any verbally made prior agreements, promises, negotiations or representations pertaining to the Contract Area described in the Operating Agreement, which is not expressly set forth in this Exploration Agreement or the Operating Agreement are of no force and effect.

3.      Binding Agreement:  The terms, covenants, and conditions of this Exploration Agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns, and such terms, covenants and conditions shall be deemed as covenants running with the lands and leases covered hereby and with each transfer or assignment of said lands or leases.  PARTNER and PURDY shall each have the right to assign all or any portion of its rights, titles, and interests hereunder; provided, however, that any such assignment shall be null and void unless it specifically provides that it is made subject to the terms and provisions hereof and reference must be made hereto for all purposes.

4.    Information and Data: Notwithstanding anything to the contrary contained herein, it is agreed that PURDY shall furnish to PARTNER, when requested, to the extent permitted by law or contractual obligation, any and all information and data of every kind and character, including but not limited to seismic data, core reports, logs, well tests, production tests and reports, joint operations costs, and revenue data and reports, relative to the Area of Mutual Interest.  An outside Auditor will audit the complete operation annually and be mutually chosen and agreed upon by PURDY and PARTNER.

5.    Press/Media Releases:  No information, in any way related to the Prospect AMI, is to be released to the media and/or for publication without the express written consent of PURDY Oil.

6.    Acceptance: Unless and until signed by PURDY, PURDY is under no obligation to sell or assign any interest in the PURDY Oil Prospect or any portion of the oil and gas wells and its lease described in this Exploration Agreement or its attachments to PARTNER until PURDY receives from such PARTNER the following:

    a.   One (1) original of the Agreement which has been duly executed by PARTNER to indicate its acceptance thereof; and

    b.   the cash payment provided for in Section I.1.

This offer May be Withdrawn at any Time for any Reason until signed.

Please indicate your agreement with the above terms by executing and returning one original of this Exploration Agreement to PURDY Oil.

Sincerely,

Purdy Oil, LLC.

_____
By: James Franklin
Exploration Manager

Agreed and accepted this 17th day of March 2022.

Digital Licensing, Inc.

_____                    _____
By: Schad E. Brannon                               Roy Nelson
Director                                           Director

EXHIBIT I

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil and PARTNER dated November 29, 2021.

Lease Dated this 29th day of November, Recorded in book OG 232 & page number 555-559 serial listing from the Kimball County Recorder's Office.

EXHIBIT II

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil and PARTNER dated March 22, 2022.

Leased Lands included in the Purdy Prospects located in Kimball County, Nebraska are described as follows: Lease: located in Township <u>13N  Range 58W</u> Portions of Section 24 containing 480 acres.

The Area of Mutual Interest shall include all portions of lands included in Township 13N R. 58 W Section 24  N2; SW4.

See Attached Map.

EXHIBIT III

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil. and PARTNER dated March 22, 2022.

The Operating Agreement by and between PURDY Oil, PURDY Oil Exploration Co. and PARTNER.

EXHIBIT IV

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil and PARTNER dated March 22, 2022.

Authority for Expenditures (AFE) for the PURDY OIL Prospect.

EXHIBIT V

Attached to and made a part of that certain Exploration Agreement by and between PURDY Oil and PARTNER dated March 22, 2022.

Bank Wiring Instructions for PURDY Oil.

Purdy Oil, LLC
Account No. ▨1509

▨ Bank
▨
▨
▨

Phone: ▨
Fax: ▨

Purdy Oil, LLC.
1100 Harrison Drive
P.O. Box 94
Pine Bluff, WY  82082
308-235-7301

Exhibit 10.1

**A.A.P.L. FORM 610 - 1989**

**MODEL FORM OPERATING AGREEMENT**

OPERATING AGREEMENT

DATED

**November 30, 2021**

OPERATOR  **Purdy Oil, LLC**

CONTRACT AREA **The leases comprising the Kimball County Leasehold are specifically described in Exhibit A of this**
**Joint Operating Agreement.**

COUNTY OF **Kimball, STATE OF Nebraska**

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**TABLE OF CONTENTS**

| Article | Title | Page |
|---|---|---|
| **I. DEFINITIONS** | | 1 |
| **II. EXHIBITS** | | 2 |
| **III. INTERESTS OF PARTIES** | | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 3 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 3 |
| **IV. TITLES** | | 4 |
| | A. TITLE EXAMINATION: | 4 |
| | B. LOSS OR FAILURE OF TITLE: | 4 |
| | 1. Failure of Title | 4 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 5 |
| | 3. Other Losses | 5 |
| | 4. Curing Title | 5 |
| **V. OPERATOR** | | 6 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 6 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 6 |
| | 1. Resignation or Removal of Operator | 6 |
| | 2. Selection of Successor Operator | 6 |

| | | |
|---|---|---|
| 3. Effect of Bankruptcy | | 6 |
| C. EMPLOYEES AND CONTRACTORS: | | 7 |
| D. RIGHTS AND DUTIES OF OPERATOR: | | 7 |
| 1. Competitive Rates and Use of Affiliates | | 7 |
| 2. Discharge of Joint Account Obligations | | 7 |
| 3. Protection from Liens | | 7 |
| 4. Custody of Funds | | 7 |
| 5. Access to Contract Area and Records | | 7 |
| 6. Filing and Furnishing Governmental Reports | | 7 |
| 7. Drilling and Testing Operations | | 7 |
| 8. Cost Estimates | | 8 |
| 9. Insurance | | 8 |
| **VI. <u>DRILLING AND DEVELOPMENT</u>** | | 8 |
| A. INITIAL WELL: | | 8 |
| B. SUBSEQUENT OPERATIONS: | | 8 |
| 1. Proposed Operations | | 8 |
| 2. Operations by Less Than All Parties | | 9 |
| 3. Stand-By Costs | | 11 |
| 4. Deepening | | 11 |
| 5. Sidetracking | | 12 |
| 6. Order of Preference of Operations | | 12 |
| 7. Conformity to Spacing Pattern | | 12 |
| 8. Paying Wells | | 12 |
| C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | | 12 |
| 1. Completion | | 12 |
| 2. Rework, Recomplete or Plug Back | | 12 |
| D. OTHER OPERATIONS: | | 13 |
| E. ABANDONMENT OF WELLS: | | 13 |
| 1. Abandonment of Dry Holes | | 13 |
| 2. Abandonment of Wells That Have Produced | | 13 |
| 3. Abandonment of Non-Consent Operations | | 14 |
| F. TERMINATION OF OPERATIONS: | | 14 |
| G. TAKING PRODUCTION IN KIND: | | 14 |
| (Option 1) Gas Balancing Agreement | | 14 |
| (Option 2) No Gas Balancing Agreement | | 14 |

i

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## <u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| **VII. <u>EXPENDITURES AND LIABILITY OF PARTIES</u>** | | 15 |
| A. LIABILITY OF PARTIES: | | 15 |
| B. LIENS AND SECURITY INTERESTS: | | 15 |
| C. ADVANCES: | | 16 |
| D. DEFAULTS AND REMEDIES: | | 17 |
| 1. Suspension of Rights | | 17 |
| 2. Suit for Damages | | 17 |
| 3. Deemed Non-Consent | | 17 |
| 4. Advance Payment | | 17 |
| 5. Costs and Attorneys' Fees | | 17 |
| E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | | 18 |
| F. TAXES: | | 18 |
| **VIII. <u>ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST</u>** | | 18 |
| A. SURRENDER OF LEASES: | | 18 |

|   | B. RENEWAL OR EXTENSION OF LEASES: | 19 |
|   | C. ACREAGE OR CASH CONTRIBUTIONS: | 20 |
|   | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: | 20 |
|   | E. WAIVER OF RIGHTS TO PARTITION: | 20 |
|   | F. PREFERENTIAL RIGHT TO PURCHASE: | 21 |
| IX. | **INTERNAL REVENUE CODE ELECTION** | 21 |
| X. | **CLAIMS AND LAWSUITS** | 21 |
| XI. | **FORCE MAJEURE** | 22 |
| XII. | **NOTICES** | 22 |
| XIII. | **TERM OF AGREEMENT** | 22 |
| XIV. | **COMPLIANCE WITH LAWS AND REGULATIONS** | 23 |
|   | A. LAWS, REGULATIONS AND ORDERS: | 23 |
|   | B. GOVERNING LAW: | 23 |
|   | C. REGULATORY AGENCIES: | 23 |
| XV. | **MISCELLANEOUS** | 23 |
|   | A. EXECUTION: | 23 |
|   | B. SUCCESSORS AND ASSIGNS: | 24 |
|   | C. COUNTERPARTS: | 24 |
|   | D. SEVERABILITY | 24 |
| XVI. | **OTHER PROVISIONS** | 24 |

ii

---

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between Purdy Oil, LLC, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided, NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.

## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.

## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

 X  A. Exhibit "A," shall include the following information:
    (1) Description of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Parties to agreement with addresses and telephone numbers for notice purposes,
    (4) Percentages or fractional interests of parties to this agreement,
    (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
    (6) Burdens on production.
 X  B. Exhibit "B," Form of Lease.
 X  C. Exhibit "C," Accounting Procedure.
    D. Exhibit "D," Insurance.
    E. Exhibit "E," Gas Balancing Agreement.
    F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.
    G. Exhibit "G," Tax Partnership.
 X  H. Other: **Exploration Agreement between Purdy Oil, LLC, a Nebraska Limited Liability Partnership.**

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III.

## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, **the royalty burdens stipulated in each lease** and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all

burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**ARTICLE IV.**

**TITLES**

**A. Title Examination:**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the

Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current

party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV. B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ARTICLE V.

## OPERATOR

**A. Designation and Responsibilities of Operator:**

**Purdy Oil, LLC,** shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for

relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

-6-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. <u>Filing and Furnishing Governmental Reports:</u> Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. <u>Drilling and Testing Operations:</u> The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

8. <u>Cost Estimates:</u> Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. <u>Insurance:</u> At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

A.  Initial Well:  Purdy Farms #1

On or before the 1st day of June 2022, Operator shall commence the drilling of the Initial

Well at the following location: Township <u>13N  Range 58W</u> Portions of Section 24 Kimball County, Nebraska and shall thereafter continue the drilling of the well with due diligence to 9,500 TVD.

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

**B. Subsequent Operations:**

    1. <u>Proposed Operations:</u> If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty- eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

    If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of- way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

    2. <u>Operations by Less Than All Parties:</u>

(a) <u>Determination of Participation.</u> If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) <u>Relinquishment of Interest for Non-Participation.</u> The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non- Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non- Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until

the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

(i) **500**% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) **500**% of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non- Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non- Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) <u>Reworking, Recompleting or Plugging Back.</u> An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties **500**% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) <u>Recoupment Matters.</u> During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such

equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each party thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non- Consenting Party.

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or

65 of 136

(ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non- Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non- Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non- Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☑ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**D . Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of **Twenty-five Thousand** Dollars (**$25,000.00**) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-

Operator so requesting an information copy thereof for any single project costing in excess of **Twenty-five Thousand** Dollars (**$25,000.00**). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least **51**% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

    1. <u>Abandonment of Dry Holes:</u> Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

    2. <u>Abandonment of Wells That Have Produced:</u> Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

- 13 -

---

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

    Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the

surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. <u>Abandonment of Non-Consent Operations:</u> The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing **51**% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☑ <u>Option No. 2:</u> No Gas Balancing Agreement:

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

## ARTICLE VII.

## EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or

obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition,

to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

- 16 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall

prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non- defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

- 17 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

- 18 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C,"

less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

- 19 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the

acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co- owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

- 20 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**F. Preferential Right to Purchase:**

☑   (Optional; Check if applicable.)

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

## ARTICLE IX.

### INTERNAL REVENUE CODE ELECTION

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.

### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed **Five-Thousand** Dollars (**$5,000.00**) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

- 21 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ARTICLE XI.

## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.

### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.

### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☑   Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all

necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

- 22 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ARTICLE XIV.

## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited to matters of performance, non- performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of Nevada shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.

## MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would

have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

- 23 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.

## OTHER PROVISIONS

IN WITNESS WHEREOF, this agreement shall be effective as of the 30th day of November, 2021.

James E. Franklin, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.

- 24 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**ATTEST OR WITNESS:**                                  **JOINT - OPERATOR**

  Purdy Oil, LLC.
_____

_____    By _____

_____        James E. Franklin
                                                Type or print name

                                                Title _Exploration Manager_

                                                Date _03/22/2022_

                                                Tax ID or S.S. No.

**JOINT OPERATOR**

Purdy Oil, LLC

By _____

Gene Purdy

Type or print name

Title Managing Member

Date _____

Tax ID or S.S. No.

**NON - OPERATORS**

Gene Purdy aka Purdy Farms

By _____

Gene Purdy

Type or print name

Title _____

Date _____

Tax ID or S.S. No.

_____

Digital Licensing, Inc.

By _____

Roydon Nelson

Type or print name

Title  COO

Date  3/21/2022

Tax ID or S.S. No.

_____

- 25 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of _____ )

) ss.

County of _____ )

This instrument was acknowledged before me on

_____ by _____

(Seal, if any)

_____

Title (and Rank) _____

My commission expires:_____

Acknowledgment in representative capacity:

State of _____ )

_____ ) ss.

County of_____ )

    This instrument was acknowledged before me on

_____ by _____ as

_____ of _____

(Seal, if any)

_____

Title (and Rank) _____

My commission expires:_____

- 26 -

EXHIBIT 5
3 pages

Rig 14 Inventory

2006 Greg. Shack mounted on a tandem axle trailer- Bedroom- bathroom - and office area.

1981 - Tandem axle gin truck - winch bed - gin pole 2 winches - Western Star

1978, Kenworth road truck - winch bed - 1 winch tandem axle

Tandem axle trash trailer- 7' x 20' covered

Justin Bryce - Driller - ████ · 4374
Lonnie Mustard - Driller + pusher - ████ 6162
Art Guitter- trucker + mechanic- ████ 2797

March 28, 2022

I Gary Naill am conveying to Purdy Oil sole ownership of Nebo Service Rig 14 for the purchase price of $125,000 - pd. with CK. #23 on Mar. 28, 2022.

G. E. Naill

Rig inventory - Nebos Services Rig 14

Unit - Trailer mounted Spencer Harris unit - 250,000#
Telescoping Double derrick - mounted on tandem axle
trailer with wings and handrails,
   N-4 Brewster Drawworks powered by 2 8V71
Detroit Diesel engines with Twin Disc torque Converters
   1/8" Drlg Line on 8 Lines - appx. 1,500' drlg. Line
Traveling Block - 200 Ton McKlssick Block
   Pump - 1000 H.P Maxim TripLex - 6" x 9" stroke -
powered by 398 Cat motor - (drilled 4 holes)
   Mud tanks - "2" - 10' wide by 4' tall x 50' long
each - 1 with shale shaker - one with mixing house and
hopper - 400 BBL capacity.
   Appx. 6,500' 4" Full hole Drill pipe
   600' 4 1/2" 4 1/2" Grade E drill pipe
   20 6" x 30' Drill Collars,
3 Pipe baskets - 7' x 30' x 3 Tall each
Catwalk - 4' x 4' x 40'
200 Ton Ideco swivel - 40' x 4 1/4" Kelly
8 5/8" x 30' Mousehole shock
Water tank - 40' x 8' x 9' water tank with accumla
house in one end with fuel supply and fresh water pump
Top dog house - 11' x 15' with 12 lockers and Knowledge
Sub - 10' x 10 x 20' with hinged V-door, ramp,
17 1/2" Ideco rotary table with split master bushings,
1 Set BJ Type C tongs with spare heads - 8 5/8" 5 1/2"
Slips & elevators - 3 1/2" through 8 5/8"
2 sets pipe racks - 40' x 40' x 30' - 4 racks
10,000 gal. rectangular fuel tanks
Sub - 10' x 10' x 20' with pipe rack
Ramp - 10' wide x 30' long x 5' tall - Unit pins and stays
on ramp - all hoses needed to rig up

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## Archer Drilling, LLC

This Multi-Member LLC Operating Agreement ("Agreement") represents Archer Drilling, LLC that was formed in the State of Nebraska on April 4th, 2022 ("Company").

The following represents the initial 5 **Member(s)** of the Company and their respective ownership interest:

**Purdy Oil, LLC** of 1100 Harrison Drive Box 94, Pine Bluffs, Nebraska, 82082, and has 80.00%

**James Franklin**, of 3510 Santoro Way, San Diego, California, 92130, and has 10.1% ownership in the Company.

**Gene Purdy**, of 1100 Harrison Drive Box 94, Pine Bluffs, Nebraska, 82082, and has 3.3% ownership in the Company.

**Garret Purdy**, of 1100 Harrison Drive Box 94, Pine Bluffs, Nebraska, 82082, and has 3.1% ownership in the Company

**Schad Brannon** of Digital Licensing Corporation has 3.5%

("Member(s)")

WHEREAS the Member(s) desire to create a limited liability company under the laws of the State of Nebraska and set forth the terms herein of the Company's operation and the relationship between the Member(s).

THEREFORE, in consideration of the mutual covenants set forth herein and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Member(s) and the Company agree as follows:

1. Name and Principal Place of Business.

EXHIBIT 6
15 pages

The name of the Company is Archer Drilling, LLC with a principal place of business at 1100 Harrison Drive Box 94, Pine Bluffs, Nebraska, 92082. The mailing address shall be the same address as the principal place of business.

2. Registered Agent.

The name of the Registered Agent is Gene Purdy with a registered office located at 1100 Harrison Drive Box 94, Pine Bluffs, Nebraska, 82082 for the service of process as of April 4th, 2022 ("Registered Agent"). The Registered Agent may change at any time by the Company filing an amendment with the Secretary of State, or respective office, in the State of Nebraska.

3. Formation.

The Company was formed on Jan April 4th, 2022, when the Member(s) filed the Articles of Organization with the office of the Secretary of State pursuant to the statutes governing limited liability companies in the State of Archer Drilling, LLC (the "Statutes").

4. Purpose.

The purpose of the Company is to engage in and conduct any and all lawful businesses, activities or functions, and to carry on any other lawful activities in connection with or incidental to the foregoing, as the Member(s) in their discretion shall determine.

5. Term.

The term of the Company shall continue in perpetuity commencing on the filing of the Articles of Organization of the Company while continuing until terminated under the provisions set forth herein.

6. Member(s) Capital Contributions.

Capital contributions to the Company shall be made by 1 Member:

Purdy Oil, LLC shall contribute $250,000 The Capital Contribution made by the Member shall be paid back to the Member before any profits are distributed by the Company.

Hereinafter known as the "Contributor(s)".

The Contributor(s) shall have no right to withdraw or reduce their contributions to the capital of the Company until the Company has been terminated unless otherwise set forth herein. The Contributor(s) shall have no right to demand and receive any distribution from the Company in any form other than cash, and Member(s) shall not be entitled to interest on their capital contributions to the Company.

The liability of the Contributor(s) for the losses, debts, liabilities, and obligations of the Company shall be limited to the amount of the capital contribution plus any distributions paid to such Contributor(s) individually, such as the Contributor's share of any undistributed assets of the Company; and (only to the extent as might be required by applicable law) any amounts previously distributed to such Contributor(s) by the Company.

7. Distributions.

For the purposes of this Agreement, "net profits" and "net losses" mean the profits or losses of the Company resulting from the conduct of the Company's business, after all expenses, including depreciation allowance, incurred in connection with the conduct of its business for which such expenses have been accounted.

The term "Cash Receipts" shall mean all Cash Receipts of the Company from whatever source derived, including without limitation capital contributions made by the Member(s); the proceeds of any sale, exchange, condemnation or other disposition of all or any part of the assets of the Company; the proceeds of any loan to the Company; the proceeds of any mortgage or refinancing of any mortgage on all or any part of the assets of the Company; the proceeds of any insurance policy for fire or other casualty damage payable to the Company; and the proceeds from the liquidation of assets of the Company following termination.

The term "Capital Transactions" shall mean any of the following: the sale of all or any part of the assets of the Company; the refinancing of mortgages or other liabilities of the Company; the receipt of insurance proceeds; and any other receipts or proceeds are attributable to capital.

A "Capital Account" for the Member shall be maintained by the Company. The Member's Capital Account shall reflect the Member's capital contributions and increases for any net income or gain of the Company. The Member's Capital Account shall also reflect decreases for distributions made to the Member and the Member's share of any losses and deductions of the Company.

During each quarterly period the net profits and net losses of the Company (other than from Capital Transactions), and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be credited or charged, as the case may be, to the capital accounts of each Member in proportion to the Members' Percentage Interests. The net profits of the Company from Capital Transactions shall be allocated in the following order of priority: (a) to offset any negative balance in the capital accounts of the Member(s) in proportion to the amounts of the negative balance in their respective capital accounts, until all negative balances in the capital accounts have been eliminated; then (b) to the Member(s) in proportion to the Members' Percentage Interests. The net losses of the Company from Capital Transactions shall be allocated

in the following order of priority: (a) to the extent that the balance in the capital accounts of any Member(s) are in excess of their original contributions, to such Member(s) in proportion to the excess balances until all such excess balances have been reduced to zero; then (b) to the Member(s) in proportion to the Members' Percentage Interests.

The Cash Receipts of the Company shall be applied in the following order of priority: (a) to the payment of interest or amortization on any mortgages on the assets of the Company, amounts due on debts and liabilities of the Company other than those due to any Member(s), costs of the construction of the improvements to the assets of the Company and operating expenses of the Company; (b) to the payment of interest and establishment of cash reserves determined by the Member(s) to be necessary or appropriate, including without limitation, reserves for the operation of the Company's business, construction, repairs, replacements, taxes and contingencies; and (c) to the repayment of any loans made to the Company by any Member(s). Thereafter, the Cash Receipts of the Company shall be distributed among the Member(s) as hereafter provided.

Except as otherwise provided in this Agreement or otherwise required by law, distributions of Cash Receipts of the Company, other than from Capital Transactions, shall be allocated among the Member(s) in proportion to the Members' Percentage Interests.

Except as otherwise provided in this Agreement or otherwise required by law, distributions of Cash Receipts from Capital Transactions shall be allocated in the following order of priority: (a) to the Member(s) in proportion to their respective capital accounts until each Member has received cash distributions equal to any positive balance in their capital account; then (b) to the Member(s) in proportion to the Members' Percentage Interests.

It is the intention of the Member(s) that the allocations under this Agreement shall be deemed to have "substantial economic effect" within the meaning of Section 704 of the Internal Revenue Code and Treas. Reg. Section 1.704-1. Should the provisions of this Agreement be inconsistent with or in conflict with Section 704 of the Code or the Regulations thereunder, then Section 704 of the Code and the Regulations shall be deemed to override the contrary provisions thereof. If Section 704 or the Regulations at any time require that limited liability company operating agreements contain provisions which are not expressly set forth herein, such provisions shall be incorporated into this Agreement by reference and shall be deemed a part of this Agreement to the same extent as though they had been expressly set forth herein.

8. Books, Records, and Tax Returns.

The Member(s), or their designees, shall maintain complete and accurate records and books of the Company's transactions in accordance with generally accepted accounting principles.

The Company shall furnish each Member, within seventy-five (75) days after the end of each fiscal year, an annual report of the Company including a balance sheet, a profit and loss statement, a capital account statement, and the amount of such Member's share of the Company's income, gain, losses, deductions, and other relevant items for federal income tax purposes.

The Member(s) intends that the Company shall be taxed as a Partnership in accordance with the provisions of the Internal Revenue Code. The Company shall prepare all Federal, State, and local income tax and information returns for the Company and shall cause such tax and information returns to be timely filed. Within seventy-five (75) days after the end of each fiscal year, the Company shall forward to each person who was a Member during the preceding fiscal year a true copy of the Company's information return filed with the Internal Revenue Service for the preceding fiscal year.

All elections required or permitted to be made by the Company under the Internal Revenue Code, and the designation of a tax matters partner pursuant to Section 6231(a)(7) of the Internal Revenue Code for all purposes permitted or required by the Code, shall be made by the Company by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests.

Upon request, the Company shall furnish to each Member a current list of the names and addresses of all of the Member(s) of the Company, and any other persons or entities having any financial interest in the Company.

9.  Bank Accounts.

All funds of the Company shall be deposited in the Company's name in a bank account or accounts as chosen by the Member(s). Withdrawals from any bank accounts shall be made only in the regular course of business of the Company and shall be made upon such signature or signatures as the Member(s) from time to time may designate.

10. Management of the Company.

The business and affairs of the Company shall be conducted and managed by the Members in accordance with this Agreement and the laws of the State of Nebraska.

Except as expressly provided elsewhere in this Agreement, all decisions respecting the management, operation, and control of the business and affairs of the Company and all determinations made in accordance with this Agreement shall be made by a vote of over fifty percent (50%) of the Members' ownership-interest.

Notwithstanding any other provision of this Agreement, the Member(s) shall not sell, exchange, lease, assign or otherwise transfer all or substantially all of the assets of the Company; sell, exchange, lease (other than space leases in the ordinary course of business), assign or transfer the Company's assets; mortgage, pledge or encumber the Company's assets other than is expressly authorized by this Agreement; prepay, refinance, modify, extend or consolidate any existing mortgages or encumbrances; borrow money on behalf of the Company; lend any Company funds or other assets to any person; establish any reserves for working capital repairs, replacements, improvements or any other purpose; confess a Judgment against the Company; settle, compromise or release, discharge or pay any claim, demand or debt, including claims for insurance; approve a merger or consolidation of the Company with or into any other limited liability company, corporation, partnership or other entity; or change the nature or character of the business of the Company without a vote of over fifty percent (50%) of the Members' ownership-interest.

The Member(s) shall receive such sums for compensation as Member(s) of the Company as may be determined from time to time by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests.

11. Meetings of Member(s).

The annual meeting of the Member(s) shall be held on the 1st of January (day/month) at the principal office of the Company or at such other time and place as the Member(s) determine, for the purpose of transacting such business as may lawfully come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day.

The Member(s) may by resolution prescribe the time and place for the holding of regular meetings and may provide that the adoption of such resolution shall constitute notice of such regular meetings.

Special meetings of the Member(s), for any purpose or purposes, may be called by any Member(s) (or such other number of Member(s) as the Member(s) from time to time may specify).

Written or electronic notice stating the place, date, and time of the meeting, the means of electronic video screen communication or transmission, if any, and describing the purposes for which the meeting is called, shall be delivered not fewer than ten (10) days and not more than sixty (60) days before the date of the meeting to each Member, by or at the direction of the Manager or the Member(s) calling the meeting, as the case may be.

At any meeting of the Member(s), the presence of Member(s) holding a majority of the Members' Percentage Interests, as determined from the books of the Company, represented in

person or by proxy, shall constitute a quorum for the conduct of the general business of the Company. However, if any particular action by the Company shall require the vote or consent of some other number or percentage of Member(s) pursuant to this Agreement, a quorum for the purpose of taking such action shall require such other number or percentage of Member(s). If a quorum is not present, the meeting may be adjourned from time to time without further notice, and if a quorum is present at the adjourned meeting, any business may be transacted which might have been transacted at the meeting as originally notified. The Member(s) present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Member(s) to leave less a quorum.

At all meetings of the Member(s), a Member may vote by proxy executed in writing by the Member or by a duly authorized attorney-in-fact of the Member. Such proxy shall be filed with the Company before or at the time of the meeting.

A Member of the Company who is present at a meeting of the Member(s) at which action on any matter is taken shall be presumed to have assented to the action taken, unless the dissent of such Member shall be entered in the minutes of the meeting or unless such Member(s) shall file a written dissent to such action with the person acting as the secretary of the meeting before the meeting's adjournment. Such right to dissent shall not apply to Member(s) who voted in favor of such action.

Unless otherwise provided by law, any action required to be taken at a meeting of the Member(s), or any other action which may be taken at a meeting of the Member(s), may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Member(s) entitled to vote with respect to the subject.

Member(s) of the Company may participate in any meeting of the Member(s) by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matters to be voted upon. Participation in a meeting pursuant to this paragraph shall constitute presence in person at such meeting.

<u>12. Assignment of Interests.</u>

Except as otherwise provided in this Agreement, no Member(s) or other person holding interest in the Company may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of their interest in the Company, including without limitation, the capital, profits or distributions without the vote consisting of the majority Members' ownership percentage interest in the Company.

A Member may assign all or any part of such Member's interest in the allocations and distributions of the Company to any of the following (collectively the "permitted assignees"): any person, corporation, partnership or other entity as to which the Company has permitted to the

assignment of such interest in the allocations and distributions of the Company in accordance with Section 14 of this Agreement. An assignment to a permitted assignee shall only entitle the permitted assignee to the allocations and distributions to which the assigned interest is entitled unless such permitted assignee applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

The Member(s) agree that Member(s) may voluntarily withdraw from the Company only with the approval, vote, or consent consisting of the majority Members' ownership percentage interest. Unless the withdrawing member's ownership interest was sold, it shall be transferred to the remaining Member(s) in the Company at the same ownership interest percentage ratio that exists at the time of withdrawal. After being removed from the Company, the withdrawing Member shall be unequivocally released from any legal or financial liability that is related to the Company unless otherwise agreed upon.

An assignment, pledge, hypothecation, transfer, or other disposition of all or any part of the interest of a Member in the Company or other person holding any interest in the Company in violation of the provisions hereof shall be null and void for all purposes.

No assignment, transfer, or other disposition of all or any part of the interest of any Member permitted under this Agreement shall be binding upon the Company unless and until a duly executed and acknowledged counterpart of such assignment or instrument of transfer, in form and substance satisfactory to the Company, has been delivered to the Company.

No assignment or other disposition of any interest of any Member may be made if such assignment or disposition, alone or when combined with other transactions, would result in the termination of the Company within the meaning of Section 708 of the Internal Revenue Code or under any other relevant section of the Code or any successor statute. No assignment or other disposition of any interest of any Member may be made without an opinion of counsel satisfactory to the Company that such assignment or disposition is subject to an effective registration under, or exempt from the registration requirements of, the applicable Federal and State securities laws. No interest in the Company may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.

Anything herein contained to the contrary, the Company shall be entitled to treat the record holder of the interest of a Member as the absolute owner thereof and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Company the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Company to establish to the satisfaction of the Company that an interest has been assigned or transferred in accordance with this Agreement.

13. Right of First Refusal.

If a Member desires to sell, transfer or otherwise dispose of all or any part of their interest in the Company, such Member (the "Selling Member") shall first offer to sell and convey such interest to the other Member(s) of the Company before selling, transferring or otherwise disposing of such interest to any other person, corporation or other entity. Such offer shall be in writing, shall be given to every other Member, and shall set forth the interest to be sold, the purchase price to be paid, the date on which the closing is to take place (which date shall be not less than thirty nor more than sixty (60) days after the delivery of the offer), the location at which the closing is to take place, and all other material terms and conditions of the sale, transfer or other disposition.

Within fifteen (15) days after the delivery of said offer, the other Member(s) shall deliver to the Selling Member a written notice either accepting or rejecting the offer. Failure to deliver said notice within said fifteen (15) days conclusively shall be deemed a rejection of the offer. Any or all of the other Member(s) may elect to accept the offer, and if more than one of the other Member(s) elects to accept the offer, the interest being sold and the purchase price, therefore, shall be allocated among the Member(s) so accepting the offer in proportion to their Members' Percentage Interests, unless they otherwise agree in writing.

If any or all of the other Member(s) elect to accept the offer, then the closing of title shall be held in accordance with the offer, and the Selling Member shall deliver to the other Member(s) who have accepted the offer an assignment of the interest being sold by the Selling Member and said other Member(s) shall pay the purchase price prescribed in the offer.

If no other Member accepts the offer, or if the Member(s) who have accepted such offer default in their obligations to purchase the interest, then the Selling Member, within one-hundred and twenty (120) days after the delivery of the offer, may sell such interest to any other person or entity at a purchase price which is not less than the purchase price prescribed in the offer and upon the terms and conditions which are substantially the same as the terms and conditions set forth in the offer, provided all other applicable requirements of this Agreement are complied with. An assignment of such interest to a person or entity who is not a Member of the Company shall only entitle such person or entity to the allocations and distributions to which the assigned interest is entitled unless such person or entity applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

If the Selling Member does not sell such interest within said one-hundred and twenty (120) days, then the Selling Member may not thereafter sell such interest without again offering such interest to the other Member(s) in accordance with this Agreement.

14. Admission of New Member(s).

The Company may admit new Member(s) (or transferees of any interests of existing Member(s)) into by the purchase or transfer of another Member's ownership interest and a vote for adding the new Member consisting of the majority Members' ownership percentage interest in the Company.

As a condition to the admission of a new Member, such Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Company, as the Company may deem necessary or desirable to effectuate such admission and to confirm the agreement of such Member to be bound by all of the terms, covenants, and conditions of this Agreement, as the same may have been amended. Such new Member shall pay all reasonable expenses in connection with such admission, including without limitation, reasonable attorneys' fees and the cost of the preparation, filing or publication of any amendment to this Agreement or the Articles of Organization, which the Company may deem necessary or desirable in connection with such admission.

No new Member shall be entitled to any retroactive allocation of income, losses, or expense deductions of the Company. The Company may make pro-rata allocations of income, losses, or expense deductions to a new Member for that portion of the tax year in which the Member was admitted in accordance with Section 706(d) of the Internal Revenue Code and regulations thereunder.

In no event shall a new Member be admitted to the Company if such admission would be in violation of applicable Federal or State securities laws or would adversely affect the treatment of the Company as a partnership for income tax purposes.

15. Sale of Company.

The sale of the Company, either partially or in its entirety, shall only be approved by a vote of over fifty percent (50%) of the Members' ownership-interest. Any purchase agreement that is presented to the Company shall be reviewed by up to fifteen (15) days by the Member(s) and put up to a vote within a seven (7) day period thereafter. At the option of any Member, the vote may be delayed by up to thirty (30) days to review the details of the purchase.

If an agreement to sell the Company is approved by the Member(s), then all sale proceeds shall first be paid to the debt of the Company unless the Buyer is accepting some or all of the debt as part of the purchase. All remaining proceeds shall be dispersed in relation to each Member's percent ownership-interest in the Company.

16. Withdrawal Events.

In the event of the death, retirement, withdrawal, expulsion, or dissolution of a Member, or an event of bankruptcy or insolvency, as hereinafter defined, with respect to a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company pursuant to the Statutes (each of the foregoing hereinafter referred to as a "Withdrawal Event"), the Company shall terminate sixty (60) days after notice to the Member(s) of such withdrawal Event unless the business of the Company is continued as hereinafter provided.

Notwithstanding a Withdrawal Event with respect to a Member, the Company shall not terminate, irrespective of applicable law, if within the aforesaid sixty-day period the remaining Member(s), by the unanimous vote or consent of the Member(s) (other than the Member who caused the Withdrawal Event), shall elect to continue the business of the Company.

In the event of a Withdrawal Event with respect to a Member, any successor in interest to such Member (including without limitation any executor, administrator, heir, committee, guardian, or other representative or successor) shall not become entitled to any rights or interests of such Member(s) in the Company, other than the allocations and distributions to which such Member is entitled unless such successor in interest is admitted as a Member in accordance with this Agreement.

An "event of bankruptcy or insolvency" with respect to a Member shall occur if such Member: (1) applies for or consents to the appointment of a receiver, trustee or liquidator of all or a substantial part of their assets; or (2) makes a general assignment for the benefit of creditors; or (3) is adjudicated a bankrupt or an insolvent; or (4) files a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or to take advantage of any bankruptcy, insolvency, readjustment of debt or similar law or statute, or an answer admitting the material allegations of a petition filed against them in any bankruptcy, insolvency, readjustment of debt or similar proceedings; or (5) takes any action for the purpose of effecting any of the foregoing; or (6) an order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall continue unstated and in effect for thirty (30) days.

## 17. Dissolution and Liquidation.

The Company shall terminate upon the occurrence of any of the following : (i) the election by the Member(s) to dissolve the Company made by a vote of over fifty percent (50%) of the Members' ownership-interest.; (ii) the occurrence of a Withdrawal Event with respect to a Member and the

failure of the remaining Member(s) to elect to continue the business of the Company as provided for in this Agreement above; or (iii) any other event which pursuant to this Agreement, as the same may hereafter be amended, shall cause a termination of the Company.

The liquidation of the Company shall be conducted and supervised by a person designated for such purposes by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests (the "Liquidating Agent"). The Liquidating Agent hereby is authorized and empowered to execute any and all documents and to take any and all actions necessary or desirable to effectuate the dissolution and liquidation of the Company in accordance with this Agreement.

Promptly after the termination of the Company, the Liquidating Agent shall cause to be prepared and furnished to the Member(s) a statement setting forth the assets and liabilities of the Company as of the date of termination. The Liquidating Agent, to the extent practicable, shall liquidate the assets of the Company as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

The proceeds of sale and all other assets of the Company shall be applied and distributed in the following order of priority: (1) to the payment of the expenses of liquidation and the debts and liabilities of the Company, other than debts and liabilities to Member(s); (2) to the payment of debts and liabilities to Member(s); (3) to the setting up of any reserves which the Liquidating Agent may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Company, which reserves shall be paid over to a licensed attorney to hold in escrow for a period of two years for the purpose of payment of any liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as provided; (4) to the Member(s) in proportion to their respective capital accounts until each Member has received cash distributions equal to any positive balance in their capital account, in accordance with the rules and requirements of Treas. Reg. Section 1.704-1(b)(2)(ii)(b); and (5) to the Member(s) in proportion to the Members' Percentage Interests.

The liquidation shall be complete within the period required by Treas. Reg. Section 1.7041(b)(2)(ii)(b).

Upon compliance with the distribution plan, the Member(s) shall no longer be Member(s), and the Company shall execute, acknowledge and cause to be filed any documents or instruments as may be necessary or appropriate to evidence the dissolution and termination of the Company pursuant to the Statutes.

18. Representation of Member(s).

Each of the Member(s) represents, warrants and agrees that the Member is acquiring the interest in the Company for the Member's own account for investment purposes only and not with a view to the sale or distribution thereof; the Member, if an individual, is of legal age; if the Member is an organization, such organization is duly organized, validly existing and in good standing under the laws of its State of organization and that it has full power and authority to execute this Agreement and perform its obligations hereunder; the execution and performance of this Agreement by the Member does not conflict with, and will not result in any breach of, any law or any order, writ, injunction or decree of any court or governmental authority against or which binds the Member, or of any agreement or instrument to which the Member is a party; and the Member shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any State or other governmental authorities, as the same may be amended.

19. Certificates Evidencing Membership.

Every membership interest in the Company shall be evidenced by a Certificate of Membership issued by the Company. Each Certificate of Membership shall set forth the name of the Member holding the membership interest and the Member's Percentage Interest held by the Member, and shall bear the following statement:

"The membership interest represented by this certificate is subject to, and may not be transferred except in accordance with, the provisions of the Operating Agreement of Archer Drilling, LLC dated effective as of April 4th, 2022, as the same from time to time may be amended, a copy of which is on file at the principal office of the Company."

20. Notices.

All notices, demands, requests, or other communications which any of the parties to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been properly given if sent by courier or by registered or certified mail, return receipt requested, with postage prepaid, addressed as follows: (a) if to the Company, at the principal place of business of the Company designated by the Company; and (b) if to any Member, to the address of said Member first above written, or to such other address as may be designated by said Member by notice to the Company and the other Member(s) pursuant to this Agreement.

21. Arbitration.

Any dispute, controversy or claim arising out of or in connection with this Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the city in which the principal place of business of the Company is then located, pursuant to the commercial arbitration rules then in effect of the American

Arbitration Association (or at any other time or place or under any other form of arbitration mutually acceptable to the parties involved). Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in a court of competent jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence, and attorneys' fees, except that in the discretion of the arbitrator, any award may include the attorney's fees of a party if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or in bad faith.

22. Amendments.

This Agreement may not be altered, amended, changed, supplemented, waived, or modified in any respect or particular unless the same shall be in writing and agreed to by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests. No amendment may be made to Articles that apply to the financial interest of the Member(s), except by the vote or consent of all of the Member(s). No amendment of any provision of this Agreement relating to the voting requirements of the Member(s) on any specific subject shall be made without the affirmative vote or consent of at least the number or percentage of Member(s) required to vote on such subject.

23. Miscellaneous.

This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of Archer Drilling, LLC. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

The captions in this Agreement are for convenience only and are not to be considered in construing this Agreement. All pronouns shall be deemed to be masculine, feminine, neuter, singular, or plural as the identity of the person or persons may require. References to a person or persons shall include partnerships, corporations, limited liability companies, unincorporated associations, trusts, estates, and other types of entities.

This Agreement, and any amendments hereto, may be executed in counterparts all of which taken together shall constitute one agreement.

This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof. It is the intention of the Member(s) that this Agreement shall be the sole agreement of the parties, and, except to the extent a provision of this Agreement provides for the incorporation of federal income tax rules or is expressly prohibited or ineffective under the Statutes, this Agreement shall govern even when inconsistent with, or different from, the

provisions of any applicable law or rule. To the extent any provision of this Agreement is prohibited or otherwise ineffective under the Statutes, such provision shall be considered to be ineffective to the smallest degree possible in order to make this Agreement effective under the Statutes.

Subject to the limitations on transferability set forth above, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns.

No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

**IN WITNESS WHEREOF**, the Member(s) have executed this Agreement on April 4th, 2022.

Signature: _____  Date: 4-12-22 _____

Print Name: James Franklin

Signature: _____  Date: 4-12-22

Print Name: Gene Purdy

Signature: _____  Date: 4-12-22

Print Name: Garret Purdy

Signature: _____  Date: April 12, 2022

Print Name: Schad Brannon

**Purdy Oil, LLC**
Location: NE4 Sec 24, T13N R58W;
County/State: Kimball County, Nebraska
Objective Formation:
A.F.E. No.:

Gene Purdy #1
Field: Wildcat
Proposed Total Depth: 10,000'
Preparped by :J Franklin

Paid  Balance  Note

| | | | | Note |
|---|---|---|---|---|
| Acreage | Appraisal Well - 15,000' MD 10,000' TVD | | $100,000 | |
| Location | | | $0 | |
| Mobilization | | | $150,000 | |
| Drilling - Purchase Rig or Rent | 30 days @ $29.9K/day or $590,000 | | $590,000 | If we purchase the rig  $590K if we don't 990K |
| Bond | State of Nebraska | | $100,000 | |
| Mud | Est. | | $60,000 | Additional per NOGC |
| Bits | Est. | | $35,000 | To Start |
| BOP | Est. | | $0 | Could be $85K for special bit |
| Mud Motor | Est. | | $0 | |
| Cementing - Surface | | | $0 | |
| Surface Casing - 1000 8 5/8 24# | | | $0 | |
| Geologist | | | $25,000 | Coult reach $50K for 30 days. |
| Acidization | | | $20,000 | Single zone - Could be 4X |
| Administration | | | $50,000 | |
| Plugging & Abondoning | | | $45,000 | Low risk based upon NMR |
| Contingency | | | $120,000 | |
| | | | $1,295,000 | |

**Total Dry Hole Costs**

**Completion:**

| | | Note |
|---|---|---|
| Conductor Pipe ( 80 ft of 20" @ $ 55.55/ft.) | - | 80' requirement |
| Production Casing (10,000 ft of J55 @ $ 50.00/ft.) | 500,000 | Contingent upon confirmation |
| Cementing | 200,000 | Haliburtor |
| Wellhead | 6,000 | |
| Tubing  (10,00 ft of 2 7/8" @ $ 20.00/ft.) | 200,000 | |
| Downhole Equipment | 44,600 | |
| Production Facilities (Tank Battery) | $250,000 | |
| Miscellaneous | 50,000 | |
| | | |
| Total  Completion Costs | 1,250,600 | |

**Total Drilling and Completion Costs**          $2,545,600

**EXHIBIT 7**
1 page



# EXCEL EQUIPMENT COMPANY INC.
### Construction Equipment • Sales, Consignments and Rentals
*PO Box 191048*
*Boise, ID 83719-1048*
*Bus: (208) 562-0096*
*Fax: (208)562-0163*

## *Rocket Drillco*
## Rig# RD2

**DRAWWORKS:**
**BREWSTER, Model N-4, Single Drum Drawworks, 650Hp, Lebus Grooved for 1-1/8" Line, Hydraulic Makeup & Breakout Catheads, Air Driller's Console, Crown-O-Matic, 8" water cooled brakes,**

**COMPOUND:**
**BREWSTER 2-Engine, In-Line Compound**

**BRAKE:**
**D & H 15" Double Hydromatic Brake With jaw clutch**

**DRAWWWORKS POWER:**
**No. 1 - CATERPILLAR 3306 Diesel Engine 361HP, S/N 64Z33301 w/ 24 Volt Electric Start, Radiator, Gauges,**
**ALLISON 955 Torque Converter.**

**No. 2 - CATERPILLAR 3306 Diesel Engine 361HP, S/N 64Z33298 w/ 24 Volt Electric Start, Radiator, Gauges,**
**ALLISON 955 Torque Converter**

**MAST:**
**SPENCER HARRIS 97'H Cantilever Mast, 285,000 Lb. Static Hook Load, Crown Block w/ (4) 30" Sheave Cluster & (1) 30" Fastline Sheave, 1-1/8" Line, Racking Board, Tong Counter Weights, Ladder, Derrick Climber, Geronimo, 4" Standpipe & Manifold**

**CARRIER:**
**SPENCER HARRIS 40'L, Tri-Axle, Dual Wheel Trailer w/ Leveling Jacks, 57'8"L Back-On-Ramp, Fold Out Walkways, Deadline Anchor, Safety Rails.**

**SUBSTRUCTURE:**
**SHOPBUILT 11'6"W x 16'H x 23'6"L Swing Up Substructure w/ Rotary Beams, (Refurbished in 2009) With Certifications, V Door Ramp, Stairs Safety Rails, Skidded.**

**PUMP: (Primary)**
**GARDNER DENVER PZ9 Triplex Mud Pump, 1000 Hp. W / Forged Steel Fluid End, Quick Change Valve & Cylinder Head Caps, HYDRIL Pulsation Dampener, OTECO 3" Shear Relief Valve, Pressure Gauge, Charging Pump, V-Belt Drive Assembly, Master Skidded w/ Engine**

**EXHIBIT 8**
**10 pages**

**PUMP POWER:**
**CATERPILLAR D-398 Diesel Engine S/N 6685860 w/ Air Start, Radiator, Gauges, Mounted Pump Master Skid.**

**PUMP: (Standby)**
**NATIONAL N1100 Duplex Mud Pump, 500 Hp. w/ Forged Steel Fluid End, Quick Change Valve & Cylinder Head Caps, HYDRIL Pulsation Dampener, OTECO 3" Shear Relief Valve, Pressure Gauge, Charging Pump, V-Belt Drive Assembly, Master Skidded w/ Engine**

**PUMP POWER:**
**CATERPILLAR D-398 Diesel Engine S/N 66B5860 w/ Air Start, Radiator, Gauges, Mounted Pump Master Skid.**

**ROTARY TABLE**
**Gardner Denver 27 -1/2" Rotary Table w/ Split Master Bushings, with raised floor**

**SWIVEL**
**BREWSTER 6S 220 Ton Swivel**

**KELLY**
**Kelly, Square drive , 5-1/4" x 37', with Kelly bushing**

**KELLY VALVES**
**Upper Kelly Valve.**
**Lower Kelly Valve**

**TRAVELING BLOCK / HOOK**
**BREWSTER 175 Ton Block/Hook Combination, with elevator links**

**BLOWOUT PREVENTER and VALVES**
**SHAFFER LWS Double gate, Blowout Preventer 13 5/8" X 3,000 psi**
**13 5/8"Dia. x 30"H x 3 M Drilling Spools. 3,000 Psi. Choke Manifold. Choke Valves- Kill Valves-**

**CLOSING UNIT**
**Closing Unit., 6 station, with drillers control panel**
**120 Gal 5 station accumulator w/remote**

**RIG HOUSES:**
**Dog House, 10'W x 50'L Doghouse w/ (4) Lockers, Knowledge Box, Parts Room, Bench Storage, (1) Heater, Air Conditioner, Lights, Skidded**

**SHOPBUILT 8'W x 25'L Mud House w/ Pump parts Room, Mud Hopper, Heater, Lights, Skidded.**

**UTILITY HOUSES/GENERATORS:**
**Utility House, 10'W x 50'L, Electrical Panel, Air Compressor, Transformer**

**No. 1 - DETROIT 350 Kw. AC Generator**
**Powered By DETROIT Series 60 Diesel Engine w/ Electric Start, Radiator, Gauges.**

**No. 2 - CATERPILLAR 234 Kw. AC Generator**
 **Powered By Caterpillar, 3306, Diesel Engine w/ Electric Start, Radiator, Gauges**
**All above Mounted 12'W x 50'L Utility House w/ Parts Room, Lights, Skidded**

**MUD SYSTEM:**
**SHOPBUILT, 10'W x 6'H x 42'L, 432 Bbl. Suction Tank w19' Porch, (3) Compartment, (3) OILWORKS**
**Pit boss 10 Hp. Mud Agitators p/b BALDOR 10 Hp. Electric Motors, Slant Bottom, Internal Plumbing,**
**Top Mounted Walkways, Safety Rails, Lights, Skidded. MISSION 5" x 6" Centrifugal Pump p/b TECO**
**50 Hp. Electric Motor**

**SHOPBUILT 10'W x 6'H x 42'L, 432 Bbl. Shaker Tank w/ 9' Covered Porch, (4) Compartment,**
**(1) OILWORKS Pitboss 10 Hp. Mud Agitator S/N 2143 p/b BALDOR 10 Hp. Electric Motor, Slant**
**Bottom,**
**Internal Plumbing, Top Mounted Walkways, Safety Rails, Lights, Skidded.**
**FIVE STAR 5" x 6" Centrifugal Pump p/b TECO 50 Hp.  Electric Motor**
**FIVE STAR 5" x 6" Centrifugal Pump p/b TECO 50 Hp. Electric Motor**
**FLUID SYSTEMS, Single Screen, Linear Motion Shale Shaker S/N 2314**
**O'DRILL / MCM, Desilter w/ (8) 4" Cones**
**O'DRILL / MCM, Desander w/ 2 10" Cones**

**WATER TANK**
**SHOPBUILT 10'W x 8'H x 40'L, 549 Bbl. Water Tank w/Parts Room, Parts Bins, Lubester, Lights,**
**Centrifugal Water Pump, with Dog house stand inside, Oilfield Skidded**
**FUEL TANK**
**SHOPBUILT 8'W x 8'H x 30'L, 13,837 Gallon Fuel Tank w/ (2) Fuel Transfer Pumps, Oilfield Skidded**

**MISCELLANEOUS EQUIPMENT INCLUDING**

**Approx. 6' X 20' Bubble buster flash tank**
**1 set type C tongs w/heads**
**12" x 400 x 10" crossover spool**
**41 Misc. handling and crossover subs**
**Wire line unit XCE serial # 01 006N4**
**2 pin ROP and weight indicator**
**2 sets slips**
**400K weight indicator**
**2 sets elevators**
**3" Marlow trash pump**



**EXCEL EQUIPMENT COMPANY INC.**
**Construction Equipment • Sales, Consignments and Rentals**
**PO Box 191048**
**Boise, ID 83719-1048**
**Bus: (208) 562-0096**
**Fax: (208)562-0163**

**Rig# R4**

**DRAWWORKS:**
**DRILLMASTER 1200M New (2009) Single Drum Drawworks, 1,200 Hp**
**Lebus grooved for 1-1/4" Drilling Line, Hydraulic operated Makeup**
**& Breakout winches, Over-Running Clutch, Air Driller's Console, Crown-O-Matic standard chain drive**
**for rotary table.**

**COMPOUND:**
**2-Engine, In-Line Compound For rotary & Drawworks drive.**
**BRAKE:**
**Superior 4 section 60" Hydromatic Brake**

**DRAWWWORKS POWER:**
**No. 1 – CATERPILLAR C-18 Diesel Engine S/N# WJH01256,**
**600 Hp Rated, w/24 Volt Electric Start, Radiator, Gauges,**
**Allison S-6610 6 speed transmission Air clutch**
**Hours# 18,307**
**No. 2 – CATERPILLAR C-18 Diesel Engine S/N# WJH01260,**
**600 Hp Rated, w/24 Volt Electric Start, Radiator, Gauges,**
**Allison S-6610 6 speed transmission Air clutch**
**Hours# 17,854**
**Hydraulic power unit 40HP for tong winches and boom line winch**

**MAST:**
**DRILLMASTER New 2009 SN#09864 20'1 1"W x 136'H Cantilever Mast,**
**With a Gross Nominal Capacity of 915,000 Lbs. and a**
**650,000 Lb. Static Hook Load, Max wind 91 Knots,**
**with ten (10) lines. Crown Block w/ (5)42" Sheave Cluster &**
**1-56"Fast line Sheave grooved for 1-1/4" diameter drilling line.**
**Each Crown Sheave wire rope groove is flame hardened.**
**Each Crown Sheave is fitted with Timken roller bearings and grease seals.**
**Derrick complete with Crown Safety Platform, 20 finger Racking Board W/ electric mule, Bridal**
**Lines, Tong Counter Weights, Survey Line Sheaves,**
**Tugger Sheaves, Ladder, Derrick Climber, Geronimo line,**
**4" Standpipe & Manifold and Derrick Stand.**
**Last Certification 8/23/2009**

**SUBSTRUCTURE:**
**DRILLMASTER New (2009) 29'10"W x 20'H x 48'8"L**
**(4) Box-On-Box Substructure w/ Rotary Beams, V-Door Ramp,**
**Stairs, (2) Air Receiver Tanks, NATIONAL Deadline Anchor, Hydraulic power unit 40HP, Safety Rails,**
**inside Catwalk Trolley, 7'W x 14'L built in Tool**
**Room (ODS) (3) Stairs, Outside wall Winterized, Jacking door,**
**12' X 12' Setback spreader, internal stairway, Vapor proof lighting,**
**Skidded with oilfield tail rolls**

**PUMP: (Primary)**
**CNPC Equipment F-1000 Triplex Mud Pump New 2009,**
**S/N BZ11-040E, 1,000Hp.**
**w/ LANZOU Pulsation Dampener**
**MF 5,000 Psi. Pressure Gauge**
**FIVE STAR 6"x8"x14" Charging Pump  p/b TECO 75 Hp. Electric Motor,**
**Chinese 3"Shear Relief Value, Master Skidded w/ (2) Engines belt compound**

**PUMP POWER**
**CATERPILLAR C-18 Diesel Engine S/N WJHO1709,**
**575 HP w/24 Volt Electric Start, Radiator, Gauges,**
**V-Belt Drive EATON 18CB500 Air Flex Clutch,**
**Mounted Pump Master Skid.**
**Hours # 14,911**
**CATERPILLAR C-18 Diesel Engine S/N WJH01683,**
**575 HP w/ 24 Volt Electric Start, Radiator, Gauges,**
**V-Belt Drive EATON18CB500 Air Flex Clutch,**
**Mounted Pump Master Skid**
**Hours#14,859**

**PUMP (Secondary)**
**CNPC Equipment F1000 Triplex Mud Pump New 2009,**
**S/N BZ11-024E, 1,000 Hp.**
**w/ LANZHOU Pulsation Dampener ,**
**MF 5,000 Psi. Pressure Gauge**
**FIVE STAR 6" x 8" x14" Charging Pump  p/b WORLDWIDE 75 Hp. Electric motor,**
**3" Shear Relief Valve, Master Skidded w/ (2) Engine belt compound**

**PUMP POWER**
**CATERPILLAR C-18 Diesel Engine S/N WJH-1696,**
**575 HP w/ 24 volt Electric Start, Radiator, Gauges,**
**V-Belt Drive, EATON 18CB500 Air Flex Clutch,**
**Mounted pump Master Skid.**
**Hours#14,188**
**CATERPILLAR C1-8 Diesel Engine S/N WJH-1713,**
**575 HP w/ 24 Volt Electric Start, Radiator, Gauges,**
**V-Belt Drive, EATON 18CB500 Air Flex Clutch,**
**Mounted Pump Master Skid.**
**Hours#14,209**

**ROTATING EQUIPMENT:**
**ROTARY TABLE**
**Liberty RT-275, New 2009, complies with API split master bushings,**
**W/ chain drive sprocket, 500 Ton capacity**

**SWIVEL**
**Ideco 450**

**KELLY**
**5-1/4" x 42' Hex Kelly W/ HDS Kelly Drive Bushing**

**KELLY SPINNER**
**OWI 1500 Kelly Spinner S/N 00474B w/ (2) Air Motors,**

**KELLY VALVES**
**Upper Kelly Valve.**
**Lower Kelly Valve**

**TRAVELING EQUIPMENT**
**Sentry Rig Equipment Company**
**350 Ton Capacity New 2009**
**4G350 Traveling Block w/ (5) 36" Sheaves, 1-1/4" Line,**
**Unitized "Hydra-Hook" 350 Ton Capacity**

**BLOWOUT PREVENTER and VALVES**
**1 EACH -13-5/8" X 5000# Jiangsu Xianz hong Petroleum**
**Double Gate BOP, Top & Bottom Stud configuration**
**Including - 1set of 5" Pipe Rams Blocks & 1set of Blind Rams,**
**With 2 - 4" outlets on each side of Body of BOP**

**1 EACH - 13-5/8" SHAFFER ANNULAR BOP**
**Includes rubber element**

**1 EACH - 13 5/8" X 5000# Type D DRILLING SPOOL W/ - 2" SIDE OUTLET & 3" SIDE OUTLET**
**[MATCHED TO CHOKE MANIFOLD**

**1 EACH - CHOKE MANIFOLD - 3" X 5000# COMPLETE**
**INC - STEEL FLEX LINE W/ FLANGES TO CONNECT**
**TO BOPS OR DRILLING SPOOLS**

**CLOSING UNIT**
**2008 Jiangsu Xianz hong Petroleum Model FXQ640-6**
**Closing Unit Accumulator, 6 Station,**
**Rig Floor Controls and monitor panel,**
**Complete W/ 15 Bottles, 30 HP Cat 3517 Charge Pump, 2 Air Pumps, & set up for Nitrogen Bottle**
**Backup**
**Suitcase Closing Unit Skid 7'-1 0" x 35' with junk basket**

**CHOKE MANIFOLD and VALVES**
**Jiangsu Xianz hong Petroleum Choke Manifold w/ (1) 5-Way Cross, (3) 4-1/16"x 5M**
**Gate Valves, (4) 2-9/16" x 5M Gate Valves, (1) Manual**
**Adjustable Chokes, Hydraulic Adjustable Chokes, Mounted Oil Field Skid.**
**W/ 2 Kill Valves- & 2-Choke Valves mounted at drilling spool**

**RIG HOUSES:**
**Dog House,**
**DRILLMASTER 9' 1 1"W x 39' 1 1"L**
**Doghouse / Change house Combination w/ 17'5"L**
**Driller's House w/ Knowledge Box (5) Lockers, Bench Storage, Heater, Lights.**
**5'L Breezeway, 1 7'5"L Change House, w/Bench Storage, (16-Lockers,**
**Cabinets, Heater & Lights. Oil Field Skidded.**

**GENERATOR/UTILITY HOUSES**
**DRILLMASTER 1 1'10"W x 37'9"L x 11' 6" T**
**Utility House w/Lights, Oil Field Skidded to include the following items.**

**No #1 380 Kw. AC CATERPILLAR Generator Package Powered by Caterpillar C-15 Diesel Engine S/N**
**JRE01987 w/ 24 Volt Electric Start, Radiator, HD Air cleaner Gauges. Marathon 572RSL4025**
**Generator End SN# 554268-1106, complete with Oil Field skid.**
**Hours# 14,574**

**No #2 380 Kw. AC CATERPILLAR Generator Package Powered by Caterpillar C-15 Diesel Engine S/N**
**JRE01970 w/ 24 Volt Electric Start, Radiator, HD Air cleaner Gauges. Marathon 572RSL4025**
**Generator End SN# 554273-1106, complete with Oil Field skid.**
**Hours# 15,717**

**NO. 1 GARDNER-DENVER EBE99N New 2006**
**Electro Saver II Rotary Screw Air Compressor S/N# S237421,**
**P/b TOSHIBA 30 Hp. Electric Motor, Mounted 240 Gallon Horizontal Tank.**
**Hours# 15,128**

**NO. 2 GARDNER-DENVER EBE99N New 2006**
**Electro Saver II Rotary Screw Air Compressor S/N# S237419,**
**P/b TOSHIBA 30 Hp. Electric Motor, Mounted 240 Gallon Horizontal Tank.**
**Hours# 14,400**

**SIEMENS Interlock Panel, 600 Amp 480 Volt Main Lockout Disconnects breakers.**

**ALLEN BRADLEY Electrical Load center with magnetic starter & breakers,**

**SQUARE D 225 amp 240 volt panel with breakers**

**SQUARE D 75KVA Transformer 480 volt to 240 volt**

**DRILLMASTER 7'9"W x 13"H x 43'1"L Electrical Suitcase.**

**DRILLMASTER 2'5"W x 1 3"H x 36'3"L Electrical Suitcases.**

**MUD SYSTEM:**
**DRILLMASTER 9'6"W x 7'H x 34'5"L, 394 Bbl. Suction Tank**
**10'L Covered Porch, (3) Compartments,**
**(3) MAX 2000 Mud Agitators p/b TECO 25 Hp. Electric Motors,**
**Sloped Bottom, Top Mounted Walkways, Safety Rails, Lights, Oil Field Skidded.**
**FIVE STAR 6"x8"x14" Centrifugal Mixing Pump S/N 5284, p/b BALDOR 75 Hp. Electric Motor.**
**FIVE STAR 6"x8"x14" Centrifugal Mixing Pump S/N 5284, p/b BALDOR 75 Hp. Electric Motor.**
**With internal jetting system, 3 dump gates.**

**DRILLMASTER 9'6"W x 7'H x 34'7"L, 394 Bbl. Shaker Tank**
**10'L Covered Porch, (3) Compartments**
**MAX 2000 Mud Agitator Agitators p/b TECO 25 Hp. Electric Motors,**
**Sloped Bottom, Top Mounted Walkways, Safety Rails, Lights, Skidded.**
**With internal jetting system, 3 dump gates.**

**FIVE STAR 6"x8"x14" Centrifugal Mixing Pump S/N 5269, p/b BALDOR 75 Hp. Electric Motor.**

**FIVE STAR 6"x8"x14" Centrifugal Mixing Pump S/N 5283, p/b BALDOR 75 Hp. Electric Motor.**

**SHALE SHAKER, Fluid Systems Inc., Single Screen, Linear Motion Shale Shaker S/N2450,**

**SHALE SHAKER, Fluid Systems Inc., Single Screen, Linear Motion Shale Shaker S/N3089,**

**NOI DSN-ZH-10CTX Desander S/N 8714-5732,w/ (2) 10" Cones.**

**NOI DSL-10GG-4CTX Desilter S/N 8714-5731,w/ (10)4" Cones.**

**DRILCO "Deep Pit" Degasser p/b TECO 10 Hp. Electric Motor**

**Bubble Buster: Geothermal Type Bubble Buster**

**MUD HOUSE**
**DRILLMASTER 9' 1 1"W x 26'L Mud House w/Mud Hopper, Test Sink, Ventilation Fan, Electric Heater, Lights, Double Side Door, (2) End Doors, Skidded.  Includes 7'H Tri-Stand on one end the other end sets on suction tank.**

**FUEL TANK**
**DRILLMASTER 7'1 1"Wx8'Hx30'L, 13,860 Gallon Fuel Tank**
**w/ (2) AMT 1/2 Hp. Fuel Transfer Pumps p/b BALDOR 1/2 Hp. Electric Motors,**
**With Three (3) Compartments, Combo Lubester Oilfield Skidded.**

**WATER TANK**
**DRILLMASTER 10'10"W x 8'1"H x 35'L, 529 Bbl. Water Tank**
**w/ 10'L Covered Extension, Pump Room, OilField Skidded**

**FIVE STAR 3"x4"x1 1" Centrifugal Water Pump**
**S/N 5420, p/b TECO 20 Hp. Electric Motor.**

**FIVE STAR 3"x4"x1 1" Centrifugal Water Pump**
**S/N5267, p/b TECO 20 Hp. Electric Motor.**

**INSTRUMENTATION**
**Weight Indicator**
**Mud Gauges.**

**ANCILLARY EQUIPMENT:**
**DRILLMASTER 5'W x 2'4"H x 60'L, 2-Section Catwalk w/ Steel Deck and stands for string blocks.**

**Pipe Racks 5 Sets 29" x 30' 1 set 29" x 12' 1 set 41" x 30'**

**FIVE STAR "Retriever" Electric Measuring Device S/N 862, w/ 15,000 Ft. of. 092 Wire line**

**2 sets drill pipe elevators 5"**

**2 sets of drill pipe slips 5"**

**2 sets of drill collar slips 7" & 9"**

**2 sets tongs with all head for pipe & casing**

**2 sets of safety clamps**

**Mud box**

**108" 4" elevator bails**

**Crossover, bottom hole, lifting Subs**

**Air Hoist Air Wrench, Model HUL40, S/N-REM10370, 9000 lb. Pull Rating**

**Air Hoist Air Wrench, Model KSUL, S/N-REM13962, 10,500 lb. Pull Rating**

**4,000 Ft. of 1-1/4" Drill Line, Mounted Spooler Stand**

**3-1/2" X 5,000 Psi. Rotary Hose**

**Vibrator Hose 2 Each 3 ½" x 18'**

**Rat hole**

**Mouse hole**

**8 rig matting boards**

**Small hand tools & wrenches**

**Fluorescent & Mercury-Vapor Rig Lights & Wiring Explosion proof**

**Atco Office/ living shack all electric w/ oil field skid**



ARCHER DRILLING, LLC
1100 Harrison Dr.
P.O. Box 94
Pine Bluffs, Wyoming 82082

## INVOICE FOR SERVICES RENDERED

**September 20, 2022**

**Purdy Oil, LLC**
**P.O. 94**
**Pine Bluffs, Wyoming 82082**
**Attn: James Franklin & Gene Purdy**

Re: Invoice for Mobilization and Drilling Equipment Rental Costs for Purdy Farms 1 Well (API # 26015227690000)

Dear Mr. Franklin and Mr. Purdy,

Enclosed is Archer Drilling, LLC's invoice for 87 days of equipment rental in the amount of **$2,262,000.00** for Purdy Oil, LLC's share of the mobilization and drilling costs for the Purdy Farms 1 Well in Kimball County, Nebraska, as provided for under Section I, Paragraph 2 of the Exploration Agreement dated [November 29, 2021] (the "Exploration Agreement") by and between Purdy Oil, LLC ("***Purdy Oil***") and Digital Licensing, Inc. With reservation of all rights with respect to any additional amounts which may be due and owing by Purdy Oil to Archer Drilling, the enclosed invoice represents all amounts incurred to date with respect to the mobilization and drilling of the Purdy Farms 1 Well, less the $1,056,000 provided for in Section III, Paragraph 2 of the Exploration Agreement.

The amounts due and owing Archer Drilling by Purdy Oil as reflected by the enclose invoice are immediately due and payable.

Archer Drilling, LLC

By: _____

Name: Roy Nelson
Title: Chief Operations Officer

| Month | Dates | No. Days | Equipment Day Rate $26,000 |
|-------|-------|----------|----------------------------|
| JUN 2022 | June 20th – June 30th | 11 Days | $286,000.00 |
| JUL 2022 | July 1st – July 31st | 31 Days | $807,000.00 |
| AUG 2022 | Aug 1st – Aug 31st | 31 Days | $807,000.00 |
| SEP 2022 | Sept 1st – Sept 14th | 14 Days | $364,000.00 |
| **Total** | | **87 Days** | **$2,262,000.00** |

**EXHIBIT 9**
**1 page**

US_ACTIVE\122344835\V-1

**connie@neilan.law**

| | |
|---|---|
| **From:** | Gene Purdy <purdyfarms1@gmail.com> |
| **Sent:** | Friday, October 7, 2022 3:47 PM |
| **To:** | James Franklin |
| **Subject:** | I need funds! |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

James

The Purdy Oil account was overdrawn, and funds were being debited from my Purdy Farms account. Before Archer Drilling stepped in the outstanding invoices ended up totaling $88,708.88. Your portion is (96.67%) = $85,563.61. My portion is (3.5456%) = $3,147.27. I have my portion, but I need to collect your portion. I need to know if you can pay your portion or if I am going to have to shut the company down to limit the damage. I didn't sign up to pay your portion of Purdy Oil.

Gene

EXHIBIT 10
1 page

29

State of Nebraska, Kimball County, as filed for record
on the 19th day of October, 20 22 at 1:10pm
Book OG 933      Page 29-30
Cathleen A. Sibal, Kimball County Clerk
By HP

| F | N | A |
|---|---|---|
| HP | HP | HP |

Return to:
Purdy Oil, LLC
PO Box 94
Pine Bluffs, WY 82082

## TERMINATION OF OIL, GAS AND MINERAL LEASE

EXHIBIT 11
2 pages

*30*

**PURDY FARMS**
**P.O. BOX 94**
**PINE BLUFFS, WYOMING 82082**

7 October 2022

Purdy Oil, LLC
P.O. Box 94
Pine Bluffs, Wyoming 82082

Re:  Termination of Oil, Gas and Mineral Lease dated 22 November 2021 from Purdy Farms as
Lessor to Purdy Oil, LLC, as Lessee.

Gentlemen:

Please be advised that Purdy Farms is hereby terminating and rescinding, effectively
immediately, the Oil, Gas and Mineral Lease dated 22 November 2021, from Purdy Farms, as
Lessor, to Purdy Oil, LLC (*"Purdy Oil""*), as Lessee, covering the N/2 and SW/4 of Section 24,
T13N, R58W, Kimball County, Nebraska (the *"Subject Lease"*).  Without waiver of any other
grounds for termination and rescission, Purdy Farms is terminating and rescinding the Subject
Lease for failure of consideration.  Specifically, Gene Purdy agreed to grant the Subject Lease, as
a Capital Contribution, to Purdy Oil in consideration for James Franklin's and GSSR's agreement
to contribute $2,750,000, as Capital Contributions, to Purdy Oil to fund the development of the
Subject Lease.   James Franklin and GSSR have failed to make their required Capital
Contributions to Purdy Oil in the amount of $2,750,000, or any part thereof, rendering Purdy
Oil incapable of meeting its financial obligations relating to the drilling and development of the
Subject Lease.

10-7-22

Gene Purdy, aka Purdy Farms

State of Nebraska
County of Kimball

The foregoing instrument was acknowledged before me this 10th
day of October, 2022.

Josi Morgan, Notary Public

GENERAL NOTARY - State of Nebraska
JOSI MORGAN
My Comm. Exp. August 24, 2009

US_ACTIVE\122344885\V-1

, 31

State of Nebraska, Kimball County, as filed for record
on the 19ᵗʰ day of October, 2022 at 2:11 pm
Book OG 233      Page 31- 43
Cathleen A. Sibal, Kimball County Clerk
By HP

| F | N | A |
|---|---|---|
| HP | HP | HP |

Return to:
Purdy Farms
PO Box 94
Pine Bluffs, WY 82082

## OIL, GAS AND MINERAL LEASE

EXHIBIT 12
13 pages

*32*

## OIL, GAS AND MINERAL LEASE

### Nebraska

THIS AGREEMENT is made and entered into this 8ᵗʰ day of October 2022, between Gene and/or Rhonda Purdy aka Purdy Farms, Lessor (whether one or more), whose address is P.O. Box 94, Pine Bluffs, Wyoming, 82082, and Digital Licensing, Inc. aka DLI, Lessee whose address is: 30 N Gould St., Ste M. Sheridan, Wyoming 82801.

1.      GRANT.  Lessor, in consideration of a cash payment and other good and valuable consideration in hand paid, of the royalties herein provided for, and of the agreements of Lessee herein contained, hereby grant, leases and lets exclusively unto Lessee the land described in paragraph 2 below, hereinafter referred to as leased premises, for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas (the term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gases), sulphur, fissionable materials, and all other minerals, conducting exploration, geological and geophysical surveys, core tests, gravity and magnetic surveys, for introducing or injecting fire, air, gas, steam, water, salt water, chemicals, and fluids or substances into any subsurface stratum or strata which is not productive of fresh water for primary, secondary and other enhanced recovery operations.

2.      LEASED PREMISES.  (Description) T13N R58W Section 24, N2; SW4 in the County of Kimball, State of Nebraska, containing 480 gross acres, more or less, including all riparian rights and any interests therein which Lessor may hereafter acquire by reversion, accretion, prescription or otherwise.  For the purpose of determining the amount of any rentals or shut-in payments hereunder, the number of gross acres above specified shall be deemed correct, whether actually more or less.

3.      TOP LEASE.   It is agreed that if and to the extent that this Lease covers any oil, gas or other minerals that are subject to an existing oil, gas and/or mineral lease that has not expired or been released (an "Existing Lease"), this is a top lease with respect to such Existing Lease and, in such case, the primary term of this lease insofar as it covers oil, gas or other minerals subject to such Existing Lease, shall commence earliest to occur of (a) the date that written releases are filed in the official public records of the county in which the land is located by all owners of record of the Existing Lease; (b) the date upon which a judgment of a court of competent jurisdiction terminating the Existing Lease becomes final and non-appealable, or (c) the date on which Lessor and Lessee agree that the primary term shall commence. This Lease is intended to and does include and vest in Lessee any and all remainder and reversionary interest and after-acquired title of Lessor in any Existing Lease upon expiration or the release of such Existing Lease.  With respect to all lands and oil, gas and other minerals covered by this Lease which are not subject to an Existing Lease, the primary term of this Lease shall commence on the date set out above.  The date on which this Lease commences shall be referred to herein as the "Effective Date."

4.      TERM.  Subject to the other provisions herein contained, this Lease shall be for a term of three (3) years from the Effective Date hereof (called "primary term") and as long thereafter as oil, gas, sulphur, fissionable materials or other mineral is produced in paying quantities from the leased premises or land pooled therewith, or this lease is otherwise maintained in force and effect pursuant to other provisions herein contained.

5.      RENTAL PAYMENT.  Subject to the other provisions herein contained, if production of oil and gas from drilling or mining operations is not present on said land, or on acreage pooled therewith as hereinafter provided for, on or before one year from the Effective Date hereof, Lessee shall pay or tender, or make a bona fide attempt to pay or tender, to Lessor, or to the credit of Lessor, which depository and its successors shall be Lessor's agents and shall continue as the depository for all rentals

US_ACTIVE\122343192\V-2

*33*

payable hereunder regardless of changes in ownership of said land or rentals, the sum of **Nine Hundred Sixty Dollars ($960.00 )** hereinafter called rentals, which shall cover the privilege of deferring commencement of drilling or mining operations for a period of twelve (12) months. In like manner and upon like payment or tenders in advance for Three years for the commencement of drilling or mining operations may be further deferred for successive periods of twelve (12) months each during the primary term of **THREE** years. All payments or tenders may be made in currency, or by check or by draft, and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails on or before the rental due date in a stamped envelope addressed to the depository or to the Lessor at the last address known to Lessee shall constitute proper payment.

6.   ROYALTY PAYMENT. The royalties to be paid to the Lessor are: (a) On oil, 12.5% of that produced and saved from said land, the same to be delivered at the wells or to the Lessor's credit into the pipelines to which the wells may be connected, Lessee shall have the continuing right to purchase such production at the wellhead market price then prevailing in the same field (or if there is no such price then prevailing in the same field, then the nearest field in which there is such a prevailing price) for production of similar grade and gravity. Lessee may sell any royalty oil in its possession and pay Lessor the price received by Lessee for such oil computed at the well; (b) For gas (including casinghead gas) and all other substances covered hereby (i) if used off the leased premises or used in the manufacture of gasoline or other products, the market value at the well of one-eighth (1/8) of the gas so used, or (ii) if sold on or off the leased premises, 12.5% of the amount realized from such sale, provided the amount realized from the sale of gas on or off the leased premises shall be the price established by the Gas Sales Contract entered into in good faith by Lessee and gas purchaser, provided that on gas sold by Lessee the market value shall not exceed the amount received by Lessee for such gas computed at the mouth of the well; (c) If a well on the leased premises or lands pooled therewith is capable of producing oil or gas or any other substance covered hereby but such well is either shut-in or production therefrom is not being sold or purchased by Lessee or royalties on production therefrom are not otherwise being paid to Lessor, and if this lease is not otherwise maintained in effect, such well shall nevertheless be considered as though it were producing for the purpose of maintaining this lease, whether during or after the primary term, and Lessee shall tender a shut-in payment of One Dollar per acre then covered by this lease, such payment to be made to Lessor or to Lessor's credit in the depository designated above, on or before 90 days after the next ensuing anniversary date of this lease, and thereafter on or before each anniversary date hereof while the well is shut-in or production therefrom is not being sold or purchased by Lessee or royalties on production therefrom are not otherwise being paid to Lessor. This lease shall remain in force so long as such well is capable of producing and Lessee's failure to properly pay shut-in payment shall render Lessee liable for the amount due but shall not operate to terminate this lease. The intermittent production from any well during such year shall not render necessary any new or additional shut-in payments with respect to such well and the acreage ascribed thereto.

7.   POOLING. Lessee shall have the right but not the obligation during or after the primary term while this lease is in effect to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all depths or horizons, and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it necessary or proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The unit formed by such pooling for an oil well shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a gas well shall not exceed 640 acres plus a maximum acreage tolerance of 10%, except that larger units may be formed for oil wells or gas having jurisdiction. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling or reworking operations on die leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit

2

US_ACTIVE\122343192\V-3

*34*

production produced and saved which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit. Pooling in one or more instances shall not exhaust Lessee's pooling rights hereunder, and Lessee shall have the recurring right but not the obligation to revise any unit formed hereunder by expansion or contraction, or both, either before or after commencement of production, in order to conform to the well spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are payable hereunder shall thereafter be adjusted accordingly. In the absence of production from a unit, or upon permanent cessation thereof, Lessee may terminate the unit by filing of record a written declaration describing the unit and stating the date of termination.

8.      OPERATIONS. If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled therewith, or if all production (whether or not in paying quantities) ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences operations for reworking an existing well or for drilling an additional well on the leased premises or lands pooled therewith within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production, or, should the lease be within the primary term, if Lessee tenders rentals on or before the next rental payment date (if any) next ensuing after the expiration of said 90-day period; provided that should completion of operations on the dry hole or cessation of all production occur less than 90 days before the last rental payment date, no rental payments or further operations shall be required to maintain this lease for the remainder of the primary term. If at the end of the primary term or any time thereafter, oil, gas or other substances covered hereby are not being produced *in* paying quantities from the leased premises or lands pooled therewith, but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or restore production therefrom, this lease shall remain in force so long as such operations are prosecuted with no cessation of more than 90 consecutive days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to formations then capable of producing in paying quantities an the leased premises or lands pooled therewith, or (b) protect the leased premises from uncompensated drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells except as expressly provided herein.

9.      LESSER INTEREST. Should Lessor own less than the full mineral estate in all or any part of the leased premises, the royalty and shut-in payments, payable hereunder shall be reduced to the proportion that Lessor's mineral interest in such part of the leased premises bears to the full mineral estate in such part of the leased premises.

10.     ANCILLARY RIGHTS. Lessee may use in its operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds, unless otherwise granted. The right of ingress and egress granted hereby shall apply to the entire leased premises described in Paragraph 2 above, notwithstanding any partial release or other termination of this lease with respect thereto. If expressly requested in writing by the surface owner, Lessee agrees to bury pipelines across cultivated land below ordinary plow depth, as such depth may he determined at the

3

*35*

time of burial. After the pipeline has once been laid below such depth, Lessee shall not thereafter be required to restore the ground cover, or to lower, or to remove such pipeline unless the surface owner first agrees in writing to bear the entire cost thereof, and advances to Lessee the estimated cost thereof. No well shall be located less than 200 feet from any house or barn now on the leased premises without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises, and to timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises during the term of this lease or within a reasonable time thereafter. Lessee may lay pipelines, build roads, tanks, power stations, erect telephone and power lines, and construct other facilities deemed necessary by Lessee on and aver and across the leased premises and other lands owned or claimed by Lessor adjacent and contiguous thereto to produce, save, take care of, treat, transport and own products granted by this lease.

11.   OWNERSHIP CHANGES.  The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or horizon, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors, and assigns. No change in Lessors ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessee's usual form of division order. In the event the death of any person entitled to shut-in payments hereunder, Lessee may pay or tender such shut-in payments to the credit of decedent or decedent's estate in the depository designated above. If at any time two or more persons are entitled to shut-in payments hereunder, Lessee may pay or tender such shut-in payments to such persons or to the credit in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in payments hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

12.   BREACH OR DEFAULT.  No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after such judicial determination to remedy the breach or default and Lessee fails to do so. This Paragraph 11 shall not apply to erroneous payment of rental.

13.   WARRANTY OF TITLE.  Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder and agrees that Lessee at Lessees option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties, or shut-in payments otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in payments hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved. Lessee shall have the right to accept leases or conveyances from others owning or claiming to own interests in the leased premises or minerals

4

US_ACTIVE\122343192\V-3

*36*

covered hereby adverse to the rights of Lessor herein. Should Lessee become involved in any dispute or litigation arising out of any claim adverse to the title of Lessor to said leased premises, Lessee may recover from Lessor its reasonable and necessary expenses and attorney fees incurred in such dispute or litigation, with the right to apply royalties accruing hereunder toward satisfying said expenses and attorney fees.

14.   REGULATION AND DELAY. Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations, and orders of any governmental authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed or interrupted by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike, or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this lease shall not terminate because of such prevention, delay or interruption, end shalt be maintained in force and effect for so long as such force majeure continues, and for 60 days thereafter, or so long as this lease is maintained in force by some other provisions thereof; whichever is the later date. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so prevented, delayed or interrupted.

15.   EXECUTION. This lease may he signed in any number of counterparts, each of which shall be binding upon all who execute same, whether or not all parties named in the caption hereof execute this lease. Should any one or more of the parties named herein as Lessor fail to execute this lease, it shall nevertheless be binding on the party or parties who execute the same, and additional parties may execute this lease as Lessor, and this lease shall be binding on each party executing the same notwithstanding that such parry is named herein as Lessor, and all of the provisions of this lease shall inure to the benefit of and be binding on the parties hereto end their respective heirs, legal representatives, successors and assigns. IN WITNESS WHEREOF, this lease is executed to be effective as of the date first written above, but upon execution shall be binding on the signatory and the signatory's heirs, devisees, executors, administrators, successors, and assigns, whether or not this lease has been executed by all parties hereof named as Lessor.

*[Including Notarized Signature Page & Addendum That Follows]*

US_ACTIVE\122343192\V-3

5

*3/7*

LESSOR (WHETHER ONE OR MORE)
Gene G. Purdy and/or Rhonda Purdy
aka Purdy Farms
P.O. Box 94, Pine Bluffs, WY 82082

_____
Gene and/or Rhonda Purdy

STATE OF __Nebraska__

COUNTY OF __Kimball__  } SS.

The foregoing instrument was acknowledged before me this 19th day of October, 2022, by Gene
Purdy aka Purdy Farms.

_____
Notary public in and for

My Commission Expires:
__8/24/2026__

__Kimball__ County, __Nebraska__

GENERAL NOTARY - State of Nebraska
JOSI MORGAN
My Comm. Exp. August 24, 2026

LESSEE (WHETHER ONE OR MORE)
Roydon Nelson aka Digital Licensing Inc
(DLI)
P.O. Box 94, Pine Bluffs, WY 82082

_____
Digital Licensing Inc (DLI)

STATE OF __Nebraska__

COUNTY OF __Kimball__  } SS.

The foregoing instrument was acknowledged before me this 19th day of October, 2022, by
Roydon Nelson aka Digital Licensing Inc (DLI).

_____
Notary public in and for

My Commission Expires:
__8/24/2026__

__Kimball__ County, __Nebraska__

GENERAL NOTARY - State of Nebraska
JOSI MORGAN
My Comm. Exp. August 24, 2026

US_ACTIVE\122343192\V-3

6

*38*

## ADDENDUM

I.   Lessee or assigns will pay damages in the amount of $2,000.00 per location if said location is on irrigated land or $1,500.00 per location if said location is on dry land or pastureland before drilling rig moves on. In the event additional surface, crop or other damages are sustained over and above the amount paid as set forth above, Lessee will pay the same upon abandoning location or upon the completion of a well.

II.  Upon written request of Lessor, Lessee shall surround its pumper jacks and all production equipment and/or pits with fences sufficient to exclude livestock.

III. Lessee shall remove all surface dirt and topsoil and save it and replace it in its original condition upon abandonment of location.

IV.  The production of oil and/or gas under this lease shall not operate to maintain this lease in force for more than three years after expiration of the primary term, except as to the formation from which said oil or gas is being produced.

V.   The shut-in gas clause shall not maintain this lease in force more than three years after the expiration of the primary term.

VI.  Only roadways mutually agreed upon by Lessor and Lessee will be used for ingress and egress for drilling and/or production, provided that Lessee shall not unreasonably deny or delay Lessee's right to roadway ingress and egress to the lease. In the event production is established, Lessee shall pay rent for the location of the production equipment in the sum of $300.00 per year per well. It is further agreed that any holding tanks or treaters for such equipment shall be located in areas mutually agreed upon by the parties, provided that Lessee shall not unreasonably deny or delay Lessee's requests for locations for holding tanks or treaters.

VII. Lessee shall fill in all pits constructed by Lessee and remove from the premises all dumped material including but not limited to machinery, parts, cable and trash, and the surface shall be restored to its original condition upon abandonment of a location. No material, machinery, parts or trash shall be dumped in any abandoned well.

VIII. The right to use, free of cost, water found on said land shall be limited to drilling operations only.

IX.  Lessor shall have the right, at its sole risk and expense, to have excess gas, free of cost from any well for use upon the leased premises or any land owned or leased by Lessor adjacent to the leased premises for any purposes other than resale. Lessee acknowledges that any excess gas used by Lessee will not be odorized and will, therefore, be more dangerous than normal sources of natural gas. It is the understanding between the parties that all appropriate agreements and documents concerning connections, at Lessee's expense, and operations regarding the use of excess gas shall be formulated and prepared

7

US_ACTIVE\122343192\V-3

*39*

at such time as is warranted.  Excess gas shall be all gas not sold or used to operate production equipment.

X.  As used herein, plow depth shall mean three feet.  At Lessee's written request, pipelines and electrical lines shall be maintained at or below plow depth.

XI.  Royalty payments under said lease shall be made within four months after the completion of a producing well.  In the event said payments are not made within said four months, unpaid amounts shall draw interest at a rate of 2-1/2% per annum above the base rate of FirsTier Bank, Kimball, Nebraska, adjusted prospectively on the dates of change of such prime rate.

XII.  In the event Lessee or its assigns owns any interest in any oil, gas or other minerals, be it working interest, royalty interest, or overriding royalty interest, adjoining or cornering the land described in this lease, and a commercially productive well is drilled upon any adjoining or cornering 40 acre legal subdivision, this lease shall be terminated nine months from the date of the completion of such adjoining well unless a well is drilled in the adjoining or cornering legal 40 acre subdivision of the land described in this lease.

XIII.  No drilling under this lease shall take place that causes a cessation of operation of any irrigation system.  In making repairs on any well or its facilities or for a work over of a well that is located on any irrigated parts of this land, lessee shall not cause a cessation of operation of the irrigation system for a period in excess of 3 days without first obtaining permission from the lessors.

XIV.  Assignment of this lease shall not be made by Lessee without first obtaining consent of Lessor.  Lessor shall not unreasonably withhold or delay such consent.

XV.  Lessee waives notice of any breach of this lease by Lessee or its assigns, whether such breach is of a stated or implied covenant.

XVI.  This lease is made without warranty of title or peaceable possession, except as to Lessors own acts, and Lessor shall not be liable for the return of any bonus, rentals, royalties or other moneys paid hereunder.  Lessee shall not acquire, by lease or otherwise, any interest adverse to Lessor's title, prior to recognition of such interest by Lessor in writing, or by a judgment of court.  Any adverse title information in Lessee's possession will be furnished to Lessor upon request.

XVII.  Rentals payable under this lease shall not be reduced by virtue of any partial release or releases of this lease.

XVIII.  In the event Lessee fences its area of operations and places locked gates across any access roads, Lessee shall give to Lessor keys to said locked gates or shall otherwise afford access to all locked areas at all times.

XIX.  After the discovery and production of oil, gas or other hydrocarbons in paying quantities, Lessee shall reasonably develop the leased premises, both horizontally and vertically, for the production of oil and gas.

8

US_ACTIVE\122343192\V-3

40

XX.     Royalties shall be paid under this lease to whomever is entitled to receive them, free from all costs of operation, production, gathering, treatment, extraction, compression, transportation, delivery, cleaning, dehydration or processing, or any other deduction or charge, except for severance taxes, unless agreed to in writing by the parties.

XXI.    Upon termination of this lease, Lessee shall have 120 days to remove all of its property, and in default thereof, title to the same, at Lessor's option, shall belong to Lessor.  After termination of the lease, at Lessor's option, he may require the Lessee to remove all or any part of the property, including the right to demand the plugging and abandoning of any well, and upon failure of the Lessee to respond, Lessor may effect removal at Lessee's expense.

XXII.   Lessee will reimburse Lessor for any penalties, reimbursements, reseeding expenses or other losses suffered by Lessor as a result of Lessee's operations on any portion of the premises covered by a Conservation Reserve Program contract in existence on the date of this lease and with respect to which Lessor has provided written notice on or prior to the date of this Lease.  To the extent reasonably possible, Lessee agrees to minimize operations on the premises which may violate any such contract.

XXIII.  Lessee will set a minimum of 500 feet of surface casing in any producing well, but in no event shall surface pipe be set at a depth less than required by the Nebraska Oil and Gas Conservation Commission or other regulating bodies.

XXIV.   Lessor may, at Lessor's expense and risk, at his option, be present or have a representative on the premises during operations, with the right to examine all cores, logs and other well data, and the Lessee shall provide all pertinent information necessary for verification of the accuracy of Lessee's production reports and royalty payments.  Lessee shall furnish Lessor, upon written request, within 10 days after said request or after Lessee shall have obtained the same, copies of all logs made, including a processed stack section, of wells drilled on the leased premises or on premises with which the surveys, core date completion data bottom hole pressure data, and all data and information as may be reasonably necessary fully to apprise Lessor of Lessee's operations and the results thereof, but not including geologic interpretations.

XXV.    Lessor reserves all rights, in a manner that does not unreasonably interfere with Lessee's operations, to grant, lease, mine and/or produce any minerals from said land except interests in gas and oil and their constituent products herein leased to Lessee.

XXVI.       It is expressly agreed, notwithstanding anything to the contrary herein, if this lease be in force and effect at the expiration of the primary term, this lease shall thereupon terminate as to all formations not penetrated by the drilling of a test well or wells on the leased premises or land pooled or consolidated therewith, except if drilling is in progress at the end of the extended primary term.

A.      Seven (7) years after the expiration of the primary term of this lease, formations on the leased premises not included in any unit and not producing oil or gas in paying quantities shall revert to Lessor.  Lessee shall be obligated, subject to the other terms of

9

US_ACTIVE\122343192\V-3

41

this paragraph, to file of record in the courthouse a release of the lease covering such nonproducing zones or formations within sixty (60) days following written demand therefore. If such release is not filed within said sixty (60) day period, then Lessee shall be subject to damages and for any attorney's fees incurred by Lessor in obtaining such release.

XXVII.    NO DEDUCTION CLAUSE: It is also agreed between the Lessor and the Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder. Lessee shall directly reimburse Lessor for any such charges or expenses withheld by a purchaser, by Lessee or by others.

XXVIII.    ROYALTY: Lessor's royalty base, in addition to all substances produced and sold or used, shall specifically include the value of any product, such as tank bottoms, exchanged for the expenses of exploration, production, maintenance or marketing, for which he is not otherwise fully compensated.

XXIX. Land Use Restrictions. To the maximum extent feasible, Lessee will minimize the use of surface pits and hazardous materials in drilling operations on the Leased Land. Any pits, ponds, or other surface impoundments used in connection with the development or operation of the Leased Land shall comply with all applicable local, state, and federal standards and in any case shall meet or exceed the standards for such structures located within a wellhead protection or critical aquifer protection area as defined by the federal Safe Drinking Water Act or any state law counterpart. Any pit or other surface disruption associated with drilling operations on the Leased Land will be fully reclaimed and restored to its natural condition immediately following the completion of drilling operations. All substances brought onto the Leased Land, and wastes generated as part of the exploration, development, or production process, will be removed from the Leased Land immediately following the completion of drilling operations. No pipe, chemicals, or other material or equipment will be placed on the Leased Land except items that are onsite for immediate use in operations. Equipment or material placed on site and not actively used for thirty consecutive days will be deemed not to be for immediate use in operations. Within fifteen days after a development or production operation is completed, all the associated development structures, equipment, and any other material brought to or generated at the site which is no longer needed at the site will be removed from the site. If any topsoil has been disturbed by the operation, the area will be graded to its original contour, and the topsoil replaced, properly seeded, fertilized, and maintained until the original cover in the affected area is reestablished.

XXX. Assumption of Liability. Lessee assumes the following liabilities associated with the Leased Land: Lessee acknowledges that it is entering into this Lease without relying on any representations by Lessor concerning the condition, environmental or otherwise, of the Leased land. Instead, Lessee is relying solely upon its independent investigation to determine the status of the Leased Land. As partial consideration for this Lease, Lessee agrees to assume all liabilities it may incur as an owner or operator of the Leased Land,

10

US_ACTIVE\12234319\V-3

42

including any environmental cleanup obligations that may be imposed under any local, state, or federal law, including the common law. Lessee further agrees to hold Lessor harmless from any claim Lessee may have or acquire, in contribution or otherwise, associated with the condition of the property or Lessee's liability as an owner or operator. This includes, without limitation, any claim or cause of action Lessee may have at common law or under any local, state, or federal statute such as the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) or a state or local counterpart. Lessee agrees to assume all liabilities associated with any activity conducted on the Leased Land, by Lessee, its contractors, and any other person or entity exercising or purporting to exercise rights through Lessee or on Lessee's behalf.

XXXI. Agreement to Remedy Environmental Problems. Lessee agrees to remedy any Environmental Problem resulting from, arising out of, or in any manner associated with any activity by Lessee, its contractors, and any other person or entity exercising or purporting to exercise rights through Lessee or on Lessee's behalf, that presently impacts, or is likely to impact, the Leased Land. In the event an Environmental Problem is identified, Lessor will give Lessee notice of the Environmental Problem and Lessee will, at its sole risk and expense, take the necessary action to define and remedy the Environmental Problem. For purposes of this section, "Environmental Problem" means any situation which: violates any local, state, or federal requirement, is reportable under any environmental law, gives rise to a cleanup, sampling, testing, monitoring, assessment, or similar obligation under any common law, statutory, or regulatory theory, concerns conditions, structures, or substances that require special environmental handling for their proper renovation, demolition, or disposal, or exposes Lessor to a substantial threat of liability associated with the health, safety, and welfare of the public, workers, or the environment.

XXXII.     Agreement to indemnify. Lessee will protect, indemnify, hold harmless, and defend Lessor against any claim, demand, cost, liability, loss, or damage suffered by Lessor (including Lessor's reasonable attorney fees and litigation costs) resulting from, arising out of, or associated with one or more of the following events arising out of or related to Lessee's operations on the leased premises: Lessee's breach of any covenant, obligation, or duty created by the terms of this Lease; Lessee's failure to comply with the Lessor's retained rights under this Lease; Any matter encompassed by Lessee's assumption of liabilities, including environmental liabilities, under the terms of this Lease; any activity expressly or impliedly authorized or required by this lease; any matter associated with producing wells, nonproducing wells, existing well bores, unplugged wells, or previously plugged well bores,; any matter associated with the management, use, and disposal of produced water and wastes or substances associated with the development or operation of the Leased Land; any matter associated with this Lease relating to the generation, processing, handling, transportation, storage, treatment, recycling, marketing, use, disposal, release or discharge, or threatened release or discharge, of oil, natural gas, natural gas liquids, all other petroleum substances, any waste materials, or any "hazardous substance" or "pollutant or contaminant" as those terms are defined (Now or in the future) under CERCLA and its state counterpart. Any matter relating to Lessee's ownership, use, or occupancy of the Leased Land or any area impacting the Leased Land. Lessee's obligations created by this Section are continuing

11

43

obligations which will remain in effect, and be enforceable by Lessor, even after the Lease terminates or otherwise ceases to burden the Leased Land. In the event Lessor conveys or assigns all or any part of its interest in the Leased Land, Lessor's grantees or assignees will also be covered by Lessee's indemnity to the extent of the interest they receive in the Leased Land. Lessee's indemnity obligation will apply even though the basis for Lessor's liability arises out of Lessor's statutory or common law strict liability, sole or concurrent negligence, or any other statutory, tort, or contract theory.

XXXIII.     If any roads are constructed under this lease that have gravel or stone placed on it, Lessee and its assigns will not cause of any said gravel or rock to get onto the cultivated fields. If gravel or rock does encroach on cultivated fields, Lessee or its assigns, at their sole expense, will remove that gravel and rock. Lessee shall not conduct any grading or other operations off of any road established under this lease and if grading or other operations are conducted off of the road, Lessee or its assigns will replace any grass or crops impacted by that operation. Lessee or its assigns also agree to remove all rock and gravel placed on the premises at the time lease terminates, and not later than 120 after the termination of said lease.

12

US_ACTIVE\122343192\V-3

IN THE DISTRICT COURT OF KIMBALL COUNTY, NEBRASKA

| | | |
|---|---|---|
| PURDY OIL, LLC,<br>A Nebraska Limited Liability Company, | ) ) ) | Case No. Ci 22-_____ |
| ARCHER DRILLING, LLC,<br>A Wyoming Limited Liability Company | ) ) ) | |
| JAMES FRANKLIN, | ) ) | PRAECIPE – DIGITAL LICENSING, INC. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DIGITAL LICENSING, INC.,<br>A Wyoming Corporation, | ) ) ) | |
| SCHAD BRANNON, | ) ) | |
| GENE PURDY, | ) ) | |
| GARRETT PURDY, | ) ) | |
| ALL PERSONS having or claiming any interest<br>In and to the mineral interests in, on or<br>Under the premises at T13N R58W §24 N2;<br>SW4 in the County of Kimball, State of<br>Nebraska, containing 480 acres +/-, real<br>names unknown, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

TO:  THE CLERK Of THE DISTRICT COURT:

PLEASE ISSUE Summons, directed to the Defendant, DIGITAL LICENSING, INC., for service by Certified Mail, Return Receipt Requested.  The Defendant may be served as follows:

DIGITAL LICENSING, INC.
Northwest Registered Agent Service, Inc.,
30 N. Gould Street, Ste N
Sheridan, WY 82801

Please indicate service of a copy of the Complaint.

1

DATED: _____, 2022.

PURDY OIL, LLC, a Nebraska Limited Liability
Company; ARCHER DRILLING, LLC , A Wyoming
Limited Liability Company; JAMES FRANKLIN,
Plaintiffs,

By:_____

Monte L. Neilan, NSBA #21186
MONTE L. NEILAN, Attorney at Law
A Limited Liability Company
1721 Broadway, Suite 225
P.O. Box 1527
Scottsbluff, NE 69363
Telephone: (308) 633-3600
Fax: (308) 633-3650
e-mail:  monte@neilan.law

2

IN THE DISTRICT COURT OF KIMBALL COUNTY, NEBRASKA

| | | |
|---|---|---|
| PURDY OIL, LLC,<br>A Nebraska Limited Liability Company, | ) | Case No. Ci 22-_____ |
| | ) | |
| ARCHER DRILLING, LLC,<br>A Wyoming Limited Liability Company | ) | |
| | ) | |
| JAMES FRANKLIN, | ) | PRAECIPE – SCHAD BRANNON |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DIGITAL LICENSING, INC.,<br>A Wyoming Corporation, | ) | |
| | ) | |
| SCHAD BRANNON, | ) | |
| | ) | |
| GENE PURDY, | ) | |
| | ) | |
| GARRETT PURDY, | ) | |
| | ) | |
| ALL PERSONS having or claiming any interest)<br>In and to the mineral interests in, on or<br>Under the premises at T13N R58W §24 N2;<br>SW4 in the County of Kimball, State of<br>Nebraska, containing 480 acres +/-, real<br>names unknown, | )<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

TO:  THE CLERK Of THE DISTRICT COURT:

    PLEASE  ISSUE  Summons,  directed  to  the  Defendant,  SCHAD  BRANNON,  for  service  by Certified Mail, Return Receipt Requested.  The Defendant may be served as follows:

                 SCHAD BRANNON
                 5819 Wish Avenue
                 Encino, CA 91316

    Please indicate service of a copy of the Complaint.

1

DATED: _____, 2022.

> PURDY OIL, LLC, a Nebraska Limited Liability
> Company; ARCHER DRILLING, LLC , A Wyoming
> Limited Liability Company; JAMES FRANKLIN,
> Plaintiffs,
>
>
> By: _____
>      Monte L. Neilan, NSBA #21186
> MONTE L. NEILAN, Attorney at Law
> A Limited Liability Company
> 1721 Broadway, Suite 225
> P.O. Box 1527
> Scottsbluff, NE 69363
> Telephone: (308) 633-3600
> Fax: (308) 633-3650
> e-mail:  monte@neilan.law

IN THE DISTRICT COURT OF KIMBALL COUNTY, NEBRASKA

| | | |
|---|---|---|
| PURDY OIL, LLC,<br>A Nebraska Limited Liability Company, | ) | Case No. Ci 22-_____ |
| | ) | |
| ARCHER DRILLING, LLC,<br>A Wyoming Limited Liability Company | ) | |
| | ) | |
| JAMES FRANKLIN, | ) | PRAECIPE – GARRET PURDY |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DIGITAL LICENSING, INC.,<br>A Wyoming Corporation, | ) | |
| | ) | |
| SCHAD BRANNON, | ) | |
| | ) | |
| GENE PURDY, | ) | |
| | ) | |
| GARRETT PURDY, | ) | |
| | ) | |
| ALL PERSONS having or claiming any interest<br>In and to the mineral interests in, on or<br>Under the premises at T13N R58W §24 N2;<br>SW4 in the County of Kimball, State of<br>Nebraska, containing 480 acres +/-, real<br>names unknown, | ) | |
| | ) | |
| Defendants. | ) | |

TO:  THE CLERK Of THE DISTRICT COURT:

PLEASE ISSUE Summons, directed to the Defendant, GARRET PURDY for service by the Kimball County Sheriff's Office, or other authorized person.  The Defendant may be served as follows:

Garret Purdy
1648 Rd 17 W
Bushnell, NE 69128

Please indicate service of a copy of the Complaint.

1

DATED: _____, 2022.

        PURDY OIL, LLC, a Nebraska Limited Liability
        Company; ARCHER DRILLING, LLC , A Wyoming
        Limited Liability Company; JAMES FRANKLIN,
        Plaintiffs,

By: _____
         Monte L. Neilan, NSBA #21186
       MONTE L. NEILAN, Attorney at Law
       A Limited Liability Company
       1721 Broadway, Suite 225
       P.O. Box 1527
       Scottsbluff, NE 69363
       Telephone: (308) 633-3600
       Fax: (308) 633-3650
       e-mail:  monte@neilan.law

IN THE DISTRICT COURT OF KIMBALL COUNTY, NEBRASKA

| | |
|---|---|
| PURDY OIL, LLC,<br>A Nebraska Limited Liability Company, | Case No. Ci 22-_____ |
| ARCHER DRILLING, LLC,<br>A Wyoming Limited Liability Company | |
| JAMES FRANKLIN, | PRAECIPE – GENE PURDY |
| Plaintiffs, | |
| v. | |
| DIGITAL LICENSING, INC.,<br>A Wyoming Corporation, | |
| SCHAD BRANNON, | |
| GENE PURDY, | |
| GARRETT PURDY, | |
| ALL PERSONS having or claiming any interest<br>In and to the mineral interests in, on or<br>Under the premises at T13N R58W §24 N2;<br>SW4 in the County of Kimball, State of<br>Nebraska, containing 480 acres +/-, real<br>names unknown, | |
| Defendants. | |

TO:  THE CLERK Of THE DISTRICT COURT:

PLEASE ISSUE Summons, directed to the Defendant, GENE PURDY for service by the Laramie County Sheriff's Office, or other authorized person.  The Defendant may be served as follows:

Gene Purdy
1100 Harrison Drive
Pine Bluffs, WY 82082

Please indicate service of a copy of the Complaint.

1

DATED: _____, 2022.

PURDY OIL, LLC, a Nebraska Limited Liability Company; ARCHER DRILLING, LLC , A Wyoming Limited Liability Company; JAMES FRANKLIN, Plaintiffs,

By: _____
        Monte L. Neilan, NSBA #21186
MONTE L. NEILAN, Attorney at Law
A Limited Liability Company
1721 Broadway, Suite 225
P.O. Box 1527
Scottsbluff, NE 69363
Telephone: (308) 633-3600
Fax: (308) 633-3650
e-mail:  monte@neilan.law