# Exhibit 2

Filed in Kimball District Court
*** EFILED ***
Case Number: D71CI230000001
Transaction ID: 0019890811
Filing Date: 05/08/2023 01:36:27 PM MDT

IN THE DISTRICT COURT OF KIMBALL COUNTY, NEBRASKA

| | | |
|---|---|---|
| PURDY OIL, LLC, a Nebraska Limited Liability Company, ARCHER DRILLING, LLC, A Wyoming Limited Liability company, and JAMES FRANKLIN, | ) ) ) ) ) ) ) | Case No. CI 23-01 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS DIGITAL LICENSING, INC.'S AND SCHAD BRANNON'S ANSWER AND FIRST AMENDED COUNTERCLAIMS, AND PLAINTIFF ARCHER DRILLING, LLC'S CROSSCLAIMS** |
| DIGITAL LICENSING, INC., a Wyoming Corporation, SCHAD BRANNON, GENE PURDY, GARRET PURDY, ALL PERSONS having or claiming any interest in, on, or under the premises at T13N, R58W § 24 N2; SW4 in the County of Kimball, State of Nebraska, containing 480 acres +/-, real names unknown, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Defendants Digital Licensing, Inc. and Shad Brannon (collectively referred to as "DLI Defendants"), and Plaintiff Archer Drilling, LLC, by and through their attorneys, Rembolt Ludtke LLP and Dentons US LLP, and for their Answer, First Amended Counterclaims and Crossclaims to Plaintiffs' Complaint state and allege as follows:

## PARTIES & JOINDER

1.      The DLI Defendants admit that Plaintiff, Purdy Oil, LLC, is a Nebraska limited liability company, with a principal address in Kimball County, Nebraska.  The DLI Defendants are without sufficient information to admit or deny remaining allegations of Paragraph 1 of Plaintiffs' Complaint and therefore deny same.

2.      The DLI Defendants admit the allegations in Paragraph 2 of Plaintiffs' Complaint.

3.      The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 3 of Plaintiffs' Complaint and therefore deny same.

4.      The DLI Defendants admit the allegations in Paragraph 4 of Plaintiffs' Complaint.

5.      The DLI Defendants admit the allegations in Paragraph 5 of Plaintiffs' Complaint.

6.      The DLI Defendants admit the allegations in Paragraph 6 of Plaintiffs' Complaint.

7.      The DLI Defendants deny the allegations of Paragraph 7 of Plaintiffs' Complaint.

8.      Paragraph 8 of Plaintiffs' Complaint constitutes legal conclusion to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 8 of Plaintiffs' Complaint.

## JURISDICTION & VENUE

9.      Paragraph 9 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.

10.      Paragraph 10 of Plaintiffs' Complaint constitutes legal conclusion to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 10 of Plaintiffs' Complaint.

11.      Paragraph 11 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.  To the extent a

response's required, the DLI Defendants deny the allegations in Paragraph 11 of Plaintiffs' Complaint.

12.     Paragraph 12 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 12 of Plaintiffs' Complaint.

## FACTS COMMON TO ALL CLAIMS HEREIN

**Purdy Oil, LLC**

13.     The DLI Defendants deny the allegations in Paragraph 13 of Plaintiffs' Complaint.

14.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 14 of Plaintiffs' Complaint and therefore deny same.

15.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 15 of Plaintiffs' Complaint and therefore deny same.

**Purdy Farms Lease**

16.     The DLI Defendants deny the allegations in the first sentence of Paragraph 16 of Plaintiffs' Complaint.  The DLI Defendants are without sufficient information to admit or deny the remaining allegations of Paragraph 16 of Plaintiffs' Complaint and therefore deny same.

**Permit**

17.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 17 of Plaintiffs' Complaint and therefore deny same.

18.     The DLI Defendants deny the allegations in Paragraph 18 of Plaintiffs' Complaint.

**Exploration Agreement**

19.     The DLI Defendants admit the allegations in Paragraph 19 of Plaintiffs' Complaint.

20.     The DLI Defendants state that the terms of the Exploration Agreement speak for themselves.  Except as expressly admitted herein, the DLI Defendants deny the allegations of Paragraph 20 of Plaintiffs' Complaint.

21.     The DLI Defendants deny the allegations in Paragraph 21 of Plaintiffs' Complaint.

22.     The DLI Defendants state that the terms of the Exploration Agreement speak for themselves.  Except as expressly admitted herein, the DLI Defendants deny the allegations of Paragraph 22 of Plaintiffs' Complaint.

23.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 23 of Plaintiffs' Complaint and therefore deny same.

**Archer Drilling, LLC**

24.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 24 of Plaintiffs' Complaint and therefore deny same.

25.     The DLI Defendants admit the allegations of Paragraph 25 of Plaintiffs' Complaint except to the extent such allegations imply or infer that Exhibit 6 to Plaintiffs' Complaint is the currently effective operating agreement for Archer Drilling, LLC, which the DLI Defendants deny.

26.     The DLI Defendants state that the provisions of Exhibit 6 speak for themselves.  Except as expressly admitted herein, the DLI Defendants deny the allegations of Paragraph 26 of Plaintiffs' Complaint.

27.     The DLI Defendants deny the allegations in Paragraph 27 of Plaintiffs' Complaint.

28.     The DLI Defendants deny the allegations in Paragraph 28 of Plaintiffs' Complaint.

29.    The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 29 of Plaintiffs' Complaint and therefore deny same.

30.    The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 30 of Plaintiffs' Complaint and therefore deny same; in particular, the DLI Defendants deny that the detachment of Plaintiff James Franklin's left retina was a "work" related injury.

31.    The DLI Defendants deny the allegations in Paragraph 31 of Plaintiffs' Complaint.

**Equipment Purchasing**

32.    The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 32 of Plaintiffs' Complaint and therefore deny same.

33.    The DLI Defendants deny the allegations in Paragraph 33 of Plaintiffs' Complaint.

**Equipment List**

34.    DLI Defendants admit that on or about June 2022, Drilling Rigs Nos. 2 & 4 were purchased by, or for the benefit of, Archer Drilling, LLC.  The DLI Defendants are without sufficient information to admit or deny remaining allegations of Paragraph 34 of Plaintiffs' Complaint and therefore deny same.

**Conflict**

35.    Paragraph 35 of Plaintiffs' Complaint contains conclusory and confusing allegations to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 35 of Plaintiffs' Complaint.

36.    The DLI Defendants admit that on or about August 19, 2022, a new operating agreement for Archer Drilling, LLC was executed which superseded and replaced the April 4, 2022 operating agreement of Archer Drilling, LLC attached to Plaintiffs' Complaint as

Exhibit 6.  Except as expressly admitted herein, the allegations in Paragraph 36 of Plaintiffs' Complaint are denied.

37.     The DLI Defendants admit that the Invoice for Services Rendered attached as Exhibit 9 to Plaintiffs' Complaint was sent by Archer Drilling, LLC to Purdy Oil, LLC on or about September 20, 2022.  Except as expressly admitted herein, the allegations of Paragraph 37 of Plaintiffs' Complaint are denied.

38.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 38 of Plaintiffs' Complaint and therefore deny same.

39.     The DLI Defendants admit that Exhibit 10 to Plaintiffs' Complaint is a true and correct copy of an email sent by Gene Purdy to James Franklin on October 7, 2022.  Except as expressly admitted herein, the allegations in Paragraph 39 of Plaintiffs' Complaint are denied.

40.     The DLI Defendants admit that Exhibit 11 to Plaintiffs' Complaint is a true and correct copy of a recorded letter which was sent from Purdy Farms to Purdy Oil, LLC on or about October 7, 2022. Except as expressly admitted herein, the allegations in Paragraph 40 of Plaintiffs' Complaint are denied.

41.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 41 of Plaintiffs' Complaint and therefore deny same.

42.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 42 of Plaintiffs' Complaint and therefore deny same.

43.     The DLI Defendants admit that Exhibit 12 to Plaintiffs' Complaint is a true and correct copy of a recorded Oil, Gas and Mineral Lease dated October 8, 2022 from Purdy Farms, Lessor, to Digital Licensing, Inc.  Except as expressly admitted herein, the allegations in Paragraph 43 of Plaintiffs' Complaint are denied.

44.     The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 44 of Plaintiffs' Complaint and therefore deny same.

45. The DLI Defendants are without sufficient information to admit or deny the allegations of Paragraph 45 of Plaintiffs' Complaint and therefore deny same.

46. The DLI Defendants admit the allegations in Paragraph 46 of Plaintiffs' Complaint.

**FIRST CLAIM FOR RELIEF**
**DECLARATORY RELIEF – OWNERSHIP, CONTROL, AND**
**ASSETS OF ARCHER DRILLING, LLC**

47. Paragraph 47 of Plaintiffs' Complaint is a pleadings recitation to which no response is required.

48. Paragraph 48 of Plaintiffs' Complaint contains conclusory and confusing allegations to which no response is required. To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 48 of Plaintiffs' Complaint.

49. The DLI Defendants admit the allegations in Paragraph 49 of Plaintiffs' Complaint.

50. The DLI Defendants admit the allegations in Paragraph 50 of Plaintiffs' Complaint.

51. DLI Defendants admit that a controversy exists between DLI Defendants and Plaintiffs Purdy Oil, LLC and James Franklin. DLI Defendants deny that the ownership of the members of Archer Drilling, LLC is correctly set out in Plaintiffs' Complaint. Except as expressly admitted herein, the DLI Defendants deny the allegations in Paragraph 51 of Plaintiffs' Complaint.

52. DLI Defendants admit that a controversy exists between DLI Defendants and Plaintiffs Purdy Oil, LLC and James Franklin. Except as expressly admitted herein, the DLI Defendants deny the allegations in Paragraph 52 of Plaintiffs' Complaint.

53. Paragraph 53 of Plaintiffs' Complaint constitutes legal and conclusory allegations to which no response is required. To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 53 of Plaintiffs' Complaint.

54.     Paragraph 54 of Plaintiffs' Complaint constitutes legal and conclusory allegations to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 54 of Plaintiffs' Complaint.

55.     Paragraph 55 of Plaintiffs' Complaint constitutes legal and conclusory allegations to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 55 of Plaintiffs' Complaint.

## SECOND CLAIM FOR RELIEF
## QUIET TITLE TO PURDY FARMS LEASE

56.     Paragraph 56 of Plaintiffs' Complaint is a pleadings recitation to which no response is required.

57.     The DLI Defendants deny the allegations in Paragraph 57 of Plaintiffs' Complaint.

## THIRD CLAIM FOR RELIEF
## DECLARATORY RELIEF – OPERATIONAL CONTROL ON THE PURDY FARMS LEASE

58.     Paragraph 58 of Plaintiffs' Complaint is a pleadings recitation to which no response is required.

59.     Paragraph 59 of Plaintiffs' Complaint contains conclusory and confusing allegations to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 59 of Plaintiffs' Complaint.

60.     DLI Defendants admit that a controversy exists between DLI Defendants and Plaintiffs Purdy Oil, LLC and James Franklin. Except as expressly admitted herein, the DLI Defendants deny the allegations in Paragraph 60 of Plaintiffs' Complaint.

61.     Paragraph 61 of Plaintiffs' Complaint contains conclusory and confusing allegations to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 61 of Plaintiffs' Complaint.

62.     The DLI Defendants deny the allegations in Paragraph 62 of Plaintiffs' Complaint.

63.     Paragraph 63 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 63 of Plaintiffs' Complaint.

64.     Paragraph 64 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.  To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 64 of Plaintiffs' Complaint.

## FOURTH CLAIM FOR RELIEF
## CONSPIRACY TO RESTRAIN TRADE (NEB. REV. STAT. § 59-801 ET SEQ.)

65.     Paragraph 65 of Plaintiffs' Complaint is a pleadings recitation to which no response is required.

66.     The DLI Defendants deny the allegations in Paragraph 66 of Plaintiffs' Complaint.

67.     The DLI Defendants deny the allegations in Paragraph 67 of Plaintiffs' Complaint.

68.     The DLI Defendants deny the allegations in Paragraph 68 of Plaintiffs' Complaint.

## FIFTH CLAIM FOR RELIEF
## RESTRAINT TO TRADE (NEB. REV. STAT. § 59-801 ET SEQ.)

69.     Paragraph 69 of Plaintiffs' Complaint is a pleadings recitation to which no response is required.

70.     The DLI Defendants deny the allegations in Paragraph 70 of Plaintiffs' Complaint.

71.     The DLI Defendants deny the allegations in Paragraph 71 of Plaintiffs' Complaint.

72.     The DLI Defendants deny the allegations in Paragraph 72 of Plaintiffs' Complaint.

## SIXTH CLAIM FOR RELIEF
## BREACH OF CONTRACT - EXPLORATION AGREEMENT
## (FIDUCIARY DUTIES; IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING)

73. Paragraph 73 of Plaintiffs' Complaint is a pleadings recitation to which no response is required.

74. Paragraph 74 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required. To the extent a response's required, the DLI Defendants deny the allegations in Paragraph 74 of Plaintiffs' Complaint.

75. Paragraph 75 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.

76. The DLI Defendants deny the allegations in Paragraph 76 of Plaintiffs' Complaint.

77. The DLI Defendants deny the allegations in Paragraph 77 of Plaintiffs' Complaint.

78. The DLI Defendants deny the allegations in Paragraph 78 of Plaintiffs' Complaint.

## SEVENTH CLAIM FOR RELIEF
## BREACH OF CONTRACT - OPERATING AGREEMENT OF
## PURDY OIL, LLC

79. Paragraph 79 of Plaintiffs' Complaint is a pleadings recitation to which no response is required.

80. Paragraph 80 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.

81. Paragraph 81 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.

82. Paragraph 82 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required. To the extent a response is required, the DLI Defendants deny the allegations in Paragraph 82 of Plaintiffs' Complaint.

83. Paragraph 83 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required. To the extent a response

is required, the DLI Defendants deny the allegations in Paragraph 83 of Plaintiffs' Complaint.

84.    Paragraph 84 of Plaintiffs' Complaint constitutes legal conclusions to which no response is required.  To the extent a response is required, the DLI Defendants deny the allegations in Paragraph 84 of Plaintiffs' Complaint.

## EIGHTH CLAIM FOR RELIEF
### NEGLIGENCE

85.    Paragraph 85 of Plaintiffs' Complaint is a pleadings recitation to which no response is required.

86.    The DLI Defendants deny the allegations in Paragraph 86 of Plaintiffs' Complaint.

87.    The DLI Defendants deny the allegations in Paragraph 87 of Plaintiffs' Complaint.

88.    The DLI Defendants deny the allegations in Paragraph 88 of Plaintiffs' Complaint.

89.    The DLI Defendants deny all allegations in Plaintiffs' Complaint not expressly admitted herein.

90.    The DLI Defendants deny that Plaintiffs are entitled to the damages requested in Plaintiffs' Complaint.

## AFFIRMATIVE DEFENSES

91.    Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

92.    Plaintiffs' Complaint is barred due to Plaintiffs' prior material breach of contract.

93.    Plaintiffs' Complaint is barred due to failure of consideration.

94.    Plaintiffs' Complaint is barred in whole or in part by the doctrines of waiver and estoppel.

95.    Plaintiffs' Complaint is barred in whole or in part by the doctrine of unclean hands.

96.     Counsel for Plaintiffs has no authority to pursue any claims on behalf of Archer Drilling, LLC

97.     The DLI Defendants reserve the right to assert additional defenses as those defenses become known during the course of discovery.

**WHEREFORE**, the DLI Defendants respectfully requests an Order dismissing Plaintiffs' Complaint with prejudice, at Plaintiffs' cost, and awarding such other and further relief in favor of the DLI Defendants as the Court deems fair and just.

## CROSSCLAIMS/COUNTERCLAIMS

COME NOW, through their lawful undersigned attorneys, (A) "Plaintiff" Archer Drilling, LLC, who asserts the following Crossclaims against Purdy Oil, LLC ("*Purdy Oil*") and James Franklin (together, the "*Franklin Plaintiffs*") and (B) the DLI Defendants, who assert the following First Amended Counterclaims against the Franklin Plaintiffs, and, in each case, and state and allege as follows:

### Archer Drilling Limited Liability Company Operating Agreement

1.     Archer Drilling, LLC ("*Archer Drilling*") was formed for the purpose of acquiring and operating drilling rigs and related equipment for the purpose drilling oil and gas wells.

2.     Exhibit 6 to Plaintiffs' Complaint is a copy of the Limited Liability Company Operating Agreement of Archer Drilling, LLC that was executed by its initial members on April 12, 2022 (the "*Initial Archer Operating Agreement*").

3.     Under the terms of the Initial Archer Operating Agreement, Plaintiff Purdy Oil was required to contribute $250,000 to Archer Drilling as a capital contribution to provide working capital for Archer Drilling's business operations.  However, as a result of James Franklin's failure to make required capital contributions to Purdy Oil, Purdy Oil was unable to make any capital contributions to Archer Drilling, leaving Archer Drilling without any funds to conduct its business.

4.     Instead, Digital Licensing, Inc. ("*DLI*") provided all of the cash contributions (directly and indirectly) required by Archer Drilling to fund its operations and purchase of drilling rigs.

5.     On or about August 18, 2022, Plaintiff James Franklin ("*Franklin*") and representatives of Plaintiff Purdy Oil met with representatives of DLI in Pine Bluffs, Wyoming.  The purpose of the meeting was to discuss the inequity of DLI's financing Archer Drilling's operations and purchase of drilling rigs, but not owning any equity interest in Archer Drilling.  To address this issue, the parties at the meeting, including Franklin and Gene Purdy on behalf of Purdy Oil, agreed to enter into a new limited liability operating agreement for Archer Drilling under which DLI would own a 51% equity interest, and Franklin, Gene Purdy and Garrett Purdy would each own a 16.33% equity interest in Archer Drilling.

6.     At the conclusion of the August 18, 2022 meeting, each of DLI, Franklin, Gene Purdy and Garret Purdy executed a new limited liability company operating agreement for Archer Drilling, superseding and replacing the Initial Archer Operating Agreement, in which the ownership of the parties in Archer Drilling was agreed to be as follows: (i) DLI - 51%; (ii) Franklin - 16.33%; (iii) Gene Purdy 16.33%, and (iv) Garret Purdy - 16.33% (the "*Renegotiated Archer Operating Agreement*").  A true and correct copy of the Renegotiated Archer Operating Agreement is attached hereto as Exhibit A.

### Ownership of Rigs Nos. 1, 2 & 4

7.     Rig No. 1, described in Paragraph 23 of Plaintiffs' Complaint, and Rig Nos. 2 and 4 described in Paragraph 34 of Plaintiffs' Complaint (collectively, the "*Archer Rigs*") were purchased 100% with funds provided, directly or indirectly, by DLI.  Although DLI funds used to purchase the Archer Rigs were initially deposited in a Purdy Oil account, those funds were always intended to be, and were in fact, advanced to Archer Drilling for the express purpose of purchasing, and owning, the Archer Rigs.

**Purdy Oil's Use of Archer Rig No. 4**

8.    Purdy Oil used the Archer Rig No. 4 in the drilling of the Purdy Farms No. 1 Well with the understanding and agreement that Archer Drilling would be compensated by Purdy Oil for the use of Archer Rig No. 4 at a daily fair market rate.  The Archer Rig No. 4 was used by Purdy Oil to drill the Purdy Farms No. 1 Well for a total of 87 days (including mobilization).  The daily fair market rate for Archer Rig No. 4 was $26,000.  As a result, Purdy Oil is obligated to compensate Archer Drilling for the use of Rig No. 4 for 87 days at a rate of $26,000/day, for a total amount of $2,262,000 due from Purdy Oil to Archer Drilling.  Exhibit 9 to Plaintiffs' Complaint is Archer Drilling's Invoice to Purdy Oil for the use of Rig No. 4 for 87 days in the amount of $2,262,000, which amount is due and owing by Purdy Oil to Archer Drilling.

**Rescission Under Neb. Rev. Stat. §8-1118**

9.    The Franklin Defendants offer and sale to DLI of a participation interest in the drilling of an oil and gas well on the Purdy Farm Lease under the Exploration Agreement (the "Purdy Farms Participation Interest") constituted an offer and sale of a "security" as that term is defined in the Nebraska Securities Act.

10.    In connection with the offer and sale of the Purdy Farms Participation Interest to DLI, the Franklin Defendants made untrue statements of material facts and omitted to disclose material facts relating to the Purdy Farms Participation Interest (the "*Material Misstatements and Omissions*").  At the time of DLI's acquisition of the Purdy Farms Participation Interest, DLI was not aware of the Material Misstatements and Omissions by the Franklin Defendants and the Franklin Defendants knew, or with the exercise of reasonable care, should have known of the existence of such Material Misstatements and Omissions.

11.    Such Material Misstatements and Omissions by the Franklin include, *inter alia*, (i) the misrepresentation that the Purdy Farms Participation Interest was subject to an existing Farmout

Agreement and a 12.5% overriding royalty interest, (ii) the misrepresentation that the Purdy Farms Participation Interest would not be treated as a tax partnership, (iii) the misrepresentation that Purdy oil would pay its portion of the costs of mobilization, demobilization and drilling costs, and (iv) the failure to disclose that the Purdy Farms Participation Interest was intended to be part of an exempt offering of "Joint Venture General Partnership" security interests with other investors.

12.     Under the provisions of § 8-1118 of the Nebraska Securities Act, DLI seeks recovery from the Franklin Defendants of (i) the consideration paid by DLI for the Purdy Farms Participation Interest (ii) six percent interest upon such consideration paid from the date of payment, (iii) attorneys' fees, and (iv) costs.  In connection with such request, DLI hereby tenders, in full, it's Purdy Farms Participation Interest to the Franklin Defendants, subject only to affirmation of DLI's rescission rights under § 8-1118 of the Nebraska Securities Act.

### CROSSCLAIM/COUNTERCLAIM COUNT I
### (Declaratory Relief against the Franklin Plaintiffs)

13.     Archer Drilling and DLI incorporate by reference the allegations of each of the numbered Paragraphs of Archer Drilling's and DLI's Crossclaims/Counterclaims set out above as if fully set forth herein.

14.     Pursuant to Neb. Rev. Stat. §25-21,145, Archer Drilling and DLI asks this Court to declare the rights of the parties under the Renegotiated Archer Operating Agreement.   Specifically, Archer Drilling and DLI asks this Court to find and declare that:

   a.     The Renegotiated Archer Operating Agreement supersedes and replaces the Initial Archer Operating Agreement.

   b.     The Members of Archer Drilling and their respective ownership interests in Archer Drilling are as follows: (i) Digital Licensing, Inc.:  51.00% ownership, (ii) James

Franklin:  16.33% ownership, (iii) Gene Purdy:  16.33% ownership, and (iv) Garret Purdy:  16.33% ownership.

c.   Neither James Franklin or Purdy Oil, LLC had the right or authority to file Plaintiffs' Complaint on behalf of Archer Drilling.

## CROSSCLAIM COUNT II
### (Declaratory Relief against Franklin Plaintiffs)

15.   Archer Drilling incorporates by reference the allegations of each of the numbered Paragraphs of Archer Drilling's and DLI's Crossclaims/Counterclaims set out above as if fully set forth herein.

16.   Pursuant to Neb. Rev. Stat. §25-21,145, Archer Drilling asks this Court to declare the rights of the parties with respect to Archer Drilling's ownership of Rig Nos. 1, 2 & 4 identified in Plaintiffs' Complaint and Archer Drilling's ownership of the real property described in Paragraph 50 of Plaintiffs' Complaint (the "***Archer Real Property***").   Specifically, Archer Drilling and DLI asks this Court to find and declare that:

a.   Archer is the legal owner of Rig Nos. 1,2 & 4 described in Plaintiffs' Complaint, and all rights and assets appurtenant thereto, free of any claims by the Franklin Plaintiffs.

b.   Archer is the legal owner of the Archer Real Property free any claims by the Franklin Plaintiffs.

## CROSSCLAIM COUNT III
### (Quantum Meruit and Unjust Enrichment against Purdy Oil)

17.   Archer Drilling incorporates by reference the allegations of each of the numbered Paragraphs of Archer Drilling's and DLI's Crossclaims/Counterclaims set out above as if fully set forth herein.

18.   Purdy Oil used Archer Drilling's Rig No. 4 in the drilling of the Purdy Farms No. 1 Well with the knowledge that Archer Drilling expected to be compensated for the reasonable value of Purdy Oil's Rig No. 4, as evidenced by the obligations assumed by Purdy Oil

under Article I, Paragraph 1 of the Exploration Agreement attached as Exhibit 4 to Plaintiffs' Complaint.  The reasonable value of the use of Archer Drilling's Rig No. 4 for 87 days was a rate of $26,000/day for a total value to Purdy Oil of $2,262,000.

19.    As a result of Purdy Oil's use of Archer Drilling's Rig No. 4 with the knowledge that Archer Drilling expected to be compensated for the use of such Rig, Purdy Oil is indebted to Archer Drilling in the amount of $2,262,000 under a claim in quantum meruit.

20.    In the alternative, Purdy is indebted to Archer Drilling in the amount of $2,262,000 for the use of Archer Drilling's Rig No. 4 under the theory of unjust enrichment.

## COUNTERCLAIM COUNT IV
### (Rescission Under § 8-1118 of the Nebraska Securities Act)

21.    DLI incorporates by reference the allegations of each of the numbered Paragraphs of Archer Drilling's and DLI's Crossclaims/Counterclaims as set out above as if fully set forth herein.

22.    As a result of the Franklin Defendants Material Misstatements and Omissions in connection with the offer and sale of the Purdy Farms Participation Interest, DLI is entitled to recover, and hereby seeks recovery from the Franklin Defendants of (i) the consideration paid by DLI for the Purdy Farms Participation Interest (ii) six percent interest upon such consideration paid from the date of payment, (iii) attorneys' fees, and (iv) costs.  In connection with such recovery, DLI hereby tenders to the Franklin Defendants its Purdy Farms Participation Interest.

## DLI's ALTERNATIVE COUNTERCLAIMS

23.    In the unlikely event that DLI's recission rights under Counterclaim Count IV above are not granted, DLI pleads the following facts and grounds for recovery solely in the alternative.

### Removal of Purdy Oil as Operator

24.     Exhibit 4 to Plaintiffs' Complaint includes a copy of the
Operating Agreement which governed Purdy Oil's operations relating
to the drilling of the Purdy Farms No. 1 Well.  Pursuant to the
provisions of Article V.B. of the Operating Agreement the Non-
Operators had the right to remove Purdy Oil as Operator under the
Operating Agreement for "good cause" if Purdy Oil failed to conduct its
activities under the Operating Agreement as a reasonable prudent
operator, in a good and workmanlike manner, with due diligence and
dispatch in accordance with good oilfield practice.  Such removal may
be effectuated by a majority vote of the Non-Operators, after excluding
the interest of the Operator.

25.     By letter dated 20 September 2022 (the "*Removal
Notice*"), Purdy Oil was notified that it had been removed as Operator
for good cause under the Operating Agreement by a vote of a majority
in interest of the Non-Operators after excluding the interest of the
Operator.   A true and correct copy of the Removal Notice is attached
hereto as Exhibit B.

### Designation of Archer Drilling as Successor Operator

26.     In the Removal Notice, Purdy Oil was also notified that
pursuant to the provisions of Article V.B of the Operating Agreement,
Archer Drilling, LLC had been appointed successor operator to Purdy
Oil by a vote of a majority of the Non-Operators after excluding the
interest of the Operator.

### Subsequent Operations/Non-Consent

27.     In a Notice of Subsequent Operations dated 20 September
2022, DLI proposed a Subsequent Operation under Article VI.B of the
Operating Agreement relating to the plugging back of the Purdy
Farms No. 1 Well and sidetracking the well to a 7,500 foot depth and
test, with the alternative of drilling to a depth of 9,500 feet (the
"*Subsequent Operations Proposal*").  A true and correct copy of the
Subsequent Operations Proposal is attached hereto as Exhibit C.

28.    Under the terms of Article VI.B of the Operating Agreement, a failure by a Working Interest Owner to timely elect to participate in a proposed Subsequent Operation will result in such party (a "*Non-Consenting Working Interest Owner*") relinquishing its interest in the Subsequent Operation until the Working Interest Owners who timely elected to participate in the Subsequent Operation (the "*Participating Working Interest Owners*") have recovered from the proceeds of production from such Subsequent Operation an amount equal to 500% of the Non-Consenting Working Interest Owners' share of the cost of conducting such Subsequent Operation (the "*Non-Consent Penalty*").

29.    The Participating Working Interest Owner who timely elected to participate in the Subsequent Operation proposed by DLI was DLI.  The Non-Consenting Working Interest Owner who failed to timely elect to participate in the Subsequent Operation proposed by DLI and who was, accordingly, subject to the Non-Consent Penalty was Purdy Oil.

**Termination of the Purdy Oil Lease**

30.    Exhibit 1 to Plaintiffs' Complaint is the Limited liability Company Operating Agreement of Purdy Oil, LLC (the "*Purdy Oil Operating Agreement*").  Under the provisions of Paragraph 6 of the Purdy Oil Operating Agreement, Franklin agreed to contribute $250,000 to Purdy Oil, and further agreed to cause GSSR to contribute $2,500,000 to Purdy Oil, each such contribution to constitute a Capital Contribution to Purdy Oil.

31.    In consideration for the agreement of Franklin to cause $2,750,000 in Capital Contributions to be made to Purdy Oil, Gene Purdy issued the oil and gas lease attached as Exhibit 2 to Plaintiffs' Complaint to Purdy Oil (the "*Purdy Oil Lease*") for no bonus consideration.

32.    Franklin failed and refused to cause $2,750,000 to be contributed to Purdy Oil as contractually agreed in the Purdy Oil Operating Agreement, resulting in a total failure of consideration for

Gene Purdy with respect to the issuance of the Purdy Oil Lease to Purdy Oil.

33.     As a result of the failure of consideration for Gene Purdy's issuance of the Purdy Oil Lease to Purdy Oil, Gene Purdy elected to terminate the Purdy Oil Lease on October 7, 2022.  A true and correct copy of Gene Purdy's notice of termination to Purdy Oil is attached as Exhibit C to Plaintiffs' Complaint.

34.     Following Gene Purdy's termination of the Purdy Oil Lease, Gene Purdy, aka Purdy Farms issued a new oil and gas lease to DLI covering the minerals and lands previously covered by the Purdy Oil Lease (the "*DLI Oil & Gas Lease*").  A true and correct copy of the DLI Oil & Gas Lease is attached to Plaintiffs' Complaint as Exhibit 12**.** As a result of the valid termination of the Purdy Oil Lease, and the execution and delivery of the DLI Oil & Gas Lease, the DLI Oil & Gas Lease is the currently effective lease covering the oil, gas and minerals described therein.

### Purdy Oil's Negligence/Gross Negligence

35.     Purdy Oil's inability to drill the Purdy Farms No. 1 Well to the initial targeted depth was the result of Purdy Oil's negligence and gross negligence in failing to operate as a reasonable and prudent Operator under the Operating Agreement, which failures exhibited a wanton indifference and reckless disregard by Purdy Oil to the damages that would be incurred by DLI and the other Working Interest Owners in the Purdy Farms No. 1 Well as a result of Purdy Oil's negligence and gross negligence.  Purdy Oil's negligent and grossly negligent acts included, but were not limited to, the following:

a.   Purdy Oil's reckless conduct in failing to have adequate experienced staff to supervise critical aspects of the drilling operations for the Purdy Farms No. 1 Well.

b.   Purdy Oil's actions in failing to maintain drill hole integrity which Purdy Oil knew or should have known would result in damage to the drill hole preventing Purdy Oil from

reaching the initial targeted depth in the Purdy Farms No. 1 Well.

c.  Purdy Oil's gross negligence in not preserving the integrity of the drill hole by running casing to the depth that had been achieved and allowing the degradation of the drill hole.

d.  Purdy Oil's reckless conduct in injecting fluids in the wellbore that Purdy Oil knew, or should have known, would cause clays in the wellbore to swell resulting in the drill string becoming stuck in the drill hole.

e.  Purdy Oil's negligence in purchasing critical items of equipment that were non-operational.

f.  Purdy Oil's negligence in not having a written working plan for the proposed operations.

### Purdy Oil's Fraud and Misappropriation of Funds

36.   DLI transferred in excess of $2,000,000 into Purdy Oil's accounts pursuant to DLI's agreement with the Franklin Plaintiffs that such funds would be used solely for the purpose of drilling of the Purdy Farms No. 1 Well and for the purpose of purchasing drilling equipment for, and on behalf, of Archer Drilling (the "*Intended Purposes*").

37.   DLI's funds were to be used by Purdy Oil solely for their Intended Purposes.

38.   However, the funds transferred by DLI to Purdy Oil were improperly and fraudulently used by the Franklin Plaintiffs to purchase goods and services for the personal benefit of Franklin and to finance Franklin's activities unrelated to the Intended Purposes.

39.   The Franklin Plaintiffs have committed conversion of DLI funds and have engaged in committing fraud.

## ALTERNATIVE COUNTERCLAIM COUNT I
### (Declaratory Relief against Purdy Oil - Operating Agreement)

40.    DLI incorporates by reference the allegations of each of the numbered Paragraphs of DLI's Alternative Counterclaims set out above as if fully set forth herein.

41.    Pursuant to Neb. Rev. Stat. §25-21,145, DLI asks this Court to declare the rights of the parties under the Operating Agreement attached as Exhibit 4 to Plaintiffs' Complaint (the "*Operating Agreement*").  Specifically, DLI asks this court to find and declare that:

a.    Purdy Oil failed to conduct its activities under the Operating Agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch in accordance with good oilfield practice.

b.    Purdy Oil was negligent and grossly negligent in its conduct of operations under the Operating Agreement with respect to the drilling of the Purdy Farms No. 1 Well.

c.    Purdy Oil has been removed as Operator under the Operating Agreement and Archer Drilling, LLC has been appointed as successor Operator under the Operating Agreement.

d.    Pursuant to Article VI.B of the Operating Agreement DLI has issued a valid and binding Subsequent Operations Proposal to which Purdy Oil failed to timely respond, resulting in Purdy Oil being a Non-Consenting Working Interest Owner in the Subsequent Operations Proposal subject to the Non-Consent Penalty set out in Article VI.B of the Operating Agreement.

e.    Until such time as DLI has recovered the Non-Consent Penalty from Purdy Oil under the Operating Agreement, DLI is the owner of 100% of the working interest in the Purdy Farms No. 1 Well.

**ALTERNATIVE COUNTERCLAIM COUNT II**
**(Declaratory Relief against Purdy Oil - Purdy Oil Lease)**

42.    DLI incorporates by reference the allegations of each of the numbered Paragraphs of DLI's Alternative Counterclaims set out above as if fully set forth herein.

43.    Pursuant to Neb. Rev. Stat. §25-21,145, DLI asks this Court to declare the rights of the parties under the Purdy Oil Lease and the DLI Oil & Gas Lease.  Specifically, DLI asks the Court to find and declare:

    a. The Purdy Oil Lease has been validly terminated for failure of consideration.

    b. The DLI Oil & Gas Lease is valid and effective and covers the oil, gas and mineral rights previously covered by the terminated Purdy Oil Lease.

**ALTERNATIVE COUNTERCLAIM COUNT III**
**(Negligence and Gross Negligence against Purdy Oil)**

44.    DLI incorporates by reference the allegations of each of the numbered Paragraphs of DLI's Alternative Counterclaims set out above as if fully set forth herein.

45.    Purdy Oil's inability to drill the Purdy Farms No. 1 Well to its initial targeted depth was the result of Purdy Oil's negligence and gross negligence in failing to operate as a reasonable and prudent Operator under the Operating Agreement.  Purdy Oil's negligent and grossly negligent acts included, but were not limited to, those set out in Paragraph 35 above.

46.    As a direct and proximate result of Purdy Oil's acts of negligence and gross negligence, DLI has been damaged in an amount in excess of $2,000,000.00.

47.    Due to Purdy Oil's gross negligence, DLI is entitled to an award of punitive damages to punish Purdy Oil to make an example of Purdy Oil.

## ALTERNATIVE COUNTERCLAIM COUNT IV
### (Unjust Enrichment against the Franklin Plaintiffs)

48.     DLI incorporates by reference the allegations of each of the numbered Paragraphs of DLI's Alternative Counterclaims set out above as if fully set forth herein.

49.     The Franklin Plaintiffs have been unjustly enriched by the wrongful acts of the Franklin Plaintiffs of diverting the payments made by DLI for the Intended Purposes to uses for the personal benefit of the Franklin Plaintiffs.

50.     As such, said the Franklin Plaintiffs have been unjustly enriched to the detriment and damage of DLI and DLI is entitled to recover from the Franklin Plaintiffs all amounts which were paid by DLI to Purdy Oil, and which were improperly diverted to the personal benefit The Franklin Plaintiffs.

51.     DLI has retained the services of an attorney to prosecute this action for unjust enrichment against the Franklin Plaintiffs and is entitled to an award of attorney's fees and costs incurred.

## ALTERNATIVE COUNTERCLAIM COUNT V
### (Fraud against the Franklin Plaintiffs)

52.     DLI incorporates by reference the allegations of each of the numbered Paragraphs of DLI's Alternative Counterclaims set out above as if fully set forth herein.

53.     The Franklin Plaintiffs made false representations when they promised to use DLI's money for the drilling of the Purdy Farms No. 1 Well and for the purchase of drilling equipment according to the terms of the agreements between the parties and, instead diverted a significant portion of such funds to the personal use of the Franklin Plaintiffs.

54.     At the time that the Franklin Plaintiffs made said representations, the Franklin Plaintiffs either knew the representation to be false or that the Franklin Plaintiffs lacked a sufficient basis of information to make said representations.

55.     Upon information and belief, the Franklin Plaintiffs have absconded with the funds to DLI's financial detriment.

56.     Upon information and belief, the Franklin Plaintiffs intended to induce DLI to act in reliance upon the false representations set forth above so that the Franklin Plaintiffs could be enriched thereby.

57.     DLI justifiably relied upon the Franklin Plaintiffs' representations.

58.     As a direct and proximate result of the Franklin Plaintiffs' false representations, DLI has been harmed in an amount to be determined at trial.

59.     Due to the Franklin Plaintiffs' fraudulent actions, DLI is an entitled to award of punitive damages to punish the Franklin Plaintiffs and to make an example of the Franklin Plaintiffs.

60.     DLI has been compelled to retain the services of an attorney to prosecute this action and, therefore, DLI is entitled to reasonable attorney's fees, costs and interest as damages of suit incurred herein.

### WHEREFORE, THE DLI DEFENDANTS AND ARCHER DRILLING, LLC
### PRAY FOR THE FOLLOWING RELIEF AGAINST THE FRANKLIN PLAINTIFFS:

1.     For Declaratory Relief as set forth in Counts I and II above.

2.     For Quantum Meruit and Unjust Enrichment against Purdy Oil in the amount of $2,262,000.

3.     For rescission under § 8-1118 of the Nebraska Securities Act.

4.     In the alternative to rescission under § 8-1118 of the Nebraska Securities Act:

   a.  Declaratory Relief as set forth in Alternative Counts I and II above.

b.  For Damages against Purdy Oil in an amount in excess of $2,000,000.00 as a result of Purdy Oil's negligence and gross negligence.

c.  For Damages against the Franklin Plaintiffs unjust enrichment and fraud.

d.  For Punitive Damages against the Franklin Plaintiffs for gross negligence and fraud.

5.   For an award of pre-judgment interest, as well as reasonable attorneys' fees as both normal and special damages, and other costs; and

6.   For such other and further relief that this Court deems just and proper.

Dated May 8, 2023

DIGITAL LICENSING, INC. and SCHAD BRANNON, Defendants and Counterclaimants, and ARCHER DRILLING, LLC, Cross claim Plaintiff.

By:   REMBOLT LUDTKE LLP
      1128 Lincoln Mall, Suite 300
      Lincoln, NE 68505
      (402) 475-5100

By:   /s/Mark A. Fahleson
      Mark A. Fahleson (#19807)
      mfahleson@remboltlawfirm.com

and

      Nick Janda (California Bar #)
      Dentons US LLP
      4655 Executive Drive, Suite 200
      San Diego, California 92121
      Tel:  (619) 699-2515
      *Pro Hac Vice Pending*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, except to the extent that any of the following receive e-service (in which case service to such persons was solely by e-service), that I caused a true and correct copy of the foregoing to be sent by ordinary United States mail, first class postage prepaid, on, addressed to:

      Monte L. Neilan
      Monte@neilan.law

                <u>/s/Mark A. Fahleson      </u>
                Mark A. Fahleson (#19807)

4869-8537-1744, v. 1

EXHIBIT

A

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## ARCHER DRILLING, LLC

This Multi-Member LLC Operating Agreement ("Agreement") represents Archer Drilling, LLC that was formed in the State of Wyoming on April 4th, 2022 ("Company").

The following represents the initial 4 **Member(s)** of the Company and their respective ownership interest:

**Digital Licensing Incorporated or Member 1** of 30 N Gould St Sheridan, WY 82801, and has 51.00%.

**James Franklin or Member 2** of 3510 Santoro Way, San Diego, California, 92130, and has 16.33% ownership in the Company.

**Gene Purdy or Member 3** of 1100 Harrison Drive Box 94, Pine Bluffs, Wyoming, 82082, and has 16.33% ownership in the Company. Member 3.

**Garret Purdy or Member 4** of 1100 Harrison Drive Box 94, Pine Bluffs, Wyoming, 82082, and has 16.33% ownership in the Company

("Member(s)")

**WHEREAS** the Member(s) desire to create a limited liability company under the laws of the State of Wyoming and set forth the terms herein of the Company's operation and the relationship between the Member(s).

**THEREFORE**, in consideration of the mutual covenants set forth herein and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Member(s) and the Company agree as follows:

1. Name and Principal Place of Business.

The name of the Company is Archer Drilling, LLC with a principal place of business at 1100 Harrison Drive Box 94, Pine Bluffs, Wyoming, 82082. The mailing address shall be the same address as the principal place of business.

2. Registered Agent.

The name of the Registered Agent is Gene Purdy with a registered office located at 1100 Harrison Drive Box 94, Pine Bluffs, Wyoming, 82082 for the service of process as of April 4th, 2022 ("Registered Agent"). The Registered Agent may change at any time by the Company filing an amendment with the Secretary of State, or respective office, in the State of Wyoming.

Page **1** of **15**

3. Formation.

The Company was formed on April 4th, 2022, when the Member(s) filed the Articles of Organization with the office of the Secretary of State pursuant to the statutes governing limited liability companies in the State of Wyoming (the "Statutes").

4. Purpose.

The purpose of the Company is to exclusively engage in and conduct any and all lawful businesses, activities or functions, conduct the oil well drilling for lease dated this 29th day of November, recorded in book OG 232 & page number 555-559 serial listing from the Kimball County Recorder's Office and to carry on any other lawful activities in connection with or incidental to the foregoing, as the Member(s) in their discretion shall determine.

5. Term.

The term of the Company shall continue in perpetuity commencing on the filing of the Articles of Organization of the Company while continuing until terminated under the provisions set forth herein.

6. Member(s) Capital Contributions.

Capital contribution to the Company shall be made by Member 1:

Digital Licensing, LLC shall contribute $900,000 The Capital Contribution made by the Member shall be paid back to the Member before any profits are distributed by the Company.

Hereinafter known as the "Contributor(s)".

The Contributor(s) shall have no right to withdraw or reduce their contributions to the capital of the Company until the Company has been terminated unless otherwise set forth herein. The Contributor(s) shall have no right to demand and receive any distribution from the Company in any form other than cash, and Member(s) shall not be entitled to interest on their capital contributions to the Company.

The liability of the Contributor(s) for the losses, debts, liabilities, and obligations of the Company shall be limited to the amount of the capital contribution plus any distributions paid to such Contributor(s) individually, such as the Contributor's share of any undistributed assets of the Company; and (only to the extent as might be required by applicable law) any amounts previously distributed to such Contributor(s) by the Company.

7. Distributions.

Page **2** of **15**

For the purposes of this Agreement, "net profits" and "net losses" mean the profits or losses of the Company resulting from the conduct of the Company's business, after all expenses, including depreciation allowance, incurred in connection with the conduct of its business for which such expenses have been accounted.

The term "Cash Receipts" shall mean all Cash Receipts of the Company from whatever source derived, including without limitation capital contributions made by the Member(s); the proceeds of any sale, exchange, condemnation or other disposition of all or any part of the assets of the Company; the proceeds of any loan to the Company; the proceeds of any mortgage or refinancing of any mortgage on all or any part of the assets of the Company; the proceeds of any insurance policy for fire or other casualty damage payable to the Company; and the proceeds from the liquidation of assets of the Company following termination.

The term "Capital Transactions" shall mean any of the following: the sale of all or any part of the assets of the Company; the refinancing of mortgages or other liabilities of the Company; the receipt of insurance proceeds; and any other receipts or proceeds are attributable to capital.

A "Capital Account" for the Member shall be maintained by the Company. The Member's Capital Account shall reflect the Member's capital contributions and increases for any net income or gain of the Company. The Member's Capital Account shall also reflect decreases for distributions made to the Member and the Member's share of any losses and deductions of the Company.

During each quarterly period the net profits and net losses of the Company (other than from Capital Transactions), and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be credited or charged, as the case may be, to the capital accounts of each Member in proportion to the Members' Percentage Interests. The net profits of the Company from Capital Transactions shall be allocated in the following order of priority: (a) to offset any negative balance in the capital accounts of the Member(s) in proportion to the amounts of the negative balance in their respective capital accounts, until all negative balances in the capital accounts have been eliminated; then (b) to the Member(s) in proportion to the Members' Percentage Interests. The net losses of the Company from Capital Transactions shall be allocated in the following order of priority: (a) to the extent that the balance in the capital accounts of any Member(s) are in excess of their original contributions, to such Member(s) in proportion to the excess balances until all such excess balances have been reduced to zero; then (b) to the Member(s) in proportion to the Members' Percentage Interests.

The Cash Receipts of the Company shall be applied in the following order of priority: (a) to the payment of interest or amortization on any mortgages on the assets of the Company, amounts due on debts and liabilities of the Company other than those due to any Member(s), costs of the construction of the improvements to the assets of the Company and operating expenses of the

Page **3** of **15**

Company; (b) to the payment of interest and establishment of cash reserves determined by the Member(s) to be necessary or appropriate, including without limitation, reserves for the operation of the Company's business, construction, repairs, replacements, taxes and contingencies; and (c) to the repayment of any loans made to the Company by any Member(s). Thereafter, the Cash Receipts of the Company shall be distributed among the Member(s) as hereafter provided.

Except as otherwise provided in this Agreement or otherwise required by law, distributions of Cash Receipts of the Company, other than from Capital Transactions, shall be allocated among the Member(s) in proportion to the Members' Percentage Interests.

Except as otherwise provided in this Agreement or otherwise required by law, distributions of Cash Receipts from Capital Transactions shall be allocated in the following order of priority: (a) to the Member(s) in proportion to their respective capital accounts until each Member has received cash distributions equal to any positive balance in their capital account; then (b) to the Member(s) in proportion to the Members' Percentage Interests.

It is the intention of the Member(s) that the allocations under this Agreement shall be deemed to have "substantial economic effect" within the meaning of Section 704 of the Internal Revenue Code and Treas. Reg. Section 1.704-1. Should the provisions of this Agreement be inconsistent with or in conflict with Section 704 of the Code or the Regulations thereunder, then Section 704 of the Code and the Regulations shall be deemed to override the contrary provisions thereof. If Section 704 or the Regulations at any time require that limited liability company operating agreements contain provisions which are not expressly set forth herein, such provisions shall be incorporated into this Agreement by reference and shall be deemed a part of this Agreement to the same extent as though they had been expressly set forth herein.

8. Books, Records, and Tax Returns.

The Member(s), or their designees, shall maintain complete and accurate records and books of the Company's transactions in accordance with generally accepted accounting principles.

The Company shall furnish each Member, within seventy-five (75) days after the end of each fiscal year, an annual report of the Company including a balance sheet, a profit and loss statement, a capital account statement, and the amount of such Member's share of the Company's income, gain, losses, deductions, and other relevant items for federal income tax purposes.

The Member(s) intends that the Company shall be taxed as a Partnership in accordance with the provisions of the Internal Revenue Code. The Company shall prepare all Federal, State, and local income tax and information returns for the Company and shall cause such tax and information returns to be timely filed. Within seventy-five (75) days after the end of each fiscal year, the

Page **4** of **15**

Company shall forward to each person who was a Member during the preceding fiscal year a true copy of the Company's information return filed with the Internal Revenue Service for the preceding fiscal year.

All elections required or permitted to be made by the Company under the Internal Revenue Code, and the designation of a tax matters partner pursuant to Section 6231(a)(7) of the Internal Revenue Code for all purposes permitted or required by the Code, shall be made by the Company by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests.

Upon request, the Company shall furnish to each Member a current list of the names and addresses of all of the Member(s) of the Company, and any other persons or entities having any financial interest in the Company.

9.  Bank Accounts.

All funds of the Company shall be deposited in the Company's name in a bank account or accounts as chosen by the Member(s). Withdrawals from any bank accounts shall be made only in the regular course of business of the Company and shall be made upon such signature or signatures as the Member(s) from time to time may designate.

10. Management of the Company.

The business and affairs of the Company shall be conducted and managed by the Members in accordance with this Agreement and the laws of the State of Wyoming.

Except as expressly provided elsewhere in this Agreement, all decisions respecting the management, operation, and control of the business and affairs of the Company and all determinations made in accordance with this Agreement shall be made by a vote of over fifty percent (50%) of the Members' ownership-interest.

Notwithstanding any other provision of this Agreement, the Member(s) shall not sell, exchange, lease, assign or otherwise transfer all or substantially all of the assets of the Company; sell, exchange, lease (other than space leases in the ordinary course of business), assign or transfer the Company's assets; mortgage, pledge or encumber the Company's assets other than is expressly authorized by this Agreement; prepay, refinance, modify, extend or consolidate any existing mortgages or encumbrances; borrow money on behalf of the Company; lend any Company funds or other assets to any person; establish any reserves for working capital repairs, replacements, improvements or any other purpose; confess a Judgment against the Company; settle, compromise or release, discharge or pay any claim, demand or debt, including claims for insurance; approve a merger or consolidation of the Company with or into any other limited liability company, corporation, partnership or other entity; or change the nature or character of

Page **5** of **15**

the business of the Company without a vote of over fifty percent (50%) of the Members' ownership-interest.

The Member(s) shall receive such sums for compensation as Member(s) of the Company as may be determined from time to time by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests.

<u>11. Meetings of Member(s).</u>

The annual meeting of the Member(s) shall be held on the 1st of January (day/month) at the principal office of the Company or at such other time and place as the Member(s) determine, for the purpose of transacting such business as may lawfully come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day.

The Member(s) may by resolution prescribe the time and place for the holding of regular meetings and may provide that the adoption of such resolution shall constitute notice of such regular meetings.

Special meetings of the Member(s), for any purpose or purposes, may be called by any Member(s) (or such other number of Member(s) as the Member(s) from time to time may specify).

Written or electronic notice stating the place, date, and time of the meeting, the means of electronic video screen communication or transmission, if any, and describing the purposes for which the meeting is called, shall be delivered not fewer than ten (10) days and not more than sixty (60) days before the date of the meeting to each Member, by or at the direction of the Manager or the Member(s) calling the meeting, as the case may be.

At any meeting of the Member(s), the presence of Member(s) holding a majority of the Members' Percentage Interests, as determined from the books of the Company, represented in person or by proxy, shall constitute a quorum for the conduct of the general business of the Company. However, if any particular action by the Company shall require the vote or consent of some other number or percentage of Member(s) pursuant to this Agreement, a quorum for the purpose of taking such action shall require such other number or percentage of Member(s). If a quorum is not present, the meeting may be adjourned from time to time without further notice, and if a quorum is present at the adjourned meeting, any business may be transacted which might have been transacted at the meeting as originally notified. The Member(s) present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Member(s) to leave less a quorum.

Page **6** of **15**

At all meetings of the Member(s), a member may vote by proxy executed in writing by the Member or by a duly authorized attorney-in-fact of the Member. Such proxy shall be filed with the Company before or at the time of the meeting.

A Member of the Company who is present at a meeting of the Member(s) at which action on any matter is taken shall be presumed to have assented to the action taken, unless the dissent of such Member shall be entered in the minutes of the meeting or unless such Member(s) shall file a written dissent to such action with the person acting as the secretary of the meeting before the meeting's adjournment. Such right to dissent shall not apply to Member(s) who voted in favor of such action.

Unless otherwise provided by law, any action required to be taken at a meeting of the Member(s), or any other action which may be taken at a meeting of the Member(s), may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Member(s) entitled to vote with respect to the subject.

Member(s) of the Company may participate in any meeting of the Member(s) by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matters to be voted upon. Participation in a meeting pursuant to this paragraph shall constitute presence in person at such meeting.

12. Assignment of Interests.

Except as otherwise provided in this Agreement, no Member(s) or other person holding interest in the Company may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of their interest in the Company, including without limitation, the capital, profits or distributions without the vote consisting of the majority Members' ownership percentage interest in the Company.

A Member may assign all or any part of such Member's interest in the allocations and distributions of the Company to any of the following (collectively the "permitted assignees"): any person, corporation, partnership, or other entity as to which the Company has permitted to the assignment of such interest in the allocations and distributions of the Company in accordance with Section 14 of this Agreement. An assignment to a permitted assignee shall only entitle the permitted assignee to the allocations and distributions to which the assigned interest is entitled unless such permitted assignee applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

The Member(s) agree that Member(s) may voluntarily withdraw from the Company only with the approval, vote, or consent consisting of the majority Members' ownership percentage interest. Unless the withdrawing member's ownership interest was sold, it shall be transferred to

Page **7** of **15**

the remaining Member(s) in the Company at the same ownership interest percentage ratio that exists at the time of withdrawal. After being removed from the Company, the withdrawing Member shall be unequivocally released from any legal or financial liability that is related to the Company unless otherwise agreed upon.

An assignment, pledge, hypothecation, transfer, or other disposition of all or any part of the interest of a Member in the Company or other person holding any interest in the Company in violation of the provisions hereof shall be null and void for all purposes.

No assignment, transfer, or other disposition of all or any part of the interest of any Member permitted under this Agreement shall be binding upon the Company unless and until a duly executed and acknowledged counterpart of such assignment or instrument of transfer, in form and substance satisfactory to the Company, has been delivered to the Company.

No assignment or other disposition of any interest of any Member may be made if such assignment or disposition, alone or when combined with other transactions, would result in the termination of the Company within the meaning of Section 708 of the Internal Revenue Code or under any other relevant section of the Code or any successor statute. No assignment or other disposition of any interest of any Member may be made without an opinion of counsel satisfactory to the Company that such assignment or disposition is subject to an effective registration under, or exempt from the registration requirements of, the applicable Federal and State securities laws. No interest in the Company may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.

Anything herein contained to the contrary, the Company shall be entitled to treat the record holder of the interest of a Member as the absolute owner thereof and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Company the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Company to establish to the satisfaction of the Company that an interest has been assigned or transferred in accordance with this Agreement.

13. Right of First Refusal.

If a Member desires to sell, transfer, or otherwise dispose of all or any part of their interest in the Company, such Member (the "Selling Member") shall first offer to sell and convey such interest to the other Member(s) of the Company before selling, transferring or otherwise disposing of such interest to any other person, corporation or other entity. Such offer shall be in writing, shall be given to every other Member, and shall set forth the interest to be sold, the purchase price to be paid, the date on which the closing is to take place (which date shall be not less than thirty nor more than sixty (60) days after the delivery of the offer), the location at which the closing is to take place, and all other material terms and conditions of the sale, transfer or other disposition.

Page **8** of **15**

Within fifteen (15) days after the delivery of said offer, the other Member(s) shall deliver to the Selling Member a written notice either accepting or rejecting the offer. Failure to deliver said notice within said fifteen (15) days conclusively shall be deemed a rejection of the offer. Any or all of the other Member(s) may elect to accept the offer, and if more than one of the other Member(s) elects to accept the offer, the interest being sold and the purchase price, therefore, shall be allocated among the Member(s) so accepting the offer in proportion to their Members' Percentage Interests, unless they otherwise agree in writing.

If any or all of the other Member(s) elect to accept the offer, then the closing of title shall be held in accordance with the offer, and the Selling Member shall deliver to the other Member(s) who have accepted the offer an assignment of the interest being sold by the Selling Member and said other Member(s) shall pay the purchase price prescribed in the offer.

If no other Member accepts the offer, or if the Member(s) who have accepted such offer default in their obligations to purchase the interest, then the Selling Member, within one-hundred and twenty (120) days after the delivery of the offer, may sell such interest to any other person or entity at a purchase price which is not less than the purchase price prescribed in the offer and upon the terms and conditions which are substantially the same as the terms and conditions set forth in the offer, provided all other applicable requirements of this Agreement are complied with. An assignment of such interest to a person or entity who is not a Member of the Company shall only entitle such person or entity to the allocations and distributions to which the assigned interest is entitled unless such person or entity applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

If the Selling Member does not sell such interest within said one-hundred and twenty (120) days, then the Selling Member may not thereafter sell such interest without again offering such interest to the other Member(s) in accordance with this Agreement.

14. Admission of New Member(s).

The Company may admit new Member(s) (or transferees of any interests of existing Member(s)) into by the purchase or transfer of another Member's ownership interest and a vote for adding the new Member consisting of the majority Members' ownership percentage interest in the Company.

As a condition to the admission of a new Member, such Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Company, as the Company may deem necessary or desirable to effectuate such admission and to confirm the agreement of such Member to be bound by all of the terms, covenants, and conditions of this Agreement, as the same may have been amended. Such new Member shall pay all reasonable expenses in connection with such admission, including without limitation, reasonable attorneys' fees and the

Page **9** of **15**

cost of the preparation, filing or publication of any amendment to this Agreement or the Articles of Organization, which the Company may deem necessary or desirable in connection with such admission.

No new Member shall be entitled to any retroactive allocation of income, losses, or expense deductions of the Company. The Company may make pro-rata allocations of income, losses, or expense deductions to a new Member for that portion of the tax year in which the Member was admitted in accordance with Section 706(d) of the Internal Revenue Code and regulations thereunder.

In no event shall a new Member be admitted to the Company if such admission would be in violation of applicable Federal or State securities laws or would adversely affect the treatment of the Company as a partnership for income tax purposes.

15. Sale of Company.

The sale of the Company, either partially or in its entirety, shall only be approved by a vote of over fifty percent (50%) of the Members' ownership-interest. Any purchase agreement that is presented to the Company shall be reviewed by up to fifteen (15) days by the Member(s) and put up to a vote within a seven (7) day period thereafter. At the option of any Member, the vote may be delayed by up to thirty (30) days to review the details of the purchase.

If an agreement to sell the Company is approved by the Member(s), then all sale proceeds shall first be paid to the debt of the Company unless the Buyer is accepting some or all of the debt as part of the purchase. All remaining proceeds shall be dispersed in relation to each Member's percent ownership-interest in the Company.

16. Withdrawal Events.

In the event of the death, retirement, withdrawal, expulsion, or dissolution of a Member, or an event of bankruptcy or insolvency, as hereinafter defined, with respect to a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company pursuant to the Statutes (each of the foregoing hereinafter referred to as a "Withdrawal Event"), the Company shall terminate sixty (60) days after notice to the Member(s) of such withdrawal Event unless the business of the Company is continued as hereinafter provided.

Notwithstanding a Withdrawal Event with respect to a Member, the Company shall not terminate, irrespective of applicable law, if within the aforesaid sixty-day period the remaining Member(s), by the unanimous vote or consent of the Member(s) (other than the Member who caused the Withdrawal Event), shall elect to continue the business of the Company.

In the event of a Withdrawal Event with respect to a Member, any successor in interest to such Member (including without limitation any executor, administrator, heir, committee, guardian, or

Page **10** of **15**

other representative or successor) shall not become entitled to any rights or interests of such Member(s) in the Company, other than the allocations and distributions to which such Member is entitled unless such successor in interest is admitted as a Member in accordance with this Agreement.

An "event of bankruptcy or insolvency" with respect to a Member shall occur if such Member: (1) applies for or consents to the appointment of a receiver, trustee or liquidator of all or a substantial part of their assets; or (2) makes a general assignment for the benefit of creditors; or (3) is adjudicated a bankrupt or an insolvent; or (4) files a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or to take advantage of any bankruptcy, insolvency, readjustment of debt or similar law or statute, or an answer admitting the material allegations of a petition filed against them in any bankruptcy, insolvency, readjustment of debt or similar proceedings; or (5) takes any action for the purpose of effecting any of the foregoing; or (6) an order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall continue unstated and in effect for thirty (30) days.

## 17. Dissolution and Liquidation.

The Company shall terminate upon the occurrence of any of the following : (i) the election by the Member(s) to dissolve the Company made by a vote of over fifty percent (50%) of the Members' ownership-interest.; (ii) the occurrence of a Withdrawal Event with respect to a Member and the failure of the remaining Member(s) to elect to continue the business of the Company as provided for in this Agreement above; or (iii) any other event which pursuant to this Agreement, as the same may hereafter be amended, shall cause a termination of the Company.

The liquidation of the Company shall be conducted and supervised by a person designated for such purposes by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests (the "Liquidating Agent"). The Liquidating Agent hereby is authorized and empowered to execute all documents and to take any and all actions necessary or desirable to effectuate the dissolution and liquidation of the Company in accordance with this Agreement.

Promptly after the termination of the Company, the Liquidating Agent shall cause to be prepared and furnished to the Member(s) a statement setting forth the assets and liabilities of the Company as of the date of termination. The Liquidating Agent, to the extent practicable, shall liquidate the

Page **11** of **15**

assets of the Company as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

The proceeds of sale and all other assets of the Company shall be applied and distributed in the following order of priority: (1) to the payment of the expenses of liquidation and the debts and liabilities of the Company, other than debts and liabilities to Member(s); (2) to the payment of debts and liabilities to Member(s); (3) to the setting up of any reserves which the Liquidating Agent may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Company, which reserves shall be paid over to a licensed attorney to hold in escrow for a period of two years for the purpose of payment of any liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as provided; (4) to the Member(s) in proportion to their respective capital accounts until each Member has received cash distributions equal to any positive balance in their capital account, in accordance with the rules and requirements of Treas. Reg. Section 1.704-1(b)(2)(ii)(b); and (5) to the Member(s) in proportion to the Members' Percentage Interests.

The liquidation shall be complete within the period required by Treas. Reg. Section 1.7041(b)(2)(ii)(b).

Upon compliance with the distribution plan, the Member(s) shall no longer be Member(s), and the Company shall execute, acknowledge and cause to be filed any documents or instruments as may be necessary or appropriate to evidence the dissolution and termination of the Company pursuant to the Statutes.

18. Representation of Member(s).

Each of the Member(s) represents, warrants and agrees that the Member is acquiring the interest in the Company for the Member's own account for investment purposes only and not with a view to the sale or distribution thereof; the Member, if an individual, is of legal age; if the Member is an organization, such organization is duly organized, validly existing and in good standing under the laws of its State of organization and that it has full power and authority to execute this Agreement and perform its obligations hereunder; the execution and performance of this Agreement by the Member does not conflict with, and will not result in any breach of, any law or any order, writ, injunction or decree of any court or governmental authority against or which binds the Member, or of any agreement or instrument to which the Member is a party; and the Member shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any State or other governmental authorities, as the same may be amended.

Page **12** of **15**

19. Certificates Evidencing Membership.

Every membership interest in the Company shall be evidenced by a Certificate of Membership issued by the Company. Each Certificate of Membership shall set forth the name of the Member holding the membership interest and the Member's Percentage Interest held by the Member, and shall bear the following statement:

"The membership interest represented by this certificate is subject to, and may not be transferred except in accordance with, the provisions of the Operating Agreement of Archer Drilling, LLC dated effective as of April 4th, 2022, as the same from time to time may be amended, a copy of which is on file at the principal office of the Company."

20. Notices.

All notices, demands, requests, or other communications which any of the parties to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been properly given if sent by courier or by registered or certified mail, return receipt requested, with postage prepaid, addressed as follows: (a) if to the Company, at the principal place of business of the Company designated by the Company; and (b) if to any Member, to the address of said Member first above written, or to such other address as may be designated by said Member by notice to the Company and the other Member(s) pursuant to this Agreement.

21. Arbitration.

Any dispute, controversy or claim arising out of or in connection with this Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the city in which the principal place of business of the Company is then located, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any other time or place or under any other form of arbitration mutually acceptable to the parties involved). Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in a court of competent jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence, and attorneys' fees, except that in the discretion of the arbitrator, any award may include the attorney's fees of a party if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or in bad faith.

22. Amendments.

This Agreement may not be altered, amended, changed, supplemented, waived, or modified in any respect or particular unless the same shall be in writing and agreed to by the affirmative vote or consent of Member(s) holding a majority of the Members' Percentage Interests. No

Page **13** of **15**

amendment may be made to Articles that apply to the financial interest of the Member(s), except by the vote or consent of all of the Member(s). No amendment of any provision of this Agreement relating to the voting requirements of the Member(s) on any specific subject shall be made without the affirmative vote or consent of at least the number or percentage of Member(s) required to vote on such subject.

23. Miscellaneous.

This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of Wyoming. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

The captions in this Agreement are for convenience only and are not to be considered in construing this Agreement. All pronouns shall be deemed to be masculine, feminine, neuter, singular, or plural as the identity of the person or persons may require. References to a person or persons shall include partnerships, corporations, limited liability companies, unincorporated associations, trusts, estates, and other types of entities.

This Agreement, and any amendments hereto, may be executed in counterparts all of which taken together shall constitute one agreement.

This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof. It is the intention of the Member(s) that this Agreement shall be the sole agreement of the parties, and, except to the extent a provision of this Agreement provides for the incorporation of federal income tax rules or is expressly prohibited or ineffective under the Statutes, this Agreement shall govern even when inconsistent with, or different from, the provisions of any applicable law or rule. To the extent any provision of this Agreement is prohibited or otherwise ineffective under the Statutes, such provision shall be considered to be ineffective to the smallest degree possible in order to make this Agreement effective under the Statutes.

**[ Rest of this page is left blank on purpose – Signature page to follow]**

Page **14** of **15**

Subject to the limitations on transferability set forth above, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns.

No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

**IN WITNESS WHEREOF**, the Member(s) have executed this Agreement on April 4th, 2022.

Member 1 Signature: ___

Print Name: Schad Brannon

Member 2 Signature: _____

Print Name: James Franklin

Member 3 Signature: _____

Print Name: Gene Purdy

Member 4 Signature: _____

Print Name: Garret Purdy

Page **15** of 15

Subject to the limitations on transferability set forth above, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns.

No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

**IN WITNESS WHEREOF**, the Member(s) have executed this Agreement on April 4th, 2022.

Member 1 Signature: _____

Print Name: Schad Brannon

Member 2 Signature: _____

Print Name: James Franklin

Member 3 Signature: _____

Print Name: Gene Purdy

Member 4 Signature: _____

Print Name: Garret Purdy

Page **15** of **15**



EXHIBIT
B

**NOTICE OF REMOVAL OF WESTERN OIL EXPLORATION COMPANY AS OPERATOR**
**NOTICE OF PROPOSED SUBSEQUENT OPERATIONS**

**20 September 2022**

**WESTERN OIL EXPLORATION COMPANY**
**848 Rainbow Blvd. Suite 2818**
**Las Vegas, NV 89107**
**Attn: James Franklin**
**Email: jfranklin@westernoilx.com**

Dear Mr. Franklin:

This letter shall serve as notice to you and your company **WESTERN OIL EXPLORATION COMPANY** (**"*Western Oil*"**) that Western Oil has been removed as Operator for good cause under that certain Operating Agreement dated August 8, 2018 ("the "***Operating Agreement***"), covering lands in Township 17N-56E, White Pine County, Nevada by an affirmative vote of Non-Operators owning a majority interest based on ownership remaining after excluding the voting interest of Operator, as evidenced by the signatures of said Non-Operators on this notice. The basis for Western Oil's removal for good cause under the Operating Agreement by the Non-Operators is Western Oil's failure to conduct its activities under the Operating Agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and its material failure to perform its obligations under the Operating Agreement.

Additionally, Western Oil has breached its contractual obligations under its Exploration Agreement duly executed **22nd October 2020** as a result of its failure to conduct its activities in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, resulting in Western Oil's failure to reach the total vertical depth (TVD) of 10,000 and its exhaustion of the total authorization for Expenditure ("AFE") of $4,997,000.00 drilling the initial well. Therefore:

In accordance with; ***ARTICLE VI. DRILLING AND DEVELOPMENT:*** which states.

> **Western Oil Exploration Company, Drill Plan Dated 10 September 2018, Initial Well #1**
> *Drill 6 1/2" hole to projected TD of 10,000' with 9.5 - 10.5 ppg bentonite, cmc, polymer mud. Log hole from TD to bottom of intermediate casing with caliper, SP, Gr, Dual induction, Neutron Density, and acoustic porosity wireline logs. If needed, set 4 1/2" 13.5 ppf, C - 75, LTC production casing and circulate cement to 2,900' or 1,000' into intermediate casing. Run cement bond log.*
>
> *Attached to and made a part of that certain Exploration Agreement by and between Western Oil. and PARTNER dated September 7, 2016. Leased Lands included in the Newark Valley Prospects located in White Pine County, Nevada are described as follows: Lease Number N82639 located in Township 17N-R56E Sections 25, 26, 27, 34, 35 and 36: containing 3,840 acres.*
> *The Area of Mutual Interest shall include all portions of lands included in Township 17N-R56E Sections 25, 26, 27, 34, 35 and 36: ALL.*

US_ACTIVE\122346206\V-2

In accordance with; **SECTION I CASH PAYMENT/ASSIGNMENT (2):** which states.

> **Western Oil Exploration Company., Exploration Agreement**
> *As partial consideration hereunder, WESTERN, or its assigns as Operator, shall enter into a Drilling Contract and pay their portion of requisite mobilization and demobilization fees and costs including drilling and completion costs estimated to be $4,247,000 for each of the first two appraisal wells and $750,000 of leasing, geology and geophysics expenses also for each well. Subsequent wells will be drilled to optimize oil production and Drilling Contracts may be customized for these wells. This will be done by requesting bids by multiple drilling contractors to identify and develop an Authorization for Expenditure (AFE) that is the lowest price for the appropriate level of service.*

**Therefore:**

In accordance with; **ARTICLE V. OPERATOR B. Resignation or Removal of Operator and Selection of Successor:** which states.

> *1.  Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.*

As set out above, this shall serve as notice from a majority in interest of Non-Operators, after excluding the interest of Operator, that Western Oil has been removed as Operator under the Operating Agreement for good cause. The "good cause" authorizing removal of Western Oil as Operator includes, but is not limited to, the following breaches of the Operating Agreement:

- Misrepresentation.
- Fraud
- Misappropriation of funds.
- Unjust Enrichment
- Gross Negligence letting the company become insolvent.
- Gross Negligence in not always having adequate experienced staff on site to oversee critical aeras of the operations.
- Gross Negligence for not maintaining drill hole integrity by causing damage to the drill hole resulting in the inability to proceed to TVD depth.
- Gross Negligence in not preserving the integrity of the drill hole by casing in the depth that had been achieved and allowing degradation of the drill hole.

---

This shall also serve as notice that, effectively immediately, the Successor Operator shall be **ARCHER DRILLING, LLC**, a Wyoming, LLC selected by the affirmative vote below of the Non-Operators, two (2) or more having majority interest in the Contract Area after excluding the voting interest of Operator. In accordance with; **ARTICLE V. OPERATOR B. Resignation or Removal of Operator and Selection of Successor 2:** which states.

2. *Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor **Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned.** The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.*

Signatures below confirm affirmative vote for removal of Operator **WESTERN OIL EXPLORATION COMPANY** and appointment of the successor Operator **ARCHER DRILLING, LLC** is hereby selected by the non-Defaulting Parties.

| For and on Behalf of Global Bullion Holdings, LLC, and Digital Licensing Inc. | For and on behalf of Scott & Mary Ellen Moncrieff |
|---|---|
| X | X |
| Schad E. Brannon | Scott Moncrieff |

**Thereafter:**

This shall serve as notice that the Non-Operators bearing the cost of drilling the Initial Well elect to terminate operations for the drilling of the Initial Well under Article VI.F of the Operating Agreement, and instead desire to purpose a Subsequent Operation as the Initial Well is no longer capable of reaching TVD and the AFE has been exhausted. In accordance with; **ARTICLE VI. DRILLING AND DEVELOPMENT B. Subsequent Operations:** which states.

*Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation.*

**Digital Licensing Incorporated 30 N Gould St Ste N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

46 of 56

The Non-Operators are now invoking their rights under the operating agreement in the above section to propose Subsequent Operations, in a separate proposal which states that it will submit to the parties for consideration of participation containing the following information.

- The Location.
- Specify Work to be Performed.
- Proposed Depth.
- Objective Zone and Estimated Cost of Operations.

In accordance with; **ARTICLE VI. DRILLING AND DEVELOPMENT B. Subsequent Operations:** which states.

> *If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.*

2. Operations by Less Than All Parties:

> *(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.*

> *If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours*

**Digital Licensing Incorporated 30 N Gould St N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

47 of 56

*(exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.*

The operator **ARCHER DRILLING, LLC** once the Subsequent Operations proposal has been served the Parties including Western Oil, and any other parties including but not limited to Appendix "A" that **ARCHER DRILLING, LLC,** deems necessary to notify shall be bound by the above procedures as duly notified above. Immediate action is required as non-action can result in relinquishment of interest for non-participation.

Should Western Oil or any other interested party desire to remain a consenting party to this Subsequent Operation Western Oil or any other interested party shall be required to provide notice of their election to participate and shall be required to pay, their proportionate shares of the cost by depositing their share of the capital contribution to the **ARCHER DRILLING, LLC** operating account located at **First Tier Bank**, to an account number to be provided **2600704247** no later than 48 hours after duly notified or by **2:00 PM MST Wednesday, 22nd September 2022** so the succession operator can commence the proposed operation and complete for the account of the Consenting Parties.

| Signatures affixed here to indicate two (2) or more affirmative votes in accordance with the **WESTERN OIL EXPLORATION OPERATING AGREEMENT** procedures for operator removal for good cause and appointment of succession operator: | |
|---|---|
| X *[signature]* | X *[signature]* Mary Ellen Moncrieff |
| Schad E. Brannon | Scott Moncrieff |
| Managing Director | Investor/Stakeholder |
| Global Bullion Holdings, LLC | Individual |
| Digital Licensing Incorporated | |

Copy to: Appendix "A"
Nick Janda - Dentons US LLP - 4655 Executive Drive Suite 700 San Diego, CA 92121
Barry F. Cannady - Dentons US LLP - 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201-1858

---

**Digital Licensing Incorporated 30 N Gould St Ste N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

48 of 56

## APPENDIX A

| Interested Parties | Contact | Company |
|---|---|---|
| Nicole Scott | nicoletscott@yahoo.com | Lease Holder |
| Alberto Vasquez | alberto@westernoilx.com | CFO – Western Oil |
| Alberto Vasquez | alberto@optimacentral.com | NER |
| Schad Brannon | schadebrannon@gmail.com | Digital Licensing Inc |
| Roy Nelson | roydog.nelson@gmail.com | Digital Licensing Inc |
| Brett Platt | platt@gssrhk.com | GSSR |
| Gary Smalls | alberto@optimacentral.com | AC Consulting |
| Scott Moncrieff & | scottemoncrieff@gmail.com | n/a |
| Mary Ellen Moncrieff | mshannon261@yahoo.com | n/a |
| Steve Hagy's | alberto@optimacentral.com | CFO – Western Oil |
| Anthony Crews | alberto@optimacentral.com | CFO – Western Oil |
| Eileen Russo | alberto@optimacentral.com | Enegix |
| Jonathan | jferrucci@enegix.com | Enegix |
| Paagal Investments | alberto@optimacentral.com | Paagal Investments |
| Wayne Steele | alberto@optimacentral.com | CFO – Western Oil |
| Schad Brannon | schadebrannon@gmail.com | Global Bullion Holdings |
| Michael McDowell (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Nicholas Hughes (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Paul Stevens (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Karla Dick (NER) | alberto@optimacentral.com | CFO – Western Oil |
| David Buhrr (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Ruth Harvey (NER) | alberto@optimacentral.com | CFO – Western Oil |
| James P Fiore (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Austin M | alberto@optimacentral.com | CFO – Western Oil |
| Benjamin Hall | alberto@optimacentral.com | CFO – Western Oil |
| Brad Snavely | brad@ststurf.com | n/a |
| Darrin H | alberto@optimacentral.com | CFO – Western Oil |
| Karina Chandler | Karina.ann.chandler@gmail.com | n/a |
| Michael C | alberto@optimacentral.com | CFO – Western Oil |
| Peter & Stacy M | peter@migalepainting.com | n/a |
| Shannon C | alberto@optimacentral.com | CFO – Western Oil |
| Andrew Felsburg | Andrew afelsburg1@gmail.com | Proprietary Capital Solutions |
| Jonathan Gubin | jonathan@capitalinventures.com | Capital InVentures |

**Digital Licensing Incorporated 30 N Gould St Ste N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

49 of 56



<div style="border">EXHIBIT<br>C</div>

**NOTICE OF REMOVAL OF WESTERN OIL EXPLORATION COMPANY AS OPERATOR**
**NOTICE OF PROPOSED SUBSEQUENT OPERATIONS**

**20 September 2022**

**WESTERN OIL EXPLORATION COMPANY**
 **848 Rainbow Blvd. Suite 2818**
**Las Vegas, NV 89107**
**Attn: James Franklin**
**Email: jfranklin@westernoilx.com**

Dear Mr. Franklin:

This letter shall serve as notice to you and your company **WESTERN OIL EXPLORATION COMPANY** (**"*Western Oil*"**) that Western Oil has been removed as Operator for good cause under that certain Operating Agreement dated August 8, 2018 ("the **"*Operating Agreement*"**), covering lands in Township 17N-56E, White Pine County, Nevada by an affirmative vote of Non-Operators owning a majority interest based on ownership remaining after excluding the voting interest of Operator, as evidenced by the signatures of said Non-Operators on this notice. The basis for Western Oil's removal for good cause under the Operating Agreement by the Non-Operators is Western Oil's failure to conduct its activities under the Operating Agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and its material failure to perform its obligations under the Operating Agreement.

Additionally, Western Oil has breached its contractual obligations under its Exploration Agreement duly executed **22nd October 2020** as a result of its failure to conduct its activities in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, resulting in Western Oil's failure to reach the total vertical depth (TVD) of 10,000 and its exhaustion of the total authorization for Expenditure ("AFE") of $4,997,000.00 drilling the initial well. Therefore:

In accordance with; ***ARTICLE VI. DRILLING AND DEVELOPMENT:*** which states.

> **Western Oil Exploration Company, Drill Plan Dated 10 September 2018, Initial Well #1**
> *Drill 6 1/2" hole to projected TD of 10,000' with 9.5 - 10.5 ppg bentonite, cmc, polymer mud. Log hole from TD to bottom of intermediate casing with caliper, SP, Gr, Dual induction, Neutron Density, and acoustic porosity wireline logs. If needed, set 4 1/2" 13.5 ppf, C - 75, LTC production casing and circulate cement to 2,900' or 1,000' into intermediate casing. Run cement bond log.*
>
> *Attached to and made a part of that certain Exploration Agreement by and between Western Oil. and PARTNER dated September 7, 2016. Leased Lands included in the Newark Valley Prospects located in White Pine County, Nevada are described as follows: Lease Number N82639 located in Township 17N-R56E Sections 25, 26, 27, 34, 35 and 36: containing 3,840 acres.*
> *The Area of Mutual Interest shall include all portions of lands included in Township 17N-R56E Sections 25, 26, 27, 34, 35 and 36: ALL.*

US_ACTIVE\122346206\V-2

In accordance with; **SECTION I CASH PAYMENT/ASSIGNMENT (2):** which states.

> **Western Oil Exploration Company., Exploration Agreement**
> *As partial consideration hereunder, WESTERN, or its assigns as Operator, shall enter into a Drilling Contract and pay their portion of requisite mobilization and demobilization fees and costs including drilling and completion costs estimated to be $4,247,000 for each of the first two appraisal wells and $750,000 of leasing, geology and geophysics expenses also for each well. Subsequent wells will be drilled to optimize oil production and Drilling Contracts may be customized for these wells. This will be done by requesting bids by multiple drilling contractors to identify and develop an Authorization for Expenditure (AFE) that is the lowest price for the appropriate level of service.*

**Therefore:**

In accordance with; **ARTICLE V. OPERATOR B. Resignation or Removal of Operator and Selection of Successor:** which states.

> *1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.*

As set out above, this shall serve as notice from a majority in interest of Non-Operators, after excluding the interest of Operator, that Western Oil has been removed as Operator under the Operating Agreement for good cause. The "good cause" authorizing removal of Western Oil as Operator includes, but is not limited to, the following breaches of the Operating Agreement:

- Misrepresentation.
- Fraud
- Misappropriation of funds.
- Unjust Enrichment
- Gross Negligence letting the company become insolvent.
- Gross Negligence in not always having adequate experienced staff on site to oversee critical aeras of the operations.
- Gross Negligence for not maintaining drill hole integrity by causing damage to the drill hole resulting in the inability to proceed to TVD depth.
- Gross Negligence in not preserving the integrity of the drill hole by casing in the depth that had been achieved and allowing degradation of the drill hole.

---

**Digital Licensing Incorporated 30 N Gould St Ste N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

51 of 56

This shall also serve as notice that, effectively immediately, the Successor Operator shall be **ARCHER DRILLING, LLC**, a Wyoming, LLC selected by the affirmative vote below of the Non-Operators, two (2) or more having majority interest in the Contract Area after excluding the voting interest of Operator. In accordance with; **ARTICLE V. OPERATOR B. Resignation or Removal of Operator and Selection of Successor 2:** which states.

> 2. *Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor **Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned.** The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.*

Signatures below confirm affirmative vote for removal of Operator **WESTERN OIL EXPLORATION COMPANY** and appointment of the successor Operator **ARCHER DRILLING, LLC** is hereby selected by the non-Defaulting Parties.

| For and on Behalf of Global Bullion Holdings, LLC, and Digital Licensing Inc. | For and on behalf of Scott & Mary Ellen Moncrieff |
|---|---|
| X _[signature]_ | X _[signature]_ |
| Schad E. Brannon | Scott Moncrieff |

**Thereafter:**

This shall serve as notice that the Non-Operators bearing the cost of drilling the Initial Well elect to terminate operations for the drilling of the Initial Well under Article VI.F of the Operating Agreement, and instead desire to purpose a Subsequent Operation as the Initial Well is no longer capable of reaching TVD and the AFE has been exhausted. In accordance with; **ARTICLE VI. DRILLING AND DEVELOPMENT B. Subsequent Operations:** which states.

> *Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation.*

**Digital Licensing Incorporated 30 N Gould St Ste N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

52 of 56

The Non-Operators are now invoking their rights under the operating agreement in the above section to propose Subsequent Operations, in a separate proposal which states that it will submit to the parties for consideration of participation containing the following information.

- The Location.
- Specify Work to be Performed.
- Proposed Depth.
- Objective Zone and Estimated Cost of Operations.

In accordance with; **ARTICLE VI. DRILLING AND DEVELOPMENT B. Subsequent Operations:** which states.

> *If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.*

2. Operations by Less Than All Parties:

> *(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.*

> *If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours*

**Digital Licensing Incorporated 30 N Gould St N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

53 of 56

*(exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.*

The operator **ARCHER DRILLING, LLC** once the Subsequent Operations proposal has been served the Parties including Western Oil, and any other parties including but not limited to Appendix "A" that **ARCHER DRILLING, LLC,** deems necessary to notify shall be bound by the above procedures as duly notified above. Immediate action is required as non-action can result in relinquishment of interest for non-participation.

Should Western Oil or any other interested party desire to remain a consenting party to this Subsequent Operation Western Oil or any other interested party shall be required to provide notice of their election to participate and shall be required to pay, their proportionate shares of the cost by depositing their share of the capital contribution to the **ARCHER DRILLING, LLC** operating account located at **First Tier Bank,** to an account number to be provided **2600704247** no later than 48 hours after duly notified or by **2:00 PM MST Wednesday, 22nd September 2022** so the succession operator can commence the proposed operation and complete for the account of the Consenting Parties.

| Signatures affixed here to indicate two (2) or more affirmative votes in accordance with the **WESTERN OIL EXPLORATION OPERATING AGREEMENT** procedures for operator removal for good cause and appointment of succession operator: | |
|---|---|
| X *8Bm* | X *[signature] Mary Ellen Moncrieff* |
| Schad E. Brannon | Scott Moncrieff |
| Managing Director | Investor/Stakeholder |
| Global Bullion Holdings, LLC | Individual |
| Digital Licensing Incorporated | |

Copy to: Appendix "A"
Nick Janda - Dentons US LLP - 4655 Executive Drive Suite 700 San Diego, CA 92121
Barry F. Cannady - Dentons US LLP - 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201-1858

---

**Digital Licensing Incorporated 30 N Gould St Ste N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

54 of 56

## APPENDIX A

| Interested Parties | Contact | Company |
|---|---|---|
| Nicole Scott | nicoletscott@yahoo.com | Lease Holder |
| Alberto Vasquez | alberto@westernoilx.com | CFO – Western Oil |
| Alberto Vasquez | alberto@optimacentral.com | NER |
| Schad Brannon | schadebrannon@gmail.com | Digital Licensing Inc |
| Roy Nelson | roydog.nelson@gmail.com | Digital Licensing Inc |
| Brett Platt | platt@gssrhk.com | GSSR |
| Gary Smalls | alberto@optimacentral.com | AC Consulting |
| Scott Moncrieff & | scottemoncrieff@gmail.com | n/a |
| Mary Ellen Moncrieff | mshannon261@yahoo.com | n/a |
| Steve Hagy's | alberto@optimacentral.com | CFO – Western Oil |
| Anthony Crews | alberto@optimacentral.com | CFO – Western Oil |
| Eileen Russo | alberto@optimacentral.com | Enegix |
| Jonathan | jferrucci@enegix.com | Enegix |
| Paagal Investments | alberto@optimacentral.com | Paagal Investments |
| Wayne Steele | alberto@optimacentral.com | CFO – Western Oil |
| Schad Brannon | schadebrannon@gmail.com | Global Bullion Holdings |
| Michael McDowell (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Nicholas Hughes (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Paul Stevens (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Karla Dick (NER) | alberto@optimacentral.com | CFO – Western Oil |
| David Buhrr (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Ruth Harvey (NER) | alberto@optimacentral.com | CFO – Western Oil |
| James P Fiore (NER) | alberto@optimacentral.com | CFO – Western Oil |
| Austin M | alberto@optimacentral.com | CFO – Western Oil |
| Benjamin Hall | alberto@optimacentral.com | CFO – Western Oil |
| Brad Snavely | brad@ststurf.com | n/a |
| Darrin H | alberto@optimacentral.com | CFO – Western Oil |
| Karina Chandler | Karina.ann.chandler@gmail.com | n/a |
| Michael C | alberto@optimacentral.com | CFO – Western Oil |
| Peter & Stacy M | peter@migalepainting.com | n/a |
| Shannon C | alberto@optimacentral.com | CFO – Western Oil |
| Andrew Felsburg | Andrew afelsburg1@gmail.com | Proprietary Capital Solutions |
| Jonathan Gubin | jonathan@capitalinventures.com | Capital InVentures |

**Digital Licensing Incorporated 30 N Gould St Ste N Sheridan, WY 82801**
**Global Bullion Holdings, LLC 1810 East Sahara Ave Ste 425 Las Vegas, Nevada 89104**
US_ACTIVE\122346206\V-2

55 of 56

## Certificate of Service

I hereby certify that on Monday, May 08, 2023 I provided a true and correct copy of the Answer & Counterclaim to the following:

Purdy Oil, LLC represented by Neilan,Monte,L (Bar Number: 21186) service method: Electronic Service to monte@neilan.law

Stickman,Inc., represented by Spencer Ryan Murphy (Bar Number: 26081) service method: Electronic Service to smurphy@bairdholm.com

Archer Drilling, LLC represented by Neilan,Monte,L (Bar Number: 21186) service method: Electronic Service to monte@neilan.law

Brannon,Schad, represented by Sheila Bentzen (Bar Number: 25020) service method: Electronic Service to sbentzen@remboltlawfirm.com

Purdy,Gene, represented by David L. Wilson (Bar Number: 16082) service method: Electronic Service to dwilsonlaw@embarqmail.com

Franklin,James, represented by Neilan,Monte,L (Bar Number: 21186) service method: Electronic Service to monte@neilan.law

Digital Licensing, Inc. represented by Sheila Bentzen (Bar Number: 25020) service method: Electronic Service to sbentzen@remboltlawfirm.com

Signature: /s/ Fahleson,Mark,A, (Bar Number: 19807)