# Exhibit 8

# STATE OF NEVADA

**BARBARA K. CEGAVSKE**
*Secretary of State*

**KIMBERLEY PERONDI**
*Deputy Secretary
for Commercial Recordings*



*Commercial Recordings Division*
*202 N. Carson Street*
*Carson City, NV 89701-4201*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

**OFFICE OF THE**
## SECRETARY OF STATE

Theresa Mains
2251 N. Rampart Blvd. Suite 102
Las Vegas, NV 89128

**Job:**C20190304-2968
March 4, 2019

**Special Handling Instructions:**

**Charges**

| Description | Document Number | Filing Date/Time | Qty | Price | Amount |
|---|---|---|---|---|---|
| Articles of Organization | 20190097978-52 | 3/4/2019 9:21:58 PM | 1 | $75.00 | $75.00 |
| Initial List | 20190097979-63 | 3/4/2019 9:21:59 PM | 1 | $150.00 | $150.00 |
| Business License 3/2019-3/2020 | 20190097979-63 | 3/4/2019 9:21:59 PM | 1 | $200.00 | $200.00 |
| Total | | | | | $425.00 |

**Payments**

| Type | Description | Amount |
|---|---|---|
| Credit | 052100|5517633154126470003054 | $425.00 |
| Total | | $425.00 |

**Credit Balance:** $0.00

**Job Contents:**

| | |
|---|---|
| LLC Charter | 1 |
| File Stamped Copies | 2 |
| Business License | 1 |

Theresa Mains
2251 N. Rampart Blvd. Suite 102
Las Vegas, NV 89128





**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

*050106*

# Articles of Organization
# Limited-Liability Company
(PURSUANT TO NRS CHAPTER 86)

| Filed in the office of | Document Number |
| --- | --- |
| *Barbara K Cegavske*<br>Barbara K. Cegavske<br>Secretary of State<br>State of Nevada | 20190097978-52 |
| | Filing Date and Time<br>03/04/2019 9:21 PM |
| | Entity Number<br>E0100172019-5 |

(This document was filed electronically.)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                                      ABOVE SPACE IS FOR OFFICE USE ONLY

| | | |
| --- | --- | --- |
| **1. Name of Limited-Liability Company:** (must contain approved limited-liability company wording; see instructions) | THE GOLD COLLECTIVE LLC | Check box if a Series Limited-Liability Company **☒**    Check box if a Restricted Limited-Liability Company **☐** |

**2. Registered Agent for Service of Process:** (check only one box)

☐ Commercial Registered Agent: _____ Name

☒ Noncommercial Registered Agent (name and address below)   ***OR***   ☐ Office or Position with Entity (name and address below)

| THERESA MAINS, ESQ. | | |
| --- | --- | --- |
| Name of Noncommercial Registered Agent  **OR**  Name of Title of Office or Other Position with Entity | | |
| 2251 N RAMPART BLVD 102 | LAS VEGAS | Nevada | 89128 |
| Street Address | City | Zip Code |
| | | Nevada |
| Mailing Address (if different from street address) | City | Zip Code |

| **3. Dissolution Date:** (optional) | Latest date upon which the company is to dissolve (if existence is not perpetual): _____ |
| --- | --- |

| **4. Management:** (required) | Company shall be managed by: **☒** Manager(s)  **OR**  ☐ Member(s) (check only one box) |
| --- | --- |

**5. Name and Address of each Manager or Managing Member:** (attach additional page if more than 3)

| 1) | SCHAD BRANNON | | | |
| --- | --- | --- | --- | --- |
| | Name | | | |
| | 2251 N RAMPART BLVD 102 | LAS VEGAS | NV | 89128 |
| | Street Address | City | State | Zip Code |
| 2) | | | | |
| | Name | | | |
| | | | | |
| | Street Address | City | State | Zip Code |
| 3) | | | | |
| | Name | | | |
| | | | | |
| | Street Address | City | State | Zip Code |

**6. Name, Address and Signature of Organizer:** (attach additional page if more than 1 organizer)

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

| SCHAD BRANNON | X *SCHAD BRANNON* | | |
| --- | --- | --- | --- |
| Name | Organizer Signature | | |
| 2251 N RAMPART BLVD 102 | LAS VEGAS | NV | 89128 |
| Address | City | State | Zip Code |

**7. Certificate of Acceptance of Appointment of Registered Agent:**

*I hereby accept appointment as Registered Agent for the above named Entity.*

| X *THERESA MAINS, ESQ.* | 3/4/2019 |
| --- | --- |
| Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity | Date |

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State NRS 86 DLLC Articles
Revised: 10-1-15



# LIMITED LIABILITY COMPANY CHARTER

I, Barbara K. Cegavske, the Nevada Secretary of State, do hereby certify that **THE GOLD COLLECTIVE LLC** did on March 4, 2019, file in this office the Articles of Organization for a Limited Liability Company, that said Articles of Organization is now on file and of record in the office of the Nevada Secretary of State, and further, that said Articles contain all the provisions required by the laws governing Limited Liability Companies in the State of Nevada.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on March 4, 2019.



*Barbara K. Cegavske*

Barbara K. Cegavske
Secretary of State

Certified By: Electronic Filing
Certificate Number: C20190304-2968

**INITIAL/ANNUAL LIST OF MANAGERS OR MANAGING MEMBERS AND STATE BUSINESS LICENSE APPLICATION OF:**

ENTITY NUMBER

| THE GOLD COLLECTIVE LLC | E0100172019-5 |
|---|---|

NAME OF LIMITED-LIABILITY COMPANY

FOR THE FILING PERIOD OF  MAR, 2019  TO  MAR, 2020

*100403*

**USE BLACK INK ONLY - DO NOT HIGHLIGHT**

**\*\*YOU MAY FILE THIS FORM ONLINE AT www.nvsilverflume.gov\*\***

☐ Return one file stamped copy. (If filing not accompanied by order instructions, file stamped copy will be sent to registered agent.)

*IMPORTANT:* Read instructions before completing and returning this form.

1. Print or type names and addresses, either residence or business, for all manager or managing members. A **Manager, or if none, a Managing Member** of the LLC must sign the form. *FORM WILL BE RETURNED IF UNSIGNED.*

2. If there are additional managers or managing members, attach a list of them to this form.

3. Return completed form with the fee of $150.00. A $75.00 penalty must be added for failure to file this form by the deadline. An annual list received more than 90 days before its due date shall be deemed an amended list for the previous year.

4. State business license fee is $200.00. Effective 2/1/2010, $100.00 must be added for failure to file form by deadline.

5. Make your check payable to the Secretary of State.

6. **Ordering Copies:** If requested above, one file stamped copy will be returned at no additional charge. To receive a certified copy, enclose an additional $30.00 per certification. A **copy fee of $2.00 per page** is required for **each additional copy** generated when ordering 2 or more file stamped or certified copies. Appropriate instructions must accompany your order.

7. Return the completed form to: Secretary of State, 202 North Carson Street, Carson City, Nevada 89701-4201, (775) 684-5708.

8. Form must be in the possession of the Secretary of State on or before the last day of the month in which it is due. (Postmark date is not accepted as receipt date.) Forms received after due date will be returned for additional fees and penalties. Failure to include annual list and business license fees will result in rejection of filing.

Filed in the office of

*Barbara K Cegavske*

Barbara K. Cegavske
Secretary of State
State of Nevada

| Document Number |
|---|
| **20190097979-63** |
| Filing Date and Time |
| **03/04/2019 9:21 PM** |
| Entity Number |
| **E0100172019-5** |

(This document was filed electronically.)
**ABOVE SPACE IS FOR OFFICE USE ONLY**

**ANNUAL LIST FILING FEE:** $150.00    **LATE PENALTY:** $75.00 (if filing late)          **BUSINESS LICENSE  FEE:** $200.00    **LATE PENALTY:** $100.00 (if filing late)

**CHECK ONLY IF APPLICABLE AND ENTER EXEMPTION CODE IN BOX BELOW**

**NRS 76.020 Exemption Codes**

☐ Pursuant to NRS Chapter 76, this entity is exempt from the business license fee. Exemption code: [    ]

001 - Governmental Entit
006 - NRS 680B.020 Insurance Co.

**NOTE:** If claiming an exemption, a notarized Declaration of Eligibility form must be attached. Failure to attach the Declaration of Eligibility form will result in rejection, which could result in late fees.

| NAME | |
|---|---|
| SCHAD BRANNON | MANAGER OR MANAGING MEMBER |

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 2251 N RAMPART BLVD 102 | LAS VEGAS | NV | 89128 |

| NAME | |
|---|---|
| | MANAGER OR MANAGING MEMBER |

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

| NAME | |
|---|---|
| | MANAGER OR MANAGING MEMBER |

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

| NAME | |
|---|---|
| | MANAGER OR MANAGING MEMBER |

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

None of the managers or managing members identified in the list of managers and managing members has been identified with the fraudulent intent of concealing the identity of any person or persons exercising the power or authority of a manager or managing member in furtherance of any unlawful conduct.

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

**X** SCHAD BRANNON

**Signature of Manager, Managing Member or
Other Authorized Signature**

| Title | Date |
|---|---|
| MANAGER | 3/4/2019 9:21:58 PM |

Nevada Secretary of State List ManorMem
Revised: 7-1-17



# NEVADA STATE BUSINESS LICENSE

## THE GOLD COLLECTIVE LLC
**Nevada Business Identification # NV20191171743**

## Expiration Date: March 31, 2020

In accordance with Title 7 of Nevada Revised Statutes, pursuant to proper application duly filed and payment of appropriate prescribed fees, the above named is hereby granted a Nevada State Business License for business activities conducted within the State of Nevada.

Valid until the expiration date listed unless suspended, revoked or cancelled in accordance with the provisions in Nevada Revised Statutes. License is not transferable and is not in lieu of any local business license, permit or registration.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on March 4, 2019

*Barbara K. Cegavske*

Barbara K. Cegavske
Secretary of State

*You may verify this license at www.nvsos.gov under the Nevada Business Search.*

**License must be cancelled on or before its expiration date if business activity ceases.
Failure to do so will result in late fees or penalties which by law <u>cannot</u> be waived.**

<div align="center">

**OPERATING AGREEMENT**
**OF**
**THE GOLD COLLECTIVE, LLC**

</div>

THE MEMBERSHIP INTERESTS AND OTHER SECURITIES PRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

This Operating Agreement (this "Agreement") is made and entered into as of the 18th day of July 2019, by and among the members set forth on the signature page and also listed on Exhibit A attached hereto and made a part hereof. Capitalized terms not otherwise defined herein are defined in Article 4.

The Members hereby agree as follows:

<div align="center">

**ARTICLE 1**
**ORGANIZATION OF COMPANY**

</div>

1.1      **Organization and Formation**. The Members have organized and formed the Company as a Nevada limited liability company. The Members shall execute and file such instruments as are necessary to form the Company as a limited liability company in the State of Nevada and shall file any necessary amendments to reflect the formal agreements documented herein.

1.2      **Name**. The name of the Company is "THE GOLD COLLECTIVE, LLC" or such other name as the Majority may determine from time to time.

1.3      **Principal Place of Business**. The initial principal place of business of the Company shall be at 400 South 4th Street Suite 102 Las Vegas, Nevada 89101 and at any place to which Company relocates after the date of this Agreement. The Company may relocate its principal place of business and registered office to any other place or places as the Majority may from time to time agree.

1.4      **Registered Office and Registered Agent**. The Company's Initial registered agent for service of process and the company's registered office is designated by, and reflected in, the Articles of Organization (as they may be amended from time to time) filed with the Nevada Secretary of State. The registered office and registered agent of the Company shall be 400 South 4th Street Suite 102 Las Vegas, Nevada 89101 Attn: Theresa Mains Esq or may be changed from time to time by the agreement of the Majority by filing the address of the new registered office, or the name of the new registered agent, with the Nevada Secretary of State pursuant to the Act.

<div align="center">

1

</div>

1.5 **Records to be Maintained**. At all times during the continuance of the Company, the following records shall be kept at the Company's principal office, and shall be subject to inspection and copying at the request and expense of any Member during ordinary business hours:

(a) A list of the full name and last known address of each Member, both past and present, setting forth the amount of cash each member has contributed and has agreed to contribute in the future, a description and statement of the agreed value of any other property, contract, licenses and/or services each Member has contributed or has agreed to contribute in the future, and the date on which each became a Member.

(b) A copy of the Articles of Organization, as amended or restated, together with executed copies of any powers of attorney under which any article, application, or certificate has been executed.

(c) Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years.

(d) Copies of this Agreement together with any amendments, and copies of any financial statements of the Company for the three most recent years.

(e) Minutes of every meeting of the Members.

(f) Such other information and records as are required to be kept by the Act.

## ARTICLE 2
## BUSINESS OF COMPANY

2.1 **Purpose**. The purpose of the Company shall be to operate general business activities that are legal lawful and ethical, in an effort to grow business in multiple industries creating a fully integrated operation, specifically in the commodities space.

2.2 **Profits.** Profits will be derived from the sales of precious metals.

## ARTICLE 3
## MEMBERS

3.1 **Names and Addresses of Members; Special Supplemental Financing; Designation of Manager**. The names and addresses of the Members are set forth on Exhibit A hereto. The Members expressly agree that, notwithstanding any other term or condition of this Agreement, that the Company shall expand its business and facilities by way of additional equity financing, and that all the Members agree to be diluted on a pro rata basis in both Membership Units and Membership Interests. Schad E. Brannon and Roydon B. Nelson are designated as the "Manager" (within the meaning of the "Act", as defined in Section 4.1) of the Company.

2

3.2      **Conflicts.**

(a) It is understood and agreed that the Members and their Affiliates may conduct any business or activity whatsoever without any accountability to the Company or which is competitive with that of the business of the Company.

b) Each Member understands and acknowledges that the conduct of the business of the Company may involve business dealings with other businesses or undertakings of the other Members and their Affiliates. The creation of the Company and the assumption by each of the Members of its duties hereunder shall be without prejudice to the respective rights of the other Members and their Affiliates to maintain such other interests and activities and to receive and enjoy profits or compensation there from, and each Member waives any rights it might otherwise have to share or participate in such other interests or activities of the other Members and their Affiliates.

## ARTICLE 4
## <u>DEFINITIONS</u>

The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

4.1      "Act" shall mean the Chapter 86 of the Nevada Revised Statutes, which pertains to limited liability companies, as may be amended from time to time.

4.2      "Affiliate" of a Member has the same meaning as a Permitted Transferee of that Member as set forth in Section 8.1 hereof.

4.3      "Articles of Organization" shall mean the Articles of Organization of the Company as filed with the Secretary of State of Nevada as the same may be amended from time to time.

4.4      "Capital Account" of a Member means the capital account of that Member determined and maintained by the Company from the date hereof as follows: (a) the amount of money contributed by the Member to the Company, plus (b) the fair market value of any assets contributed by the Member to the Company as agreed to by the Members (net of liabilities ) as agreed to in the Contribution Agreement, plus (c) the amount of Net Profits and other items of income and gain allocated to the Member pursuant to Article 6, minus (d) the amount of money distributed to a Member, and minus (f) the amount of Net Losses and other items of loss and deduction allocated to the Member pursuant to Article 6. The Capital Accounts of the Members as of the date hereof are set forth on Exhibit A attached hereto and made a part hereof by reference.

4.5      "Capital Contribution" shall mean any contribution to the capital of the Company in cash or any other assets contributed by a Member whenever made. "Initial Capital Contribution" shall mean the contribution to the capital of the Company by each Member pursuant to Section 5.1 and Section 5.2 hereof.

4.6      "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time (and any corresponding provisions of succeeding law).

4.7      "Company" shall mean "THE GOLD COLLECTIVE, LLC".

3

4.8      "Distributable Cash" means all cash, revenues, and funds received by the Company from Company's operations or the sale or refinancing of all or a portion of the Company's assets, less the sum of the following to the extent paid or set aside by a Majority:

(a)      All principal and interest payments on indebtedness of the Company and all other sums paid to lenders;

(b)      All cash expenditures incurred incident to the normal operation of the Company's business; and

(c)      Such Reserves as the Majority determine are reasonably necessary to the proper operation, expansion, and improvement of the Company's business, as well as for contingencies and the winding down of the business.

4.9      "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

4.10      "Majority" shall mean in excess of fifty percent (50%) of the Membership Interests as such Membership Interests may be held or voted from time to time.

4.11      "Member" shall mean each of the Persons who execute the signature page or a counterpart of this Agreement as a member, and each of the Persons who may hereafter become members of the Company.

4.12      "Membership Interest" shall mean a Member's entire interest in the Company, including the Member's Percentage Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in, any decision or action of or by the Members granted pursuant to this Agreement and the Act. The Membership Interest of each Member shall be represented by the Member's Membership Units.

4.13      "Membership Units" or "Units" shall mean the units into which the ownership of the Company is divided and be comprised of "Class A Units" or "Preferred Units" and "Class B Units". Preferred Unit Class Units shall have no rights, terms and preferences of the management of the Company  under this Agreement, and the sole rights, terms and preferences of the other classes of units shall be at the sole discretion and  all distributions of Company management  derived solely from a prospective of specific licensing and authority to operate  and transact on behalf of and  by the parties to this Agreement  on a pro rata basis according to each Unit Class Unit holder's percentage ownership of its respective Unit Class Units , as provided in the chart below in this Section 4.13, as amended and updated from time to time, then each respective  Unit Class Unit holder shall be entitled to such  Class Unit holder's pro rata interest in and  of their respective  Unit Class Net Profit Interest based on the amount of funds paid to the Company for such  Unit Class Unit holder's  Unit Class Units as a percentage of the Subscribed Amount for that  Unit Class, and the remainder of the respective  Unit Class Unit Net Profit Interest shall be payable to the Class A Preferred Unit holders on a pro rata basis according to each Class A Unit holder's percentage ownership of Class A Units. For the sake of clarification, it is expressly stated that holders of Class A Units Membership Interest holders, except with respect to the right, terms and preferences expressly accorded to the management B Class Units in this Section 4.13. The total number of Membership Units into which ownership of the Company is initially divided and the initial number

4

of Membership Units of each Member are as set forth in Section 5.4. In addition, the initial purchaser and holder of Preferred Class Units are set forth in Section 5.4.

The purchaser of specific Preferred Class Units shall subscribe for the respective Preferred Class Units from the Company and pay for the respective Preferred Class Units by delivering the purchase price for the respective Preferred Class Units to the Company according the In Exhibit A and the Subscription Agreement as may be updated from time to time.

4.14    "Member" shall mean each of the Persons who execute the signature page or a counterpart of this Agreement as a member, and each of the Persons who may hereafter become members of the Company.

4.15    "Net Profits" and "Net Losses" shall mean for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss, as the case may be, for such year or period, determined in accordance with Section 703(a) of the Code. (For this purpose, all items of income, gain, loss, and deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in calculating "taxable income or loss").

4.16    "Percentage Interest" of each Member shall mean each Member's respective Membership Interest expressed as a percentage of the total Membership Interests, which shall be the ratio of the number of Membership Units held by the Member to the total of all Membership Units held by all of the Members. The initial number of Membership Units and resulting Percentage Interest of each Member are set forth opposite such member's name under Section 5.4 and the heading "Percentage Interest" on Exhibit A attached hereto and by this reference made a part hereof.

4.17    "Persons" shall mean any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such individual or entity when the context so permits.

4.18    "Reserves" shall mean, for any fiscal period, funds set aside or amounts allocated during such period to reserves that shall be maintained in amounts deemed sufficient by the Majority for working capital and to pay taxes, insurance, debt service (including debts to Members and their Affiliates), contingent liabilities, or other costs or expenses incident to the ownership or operation of the Company's business. Such Reserves as the Majority determine are reasonably necessary to the proper operation, expansion, and improvement of the Company's business, as well as for contingencies and the winding down of the business.


**ARTICLE 5**
**CAPITAL**

5.1    **Initial Capital Contributions of Members**. Each Member hereby agrees to contribute to the Company on the date hereof in cash as its Initial Capital Contribution an amount equal to the amount set forth in Exhibit A.

5.2    **Purpose of Initial Capital Contributions**. The Initial Capital Contribution set forth in Section 5.1 is being used (a) for start-up purposes and (b) for other "set-up" working capital and other purposes as determined by the Majority.

5.3     **Optional Future Capital Contributions**.

(a) Except as provided for in Section 5.1 hereof, no Member shall be required to make any other capital contributions to the Company. In the event that the Persons owning two-thirds or more of the Membership Interests (the "Electors") reasonably believe that the Company requires capital in addition to the capital set forth in Sections 5.1 and 5.2 hereof (the "Optional Funds") for the following reasons:

(i) an event of default (as defined in a loan agreement or lease with any third party including any Affiliate of a Member) which event of default would entitle such lender or lessor to demand payment of the amount due and/or accelerate the balance of the loan or lease has occurred and is continuing without waiver or consent thereof by such lender (provided, however, that a non-monetary default shall not be considered an event of default unless such lender has accelerated the loan or given notice that it will accelerate the loan if such non-monetary default is not cured) (a "Bank Default");

(ii) capital in addition to the Initial Capital Contributions is needed; or

(iii) capital is needed to cover any deficits in the operations of the business of the Company, then the Electors may request that the Members contribute such Optional Funds in proportion to each Member's Percentage Interests. The Electors shall send written notice to the other Members of the amount of Optional Funds requested from each of the Members not less than thirty (30) days before the date the Members are requested to contribute the Optional Funds unless such funds are needed sooner (for emergency purposes, such as to cure a default with a lender or lessor). If a Member does not meet the request for its entire pro rata share of the Optional Funds, the other Members (the "Electing Members") may either (i) make a preferred capital contribution of the Optional Funds to the Company (an "Optional Preferred Contribution"), (ii) make a loan of the Optional Funds to the Company (an "Optional Loan") or (iii) contribute additional Capital Contributions ("Additional Capital"). No Member, however, shall ever be required to make an Optional Preferred Contribution, Optional Loan, or Additional Capital. Optional Preferred Contributions and Optional Loans shall contain terms and conditions mutually agreed upon between the Electors and the Electing Members. If Additional Capital is made, then the Percentage Interests shall be adjusted accordingly by the amount of the Additional Capital. If insufficient Optional Funds are raised from the Members pursuant to this Section, the Electing Member may allow third-parties to make Optional Preferred Contributions, Optional Loans, or Additional Capital pursuant to the terms and conditions of this Section.

(b) If Optional Preferred Contributions are made from third parties as aforesaid, such third parties shall thus become Members of the Company and the Members shall take all necessary steps to add such parties as Members.

5.4     **Initial Membership Units and Percentage Interests**. The initial number of Membership Units and the respective initial Percentage Interests of the Members shall be as set forth on Exhibit A. The Electors may alter this Exhibit if and when Additional Capital is, or Optional Preferred Contributions are made, or additional Members are admitted to the Company.

5.5      **Third Party Rights**. The right of the Company to require any capital contributions under the terms of this Agreement shall not be construed as conferring any rights or benefits to or upon any other party not a party to this Agreement, including, but not limited to, the holder of any obligation secured by a mortgage, deed of trust, security interest, or other lien or encumbrance affecting the Company, or any interest of a Member therein, or any assets or properties of the Company, or any part thereof or any interest therein. No Member shall have any personal liability to provide capital, or perform any other obligation under this Agreement, except for those obligations set forth in Section 5.1.

5.6      **No Payments of Individual Obligations**. The Members shall use the Company's credit and assets solely for the benefit of the Company. No asset of the Company shall be transferred or encumbered for, or in payment of, any individual obligation of a Member or of any Affiliate of a Member or entity in which any direct or indirect holder of any interest in the Company has an interest.

5.7      **Title to Company Assets**. All real owned assets by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in such company assets in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes.

5.8      **Member Preemptive Rights**. All Members shall have equal preemptive rights in proportion to their respective then-existing Percentage Interests to make Capital Contributions and receive Membership Units for Capital Contributions (other than the Initial Capital Contributions) and to purchase all or part of any equity securities (including, but not limited to, securities convertible into Membership Interests) hereafter sold or issued by the Company, except any sale or issuance (a) pursuant to a merger or other strategic alliance of the Company or (b) to employees or other service providers of the Company as incentive compensation.

## ARTICLE 6
## DISTRIBUTIONS; ALLOCATION OF NET PROFITS AND NET LOSSES

6.1      **Company Operating Account.** Mr. Roydon B. Nelson is appointed as the account manager for the company. As account manager Mr. Nelson is responsible for the opening, maintaining and ensuring the account(s) of the company remain open and in good standing at all times.

6.2      **Distributions of Distributable Cash**. Distributions of Distributable Cash shall be made to the Members at such times and in such amounts as the Majority shall determine.

    (a)      All amounts which the Company is required to withhold pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section if paid over by the Company to the agency to which such withheld funds are due.

6.3      **Allocations of Net Profits and Net Losses**. Net Profits and Net Losses for each Fiscal Year shall be allocated to the Members in proportion to their respective Percentage Interests at the end of such Fiscal Year.

6.4     **Special Allocations**. The Members expect and intend that upon the liquidation of the Company and after giving effect to all contributions and all allocations for all periods, and after payment of any Optional Preferred Contribution Priority Returns and the repayment of Optional Preferred Contributions, if any, the Members' Capital Accounts will have positive balances in proportion to their Percentage Interests. If the Majority determines that this would not be the result, then the allocations provided for in this Article 6 shall be modified in a manner consistent with Treasury Regulations Section 1.704-1(b) and 1.704-2 to the extent necessary to cause the Members' Capital Accounts to be in such proportions.

6.5     **Adjustment to Percentage Interest**. If the Percentage Interests of the Members are adjusted during a Fiscal Year, all allocations of Net Profits and other items of income and gain and Net Losses and other items of loss and deduction shall be made by the Majority in accordance with the terms of this Agreement, by use of any method prescribed by the Treasury Regulations which takes into account the varying interests of the Members in the Company during such Fiscal Year.

6.6     **Compliance with Tax Code**. It is intended that the maintenance of Capital Accounts for each Member and the allocation of Company income, gain, loss, deductions and credits for tax purposes in accordance with this Agreement will comply with Sections 704(b), 704(c) and other applicable provisions of the Code; provided, however, that this Agreement shall control the determination of the amount that is credited to any Member's Capital Account upon a contribution of property by that Member to the Company. If, at any time, the Company is advised by its tax counsel or accountant that the applicable provisions of this Agreement are likely not to be respected for federal income tax purposes, the Majority shall amend this Agreement to the minimum extent necessary to satisfy the applicable requirements of the Code; provided, however, that no such amendment shall be made which could under any circumstances increase the amount of capital contributions otherwise required to be made by any Member, or adversely alter the timing or the amount of any distributions to which any Member otherwise would be entitled, under the provisions of the Agreement.

6.7     **Accounting Principles**. The Net Profits and Net Losses of the Company shall be determined in accordance with accounting principles applied on a consistent basis using the accrual method of accounting.

6.8     **Interest on and Return of Capital Contributions**. No Member shall be entitled to interest on its Capital Contributions, or on any undistributed income, or to return of its Capital Contributions, except as otherwise specifically provided for in this Agreement.

6.9     **Accounting Period**. The Company's accounting period shall be the Fiscal Year.

6.10     **Records, Audits, and Reports**. At the expense of the Company, the Majority shall designate a Person to maintain records and accounts of all operations and expenditures of the Company. Such books and records shall reflect all transactions and other matters relating to the Company's business in the detail and completeness customary and usual for businesses of the type engaged in by the Company. The books and records shall at all times be maintained at the principal place of business of the Company and shall be open to the reasonable inspection, examination, and copying by the Members or their duly authorized representatives during reasonable business hours. The Company shall also keep such other records and information at its principal place of business as may be required by the Act.

6.11     **Tax Matters Partner Roydon B. Nelson** is hereby designated "Tax Matters Partner", for **THE GOLD COLLECTIVE, LLC EIN # 84-1865831** as defined in the Code. The Tax Matters Partner is authorized to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings; provided, however, that the Tax Matters Partner shall furnish each Member with a copy of any notice or written communications that the Company or the Tax Matters Partner receives from any taxing authority promptly upon receipt thereof. Each Member shall cooperate with the Tax Matters Partner and do or refrain from doing any and all things reasonably required by the Tax Matters Partner to conduct such proceedings. The Tax Matters Partner shall decide on all matters involving elections under federal and state tax laws, after obtaining the prior approval of the Majority, such approval not to be unreasonably withheld or delayed.

## ARTICLE 7
## MANAGEMENT OF THE COMPANY

7.1     **Control and Management**. Subject to the limitations set forth in section 7.2, the day-to-day operations and business affairs of the business of the Company shall be exclusively directed and managed by the Manager. Such management authority shall include hiring and firing of employees, preparation and implementation of capital and operating budgets, promotion and marketing, maintenance and repair of the business. The Manager shall use his reasonable efforts to carry out the purposes, business, and objectives of the Company, and shall devote to the Company business such time as it believes in its reasonably good faith judgment shall be reasonably required. It is understood that the Manager will be devoting full-time to the business of the Company but rather the amount of time which it, in its reasonable judgment, deems is necessary and appropriate.

7.2     **Major Decisions**.

(a)  For purposes of this Section 7.2, the following terms have the meanings indicated: "Major Decisions" means any decision to act or not to act that relates to the following, as approved by "Majority" shall mean in excess of fifty percent (50%) of the Membership Interests as such Membership Interests may be held or voted from time to time.:

(i) Changing the scope of business of the Company;

(ii) Entering into contracts with Members or their Affiliates;

(iii) Except as set forth in section 5.4, changing or permitting to be changed the capitalization of the Company by Capital Contributions in addition to the Initial Capital Contributions or changing or permitting to be changed the ownership of the Company by issuing additional Membership Units or otherwise changing the number of outstanding Membership Units;

(iv) Reorganizing the Company or approving any public or private offering of securities of the Company;

9

(v) Approving Transfers (as defined in Section 8.1) of all or any part of any Membership Interests, admission of new Members, or dissolution of the Company, except for Transfers to Permitted Transferees;

(vi) Borrowing money (except for accounts payable and expenses incurred in the ordinary course of business) or amending the terms of any loan agreements;

(vii) Selling, assigning, transferring, exchanging, granting leasehold estates in, or otherwise disposing of, all or any material portion of the Company's assets;

(viii) Making, executing, or delivering on behalf of the Company any assignment for the benefit of creditors or any guarantee, indemnity bond, or surety bond or any equivalent thereof;

(ix) Any amendment (except for amendments changing Exhibit A to reflect the infusion of Additional Capital or as contemplated in section 11.6) to this Agreement; or

(x) Any agreement for the foregoing.

(b)  If any Member does not notify the other Member of its approval or disapproval of any Major Decision submitted for its approval within fifteen (15) days after its receipt of a request for approval, the Member seeking such approval shall again request the approval of such other Member by mail, electronic mail, overnight mail (fare prepaid), facsimile transmission or other similar means of communication. If the Member whose approval is sought then does not notify the Member seeking approval of its approval or disapproval of the transaction or action within ten (10) business days following receipt of such request, the matter shall be deemed approved. Any such request for approval shall include language in bold, underlined, or other conspicuous print to the effect that the failure to act timely could result in a deemed approval of the action requested.

7.3     **Members' Compensation and Reimbursement**. Except as approved by a Majority, no Member shall be paid or entitled to any salaries, fees, commissions, or other compensation for any services rendered to or on behalf of the Company or in connection with its business affairs, operations, or assets.

7.4     **Reliance by Third Parties**. Except for Major Decisions which shall be in writing, the signed statement of those Members constituting a Majority delivered to any third party reciting that such Member has authority to undertake any act on behalf of the Company shall be all the evidence such third party shall need concerning the capacity of such Member, and such third party shall be entitled to rely upon such statement without inquiring further into the authority of such Member to bind the Company.

7.5     **Time To Be Devoted to Management of Business**. Each Member shall devote so much of its time to the business of the company as in its reasonable and good faith judgment the conduct of Company business shall reasonably require, and no Member shall be obligated to manage the Company as its sole and exclusive function or to do or perform any act or thing in connection with the business of the Company not expressly set forth in this Agreement.

7.6      **Liability and Indemnification of Members**.

(a)   A Member shall be liable under this Agreement only for its respective fraud, gross negligence or willful misconduct, and shall not be liable (i) for errors in judgment (including, without limitation, believing in good faith that it is acting within the power and authority as described in this Agreement), (ii) for any acts or omissions that do not constitute gross negligence or willful misconduct, or (iii) for the negligence (whether of omission or commission), dishonesty, or bad faith of any employee, consultant, agent, attorney, accountant, engineer, architect, or insurance agent of the Company selected and supervised by a Member with reasonable care. Any act or omission by a Member, if done in reliance upon the opinion of legal counsel or public accountants selected with the exercise of reasonable care by such Member on behalf of the Company, shall conclusively be presumed not to constitute fraud, gross negligence, or willful misconduct on the part of such Member. Any defense undertaken by the Company or its insurance carrier hereunder shall afford the indemnified Member the right to have its own counsel participate (at such Member's sole cost) in the defense.

(b)   In any threatened, pending, or completed action, suit, or proceeding (civil or criminal) to which a Member was or is a party, or is threatened to be made a party, by reason of the fact that it is or was a Member, the Company shall indemnify and hold harmless such Member against all expenses (including reasonable attorneys' and accountants' fees, court costs, and expenses), judgments, and amounts paid in settlement actually and reasonably incurred by it in connection with such action, suit, or proceeding if the conduct of such Member did not constitute fraud, gross negligence, or willful misconduct.

(c)   To the extent that a Member has been successful on the merits in seeking indemnification in accordance with this Section 7.6, the Company shall indemnify it and hold it harmless against the expenses (including reasonable attorneys' and accountants' fees and costs) actually and reasonably incurred by it in connection therewith.

(d)   The termination of any action, suit, or proceeding by judgment, order, settlement, or otherwise shall not, by itself, create a presumption that the conduct of a Member constituted fraud, gross negligence, or willful misconduct.

(e)   Expenses, (including reasonable attorneys' and accountants' fees, court costs, and expenses) incurred in defending any claim, action, suit or proceeding (civil or criminal) shall be paid by the Company in advance of the final disposition of the matter upon receipt of an undertaking by or on behalf of such Member to repay such amount if such member is ultimately determined not to be entitled to such indemnity. Regardless of the indemnity provided for under this Section 7.6, the Company may carry such indemnification insurance as the Members deem necessary.

(f)   As used in this Section 7.6, the indemnification and reimbursement of a Member shall also be provided to such Member's Affiliates and its members, partners, shareholders, directors, officers, employees, and agents, and its and their respective members', partners', and corporations' directors, officers, employees, and agents, and to the

11

members of the Members, and the managers, officers, employees, and agents of the Company, to the extent that such Persons are also named.

(g)  Nothing in this section 7.6 is intended to provide any Member with any indemnification against liability for, or to relieve any Member for liability for any act or omission of such Member constituting a breach of such Member's obligations under this Agreement.

## ARTICLE 8
## TRANSFERABILITY

8.1     **Restrictions on Transfer**. Except as otherwise specifically provided in this Article 8, no Member shall make or grant or permit to be made or granted (directly or indirectly, voluntarily or involuntarily or by operation of law) any transfer, assignment, sale, exchange, gift, mortgage, encumbrance, security interest in, or other disposition (a "Transfer") of all or any part of its Membership Interest, excluding a Transfer to a Permitted Transferee (as defined below), without the prior written approval of the Majority, which approval may be withheld in the Majority's sole discretion, and any attempt to do so shall be void. Each Member agrees that, until it has transferred its Membership Interest in accordance with the provisions hereof, it will maintain its existence as a corporation, Company, or limited liability company, as the case may be, and will not permit any Transfer (other than to a Permitted Transferee as defined below) of (i) as to a corporate Member, any stock in such Member, or, as to a Member which is a Company, any Company interest in such Member, or, as to a Member which is a limited liability company, any membership interests in such Member or (ii) any Company or limited liability member interest in or partnership interest or stock of a partner or shareholder in such Member or any other constituent owner of an indirect interest in the Company (each, a "Tiered Interest") unless such Transfer does not, individually or in the aggregate, result in a change of control of such Member.

(a)  "Permitted Transferee" means:

(i) With respect to a Member, any lineal descendant of the now existing principal or 25% or greater shareholder or shareholder of a corporate general partner or any spouse or child or adopted child of any such descendant or any child of any such spouse;

(ii) Any trust or trusts for the benefit of any of the Persons named in Section 8.1(a)(i);

(iii) The executors, administrators, conservators, or personal representatives of any Person referred to in Section 8.1(a)(i) or 8.1(a)(ii); or

(iv) Any Entity which, directly or indirectly, is owned and controlled by one or more of the Persons referred to in Sections 8.1(a)(i), 8.1(a)(ii), and 8.1(a)(iii) is owned by one or more of the Persons referred to in Sections 8.1(a)(i), 8.1(a)(ii) and 8.1(a)(iii).

(b)  Notwithstanding anything to the contrary provided herein, a Transfer of a Membership Interest or a Tiered Interest to a Permitted Transferee is permitted hereunder provided that, at the time of the Transfer, the Permitted Transferee agrees to be bound by the terms of this Agreement and such Transfer shall not result in the Company being taxed as a corporation.

(c)   A change in the trustee of any trust which is a Member or partner or shareholder in a Member shall not constitute a Transfer.

8.2     **Admission of Transferee as Member**. The transferee of Membership Units and the Membership Interest represented by such Membership Units in compliance with the provisions of this Article 8 shall be admitted as a Member without express approval by the Members pursuant to Section 7.2. Such transferee shall be recognized on the books of the Company as the owner of the transferred Units and the resulting Percentage Interest.

8.3     **Further Restrictions on Assignment**. Notwithstanding anything herein to the contrary, no Transfer of any Membership Interest may be made unless:

(a)   The Company receives an opinion satisfactory to its legal counsel to the effect that such Transfer may be made without registering such Membership Interest under the Securities Act of 1933, as amended, or any applicable state blue sky or securities laws or regulations, and that such Transfer will not violate any applicable federal or state securities laws;

(b)   The transferor and the transferee shall execute and acknowledge such instruments as counsel for the Company may deem necessary or desirable to effect the admission of the transferee as a substituted or additional Member, including the written acceptance and adoption by the transferee of all of the terms and provisions of this Agreement as the same may be amended from time to time, and the transferee shall pay all reasonable fees and other costs (including reasonable attorneys' fees) incurred by the Company in connection with the Transfer and admission of the transferee to the Company; and

(c)   The Company shall have filed any documents necessary to effect the substitution or addition of the transferee as a substituted Member in place of the transferor. The transferee of any Transfer which does not comply with the provisions of this Article 8 shall have no right to require any information or account of the Company's transactions, to inspect the Company's books and records, or to participate in any option granted to, or matter requiring the approval or disapproval of, the Members, and such right shall be exercisable by, and only by, the transferor, and such transferee shall have no other rights except as required by law.

8.4     **Tax Allocations and Cash Distributions**.

(a)   If a Membership Interest is transferred, the Net Profits or Net Losses allocable, and cash distributable, to the holder of such Membership Interest for the then fiscal year of the Company shall be allocated proportionately between the transferor and the transferee based upon the number of days during such Fiscal Year in which each party was the owner of the transferred Membership Interest. However, if such parties agree that such Net Profits or Net Losses and cash are to be allocated and distributed based upon an interim closing of the Company's books, and such parties agree to pay all expenses incurred by the Company in connection therewith and so notify the non-transferring Member, then all such Net Profits or Net Losses and cash shall be allocated and distributed between the transferor and transferee based upon an interim

13

closing of the Company's books and records. In no event, however, shall Distributable Cash attributable to or Net Profits or Net Losses arising from a capital event be distributed and allocated to any Member other than the Members owning Membership Interests as of the date of the capital event in question. The Majority may cause the Company to elect to make the optional adjustment to the basis of the Company's property as permitted under Section 754 of the Code.

(b)     Any transferee of a Membership Interest shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred Membership Interest.

<div align="center">

**ARTICLE 9**
**MISCELLANEOUS OTHER PROVISIONS**

</div>

9.1      **Non-Disclosure**. The Members acknowledge that during the term of this Agreement, by virtue of the positions of trust and confidence they will occupy with the Company as a Member, employee, or agent of, or consultant to, the Company, they and their agents will be exposed to confidential information and trade secrets belonging to the Company, most of which will be (i) marked "confidential," (ii) have limited or restricted access thereto to those persons who "need to know" such information, or (iii) otherwise confidential and proprietary by virtue of the value they have to the business and operations of the Company. Confidential information and trade secrets for purposes of this Section 9.1 means business plans, trade secrets, inventions, improvements to existing inventions and patents, potential customer surveys and lists, marketing strategies, know how, source and object codes, schematic drawings and designs, plans and specifications, and related information that is treated as confidential by the Company and is not generally known publicly or in the industry in which the Company does business or by a person to whom the disclosure is made. The Members acknowledge that the Company has a legitimate proprietary interest in the confidential information and trade secrets, that maintaining the confidentiality and integrity of same is very important to the Company, and that disclosure of same would cause substantial loss to the Company both monetarily and in terms of loss of goodwill and competitive position. Accordingly, the Members agree not to use, copy, remove from the Company's premises, or divulge any confidential information at any time, except as required in pursuance of its responsibilities for and on behalf of the Company. The Members further agree to take all reasonable steps necessary or reasonably requested by the Company to ensure that all confidential information is kept confidential.

9.2      **Injunctive Relief**. All of the Members agree to comply fully with, and be bound by, all of the terms, provisions, and conditions in this Article 9, and Sections 7.2, 8.1, 8.2 and 8.3 (the "Injunctive Relief Sections") the scope and time periods of which have been carefully considered and specifically agreed to as being reasonable and necessary. Therefore, if any Member shall at any time breach, violate, or fail to comply fully with any of the terms, provisions, or conditions of the Injunctive Relief Sections, the Company or the damaged Member shall be entitled to equitable relief against the breaching party by way of injunction (in addition to, but not in substitution for, any and all other relief to which the Company or the damaged Member may be entitled either by law or in equity) to restrain such breach or violation, or to compel compliance fully with the terms, provisions, or conditions of the Injunctive Relief Sections of this Agreement. In any proceeding, whether in equity or at law, the Members specifically waive the necessity of any proof that any breach, violation, or failure to comply fully with the terms, provisions, or conditions of the Injunctive Relief Sections of this Agreement will cause irreparable injury; and all agree not to raise as a defense in any such proceeding any allegation that any of the provisions of the Injunctive Relief

Sections are either unnecessary or unreasonable, or that any of them illegally restrain trade or any personal rights. The rights and remedies of the Company and Members under this Article 9 are in addition to all rights and remedies to which the Company or the Members are or shall otherwise be entitled. The Members further agree to reimburse the Company for any costs of enforcing these provisions, including reasonable attorneys' fees. It is the intent and understanding of the Members that if, in any action before any court legally empowered to enforce the Injunctive Relief Sections, any term, restriction, covenant, or promise therein is found to be unreasonable and for that reason unenforceable, then such term, restriction, covenant, or promise shall be deemed modified to the extent necessary to make it enforceable by such court. The Members, on their own behalf and on behalf of their respective Affiliates, consent to the jurisdiction of the courts located in Clarke County, Nevada and agree not to seek removal or change of venue from such forum.

9.3     **Rights of Purchase and Sale of Membership Interest**. Upon the death of a member (or if such Member is a legal entity, upon the death of the beneficiary of a trust or the direct or indirect principal or controlling shareholder, partner, or member, or upon the liquidation, dissolution or bankruptcy of such legal entity, ("Deceased Member"), then (a) such Member (together with its Permitted Transferees) shall no longer have any right to vote or participate in any Major Decision or form the Majority (except as otherwise set forth in section 7.2(a)(ix) and (b) the Company shall have the exclusive right, for a period of one (1) year from the date of such death or other enumerated event, to negotiate the terms and conditions of a purchase and sale of the Membership Interest of such Deceased Member, and the decision of the Deceased Member (or his personal representation, trustee, executor, or successor as the case may be) shall be binding on the Permitted Transferees of such Deceased Member.

## ARTICLE 10
## DISSOLUTION AND TERMINATION

10.1     **Dissolution**. The Company shall be dissolved upon the occurrence of any of the following events:

(a)     The sale of all or substantially all of the assets of the Company; or

(b)     The decision of the Members pursuant to Section 7.2 to dissolve.

10.2     **Winding Up, Liquidation, and Distribution of Assets**. Upon dissolution, the Members shall proceed with the winding up of the affairs of the company. During such windup process, the Net Profits, Net Losses, and Distributable Cash shall continue to be shared by the Members in accordance with this Agreement. Upon the dissolution of the Company, the Members shall sell or convert into cash all assets other than cash as promptly as possible, but in a businesslike manner so as not to cause undue loss. Each Member shall have the right to bid on and purchase, subject to competing bids of each other Member, any of the assets being sold on the same terms and conditions as apply to any unrelated third party. The proceeds from the sale of the Company's assets, to the extent available, together with any assets to be distributed in kind, shall be applied and distributed by the Members in the following order of priority:

(a)     First, to creditors (including Members and their Affiliates who are creditors) and the expenses of liquidation, in the order of priority provided by law;

(b)     Second, to the establishment of any Reserves which the Majority determines to be reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; and

(c)     Thereafter, to the Members in the proportions and amounts set forth in Article 6. If the Company receives a promissory note upon the sale of all or substantially all of its assets, then the Company shall remain in existence to collect the proceeds of such promissory note. The proceeds collected from any such promissory note shall be distributed as soon as practicable in accordance with this Section 10.2. Any amounts withheld for Reserves pursuant to Section 10.2 (b) shall be distributed from time to time as the Members determine to the Members in the same proportions as the amounts withheld would have otherwise been distributed pursuant to this Section 10.2.

10.3     **Time of Liquidation**. A reasonable time, as determined by the Majority, shall be allowed for the orderly liquidation of the properties and other assets of the Company and the discharge of liabilities to creditors so as to enable the Members to attempt to minimize to the extent they deem practicable, advisable, or desirable, the normal losses attendant upon a liquidation.

10.4     **Report on Liquidation**. As soon as practicable, and in any event within ninety (90) days following the completion of the liquidation of the Company's properties, the Majority shall supply financial statements which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation, each Member's pro rata portion of distributions, and the amount retained as Reserves pursuant to Section 10.2(b).

10.5     **Deficit Capital Account**. No Member shall have any liability to the Company or to any other Member, or to the creditors of the Company on account of any deficit balance in any Member's Capital Account. Nothing in this Section 10.5 shall modify the Member's respective obligations to contribute capital as and when required in Article 5.

10.6     **Return of Contribution Nonrecourse to Other Members**. Upon dissolution, each Member shall look solely to the assets of the Company for the return of its capital Contributions. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return any portion of the Capital Contribution of one or more Members, no Member shall have recourse against any other Member. Nothing in this Section shall modify the Member's respective obligations to contribute capital as and when required in Article 5.

10.7     **Certificate of Cancellation**. When all debts, liabilities, and obligations have been paid and discharged, or adequate provisions have been made therefore, and all of the remaining property and assets have been distributed to the Members, a certificate of cancellation in the form required under the Act shall be executed and filed with the Nevada Secretary of State. Upon the filing of the certificate of cancellation, the existence of the Company shall cease, except for the purpose of suits, other proceedings, and appropriate action as provided in the Act. No Member, except as authorized by the Members, shall have the authority to distribute any Company property discovered after dissolution, convey real estate, or take such other action as may be necessary on behalf of and in the name of the Company.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

11.1        **Notices**. Any notice or other things required or desired to be served, given or delivered hereunder shall be deemed validly served, given or delivered upon: (a) the deposit thereof in the United States mail, registered or certified, with proper postage prepaid, (b) the legible facsimile transmission thereof with a written confirmation, (c) the prepaid deposit thereof with an overnight courier, or (d) personal delivery, each addressed to the Member to be notified at the address listed in Section 3.1, as such address may be changed from time to time upon notice to the Company. Notice shall be deemed received three (3) business days after delivery by (a) above, and the next business day after delivery by (b), (c) and (d) above.

11.2        **Application of Nevada Law**. This Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Nevada, and specifically the Act, exclusive of its conflict-of-laws rules.

11.3        **Arbitration.**

(a)        All controversies, claims, and matters of difference arising under this Agreement shall be submitted to arbitration. Without limiting the generality of the foregoing, the following shall be considered controversies for this purpose:

(i)        all questions relating to the interpretation or breach of this Agreement,

(ii)        all questions relating to any representations, negotiations, and other proceedings leading to the execution of this Agreement, and

(iii)        all questions as to whether the right to arbitrate any such question exists. Any party may, without inconsistency with this Agreement, seek from a court any interim or provisional relief that may be necessary to protect the rights or property of that party, pending the establishment of the arbitral tribunal (or pending the tribunal's determination of the merits of the controversy). The tribunal shall have authority to make the final determination of the rights of the parties, including authority to make permanent, modify, or dissolve any judicial order granting such provisional relief.

(b)        The party desiring arbitration shall so notify the other parties, identifying in reasonable detail the matters to be arbitrated and the relief sought. Arbitration shall be before a three-person tribunal of neutral arbitrators, consisting of attorneys with at least ten (10) years' experience in commercial law. The American Arbitration Association ("AAA") shall submit a list of persons meeting the criteria outlined above, and the parties shall mutually agree upon the three arbitrators. If the parties fail to select arbitrators as required above within twenty (20) days after delivery of notice from the party desiring arbitration, the AAA shall appoint the arbitrator or arbitrators that have not been selected by the parties. The arbitrators shall be entitled to a fee commensurate with their fees for professional services requiring similar time and effort.

(c)        All matters arbitrated hereunder shall be arbitrated in Clarke County, Nevada and shall be governed by Nevada law, exclusive of its conflicts-of-laws rules. The statute

17

of limitations of the State of Nevada applicable to the commencement of a lawsuit shall apply to the commencement of an arbitration hereunder. Arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the AAA, except to the extent such Rules conflict with the express provisions of this Section 11.3 (which shall prevail in the event of such conflict). The arbitrators shall conduct a hearing no later than sixty (60) days after designation of the tribunal, and a decision shall be rendered by the arbitrators within thirty (30) days after the hearing. At the hearing, the parties shall present such evidence and witnesses as they may choose, with or without counsel. Adherence to formal rules of evidence shall not be required but the arbitration panel shall consider any evidence and testimony that it determines to be relevant, in accordance with procedures that it determines to be appropriate. Any award entered shall be made by a written opinion stating the reasons for the award made. The arbitrators may award legal or equitable relief, including but not limited to specific performance. The arbitrators are not empowered to award damages in excess of compensatory damages, and each party irrevocably waives any right to recover such damages with respect to any dispute resolved by arbitration.

(d)     Arbitration may proceed in the absence of any party if appropriate written notice of the proceedings has been given to such party. The parties agree to abide by all awards rendered in such proceedings. Such awards shall be final and binding on all parties. Each party shall continue to perform its obligations under this Agreement pending conclusion of the arbitration. No party shall be considered in default hereunder during the pendency of arbitration proceedings relating to such default. The arbitrators' fees and other costs of the arbitration shall be borne by the party against which the award is rendered, except as the arbitration panel may otherwise provide in its written opinion.

11.4     **Attorneys' Fees**. If any party to this Agreement shall institute an arbitration or any other action or proceeding to interpret or enforce this Agreement, or to obtain damages by reason of any alleged breach of this Agreement, the prevailing party shall be entitled to recover costs of suit or arbitration and a reasonable sum for attorneys' fees and expenses from the non-prevailing party, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to award/judgment. The award/judgment or order entered shall contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such award/judgment or order. For the purposes of this Section, attorneys' fees shall include, without limitation, fees with respect to post-judgment motions, contempt proceedings, garnishment levy and debtor and third-party examinations, discovery, and bankruptcy litigation.

11.5     **Waiver of Action for Partition**. Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

11.6     **Ministerial Amendments**. The Majority shall have full power, with prior notice to the other Members, to amend the Company's Article of Formation whenever required by law to reflect distributions of capital, or to preserve the existence of the Company or the limited liability status of the Members throughout the term of this Agreement.

11.7     **Substantive Amendments**. This Agreement may not be amended except by the Members pursuant to Section 7.2.

11.8     **Execution of Additional Instruments**. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney, and other instruments necessary to comply with any applicable laws, rules or regulations.

11.9     **Construction**. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

11.10     **Headings**. The headings in this Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any of its provisions.

11.11     **Waivers**. The failure of any party to seek redress for a violation of, or to insist upon the strict performance of, any covenant or condition of this Agreement shall not prevent a subsequent act, that would have originally constituted a violation, from having the effect of an original violation.

11.12     **Severability**. If any provision of this Agreement or its application to any person or circumstance shall be invalid, illegal, or unenforceable to any extent, the remainder of this Agreement and its application shall not be affected and shall be enforceable to the fullest extent permitted by law.

11.13     **Heirs, Successors, and Assigns**. Each and all of the covenants, terms, provisions, and agreements contained in this Agreement shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors, and assigns.

11.14     **No Third-Party Beneficiaries**. The provisions of this Agreement are intended for the sole benefit of the parties hereto and are not intended to benefit or be enforced by any person not a party to this Agreement, including without limitation any creditors of the Company.

11.15     **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

11.16     **Investment Intent**. Each Member acknowledges that sufficient financial and other information was given or made available to it and its owners in order to permit each of them to evaluate their investment as Members, and that they are aware that their Membership Interests have not been registered under the Securities Act of 1933, as amended, or any state securities act, in reliance upon the certain exemption from such registration requirements. Each Member represents that it is acquiring its interest in the Company for investment for its own account and not with a view to the distribution or resale thereof.

The undersigned hereby agree, acknowledge, and certify that the foregoing Agreement constitutes the Operating Agreement of THE GOLD COLLECTIVE, LLC

<p align="center">**&lt;Signature Page to Follow&gt;**</p>

# Signature Page

**Signature for Class B Units**

**MEMBERS:**

By: _____ Date: July 18, 2019
Name: Schad Brannon
Title: Managing Member


By: _____ Date: July 18, 2019
Name: Roydon B. Nelson
Title: Managing Member

---

It is hereby acknowledged that partner Roydon B. Nelson is appointed as the designated account manager and has full authority of the company to open bank accounts for The Gold Collective, LLC.

Here by agreed and acknowledged by:

_____ SB          _____ RN

**EXHIBIT A**
**MEMBERSHIP UNITS**
**AND PERCENTAGE INTERESTS FOR EIN NO: 84-1865831**

| NAME OF MEMBER | MEMBERSHIP UNITS | MEMBERSHIP INTERESTS |
|---|---|---|
| Bullion Holdings of Nevada, LLC | 1000.00 Class B Units | 100.00% |
| **TOTALS** | **1,000 Units** | **100.00%** |

Here by agreed and acknowledged by:

_SB_ SB          _RN_ RN

21