Michael E. Welsh (Massachusetts Bar No. 693537)
welshmi@sec.gov
Casey R. Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel: (801) 524-5796

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>              Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited liability company; BRENDAN J. STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual;<br><br>              Defendants, | Case No. 2-23-cv-00482-RJS<br><br><br>**PLAINTIFF'S OPPOSITION TO THE DLI DEFENDANTS' MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER**<br><br><br>Chief Judge Robert J. Shelby |

ARCHER DRILLING, LLC, a Wyoming
limited liability company; BUSINESS
FUNDING SOLUTIONS, LLC, a Utah
limited liability company; BLOX LENDING,
LLC, a Utah limited liability company;
CALMFRITZ HOLDING, LLC, a Utah
limited liability company; CALMES & CO,
INC., a Utah corporation; FLAHERTY
ENTERPRISES, LLC, an Arizona limited
liability company; IX VENTURES FZCO, a
United Arab Emirates company; PURDY
OIL, LLC, a Nebraska limited liability
company; THE GOLD COLLECTIVE LLC,
a Utah limited liability company; and UIU
HOLDINGS, LLC, a Delaware limited
liability company,

Relief Defendants.

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ................................................................................................ i

**TABLE OF AUTHORITIES** ......................................................................................... ii

**ARGUMENT** .................................................................................................................. 3

   I.   THE SEC HAS PRESENTED SUFFICIENT EVIDENCE TO SUPPORT ITS

   REQUESTED EXPEDITED RELIEF ........................................................................ 4

   II.   THE SEC'S CONTINUED INVESTIGATION OF NON-PARTIES DOES NOT

   SUPPORT DISSOLUTION OF THE TRO ............................................................... 15

   III.   THE TRO WAS PROPERLY EXTENDED VIA DEFENDANTS' CONSENT. ........ 17

   **CONCLUSION** ............................................................................................................ 21

## TABLE OF AUTHORITIES

**Cases**

*Bowles v. Bay of New York Coal & Supply Corp.*, 152 F.2d 330 (2d Cir. 1945) ........................ 14

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) ............................................................. 3

*Dine Citizens Against Ruining Our Environment v. Jewell*,

    839 F.3d 1276 (10th Cir. 2016) ..................................................................... 2, 3

*Edmisten v. Werholtz*, 287 F. App'x 728 (10th Cir. 2008) ............................................. 4

*Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr., LLC*,

    503 F. App'x 616 (10th Cir. 2012) ................................................................... 5

*Hernandez v. Helm*, 2019 WL 5922233 (N.D. Ill. Nov. 12, 2019) .............................. 15

*Isler v. New Mexico Activities Ass'n*, 2010 WL 11623621 (D.N.M. Feb. 2, 2010)..................... 18

*Ophir-Spiricon, LLC v. Mooney*, 2011 WL 5881766 (D. Utah Nov. 23, 2011) ............................ 6

*Pan Am. World Airways, Inc. v. Flight Eng'rs Intl. Assoc.*, 306 F. 2d 840 (2d Cir. 1962) .......... 19

*Panorama Consulting Sols., LLC v. Armitage*,

    2017 WL 11547467 (D. Colo. June 21, 2017) (unpublished) ..................................... 4

*Porter v. Mueller*, 156 F.2d 278 (3d Cir. 1946)............................................................. 14

*Sample Farms, LLC v. ConocoPhillips Co.*,

    2015 U.S. Dist. LEXIS 36636 (W.D. Okla. Mar. 24, 2015)..................................... 18

*SEC v. Asset Management Corp.*, 456 F. Supp. 998 (S.D. Ind. 1978) ........................... 13

*SEC v. F.N. Wolf & Co., Inc.*, 1993 WL 568717 (S.D.N.Y. Dec. 14, 1993)......................... 14, 15

*SEC v. Forte*, 598 F. Supp. 2d 689 (E.D. Pa. 2009) ..................................................... 12

*SEC v. Gen-See Cap. Corp.*, 2009 WL 57589 (W.D.N.Y. Jan. 8, 2009)............................. 12

*SEC v. Life Partners Holdings, Inc.*, 2012 WL 12850253 (W.D. Tex. Aug. 17, 2012)............... 15

*SEC v. Roor*, No. 99 Civ. 3372, 1999 WL 553823 (S.D.N.Y. July 29, 1999) ............................. 12

*SEC v. Zafar*, No. 06-CV-1578, 2009 WL 129492 (E.D.N.Y. Jan. 20, 2009) ............................. 12

*SEC. v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031 (9th Cir. 2005) ......................................... 13

## Statutes

15 U.S.C. § 77q(a)(2) ................................................................................................................. 5

15 U.S.C. § 78b ......................................................................................................................... 12

15 U.S.C. § 78j(b) ....................................................................................................................... 5

15 U.S.C. § 78u(a)(1) ................................................................................................................ 14

## Rules

FED. R. CIV. P. 45 ...................................................................................................................... 16

FED. R. CIV. P. 65(b)(2) ............................................................................................................. 16

The DLI Defendants'[1] motion to dissolve the Court's temporary restraining order (Dkt. No. 132, herein, "DLI Motion" or "DLI Mot."), much like the fraudulent investment scheme at the heart of this case, proffers outlandish and explosive claims.  Indeed, the DLI Defendants would have the Court believe that Plaintiff Securities and Exchange Commission ("SEC") misrepresented to the Court facts regarding Defendants' dissipation of investor funds and efforts to move Defendant Digital Licensing Inc.'s ("DLI's") operations overseas; and that it is the SEC and Receiver, not the DLI Defendants, that are the source of any loss to investors.  But like the DLI Defendants' false claims to investors about their "node software license" investment scheme, their representations about the SEC and Receiver don't square with the facts.

The SEC didn't "get this case wrong."  While the DLI Defendants attack the *weight* of the SEC's evidence, their motion fails to contradict the facts the SEC presented in its motion for a temporary restraining order (Dkt. No. 3, herein "TRO Motion").  For example, the DLI Defendants provide no evidence—no documents, no declarations, and no affidavits from the DLI Defendants themselves—disputing the falsity of numerous representations about DLI and the "node licenses" Defendants made to investors.  And the scant evidence they provide (primarily declarations from lower-level functionaries) does not contradict the proof of fraud and dissipation that the SEC appended to its TRO Motion:  in fact, their new facts buttress the SEC's case.  What's more, the DLI Defendants' motion fails to mention, let alone address, the primary evidence—including the declaration of a Special Agent of the Bureau of Land Management—supporting the SEC's securities fraud claims.  The Court may and should weigh each party's evidence in the upcoming

---

[1] Herein, "DLI Defendants" refers, collectively, to Defendants Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, and Roydon B. Nelson, and Relief Defendants Business Funding Solutions, LLC; Blox Lending, LLC; The Gold Collective, LLC; and UIU Holdings, LLC—those individuals and entities who owned and controlled Defendant Digital Licensing Inc. (d/b/a "Debt Box").

preliminary injunction hearing, but the DLI Defendants' "new facts" provide no basis for dissolving the TRO in the interim.

Nor did the SEC misrepresent the exigency of its requested expedited relief. The facts, as set forth in support of the SEC's TRO motion, and as supplemented by the attached declaration of an SEC staff accountant in response to the DLI Defendants' newly raised arguments, show that injunctive relief, an asset freeze, and receivership are necessary to prevent ongoing harm to investors. For example, bank records reveal that the DLI Defendants dissipated investor funds and that numerous bank accounts were closed. And while the DLI Defendants now lean on the technicality that certain corporate documents show attempts to move DLI's business interests overseas in 2022, those documents don't match the facts on the ground, which reveal that the DLI Defendants made significant efforts to move investor funds outside of the Court's jurisdiction in the months leading up to the SEC's filing. The evidence supporting the SEC's TRO motion more than satisfies the standards articulated by the Tenth Circuit in *Dine Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276 (10th Cir. 2016) for application of expedited relief.

Finally, the DLI Defendants' "supplemental" motion to dissolve (*see* Dkt. No. 163), filed two days ago and in contravention of the Court's briefing schedule, does not raise any procedural defect in the Court's standard TRO procedure. Pursuant to the plain language of the Court's original and renewed TROs, the DLI Defendants consented to the continued extension and renewal of the TRO by failing to file any objection for 46 days. Moreover, despite being served with the original TRO and the SEC's initial discovery requests no later than August 2, the DLI Defendants have yet to comply with the original TRO's expedited discovery and repatriation provisions, and have no basis to now argue the TRO renewals were somehow the SEC's or the Court's fault. The SEC thus respectfully requests that the DLI Motion be denied.

## ARGUMENT

In *Dine*, the Tenth Circuit instructed that a movant must satisfy four prongs to obtain expedited injunctive relief such as a preliminary injunction or a TRO: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." 839 F.3d at 1281, quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002). As the Court concluded at the July 28 *ex parte* hearing, after its thorough review of the evidence submitted in support of the TRO Motion (which the SEC incorporates in full by reference here (*see* Dkt. No. 3)), the Court was "satisfied that the Commission has . . . shown its entitlement to relief under Rule 65 and the four required elements" and that "the Commission has satisfied its obligation to make a strong showing on both the likelihood of success on the merits and the balance of harms prong." (Dkt. No. 132-2, *Ex Parte* Hrg. Tr. at 24:9–25:3.)

The DLI Defendants' contention that the Court somehow got it wrong rests almost entirely on a flawed premise: that the SEC somehow "misled" the Court into believing that Defendants were dissipating assets and that additional, new facts show there was no such exigency. The DLI Defendants' attempt to submit new evidence should itself be grounds for denial of their motion to dissolve, or at a minimum conversion of their motion into an opposition to preliminary injunction.[2]

---

[2]   The DLI Defendants raise numerous factual arguments in their Motion, including referencing purported events occurring ***after*** the Court's issuance of the TRO. "The proper forum for dealing with these disputes, though, is not during a hearing on the motion to dissolve, but, rather, during the hearing on the motion for a preliminary injunction." *Panorama Consulting Sols., LLC v. Armitage*, No. 17-cv-01400, 2017 WL 11547467, at *2 (D. Colo. June 21, 2017) (unpublished). This is particularly true where, as here, the defendants do not raise jurisdictional issues and have not responded to the allegations in the Complaint. *See id.* (citing *Edmisten v. Werholtz*, 287 F. App'x

But even assuming, counterfactually, that the Court may consider this new evidence on a motion

to dissolve, nothing in the DLI Motion provides any basis to reconsider the Court's prior ruling.[3]

And the DLI Defendants' remaining arguments concerning discovery, the scope of the asset freeze,

and the DLI Defendants' own failure to cooperate with the Receiver do not relate to propriety of

the TRO.  Accordingly, the DLI Motion should be denied.

## I.   THE SEC HAS PRESENTED SUFFICIENT EVIDENCE TO SUPPORT ITS REQUESTED EMERGENCY RELIEF.

As the Court recognized at the July 28 *ex parte* hearing, the substantial evidence submitted

by the SEC in support of its TRO Motion amply supports the Court's issuance of the TRO.  This

evidentiary record spans over 1,000 pages of materials, including, *inter alia*: DLI "node license"

marketing materials; Defendants' social media posts, videos, and transcripts containing

misrepresentations about the node license investment scheme; communications from the DLI

Defendants to investors; and declarations submitted by an investor, two purported DLI business

partners, SEC investigative staff, and a Special Agent of the Bureau of Land Management.  The

DLI Defendants do not even begin to address the vast majority of this evidence:  instead, they ask

the Court to ignore it based on their own, unsupported assertions of hardship and a handful of

---

728, 732 (10th Cir. 2008) (concluding the district court erred in denying a motion for a TRO/preliminary injunction when it failed to accept as true allegations in the complaint until they were denied)).  To the extent the DLI Defendants seek to convert the motion to dissolve hearing into a preliminary injunction hearing, the SEC is prepared to adjourn the preliminary injunction briefing schedule and proceed immediately with a preliminary injunction hearing.

[3] Without any Tenth Circuit authority on their side, the DLI Defendants contend that a motion to dissolve a temporary restraining order should be treated as a motion for reconsideration.  (Dkt. No. 150).

documents that do not address, much less rebut, the litany of deceptive acts and material misstatements made by the DLI Defendants in connection with the securities offering at issue.

### A.   The SEC Has Shown a Substantial Likelihood of Prevailing on the Merits.

As the Court previously found, the SEC's TRO Motion made a "robust showing" that the DLI Defendants violated the anti-fraud provisions of the federal securities laws.  (Dkt. No. 132-2, *Ex Parte* Hrg. Tr. at 7:7-11).  The SEC's TRO Motion summarizes in detail the evidence showing the manner in which DLI's node licenses meet each of the requirements to constitute investment contracts.  (Dkt. No. 3, TRO Mot. at 14).  It also details the voluminous evidence showing the DLI Defendants' material misstatements and omissions to investors about nearly every aspect of the DEBT Box investment, in violation of Section 17(a)(2) of the Securities Act, and Section 10(b) of the Exchange Act.  (*See id*. at 15–17.)  The DLI Defendants, despite arguing that the SEC "failed to make a clear showing of substantial likelihood of prevailing on the merits," (*see* Dkt. No. 132, DLI Mot. at 13–20) fail to even ***mention***, let alone address, the following examples (of many) of Defendants' false claims about the node license investment:

- The DLI Defendants falsely claimed that purchasing a DEBT Box node license would allow an investor to "mine" various crypto assets in a "proof of work" process akin to mining bitcoin.  (Dkt. No. 3-4, Watkins Decl., ¶ 8 & Exs. 2–12; *id*. ¶ 15, 18d.).[4]

---

[4]  Rather than provide any countervailing declarations from Defendants themselves, stating under oath that they did not make the misrepresentations SEC staff attorney Joseph Watkins viewed on social media and recounted in his declaration, the DLI Defendants suggest the Watkins declaration is somehow inappropriate because Mr. Watkins "lacks any personal, direct, or real-time knowledge of the underlying events." (*See* Dkt. No. 132, DLI Mot. at 14.)  But it is black-letter law that "the Federal Rules of Evidence do not apply" to preliminary proceedings for injunctive relief.  *See Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr., LLC*, 503 F. App'x 616, 620 (10th Cir. 2012) (challenges to the admissibility of evidence "are inappropriate at this stage in the proceedings"); *Ophir-Spiricon, LLC v. Mooney*, No. 1:11-cv-00161, 2011 WL 5881766, at *1 (D. Utah Nov. 23, 2011) (unpublished) (collecting cases).  In addition, the DLI Defendants fail to address the numerous publicly available YouTube videos and other social media reported on in his declaration, or make any

- The DLI Defendants falsely claimed that Lazy Magnolia, the beverage bottling company associated with supporting DLI's "BEV" crypto asset, had secured "multi-million-dollar" bottling contracts for distribution with retailers such as "7-11, Aldis, Food Lion, Sam's Club and more." (*See* Dkt. No. 3-4, Watkins Decl. ¶¶ 8b, 31.)

- The DLI Defendants repeatedly misrepresented to investors that DLI possessed—somehow independent of any partnership it had with Fleet Space—proprietary technology that can scan the earth and identify oil and precious metals within a range of 6 feet. (*See*, *e.g.*, Dkt. No. 3-4, Watkins Decl. ¶ 18c.) Defendants further misrepresented to investors that DLI had already used this technology to successfully locate substantial oil deposits. (*See*, *e.g.*, *id.* ¶¶ 16a, 18c.)

The TRO Motion also provides ample evidence establishing that the DLI Defendants violated Sections 17(a)(1) and (3) and Section 10(b) of the Exchange Act and Rules 10b–5(a) and 10b–5(c) by engaging in a scheme to defraud investors regarding the business profits supposedly supporting the node licenses. (*See* Dkt. No. 3, TRO Mot. at 17–18.) Again, the DLI Defendants' motion to dissolve fails to even acknowledge this evidence, including, for example, that:

- The DLI Defendants engaged promoters and business partners that repeated their false claims regarding Debt Box's "scan technology" and successful oil extraction. For instance, promotional materials distributed by Defendant iX Global, LLC falsely represented that Debt Box was actively drilling "the Scott lease in the Great Basin of Nevada." (Dkt. No. 3-4, Watkins Decl. ¶ 34).

- Defendant Travis Flaherty, another promoter engaged by DLI, posted a video presentation from DLI's supposed "Geo Specialist" regarding the use of DLI's purported "SCAN technology" to discover oil at its Nevada well site. (Dkt. No. 3-4, Watkins Decl. ¶ 24.) As shown by the declarations from the CEO of Fleet Space and Bureau of Land Management Special Agent, these statements were false because DLI does not possess this technology and the Nevada oil well site has never produced oil. (*See* Dkt. No. 3-7 at Ex. 31, Nardini Decl.; Dkt. No. 3-8 at Ex. 34, Mortensen Decl.)

---

suggestion that what Mr. Watkins has reported is inaccurate. Similarly, while the DLI Defendants criticize the declaration of investor Michael Johnson as "inadmissible" and containing "hearsay" and "speculations" (*see* Dkt. No. 132, DLI Mot. at 17), they fail to address the transcripts of YouTube videos Mr. Johnson watched before purchasing node licenses, which contain some of the same misstatements he reports in his declaration.

Incredibly, despite suggesting that their motion to dissolve addresses each of the declarations submitted in support of the SEC's TRO Motion (*see* Dkt. No. 132, DLI Mot. at 13–14 (listing and describing "the following four declarations in the *ex parte* TRO application")), the DLI Motion does not ***mention***—let alone address—the fifth declaration appended to the TRO Motion, of Special Agent Michael Allen Mortensen of the U.S. Bureau of Land Management. (*See* Dkt. No. 3-8 at Ex. 34, Mortensen Decl.)  Mr. Mortensen's unrebutted declaration makes clear that the Nevada well site never produced oil, in stark contrast to the DLI Defendants' and their promotors' representations about the site.  (*See generally id.*; *see also*, *e.g.*, Dkt. 3-2, Watkins Decl. ¶¶ 8c; 15d; 16a; 17 (asserting the Nevada site was producing royalties and had "400 million barrels" of oil); 18a ("In oil for instance just from the months of January through the last day of March $34.7 million dollars is brought into the ecosystem"); 20; 34.

Furthermore, while the DLI Defendants' motion tries to harmonize their story with the declarations from DLI's purported "business partners" supporting the TRO Motion, their arguments about those declarations are inconsistent with their content.  For example, the DLI Defendants argue that the declaration of Flavia Nardini, CEO of DLI's supposed business partner, Fleet Space, is somehow consistent with the representations made to investors about that partnership.  (*See* Dkt. No. 132, DLI Mot. at 15–16.)  It is not.  For instance, in a July 2022 YouTube video, Defendant Jason Anderson represented to investors that DLI currently possessed satellite technology that allowed it "to see vibrations and different frequencies" to identify "silver, palladium, gold, and other elements."  (*See* Dkt. 3-4, Watkins Decl. ¶ 18c.)  But as Ms. Nardini's declaration makes clear, none of the DLI Defendants had even communicated with a Fleet Space representative at the time of Jason Anderson's misstatement, much less executed an agreement and deployed Fleet Space's technology. (Dkt. No. 3-7 at Ex. 31, Nardini Decl. ¶¶ 5, 15, 38).

Likewise, in a video posted to YouTube on November 14, 2022, Defendant Schad Brannon showed a visual on his computer screen of DLI's purported techology to lend credence to his claim that Debt Box used the technology to drill for oil in Ghana.  (*See* Dkt. No. 3-4, Watkins Decl. ¶ 24). Yet, as Ms. Nardini testifies, Fleet Space had not signed any agreement with DLI or its affiliates in November 2022, and Fleet Space did not have the ability in operate in Ghana.  (Dkt. No. 3-7 at Ex. 31, Nardini Decl. ¶¶ 13, 15, 21).  Nor does Ms. Nardini only identify fraudulent misstatements from "unidentified DEBT Box promotors" regarding Fleet Space's technology (*see* Dkt. No. 132, DLI Mot. at 16)—Ms. Nardini specifically states that Defendant Jason Anderson made false statements regarding DLI's purportedly operating satellites in a January 2023 YouTube video. (Dkt. No. 3-7 at Ex. 31, Nardini Decl. ¶¶ 19–21.)[5]

Likewise, although Defendants attempt to discount the declaration of Richard Serena as "irrelevant, speculative, and wrong" (*see* Dkt. No. 132, DLI Mot. at 18), they provide no countervailing evidence to rebut Mr. Serena's testimony—supported by financial statements from Lazy Magnolia (the Mississippi brewery purportedly backing DLI's "BEV" node license) showing Defendants' representations to investors about the brewery's supposed profits were false.  (*See*, *e.g.*, Dkt. No. 3-8 at Ex. 33, Serena Decl. ¶ 7 & Ex. A.)  While Defendants quibble with Serena's knowledge of the brewery's profits following his exit, the declaration of Derrick Hope, appended to their motion, simply states that at some point since "January 2023," the brewery has "repaired" unidentified "existing equipment," "ordered and purchased" unidentified "new pieces of

---

[5] Defendants seek to explain away these misstatements by pointing to a press release issued by an entity controlled by one of the DLI Defendants.  Yet nothing in the unsubstantiated document corroborates the DLI Defendants' statements.  If anything, it further demonstrates that the "proprietary technology" they claimed to posses was actually Fleet Space's "satellite-based mineral exploration technology."

equipment," installed an unidentified number of "new power panels" and "new floor drains," and "re-epoxied" its floors. (*See* Dkt. No. 132-10, Hope Decl. ¶¶ 4–7.) Mr. Hope does not claim that the brewery is now making the sorts of profits, or has the sorts of contracts, that Defendants represented to investors—instead, he just testifies he never personally heard Defendants make those sorts of representations. (*See id.* ¶ 8.) This is wholly insufficient to rebut the evidence showing that even in 2022—when Mr. Serena was still employed by Lazy Magnolia—Jason Anderson falsely represented to investors that the brewery itself (not an affiliate) was generating $12 million in revenue; and that Defendants falsely claimed Lazy Magnolia had obtained significant contracts for retail distribution. (*See, e.g.*, Dkt. No. 3-4, Watkins Decl. ¶¶ 8b, 21.)

In short, the SEC's extensive evidence more than supports its fraud claims against the DLI Defendants, and supports the requisite showing of a substantial likelihood of prevailing on the merits. Defendants' quibbles with the weight of this evidence are a matter for the preliminary injunction hearing, not a motion to dissolve.

### B.   The SEC Has Shown Irreparable Harm Absent Issuance of Its Requested Relief.

The SEC's TRO Motion also demonstrated that investors would be irreparably harmed if the Court did not grant the request relief. This is not a case based on prior, now discontinued misconduct. At the time of the TRO, Defendants' fraudulent scheme was ongoing and expanding. As evidence of the sprawling scope of the scheme, the SEC initially estimated Defendants raised $49 million (TRO Mot. at 22), but now understands Defendants raised ***over $130 million*** from investors. (*See* Dkt. No. 125-1, Dewey Decl. ¶ 34.) Absent the issuance of the TRO, the DLI Defendants would have continued to offer unregistered DEBT Box securities and continued to violate the federal securities laws. The TRO Motion also demonstrated that Defendants (including the DLI Defendants) dissipated investor funds, both through luxury purchases and by draining bank

accounts. (*See* Dkt. No. 3-10, Zaki Decl. ¶¶ 18–20, Ex. 8; Dkt. No. 3-10, Watkins Decl. ¶ 32; *see also* Dkt. No. 100).  Finally, the SEC provided evidence that the DLI Defendants were relocating operations to UAE and transferring investor funds to unreachable overseas accounts.

In their Motion, the DLI Defendants ignore this evidence and instead cling to two lines from the TRO Hearing to claim that the SEC failed to establish irreparable harm.  As set forth below, these arguments are entirely without merit and misstate the record.

***First***, Defendants contend that the SEC has failed to establish that Defendants were dissipating assets because, while other Defendants may have recently closed accounts (Dkt. No. at Ex. 1, Zaki Supp. Decl., ¶ 10a), the DLI Defendants did not close any bank accounts in July 2023. As set forth in the TRO Motion, on July 7, 2023, the SEC became aware of several accounts controlled by Defendants that were closed, including four accounts controlled by Relief Defendant Gold Collective; three accounts controlled by Defendant iX Global; and two accounts controlled by DLI.  (*See* Ex. 1, Zaki Supp. Decl. at Ex. A.)  Further, mere days before the TRO Hearing— consistent with counsel's representation to the Court—the SEC learned that a substantial portion of the funds held in two bank accounts controlled by Defendants, including one controlled by DLI, had been substantially drained of assets.  (*See* Dkt. No. 3-10, Zaki Decl., ¶ 10c; Ex. 1, Zaki Supp. Decl., ¶ 10b, c.)

***Second***, there is no factual support for the DLI Defendants' contention that the SEC somehow misled the Court by stating Defendants were in the process of relocating to the United Arab Emirates to evade the SEC's jurisdiction.  (Dkt. No. 132, DLI Mot. at 11).  Defendants do not dispute that Jacob Anderson stated in June 2023 that Debt Box was moving its "operations" to the United Arab Emirates for the express purpose of evading the federal securities laws. (Ex. 2, Watkins Decl. ¶ 27.)  Nor do Defendants dispute the accuracy of Jacob Anderson's statement.

Instead, the DLI Defendants claim that because DLI's principals signed corporate documents in 2022, DLI "moved its operations to the UAE in May 2022" and therefore, no TRO is necessary.

The evidence does not support the DLI Defendants' argument. As the Receiver's investigation uncovered, DLI continues to maintain an office in Utah. (*See* Dkt. No. 125-1, Dewey Decl. ¶ 68.). The SEC's investigation also revealed that DLI continues to maintain at least one U.S. bank account (Dkt. No. 3-10, Zaki Decl. at Ex. 3). Further, bank records from that U.S. account show that, contrary to Defendants arguments, the DLI Defendants were still in the process of establishing an office in the UAE ***in June 2023***—less than a month before the SEC moved for a TRO, and around the same time Jacob Anderson was declaring DLI's intent to move operations overseas. (*See* Ex. 1, Zaki Supp. Decl. at Ex. B (identifying a June 16, 2023 wire of $35,000 from DLI to Defendant Brannon with the memo line, "Set up office in UAE").)

In any event, the DLI Defendants misunderstand the relevance of DLI's UAE relocation. Regardless of when the DLI Defendants began the process, or signed corporate documents memorializing the move, the fact that Defendants are continuing to transfer assets overseas shows a likelihood of dissipation. Now, of course, the DLI Defendants are refusing to allow the Receiver to take control of assets and bank accounts controlled by the UAE DLI entity, claiming that it is somehow distinct from Defendant DLI. Thus, absent the Court's order, there is a substantial risk that the DLI Defendants will transfer additional investor funds overseas, outside the Court's reach, and that the UAE entity will dissipate the funds and assets it already controls.

### C.     The Threatened Injury Outweighs Any Harm Caused to the DLI Defendants.

The SEC's evidence also plainly shows that the threatened injury—*i.e.*, Defendants' ongoing fraudulent offering, as well as their concealment and dissipation of investor assets—outweighs whatever damage the proposed injunction may cause to the DLI Defendants. The TRO

preserves the *status quo* and prevents any ongoing violations of the securities laws through the continued solicitation of additional investors into the DLI Defendants' fraudulent securities offering. It also prevents Defendants, via the asset freeze, from further dissipating investor funds that may be subject to a disgorgement judgment.

The DLI Defendants assert that the TRO has caused "devastating" harm to "Defendants and Relief Defendants." (Dkt. No. 132, DLI Mot. at 20.) But they provide no evidence backing up this bombast. For example, while they claim to have "had to resort to borrowing petty cash" to "get through these past weeks," they append no supporting declaration from any Defendant verifying that claim, nor do they explain how the stipulated agreement to provide each of them, individually, with between $4,014 and 8,114 monthly in living expenses during the pendency of the TRO is somehow insufficient. (*See* Dkt. No. 120, Stip. Order at ¶¶ 2–5.) And while they submit a declaration asserting that there is an unrealized threat to existing oil rigs, and recently a theft of two Ford trucks and unidentified equipment at sites owned by Archer Drilling and Ignis Energy (*see* Dkt. No. 130-12, Saetrum Decl.) they do not provide any evidence that such harm is the result of the TRO rather than the work of a disgruntled employee. Moreover, the only reason the SEC and Receiver have been unable to address issues regarding the business of these DLI affiliates is because the DLI Defendants have refused to agree that the Receivership Order extends to these or similar entities. (*See* Dkt. No. 125, Mot. to Clarify at 5–6.) The DLI Defendants do not explain how purported harm to a Relief Defendant (Archer Drilling) and a third-party not named in the Complaint (Ignis Energy)—who have not themselves moved to dissolve the TRO, and whom the DLI Defendants even now contend are not affiliates or subsidiaries of DLI—is "devastating" to the DLI Defendants.

The DLI Defendants also contend that the TRO has harmed them because another individual not named in this suit, Gene Purdy (of Relief Defendant Purdy Oil, LLC) has received a death threat. (*See* Dkt. No. 132, DLI Mot. at 2–3; *id*. at 21 & Ex. 13.) The SEC takes this threat seriously and intends to investigate its origins. But the threatening note makes no mention of this action, the TRO, or the SEC—and is equally as likely to have come from another defendant as from (as the DLI Defendants imply) an investor outraged by the SEC's action. While serious, it is not a reason to dissolve the TRO.

Furthermore, while the DLI Defendants claim that the asset freeze in general has caused them harm,[6] they provide no basis for the Court to allow them to continue to use fraudulently obtained investor funds for personal or business expenses. *See*, *e.g.*, *SEC v. Forte*, 598 F. Supp. 2d 689, 692–93 (E.D. Pa. 2009) ("Several courts have held that before they will unfreeze assets, the defendant must establish that the modification is in the interest of the defrauded investors," and "Where the frozen assets fall far below the amount needed to compensate investors, the court should exercise its discretion to deny a request to release funds for living expenses.") (cleaned up); *see also SEC v. Zafar*, 2009 WL 129492, *9 (E.D.N.Y. Jan. 20, 2009) (unpublished); *SEC v. Roor*, 1999 WL 553823, *3 (S.D.N.Y. July 29, 1999) (unpublished). As noted above, the Receiver's tracing analysis revealed that at least $130 million in investor funds flowed into the fraudulent securities scheme—and the DLI Defendants accountings do not show sufficient resources available to repay such amounts in disgorgement. As such, every dollar of investor funds that

---

[6] The DLI Defendants make no argument that the injunctive relief imposed by the TRO (that is, the prohibitions against further violations of the federal securities laws and Defendants' continued offer and sale of the node licenses and solicitation of investors) has caused them any harm. Instead, they appear to take issue solely with the asset freeze provisions of the TRO.

13

Defendants spend is one less dollar the SEC may be able to recover for investors at the conclusion of this case.  Defendants provide no evidence to show that the funds they seek to unfreeze are untainted, and thus cannot show that any harm caused to them by the freeze on those funds outweighs the potential harm to investors of lifting the freeze.

       **D.**       **The TRO Is in the Public Interest.**

Finally, the evidence the SEC submitted in support of the TRO Motion shows that the TRO is in the public interest.  In enacting the federal securities laws, Congress entrusted the SEC with the vital mission of ensuring the honesty and fairness of the capital markets.  *See SEC v. Gen-See Cap. Corp.*, 2009 WL 57589, at *1 (W.D.N.Y. Jan. 8, 2009) (unpublished) (noting the SEC is "charged with safeguarding the public interest through enforcement of the securities laws"); 15 U.S.C. § 78b (providing securities transactions "are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions").  Accordingly, when the SEC files a civil action to enforce the securities laws, it vindicates public rights and furthers the public interest.  *SEC. v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031, 1044–45 (9th Cir. 2005) ("The entire purpose and thrust of a Commission enforcement action is to expeditiously safeguard the public interest by enjoining securities violations. The claims asserted in such an action stem from, and are colored by, the intense public interest in Commission enforcement of these laws." (quoting S*EC v. Asset Management Corp.*, 456 F. Supp. 998, 1000 (S.D. Ind. 1978) (cleaned up))). Defendants cite no case in which any injunction requested by the SEC was determined to fall outside the public interest.

Here, the injunctive relief obtained in the TRO prevents Defendants from resuming operations of their fraudulent scheme (which, as the time the SEC obtained the TRO, was expanding through the offer of two new node licenses, "REV" and "DLS.").  (*See* Dkt. No. 3-5,

Watkins Decl. at Ex.1.)  It also requires compliance with securities laws that are designed to promote integrity in the offer, purchase and sale of securities and enable investors to make investment decisions based upon accurate and complete information.  Furthermore, the TRO's asset freeze provisions protect current investors from any additional dissipation of funds they provided to the DLI Defendants.

The DLI Defendants argue only that the TRO is not in the public interest because the market price of one of Defendants' crypto asset securities fell "within days of the SEC's unsealing of the Complaint."  (*See* Dkt. No. 132, DLI Mot. at 22.)  But the DLI Defendants do not explain how this purported price fluctuation was caused by the issuance of TRO, rather than the unsealing of the Complaint itself.   Indeed, any such market correction was likely caused by investors learning of Defendants' sprawling fraud.   What's more, the current market price of Defendants' securities is simply not relevant for purposes of the public interest inquiry.  The question is whether it is in the public interest to halt Defendants' ongoing violations of the federal securities laws and prevent further dissipation of investor funds.  Simply put, the SEC has met this standard.

## II.   THE SEC'S CONTINUED INVESTIGATION OF NON-PARTIES DOES NOT SUPPORT DISSOLUTION OF THE TRO.

The DLI Defendants' complaints regarding the SEC's continued investigation of third parties is also no basis for dissolution of the TRO.   As courts throughout the country have recognized for decades, federal agencies, including the SEC, may continue to investigate after filing suit.  *See Bowles v. Bay of New York Coal & Supply Corp.*, 152 F.2d 330, 331 (2d Cir. 1945) (observing it is "quite settled" that "the rules of civil procedure do not apply to control or restrict administrative subpoenas"); *Porter v. Mueller*, 156 F.2d 278, 280 (3d Cir. 1946)  ("Limiting use of the subpoena to 'investigations' occurring before suit is brought would effectively hamper enforcement of the [Emergency Price Control Act of 1942]."); *SEC v. F.N. Wolf & Co., Inc.*, 1993

WL 568717 (S.D.N.Y. Dec. 14, 1993) (unpublished) (holding that the filing of a civil action does not preclude further investigation by the SEC). For example, in *Wolf*, a defendant argued that the SEC, once it had filed suit, was "limited to discovery conducted pursuant to the Federal Rules of Civil Procedure and [could] not issue subpoenas or other information requests beyond the scope of those rules." 1993 WL 568717, at *1. The defendant further argued that if the SEC gathered materials through its statutory or informal powers, it should be precluded from using those materials in the litigation. *See id*. That court unequivocally rejected both arguments, noting that the "extremely broad" investigatory powers conferred by Congress, including through Section 21(a) of the Exchange Act, 15 U.S.C. § 78u(a)(1), means that "[the SEC's] institution of civil litigation did not shrink the scope of the investigative resources available to the SEC, nor limit its use of information obtained from those resources to purposes other than the litigation." *Id*. at *2.[7]

While the 10th Circuit has not opined on the issue, the majority rule represented by *Bowles*, *Porter*, and *Wolf* remains vital to the SEC's enforcement of the securities laws. Here, the SEC filed suit on an emergency basis against the primary perpetrators of a fraudulent scheme, under the

---

[7] Defendants cite a single unpublished case, from the Western District of Texas, for the proposition that the SEC may not issue investigative subpoenas once a civil suit is filed regarding the same subject matter. (See Dkt. No. 132, DLI Mot. at 22, citing *SEC v. Life Partners Holdings, Inc.*, No. 1:12-CV-00033, 2012 WL 12850253, at *2 (W.D. Tex. Aug. 17, 2012) (unpublished)). That case, however, involved the taking of an investigative deposition of a witness prior to the beginning of discovery. *See* 2012, WL 12850253, at *1. *Life Partners* has not been followed by any court in the Tenth Circuit. Furthermore, the single case citing *Life Partners*, in *dicta*, noted that its holding was limited to situations in which the SEC used an administrative subpoena to "obtain information for use in [the] litigation that it could not have otherwise obtained under the Federal Rules." *See Hernandez v. Helm*, No. 18 C 7647, 2019 WL 5922233, *7 (N.D. Ill. Nov. 12, 2019) (unpublished). None of those circumstances is present here, where the TRO authorizes expedited discovery, the SEC has only issued document subpoenas to a limited number of third parties, and the SEC has already agreed to produce any documents obtained from those subpoenas with the DLI Defendants.

assumption that continued investigation of other individuals and entities might result in the later amendment of its Complaint to allege separate violations against others not currently named.  If, as the DLI Defendants assert, the SEC is prohibited from further investigation into related individuals or entities upon filing of a case, the SEC would be required to bring every investigation to completion before charging any defendant—an unworkable standard that would be contrary to the public interest in obtaining expedited relief in actions such as these.

In any event, the DLI Defendants do not argue that the SEC's issuance of a select number of administrative document subpoenas provides any basis for dissolution of the TRO, and only request that the Court "prohibit the SEC from serving secret administrative subpoenas in this civil action" and require the SEC to produce "all documents and materials that the SEC received from all prior administrative investigative subpoenas."  (Dkt. No. 132, DLI Motion at 23.)  The SEC has already agreed to produce its investigative file to Defendants, which will necessarily include any documents obtained via these subpoenas, and—for avoidance of doubt—will agree to issue any additional third-party subpoenas pursuant to Rule 45.

## III.   THE TRO WAS PROPERLY EXTENDED VIA DEFENDANTS' CONSENT.

Finally, the DLI Defendants' last-minute, "supplemental" motion for dissolution of the TRO (*see* Dkt. No. 163) does not comport with the procedural posture of this case or their own actions to date.[8]  As the various cases cited by the DLI Defendants recognize, Rule 65(b) provides

---

[8]  Defendants' filing is also directly contrary to the Court's instructions at the September 20, 2023 status conference—at which the parties agreed to a briefing schedule for the DLI Defendants' motion to dissolve, and the Court advised the parties that while other defendants could file joinder motions up and until Friday, September 22, 2023, those motions should not raise new legal arguments.  The Court did not grant the DLI Defendants leave to file a "supplemental" brief on September 25 raising legal arguments not presented in their original motion.

that a TRO issued *ex parte* "expires at the time after entry—not to exceed 14 days—that the court

sets, unless before that time the court, for good cause, extends it for a like period *or the adverse*

*party consents to a longer extension*." FED. R. CIV. P. 65(b)(2) (emphasis added). Here, the Court

properly extended the TRO three times based on the DLI Defendants' consent—explicitly

demonstrated by their failure to object to the TRO.

The Court issued its original TRO on July 28, 2023. (*See* Dkt. No. 9.)  As the Court

explained in modifying the language in the SEC's proposed TRO:

> I'm going to include the standard language that I include in a lot of my TROs, well,
> most of them, maybe all of them, that the temporary restraining order will expire
> under Rule 65, 10 days after issuance.  But I'm going to include language in the
> order saying that it will automatically renew unless I've received prior to that time
> some opposition to the motion by one of the affected parties.
>
> I'll just tell you it's my practice and I'll tell the defendants if and when they appear,
> I ordinarily do that two or three times, but at some point it will be time to convert
> the TRO to a preliminary injunction.  But I'll try to signal that in my orders that I
> issue.

(Dkt. No. 132-2, TRO Hearing Tr. At 25:16–26:2.)  In addition, the Court noted that the SEC

could file a motion for preliminary injunction "after you've had the chance to obtain some

expedited discovery."  (*Id*. at 26:4–7.)

The DLI Defendants admit they were made aware of the TRO no later than August 2, 2023,

when "Defendants learned of this action through the U.S. Marshals' seizure of assets."  (*See* Dkt.

No. 132, DLI Mot. at 8.)  Among other things, the TRO froze the assets of the DLI Defendants

and required them to repatriate funds and respond to the SEC's discovery requests within 5 days

of service.  (*See* Dkt. No. 9, TRO at §§ VIII, IX, XIII, XV.)  The DLI Defendants ignored these

provisions of the Court's Order:  as of today's date, 61 days after the Court issued the TRO, the

DLI Defendants have failed to produce responsive documents and have failed to repatriate

overseas funds.  Following Court-ordered meet-and-confers, the DLI Defendants have now agreed

to produce a small subset of the documents originally requested by September 29—nearly two months after they received the SEC's expedited discovery requests.

Section XVI of the TRO, in accordance with the Court's instructions at the July 28 hearing, provided that "this Temporary Restraining Order shall expire 10 days after entry of this Order," and that "the court will renew the Order unless it receives an Opposition from the Defendants." (Dkt. No. 9, TRO § XVI.)  The DLI Defendants did not object to the TRO, which was renewed (with a similar automatic renewal provision) on August 7 (*see* Dkt. No. 33); on August 17 (*see* Dkt. No. 78); and on August 29 (*see* Dkt. No. 121).  In the August 29, 2023 order, the Court provided that "this Temporary Restraining Order shall expire 14 days after entry of this Order," and further that "[t]he court anticipates renewing the Order, but Defendants may move to dissolve the Order at any time."  (Dkt. No. 121, TRO § XVI.)  On September 12, 2023—the day when the TRO was set to renew for a fourth time, and 46 days after entry of the original TRO—the DLI Defendants filed their motion to dissolve.  At that time, they did not raise any argument that renewal of the TRO was procedurally improper:  instead, they waited until after the Court held a status and set a briefing schedule before raising this argument, in a "supplemental" brief, fifty-nine days after entry of the original TRO and two days before the date set for the SEC's response to their September 12 motion.  (*See* Dkt. No. 163.)

That is, while the DLI Defendants now assert they "did not consent to the issuance of any TROs or preliminary injunction in this case," their actions in response to the TRO and its renewals belie this unsupported assertion.  Despite the Court's clear instruction that the TRO would be renewed—and eventually converted to a preliminary injunction—absent objection by a Defendant, the DLI Defendants filed no objection, and only filed a motion to dissolve when the TRO was set to renew for a fifth time.  If, as they now argue, the TRO was truly a "nightmare" for their ongoing

business concerns, or was procedurally improper from the beginning "by operation of law," there is simply no excuse for their failure to raise these objections earlier, and any such objections should be deemed waived.[9]

In any event, even assuming that, counterfactually, the DLI Defendants did not consent to the continued operation of the TRO, the remedy is not to dissolve the TRO but to expeditiously convert it into a preliminary injunction.  The DLI Defendants failed to comply with the TRO's repatriation and expedited discovery requirements, thus depriving the SEC for nearly two months of evidence important to a preliminary injunction hearing.  In short, any delay in the Court's expeditiously addressing the SEC's request for a preliminary injunction is of the DLI Defendants' own making.  Thus, to the extent the Court is inclined to dissolve the TRO, the SEC requests suspension of briefing on its preliminary injunction motion and an immediate preliminary injunction hearing, at which the SEC will present evidence sufficient to support a preliminary injunction and continued asset freeze.

---

[9] The DLI Defendants cite no Tenth Circuit case to the contrary—the two district court cases they cite do not involve a defendant who failed to object to an extension of the TRO.  *See Sample Farms, LLC v. ConocoPhillips Co.*, 2015 U.S. Dist. LEXIS 36636, at *2–3 (W.D. Okla. Mar. 24, 2015) (unpublished) (finding insufficient evidence of immediate injury to support an extension of the TRO, and denying plaintiff's request for an additional extension beyond 28 total days where defendant had not consented to such extension); *Isler v. New Mexico Activities Ass'n*, 2010 WL 11623621, at *1 (D.N.M. Feb. 2, 2010) (unpublished) (dissolving TRO where defendant moved to dissolve thirteen days after the TRO issued).  In addition, the Second Circuit case the DLI Defendants rely on, *Pan Am. World Airways, Inc. v. Flight Eng'rs Intl. Assoc.*, 306 F. 2d 840 (2d Cir. 1962) merely stands for the proposition that notice of a TRO and a hearing "cannot serve to extend indefinitely beyond the time period limited by the Rule the time during which a temporary restraining order remains effective"—it does not hold that as here, where a party consents to renewal by failing to follow the requirements for objection in the TRO, the TRO nonetheless expires by operation of law.  *See id.* at 842.

## **CONCLUSION**

For the reasons stated herein, and in the SEC's TRO Motion (Dkt. No. 3), the SEC respectfully requests that the Court deny the DLI Motion.  In the alternative, to the extent the Court intends to dissolve the TRO, the SEC requests an immediate preliminary injunction hearing.

Dated: September 27, 2023.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

*/s/ Michael E. Welsh*                         `
Michael E. Welsh
Casey R. Fronk
Attorneys for Plaintiff
Securities and Exchange Commission

21

## CERTIFICATE OF SERVICE

On this 27th day of September 2023, I hereby certify that I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification and service to all counsel of record.

/s/ *Michael E. Welsh*