Matthew R. Lewis (7919)
Taylor J. Smith (17537)
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, 10th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
mlewis@kba.law
tsmith@kba.law

Jason P. Gottlieb (admitted *pro hac vice*)
David E. Ross (admitted *pro hac vice*)
Jeffrey D. Brooks (admitted pro hac vice)
Alexander R. Yarm (admitted *pro hac vice*)
**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10022
Telephone: (212) 735-8600
jgottlieb@morrisoncohen.com
dross@morrisoncohen.com
ayarm@morrisoncohen.com

*Attorneys for Defendants Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, Roydon B. Nelson, and Relief Defendants Business Funding Solutions, LLC; Blox Lending, LLC; The Gold Collective LLC; and UIU Holdings, LLC*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an | **DEFENDANTS JASON R. ANDERSON, JACOB S. ANDERSON, SCHAD E. BRANNON, AND ROYDON B. NELSON AND RELIEF DEFENDANTS BUSINESS FUNDING SOLUTIONS, LLC, BLOX LENDING, LLC, THE GOLD COLLECTIVE LLC, AND UIU HOLDINGS, LLC'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER AND MODIFY TEMPORARY RECEIVERSHIP ORDER TO APPOINT A NEW RECEIVER**<br><br>**EXPEDITIOUS CONSIDERATION REQUESTED**<br><br>Case No. 2:23-cv-00482-RJS |

#12465300v8\031376\0001

| | |
|---|---|
| individual; BENAJMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited liability company; BRENDAN J. STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual;<br><br>      Defendants,<br><br>ARCHER DRILLING, LLC, a Wyoming limited liability company; BUSINESS FUNDING SOLUTIONS, LLC, a Utah limited liability company; BLOX LENDING, LLC, a Utah limited liability company; CALMFRITZ HOLDINGS, LLC, a Utah limited liability company; CALMES & CO, INC., a Utah corporation; FLAHERTY ENTERPRISES, LLC, an Arizona limited liability company; IX VENTURES FZCO, a United Arab Emirates company; PURDY OIL, LLC, a Nebraska limited liability company; THE GOLD COLLECTIVE LLC, a Utah limited liability company; and UIU HOLDINGS, LLC, a Delaware limited liability company,<br><br>      Relief Defendants. | Chief Judge Robert J. Shelby |

## **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 2

    I.    THE *EX PARTE* TRO (WITH AN ASSET FREEZE) WAS IMPROPERLY ISSUED THROUGH THE SEC'S FALSE AND MISLEADING INFORMATION ............................................................................... 2

        A.    THE SEC FAILED TO SHOW ANY IRREPARABLE HARM OR EXIGENCY TO WARRANT THE ISSUANCE OF THE *EX PARTE* TRO/ASSET FREEZE. ........................ 2

        B.    THE SEC FAILED TO MAKE A CLEAR SHOWING OF SUBSTANTIAL LIKELIHOOD OF PREVAILING ON THE MERITS. ......................................................................................... 5

        C.    THE SEC FAILED TO SHOW THAT THE THREATENED INJURY OUWEIGHS THE HARM THAT THE TRO/ASSET FREEZE CAUSED ......................................... 8

        D.    THE SEC FAILED TO SHOW THAT THE TRO HAS NOT ADVERSELY AFFECTED THE PUBLIC INTEREST ................................................................................... 8

    II.    THE *EX PARTE* TRO SHOULD BE DISSOLVED BECAUSE IT WAS NOT ISSUED IN ACCORDANCE WITH APPLICABLE PROCEDURAL LAW ................................................................................. 9

    III.    THE SEC ALSO IMPROPERLY ISSUED NUMEROUS *EX PARTE* ADMINISTRATIVE INVESTIGATIVE SUBPOENAS. ..................... 10

    IV.    THE RECEIVER FAILED TO DISCLOSE A POTENTIAL CONFLICT OF INTEREST AND HAS FAILED TO MANAGE DLI'S ASSETS PROPERLY. ............................................................................ 11

CONCLUSION…………………………………………………………………………..12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*,
415 U.S. 423 (1974) ........................................................................................................10

*SEC v. Life Partners, Holdings, Inc.*,
No. 1:12-CV-00033-JRN, 2012 WL 12850253 (W.D. Tex. Aug. 17, 2012) ..........................10

**Statutes**

Securities Exchange Act Section 10 ................................................................................................5

Securities Exchange Act Section 17 ................................................................................................5

Federal Rules of Civil Procedure Rule 45 ......................................................................................10

Federal Rules of Civil Procedure Rule 65 ......................................................................................10

**Other Authorities**

www.sec.gov/news/press-release/2023-146 .....................................................................................9

https://sign.moveon.org/petitions/we-stand-with-the-debt-box ........................................................9

www.sec.gov/divisions/enforce/enforcementmanual.pdf) ..............................................................11

www.radiantexploration.com/about ..................................................................................................6

www.youtoube.com/watch?v=fMDGb0_3a8w ................................................................................6

www.youtube.com/watch?v=bvP78-I-Jv0 .........................................................................................4

## REPLY IN FURTHER SUPPORT OF MOTION TO DISSOLVE TRO AND MODIFY TEMPORARY RECEIVERSHIP ORDER

Defendants Jason R. Anderson ("Jason Anderson"), Jacob S. Anderson ("Jacob Anderson"), Schad E. Brannon ("Brannon"), and Roydon B. Nelson ("Nelson") (collectively "Defendants") and Relief Defendants Business Funding Solutions, LLC, Blox Lending, LLC, The Gold Collective LLC, and UIU Holdings, LLC (collectively "Relief Defendants), through undersigned counsel, hereby submit their reply in further support of their Motion to Dissolve the Temporary Restraining Order, including an asset freeze, and to Modify the Temporary Receivership Order[1] (hereinafter "Motion to Dissolve" or "MTD").

## PRELIMINARY STATEMENT

The SEC did get this case wrong. Badly wrong.

In July 2023, the SEC found some bank account closures and fluctuating balances associated with crypto entities in Utah. Instead of conducting a full and fair investigation to find out what was really happening, the SEC acted on prejudice, suspicions, and hunches. The SEC assumed the worst, convincing themselves that there was dissipation of assets overseas, and brought an emergency enforcement action for fraud. The SEC had insufficient evidence to support its *ex parte* TRO/asset freeze application. So, when this Court inquired about irreparable harm or exigency and other elements for a TRO/asset freeze at a sealed hearing, the SEC provided false and misleading information about Defendants to salvage its application.

Contrary to the SEC's claim, there was no dissipation of assets by Defendants, and nothing in the SEC's Opposition, which is rife with factual errors, changes that incontrovertible fact. Even

---

[1] The SEC continues to incorrectly lump Defendants Jason Anderson, Jacob Anderson, Brannon and Nelson as "DLI Defendants." As previously discussed in Defendants' Opposition to the SEC and Receivership's motions to clarify (ECF No.162), Digital Licensing Inc. ("DLI") was not commonly owned, managed, operated, and/or controlled by Jason Anderson, Jacob Anderson, Brannon, and Nelson. Brannon and Nelson, as owners, were in charge.

with more than 60 days to shore up its case, the SEC has failed to produce any evidence that Defendants dissipated assets. In fact, in what the SEC repeatedly calls a "sprawling fraud case" of more than $100 million, it tellingly could not find any "investor" witnesses willing to champion its cause, except for one individual (Andrew Michael Johnson) whose declaration has been discredited. Meanwhile, more than 3,500 U.S. node/token holders of DEBT Box have signed a petition to the Court condemning this unnecessary action that has wrecked the lives of many.

No sound basis exists to further extend the draconian TRO, with an asset freeze, or the receivership, in place until the October 30, 2023 preliminary injunction hearing. The Motion to Dissolve, including the modification of the Receivership Order, should be granted in full.

## ARGUMENT

**I.   THE *EX PARTE* TRO (WITH AN ASSET FREEZE) WAS IMPROPERLY ISSUED THROUGH THE SEC'S FALSE AND MISLEADING INFORMATION.**

   **A.   THE SEC FAILED TO SHOW ANY IRREPARABLE HARM.**

The *ex parte* TRO (with an asset freeze) should be dissolved because there was no risk of "immediate and irreparable injury, loss, or damage" that required an injunction before the Defendants and Relief Defendants could be heard in opposition. MTD at 10-13. Facing the Court's imminent denial of its TRO application, the SEC made a false and misleading statements about Defendants' alleged contemporaneous dissipation of assets: that "even in the last 48 hours [as of July 28, 2023] defendants have closed *additional bank accounts*, and I believe the number … was around 33 bank accounts have been closed." *Id*. at 7-8, 10-11 (quoting TRO Hearing Transcript ("Tr.") at 20) (emphasis supplied).

As shown in the Motion to Dissolve, there were no bank account closures involving DLI, Defendants, or Relief Defendants in July 2023. MTD at 10-11. In fact, DLI, Defendants, and Relief Defendants did not close a single bank account at any time in 2023. *Id*. at 11. Rather,

various banks themselves decided to close certain of DLI, Defendants, and Relief Defendants' accounts in 2021 and 2022, and informed them of their decision. *Id*. (citing Ex. 3).[2]

In Opposition, instead of admitting that it provided false and misleading information to the Court, the SEC pivots by asserting a new, alternative theory: that what it really meant was that "mere days before the TRO Hearing--consistent with counsel's representation to the Court--the SEC learned that a substantial portion of the funds held in two bank accounts controlled by Defendants, including one controlled by DLI, had been *substantially drained of assets*." Opp. at 10 (emphasis added). Assuming the worst, with nothing more than suspicions, the SEC suggests that this "drain[ing] of assets" could only mean that assets were being dissipated overseas. *Id*.

There was neither dissipation nor any risk of dissipation of assets overseas by Defendants. The sole account at Mountain America Credit Union (MACU), account ending in xx2717, which is the only account that the SEC is left with, *see* Supplemental Declaration of Karaz S. Zaki ¶ 10.b (ECF No. 168-1), was a joint legacy account for Messrs. Nelson and Brannon and DLI, with fluctuating monthly balances for savings, money market, and checking. *See* Ex. 23 (July and August 2023 statements for MACU account ending in xx2717) (attached hereto).[3] The account's balance fluctuated because Nelson paid ordinary-course business expenses, not because he dissipated assets by transferring them to clandestine accounts overseas. Indeed, had the SEC reviewed the August 2023 MACU account statements before Mr. Zaki's declaration was submitted on September 27, 2023, the SEC would have noticed that the MACU checking account's checking balance had jumped back up to $216,306.62 by August 1, 2023, before the unsealing of the SEC's

---

[2] After receiving account closure letters from the banks, Defendants went to another local bank in Utah, and opened new accounts there. There was no dissipation of assets overseas.

[3] None of the seven bank accounts that were allegedly closed recently belonged to Defendants or Relief Defendants. *See* Zaki Supplemental Declaration ¶ 10.a & n.1.

3

Complaint, and remained so. *See* Ex. 23 at unmarked pages 4-5. The SEC's new theory on Defendants' asset dissipation fails.

In addition, the SEC continues to push its false and misleading narrative that at the time of the TRO's issuance, "Defendants were in the process of relocating to the United Arab Emirates to evade the SEC's jurisdiction" or "Jacob Anderson was declaring [in June 2023] DLI's intent to move operations overseas." Opp. at 10-11. As explained in the Motion to Dissolve, the June 14, 2023 video posted on YouTube (www.youtube.com/watch?v=bvP78-I-Jv0), at time stamp 47:28-47:33 of the video, Mr. Anderson indisputably stated: "And so one of things that we have done is *we have moved all the operations currently to Abu Dhabi*." MTD at 12. Indeed, the corporate documents confirm that DLI had moved its operations to Sharjah, UAE and formed Digital Commodity Software House (DCSH), a UAE entity, in May 2022, approximately 14 months before the issuance of the *ex parte* TRO, which undercuts any claim of irreparable harm proffered by the SEC. *See* MTD at 12-13 (discussing corporate documents and citing cases).

In Opposition, the SEC—now relying in part on the "Receiver's investigation"—claims that DLI's operations have not moved because DLI has an office in Utah; has one U.S. bank account; and sent a bank wire of $35,000 from DLI to Mr. Brannon for "[s]etting up office in UAE." Opp. at 11. This is incorrect. The corporate documents, which the SEC and Receiver cannot rebut, establish that DLI had moved its operations to UAE more than a year ago. Moreover, whether there remains an office in Utah (which DLI has long vacated); a single legacy bank account, the aforementioned MACU, account ending in xx2717 (under a joint ownership of Messrs. Brannon and Nelson and DLI); or a wire of $35,000 to be used for office furniture (for new office renovation and furniture within UAE) does not demonstrate that DLI is *currently* moving its operations to UAE or that Defendants are dissipating assets overseas.

4

B.   **THE SEC FAILED TO MAKE A CLEAR SHOWING OF SUBSTANTIAL LIKELIHOOD OF PREVAILING ON THE MERITS.**

At the *ex parte* TRO hearing, the SEC made the following claim relating to the likelihood of success: "[E]ven in that short time [that the SEC has been investigating] we have had affidavits verifying multiple instances where the key businesses underlying [Defendants'] operations are fraudulent." MTD at 13-14 (quoting Tr. at 22). But none of the four declarations (Declarations of Joseph D. Watkins, Flava Tat Nardini, Andrew Michael Johnson, and Rick Lee Serna) that the SEC relied upon in its TRO application support such a claim.  MTD at 13-20.

Indeed, the SEC in its Opposition fails to discuss how each of the required elements of the securities fraud claims under Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder would be satisfied to make a clear showing of substantial likelihood of success. Instead, the SEC misstates and distorts its own TRO submission (including the Watkins Declaration), incorrectly points to "misrepresentations" that Defendants never made, and improperly burden-shifts to Defendants to address and disprove irrelevant and unreliable declarations.  *See* Opp. at 5-9.

Specifically, the SEC cites the Watkins Declaration for the following four assertions:

- **The SEC's Claim 1**:  That the Watkins Declaration (at ¶¶ 8, 15, 18d & Exs. 2-12) supports the claim that the "DLI Defendants falsely claimed that purchasing a DEBT Box node license would allow an investor to 'mine' various crypto assets in a 'proof of work' process akin to mining bitcoin." Opp. at 5;

- **The SEC's Claim 2**:  That the Watkins Declaration (at ¶¶ 8b, 31) supports the claim that the "DLI Defendants falsely claimed that Lazy Magnolia … had secured 'multi-million dollar' bottling contracts for distribution with retailers such as '7-11, Aldis, Food Lion, Sam's Club and more." Opp. at 6;

- **The SEC's Claim 3**:  That the Watkins Declaration (at ¶¶ 16a, 18c) supports the claim that the "DLI Defendants repeatedly misrepresented to investors that DLI possessed … proprietary technology that can scan the earth and identify oil and precious metals within a range of 6 feet" and that "Defendants further misrepresented to investors that DLI had already used this technology to

5

successfully locate substantial oil deposits." Opp. at 6; and

- **The SEC's Claim 4**: That the Watkins Declaration (at ¶ 34) supports the claim that the "DLI Defendants engaged promoters and business partners that repeated their false claims regarding Debt [sic] Box's 'scan technology' and successful oil extraction …." Opp. at 6.

The Watkins Declaration does not support these claims. As discussed in the Motion to Dissolve (at 14), Mr. Watkins catalogued what he searched, read, and/or watched during the investigation of this matter in his Declaration. He has no personal knowledge of the underlying events. Thus, he can make no claims or draw conclusions about whether anyone "falsely claimed," "misrepresented," or otherwise engaged in any alleged misconduct in his Declaration. Moreover, none of the referenced paragraphs or exhibits discuss anything about falsity or misrepresentations.

Next, the SEC claims that on a video presentation, "DLI's supposed 'Geo Specialist' made a false statement regarding the use of "'SCAN technology' to discover oil at its Nevada well site." Opp. at 6. The SEC is wrong for two reasons. *First*, the actual video presentation (www.youtoube.com/watch?v=fMDGb0_3a8w) shows at time stamp 0:38/12:27 and 1:29/12:27 that the discussion is about using scanning technology for oil drilling in *Nebraska*, not Nevada. Messrs. Jason Anderson, Jacob Anderson, Brannon or Nelson never stated to anyone that there was any oil production in the Nevada well site.

*Second*, as discussed in the Motion to Dissolve (at 17), before entering into a contract with Fleet Space, Mr. Brannon, on behalf of his company, Resonance Frequency Exploration Group LLC ("RFEG"), not DLI, already had access to, and used, its own "nuclear magnetic resonance (NMR) technology and mapping-analysis algorithms" through Radiant Exploration.[4] *See* Ex. 7 to

---

[4] Radiant Exploration's website (www.radiantexploration.com/about) provides that it "has advanced technology that can remotely survey and detect the presence of any element on the Periodic Table of Elements. This is achieved using physical properties that occurs at the subatomic level of physics - Magnetic Resonance (MR)." This is the technology that RFGE employed.

MTD (Fleet Space announcing that the contract "[c]ombines [Fleet's] ExoSphere's 3D rendering of subsurface topography *with RFEG's nuclear magnetic resonance (NMR) technology and mapping-analysis algorithms*); Ex. 24 (January 16, 2020 letter from Ghana's Minerals Commission to the Gold Collective, LLC, one of Brannon's entities, discussing the use of NMR Technology) (attached hereto). This was independent of any partnership it had with Fleet Space. There was no misrepresentation regarding the use of such technology.

Further, the SEC makes much of Defendants not addressing the Declaration of Michael Allen Mortenson of the U.S. Bureau of Land Management. Opp. at 7. But Mr. Mortenson's Declaration is irrelevant: he was assigned to an ongoing investigation concerning Defendants Western Oil Exploration Company and James E. Franklin and interviewed Messrs. Brannon and Nelson as victim-witnesses of Mr. Franklin's separate fraud. ECF No. 3-8, at 23, 26 of 87 (Mortenson Decl. ¶¶ 4, 29, 32-33, 38). To the extent that Mr. Mortenson stated that the Nevada well site had not produced any oil, that statement is of no moment; as stated above, Messrs. Jason Anderson, Jacob Anderson, Brannon or Nelson never stated that the Nevada well site had produced oil. *See* Watkins Decl. ¶¶ 8c, 15d, 16a, 17, 18a, 20, 34 (showing that none of Defendants made any statements about any oil production in the Nevada well site). In addition, Jason Anderson's one statement about "oil," read in full in the Watkins Declaration, shows that it related to the "burning" of crypto assets—not the revenue of any oil projects. *See id*. ¶ 18a.

Finally, the SEC claims, citing to the Watkins Declaration (¶¶ 8b, 21), that while Mr. Serena was still employed by Lazy Magnolia in 2022, "Jason Anderson falsely represented to investors that the brewery itself (not an affiliate) was generating $12 million in revenue" and that "Defendants falsely claimed Lazy Magnolia had obtained significant contracts for retail distribution." Opp. at 9. The SEC's claims are incorrect for three reasons. *First*, the Serena

7

Declaration does not state that he heard any misrepresentation by Jason Anderson or any other Defendants.  Also, as discussed in the Motion to Dissolve (at 18-19), the Serena Declaration remains irrelevant, speculative and wrong.  *Second*, the Watkins Declaration does not identify any video in which Jason Anderson states that "the brewery itself (not an affiliate) was generating $12 million in revenue"; as discussed in the Motion to Dissolve (at 19-20), the video identified in paragraph 21 of the Watkins Declaration refers to how Lazy Magnolia helped *Richard's Rainwater*, a different company, which Lazy Magnolia bottled for, reach its revenue mark to over $12 million a month in revenue.  *Finally*, neither the Watkins Declaration (¶ 8b) nor the BEV Lite Paper (Ex. 8 to Watkins Decl.) state that "Lazy Magnolia had obtained significant contracts for retail distribution."  *See also* MTD at 19.  The SEC does not come close to a clear showing of substantial likelihood of success on the merits.

### C. THE SEC FAILED TO SHOW THAT THE THREATENED INJURY OUWEIGHS THE HARM THAT THE TRO/ASSET FREEZE CAUSED

Defendants explained how the SEC failed to establish that the threatened injury outweighed the harm that the TRO caused Defendants and Relief Defendants.  MTD at 3-4, 20-21.  Indeed, the TRO/asset freeze has not maintained status quo.  It has caused substantial and actual harm to many.  In Opposition, the SEC again cries wolf about the unfounded risk of dissipating of assets overseas and speculates that the harm that Defendants and third-parties suffered (including a death threat) was not substantial or related to the TRO/asset freeze.  Opp. at 11-14.  In fact, the SEC goes so far as claiming that *the IRS-minimum living expenses for families* that the SEC permitted for Defendants (ECF No. 119) on August 29, 2023--more than a month after the entry of the *ex parte* TRO/asset freeze--is sufficient.  Opp. at 12.  Suffice it to say, these arguments are without merit.

### D. THE SEC FAILED TO SHOW THAT THE TRO HAS NOT ADVERSELY AFFECTED THE PUBLIC INTEREST.

Defendants pointed out how the TRO has caused a catastrophic disruption to the DEBT

8

Box community in over 130 countries and caused the native DEBT Box token to take a free-fall of approximately 71% of its market value (an approximately $428 million loss).  MTD at 21-22.  In response, the SEC proclaims that it is entitled to do that to "vindicate public rights," because of the alleged "additional dissipation of funds," and speculates that a "market correction" was due to "investors learning of Defendants' sprawling fraud," not the TRO.  Opp. at 14-15.

The SEC's claims are false.  As discussed, there was no dissipation of assets by Defendants.  And the SEC's current litigation posture as to what caused the plummeting of the token value does not comport with the SEC press release issued on August 3, 2023, which headlined the TRO and asset freeze.  *See* 8/3/2023 SEC press release no. 2023-146 (announcing under the headline, "SEC Obtains Emergency Relief to Halt Utah-Based Company Crypto Asset Fraud Scheme Involving 18 Defendants," that the SEC "obtained a temporary asset freeze, restraining order, and other emergency relief" in the first sentence) (available at www.sec.gov/news/press-release/2023-146).

To the extent that there is any doubt on how the TRO has adversely affected the public interest, please review a MoveOn's "We Stand With the Debt Box" petition addressed to the Court (available at https://sign.moveon.org/petitions/we-stand-with-the-debt-box), signed by over 3,500 U.S. node/token holders of DEBT Box. By contrast, in what the SEC persistently calls a "sprawling fraud," the SEC has presented no "investor" witness statement, except for the discredited declaration of Andrew Michael Johnson.  *See* MTD at 17-18.

## II.     THE *EX PARTE* TRO SHOULD BE DISSOLVED BECAUSE IT WAS NOT ISSUED IN ACCORDANCE WITH APPLICABLE PROCEDURAL LAW.

As discussed in the Supplemental Memorandum (ECF No. 163), under Rule 65(b)(2) of the Federal Rules of Civil Procedure, the movant for the TRO was required, unless it obtained consent from adverse parties, to request a preliminary injunction hearing within 28 days of the issuance of the TRO—Supp. Mem. at 3-4.  The SEC failed to do either—that is, obtain consent or

9

request a preliminary injunction hearing.[5]

The SEC's principal argument is that Defendants and Relief Defendants consented to the post-28-day extensions by not objecting. Opp. at 17-20. The SEC provides no legal authority for that burden-shifting position. But that is, of course, not surprising, as the Supreme Court in *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 442 (1974), explained that "Rule 65(b) does not place upon the party against whom a temporary restraining order has issued the burden of coming forward and presenting its case against a preliminary injunction." The TRO should be dissolved on this ground as well.

### III. THE SEC ALSO IMPROPERLY ISSUED NUMEROUS *EX PARTE* ADMINISTRATIVE INVESTIGATIVE SUBPOENAS.

The SEC issued numerous *ex parte* administrative investigative subpoenas related to this action, instead of serving Fed. R. Civ. P. 45 subpoenas that the Court had authorized in the *ex parte* TRO. *See* MTD at 22-23. This was improper. *Id*. (citing case law). In response, the SEC argues that it had the authority, based on a "majority rule," to issue such subpoenas, and that it only issued a "limited number" of administrative subpoenas. Opp. at 16-17 & n.7.

The SEC claims are again false, misleading and insufficient. *First*, notwithstanding any pre-2000 decisions cited by the SEC, the current, internal Enforcement Manual of SEC's Enforcement Division (to be followed by the SEC's staff) cautions against the practice that the SEC now claims is the "majority rule" and that the "staff should not use investigative subpoenas solely to conduct discovery with respect to claims alleged in the pending complaint." SEC,

---

[5] After the initial briefing, undersigned counsel realized that there was an important procedural question that was not addressed. And to give the SEC an opportunity to address the issue in its Opposition, which it did, counsel filed a four-page supplemental brief on the application of Rule 65(b)(2) on September 25, 2023, before the due date for the SEC's Opposition. To the extent that leave was necessary, we respectfully apologize for not seeking one in the first instance, and request that leave be granted *nunc pro tunc*.

#12465300v8\031376\0001

Division of Enforcement, Enforcement Manual at 32-33 (2017) (available at www.sec.gov/divisions/enforce/enforcementmanual.pdf). *Second*, the SEC's claim that it only issued a "limited number" of administrative investigative subpoenas is untrue. To date, at least 20 such secret administrative investigative subpoenas that are related to this civil action have been issued by the SEC. *Finally*, while the SEC claims that it will not issue any more of such subpoenas, the SEC should be ordered to produce not just the responsive documents produced by the subpoena recipients, but also all subpoenas issued by the SEC, as well as all related correspondence.

### IV. THE RECEIVER FAILED TO DISCLOSE A POTENTIAL CONFLICT OF INTEREST AND HAS FAILED TO MANAGE DLI'S ASSETS PROPERLY.

As discussed in the Motion to Dissolve, a receiver has a fiduciary duty to stakeholders and the court to protect DLI's assets. The receiver is an officer of the court, <u>not</u> an employee of the SEC. MTD at 23-24. But in this case, the Receiver (Josias N. Dewey), whose firm has a potential conflict-of-interest that he still has not fully disclosed, is serving the SEC's team as a deputized agent and has neglected his true duties as a strict fiduciary in managing DLI's assets. That is why he should be removed.

*First*, the Receiver has prioritized his efforts to assist the SEC. For example, to assist the SEC's "irreparable harm" argument in support of sustaining the TRO--a subject that is indisputably outside the Receiver's province--the Receiver provides in his Response ("RR") (ECF No. 166) that Defendants "falsely claim" that DLI's operations were transferred to the UAE by the end of May 2022, and the Receiver discloses that his team conducted historical research—that is, tracing of the alleged money flow from May 2022 onward—to substantiate that point. RR at 4 n.7. This Court should inquire why an alleged neutral fiduciary, the Receiver, would jump into the fray about the issue of "irreparable harm" and why he would retreat to the historical records from 2022 to figure out how to manage the *current* assets of DLI.

11

*Second*, the Receiver has mismanaged his current workload. For example, the Receiver failed to protect the four oil drilling rigs of DLI, which have a value of several million dollars. Counsel for Defendants provided all the requested information about the rigs almost 50 days ago, on August 14, 2023. *See* Ex. 18. In his Response, the Receiver effectively admits that these oil rigs remain left unattended and without security, subjecting them to ongoing risk of theft, loss, and vandalism (some of which have already occurred). *See* RR at 7-8. We respectfully submit that this is unacceptable and by itself establishes that the Receiver is not acting with the required "reasonable diligence" to protect the assets at issue. Separately, the Receiver also admits that it is exploring selling the rigs. But this would improperly destroy and not maintain the status quo.

*Finally*, the Receiver still has not disclosed the conflict-of-interest issue. Contrary to his claim, the Receiver did not explain the issue "weeks ago." RR at 5. Rather, during a Zoom call, counsel for Defendants advised counsel for the Receiver that this was a serious issue and that more information needed to be provided. The Receiver agreed and promised additional information. But he has instead explained nothing. Also, the Receiver's argument that there is no conflict is puzzling, as he admits that his law firm previously represented a client that was "adverse to Defendant Western Oil" and admits that Exhibit 21 shows that the Receiver's "former client was an adverse counterparty in a prior transaction with certain Defendants in this case." RR at 5. As DLI's fiduciary, more disclosure is needed.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the opening and supplemental memorandums, Defendants and Relief Defendants' Motion to Dissolve should be granted in full.

#12465300v8\031376\0001

Respectfully submitted,

**KUNZLER BEAN & ADAMSON, PC**

Matthew R. Lewis
Taylor J. Smith

**MORRISON COHEN LLP**

/s/ *Jeffrey D. Brooks*
Jason P. Gottlieb (admitted pro hac vice)
David E. Ross (admitted pro hac vice)
Jeffrey D. Brooks (admitted pro hac vice)
Alexander R. Yarm (admitted pro hac vice)

*Attorneys for Defendants Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, Roydon B. Nelson, and Relief Defendants Business Funding Solutions, LLC; Blox Lending, LLC; The Gold Collective LLC; and UIU Holdings, LLC*

13