Romaine C. Marshall (9654)
Jose A. Abarca (12762)
Jonathan E. Schmalfeld (admitted *pro hac vice*)
POLSINELLI PC
2825 E Cottonwood Pkwy, Suite 500
Salt Lake City, UT  84121
Telephone: (801) 999-3504
rmarshall@polsinelli.com
jabarca@polsinelli.com
jschmalfeld@polsinelli.com

*Attorneys for Defendants iX Global, LLC,*
*Joseph A. Martinez, and Travis Flaherty*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>vs.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah | **DEFENDANTS IX GLOBAL, LLC, JOSEPH A. MARTINEZ, AND TRAVIS FLAHERTY'S RULE 12(b)(6) MOTION TO DISMISS**<br><br>Case No. 2:23-cv-00482-RJS-DBP<br>Chief Judge Robert J. Shelby<br>Magistrate Judge Dustin B. Pead |

limited liability company; BRENDAN J.
STANGIS, an individual; and MATTHEW D.
FRITZSCHE, an individual,

       Defendants,

ARCHER. DRILLING, LLC, a Wyoming
limited liability company; BUSINESS
FUNDING SOLUTIONS, LLC, a Utah
limited liability company; BLOX LENDING,
LLC, a Utah limited liability company;
CALMFRITZ HOLDINGS, LLC, a Utah
limited liability company; CALMES & CO,
INC., a Utah corporation; FLAHERTY
ENTERPRISES, LLC, an Arizona limited
liability company; IX VENTURES FZCO, a
United Arab Emirates company; PURDY
OIL, LLC, a Nebraska limited liability
company; THE GOLD COLLECTIVE LLC,
a Utah limited liability company; and UIU
HOLDINGS, LLC, a Delaware limited
liability company,

       Relief Defendants.

Defendants iX Global, LLC ("iX Global"), Joseph A. Martinez ("Mr. Martinez"), and Travis Flaherty (collectively, "iX Global Defendants"), pursuant to Federal Rule of Procedure 12(b)(6), file this Motion to Dismiss Plaintiff's claims against them for alleged violations of Section 5(a) and (c) of the Securities Act (Count I), Section 15(a)(1) of the Exchange Act (Count VI), and Equitable Disgorgement (Count VII).

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

   I.   Blockchain Background ............................................................................................ 2

   II.   DEBT Software Licenses ......................................................................................... 3

   III.   The SEC's Approach to Digital Assets ................................................................... 4

ARGUMENT ....................................................................................................................... 6

   I.   Rule 12(b)(6) Motion to Dismiss Standard ............................................................. 6

   II.   Software Licenses Are Not Investment Contracts .................................................. 7

        A.   Investment Contract Law ............................................................................. 7

        B.   Investment Contracts Require an "Investment" and "Contract" Apart from a
           Pure Asset Sale ........................................................................................... 10

        C.   The SEC Has Failed to Plead Any Ongoing Contractual Obligation
           Accompanying the Asset Sales at Issue...................................................... 12

        D.   The Breadth of Securities Laws is Not so Limitless to Cover <u>All</u> Investments ........ 14

   III.   The Major Question Doctrine Forecloses the SEC's Newfound Attempt to Regulate
        Through Enforcement the Digital Asset Industry Using 1930's Securities Law
        Language ................................................................................................................ 16

        A.   The SEC's Approach to the Digital Asset Industry................................... 16

        B.   The SEC Does Not Have Congressionally Granted Authority to Prosecute
           Mining Software License Providers ........................................................... 18

   IV.   Punishing the iX Global Defendants for Failing to Register with the SEC Products
        Which Have Never Been Required to be Registered Before Violates Fair Play and
        Due Process ............................................................................................................ 22

CONCLUSION.................................................................................................................... 23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................6, 7

*Alvarado v. KOB–TV, L.L.C*,
    493 F.3d 1210 (10th Cir. 2007) .......................................................................................2

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................................6

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023)...........................................................................................19, 20

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012)......................................................................................................23

*In re Coinbase, Inc*,
    Case 23-1779 (3rd Cir. April 24, 2023) ........................................................................22

*Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*,
    680 F.3d 1194 (10th Cir. 2011) .....................................................................................6

*Continental Marketing Corp. v. SEC*,
    387 F.2d 466 (10th Cir. 1967) ..................................................................................8, 12

*Dahl v. English*,
    578 F.Supp. 17 (N.D. Ill. 2983) ..................................................................................15

*Estate of Ronquillo ex rel. Estate of Sanchez v. City & Cnty. of Denver*,
    720 F. App'x 434 (10th Cir. 2017) ..............................................................................12

*Faircloth v. Finesod*,
    938 F.2d 513 (4th Cir. 1991) .......................................................................................15

*Faircloth v. Jackie Fine Arts, Inc.*,
    682 F. Supp. 837 (D.S.C. 1988), aff'd in part, rev'd ...................................................15

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)......................................................................................................22

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)...................................................................................7, 19, 20

*Grayscale Investments, LLC v. SEC*,
    Case No. 22-1142 (D.C. Cir. Aug. 29, 2023) .........................................................17

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) ...............................................................................15

*Hoctor v. U.S. Dept. of Agriculture*,
    82 F.3d 165 (7th Cir. 1996) ...................................................................................16

*Int' Bhd. Of Teamsters v. Daniel*,
    439 U.S. 551 (1979).................................................................................................10

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ..................................................................................18

*Lewis v. Creasey Corp.*,
    248 S.W. 1046 (Ky. Ct. App. 1923) ..........................................................................8

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986).................................................................................................18

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982)...........................................................................................11, 14

*Mbaku v. Carrington Mortg. Servs., LLC*,
735 F. App'x 533, 536 (10th Cir. 2018) (unpublished).................................................2

*McGill v. American Land and Exploration Company*,
    776 F.2d 923 (10th Cir. 1985) ............................................................................9, 10

*McVay v. W. Plains Serv. Corp.*,
    823 F.2d 1395 (10th Cir. 1987) ................................................................................9

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019)................................................................................................8

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ...............................................................................11, 13

*People v. Steele*,
    36 P.2d 40 (Cal. Dist. Ct. App. 1934)........................................................................8

*Resol. Tr. Corp. v. Stone*,
   998 F.2d 1534 (10th Cir. 1993) (abrogated on other grounds by *Boyle v.
   United States*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009)) ................................13

*Reves v. Ernst & Young*,
   494 U.S. 56 (1990)........................................................................................................14, 16, 23

*Risley, et al. v. Universal Navigation, Inc.*,
   Case No. 1:22-cv-02780, Dkt. #90, slip op. (S.D.N.Y. Aug. 29, 2023) ............................3, 21

*SEC v. Belmont Reid & Co.*,
   794 F.2d 1388 (9th Cir. 1986) ...............................................................................................13

*SEC v. Binance Holdings Limited, et al.*,
   Case No. 23-1599 (D.D.C. June 5, 2023) ...............................................................................18

*SEC v. Coinbase*,
   Case No. 1:23-cv-04738, Dkt. #59 (S.D.N.Y. Aug. 11, 2023).....................................14, 18, 19

*SEC v. Edwards*,
   Case No. 02-1196, 2003 WL 21498455 (U.S. June 26, 2023) ...........................................11, 13

*SEC v. Kik Interactive Inc.*,
   492 F.Supp.3d 169, 179 (S.D. N.Y. 2020) ..............................................................................10

*SEC v. LBRY, Inc.*,
   Case No. No. 1:21-cv-260-PB (D. N.H. Jan 30, 2023)............................................................10

*SEC v. Life Partners, Inc.*,
   87 F.3d 536 (D.C. App. 1996) .................................................................................................13

*SEC v. Ripple Labs, Inc.*,
   Case No. 1:20-cv-10832, 2023 WL 4507900 (S.D.N.Y. July 13, 2023)............................10, 12

*SEC v. Telegram*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)................................................................................10, 17

*SEC v. Terraform Labs Pte., Ltd.*,
   Case No. 23-cv-1346 (JSR), 2023 WL 4858299 (S.D. N.Y. July 31, 2023)..........................20

*SEC v. Wahi*,
   Case 2:22-cv-01009-TL, Dkt. #59 (W.D. Wash. Feb. 6, 2023)...............................................17

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)....................................................................7, 8, 9, 10, 11, 12, 13, 14, 16

*SEC v. Scoville*,
   913 F.3d 1204 (10th Cir. 2019) ........................................................................14

*Sessions v. Dimaya*,
   584 U.S. —, 138 S. Ct. 1204 (2018) (Gorsuch, J., concurring in part) ...................22

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
   253 F. Supp. 359 (S.D.N.Y. 1966) ..............................................................13, 15

*Soto for Estate of Jimenez v. Bd. Of Cty. Comm'rs of Caddo Cty.*,
   748 F. App'x 790 (10th Cir. 2018) (unpublished) ...............................................7

*State v. Gopher Tire & Rubber Co.*,
   177 N.W. 937 (Minn. 1920)...........................................................................7

*United States Telecom Assn. v. FCC*,
   855 F. 3d 381 (CADC 2017) (Kavanaugh, J., dissenting from denial of reh'g
   en banc) .................................................................................................19

*In re Voyager Digit. Holdings, Inc.*,
   649 B.R. 111 (Bankr. S.D.N.Y. 2023)................................................................6

*West Virginia v. EPA*,
   142 S.Ct. 2587 (2022)..................................................................................19

*Woodward v. Terracor*,
   574 F.2d 1023 (10th Cir. 1978) ...............................................................14, 15

**Statutes**

5 U.S.C. § 706.................................................................................................18

7 U.S.C. § 9....................................................................................................7

15 U.S.C. § 57a...............................................................................................7

15 U.S.C. § 77b(a)(1).........................................................................................7

**Other Authorities**

17 CFR § 240.3a68-4........................................................................................7

Black's Law Dictionary (11th ed. 2019)................................................................16

FRCP 12(b)(6) ................................................................................................6

## **INTRODUCTION**

In this case the SEC must demonstrate that software is an investment contract.  Even with the benefit (or burden) of almost 100 years of securities law jurisprudence it simply cannot do it. As explained, by even attempting to demonstrate that software is an investment contract the SEC strains credibility since doing so would require this Court to cast an infinitely wide net over all asset sales, regardless of their form, so long as the buyer has some subjective profit motive behind the purchase.

The stage has been set.  This action is one of many happening in and out of courtrooms across the country, initiated by the SEC in a power grab – which power Congress must first authorize – over a multi-national, multi-trillion-dollar industry that is redefining how the internet operates.  To be sure, this case is complex; it involves cryptographic technologies and an emerging body of law attempting to awkwardly classify technologies under existing and proposed interpretations of securities laws.

But there are three reasons which, as a simple matter of law, this case should be dismissed: (1) The SEC has failed to allege a contractual agreement for ongoing efforts of some third party and/or contractual right to profits from those ongoing efforts; (2) the SEC does not have the Congressionally vested authority to expand the term "investment contract" to encompass virtually the entire digital asset industry; and (3) it violates due process to punish the iX Global Defendants for actions which no one in the history of securities law jurisprudence has been held liable for.

Accordingly, the iX Global Defendants respectfully request this Court dismiss this case against them, and for all further relief which this Court deems is just and proper.

## FACTUAL BACKGROUND[1]

### I.   Blockchain Background

Digital assets, often referred to as "cryptocurrencies," "crypto assets," and "tokens," are essentially computer code entries on "blockchain" technology that record the owners' rights to access an application or service on a computer network.  Compl. ¶ 41.

Blockchains often require nodes to operate.  Appx. A, # 3-A.  A node is a piece of software that connects to other nodes in the blockchain to create a network.  *Id*.  Nodes are where data is stored, received, and transmitted.  *Id*.  They are crucial to network security and integrity.  *Id*.  Each blockchain has a different protocol or way of validating transactions.  *Id*.  The Bitcoin protocol is different to that of Ethereum and has a different means of 'consensus'.  *Id*.  Thus, what a node does in any given blockchain protocol will vary.  *Id*.  As described by the SEC:

> Proof of work, the mechanism used by the Bitcoin blockchain, involves computers, known as "validator nodes," attempting to "mine" a "block" of transactions, in part by solving a complex mathematical problem. The first miner to successfully solve the problem earns the right to update the blockchain and is rewarded with the blockchain's native crypto asset. Proof of stake, the consensus mechanism currently used by the Ethereum blockchain, involves the blockchain protocol selecting block validators from crypto asset holders who have committed or "staked" a minimum number of crypto assets as part of the validation process.

---

[1] In a Rule 12(b)(6) Motion to Dismiss, the Court is permitted to consider the well-pleaded allegations in the Complaint, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Mbaku v. Carrington Mortg. Servs., LLC*, 735 F. App'x 533, 536 (10th Cir. 2018) (unpublished) (citation omitted); *see also Alvarado v. KOB–TV, L.L.*C., 493 F.3d 1210, 1215 (10th Cir. 2007) ("[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."). For the Court's convenience and ease of reference, attached to this brief is an appendix listing citations to documents incorporated into the Complaint, agency statements, legislation, and other matters of public record which the Court may take judicial notice of.

Appx. A, # 1-A ¶ 68.  There is no set way to perform the consensus function in any particular blockchain. *Id.* ¶ 364 (stating that the Solana blockchain "aims to improve blockchain scalability and achieve high transaction speeds by using a combination of consensus mechanisms.").

The eleven DEBT Box tokens listed in the SEC's Complaint are BEP-20 tokens, created on the Binance Blockchain. Compl. ¶ 3. This is similar to ERC-20 tokens which are the equivalents built on the Ethereum blockchain. As recently explained by a Southern District of New York Court:

> Issuers who create ERC-20 tokens are known as "developers"; each of them theoretically could register their tokens with the Securities and Exchange Commission (the "SEC"), but such registrations are few, as Congress and the court have yet to make a definitive determination as to whether such tokens constitute securities, commodities, or something else.

*Risley, et al. v. Universal Navigation, Inc.,* Case No. 1:22-cv-02780, Dkt. #90, slip op. at 6 (S.D.N.Y. Aug. 29, 2023).  The BEP-20 protocol allows for creation of customizable tokens.  The owner of those tokens has the ability to transfer them, which is recorded on the Binance Blockchain.  Compl. ¶¶ 43-44.

## II.   DEBT Software Licenses

The Decentralized Eco-Friendly Blockchain Technology (or "DEBT") is the blockchain project at issue in this litigation, created by Digital Licensing, Inc *d/b/a* DEBT Box ("DEBT Box"). The DEBT token is the central utility token for the DEBT Box ecosystem of tokens, all of which are tied to various real world asset projects ("DEBT Box Tokens").  Appx. A, # 3-C.  For example, the Digital Gold (or DLG) token is tied to gold mining in the Southwestern United States and in Ghana, West Africa.  Appx. A, # 3-D.

All DEBT Box Tokens are currently BEP-20 tokens, meaning they are tokens built on the BNB Smart Chain and which utilize BNB validators to perform certain validating functions

required for transfer of the tokens.  Compl. ¶ 43; Appx. A, # 4-A.  There are two ways for individuals to obtain DEBT Box Tokens: (1) they can purchase the tokens on decentralized exchanges such as PancakeSwap; or (2) the individual can purchase a license to use the software required to "synthetically mine" the DEBT Box Tokens.  Appx. A, # 3-N.

DEBT Box does what is called "synthetic mining" whereby all users who have the applicable software running on a machine with the necessary computing power and connected to the internet at the applicable period are awarded the network's native currency.  Appx. A, # 3-O. This creates a system whereby users can demonstrate the ability to participate in network validation if called upon, without the high energy demand of traditional proof-of-work mining.

Notably, the purchase of the DEBT Box node license software does not entitle users to any DEBT Box Tokens. Appx. A, ## 3-C through 3-M.  In the same way the purchase of a Bitcoin mining machine does not entitle the buyer to any Bitcoin tokens.  Compl. ¶ 45.  Instead, a user is required to have the DEBT Box node license software running on a computer connected to the internet and participate in synthetic mining to obtain token rewards.  Appx. A, ## 3-C through 3-M.

## III.    The SEC's Approach to Digital Assets

The SEC's stated mission is maintaining fair, orderly, and efficient markets, and facilitating capital formation. Appx. A, # 1-B.  Until July 2017, the SEC issued no guidance on how digital assets fit into this mission, and even then, merely concluded that the sale of one particular digital asset was an investment contract and that each "particular transaction" would need to be analyzed to determine if it "involves the offer and sale of a security."  Appx. A, # 1-C.  The current Chair of the SEC, Gary Gensler, has himself admitted that "trading in these crypto-assets do not have a

regulatory framework, either at the SEC or our sister agency the Commodity Futures Trading Commission" ("CFTC") and that "it's only Congress that can really address" this needed regulatory framework. Appx. A, # 2-A.  This is an issue echoed by former SEC Chair Mary Jo White when she noted "[o]ne key regulatory issue is whether blockchain applications require registration under existing [SEC] regulatory regimes …" Appx. A, # 1-D.  Indeed, Congress is attempting to address this regulatory gap through legislation such as the Financial Innovation and Technology ("FIT") for the 21st Century Act in the House of Representatives and the Responsible Financial Innovation Act ("RFIA") in the Senate.  Appx. A, ## 2-B & 2-3.  Neither of these bills give complete oversight over the industry or the issuance of digital assets to the SEC. *Id.*

Under previous administrations, the SEC brought limited enforcement actions against digital asset issuers; primarily those who participated in "ICOs."  Even when tokens were sold in part through an ICO, senior officials at the SEC continued to take the position that:

> [P]utting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions. And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value.

Appx. A, # 1-E.  The same official stated that a "token…all by itself is not a security." *Id.* The SEC Staff later reiterated the view of senior SEC officials that Ether is not a security in a response during the S-1 filing process for Coinbase, Inc. Appx. A, # 1-F.  However, despite there being no changes of securities laws in the interim, the SEC has dramatically increased its enforcement actions under the current administration.  In 2022, the SEC brought a total of thirty cryptocurrency related enforcement actions, which was a 50% increase over the previous year. Appx. A, # 4-C. This has only increased in 2023, with the SEC recently instituting litigation against Coinbase, Inc.,

an entity that the SEC approved to operate as a public company in 2021 over conduct which Coinbase was conducting in 2018 and clearly disclosed in its registration process.  Appx. A, # 1-G.

The CFTC and SEC both have claimed various assets are both commodities and securities, over which each agency has the exclusive jurisdiction to regulate. Appx. A, # 1-A (SEC Claiming BUSD token is a digital asset security); #4-H (CFTC claiming BUSD token is a digital asset commodity). Something that a court in New York noted leads to an environment where "[r]egulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities."  *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023).

## **ARGUMENT**

## I.     **Rule 12(b)(6) Motion to Dismiss Standard**

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the Rule 12(b)(6) analysis is typically confined to the plausible allegations in a complaint, the court may also consider "the attached exhibits and documents incorporated into the complaint by reference." *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011) (citation omitted).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. 678.  Before accepting allegations as true, the court must "first discard allegations in the complaint that are 'legal conclusions' or

'threadbare' recitals of the elements of a cause of action, supported by mere conclusory statements." *Soto for Estate of Jimenez v. Bd. Of Cty. Comm'rs of Caddo Cty*., 748 F. App'x 790, 793 (10th Cir. 2018) (unpublished) (brackets omitted) (quoting *Iqbal,* 556 U.S. at 678).

## II.   Software Licenses Are Not Investment Contracts

### A.      Investment Contract Law

While there are certain narrow exceptions where Congress has statutorily provided joint jurisdiction over certain products with both the CFTC and SEC,[2] generally the CFTC has authority over commodities and the SEC has exclusive authority over securities. *See* 7 U.S.C. § 9. Meanwhile, the Federal Trade Commission ("FTC") has exclusive jurisdiction with respect to unfair or deceptive acts under the FTC Act.  *See* 15 U.S.C. § 57a. Securities are defined as including stocks, bonds, and as appliable to the instant case any "investment contract" which is an undefined term in the Securities Act of 1933.  *See* 15 U.S.C. § 77b(a)(1).  It is outside the power of the SEC to regulate, through rulemaking or enforcement actions, matters which do not involve securities. *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 161 (2000). ("an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress").

Under federal law, the United States Supreme Court's 1946 decision in *SEC v. W.J. Howey Company* is still regarded as the definitional case for "investment contract."  328 U.S. 293 (1946). In *Howey*, the Supreme Court acknowledged the term "investment contract" was undefined in the Securities Act and the Exchange Act and determined that the meaning of "investment contract" has been "crystalized" by "prior judicial interpretations."  *Id*. at 298 (citing *State v. Gopher Tire*

---

[2] *See* 17 CFR § 240.3a68-4.

& *Rubber Co*., 177 N.W. 937 (Minn. 1920).  In using state law guidance, the *Howey* decision

abided by the canonical rule that undefined terms in statutes are given their "ordinary meaning at

the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019)

(quotations and alterations omitted).

 The language of the *Howey* opinion that is frequently used in other courts' examination of

potential "investments contracts" is "a contract, transaction or scheme whereby a person invests

his money in a common enterprise and is led to expect profits solely from the efforts of the

promoter or a third party." *Id*. at 298–299.  Consequently, courts typically look to these elements

in such an examination: 1) an investment; 2) in a common enterprise; 3) with profits to come solely

from the efforts of others.  *Id*. at 301.

 The contractual obligation to distribute later profits is what distinguishes an investment

contract from a mere asset sale.  *See People v. Steele*, 36 P.2d 40, 42 (Cal. Dist. Ct. App. 1934)

("under the contract now before us, the complaining witness could not expect any return for his

money on account of anything done by others nor because of his investment alone.  His profit must

accrue, if at all, from operations conducted himself…"); *Lewis v. Creasey Corp*., 248 S.W. 1046,

1049 (Ky. Ct. App. 1923) (holding the term "investment contract" did not extend to "contracts

containing mutual obligations, such as are daily entered into commercial life, and from which a

profit can only be reaped by the uses which the investor alone makes of them.").

 This is what separates a sale of beavers from a sale of beavers with a promise to raise those

animals for later sale at a profit.  *See Continental Marketing Corp. v. SEC*, 387 F.2d 466, 468-71

(10th Cir. 1967). Indeed, the SEC itself argued in *Howey* "the Commission's proffered definition

of an 'investment contract,' which ha[s] therefore been the established judicial definition, as

including any **contractual arrangement** for the investment of money in an enterprise with the

expectation of profit through the efforts of promotors." <u>Br. for the SEC</u>, *SEC v. W.J. Howey Co*.,

Case No. 843, 1946 WL 50582, at *9 (U.S. Apr. 17, 1946) (emphasis added).

The Supreme Court itself has never spoken directly to the issue of "commonality," nor

defined what might constitute a "common enterprise" for the purposes of a *Howey* analysis. While

Federal Circuits consistently apply the *Howey* test when called upon to determine the existence of

an "investment contract," their interpretation of the commonality element varies. The Tenth

Circuit rejects horizontal commonality as a requirement but does not go so far as to require vertical

commonality, instead relying on an "economic reality" analysis also rooted in the *Howey* decision.[3]

In *McGill v. American Land and Exploration Company*, the Court explained that a

transaction that:

> is purely commercial in nature (for example, a commercial loan or a sale of assets)
> . . . does not give rise to a 'common enterprise' or a 'security.' If, on the other hand,
> a transaction is in reality an investment (that is, a transaction of the type in which
> stock if often given). . . then it creates a 'common enterprise' and gives rise to a
> 'security' falling within the ambit of the 1933 and 1934 Securities Acts."

776 F.2d 923, 925 (10th Cir. 1985); *see also McVay v. W. Plains Serv. Corp*., 823 F.2d 1395, 1399

(10th Cir. 1987) (receipt of interest not directly tied to profitability is not a security and "lack[ed]

any of the basic attributes of true stock.").

---

[3] Note, that the SEC has taken the position that neither vertical or horizontal commonality is required and instead "does [not] view a 'common enterprise' as a distinct element of the term 'investment contract.'" Appx. A, # 1-H, at N. 11. No court has ever supported this attempt by the SEC to turn the three-part *Howey* test into a two-part test of the SEC's own administrative making, nor has the SEC ever attempted formal rule making on this issue as it would immediately be struck down as an unconstitutional overreach completely inconsistent with Congressional law and judicial interpretation of the same.

The *McGill* Court followed standing Supreme Court precedent that, in any investment contract case, the root analysis is whether the instrument(s) in question resembles substantially the characteristics of a security such as "the type in which stock is often given" in which the investor is contractually entitled to some future value or returns. *McGill,* 776 F.2d at 925, *see also Int' Bhd. Of Teamsters v. Daniel*, 439 U.S. 551, 559-60 (1979).

### B.   Investment Contracts Require an "Investment" and "Contract" Apart from a Pure Asset Sale

The case law is clear that digital assets, by themselves, are not securities. *SEC v. Telegram*, 448 F. Supp. 3d 352, 366 (S.D.N.Y. 2020) (clarifying that a digital asset is not a security nor is a purchase agreement for that digital asset, but rather the entire scheme that comprised the agreements along with accompanying understandings of purchasers is what was determined to be a security); *SEC v. Ripple Labs, Inc*., Case No. 1:20-cv-10832, 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ("XRP, as a digital token, is not in and of itself a "contract, transaction[,] or scheme" that embodies the *Howey* requirements of an investment contract. Rather, the Court examines the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP."); *SEC v. LBRY, Inc*., Case No. No. 1:21-cv-260-PB, Transcript of Motion Hearing, at 24:23-26:21 (D. N.H. Jan 30, 2023) (clarifying that previous ruling was not that tokens themselves were securities as an issue not litigated and stating "there are a lot of tokens that have consumptive use that maybe ultimately should be regulated as a commodity rather than as a security.  But that's not me.  That's not my job.").[4]

---

[4] In *SEC v. Kik Interactive Inc*., the Court held that despite the terms of use disclaiming against any ongoing obligation after disbursement of the digital assets at issue, the common enterprise prong under *Howey* was still met under the Second Circuit horizontal commonality test. 492 F.Supp.3d 169, 179 (S.D. N.Y. 2020).  However, in *Kik*, there were contractual agreements to use

Instead, whether it be software, beavers, orange groves, or condos, every appellate level court has determined that an ongoing contractual obligation is required for there to be an investment contract. *See Noa v. Key Futures, Inc*., 638 F.2d 77, 79 (9th Cir. 1980) (sale of silver bars with no ongoing obligation is not an "investment contract"); *Marine Bank v. Weaver*, 455 U.S. 551, 559-60 (1982) (no investment contract where business agreement was not "within the ordinary concept of security" and did not include contractual right to receive future profits). Indeed, until a recent change in leadership at the SEC, the SEC itself has taken this very position in its own filings and releases, stating "without any collateral arrangements with the seller or others, [an asset sale] does not involve the offer of a security." Appx. A, # 1-I; *see also* Brief for the SEC, *SEC v. Edwards*, Case No. 02-1196, 2003 WL 21498455, at *17 (U.S. June 26, 2023) ("Thus, the very term 'investment *contract*' makes clear that instruments of that name include those in which a return—whether labeled income or profit—is promised in a contract.") (emphasis in original); <u>Brief for the SEC</u>, *SEC v. W.J. Howey Co*., Case No. 843, 1946 WL 50582, at *9 (U.S. Apr. 17, 1946).

Prior to its foray into enforcement of digital assets, the SEC has never said that an "investment contract" just ***can*** include an ongoing contractual obligation. Instead of this new tortured reading of the term, the SEC said what the law was in its *Edwards* briefing in the exact way that iX Global Defendants are arguing it now: and investment contract ***requires*** a promise of return, whether labeled income or profit, "in a contract."

---

pre-sale proceeds to develop a minimum viable product, which the Court held were integrated with the sales without contractual obligations. *Id*. at 181-182. Additionally, as stated above, the Tenth Circuit does not follow the Second Circuit's horizontal commonality test, and *Kik* did not analyze the issue as to whether the tokens, standing alone and divorced of that contractual agreement, would constitute an investment contract.

**C.   The SEC Has Failed to Plead Any Ongoing Contractual Obligation Accompanying the Asset Sales at Issue**

Here, the SEC does not point to a single legally enforceable post-sale obligation which could turn an asset sale into a securities transaction. *See Ripple*, 2023 WL 2507900, at *7 (n. 11). The SEC alleges that individuals were sold node license software, which like any software, is not in-and-of-itself an investment contract any more than a beaver was an investment contract in *Continental Marketing* or an orange grove was an investment contract in *Howey*. While the SEC alleges that depending on the type of software license purchased, purchasers "became entitled to receive one or more of eleven DEBT Box crypto assets" (Compl. ¶ 47), this is an alleged fact which is directly contradicted by the documents incorporated into the complaint by reference. *See Estate of Ronquillo ex rel. Estate of Sanchez v. City & Cnty. of Denver*, 720 F. App'x 434, 437 (10th Cir. 2017) (holding that on a motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true "except when directly contracted" by documents incorporated into the complaint).

In all the documentation incorporated by reference into the SEC's Complaint, there is not a single document which stated that mere ownership of a software license entitles a user to anything other than the use of that software. Each of the software licenses described on the DEBT Box website and incorporated by reference into the SEC's Complaint explicitly state that it is not the purchase of node license which entitles a user to digital tokens, but instead operating a node which allows users to earn a "reward[] for their blockchain support with [associated] tokens." Appx. A, ## 3-C through 3-M

While the SEC alleges that individuals made certain public statements regarding their intent to "increase the value" of the ***tokens***[5] (and not the software licenses themselves) (Compl. ¶49), they do not point to a single enforceable or advertised contractual obligation for some ongoing efforts as is required to convert the sale of an ordinary asset or commodity into a "investment contract" scheme.  In fact, the opposite is true based on the evidence incorporated by reference into the Complaint, with the DEBT Council disclaiming any obligation for ongoing work on behalf of themselves or any third party. Appx. A, # 3B, at Sections 7, 12(3), 12(6)(3) ("No one is contractually or legally obligated to continue to participate in any applicable blockchain and may cease participation if they determine that such participation is no longer profitable, if they are prevented from doing so by government or regulatory agencies, or for any other reason"), and 12(7).

The SEC has not, and cannot, point to any ***contractual*** services agreement similar to payphone services agreement (as was the case in *Edwards*), beaver ranching agreement (as was

---

[5] Even if there were allegations that the iX Global Defendants violated securities law through the unregistered sale of tokens as opposed to software, which is not alleged, that still would not be an investment contract as the tokens are tied to the market forces of the commodities which underpin those tokens.  *See Noa v. Key Futures, Inc*., 638 F.2d 77, 79 (9th Cir. 1980) (sale of silver bars with no ongoing obligation is not an "investment contract").  While a promoter who touts his experience is a factor to consider on this element of the *Howey* Test, it is not determinative.  *Noa*, 638 F.2d at 79.

When the value of a particular investment is dependent primarily on market forces versus the efforts of the promotors, the *Howey* Test is not satisfied.  *Id*., *see also SEC v. Life Partners, Inc.*, 87 F.3d 536, 545-47 (D.C. App. 1996) (explaining that *Howey* Test requires profits to be derived "predominantly" from the efforts of others); *SEC v. Belmont Reid & Co*., 794 F.2d 1388, 1391 (9th Cir. 1986) (same for gold mining); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc*., 253 F. Supp. 359, 366-67 (S.D.N.Y. 1966) (same for sugar futures); *Resol. Tr. Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993) (holding that special interest payments as opposed to dividends tied to profitability do not meet the "profits" prong of Howey) (abrogated on other grounds by *Boyle v. United States*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009)).

the case in *Continental Mktg. Corp.*) or orange grove cultivation agreement (as was the case in *Howey*).  Instead, the SEC points to vague statements about the intentions of the DEBT Council. As aptly stated under Tenth Circuit law:

> The only contractual agreement between [buyers] and [promotor] was the [asset sales contract]. [Promotor] was under no contractual obligation to the [buyers] other than to deliver title once purchase terms were met. Unlike *Howey*, [promotor] was not under any collateral management contract with the purchasers of its land. In short, the record in the instant case simply shows the purchase by the [buyers] of [an asset]. Though it is possible that the [buyers] may have a common-law remedy against the defendants arising out of the purchase of [assets], such does not mean that the transaction itself is an "investment contract," thereby invoking the provisions of the federal securities laws.

*Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978); *see also SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) (holding that advertising for an internet traffic service ***and*** contractual right for share of advertising profits created an investment contract scheme).  Here, as in *Woodward*, without some sort of contractual ongoing obligation which the SEC can point to, this case must be dismissed.  Regardless of how much fraud the SEC alleges (which is not alleged against the iX Global Defendants and, if true, would make the iX Global Defendants victims as much as all other buyers of the node license software) this is not a ***securities law*** case.[6]

### D.    The Breadth of Securities Laws is Not so Limitless to Cover <u>All</u> Investments

As the Supreme Court has stated, "Congress enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment. Congress did not, however, 'intend to provide a broad federal remedy for all fraud.'"  *Reves v. Ernst & Young*,

---

[6] For additional analysis as to the necessity of a contractual arrangement for there to be an "investment contract" under securities law, *see* Brief of Securities Law Scholars as *Amici Curiae* in Support of Coinbase's Motion for Judgment on the Pleadings, *SEC v. Coinbase*, Case No. 1:23-cv-04738, Dkt. #59 (S.D.N.Y. Aug. 11, 2023).

494 U.S. 56, 61 (1990) (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982).  By reading "contract" out of the term "investment contract" the SEC would turn securities laws into a broad federal remedy for all frauds, something the Supreme Court and common sense says was not the intent behind the securities acts.

"The mere presence of a speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the securities acts.  In a sense anyone who buys or sells a horse or an automobile hopes to realize a profitable 'investment.'"  *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc*., 253 F.Supp. 359, 367 (S.D. N.Y. 1966). *See also Dahl v. English*, 578 F.Supp. 17 (N.D. Ill. 2983) (sale of art in lithographic plate form not a securities transaction despite allegations of pooling of funds and subjective investment intent by purchasers); *Faircloth v. Jackie Fine Arts, Inc.,* 682 F. Supp. 837, 845 (D.S.C. 1988), aff'd in part, rev'd in part sub nom. *Faircloth v. Finesod,* 938 F.2d 513 (4th Cir. 1991) (same for sale of art master as a reproduction plate); *Woodward*, 574 F.2d 1023 (land sale not an investment contract despite advertisements for profit potential). Instead, what is and always has been required, is an "examination of the economic reality of each transaction…and the nature of the investment and ***the collateral agreements***." *Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989) (emphasis added).

In a recent hearing before Congress, SEC Chair Gary Gensler was asked whether the purchase of Pokémon cards constitutes a securities transaction.  Appx. A, # 2-D.  He responded that of course it is not.  *Id*.  However, when asked if the same exact Pokémon card was tokenized on the blockchain and sold, he responded he would need more information before making a determination as to whether that would be a securities transaction.  *Id*.  This demonstrates the

absurdity of the SEC's position.  As fellow SEC Commissioner Hester Peirce has stated in response to a separate rulemaking proposal: "[t]hank you, Chair Gensler.  The best thing I can say for this proposal is that it serves, perhaps unintentionally, as a mirror reflecting the Commission's distorted thinking.  In that mirror, you will see the Commission's attitude toward technology, which is not neutral, but hostile."  Appx. A, # 1-J.

Congress granted the SEC broad authority over "any instrument that might be sold as an investment" but it did not grant the SEC authority over all investments.  *Reves*, 494 U.S. 61 (emphasis added); *see also* Black's Law Dictionary (11th ed. 2019), *instrument* (defining an "instrument" as "[a] written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate.").  To rule otherwise would replace the *Howey* test with a new three-part test of: (1) an investment of money; (2) with the expectation of profit; (3) into something the SEC does not like.  Despite the SEC's wishes, that is not the law of the United States.

III.   **The Major Question Doctrine Forecloses the SEC's Newfound Attempt to Regulate Through Enforcement the Digital Asset Industry Using 1930's Securities Law Language**

A.   **The SEC's Approach to the Digital Asset Industry**

Despite repeated requests from the digital asset industry, the SEC has failed to provide any substantive rulemaking on when a digital asset or, in this case, software which can be used to collect digital assets, constitutes an "investment contract" under the federal securities laws.  This intentional lack of regulatory clarity has allowed the SEC to litigate against individual digital asset industry participants with no judicial recourse for the industry at large to challenge the agency's interpretive rules as to how digital assets fit within depression-era securities laws until after they

are sued. *See Hoctor v. U.S. Dept. of Agriculture*, 82 F.3d 165, 167 (7th Cir. 1996) ("Every governmental agency that enforces a less than crystalline statute must interpret the statute, and it does the public a favor if it announces the interpretation in advance of enforcement...").

Instead, the SEC has engaged in regulation by enforcement which "makes it difficult for industry participants to draw broader conclusions or extrapolate rules or principles from enforcement actions that, as the *Telegram* court notes, are specific to the facts of a particular project and digital asset." Appx. A, 4-D. The SEC's regulation by enforcement has been criticized as "a process designed to produce more heat than light"[7] and has been questioned by the SEC's former Chair (Appx. A, 4-E), current sitting Congressmen (Appx. A, 2-E), and current SEC Commissioners (Appx. A, 1-K) alike.

Indeed, the D.C. Circuit Court of Appeals recently released a finding that the SEC had acted arbitrarily and capriciously in denying a digital asset exchange traded product registration. *See Grayscale Investments, LLC v. SEC*, Case No. 22-1142 (D.C. Cir. Aug. 29, 2023). In the unanimous ruling, the *Grayscale* Court found "when agencies articulate legal standards on a case-by-case basis, they must justify different results reached on similar facts to lend predictability and intelligibility to agency actions, promote fair treatment, and facilitate judicial review." *Id*. at pg. 8 (internal citations and quotations omitted). The *Grayscale* Court ruled that the SEC provided inconsistent treatment of similar digital asset products and ignored obvious facts in the agency's arbitrary and capricious determination. *Id*.

---

[7] Defs.' Mot. To Dismiss, *SEC v. Wahi*, Case 2:22-cv-01009-TL, Dkt. #59, pg. 3 (W.D. Wash. Feb. 6, 2023).

This matter against the iX Global Defendants is just one of many which the SEC has brought in recent years against digital asset industry participants.  (Appx. A, 4-B).  Most notably, the SEC has recently filed lawsuits against two of the largest digital asset exchanges in the world.[8] This is all being done under the SEC's ever-changing bullseye, where a business (like Coinbase) or a digital asset (like Ether) can be blessed by SEC officials one day and have its legality questioned the next.

**B.**   **The SEC Does Not Have Congressionally Granted Authority to Prosecute Mining Software License Providers**

"Congress has given the Securities and Exchange Commission substantial power to enforce the nation's securities laws… But the Constitution constrains the SEC's powers by protecting individual rights and the prerogatives of the other branches of government."  *Jarkesy v. SEC*, 34 F.4th 446, 449 (5th Cir. 2022).  The SEC, like all administrative agencies, is a creature of Congress and "an agency literally has no power to act ... unless and until Congress confers power upon it."  *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Whether Congress conferred any particular agency with any particular power is a "relevant question[] of law" to be decided by the courts.  5 U.S.C. § 706.

One of the authors of the RFIA, Senator Cynthia Lummis, recently filed an *amicus curiae* brief in the *SEC v. Coinbase* matter arguing precisely the point raised here: the SEC has admitted it does not have the authority to regulate the digital asset industry but "seeks to circumvent the political process and commandeer that authority for itself."  Brief of United States Senator Cynthia

---

[8] *See SEC v. Binance Holdings Limited, et al*., Case No. 23-1599 (D.D.C. June 5, 2023); *SEC v. Coinbase, Inc*., Case No. 1:23-cv-04738 (S.D.N.Y. June 6, 2023).

M. Lummis, as *Amicus Curiae* in Support of Defendant, *SEC v. Coinbase*, Case No. 1:23-cv-04738, Dkt. #53 (S.D.N.Y. Aug. 11, 2023).  In the briefing, Senator Lummis stated:

> Amicus also has a special interest in upholding the Constitution's separation of powers by ensuring that federal administrative agencies do not exceed the authority conferred upon them or encroach upon Congress's ongoing legislative efforts. Amicus believes that the SEC's approach to enforcement in this case and in the crypto asset industry more broadly contravenes that separation of powers.

*Id.*

The SEC's attempt to usurp Congress's role to regulate the multi-trillion-dollar digital asset industry without clear Congressional approval is prohibited under the Major Question Doctrine. Congress must speak clearly if it wishes to assign to an agency any decisions of vast "economic and political significance."  *See West Virginia v. EPA*, 142 S.Ct. 2587, 2608-09 (2022); *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).  The Major Question Doctrine serves as an interpretive tool reflecting "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000).  It is an expectation that Congress normally "intends to make major policy decisions itself, not leave those decisions to agencies." *United States Telecom Assn. v. FCC*, 855 F. 3d 381, 419 (CADC 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc).

As stated by Justice Barrett in her concurring opinion in *Biden v. Nebraska*: "[g]iven these baseline assumptions, an interpreter should typically greet an agency's claim to extravagant statutory power with at least some measure of skepticism.  That skepticism is neither made-up nor new.  On the contrary, it appears in a line of decisions spanning at least 40 years."  143 S. Ct. at 2381 (Barrett, J., concurring) (internal citations and quotations omitted).

We have also pumped the brakes when an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy.  Of course, an agency's post enactment conduct does not control the meaning of a statute, but this Court has long said that courts may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it proffers in court.  The agency's track record can be particularly probative in this context: A longstanding want of assertion of power by those who presumably would be alert to exercise it may provide some clue that the power was never conferred.

*Id*. at 2383(internal citations and quotations omitted).

Those principles apply directly to this matter.  The current Chairman of the SEC, who just a few years ago said "only Congress" could address the treatment of digital assets under U.S. securities laws and that "three-quarters of the [digital asset] market are …not what would be called securities" (Appx. A, # 4-G) has since done a complete about-face and found unheralded power for his agency to regulate where it previously, by his own admission, had none.  The 1930's securities laws and the 1940's Supreme Court definition of "investment contracts" has not changed since Chair Gensler made those contradictory statements.  These actions are exactly the "longstanding want of assertion of power by those who presumably would be alert to exercise it" which the Major Question Doctrine is in place to prevent.

In a recent case, a Southern District of New York Court held that the Major Question Doctrine does not apply to the digital asset industry because the doctrine is reserved for situations where agency's actions effectively prohibit an otherwise legal industry, and the industry is of equal importance as the tobacco industry was in the U.S. at the time of the *Williamson Tobacco* decision in 2000.  *See SEC v. Terraform Labs Pte., Ltd.,* Case No. 23-cv-1346 (JSR), 2023 WL 4858299, at *20-21 (S.D. N.Y. July 31, 2023).  However, the *Terraform Labs* Court failed to recognize that

the SEC's actions have dramatically chilled digital asset development in the United States; an industry which one-in-five Americans participates in.

The current chair of the SEC has said he considers virtually every digital asset except Bitcoin to be a security, going as far as to refuse to answer when asked by Congress whether the second largest digital asset, Ether, is an investment contract despite statements from senior leaders of his own agency and leaders of the CFTC confirming the asset's status as a commodity. Appx. A, # 4-F.  This regulation by enforcement has resulted in an "effective ban" on the development of digital assets in the United States and lead to many in the industry to leave the country entirely. Appx. A, # 4-J.  This has dramatically chilled the $2 trillion dollar industry (Appx. A, # 2-F)[9] in the United States, and left businesses in the industry, large and small, to wonder if they will be the next forced to defend themselves against the full weight and authority of the agency's arbitrary actions.  The SEC does not have the authority to conduct itself in a way that so completely controls and prohibits the digital asset industry without clear Congressional delegation.

Recently, a Southern District of New York District Court ruled "the Court declines to stretch federal securities laws to cover the conduct alleged and concludes Plaintiff's concerns are better addressed by Congress than this Court." *Risley, et al. v. Universal Navigation, Inc.,* Case No. 1:22-cv-02780, Dkt. #90, slip op. at pg. 28 (S.D.N.Y. Aug. 29, 2023).  The iX Global Defendants respectfully request that this Court rule the same.

---

[9] Note: most analysis as to the size of the digital asset industry focuses strictly on the market cap of various major cryptocurrencies such as Bitcoin and Ether.  However, the true size of the industry is much larger, encompassing developers, service providers, art, computing infrastructure, and countless other areas outside of the strict value of cryptocurrencies themselves. For the purposes of this memorandum though, the values cited come from materials which the Court may take judicial notice of for the purposes of this Motion to Dismiss.

IV.   **Punishing the iX Global Defendants for Failing to Register with the SEC Products Which Have Never Been Required to be Registered Before Violates Fair Play and Due Process**

As a matter of law, the SEC's positions that an "investment contract" does not require a contract and that computer software connected to cryptographic asset technologies is the type of "instrument" which Congress intended to fall under the SEC purview under the Securities Act of 1933 and Securities and Exchange Act of 1934 are wrong.  However, even if this Court agrees those positions have potential merit, imposing liability against the iX Global Defendants for failing to register the sales of a product which has never been registered before violates principles of fair notice and due process.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012).

The SEC has failed to put out any substantive rulemaking for digital assets and related technologies, instead leaving industry participants to try to divine applicable rules from non-binding guidance, contradictory Commissioner statements, and one-off enforcement actions.  *See, e.g.,* Appx. A, # 1-B through 1-L, 4-D; Coinbase, Inc.'s Petition for Writ of Mandamus, *In re Coinbase, Inc,* Case 23-1779, Dkt. #1 (3rd Cir. April 24, 2023).  "Neither complex [SEC] staff guidance nor enforcement actions are a satisfactory way to guide people who are eager to comply with the law, but unsure how to do so." Appx. A, # 1-L.

The Supreme Court has consistently held that "[v]ague laws invite arbitrary power" which violate the Due Process Clause of the Fifth Amendment when they leave "people in the dark about what the law demands and allow[] prosecutors and courts to make it up." *Sessions v. Dimaya,* 584

U.S. —, 138 S. Ct. 1204, 1223 (2018) (Gorsuch, J., concurring in part); *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-159 (2012).

The SEC has, through failure to offer any guidance specific to digital assets, instead relied on the broad authority under securities laws to regulate "virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. at 61. But as stated in *Reves*, that authority is not limitless, and where an agency is pursuing a novel interpretation of the law without any warning or official guidance, the Constitution's notions of fair notice and Due Process protects the public from those arbitrary and unwarned enforcement actions.

## CONCLUSION

For the foregoing reasons, the iX Global Defendants respectfully request this Court dismiss this case against them, and for all further relief which this Court deems is just and proper.

Dated: October 6, 2023

POLSINELLI PC

_/s/ Jose A. Abarca_
Romaine C. Marshall
Jose A. Abarca
Jonathan E. Schmalfeld

*Attorneys for Defendants iX Global, LLC,*
*Joseph A. Martinez, Travis Flaherty, and*
*Flaherty Enterprises, LLC*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of October, 2023, the foregoing document was served via CM/ECF to all counsel of record.

<u>*/s/ Kaitlin Morgan*</u>