Jason A. McNeill (9711)
 mcneill@mvmlegal.com
Eric K. Schnibbe (8463)
 schnibbe@mvmlegal.com
**MCNEILL | VON MAACK**
236 South 300 East
Salt Lake City, Utah 84111
Telephone: 801.823.6464

Jessica B. Magee (*admitted pro hac vice*)
 jessica.magee@hklaw.com
Scott F. Mascianica (*admitted pro hac vice*)
 scott.mascianica@hklaw.com
Andrew W. Balthazor (*admitted pro hac vice*)
 andrew.balthazor@hklaw.com
**HOLLAND & KNIGHT**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214.969.1700

Attorneys for Josias N. Dewey, Court-Appointed Temporary Receiver

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>  Plaintiff,<br><br>v.<br><br>**DIGITAL LICENSING INC. (d/b/a "DEBT Box"),** a Wyoming corporation; **JASON R. ANDERSON,** an individual; **JACOB S. ANDERSON,** an individual; **SCHAD E. BRANNON,** an individual; **ROYDON B. NELSON,** an individual; **JAMES E. FRANKLIN,** an individual; **WESTERN OIL EXPLORATION COMPANY, INC.,** a Nevada corporation; **RYAN BOWEN,** an individual; **IX GLOBAL, LLC,** a Utah limited liability company; **JOSEPH A. MARTINEZ,** an individual; **BENJAMIN F. DANIELS,** an individual; **MARK W. SCHULER,** an individual; **B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"),** a Utah limited liability company; **TRAVIS A. FLAHERTY,** an individual; **ALTON O. PARKER,** an individual; **BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"),** a Utah limited liability company; **BRENDAN J. STANGIS,** an individual; and **MATTHEW D. FRITZSCHE,** an individual, | **TEMPORARY RECEIVER'S REPLY IN SUPPORT OF MOTIONS TO CLARIFY TEMPORARY RECEIVERSHIP ORDER**<br><br><br><br>Case No. 2:23-cv-00482-RJS<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

|   |   |
|---|---|
| **Defendants,**<br><br>ARCHER DRILLING, LLC, a Wyoming limited liability company; BUSINESS FUNDING SOLUTIONS, LLC, a Utah limited liability company; BLOX LENDING, LLC, a Utah limited liability company; CALMFRITZ HOLDINGS, LLC, a Utah limited liability company; CALMES & CO, INC., a Utah corporation; FLAHERTY ENTERPRISES, LLC, an Arizona limited liability company; IX VENTURES FZCO, a United Arab Emirates company; PURDY OIL, LLC, a Nebraska limited liability company; THE GOLD COLLECTIVE LLC, a Utah limited liability company; and UIU HOLDINGS, LLC, a Delaware limited liability company,<br><br>**Relief Defendants.** |   |

Temporary Receiver Josias N. Dewey ("Receiver") submits this Reply in Support of the pending Motions to Clarify Temporary Receivership Order [ECF 125 and 144] (hereinafter "Motions"), and respectfully shows the following:

## I.
## INTRODUCTION AND RELIEF SOUGHT

Defendants[1] argue there is no evidence to support clarification (ECF 162 (hereinafter "Resp."), p. 2). This is demonstrably false. Defendants ignore—and thus do not rebut—the extensive evidence submitted by the SEC and Receiver in support of their respective Motions, all while providing scant evidence to support their self-serving statements that the entities at issue are

---

[1] Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon and Roydon B. Nelson (hereinafter "DEBT Council Defendants") and Relief Defendants Blox Lending, LLC ("Blox"), Business Funding Solutions, LLC ("BFS"), The Gold Collective, LLC ("TGC") and UIU Holdings, LLC ("UIU") (collectively, "Defendants").

1

not affiliates of Digital Licensing, Inc. ("DLI"). Indeed, Defendants' silence on nearly all the evidence before this Court says everything: these entities are DLI affiliates and the Receivership Order should be clarified to explicitly identify them as Receivership Entities.

Defendants' arguments for why the entities cannot be affiliates are best summarized as follows: (1) the entities at issue—Blox, BFS, TGC, UIU, Ignis Energy, LLC ("Ignis") and Digital Commodity House ("DCH")[2] (collectively "Affiliate Entities")—are not all controlled by the same four DEBT Council Defendants (Resp., p. 5); (2) the Affiliate Entities purportedly entered into some arms-length agreements with DLI (Resp., p. 2); and (3) none of the Affiliate Entities were created for the purpose of supporting DLI. (Resp., p. 7).[3] Each of these arguments defies the applicable law and demonstrated facts.

First, Defendants' *sole* legal authority in opposition actually *supports* clarification. As detailed herein, the overwhelming body of case law shows that affiliation is determined through control, which is not based on artificial tests but rather a collective assessment of numerous factors that consider substance over form, including the power to direct or influence operations, the extent of financial transactions between entities, and an overlap of members in a control group.[4]

---

[2] Neither Ignis nor DCH has appeared in this matter to oppose clarification. Yet Defendants filed a Response that opposes their classification as affiliates. This further underscores the interrelated and overlapping nature of the ownership-and-control structure within the DEBT Box ecosystem.

[3] Defendants make other, unsupported allegations that have no bearing on the relevant issues. They claim that clarifying the Receivership Order [ECF 10] will "likely cause more difficulties and dislocations (including potential environmental issues managing Ignis Energy's oil wells and pipelines in Oklahoma)." (Resp., pp. 9–10). Besides being entirely unsupported by any evidence, this has no bearing on whether the Affiliate Entities are, in fact, affiliates. Similarly, the Receiver's handling of ongoing litigation involving the Affiliate Entities will be based on the best interests of the Receivership Estate, which may include retaining current counsel. (*See* Resp., p. 10). The Court should ignore these meritless allegations.

[4] Conversely, most of the limited material Defendants present as proof to rebut the Motions includes organizational documents for the Affiliate Entities. (Resp., Exs. 1–10, 13–14). If anything, these documents reinforce that the DEBT Council Defendants also control the Affiliate

Second, rather than respond to the extensive evidence demonstrating the intertwined nature of operations and control between DLI and the Affiliate Entities, Defendants' offer a mere two documents to support their claims of arms-length transactions. Not only does their sparse evidence fail to rebut the evidence before this Court, but it also actually underscores the interconnectedness of those two Affiliate Entities, DLI, and the DEBT Box ecosystem.

Third, Defendants' claim that the Affiliate Entities were not created or established for the purpose of supporting DLI is inapposite. They provide no case law to support this flawed argument which, if accurate, would create a logical inconsistency whereby the date on which a company is created governs determination of affiliate status. The actual evidence before this Court, when assessed through the proper legal precedent, demonstrates affiliation.

Accordingly, Defendants are wrong on both the law and the facts, and the Court should grant the Motions.[5]

## II.
## ARGUMENT AND AUTHORITIES

A.  **Applicable Law**

District courts have broad powers and wide discretion to determine relief in a receivership. *U.S. v. RaPower-3, LLC*, No. 2:15-cv-00828-DN, 2019 WL 2195409, *2 (D. Utah May 3, 2019) (unpublished). Accordingly, "courts frequently include all subsidiaries and affiliates of receivership defendants in the receivership, regardless of where they may be located." *Id.* (citations

---

Entities, a factor *supporting* clarification (such as admitting DCH's direct interest in DLI). (Resp., Ex. 7).

[5] Defendants do not contest that this Court has the power to include the non-party Affiliate Entities in the Receivership. *See* ECF 125, pp. 9–10. Accordingly, it is not disputed that sufficient minimum contacts exist for the Court to order clarification including non-parties.

omitted); *see also San Vincente Medical Partners v. American Principals Holding,* 962 F.2d 1402, 1406 (9th Cir. 1992); *SEC v. Elmas Trading,* 620 F. Supp. 231, 234-236 (D. Nev. 1985).

Defendants agree that an affiliate is a person or entity that directly—or indirectly through one or more intermediaries—controls, is controlled by, or is under common control with the person or entity specified. *See, e.g.*, *In re Motorola Sec. Litig.,* 644 F.3d 511, 519–20 (7th Cir. 2011); (Resp., p. 4). In turn, control means the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise." 17 C.F.R. § 230.405. Defendants acknowledge this test for control in the single legal authority they cite. (Resp., p. 4 (*citing SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1087 (9th Cir. 2010))).

Without legal support, Defendants argue the Affiliate Entities must be managed, operated, and controlled by *all four* DEBT Council Defendants to be affiliates. (Resp., p. 5). Under this logic, entities can never be affiliates where there is anything but complete identity between and among their control persons. This is not the law. Courts across the country—including in the *Platforms Wireless* case upon which Defendants rely—do not follow such an artificial test:

> "Control" is not to be determined by artificial tests, but is an issue to be determined from the particular circumstances of the case. [ . . . ] it is not necessary that one be an officer, director, manager, or even shareholder to be a controlling person. Further, control may exist although not continuously and actively exercised.

*Platforms Wireless,* 617 F.3d at 1087.

Instead, courts consider the totality of facts to identify affiliates, such as the nature of the relationship between entities, the degree of control and influence (including common control by another company or individual), and the financial interests between the parties. *See, e.g.*, *id.*; *SEC v. Francisco,* No. SACV-16-02257-CJC, 2017 WL 5952169, at *2 (C.D. Cal. July 6, 2017) (unpublished). Notably, courts considering the scope of "affiliate" in receivership orders have

found affiliate status for several entities controlled by a *subset* of the broader control group of the entity defendants already in receivership. *See, e.g.*, *SEC v. Private Equity Mgmt. Grp., Inc.*, No. CV 09-2901 PSG, 2009 WL 2488044 (C.D. Cal. Aug. 10, 2009) (unpublished) (sixteen entities found to be affiliates based on evidence that, *inter alia*, they were controlled by subset of nine individuals comprising control group). Consistent with *Platform Wireless*, courts have considered several factors such as overlapping control persons, intermingling of funds—including loans, payment of fees and costs by one entity for another, common control over financial accounts, shared addresses, and connections between the alleged affiliates themselves. *Id.*; *Elmas Trading,* 620 F. Supp. at 234–236.[6]

## B.  The DEBT Council Defendants Controlled DLI and the DEBT Box Ecosystem

The evidence—often in DEBT Council Defendants' own words—shows that these four individuals controlled DLI and the broader "DEBT Box ecosystem" detailed in the SEC's Complaint [ECF 1]. Defendants Brannon and Nelson are DLI's listed President and Director. [*See, e.g.*, ECF 125-1 (hereinafter "Dewey Dec.") ¶ 78]. For the majority of DEBT Box node license sales addressed in the SEC's complaint, the Terms of Sale indicated that the transaction was "between you ('you' and 'your') and **Digital Licensing, Inc. and its affiliates, including DEBT Box** (collectively 'DEBT', 'we,' 'our' or 'us')[.]" [Dewey Dec. ¶ 94; Ex. 28].[7]

According to various litepapers, the DEBT Council Defendants are responsible for managing the DEBT Box ecosystem and working with strategic partners to add value for all license and toke holders. [*See, e.g.*, Dewey Dec. Ex. 3]. There are several examples of all of the DEBT

---

[6] The *Private Equity Management Group* matter includes several orders where the court granted clarification of affiliate entities using the same framework.

[7] As further detailed herein and elsewhere, DLI changed its Terms of Use so that references to DLI were changed to "Digital Commodity House, FZCO." [Dewey Dec. ¶¶ 95–98; Exs. 29–31].

Council Defendants acknowledging their control over DEBT Box. [ECF 3–4, ¶¶ 16, 18–27]. For example, Jason Anderson identified himself as DEBT Box's "controller," claiming he had a "DEBT Council giving me good counsel to make sure we are doing it right." [https://www.youtube.com/watch?v=Q4309m-MheU]. Additionally, Jason Anderson appeared at an iX Global event with the other DEBT Council Defendants to tout that "we," a control group he says has worked together for "almost twenty years," wanted to bring DEBT Box to every single household in the world. [https://www.youtube.com/watch?v=3gfObn4pRwc].[8] Defendant Jacob Anderson, interviewed in his capacity as "DEBT Box founder" and "member of the DEBT Council" similarly detailed the DEBT Council Defendants' history of founding and managing DEBT Box. [https://www.youtube.com/watch?v=8RdMBpKMGVw]. The Defendants do not—and cannot—rebut the evidence that the DEBT Council Defendants had the power to control—and did in fact control—DLI and the DEBT Box ecosystem.[9]

C.   **The Uncontroverted Evidence Establishes Affiliation**

Defendants choose not to address the vast majority of evidence submitted in support of the Motions. Contrary to their claim that the SEC and Receiver unfairly "lumped" the Affiliate Entities together, a non-exhaustive sample of evidence before this Court methodically illustrates how each of the Affiliate Entities ties to DLI, DEBT Box, the DEBT Council control group, and each other.

---

[8] Notably, in this video Jason Anderson touts Blox employee Emily Eads as his "right hand person" and that, without her, he could not run 17 companies (0:41—0:50). In this video, another DEBT Council Defendant confirms that they "created the vehicle" that is DEBT Box (2:30).

[9] The Defendants attempt to mislead this Court into believing that DLI's operations concluded a move to UAE in May 2022. (Resp., at 13 (*citing* ECF No. 132, pp. 12–13)). As evidenced previously and in the chart herein, they continued to use DLI for several key DEBT Box activities. *See* [ECF 168, pp. 10–11]. Among other items, as further detailed in **Section C** below, bank transactions evidence millions of dollars deposited into DLI's corporate accounts—in connection with sale of node licenses, and other activities—after the purported move.

| ENTITY | AFFILIATE EVIDENCE |
|---|---|
| Blox | Jason Anderson controls Blox. [Dewey Dec. ¶ 48; Ex. 4; Resp., p. 5].<br><br>Blox has the same principal place of business as DLI. [Dewey Dec. ¶¶ 49, 69, 85].<br><br>iX Global paid over $3 million directly to Blox in connection with purchasing DEBT Box licenses for subsequent sales to investors. [Dewey Dec. ¶ 51].<br><br>Blox proceeds were used to purchase oil rigs where DLI claims a security interest and to help pay for the acquisition of Lazy Magnolia Brewery. [Dewey Dec. ¶¶ 52–53].<br><br>Blox received and used DLI funds to purchase real property. [Dewey Dec. ¶¶ 102–113; ECF No. 161 ¶¶ 44, 55].<br><br>Blox funded the primary source of liquidity for the various DEBT Box project tokens, owning more than 99% of equity in the DEBT token/BSC-USD liquidity pool. [Dewey Dec. ¶ 60].<br><br>Blox Lending employees—including Emily Eads using emily@bloxlending.com—extensively communicated with DEBT Council Defendants on review and publication of DEBT Box marketing and investment materials and getting the DEBT token listed on exchanges. [Dewey Dec. ¶¶ 63–64; Exs. 8–12].<br><br>DEBT Box's "Blox" project token litepaper represents that the project is supported by royalties generated from real estate transactions. [Dewey Dec. Ex. 3]. Blox holds itself out as a real estate company. *See* https://www.bloxlending.com/projects. Blox's real estate investment offerings currently include three homes owned by DEBT Council member Jacob Anderson. [ECF 101]. Blox lists a fourth investment offering of a property owned by BFS, itself owned by Jacob Anderson. [*Id.*]. Hence, Blox supposedly uses revenues from financing a DEBT Council Defendant's homes to buy and burn DEBT Box Blox tokens out of the DEBT Box ecosystem.<br><br>***Defendants ignore these facts***. *Instead, Defendants point to a single purported agreement, never made available to the Receiver until inclusion in the Response, to supposedly demonstrate some arms-length relationship. (Resp., Ex. 12). This agreement—signed by Defendants Jason Anderson and Nelson—actually further supports the affiliated nature of the two entities. These entities are controlled by the same control group, and both are necessary cogs to the DEBT Box ecosystem.* |
| BFS | Jason Anderson controls BFS. [Dewey Dec. ¶ 66; Exs. 13–14; Resp., p. 5].<br><br>BFS's business records list its principal address as the same building address as UIU, Blox, and DLI. [Dewey Dec. ¶ 69]. |

|     | |
| --- | --- |
|     | More than 60% of BFS's deposits from May 31, 2018 to May 4, 2023 (over $16.2 million) came from DLI, UIU, TGC, and Blox. [Dewey Dec. ¶ 70].<br><br>DLI provided approximately 95% of all funds deposited into BFS's bank account November 4, 2021-November 4, 2022 (at least $10,042,761). [Dewey Dec. ¶ 71].<br><br>Majority of withdrawals during relevant period went to UIU (~28%) and Jason Anderson (~32%) (approximately $10 million of the total $16.5 million withdrawn during that period). [Dewey Dec. ¶ 74].<br><br>***Zero evidence*** *rebutting these affiliation facts. Instead, Defendants baldly assert, without any evidentiary support, that BFS merely conducted business with DLI "through arms-length transactions." (Resp., p. 7).* |
| TGC | Nelson and Brannon control TGC. [Dewey Dec. ¶¶ 77–78; Exs. 19–21].<br><br>In a TGC lawsuit, Brannon and Nelson verified allegations that they manage both TGC *and* DLI. [Dewey Dec. ¶ 78; Ex. 21].<br><br>DLI transferred at least $4,496,394.30 to TGC—more than half of TGC's total deposits—between March 13, 2019 and May 18, 2023. [Dewey Dec. ¶¶ 79–80].<br><br>TGC bank account at Mountain America Credit Union linked with DLI, both under the control of Defendants Brannon and Nelson. [ECF 144-1 ("Second Dewey Dec.") ¶18].<br><br>PowerPoint presentation showing TGC as a DLI affiliate. [Dewey Dec, ¶ 82; Ex. 22].<br><br>***Zero evidence*** *rebutting what is before the Court. Instead, Defendants simply claim that TGC was founded before DLI and controlled by Brannon and Nelson. (Resp. p. 6).* |
| UIU | Jason Anderson controls UIU. [Dewey Dec. ¶¶ 83–84; Exs. 23–25].<br><br>UIU operates from the same business address as BFS, Blox, and DLI. [Dewey Dec. ¶ 85].<br><br>Jason Anderson signed UIU corporate banking resolution using Jason@bloxlending.com. [Dewey Dec. ¶ 84; Ex. 23].<br><br>UIU received and transferred millions of dollars to and among BFS and Blox, which had proceeds traceable to DLI. [*See* Dewey Dec. ¶¶ 86–88]. |

8

|      |                                                                                                                                                                                                                                                                                                                                                                                                                       |
|------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|      | ***Zero evidence*** presented of UIU's purported arms-length business arrangements. Defendants present no evidence at all concerning UIU save for its formation document which confirms Anderson's control and the similar business address.                                                                                                                                                                         |
| DCH  | Defendants claim that DLI transferred 100% of its ownership to DCH, which Nelson and Brannon purportedly manage and control. [Resp, p. 6; Exs. 4–7].                                                                                                                                                                                                                                                                  |
|      | DCH email domains commingled with DLI emails and website domain, all controlled by same provider. [Dewey Dec. ¶¶ 14–15, 90; Ex. 1].                                                                                                                                                                                                                                                                                   |
|      | Terms for sale of DEBT Box node licenses (*see* pg. 5 above) specifically changed to include DCH (replacing DLI). [Dewey Dec. ¶¶ 94–98; Ex. 28].                                                                                                                                                                                                                                                                     |
|      | DCH Terms for thedebtbox.com governed by State of Wyoming (where DLI is incorporated) with disclaimer that services are hosted in U.S. and intended for U.S. visitors. [Dewey Dec. ¶¶ 95–98; Ex. 29–31].                                                                                                                                                                                                              |
|      | DEBT Box Twitter Account admitted DLI is now DCH. [Dewey Dec. ¶ 90; Ex. 30]                                                                                                                                                                                                                                                                                                                                           |
|      | DCH controls all DEBT Box tokens, and purportedly at least $2.5 million of USD equivalent digital assets traceable to DEBT Box license sales. [Dewey Dec. ¶¶ 93, 99; Exs. 27, 32]                                                                                                                                                                                                                                     |
|      | Although claiming to have transferred all operations overseas by May 31, 2022, nearly $16.82 million was deposited into three DLI U.S. bank accounts thereafter—with more than $17 million withdrawn in the same time period—all in connection with selling node licenses, receiving wires from other Defendants and Relief Defendants for license sales, and transfers to DEBT Council Defendants and certain Relief Defendants.[10] [*See* ECF No. 166, p. 4 n.7]. |
|      | ***Zero evidence*** rebutting what is before the Court. Notably, Defendants claim that the sole argument for affiliation is the fact (relevant as it is) of shared email domains, completely ignoring all other the evidence submitted. (Resp., p. 9). As detailed above, this is incorrect.                                                                                                                         |
| Ignis | Nelson and Brannon own and control Ignis. [Second Dewey Dec. ¶¶ 13, 18, 20, 23].                                                                                                                                                                                                                                                                                                                                     |

---

[10] The Defendants' claim that DCH loaned $1 million to Ignis. (Resp., p. 7; Ex. 11). But the evidence shows DLI making payments to Ignis—purportedly after they shut down operations in the U.S. And, according to the agreement itself, this loan agreement between these two purportedly unrelated parties notes that the loan amount "shall be considered repaid ***to the DEBT Box ecosystem*** when confirmation is recorded within the company minutes in the form of funding the corresponding liquidity pool and/or the DEBT token liquidity pool." (Resp., Ex. 11). Once again, the document supports the affiliated nature of these two entities.

| |
|---|
| Ignis email domains and DLI emails commingled; website controlled by same provider. [Dewey Dec. ¶¶ 14–15; Ex. 1; Second Dewey Dec. ¶¶ 11–12; Ex. 1]<br><br>Defendants claimed DLI would make timely payment for Ignis-related expenses [Second Dewey Dec. ¶¶ 19–23; Exs. 8–9].<br><br>Nelson and Brannon linked bank accounts between DLI and Ignis (both authorized signatories. [Second Dewey Dec. ¶¶ 15, 17–18; Exs. 4-7].<br><br>February 14, 2023, to May 16, 2023, one DLI account (xx 2717) made eight transfers to Ignis for a total of $465,001 for Ignis asset purchases. [Second Dewey Dec, ¶¶ 15, 24–26; Ex. 10].<br><br>***Defendants don't address most of these facts***. *They claim that Ignis only received a loan from affiliate DCH (executed on both sides of the transaction by Brannon (DCH) and Nelson (Ignis)). (Resp., pp. 7–8; Ex. 11). They ignore the other, extensive facts before the Court demonstrating common control and, as detailed in n.10 herein, the documents actually support affiliation.* |

## CONCLUSION

For the foregoing reasons, the Temporary Receiver respectfully requests that the Court grants the Motions to Clarify and order all other relief it deems appropriate.

DATED this 6th day of October, 2023.

                                                      **MCNEILL | VON MAACK**

                                                      /s/ Eric K. Schnibbe
                                                      Jason A. McNeill
                                                      Eric K. Schnibbe

                                                    **HOLLAND & KNIGHT**

                                                    Jessica B. Magee
                                                    Scott F. Mascianica
                                                    Andrew W. Balthazor

                                                    *Attorneys for Josias N. Dewey, Court-Appointed Temporary Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MCNEILL VON MAACK and that pursuant to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the foregoing **TEMPORARY RECEIVER'S REPLY IN SUPPORT OF MOTIONS TO CLARIFY TEMPORARY RECEIVERSHIP ORDER** was delivered to counsel of record this 6th day of October, 2023, by filing of the same through the Court's CM/ECF System.

/s/ Camille Coley