1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

   SECURITIES AND EXCHANGE          )
5  COMMISSION,                      )
                                    )
6           Plaintiff,              )
                                    )
7        vs.                        )
                                    )   Case No:   2:23cv482
8  DIGITAL LICENSING, a             )
   Wyoming corporation doing        )
9  business as Debt Box, et         )
   al,                              )
10                                  )
            Defendants.             )
11  _____

12

13

14

15

16

17          BEFORE THE HONORABLE ROBERT J. SHELBY

18                  OCTOBER 6, 2023

19                ZOOM MOTION HEARING

20

21

22

23

                        Reported by:
24              KELLY BROWN HICKEN, RPR, RMR
                       801-521-7238
25

1

```
 1                        APPEARANCES OF COUNSEL

 2    FOR THE PLAINTIFF:        SECURITIES AND EXCHANGE COMMISSION
                                BY:  MICHAEL WELSH
 3                                   CASEY FRONK
                                     TROY FLAKE
 4                                   TRACY COOMBS
                                     Attorneys at Law
 5                              351 S WEST TEMPLE STE 6.100
                                SALT LAKE CITY, UTAH  84101
 6

 7    FOR ANDERSON, BRANNON, NELSON, BUSINESS FUNDING SOLUTIONS
         BLOX LENDING, GOLD COLLECTIVE, UIU HOLDINGS:
 8
                                MORRISON COHEN LLP
 9                              BY:  JASON P. GOTTLIEB
                                     JEFFREY D. BROOKS
10                                   ALEXANDER YARM
                                     DAVID ROSS
11                                   Attorney at Law
                                909 THIRD AVE 27TH FL
12                              NEW YORK, NY 10022

13                              KUNZLER BEAN & ADAMSON
                                BY:  MATTHEW R. LEWIS
14                                   Attorney at Law
                                50 W BROADWAY, STE 1000
15                              SALT LAKE CITY, UTAH 84101

16    FOR BOWEN:                RAY QUINNEY & NEBEKER PC
                                BY:  EMILY BRINN NUVAN
17                                   MARIA E. WINDHAM
                                     JAMIE Z. THOMAS
18                                   Attorneys at Law
                                36 S STATE ST STE 1400
19                              SALT LAKE CITY, UT 84145

20    FOR IX GLOBAL, MARTINEZ, FLAHERTY:

21                              POLSINELLI PC
                                BY:  ROMAINE C. MARSHALL
22                                   JOSE A. ABARCA
                                     Attorneys at Law
23                              2825 E COTTONWOOD PKWY STE 500
                                SALT LAKE CITY, UT  84121
24

25                       APPEARANCES CONTINUED ON NEXT PAGE
```

```
 1                          APPEARANCES CONTINUED

 2                               POLSINELLI PC
                                 BY:  JONATHAN E. SCHMALFELD
 3                                    Attorney at Law
                                 100 S FOURTH ST, STE 1000
 4                               ST. LOUIS, MO 63102

 5
        FOR DANIELS, SCHULER, B&B INVESTMENT, PARKER,
 6          BW HOLDINGS:
                                 CLYDE SNOW & SESSIONS
 7                               BY:  KEITH M. WOODWELL
                                      KATHERINE E. PEPIN
 8                                    THOMAS A. BRADY
                                      Attorneys at Law
 9                               201 S MAIN ST, STE 2200
                                 SALT LAKE CITY, UTAH  84111
10
        FOR STANGIS:             PARSONS BEHLE & LATIMER
11                               BY:  BRENT R. BAKER
                                      Attorney at Law
12                               201 S MAIN ST, STE 1800
                                 SALT LAKE CITY, UTAH  84145
13

14      FOR FRITZSCHE:           KESLER & RUST
                                 BY:  ADAM LEE GRUNDVIG
15                                    Attorney at Law
                                 68 S MAIN ST 2ND FL
16                               SALT LAKE CITY, UTAH 84101

17
        FOR RECEIVER:            MCNEILL VON MAACK
18                               BY:  JASON A. McNEILL
                                      ERIC K. SCHNIBBE
19                                    Attorneys at Law
                                 236 S 300 E
20                               SALT LAKE CITY, UTAH  84111

21                               HOLLAND & KNIGHT LLP
                                 BY:  JESSICA B. MAGEE
22                                    Attorney at Law
                                 1722 ROUTH ST STE 1500
23                               DALLAS, TX 75201

24

25                          APPEARANCES CONTINUED ON NEXT PAGE
```

```
 1                         APPEARANCES CONTINUED

 2     FOR CALMFRITZ HOLDINGS, CALMES & CO:
                                COHNE KINGHORN
 3                              BY:  KATHRYN TUNACIK SMITH
                                     Attorney at Law
 4                              111 EAST BROADWAY, 11TH FLOOR
                                SALT LAKE CITY, UTAH  84111
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              SALT LAKE CITY, UTAH, FRIDAY, OCTOBER 6, 2023

 2                          *   *   *   *   *

 3              THE COURT:  We'll go ahead and call the case and go

 4    on the record.  MJ, if you'd start the recording.

 5              We'll go on the record in Case Number 2:23-CV-482.

 6    This is our Securities and Exchange Commission vs. Digital

 7    Licensing and others case.  This is the time set for hearing

 8    on the defendant's motion to dissolve the temporary

 9    restraining order that's in the case.

10              Before I invite counsel to make their appearances,

11    let me -- we have some people who joined us that I don't

12    recognize, and this hearing is not open to the public.  It's

13    against judicial conference policy to broadcast proceedings in

14    the United States trial courts.  This hearing is proceeding by

15    Zoom as a courtesy to counsel and especially our out-of-state

16    counsel, but it's not open to the public.

17              So I see someone who is connected as just with the

18    name Matt.  Would you identify yourself, please?  And you're

19    on mute.

20              MR. FRITZSCHE:  Yes.  I am Matt Fritzche.  I'm one

21    of the defendants.

22              THE COURT:  Okay.  Thank you.  And I see Mr.

23    Grundvig noting that.

24              I see someone connected as Jake.  Would you please

25    identify yourself?
```

```
 1              MR. ANDERSON:  Jake Anderson, one of the

 2   defendants.

 3              THE COURT:  All right.  Thank you.

 4              And I see someone connected as, I'm sure I'm going

 5   to mispronounce this, and I apologize, Nazir Momin.  Would you

 6   kindly introduce yourself?  You're on mute, if you're

 7   speaking.

 8              Ms. McNamee, I'm not sure, I think as the host of

 9   the hearing you probably can remove someone from the call.  If

10   we don't get an answer from Mr. Momin soon, I'll ask you to

11   just remove them from the call, please.

12              All right.  Having said that, then, why don't we

13   begin making our appearances, please, beginning with the

14   Commission.

15              MR. WELSH:  Good morning, Your Honor.  Michael

16   Welsh on behalf of the Commission.  With me colleague Casey

17   Fronk, Troy Flake and Tracy Coombs, regional director of the

18   Salt Lake office.

19              THE COURT:  All right.  And thank you.

20              And let me say, Ms. Coombs, that I apologize for

21   the late notice, and I appreciate you making the effort to be

22   here today.  I'm in my 12th year on the bench, and I haven't

23   ever issued an order like that previously.  We'll have -- I

24   thought it was important you be hear for this discussion

25   today.
```

 1          Mr. Gottlieb, we'll just go in the same order we

 2     went I think in the last couple hearings.  Mr. Gottlieb.

 3          MR. GOTTLIEB:  Thank you, Your Honor.  Jason

 4     Gottlieb from Morrison Cohen together with my partners

 5     Jeffrey Brooks and David Ross.  We represent defendants Jason

 6     Anderson, Jacob Anderson, Schad Brannon and Roydon Nelson

 7     along with relief defendants Business Funding Solutions, LLC;

 8     Blox Lending, LLC; the Gold Collective, LLC; and UIU Holdings,

 9     LLC.

10          THE COURT:  Thank you.

11          And, Mr. Marshall, before we turn to you, I realize

12     there's something I forgot to say while I was making the point

13     a moment ago that it's illegal to broadcast the federal court

14     proceedings.  I failed to say that it's also unlawful to

15     record any proceedings in the US District Courts by audio or

16     video or any other means.  And so it's unlawful for anyone

17     who's participating in this call as counsel or as a party to

18     record the proceeding.  There's one official record of this

19     hearing, and it's the record being prepared by our court

20     reporter here in the courtroom with me.  Thank you.

21          Mr. Marshall?

22          MR. MARSHALL:  Good afternoon.  Thank you, Your

23     Honor.  Romaine Marshall from the law firm Polsinelli.  I'm

24     here with my colleagues Jose Abarca and Jonathan Schmalfeld.

25     Mr. Abarca is in a conference room with our client Joseph

1    Martinez.  One of the other attendees is Travis.  You'll see

2    Travis's iPhone.  That is our client Travis Flaherty.  Thank

3    you, Your Honor.

4              THE COURT:  Thank you.  I missed others.  I see

5    there's a second -- there's a whole second page of this.  One

6    moment.  Let me see if I know -- I think I recognize it.

7    Well, there's also -- I see somebody who's connected by phone

8    with a phone number 1-516-852-6401.  Would you identify

9    yourself, please?

10             MR. YARM:  Good afternoon, Your Honor.  Alexander

11   Yarm from Morrison Cohen just listening in.

12             THE COURT:  All right.  Thank you.

13             MR. GOTTLIEB:  Forgive me for skipping Mr. Yarm,

14   Your Honor.

15             THE COURT:  I didn't catch that.  I'm sorry.

16             MR. GOTTLIEB:  I just said forgive me in the roll

17   call I inadvertently omitted Mr. Yarm from my Morrison Cohen

18   colleagues.  Apologies for that.

19             THE COURT:  All right.  Thank you, Mr. Gottlieb.

20             I think I --

21             MR. LEWIS:  Your Honor?

22             THE COURT:  Sorry.  Go ahead.

23             MR. LEWIS:  This is Matthew Lewis.  While you're on

24   those defendants, I'm local counsel for the defendants and

25   relief defendants represented by Morrison Cohen.

1     THE COURT:  Right.  Thank you.

2     Okay.  I think next usually we heard from

3 Mr. Baker.  Are you with us, Mr. Baker?  There you are.

4     MR. BAKER:  I am.  And I represent Mr. Brendon

5 Stangis.

6     THE COURT:  Thank you.

7     Let's see.  Mr. Grundvig, I think you have been

8 next in the roll call.

9     MR. GRUNDVIG:  Thank you, Your Honor.  Adam

10 Grundvig of Kesler & Rust for Matthew Fritzsche, who is here

11 today.

12     THE COURT:  Thank you.

13     Miss Nuvan?

14     MS. NUVAN:  Good morning, Your Honor.  I typically

15 represent defendant Ryan Bowen, but Maria Windham is actually

16 here on behalf of Ryan Bowen today.

17     MS. WINDHAM:  Good morning, Your Honor.  I

18 represent Ryan Bowen together with Emily Nuvan and Jamie

19 Thomas.  And I see that there is an attendee named Ryan Bowen

20 on the phone.  I believe that is Brittany Bowen, who is a

21 representative of Ryan Bowen.

22     THE COURT:  Did you say Brittany Bowen is a

23 representative of Brian Bowen?  Is that what you said?

24     MS. WINDHAM:  Of Ryan Bowen, yes.

25     THE COURT:  Of Ryan Bowen.  I don't know what that

 1    means, representative.  You mean counsel?

 2              MS. WINDHAM:  No.  She is his girlfriend and has

 3    been participating.  She's a co-client of ours with Ryan

 4    Bowen.

 5              MR. BOWEN:  And Ryan Bowen is here, also.

 6              THE COURT:  All right.  Okay.  All right.  I think

 7    based on what you've just said, Miss Windham, we'll let that

 8    be.

 9              Mr. Woodwell, I think you're next.

10              MR. WOODWELL:  Thank you, Your Honor.  Keith

11    Woodwell, Thomas Brady and Katherine Pepin from Clyde, Snow

12    and Sessions.  We represent defendants Daniels, Schuler and

13    Parker as well as B&B Investment Group and BW Holdings.

14              THE COURT:  Thank you.

15              Let's see.  Ms. Magee, I think you were next in our

16    roll call.

17              MS. MAGEE:  Good afternoon.  Jessica Magee from

18    Holland & Knight for the receiver.  And I'm joined by Eric

19    Schnibbe, our local counsel from McNeill Von Maack.

20              THE COURT:  Right.  Thank you.

21              Mr. Franklin?  No Mr. Franklin today.  I'm trying

22    to remember now who -- he's the one person on this list for

23    whom -- I think he joined us late last time, and I didn't

24    catch the name of his client.  Mr. Franklin, no?

25              All right.  Is there anyone else joining us as

1    counsel who hasn't made an appearance today who intends to be

2    heard or speak?

3           MS. SMITH:  Your Honor, I don't know that I intend

4    to be heard today, but this is Kathryn Smith and I'm present

5    on behalf of Calmfritz Holdings, LLC, and Calmes & Co.  And

6    I'm with the law firm Cohne Kinghorn.  I'll be entering a

7    notice of appearance today.

8           THE COURT:  Okay.  Thank you.

9           All right.  Let me preview what I think is going to

10   happen today and then provide an explanation and then hear

11   from all of you.  At times some of the things that I may say

12   today may sound a little dramatic, and I'm not saying them to

13   be dramatic or hyperbolic or colorful.  I just plan to be as

14   plain and direct as I can be.  But I also want to ensure that

15   I don't minimize what I have what I think are serious concerns

16   that I have about what's happened at times in this case, at

17   least as best as I understand it.

18          Let me add a few more caveats before I begin.

19   First, I've not made any final conclusions or decisions about

20   what I'm about to say.  I'm just making observations about

21   what I think I witnessed and what I think to be the case.

22   Second, for purposes of our discussion today I'll just assume

23   for purposes of our discussion that the Commission has made a

24   strong showing of a likelihood of success on the merits in

25   connection with their efforts to obtain and their successful

1      efforts to obtain the TRO in this case.

2              My friend and former colleague Judge Benson who

3      over the course of his quite distinguished career served as

4      the US attorney here in the District of Utah for a time before

5      serving as a district judge on this court for I think 30 years

6      or so would often say that the prosecutorial discretion is the

7      single greatest unchecked power in our Democratic system of

8      government.  And I think that the power that the lawyers for

9      the Securities and Exchange Commission has is of a kind with

10     that prosecutorial discretion that Judge Benson used to talk

11     about.

12             What I think we're going to do today is probably

13     dissolve the TRO, discuss a plan for transitioning the

14     receivership, and I suspect we'll talk about an order to show

15     cause that at least right now I think I likely will be

16     issuing, ordering the Commission to show cause why I shouldn't

17     hold the SEC in contempt.  I don't say anything of that

18     lightly.

19             Let me briefly explain why I think those are things

20     that might be done today.  I might have said briefly.  That's

21     probably unfair.  I don't think this is going to be brief.

22     But let me describe my thinking and try to be as transparent

23     as I can be.

24             The Commission filed this case in late July and

25     immediately sought an ex-parte temporary restraining order

1    under Rule 65(b) in the Federal Rules of Civil Procedure.  I

2    was out of town for a speaking engagement, a conference when

3    the case was filed.  I was the third judge assigned to the

4    case, and there was some delay getting me assigned and getting

5    a date set for an ex-parte hearing.  That was concerning to me

6    under the circumstances because reading the materials I could

7    see that the Commission's position was that we had immediate

8    ongoing irreparable injury in this case and that the Court's

9    intervention was essential to stop that harm.

10         And I guess that's where I begin.  I begin with the

11   fact that we were here in an ex-parte context under Rule 65(b)

12   which requires any party seeking ex-parte injunctive relief to

13   file a certification by counsel including specific facts

14   demonstrating the irreparable, immediate and irreparable harm

15   that the applicant will suffer in the absence of the

16   injunctive relief sought.

17         So the first thing I read was a Rule 65(b)

18   certification that was filed in the case by Mr. Welsh.  I have

19   that with me here.  I'll just note I was struck by something

20   as I read this.  I read this while I was out of state

21   preparing for the hearing the next day.  I read all of the

22   Commission's -- that's not right.  I read the Commission's

23   brief in support of the TRO, I read the complaint, and I read

24   some of the attached materials because of the time involved in

25   trying to get this case to hearing in an ex-parte context.  I

1    did not read all of the underlying affidavits.

2              I was struck when I read the Rule 65(b)

3    certification by something that Mr. Welsh said.  I just

4    thought it was unusual.  Mr. Welsh said in connection with his

5    background and the background in this case in Paragraph 3, he

6    said that he was informed and believed that on at least seven

7    occasions in the last 10 years the Commission Salt Lake

8    regional office had sought and obtained emergency and/or

9    ex-parte relief for the protection of defrauded investors in

10   cases filed in this district.  And he goes on to talk about

11   the fact that in some instances some of the defendants were

12   eventually held in contempt or violated TROs and injunctions

13   and the like.

14             And I thought that was a strange thing to read.

15   And I didn't think much of it at the time, but in reflecting

16   on where we are I'm struck by, I think the significance of

17   that commentary is to say, Judge, our office is familiar with

18   this.  We understand this process, and you and your colleagues

19   regularly entertain this kind of relief and enter these kinds

20   of orders.  We know what we're doing.  You can trust us.

21             In the very next paragraph this is what Mr. Welsh

22   says.  He says that, evidence obtained by the Commission and

23   set forth in -- and now I'm paraphrasing -- the six filings

24   that we've made in this case in connection with the ex-parte

25   application for the TRO, evidence obtained by the Commission

14

1    indicates that defendants are currently in the process of

2    attempting to relocate assets and investor funds overseas

3    where at least Jacob Anderson has contended that those assets

4    will be outside the reach of US regulators.

5            I think that statement is partially false or at

6    best misleading.  I've watched the YouTube video of

7    Mr. Anderson that was referenced by the parties and by the

8    Commission.  I don't think it can fairly be characterized that

9    Mr. Anderson said he was placing, he was working on placing

10   assets outside the reach of US regulators.  I think he talks

11   about moving his operations to Dubai for reasons that he

12   explains.  And this of course becomes one of the two lynchpins

13   of the Commission's efforts to establish irreparable injury

14   when we get to the hearing that we had.

15           I also don't think it's true based on the record

16   before me that at the time this affidavit was -- or it's a

17   declaration, well, it's a certification, Mr. Welsh.  I don't

18   think there's evidence that establishes that the defendants

19   were currently in the process of relocating assets and

20   investor funds overseas.  I don't think there's any evidence

21   of that before me in this case.  The closest I think we get is

22   a $35,000 wire transfer with a memo.  It's referenced in the

23   papers.  It's the June 16, 2023, wire for $35,000 from DLI to

24   Brannon with a memo line, set up office in UAE.  That transfer

25   was roughly six weeks before the Commission made this

1   certification and filed this action.  I don't see evidence

2   before me, though the Commission will tell me if I'm just

3   missing it, that there were contemporaneous efforts relocating

4   assets at the time the TRO was filed.

5            Immediately after that sentence that Anderson has

6   contended that those assets will be outside the reach of

7   US regulators -- and let me say, let me pause and just say on

8   this point.  This discussion has broken down in the papers

9   into an argument I think about whether the company's

10  operations were moved to Dubai in 2022 or whether that move

11  was still underway as late as the filing of this application

12  because there was still an office in Utah and still a bank

13  account in Utah.  It's wholly immaterial in my mind.  The

14  reason the Commission cited this fact and I relied on it I

15  think has to be because it was trying to make a showing of

16  irreparable harm, which in connection with the application for

17  the TRO was premised on the idea that the defendants were

18  secreting assets out of the country to place beyond the reach

19  of the court, so in the event that the Commission was

20  successful in proving the fraud that it alleges in this case

21  the investors would be harmed because there would be no

22  ability to recover.

23            So I'm not surprised that the Commission in this

24  certification focused on assets being moved even though

25  Mr. Anderson did not say that in his YouTube video.

1                 In the very next sentence that follows, it's

2       Paragraph 6, and I observe that a Paragraph 5 is missing or

3       it's just mis-numbered or something.  Paragraph 6 begins, for

4       example.  This is the very next sentence after discussion

5       about relocating funds overseas.

6                 This is what Mr. Welsh says:  For example, bank

7       records obtained by the Commission and summarized in the

8       declaration of the Commission's accountant, and forgive me, I

9       know I'm going to butcher this.  And I don't know whether it's

10      a Mr. Zaki or Ms. Zaki, but Mr. Welsh says:  The Commission's

11      accountant Karaz S. Zaki appended to the TRO motion as

12      Exhibit 3.  All of that shows that on June 26, 2023, defendant

13      IX Global, LLC, the multilevel marketing entity through which

14      the defendants node licenses are primarily promoted began

15      closing bank accounts in the United States and removed over

16      $720,000 in putative investor funds from those accounts.

17                That sentence is also literally false in at least

18      one respect.  I think the evidence before the Court now

19      demonstrates that defendant IX Global did not close those

20      accounts, the bank closed those accounts, though I assume for

21      purposes of this hearing the Commission did not know of that

22      at the time.

23                More importantly I think related to the effort to

24      obtain an ex-parte TRO the clear inference of this statement

25      is that this is an example, as those words are used in this

                                                                    17

 1    paragraph, this is an example of the defendant's current

 2    efforts to relocate its assets and investor funds, but that's

 3    not true.  The $720,000 that were removed from those accounts

 4    when they were closed by the bank were deposited into a

 5    Mountain America Credit Union account in Sandy, Utah, not in

 6    Dubai, not in the UAE.  I think that statement is literally

 7    false or at best misleading.

 8            So then we get to the Commission's application for

 9    the TRO.  It's Docket Number 3.  And just to recite history

10    that we're all familiar with now, we set the hearing on an

11    expedited basis.  We proceeded ex-parte without notice to

12    defendants.  Related to that I should say that I drew some

13    inferences in this case based on the Commission's filings, and

14    some of them may not be justified, and I acknowledge that I

15    have some responsibility for failing to catch some things that

16    should have caught my attention I think and should have

17    suggested some further investigation by the Commission

18    including the fact that -- well, so we get to the application.

19    In preparation for that hearing and having carefully reviewed

20    the materials submitted by the SEC, I concluded that the SEC

21    had failed to brief the correct standard for obtaining

22    injunctive relief in the 10th Circuit.

23            Now I may be wrong, and the Commission regularly

24    files applications for injunctive relief reciting that

25    Second Circuit decision from 1990, and there's a handful,

1    there's more than a handful of cases I think, and it's not

2    just the SEC.  I've seen the same in briefing from the Federal

3    Trade Commission.  I can't remember if I've seen other

4    agencies make this argument, that they need not demonstrate

5    irreparable injury in order to obtain a TRO.  I think

6    otherwise after the Supreme Court decision in Winter, which I

7    think left room for circuits to sort of establish their own

8    standards, at least within a certain range, the 10th Circuit

9    reads Winter to say that you can't relax any of the four

10   elements of a Rule 65 showing for injunctive relief.

11          So my view is, and I expressed this to the

12   Commission's counsel at the hearing, that the application was

13   deficient because there was not even an argument let alone an

14   attempt to establish irreparable harm.  And I said that I was

15   not prepared to grant a TRO when the Commission had not made

16   such a showing.

17          And then for reasons that I think are, I don't know

18   how clear they are on the transcript and the hearing, but what

19   I was struggling with was trying to figure out whether to

20   require the Commission to work over the weekend to prepare a

21   revised application or whether there was information in the

22   application and supporting materials that could establish

23   irreparable injury.  They just hadn't been argued that way by

24   the Commission.

25          So there was a back and forth of counsel.  We took

```
 1    an extended recess and after further consideration we had an

 2    exchange with the counsel, and I ultimately concluded given

 3    the exigency of the circumstance and so long as counsel

 4    wasn't -- gosh, now I don't have a clear memory on this and I

 5    didn't focus on this directly, the material part of this.  I

 6    had a discussion with the Commission's counsel on this

 7    question of irreparable injury, and this is what counsel said.

 8    A couple things.  I'm going to start with this.  I'm reading

 9    from Page 9 of the transcript, beginning on Page 18, Mr. Welsh

10    is speaking to the Court, and he says:

11              But to the irreparable harm I would submit,

12         Your Honor, that from briefings that we have pointed

13         out defendants are moving assets overseas.

14              Are moving assets overseas.  I think that's not

15    established now.

16              They had said in videos that the reason they're

17    doing this is to avoid SEC jurisdiction.

18              And I think that is literally true, but misleading

19    under the circumstances.  It's clear as I said in watching the

20    YouTube video that Mr. Anderson is responding to a question

21    asked by somebody who is in the chat asking about the SEC's

22    position about crypto.  And Mr. Anderson in his response talks

23    about the ambiguity and the lack of direction and clarity from

24    the Commission which exposes companies including some in this

25    case in Mr. Anderson's view to risk if they operate here
```

1    without clear guidance.  Mr. Anderson relates, and I have no

2    idea whether this is true, but this is what he says, is that

3    Dubai has given very clear guidance, and he's made a decision

4    to move his company's operations somewhere where he knows what

5    the law would require, and the gist of it is so he can comply.

6         And I agree that he does say at the end of that

7    explanation, so they would be under the jurisdiction of, I

8    don't remember if he says Saudi Arabia, Dubai or the UAE, but

9    he does go on to say, and not the SEC.

10        In the context of this application I inferred, and

11   I don't think, the Commission did not say this, so this isn't,

12   I don't put this at the Commission's feet.  But reading the

13   papers I was led to believe that the defendants were aware of

14   an ongoing SEC investigation.  I now think that that's not the

15   case.  And I think that that's unusual, though I know it's not

16   unprecedented, and I'm no expert on SEC matters.

17        What I do know is that Mr. Anderson's statement is

18   material in showing a fear or irreparable injury, the risk of

19   irreparable injury, if the point is aware of an SEC

20   investigation this man is moving his companies and his

21   operations and assets overseas.  This characterization of

22   Mr. Anderson's comment in that video take on a different color

23   I think in the context that the defendants were unaware of the

24   investigation at the time.  And in any event, what the

25   Commission doesn't explain either in the hearing or in his

1    papers or anywhere is any context for the statement.  It is

2    ironic, I think, and now it's going to sound like I'm

3    quibbling, and I don't mean to be, but I think the Commission

4    is going to make the argument in this case that some of the

5    defendants here engaged in securities fraud because they made

6    representations without providing additional information that

7    placed those representations in context so an investor or

8    potential investor could assess the reliability of those

9    statements.

10        I would have had a very different view of this

11    summary statement about Mr. Anderson placing his operations

12    outside the jurisdiction of the SEC had I understood the

13    context in which that statement was made.  The SEC made no

14    effort to place that statement in context.

15        But more troubling to me is what Mr. Welsh said

16    later in this exchange.  I'm reading now from Page 20 of the

17    transcript from this hearing beginning at Line 9.  I think

18    this is after I've gone on to say that I have concerns, I'm

19    going back to the language of the Diné Citizens case talking

20    about the, I said the language from the 10th Circuit seems

21    clear and unequivocal that we have to establish, I go on to

22    say, irreparable injury, and this is the exchange that follows

23    after I say, I say more, that I think this is a disfavored

24    injunction in the 10th Circuit so there's a heightened burden

25    for the applicant.  But I say:

1            But I'm eager to hear what else, if anything

2       you would like to add, Mr. Welsh, on the remaining

3       elements.

4            Thank you, Your Honor.  At the outset I

5       appreciate Your Honor's candor with respect to

6       the concerns regarding reaching each of the elements.

7       This is -- the decision to bring this TRO is not a

8       decision we take lightly, either.

9            Just as we were on break, I was reminded by

10       investigative staff with respect to the respect to

11       the investigation which remains ongoing that even

12       in the last 48 hours, defendants have closed

13       additional bank accounts.  And I believe the number,

14       I don't have it in front of me, was around 33 bank

15       accounts have been closed.

16            That statement is literally false.  It's

17   also highly leading.  And Mr. Welsh may say and the Commission

18   may say the reference at the end to 33 bank accounts having

19   been closed wasn't meant to say that they'd been closed in the

20   last 48 hours, but that's clearly how it reads and that's how

21   I construed it in the context of the hearing.

22            I'll tell you this was the single most important

23   fact shared with me in considering the TRO in deciding whether

24   there was material harm, eminent risk of injury.  It's false.

25   It is not true that the defendants closed any bank accounts in

 1    the 48 hours before the hearing.

 2              The defendants point this out in their motion to

 3    dissolve more on that in a moment, well except let me say I

 4    don't think the Commission takes the position that that wasn't

 5    false.  In its papers the Commission does not attempt to

 6    defend that statement.

 7              What is more troubling about this statement is it

 8    was made with another SEC prosecutor on the screen in the room

 9    and at least two SEC investigators.  Nobody stopped to correct

10    the record.  Nobody stopped to clarify.  Nobody stopped to say

11    anything about this misrepresentation.

12              It gets worse.  When the defendants in their motion

13    to dissolve the TRO explained that no bank accounts had been

14    closed in the last 48 hours -- I'll also say what the

15    Commission said is the defendants have closed bank accounts.

16    That's also false, but I assume the Commission did not know

17    that was false at the time.

18              Then in a motion to dissolve the TRO the defendants

19    pointed out no bank accounts were closed in 48 hours.  In

20    fact, I think what the defendants say, and this is not true,

21    it's just not correct, no bank accounts were closed in 2023, I

22    think is what the defendants say, at least some of the

23    defendants.  There were bank accounts closed in 2023.  There

24    were some accounts closed in January and some in June, but

25    none in July and none within 48 hours of the hearing that we

1    had.

2           So the defendants point this out in their motion to

3    dissolve the TRO, and they're very clear about it.  And the

4    defendants specifically take issue with two of the statements

5    made by the Commission, and they focus first on this question

6    about even in the last 48 hours they quote that language on

7    Page 10 of the motion to dissolve, Docket 132.  And they say

8    that that was false.

9           And, I'm sorry.  I was -- I now have in front of me

10   what the defendants say.  These are Mr. Gottlieb's clients.

11   They say that no bank account closures involving DLI, the

12   defendants or the relief defendants occurred in July of 2023.

13   I think that is correct.  So my apologies.  So this is

14   squarely presented to the Commission and the opposition.

15          The Commission responds in Docket 168, this is

16   styled, Plaintiff's Opposition to the DLI Defendants Motion to

17   Resolve the Temporary Restraining Order.  I'm reading now from

18   Page 10, but the relevant discussion is in Section B on Page 9

19   to 11 where the Commission's making the argument that it has

20   shown irreparable harm absent issuance of the request of

21   relief.

22          The SEC goes on to say in their motion the DLI

23   defendants ignored the evidence that the Commission cites here

24   in their brief, that the evidence that the DLI defendants were

25   relocating operations, now it's operations, not assets, to UAE

1    and transferring investor funds to unreachable overseas

2    accounts.

3            In their motion the DLI defendants ignore this

4    evidence and instead cling to two lines from the TRO hearing

5    to claim that the SEC failed to establish irreparable injury.

6    Those two lines being, the first being the fact that bank

7    accounts had been closed in 48 hours.  And this is what the

8    Commission says.

9            Well, let me say, I'll just summarize first and

10   then I'll read it.  Rather than engage with what the

11   Commission actually said to me in that hearing, the Commission

12   mischaracterizes the statement that the Commission made in the

13   hearing.  Here's what they say.

14           Further, mere days before the TRO hearing

15   consistent with counsel's representation to the Court the SEC

16   learned that a substantial portion of the funds held in two

17   bank accounts controlled by the defendants including one

18   controlled by DLI had been substantially drained of assets.

19           That is a mischaracterization of the representation

20   that counsel made to me, and they knew it because it had been

21   recited and quoted in the defendant's motion to dissolve.

22   That's not what the counsel said.  Had counsel said this, it

23   would have led to further discussion about, tell me about

24   that.  What are the nature of the withdrawals?  Which

25   accounts?  Is there evidence that that's an attempt to

1   dissipate or secret assets?  Could it be business expenses,

2   the routine business expenses?  We didn't have that discussion

3   because the statement was the accounts were closed by the

4   defendants.

5           In support of this contention that's consistent

6   with their prior representation the Commission had learned

7   that a substantial portion of the funds held in two accounts

8   had been transferred or substantially drained of assets.  The

9   Commission cites two sources.  The first is Zaki's initial

10  declaration at Paragraph 10, which provides no support for the

11  Commission statement.  The second cite is Zaki's supplemental

12  declaration in Paragraphs 10B and 10C.

13          In short what those paragraphs establish is that

14  there was a $50,000 withdrawal in one of the accounts or a

15  reduction at least in the value of the account in the days

16  leading up to the TRO, and then in the second account that's

17  referenced by Saki in his or her declaration the account went

18  from about $690,000 to about $390,000, I think, about a

19  $300,000 reduction in the value.

20          Maybe that's substantial draining of assets.  I

21  don't know, and I don't want to quibble, but that's not what

22  the Commission said at the hearing.  It's not what I relied on

23  in issuing the TRO.

24          There's more, but I think I'll pull up here and

25  just say -- oh, no.  I want to add this, as well.  This

1    doesn't go to an order to show cause that may or may not issue

2    to the Commission, but it goes to the sufficiency of the

3    Commission's showing in the papers.

4              I conclude based on my review of everything in the

5    record that the TRO was improvidently granted in the first

6    case.  And I was quite surprised that after having a receiver

7    in place for about two months that the only new information

8    the Commission produced to show a likelihood of irreparable

9    harm absent the TRO is the reduction in value in those two

10   accounts that I just mentioned totaling about $350,000 and I

11   think without any forensic analysis about where those monies

12   went.

13             I will say having reviewed the Saki declaration,

14   and I think I'm thinking about Exhibit A to the supplemental

15   declaration, the net value of proceeds in the accounts that

16   Saki analyzes actually increased over $600,000 over the period

17   that's analyzed.  Now that may be investor funds that were

18   unlawfully or improperly obtained or who knows what they are.

19   There's not an assessment of it.  But there are many concerns.

20             On balance, in addition to concluding that the TRO

21   was improvidently granted in the first case I think there is

22   no evidence before me that would establish the proprietary of

23   that injunction today under the Rule 65 factors.  So I think

24   for those reasons, I think the TRO has to be resolved.

25             This leaves me with a question that I'll be seeking

1    your input about today.  You know, when we're moving at light

2    speed evaluating an application for a TRO that requests among

3    other things the appointment of a receiver.  There's not time

4    to negotiate the details of executing a receivership that has

5    to be done right way.  It's a difficult and complex exercise

6    to jump into a situation like this and for a receiver to get

7    his or her arms around the operations and to take control and

8    to execute and discharge the duties of a receiver.  I've not

9    before been in a position of dissolving a TRO and

10   receivership, but we have a luxury of some time at least to

11   ensure an orderly handoff if at the conclusion of this hearing

12   I dissolve the TRO, as I think I will.  So I'll be eager to

13   hear from all of you how we can do this in the most orderly

14   and expeditious fashion.

15        And then I'm happy to hear anything that the

16   Commission staff or anyone representing the Commission wants

17   to say today about my comments, though you need not say

18   anything.  The question that lingers is how under these

19   circumstances I could do anything other than issue an order to

20   show cause on contempt, and afford the Commission an

21   opportunity to respond fully after an opportunity to visit

22   with one another and evaluate more carefully the record and my

23   statements and then provide a full throated response before I

24   make any conclusions.

25        I will say that if we would dissolve the TRO today

```
 1      I think a number of pending motions likely are moot including

 2      the SEC's motion to clarify the receivership order,

 3      Docket 125; the receiver's motion to clarify the receivership

 4      order, Docket 144; the receiver's motion for contempt and

 5      sanctions, Docket 138.  The reason I think the last one is

 6      moot is not that I'm impressed with the effort of some of the

 7      defendants have made to comply with this court's order which I

 8      take seriously, but rather the sole purpose of civil contempt

 9      is to obtain compliance of the court order.  And if that order

10      is vacated, there's nothing to obtain compliance with.

11            Those are just my preliminary thoughts.  I

12      appreciate your patience.  I've carried on for quite sometime

13      now.  I wanted to be clear.  I wanted to be relatively

14      complete so that you knew what I was thinking.  I wanted to be

15      transparent.

16            And let me first invite the Commission to weigh in

17      in whatever order and on whatever topics you wish to address.

18      And I don't know if it will be Mr. Welsh or someone else.

19      Anyone?  I'm all ears.

20            MR. WELSH:  Thank you, Your Honor.  My apologies

21      for being in a different office now.  My Zoom crashed halfway

22      through the hearing.

23            THE COURT:  I'm sorry to interrupt for a moment.  I

24      can tell from my court reporter here in the courtroom we're

25      having a hard time hearing you.  I think it's -- and I said
```

1    Ms. Coombs earlier.  I apologize.  My goodness.  I'm sorry.  I

2    know it's not Miss Coombs.  Tracy Coombs is the counsel who

3    entered an appearance, the regional director.  I have your

4    name in front of me somewhere.  I apologize sincerely.

5              But, Mr. Coombs, go ahead, please.

6              MR. WELSH:  Your Honor, this is Michael Welsh.  I'm

7    on Tracy Coombs' camera because my Zoom crashed.  My office is

8    still up.  I apologize.  It crashed halfway through the

9    meeting, so I came down here.  So apologies to the court

10   reporter, as well.  For the Court this is Michael Welsh from

11   the SEC speaking now.

12             Thank you, Your Honor, for that.  I'll start by

13   referring to the record and transcript.  And as I was looking

14   at it there are some words that I wish I clarified there.  I

15   did not intend in any way intend to misrepresent to the Court.

16   What I was trying to represent with respect to the bank

17   accounts closing in that time was in connection with our

18   discussion as to whether or not we should re-file or if there

19   was sufficient information there.  I did not -- I think I

20   mentioned an estimation in the record, I don't have it in

21   front of me, but I believe I said something along the lines, I

22   don't have the number in front of me, but as to the 33

23   accounts, we were referring to the 29 accounts that SEC

24   subpoenaed, 24 of which were closed.  The last 48 hours as you

25   mentioned, yes, those accounts did not close.  What we saw was

1   when checking the numbers when reaching out to the bank from

2   prior submissions after the application was submitted we

3   noticed withdrawals in the accounts that were substantial of

4   75 percent in one and 50 percent in the other.  I understand

5   that you mentioned that it was only 30,000.  But I point that

6   out just because that was the remaining DLI bank account in

7   the United States.

8              With respect to the video, Your Honor is correct in

9   saying that they were talking about with respect to avoiding

10  SEC jurisdiction for lack of clarity.  But in the video you

11  said he moved operations, and then later in the video he said,

12  so we're moving to Abu Dhabi.

13             It was a covert investigation.  We don't have

14  access to individual bank accounts, but we're seeing such as

15  the relief defendants IX Venture, FZCO being created in Abu

16  Dhabi receiving $2 million from investor funds being

17  transferred there and then seeing bank accounts close on

18  June 30th, which we were alerted to when we were reaching out

19  to the banks in July.

20             THE COURT:  Mr. Welsh --

21             MR. WELSH:  With respect --

22             THE COURT:  Mr. Welsh.

23             MR. WELSH:  Yes, Your Honor.

24             THE COURT:  The investor funds that you maintained

25  were transferred, am I right that whatever those transfers

1    were, and I think the most recent of those was about

2    $1 million-something transfer in -- was it in January of this

3    year?

4                MR. WELSH:  I believe so, Your Honor, yes.

5                THE COURT:  And the Commission is not aware of any

6    direct transfers of monies that you contend are investor funds

7    from the United States to UAE after January of this year; is

8    that true?

9                MR. WELSH:  It's true, Your Honor, to what we are

10   aware of.  But I just want to point out for transparency

11   purposes, we had frozen approximately $11 million out of 130

12   that's been raised by defendants primarily in cryptocurrencies

13   in which we have not been able to identify any of those

14   accounts.  So the amounts that we pointed to were what we had

15   evidence of, which our view was it shows a pattern consistent

16   with, yes, Mr. Anderson said we're moving operations there, we

17   inferred that to be assets as well along with operations.  I

18   assume it would be servers, but also where the funds were

19   going.

20               We see the accounts closing in 2022 and 2023 during

21   the time period of the offering, and we assumed and made a

22   connection there deducing that that meant that was part of the

23   operations.

24               We have not been able to obtain individual bank

25   accounts.  We have not been able to obtain account records of

 1    the other accounts that the defendants have said they moved

 2    the funds to during that discovery process.  We would have

 3    certainly, Your Honor, would have included that in our

 4    opposition if we had access to those records.  But what we

 5    were trying to do as a good faith effort to demonstrate to

 6    Your Honor what our concerns were was that we were seeing this

 7    money come in in massive amounts and being moved from these

 8    accounts quickly, but then seeing several of the accounts

 9    closed.  We did not -- to be clear, we did not know the

10    reasoning for the closure of the accounts that had been

11    identified as defendants' responses to our submissions.  What

12    we were seeing was that accounts were being closed at those

13    times.

14          So I just say that to give Your Honor an

15    understanding of where we were coming from in this emergency

16    action, where we identified these videos, saw what was

17    happening, and then once we started looking into the transfer

18    of funds and the accounts belonging to these companies, seeing

19    a lot of them being closed at different times and then seeing

20    a video saying moving operations and then seeing it transfer

21    funds to a UAE entity, that was the basis for us saying that

22    there is certainly an emergency, and there's a pattern here of

23    (inaudible) operations and in turn accessing (inaudible).

24          MS. COOMBS:  Your Honor, this is Tracy Coombs, the

25    regional director.  I hope you can hear me.  We're trying to

1    sort of share a desk here.

2            But I think that we will look very carefully at

3    what Your Honor has pointed out and certainly would respond in

4    the event that there were any order to show cause with respect

5    to what was shown to the court.  But we obviously take what

6    the Court has said very seriously and would gladly respond if

7    given the opportunity.  Thank you.

8            THE COURT:  Thank you, Miss Coombs.

9            Bear with me for a moment.  I'm going to pause for

10   just a moment.  We'll be in a very brief recess.  Just for a

11   moment or so.

12           (Time lapse.)

13           THE COURT:  Mr. Welsh, let me just ask, is there

14   anything more the Commission would like to say in response to

15   the issues that I think I placed on the table in my

16   preliminary comments?

17           MR. WELSH:  Excuse me.  Not at this time, Your

18   Honor.

19           THE COURT:  Okay.  Then I need another moment.

20   Excuse me.

21           (Time lapse.)

22           THE COURT:  Okay.  We'll go back on the record.

23   Thanks again for your patience.

24           Let me just say then that I think nothing that

25   Mr. Welsh just said causes me to change my preliminary view

1    that the temporary restraining order was improvidently issued

2    and that there's no factual or legal basis to support its

3    remaining in place.  I think the net effect of that is that

4    I'll be dissolving the TRO, and I have a very short oral

5    ruling I'm going to give today.  I'll be following this with a

6    written decision explaining in greater detail my analysis.

7            But I think the next issue that that raises in my

8    mind, and this is uncharted territory for me, is how to

9    transition a receivership.  So let me ask, Ms. Magee, if you

10   have any thoughts about that.

11           MS. MAGEE:  Thank you, Your Honor.  I agree it's

12   uncharted territory.  The receiver serves at the pleasure and

13   pursuant to the discretion of Your Honor.  The receivership in

14   this matter was created and really sprang forth by extension

15   from the application for emergency and what I'll call

16   ancillary relief, the TRO, the embedded asset freeze, the

17   receivership.  I believe, though I have not researched for

18   purposes of today's hearing, that the Court in its discretion

19   can determine that a receivership temporary or otherwise of

20   whatever scope is appropriate can exist or continue

21   notwithstanding the lack of emergency orders, injunctive

22   orders (inaudible), but I cannot cite you to a case at this

23   moment.  We serve at Your Honor's pleasure.

24           THE COURT:  Rule 66 I think seems to suggest that.

25   But I've not -- it's very ambiguous and doesn't include any

1    standards or specificity.  It really seems, I mean, I think it
2    is -- I'm going to ask a question that reveals my lack of
3    knowledge about this.  I don't know the receivership in this
4    context is the same as an equity receivership, but because it
5    was issued in connection with the Rule 65 injunction I think
6    it's for all intents and purposes with respect to the
7    receivership we're in equity.  So I gather that means that I
8    have broad discretion to try to --
9              MS. MAGEE:  Fashion a relief you believe
10   appropriate on the equity.
11             THE COURT:  Fair enough.  Thank you.  Well said.
12             I think I interrupted you.  Go ahead, Ms. Magee, if
13   there's anything more.
14             MS. MAGEE:  Only that where I have seen I would say
15   similarly dissimilar situations are for instance receivers
16   that are put in place postjudgment of a litigation where
17   there's a risk of dissipation or a loss, so not an emergency
18   basis, but there is some need in the court's determination
19   that a third party, not the controllers of the entity or
20   entities themselves, should steward those companies or their
21   assets for some period of time or for some particular purpose.
22             Again I leave that to Your Honor's discretion.  I
23   would say only more that the work that we have done today we
24   believe has discharged vigorously and diligently and
25   efficiently the duties outlined in the temporary receivership

1     order.  So we stand ready to proceed under that order as we

2     have been or pause and determine if you would like our input

3     on how to prepare to transition, to tailor or to wind down if

4     Your Honor believes that is appropriate at this juncture.  I'm

5     happy to brief any issues if you'd like our research.

6           THE COURT:  Mr. Gottlieb, I think this question is

7     best directed to you, but we'll hear from anyone who wishes to

8     weigh in on this.  My instinct is to provide a deadline to

9     direct counsel for the receiver and counsel for the defendants

10    to meet and confer and to submit a proposal to the court by a

11    date certain.  But what's your view?

12          MR. GOTTLIEB:  Your Honor, thank you very much.  We

13    appreciate the Court's close and careful attention to these

14    issues.  We think that in this case lives have been turned

15    upside down, businesses have been greatly hampered, jobs have

16    been lost.  We can't fix the past, but I think we can remedy

17    some of these issues as soon as possible.  As a result I do

18    think that the assets, the control of the companies and the

19    cryptocurrency wallet control should be transferred back as

20    soon as possible.  If the entire purpose of the reason for the

21    TRO and the receivership is being vacated, I think that the

22    wisest course of action is just to return to the status quo

23    and do as well as we can.

24          I like Your Honor's suggestion about providing a

25    deadline for a meet and confer to submit a proposal.  I do

1    think that that deadline should be as close in time as

2    possible given the damage that the defendants have suffered

3    and the companies have suffered in the meantime.

4           So I think the receiver should be putting work on

5    pause, and I think we should be having that meet and confer as

6    soon as possible about how to transfer control and any assets

7    back to the defendants.

8           THE COURT:  Mr. Gottlieb, as you're saying that, I

9    have a slightly -- I have another idea.  I think it's the

10   defendants who are maximally incentivized here to make this

11   transition happen as expeditiously and as efficiently as

12   possible.  I wonder if I should place the initial burden back

13   on the defendants, and by that I mean I think I mean you and

14   your team, to file a proposal or at least exchange one, to

15   write up something to send to Miss Magee describing the timing

16   and sequence of events that you contend should happen.  And

17   then the exchange of that initial sort of demand if you will

18   would trigger what I'm going to say as a 48-hour period of

19   meet and confer and then a joint report from the parties

20   48 hours following your service of your proposal to the

21   receiver's counsel.  How does that strike you?

22          MR. GOTTLIEB:  That's a good idea, Your Honor.  I

23   think we can do that.  I think we would be able to do it even

24   quicker.  But certainly we can write a proposal as soon as

25   possible and send it to Ms. Magee and her colleagues in order

 1     to start that 48-hour period of negotiation.  Hopefully we can

 2     shorten that to the extent possible.

 3               THE COURT:  There's a lot of counsel on this call,

 4     and there's a lot of interested parties.  I think this is

 5     going -- it's not going to -- it may not be easy to coordinate

 6     with everyone.  But, Mr. Gottlieb, I'm going to charge you I

 7     think with coordinating on the defense side at least so

 8     there's a unified voice to the extent that's possible with the

 9     receiver and we're not running the receiver around trying to

10     do inconsistent things or what have you.

11               So before I make that the order of the Court let me

12     hear from anyone else who wants to weigh in on that.  And how

13     about by show of hands for counsel if you want to weigh in on

14     this or you have --

15               Miss Magee, you're first in line.  There you go.

16     Go ahead.

17               MS. MAGEE:  And this may be something that

18     Mr. Gottlieb and I I'm sure can discuss together, so maybe

19     this is an issue flagged and a question to be answered.

20     But --

21               Mr. Welsh, or somebody go off, please.

22               MR. WELSH:  I'm sorry.  We're closing that right

23     now.  Sorry about that.

24               MS. MAGEE:  That's okay.

25               Your Honor, again I think Mr. Gottlieb and I can

1    probably work this out together.  But just in terms of your

2    own thinking for dissolution of the TRO, let's assume that

3    that were to happen at this moment in time a TRO dissolves and

4    with it an asset freeze, I would think that the two-day

5    restrains parties, some but certainly not all of them are

6    receivership entities, DLI, right?  Let's just say DLI, since

7    there's been no decision on clarification that may quickly be

8    muted, we would just want to be very clear-eyed on the

9    receiver's duties and where they stop with regard to unfrozen

10    accounts continued monitor.

11            Again, I think that's something that Mr. Gottlieb

12    and I can discuss, but I didn't want the moment to pass if

13    Your Honor had a strong view on how we should approach that

14    issue.

15            THE COURT:  I'm going to speak at 10,000 feet --

16            Well, Mr. Baker, go ahead.  Why don't we hear from

17    counsel first.  Go ahead.

18            MR. BAKER:  Yeah.  Again, Miss Magee is talking

19    about coordinating with Mr. Gottlieb.  And as you heard me in

20    our last hearing, there's a clump of defendants, a bucket of

21    defendants, that are not similarly situated with

22    Mr. Gottlieb's position at this point.  And we want to be able

23    to engage with Ms. Magee, as well.

24            THE COURT:  Yes.  I'm just asking you to coordinate

25    I think your efforts with Mr. Gottlieb in the first instance

```
 1    if you can so that the receiver is not trying to answer to
 2    18 different people.  And I understand your interest may not
 3    align with Mr. Gottlieb's, but I want you at a minimum to meet
 4    and confer about where you share common ground or where you
 5    made need -- he may submit a response on behalf of all the
 6    defendant groups, one response from Mr. Gottlieb with the
 7    input from you and Mr. Marshall and others.  But to the extent
 8    you can -- there's another way to do this, which is to pull
 9    the string.  That seems to me to be unwise right now.  But let
10    me just articulate my general high level view to try to inform
11    the direction of the conversations.
12             Having concluded that the TRO is improvidently
13    granted, having rested the need for the asset freeze and the
14    receivership to address the harms that I was concerned about
15    addressing, having now decided that there's not a legal basis
16    to support that, I want the transition to be complete and
17    quick.  I want the defendants to be back in control.
18             And let me say on this point.  I've had this
19    thought a handful of times during this hearing, but I want to
20    be clear about this.  At the -- how do I say this?  I fully
21    expect counsel for the defendants in this case that you will
22    communicate to your clients the importance of ensuring that
23    there are no efforts to dissipate or remove assets during the
24    pendency of this action until we can decide this case on the
25    merits.  At least some of the -- I know we're going to be
```

          1    arguing or deciding at some point soon about whether these are
          2    securities, whether the causes of action are sustainable,
          3    whether there is a legal basis and the like.  I don't know
          4    what -- I don't know what the facts might look like at some
          5    point, but if I'm presented without evidence that the
          6    defendants are actively engaged in some effort to place
          7    outside the scope the jurisdiction of this court assets that
          8    are in question right now, which is different than operating
          9    their business, business expenses and the like, we'll have
         10    really serious conversations about that if we need to.  I just
         11    want to be clear about my expectation while I'm handing the
         12    keys back to the defendants and their entities.
         13             I'm sure I didn't need to say that, but I didn't
         14    want it to go unsaid and then somebody say later they didn't
         15    know that this was going to be a big deal.  It will be a big
         16    deal.
         17             Who else wishes to be heard about this idea that I
         18    have for the defendants to tender a plan or demand and then a
         19    meet-and-confer period followed by either joint or separate
         20    status reports from the parties?  Anyone else?
         21             Okay.  Well, then that's what I'm going to direct.
         22    I'm going to direct, Mr. Gottlieb, for you to meet and confer
         23    first with your colleagues.  I don't really mean colleagues, I
         24    guess I mean the defense counsel who appeared in this case.
         25    Do your best to see if you can present a clear and concise

1          plan or demand to the receiver, a plan -- I guess it's a plan

2          of action going forward, and then negotiate and meet and

3          confer vigorously.  I said 48 hours because I think that's a

4          reasonable amount of time.  I know that counsel will have to

5          communicate with one another and then your clients and then

6          back with one another.  If you need more time just tell me

7          that.  I just want to keep us on a tight timeframe, and then

8          I'll look for those status reports.

9                    MR. GOTTLIEB:  Thank you, Your Honor.  Understood.

10                   THE COURT:  I think the next thing -- well, I want

11         to provide a short oral ruling, but let me first ask, what if

12         anything else we should take up while we're here together

13         today.

14                   Let me start with the Commission.  Mr. Welsh,

15         anything more we should take up today while we're together?

16                   MR. WELSH:  Just one thing for housekeeping, Your

17         Honor, related to answers for defendants.  I believe last time

18         you said you wanted them all due at the same time.  We had a

19         motion dismissed today, and you granted defendants' extension

20         request.  We had received other extension requests from other

21         defendants.  We have said that this one's your order that you

22         wanted them all at the same time.  So I guess for their sake I

23         wanted to raise that and see if that's acceptable to extend

24         their answers to two weeks as well if they wish to do so.

25                   THE COURT:  I'm sorry if I was unclear in our

1    earlier discussion, and I don't recall what words I used

2    exactly.  My intent was to try to ensure that we weren't being

3    redundant with arguments that the defendants were advancing in

4    motions to dismiss and that we consolidate the briefing to the

5    extent that it's possible preserving for individual defendants

6    consistent with their own individual circumstances to assert

7    whatever defenses or legal arguments they wanted to advance.

8            But the timing of the presentation -- maybe I did

9    talk about the timing because I didn't want the Commission

10   having to respond to, that's right, seriatim.

11           What do you propose, Mr. Welsh?  That we afford all

12   the defendants the additional extension of time in the

13   deadline for filing for anyone who hasn't already answered or

14   filed a motion to just file at the same time that the Gottlieb

15   defendants are filing and then stay the Commission's response

16   on the motion we got today for that additional seven days so

17   that responsive briefing is all in alignment?  Is that you

18   think the most efficient way to proceed?

19           MR. WELSH:  From our perspective I think that makes

20   sense, Your Honor.  But if others disagree I'm happy to hear

21   their thoughts.

22           THE COURT:  I'm not going to invite a lot of

23   discussion or argument about that.  I'm going to stay for

24   seven days the time for the Commission to respond to any

25   motions that are filed today.  And I'm going to grant an

```
 1    extension for all the remaining defendants through the period

 2    that we granted for the Gottlieb defendants to answer.  And

 3    then we'll just do the best we can.  It's going to be a lot of

 4    paper, I think, Mr. Welsh, and we'll sort it out.

 5              Okay.  Anything else from the Commission,

 6    Mr. Welsh?

 7              MR. WELSH:  No, Your Honor.

 8              THE COURT:  Mr. Gottlieb?  I see you took yourself

 9    off mute, but I can't hear you at all.

10              MR. GOTTLIEB:  Your Honor, no, thank you.

11              THE COURT:  By show of hands anyone else who wants

12    to be heard before I provide a short oral ruling and we

13    recess?  I guess there's two screens.  Hold on.  No, I don't

14    see any hands.  All right.  So bear with me.  This is short.

15              I'm going to place on the docket -- well, the

16    minute entry from this hearing will reflect that I provided

17    this short oral ruling.  The effect of this ruling will go

18    into effect immediately.  We will prepare and file a written

19    memorandum decision and order that more completely and more

20    fully describes the Court's action and the basis for the

21    action.

22              But as for today I'll say that a party seeking a

23    temporary restraining order in the 10th Circuit must

24    establish, first, a substantial likelihood of prevailing on

25    the merits; second, irreparable harm unless the injunction is
```

1    issued; third, that the threatened injury to the applicant

2    outweighs the harm that the preliminary injunction may cause

3    any opposing parties; and fourth, that the injunction if

4    issued would not adversely affect the public interest.

5            That's language from the Diné Citizens decision

6    from the 10th Circuit in 2016, where the 10th Circuit went on

7    to say:  The temporary restraining orders are an extraordinary

8    remedy, so the movant's right to relief must be clear and

9    unequivocal.

10           Having carefully considered the parties' filings

11   and the parties' arguments and for at least in part the

12   reasons I've already articulated today during this hearing, I

13   am now convinced that the TRO was improvidently granted in the

14   first instance, because even considering the new evidence

15   submitted by the Commission in my judgment it has failed to

16   show irreparable harm.  I'm not going to go -- because the

17   Commission has to establish all four elements and having

18   already decided they failed in one respect, I'm not going to

19   separately consider the other elements.

20           The motion to dissolve, there were several motions,

21   they are Docket Numbers 132, 145 and 159 are granted.  The

22   current TRO, Docket 165, is dissolved as of now.  And as I

23   said, I'll provide a written order more fully explaining my

24   reasoning.

25           Because there is no longer a TRO in place the

 1    receivership order, Docket Number 10, is also dissolved.  And

 2    the motions I mentioned earlier, I'll recite them again, these

 3    motions will can denied as moot.  Docket 125, the Commission's

 4    motion to clarify the receivership order --

 5              Excuse me one moment.

 6              (Time lapse.)

 7              THE COURT:  -- Docket 144, the receiver's motion to

 8    clarify the receivership order; and Docket 138, the receiver's

 9    motion for contempt and sanctions.

10              I appreciate your time and your patience today,

11    counsel.  We'll be in recess.

12              (The court proceedings were concluded.)

13                        *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF UTAH          )

2                           ) ss.

3    COUNTY OF SALT LAKE  )

4              I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6              That as such reporter, I attended the hearing of

7    the foregoing matter on October 6, 2023, and thereat reported

8    in Stenotype all of the testimony and proceedings had, and

9    caused said notes to be transcribed into typewriting; and the

10   foregoing pages number from 5 through 48 constitute a full,

11   true and correct report of the same.

12             That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14             And hereby set my hand and seal, this _____ day of

15   _____ 2023.

16

17

18

19

20             _____
                    KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```