# Exhibit 1

# UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

v.

COINBASE, INC. AND COINBASE GLOBAL, INC.,

*Defendants*.

23 Civ. 4738 (KPF)

## MEMORANDUM OF LAW IN SUPPORT OF COINBASE'S MOTION FOR JUDGMENT ON THE PLEADINGS

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

*Attorneys for Defendants*

Dated: August 4, 2023

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ....................................................................................................... 2

ARGUMENT .............................................................................................................. 5

I.      THE COMPLAINT DOES NOT PLEAD "SECURITIES" TRANSACTIONS. ............... 6

    A.     Because the Complaint alleges no contractual undertaking beyond the point of sale, no "investment contract" is pleaded. .................................. 7

        (i)     The SEC misreads *Howey* in asserting that a "scheme" without a contractual undertaking will suffice. ......................................... 10

        (ii)     Recent crypto cases do not support the SEC's efforts to use "scheme" as an escape hatch from statutory text. ..................................... 13

        (iii)     The SEC's effort to portray a simple asset sale as a security is an unprecedented stretch. ........................................................... 14

    B.     Transactions on Coinbase and through Prime are not investment contracts because the purchaser gets no share in business income, profits, or assets. .......... 18

        (i)     An investment contract requires an expectation in the income, profits, or assets of a business. ................................................... 18

        (ii)     Because the SEC does not allege an expectation in the income, profits, or assets of any business, the Exchange Act claims cannot stand. ............ 19

II.     THE MAJOR QUESTIONS DOCTRINE COMPELS REJECTION OF THE SEC'S CONSTRUCTION OF "INVESTMENT CONTRACT." .................................. 21

III.     COINBASE IS ENTITLED TO JUDGMENT ON THE CLAIM THAT IT ACTS AS AN UNREGISTERED BROKER THROUGH WALLET. ................................ 25

IV.     COINBASE IS ENTITLED TO JUDGMENT ON THE CLAIM THAT ITS STAKING SERVICES CONSTITUTE UNREGISTERED SECURITIES .................... 27

    A.     Coinbase's staking services do not involve an investment of money .................. 27

    B.     Profits from Coinbase's staking services are not by dint of managerial services .. 29

CONCLUSION ................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Cases**                                                                                       **Page(s)**

*Ala. Ass'n of Realtors* v. *Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021)..................................................................................22, 24

*Biden* v. *Nebraska*,
  143 S. Ct. 2355 (2023)..........................................................................21, 22, 23, 24

*Davis* v. *Rio Rancho Estates, Inc.*,
  401 F. Supp. 1045 (S.D.N.Y. 1975)...............................................................13

*De Luz Ranchos Inv. Ltd.* v. *Coldwell Banker & Co.*,
  608 F.2d 1297 (9th Cir. 1979) ........................................................................10

*FDA* v. *Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)..........................................................................................21

*Found. Ventures, LLC* v. *F2G, Ltd.*,
  2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010)................................................26

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985)............................................................................27

*Hart* v. *Pulte Homes of Mich. Corp.*,
  735 F.2d 1001 (6th Cir. 1984) ........................................................................13

*Hocking* v. *Dubois*,
  885 F.2d 1449 (9th Cir. 1989) (en banc) ............................................. 12 & n.9, 30

*In re Voyager Dig. Holdings, Inc.*,
  649 B.R. 111 (Bankr. S.D.N.Y. 2023)........................................................23 n.18

*Int'l Bhd. of Teamsters* v. *Daniel*,
  439 U.S. 551 (1979)..........................................................................................29

*Lively* v. *WAFRA Inv. Advisory Grp., Inc.*,
  6 F.4th 293 (2d Cir. 2021) ..........................................................................5-6

*Marine Bank* v. *Weaver*,
  455 U.S. 551 (1982)..........................................................................................27

*Noa* v. *Key Futures, Inc.*,
  638 F.2d 77 (9th Cir. 1980) ......................................................................16, 19

*People* v. *White*,
   124 Cal. App. 548 (1932) ..................................................................................8

*Prohaska* v. *Hemmer-Miller Dev. Co.*,
   256 Ill. App. 331 (1930) ...............................................................................8, 11

*Rhee* v. *SHVMS, LLC*,
   2023 WL 3319532 (S.D.N.Y. May 8, 2023) .......................................................27

*Revak* v. *SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994) ......................................................................9, 20 n.14

*Ricatto* v. *M3 Innovations Unlimited, Inc.*,
   2019 WL 6681558 (S.D.N.Y. Dec. 6, 2019) .......................................................6

*Rodriguez* v. *Banco Cent. Corp.*,
   990 F.2d 7 (1st Cir. 1993) .........................................................................9-10, 19

*SEC* v. *Belmont Reid & Co.*,
   794 F.2d 1388 (9th Cir. 1986) .................................................................15, 17

*SEC* v. *C. M. Joiner Leasing Corp.*,
   320 U.S. 344 (1943) ..................................................................................8

*SEC* v. *Edwards*,
   540 U.S. 389 (2004) ........................................................................... *passim*

*SEC* v. *GEL Direct Tr.*,
   2023 WL 3166421 (S.D.N.Y. Apr. 28, 2023) .................................................25-26

*SEC* v. *Kik Interactive Inc.*,
   492 F. Supp. 3d 169 (S.D.N.Y. 2020) .........................................................13, 16

*SEC* v. *Lauer*,
   52 F.3d 667 (7th Cir. 1995) ...................................................................18, 20 n.14

*SEC* v. *LBRY, Inc.*,
   2022 WL 16744741 (D.N.H. Nov. 7, 2022) .................................................18 n.13

*SEC* v. *Life Partners, Inc.*,
   87 F.3d 536 (D.C. Cir. 1996) ...................................................................20 n.14, 30

*SEC* v. *Ripple Labs, Inc.*,
   2023 WL 4507900 (S.D.N.Y. July 13, 2023) ............................................... *passim*

*SEC* v. *StratoComm Corp.*,
   2 F. Supp. 3d 240 (N.D.N.Y. 2014) .............................................................25

*SEC* v. *Telegram Grp., Inc.*,
448 F. Supp. 3d 353 (S.D.N.Y. 2020) ................................................................16

*SEC* v. *Terraform Labs Pte. Ltd.*,
2023 WL 4858299 (S.D.N.Y. July 31, 2023) ................................................ *passim*

*SEC* v. *W.J. Howey Co.*,
328 U.S. 293 (1946) ....................................................................................... *passim*

*State* v. *Agey*,
88 S.E. 726 (N.C. 1916) ....................................................................... 7-8, 11

*State* v. *Evans*,
154 Minn. 95 (1922) ...................................................................................8

*State* v. *Gopher Tire & Rubber Co.*,
146 Minn. 52 (1920) ..............................................................................8, 10

*State* v. *Ogden*,
154 Minn. 425 (1923) ............................................................................8, 11

*State* v. *Robbins*,
185 Minn. 202 (1932) ........................................................................8, 11, 12

*Stevens* v. *Liberty Packing Corp.*,
111 N.J. Eq. 61 (1932) ...........................................................................8, 11

*United Hous. Found., Inc.* v. *Forman*,
421 U.S. 837 (1975) ............................................................................21, 29

*Util. Air Regul. Grp.* v. *EPA*,
573 U.S. 302 (2014) ..................................................................................21

*Wals* v. *Fox Hills Dev. Corp.*,
24 F.3d 1016 (7th Cir. 1994) ...............................................................18, 21

*West Virginia* v. *EPA*,
142 S. Ct. 2587 (2022) ........................................................................21, 22

**Rules & Statutes**

15 U.S.C. § 77h(a) .........................................................................................4

15 U.S.C. § 78c(a)(4)(A) ..............................................................................25

15 U.S.C. § 78c(a)(10) ...................................................................................6

17 C.F.R. § 230.461(b) ...................................................................................4

Fed. R. Civ. P. 12(c) ...................................................................................5

**Legislative Materials**

Clarity for Payment Stablecoins Act of 2023,
    H.R. 4766, 118th Cong. (2023)...............................1 n.1, 5 n.7, 23 n.17

Crypto-Currency Act of 2020,
    H.R. 6154, 116th Cong. (2020) .........................................23 n.17

Digital Commodities Consumer Protection Act of 2022,
    S. 4760, 117th Cong. (2022)...........................................23 n.17

Digital Commodity Exchange Act of 2022,
    H.R. 7614, 117th Cong. (2022)........................................23 n.17

Eliminate Barriers to Innovation Act of 2021,
    H.R. 1602, 117th Cong. (2021).......................................23 n.17

Financial Innovation and Technology for the 21st Century Act,
    H.R. 4763, 118th Cong. (2023)...................1 n.1, 5 n.7, 23 n.17

Lummis-Gillibrand Responsible Financial Innovation Act,
    S. 2281, 118th Cong. (2023)...........................................23 n.17

The Token Taxonomy Act of 2021,
    H.R. 1628, 117th Cong. (2021)........................................23 n.17

U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019,
    H.R. 923, 116th Cong. (2019) .........................................23 n.17

**Other Materials**

Black's Law Dictionary (3d ed. 1933)........................................................14

Defs' Br. ISO Mot. Summ. J., *SEC* v. *Ripple Labs, Inc.*,
    No. 1:20-cv-10832-AT-SN (S.D.N.Y. Sept. 17, 2022) .................... 12-13

Brief for the SEC as Amicus Curiae, *Int'l Bhd. of Teamsters* v. *Daniel*,
    Nos. 77-753 & 77-754 (U.S. Aug. 18, 1978)..............................9

Brief for the SEC as Amicus Curiae on Reh'g En Banc, *Hocking* v. *Dubois*,
    No. 85-1932 (9th Cir. Oct. 24, 1988)....................................12 n.9

Brief for the SEC, *SEC* v. *Edwards*,
    No. 02-1196 (U.S. June 26, 2003) ...............................9, 18, 21

Brief for the SEC, *SEC* v. *W.J. Howey Co.*,
    No. 843 (U.S. Apr. 17, 1946)......................................... *passim*

Brief for the SEC in Supp. Mot. Summ. J., *SEC* v. *Ripple Labs, Inc.*,
No. 1:20-cv-10832-AT-SN (S.D.N.Y. Sept. 17, 2022) ........................................................20

Brief for the SEC in Opp. Defs' Mot. Summ. J., *SEC* v. *Ripple Labs, Inc.*,
No. 1:20-cv-10832-AT-SN (S.D.N.Y. Oct. 21, 2022)............................................................13

Gary Gensler, *Cryptocurrencies: Oversight of New Assets in the Digital Age*,
Hr'g Before the U.S. H. Comm. on Agric., 115th Cong. (July 18, 2018) .............3 n.3, 17 n.12

SEC Comm'r Hester M. Peirce,
*Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023) .......23 n.16

SEC Chair Gary Gensler,
*Statement on Financial Stability Oversight Council's Report on Digital Asset*
*Financial Stability Risks and Regulation Before the Financial Stability*
*Oversight Council Open Meeting* (Oct. 3, 2022).................................................................3 n.2

SEC Dir. Div. of Corp. Fin. William Hinman,
*Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018) ....3 n.3, 17 n.12

Tr. Hr'g TRO, *SEC* v. *Binance Holdings Ltd.*,
Case No. 1:23-cv-01599-ABJ (D.D.C. June 13, 2023) ............................................10, 23 n.18

Tr. Mots. Hr'g, *SEC* v. *LBRY, Inc.*,
Case No. 1:21-cv-00260-PB (D.N.H. Jan. 30, 2023) ......................................................17 n.13

## PRELIMINARY STATEMENT

Two years ago, recognizing that the SEC wanted but lacked statutory power to regulate crypto exchanges, Chair Gary Gensler asked Congress for a legislative mandate. None came. Now, without any intervening legislative act, the Commission accuses Coinbase—the largest U.S. crypto exchange—of having "defied" the federal securities laws in failing to register as a securities exchange, broker, and clearing agency since 2019. Compl. ¶ 3, ECF No. 1. No matter that the SEC allowed Coinbase to go public in 2021 with the same business it operates now. *Id.* ¶¶ 16, 111. No matter that Congress has for years been actively considering—and just last week advancing— legislation to grant and allocate among other regulatory agencies the very authority the SEC now claims for itself.[1] The SEC wanted to get the jump.

In making that jump, the SEC has violated due process, abused its discretion, and abandoned its own earlier interpretations of the securities laws. But there is a more fundamental problem with its case—one the Chair recognized two years ago and that entitles Coinbase to judgment on the pleadings now: The subject matter falls outside the agency's delegated authority. The SEC may pursue this enforcement action only if relevant transactions in the digital assets and services identified in the Complaint are "investment contracts" and therefore "securities" under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). Because as a matter of law none of them are, the claims must be dismissed.

An indispensable feature of the "investment contract," as defined by the Supreme Court in *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946), and by the state securities law jurisprudence that

---

[1] *See, e.g.*, Samuel Haig, *U.S. House Financial Services Committee Advances Landmark Crypto Bill*, Yahoo! Fin. (July 27, 2023), https://tinyurl.com/2x7tafjc ("The bill passed by a vote of 35 to 15, with six Democrats crossing the floor to join all Republicans in passing the act."); Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023), https://tinyurl.com/yc38dmjn; Clarity for Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. (2023), https://tinyurl.com/z567v84p.

grounded *Howey*, is that it at least purport to grant the purchaser a contractual right to the profits, income, or assets of a business enterprise. The SEC does not and cannot allege that transactions in the 12 tokens identified in the Complaint that take place on Coinbase's secondary market spot exchange, or on other secondary market exchanges through Coinbase Prime, carry such rights. They are asset sales, with the obligations of buyer and seller discharged at the point of sale. Were there doubt on this score, the major questions doctrine would require dismissal in deference to Congress's prerogative to decide how to establish and allocate authority over the digital asset arena.

Nor does Coinbase operate as a "broker" of investment contracts by making Wallet software available to users. The token that the SEC says customers can self-custody using Wallet, NEXO, is not alleged to carry any more rights to a share in any enterprise than the other 12 tokens identified. Even were it otherwise, the Complaint pleads nothing to suggest that Coinbase functions as a "broker" under the securities laws by making available to users free software allowing them to store and access their own digital assets on their own computers or devices.

Finally, the SEC's claims targeting Coinbase's "staking" program fail as a matter of law because (i) the facts pleaded and incorporated by reference establish that staking service customers make no investment of money by staking through Coinbase's software, and (ii) staking customers receive ministerial as opposed to managerial services from Coinbase.

## **BACKGROUND**

Coinbase has been a publicly traded U.S. company since April 2021. Compl. ¶¶ 16, 111. The core of Coinbase's business—and the focus of the SEC's charges—is a spot market for secondary trading of digital assets that are sometimes called "cryptocurrencies" or "tokens" or "crypto assets." *Id.* ¶¶ 44, 62. These assets are computer code entries on "blockchain" technology that record their owners' rights to access applications or services on a network. *Id.* ¶¶ 44-45. The

first crypto asset, Bitcoin, was invented in 2008.[2] The second major crypto asset, Ether, launched in 2015 and relies on the Ethereum blockchain network and "proof of stake" validation. *See* Compl. ¶ 50. While Bitcoin and Ether, both traded on Coinbase, remain the most popular tokens, there are now over 25,000 other tokens in circulation. *Historical Snapshot – 30 July 2023*, CoinMarketCap, https://tinyurl.com/yt5eubs8. These assets carry a variety of utility functions. *E.g.*, Compl. ¶¶ 127-28 (efficient transaction processing), 162-63 (access to computing storage), 190-91 (access to gaming platform), 203 (upkeep of digital pets), 283 (payment of transaction fees). Senior SEC officials have admitted that Bitcoin and Ether are not securities.[3]

In addition, Coinbase, through its Prime service, allows institutional customers to execute at scale trades of approved assets over the Coinbase spot exchange and other secondary spot exchanges. Compl. ¶ 63. On both the spot exchange and Prime, a customer's offer to buy or trade an asset is matched in a blind bid-ask with another's offer to sell or trade—the exchange is one digital asset for another digital asset or fiat currency. *See id.* ¶¶ 88, 97. The SEC does not allege that anything else is exchanged or promised, and nothing is. *See* Answer ¶ 27, ECF No. 22.[4]

Though its officials have admitted that Bitcoin and Ether are not securities, the SEC now asserts that 12 other tokens listed for trading on Coinbase *are* securities. Compl. ¶¶ 114, 119. And it claims that Coinbase acts as a broker of these and a thirteenth alleged "security," NEXO, by making available free software called Coinbase Wallet that customers can use to store and access

---

[2] SEC Chair Gary Gensler, *Statement on Financial Stability Oversight Council's Report on Digital Asset Financial Stability Risks and Regulation Before the Financial Stability Oversight Council Open Meeting* (Oct. 3, 2022), https://tinyurl.com/2ax6c5dx.

[3] *Cryptocurrencies: Oversight of New Assets in the Digital Age*, Hr'g Before the U.S. H. Comm. on Agric. at 24, 115th Cong. (July 18, 2018) (statement of Gary Gensler), https://tinyurl.com/2c57act4 (stating that Bitcoin and Ether have "been designated by the SEC *as not securities*" (emphasis added)); William Hinman, Dir., SEC Div. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://tinyurl.com/9k6hbh3m.

[4] Answer paragraphs cited herein describe statements made or admitted by SEC personnel, points contained in or omitted from the SEC's pleading, and facts as to which the Court can take judicial notice. All of these are properly considered on a motion for judgment on the pleadings. *See infra* p.6.

their own digital assets on their devices. *Id.* ¶¶ 4, 64, 114, 119. The SEC does not claim—nor could it—that Coinbase ever takes custody of or controls assets stored using the Wallet tool.

A final target of the SEC's charges is Coinbase's "staking" services, which allow customers to receive rewards paid out by proof-of-stake protocols for contributing to the validation of transactions on those blockchains. *Id.* ¶ 7. The SEC calls this too an unregistered investment contract, even though customers who stake through Coinbase never risk loss of their tokens by staking with Coinbase. *See Howey*, 328 U.S. at 301. Nor are rewards earned by stakers based on the managerial efforts of others. The services Coinbase renders in connection with staking are— as alleged—mere ministerial IT services. *Id.* ¶¶ 7-8; Coinbase User Agreement App'x 4 §§ 3.1.1 to 3.1.5 (last updated July 28, 2023), https://tinyurl.com/mvzecc5u (hereafter "User Agreement").[5]

All four services targeted here—the spot exchange, Prime, Wallet, and staking—have been central features of Coinbase since well before April 2021, when the SEC declared the Company's registration statement effective after an intensive six-month review. Compl. ¶ 111.[6] By that declaration, the SEC necessarily found that Coinbase's public listing served "the public interest and the protection of investors" and that "adequa[te]" information about Coinbase and its offerings was "available to the public." 15 U.S.C. § 77h(a); 17 C.F.R. § 230.461(b). The next month, Chair Gensler confirmed what was implicit in declaring effective an S-1 for an unregistered exchange, testifying that "there is not a market regulator around these crypto exchanges" and "only Congress" could confer authority to regulate crypto exchanges. Answer ¶ 50.

Congress has consistently recognized that regulatory authority over digital assets remains

---

[5] The User Agreement is incorporated by reference into the Complaint. *See, e.g.*, Compl. ¶¶ 84-86, 89, 321, 324, 343, 349-50, 352, 354.

[6] *See* Coinbase Global, Inc., Registration Statement (Form S-1) (Feb. 25, 2021), https://tinyurl.com/3mu2pj35; Coinbase Global, Inc., Notice of Effectiveness (Apr. 1, 2021), https://tinyurl.com/bde7p3wk; Coinbase Global, Inc., Draft Registration Statement on Form S-1 (Form DRS) (Oct. 9, 2020), https://tinyurl.com/3nhp4mjr.

unassigned. In recent years, it has considered more than 20 legislative proposals for regulation of digital assets, none reflecting the view that the SEC has the authority it claims through this action. *Id.* ¶¶ 51-53. Just last week, several such bills clarifying the allocation of agency regulatory authority over digital assets advanced from committees to the House floor to await a vote.[7]

Until recently, the SEC, too, hewed to the comparatively modest position regarding its own authority reflected in Chair Gensler's May 2021 congressional testimony. From 2008 to 2017, the agency made no attempt to regulate crypto. Answer ¶¶ 46-47. Though it announced in 2017 that certain digital assets sold in "initial coin offerings" ("ICOs") and immediately after might be securities under *Howey*, the SEC's Director of Corporation Finance later acknowledged that a "token . . . all by itself is not a security." *See* Compl. ¶ 60; Answer ¶¶ 47-48.[8]

This action completes the SEC's entire change of position. By December 2022, Chair Gensler was telling a reporter the SEC already had "enough authority" in existing securities laws to fully regulate digital asset platforms. Answer ¶ 73. On March 22, 2023, the Commission sent Coinbase a Wells Notice. *Id.* ¶ 75. On June 6, days after the introduction of major new legislation to regulate digital assets—and the very same morning Congress began hearing testimony on the bill (including from Coinbase's Chief Legal Officer)—the SEC filed this action. *Id.* ¶ 79.

## ARGUMENT

Coinbase moves to dismiss under Federal Rule of Civil Procedure 12(c). "To survive a Rule 12(c) motion," the "complaint must contain sufficient factual matter, accepted as true, to state

---

[7] *See, e.g.*, Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023), https://tinyurl.com/yc38dmjn; Clarity for Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. (2023), https://tinyurl.com/z567v84p; *see also* Samuel Haig, *U.S. House Financial Services Committee Advances Landmark Crypto Bill*, Yahoo! Fin. (July 27, 2023), https://tinyurl.com/2zjsykt8.

[8] In the absence of formal SEC guidance, Coinbase sought to integrate this and other statements by SEC personnel into its asset listing review process. Answer ¶¶ 55-59. Deepening the unfairness of its regulation-by-enforcement approach, the SEC seeks to throw these efforts back in Coinbase's face. *See* SEC Ltr. Resp. Opp., ECF No. 26 ("SEC Ltr.") at 1; Compl. ¶¶ 109-10.

a claim to relief that is plausible on its face." *Lively* v. *WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021). "[T]he court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Ricatto* v. *M3 Innovations Unlimited, Inc.*, 2019 WL 6681558, at *3 (S.D.N.Y. Dec. 6, 2019) (cleaned up). "If the allegations of a pleading are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the pleading." *Id.* at *4 (cleaned up).

Application of these standards requires dismissal. Though Coinbase has raised many other defenses provable upon summary judgment or at trial, the issues raised by this motion—which rest solely on deficiencies in the Complaint—are independently dispositive of the entire case.

## I. THE COMPLAINT DOES NOT PLEAD "SECURITIES" TRANSACTIONS.

Indispensable to the SEC's Exchange Act claims is the contention that trades over Coinbase and through Prime of the 12 tokens identified in the Complaint are exchanges of "investment contract[s]"—a species of "instrument commonly known as a 'security'" identified in the Act. 15 U.S.C. § 78c(a)(10). The Supreme Court, drawing from state court decisions interpreting "Blue Sky" statutes that predated the federal securities laws, has defined an "investment contract" as a contract—or a "transaction or scheme" of connected contractual undertakings—in which a person invests in an enterprise in exchange for a promise to deliver the profits or income of a business at a future date. *Howey*, 328 U.S. at 298-99 ("[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."). Decades of precedent confirm that for an investment to constitute an investment contract, the buyer must have a

contractually-grounded expectation of delivery of future value. The investment, moreover, must be directed in the business itself rather than a purchase of the business's products or output.

So for example: one can invest in a baseball or other trading card company, through an instrument that imposes obligations on the company, and that will be a security. Or one can buy baseball cards on the open market, hoping they appreciate in value, and one will have bought a commodity. That remains true even if the company makes representations about plans to create a premier card trading platform, to drive up the value of the cards it sells. Those representations can't turn baseball cards into securities. Baseball cards are not "shares in the [baseball card] enterprise." *Howey*, 328 U.S. at 299.

This principle applies equally here: the transactions over Coinbase's platform and Prime are not, and do not involve, contractual undertakings to deliver future value reflecting the income, profits, or assets of a business. They are commodity sales, with the obligations on both sides discharged entirely the moment the digital token is delivered in exchange for payment. The SEC's Complaint does not allege otherwise. Because it does not and cannot plead the required elements of an investment contract, the SEC's Exchange Act claims should be dismissed.

### A. Because the Complaint alleges no contractual undertaking beyond the point of sale, no "investment contract" is pleaded.

The Supreme Court has explained that when Congress identified an "investment contract" as a "security" subject to federal regulation, it "was using a term the meaning of which had been crystallized by . . . prior judicial interpretation" applying states' Blue Sky laws. *Howey*, 328 U.S. at 298. The SEC's own briefing in *Howey* agreed that Congress was "adopt[ing] that construction of the term which was uniformly followed by the state courts." Br. for the SEC, *SEC* v. *W.J. Howey Co.*, No. 843 (U.S. Apr. 17, 1946), 1946 WL 50582 ("SEC *Howey* Br."), at *18. That construction invariably referred to a contractual undertaking to deliver value at a later date. *See, e.g.*, *State* v.

*Agey*, 88 S.E. 726, 729-30 (N.C. 1916) (contract for cultivation and portion of sales); *State* v. *Gopher Tire & Rubber Co*., 146 Minn. 52, 54 (1920) (contract for pro rata share in total profits); *State* v. *Evans*, 154 Minn. 95, 99 (1922) (option contract with right to surrender for amounts paid or convert into downpayment on other property); *State* v. *Ogden*, 154 Minn. 425, 427-28 (1923) (contract for drilling and connecting oil wells); *Prohaska* v. *Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 338-39 (1930) (contract for cultivation of and insurance on crops); *Stevens* v. *Liberty Packing Corp.*, 111 N.J. Eq. 61, 61-64 (1932) (contract for rabbit breeding and for purchase of offspring); *State* v. *Robbins*, 185 Minn. 202, 204 (1932) (same for muskrats); *People* v. *White*, 124 Cal. App. 548, 555 (1932) (contract for payment of "specified sum on a specified date as principal and earnings" on investment funds); *cf. SEC* v. *Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *11 (S.D.N.Y. July 31, 2023) (recognizing that *Howey* involved "a contract that promised a future return based on an initial investment—that is, an investment contract").

Even before *Howey*, the Supreme Court acknowledged that an instrument must at least appear to the investor to confer contractual rights to delivery of future value before it can be called an "investment *contract*." The Court in *SEC* v. *C. M. Joiner Leasing Corp.*, while reserving on the question of an oil lease contract's enforceability under state law, concluded that the arrangement was an investment contract involving a promise to deliver future value because "acceptance of the offer quoted *made a contract* in which payments were timed and contingent upon completion of the well." 320 U.S. 344, 349 (1943) (emphasis added).

Until recently, the SEC too acknowledged that an irreducible feature of the investment contract is that it confer—or at least appear to confer—contractual rights to delivery of future value. In its *Howey* brief, the SEC wrote that an "investment contract" includes "any *contractual* arrangement for the investment of money in an enterprise with the expectation of deriving profit

-8-

through the efforts of the promoters." SEC *Howey* Br. 9 (emphasis added); *id.* at 40 (noting that asset sale was made with "the accompanying *contractual* arrangements upon which the investor relies for his expectation of profit" (emphasis added)). The SEC further observed that an "investment contract may be modified or terminated," and noted that "the *contractual* rights of investors" in *Howey* were "not merely interests in the land, but enforceable written contracts for development, cultivation and marketing of produce by the promoters." *Id.* at 28-29 (emphasis added). Three decades later, the SEC defended its conception of a pension fund interest as an "investment contract" by arguing that it granted a "contingent" interest in future profits that was "legally cognizable." Br. for SEC as Amicus Curiae, *Int'l Bhd. of Teamsters* v. *Daniel*, Nos. 77-753 & 77-754 (U.S. Aug. 18, 1978), 1978 WL 206829, at *36-37 & n.27. Three more decades later, in arguing that a bond-like instrument pegged to pay phones was an "investment contract," the SEC emphasized that "contract" carries independent meaning: "The second word in the quoted term, 'contract,' means '[a]n agreement between two or more persons to do or forbear something.'" Br. for SEC, *SEC* v. *Edwards*, No. 02-1196 (U.S. June 26, 2003), 2003 WL 21498455 ("SEC *Edwards* Br."), at *17.

Post-*Howey* case law has likewise consistently recognized that an investment contract involves a contractual undertaking to deliver future value. For example, the Second Circuit in *Revak* v. *SEC Realty Corp.* held that a condo sale unaccompanied by any "collateral agreement" supporting a future expectation of rental income was not an investment contract. 18 F.3d 81, 88-89 (2d Cir. 1994). Writing for the First Circuit in *Rodriguez* v. *Banco Central Corp.*, Judge Boudin held that a contract for land in a new development that turned out to be a swamp was not an investment contract because "[t]he evidence did not show that the promoter or any other obligated person or entity was promising the buyers to build or provide anything" after the sale of the land.

990 F.2d 7, 11 (1st Cir. 1993). And in *De Luz Ranchos Investment Ltd.* v. *Coldwell Banker & Co.*, the Ninth Circuit found no investment contract where land sale contracts "obligate[d] [defendant] to do no more than transfer title" and there was "no reference in the contracts to an obligation on the part of [defendant] to develop any land." 608 F.2d 1297, 1301 (9th Cir. 1979).

In its Complaint in this action, the SEC does not allege a contractual undertaking to deliver future value. It does not even allege that purchasers of tokens on Coinbase or through Prime reasonably understood they were buying a bundle of rights that included a contractual right to future value. That is fatal to the SEC's Exchange Act claims.

### (i)     The SEC misreads *Howey* in asserting that a "scheme" without a contractual undertaking will suffice.

Having failed to plead a contractual undertaking, the SEC now argues that a "contract" is not required—that all the SEC need allege to assert its authority is a nebulous "scheme." *See* Tr. Hr'g TRO, *SEC* v. *Binance Holdings Ltd.*, Case No. 1:23-cv-01599-ABJ (D.D.C. June 13, 2023), ECF No. 69 ("*Binance* Hr'g Tr.") at 16:23-24 ("*Howey* says that an investment contract can cover schemes *or* contracts." (emphasis added)); Pre-motion Hr'g Tr., ECF No. 30 ("Hr'g Tr.") at 40:24-41:13 (same). This position is contrary to decades of the SEC's own prior briefing and analysis. And it is wrong as a matter of law: The SEC misconstrues *Howey* as excising the word "contract" from the statute.

In the basic investment contract, a purchaser paid a seller to invest in a business and the seller agreed to deliver a proportionate share of the business's income or profits at a later date. *See Howey*, 328 U.S. at 299 (basic investment contract grants "shares in the enterprise . . . evidenced by formal certificates"); *see also, e.g.*, *Gopher Tire*, 146 Minn. at 56 ("booster" certificates). "Scheme," as the *Howey* Court used the term, captured variations on the basic investment contract that involved a series of contractual undertakings. This became necessary because some promoters

cloaked the economics of their offerings in more complex arrangements that had investors paying money for tangible assets of a business and separately receiving a right to cash flows from the labor upon those assets. So an investor would receive, say, a share of land in an orange grove, and stapled to that a separate undertaking to cultivate the grove and sell oranges, and deliver a pro rata share of profits from the orange business. Through this artifice, promoters sought to sell assets accompanied by promises of participation in future earnings in the promoters' enterprise in a wide variety of colorful business settings while evading Blue Sky law obligations. *See, e.g.*, *Agey*, 88 S.E. at 729-30 (fig trees and promise of participation in fig sales); *Ogden*, 154 Minn. at 427-28 (1923) (land units and oil well-related services, with net profits from to-be-formed oil company to be distributed pro rata by units held); *Prohaska*, 256 Ill. App. at 338-39 (land coupled with promise of participation from alfalfa sales); *Stevens*, 111 N.J. Eq. at 61-64 (rabbits and share of offspring); *Robbins*, 185 Minn. at 204 (same for muskrats).

These schemes did not fool the courts, which examined the linked contracts together. To "meet the countless and variable schemes devised by those who [would] seek the use of the money of others on the promise of profits," judges called the bluff on contractual arrangements where the asset purchase was just a proxy for the investment of money in return for the promise of cash flows from the business. *Howey*, 328 U.S. at 299. Courts thus recognized an investment contract when an overall contractual scheme, though it might "differ[] from other contracts" more readily identifiable as securities, "evidenc[ed] a right to participate in the proceeds of a venture." *Ogden*, 154 Minn. at 427-28. Following these Blue Sky precedents, *Howey* held that a purchaser's "shares in the enterprise" need not be "evidenced by formal certificates" but could also be evidenced by "nominal interests in the physical assets employed in the enterprise." 328 U.S. at 299.

This is the backdrop against which the *Howey* Court defined an investment contract to

mean "a contract, transaction or *scheme* whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298-99 (emphasis added). "Scheme" captured the more complex contractual arrangements— and indeed the facts of *Howey*, which involved not one but a series of related contractual undertakings. The Court held that the "economic reality" of the whole contractual scheme must be evaluated. *See* 328 U.S. at 298-99; *see also Robbins*, 185 Minn. at 204 (contract for sale of breeding muskrats and contract for breeding and management services "together . . . constitute a sale of an interest in a profit-sharing scheme"). When promoters unpack a security into disparate agreements, courts would not hesitate to reassemble them for purpose of the investment-contract analysis. *E.g.*, *Hocking* v. *Dubois*, 885 F.2d 1449, 1457-58 (9th Cir. 1989) (en banc).[9]

But that doesn't mean any extra-contractual utterance or plan is a "scheme," or that the SEC should be permitted to cram that definition into the mouth of the *Howey* Court—and through *Howey* into the securities laws—and thereby read the word "contract" out of "investment contract." To the contrary: that result would do violence to the statutory language and the case law that framed and then interpreted it. Indeed, before the SEC's enforcement blitz against the crypto industry, no court had ever adopted the atextual position that a bare investment accompanied by a hope of value increase but no contractual undertaking could qualify as an investment contract. When pressed on this point, the SEC has come up empty on precedent. *See* Defs.' Br. ISO Mot. Summ. J. at 15-27, *SEC* v. *Ripple Labs, Inc.*, Case No. 1:20-cv-10832-AT-SN (S.D.N.Y. Sept. 17,

---

[9] The SEC, misrepresenting *Hocking*, says it involved "finding an investment contract where there was 'no evidence' of any binding contractual obligations." SEC Ltr. at 2. In fact, *Hocking* (like *Howey*) involved two contracts, one for real estate and one for services, and the Court remanded on the question of whether the two contracts were sufficiently related to together constitute an investment contract. *See Hocking*, 885 F.2d at 1457, 1462. Indeed, the SEC submitted an amicus brief in *Hocking* arguing that because "there was no affiliation or selling arrangement between the condominium seller or the real estate agent and the rental pool operator[,] the condominium sale and the pooling arrangements were two separate transactions, and the sale was not covered by the federal securities laws." Br. for SEC as Amicus Curiae on Reh'g En Banc, *Hocking* v. *Dubois*, No. 85-1932, at 3 (9th Cir. Oct. 24, 1988).

2022), ECF No. 825 (arguing that *Howey* and its progeny require a contract imposing post-sale obligations on the promoter and entitling the investor to a share of the enterprise's profits); Pl.'s Br. Opp. Defs.' Mot. Summ. J. at 15-24, *Ripple* (S.D.N.Y. Oct. 21, 2022), ECF No. 841 (arguing, without authority, that no contract is required); *SEC* v. *Ripple Labs, Inc.*, 2023 WL 4507900, at *7 & n.11 (S.D.N.Y. July 13, 2023) (declining to address SEC's argument).

### (ii) Recent crypto cases do not support the SEC's efforts to use "scheme" as an escape hatch from statutory text.

To support its departure from statutory text and precedent, the SEC may invoke two recent decisions in the crypto sphere, *SEC* v. *Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020), and *Terraform*, 2023 WL 4858299. Neither of these cases—involving actions against token issuers rather than secondary market exchanges—can bear the weight of the SEC's extreme position.

In *Kik*, Judge Hellerstein accepted the SEC's contention that "an ongoing contractual obligation is not a necessary requirement for a finding of a common enterprise." 493 F. Supp. 3d at 178. This conclusion ignored the decades of precedent discussed above, and the two cases the court cited for this proposition do not support it. Both involved contractual schemes with ongoing obligations to the purchaser, and both held that the transactions at issue nevertheless did *not* involve investment contracts. *See Hart* v. *Pulte Homes of Mich. Corp.*, 735 F.2d 1001, 1002-03 (6th Cir. 1984) (contractual arrangement entitling purchaser to ongoing lease payments, insurance, maintenance, utilities, and real estate taxes); *Davis* v. *Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1047 (S.D.N.Y. 1975) (purchase agreement providing that "title will be conveyed to [the purchaser] when the purchase price and interest are paid in full").

*Terraform*, for its part, rejected an argument that an "investment contract" requires "a formal common-law contract between transacting parties," and concluded that no "enforceable written contract" is required to establish the existence of an investment contract. 2023 WL

4858299, at *11. "[W]herever the 'contracting' parties agree—that is, 'scheme'—that the contractee will make an investment of money in the contractor's profit-seeking endeavor," the court reasoned, there is an investment contract. *Id.* This conception of "scheme" sweeps far more broadly than the statute or the cases permit. *See* Point I.A.i, *supra*; Black's Law Dictionary 1584 (3d ed. 1933) ("[A] scheme is a document containing provisions for regulating the management or distribution of property rights, or for making an arrangement between two persons having conflicting rights."). But it is nevertheless consistent with Coinbase's position and does not save the SEC's claims. Nowhere in its Complaint does the SEC allege, in the words of the *Terraform* decision, that the "'contracting' parties" on Coinbase's exchange—the parties on either side of the blind bid-ask token trades—"agree[d]" or "schemed" that the buyer's payment would be invested in the seller's "profit-seeking endeavor." Nor could it. *See Ripple*, 2023 WL 4507900, at *11 (no investment contract where buyers "could not have known if their payments of money went to [an issuer], or any other seller of" the subject token).[10]

### (iii) The SEC's effort to portray a simple asset sale as a security is an unprecedented stretch.

Throughout the Complaint, the SEC tries to mask the deficiencies of its allegations—and, specifically, its inability to identify any transaction over Coinbase that includes a contractual undertaking to deliver future value—with the *ipse dixit* that "crypto asset securities" trade on the Coinbase platform. *E.g.*, Compl. ¶¶ 1,5, 74, 92, 102, 114. That is sleight of hand. Unlike a stock

---

[10] Other aspects of *Terraform* appear to stray beyond rejecting a requirement of formality or technical enforceability and even adopt a broader view of the SEC's authority than the SEC itself has articulated. *See Terraform*, 2023 WL 4858299, at *9 (suggesting authority to regulate tokens because the SEC is not "restricted . . . to regulating only those instruments that are specifically listed by their precise names" in the statute); *id.* at *11, *14 (while acknowledging that *Howey* involved "a contract that promised a future return based on an initial investment," suggesting that an issuer's mere public representations about "the possibility of profiting from" token purchases sufficed to establish an investment contract if "an objective investor would have perceived the [issuer's] statement and actions as promising the possibility" of returns). Coinbase respectfully submits that these portions of the court's opinion are insupportable for the reasons explained in the text.

or bond or certificate of interest sold on a secondary market, the object of the sale here, a digital asset, is not itself a security. And it can be a *component* of a security—an investment contract—*only if* accompanied by relevant contractual undertakings. *See Ripple*, 2023 WL 4507900, at *7 (noting that in precedent investment contract cases involving asset sales, "the subject of the investment contract was a standalone commodity, which was not itself inherently an investment contract"). The orange groves weren't investment contracts in *Howey. See* 328 U.S. at 299, 300 (investment contracts were not "fee simple interests in land" but rather packages that included "land sales contracts, warranty deeds and service contracts"); *see also Terraform*, 2023 WL 4858299, at *11 ("it was the cultivator's promise to share in the profits generated by his cultivation of the parcels that transformed the transaction from a mere sale of property into a contract that promised a future return based on an initial investment"). The payphones weren't securities in *SEC* v. *Edwards*, 540 U.S. 389, 391 (2004) ("The payphones were offered packaged with a site lease, a 5-year leaseback and management agreement, and a buyback agreement."). "[A] digital token[] is not in and of itself a 'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract." *Ripple*, 2023 WL 4507900, at *8.

The SEC's failure to plead a relevant contractual arrangement surrounding the tokens at issue here is even more conspicuous than in earlier eras of overaggressive enforcement. In the 1980s, for example, the SEC sued sellers of gold coins, claiming that their promise to deliver coins at a future time was an investment contract. *SEC* v. *Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986). The Ninth Circuit disagreed, because although the sellers undertook to mine the gold needed to fulfill the contracts, the resulting value to be delivered—the coins—would not be a product principally of the sellers' managerial efforts but rather of the market value of gold at the time of delivery. *Id.* The Court worried that the SEC's contrary logic could be applied "to any sale-

of-goods contract in which the buyer pays in advance of delivery and the ability of the seller to perform is dependent, in part, on both his managerial skill and some good fortune." *Id.*; *see also Noa* v. *Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980) (sale of silver bars with no ongoing obligations not an "investment contract").

Here, the SEC pursues a far more exorbitant theory, with even less grounding in text or historical context. Unlike in *Belmont Reid*—and even in other digital asset cases the SEC has pursued—the purchaser on Coinbase's exchange has no contractual right to *anything* except ownership of the purchased token. In *SEC* v. *Telegram Group, Inc.*, there was at least a contract for future issuance of digital tokens pursuant to which, if the issuer "did not deliver Grams to the Initial Purchasers by October 31, 2019, the Gram Purchase Agreements would have obligated Telegram to refund any remaining funds from the 2018 Sales." 448 F. Supp. 3d 353, 363 (S.D.N.Y. 2020). And in *Kik*, there was an integrated offering pursuant to which tokens were sold for future delivery. 492 F. Supp. 3d at 175, 181. In *Ripple*, the institutional sales that the court found qualified as investment contracts were made "pursuant to written contracts" for future delivery. 2023 WL 4507900, at *8, *11. In this case, by contrast, the SEC has charged Coinbase based solely on blind, bid-ask, spot exchange transactions—the very sort of transactions the *Ripple* court recently held as a matter of law were not investment contracts because the undisputed facts showed no relevant relationship between the parties to the sale. *Id.* at *11-12; *see also id.* at *6-7 (while declining to reach whether a contractual undertaking is required to establish an investment contract in all cases, concluding that the absence of "any promises or offers" in context of "blind bid/ask transactions" on secondary exchanges precluded finding of an investment contract).[11]

---

[11] *Ripple* declined to hold that an investment contract requires "essential ingredients" not reflected in *Howey*. *Ripple*, 2023 WL 4507900, at *6. Coinbase does not argue for requirements outside of *Howey*, but rather that *Howey* itself requires a contractual undertaking to grant the buyer a share in an enterprise.

On Coinbase's secondary-market exchange and through Prime, there is no investment of money coupled with a promise of future delivery of anything. There is an asset sale. That's it. It is akin to the sale of a parcel of land, the value of which may fluctuate after the sale. Or a condo in a new development. Or an American Girl Doll, or a Beanie Baby, or a baseball card.

Notably, SEC officials have admitted that two tokens traded on Coinbase, Bitcoin and Ether, are commodities rather than securities.[12] When a purchaser buys Bitcoin on Coinbase, she has no fewer and no more contractual rights than a purchaser of DASH, or ADA, or any of the other tokens called out in the Complaint: she is entitled to delivery of her tokens, nothing more. No principled basis exists to distinguish transactions in the tokens the SEC has already conceded to be commodities and transactions in the tokens the SEC now claims to be securities. The secondary market sales of all these tokens are all asset sales carrying no post-sale contractual obligations.[13] The *Ripple* court found no investment contract based on facts substantially identical to those alleged here. 2023 WL 4507900, at *13. To accept otherwise would be to allow the SEC to do precisely what the Ninth Circuit said it couldn't thirty years ago: turn "any sale-of-goods contract" into a security. *Belmont Reid & Co.*, 794 F.2d at 1391.

---

[12] *Cryptocurrencies: Oversight of New Assets in the Digital Age*, Hr'g Before the U.S. H. Comm. on Agric. at 28 (July 18, 2018) (statement of Gary Gensler) (stating that Bitcoin and Ether have "been designated by the SEC *as not securities*" (emphasis added)), https://tinyurl.com/2c57act4; William Hinman, Dir., SEC Div. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://tinyurl.com/9k6hbh3m.

[13] In response to Coinbase's pre-motion letter, the SEC (1) asserted that Coinbase engages in primary offers; and (2) claimed *SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) treated secondary market transactions as indistinguishable from purchases directly from issuers. SEC Ltr. at 3; *see also* Hr'g Tr. at 41:23-42:1 (asserting that *LBRY* "draws no distinction between primary and secondary transactions"). The assertion about primary offering is flat wrong and contradicted by the only source cited, Coinbase's website. *See* Answer Response ¶ 65. As to *LBRY*, the SEC omits that when the court there expressed "concern" about secondary market regulation, the SEC assured the court it was "not seeking in th[at] action to regulate secondary sales," and that the court then emphasized its ruling did *not* reach secondary sales. Mots. Hr'g Tr. at 24:23-36:8, *LBRY*, Case No. 1:21-cv-00260-PB (Jan. 30, 2023), ECF No. 105; Mem. & Order, *LBRY* (July 11, 2023), ECF No. 109 at 8-9 (stating that the issue of "secondary market offerings" has "not been litigated in this case").

B.    **Transactions on Coinbase and through Prime are not investment contracts because the purchaser gets no share in business income, profits, or assets.**

The SEC's Exchange Act claims fail for the additional and independent reason that any future value that token purchasers on Coinbase and through Prime may hope to reap is not in the profits, income, or assets of the issuer's business. That feature is missing entirely.

(i)    **An investment contract requires an expectation in the income, profits, or assets of a business.**

An investment contract is not simply an agreement to pay money for something one hopes will increase in value (like a collectible), but a contract involving "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." *Howey*, 328 U.S. at 298 (cleaned up). "Investment contracts" are thus "unconventional instruments that have the essential properties of a debt or equity security." *Wals* v. *Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994) (Posner, C.J.); *SEC* v. *Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (Posner, C.J.) (an investment contract, while "not a conventional security like a bond or a share of common stock," has "the essential properties of a conventional security"). As the SEC itself argued to the Supreme Court in *Edwards*, an "'investment contract' embodies the essential attributes" of securities, including "debt [or] equity participation." SEC *Edwards* Br. at *19-20 (cleaned up).

This feature of the investment contract is reflected in the words and structure of the Exchange Act. All 28 instruments identified as securities in the Act involve investments of capital to be employed by the issuing firm. They denote the ways in which investors capitalize a business, and receive a return for that investment from the financial performance of that business. Reflecting the varieties of corporate finance, a classic security can be a simple share of stock, constituting a claim on dividends and the residual value of an enterprise; a preferred share of stock, with a coupon and a liquidation preference; a bond, note, or other debt contract that yields a fixed return for the investor, *Edwards*, 540 U.S. at 394; or an investment contract, where the investor pays money to

a promoter and in exchange receives a contractual claim on the proceeds or assets of the business. But every classic security constitutes an investment in an issuer's business—a contribution to an issuer's capital structure. Investment contracts are no exception. This is why the Supreme Court defined them as "shares in the enterprise." *Howey*, 328 U.S. at 299. It did so against the backdrop of the SEC's contention that, through the statutory definition of "security," "Congress intended to afford safeguards to investors in *business enterprises*." SEC *Howey* Br. at *11 (emphasis added).

This feature also distinguishes traditional securities from traditional commodities. While securities represent investments in an issuer's *business*, commodities are a company's *product*. An investment contract is not formed when returns depend on the market value of a commodity that is an output of the business. *See, e.g.*, *Noa*, 638 F.2d at 80 (no investment contract because value of silver delivered was a function of market). That is so because the increase in the value of the output is not part of the "income or profit" of the business. *See Rodriguez*, 990 F.2d at 11 ("[W]hat was purchased in this case was not a share of a business enterprise and so not a security.").

### (ii) Because the SEC does not allege an expectation in the income, profits, or assets of any business, the Exchange Act claims cannot stand.

Because the Complaint does not allege that any purchaser on Coinbase's secondary exchange received or even reasonably believed she was receiving a "share[] in [an] enterprise," *Howey*, 328 U.S. at 299, the Exchange Act claims must be dismissed.

The SEC tries to allege around this legal obstacle by pleading that customers buy tokens for investment purposes, hoping the tokens will increase in value. Compl. ¶ 126. The theory is that purchasers expect an increase in the market value of their tokens by virtue, at least in part, of the issuers' efforts in developing the operational performance of their platforms. *Id.* Boiled down, the SEC's position is that the more useful the tokens become in the world, and the more effective the promoters are in marketing the platform, the greater the value of each token in the holder's hands.

But those allegations, even accepted as true, do not establish an investment contract. While "[i]t may certainly be the case that many [Coinbase customers] purchased [tokens] with an expectation of profit," the SEC does not allege facts that any such purchaser intended to invest or understood she was investing in *a business enterprise*. *See Ripple*, 2023 WL 4507900, at *12 (no investment contract where purchasers unaware they were paying money to issuer). *Howey* is clear that a transaction is not an investment contract unless it is an agreement to purchase a "share[] in the enterprise." 328 U.S. at 299. Reiterating the principle in *Edwards*, the Supreme Court held that an investment contract requires "the placing of capital or laying out of money in a way intended to secure *income or profit from its employment*" in an enterprise. 540 U.S. at 394 (emphasis added; quoting *Howey*, 328 U.S. at 298). That foundational principle undergirds the "common enterprise" concept from *Howey*. It is not enough to show that multiple investors paid money to a common recipient which then banked the funds. The funds must instead be "pooled"—that is, deployed in the enterprise in a way that ties the investors' fortunes together—usually with pro rata distribution of profits. *See Revak*, 18 F.3d at 87 (with horizontal commonality, "the fortunes of each investor depend upon the *profitability* of the enterprise as a whole" (emphasis added)).[14]

In urging otherwise, the SEC has invoked *Edwards* as stating that "capital appreciation . . . from the development of the initial investment" suffices to establish a share in the enterprise. Pl.'s Br. ISO Mot. Summ. J., *Ripple* (S.D.N.Y. Sept. 17, 2022), ECF No. 825 at 53. But "capital appreciation" has always meant appreciation of the value of the *business*, never of the thing the

---

[14] *See also SEC* v. *Life Partners, Inc.*, 87 F.3d 536, 544 (D.C. Cir. 1996) ("commingling in itself is but an administrative detail; it is the inter-dependency of the investors that transforms the transaction substantively into a pooled investment"); *Lauer*, 52 F.3d at 670 ("each investor's interest is pooled with that of the other investors, so that each has an undivided share in a pool of assets rather than an individual asset"). *Terraform* nevertheless held that the SEC pleaded "pooling" as to the LUNA token by alleging that an issuer "used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves." 2023 WL 4858299, at *13. This conception of "pooling" deprives the term of all meaning and cannot be reconciled with the Second Circuit's common-sense holding in *Revak* that investors do not "share[] or pool[]" their funds merely by paying money to a common promoter. 18 F.3d at 88.

business sells. *See Edwards*, 540 U.S. at 393-94 (discussing payment of money from "income or profit" of the business); *see also* SEC *Edwards* Br. at *17 (same). This is because "'investment contract' has the limited purpose of identifying unconventional instruments that have the essential properties of a debt of equity security." *Wals*, 24 F.3d at 1018; *see also United Hous. Found., Inc.* v. *Forman*, 421 U.S. 837, 850-51 (1975) (even "stock" so labeled must be examined to determine whether it bears essential attributes of a security). Before the SEC's recent campaign against crypto, never in the 100-plus-year history of the concept had an output from a business been designated an "investment contract." It should not be so designated now.

## II.   THE MAJOR QUESTIONS DOCTRINE COMPELS REJECTION OF THE SEC'S CONSTRUCTION OF "INVESTMENT CONTRACT."

Even if the SEC presented a colorable claim that the transactions here are "investment contracts," the "major questions" doctrine would require dismissal of the Complaint in deference to Congress's prerogative to decide how to regulate "a significant portion of the American economy." *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2608-09 (2022); *see also Biden* v. *Nebraska*, 143 S. Ct. 2355, 2373 (2023). The doctrine holds that an "[e]xtraordinary grant[] of regulatory authority" requires "clear congressional authorization," and courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 142 S. Ct. at 2609 (cleaned up). When the government "claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," *Util. Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014), courts cannot accept an agency's "novel" statutory construction—even if "colorable" or "plausible." *West Virginia*, 142 S. Ct. at 2605, 2609. The doctrine applies with special force when an agency claims authority it has previously acknowledged it lacks. *Nebraska*, 143 S. Ct. at 2372; *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).

-21-

The major questions principle applies directly here. The wholesale regulation of secondary markets for trading digital assets qualifies as "extraordinary," and the digital asset industry, worth around $1 trillion, is a "significant portion of the American economy." *West Virginia,* 142 S. Ct. at 2608-09; *Nebraska*, 143 S. Ct. at 2373 (observing that economic impact of approximately $50 billion sufficed to render doctrine applicable in *Alabama Association of Realtors* v. *Department of Health & Human Services*, 141 S. Ct. 2485 (2021)). One in five adults in the United States has owned a cryptocurrency. Answer ¶ 21. Hundreds of millions of people globally use cryptocurrencies that are traded on platforms in the United States for myriad purposes. *Id.*

And far from the required "clear congressional authorization," *West Virginia*, 142 S. Ct. at 2609, the SEC's authority is clear as mud. Its construction of "investment contract" is divorced from the statutory term's plain meaning, contrary to the historical context that the Supreme Court and the Commission itself long ago agreed must inform the term's meaning, *supra* Section I.A, and predicated on a linguistic trick—a novel expansion of the word "scheme" as it appears in a very different context in a 77-year-old judicial decision.

It is also contrary to the position the SEC Chair took only two years ago, when he conceded in congressional testimony that "trading in . . . crypto assets do[es] not have a regulatory framework" at the SEC, and that "only Congress" could confer such plenary regulatory authority over crypto exchanges. Answer ¶ 50.[15] One Commissioner has expressly recognized that "if we seriously grappled with the legal analysis and our statutory authority, . . . we would have to admit that we likely need . . . more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us. And Congress might decide to give that

---

[15] At the pre-motion hearing in this case, the SEC suggested Chair Gensler's concession was cabined to exchanges trading in Bitcoin. Hr'g Tr. at 29:13-15 ("I think if we go back to the actual transcript and you see that the question was asked, I believe it involved Bitcoin, which is not at issue here."). A fair review of the transcript, which includes Chair Gensler's references to assets (plural), does not support that take.

authority to someone else."[16]

To an unprecedented degree—even as compared to other cases where courts have deferred to the legislature under the major questions doctrine—Congress is actively considering the very question the agency has now taken upon itself to answer. *See Nebraska*, 143 S. Ct. at 2373 ("The Secretary's assertion of administrative authority has conveniently enabled him to enact a program that Congress has chosen not to enact itself.") (cleaned up). Congress has in recent years considered more than 20 legislative proposals concerning regulation of digital assets, some apportioning regulatory oversight across multiple agencies, others vesting jurisdiction with the CFTC or stating the SEC lacks such regulatory authority. Answer ¶ 51. But rather than let Congress decide, the SEC has mounted a campaign of regulation-by-enforcement culminating in this action, filed hours before the House was scheduled to hear testimony concerning a proposed bill that would divide regulatory authority over crypto assets between the SEC and the CFTC. None of the many bills introduced in this area over the past several years—which include bipartisan legislation proposed last month by Senators Gillibrand and Lummis and legislation advanced just last week from two House committees on a bipartisan vote[17]—would vest the SEC with sole regulatory authority. Yet here the SEC is, claiming that authority for itself on the strength of shaky and inadequate legal authority—all while steadfastly refusing to explain to the public what contours or

---

[16] Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://tinyurl.com/47cypbvt.

[17] *See, e.g.*, Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023), https://tinyurl.com/yc38dmjn; Clarity for Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. (2023), https://tinyurl.com/yc2nmpsx; Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023), https://tinyurl.com/3yx8f5hm; *see also, e.g.*, Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022), https://tinyurl.com/45cnjwyd; Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022), https://tinyurl.com/bdd7r5p3; The Token Taxonomy Act of 2021, H.R. 1628, 117th Cong. (2021), https://tinyurl.com/bezac866; Eliminate Barriers to Innovation Act of 2021, H.R. 1602, 117th Cong. (2021), https://tinyurl.com/2mx3mt8m; Crypto-Currency Act of 2020, H.R. 6154, 116th Cong. (2020), https://tinyurl.com/589kheax; U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019, H.R. 923, 116th Cong. (2019), https://tinyurl.com/3hscvaj2.

limits it puts on that authority.[18] That is impermissible under the major questions doctrine.

The SEC suggests that it escapes the major questions doctrine because it jumped straight to enforcement, without first submitting its statutory interpretation to the test of notice-and-comment rulemaking. This, the SEC says, is merely "enforc[ing] statutory requirements," not regulatory action. *See* SEC Ltr. at 3. The argument defeats itself. The notion that an agency deserves *greater* deference for assuming power peremptorily, while refusing to follow the regulatory process, does even further violence to the separation of powers.

Nor, finally, does the recent *Terraform* ruling justify the SEC's major questions overreach. In concluding that the SEC's claims of authority were insufficiently "extraordinary" and the crypto industry was insufficiently "importan[t]" to warrant the doctrine's application, *Terraform* overlooked entirely the Supreme Court's recent clarifications and application of the doctrine in the *Nebraska* and *Alabama Association of Realtors* cases. *See* 2023 WL 4858299, at *8-9 (relying on a 2021 article; omitting discussion of recent precedent). Viewed in light of those cases, there is no question that the SEC's claim of authority to regulate exchanges at the core of the $1 trillion digital asset industry (in circumstances where registration of such an exchange remains impossible, no less, *see* Answer ¶ 73) carry a sufficiently "exceptional" potential economic impact, or that its "novel" statutory construction is sufficiently "extraordinary" to implicate the doctrine. *See Nebraska*, 143 S. Ct. at 2373 (economic impact); *id.* at 2369-70 (novelty of construction).

Ordinary principles of statutory construction and application of precedent dictate that "investment contract" does not stretch to cover the facts pleaded here, so the Court need not reach

---

[18] *See, e.g., In re Voyager Dig. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023) (The crypto "regulatory environment [] at best can be described as highly uncertain . . . Regulators themselves cannot seem to agree as to whether cryptocurrencies are commodities [or securities]."); *Binance* Hr'g Tr. at 12:15-19 (Court: "I'm asking you, the ones that you are not putting in the securities category, what are they? Are they commodities?" [SEC]: "We are not taking a position at this time.").

the major questions doctrine. But if the Court were to find the SEC's construction colorable at all, the doctrine would have to be considered. Its application here, where an agency has arrogated to itself authority to police a vast swath of the economy, would mandate dismissal.

## III. COINBASE IS ENTITLED TO JUDGMENT ON THE CLAIM THAT IT ACTS AS AN UNREGISTERED BROKER THROUGH WALLET.

The SEC alleges that Coinbase acts as an unregistered securities broker in violation of Exchange Act § 15(a) by offering customers its free digital-asset Wallet software. Compl. ¶ 4. This claim fails at the threshold for the reasons stated above: The SEC does not allege facts to show that any of the tokens it identifies in the Complaint are "investment contracts"—including NEXO, which is not available for trading on Coinbase but can be accessed by customers using Wallet. But the SEC's claim as to Wallet also fails for the independent reason that it pleads nothing to suggest that Coinbase acts as a broker by making Wallet available to customers.

Under the Exchange Act, a "broker" is "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). "To demonstrate that someone is acting as a broker, the SEC is required to show a regularity of participation in securities transactions at key points in the chain of distribution." *SEC* v. *StratoComm Corp.*, 2 F. Supp. 3d 240, 262 (N.D.N.Y. 2014) (cleaned up), *aff'd*, 652 F. App'x 35 (2d Cir. 2016). Courts look to a number of factors to determine whether an entity is acting as a broker, including whether it "(1) actively solicits investors; (2) receives transaction-based compensation; (3) handles securities or funds of others in connection with securities transactions; (4) processes documents related to the sale of securities; (5) participates in the order-taking or order-routing process; (6) sells, or previously sold, securities of other issuers; (7) is an employee of the issuer; (8) is involved in negotiations between the issuer and the investor; and/or (9) makes valuations as to the merits of the investment or gives advice." *SEC* v. *GEL Direct Tr.*, 2023 WL 3166421, at *2

(S.D.N.Y. Apr. 28, 2023); *see also Found. Ventures, LLC* v. *F2G, Ltd.*, 2010 WL 3187294, at *5 (S.D.N.Y. Aug. 11, 2010) (collecting cases).

The Complaint is devoid of allegations to establish that Coinbase performs any such relevant "broker" activities through Wallet. The SEC offers no well-pleaded facts that Coinbase uses Wallet to take or process orders;[19] or to negotiate transactions for customers; or to make investment recommendations, provide digital asset valuations, or offer other transactional advice to customers; or to recommend or arrange customer financing; or to process trade documentation; or to hold customer assets or funds.

Wallet is used for none of these things. Wallet is just passive software—in the form of a mobile application or browser extension—that allows customers to store the private keys for their own digital assets on their own computers or mobile devices. As the Complaint acknowledges, customers control and maintain custody over those assets at all times, Compl. ¶ 64, and direct all activities with respect to them, without any guidance or advice from Coinbase. While customers can connect their Wallets to, and use the stored digital assets on, third-party platforms, including decentralized exchanges, *id.* ¶¶ 64, 82, the SEC does not allege that Coinbase performs any key trading functions on behalf of users in connection with those activities. Nor could it. Wallet simply provides a user interface and technical connection to the third-party platforms, so that customers can use their digital assets on those platforms—just like anyone can bring their personal wallet to a store and spend money from it there. As a matter of well-settled law, none of this remotely entails the activities of a broker.

The SEC alleges that through March 2023 Coinbase received commissions on certain

---

[19] While the SEC alleges the conclusion that Wallet "routes" orders through third-party platforms, Compl. ¶¶ 4, 64, it pleads no facts showing that Wallet does anything but allow users to access the functionality on those platforms.

transactions in digital assets held in Wallet. Compl. ¶ 101. As a matter of law such "[c]ommission-based payment, standing alone, is not dispositive of whether a party acts as a broker-dealer under the Exchange Act." *Rhee* v. *SHVMS, LLC*, 2023 WL 3319532, at *9 (S.D.N.Y. May 8, 2023). And Coinbase no longer receives *any* fees in connection with customers' use of its Wallet software.

Digital wallet offerings are ubiquitous, and Coinbase is aware of no case calling them "brokers." The SEC offers no allegations that could support making this case the first.

## IV. COINBASE IS ENTITLED TO JUDGMENT ON THE CLAIM THAT ITS STAKING SERVICES CONSTITUTE UNREGISTERED SECURITIES.

Coinbase's staking services allow customers to earn rewards by participating in the proof-of-stake validation process of certain blockchain networks. *See* Compl. ¶¶ 310, 316. As Coinbase's User Agreement makes clear, for users who choose to stake their tokens Coinbase operates the IT necessary to perform the validation. *See* User Agreement §§ 2.7 to 2.7.4, App'x 4 § 3.1.1 to 3.1.5. In exchange, Coinbase charges a fee expressed as a percentage of the rewards generated by the protocol. Compl. ¶ 310. The remaining rewards are paid to users. *Id.*

The SEC tries to force this garden variety fee-for-services arrangement into the definition of an investment contract. The claim fails as a matter of law, for two independent reasons.

### A. Coinbase's staking services do not involve an investment of money.

Coinbase's staking services are not an investment because, on the facts alleged and incorporated by reference, they do not involve relinquishment of property creating a risk of loss.

Staking provides an opportunity for customers to earn tokens. Yet "for an instrument to be a security the investor must risk loss," *see Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985) (citing *Marine Bank* v. *Weaver*, 455 U.S. 551, 558-59 (1982)), and Coinbase's staking services create no risk. While some blockchain networks may subject validators to slashing penalties for errant validation, Compl. ¶ 313, that is

true whether customers stake with Coinbase or on their own; slashing isn't a risk of using Coinbase services. Customers are more protected on Coinbase: Coinbase has never suffered a slashing event, and indemnifies customers for any slashing penalties resulting from Coinbase's acts or omissions. User Agreement § 3.1.3; Compl. ¶ 343; *Coinbase Help Center*, https://tinyurl.com/yuzm6erk.

The SEC points to certain Coinbase Global, Inc. risk disclosures relating to potential cybersecurity attacks, loss of private keys, or smart contract failures. Compl. ¶ 345. These risks too are unrelated to the Coinbase staking service. That some Coinbase customers may be subject to certain custodial, operational, or security risks at Coinbase, or could lose their assets if the relevant "blockchain is forced or chooses to shut down or cease operations," *id.* ¶¶ 343-45, does not plead risk of financial loss by virtue of staking through Coinbase. *All* crypto owners, whether their assets are staked on Coinbase or not, are subject to them.

The SEC next attempts to invent some staking-specific risk by pointing to a disclaimer in Coinbase's User Agreement that "[a]ny bond or trust account maintained by Coinbase for the benefit of its customers may not be sufficient to cover all losses incurred by customers." *Id.* ¶ 343. That disclosure has nothing to do with staking—it concerns Coinbase's money transmission activities in New York, where Coinbase doesn't even offer staking services. *See* User Agreement App'x 3 (setting forth required state money transmission services disclosures). Nothing in the Complaint otherwise alleges a staking-specific source of financial loss. That deficiency is fatal.

Finally, the SEC suggests that users "invest money" by "giv[ing] up control" of their digital assets in order to stake with Coinbase. Compl. ¶ 341; *see also id.* ¶ 342 (alleging that "investors tender their crypto assets to Coinbase in order to participate in the Coinbase Staking Program"). But at no point in the staking process do users ever give up ownership or control of their assets to Coinbase. The Coinbase User Agreement makes clear that *users* at all times "control the Digital

Assets held in [their] Digital Asset Wallet," User Agreement § 2.7.3, and staking "does not affect the ownership of [users'] digital assets *in any way*," *id.* App'x 3 § 3.1.1 (emphasis added). Because there is no change in the user's ownership interest in her tokens, staking through Coinbase does not involve an investment of money as a matter of law. *See Int'l Bhd. of Teamsters* v. *Daniel*, 439 U.S. 551, 561 (1979) ("In every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security."). This deficiency is also fatal.

Although some blockchain networks require tokens to be locked-in to participate in staking, Compl. ¶¶ 315, 341, just like the purported "risks" the SEC tries but fails to tie to Coinbase's staking services these restrictions on use during staking with Coinbase are dictated by the *blockchain networks'* required bonding periods—which, as the SEC acknowledges, apply whether or not a customer chooses to stake through Coinbase or on her own. Compl. ¶ 315. These network-established bonding periods cannot transform Coinbase's staking services into an investment. The SEC must allege that Coinbase imposes something distinct from a user's experience staking on her own. It has failed to do so. That dooms its staking-based claims.

### B. Profits from Coinbase's staking services are not by dint of managerial services.

No aspect of the Coinbase staking service in any event reflects profits generated by the "essential managerial efforts" of others, as it must to constitute an investment contract. *Hocking*, 885 F.2d at 1455. Staking rewards are not properly conceived as investment profit but rather reflect payments for putting staked assets to work to perform validation services, in support of the relevant blockchain. *See United Hous. Found., Inc.* v. *Forman*, 421 U.S. 837, 852-53 (1975) ("securities laws do not apply" "when a purchaser is motivated by a desire to use . . . the item purchased"). Those reward payments are set by network protocols and are the same whether customers stake

-29-

through Coinbase, on their own, or through some other service.

Nor does the SEC allege any managerial efforts on the part of Coinbase, instead noting only technical or administrative aspects of the service. *E.g.*, Compl. ¶¶ 319, 360, 364. The SEC does not dispute that customers could download the same software used by Coinbase, operate it from their home computers, and receive substantially the same protocol-determined rewards. *See Life Partners, Inc.*, 87 F.3d at 546 (*Howey* third prong not satisfied where post-purchase efforts were ministerial). And once Coinbase has undertaken those technical efforts to set up and operate a validator node, Coinbase can do and does nothing to influence the returns a user receives from her staked tokens. Staking rewards are determined entirely by the token's blockchain protocol. The lack of pleaded managerial agency negates *Howey*'s efforts-of-others element as a matter of law, and the SEC's attempt to transform Coinbase's fee-for-service staking arrangement into a security therefore fails.

\*          \*          \*

Coinbase has long supported and proactively sought additional regulation for the digital asset industry. Nothing in its defense of the SEC's charges marks a deviation from that position: Coinbase welcomes new regulatory rules of the road and believes they would benefit Coinbase and the industry. But regulation must be fair, and transparent, and lawful. The SEC's attack on Coinbase is none of that. This action reflects an abrupt, unexplained change of agency position, unmoored from the statutory authority Congress has given the SEC. It proceeds in the form of a punitive ad hoc enforcement action, notwithstanding Coinbase's repeated pleas for forward-looking notice-and-comment rulemaking. Most fundamentally, it does not comply with the securities laws. The SEC has overstepped its statutory authority, and the case should accordingly be dismissed.

## CONCLUSION

For the foregoing reasons, Coinbase is entitled to judgment on the pleadings.

Dated:  August 4, 2023
New York, New York

Respectfully submitted,


WACHTELL, LIPTON, ROSEN & KATZ

/s/   *William Savitt*
William Savitt
Kevin S. Schwartz
Sarah K. Eddy
Adam M. Gogolak
David P.T. Webb
Sijin Choi
51 West 52nd Street
New York, New York  10019
(212) 403-1000
wdsavitt@wlrk.com

Steven R. Peikin
Kathleen S. McArthur
James M. McDonald
Julia A. Malkina
Olivia G. Chalos
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
(212) 558-4000

*Attorneys for Defendants*