Michael E. Welsh (Massachusetts Bar No. 693537)
welshmi@sec.gov
Casey R. Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Troy Flake (California Bar No. 267523)
flaket@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel: (801) 524-5796

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited liability company; BRENDAN J. STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual,<br><br>Defendants, | **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OMNIBUS MEMORANDUM IN OPPOSITION OF DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:23-cv-00482-RJS<br><br>Judge Robert J. Shelby |

ARCHER DRILLING, LLC, a Wyoming limited
liability company; BUSINESS FUNDING
SOLUTIONS, LLC, a Utah limited liability
company; BLOX LENDING, LLC, a Utah
limited liability company; CALMFRITZ
HOLDINGS, LLC, a Utah limited liability
company; CALMES & CO, INC., a Utah
corporation; FLAHERTY ENTERPRISES, LLC,
an Arizona limited liability company; IX
VENTURES FZCO, a United Arab Emirates
company; PURDY OIL, LLC, a Nebraska limited
liability company; THE GOLD COLLECTIVE
LLC, a Utah limited liability company; and UIU
HOLDINGS, LLC, a Delaware limited liability
company,

          Relief Defendants.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………..…………vi

PRELIMINARY STATEMENT…………………………………………………………...…..1

SUMMARY OF THE ALLEGATIONS………………………………………………………...3

    I.    DEBT BOX AND THE DEBT COUNCIL…………..…………………………………..3

    II.    THE NODE LICENSE OFFERING………………………………………………….....3

    III.    DEBT BOX'S PROMOTERS…………………………………………………….....5

    IV.    DEFENDANTS' MISREPRESENTATION AND DECEPTIVE CONDUCT……....…6

        A.  Misrepresentations About the Node Licenses' Mining Capabilities……………….....6

        B.  Misrepresentations About Oil Operations and Business Partnership Revenues………7

        C.  Misrepresentations About the "Proprietary" Satellite Technology…………………...7

        D.  Defendants' Attempts to Conceal the Truth from Investors…………………………..8

    V.    THE FAIR PROJECT…………………………………………………………………..8

STANDARD OF REVIEW……....…………………………………………………………..9

ARGUMENT………………………………………………………………………………...10

    I.    DEFENDANTS OFFERED AND SOLD UNREGISTERED SECURITIES………..10

        A.  Defendants' Offering Constitutes an Investment Contract under *Howey*………..…..10

            1.   Node License Purchasers Made an "Investment of Money"………………...11

            2.   Node License Purchasers Invested in a Common Enterprise………………..11

            3.   Node License Purchasers had a Reasonable Expectation of Profits
               from the Efforts of Others.…………………………………………………..14

        B.  Defendants' Attempts to Insert Extraneous Requirements
          into the *Howey* Analysis Lack Merit…..………………………………………….15

            1.   A Predicate Formal Agreement Between the Seller and Purchaser of the
               Token is Not a Required Element of an Investment Contract………………16

a.  No Court Had Adopted a Formal Agreement Requirement..........18

b.  Crypto Asset Securities Cases Follow the Same Analysis...........20

II.  DEFENDANTS VIOLATED THE REGISTRATION PROVISIONS
OF THE FEDERAL SECURITIES LAWS………………………………………..…...21

A. The SEC has Adequately Pled a *Prima Facie* Case
Under Securities Act Section 5…………………………………………………...21

B. Defendants Violated Section 15(a)(1) of the Exchange Act…………………………22

III.  THE SEC HAS ADEQUATELY PLED THAT DEFENDANTS VIOLATED
THE ANTIFRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS………23

A. The DLI Defendants' Motion Fails to Provide Any Justification
to Dismiss the SEC's Scheme Liability Claims (Count II and IV)…..………………24

B. Allegations Regarding Defendants' Material Misstatements are Sufficiently
Particularized (Counts IV and VI)…………………………………………………...26

1.  The Complaint Alleges Specific Misstatements by Each
DEBT Council Member…………………………………………...…………27

2.  Defendants' Factual Arguments Are Without Merit………………..……......28

3.  The Complaint Also Alleges Continuous Misrepresentations by DEBT
Council Members and DEBT Box Regarding Key Aspects of the
Offering………………………………………………………………..…..........30

C. Defendants' Misrepresentations Were Material…………………………..31

D. Defendants Acted with the Requisite Scienter………………………………33

IV.  DEFENDANTS' CONSTITUTIONAL ARGUMENTS ARE UNFOUNDED...……...35

A. The Major Questions Doctrine Does Not Apply……………………………………35

1.  The Major Questions Doctrine Is Not Concerned with
Agency Enforcement of Congressional Enactments……..…………………35

2. Even If the Major Questions Doctrine Were Applicable in the
Enforcement Context, the Circumstances Warranting
Its Application Are Absent Here…..…………………………………………37

B. This Action Does Not Violate Due Process…………………………………………39

CONCLUSION…………………….…………………………………………………………40

## Table of Authorities

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980) ........................................................................ 25

*Alabama Assn. of Realtors v. HHS*, 141 S. Ct. 2485 (2021) ............................... 37

*Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980) ............... 10, 11

*Ashcroft v. Iqbal*, 1556 U.S. 662 (2009) .................................................................... 9

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ............................ 25

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................ 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 9

*Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549 (D. Utah Oct. 30, 2007) ..................... 11, 12

*Biden v. Nebraska*, 143 S. Ct. 2375 (2023) ............................................. 35, 36, 38, 39

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................................................... 36

*Campbell v. Castle Stone Homes, Inc.*,
   2011 WL 902637 (D. Utah, March 15, 2011) ................................................... 12

*Casanova v. Ulibarri*, 595 F.3d 1120 (10th Cir. 2010) ............................................... 9

*Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) ....................................... 10, 18

*De Gutierrez v. Albuquerque Pub. Sch.*, 2018 WL 3647208 (D.N.M. Aug. 1, 2018) ................. 40

*Dias v. City & Cty. of Denver*, 567 F.3d 1169 (10th Cir. 2009) .................................... 9

*Diskin v. Lomasney & Co.*, 452 F.2d 871 (2d Cir. 1971) ........................................... 16

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ........................................ 39

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) ..................................................... 24

*FTC v. Kochava Inc.*, 2023 WL 3249809 (D. Idaho May 4, 2023) ............................... 36

*Gary Plastic Packaging Corp. v. Merrill Lynch,*
   *Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985) ............................. 11, 19

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs.*
   *& Prod. Liab. Litig.*, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ........................ 32

*Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551 (1979) ........................................... 11

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) ................. 28

*Malouf v. SEC*, 933 F.3d 1248 (10th Cir. 2019) ....................................................... 24

*McCown v. Heidler*, 527 F.2d 204 (10th Cir. 1975) ............................................... 11, 19

*McGill v. American Land & Exploration Co.*, 776 F.2d 923 (10th Cir. 1985) .................. 12

*McHenry v. Renne*, 84 F.3d 1172 (9th Cir. 1996) .................................................... 23

*McVay v. Western Plains Serv. Corp.*, 823 F.2d 1395 (10th Cir. 1987) ...................... 14

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) ........................................... 24

*Reves v. Ernst & Young*, 494 U.S. 56, at 60-61 (1990) ............................................. 39

*Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997)........................... 9, 27, 33

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
  119 F. Supp. 3d 1213 (C.D. Cal. 2015) ............................................................. 25

*SEC v. Arbitrade Ltd.*, 2023 WL 2785015 (S.D. Fla. Apr. 5, 2023) ................................. 13, 20

*SEC v. Arnold*, 2007 WL 2786248 (D. Colo. Sept. 24, 2007)......................................... 33

*SEC v. Art Intellect*, 2013 WL 840048 (D. Utah Mar. 6, 2013) ...................................... 12, 13, 23

*SEC v. Battoo*, 158 F. Supp. 3d 676 (N.D. Ill. 2016)............................................... 16

*SEC v. Brigadoon Scotch*, 480 F.2d 1047 (2d Cir. 1973)............................................. 39

*SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375 (D. Colo. 2004) ...................................... 31

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943)............................................. 11, 17, 36

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963)................................... 36

*SEC v. Cochran*, 214 F.3d 1261 (10th Cir. 2000)................................................... 32

*SEC v. Coddington*, 2015 WL 1401679 (D. Colo. Mar. 23, 2015) ..................................... 33

*SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998)..................................................... 40

*SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475 (S.D.N.Y. 2002) ................................ 32

*SEC v. Czarnik*, 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) ........................................ 31

*SEC v. Earle*, 2023 WL 2899529 (S.D. Cal. Apr. 11, 2023) ......................................... 26

*SEC v. Edwards*, 540 U.S. 389 (2004)............................................................ *passim*

*SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69 (D.D.C. 2014) ..................................... 30

*SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019)................................................ 31

*SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022) ............................................. 27

*SEC v. Gordon*, 2009 WL 1652464 (S.D.N.Y. June 11, 2009) ......................................... 25

*SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1 (D.D.C. 1998) ..................................... 23

*SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020)................................ *passim*

*SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022)........................................ 39

*SEC v. Leslie*, 2008 WL 3876169 (N.D. Cal. Aug. 19, 2008)......................................... 33

*SEC v. McDuffie*, 2014 WL 4548723 (D. Colo. Sept. 15, 2014) ...................................... 21, 25

*SEC v. Mediatrix Capital Inc.*, 2020 WL 3469700 (D. Colo. June 25, 2020)........................... 13

*SEC v. Mine Shaft Brewing LLC*, 2023 WL 6541552 (D. Utah Oct. 6, 2023) ............................ 22

*SEC v. Monterosso*, 756 F.3d 1326 (11th Cir. 2014)................................................ 28

*SEC v. Mozilo*, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009).......................................... 27

*SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988 (N.D. Cal. 2021) ............................................... 15

*SEC v. Nacchio*, 438 F. Supp. 2d 1266 (D. Colo. 2006) ........................................................... 33

*SEC v. PlexCorps*, 2018 WL 4299983 (S.D.N.Y. Aug. 9, 2018) ................................................ 40

*SEC v. Pocklington*, 2018 WL 6843663 (C.D. Cal. Sept. 10, 2018) ......................................... 28

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ..................................................................... 22

*SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ...................................... 16

*SEC v. RMR Asset Mgmt. Co.*, 479 F. Supp. 3d 923 (S.D. Cal. 2020) ...................................... 22

*SEC v. Santos*, 355 F. Supp. 2d 917 (N.D. Ill. 2003) ............................................................... 31

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ............................................................... 10, 19

*SEC v. Seethrueequity, LLC*, 2019 WL 1998027 (S.D.N.Y. April 26, 2019) ......................... 25, 26

*SEC v. Sells*, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ..................................................... 26

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ..................................................................... *passim*

*SEC v. Shavers*, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014) .............................................. 11

*SEC v. Shields*, 744 F.3d 633 (10th Cir. 2014) ....................................................................... 10

*SEC v. SkiHawk Cap. Partners, LLC*,
2023 WL 2574376 (D. Colo. Mar. 20, 2023) ....................................................................... 34

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012) ................................................................... 27, 34

*SEC v. Stoker*, 865 F. Supp. 2d 457 (S.D.N.Y. 2012) .............................................................. 28

*SEC v. Terraform Labs Pte. Ltd.*,
2023 WL 4858299 (S.D.N.Y. July 31, 2023) ................................................................. *passim*

*SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946) ................................................................... *passim*

*SEC v. Winemaster*, 529 F. Supp. 3d 880 (N.D. Ill. 2021) ...................................................... 26

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ................................................................... 31

*SEC v. Young*, 2022 WL 2977080 (10th Cir. July 28, 2022) .................................................... 13

*SEC v. Yuen*, 221 F.R.D. 631 (C.D. Cal. 2004) ....................................................................... 27

*Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir.2006) .......................................... 25

*Solis v. Latium Network, Inc.*, 2018 WL 6445543 (D.N.J. Dec. 10, 2018) ................................ 20

*TDC Lending LLC v. Priv. Cap. Grp., Inc.*,
340 F. Supp. 3d 1218 (D. Utah 2018) ................................................................................. 33

*Tutor Perini Corp. v. Banc of America Securities, LLC*,
2013 WL 5376023 (D. Mass. Sept. 24, 2013) ..................................................................... 31

*United Hous. Found. v. Forman*, 421 U.S. 837 (1975) ...................................................... 10, 14

*United States v. Cmty. Health Sys.*, Inc., 501 F.3d 493 (6th Cir. 2007) ................................... 31

*United States v. Freeman*, 2023 WL 5391417 (D.N.H. Aug. 22, 2023) .................................... 36

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) ..................................................... 39

*United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013) ....................... 30

*United States v. Zaslavskiy*, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) .......................... 39, 40

*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998) .................................................. 23

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ............................................................. 35, 37, 38

**Statutes**

15 U.S.C. § 77b(a)(1) ................................................................................................................... 2

15 U.S.C. § 77e(a) ...................................................................................................................... 21

15 U.S.C. § 78c(a)(4)(A) ........................................................................................................... 22

15 U.S.C. § 78c(a)(9) ................................................................................................................. 22

15 U.S.C. § 78u-4(b)(2) ............................................................................................................. 34

**Other Authorities**

Framework for "Investment Contract" Analysis of Digital Assets,  https://www.sec.gov/corpfin/ framework-investment-contract-analysis-digitalassets, (Apr. 3, 2019) ................................... 40

SEC Rel. No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017) .................................................................. 40

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................... 9, 23

**Regulations**

17 C.F.R. §§ 240.10b-5(a)(b)(c) ............................................................................................... 24

**Constitutional Provisions**

U.S. Const. art. II, § 3 ............................................................................................................... 36

## PRELIMINARY STATEMENT

As pled in the Securities and Exchange Commission's ("SEC's") Complaint, Defendants Digital Licensing Inc. ("DEBT Box"), Jason Anderson, Jacob Anderson, Schad Brannon, and Roydon Nelson (the "DLI Defendants") orchestrated and controlled a sprawling, multi-year fraudulent scheme, which was aided and promoted by those Defendants who have moved to dismiss or joined the DLI Defendants' Motion (collectively, the "Moving Defendants").[1] *See* Dkt. Nos. 182, 191, 192, 193, 196, 197. Each of the motions should be denied. The facts pled in the SEC's Complaint detail how Defendants offer and sale of the "Node Licenses" constituted unregistered offers and sales of securities in violation of the federal securities laws. Moreover, the Complaint pleads specific facts related to the DLI Defendants' false statements and deceptive conduct concerning material aspects of their unregistered securities offering. These allegations are sufficient to support the Complaint's causes of action against each of the Moving Defendants.

*First*, the Complaint pleads facts sufficient to allege that Defendants' "Node License" offering constituted an investment contract and therefore a security. As alleged, investors who purchased Node Licenses invested money in DEBT Box and reasonably expected to earn profits from Defendants' managerial efforts—which Defendants represented would increase the value of DEBT Box crypto assets. The offering alleged in the Complaint is therefore an investment contract under *SEC v. W.J. Howey Co.,* 328 U.S. 293, 299 (1946). Defendants' attempts to elevate additional form over substance and impose additional requirements to the investment contract

---

[1] References to the Moving Defendants' memoranda of law in support of their individual motions to dismiss are as follows: Jason Anderson, Jacob Anderson, Schad Brannon and Relief Defendants Business Funding Solutions, Blox Lending, LLC, the Gold Collective, LLC, and UIU Holdings "DLI Mot." (Dkt. No. 197); iX Global, LLC, Joseph Martinez, and Travis Flaherty, "IX Mot." (Dkt. No. 182); Benjamin Schuler, Alton Parker, B&B Investment Group, and BW Holdings, LLC, "FAIR Mot." (Dkt. No. 191); Brandan Stangis, "Stangis Mot." (Dkt. No. 192); Matthew Fritzsche, "Fritzsche Mot." (Dkt. No. 196); Flaherty Enterprises, LLC, "FE Mot." (Dkt. No. 193).

analysis cannot be squared with decades of Supreme Court and Tenth Circuit precedent, as Defendants' own case law confirms.

*Second*, the Complaint sets forth particularized allegations of the DLI Defendants' false and misleading statements and omissions, deceit, concealment, and other conduct aimed at defrauding Node License investors, in violation of Rule 10(b)-5 and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Section 17(a) of the Securities Act of 1933 ("Securities Act").  Defendants' arguments to the contrary: (a) ignore the SEC's scheme liability claims; (b) apply legal requirements inapplicable to SEC enforcement actions; and (c) mischaracterize DEBT Box's promotional materials and the DLI Defendants' prior statements.

*Third*, the major questions doctrine and Due Process Clause do not bar the SEC's claims. Congress, not the SEC, defined the term "security" broadly, to capture the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey Co.,* 328 U.S. at 299.  No federal court has ever accepted Defendants' argument that the term "investment contract" as used in the Securities Act, 15 U.S.C. § 77b(a)(1), or as construed by the Supreme Court in *Howey*, is unconstitutionally vague in any context.  Indeed, courts applying *Howey* have ruled favorably on allegations that schemes involving crypto assets or mining software constituted investments contracts, including in the over ***one hundred*** enforcement actions applying *Howey* to crypto asset related offerings filed by the SEC ***before*** Defendants first offered Node Licenses to investors.

For these reasons, set forth in more detail below, the Complaint adequately states claims against the Moving Defendants. Defendants' motions should be denied.

## SUMMARY OF THE ALLEGATIONS

### I.     DEBT BOX AND THE DEBT COUNCIL.

DEBT Box is a Wyoming corporation that operated in Utah throughout the relevant time period. Dkt. No. 1, Complaint ("Compl.") ¶ 13.  Other than the conduct at issue in this case, DEBT Box had no other business.  *Id.* ¶ 67.  Defendants Jason Anderson, his brother Jacob ("Jake") Anderson, Schad Brannon, and Roydon Nelson—who call themselves the "DEBT Council"—purport to be the co-founders of DEBT Box, and together exercise full control over the entity.  *Id.* ¶ 13.  According to DEBT Box's corporate filings, Brannon is currently DEBT Box's acting President, and Brannon is the company's sole Director, Treasurer, and Secretary.  *Id.* ¶¶ 13, 16, 17.  In addition, DEBT Box and its promoters have introduced Jason Anderson and his brother, Jake, as the "co-founders" of DEBT Box.  *Id.* ¶¶ 14, 15.

### II.     THE NODE LICENSE OFFERING.

Beginning in May 2021, DEBT Box directly, and indirectly through the DEBT Council and other promoters, began offering investments in "node software licenses" ("Node Licenses"), which according to Defendants would "mine" at least one of eleven separate crypto assets created and issued by DEBT Box.  *Id.* ¶ 2.  As represented by Defendants, once an investor obtained an account, and paid a fee, the investor could purchase Node Licenses for prices ranging between $1,000 and $12,000 per license.  *Id.* ¶ 13.  Upon purchase of one or more Node Licenses, the investor would purportedly become entitled to receive—via "mining"—one or more of the DEBT Box crypto assets which—according to DEBT Box's website, Defendants' representations, and DEBT Box's Twitter account—are "linked to real world commodities" and "backed by royalties coming from various industries."  *Id.* ¶¶ 2, 8, 12, 16, 22, 28.  As described in DEBT Box's promotional materials, including its "Lite Papers", "the DEBT Box ecosystem benefits from the physical production of these commodities by supporting real-world projects that generate

revenues.  These real-word [*sic*] commodity production projects benefit from [DEBT Box's *financial support, technologies, and operational assistance*."  *See id.* ¶¶ 47–48; Dkt. No. 182-1 at 3C–3M (DEBT Box Lite Papers) (emphasis added).

For example, the Lite Paper for DEBT Box's first crypto asset, Black Gold or "BGLD," describes that crypto asset as "a DEBT Box project supported by and linked to the physical production and sale of crude oil."  The BGLD Lite Paper states that DEBT Box is currently supporting oil wells in Nebraska and Nevada, and is evaluating approximately twenty "future" oil field projects in the United States and Africa.  Compl. ¶ 48; Dkt. No. 182-1 at 3-D (BGLD Lite Paper).  The BGLD Lite Paper further explains that investor funds will be used by DEBT Box to provide operational and financial support to these oil extraction projects:  "By purchasing a [BGLD Node License], you're allowing [DEBT Box] to support oil industry projects within the exploration, drilling and physical production of crude oil with certain key benefits," such as DEBT Box's "proprietary satellite scanning technology," the "ability to attract new liquidity," and operational expertise to reduce "waste" and "exploration costs."  Compl. ¶¶ 48, 70; Dkt. No. 182-1 at 3-D.

In addition to touting how each crypto asset (or "token") is supposedly "supported" or "backed by" various underlying businesses and commodities, Defendants represented to investors that DEBT Box would undertake efforts to develop the DEBT Box ecosystem and "increase the value" of all of the DEBT Box crypto assets "for all license and token holders."  *Id*. ¶¶ 49, 70.  As the sole members of the DEBT Council, Jason and Jake Anderson, Brannon, and Nelson held themselves out to investors as the administrators of the DEBT "ecosystem."  *Id.* ¶ 49.  Defendants represented that one way they would "increase the value" of DEBT Box crypto assets was by periodically reducing the supply of those crypto assets by purchasing and then "burning" them

(*i.e.*, removing them from circulation). *Id*. According to Defendants, this "burning" would be achieved, in part, through revenues DEBT Box received from the projects "backing" these crypto assets. *Id*. ¶¶ 47, 49, 68. For example, the Lite Paper for the crypto asset "BEV" represented:

> A recent ***multi-million-dollar contract*** has been awarded to our partner, providing distribution services to retailers such as 7-11, Aldis, Food Lion, Sam's Club, and more. ***Royalties received will be used to buy BEV Project token [sic] out of the market*** to be burned. With our unique digital approach, we are able to be more competitive with our negotiating and will continue to seek additional methods for burning [t]he BEV token…

*Id*. ¶ 50; Dkt. No. 182-1 at 3-J (BEV Lite Paper) (emphasis added). Investors had no involvement in how DEBT Box or any of its crypto assets operated, the selection of business partnerships by the DEBT Council, the development of the DEBT Box ecosystem, or any business decisions made by Defendants. Compl. ¶ 49.

## III.   DEBT BOX'S PROMOTERS.

Initially, DEBT Box and the DEBT Council were primarily responsible for marketing Node Licenses, along with individual promoters engaged by DEBT Box, including Stangis and Fritzche, to promote the offering on social media sites. *Id*. ¶¶ 29, 30, 90.

In October 2022, DEBT Box partnered with iX Global, a multi-level marketing ("MLM") company, to market the sale of the Node Licenses. Compl. ¶¶ 93, 94. As a result of this partnership, Martinez, Flaherty, Schuler, and Daniels began promoting the Node Licenses software licenses via iX Global's websites and pre-existing MLM network, as well as through hundreds of promotional videos posted on YouTube, Instagram, and Facebook. *Id*. ¶ 94. As compensation for their services, each of these individuals received a commission for every Node Licenses they sold. *Id*. ¶¶ 95–100. Aided by these promotional efforts, Defendants raised millions from investors from their offering of the Node Licenses. *Id*. ¶¶ 1, 100. DEBT Box never filed a registration statement with

the SEC with respect to any offer or sale of Node Licenses, and none was in effect during the Node Licenses offering.  *Id*. ¶ 63.

## IV.   DEFENDANTS' MISREPRESENTATIONS AND DECEPTIVE CONDUCT

To entice investors, DEBT Box and the DEBT Council touted their various underlying business partnerships, technologies, revenues, and royalties that, according to Defendants, would increase the value of the DEBT crypto assets being "mined" by the Node Licenses.  But the technology and businesses supposedly "backing" the crypto assets were a sham.

### A.  Misrepresentations About the Node Licenses' Mining Capabilities

At all times during relevant period, DEBT Box and its controlling members (*i.e.*, Defendants Jason Anderson, Jake Anderson, Brannon, and Nelson (*id*. ¶ 13)) repeatedly represented to investors that the DEBT Box node licenses "mined" DEBT Box's crypto assets through a process akin to mining for bitcoin (*i.e.*, through a "proof of work" consensus mechanism), which is a protocol for a system of computers to come to agreement as to the state of a distributed, digital ledger (or "blockchain"), which then pays "rewards" to certain participants in this "mining" process).  *Id.*  ¶¶ 45, 65.  For example, in YouTube videos published on May 6 and August 22, 2022, DEBT Box, Jake Anderson and Jason Anderson represented that the DEBT Box crypto assets could only be generated through mining.  *Id.* ¶ 65.

In reality, the Node Licenses could not "mine" DEBT Box's crypto assets because, by definition, none of those crypto assets were minable.  *Id*. ¶¶ 3, 66.  Each of the eleven DEBT Box crypto assets was created through the execution of a "smart contract" on a distributed digital ledger known as the "BNB Blockchain."  The first of these was created several months after the initial offering of Node Licenses to the public.  *Id*. ¶¶ 3, 43–45, 66.  Rather than requiring mining software to generate new tokens like the Bitcoin blockchain protocol generates new bitcoins, the entire supply of each DEBT Box crypto assets was pre-generated and immediately available to

Defendants.  As a result, the Node Licenses were merely a vehicle for Defendants to distribute a proportional allocation of their crypto assets to investors on a periodic basis.  *Id*. ¶ 66.

### B.  Misrepresentations About Oil Operations and Business Partnership Revenues.

DEBT Box's marketing materials and the members of the DEBT Council also made numerous misrepresentations regarding DEBT Box and its partners' success at generating revenue through oil drilling operations. *Id*. ¶ 68, 75, 76.  These Defendants variously claimed, among other things, to have "hit payload" of oil; to have started extracting oil from an "oil pool that is 100 billion barrels in size;" to have received millions of dollars in profits from their oil partnerships; and to have partnered with numerous oil wells.  *Id*.  ¶ 68.  In reality, DEBT Box did not have any agreements to share in the profits of operational oil wells, and the Western Oil well sites touted by DEBT Box and the members of the DEBT Council have never produced any oil—a fact Defendants knew and indeed admitted (as to the Nevada well) to federal investigators.  *Id*. ¶ 71.

DEBT Box and Jason Anderson made similar misrepresentations regarding the partnerships supposedly supporting DEBT Box's "BEV" crypto asset. *Id*. ¶ 80.  The BEV Lite Paper falsely claimed that a business partner, Lazy Magnolia, had secured "multi-million-dollar" bottling contracts, including with retailers such as "7-11, Aldis, Food Lion, Sam's Club and more." *Id*.  And in August 2022, Jason Anderson falsely claimed that its beverage distribution partner was generating "over $12 million a month in revenue" from its rainwater bottling business.  *Id*.  In reality, no DEBT Box business partners (including Lazy Magnolia) had contracts with these retailers or were generating "over $12 million in month in revenue."  *Id*. ¶ 81.

### C.  Misrepresentations About "Proprietary" Satellite Technology.

The DLI Defendants also claimed that DEBT Box had access to "advanced proprietary remote sensing and satellite imagery technology", which they claimed was further bolstered through a partnership with an Australian technology company, Fleet Space. *Id*. ¶ 73.  For example,

DEBT Box's marketing materials claimed that their technology was capable of scanning the earth "through the frequencies" to determine exactly where gold, oil, or indeed any "mineral on the periodic table" was located, and "pinpoint gold, for example, or aluminum or silver, or natural gas within six centimeters in the ground." *Id*. ¶ 74.  In reality, DEBT Box had no such technology, and no such deal with Fleet Space. *Id*. ¶¶ 77, 78.  To the contrary, Fleet Spaces' CEO was forced to ask DEBT Box to cease and desist after learning that DEBT Box was misrepresenting their purported partnership and misappropriating Fleet Space's marketing materials. *Id*. ¶ 78.

### D.    Defendants' Attempts to Conceal the Truth from Investors.

To prevent investors from discovering the falsity of their misstatements, Defendants took significant steps to lull investors and otherwise deceive them about the businesses purportedly "backing" the securities. *Id*. ¶¶ 85, 86.  For example, DEBT Box and the DEBT Council created "accounts" for DEBT Box investors that falsely created the appearance that the node licenses were "mining" new crypto assets and that those "tokens" were increasing in value based on revenues generated by underlying businesses. *Id*. ¶ 85.  And they took steps to conceal the true status of DEBT Box's purported partnerships with Fleet Space and Lazy Magnolia from investors, including by deceiving investors about Fleet Space's "partnership" and refusing to disclose the details of their claimed underlying contracts with other "partners." *Id*. ¶¶ 47, 51, 78, 86–88.

## V.    THE FAIR PROJECT

More recently, through a partnership with Jason and Jake Anderson, Defendants Schuler, Daniels, and Parker spun-off the DEBT Box model to create the FAIR Project, which offers so-called "software-mining license[s]" to investors with the promise of "mining" crypto assets with a "proof of work" algorithm backed by revenues from the use of artificial intelligence in the pharmaceutical industry. *See id*. ¶¶ 28, 58, 59.  As with the Node Licenses, the offer and sale of the FAIR Project "software-mining licenses" has not been registered with the SEC. *See id*. ¶ 63.

## <u>STANDARD OF REVIEW</u>

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must determine whether the Complaint's allegations are sufficient to state a claim within the meaning of Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). The standard is a liberal one, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (cleaned up). The court must "accept as true all well pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (citation omitted). All reasonable inferences must be drawn in plaintiff's favor. *Ashcroft v. Iqbal*, 1556 U.S. 662, 678 (2009); *Dias*, 567 F.3d at 1178.

Rule 9(b) provides, in part, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*  In addition, "[t]he requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct . . . and to be construed as to do substantial justice.'" *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (claims that are "not premised on fraud do not trigger Rule 9(b) scrutiny") (cleaned up).

## ARGUMENT

**I.     DEFENDANTS OFFERED AND SOLD UNREGISTERED SECURTIES.**

### A.     Defendants' Offering Constitutes an Investment Contract under *Howey*.

Under Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10), an "investment contract" is a security.  15 U.S.C. §§ 77b(a)(1); 78c(a)(10).  Nearly 80 years ago, in *Howey*, the Supreme Court established a test to determine when an "unconventional scheme or contract" constitutes an investment contract and therefore a security.  *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (*citing Howey*, 328 U.S. at 298–99).  That test requires that a scheme involve: "(1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *SEC v. Scoville*, 913 F.3d 1204, 1220 (10th Cir. 2019) (citing *Howey*, 328 U.S. at 298–99).  "The test 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'"  *SEC v. Shields*, 744 F.3d 633, 643 (10th Cir. 2014) (quoting *Howey*, 328 U.S. at 299).  Moreover, the Supreme Court "has expressly stated that in assessing whether an investment scheme is an investment contract, 'form should be disregarded for substance,' and courts should focus on the 'economic realities underlying a transaction, and not on the name appended thereto.'"  *Shields*, 744 F.3d at 643 (quoting *United Hous. Found. v. Forman*, 421 U.S. 837, 852 (1975)).

In assessing economic realities, courts look at the totality of the circumstances surrounding the offer of an investment contract and what the offeror invites investors to reasonably understand and expect.  *Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466, 468 (10th Cir. 1967) (promoters' offerings should "be judged as being what they were represented to be." (cleaned up)); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980) (describing "the promotional emphasis of the developer" as "central" to the *Howey* test).  This necessarily includes an examination of how

the promoter marketed the investment. *Aldrich*, 627 F.2d at 1039 ("Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered … in virtually every relevant investment contract case."); *see also, e.g.*, *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943) (analyzing the "sales campaign" and "sales literature"); *SEC v. Edwards*, 540 U.S. 389, 391 (2004) (quoting the marketing brochure); *McCown v. Heidler*, 527 F.2d 204, 210 (10th Cir. 1975) (relying on "brochure" and written instructions to salesmen); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 233, 240 (2d Cir. 1985) (relying on "implicit" promises).

Here, the Complaint alleges the necessary elements to establish Defendants' offer and sale of the Node Licenses constituted an investment contract under *Howey* and its progeny.

### 1.  Node License Purchasers Made an "Investment of Money."

There is no dispute that the offer and sale of Node Licenses constituted an "investment of money" under *Howey*.  This requirement is met where investors "gave up some tangible and definable consideration."  *Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549, at *5 (D. Utah Oct. 30, 2007) (quoting *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559–60 (1979)).  Here, Defendants raised millions from investors in the form of US Dollars, Bitcoin, or other crypto assets in exchange for Node Licenses.  Compl. ¶¶ 46, 54–56; *see Telegram*, 448 F. Supp. 3d at 368–69 ("[P]roviding dollars or euros in exchange for the future delivery of" a digital asset "establish[es]" an "investment of money" under *Howey*); *SEC v. Shavers*, 2014 WL 12622292, at *5–6 (E.D. Tex. Aug. 26, 2014) (Bitcoin satisfies the "investment of money" requirement).

### 2.  Node License Purchasers Invested in a Common Enterprise.

In the Tenth Circuit, the determination of whether a common enterprise exists does not

require the presence of either horizontal or vertical commonality.[2]  The Tenth Circuit has rejected such "rigid" requirements and instead, counsels courts to examine the "economic reality" so that when a transaction, in substance, involves an investment, the common enterprise will be present. *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985) (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

The "***determining factor*** of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit." *SEC v. Art Intellect*, 2013 WL 840048, at *15 (D. Utah Mar. 6, 2013) (emphasis added) (quoting *Berrios-Bones*, 2007 WL 3231549, at *5); *Campbell v. Castle Stone Homes, Inc.*, 2011 WL 902637, at *4 (D. Utah, March 15, 2011) (same).  Under *Howey*, profit means an "income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment." *Telegram*, 448 F. Supp. 3d at 371 (internal quotation omitted); *see Edwards*, 540 U.S. at 394 (profits include "the increased value of the investment"); *SEC v. SG Ltd.*, 265 F.3d 42, 53 (1st Cir. 2001). (purchaser may expect profits from "capital appreciation from the original investment").  Although not required, the pooling of investor funds supports the finding of a common enterprise. *Art Intellect*, 2013 WL 840048, at *15 (common enterprise where "investor funds were commingled in common accounts"); *see also*

---

[2] Horizontal commonality exists when "investors' assets are pooled and the fortune of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise," whereas vertical commonality exists when the fortunes of the investors are tied to the fortunes of the promoter. *Telegram*, 448 F. Supp. 3d at 369.  Here, the SEC has pleaded facts showing how proceeds from the Node License sales were pooled to fund the DEBT Box ecosystem (*e.g.*, Compl. ¶¶ 54, 55, 61) and has alleged the alignment of fortunes between Defendants and investors in the ongoing enterprises (*e.g.*, *id.* ¶¶ 49, 61).  Thus, even under the "rigid" standards applied by courts outside the Tenth Circuit, Defendants offering meets the common enterprise requirement. *See SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y 2020) (common enterprise found where "Kik deposited the funds in a single bank account"; "used the funds for its operations, including the construction of the digital ecosystem it promoted"; and "the success of the ecosystem drove demand for [the token] and thus dictated investors' profits.").

*SEC v. Mediatrix Capital Inc.*, 2020 WL 3469700, at *2 (D. Colo. June 25, 2020), *aff'd sub nom*. *SEC v. Young*, 2022 WL 2977080 (10th Cir. July 28, 2022) (common enterprise where defendants "commingled investor funds" and "traded those funds in an undifferentiated fashion").

Here, the economic realities demonstrate that the common enterprise requirement is met. **First**, Defendants promoted Node Licenses as a passive investment. DEBT Box and the DEBT Council told investors that DEBT Box would handle all aspects of the enterprise, including the selection of business partners, the negotiation of revenue sharing agreements, the management and development of the DEBT Box ecosystem, and the creation of secondary markets where Node License purchasers could sell their tokens for a profit. Compl. ¶¶ 49, 51, 53; *see SEC v. Arbitrade Ltd.*, 2023 WL 2785015, at *5 (S.D. Fla. Apr. 5, 2023) (common enterprise where "investors' expectation of profits derived from their expectation that the value of their DIG tokens would increase due to the efforts of [defendants] to back the tokens with gold bullion"). **Second**, the Node License purchasers collectively shared the risks and fortunes of the project. Each Node License received a proportional amount of DEBT Box crypto assets. *Id.* ¶¶ 47. 58. Any increase or decrease in the value of these crypto assets would be shared equally by all token holders. *Id.* ¶ 61. **Third**, Defendants pooled investor funds in accounts controlled by DEBT Box and members of the DEBT Council. Compl. ¶¶ 54–56, 86. Node License purchasers were told their funds would be used to support the projects—*e.g.*, BGLD Node License purchasers' money would be used to support oil extraction projects. *Id.* ¶¶ 44, 55, 70; Dkt. No. 182-1 at 3-D (BGLD Lite Paper); *see also Art Intellect*, 2013 WL 840048, at *15; *Mediatrix Capital Inc.*, 2020 WL 3469700, at *2; *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020) ("The economic reality is that Kik, as it said it would, pooled proceeds from its sales of Kin in an effort to create an infrastructure

for Kin, and thus boost the value of the investment."). These allegations are more than sufficient to satisfy common enterprise element of the *Howey* test.[3]

### 3. Node License Purchasers had a Reasonable Expectation of Profits from the Efforts of Others.

The Complaint also pleads sufficient facts to satisfy *Howey*'s requirement that the investment come with a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852. The inquiry as to investors' reasonable expectation of profits is an objective one. "If an objective investor would have perceived the defendants' statements and actions as promising the possibility of such returns, the third prong of *Howey* is satisfied." *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *14 (S.D.N.Y. July 31, 2023); *Telegram*, 448 F. Supp. 3d at 371 (inquiry "is an objective one focusing on the promises … made to investors; it is not a search for the precise motivation of each individual participant").

Through a steady stream of marketing, Defendants encouraged investors to view the Node Licenses as an investment vehicle. Investors were promised profits from the Defendants' ventures in the form of crypto assets, which would purportedly increase in value via Defendants' efforts in leveraging their supposedly "proprietary" technology and securing successful partnerships. Defendants also represented that DEBT Box would use the profits from those partnerships to "burn" crypto assets, which would reduce the overall supply of the crypto asset, thereby increasing the value of the assets held by investors. *Id.* ¶ 49. Further, DEBT Box marketing materials

---

[3] The economic realities of the Node License offering do not resemble the loan agreements at issue in *McVay v. Western Plains Serv. Corp.*, 823 F.2d 1395 (10th Cir. 1987). There, the Tenth Circuit held that the loan agreements were not offered as an investment, noting that they could not increase in value. *Id.* at 1391. Here, in contrast, Defendants marketed the Node Licenses as an investment, touting potential returns for investors from the increase in the value of the mined crypto assets. Indeed, Defendants repeatedly told investors that they would periodically burn tokens for the specific purpose of increasing the value of the tokens held by Node License purchasers.

emphasized that the DEBT Council would use funds from the sale of Node Licenses to develop the "DEBT ecosystem," which would further increase the value of the underlying crypto assets. *Terraform*, 2023 WL 4858299, at *14 (profits from sale of a crypto asset "would be fed back into further development of the Terraform ecosystem, which would, in turn, increase the value of the LUNA coins"); *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 997 (N.D. Cal. 2021) (expectation of profits element met where the crypto assets at issue "were, at the time of the transaction, solely objects for trading").

Investors were not required to undertake any efforts to realize returns on their Node License investments. *Id*. ¶ 53. DEBT Box's marketing materials identified no reason for investors to pay up to $12,000 for a Node License other than to obtain DEBT Box's crypto assets. *Id*. ¶¶ 47–53. Accordingly, a reasonable Node License purchaser would believe that the value of the crypto assets would increase from DEBT Box and the DEBT Council's efforts. *Id*. ¶¶ 49, 53. The Complaint's well-pled facts demonstrates that Defendants' offers and sales of Node Licenses meet the three prongs of the *Howey* test.

### B. Defendants' Attempts to Insert Extraneous Requirements Into the *Howey* Analysis Lack Merit.

Defendants attempt to escape the conclusion mandated by *Howey* and its progeny by asking the Court to ignore Defendants' extensive marketing campaign and representations about the Node Licenses and instead focus on boilerplate disclaimers set forth in DEBT Box's supposed "Terms and Conditions." IX Mot. at 13. As an initial matter, Defendants improperly offer the "Terms and Conditions" document to provide evidentiary support for their defense that they did not commit securities violations.[4] In any event, it is well-established that disclaimers do not control the

---

[4] Defendants stretch the incorporation-by-reference doctrine beyond its breaking point by citing the "Terms and Conditions" document. The Complaint does not quote or otherwise mention the

outcome. *SEC v. Battoo*, 158 F. Supp. 3d 676 (N.D. Ill. 2016) (marketing disclaimers ineffective as shield from liability under the securities laws); *SG Ltd.*, 265 F.3d at 54 (disclaimers do not undo the economic reality when the promoters made statements promising profits); *Telegram*, 448 F. Supp. 3d at 365 (same).

Defendants' additional contention that an "ongoing contractual obligation is required for there to be an investment contract" (IX Mot. at 10–12), is incorrect and should be rejected. There is simply no such requirement, and Defendants' own caselaw undermines their argument.

### 1. A Predicate Formal Agreement Between the Seller and Purchaser of the Token Is Not a Required Element of an Investment Contract.

Defendants' argument that *Howey* requires a formal contractual undertaking is inconsistent with what *Howey* and its progeny actually hold. [5]   In *Howey*, all investors purchased tracts of orange groves pursuant to land sale agreements, and all were offered—but only a certain percentage entered into—a separate service contract whereby one of the defendants committed to undertake efforts to cultivate the land for the investors' benefit. *See* 328 U.S. at 296–99. In so holding, the Supreme Court emphasized the lower courts' error in "treat[ing] the contracts and deeds as separate transactions involving no more than an ordinary real estate sale and an agreement by the seller to manage the property for the buyer." 328 U.S. at 297–98. The Court further

---

cited document. Nor could it. By its own terms, the document upon which Defendants seek to rely ***did not exist*** at the time of the Complaint's filing. *See* Dkt. No. 182-1 at 3-B (cited document lists November 2, 2023 as date it was last modified).

[5] Defendants' attempts to resurrect the common law (*e.g.*, IX Mot. at 7–8) are fundamentally inconsistent with the federal securities laws. *See*, *e.g.*, *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971) (the definition of "offer" under the Securities Act "goes well beyond the common law"). Even Defendants' own cases reject this argument. *E.g.*, *SEC v. Ripple Labs Inc.*, 2023 WL 4507900, at *6 (S.D.N.Y. July 13, 2023) (cited in IX Mot. at 10, 12). In any event, the facts of those cases vary significantly, and at most, they demonstrate that state courts applied "investment contracts" to the "variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the effort of [others]." *Howey*, 328 U.S. at 299.

explained that the written contracts only "evidenced" the relationships, and the legal transfer of rights was "purely incidental." *Id.* at 300 ("The investment contracts ***in this instance take the form of*** land sales contracts, warranty deeds and service contracts." (emphasis added)). In other words, these formalities were present but were not dispositive to the existence of an investment contract. Although the defendant in *Howey chose* to legally bind itself to purchasers in the form of certain service undertakings, that the defendant was bound under state law did not determine the substance of the transactions. Indeed, the Court underscored that it was "***immaterial*** whether the shares in the enterprise ***are evidenced by formal certificates*** or by nominal interests in the physical assets employed in the enterprise." *Id.* at 299 (emphasis added).

This formulation is consistent with the Supreme Court's decision in *Joiner*, predating *Howey* by three years, on this very point. There, the Court held that the sale of oil leasehold interests gave rise to investment contracts based on the promoter's stated intent to drill an exploratory oil well, which appeared only in sales literature and not in the actual leasehold assignments. 320 U.S. at 346–48. *Joiner* thus looked to these representations to determine whether, given the factual setting as a whole, an investment contract existed, emphasizing: "the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung." *Id.* at 348. Critically, the Court also found it "unnecessary to determine" whether the purchaser had also acquired "a legal right to compel" the promoter to undertake efforts under state law. *Id.* at 349. Defendants' insistence that no investment contract can exist here— because investors did not sign a formal contract formalizing the Defendants' promises to generate profit—is directly foreclosed by *Joiner*.

Under *Howey* and *Joiner*, what matters is not any predicate formal agreement between an offeror and offeree, but rather the totality of circumstances—the economic reality—surrounding

the offer and sale of an asset, including promises and undertakings in whatever form or manner those may take.  ***That*** is the investment contract.[6]

### a. No Court Has Adopted a Formal Agreement Requirement.

Courts, including the Tenth Circuit, have consistently followed *Joiner* and *Howey* in finding investment contracts without analyzing—let alone requiring—any "contractual" undertakings.  For example, in *Continental Marketing*, one of the cases on which Defendants rely, the Tenth Circuit concluded that contracts for the sales of beavers, offered alongside optional arrangements for maintaining the beavers provided by third party ranchers, constituted investment contracts.  387 F.2d at 468.  Much like in *Howey*, the *promoter* that was held to be offering securities was nominally selling a product with intrinsic value (orange groves in *Howey*, and beavers in *Continental Marketing*).  But neither of those defendants merely offered those items. Instead, the marketing in both cases was cloaked with an investment opportunity—optional in both cases—to profit from the entrepreneurial efforts of another with respect to those assets.  In *Howey*, that option was for the defendants themselves to manage the orange grove.  In *Continental Marketing*, an entirely unrelated third party could manage, if the investor later chose to enter into that separate arrangement.

The *Continental Marketing* court recognized that the seller's "formal contractual documents" provided that its "contracts and services begin and end with the sale and delivery of live, specific and identified animals and that purchasers' reliance on the company extends no

---

[6] The IX Defendants cite to the SEC's brief in *Howey* in which the SEC proposed a definition of "investment contract" as "including any *contractual* arrangement for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters." (IX Motion at 8–9). Yes, the SEC argued in *Howey*, as well as in *Daniel*, and in *Edwards*, that an "investment contract" *can* include a "contractual arrangement."  But that does not mean one is *required*, as Defendants now suggest.

further." *Id.* at 468.  Nonetheless, heeding *Howey*'s admonition "to disregard form for substance and place emphasis on economic reality," the Tenth Circuit found the court found that "[t]he more critical factor is the nature of the investor's participation in the enterprise." *Id.* at 470.  Like here, investors were "encouraged not to take possession of the animals" and the promoters' marketing materials emphasized the potential profits investors could realize if they contracted with one of the ranchers recommended by the promoter.  *Id.*; *see also McCown*, 527 F.2d at 207–09 (promoter's promise to engage in profit-increasing efforts is a "contractual promise").

Similarly, the First Circuit in *SG Ltd*. found an investment contract based solely on representations on the promoter's website, without a common law written agreement binding the promoter to undertake efforts. 265 F.3d 42, 49–55 (1st Cir. 2001). The court made that determination despite the district judge's finding that the investors' payments to defendant were part of a "[video] game lacking a business context" that "was not part of the commercial world." *Id.* at 46, 47; *see also Gary Plastic*, 756 F.2d at 233, 240 (holding offer constituted an investment contract based in part on Merrill Lynch's statement in an "Information Bulletin" that it "fully intends to maintain a secondary market for its customers which would enable them to sell" the instruments they were buying from Merrill Lynch, and on its "*implicit* promise to maintain its marketing efforts" with respect to the instruments (emphasis added)).

More recently, in *Scoville*, the Tenth Circuit had little trouble concluding the investors' only expectation of profits came from "the representations made to them" on the promoter's website. *See* 913 F.3d at 1221–22.  The *Scoville* court made this determination without discussing any written agreement, while noting there was no contract governing how investors would be repaid.  *Id.* at 1210.  The same is true here.  Defendants' marketing campaign emphasized that DEBT Box and DEBT Council would undertake efforts to increase the value of the crypto assets.

Whether a formal contract set forth these promises does not alter the economic realities of the transaction.

### b. Crypto Asset Securities Cases Follow the Same Analysis

The *Howey* test was artfully crafted to be evergreen—*i.e.*, to encompass any number of developments, including technological ones such as crypto assets. *See Edwards*, 540 U.S. at 393 (*Howey* can adapt to all "schemes devised by those who seek the use of the money of others on the promise of profits" (citation omitted). This is why courts have declined invitations by defendants in the crypto asset space to apply a test other than *Howey*'s, and not one has taken up the repeated attempts to insert the "contractual obligation" requirement into the analysis.

In *Terraform*, the court held that "[b]y stating that 'transaction[s]' and 'scheme[s]'—and not just 'contract[s]'—qualify as investment contracts, the Supreme Court made clear in *Howey* that Congress did not intend the term to apply only where transacting parties had drawn up a technically valid written or oral contract under state law." 2023 WL 4858299, at *11.

In *Balestra v. ATBCOIN LLC*, the court similarly found an investment contract despite the absence of a common law contract obligating the issuer to undertake efforts or any entitlement of investors to share in the issuer's profits. *See* 380 F. Supp. 3d 340, 354, 357 (S.D.N.Y. 2019) ("ATB Coins did not entitle purchasers to a pro rata share of the profits derived from any ATB-managed transaction. However, such a formalized profit-sharing mechanism is not required." (citations omitted)). Instead of a contract, the court held investors' expectation of profits came from "a marketing campaign," a "press release," "advertisements," and the promoter's website. *Id.* at 355; *see also Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (finding securities in "general sale" of crypto assets based on representations in "promotional materials, advertising methods, and public statements"); *Arbitrade*, 2023 WL 2785015, at *8 (same for sale of crypto assets purportedly backed by gold bullion).

The court reached the same result in *Kik*, which involved a single, two-stage offering. The first stage was an initial private sale to "sophisticated participants," and the second phase was a general distribution to 10,000 public investors. *See* 492 F. Supp. 3d at 174-76. While the private sales were governed by written agreements, the only documentation for the public sales was a "Terms of Use Agreement" which "constitut[ed] the entire agreement between the purchaser and Kik" and through which Kik "expressly disclaimed any ongoing obligation" to the public investors after they purchased the tokens. *Id.* at 175, 178. In holding the entire offering violated Section 5 of the Securities Act, the court rejected an "ongoing contractual obligation" requirement, observing: "contractual language is important to, but not dispositive of, the common enterprise inquiry, and courts regularly consider representations and behavior outside the contract." *Id.* at 178 (citing *Joiner*, 320 U.S. at 352–55).

## II.   DEFENDANTS VIOLATED THE REGISTRATION PROVISIONS OF THE FEDERAL SECURITIES LAWS.

### A.  The SEC has Adequately Pled a *Prima Facie* Case Under Securities Act Section 5.

Section 5(a) and (c) of the Securities Act prohibit any person, directly or indirectly, to make use of the mail or interstate commerce to offer or sell a security unless a registration statement has been filed with the SEC. 15 U.S.C. § 77e(a), (c). To establish its *prima facie* case under Section 5, the SEC need only allege that: (1) no registration statement was filed or was in effect as to the securities in question; (2) the defendant, directly or indirectly, sold or offered to sell these securities; and (3) in connection with the offer or sale, there was a use of interstate transportation, or communication in interstate commerce, or of the mails. *SEC v. McDuffie,* 2014 WL 4548723, at *5 (D. Colo. Sept. 15, 2014). No scienter is required. *Id.* at *5. Once the SEC establishes a

*prima facie* violation, the defendant has the burden of proving that the securities qualified for an exemption from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

Here, the Complaint alleges a *prima facie* case that each of the Moving Defendants violated Section 5 in connection with the sale of DEBT Box and FAIR Project Node Licenses.  DEBT Box and the FAIR Project did not register their offerings with the SEC.  Compl. ¶ 59.  As detailed above, the Node Licenses were securities under the federal securities laws.  Defendants do not dispute the allegations that they sold these securities into the public market. *Id.* ¶¶ 2, 20, 29–31, 59.  Nor do Defendants dispute the allegations that they used the means and instrumentalities of interstate commerce and the mails to conduct their offers and sales.  *Id.* ¶¶ 9, 58.

## B.  Defendants Violated Section 15(a)(1) of the Exchange Act.

Section 15(a)(1) of the Exchange Act makes "unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . .  unless such broker or dealer is registered . . .."  Section 3(a)(4)(A) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A); *see also* 15 U.S.C. § 78c(a)(9) (defining "person" to include a company).

Courts in the Tenth Circuit, in determining "whether a person has engaged in the business of being a broker," apply the so-called "*Hansen* factors," which focus on "conduct-based factors and a 'totality of the circumstances approach.'"  *SEC v. RMR Asset Mgmt. Co.*, 479 F. Supp. 3d 923, 926 (S.D. Cal. 2020); *SEC v. Mine Shaft Brewing LLC*, 2023 WL 6541552, at *7 (D. Utah Oct. 6, 2023) (listing the *Hansen* factors, noting that all factors "need not be satisfied").  The *Hansen* factors consider whether the defendant, for example, received transaction-based income

22

(*e.g.*, commissions) for his solicitation and regularly participated in securities transactions.  *See Art Intellect*, 2013 WL 840048, at *20.

Here, the Complaint adequately alleges Jason Anderson, Jake Anderson, Nelson, Brannon, Martinez, Flaherty, Schuler, Daniels, Bowen, Stangis, Fritzsche, iX Global, and Core 1 Crypto (the "Soliciting Defendants") acted as unregistered brokers.  Compl. ¶¶ 90–100.  The Soliciting Defendants used the internet to actively solicit investors, consummated or help consummate millions in securities sales, and received commission payments on the investments they secured. This sort of repeated, regular activity has been found to constitute "regularity of participation" in securities transactions for purposes of Section 15(a)(1)'s registration requirements.  *E.g.*, *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 13 (D.D.C. 1998) (defendants acted as brokers when collectively they solicited 40 investors to purchase a total of $1.7 million in investments).  While engaged in these solicitation efforts, none of Soliciting Defendants were registered as a broker with the Commission, nor associated with any registered broker.  Compl. ¶ 90.  Thus, Defendants' Motions should be denied as to Count VI of the Complaint.

### III.   THE SEC HAS ADEQUATELY PLED THAT DEFENDANTS VIOLATED THE ANTIFRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS.

The Complaint also adequately alleges that DEBT Box and each member of the DEBT Council violated the anti-fraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," but scienter "may be alleged generally." FED. R. CIV. P. 9(b).   "[T]he heightened pleading standard of Rule 9(b) is not an invitation to disregard the requirement of simplicity, directness and clarity of Rule Fed. R. Civ. P. 8." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1239 (N.D. Cal. 1998) (citing *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996)).  Rather, "[i]n a securities fraud action, a pleading is sufficient

under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (citation omitted); *see Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) ("Rule 9(b) requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." (cleaned up)).  The Complaint meets these standards.

### A. The DLI Defendants' Motion Fails to Provide Any Justification to Dismiss the SEC's Scheme Liability Claims (Counts II and IV).

Despite moving to dismiss the SEC's Second, Third, Fourth, and Fifth Claims (DLI Mot. at 1), the DLI Defendants' Motion addresses only the misstatement claims. However, the Complaint does not merely allege that the Andersons, Brannon, and Nelson made false statements and omissions (in violation of Section 17(a)(2) of the Securities Act and Rule 10b-5(b) and Section 10(b) of the Exchange Act) (Counts III and V), but that—in violation of Sections 17(a)(1) and (3) of the Securities Act, and in violation of Rule 10b-5(a) and (c) and Section 10(b) of the Exchange Act—each of the DEBT Council defendants *also* engaged in a fraudulent scheme.[7]  As the sole Moving Defendants charged with securities fraud, the DLI Defendants' failure to offer a single argument that the SEC has failed to adequately allege that Defendants engaged in other deceptive conduct is fatal to their Motion to Dismiss the SEC's Second and Fourth Claims.

The elements of scheme liability under Rule 10b-5(a) and (c) of the Exchange Act, and Sections 17(a)(1) and 17(a)(2) of the Securities Act are: (1) the defendant directly or indirectly (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud;

---

[7] In relevant part, Sections 17(a)(1) and (3) of the Securities Act and Rule 10b-5(a) and (c) of the Exchange Act impose "scheme liability" by prohibiting defendants from engaging in a "scheme . . . to defraud" or a "course of business which operates . . . as a fraud." 15 U.S.C. §§ 77q(a)(1); 17 C.F.R. §§ 240.10b-5(a)(c); *Malouf v. SEC*, 933 F.3d 1248, 1254, 1259–60 (10th Cir. 2019).

(3) with scienter. *McDuffie*, 2014 WL 4548723, at *10.[8]   A defendant can be held liable for engaging in a fraudulent scheme under these provisions if he "'committed a manipulative or deceptive act in furtherance of a scheme,'" which is an act that "create[s] the false appearance of fact." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir.2006) (cleaned up).

For purposes of alleging a violation of the scheme liability provisions, the SEC need not plead or specify that defendants made any particular misrepresentation, on a particular date, to a particular investor.  Instead, the Complaint sufficiently pleads scheme liability under Rule 9(b) if it alleges "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1239 (C.D. Cal. 2015); *SEC v. Gordon*, 2009 WL 1652464 at *4 (S.D.N.Y. June 11, 2009). That is why courts have held that Rule 9(b) is "relaxed" for fraudulent or manipulative scheme claims as those here. *See ScripsAmerica*, 119 F. Supp. 3d at 1239 (*citing ATSI Communications*, 493 F.3d at 101–02).

The Complaint alleges DEBT Box, Jason and Jake Anderson, Nelson, and Brannon orchestrated and ran a scheme to defraud the investors who purchased the Node Licenses by participating in a course of conduct to conceal the truth about facts central to the investment, their access to "proprietary" technology, the existence of lucrative business partnerships, and the process by which investors received DEBT Box crypto assets through their Node Licenses. Compl. ¶¶ 83–89; *see SEC v. Seethruequity, LLC*, 2019 WL 1998027, at *5 (S.D.N.Y. April 26, 2019) (denying motion to dismiss scheme liability claims where complaint alleged that "the defendants' entire business model, beyond any misstatements or omissions, is deceptive."). *First*,

---

[8] Scheme liability claims under Section 17(a)(3) of the Securities Act only requires negligence. *See McDuffie*, 2014 WL 4548723 at *10; *Aaron v. SEC*, 446 U.S. 680, 687 n.5, 695-97 (1980).

DEBT Box (and each member of the DEBT Council) repeatedly represented to investors that Node Licenses they purchased were mining crypto assets, and that the businesses underlying the DEBT Box crypto assets were generating significant revenue.  Compl. ¶¶ 84, 85; *SEC v. Earle*, 2023 WL 2899529, at *7 (S.D. Cal. Apr. 11, 2023) (misleading statements can support a claim for scheme liability); *SeeThruEquity*, 2019 WL 1998027, at *5 (same).  DEBT Box, the Andersons, Brannon, and Nelson, also used promoters and purported partners like James Franklin to disseminate false information to investors regarding the Node Licenses and underlying business ventures.  *Second*, Defendants created DEBT Box accounts for Node License purchasers and deposited crypto assets in those accounts to create the deceptive appearance of successful mining activities and profitable business partnerships.  Compl. ¶ 86; *SEC v. Sells*, 2012 WL 3242551, at *9 (N.D. Cal. Aug. 10, 2012) (finding that the SEC pleaded a deceptive act where defendants' "activities or the concealment of their actions resulted in the misrepresentations to the market by others"); *SEC v. Winemaster*, 529 F. Supp. 3d 880, 919 (N.D. Ill. 2021).  *Third*, to create the appearance of a successful business partnership for DEBT Box's BEV token, Jason Anderson and Jake Anderson used investor funds to purchase a Mississippi brewery, which they held out to be a successful independent business partner.  Compl. ¶ 86.

These allegations, along with the other factual allegations in the Complaint describing the fraudulent scheme, are sufficiently particularized to state a claim for relief under Sections 17(a)(1) and (3) of the Securities Act, and Rule 10b-5(a) and (c) of the Exchange Act for scheme liability. None of the Moving Defendants make any arguments to the contrary.

### B.  Allegations Regarding Defendants' Material Misstatements are Sufficiently Particularized (Counts IV and VI).

The SEC's factual allegations in support of its claims against DEBT Box and each of the members of the DEBT Council under Section 17(a)(2) of the Securities Act and Section 10(b) of

the Exchange and Rule 10b-5(b), for making untrue statements and omissions, are also sufficiently

particularized to satisfy Rule 9(b).  To state claims under Rule 10b-5(b) and Section 10(b), the

SEC must allege that DEBT Box, Jacob Anderson, Jake Anderson, Brannon, and Nelson "made:

(1) 'a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with

the purchase or sale of securities, and (5) by means of interstate commerce."  *SEC v. Smart*, 678

F.3d 850, 856 (10th Cir. 2012).  Section 17(a)(2) requires "substantially similar proof." *SEC v.

GenAudio Inc.*, 32 F.4th 902, 921 (10th Cir. 2022) ("The primary difference between § 17(a) and

§ 10(b) lies in the element of scienter." (cleaned up)).

### 1.   The Complaint Alleges Specific Misstatements by Each DEBT Council Member.

The Complaint does not, as the DLI Defendants suggest, improperly "lump" the DLI

Defendant or rely on "group pleading."  DLI Mot. at 7–8.[9]  Here, the Complaint more than satisfies

the requirements of Rule 9(b), as it includes specific allegations regarding the time, place, and

manner of several material misstatements made by DEBT Box and each of the four members of

the DEBT Council.  For example:

- In an August 22, 2022 YouTube video, **Jake Anderson** and **Jason Anderson** represented that the DEBT Box crypto assets could only be generated through mining.  Compl. ¶ 65. A **DEBT Box** May 6, 2022 YouTube video repeated these claims.  *Id.*

- During an October 2022 investor presentation, **Jason Anderson** told investors that DEBT Box's proprietary technology would allow DEBT Box, and its partners, to locate gold, oil,

---

[9] In any event, Defendants assertion that the use of "group pleading" doctrine is improper in SEC enforcement actions misses the mark.  Defendants only support for this argument, *SEC v. Yuen*, 221 F.R.D. 631 (C.D. Cal. 2004), acknowledged that the group pleading doctrine was recognized by both the Ninth and the Tenth Circuits. *Id.* at 635; *see Schwartz,* 124 F.3d at 1254 (holding that "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents").  The court in *Yuen* merely rejected application of the doctrine where the complaint lacked "allegations regarding Defendants' role in the fraudulent scheme. 221 F.R.D. at 635.  But since *Yuen*, multiple courts in the Ninth Circuit have applied the group pleading doctrine to SEC enforcement actions. *E.g.*, *SEC v. Mozilo*, 2009 WL 3807124, at *13 (C.D. Cal. Nov. 3, 2009) (applying group pleading doctrine where defendant was president, COO and involved in day-to-day operations).

natural gas, and "any mineral on the periodic table" within a few feet of its actual location. *Id.* ¶ 74.  The Complaint details similar representations made by **DEBT Box** in a July 2022 email to investors (*id.* ¶ 74); by **Brannon** in a November 14, 2022 YouTube video (*id.* ¶ 75); by **Nelson** in a March 11, 2023 YouTube video (*id* ¶ 76); and by **Jake Anderson** in a June 14, 2023 YouTube video (*id.* ¶ 76).

- In a November 14, 2022 YouTube video, **Brannon** claimed that DEBT Box owned and operated four oil rigs in the United States.  *Id.* ¶ 68c.

- **Jake Anderson** claimed in an August 22, 2022 YouTube video that DEBT Box had identified "sizable deposits" of oil at Western Oil's well site, and that "all of the revenues that come off of this go into BGLD."  *Id.* ¶ 68b.

- In a January 2023 email to investors, **DEBT Box** claimed that it had obtained at least "$5,475,600.00 USD" in profits from its oil operations and was reinvesting those profits into the DEBT Box.  *Id.* at ¶ 68f.  Around that same time, **Jason Anderson** claimed that DEBT Box was receiving royalties from "over 200 wells."  *Id.* ¶ 68e.

The Complaint also alleges in detail why each of these statements was false and misleading at all times.  Compl. ¶¶ 66–67, 69–72, 77–79.[10]

### 2.  Defendants' Factual Arguments Are Without Merit .

Rather than address these specific factual allegations in the Complaint detailing false and misleading statements by each of the DLI Defendants, the DLI Defendants  argue that three other alleged misstatements were "taken out of context . . . to make them appear inaccurate."  DLI Mot. at 12.  But even if the Court were to consider the factual "context" of these statements on a motion

---

[10] Defendants' reliance on *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) is misplaced.  DLI Mot. at 9.  First, the Supreme Court's ruling in *Janus* is limited to Rule 10b-5*(b)*, and has no impact on Section 17(a) of the Securities Act or scheme liability claims under Rule 10b5-(a) or (c).  *E.g.*, *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014); *SEC v. Stoker*, 865 F. Supp. 2d 457, 465–66 (S.D.N.Y. 2012).  Second, even in the Rule 10b-5(b) context, courts applying *Janus* have found company officers liable for false and misleading statements in their own company's documents.  *SEC v. Pocklington*, 2018 WL 6843663, at *14 (C.D. Cal. Sept. 10, 2018) (collecting cases, holding corporate officers who are jointly involved in day-to-day operations and who each exercise power and control may be jointly liable as statement "makers" under Rule 10b-5).  The Complaint alleges that the members of the DEBT Council controlled DEBT Box.  The DEBT Council, which included the President of the company, the sole director, and the two co-founders, were responsible for the marketing and operation of DEBT Box's sole business.  These allegations are more than sufficient.

to dismiss, they remain misleading.

For example, the DLI Defendants claim that Jason Anderson "never discussed oil profits" in the January 14, 2023 YouTube video. DLI Mot. at 12; *see* Compl. ¶ 68e (alleging Jason Anderson told investors "that DEBT Box was receiving royalties from partnerships with 'over 200 wells currently'" and that "from January 1, 2022 through March 31, 2022, DEBT Box obtained '34.7 million dollars' in profits from its oil partnerships). Defendants claim Anderson was merely discussing the "burning" of tokens. True, Jason Anderson did discuss burning BLGD tokens, which would increase the value of BGLD for all tokens holds. But that is not all he said:

> With the ***royalty model of the wells*** what's happening is we are locking in a ***set fixed percentage of the [oil] extraction and we are putting it back into the ecosystem burning it*** to never be seen again. It's the best liquidity provider in the world because if you know that there's ***a consistent amount of revenue coming in from the underlying projects*** that's taking coins out, what happens? Less and less coins exist. With less and less tokens existing the miners can come out and mine every single day. ***In oil, for instance, just from the months of January through the last day of March, $34.7 million dollars is brought into the ecosystem, we've actually burned that and announced it in April***. We do it every quarter.

DLI Mot. at 12 (Jan. 14, 2023 YouTube video at 14:00 timestamp). The Complaint thus correctly alleges this statement was false and misleading because at the time it was made DEBT Box did not have any agreements to share in the profits of operational oil wells. Compl. ¶ 69.

Defendants next contend that that Brannon's statement in a July 2023 YouTube video that certain oil wells were producing "100 barrels a day" was taken out of context because Brannon never specifically confirmed that DEBT Box owned those wells. DLI Mot. at 12; *see* Compl. ¶ 68g. But again, while making that representation to investors, Brannon implied that those wells were controlled by DEBT Box—claiming that an area outlined on the referenced DEBT Box map was "such a hot spot . . . its been fortunate that we've been able to move into this area," and mentioning "the guys we have on the ground; they grew up in this town, and so we had them out on rigs doing some of the previous work." Later in the same video, Brannon also highlighted the

same section of the map purportedly containing the wells producing "100 barrels a day," and stated "we got about 21 wells" for oil and gas. The Complaint thus correctly alleges Brannon's statement was false and misleading because Defendants did not have any agreements with operational oil wells. Compl. ¶ 69.

Finally, Defendants quote a portion of Jason Anderson's response to a question about DEBT Box's supposed satellite technology to claim his response only concerned Gold, and not oil as alleged in the Complaint. DLI Mot. at 13; *see* Compl. ¶ 74. While Defendants are correct that Jason Anderson started his answer by discussing gold, he then proceeded to discuss the use of the technology in connection with oil. The Complaint thus correctly alleges the statement was false because DEBT Box did not possess "remote sensing and satellite imagery technology" that could "scan the Earth" to accurately locate minerals. *Id.* ¶¶ 74, 77.

### 3. The Complaint Also Alleges Continuous Misrepresentations By DEBT Council Members and DEBT Box Regarding Key Aspects of the Offering.

In addition, the Complaint alleges that the DLI Defendants' misrepresentations, were ongoing and continuous throughout the relevant time period. They were repeated in DEBT Box's promotional materials and in investor presentations and YouTube videos by Jason Anderson, Jake Anderson, Brannon, and Nelson. *E.g.*, Compl. ¶¶ 73, 80. In cases like this one, involving a long-running fraudulent scheme with numerous misrepresentations and omissions by defendants, courts have consistently held that Rule 9(b) does not require a plaintiff to plead each and every instance of fraud. *See, e.g.*, *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 83 (D.D.C. 2014) (SEC not required "to allege every fact pertaining to every instance of fraud when a scheme spans several years"); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013) (citation omitted) ("[W]here the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to

plead the specifics with respect to each and every instance of fraudulent conduct."); *United States v. Cmty. Health Sys.*, Inc., 501 F.3d 493, 511 (6th Cir. 2007) (where, as here, the exemplar allegations are sufficiently representative, "the defendant will, in all likelihood, be able to infer with reasonable accuracy the precise claims at issue by examining the … representative samples").

Given the nature of the alleged fraud, this manner of pleading is both legally and factually appropriate. *Tutor Perini Corp. v. Banc of America Securities, LLC*, 2013 WL 5376023, *13 (D. Mass. Sept. 24, 2013) (holding that for 10(b) claim, it is unnecessary to plead precise dates where misrepresentations occurred repeatedly over time period); *SEC v. Santos*, 355 F. Supp. 2d 917, 921 (N.D. Ill. 2003) (the specific dates of each transaction are not necessary to provide Defendant with fair notice under 9(b) of this particular fraud). The Motion should be denied.

### C. Defendants' Misrepresentations Were Material.

Because they cannot meaningfully contest the falsity of their various misstatements, the Moving Defendants pivot to an argument that their various lies and omissions were not material. But, "[a]t the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *SEC v. Czarnik*, 2010 WL 4860678, at *5 (S.D.N.Y. Nov. 29, 2010); *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008). And courts caution that "a complaint normally should not be dismissed based on materiality 'unless [the statements or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *SEC v. Fiore*, 416 F. Supp. 3d 306, 322 (S.D.N.Y. 2019); *SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375, 1379 (D. Colo. 2004).

The DLI Defendants do not dispute that Defendants' misstatements concerning oil production and "proprietary technology" were material. *See* DLI Mot at 10. Rather, they contend that Defendants statements regarding the mining capabilities of the Node Licenses were not

material because DEBT Box "disclosed" that Node Licenses mined based on a "synthetic mining algorithm *that functions like other proof of work algorithms*." *Id.* (emphasis added). But this "disclosure" is itself another example of Defendants' false statements. In particular, the Complaint alleges that the Node Licenses did not mine crypto assets through an algorithm akin to "other proof of work algorithms" like Bitcoin. Compl. ¶¶ 45, 66, 67.

Equally unpersuasive are the DLI Defendants' arguments that, as a matter of law, a reasonable investor would not consider it important that their $12,000 license did what Defendants represented it did, or that Defendants beverage distribution partner did not have the million-dollar contracts Defendants claimed. DLI Mot. at 10. These misrepresentations go to the heart of the investment; they concerned the method by which the investments would generate returns for investors, and the profits investors could expect from the enterprise. *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 492 (S.D.N.Y. 2002) (misrepresentations and omissions that are "central" to business are material as a matter of law); *see In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) ("environmentally friendly" statements were material because environmental friendliness was a core aspect of Volkswagen's business). Had investors known, contrary to Defendants' repeated misrepresentations, that the Node Licenses did not "mine" crypto assets but instead were merely instruments to effectuate the distribution of DEBT Box's pre-generated crypto assets (Compl. ¶ 44), and that the underling business partnerships Defendants touted were not profitable (*id.* ¶ 44), any reasonable investor would have considered that information in deciding to invest. *See SEC v. Cochran*, 214 F.3d 1261, 1268 (10th Cir. 2000) (information implicating the fair market value would be material to a reasonable investor).

32

### D.  Defendants Acted with the Requisite Scienter.

The Federal Rules of Civil Procedure and binding precedents explicitly permit the SEC to aver scienter generally in securities fraud cases.  No particularity is required.  Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred ***generally***." (Emphasis added.)  True to that clear language, the Tenth Circuit has held that, although a fraud complaint must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof," the law "does not require any particularity in connection with an averment of intent, knowledge or condition of mind."  *Schwartz*, 124 F.3d at 1252; s*ee also SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1279 (D. Colo. 2006) (same); *SEC v. Arnold*, 2007 WL 2786248, *3 (D. Colo. Sept. 24, 2007) (denying motion to dismiss, although the "allegations of [the defendant's] knowledge and intent, i.e., his scienter, are somewhat general . . . they are sufficient to satisfy the pleading requirements of [Rule 9(b)]"); *SEC v. Leslie*, 2008 WL 3876169, at *6 (N.D. Cal. Aug. 19, 2008) (the SEC "may aver scienter generally, just as the rule states—that is, simply by saying that scienter existed" (internal quotation marks omitted)).

Defendants' argument that something more is required relies on cases decided under, and discussing, the Private Securities Litigation Act ("PSLRA").  *See* DLI Mot. at 19 (citing *TDC Lending LLC v. Priv. Cap. Grp., Inc.*, 340 F. Supp. 3d 1218, 1227 (D. Utah 2018) (holding allegation that "all Individual Defendants knew" of the falsity "insufficient under the PSLRA's heightened standard").  However, it is well settled that "the heightened pleading requirements of the Private Securities Litigation Reform Act ('PSLRA') do not apply to the SEC." *SEC v. SkiHawk*

*Cap. Partners, LLC*, 2023 WL 2574376, at *6 (D. Colo. Mar. 20, 2023); 15 U.S.C. § 78u-4(b)(2) (imposing a heightened pleading standard for scienter on "private action" only).[11]

Under the proper standard set forth in Rule 9(b), the allegations in the Complaint more than sufficiently plead scienter for its claims under Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a)(1) of the Securities Act.[12]  For example, the Complaint alleges that Nelson, Brannon, Jake Anderson, and Jason Anderson exercised sole control of DEBT Box (Compl. ¶ 13; *see also id.* ¶¶ 14–16) and were directly involved in DEBT Box's marketing of the Node Licenses—DEBT Box's sole business (*id.* ¶ 67)—and were responsible for the development of the DEBT Box ecosystem.  *Id.*  As members of the DEBT Council, each of these defendants was directly involved in the selection of partners for DEBT Box, and therefore would have been involved in the approval of partnership agreements and knew or should have known that DEBT Box did not have the contracts or partnerships that it claimed to have.  Compl. ¶¶ 79, 82.

Additionally, Brannon, Jake and Jason Anderson, and Nelson's scienter as to Western Oil's oil production is further demonstrated by their own statements.  Each of the members of the DEBT Council toured Western Oil's nonoperational well sites on multiple occasions and posted YouTube highlighting their inspection of the purportedly successful business operational.  *Id.* ¶ 71. Defendants knew or were reckless in not knowing that these oil sites were nonoperation.  Indeed,

---

[11] The DLI Defendants urge the Court to apply the same standard to SEC enforcement actions because "the Court will need to make individualized determinations of culpability … if any of the Defendants are found culpable." DLI Mot. at 11.  But the Court does not make such determinations on a Rule 12 motion.

[12] "Section 10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is sufficient for § 17(a)(2) and § 17(a)(3)." *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012).  Because the Complaint adequately pleads scienter against each under the more rigorous scienter standards associated with the Complaint's Second, Fifth, and Sixth Claims, the SEC likewise sufficiently pleads the lesser negligence requirement of its Sections 17(a)(2) and 17(a)(3) claims.  *SEC v. Coddington*, 2015 WL 1401679, at *7 (D. Colo. Mar. 23, 2015)

Brannon and Nelson admitted that Western Oil's well sites were nonoperational to government investigators. *Id.* ¶ 72. The SEC's allegations are more than sufficient to support an inference of scienter under Rule 9(b).

## IV.   DEFENDANTS' CONSTITUTIONAL ARGUMENTS ARE UNFOUNDED.

Without law on their side, Defendants devote substantial portions their respective motions arguing that the Complaint's straightforward application of the federal securities laws—supported by decades of Supreme Court jurisprudence—violate the major questions doctrine and the Due Process Clause of the U.S. Constitution. These arguments fail as a matter of law.

### A.   The Major Questions Doctrine Does Not Apply.

Defendants' argument that the "major questions doctrine" bars the SEC's claims misunderstands the reach and purpose of the doctrine and, in any event, overlooks Congress's mandate to the SEC to regulate investments in whatever form they might take.

### 1.   The Major Questions Doctrine Is Not Concerned with Agency Enforcement of Congressional Enactments.

The major questions doctrine is rooted in "both separation of powers principles and a practical understanding of legislative intent." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). It is premised on the notion that "one branch of government" should not "arrogat[e] to itself power belonging to another" (*Biden v. Nebraska*, 143 S. Ct. 2375, 2373 (2023)), and the "presum[ption] that Congress intends to make major policy decisions itself" (*West Virginia*, 142 S. Ct. at 2609 (cleaned up)). Focused on preventing "the Executive seizing the power of the Legislature" (*Nebraska*, 143 S. Ct. at 2373), the doctrine constrains agencies' "regulatory assertions" of "highly consequential power beyond what Congress could reasonably be understood to have granted" (*West Virginia*, 142 S. Ct. at 2609, 2621 (cleaned up)), such as the adoption of an entirely new "regulatory scheme" (*id.* at 2616), or the enactment of a new regulatory "program" (*Nebraska*, 143

S. Ct. at 2369).

Defendants cite no support for extending the major questions doctrine to an agency's exercise of statutory enforcement authority; indeed, courts have rightly rejected that argument. *E.g.*, *FTC v. Kochava Inc.*, 2023 WL 3249809, at *13 (D. Idaho May 4, 2023) ("[T]he FTC is not flexing its regulatory muscles—it is merely asking a court to interpret and apply a statute enacted by Congress. Accordingly, [the major questions] doctrine … is inapplicable."); *United States v. Freeman*, 2023 WL 5391417, at *8 (D.N.H. Aug. 22, 2023) (rejecting major questions doctrine in statutory enforcement action); *Terraform*, 2023 WL 4858299, at *9 (same). Yet that is precisely what is at issue in this case. In filing this action, the SEC is exercising the power to "take Care that the Laws be faithfully executed" that the Constitution vests in the Executive Branch. U.S. Const. art. II, § 3. "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts" the "'take Care'" "responsibility." *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (per curiam) (citation omitted).

Congress established the SEC to administer and enforce the securities laws, which were designed to "eliminate … abuses which were found to have contributed to the stock market crash of 1929" by adopting a "philosophy of full disclosure" to "achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963); *see Terraform*, 2023 WL 4858299, at *9 ("the SEC's role is not to exercise vast economic power over the securities markets, but simply to assure that they provide adequate disclosure to investors"). Since its creation, the SEC has exercised its Congressionally bestowed enforcement authority with respect to a wide variety of securities. *E.g.*, *Edwards*, 540 U.S. at 389; *Joiner*, 320 U.S. at 344. Congress does not alter the SEC's mandate to enforce existing law by considering possible new legislation.

**2. Even If the Major Questions Doctrine Were Applicable in the Enforcement Context, the Circumstances Warranting Its Application Are Absent Here**

The Supreme Court has indicated the major questions doctrine applies to "agencies' assert[ions] of highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. Those concerns are simply not present here.

First, this civil enforcement action does not have the vast economic or political significance the Supreme Court has noted when applying the major questions doctrine. In *Alabama Assn. of Realtors v. HHS*, the Court emphasized that the challenged CDC eviction moratorium would govern 80 percent of the country. 141 S. Ct. 2485, 2489 (2021).

And in *West Virginia*, the Court described the EPA rule at issue as one that would have "force[d] a nationwide transition away from the use of coal to generate electricity," allowing the EPA "to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." 142 S. Ct. at 2610, 2616 (cleaned up). Defendants' argument that the current size of the "digital asset industry" gives this lawsuit comparable economic and political significance fails for several reasons. One, in this enforcement action, the SEC is not exercising authority over the entire "digital asset industry." Rather, this action covers only Defendants' conduct as an issuers and promoters of particular crypto assets, and a "determination that certain of such assets are securities hardly amounts to a 'transformative expansion of [the Commission's] authority.'" *Terraform*, 2023 WL 4858299, at *8 (quoting *West Virginia*, 142 S. Ct. at 2610).

Second, it is simply not the case that this enforcement action is an exercise of authority beyond what Congress could reasonably be seen to have granted to the SEC—in sharp contrast to cases in which the Supreme Court has applied the major questions doctrine. In explaining why the EPA regulatory scheme challenged in *West Virginia* was an unanticipated exercise of authority, the Court observed that the EPA had "located that newfound power in the vague language in an

37

ancillary provision" of the Clean Air Act which "was designed to function as a gap filler and had rarely been used in the preceding decades." 142 S. Ct. at 2610 (cleaned up).  Similarly, the Court in *Nebraska* found it unlikely that by giving the Secretary of Education discretion to modify or waive statutory student loan provisions, Congress authorized him to create "a novel and fundamentally different loan forgiveness program" that would "release 43 million borrowers from their obligations to repay $430 billion." 143 S. Ct. at 2369, 2372. Noting it was the first time the Secretary had "claimed powers of this magnitude" and that "Congress ha[d] chosen not to enact" such a program, the Court concluded that the "tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." *Id.* at 2375.

The circumstances presented in those cases are a far cry from what is at issue here. The SEC did not file this action pursuant to a "previously little-used backwater" provision (*West Virginia*, 142 S. Ct. at 2612) or some "humdrum reporting requirement" (*Nebraska*, 143 S. Ct. at 2371).  Rather, the SEC filed this action pursuant to the same authority it has exercised since its establishment to enforce the same provisions of the federal securities laws that it seeks to enforce in this case. That authority was intended to be brought to bear with respect to interests or instruments encompassed by the term "security" under the federal securities laws, and "there is no indication that Congress intended to hamstring the SEC's ability to resolve new and difficult questions posed by emerging technologies where these technologies impact markets that on their face appear to resemble securities markets." *Terraform*, 2023 WL 4858299, at *9.  To the contrary, because "Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called," it enacted a definition of "security" that is "sufficient to encompass virtually any instrument that might be sold as an investment." *Edwards*, 540 U.S. at 393.  "Congress painted with a broad brush" precisely because

"[i]t recognized the virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes." *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990); *see also, e.g.*, *SG Ltd.*, 265 F.3d at 44 (applying federal securities laws to "virtual shares in an enterprise existing only in cyberspace"). The SEC's clear authority to enforce the federal securities laws thus forecloses the doctrine's application here.[13]

### B.   This Action Does Not Violate Due Process.

Finally, Defendants claim they did not have "fair notice" that their misconduct was illegal under the securities laws.  IX Mot. at 27; Stangis Mot. at 6.  Due process requires that laws "provide a person of ordinary intelligence fair notice of what is prohibited," and thus not be impermissibly vague.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (cited in IX Mot. at 22). Courts have repeatedly rejected the argument that the statutory term "investment contract" is unconstitutionally vague, given the Supreme Court's decades-long jurisprudence construing the term. *See, e.g., SEC v. Brigadoon Scotch*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973) ("untenable" to claim the term "investment contract" was void for vagueness); *United States v. Zaslavskiy*, 2018 WL 4346339, at *8–9 (E.D.N.Y. Sept. 11, 2018) (rejecting argument that the "securities laws are unconstitutionally vague . . . as applied to cryptocurrencies"); *Kik*, 492 F. Supp. 3d at 183 (same); *SEC v. LBRY, Inc.*, 2022 WL 16744741, at *8 (D.N.H. Nov. 7, 2022) (same); *see also United States v. Smith*, 985 F. Supp. 2d 547, 588–89 (S.D.N.Y. 2014) (judicial decisions can provide notice of statute's import).

In 2017, the SEC issued a public report that analyzed the offer and sale of "DAO tokens" and concluded they were offered and sold as investment contracts based on *Howey* and later cases.

---

[13] Even if the major questions doctrine applied, it would not foreclose this enforcement action. That is because the Commission has "clear congressional authorization" (*Nebraska*, 143 S. Ct. at 2375 (cleaned up)) to enforce the federal securities laws.

SEC Rel. No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017) (the "DAO Report"); *see also Zaslavskiy*, 2018 WL 4346339, at *9 (finding that the DAO Report was relevant guidance).   Since then, the SEC has issued staff guidance on the application of *Howey* to the sales of crypto assets and filed dozens of actions alleging violations based on the unregistered offers and sales of crypto assets securities, including cases filed ***years*** before Defendants first offered or sold the Node Licenses to the public. Compl. ¶ 20; *see, e.g., SEC v. PlexCorps*, 2018 WL 4299983, at *1 (S.D.N.Y. Aug. 9, 2018) (complaint filed December 1, 2017); *Zaslavskiy*, 2018 WL 4346339, at *1 n.1 (September 29, 2017).[14]   *Howey* and the SEC's consistent guidance provide more than fair notice of what the securities laws require.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.[15]

---

[14] Framework for "Investment Contract" Analysis of Digital Assets,  https://www.sec.gov/corpfin/framework-investment-contract-analysis-digitalassets, (Apr. 3, 2019).

[15] Defendant Flaherty Enterprises purports to reserve its right to seek dismissal for lack of subject matter and personal jurisdiction. FE Mot. at 3.  Although not properly before the Court, these "reserved" arguments fail as a matter of law.  The Court has subject matter jurisdiction over Travis Flaherty, which extends to Relief Defendants in recipient of his ill-gotten gains. *See SEC v. Colello,* 139 F.3d 674, 676 (9th Cir. 1998).   Defendants attempt to preserve his personal jurisdiction arguments for another day fare no better.  *See, e.g.*, *De Gutierrez v. Albuquerque Pub. Sch.*, 2018 WL 3647208, at *6 (D.N.M. Aug. 1, 2018) (statement in Rule 12 motion reserving rights to assert defenses does not preserve lack of personal jurisdiction defense).

Dated: November 13, 2023.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

*/s/ Michael E. Welsh*                                    `
Michael E. Welsh
Casey R. Fronk
Attorneys for Plaintiff
Securities and Exchange Commission

## CERTIFICATE OF SERVICE

On this 13th day of November 2023, I hereby certify that I electronically filed a true and

correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent

notification and service to all counsel of record.

*/s/ Michael E.  Welsh*

41