IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. dba DEBT BOX, a Wyoming corporation, et al.,<br><br>Defendants/Relief Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:23-cv-00482-RJS-DBP<br><br>Chief Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

On July 26, 2023, the Securities and Exchange Commission filed a sealed Complaint[1] and an ex parte Application for Entry of Temporary Restraining Order (TRO Application).[2]  The Commission alleges Defendants were engaged in an "ongoing, sprawling, fraudulent securities offering through which [they] defrauded thousands of investors of at least $49 million."[3]  After an ex parte hearing, the court issued a Temporary Restraining Order (TRO) that, among other things, froze Defendants' and Relief Defendants' assets.[4]  The court also appointed a Receiver.[5]

Without objection, the court renewed the TRO several times.[6]  In September, multiple Defendants moved to dissolve the TRO.[7]  The court held a hearing and granted the Motions to Dissolve, concluding the TRO was improvidently issued because the Commission was unable to

---

[1] ECF 1, *Complaint*.  The Complaint is no longer sealed.  *See* ECF 14, *Aug. 2, 2023 Order Unsealing Case*.

[2] ECF 3, *TRO Application*.

[3] *Complaint* ¶ 1.

[4] ECF 9, *First TRO*; *see also* ECF 11, *July 28, 2023 Minute Entry*.

[5] ECF 10, *Temporary Receivership Order*; *see also* Fed. R. Civ. P. 66.

[6] ECF 33, *Second TRO*; ECF 78, *Third TRO*; ECF 121, *Fourth TRO*.

[7] ECF 132, *DEBT Council Defendants' Motion to Dissolve*; ECF 145, *iX Global Defendants' Motion to Dissolve*; ECF 159, *Fritzsche Motion to Dissolve*.

show irreparable harm was likely without a TRO.[8]  Accordingly, the court dissolved the TRO
and determined the Receivership should not continue beyond a transition period.[9]  The court
issues this Order to more fully explain its reasons for dissolving the TRO.

## BACKGROUND & PROCEDURAL HISTORY

The Commission named eighteen Defendants and ten Relief Defendants, and its
Complaint describes a network of corporations and individuals involved with cryptocurrency.[10]
The court's decision is based on irreparable harm, so it will focus on the parties, factual
allegations, and arguments most relevant to that issue.

### The DEBT Council & iX Global Defendants

Defendant Digital Licensing Inc. dba DEBT Box (DEBT Box) is a Wyoming corporation
that allegedly operated out of Draper, Utah.[11]  Before the TRO, DEBT Box sold node software
licenses, which enabled purchasers to obtain crypto assets on DEBT Box's platform.[12]  The
Commission alleges Defendants Jason Anderson, Jacob Anderson, Schad Brannon, and Roydon
Nelson call themselves "the DEBT Council" and "together exercise sole control of DEBT
Box."[13]  The court will collectively refer to the Andersons, Brannon, and Nelson as the DEBT
Council Defendants.[14]

---

[8] ECF 187, *Oct. 6, 2023 Minute Order*.

[9] *Id.*

[10] *Complaint* ¶¶ 13–100.

[11] *Id.* ¶ 13; *see also DEBT Council Defendants' Motion to Dissolve* at 10.

[12] *DEBT Council Defendants' Motion to Dissolve* at 10.

[13] *Complaint* ¶ 13.

[14] The court uses "DEBT Council Defendants" as a helpful shorthand.  It is not settling who controls DEBT Box.

The Commission alleges Defendant iX Global, LLC is a multi-level marketing company that partnered with DEBT Box to market DEBT Box's crypto assets.[15]  It further alleges Defendant Joseph Martinez is iX Global's Registered Agent and Defendant Travis Flaherty is an iX Global "Brand Ambassador" who solicited customers to purchase DEBT Box crypto assets.[16] The court will collectively refer to iX Global, Martinez, and Flaherty as the iX Global Defendants.

**The Commission Files a Sealed Complaint**

The Commission filed its sealed Complaint on July 26, 2023.[17]  In it, the Commission alleges, "Defendants have defrauded thousands of investors of at least $49 million."[18] Specifically, the Commission alleges some Defendants, including the DEBT Council Defendants, made false and misleading representations to investors.[19]  It also alleges some Defendants, including the DEBT Council and iX Global Defendants, acted as unregistered brokers[20] and all Defendants offered and sold unregistered securities.[21]  The Complaint includes numerous factual allegations, but the court will focus on those germane to irreparable harm.

The most relevant allegations concern Defendants' purported attempts to move assets overseas.  The Commission begins a paragraph in its Complaint by alleging, "In the past two months, certain [D]efendants have taken steps to evade law enforcement."[22]  It then contends

---

[15] *Complaint* ¶ 21.

[16] *Id.* ¶¶ 21, 26.

[17] *See id.*

[18] *Id.* ¶ 1.

[19] *Id.* ¶¶ 64–82; *see also id.* ¶¶ 105–21.

[20] *Id.* ¶¶ 90–100; *see also id.* ¶¶ 122–24.

[21] *Id.* ¶¶ 60–63; *see also id.* ¶¶ 101–04.  The Commission argues node software licenses are investment contracts and thus securities.  *Id.* ¶ 2; *TRO Application* at 23.  The court is not deciding that issue in this Order.

[22] *Complaint* ¶ 6.

3

"DEBT Box has stated that it is in the process of moving its operations to the United Arab Emirates for the express purpose of evading the federal securities laws."[23]  The Commission then quotes two statements Jacob Anderson made in a June 14, 2023 YouTube video: "we have moved all of [DEBT Box's] operations to Abu Dhabi" and "we're going to be under the jurisdictional control of Abu Dhabi, not the SEC."[24]  The next sentence in the Complaint states, "On June 26, 2023, Defendant iX Global . . . began closing its bank accounts in the United States and has since removed over $720,000 in investor funds from those bank accounts."[25]

**The Commission Requests an Ex Parte TRO**

With its Complaint, the Commission filed an ex parte TRO Application[26] and an ex parte Application for Appointment of a Temporary Receiver.[27]

The TRO Application included the required Attorney Certification,[28] which must state "in writing any efforts made to give notice and the reasons why it should not be required."[29]  In the Certification, Commission attorney Michael Welsh avers, "Evidence obtained by the Commission, and set forth in the [TRO Application] indicates that Defendants are currently in the process of attempting to relocate assets and investor funds overseas, where at least Defendant Jacob Anderson has contended that those assets will be outside the reach of U.S. regulators."[30]  The next sentence states, "For example, bank records obtained by the Commission . . . show that

---

[23] *Id.*

[24] *Id.*; *see also* iX Global, *The Future of DEBT & L1 Blockchain!!!*, YouTube (June 14, 2023), https://www.youtube.com/watch?v=bvP78-I-Jv0 (*June 14, 2023 YouTube Video*) at 46:40–48:10.

[25] *Complaint* ¶ 6.

[26] ECF 3.

[27] ECF 4.

[28] ECF 3-2, *Rule 65(b)(1)(B) Attorney Certification*.

[29] Fed. R. Civ. P. 65(b)(1)(B).

[30] *Rule 65(b)(1)(B) Attorney Certification* ¶ 4.

on June 26, 2023, Defendant iX Global, LLC—the multi-level-marketing entity through which the Defendants' 'node licenses' are primarily promoted—began closing its bank accounts in the United States, and removed over $720,000 in putative investor funds from those accounts."[31] Welsh also states DEBT Box "is in the process of moving its operations to the United Arab Emirates for the express purpose of evading the federal securities laws," citing the June 14, 2023 YouTube video.[32] For these reasons, Welsh contended notice of the Commission's TRO Application should not be required.[33]

In the TRO Application, the Commission argued the TRO requirements are relaxed when it is the movant.[34] Typically, the movant must show it is likely to succeed on the merits, it is likely to suffer irreparable harm, that the balance of harms tips in its favor, and that the TRO is in the public interest.[35] But the Commission argued it is required to show only "a likelihood of prevailing on the merits and a reasonable likelihood that the wrong will be repeated."[36] In support, the Commission cited one case from the Second Circuit and two district court cases within the Tenth Circuit.[37] Because the Commission believed it was entitled to a relaxed standard, it did not argue there would be irreparable harm without a temporary restraining order. Nor did it address the balance of harms or public interest.

---

[31] *Id.* ¶ 6. The Certification does not include a paragraph 5. *See id.* at 3.

[32] *Id.* ¶ 7.

[33] *Id.* ¶ 11.

[34] *TRO Application* at 21–22.

[35] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Wiechmann v. Ritter*, 44 F. App'x 346, 347 (10th Cir. 2002) (unpublished) (stating the requirements for a TRO and a preliminary injunction are the same).

[36] *TRO Application* at 21 (quoting *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275 (D. Utah 2017)).

[37] *Id.* (citing *SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990); *Traffic Monsoon*, 245 F. Supp. 3d; *SEC v. Cell>Point, LLC*, No. 21-cv-01574-PAB-KLM, 2022 WL 444397 (D. Colo. Feb. 14, 2022)).

Although the Commission did not attempt to establish irreparable harm, its Application includes facts relevant to that prong. For example, the second paragraph of the TRO Application states,

> In June, Defendants began to liquidate investor funds and move operations overseas. On June 26, 2023, Defendant iX Global . . . closed its main accounts with Bank of America and cashed out over $720,000 in putative investor funds. Meanwhile, DEBT Box's principals claim DEBT Box is in the process of moving its operations to the United Arab Emirates for the express purpose of evading the federal securities laws. For instance, in a June 14, 2023, promotional video posted on YouTube, Defendant Jacob Anderson claimed Defendants "have moved all of [DEBT Box's] operations to Abu Dhabi," so as to "be under the jurisdictional control of Abu Dhabi, not the SEC." Defendants have also taken action to block SEC investigative staff from viewing their social media sites, and appear to have recently deleted a website containing training materials for the scheme's promotors [sic].[38]

Later in the Application, the Commission repeated these points and then stated, "A review of the bank records of Relief Defendant IX Ventures FZCO, a [United Arab Emirates] company, shows that it now has over $2 million in a UAE account, at least $1.35 million of which are funds investors paid to Defendants to purchase node licenses."[39] The Commission further contended bank records "show Defendants are rapidly dissipating investor funds, both through luxury purchases and by recently draining accounts of those funds."[40]

After arguing it was entitled to a TRO, the Commission requested the court freeze Defendants' and Relief Defendants' assets, order an accounting and document preservation, permit expedited discovery, and order Defendants and Relief Defendants to repatriate assets.[41]

---

[38] *Id.* at 10 (alteration in original).

[39] *Id.* at 20–21.

[40] *Id.* at 32; *see also id.* ("Defendants appear to have already gone to significant lengths to dissipate assets and relocate investor funds outside the United States.").

[41] *Id.* at 31–34.

The TRO Application included several Declarations and Exhibits.  Most relevant here is the Declaration of Karaz Zaki, an accountant who helped with the Commission's investigation.[42] Zaki analyzed records for twenty-nine bank accounts associated with Defendants and Relief Defendants.[43]  The bank records included monthly statements, deposit records, canceled checks, bank signature cards, and wire details.[44]  The court will describe Zaki's Declaration in more detail when it evaluates the parties' arguments.

**The Court Issues an Ex Parte TRO**

The case was assigned to the undersigned on July 27,[45] and on July 28, an ex parte hearing was held on the TRO Application.[46]  The court began by quoting the Tenth Circuit respecting the required showing to obtain injunctive relief: "Any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."[47] Because of this authority, the court did not believe it could issue a TRO under the relaxed standard proposed by the Commission in its papers.[48]  The court also explained it thought the Commission was requesting a disfavored injunction, meaning it must "make a strong showing both on the likelihood of success on the merits and on the balance of harms."[49]

---

[42] ECF 3-10, *First Zaki Declaration* ¶¶ 4, 6.

[43] *Id.* ¶ 7.

[44] *Id.*

[45] ECF 7, *Case Reassignment*.

[46] *July 28, 2023 Minute Entry*; ECF 111, *TRO Hearing Transcript*.

[47] *TRO Hearing Transcript* at 6–7 (quoting *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016)).

[48] *Id.* at 4–7.

[49] *Id.* at 7–8, 18; *see also Colorado v. EPA*, 989 F.3d 874, 884 (10th Cir. 2021).

Although the court was persuaded the Commission had shown a likelihood of success on the merits, the Commission had not addressed the other required TRO prongs.[50]  Furthermore, the Commission had not argued it made the strong showing necessary for a disfavored injunction.[51]  For these reasons, the court stated it was prepared to deny the TRO Application without prejudice.[52]

In response, Welsh contended that although the Commission had not addressed the last three TRO prongs, information relevant to each prong was in its Application.[53]  He also offered to address the prongs during the hearing, and he began doing so.[54]  For example, concerning irreparable harm, he stated, "[W]e pointed out Defendants are moving assets overseas.  They have said in videos that the reason they are doing this is to avoid SEC jurisdiction.  They have dissipated funds both in closing known accounts and using those funds to purchase exorbitant gifts for themselves . . . ."[55]

After taking a recess to consider the Commission's arguments, the court decided to let it address the missing prongs through oral argument.[56]  The court concluded this was appropriate because the Commission had included facts relevant to each prong in its Application.[57]  Moreover, because this was an ex parte hearing, there would not be the usual prejudice that occurs if a party is allowed to raise new arguments at a hearing.[58]

---

[50] *TRO Hearing Transcript* at 7–9.

[51] *Id.* at 4–11.

[52] *Id.*

[53] *Id.* at 9.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 16–17.

[57] *Id.*

[58] *Id.*

The Commission then orally addressed the three missing prongs.  Concerning irreparable harm, Welsh stated,

> Just as we were on break I was reminded by investigative staff with respect to the investigation which remains ongoing that even in the last 48 hours Defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed.[59]

Welsh further contended Defendants "made clear that their intentions are to move assets overseas and to dissipate funds."[60]

After the Commission addressed the missing prongs, the court ultimately concluded the Commission had made the required showing for a TRO.[61]  To the court, the most significant evidence was the Commission's representation that Defendants had closed bank accounts within the last 48 hours—this strongly suggested Defendants were contemporaneously moving funds overseas.  This was all the more troubling in view of the Commission's statements that Defendants were doing this for the express and stated purpose of avoiding the Commission's jurisdiction, coupled with the Commission's representations that Defendants were taking actions to block the Commission's investigative staff from viewing social media sites—clearly inferring Defendants were aware of the Commission's ongoing investigation and were actively impeding that investigation.[62]

The court issued the first TRO after the hearing.[63]  The Order stated it would expire after ten days and the court anticipated renewing the TRO unless there was opposition.[64]  The court

---

[59] *Id.* at 20.

[60] *Id.* at 20–21.

[61] *Id.* at 24–25.

[62] *Id.* at 9; *see also Rule 65(b)(1)(B) Attorney Certification* ¶¶ 4–6.

[63] *First TRO.*

[64] *Id.* at 16.

also entered a Temporary Receivership Order, appointing Josias Dewey as the "temporary receiver of [DEBT Box] and its subsidiaries and affiliates."[65]

**Defendants Move to Dissolve the TRO**

After the first TRO expired, the court entered identical TROs on August 7, August 17, and August 29.[66]  In each TRO, the court stated it intended to renew the TRO unless there was opposition.[67]

On September 12—the day the fourth TRO was set to expire—the DEBT Council Defendants filed a Motion to Dissolve.[68]  This was the first challenge to the TROs.  The court set a status conference for September 15 to discuss scheduling[69] and renewed the TRO.[70]  On September 14, the iX Global Defendants filed their own Motion to Dissolve.[71]

At the status conference on Friday, September 15, the court set a briefing schedule for a preliminary injunction hearing.[72]  The court also scheduled daily status conferences for September 18–22 to address anticipated discovery disputes,[73] and it stayed briefing on the Motions to Dissolve.[74]  The court told the parties it would review the Motions to Dissolve in greater detail and inform the parties how it intended to proceed.

---

[65] *Temporary Receivership Order* at 3.

[66] *Second TRO*; *Third TRO*; *Fourth TRO*.

[67] *Second TRO* at 16; *Third TRO* at 17; *Fourth TRO* at 17.

[68] *DEBT Council Defendants' Motion to Dissolve*.  Relief Defendants Business Funding Solutions LLC, Blox Lending LLC, The Gold Collective LLC, and UIU Holdings LLC were also moving parties on this Motion.  *Id.*

[69] ECF 134, *Notice of Hearing*.

[70] ECF 136, *Fifth TRO*.  The court renewed the TRO for a final time on September 26, 2023.  ECF 165, *Sixth TRO*.

[71] *iX Global Defendants' Motion to Dissolve*.  The following week, Defendant Matthew Fritzsche filed a Motion to Dissolve, incorporating the iX Global Defendants' arguments.  *Fritzsche Motion to Dissolve*.

[72] ECF 147, *Sept. 15, 2023 Minute Entry*.

[73] The court held a status conference on Monday, September 18.  ECF 151, *Sept. 18, 2023 Minute Entry*.  It did not hold conferences the other days as the parties informed the court they did not have disputes that needed its attention.

[74] *Sept. 15, 2023 Minute Entry*.

The following Monday, the court ordered the Commission to respond to the Motions to Dissolve, and it ordered the Receiver to respond to portions of the DEBT Council Defendants' Motion.[75] The court set an expedited briefing schedule and a hearing date.[76]

The moving Defendants raised several arguments. Most relevant here, they argued the Commission had not shown irreparable harm.[77] They also argued the Commission made false or misleading statements to obtain the ex parte TRO.[78] In Opposition, the Commission contended it had shown irreparable harm and had not misled the court.[79] It also included an updated Declaration from its accountant, Zaki.[80]

**The Court Dissolves the TRO**

The Motions to Dissolve were fully briefed on October 3,[81] and the court held a hearing on October 6.[82] The court began by highlighting instances where it believed the Commission presented false or misleading information concerning irreparable harm in its ex parte TRO papers.[83] The court will detail these instances later, but, for example, it was concerned there

---

[75] *Sept. 18, 2023 Minute Entry*. The court asked the Receiver to respond to the DEBT Council Defendants' arguments that the Receiver failed to disclose a potential conflict of interest and failed to manage DEBT Box's assets. *See DEBT Council Defendants' Motion to Dissolve* at 28–30.

[76] *Sept. 18, 2023 Minute Entry*.

[77] *DEBT Council Defendants' Motion to Dissolve* at 15–18; *iX Global Defendants' Motion to Dissolve* at 7–8; *Fritzsche Motion to Dissolve* at 3.

[78] *DEBT Council Defendants' Motion to Dissolve* at 15–18; *iX Global Defendants' Motion to Dissolve* at 7–8.

[79] ECF 168, *Opposition to DEBT Council Defendants*; *see also* ECF 169, *Opposition to iX Global Defendants*.

[80] ECF 168-1, *Second Zaki Declaration*.

[81] ECF 175, *DEBT Council Defendants' Reply*; ECF 174, *iX Global Defendants' Reply*; *see also* ECF 150, *DEBT Council Defendants' Notice of Supplemental Authority*; ECF 163, *DEBT Council Defendants' Supplemental Memorandum*.

[82] ECF 187, *Oct. 6, 2023 Minute Order*; *see also* ECF 189, *Motion to Dissolve Hearing Transcript*.

[83] *Motion to Dissolve Hearing Transcript* at 13–27.

appeared to be no evidence supporting the Commission's statement in oral argument that Defendants closed bank accounts in the 48 hours before the ex parte TRO hearing.[84]

After outlining its concerns, the court explained it believed the TRO likely should not have issued in the first instance and even considering new evidence, the Commission had not shown irreparable harm.[85]  The court stated it was inclined to dissolve the TRO, transition out the Receivership, and deny as moot several pending Motions concerning the Receivership.[86] The court then invited the Commission to address any topics it wished.[87]

The Commission stated it had not intended to mislead the court and explained why it presented the evidence the way it had.[88]  Notably, the Commission did not contend the court was mistaken about the evidence.[89]  Nor did the Commission argue it was entitled to a TRO.[90]

For these reasons, the court concluded the TRO was improvidently issued and even considering new evidence, the Commission had failed to show irreparable harm.[91]  The court thus dissolved the TRO.[92]

---

[84] *Id.* at 22–27.

[85] *Id.* at 28.  The new evidence was Zaki's updated Declaration and attached Exhibits.  *See id.*

[86] *Id.* at 28–30.

[87] *Id.* at 30.

[88] *Id.* at 31–35.

[89] *Id.*

[90] *Id.*

[91] *Id.* at 46–47.

[92] *Id.*

Because there was no longer a TRO in place, the court also dissolved the Receivership

and denied as moot three Motions concerning the Receivership.[93]  It also ordered Defendants to

create a transition proposal, meet and confer with the Receiver, and provide an update to the

court.[94]  The court stated it would issue a written ruling more fully explaining its reasons for

dissolving the TRO.[95]  This is the Order the court contemplated.

## LEGAL STANDARDS

A party requesting a temporary restraining order must establish "(1) a substantial

likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued;

(3) that the threatened injury outweighs the harm that the preliminary injunction may cause the

opposing party; and (4) that the injunction, if issued, will not adversely affect the public

interest."[96]  Temporary restraining orders are "an extraordinary remedy," so "the movant's right

to relief must be clear and unequivocal."[97]

Irreparable harm "is the single most important prerequisite" for a temporary restraining

order.[98]  Accordingly, the movant must demonstrate irreparable harm is likely before the court

---

[93] *Id.* at 47–48.  The court denied the following Motions as moot: ECF 125, *SEC's Motion to Clarify Receivership Order*; ECF 144, *Receiver's Motion to Clarify Receivership Order*; ECF 138, *Receiver's Motion for Contempt and Sanctions*.  The Motion for Contempt was based on certain Defendants' alleged failure to comply with the TRO and Temporary Receivership Order.  *Receiver's Motion for Contempt and Sanctions* at 7–11.  Because the court concluded the TRO was improvidently issued, it also concluded there was no basis for civil contempt.  *See Reliance Ins. Co. v. Mast Constr. Co.*, 84 F.3d 372, 376 (10th Cir. 1996) ("[A] claim for civil contempt must fall if the order that was disobeyed is subsequently reversed by the issuing court or the appellate court, or if its issuance exceeded the power of the issuing court."); *see also United States v. United Mine Workers of Am.*, 330 U.S. 258, 295 (1947) ("The right to remedial relief falls with an injunction which events prove was erroneously issued . . . .").

[94] *Id.* at 39, 43–44.

[95] *Id.* at 47.

[96] *See Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

[97] *Id.* (quoting *Wilderness Workshop v. BLM*, 531 F.3d 1220, 1224 (10th Cir. 2008)).

[98] *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017)).

will consider the other prongs.[99]  "Demonstrating irreparable harm is 'not an easy burden to fulfill.'"[100]  The movant must show the anticipated injury is "certain, great, actual and not theoretical."[101]  Put differently, the movant must show the injury "is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."[102]  "'Merely serious or substantial' harm is not irreparable harm."[103]

As explained, the Commission initially argued for a relaxed TRO standard.[104]  The court declined to apply that standard at the TRO hearing, but it invited the Commission to file additional briefing on this issue.[105]  The Commission did not argue for a modified standard in its Oppositions, but the court will briefly explain why it does not apply a relaxed standard.

In *Winter v. Natural Resources Defense Council*, the Supreme Court overruled the Ninth Circuit's use of a preliminary injunction test that required a possibility, rather than likelihood, of irreparable harm.[106]  Before *Winter*, the Tenth Circuit permitted a modified injunctive relief test where a movant could make a lesser showing on the merits prong if the other three requirements weighed strongly in its favor.[107]  But in *Diné Citizens*, the Tenth Circuit concluded the modified test was inconsistent with *Winter*.[108]  It stated, "Under *Winter*'s rationale, any modified test

---

[99] *Id.*

[100] *First W. Cap. Mgmt.*, 874 F.3d at 1141 (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).

[101] *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).

[102] *Id.* (quoting *Heideman*, 348 F.3d at 1189).

[103] *Id.* (brackets omitted) (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).

[104] *TRO Application* at 21.

[105] *TRO Hearing Transcript* at 26.

[106] 555 U.S. 7, 22 (2008).  After *Winter*, some circuits have permitted a "sliding scale" approach that modifies the typical standard.  *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).

[107] *Diné Citizens*, 839 F.3d at 1281–82.

[108] *Id.* at 1282.

which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."[109]

Diné Citizens did not involve a request from the Commission or another administrative agency.  However, the Tenth Circuit's statement that "any modified test . . . is impermissible" does not appear to allow modification.  Absent Tenth Circuit authority stating otherwise, the court concludes there is no basis to deviate from the standard outlined in Diné Citizens.[110]

## ANALYSIS

The Commission argues irreparable harm is likely because Defendants were (1) closing accounts, (2) moving assets and funds overseas, (3) dissipating funds, and (4) removing evidence.  The court addresses each argument in turn.  Finally, considering the arguments together, the court concludes the Commission has not shown irreparable harm is likely in the absence of the requested injunctive relief.

### 1.  Closing Accounts

The Commission stated Defendants were closing bank accounts in the United States, including in the 48 hours before the ex parte TRO hearing.[111]  This was significant evidence of irreparable harm because it indicated Defendants were in the process of dissipating funds.  However, the Commission has not provided evidence that any Defendants closed accounts.

---

[109] Id.

[110] Some preliminary injunctions "are disfavored and require a movant to satisfy a heightened standard."  Colorado v. EPA, 989 F.3d 874, 883 (10th Cir. 2021).  The heightened standard requires the movant to "make a strong showing both on the likelihood of success on the merits and on the balance of the harms."  Id. at 884 (quotation simplified).  The Commission's repatriation request is likely a disfavored injunction because it requires affirmative acts and alters the status quo.  See RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1208–09 (10th Cir. 2009); Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070–71 (10th Cir. 2009).  However, because the court's ruling is limited to the irreparable harm prong—which does not require a heightened showing for disfavored injunctions—its analysis does not turn on whether the Commission has requested a disfavored injunction.

[111] Complaint ¶ 6; TRO Application at 10; Rule 65(b)(1)(B) Attorney Certification ¶ 6; TRO Hearing Transcript at 20.

In its Complaint, TRO Application, and Attorney Certification, the Commission states, "On June 26, 2023, Defendant iX Global . . . began closing its bank accounts in the United States and has since removed over $720,000 in investor funds from those bank accounts."[112]  The record now before the court shows that three iX Global bank accounts did close on June 29, 2023.[113]  But iX Global did not close those accounts—the bank did.[114]

The Commission now acknowledges iX Global did not close the accounts but argues that fact is immaterial.[115]  The court disagrees.  The Commission discussed the account closures in a way that strongly suggested iX Global was closing accounts so it could move funds overseas and beyond the Commission's reach.  For example, in the Attorney Certification, Welsh stated the Commission had evidence indicating "that Defendants are currently in the process of attempting to relocate assets and investor funds overseas."[116]  The next sentence starts "For example" and identifies the iX Global account closures in June 2023.[117]

Accordingly, the court understood the Commission to be stating that iX Global closing its accounts was strong evidence Defendants were actively and contemporaneously moving funds overseas.  But iX Global did not close its accounts, so there is less reason to believe it was "attempting to relocate assets and investor funds overseas."[118]  This is especially true because

---

[112] *Complaint* ¶ 6; *TRO Application* at 10; *Rule 65(b)(1)(B) Attorney Certification* ¶ 6.  There are minor wording differences in the three filings.

[113] ECF 145-3, *Martinez Declaration: Exhibit B* (*Bank of America Letter*).  Although the Commission states the accounts closed on June 26, Bank of America stated it closed the accounts on June 29.  *Id.* at 2.  For this ruling, the exact date Bank of America closed iX Global's accounts is not material.

[114] *Id.* (stating Bank of America closed the iX Global accounts).

[115] *Opposition to iX Global Defendants* at 10.  At the hearing on the Motions to Dissolve, the Commission stated it did not know the banks closed the accounts—it just knew "that accounts were being closed at those times."  *Motion to Dissolve Hearing Transcript* at 34.  The court does not doubt the Commission on this point.  However, the court notes the Commission explicitly stated iX Global closed the accounts.

[116] *Rule 65(b)(1)(B) Attorney Certification* ¶ 4.

[117] *Id.* ¶ 6; *see also Complaint* ¶ 6; *TRO Application* at 10.

[118] *See Rule 65(b)(1)(B) Attorney Certification* ¶ 4.

bank records—which the Commission had when it filed its TRO Application—show iX Global deposited the funds from its closed accounts into a Mountain America Credit Union account, not an overseas account.[119]

The Commission also discussed closed accounts at the ex parte TRO hearing. After the court decided to let the Commission argue irreparable harm, Welsh stated, "[E]ven in the last 48 hours Defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed."[120] The court understood this to mean Defendants had closed 33 accounts in the last 48 hours. For the court, this was the most important evidence of irreparable harm without the requested TRO. But it was not true.

At the hearing on the Motions to Dissolve, Welsh confirmed bank accounts were not closed—by banks or Defendants—in the 48 hours before the TRO hearing.[121] He also clarified he meant 24 accounts, not 33, and he had not meant to imply all those accounts closed in the last 48 hours.[122] Regardless, the fact that no accounts closed in the 48 hours before the TRO hearing drastically changes the evidentiary picture.

Furthermore, there appears to be no evidence any accounts were closed by Defendants. In its Opposition, the Commission states, "[O]n July 7, 2023, the [Commission] became aware of several accounts controlled by Defendants that were closed, including four accounts controlled by Relief Defendant Gold Collective; three accounts controlled by Defendant iX Global; and two accounts controlled by [DEBT Box]."[123] But it is now clear that all those accounts were closed

---

[119] *See First Zaki Declaration* ¶ 20(a); *see also First Zaki Declaration: Exhibit* 9 at 198–204.

[120] *TRO Hearing Transcript* at 20.

[121] *Motion to Dissolve Hearing Transcript* at 31.

[122] *Id.*

[123] *Opposition to DEBT Council Defendants* at 15.

by banks (not Defendants), and none were closed in July 2023.[124]  The Commission also states "other Defendants may have recently closed accounts," citing Zaki's updated Declaration.[125] Zaki identifies 24 closed accounts, but he does not identify who closed the accounts.[126]  And the DEBT Council and iX Global Defendants provided evidence that at least 12 of the 24 closed accounts were closed by banks.[127]

In sum, the court issued the TRO believing Defendants were actively in the process of closing their accounts.  The alleged closures were compelling evidence corroborating the Commission's claims that Defendants were rapidly attempting to move assets overseas—outside the Commission's reach and beyond the court's jurisdiction—given other Commission statements that led the court to believe Defendants were aware of the investigation (e.g., the representation that Defendants had taken steps to block the Commission's staff from viewing social media sites).  But there is no evidence before the court that Defendants closed accounts or that accounts were closed in July 2023.

## 2.  Moving Assets and Funds Overseas

The Commission represented it had evidence indicating Defendants were actively moving assets and funds overseas.[128]  The court relied on this representation when concluding irreparable harm was likely.  But the Commission has not provided supporting evidence.

---

[124] *Bank of America Letter*; ECF 132-3, *DEBT Council Defendants' Motion to Dissolve: Exhibit 3* (*Bank Closure Documents*) at 12–16.

[125] *Opposition to DEBT Council Defendants* at 15 (citing *Second Zaki Declaration* ¶ 10(a)).

[126] *Second Zaki Declaration* ¶ 10(a); *Second Zaki Declaration: Exhibit A* at 7–8 (identifying closed accounts).

[127] *Bank of America Letter* (identifying three iX Global accounts closed by banks in June 2023); *Bank Closure Documents* at 2–3, 12–16 (identifying two DEBT Box and five Gold Collective accounts closed by banks in January 2023, and one Blox Lending account and one UIU Holdings account closed by banks in December 2022).

[128] *See, e.g.*, *Rule 65(b)(1)(B) Attorney Certification* ¶ 4.

The Commission represented Defendants were in the process of moving funds and assets overseas.  For example, the Attorney Certification states the Commission had evidence indicating "Defendants are currently in the process of attempting to relocate assets and investor funds overseas, where at least Defendant Jacob Anderson has contended that those assets will be outside the reach of U.S. regulators."[129]  In the ex parte TRO Application, the Commission states, "In June, Defendants began to liquidate investor funds and move operations overseas."[130]  The next sentence is about the iX Global accounts closures, suggesting—at least in the court's view—that iX Global closed its accounts to move funds overseas.[131]  Later in the Application, under a heading titled "Defendants' Attempts to Liquidate and Relocate Assets," the Commission again discusses the iX Global account closures and DEBT Box's plan to move operations overseas.[132]  And at the TRO hearing, Welsh stated, "But to the irreparable harm, I would submit, Your Honor, that from briefings that we pointed out Defendants are moving assets overseas."[133]  Finally, in its Opposition, the Commission argues the DEBT Council Defendants "made significant efforts to move investor funds outside of the [c]ourt's jurisdiction in the months leading up to the [Commission's] filing."[134]

The Commission supports these representations with three pieces of evidence.  But the evidence does not support the Commission's contention that Defendants were "in the process of

---

[129] *Id.*

[130] *TRO Application* at 10.

[131] *See id.*

[132] *Id.* at 20.

[133] *TRO Hearing Transcript* at 9.

[134] *Opposition to DEBT Council Defendants* at 7.

attempting to relocate assets and investor funds overseas."[135]  The court will address each piece of evidence in turn.

First, in its TRO Application, the Commission contends Relief Defendant IX Ventures FZCO, a United Arab Emirates company, has "over $2 million in a UAE bank account, at least $1.35 million of which are funds investors paid to Defendants to purchase node licenses."[136] Welsh also cited this evidence at the hearing on the Motions to Dissolve, stating, "[W]e're seeing . . . Relief Defendant[] IX Venture, FZCO being created in Abu Dhabi receiving $2 million from investor funds being transferred there and then seeing bank accounts close on June 30th, which we were alerted to when we were reaching out to the banks in July."[137]

iX Global did wire transfer $1.35 million to IX Ventures FZCO.[138]  But a spreadsheet attached to the Commission's TRO Application shows the money was wired in batches, with the last wire occurring on December 28, 2022.[139]  At the Motion to Dissolve hearing, Welsh confirmed the Commission was unaware of any later money transfers to the United Arab Emirates.[140]  That admission is significant—transfers in 2022 do not show Defendants were moving funds overseas in July 2023.

Second, the Commission relies on a June 14, 2023 YouTube video where Jacob Anderson discussed DEBT Box's move to Abu Dhabi.[141]  For example, in his Attorney

---

[135] *See Rule 65(b)(1)(B) Attorney Certification* ¶ 4.

[136] *TRO Application* at 21 (citing *First Zaki Declaration* ¶ 18).

[137] *Motion to Dissolve Hearing Transcript* at 32.

[138] *First Zaki Declaration* ¶ 15; *First Zaki Declaration: Exhibit 5* at 187 (spreadsheet showing iX Global account activity).

[139] *First Zaki Declaration: Exhibit 5* at 187 (showing $100,000 wired on December 27, 2021; $250,000 wired on September 7, 2022; $500,000 wired on October 4, 2022; and $500,000 wired on December 28, 2022).

[140] *Motion to Dissolve Hearing Transcript* at 32–33.

[141] *Complaint* ¶ 6; *TRO Application* at 10, 20–21; *Rule 65(b)(1)(B) Attorney Certification* ¶¶ 4, 7.

Certification, Welsh averred, "Defendants are currently in the process of attempting to relocate assets and investor funds overseas, where at least Defendant Jacob Anderson has contended that those assets will be outside the reach of U.S. regulators."[142]  In the court's judgment, this mischaracterizes Anderson's comments.

The June 14, 2023 YouTube video captures an hour-long discussion between Anderson and Martinez about DEBT Box.[143]  Around forty minutes into the discussion, Anderson responds to a listener question about the "SEC squeeze on crypto" and how it affects DEBT Box.[144] Anderson explains that DEBT Box believes Abu Dhabi has provided a clearer regulatory framework than the United States, so DEBT Box has "moved all of the operations currently to Abu Dhabi."[145]  He then states the royal family has given DEBT Box space in a financial tower in Abu Dhabi and DEBT Box is "moving everything over there, and so [it is] going to be under the jurisdictional control of Abu Dhabi, not the SEC."[146]

The Attorney Certification gives the distinct impression Anderson was discussing ongoing efforts to move assets and funds overseas so they would be "outside the reach of" the Commission.[147]  While Anderson discussed moving DEBT Box overseas, he did not say anything about moving funds to place them outside the Commission's jurisdiction.[148]  This distinction matters because moving a business overseas for strategic operational reasons does not support the Commission's irreparable harm arguments—especially in light of evidence that

---

[142] *Rule 65(b)(1)(B) Attorney Certification* ¶ 4.

[143] *See June 14, 2023 YouTube Video*.

[144] *Id.* at 46:40–52.

[145] *Id.* at 47:00–50.

[146] *Id.* at 47:50–48:08.

[147] *See Rule 65(b)(1)(B) Attorney Certification* ¶ 4.

[148] *See id.*

DEBT Box started moving to Abu Dhabi more than a year earlier, in May 2022.[149]  And as noted, Anderson spoke in terms of moving operations, not funds or assets.

The court acknowledges that elsewhere, the Commission states the YouTube video is evidence DEBT Box was moving "operations" overseas.[150]  Even so, the Commission framed the video as evidence Defendants were moving funds and assets overseas.  For example, in its TRO Application, the Commission discussed the video under the heading "Defendants' Attempts to Liquidate and Relocate Assets."[151]  And at the TRO hearing, Welsh stated, "[D]efendants are moving assets overseas.  They have said in videos that the reason they are doing this is to avoid SEC jurisdiction."[152]  Given the context of the video and Anderson's full statements, the June 14, 2023 YouTube video does not show Defendants were in the process of moving assets or funds overseas.

Third, the Commission provides a $35,000 wire from DEBT Box to Brannon on June 16, 2023, with the memo line "Set up office in UAE."[153]  The Commission does not cite this as direct evidence Defendants were moving funds or assets overseas.[154]  Rather, it cites the wire to counter the DEBT Council Defendants' argument that DEBT Box had completed its move to the

---

[149] *DEBT Council Defendants' Motion to Dissolve* at 16–18; *see also* ECF 132-5, *DEBT Council Defendants' Motion to Dissolve: Exhibit 5* (May 31, 2022 "Certificate of Corporate Resolution" showing Nelson and Brannon transferred all DEBT Box shares to a United Arab Emirates company).  The parties dispute whether DEBT Box had moved all operations to Abu Dhabi by June 14, 2023.  *Compare DEBT Council Defendants' Motion to Dissolve* at 17–18, *with Opposition to DEBT Council Defendants* at 16.  Regardless of whether DEBT Box had fully moved to Abu Dhabi, the Commission has not provided evidence Defendants were moving funds or assets overseas in 2023.

[150] *See, e.g.*, *Complaint* ¶ 6; *TRO Application* at 10; *Rule 65(b)(1)(B) Attorney Certification* ¶ 7.

[151] *TRO Application* at 20–21.

[152] *TRO Hearing Transcript* at 9.

[153] *Opposition to DEBT Council Defendants* at 16 (citing *Second Zaki Declaration: Exhibit B* at 13).

[154] *See id.*

United Arab Emirates in May 2022.[155]  Nevertheless, the court will address the wire here

because it concerns the larger issue of Defendants' efforts to move overseas.

Although the wire is evidence DEBT Box was moving operations overseas, it does not

show an immediate, irreparable threat of Defendants moving funds or assets.  The Commission

provides a spreadsheet showing the funds were transferred to Brannon, but there is no indication

they were sent to an overseas account.[156]  Nor is there evidence Brannon sent the money

overseas.[157]  Moreover, the wire was almost six weeks before the Commission requested the

TRO.[158]  For these reasons, the $35,000 wire on June 16 does not show Defendants were in the

process of moving funds and assets overseas.

In sum, there is no evidence before the court showing Defendants were moving funds and

assets overseas in 2023, as the Commission affirmatively and repeatedly alleged as part of its

successful efforts to obtain the TRO ex parte.

### 3.  Dissipating Funds

The Commission argues Defendants are likely to dissipate funds.[159]  It contends this is

likely because Defendants are "continuing to transfer assets overseas,"[160] making luxury

purchases,[161] and draining accounts.[162]  The evidence does not show likely irreparable harm.

---

[155] *Id.*

[156] *Second Zaki Declaration: Exhibit B* at 13.

[157] *Id.*

[158] *See id.*

[159] *See Opposition to DEBT Council Defendants* at 14.

[160] *Id.* at 16.

[161] *See, e.g., Complaint* ¶ 4; *TRO Application* at 18; *Opposition to DEBT Council Defendants* at 14.

[162] *Opposition to DEBT Council Defendants* at 14–15.

First, as explained, the Commission has not shown Defendants were in the process of closing accounts and transferring assets or funds overseas in 2023.

Second, the luxury purchases do not demonstrate immediate, irreparable harm.  The Commission provides evidence Martinez bought a Lamborghini in January 2023.[163] Additionally, Zaki's Declaration identifies "apparent personal expenses," including payments to car dealerships and a withdrawal from iX Global's account "of over $1 million for bills for an American Express credit card in the name of Joseph Martinez."[164]  Zaki also prepared a spreadsheet, showing these expenses.[165]  Even assuming these are personal expenses, Zaki's spreadsheet shows payments from August 2021 to April 2023.[166]  This does not show a threat of immediate, irreparable harm in July 2023.

Third, the Commission's evidence of reduced account balances is not sufficient to show irreparable harm.  In Opposition to the DEBT Council Defendants' Motion, the Commission argues there is evidence of dissipation because "a substantial portion of the funds held in two bank accounts controlled by Defendants, including one controlled by [DEBT Box], had been

---

[163] ECF 3-4, *Joseph Watkins Declaration* ¶ 32 (describing January 16, 2023 YouTube video showing Martinez with his recently purchased Lamborghini).

[164] *First Zaki Declaration* ¶ 19; *see also TRO Application* at 18; *Opposition to DEBT Council Defendants* at 14–15.

[165] *First Zaki Declaration: Exhibit 8* at 196–97.

[166] *Id.*  Zaki's updated Declaration included a four-page spreadsheet detailing "additional apparent personal expenses, continued and subsequent diversion of funds to foreign based entities, international payment processors, other apparent related entities and Relief Defendant Business Funding Solutions."  *Second Zaki Declaration* ¶ 12; *Second Zaki Declaration: Exhibit B* at 9–13.  The spreadsheet shows withdrawals through July 2023, but it is not apparent each withdrawal is for personal expenses.  *See Second Zaki Declaration: Exhibit B* at 10–13.  The Commission also provided evidence Defendants own various real estate assets.  ECF 3-11, *Jenny McBride Declaration* (identifying real and personal property owned by Defendants).  But it is not clear how and when Defendants purchased these assets, nor is it clear why these past purchases show an imminent harm.  Thus, this evidence cannot show likely irreparable harm.

substantially drained of assets."[167]  But looking at the spreadsheets the Commission submitted, the court is not persuaded it can infer irreparable harm from these two accounts.

The account controlled by DEBT Box had $367,393 in May 2023 but only $31,301 in July 2023.[168]  While that might be a substantial drop in funds, there is no evidence before the court showing the withdrawn funds were sent overseas or otherwise used improperly.[169]  Moreover, the DEBT Council Defendants contend the "balance fluctuated because Nelson paid ordinary-course business expenses."[170]  They also provide bank records showing that on August 1, 2023—before the Complaint was unsealed[171]—the checking account balance had jumped to $216,306.[172]  The court does not know why the balance fluctuated, but it cannot say with any certainty the funds were improperly dissipated, and that weighs against a finding of irreparable harm.

There is also little evidence about the second account, which is controlled by iX Global. That account had $24,617 in April 2023.[173]  On July 7, the balance was $679,956.[174]  By July 26, the balance had fallen to $384,013.[175]  But again, the court does not have evidence before it

---

[167] *Opposition to DEBT Council Defendants* at 15; *see also First Zaki Declaration* ¶ 20; *Second Zaki Declaration* ¶ 10; *Second Zaki Declaration: Exhibit A*.

[168] *Second Zaki Declaration: Exhibit A*; *see also First Zaki Declaration: Exhibit 11* at 210–11 (showing account activity in July 2023).

[169] *See Opposition to DEBT Council Defendants* at 15; *First Zaki Declaration: Exhibit 11*; *Second Zaki Declaration* ¶ 10; *Second Zaki Declaration: Exhibit A*.

[170] *DEBT Council Defendants' Reply* at 7.

[171] *Aug. 2, 2023 Order Unsealing Case*.

[172] ECF 175-1, *DEBT Council Defendants' Reply: Exhibit 23* at 6 (records showing August 1, 2023 balance).

[173] *Second Zaki Declaration: Exhibit A*.

[174] *Id.*

[175] *Id.*; *see also First Zaki Declaration: Exhibit 10* at 205–09 (showing account activity in July 2023).

showing the funds were used improperly.[176]  Without more, the court cannot assume irreparable harm.

Furthermore, the Commission's list of accounts shows a Blox Lending account and an iX Global account that did not have substantially reduced balances.[177]  There is also a Business Funding Solutions account that went from $22,056 in May 2023 to over $1.2 million in July 2023.[178]  While this does not prove Defendants did not dissipate funds, it makes it difficult for the court to conclude irreparable harm is likely.

The court understands the Commission's point that some Defendants and Relief Defendants controlled bank accounts where most or all the money that came in also went out.[179]  But without more information, the court cannot be certain imminent, irreparable harm is likely—especially where evidence shows the withdrawals and transfers are not a new development.[180]

### 4.  Removing Evidence

In its TRO Application, the Commission states, "Defendants have also taken action to block SEC investigative staff from viewing their social media sites, and appear to have recently deleted a website containing training materials for the scheme's promotors [sic]."[181]  The

---

[176] *See Opposition to DEBT Council Defendants* at 15; *First Zaki Declaration: Exhibit 10*; *Second Zaki Declaration* ¶ 10; *Second Zaki Declaration: Exhibit A*.

[177] *Second Zaki Declaration: Exhibit A* (the iX Global balance remained the same and the Blox Lending balance decreased by $16.50).  The spreadsheet shows twenty-nine accounts, all closed except the five described above.  *Id.*

[178] *Id.*

[179] *See First Zaki Declaration* ¶¶ 14–17; *Opposition to iX Global Defendants* at 10.

[180] *See First Zaki Declaration* ¶ 14 (describing a reduced balance "as of May 30, 2023"); *id.* ¶ 15 (describing a reduced balance "as of May 1, 2023"); *id.* ¶ 16 (describing "a negative ending balance as of April 30, 2023"); *id.* ¶ 17 (describing a reduced balance "as of April 28, 2023").

[181] *TRO Application* at 10.

Commission used this as evidence of irreparable harm at the TRO hearing, arguing Defendants had "started to remove evidence that [it] would need to rely upon in discovery."[182]

While some YouTube videos are no longer available, there is no evidence before the court that Defendants were deliberately removing videos to "block SEC investigative staff."[183] The Commission has not presented evidence Defendants knew about the investigation, and it even later told the court its investigation was "covert."[184]  The court thus has no reason to believe Defendants destroyed evidence to obstruct the Commission.  Moreover, even if Defendants deliberately destroyed evidence, this likely would not justify all the Commission's requested relief, like the asset freeze.  For these reasons, the fact that some videos are no longer available does not suggest a likelihood of irreparable harm.[185]

### 5.  Weighing the Evidence Collectively

The court granted the TRO believing Defendants had closed bank accounts in the 48 hours before the ex parte TRO hearing and were in the process of moving assets and funds overseas.  The Commission has not provided evidence to support those representations.  And considering all the evidence, the Commission has not shown a likelihood of imminent, irreparable harm.

---

[182] *TRO Hearing Transcript* at 10.

[183] *See TRO Application* at 10.

[184] *TRO Hearing Transcript* at 10, 22.

[185] The Commission also argues Defendants were expanding their businesses.  *See TRO Hearing Transcript* at 10–11; *see also Complaint* ¶¶ 57–59; *TRO Application* at 10–11, 20.  However, the Commission presented this as evidence a TRO is in the public interest, not as evidence of irreparable harm.  *See TRO Hearing Transcript* at 10–11.  But even if the court considered Defendants' efforts to expand their businesses, it would not conclude the Commission has shown irreparable harm.  Although the Commission describes efforts to expand business, it is unclear whether the harm is irreparable, as opposed to merely substantial, and whether it is imminent.  *See TRO Hearing Transcript* at 10–11; *TRO Application* at 10–11, 20; *Complaint* ¶¶ 57–59.  Furthermore, the court is not convinced efforts to expand business would support all the Commission's requested relief, like the asset freeze.

Because the Commission has not shown irreparable harm is likely, it is unnecessary for the court to consider the other prongs.[186]  The Commission's right to relief is not "clear and unequivocal," and it is thus not entitled to a TRO.[187]

## CONCLUSION

For the reasons provided, the ex parte TRO was improvidently issued because even considering the Commission's new evidence, it has not shown irreparable harm.  Thus, the court GRANTED the Motions to Dissolve[188] and dissolved the TRO[189] and Temporary Receivership Order.[190]  It also DENIED as moot the Commission's Motion to Clarify Receivership Order,[191] the Receiver's Motion to Clarify Receivership Order,[192] and the Receiver's Motion for Contempt and Sanctions.[193]

The court cautions that although it denied the Commission's request for extraordinary relief, it is not presently ruling on the merits of the Commission's claims.

SO ORDERED this 30th day of November 2023.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[186] *See DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018).

[187] *See Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Wilderness Workshop v. BLM*, 531 F.3d 1220, 1224 (10th Cir. 2008)).

[188] ECF 132; ECF 145; ECF 159.  The DEBT Council Defendants argued the Receiver should be replaced.  *See* ECF 132 at 28–30.  Because the court dissolved the Receivership, it also denied as moot that portion of the DEBT Council Defendants' Motion.

[189] ECF 165.  Because the court dissolved the TRO, it also dissolves the ancillary Orders stipulated to by the Commission and Defendants.  *See* ECF 112; ECF 113; ECF 120; ECF 129; ECF 156; ECF 171.

[190] ECF 10.

[191] ECF 125.

[192] ECF 144.

[193] ECF 138.