# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**SECURITIES AND EXCHANGE COMMISSION,**    :
                                           :
                                **Plaintiff,**    :          **20 Civ. 10832 (AT) (SN)**
                                           :
                          **- against -**    :          **ECF Case**
                                           :
**RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,**    :
**and CHRISTIAN A. LARSEN,**                :
                                           :
                                **Defendants.**    :
                                           :
------------------------------------------------------------------------x


**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**TO CERTIFY INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)**

Jorge G. Tenreiro
Benjamin Hanauer
Ladan F. Stewart
Marc Jones
Peter Moores

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................... iii

**INTRODUCTION** ......................................................................................................... 1

**BACKGROUND** ........................................................................................................... 2

    A.   The Court's Summary Judgment Decision .......................................................... 3

    B.   Remaining Proceedings Before Final Judgment ................................................. 5

**ARGUMENT** ................................................................................................................. 7

    A.   The Court's Ruling on Offers and Sales on Trading Platforms and Those for Services Involve Controlling Questions of Law. ..................................................................... 8

    B.   Substantial Grounds for Difference of Opinion Exist ...................................... 11

       1.   There is a Substantial Ground for Difference of Opinion on Whether Issuer Offers and Sales over Crypto Asset Trading Platforms Can Give Rise to an Investment Contract under *Howey*. ......................................................................................... 12

       2.   There Is a Substantial Ground for Difference of Opinion as to Whether Distributing an Asset in Exchange for Services Constitutes an Investment of Money. .................. 16

    C.   Certifying the Appeal Would Materially Advance the Ultimate Termination of this Litigation. ......................................................................................................... 17

    D.   The Court Should Stay Remedies and Pretrial Proceedings. ............................ 19

**CONCLUSION** ........................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Audet v. Fraser,*
605 F. Supp. 3d 372 (D. Conn. 2022) ................................................................... 15

*Balestra v. ATBCOIN LLC,*
380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................................ 12, 15

*Cal. Pub. Emps' Ret. Sys. v. WorldCom, Inc.,*
368 F.3d 86 (2d Cir. 2004) ..................................................................................... 7

*Chem. Bank v. Arthur Andersen & Co.,*
726 F.2d 930 (2d Cir. 1984) ................................................................................... 7

*Chem. Bank v. Arthur Andersen & Co.,*
552 F. Supp. 439, 458 (S.D.N.Y. 1982)
*rev'd on other grounds* 726 F.2d 930 (2d Cir. 1984) ........................................... 19

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,*
135 F.3d 837 (2d Cir. 1998) ................................................................................... 7

*FHFA v. UBS Ams. Inc.,*
712 F.3d 136 (2d Cir. 2013) ................................................................................... 7

*Frazier v. Manson,*
484 F. Supp. 449 (N.D. Tex. 1980) ...................................................................... 17

*Friel v. Dapper Labs, Inc.,*
2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023) ...................................................... 15

*Glatt v. Fox Searchlight Pictures Inc.,*
2013 WL 5405696 (S.D.N.Y. Sept. 17, 2013) ..................................................... 12

*Hector v. Wiens,*
533 F.2d 429 (9th Cir. 1976) ........................................................................... 16-17

*In re Air Crash,*
27 F. Supp. 2d 431 (S.D.N.Y. 1998) ...................................................................... 8

*In re Duplan Corp.,*
591 F.2d 139 (2d Cir. 1978) ............................................................................. 8, 17

*In re Trump,*
874 F.3d 943 (6th Cir. 2017) ................................................................................ 12

*Int'l Bhd. of Teamsters v. Daniel,*
    439 U.S. 551 & n.12 (1974) ........................................................................................... 16

*Jobanputra v. Kim,*
    2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022) ............................................................... 13

*Klinghoffer v. S.N.C. Achille Lauro,*
    921 F.2d 21 (2d Cir. 1990) ............................................................................................. 8

*Litzler v. CC Invs., L.D.C.,*
    362 F.3d 203 (2d Cir. 2004) ........................................................................................... 7

*Liu v. SEC,*
    140 S. Ct. 1936 (2020) ................................................................................................ 5, 6

*McMahan & Co. v. Wherehouse Entm't, Inc.,*
    65 F.3d 1044 (2d Cir. 1995) ........................................................................................... 7

*Morrison v. Nat'l Australia Bank,*
    561 U.S. 247 (2010) ........................................................................................................ 6

*Piambino v. Bailey,*
    610 F.2d 1306 (5th Cir. 1980) ...................................................................................... 14

*Pino v. Cardone Capital, LLC,*
    55 F.4th 1253 (9th Cir. 2022) ......................................................................................... 5

*Pollack v. Laidlaw Holdings,*
    27 F.3d 808 (2d Cir. 1994) ....................................................................................... 7, 11

*Pollack v. Laidlaw Holdings,*
    1993 WL 254932 (S.D.N.Y. June 25, 1993) ............................................................... 11

*Pollack v. Laidlaw Holdings,*
    1993 WL 17302 (S.D.N.Y. Jan. 21, 1993) *rev'd* 27 F.3d 808 (2d Cir. 1994) ......................... 11

*Reese v. BP Exploration, Inc.,*
    643 F.3d 681 (9th Cir. 2011) ........................................................................................ 12

*SEC v. Ahmed,*
    72 F.4th 379 (2d Cir. 2023) ............................................................................................ 5

*SEC v. Binance Holdings Ltd.,*
    No. 23-cv-1599 (D.D.C., filed June 5, 2023) ......................................................... 9, 10

*SEC v. C.M. Joiner Leasing Corp.,*
    320 U.S. 344 (1943) ........................................................................................................ 4

*SEC v. Coinbase, Inc.,*
    No. 23-cv-4738 (S.D.N.Y., filed June 6, 2023) ............................................................. 9

*SEC v. Cavanagh,*
  155 F.3d 129 (2d Cir. 1998) ............................................................................................ 4

*SEC v. Dragonchain, Inc.,*
  No. 22-cv-1145 (W.D. Wash., filed Aug. 16, 2022) ..................................................... 10

*SEC v. Edwards,*
  540 U.S. 389 (2004) ...................................................................................................... 15

*SEC v. Eisenberg,*
  No. 23-cv-503 (S.D.N.Y., filed Jan. 20, 2023) .............................................................. 9

*SEC v. Hydrogen Tech. Corp.,*
  No. 22-cv-8284 (S.D.N.Y., filed Sept. 29, 2022) .......................................................... 9

*SEC v. LBRY, Inc.,*
  2022 WL 16744741 (D.N.H. Nov. 7, 2022) ........................................................... 12, 6

*SEC v. Rio Tinto PLC,*
  41 F.4th 47 (2d Cir. 2022) .............................................................................................. 7

*SEC v. Rio Tinto PLC,*
  2021 WL 1893165 (S.D.N.Y. May 11, 2021) ........................................... 7, 8, 10, 11, 17, 19

*SEC v. SG Ltd.,*
  265 F.3d 42 (1st Cir. 2001) .......................................................................................... 15

*SEC v. Sun,*
  No. 23-cv-2433 (S.D.N.Y., filed Mar. 22, 2023) ......................................................... 9

*SEC v. Telegram Grp. Inc.,*
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ................................................................ 12, 14, 16

*SEC v. Terraform Labs Pte. Ltd.,*
  2023 WL 4858299 (S.D.N.Y. July 31, 2023) ........................................................ passim

*SEC v. U.S. Envtl., Inc.,*
  155 F.3d 107 (2d Cir. 1998) .......................................................................................... 7

*SEC v. Wahi,*
  No. 22-cv-1009 (W.D. Wash., filed July 21, 2022) ..................................................... 9

*SEC v. W.J. Howey Co.,*
  328 U.S. 293 (1946) .................................................................................................. passim

*Teamsters Local 445 v. Dynex Cap., Inc.,*
  531 F.3d 190 (2d Cir. 2008) .......................................................................................... 7

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) ....................................................................................................... 7

*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2008) ........................................................................ 5

*United States v. Zaslavskiy*,
   2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ...................................... 15

*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
   940 F.2d 564 (10th Cir. 1991) ................................................................ 16

*Vidal v. Nielsen*,
   2018 WL 10127043 (E.D.N.Y. Apr. 30, 2018) .................................... 12

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008) ..................................................................... 7

*Wang v. Hearst Corp.*,
   2013 WL 3326650 (S.D.N.Y. June 27, 2013) ................................. 12, 19

*Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.*,
   964 F.2d 85 (2d Cir. 1992) ........................................................................ 7

*Wildes v. BitConnect Int'l PLC*,
   25 F.4th 1341 (11th Cir. 2022) .............................................................. 15

*Zakinov v. Ripple Labs, Inc.*,
   2023 WL 4303644 (N.D. Cal. June 30, 2023)........................................ 13

**Statutes**

15 U.S.C. § 77e ................................................................................ 12, 14, 15

28 U.S.C. § 1292(b) ............................................................................ passim

**Other Authorities**

"Ripple Order Complicates Crypto Bankruptcies, Say Judges - Law360," July 28, 2023 *available at* https://www.law360.com/articles/1704192/ ............................................ 10

## INTRODUCTION

The SEC respectfully requests that this Court certify for interlocutory appeal two holdings in its July 13, 2023 order on summary judgment (D.E. 874, the "Order"): (1) the ruling that, as a matter of law, Defendants' "Programmatic" offers and sales of XRP over crypto asset trading platforms could not lead investors to reasonably expect profits from the efforts of others; and (2) the ruling that Ripple's "Other Distributions" of XRP as a "form of payment for services" (*id.* at 4) was legally insufficient to constitute an "investment of money" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Immediate appeal of these rulings is warranted under 28 U.S.C. § 1292(b) because they involve controlling questions of law as to which there are substantial grounds for difference of opinion, and obtaining an appellate ruling on these issues now may materially advance the ultimate termination of this litigation.

These two rulings involve controlling legal issues because they can be—and were—resolved as a matter of law on an undisputed factual record (*e.g.*, Order at 10, 15), and they disposed of the SEC's claims regarding the majority of Defendants' offers and sales at issue and all of the primary Section 5 liability claims against the individuals. And there are significant grounds for difference of opinion on the correctness of both rulings. Since this Court's decision, another court in this district explicitly disagreed with the Order's ruling on the Programmatic Sales. *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023) ("the Court declines to draw a distinction [where] coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not" because "*Howey* makes no such distinction"). Likewise, this Court's "Other Distributions" ruling departs from the holdings in numerous cases that an "investment of money" under *Howey* can be met through a non-cash contribution such as the provision of goods or services.

1

An immediate appeal of these two rulings—which are the core of the Court's summary judgment holding—will also materially advance the ultimate, final termination of this action. It is indisputable that a final judgment as to all parties will require this Court to determine what remedies are appropriate in light of Ripple's violations the Court found existed on summary judgment. This will require resource-intensive steps like discovery, *see* D.E. 471 (contemplating such discovery), *Daubert* practice, *see* D.E. 472 n.1 (deferring certain *Daubert* briefing until "the issue of remedies is ripe"), and briefing complex legal issues. Ripple has also indicated its own consideration of an appeal at some point in this proceeding. *See, e.g.*, D.E. 889 at 1 n.2.

The relevant question, therefore, is whether it makes sense to take the appellate path most likely to result in a single remedies phase instead of two separate rounds. The SEC respectfully submits that interlocutory review is that path, because immediate appellate resolution of the two rulings makes it more likely that this Court will be able to assess in one proceeding the remedies for all of the violations for which Defendants are ultimately held liable. By contrast, delaying appeal until after one litigated remedies phase will result in additional litigation should the Second Circuit disagree with any portion of this Court's liability rulings.

There is an additional benefit to obtaining appellate review of the rulings now: the intra-district split on critical aspects of the legal framework governing the SEC's claims heightens the need for appellate resolution. The ultimate answer to these questions could affect a number of pending cases involving crypto assets offered and sold by issuers on crypto asset trading platforms and cases in which issuers have distributed such assets for non-cash labor and services.

## BACKGROUND

This case involves Defendants' offers and sales to public investors of more than $2 billion of the crypto asset XRP through at least four channels. First, in its "Institutional Sales,"

Ripple sold $728 million in XRP to "sophisticated" counterparties pursuant to written contracts. (*See* Order at 4, 15). Second, via "Programmatic Sales," Ripple sold $757 million in XRP over crypto asset trading platforms to investors in "blind bid/ask transactions." (*Id.*). Third, Ripple recorded $609 million in non-cash revenue for "Other Distributions" of XRP in exchange for services such as labor. (*Id.* at 4-5, 15-16). Fourth, similar to Programmatic Sales, Defendants Garlinghouse and Larsen personally sold over $600 million in XRP over crypto asset trading platforms. (*Id.* at 5, 27-28). Because Defendants never registered any of these offers and sales, the SEC sued, alleging that each Defendant had violated Section 5 of the Securities Act of 1933 ("Securities Act") and that Garlinghouse and Larsen had aided and abetted Ripple's violations.

### A.    The Court's Summary Judgment Decision

Following extensive discovery, the SEC and Defendants cross-moved for summary judgment. Two of the three elements of a Section 5 violation—utilizing the means of interstate commerce and the lack of registration—were not in dispute. (Order at 10). Thus, the dispositive issue the Order addressed was whether Defendants offered and sold "investment contracts" under *Howey*. The Court correctly concluded that, as the parties agreed, this inquiry presents a "legal question that the Court resolves based on the undisputed record." (*Id.* at 11, 15).

For the Institutional Sales, where Ripple sold XRP to "sophisticated individuals and entities … pursuant to written contracts," the Court correctly determined that the *Howey* test was satisfied. (Order at 16-22). The Court thus found an "investment of money" by buyers paying Ripple "fiat or other currency in exchange for XRP." (*Id.* at 16). A "common enterprise" likewise existed because: (a) Ripple "pooled the proceeds of its Institutional Sales"; (b) "Ripple used the funds it received from its Institutional Sales to promote and increase the value of XRP by developing uses for XRP and protecting the XRP trading market"; and (c) accordingly, "each Institutional Buyer's ability to profit was tied to Ripple's fortunes and the fortunes of other

3

Institutional Buyers." (*Id.* at 17-18). Lastly, the Court properly determined that "reasonable investors … would have purchased XRP with the expectation that they would derive profits from Ripple's efforts." (*Id.* at 18-19). The Court premised this finding on "Ripple's communications, marketing campaign, and the nature of the Institutional Sales," including promotional brochures Ripple circulated to sophisticated investors in 2013 and 2014, the "XRP Market Reports" posted on its website, and the online public statements of its "senior leaders," including Garlinghouse and Larsen. (*Id.* at 19-21). The Court also noted that the lockup provisions or resale restrictions that some institutional buyers agreed to were "inconsistent with the notion that XRP was used as a currency or for some consumptive use." (*Id.* at 21).

With respect to the Programmatic Sales, the Court reached a different conclusion. The Court concluded that Ripple's sales "to public buyers" over "digital asset exchanges" did not create a "reasonable expectation of profits" from the efforts of others: "[w]hereas the Institutional Buyers reasonably expected that Ripple would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP, … Programmatic Buyers could not." (*Id.* at 23). The Court reasoned that programmatic buyers "could not have known if their payments of money went to Ripple" and "Ripple did not make any promises or offers because Ripple did not know who was buying the XRP." (*Id.* at 23-24). The Court found that, unlike a reasonable Institutional Buyer—who would have been aware of Ripple's "marketing campaign and public statements"—a "reasonable Programmatic Buyer, who was generally less sophisticated," did not share such understandings. (*Id.* at 25).

For Ripple's "Other Distributions"—exchanging XRP for non-cash services, including compensating its employees with XRP and providing XRP to third parties "to develop new applications for XRP"—the Court found there was no "investment of money." (Order at 26).

The Court reasoned that employee labor and third-party services in exchange for XRP did not constitute "tangible and definable consideration," and that Ripple could not have funded its projects with these XRP distributions because it "never received the payments" from them. (*Id.*)

As for Garlinghouse and Larsen, the Court held that their XRP sales "were programmatic sales on various digital asset exchanges through blind bid/ask transactions." (Order at 27). Relying on the same reasoning that governed its ruling on Ripple's Programmatic Sales, the Court thus granted the individuals summary judgment on the SEC's primary Section 5 charges against them. (*Id.* at 27-28). On the other hand, the Court denied summary judgment on the aiding and abetting claims against the individuals vis-à-vis the Institutional Sales, finding there were issues of fact as to the individuals' knowledge or reckless disregard of Ripple's violation, and as to substantial assistance for Larsen for a certain period. (*Id.* at 30-33).

### B. Remaining Proceedings Before Final Judgment

Resource-intensive litigation remains to determine appropriate remedies—such as injunctive relief, disgorgement, and civil monetary penalties—for Ripple's Institutional Sales in violation of Section 5. *See*, *e.g.*, *SEC v. Ahmed*, 72 F.4th 379, 391 (2d Cir. 2023) (following grant of summary judgment to SEC, litigation moves to remedies stage to determine injunctive and monetary relief and to address various disgorgement-related issues). This will involve discovery and potentially several rounds of briefing. For example, the parties previously agreed to postpone *Daubert* briefing for one of Defendants' experts whose proposed testimony is limited to issues relating to monetary relief. *See* D.E. 471, 472. The focus of this proposed testimony is the scope of expenses properly deductible from disgorgement under *Liu v. SEC*, 140 S. Ct. 1936 (2020), an issue that will likely raise an array of additional fact and legal questions. *See generally Ahmed*, 72 F.4th at 396-99. Both this Court and Magistrate Judge Netburn will presumably be asked to rule on a number of discovery and *Daubert* disputes.

5

The SEC will also seek discovery related to its anticipated requests for injunctive and monetary relief, particularly since Defendants previously obtained an order blocking discovery of documents that post-dated the filing of the Complaint, D.E. 249 at 2, all of which will be relevant to Defendants' ongoing conduct and the likelihood of future violations.  *E.g.*, *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998).  The SEC will seek this discovery, in part, because Ripple's own publicly available "XRP Market Reports" disclose that "Ripple has continued to sell XRP only in connection with ODL transactions."  *See* Ex. A https://ripple.com/insights/q1-2023-xrp-markets-report/).  This Court has already found that Ripple's ODL transactions violated Section 5.  (Order at 4, 16-22).  Moreover, these publicly available XRP Market Reports show that Ripple has made an additional approximately *$3 billion* in net, unregistered ODL sales since the filing of this case.  *E.g.*, Ex. B-E (certain additional Ripple's XRP Market Reports).

Ripple will presumably vigorously oppose any such claims for relief, and in fact it preemptively recognized the potential for "additional fact or expert discovery on the issue of disgorgement."  D.E. 471.  Ripple has now also explicitly indicated that it intends to argue that its current Institutional Sales do not implicate the federal securities laws under *Morrison v. Nat'l Australia Bank*, 561 U.S. 247 (2010), in order to oppose the SEC's request for injunctive or other relief.  D.E. 889 at 4.  Again, both this Court and Magistrate Judge Netburn will be called upon to rule on these disputes.  And, at the end of this discovery, the parties will submit briefs and the Court will have to rule on the various relief-related arguments, including as to *Liu* and *Morrison*.

The Order also found triable issues of fact on the aiding and abetting claims relating to Institutional Sales.  (*See* Order at 34).  Accordingly, litigating this case to a final judgment now also means that, should the Second Circuit reverse or remand the rulings at issue here, this Court would need to redo remedies-phase litigation *and* any trial on the aiding and abetting claims.

# ARGUMENT

Under 28 U.S.C. § 1292(b), a court may certify an order for interlocutory appeal where: (1) it "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  *SEC v. Rio Tinto PLC*, 2021 WL 1893165, at *1 (S.D.N.Y. May 11, 2021) (cleaned up); *see*, *e.g.*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 443 (1976) (interlocutory appeal after summary judgment but before remedies phase); *Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 86 (2d Cir. 1992) (same). Here, all three factors support certification.

The Second Circuit has accepted Section 1292(b) appeals to resolve questions of whether different financial instruments constitute "securities" under the Securities Act.  *See, e.g.*, *Pollack v. Laidlaw Holdings*, 27 F.3d 808 (2d Cir. 1994); *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984).  The Second Circuit has likewise accepted various other interlocutory appeals to resolve important questions of securities law, including the appeal this Court certified in *Rio Tinto*.[1]  *See also TSC Indus., Inc.*, 426 U.S. at 443 (Supreme Court review after Second Circuit interlocutory review of controlling question as to the application of the securities laws).

---

[1] *SEC v. Rio Tinto PLC*, 41 F.4th 47 (2d Cir. 2022); *see also FHFA v. UBS Ams. Inc.*, 712 F.3d 136 (2d Cir. 2013) (addressing Securities Act's statute of limitations); *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008) (addressing an investment adviser's standing to assert certain securities claims); *Teamsters Local 445 v. Dynex Cap., Inc.*, 531 F.3d 190 (2d Cir. 2008) (addressing the standard corporate scienter for securities fraud claims); *Litzler v. CC Invs., L.D.C.*, 362 F.3d 203 (2d Cir. 2004) (addressing the tolling of claims under the securities laws); *Cal. Pub. Emps' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86 (2d Cir. 2004) (addressing whether Securities Act claims can be removed to federal court as "related to" pending bankruptcies); *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107 (2d Cir. 1998) (addressing the scienter standard for securities market manipulation); *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir. 1998) (addressing the viability of private claims for conspiracy to commit securities fraud); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044 (2d Cir. 1995) (addressing the measure of damages available under the Securities Act).

The Court should certify this interlocutory appeal as well, including because of the express intra-district split on certain of the Order's rulings made as a matter of law, and because of the many pending securities actions involving crypto assets offered and sold by their issuers on crypto asset trading platforms or in exchange for services such as labor.

### A.    The Court's Ruling on Offers and Sales on Trading Platforms and Those for Services Involve Controlling Questions of Law.

A question of law is "controlling" when "reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action." *Rio Tinto*, 2021 WL 1893165, at *2 (citations omitted); *see also In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978). Certification can also be particularly appropriate where the issue involves "a purely legal question about which there are no triable issues of fact." *In re Air Crash*, 27 F. Supp. 2d 431, 435 (S.D.N.Y. 1998). And whether a legal question is "controlling" is also informed by whether "the certified issue has precedential value for a large number of cases." *Rio Tinto* at *2; *see also Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990) (courts "may properly consider the system-wide costs and benefits of allowing the appeal … the impact that an appeal will have on other cases is a factor that [courts] may take into account"). Here, each of these considerations shows that the Order's rulings involve controlling questions of law.

The rulings at issue involve pure legal questions about the application of *Howey* to crypto asset offers and sales, *and* they significantly affect the conduct of the action. As the Order itself held, "[w]hether Defendants offered or sold 'investment contracts' is a *legal* question that the Court resolves based on the undisputed record." Order at 15 (emphasis added); *see also id.* at 10, 15 (ruling on undisputed facts). The rulings dismissed the SEC's claims related to more than half of the XRP offers and sales at issue and entirely disposed of the primary Section 5 liability claims against the individuals.

8

In addition, both rulings could have a substantial impact on a large number of pending litigations. The Programmatic Sales ruling could have significant persuasive value in various pending SEC enforcement actions where issuers offered and sold crypto assets indiscriminately to public investors over crypto asset trading platforms, including cases pending in this district. *See*, *e.g.*, *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y., filed June 6, 2023) (Compl. ¶¶ 65, 294) (alleging defendants operated unregistered exchange that facilitated the offer and sale of various crypto asset securities, including offers and sales by issuers over the platform); *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599 (D.D.C., filed June 5, 2023) (Compl. ¶¶ 306, 308-09, 363) (similar allegations); *SEC v. Sun*, No. 23-cv-2433 (S.D.N.Y., filed Mar. 22, 2023) (Compl. ¶¶ 91-93) (alleging manipulative trading of crypto asset securities offered and sold over crypto asset trading platforms and transferred in exchange for services); *SEC v. Eisenberg*, No. 23-cv-503 (S.D.N.Y., filed Jan. 20, 2023) (Compl. ¶¶ 47-48, 62) (same); *SEC v. Wahi*, No. 22-cv-1009 (Compl. ¶ 1) (W.D. Wash., filed July 21, 2022) (alleging insider trading as to various crypto asset securities acquired on crypto asset trading platforms). The *Coinbase* defendants and amici on their behalf have cited this Court's Order extensively in support of dismissal. Case No. 23-cv-4738, D.E. No. 36; D.E. No. 50 at 16.[2]

The "Other Distributions" ruling likewise could impact various pending SEC cases, including in this district, where the alleged offers and sales of crypto assets were made in exchange for services such as labor. *See*, *e.g.*, *Sun, supra* (Compl. ¶¶ 91-107) (unregistered distributions for non-cash consideration such as for promotion of the crypto asset); *SEC v.*

---

[2] The issues decided in the Order could also affect cases not involving the SEC. For example, the District of New Jersey's Chief Bankruptcy Judge recently observed that the Order could "complicat[e]," "affect" and "open new potential defenses" in bankruptcy proceedings involving crypto asset exchanges. Law360, "Ripple Order Complicates Crypto Bankruptcies, Say Judges," July 28, 2023, *available at* https://www.law360.com/articles/1704192/.

*Hydrogen Tech. Corp.*, No. 22-cv-8284 (S.D.N.Y., filed Sept. 29, 2022) (Compl. ¶ 5) (distributions for labor and promotional services); *Binance*, *supra* (Compl. ¶¶ 308-310) (distributions as employee compensation); *SEC v. Dragonchain, Inc.*, No. 22-cv-1145 (W.D. Wash., filed Aug. 16, 2022) (Am. Comp. ¶¶ 68-73) (distributions for labor and services).

Defendants incorrectly frame the proper Section 1292(b) inquiry, arguing that the rulings at issue do not involve pure legal questions because determining whether something is a "security" depends on the facts of each case. *See* D.E. 889 at 2. This is a non sequitur—no two legal cases ever present the exact same facts. The question is whether the ruling at issue involves a *legal* dispute or a *factual* dispute between the parties. As the Court correctly repeatedly noted, the application of *Howey* here to an undisputed set of facts constitutes a pure legal determination. *E.g.*, Order at 15 (citing *SEC v. Thompson*, 732 F.3d 1151, 1160–61 (10th Cir. 2013)).

Nor does the SEC hereby seek to appeal a ruling based on a disputed fact, request that the Court of Appeals revisit this Court's correct determination that the facts are undisputed, or overturn any findings of fact given that the Order made none. Instead, the rulings that the SEC seeks to appeal were *legal determinations* about the existence of investment contracts based on *undisputed* facts. The *undisputed* facts (*e.g.*, Order at 23 (Programmatic Sales are "blind bid/ask transactions")) present a legal question—can an issuer's offers and sales on crypto asset trading platforms create a reasonable expectation of profits based on the efforts of others? This legal question is at issue in a number of pending cases, and a Second Circuit ruling will have "precedential value." *Rio Tinto*, 2021 WL 1893165, at *2. The pending cases may involve different crypto asset securities, but the same legal disputes at issue in the Order's rulings— whether issuer offers and sales over trading platforms and/or in exchange for noncash consideration satisfy *Howey*'s requirements—will likely be critical in those actions as well.

If Defendants were correct, no interlocutory appeal would ever be proper with respect to cases applying *Howey* to particular offers or sales, all of which naturally present their own unique facts. But that is simply not the law, and the Second Circuit has had no trouble reviewing an interlocutory order to determine whether a particular transaction involved securities under Supreme Court precedent. In *Pollack*, for example, the court heard an interlocutory appeal to determine whether an instrument was a "note" and therefore a "security" and, in doing so, made the *legal* determination of whether particular "factors alter the reasonable expectations of investors." 27 F.3d at 814. The district court had certified interlocutory review after concluding (as this Court has) that the holding that "the investments at issue were not 'securities'" was a purely legal question. *Pollack v. Laidlaw Holdings, Inc.*, 1993 WL 254932, at *2 (S.D.N.Y. June 25, 1993). And it reached that conclusion even though its own ruling on the merits had, unremarkably, involved "[a]pplying the facts of this case to *Howey*." *Pollack v. Laidlaw Holdings, Inc.*, 1993 WL 17302, at *6 (S.D.N.Y. Jan. 21, 1993) *rev'd* 27 F.3d at 814 (holding the instruments were securities under a test other than *Howey*). The Court should do the same here.[3]

**B. Substantial Grounds for Difference of Opinion Exist.**

The second Section 1292(b) factor is satisfied if "there is conflicting authority on the issue" raised for interlocutory review and it "has not been squarely addressed by the Second Circuit." *Rio Tinto*, 2021 WL 1893165, at *2 (citations omitted). Here, there can be no dispute that the Second Circuit has not had occasion to apply *Howey* to issuer offers or sales of crypto assets. This second prong is further plainly satisfied because this Court and the court in *Terraform* have come out on opposite sides of the legal question underlying the Programmatic

---

[3] Defendants state that they may seek to appeal the question of whether there can be "investment contracts" in the absence of certain contractual provisions. D.E. 889 at 1 n.2. This illustrates the point—whether such contracts exist in this case or in another case first presents a *factual* question with respect to which, if that issue is undisputed, a court may then make a *legal* ruling.

Sales ruling.  *See*, *e.g.*, *Glatt v. Fox Searchlight Pictures Inc.*, 2013 WL 5405696, at *2
(S.D.N.Y. Sept. 17, 2013) (certifying 1292(b) appeal where "[t]he intra-district split … clearly
show[s] a substantial basis exists for difference of opinion"); *Wang v. Hearst Corp.*, 2013 WL
3326650, at *2 (S.D.N.Y. June 27, 2013) (same result where intra-district split "clearly
provide[s] fodder for different opinions and have spawned them"); *see also Vidal v. Nielsen*,
2018 WL 10127043, at *2 (E.D.N.Y. Apr. 30, 2018) (same result for issue "that has divided
courts … and that has not been squarely addressed by the Second Circuit").

But courts also routinely certify for interlocutory review legal issues "without first
awaiting development of contradictory precedent" if "fair-minded jurists might reach
contradictory conclusions" as to that issue.  *In re Trump*, 874 F.3d 948, 952 (6th Cir. 2017)
(quoting *Reese v. BP Exploration, Inc.*, 643 F.3d 681, 688 (9th Cir. 2011)) (both certifying
review under Section 1292(b)).  Here, the SEC respectfully submits that various cases applying
*Howey*, including in the crypto asset context, show that reasonable jurists (in addition to the
*Terraform* court) may reach conclusions contrary to the Order's Programmatic Sales and Other
Distributions rulings, further showing a substantial ground for difference of opinion.

1.     **There is a Substantial Ground for Difference of Opinion on Whether
        Issuer Offers and Sales over Crypto Asset Trading Platforms Can
        Give Rise to an Investment Contract under *Howey*.**

Section 5 prohibits unregistered offers and sales made "directly or indirectly" by issuers,
control persons or intermediaries.  15 U.S.C. § 77e.  Courts have accordingly found Section 5
violations where unregistered crypto asset transactions occur not between the issuer and the
investor, but through intermediaries, including on trading platforms.  *E.g.*, *Terraform*, 2023 WL
4858299, at *15-16 (sales on crypto asset trading platforms); *SEC v. Telegram Grp. Inc.*, 448 F.
Supp. 3d 352, 380-81 (S.D.N.Y. 2020) (sales through underwriters); *SEC v. LBRY, Inc.*, 2022
WL 16744741, at *3 (D.N.H. Nov. 7, 2022) (sales on crypto asset trading platforms); *Balestra v.*

*ATBCOIN LLC*, 380 F. Supp. 3d 340, 356 n.14 (S.D.N.Y. 2019) ("Purchasers' ability to resell ATB Coins on other exchanges also supports the conclusion that the coins are securities"); *see generally Jobanputra v. Kim*, 2022 WL 4538201, at *8 n.8 (S.D.N.Y. Sept. 28, 2022) ("courts in this district have applied the *Howey* test to determine that cryptocurrency tokens intended to be sold on a blockchain *or in the general market* were securities within the meaning of the Securities Act," noting the lack of any "case to the contrary") (emphasis added)).

The above cases show that reasonable jurists could reach conclusions contrary to the Order's ruling that investors' reasonable expectations may turn on the issuer's choice of how it offers and sells or on the existence of intermediaries between the issuer and the investor. In the opinion of the *Terraform* court, for example, the inquiry turns on *what* the issuer objectively invites investors to understand, and not on *the method* of carrying out the transaction. Nor does it turn on investors' knowledge that they are buying their asset from the issuer or on a particular determination that each investor saw all the same information. This is so because a defendant's "public campaign … would presumably have reached individuals who purchased their crypto-assets on secondary markets—and, indeed, motivated those purchases—as much as it did institutional investors. Simply put, secondary-market purchasers had every bit as good a reason to believe that the defendants would take their capital contributions and use it to generate profits on their behalf." *Terraform*, 2023 WL 4858299, at *15; *see also Zakinov v. Ripple Labs, Inc.*, 2023 WL 4303644, at *4-5 (N.D. Cal. June 30, 2023) ("Because the *Howey* test is an objective one … whether XRP is a security will be the same for all class members, regardless of each member's individual expectations, plaintiff's status as a day trader will not affect the analysis").

The Order also reasoned that purchasers who bought XRP on crypto asset platforms (as opposed to institutional purchasers) had no reasonable basis to expect that Ripple would use the

capital it received from its sales to improve the ecosystem and thereby increase the price of XRP, in part because those public purchasers could not know that their money went to Ripple or a third-party entity XRP reseller. *See* Order at 24-25. Here, too, there is a substantial ground for difference of opinion. *E.g.*, *Terraform*, 2023 WL 4858299, at *15 ("But *Howey* makes no such distinction between purchasers … That a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts"); *see also Telegram*, 448 F. Supp. 3d at 371, 374 (analyzing expectations of initial sophisticated purchasers and those of the eventual investors in the market, noting that "[t]he inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant … The subjective intent of the Initial Purchasers does not necessarily establish the objective intent of a reasonable purchaser.").[4]

Section 5 also expressly disallows unregistered "offer[s] to sell." 15 U.S.C. § 77e. In construing the term "offer," courts have held that sellers cannot avoid liability by using broad means of disseminating information or engaging in impersonal transactions. These cases further reflect that reasonable jurists could reach a different conclusion than the Order's Programmatic

---

[4] More generally, *Howey* speaks to what the issuer invites an objective investor to understand about the proffered investment and draws no distinction between the levels of sophistication of the offerees. Indeed, the investors in *Howey* were primarily tourists staying at a hotel in Florida. 328 U.S. at 296-97. *Howey*'s objective standard, moreover, presumes that all investors are aware of all information reasonably available to them. *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (courts look to the "economic inducements held out" in promotional materials and issuer's offerings are "judged as being what they were represented to be"); *Piambino v. Bailey*, 610 F.2d 1306, 1320 (5th Cir. 1980) (looking to "expectations of a 'reasonable investor' as prompted by [issuer's] *standardized* presentation") (emphasis added). Accordingly, in the *Terraform* court's view, "[t]he SEC need not prove that each and every investor was personally led to think that profits would follow from their investment … If an objective investor would have perceived the defendants' statements and actions as promising the possibility of such returns, the SEC has satisfied *Howey*'s requirement." 2023 WL 4858299, at *14.

14

Sales holding—and therefore a substantial ground for difference of opinion as to the Programmatic Sales ruling, under which broad, impersonal offers to sell do not establish liability.

Specifically, courts have held that online marketing efforts—like those Ripple engaged in as noted in the Order, *e.g.*, Order at 7—meet the broad definition of "offer," including in the context of marketing crypto assets, because:

> [t]echnology has opened new avenues for both investment and solicitation. Sellers can now reach a global audience through podcasts, social media posts, or, as here, online videos and web links … A seller cannot dodge liability through his choice of communications—especially when the [Securities] Act covers "any means" of "communication." [15 U.S.C. § 77e(a)(1)]. We decline to adopt an interpretation that both contradicts the text and allows easy end-runs around the Act.

*Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022); *see also Pino v. Cardone Capital, LLC*, 55 F.4th 1253, 1258 (9th Cir. 2022) (explicitly following *Wildes*).

*Wildes* aligns with various cases where issuers offer their securities, including crypto assets, through online promotions. *See*, *e.g.*, *SEC v. Edwards*, 540 U.S. 389, 392, 394-97 (2002) (offers occurred via issuer's website); *SEC v. SG Ltd.*, 265 F.3d 42, 44-45 (1st Cir. 2001) (same); *Balestra*, 380 F. Supp. 3d at 355 (same); *United States v. Zaslavskiy*, 2018 WL 4346339, at *2 (E.D.N.Y. Sept. 11, 2018) (same); *Friel v. Dapper Labs, Inc.*, 2023 WL 2162747, at *4-6 (S.D.N.Y. Feb. 22, 2023) (same); *Audet v. Fraser*, 605 F. Supp. 3d 372, 381-82 (D. Conn. 2022) (same). And it is in line with the Second Circuit's own analysis that investors reasonably expect profits from the issuer's efforts where the investors were "lacking in requisite expertise, so numerous, or so dispersed that they become utterly dependent on centralized management." *United States v. Leonard*, 529 F.3d 83, 90-91 (2d Cir. 2008).

Defendants argue that there is no substantial ground for difference of opinion between the Order and *Terraform* because both cases applied *Howey* and both cases held that the asset underlying an investment contract transaction is not itself a security. D.E. 889 at 3. That

15

argument is spurious. The SEC did not argue here or in *Terraform* that the asset underlying those investment contracts were necessarily a security (and the SEC does not seek appellate review of any holding relating to the fact that the underlying assets here are nothing but computer code with no inherent value). *See also Telegram*, 448 F. Supp. 3d at 379 ("While helpful as a shorthand reference, the security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence"). Nor does the different procedural posture of the two cases matter. *See* D.E. 889 at 3. Just as the facts in *Terraform* were treated as true— essentially undisputed—for purposes of that motion, the facts here were *in fact* undisputed.

## 2. There Is a Substantial Ground for Difference of Opinion as to Whether Distributing an Asset in Exchange for Services Constitutes an Investment of Money.

In *International Brotherhood of Teamsters v. Daniel*, the Supreme Court held that "a person's 'investment,' in order to meet the definition of an investment contract, [did not need to] take the form of cash only, rather than of goods and services." 439 U.S. 551, 560 & n.12 (1974). All that is required is that the buyer provide "some tangible and definable consideration in return" for the security. *Id.* at 560. It is thus "well established that cash is not the only form of contribution or investment that will create an investment contract." *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991).

Courts, including at least one in the crypto space, have held that issuers sold investment contracts in exchange for non-cash consideration such as labor, services, or other assets. *E.g.*, *LBRY*, 2022 WL 16744741, at *2 (crypto asset issuer "used more than 142 million LBC to incentivize users, software developers, and software testers, as well as compensate employees and contractor"); *see also Uselton*, 940 F.2d at 574-75 (employee labor constituted "investment of money" where "plaintiffs contributed their legal right to a portion of their wages to [employer] CL in return for the right … to participate in CL's profit-sharing plan"); *Hector v. Wiens,* 533

F.2d 429, 432-33 (9th Cir. 1976) (farmer's provision of promissory notes backed by grain he harvested constituted "investment of money"); *Frazier v. Manson,* 484 F. Supp. 449, 452 & n.5 (N.D. Tex. 1980) ("investment of money" where plaintiff "received his limited partnership interests as compensation for…managerial services").[5]

The Order, by contrast, held that Other Distributions could not be investment contracts because Ripple did not receive money or "payments from these XRP distributions." Order at 26. There was no factual dispute that the Other Distributions recipients received XRP as employment "compensation" or in exchange for services to "develop new applications for XRP and the XRP Ledger," *id.*, and that Ripple "recognized revenue of $609 million" for these distributions, *id.* at 5. This shows substantial grounds for difference of opinion—if not an outright conflict—with the above cases as to the Order's Other Distributions ruling.

### C. Certifying the Appeal Would Materially Advance the Ultimate Termination of this Litigation.

Section 1292(b)'s final factor looks to "'the institutional efficiency of both the district court and the appellate court.'" *Rio Tinto*, 2021 WL 1893165, at *2 (citations omitted). The "critical requirement is that it (an interlocutory appeal) have the potential for substantially accelerating the disposition of the litigation." *Duplan Corp.*, 591 F.2d at 148 n.11 (citations omitted). This factor is satisfied if an interlocutory Second Circuit reversal means "the parties could resolve all actionable claims at one trial," which "would be more efficient than seeking appellate review following trial, after which a second trial might be necessary." *Rio Tinto*, 2021 WL 1893165, at *3 (citations omitted). This prong similarly is met where "immediate interlocutory appeal will 'remove a cloud of legal uncertainty' over these proceedings and may

---

[5] *LBRY* does not conduct an "investment of money" analysis, but its holding that investment contracts were nevertheless sold in exchange for non-cash consideration shows that reasonable jurists *may* disagree with the Order's investment of money holding as to Other Distributions.

'significantly affect the parties' bargaining positions and may hasten the termination of this litigation through settlement.'" *Id.* (citations omitted).

Interlocutory review would materially advance the ultimate termination of this litigation, in the most efficient manner possible, by significantly reducing the risk of two extensive remedies phases and possibly two trials. This case's current posture calls for at least one remedies phase for Ripple, relating to the Institutional Sales, that, for the reasons set forth above, promises to be heavily litigated and include at a minimum *Daubert* motion practice and "additional fact and expert discovery on the issue of disgorgement." D.E. 471. That phase could also include remedies as to Garlinghouse and Larsen should the SEC decide to proceed to trial on the currently remaining aiding and abetting claims.

Even if interlocutory certification is denied, the SEC will have to decide—after entry of final judgment—whether to appeal on an issue on which this Court and the *Terraform* court have disagreed. Defendants have also already expressed that they may appeal certain aspects of the Order. D.E. 889 at 1 n.2. If the Second Circuit reverses as to some or all of the rulings in the Order, this Court will have to oversee a second remedies phase for Ripple (and possibly Garlinghouse and Larsen), to determine the scope of appropriate relief as to the violations arising from the Programmatic Sales and Other Distributions. It would also potentially mean a second trial for Garlinghouse and Larsen, to decide whether they aided and abetted Ripple's Programmatic Sales and Other Distributions.

Allowing the Second Circuit to define the contours of Defendants' Section 5 liability now means this Court would likely conduct only a single remedies phase and no more than one trial. Moreover, an appellate finding that Defendants' offers and sales over crypto asset trading platforms violated Section 5 could eliminate the need for a trial altogether. To that end, should

18

the Second Circuit find that Garlinghouse and Larsen violated Section 5 in their own XRP offers and sales, the SEC would evaluate whether to proceed to trial on its aiding and abetting claims.

Finally, a Second Circuit reversal vis-à-vis the XRP offers and sales on which the Order granted Defendants summary judgment could increase the likelihood of resolving "this litigation through settlement." *Rio Tinto*, 2021 WL 1893165, at *3 (citations omitted). An appellate ruling and its accompanying precedential value on these controlling questions of law could make a negotiated resolution easier for the parties to achieve.

### D. The Court Should Stay Remedies and Pretrial Proceedings.

The SEC is mindful that the court has entered a pretrial order and directed the parties to adhere to the schedule set forth therein. D.E. 884, 891. Given Section 1292(b)'s emphasis on courts' "institutional efficiency," *Rio Tinto*, 2021 WL 1893165, at *2, however, the SEC respectfully asks the Court to stay any remedies litigation and any pretrial proceedings while this interlocutory certification request and any appeal are pending. *See*, *e.g.*, *Wang*, 2013 WL 3326650, at *2–3 ("The underlying case will be stayed during the pendency of this [Section 1292(b)] motion and if the appeal is granted the stay will continue to the date of the Circuit's decision."); *Chem. Bank v. Arthur Andersen & Co.*, 552 F. Supp. 439, 458 (S.D.N.Y. 1982) (certifying under Section 1292(b) whether instruments were securities and "stay[ing] further proceedings pending the outcome of the appeal"), *rev'd on other grounds*, 726 F.2d at 938-40.

## CONCLUSION

The Court should grant the SEC's motion, and certify an interlocutory appeal for the summary judgment rulings that Defendants' XRP offers and sales on crypto asset trading platforms, and offer and sales in exchange for non-cash consideration, did not violate Section 5 of the Securities Act. The Court should also stay the remainder of these proceedings during the pendency of this motion and any forthcoming appeal.

New York, N.Y.
August 18, 2023

Respectfully submitted,

*Jorge G. Tenreiro*
_____
SECURITIES AND EXCHANGE
COMMISSION

Jorge G. Tenreiro
Ladan F. Stewart
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

Benjamin Hanauer
175 W. Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

Marc J. Jones
Peter B. Moores
33 Arch Street, 24th Floor
Boston, MA 02110

*Attorneys for Plaintiff*