# Exhibit 3

|  | SEC'S SUMMARY OF ALLEGATIONS IN ITS OPPOSITION | ALLEGATIONS IN COMPLAINT |
|---|---|---|
| 1. | **Pg. 3 (Summary of Allegations ("SOA"), Point I):**<br><br>DEBT Box and its promoters have introduced Jason Anderson and his brother, Jake, as the "co-founders" of DEBT Box. Compl. ¶¶ 14, 15. | **¶ 14:**<br><br>Jason Anderson has described himself to investors as the "co-founder" and "co-owner" of DEBT Box and, along with the other members of the DEBT Council, exercises control of DEBT Box.<br><br>**¶ 15:**<br><br>Like his brother, Jake Anderson has represented himself to investors as the "co-founder" and "co-owner" of DEBT Box DEBT Box and, along with the other members of the DEBT Council, exercises control of DEBT Box.<br><br>¶¶ 14 and 15 only allege the Andersons described themselves as founders. |
| 2. | **Pg. 3 (SOA, Point I):** According to DEBT Box's corporate filings, Brannon is currently DEBT Box's acting President, and Brannon is the company's sole Director, Treasurer, and Secretary.  Compl. ¶¶ 13, 16, 17. | **¶¶ 13, 16, 17:**<br><br>None of these paragraphs describe Brannon as an "acting President" of DEBT Box or its sole Director, Treasurer, and Secretary. |
| 3. | **Pg. 3 (SOA, Point II):**<br><br>Beginning in May 2021, DEBT Box directly, and indirectly through the DEBT Council and other promoters, began offering | **¶ 2:**<br><br>Paragraph 2 does not mention that any crypto assets were "created and issued by DEBT Box." |

| | | |
|---|---|---|
| | investments in "node software licenses" ("Node Licenses"), which according to Defendants would "mine" at least one of eleven separate crypto assets created and issued by DEBT Box. Compl. ¶ 2. | |
| 4. | **Pg. 3 (SOA, Point II):**<br><br>As represented by Defendants, once an investor obtained an account, and paid a fee, the investor could purchase Node Licenses for prices ranging between $1,000 and $12,000 per license. Compl. ¶ 13. | **¶ 13:**<br><br>Paragraph 13 has nothing to do with what the SEC claims in its Opposition.  Paragraph 13 discusses DLI and the members of DEBT Council. |
| 5. | **Pg. 3 (SOA, Point II)**:<br><br>Upon purchase of one or more Node Licenses, the investor would purportedly become entitled to receive—via "mining"—one or more of the DEBT Box crypto assets which—according to DEBT Box's website, Defendants' representations, and DEBT Box's Twitter account—are "linked to real world | **¶¶ 2, 8, 12, 16, 22, 28:**<br><br>Paragraphs 8, 12, 16, 22, and 28 have nothing to do with the SEC claims in its Opposition.<br><br>Paragraph 2 does not provide sufficient support for the SEC's claim either.  Paragraph 2 provides as follows:<br><br>Beginning in at least March 2021, and continuing through the present, Defendants have unlawfully promoted Defendant Digital Licensing Inc.'s (d/b/a "DEBT Box") (herein, "DEBT Box") unregistered, fraudulent offering of so-called "node software licenses," which, as alleged herein, are investment contracts and, accordingly, securities pursuant to federal law. Among other things, Defendants, through YouTube videos, websites, social media posts, and at live investor events, have promised investors that these |

2

| | | |
|---|---|---|
| | commodities" and "backed by royalties coming from various industries." Compl. ¶¶ 2, 8, 12, 16, 22, 28. | "node software licenses" would allow investors to "mine" at least eleven separate crypto assets, and that those crypto assets, in turn, were supported by "real projects tied to real assets." See, e.g., http://thedebtbox.com (visited July 24, 2023). Defendants have represented that the value of each crypto asset is tied to profits generated by various underlying businesses performing, inter alia, gold mining, oil drilling, satellite scanning, beverage sales, and other so-called "commodity projects." |
| 6. | **Pgs. 3-4 (SOA, Point II):**<br><br>As described in DEBT Box's promotional materials, including its "Lite Papers", "the DEBT Box ecosystem benefits from the physical production of these commodities by supporting real-world projects that generate revenues. These real-word [sic] commodity production projects benefit from [DEBT Box's] **financial support, technologies, and operational assistance**." *See id.* ¶¶ 47–48; Dkt. No. 182-1 at 3C–3M (DEBT Box Lite Papers) (emphasis added). | **¶¶ 47–48; Dkt. No. 182-1 at 3C–3M (DEBT <u>Box Lite Papers</u>):**<br><br>None of the cited paragraphs have the quoted language.  Also, the Lite papers referenced in Defendant iX Global's attachment (182-1) (3C-3M) do not have this precise, quoted language. |
| 7. | **Pg. 4 (SOA, Point II):**<br><br>The BGLD Lite Paper further explains that investor funds will be used by DEBT Box to provide operational and | **¶¶ 48, 70; Dkt. No. 182-1 at 3-D:**<br><br>None of the cited paragraphs or the BLGD Lite Paper speaks of "oil extraction projects."  Nor does the BGLD Lite Paper speak of any "operational expertise" to reduce waste and exploration costs. |

3

| | | |
|---|---|---|
| | financial support to these oil extraction projects: "By purchasing a [BGLD Node License], you're allowing [DEBT Box] to support oil industry projects within the exploration, drilling and physical production of crude oil with certain key benefits," such as DEBT Box's "proprietary satellite scanning technology," the "ability to attract new liquidity," and operational expertise to reduce "waste" and "exploration costs." Compl. ¶¶ 48, 70; Dkt. No. 182-1 at 3-D. | |
| **8.** | **Pg. 4-5 (SOA, Point II):**<br><br>Defendants represented that one way they would "increase the value" of DEBT Box crypto assets was by periodically reducing the supply of those crypto assets by purchasing and then "burning" them (i.e., removing them from circulation). *Id.* [¶ 49]. | **¶ 49**:<br><br>Paragraph 49 does not say this; there is no discussion of "burning" in paragraph 49. Nor do the Lite Papers say this; rather, the Lite Papers say, for example, that "[w]ith diminished supply comes increased demand, thus *potentially* increasing the value of the token over time." XPLR Lite Paper – "Exploration Royalties" section (emphasis supplied). |
| **9.** | **Pg. 5 (SOA, Point II):**<br><br>According to Defendants, this "burning" would be achieved, in part, through revenues | **¶¶ 47, 49, 68**:<br><br>None of the cited paragraphs support this claim in the SEC's Opposition. There is nothing in these three paragraphs about how any "'burning' would be achieved, in part, through revenues DEBT Box |

4

|  |  |  |
|---|---|---|
|  | DEBT Box received from the projects "backing" these crypto assets. *Id*. ¶¶ 47, 49, 68. | received from the projects 'backing' [any] crypto assets." |
| **10.** | **Pg. 5 (SOA, Point II):**<br><br>Investors had no involvement in how DEBT Box or any of its crypto assets operated, the selection of business partnerships by the DEBT Council, the development of the DEBT Box ecosystem, or any business decisions made by Defendants. Compl. ¶ 49. | **¶ 49:**<br><br>The cited paragraph (Paragraph 49) has nothing to do with this claim in the SEC's Opposition, and does not support this claim. |
| **11.** | **Pg. 5 (SOA, Point III):**<br><br>Initially, DEBT Box and the DEBT Council were primarily responsible for marketing Node Licenses, along with individual promoters engaged by DEBT Box, including Stangis and Fritzche, to promote the offering on social media sites. *Id*. ¶¶ 29, 30, 90. | **¶¶ 29, 30, 90:**<br><br>The cited paragraphs (Paragraphs 29, 30, 90) do not support this claim in the SEC's Opposition.  These paragraphs do not state that "DEBT Box and the DEBT Council were primarily responsible for marketing Node Licenses, along with individual promoters engaged by DEBT Box, including Stangis and Fritzche, to promote the offering on social media sites." |
| **12.** | **Pg. 5 (SOA, Point III):** | **¶¶ 1, 100:** |

5

| | | |
|---|---|---|
| | Aided by these promotional efforts, Defendants raised millions from investors from their offering of the Node Licenses. *Id.* ¶¶ 1, 100. | The cited paragraphs (paragraphs 1, 100) do not support any claim that Defendants DLI, Jason Anderson, Jacob Anderson, Brannon, or Nelson were "[a]ided by … promotional efforts" and "raised millions from investors from their offering of the Node Licenses." |
| 13. | **Pg. 6 (SOA, Point IV, A):**<br><br>At all times during relevant period, DEBT Box and its controlling members (i.e., Defendants Jason Anderson, Jake Anderson, Brannon, and Nelson (*id.* ¶ 13)) repeatedly represented to investors that the DEBT Box node licenses "mined" DEBT Box's crypto assets through a process akin to mining for bitcoin (i.e., through a "proof of work" consensus mechanism), which is a protocol for a system of computers to come to agreement as to the state of a distributed, digital ledger (or "blockchain"), which then pays "rewards" to certain participants in this "mining" process). *Id.* ¶¶ 45, 65. | **¶¶ 45, 65:**<br><br>Paragraphs 45 and 65 do not state that Defendants "repeatedly represented to investors that the DEBT Box node licenses 'mined' DEBT Box's crypto assets through a process akin to mining for bitcoin."<br><br>In addition, the Lite Papers such as the XPLR Lite Paper, expressly stated that the DEBT Box blockchain ecosystem created a "synthetic proof of work (sPOW) structure."  XPLR Lite Paper (the Rewards section). |
| 14. | | |

6

#12593800v1\031376\0001

| | **Pg. 7 (SOA, Point IV, B):**<br><br>In reality, DEBT Box did not have any agreements to share in the profits of operational oil wells, and the Western Oil well sites touted by DEBT Box and the members of the DEBT Council have never produced any oil—a fact Defendants knew and indeed admitted (as to the Nevada well) to federal investigators. *Id.* ¶ 71. | **¶ 71:**<br><br>Paragraph 71 does not support this claim in the SEC's Opposition.  Further, to the extent that there is any suggestion of a federal investigation elsewhere in the Complaint, there is no allegation that "federal investigators" were investigating "DEBT Box and the members of the DEBT Council" as to the Nevada well.<br><br>Paragraph 71 provides as follows:<br><br>Jason Anderson, Jake Anderson, Brannon, Nelson, and Franklin knew or were reckless in not knowing that DEBT Box and Western Oil had never produced any oil or revenues. The DEBT Council members and Franklin knew or were reckless in not knowing that Western Oil's well in Nevada was exploratory and had been nonoperational since before the relevant time period, and that Western Oil's Nebraska well had been drilled and cased without successfully finding oil. Franklin, the founder and President of Western Oil, was intimately involved in the Western Oil's business operations. Franklin (along with each of the members of the DEBT Council) visited Western Oil's drilling sites in Nevada and Nebraska on multiple occasions, and posted multiple YouTube videos highlighting their inspection of the purportedly "successful" drilling operations occurring at these sites. |
| 15. | **Pg. 7 (SOA, Point IV, B):**<br><br>DEBT Box and Jason Anderson made similar misrepresentations regarding the partnerships supposedly supporting DEBT Box's "BEV" crypto asset. *Id.* ¶ 80. | **¶ 80:**<br><br>Paragraph 80 does not support this claim in the SEC's Opposition.<br><br>Paragraph 80 provides as follows:<br><br>Beginning in or around December 2022 and continuing to present, in promotional videos and social media posts, DEBT Box and the members of the DEBT Council have claimed that Lazy Magnolia secured "multi-million-dollar" bottling contracts, including with retailers such as "7-11, Aldis, Food Lion, Sam's Club and more" that are currently generating over "12 million dollars a month in revenue." As recently as January 15, 2023, Jason Anderson, Jake Anderson, |

7

| | | |
|---|---|---|
| | | Brannon, Nelson, and Bowen continued to claim that its bottling partners are generating millions in monthly revenue, and that DEBT Box's share of these would be proportionally allocated amongst BEV token holders. |
| 16. | **Pg. 7 (SOA, Point IV, B):**<br><br>The BEV Lite Paper falsely claimed that a business partner, Lazy Magnolia, had secured "multi-million-dollar" bottling contracts, including with retailers such as "7-11, Aldis, Food Lion, Sam's Club and more." *Id*. [¶ 80]. | **¶ 80:**<br><br>Paragraph 80 does not support this claim in the SEC's Opposition.  Paragraph 80 (see above) does not mention anything to do with BEV Lite Paper.  Further, the BEV Lite Paper does not mention Lazy Magnolia. |
| 17. | **Pg. 7 (SOA, Point IV, B):**<br><br>And in August 2022, Jason Anderson falsely claimed that its beverage distribution partner was generating "over $12 million a month in revenue" from its rainwater bottling business. *Id*. [¶ 80]. | **¶ 80:**<br><br>Paragraph 80 does not support this claim in the SEC's Opposition.<br><br>Paragraph 80 (see above) does not mention anything about any alleged false claim of Jason Anderson made in August 2022 about a "beverage distribution partner was generating 'over $12 million a month in revenue' from its rainwater bottling business." |
| 18. | **Pg. 7-8 (SOA, Point IV, C):**<br><br>For example, DEBT Box's marketing materials claimed that their technology was capable of scanning the earth "through the frequencies" to determine exactly | **¶ 74:**<br><br>Paragraph 74 does not speak of "DEBT Box's marketing materials" and does not provide the quoted language in the SEC's Opposition.<br><br>Paragraph 74 provides as follows:<br><br>These representations were repeated by Defendants DEBT Box, Jason Anderson, Jake Anderson, Brannon, Nelson, Western Oil, and Franklin in investor |

8

| | | |
|---|---|---|
| | where gold, oil, or indeed any "mineral on the periodic table" was located, and "pinpoint gold, for example, or aluminum or silver, or natural gas within six centimeters in the ground." *Id*. ¶ 74. | presentations, YouTube videos, emails to investors, and social media posts. For example, during an October 2022 investor presentation in Nebraska, Jason Anderson told investors that DEBT Box's proprietary technology would allow DEBT Box, and its partners, to locate gold, oil, natural gas, and "any mineral on the periodic table" within a few feet of its actual location. During this same presentation, Franklin repeated these claims-comparing DEBT Box's purported technology to an "MRI" of the Earth, which allowed DEBT Box and Western Oil to target any mineral on the periodic table with pinpoint accuracy. Similarly, in an October 26, 2022 YouTube video, Jason Anderson represented that DEBT Box had successfully used this technology to locate oil reserves in Africa since 2019. |
| 19. | **Pg. 8 (SOA, Point IV, C)**:<br><br>To the contrary, Fleet Spaces' CEO was forced to ask DEBT Box to cease and desist after learning that DEBT Box was misrepresenting their purported partnership and misappropriating Fleet Space's marketing materials. *Id*. ¶ 78. | **¶ 78:**<br><br>Paragraph 78 does not say what the SEC claims in its Opposition.<br><br>Paragraph 78 provides as follows:<br><br>Additionally, at no point did DEBT Box have a partnership with Fleet Space or access to its technology and products. Nor has Fleet Space ever surveyed or otherwise provided services in connection with oil wells owned by Western Oil or DEBT Box. Indeed, in or around January 31, 2023, Fleet Space sent an email to Brannon demanding that Brannon and DEBT Box cease using Fleet Space's promotional materials. |
| 20. | **Pg. 8 (SOA, Point IV, D)**:<br><br>To prevent investors from discovering the falsity of their misstatements, Defendants took significant steps to lull investors and otherwise | **¶¶ 85, 86:**<br><br>Paragraphs 85 and 86 do not say what the SEC claims in its Opposition.  In particular, these paragraphs do not speak of Defendants taking any action to "prevent investors from discovering the falsity of misstatements."  Nor do these paragraphs speaking of taking "significant steps to lull investors."<br><br>Paragraph 85 provides as follows: |

9

| | | |
|---|---|---|
| | deceive them about the businesses purportedly "backing" the securities. *Id.* ¶¶ 85, 86. | By creating and using the DEBT Box accounts to falsely represent to investors that their node software licenses were purportedly mining crypto assets backed by underlying business revenues, DEBT Box and the DEBT Council members created the deceptive appearance of both mining activities and profitable underlying business activities, and deceived investors into believing they were earning returns on their investments.<br><br>Paragraph 86 provides as follows:<br><br>To create the appearance of a successful partnership with an independent company, Jason Anderson, Jake Anderson, and Bowen misappropriated investors' monies, commingled them with other DEBT Box operating accounts, and used those monies to fund DEBT Box's purchase of Lazy Magnolia in or around December of 2022. Bowen and the Andersons concealed from investors that proceeds of the DEBT Box node software license sales were used to finance the purchase of Lazy Magnolia. |
| 21. | **Pg. 8 (SOA, Point IV, D):**<br><br>For example, DEBT Box and the DEBT Council created "accounts" for DEBT Box investors that falsely created the appearance that the node licenses were "mining" new crypto assets and that those "tokens" were increasing in value based on revenues generated by underlying businesses. *Id.* ¶ 85. | **¶ 85:**<br><br>Paragraph 85 does not say what the SEC claims in its Opposition. Aside from the erroneous statement that users created accounts, not DEBT Box or the DEBT Box Council, there is no discussion about how the "'tokens' were increasing in value based on revenues generated by underlying businesses."<br><br>Paragraph 85 provides as follows:<br><br>By creating and using the DEBT Box accounts to falsely represent to investors that their node software licenses were purportedly mining crypto assets backed by underlying business revenues, DEBT Box and the DEBT Council members created the deceptive appearance of both mining activities and profitable underlying business activities, and deceived investors into believing they were earning returns on their investments. |

10

| 22. | **Pg. 8 (SOA, Point IV, D):**<br><br>And they took steps to conceal the true status of DEBT Box's purported partnerships with Fleet Space and Lazy Magnolia from investors, including by deceiving investors about Fleet Space's "partnership" and refusing to disclose the details of their claimed underlying contracts with other "partners." *Id*. ¶¶ 47, 51, 78, 86–88. | **¶¶ 47, 51, 78, 86–88:**<br><br>These paragraphs do not say what the SEC claims in its Opposition.  In particular, there are no allegations in the Complaint that DEBT Box or the DEBT Council "refus[ed] to disclose the details of their claimed underlying contracts with other "partners."<br><br>Paragraph 47 provides as follows:<br><br>Depending upon which type(s) of node software license(s) the investors purchase, the investors become entitled to receive one (or more) of eleven DEBT Box crypto assets (which Defendants call "tokens"), the value of which, according to DEBT Box, is derived from a proportional allocation of the profits DEBT Box receives from business partnerships with various independent entities engaged in the production of, amongst other things, crude oil, gold, natural gas, bauxite, real estate, and agriculture. For example, DEBT Box's Twitter account made the following representations regarding the DEBT Box "tokens":<br><br>Paragraph 78 provides as follows:<br><br>Additionally, at no point did DEBT Box have a partnership with Fleet Space or access to its technology and products. Nor has Fleet Space ever surveyed or otherwise provided services in connection with oil wells owned by Western Oil or DEBT Box. Indeed, in or around January 31, 2023, Fleet Space sent an email to Brannon demanding that Brannon and DEBT Box cease using Fleet Space's promotional materials. |
|---|---|---|

11

#12593800v1\031376\0001



Paragraph 51 provides as follows:

Additionally, beginning in at least August 2022, and continuing to the present, DEBT Box's marketing materials, which were disseminated to investors by each of the individual Defendants, represented to investors that DEBT Box possessed proprietary satellite-imaging software. According to Jason Anderson, DEBT Box independently developed this "satellite- imaging" technology in or around 2019. Later, DEBT Box claimed that it had increased the effectiveness of its "proprietary" technology through a partnership with an Australian mining exploration company named Fleet Space Technologies ("Fleet Space"). DEBT Box represented to investors that by leveraging its purported proprietary technology, DEBT Box could increase the profits of its "numerous" undisclosed partner companies, and DEBT Box's profits from these partnerships would be shared on a proportional basis with node software license purchasers and holders of the respective crypto asset.

Paragraph 86 provides as follows:

To create the appearance of a successful partnership with an independent company, Jason Anderson, Jake Anderson, and Bowen misappropriated investors' monies, commingled them with other DEBT Box operating accounts, and used those monies to fund DEBT Box's purchase of Lazy Magnolia in or around December of 2022. Bowen and the Andersons

12

| | | |
|---|---|---|
| | | concealed from investors that proceeds of the DEBT Box node software license sales were used to finance the purchase of Lazy Magnolia.<br><br>Paragraph 87 provides as follows:<br><br>Jason Anderson, Jake Anderson, Brannon, Nelson, and Franklin all took steps to conceal DEBT Box's fictitious business partnerships. For example, Franklin and members of the DEBT Council invited investors to tour Western Oil's Nebraska and Nevada wells to lend credence to their claims that Western Oil had successful oil and natural gas drilling operation[.] [sic]<br><br>Paragraph 88 provides as follows:<br><br>In or around January 31, 2023, Jason Anderson, Jake Anderson, Brannon, and Nelson learned that investors had contacted Fleet Space regarding the company's purported partnership with DEBT Box. Rather than disclosing to investors that DEBT Box never had a partnership with Fleet Space, DEBT Box announced in a February 10, 2023 message to investors that it had 'terminated' its partnership with Fleet Space. To conceal their prior misstatements about Fleet Space, Brannon and each of the members of the DEBT Council claimed that its relationship with Fleet Space was terminated due to "harassment" of Fleet Space by competitors and other third parties. Since at least February 10, 2023, members of the DEBT Council have discouraged users from contacting companies to verify DEBT Box's claims that those entities have partnered with DEBT Box. |
| 23. | **Pg. 8 (SOA, Point V)**:<br><br>More recently, through a partnership with Jason and Jake Anderson, Defendants Schuler, Daniels, and Parker spun-off the DEBT Box model to create the FAIR Project, which offers so called | ¶¶ 28, 58, 59:<br><br>These paragraphs do not say what the SEC claims in its Opposition.  In particular, there is no discussion regarding any "promise of 'mining' crypto assets with a 'proof of work' algorithm backed by revenues from the use of artificial intelligence in the pharmaceutical industry."<br><br>Paragraph 28 provides as follows: |

| | |
|---|---|
| "software-mining license[s]" to investors with the promise of "mining" crypto assets with a "proof of work" algorithm backed by revenues from the use of artificial intelligence in the pharmaceutical industry. *See id.* ¶¶ 28, 58, 59. | **BW Holdings, LLC (d/b/a the "FAIR Project")** is a Utah limited liability company headquartered in Salt Lake City, Utah. The FAIR Project is a DEBT Box spin-off scheme created by Defendants Mark Schuler, Benjamin Daniels, and Alton Parker, and for which Defendant Jason Anderson purports to act as a "consultant." Similar to the DEBT Box scheme, the FAIR Project offers investors node software licenses which purportedly "mine" crypto assets. FAIR Project principals claim these crypto assets will increase in value due to profits from its business partners.  (Bold in original)<br><br>Paragraph 58 provides as follows:<br><br>In addition, as of June 2023, Jason and Jake Anderson have purportedly partnered with Schuler, Daniels, and Parker to promote a new node licensing venture similar to DEBT Box called the FAIR Project. The Andersons, Schuler, Daniels, and Parker claim that the FAIR Project is a "synthetic software crypto mining project that is supported by the medical and the pharmaceutical industry by tokenizing new innovative drugs as they are introduced to the market." For example, through the purchase of the FAIR Project's "RX" node software license, investors are entitled to "mine" the FAIR Project's RX crypto asset, the value of which, according to the FAIR Project, is derived from a proportional allocation of the profits FAIR Project obtains from partnerships with pharmaceutical companies. Recently, iX Global announced it would be partnering with the FAIR Project to promote its node software licenses.<br><br>Paragraph 59 provides as follows:<br><br>The Andersons, Schuler, Daniels, and Parker claim they are currently "preselling" node software licenses for a new crypto asset token offered by the FAIR Project and, according to the FA IR Project's website, the FAIR Project intends to offer seven additional varieties of crypto asset securities to the public in the near future. Defendants Jason Anderson, Jake Anderson, Schuler, Daniels, and Parker have, in fact, received investor funds during these so-called |

14

| | | "presales" of the purported node software licenses offered by the FAIR Project. |
| --- | --- | --- |

15

#12593800v1\031376\0001