Romaine C. Marshall (9654)
Jose A. Abarca (12762)
Jonathan E. Schmalfeld (admitted *pro hac vice*)
POLSINELLI PC
2825 E Cottonwood Pkwy, Suite 500
Salt Lake City, UT  84121
Telephone: (801) 999-3504
rmarshall@polsinelli.com
jabarca@polsinelli.com
jschmalfeld@polsinelli.com

*Attorneys for Defendants iX Global, LLC, Joseph A. Martinez, and Travis Flaherty*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah | **DEFENDANTS IX GLOBAL, LLC, JOSEPH A. MARTINEZ, AND TRAVIS FLAHERTY'S REPLY IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS** <br><br> Case No. 2:23-cv-00482-RJS <br> Chief Judge Robert J. Shelby |

| |
|---|
| limited liability company; BRENDAN J. STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual,<br><br>      Defendants,<br><br>ARCHER. DRILLING, LLC, a Wyoming limited liability company; BUSINESS FUNDING SOLUTIONS, LLC, a Utah limited liability company; BLOX LENDING, LLC, a Utah limited liability company; CALMFRITZ HOLDINGS, LLC, a Utah limited liability company; CALMES & CO, INC., a Utah corporation; FLAHERTY ENTERPRISES, LLC, an Arizona limited liability company; IX VENTURES FZCO, a United Arab Emirates company; PURDY OIL, LLC, a Nebraska limited liability company; THE GOLD COLLECTIVE LLC, a Utah limited liability company; and UIU HOLDINGS, LLC, a Delaware limited liability company,<br><br>      Relief Defendants. |

Pursuant to DUCivR 7-1(a)(4)(A), Defendants iX Global, LLC ("iX Global"), Joseph A. Martinez ("Mr. Martinez"), and Travis Flaherty (collectively, "iX Global Defendants"), submit this reply brief in support of their Motion to Dismiss ("iX Global MTD").

**INTRODUCTION**

Four months ago, almost to this day, the Securities and Exchange Commission baldly declared – in a flourish, for as much fanfare as possible – that it had obtained "Emergency Relief to Halt Utah-Based Company's Crypto Asset Fraud Scheme Involving 18 Defendants" which included, from the "Honorable Judge Robert J. Shelby a temporary asset freeze, restraining order, and other emergency relief.[1]"  The only problem: at least as to the emergency relief, the facts alleged in support thereof were not facts at all, as detailed last week.  Dkt. Nos. 214 and 215.

The SEC's misapprehension of the facts and the law has become a thing, at least according to one of the SEC's own Commissioners.  On October 27, 2023, in a statement on the same website the SEC announced emergency relief against the defendants here, in a post titled "Overdue: Statement of Dissent on LBRY," Commissioner Peirce pointedly stated at the outset "The Commission has brought many troubling crypto enforcement actions."[2]  Bemoaning that there, in a separate action, the "company will shut down and its assets will be placed in receivership and used to satisfy its debts," Commissioner Peirce decried "the arbitrariness and real-life consequences of the Commission's misguided enforcement-driven approach to crypto."

We do also, here.  In this Reply to the SEC's Opposition to the iX Motion to Dismiss, which will be joined by many of those 18 defendants, the SEC can do nothing to rehabilitate the Complaint and it must be dismissed.  The SEC commenced this litigation by painting the Court a picture that was unquestionably inaccurate, to obtain emergency relief to which it was not entitled. The SEC has now continued to present an inaccurate picture, this time of the facts *and* the law.

---

[1] https://www.sec.gov/news/press-release/2023-146 (dated August 3, 2023).
[2] https://www.sec.gov/news/statement/peirce-statement-lbry-102723#_ftn3.

## ARGUMENT

I.  **Common Enterprise Requires More Than Simply Expecting Profit**

The SEC's Opposition states in the Preliminary Statement "[a]s alleged, investors who purchased Node Licenses invested money in DEBT Box and reasonably expected to earn profits from Defendants' managerial efforts—which Defendants represented would increase the value of DEBT Box crypto assets." SEC Opp'n at 1 (Dkt. No. 206). While the iX Global Defendants dispute the SEC's claim that it has adequately alleged an (1) investment of money with (2) the expectation of profits based on the efforts of others, what the parties appear to agree on is that there has been no "common enterprise" alleged as required under *Howey* and well settled securities laws. *See Woodward v. Terracor*, 574 F.2d 1023, 1026 (10th Cir. 1978) ("In the absence of a 'common enterprise' between the parties, the expectation of a profit on resale is insufficient"). This is the heart of the primary issue in this case: under the 10th Circuit's analysis of commonality, a transaction that is "purely commercial in nature…does not give rise to a common enterprise or a security." *McGill v. American Land and Exploration Company*, 776 F.2d 923, 925 (10th Cir. 1985) (internal quotation omitted).

The SEC, however, wants the Court to believe that "[t]he determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit." SEC Opp'n at 13 (citing unpublished case). In so doing, the SEC confirms a main argument of the iX Global MTD: the SEC attempts to transform the three-part *Howey* test with a two-part test of (1) and investment of money; (2) with the expectation of profit. *See* iX Global MTD at 14-16 (Dkt No. 182). In the SEC's concocted paradigm, instead of there being a required

showing of a common enterprise, any asset which is bought with some subjective profit motivation is subject to the SEC's arbitrary enforcement whims. But that is simply not the law:

> The mere presence of a speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the securities acts. In a sense, anyone who buys or sells a horse, or an automobile hopes to realize a profitable      'investment.

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359, 367 (S.D. N.Y. 1966).

The "common enterprise" and "expectations of profits" prongs under *Howey* are separate factors under well-settled securities laws, and the SEC's attempt to conflate the two is not supported by law.[3] The SEC has alleged that Node License software purchasers bought Node Licenses (a purely commercial transaction) with some subjective intent to make money. But that, without more, is not sufficient to state a claim upon which relief may be granted.

## II.     The SEC Conflates Arguments to Avoid Its Common Enterprise Pleading Requirements

The iX Global Defendants have never argued that "*Howey* requires a formal contractual undertaking" despite the SEC's attempt to frame the argument as such. SEC Opp'n at 16. In fact, the SEC itself is the one who argued to the Supreme Court that "the very term 'investment *contract*' makes clear that instruments of that name include those in which a return—whether labeled income or profit—is promised in a contract." Br. for the SEC, in *SEC v. Edwards*, Case

---

[3] The SEC continues to also conflate the Node License software with the tokens which are earned through running the Node License software. *See* SEC Opp'n at fn. 3 ("Defendants marketed the **Node Licenses** as an investment, touting the potential returns for investors from the increased ***value of the mined crypto assets***.") (emphasis added). The iX Global Defendants are not accused of illegal sales of crypto asset tokens, so any statements allegedly made about those crypto asset tokens (and not the Node License software at issue in this litigation) are wholly irrelevant.

No. 02-1196, 2003 WL 21498455, at *17 (U.S. June 26, 2003) (emphasis in original). What the iX Global MTD presented is the law: not every "investment" is an "investment contract" under securities laws. iX Global MTD at 12-16. Instead, one thing that separates an investment contract from anything else purchased with some subjective intent to make money is this – an investment contract involves some offer or contractual claim to future income, profits, or assets in a business enterprise.

Tellingly, the SEC does not point to a single case that is binding on this Court which held an investment contract existed without a contractual obligation (or the offer of contractual obligation) for some ongoing efforts. *See* SEC Br. at 16-19 (citing to *Howey*[4] ("[e]ach prospective customer is offered both a land sales contract and a service contract"), *Joiner*[5] ("[h]ad the offer mailed by defendants omitted the economic inducements of the proposed and promised exploration well it would have been a quite different proposition"), *Continental Marketing*[6] ("[o]riginally investors signed a single contract which contained the purchase terms, terms for care and breeding and a guarantee that there would be a 100 percent increase of the beavers during the first year"), and *Scoville*[7] ("[a] single Adpack entitled a member…the opportunity to share in Traffic Monsoon's revenue…"). Each of these cases included a promise or offer of ongoing efforts to increase the value of the asset being sold; an element the SEC is now arguing is not required![8]

---

[4] *SEC v. W.J. Howey Co.*, 328 U.S. 293, 295 (1946).
[5] *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348 (1943).
[6] *Continental Marketing Corp. v. SEC*, 387 F.2d 466, 469 (10th Cir. 1967).
[7] *SEC v. Scoville*, 913 F.3d 1204, 1210 (10th Cir. 2019).
[8] It is worth noting that the SEC's summary of the *Kik* case is misleading. *See* SEC Opp'n at 21 (citing to *SEC v. Kik Interactive Inc.*, 492 F.Supp.3d 169, 179 (S.D. N.Y. 2020)). In *Kik*, the Court held that presales of the tokens at issue where Kik **contractually promised ongoing efforts** were integrated with public sales which disclaimed such ongoing efforts. *Id*. at 179-182. The SEC certainly understands the significance of the holding that the two types of sales were integrated for

The SEC does not, and cannot, point to any such promise or offer here. In this case, the sales documentation expressly disclaims any such ongoing obligations.[9] The SEC argues that this Court completely depart from precedent and radically expand the scope of the SEC's powers to one without any limiting principles. If Congress wanted to give the SEC authority over all investments, it would have used the word "investments" instead of "investment contracts" in drafting the securities laws. Congress did not intend for the only limiting principal over the SEC's power to be the arbitrary judgment of the SEC's Commissioners. Every sale of Pokémon cards, art, cars, or computer software (as is at issue in this case), in which the buyer hopes to make money does not require an SEC disclosure filing. Congress did not give the SEC this unlimited authority, and neither should this Court.

## III. Regulation by Enforcement is Still Regulation Subject to the Major Question Doctrine

It is an unfortunate reality that the current SEC has refused to issue rulemaking on digital assets which would be subject to comment and judicial challenge. Instead, the SEC has pursued its regulatory agenda against digital assets through unofficial guidance and one-off enforcement

---

the purposes of the decision, which makes its misreading of the case especially egregious. This is not an example of a court ruling that contractual ongoing efforts is not required. In *Kik*, the court ruled where there were two types of sales in the same period—some sales with contractual promises and some without—the contractual promise sales were imputed into the non-contractual promise sales.

[9] The SEC claims that the Terms and Conditions for purchase of the Node Licenses are not incorporated by reference into the SEC's Complaint alleging the sale of Node Licenses were investment contract transactions. SEC Opp'n at fn. 4. While it should go without saying, because the SEC appears confused, it is worth clarifying that the Debt Box Terms and Conditions cited in the iX Global Defendants' MTD (Ex. 3-B) is the document which was available on October 5, 2023, and not a document which was updated after the iX Global Defendants' MTD was filed. Regardless, the SEC has not and cannot point to any Node License sale at issue in this litigation where such a disclaimer against ongoing obligations was not present.

actions. iX Global MTD, pg. 16-21.  The *LBRY* case cited by the SEC for support of their positions in this case was recently described by SEC Commissioner Hester Peirce as "illustrat[ing] the arbitrariness and real-life consequences of the Commission's misguided enforcement-driven approach to crypto."[10]  This attempt at rulemaking without rulemaking has not gone unnoticed. Just a month ago, the Government Accountability Office issued a ruling that the SEC's Staff Accounting Bulletin No. 121 regarding the custody of digital assets was an illegal attempt to contravene the Congressional Review Act.[11]  The Third Circuit Court of Appeals has retained jurisdiction over a *mandamus* action over precisely this issue, despite the SEC's protestations and foot dragging. *In re: Coinbase Inc*, Case No. 23-1779, Dkt. No. 32 (June 20, 2023).

Now, the SEC presents to this Court arguments that its actions cannot be subject to judicial review under the major question doctrine so long as its efforts to usurp ungranted power is done in the form of arbitrary enforcement actions instead of formal rulemaking.  SEC Opp'n at 36 (claiming that the major question doctrine should not be "extend[ed]" to "an agency's exercise of statutory enforcement authority").  Under the SEC's logic, had the Food and Drug Administration ("FDA") merely brought enforcement actions against tobacco product manufacturers for failing to receive FDA product labeling approval rather than promulgating regulations specific to those products, the major question doctrine would not apply.  That would be an absurd result, and certainly not what the Court intended when it stated "regardless of how serious the problem an

---

[10] Peirce, Hester, Commissioner, *Overdue: Statement of Dissent on LBRY* (Oct. 27, 2023), *available at* https://www.sec.gov/news/statement/peirce-statement-lbry-102723.

[11] U.S. Government Accountability Office, Securities and Exchange Commission—Applicability of the Congressional Review Act to Staff Accounting Bulletin No. 121, File No. B-334540, Oct. 31, 2023, *available at* https://www.gao.gov/assets/870/862501.pdf.

administrative agency seeks to address, however, it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (internal quotations omitted).

While the iX Global Defendants and the SEC disagree on many aspects of this case, the parties are in agreement that "the SEC's role is not to exercise vast economic power over the securities markets, but simply to assure that they provide adequate disclosures to investors." SEC Opp'n at 36 (quoting *SEC v. Terraform Labs Pte., Ltd.*, Case No. 23-cv-1346 (JSR), 2023 WL 4858299 (S.D. N.Y. July 31, 2023)). In cases such as this one, and the "over **one hundred** enforcement actions applying *Howey* to crypto asset related offerings filed by the SEC," (SEC Opp'n at 2 (emphasis in original)) the SEC has exercised vast economic power over an industry which is equally prevalent in American society today as tobacco was when the FDA's attempted regulation over the tobacco industry was struck down in *Williamson Tobacco* in the early 2000's. *See* iX Global MTD, Ex. 2-F (stating there is a tax gap in the "lightly-regulated $2 trillion cryptocurrency sector.").

This and the other digital asset cases brought by the SEC have all the hallmarks of agency overreach which the major question doctrine was created to address: it is an agency exercising extravagant statutory power over a multi-trillion dollar industry, over issues which just a few years ago the current SEC Chairman said "only Congress" could address, and which Congress has considered giving various agencies authority over, no such proposal giving the SEC the authority it claims in this and other digital asset cases. *See*, *e.g.*, the *Financial Innovation and Technology ("FIT") for the 21st Century Act*, H.R. 4763, 118th Cong. (2023); *Lummis-Gillibrand Responsible Financial Innovation Act*, S. 2281, 118th Cong. (2023). The SEC should not be permitted to end-

around the Constitution's separations of powers through regulation by enforcement when the same regulation would be struck down if done through the formal rulemaking as required.

## IV. Regulation by Enforcement Does Not Provide Fair Notice or Due Process

The SEC has acted arbitrarily and capriciously and without providing due notice to digital asset industry participants. *See Grayscale Investments, LLC v. SEC*, Case No. 22-1142 (D.C. Cir. Aug. 29, 2023) ("The denial of Grayscale's proposal [for a digital asset exchange-traded fund] was arbitrary and capricious because the Commission failed to explain its different treatment of similar products."); *SEC v. Ripple Labs Inc.,* Case 1:20-cv-10832-AT-SN, Dkt. No. 531 at 6 (S.D.N.Y. July 7, 2022) (stating that the SEC demonstrated "hypocrisy" in its cryptocurrency litigation and "the SEC is adopting its litigation positions to further its desired goal, and not out of a faithful allegiance to the law."); Tr. of Proceedings, June 13, 2023, *SEC v. Binance Holdings Ltd*., Case No. 1:23-cv-01599, Dkt. No. 74-2 (D.D.C. June 21, 2023) (when SEC attorney was questioned over what evidence the SEC had to support its TRO contention that assets were being moved overseas, the SEC attorney responded "[s]o currently the assets are not going offshore… [W]e're not seeing any flows of money outside the United States.").

The "over ***one hundred*** enforcement actions applying *Howey* to crypto asset related offerings filed by the SEC"[12] (SEC Opp'n at 2 (emphasis in original)) do not relieve the SEC of

---

[12] The SEC seems to want this Court to both believe "in this enforcement action, the SEC is not exercising authority over the 'entire digital asset industry'" (SEC Opp'n at 37) while also stating the SEC's "dozens of actions alleging violations based on the unregistered offers and sales of [digital assets]" and non-binding unofficial staff statements is sufficient to provide fair notice. SEC Opp'n at 40.

The SEC cannot have it both ways: either this case is a part of a series of cases in which the SEC is seeking to usurp ungranted Congressional power over the digital asset industry through

its Constitutional obligations to provide due process and fair notice as to what conduct the SEC finds unacceptable under the law. The only thing enforcement actions provide notice of, in the absence of formal rulemaking, is that the specific conduct complained of in those actions violates the law without providing guidance on what could have been done differently to comply with the law.[13] As aptly stated by SEC Commissioner Mark Uyeda:

> the Commission and its staff can and should provide clarity to market participants, which can occur in the form of rules, interpretations, guidance, and no-action letters. This clarity should be provided before resorting to enforcement actions. The SEC's enforcement efforts should be limited to enforcing the rules as written, and should not create novel and innovative interpretations that broaden the scope of these rules and the Commission's jurisdiction over markets and their participants… enforcement actions are not subject to notice and comment.
>
> The only individuals involved in the discussions are the enforcement staff, the defendants, and their counsel. The language of enforcement orders is negotiated among them, and the full context of those discussions may not be included. While some may view an order as providing guidance on the SEC's views, it may be difficult to ascertain how the order might apply to other situations as it is limited in scope to the facts and circumstances of the specific case. Thus, using enforcement actions as a method to set regulatory policy means that the public is denied a chance to provide input.

Uyeda, Mark, Commissioner, *Remarks to the 2023 Conference on SEC Regulation Outside the United States: Fifth Annual Scott Friestad Memorial Lecture* (Nov. 6, 2023), *available at*

---

regulation by enforcement; or those previous enforcement actions were also one-off actions which provide no notice as to what digital assets generally must be registered with the SEC.

[13] As an example, in the lawsuit the SEC filed against Coinbase, the SEC accuses Coinbase of operating as an illegal broker/dealer for facilitating the sale of 13 tokens which the SEC labels as crypto-asset securities. *SEC v. Coinbase*, Case No. 1:23-cv-04738, Dkt. No. 1, ¶ 114 (S.D.N.Y. June 6, 2023). But Coinbase supports the exchange of over a hundred digital assets, at least 48 of which were traded on the platform at the time the company's S-1 filing was declared effective. iX Global MTD, Ex. 1-G. Why is SOL a digital asset security but bitcoin is not? Why is MATIC a digital asset security, but the token of the layer-1 blockchain it functions with (ether) is not? These are issues which the public cannot be put on fair notice of through enforcement actions in the absence of rulemaking.

https://www.sec.gov/news/speech/uyeda-remarks-sec-reg-outside-us-5th-annual-scott-friestad-memorial-lecture.

The SEC argues that its enforcement actions, without substantive rule making, across the digital asset industry provides fair notice and Due Process to digital asset industry participants. However, as demonstrated in the iX Global MTD, the SEC's arguments on this issue are inconsistent with the law, the views of SEC's own Commissioners, and statements from members of Congress. *See* iX Global MTD, Ex. 1-B, 1-G, 1-J, 1-K, 1-L, 2-D, and 2-E. As such, in addition to the reasons stated above, this case should be dismissed under the for failing to provide Constitutionally required Due Process and fair notice prior to instituting this action.

## CONCLUSION

For the foregoing reasons, the iX Global Defendants respectfully request this Court dismiss this case against them, and for all further relief which this Court deems is just and proper.

Dated: December 4, 2023

                POLSINELLI PC

                 /s/ *Jose A. Abarca*
                Romaine C. Marshall
                Jose A. Abarca
                Jonathan E. Schmalfeld

                *Attorneys for Defendants iX Global, LLC,*
                *Joseph A. Martinez, Travis Flaherty, and*
                *Flaherty Enterprises, LLC*

13

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of December 2023, the foregoing document was served *via* CM/ECF to all counsel of record.

<em>/s/ Kaitlin Morgan</em>