Elizabeth McFadden (D.C. Bar No. 436076)
mcfaddene@sec.gov
Melinda Hardy (D.C. Bar No. 431906)
hardym@sec.gov
Michael S. Bailey (D.C. Bar No. 983676)
baileym@sec.gov
Office of the General Counsel
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone:  (202) 551-5100

*Attorneys for Plaintiff Securities and
Exchange Commission*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited liability company; BRENDAN J. | **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO THE COURT'S NOVEMBER 30, 2023 ORDER TO SHOW CAUSE**<br><br><br>Case No. 2:23-cv-00482-RJS<br><br><br>Chief Judge Robert J. Shelby |

STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual;

Defendants,

ARCHER DRILLING, LLC, a Wyoming limited liability company; BUSINESS FUNDING SOLUTIONS, LLC, a Utah limited liability company; BLOX LENDING, LLC, a Utah limited liability company; CALMFRITZ HOLDINGS, LLC, a Utah limited liability company; CALMES & CO, INC., a Utah corporation; FLAHERTY ENTERPRISES, LLC, an Arizona limited liability company; IX VENTURES FZCO, a United Arab Emirates company; PURDY OIL, LLC, a Nebraska limited liability company; THE GOLD COLLECTIVE LLC, a Utah limited liability company; and UIU HOLDINGS, LLC, a Delaware limited liability company,

Relief Defendants.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

      A.     The Commission Alleges Widespread and Ongoing Investment Fraud and
             Moves for Emergency Relief ................................................................................. 2

      B.     Defendants Move to Dissolve the TRO ................................................................ 5

      C.     This Court Dissolves the TRO and Issues an Order to Show Cause ..................... 6

LEGAL STANDARDS ......................................................................................................... 7

DISCUSSION ...................................................................................................................... 8

I.        RESPONSE TO THE COURT'S QUESTIONS ............................................................. 9

II.       SANCTIONS ARE NOT WARRANTED ...................................................................... 18

CONCLUSION .................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Agjunction LLC v. Agrian Inc.*,
   No. 14-CV-2069, 2015 WL 416440 (D. Kan. Jan. 30, 2015) ............................................. 7, 18

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991) .......................................................................................................... 8, 19

*Diné Citizens Against Ruining Our Env't v. Jewell*,
   839 F.3d 1276 (10th Cir. 2016) ............................................................................................. 4

*Eisenberg v. Univ. of New Mexico*,
   936 F.2d 1131 (10th Cir. 1991) ............................................................................................. 7

*FDIC v. Maxxam, Inc.*,
   523 F.3d 566 (5th Cir. 2008) ............................................................................................... 20

*ITN Flix, LLC v. Univision Television Grp., Inc.*,
   No. 15-CV-736, 2018 WL 2464502 (D. Utah June 1, 2018) ............................................... 19

*Klick v. Hercules, Inc.*,
   No. 90-C-1067B, 1992 WL 92395 (D. Utah Feb. 10, 1992) .............................................. 7, 18

*Moradian v. Deer Valley Resort Co.*,
   No. 10-cv-615, 2012 WL 3544820 (D. Utah Aug. 16, 2012) ................................................ 7

*Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*,
   793 F.3d 1177 (10th Cir. 2015) ......................................................................................... 7, 18

*SEC v. Traffic Monsoon, LLC*,
   245 F. Supp. 3d 1275 (D. Utah 2017) ................................................................................... 4

*Sun River Energy, Inc. v. Nelson*,
   800 F.3d 1219 (10th Cir. 2015) ............................................................................................. 8

*Towerridge, Inc. v. T.A.O., Inc.*,
   111 F.3d 758 (10th Cir. 1997) ............................................................................................... 8

*United States v. Carter*,
   No. 16-20032-02, 2020 WL 430739 (D. Kan. Jan. 28, 2020) ............................................. 19

*United States v. Droganes*,
   728 F.3d 580 (6th Cir. 2013) ............................................................................................. 8, 19

*United States v. Horn*,
   29 F.3d 754 (1st Cir. 1994) ................................................................................................. 19

*White v. Dep't of Just.*,
    No. 16-cv-948, 2018 WL 488719 (S.D. Ill. Jan. 19, 2018)....................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................................................... 4

*Xyngular Corp. v. Schenkel*,
    200 F. Supp. 3d 1273 (D. Utah 2016) ...................................................................................... 19

**Rules**

Fed. R. Civ. P. 11(b)(3)................................................................................................................... 7

## INTRODUCTION

The Securities and Exchange Commission ("Commission") recognizes that Congress has vested it with significant responsibility in enforcing the federal securities laws. That responsibility is heightened when the Commission seeks emergency relief on an *ex parte* basis. The Commission must exercise its enforcement authority carefully and be vigilant in fulfilling its duty to be accurate and candid in its representations to the Court. The Commission cannot let its zeal to stop ongoing fraud interfere with its duty to be accurate and candid.

The Commission and its attorneys fell short of that expectation here. Commission counsel made a representation during the July 28, 2023 hearing that, unbeknownst to him at the time, was inaccurate. Commission attorneys failed to correct that statement when they learned of the inaccuracy. Commission counsel also failed to make clear that certain representations were inferences from the facts known to them rather than directly supported factual assertions.

The Commission takes this Court's concerns seriously and deeply regrets these errors. Agency officials are taking steps to ensure those errors are not repeated in this action or other proceedings. Among other measures, the Enforcement Director has assigned senior attorneys from the Commission's Denver Regional Office to supervise this matter going forward and has assigned an experienced trial attorney from the Denver Regional Office to lead the litigation team. The Division of Enforcement will also conduct mandatory training for all Division staff involved in investigations and litigation about the duty of accuracy and candor and the duty to correct any inaccuracies as soon as they come to light. But the Commission respectfully submits that sanctions are not warranted. The circumstances here fall short of the misconduct Rule 11 was intended to address, and Commission staff have not engaged in any bad faith conduct that could support sanctions under the Court's inherent authority.

## BACKGROUND

### A.   The Commission Alleges Widespread and Ongoing Investment Fraud and Moves for Emergency Relief

The Commission's investigation in this matter began in March 2023.  (Watkins Decl. ¶ 5.)[1]  The lead investigative staff attorney on the matter was Joseph Watkins, who began working for the Commission in January 2023.  (*Id.* ¶ 1.)  Another investigative staff attorney, Laurie Abbott—who joined the Commission in February 2016 and transferred to the Salt Lake Regional Office ("SLRO") in June 2017—supported Watkins.  (Abbott Decl. ¶ 1.)  Karaz Zaki, a Certified Public Accountant with over twenty years of experience in the Commission's Division of Enforcement, and Mitchell Davidson, a Certified Public Accountant who joined the Commission in April 2023, also supported the investigation.  (*See* Dkt. 3-10 ¶¶ 4, 6.)  Michael Welsh, who was the lead trial counsel in this matter, began working for the Commission in December 2022 after spending more than six years working at large law firms representing cryptocurrency exchanges and blockchain developers under investigation by the Commission.  (Welsh Decl. ¶ 1.)  The other trial counsel on the matter, Casey Fronk, joined the Commission in September 2020.  (Fronk Decl. ¶ 1.)  Tracy Combs, the SLRO's Regional Director since June 2022, supervised the investigative staff attorneys and trial counsel.  (Combs Decl. ¶ 1.)

On July 26, 2023, the Commission filed its complaint in this matter, naming as Defendants Digital Licensing Inc. ("DEBT BOX"), several individuals who allegedly control DEBT Box ("DEBT Council Defendants"), and several other individuals and entities allegedly involved in DEBT Box's fraudulent offering.  (Dkt. 1 ¶¶ 13-30.)  The complaint alleged that Defendants were misrepresenting multiple aspects of DEBT Box investments and had defrauded

---

[1] Declarations from Joseph Watkins, Laurie Abbott, Michael Welsh, Tracy Combs, Casey Fronk, and Gurbir Grewal are attached as Exhibits 1-6.

thousands of investors of at least $49 million.  (*Id.* ¶¶ 1-4.)  According to the complaint,

Defendants sold "node software licenses" and represented that these licenses would allow

investors to "mine" various types of crypto asset tokens.  (*Id.* ¶ 2.)  The Commission alleged that

Defendants misrepresented how these crypto asset tokens were created.  (*Id.* ¶¶ 65-67.)  Further,

the Commission alleged, Defendants falsely represented that DEBT Box crypto assets were

backed by real-world businesses.  (*Id.* ¶¶ 46-53.)  In reality, the Commission alleged, those

businesses either did not exist or did not have the capabilities Defendants claimed.  (*Id.* ¶ 4.)  For

instance, the Commission alleged that Defendant Jason Anderson, one of the persons who

controlled DEBT Box (*id.* ¶ 14), had falsely represented to investors that DEBT Box had

proprietary satellite technology that could locate gold, oil, natural gas, and "any mineral on the

periodic table" within a few feet of its actual location.  (*Id.* ¶¶ 73-79.)[2]

Contemporaneously with its complaint, the Commission filed a motion for a temporary

restraining order ("TRO"), an asset freeze, and appointment of a receiver, among other relief.

(Dkt. 3.)  It argued that emergency relief was needed "to stop this ongoing offering fraud and to

protect investors' assets and funds."  (*Id.* at 2.)  The Commission supported its motion with

declarations from Commission accountant Zaki, an investor, two purported DEBT Box business

partners, and a Bureau of Land Management special agent, as well as Defendants' marketing

materials and social media posts, among other materials.  (Dkt. 3-7, 3-8, 3-10.)

The Commission argued that its TRO request required it to show "a likelihood of

---

[2] Defendants' alleged fraudulent scheme closely resembles one implemented by certain of
Defendants' former business partners that is the subject of a Commission action, *SEC v. Green
United, LLC*, No. 23-cv-159 (D. Utah filed Mar. 3, 2023).  Entities associated with the *Green
United* defendants have sued some of the DEBT Council Defendants for allegedly breaching a
joint-venture agreement in connection with the same "node software licenses" at issue here.  *See
Codex United, LLC v. Profit Vault VC1*, No. 210903079 (Utah Dist. Ct. filed June 10, 2021).

prevailing on the merits and a reasonable likelihood that the wrong will be repeated," citing *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1296 (D. Utah 2017).  (Dkt. 3 at 12.)  To show the likelihood of recurrence, the Commission asserted that "Defendants continue to offer unregistered DEBT Box . . . securities" and "continue to make false statements to prospective investors about the securities on their website."  (*Id.* at 21; *see also id.* at 11 (asserting that "Defendants' fraudulent scheme continues to expand" and noting that "[a]s of the filing of this action, both the primary DEBT Box website and the related iX Global and FAIR Project promotional sites remain active and continue to solicit investors"); Dkt. 3-4 ¶¶ 36-39 (similar).)  The Commission emphasized that a "temporary restraining order is necessary to protect investors from Defendants['] continued, unrepentant conduct."  (Dkt. 3 at 22.)

The Commission also argued that an asset freeze and ancillary relief were warranted "to preserve the *status quo* and to ensure to the extent possible that sufficient funds are available to satisfy any final judgment the Court might enter."  (*Id.*)  In support of that request, the Commission represented that "the bank records obtained by the SEC show Defendants are rapidly dissipating investor funds, both through luxury purchases and by recently draining accounts of those funds."  (*Id.* at 23 (citing Dkt. 3-10 ¶¶ 18-20).)

At the TRO hearing two days later, this Court explained that, in the Court's view, the Commission's TRO request relied on an incorrect legal standard.  The Court noted that the line of authorities the Commission invoked was inconsistent with the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and the Tenth Circuit's decision in *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).  (July 28, 2023 Hr'g Tr. at 4:23-7:4.)  The Court concluded that the Commission needed to demonstrate irreparable harm absent injunctive relief, among other additional requirements, to

obtain a TRO.  (*Id.* at 8:14-9:2.)  The Court took a brief recess to consider whether to permit Commission counsel to argue that "the information that's already in [its] papers" could support a TRO under this legal standard.  (*See id.* at 15:15-17:2.)

After the recess, the Court announced that it would allow Commission counsel to present such an argument orally.  (*Id.* at 16:7-19.)  Shortly after beginning to speak, Commission counsel stated that "as we were on break I was reminded by investigative staff with respect to the investigation which remains ongoing that even in the last 48 hours defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed." (*Id.* at 20:13-18.)  The remainder of counsel's presentation detailed how Defendants' ongoing misconduct was harming investors.  For instance, counsel explained that "allowing [Defendants' scheme] to operate and expand since it is continuing to grow for an additional week or two would greatly harm individuals." (*Id.* at 23:3-8.)

At the conclusion of the hearing, the Court granted the Commission's request for a TRO, asset freeze, and receivership, determining that the Commission had met the requirements for each of those types of relief.  (*Id.* at 24:9-26:25.)

### B. Defendants Move to Dissolve the TRO

On September 12, 2023, the DEBT Council Defendants moved to dissolve the temporary restraining order, contending that the Commission had "improperly obtained the *ex parte* TRO by providing false and misleading information to the Court." (Dkt. 132 at 10.)  Defendants asserted, for example, that "[t]here were no bank account closures involving DLI [*i.e.*, DEBT Box], Defendants or Relief Defendants in July 2023." (*Id.*)  Three days later, this Court ordered the parties to begin expedited discovery the following week and set a preliminary injunction hearing for October 30, 2023.  (Dkt. 147.)

The Commission filed its opposition to the DEBT Council Defendants' motion to dissolve on September 27, 2023. (Dkt. 168.) It maintained that the *ex parte* application had not "misrepresent[ed] the exigency of its requested expedited relief," reiterating that "injunctive relief, an asset freeze, and receivership are necessary to prevent ongoing harm to investors." (*Id.* at 2.) The Commission explained that the TRO was needed to "prevent[] any ongoing violations of the securities laws through the continued solicitation of additional investors into the DLI Defendants' fraudulent securities offering"—including their planned "expan[sion] through the offer of two new node licenses." (*Id.* at 12, 14.) The Commission did not acknowledge that Defendants were correct that no bank accounts closed in July 2023—nor that the Commission's contrary representation at the TRO hearing was inaccurate. Instead, the opposition noted Defendants' "conten[tion]" that "the DLI Defendants did not close any bank accounts in July 2023" (*id.* at 10), and said that "the DLI Defendants made significant efforts to move investor funds outside of the Court's jurisdiction in the months leading up to the SEC's filing" (*id.* at 2).

### C. This Court Dissolves the TRO and Issues an Order to Show Cause

This Court held a hearing on Defendants' motion to dissolve the TRO on October 6, 2023. At that hearing, the Court concluded that "the TRO was improvidently granted in the first instance" based on the Commission's failure to establish irreparable harm. (Oct. 6, 2023 Hr'g Tr. at 47:10-19.) It thus dissolved the TRO and the receivership. (*Id.* at 47:20-48:1.) The Court also identified several "false" or "misleading" statements in the Commission's TRO application and later filings and stated that it would likely issue an order to show cause why the Commission should not be held in contempt. (*See, e.g.*, *id.* at 12:12-18, 14:21-16:4, 23:16-24:1.)

On November 30, 2023, this Court issued an order that "more fully explain[ed] its reasons for dissolving the TRO." (Dkt. 214 at 2.) It also issued an order requiring the

Commission to "show cause why the court should not impose sanctions." (Dkt. 215 at 18.) The Court noted that it was "concerned the Commission made materially false and misleading representations" in its filings and statements in connection with the TRO. (*Id.* at 17.) The Court directed the Commission to address five matters, which are discussed below. (*Id.* at 18.)

## LEGAL STANDARDS

Under Rule 11, an attorney who presents a "pleading, written motion, or other paper to the court" certifies that "to the best of their knowledge, information, and belief, based on reasonable inquiry," the paper's "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3). Rule 11 thus requires attorneys to "conduct a reasonable inquiry into the validity and accuracy of a document before it is signed." *Eisenberg v. Univ. of New Mexico*, 936 F.2d 1131, 1134 (10th Cir. 1991).

In determining whether an attorney's conduct violated Rule 11, courts apply a "standard of 'objective reasonableness—whether a reasonable attorney admitted to practice before the district court would file such a document.'" *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1182 (10th Cir. 2015) (citation omitted). The bar for objective unreasonableness "is a tough one to satisfy." *Id.* In assessing the reasonableness of a factual assertion, "[i]nferences . . . are as capable of providing evidentiary support as . . . 'direct evidence.'" *Agjunction LLC v. Agrian Inc.*, No. 14-cv-2069, 2015 WL 416440, at *8 (D. Kan. Jan. 30, 2015) (unpublished) (citation omitted). And "in determining if sanctions are appropriate, any doubts must be resolved in favor of the party signing the pleading." *Moradian v. Deer Valley Resort Co.*, No. 10-cv-615, 2012 WL 3544820, at *8 (D. Utah Aug. 16, 2012) (unpublished). Thus, "Rule 11 sanctions are appropriate only in rare cases." *Klick v. Hercules, Inc.*, No. 90-C-1067B, 1992 WL 92395, at *3 (D. Utah Feb. 10, 1992) (unpublished).

Courts also have "inherent power" to "sanction conduct that abuses the judicial process." *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 765 (10th Cir. 1997). "Because of their very potency," these "inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). Imposition of sanctions under a court's inherent authority "require[s] a finding of bad faith." *Id.* at 49; *see also Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1228 (10th Cir. 2015) (inherent power sanctions may be warranted where "counsel acted in bad faith, vexatiously, wantonly, or for oppressive reasons"). Moreover, sovereign immunity should preclude monetary sanctions against the government pursuant to the Court's inherent authority. *See United States v. Droganes*, 728 F.3d 580, 590 (6th Cir. 2013); *infra* pp. 19-20.

## DISCUSSION

The Commission takes seriously both its duty of candor to the Court and the specific concerns this Court has raised. After this Court issued its Order to Show Cause, a new team of attorneys, primarily from the Commission's Office of the General Counsel, was assigned to undertake a thorough inquiry into the Court's questions, review the events that gave rise to the Court's concerns, and prepare the response to the Order to Show Cause.

Below, the Commission addresses each of the matters identified in the Court's order. The Commission respectfully submits that, in each instance, the Commission and its staff did not intend to mislead the Court. Rather, in their haste to prepare applications for emergency relief and to argue irreparable harm, staff made errors in accurately presenting and contextualizing the evidence they had gathered. Agency officials are taking steps to ensure that such errors do not recur in this action or other matters. But the Commission respectfully submits that sanctions are not warranted under Rule 11 or the Court's inherent authority.

## I.     RESPONSE TO THE COURT'S QUESTIONS

1.    **Paragraph 4 of the Rule 65(b)(1)(B) Attorney Certification, which states, "Evidence obtained by the Commission . . . indicates that Defendants are currently in the process of attempting to relocate assets and investor funds overseas, where at least Defendant Jacob Anderson has contended that those assets will be outside the reach of U.S. regulators."**

a.    **When making this statement, what factual support did counsel possess and rely on?**

In stating that "Defendants are currently in the process of attempting to relocate assets and investor funds overseas," counsel relied on information from Zaki, an experienced Commission accountant.  (Welsh Decl. ¶¶ 3-5.)  According to Zaki's analysis of bank records:

- By December 2022, approximately $1.35 million of investor funds from the United States had been transferred into the foreign bank account of IX Ventures FZCO, an entity headquartered in the United Arab Emirates and allegedly controlled by Defendants Jason and Jacob Anderson.  (*Id.* ¶ 4; Dkt. 3-10 ¶ 18; *see* Compl. ¶ 37.)

- Certain Defendants were depleting assets in their U.S. bank accounts beginning as early as spring of 2021.  For instance, as of May 30, 2023, the balance of accounts associated with DEBT Box had decreased by over $33 million, leaving an ending balance of approximately $367,000.  (Welsh Decl. ¶ 5.)  And as of May 30, 2023, the balance of accounts associated with iX Global, a multi-level marketing company allegedly controlled by Defendant Martinez that partnered with DEBT Box to market DEBT Box's crypto asset securities, decreased by over $49 million, leaving an ending balance of approximately $763,000.  (*Id.*; *see* Compl. ¶ 21.)

- On June 30, 2023, three of iX Global's Bank of America accounts were closed.  (Welsh Decl. ¶ 5.)

Counsel also relied on the June 14, 2023 YouTube video discussed in Watkins' declaration filed with the Commission's TRO application.  (*Id.* ¶ 6.)  In that video, Defendant Jacob Anderson indicated that DEBT Box had "moved all of the operations currently to Abu Dhabi," "we're going to be moving everything over there," and "we're going to be under the jurisdictional control of Abu Dhabi, not the SEC."  (*Id.*; Dkt. 3-4 ¶ 27a.)  Based on Welsh's prior experience representing crypto companies while in private practice, Welsh believed that the video's reference to "operations" meant assets and investor funds: in his understanding, crypto

companies' activities primarily consist of issuing and purchasing crypto assets and collecting

investor funds, none of which requires physical facilities.  (Welsh Decl. ¶ 7.)  Although this

Court has suggested that Defendant Anderson's remarks can be interpreted differently (Dkt. 215

at 8), counsel's interpretation of the video at the time informed his view that Defendants were in

the process of moving assets and investor funds overseas (Welsh Decl. ¶ 7).

Counsel's statement that Defendants were "currently in the process of attempting to

relocate assets and investor funds overseas" reflects an inference drawn from his understanding

that assets were being depleted, $1.35 million of investor funds had been transferred overseas,

Defendants were engaged in an ongoing fraudulent scheme, and Defendant Anderson referred to

moving operations overseas in the June 14, 2023 YouTube video.  (Welsh Decl. ¶ 7.)  In

counsel's view, these circumstances collectively supported an inference that Defendants were

engaged in an ongoing effort to relocate assets abroad.  But staff did not have direct evidence of

recent depletion of funds or recent overseas transfers, and counsel should have identified his

statement as an inference rather than a factual representation with direct support.

Further, the Commission's statement that "Defendant Jacob Anderson has contended that

those assets will be outside the reach of U.S. regulators" was based on the June 14, 2023

YouTube video discussed above.  (*Id.* ¶ 6.)  The Commission should have identified its statement

about Defendant Anderson's remarks as the Commission's interpretation of those remarks.  And

it should have provided additional context to better enable the Court to evaluate the

Commission's interpretation, such as the fact that Defendant Anderson's comments in the video

were in response to a question about the "SEC's squeeze on crypto and how this affects DEBT

Box."  (*See* Dkt. 215 at 8.)  The Commission sincerely regrets these errors.

    **2.**    **The following statement in the TRO Application: "Defendants have also taken action to block SEC investigative staff from viewing their social media**

sites, and appear to have recently deleted a website containing training materials for the scheme's promotors [sic]."

     a.    **When the Commission filed its TRO Application, had its investigation been covert, as Welsh represented at the TRO hearing?**

When the Commission filed its TRO application, its investigation was covert in that the Commission had not communicated directly with Defendants about the investigation. (Welsh Decl. ¶ 11; Watkins Decl. ¶ 2.) For instance, the Commission had not requested or subpoenaed documents or testimony from Defendants, and it had obtained only those bank records that it could secure without notification to Defendants. (Watkins Decl. ¶ 2; Abbott Decl. ¶ 3.) As explained below, however, Commission investigative staff interacted with certain Defendants' social media pages in a way that staff believed could have alerted Defendants to the Commission's investigation. Other circumstances also supported an inference that Defendants had come to learn that the Commission was investigating them.

     b.    **If the investigation had been covert, what factual support did counsel possess and rely on when representing Defendants had "taken action to block SEC investigative staff from viewing their social media sites"?**

In making this statement, the Commission did not have direct evidence that Defendants had taken action to block Commission investigative staff from viewing Defendants' social media sites. Rather, Commission staff drew that inference based on certain events and circumstances. Commission staff inferred that Defendants were aware of the Commission's investigation—even though staff had not directly contacted Defendants—based on the following:

- During the investigation of this matter, Commission staff viewed Defendants' Instagram "Stories" while logged into an account with a name indicating it was associated with the Commission's Division of Enforcement. (Watkins Decl. ¶ 4.) Watkins understood that an Instagram user can determine which accounts have viewed their "Stories." (*Id.*)

- As the Commission neared filing the complaint and TRO application in this matter in late July 2023, Watkins could no longer view Defendants' websites that he had previously been able to view at the start of the investigation. (*Id.* ¶ 6; *see also, e.g.*, Dkt. 3-4 ¶ 12

11

(describing Watkins' inability to access iX Global's website on July 24, 2023, which he had previously visited in March 2023).)  He also noticed that some videos Defendants posted on YouTube had been taken down.  (Watkins Decl. ¶ 6.)  Watkins inferred that Defendants had taken these websites and videos down.  A possible basis for taking these websites and videos down was that Defendants were aware of the Commission's investigation.  (*Id.* ¶ 5.)

- In March 2023, the Commission had filed a lawsuit alleging a token-mining license scheme substantially similar to the one alleged in this matter.  *See SEC v. Green United, LLC*, No. 23-cv-159 (D. Utah).  (Welsh Decl. ¶ 12.)  Welsh was aware that Defendants Jason and Jacob Anderson are currently in litigation in Utah state court with a *Green United* defendant concerning the parties' prior business relationship, and that the state action involves the same "node software licenses" at issue in *Green United*.  (*Id.*)  Given the similarities in the alleged schemes and the litigation between the *Green United* and DEBT Box parties, Welsh inferred that Defendants in this case were likely aware of the possibility that the Commission was also investigating their activities.  (*Id.*)

Commission staff also inferred that Defendants had blocked staff from viewing their social media accounts because, on several occasions during the Commission's investigation, investigative staff could no longer view certain of Defendants' Instagram accounts that staff previously had been able to view.  In June and July 2023, Watkins attempted to access the Stories associated with the Instagram profiles of Defendants Jason Anderson, Martinez, and Flaherty while logged into the Enforcement Division's account.  (Watkins Decl. ¶¶ 4-5.)  Although Watkins previously had been able to view these Instagram pages, by June and July 2023, Watkins received messages that indicated the pages were not available.  (*Id.* ¶ 5.)  Watkins also was able to view these Instagram pages while logged into an account not associated with the Commission.  (*Id.*)  Watkins discussed with Welsh the unavailability of these pages and the fact that Watkins could view the pages using a non-Commission account.  (Welsh Decl. ¶ 11.)

Because Defendants had good reason to believe that the Commission would investigate them, and because Commission staff could no longer view several Defendants' Instagram pages while logged into the Enforcement Division's account, Welsh and Watkins inferred that Defendants were blocking the Commission's Enforcement account from viewing their social

media sites.  (Watkins Decl. ¶ 5.)

The Commission recognizes that staff did not have direct evidence that Defendants had taken action to block Commission staff from viewing their social media pages.  The Commission regrets not identifying that statement as an inference rather than a factual representation, and not making the bases for that inference clear to the Court.  (Welsh Decl. ¶ 13.)

**3.     Welsh's statement at the TRO hearing that "even in the last 48 hours Defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed."**

**a.     When making this statement, what factual support did counsel possess and rely on?**

This representation occurred due to a misunderstanding between Welsh and Abbott. Approximately two days before the TRO hearing, Combs asked investigative staff to contact banks to obtain current account balances for Defendants' accounts under subpoena.  (Abbott Decl. ¶ 5; Combs Decl. ¶ 4.)  Abbott, Watkins, and Davidson made those calls.  (Abbott Decl. ¶ 5.)  During those calls, the banks indicated that certain of Defendants' accounts had closed. (*Id.*)  Abbott did not realize at the time that the closed accounts identified by the banks were among the accounts that the Commission had previously known were closed.  (*Id.*)

According to Abbott, during the short recess at the TRO hearing, Abbott told Welsh that over the past two days, the Commission's investigative staff had made calls to banks and had learned of closures of Defendants' accounts.  (*Id.* ¶ 6.)  Welsh recalls Abbott's statement differently, to the effect that there was evidence of account closures in the past 48 hours, though Welsh does not recall and has no record of exactly what Abbott said.  (Welsh Decl. ¶¶ 14-15.)

The Commission recognizes that this statement was inaccurate, and the Commission regrets not notifying the Court about the error when its counsel and staff became aware of the inaccuracy.  Based on the information presented in Zaki's supplemental declaration, it appeared

that a total of 24—not 33—of Defendants' U.S. bank accounts were closed, including the three

Bank of America accounts that had been identified as closed in Zaki's initial declaration, and that

none were closed in July 2023.  (*Id.* ¶ 5; Dkt. 168-1 Ex. A.)  The Commission also understands

that investigative staff were aware that the dissipation of assets in certain Defendants' accounts

had occurred over several years as of May 30, 2023, but that investigative staff learned in the 48

hours before the TRO hearing that the balances of several bank accounts owned by certain

Defendants had substantially decreased—but not closed—more recently, in July 2023.  (*See*

Welsh Decl. ¶¶ 5, 18; Abbott Decl. ¶ 7.)

### b.      When did counsel become aware this statement was incorrect?

Abbott recognized that the statement that "in the last 48 hours Defendants have closed

additional bank accounts" did not accurately reflect what she had said or intended to convey to

Welsh (*i.e.*, that staff had *learned* in the last two days that accounts were closed) as soon as

Welsh made the statement about accounts *being closed* in the last two days.  (Abbott Decl. ¶ 7.)

But Abbott did not correct Welsh at the hearing because, as an investigative attorney, she had

little experience attending court proceedings and was concerned about interrupting the hearing.

(*Id.*)  Nor did she inform Welsh about the error after the hearing, as she did not believe the

statement was material to the Commission's showing of irreparable harm, given the other

evidence the Commission had presented of an ongoing fraudulent offering.  (*Id.*)  Abbott regrets

not recognizing that this statement should have been clarified as soon as possible.  (*Id.* ¶ 8.)

Welsh became aware that this statement may have been inaccurate when he reviewed the

DEBT Council Defendants' motion to dissolve the TRO filed on September 12, 2023.  (Welsh

Decl. ¶ 18.)  In that motion, Defendants identified Welsh's statement at the TRO hearing as

"false and misleading" because "[t]here were no bank account closures involving DLI,

Defendants, or Relief Defendants in July 2023."  (Dkt. 132 at 10.)  After reviewing the motion,

Welsh asked the investigative staff attorneys for more information about Defendants' closed accounts.  (Welsh Decl. ¶ 18; Fronk Decl. ¶ 4.)

After speaking with investigative staff, Welsh understood that (1) no accounts had closed in the 48 hours before the TRO hearing, (2) during the TRO hearing recess, Abbott had been referring to account closings she believed she had learned of in the days before the TRO hearing, not account closings that had occurred during that time, and (3) in fact, the closed accounts Abbott was referring to were accounts that staff already knew were closed.  (Welsh Decl. ¶ 18.) In discussions with investigative staff at this time, Welsh also learned that during July 2023, substantial funds had been withdrawn from certain of Defendants' bank accounts.  (*Id.*)

Welsh recognized there was a distinction between accounts closing and accounts being drained of assets and that Abbott had not discussed the accounts being drained of assets during the TRO hearing recess.  (*Id.*)  But Welsh believed that the information about the accounts being drained of assets supported a finding of irreparable harm in the same way that information about account closures supported a finding of irreparable harm.  (*Id.*; Fronk Decl. ¶ 5.)

Further, Welsh did not focus on the total number of accounts that had been closed because the DEBT Council Defendants' motion to dissolve did not specifically address that number.  But Welsh should have made clear to the Court that the "33" number represented his understanding of the total number of Defendants' bank accounts that had closed rather than the number that he believed had closed within the past 48 hours.  (Welsh Decl. ¶ 16.)  Moreover, as to the total number of closed accounts, the "33" number was inaccurate.  Zaki's supplemental declaration indicated that 24 of the 29 accounts that the Commission had subpoenaed had closed. (Dkt. 168-1 Ex. A; *see* Oct. 6, 2023 Hr'g Tr. at 31:19-24.)  Welsh stated at the TRO hearing that he did not have the number of closed accounts "in front of [him]," thus conveying his uncertainty

about the number he gave.  (July 28, 2023 Hr'g Tr. at 20:16-18.)  But Welsh should have

provided the correct number after the hearing.

In sum, the Commission should have notified the Court when staff learned that Welsh's

statement at the TRO hearing was inaccurate in multiple respects.  (Welsh Decl. ¶ 19.)  The

Commission sincerely regrets the error.

4.    **The following statement from the Commission's Opposition to the DEBT Council Defendants' Motion to Dissolve: "And while the DLI Defendants now lean on the technicality that certain corporate documents show attempts to move DLI's business interests overseas in 2022, those documents don't match the facts on the ground, which reveal that the DLI Defendants made significant efforts to move investor funds outside of the Court's jurisdiction in the months leading up to the SEC's filing."**

a.    **When making this statement, what factual support did counsel possess and rely on?**

When preparing the opposition, Commission staff believed that the evidence discussed in

response to Question 1 supported this representation.  (Welsh Decl. ¶ 20; *supra* pp. 9-10.)  The

staff also relied on additional information they had learned since the TRO hearing, including:

- According to Zaki, on June 16, 2023, DEBT Box wired $35,000 to Defendant Brannon with the memo line "Set up office in UAE."  (Welsh Decl. ¶ 20; Dkt. 168-1 Ex. B.)

- According to Zaki, beyond the $1.35 million of investor funds that the Commission identified as having been transferred to IX Ventures FZCO's foreign bank account as of December 2022, there were additional investor funds, beginning in 2021, in two foreign bank accounts of entities affiliated with certain Defendants.  (Welsh Decl. ¶ 21; Dkt. 168-1 Ex. B.)  There was approximately $650,000 of investor funds in Digital Commodity House, FZCO's foreign bank account and $3.7 million in Vertex Global FZCO LLC's foreign bank account.  (Welsh Decl. ¶ 21.)  Staff understood Defendants had used at least one of those entities to facilitate DEBT Box's operations.  (*Id.*)

- In or before early August 2023, and before the filing of the Commission's opposition to Defendants' motion to dissolve, Commission staff learned that Defendants had changed the terms and conditions of the customer agreement on DEBT Box's website.  (*Id.* ¶ 22.)  Previously the agreement was between the customer and Debt Licensing Inc., a U.S. entity; after the change, the agreement was between the customer and Digital Commodities Home, a United Arab Emirates entity.  (*Id.*)

Commission staff believed that this information—in addition to previously known

information, such as staff's understanding that Defendants were depleting assets in their accounts and staff's interpretation of the June 14, 2023 YouTube video—supported the inference that Defendants were moving investor funds overseas, even though staff still lacked direct evidence of Defendants moving investor funds overseas in the months before the TRO hearing.

As with the Commission's previous representation about Defendants moving investor funds overseas, *see supra* Question 1, this statement should have been identified as an inference rather than a representation with direct factual support.  And the Commission regrets that the statement inaccurately characterized the record, including the timeframe of Defendants' actions.

5.    **The following statement from the Commission's Opposition to the DEBT Council Defendants' Motion to Dissolve: "Further, mere days before the TRO Hearing—consistent with counsel's representation to the Court—the SEC learned that a substantial portion of the funds held in two bank accounts controlled by Defendants, including one controlled by DLI, had been substantially drained of assets."**

a.    **What statement was the Commission referencing when it stated "consistent with counsel's representation to the Court"?**

This statement was referencing Welsh's assertion at the TRO hearing that Defendants had closed additional bank accounts in the last 48 hours.  (Welsh Decl. ¶ 19.)  In particular, at the TRO hearing, Welsh said, "even in the last 48 hours Defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed."  (July 28, 2023 Hr'g Tr. at 20:13-18.)  When preparing the opposition, Welsh believed there was no meaningful distinction between accounts being closed (as he had stated at the TRO hearing) and accounts being substantially drained of assets (as stated in the opposition to the motion to dissolve).  (Welsh Decl. ¶ 18.)  In his view, both would support the inference that Defendants were moving investor funds overseas.  (*Id.*)  Thus, in asserting that the statement in the opposition was "consistent" with his statement at the TRO hearing, Welsh intended to convey that both would support a finding of irreparable harm to investors absent emergency

relief.  (*Id.* ¶ 19.)  Welsh did not intend to mislead the court.  (*Id.* ¶¶ 16, 19.)

While the opposition's assertion that staff learned in the days before the hearing that certain of Defendants' accounts had been substantially drained of assets is accurate, the Commission acknowledges that the opposition is inaccurate in suggesting that counsel had previously made such a representation to the Court.  (*See id.*)  As the Court observed, this statement from the opposition "mischaracterizes Welsh's statement at the *ex parte* hearing." (Dkt. 215 at 15.)  The opposition should have expressly acknowledged the error in Welsh's statement at the *ex parte* hearing, clarified the record, and explained why the corrected facts nonetheless supported a finding of irreparable harm.  (Welsh Decl. ¶ 19.)  The Commission apologizes for not doing so.

## II.        SANCTIONS ARE NOT WARRANTED

As explained, the Commission takes very seriously the concerns identified by the Court. In response to the Court's order to show cause, the Commission has identified errors and lapses in judgment that it will take steps to remedy.  But sanctions are not warranted under the circumstances here.

The Commission respectfully submits that this is not among the "rare cases" in which "Rule 11 sanctions are appropriate."  *Klick*, 1992 WL 92395, at *3; *see Predator*, 793 F.3d at 1182 (standard of objective unreasonableness is "a tough one to satisfy").  As discussed above, many of the statements the Court identified were inferences and lacked direct factual support. But the factual bases for these inferences—and counsel's efforts to investigate those factual bases—were not so unreasonable as to violate Rule 11.  *See supra* pp. 9-18.  Courts have held sanctions unwarranted in similar circumstances.  *See, e.g.*, *Agjunction*, 2015 WL 416440, at *8 (denying Rule 11 sanctions where litigant's "inference . . . was a reasonable one based on the

facts available to him and his extensive knowledge of the [relevant] business"); *White v. Dep't of Just.*, No. 16-cv-948, 2018 WL 488719, at *7 (S.D. Ill. Jan. 19, 2018) (unpublished) (denying Rule 11 sanctions where allegedly incorrect statements were "subject to interpretation that could render them accurate or presenting a genuine issue of fact"); *ITN Flix, LLC v. Univision Television Grp., Inc.*, No. 15-cv-736, 2018 WL 2464502, at *3 (D. Utah June 1, 2018) (unpublished) (denying Rule 11 sanctions based on circumstantial evidence from which "an outsider could reasonably conclude that" statement was true).[3]

Sanctions under the Court's inherent authority are also unwarranted, as the record would not support the "requisite" finding of "bad faith." *Chambers*, 501 U.S. at 50. The Commission respectfully submits that its counsel and staff did not intend to mislead the Court. Nor did the Commission make the statements and filings at issue for an improper purpose, such as harassing Defendants. Rather, the Commission's representatives failed to accurately characterize the bases for their factual assertions, failed to identify inferences as such and to explain the bases for those inferences, and failed to identify inaccuracies in those assertions once discovered. Sanctions are unwarranted in these circumstances. *See, e.g.*, *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1308 (D. Utah 2016) (denying sanctions under inherent authority due to absence of "any evidence that [parties] acted with a willful intent to lie").

Even if the Court were to find bad faith and impose sanctions pursuant to its inherent authority, sovereign immunity would bar monetary sanctions against the Commission. *See Droganes*, 728 F.3d at 590; *United States v. Horn*, 29 F.3d 754, 761 (1st Cir. 1994); *United*

---

[3] The circumstances of Welsh's statement at the TRO hearing also exemplify why Rule 11's drafters stressed that the Rule "does not cover matters arising for the first time during oral presentations to the court, when counsel may make statements that would not have been made if there had been more time for study and reflection." Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment.

*States v. Carter*, No. 16-20032-02, 2020 WL 430739, at *4 (D. Kan. Jan. 28, 2020) (unpublished).  *But see FDIC v. Maxxam, Inc.*, 523 F.3d 566, 595 (5th Cir. 2008) ("[S]overeign immunity falls away when a court acts under its sanctioning powers and does not abuse its discretion in so doing.").

*                    *                    *

The Commission takes the Court's concerns seriously and appreciates the opportunity to address them.  Agency officials are taking steps to ensure these concerns do not arise again in this matter and other proceedings in which the Commission is involved.  (Grewal Decl. ¶¶ 6-7; Combs Decl. ¶ 7.)  Going forward in this case, Nicholas Heinke, an Associate Regional Director of the Commission's Denver Regional Office, will supervise this matter, along with Gregory Kasper, the Regional Trial Counsel in the Denver Regional Office, both of whom have years of litigation experience at the Commission.  (Grewal Decl. ¶ 5.)  A new lead trial counsel from the Denver Regional Office will also be assigned to this matter.  (*Id.*)

The Commission is also taking broader corrective action.  For instance, the Division of Enforcement will hold a mandatory training for all Division staff involved in investigations and litigation in January 2024 on the importance of accuracy and candor and the duty to correct inaccuracies when identified.  (*Id.* ¶ 6.)  Senior leadership from the Division of Enforcement also continues to review the events here and will consider additional measures as appropriate.  (*Id.* ¶ 7.)  The Commission hopes and expects that the missteps that occurred here do not happen again.

**CONCLUSION**

For the foregoing reasons, the Commission respectfully submits that sanctions are not warranted and that the Court's Order to Show Cause (Dkt. 215) should be discharged.

20

Dated:  December 21, 2023                    Respectfully submitted,

                                            /s/ *Melinda Hardy*
                                            Melinda Hardy (D.C. Bar No. 431906)
                                            Assistant General Counsel
                                            hardym@sec.gov
                                            Elizabeth McFadden (D.C. Bar No. 436076)
                                            Deputy General Counsel
                                            mcfaddene@sec.gov
                                            Michael S. Bailey (D.C. Bar No. 983676)
                                            Senior Counsel
                                            baileym@sec.gov
                                            Office of the General Counsel
                                            Securities and Exchange Commission
                                            100 F Street NE
                                            Washington, DC 20549
                                            Telephone:  (202) 551-5100

                                            *Attorneys for Plaintiff Securities and*
                                            *Exchange Commission*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 21st day of December, 2023, I caused the foregoing to be

served to all parties entitled to service through the Court's ECF system.

<u>/s/ *Melinda Hardy*</u>
Melinda Hardy

*Attorney for Plaintiff Securities and Exchange Commission*