Exhibit 3

Elizabeth McFadden (D.C. Bar No. 436076)
mcfaddene@sec.gov
Melinda Hardy (D.C. Bar No. 431906)
hardym@sec.gov
Michael S. Bailey (D.C. Bar No. 983676)
baileym@sec.gov
Office of the General Counsel
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone:  (202) 551-5100

*Attorneys for Plaintiff Securities and
Exchange Commission*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN BOWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON O. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited liability company; BRENDAN J. | **DECLARATION OF MICHAEL E. WELSH IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO THE COURT'S NOVEMBER 30, 2023 ORDER TO SHOW CAUSE**<br><br><br>Case No. 2:23-cv-00482-RJS<br><br><br>Chief Judge Robert J. Shelby |

STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual;

Defendants,

ARCHER DRILLING, LLC, a Wyoming limited liability company; BUSINESS FUNDING SOLUTIONS, LLC, a Utah limited liability company; BLOX LENDING, LLC, a Utah limited liability company; CALMFRITZ HOLDINGS, LLC, a Utah limited liability company; CALMES & CO, INC., a Utah corporation; FLAHERTY ENTERPRISES, LLC, an Arizona limited liability company; IX VENTURES FZCO, a United Arab Emirates company; PURDY OIL, LLC, a Nebraska limited liability company; THE GOLD COLLECTIVE LLC, a Utah limited liability company; and UIU HOLDINGS, LLC, a Delaware limited liability company,

Relief Defendants.

I, Michael E. Welsh, make the following declaration, in accordance with the provisions of 28 U.S.C. § 1746:

1.      I am currently employed as a Trial Counsel in the Salt Lake Regional Office ("SLRO") of the U.S. Securities and Exchange Commission ("SEC" or "Commission").  I have been in that position since December 2022 when I started at the SEC.  As a Trial Counsel for the SEC, I am responsible for filing and litigating securities fraud actions on behalf of the Commission in federal district court.  Prior to joining the SEC, from October 2015 through November 2022, I worked in private practice.  Beginning in or around January 2017, my practice focused on representing crypto asset issuers, custodial and noncustodial crypto asset trading platforms, and other blockchain industry market participants in connection with state and federal criminal and regulatory investigations.

2

2.      I presently represent the SEC in this matter as a trial attorney.

3.      On July 26, 2023, I signed a Rule 65(b)(1)(B) Attorney Certification to the SEC's

Motion for Temporary Restraining Order ("TRO") and Asset Freeze ("SEC's Motion"), which

included the following statement: "Evidence obtained by the Commission . . . indicates that

Defendants are currently in the process of attempting to relocate assets and investor funds

overseas, where at least Defendant Jacob Anderson has contended that those assets will be

outside the reach of U.S. regulators." I relied on several pieces of evidence in connection with

this statement. First, Karaz S. Zaki, an SEC accountant, submitted a declaration in support of the

SEC's Motion based on her review of Defendants' bank and financial records. Ms. Zaki's

declaration, dated July 24, 2023, was attached as Exhibit 3 to the SEC's Motion.

4.      According to Ms. Zaki's declaration, bank records showed that as of December

2022 approximately $1.35 million of what appeared to be investor funds had been transferred

into the foreign bank account of Relief Defendant IX Ventures FZCO, a United Arab Emirates

company. (Dkt. 3-10 ¶ 18.) At the time of filing, SEC staff believed that Defendants Jason

Anderson and Jacob Anderson controlled Relief Defendant IX Ventures FZCO, but now

understands Defendant Joseph Martinez controls that entity.

5.      Ms. Zaki also submitted evidence of bank records in support of her declaration

showing that, beginning as early as spring of 2021, certain Defendants were draining their U.S.

bank accounts: (1) as of May 30, 2023, accounts associated with Defendant Digital Licensing

Inc. dba DEBT Box ("DEBT Box") had disposed of over $33 million, leaving an ending balance

of approximately $367,000 as of May 30, 2023; (2) as of May 1, 2023, accounts associated with

Defendant iX Global, LLC ("iX Global") had disposed of over $49 million, leaving an ending

balance of approximately $763,000 as of May 1, 2023; (3) as of April 30, 2023, accounts

associated with Relief Defendant Calmfritz Holdings, LLC had disposed of over $14 million, leaving a negative ending balance as of April 30, 2023; and (4) as of April 28, 2023, Relief Defendant Calmes & Co. Inc. had disposed of almost $3 million, leaving an ending balance of approximately $219,000 as of April 28, 2023. (*Id.* ¶¶ 14-17, Ex. 4-8.) Further, Ms. Zaki stated in her declaration that, according to bank records, three accounts that iX Global maintained at Bank of America were closed on June 30, 2023. (*Id.* ¶ 20.) Further, I understood that Ms. Zaki was unable to identify the location of a majority of the investor funds raised by Defendants, which the SEC initially estimated to total approximately $49 million, but now understands to be approximately $130 million.

6. I also relied on a June 14, 2023 YouTube video in which Defendant Jacob Anderson stated "we have moved all of the operations currently to Abu Dhabi," "we're going to be moving everything over there," and DEBT Box is going to be "under the jurisdictional control of Abu Dhabi, not the SEC." I do not recall whether, at the time I signed the Certification, I had viewed the video myself or was relying on information provided to me by Joseph Watkins, an investigative SLRO staff attorney assigned to this case.

7. My prior experience representing crypto companies in regulatory investigations informed my view of the facts in Ms. Zaki's declaration and the comments made by Defendant Jacob Anderson in the June 14, 2023 YouTube video. When I viewed those facts and Mr. Anderson's comments alongside the compelling evidence that Defendants were engaged in a fraudulent scheme, I made what I believed to be a reasonable inference that Defendants were "currently in the process" of attempting to relocate assets and investor funds oversees. In my experience with individuals and entities that operate in the crypto industry, the "operations" of crypto asset issuers are the acts of obtaining investor funds, storing the private keys for crypto

asset wallets that received a portion of those funds, and transferring crypto assets to investor accounts. I therefore believed that Defendant Anderson's reference to moving "operations" to Abu Dhabi indicated that Defendants were also moving to Abu Dhabi investor funds and crypto assets received from investors. I also inferred from Defendant Anderson's use of the present tense in his statement "we're going to be moving everything over there" that the process of moving assets overseas was ongoing.

8.       I regret not making clear to the Court that I was making these inferences. At the time I signed the certification, I acted in good faith and did not intend to mislead the Court. I realize now that I should have been more precise and not used the phrase "currently in the process" without also presenting direct evidence that Defendants had moved money overseas shortly before filing the certification.

9.       In the SEC's Motion, the Commission stated, "Defendants have also taken action to block SEC investigative staff from viewing their social media sites and appear to have recently deleted a website containing training materials for the scheme's promotors." I based this statement on information from Mr. Watkins who provided reason to believe that, beginning in June 2023, Defendants blocked the SEC from viewing their social media accounts, took down certain YouTube videos, and removed training materials from one of their websites.

10.      Mr. Watkins told me that as he was preserving Defendants' social media and website posts, a common investigative practice, there were some videos that he had previously seen on the websites that were no longer accessible when he tried to preserve them.

11.      In addition, Mr. Watkins told me that he could no longer access the social media posts for certain Defendants' social media accounts while using an SEC account, and had received an error message when trying to do so, but could view those same social media posts

while using a non-SEC account.  I suggested to Mr. Watkins that his inability to view the social

media accounts might have to do with the SEC's network rather than any action by Defendants;

however, Mr. Watkins told me that he had previously been able to access the same social media

accounts using an SEC account.  Although the SEC's investigation was covert (*i.e.*, staff did not

contact the persons it was investigating to request or subpoena documents or information and did

not subpoena documents from the bank accounts for individuals to avoid having to send

customers the notifications required by law), based on the information Mr. Watkins provided me,

I inferred that Defendants were aware that SEC staff was viewing their social media accounts

and had taken steps to block the staff from continuing to do so.

12.     At the same time, I also believed that Defendants had reason to suspect that the

Commission was investigating them based on their connection to a recent SEC enforcement

action.  The SEC recently filed a lawsuit in *SEC v. Green United*, No. 23-cv-159 (D. Utah),

alleging a token-mining license scheme substantially similar to the one alleged in this matter.  I

believed at least some of the Defendants would be familiar with *Green United* not only because

of the similar factual allegations, but also due to their relationship with Wright W. Thurston, one

of the defendants in the *Green United* action.  Defendants Jason and Jacob Anderson are

currently in litigation in Utah state court with Mr. Thurston, who, according to filings in that

action, is a former business partner of the Andersons (*Codex United LLC, et al., v. Profit Vault

VC1, LLC, et al.*, Civil No. 210903079).  In that consolidated action, plaintiffs and counterclaim

defendants, who are affiliated with Mr. Thurston, have alleged that Blox Lending LLC, Jason

Anderson, and Jacob Anderson, among others, have, *inter alia*, breached a joint venture

agreement and engaged in other fraudulent practices in connection with the same "node software

licenses" offerings at issue in *Green United* and this litigation.  Given the overlap between this

litigation, *Green United*, and the Utah state court litigation, and after learning of the information provided by Mr. Watkins, *see supra* ¶ 11, investigative staff, Mr. Fronk and I inferred that Defendants had reason to believe that the SEC was investigating their activities and had taken steps to block SEC staff's monitoring of their social media accounts.

13.     I realize now that I should have told that Court that SEC staff believed Defendants were taking steps to impede the SEC from viewing their social media sites and provided the Court with the specific facts, outlined above, that supported this belief.

14.     During the July 28, 2023, TRO hearing, I stated to the Court that "even in the last 48 hours Defendants have closed additional bank accounts, and I believe that number, I don't have it in front of me, was around 33 bank accounts have been closed."  During the Court's brief recess, while I prepared to argue the four factors in *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016), one of the SEC's investigative staff attorneys who was present at the hearing, Laurie Abbott, provided me information regarding certain Defendants' bank accounts that the SEC staff had just learned in the last 48 hours.

15.     I do not recall, nor do I have any record, of what exactly Ms. Abbott said to me.  I remember her telling me that there was evidence of additional bank account closures in the past 48 hours, but it is possible that she was trying to convey what investigative staff had learned in the past 48 hours and that I misinterpreted what she said.  When I made the statement to the Court that "in the last 48 hours Defendants have closed additional bank accounts," I believed this information was accurate, and continued to believe so until September 2023.  I regret that I did not verify the accuracy of the information that Ms. Abbott provided to me before making this representation to the Court.

16.     I also recognize that I should have made clear to the Court that the "33" number represented my understanding of the total number of bank accounts controlled by Defendants that had been closed.  I see now that my oral statement to the Court should have been more precise, and I in no way meant to mislead the Court.

17.     Later, when responding to certain Defendants' motion to dissolve the TRO ("Motion to Dissolve"), I became aware that my statement to the Court on July 28, 2023 about the recent back closures was inaccurate.  In responding to Defendants' arguments, I focused on the SEC's evidence of asset dissipation.  I now recognize that I should have used the opportunity to specifically address my prior statement, explain the background that caused the misstatement, and correct the record.

18.     When I received the Motion to Dissolve, I asked our investigative staff attorneys for more information on Defendants' closed bank accounts.  Investigative staff told me that while they had learned of accounts that had closed in the days before the hearing, those accounts did not, in fact, close in the 48 hours leading up to the TRO hearing but rather were the same accounts we had previously known were closed.  Investigative staff also told me that they had learned in the couple of days before the TRO hearing of the dissipation of funds from, but not the closure of, certain other of Defendants' bank accounts that had occurred between July 7 and July 23, 2023.  At the time, because I believed that evidence of bank account closures and evidence that accounts had been drained pointed to the same ongoing injury, namely, dissipation of investor funds and irreparable harm to investors, I thought that the dissipation of funds rather than the closing of accounts was a distinction that needed to be clarified and not corrected.

19.     On September 27, 2023, the SEC filed its Opposition to the Defendants' Motion to Dissolve ("SEC's Opposition") and stated, "Further, mere days before the TRO Hearing—

consistent with counsel's representations to the Court—the SEC learned that a substantial portion of the funds held in two back accounts controlled by Defendants, including one controlled by DLI, had been substantially drained of assets."  When making this statement, and specifically when referring to "counsel's representation to the Court," I was referring to my July 28 statement at oral argument that Defendants had closed additional bank accounts in the last 48 hours.  I recognize now that I should have specifically addressed and corrected the prior statement regarding account closures and then clarified what I had since been informed that SEC staff had learned prior to the TRO Hearing regarding certain Defendants' accounts.  After providing the corrected information regarding the timing of the acts at issue and the absence of any new closures, I should have then explained why the corrected facts and information regarding the dissipation of investor funds nevertheless support a finding of irreparable harm.  I deeply regret characterizing my July 28 statement at the TRO hearing as consistent with the information I provided in the SEC's Opposition.  It was not my intent to mislead the Court.

20.     The SEC's Opposition also states, "And while the DLI Defendants now lean on the technicality that certain corporate documents show attempts to move DLI's business interests overseas in 2022, those documents don't match the facts on the ground, which reveal that the DLI Defendants made significant efforts to move investor funds outside of the Court's jurisdiction in the months leading up to the SEC's filing."  In making this statement, I relied on the same evidence I identified in response to the Court's first question in its Order to Show Cause.  In addition, I relied on Ms. Zaki's supplemental declaration submitted on September 27, 2023.  (Dkt 168-1.)  She included a spreadsheet of account withdrawals, including wire transfers, and one of those wire transfers stated that DLI wired $35,000 from its Mountain American

Credit Union account to Defendant Schad Edward Brannon to "Set up office in UAE." (*Id.* at Ex. B.)

21.     I also relied on evidence that staff and the receiver had gathered since the TRO hearing showing that in addition to the $1.35 million of investor funds that we identified at IX Ventures FZCO, there was approximately $4.3 million of investor funds in one or more Defendants' foreign accounts—$650,000 at Digital Commodity House, FZCO, and $3.7 million at Vertex Global FZCO LLC.  SEC staff believe that Defendants have used Digital Commodity House, FZCO to facilitate DEBT Box operations (such as controlling crypto asset wallets containing assets traceable to the sale of DEBT Box licenses, as well as the Treasury account for DEBT Box crypto assets).  (*See* Dkt. 125-1, Dewey Decl. ¶¶ 93, 99.)

22.     Further, in or before early August 2023 and prior to the time of the SEC's Opposition, I learned that Defendants changed their terms and conditions of the customer agreement on the DEBT Box website.  The terms previously stated that the sale was between Digital Licensing, Inc., a U.S. entity, and the consumer; now it is between Digital Commodities Home, a United Arab Emirates entity, and the consumer.  Defendants have claimed that Digital Licensing, Inc. is not an affiliate of Digital Commodities Home.  I saw the change to the customer agreement as further evidence that Defendants were moving outside of the Court's jurisdiction.  Again, I inferred that Defendants were moving investor funds overseas and outside the jurisdiction of this Court based on these facts.

23.     I should have made it clear to the Court that I was making an inference regarding Defendants' efforts to move funds overseas.  Also, I should have been more precise and not used the phrase "in the months leading up to the SEC's filing" without also providing direct evidence

that Defendants had moved money overseas shortly before filing the application for a TRO.  I did not intend to mislead the Court.

24.      In all of my testimony and submissions, I did my best to provide accurate information.  On October 6, 2023, I apologized and stated that I did not intend in any way to mislead the Court.  I would like to reiterate both my sincere apology and that I never intended to mislead the Court.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20ᵗʰ day of December 2023 in Salt Lake City, Utah.


_____
Michael E. Welsh