Matthew R. Lewis (7919)
Taylor J. Smith (17537)
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, 10th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
mlewis@kba.law
tsmith@kba.law

Richard Hong (admitted *pro hac vice*)
Jason P. Gottlieb (admitted *pro hac vice*)
David E. Ross (admitted *pro hac vice*)
Jeffrey D. Brooks (admitted *pro hac vice*)
Alexander R. Yarm (admitted *pro hac vice*)
**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10022
Telephone: (212) 735-8600
rhong@morrisoncohen.com
jgottlieb@morrisoncohen.com
dross@morrisoncohen.com
jbrooks@morrisoncohen.com
ayarm@morrisoncohen.com
*Attorneys for Defendants Digital Licensing Inc., Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, Roydon B. Nelson, and Relief Defendants Business Funding Solutions, LLC; Blox Lending, LLC; The Gold Collective LLC; and UIU Holdings, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation, *et al.*,<br><br>Defendants,<br><br>ARCHER DRILLING, LLC, a Wyoming limited liability company, *et al.*,<br><br>Relief Defendants. | **DEFENDANTS DIGITAL LICENSING INC., JASON R. ANDERSON, JACOB S. ANDERSON, SCHAD E. BRANNON, AND ROYDON B. NELSON AND RELIEF DEFENDANTS BUSINESS FUNDING SOLUTIONS, LLC, BLOX LENDING, LLC, THE GOLD COLLECTIVE LLC, AND UIU HOLDINGS, LLC'S REPLY TO THE SEC'S RESPONSE TO THE COURT'S NOVEMBER 30, 2023 ORDER TO SHOW CAUSE**<br><br>Case No. 2:23-cv-00482-RJS<br><br>Chief Judge Robert J. Shelby |

# **TABLE OF CONTENT**

**Page(s)**

I.       PRELIMINARY STATEMENT ................................................................. 1

II.     THE SEC LIED AND SUPPRESSED THE TRUTH .................................................. 3

III.    THE ADVERSE IMPACTS OF THE SEC'S *EX PARTE* TRO ................................ 8

IV.    SANCTIONS UNDER RULE 11 AND THE COURT'S INHERENT
            AUTHORITY ARE WARRANTED AGAINST THE SEC ............................ 16

     A.   Rule 11 ........................................................................................................... 16

     B.   The Court's Inherent Authority ................................................................. 18

V.     CONCLUSION........................................................................................................ 20

#12692785v1\031477\0001

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berger v. United States,*
    295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. __, 140 S. Ct. 1891 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ehrenhaus v. Reynolds,*
    965 F.2d 916 (10th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Morales v. Portuondo,*
    165 F. Supp. 2d 601 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rentz v. Dynasty Apparel Industries, Inc.,*
    556 F.3d 389 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ridder v. City of Springfield,*
    109 F.3d 288 (6th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*St. Regis Paper Co. v. United States,*
    368 U.S. 208 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*White v. General Motors Corp.,*
    908 F.2d 675 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Xyngular Corp. v. Schenkel,*
    200 F. Supp. 3d 1273 (D. Utah 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20

**Rules**

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. P. 11(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Rule 11 of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

#12692785v1\031477\0001

Pursuant to the Court's December 26, 2023 Order Granting Motion to Respond (ECF No. 239), Defendants Digital Licensing Inc. ("DLI"), Jason R. Anderson ("Jason Anderson"), Jacob S. Anderson ("Jake Anderson"), Schad E. Brannon ("Brannon"), and Roydon B. Nelson ("Nelson") (collectively "DEBT Box Defendants") and Relief Defendants Business Funding Solutions, LLC ("BFS"), Blox Lending, LLC ("Blox"), The Gold Collective LLC (TGC"), and UIU Holdings, LLC ("UIU") ("Relief Defendants") respectfully submit this Reply to Plaintiff Securities and Exchange Commission's ("SEC" or "Commission") Response to the Court's *sua sponte* November 30, 2023 Order to Show Cause ("Order to Show Cause").

## I.     PRELIMINARY STATEMENT

The SEC knew that it lied. Instead of correcting the lie, the SEC concealed and suppressed it for months, causing enormous damage to the defendants in this case, as well as incalculable damage to third- party businesses, token holders, and others around the world.

In a remarkable admission, the SEC now reveals, in its Response to the Court's *sua sponte* Order to Show Cause, that the SEC's Salt Lake City Regional Office ("SLRO") staff knew that its lead trial counsel had made a materially false and misleading statement to the Court at the moment he made it on July 28, 2023, but failed to correct it for months.

And to make matters even worse, the trial counsel and the SLRO team, who knew of the materially false and misleading statement, further concealed and suppressed the truth through the SEC's Opposition to Defendant's Motion to Dissolve, while the 18 defendants, including the DEBT Box Defendants, suffered immeasurably and unjustifiably. Of course, the SLRO had numerous chances to correct the record, and provide the truth to this Court. But only after this Court issued its Order to Show Cause on November 30, 2023, did the SEC finally disclose what really happened—that it had committed "fraud on the court."

Nonetheless, the SEC (through its Office of General Counsel) argues that it should not be sanctioned. Its principal argument is that its materially false and misleading statements were based on inferences drawn from other circumstantial evidence—however wrongly drawn all the inferences may be. The SEC also claims that there was no intent to mislead or bad faith. But the SEC conspicuously does not defend, because it cannot, why the SEC, in violation of its duty of candor to the Court, knowingly failed to correct its materially false and misleading statements for more than two months. Nor does the SEC defend, because it cannot, the action of its SLRO team that affirmatively and intentionally concealed and suppressed the truth through the SEC's Opposition to Defendant's Motion to Dissolve.

The DEBT Box Defendants did not move for sanctions against the SEC when they moved to dissolve the *ex parte* TRO and asset freeze in September 2023. Like this Court, the DEBT Box Defendants were not aware of what the SEC knew or when it knew it. The DEBT Box Defendants gave the SEC the benefit of the doubt --naively, in retrospect. No longer.

The SEC should be sanctioned here. As discussed below, this is the rare case that warrants sanctions under Rule 11 of the Federal Rules of Civil Procedure and under this Court's inherent authority. The SEC knew from the outset that it had no evidence of any irreparable harm, but it falsely and misleadingly suggested in its filings with the Court that it did. And when confronted with the incontrovertible, direct evidence showing that its position on irreparable harm was untenable, the SEC, knowing the truth, nonetheless "doubled down on its [false] argument [in a court pleading], rather than acknowledging the error." Order to Show Cause at 15. In essence, the SEC obtained the TRO by lying to this Court, and abusing the judicial process.

As Justice Sutherland of the Supreme Court explained in an analogous context more than 85 years ago, "while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones."

*Berger v. United States*, 295 U.S. 78, 88 (1935).  More recently, Chief Justice Roberts pointed out that "particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. __, 140 S. Ct. 1891, 1909 (2020) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)).  The SEC did not just round corners here; it also struck foul blows while doing so to get to the result it wanted.

In light of the SEC's materially false and misleading filings, as well as the enormity of the collateral damage sustained by the investing public and the DEBT Box Defendants, which will be further discussed below, no amount of apologies to the Court, even from the Director of the SEC's Enforcement Division, or additional training of its enforcement staff is sufficient.  Indeed, had the DEBT Box Defendants, not the SEC, been the ones engaged in lying and knowingly suppressing the truth for more than two months, it is highly improbable that the SEC would deem the apologies of the DEBT Box Defendants or additional ethics training for them to be a sufficient remedy.

Accordingly, the DEBT Box Defendants respectfully request an order dismissing this case against the DEBT Box Defendants and Relief Defendants with prejudice.  In addition, the Court should order the SEC to pay the reasonable attorney's fees and costs incurred by the DEBT Box Defendants for their defense against the illegally procured TRO and asset freeze (including the fees for the out-of-state receiver that was appointed on the basis of the SEC's materially false and misleading statements).

## II.        THE SEC LIED AND SUPPRESSED THE TRUTH

As this Court found, the SEC made at least five materially false and misleading statements in its court filings and in court statements (in Paragraph 4 of the Rule 65(b)(1)(B) Attorney Certification; in the TRO Application; at the TRO hearing; and in the SEC's Opposition to the

DEBT Box Defendants' Motion to Dissolve).  *See* Memorandum Decision and Order ("Decision") at 11-12, 15-27; Order to Show Cause at 18-19 (requiring the SEC to answer questions regarding five statements that the SEC made in court filings or in court).  All of them may be considered for Rule 11 sanctions or sanctions under the Court's inherent authority.

But for the sake of brevity, the DEBT Box Defendants will focus on those that relate to the SEC's materially false and misleading claims (first made in court, then followed up in the SEC's Opposition to DEBT Box Defendants' Motion to Dissolve) regarding how the DEBT Box Defendants were allegedly actively in the process of closing their bank accounts.

* * * *

At the July 28, 2023 *ex parte* TRO hearing, the SEC's trial counsel, in arguing that there would be irreparable harm without a TRO, represented that:

> This is – the decision to bring this TRO is not a decision we take lightly, either. Just as we were on break I was reminded by investigative staff with respect to the investigation which remains ongoing that *even in the last 48 hours defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed*.

Tr. at 20 (emphasis supplied).  For this Court, the italicized portion of the SEC's representation was considered as "the most important evidence of irreparable harm without the requested TRO."  Memorandum Decision and Order ("Decision") at 17.

The Court "issued the TRO believing Defendants were actively in the process of closing their accounts." Further,

> [t]he alleged closures were compelling evidence corroborating the Commission's claims that Defendants were rapidly attempting to move assets overseas—outside the Commission's reach and beyond the court's jurisdiction—given other Commission statements that led the court to believe Defendants were aware of the investigation (e.g., the representation that Defendants had taken steps to block the Commission's staff from viewing social media sites).

4

Decision at 18.

But the moment that the claim was made by the SEC's trial counsel to the Court, at least one SEC investigative staff attorney knew that it was wrong.  *See* Declaration of Laurie E. Abbott ("Abbott Decl.") (ECF NO. 232-2) ¶ 7 ("When the hearing resumed, and Mr. Welsh [the trial counsel] made the statement concerning accounts being closed in the last 48 hours, I immediately recognized this was not what I said or meant to convey to Mr. Welsh during the break.  I meant that we had *learned* in the last two days that accounts were closed, not that the closures themselves had occurred during that period.") (emphasis in original).

The staff attorney, who was present at the hearing, failed to raise the inaccuracy issue at the hearing. Nor did the staff attorney raise the issue later because she "believed the most significant evidence that the SLRO team had presented of irreparable harm was that the alleged fraud was ongoing, and new investors were being harmed."  Abbot Decl. ¶ 7.

On September 12, 2023, the DEBT Box Defendants moved to dissolve the TRO (ECF No. 132).  The DEBT Box Defendants showed that "[t]here were no bank account closures involving DLI, Defendants or Relief Defendants in July 2023" and that the SEC's claim that "even in the last 48 hours [as of July 28, 2023] defendants have closed additional bank accounts" was false and misleading.   Motion to Dissolve at 10-11.  *See* Decision at 17-18 (explaining that there was no evidence to support the SEC's claim).

According to the SEC's trial counsel, "when responding to certain Defendants' motion to dissolve the TRO [the DEBT Box Defendants' Motion to Dissolve], [he] became aware that [his] statement to the Court on July 28, 2023 about the recent bank closures was inaccurate." Declaration of Michael Welsh ("Welsh Decl.") ¶ 17 (ECF No.  233-3).

Based on his litigation strategy, however, the trial counsel decided not to correct the record. *Id*. ¶ 18 ("At the time, because I believed that evidence of bank account closures and evidence that accounts had been drained pointed to the same ongoing injury, namely, dissipation of investor funds and irreparable harm to investors, I thought that the dissipation of funds rather than the closing of accounts was a distinction that needed to be clarified and not corrected.").  Thus, on September 27, 2023, the SEC filed its Opposition to the Defendants' Motion to Dissolve, arguing that "mere days before the TRO Hearing—consistent with counsel's representations to the Court— the SEC learned that a substantial portion of the funds held in two back accounts controlled by Defendants, including one controlled by DLI, had been substantially drained of assets." *Id.*

The Court rejected the SEC's argument:

> This plainly mischaracterizes Welsh's statement at the ex parte hearing—he explicitly said "in the last 48 hours Defendants have closed additional bank accounts."  He did not say two bank accounts "had been substantially drained of assets."

Order to Show Cause at 15.  As this Court found: "[T]he Commission mischaracterized Welsh's statement and then doubled down on its argument, rather than acknowledging the error." *Id.*

At the October 6, 2023 Motion to Dissolve hearing, after the Court provided its preliminary ruling dissolving the TRO and asset freeze, the Court asked the SEC whether it wished to weigh in on any topic.  Tr. at 30.  The SEC's trial counsel attempted to justify what he did. *Id*. at 31-34.  But at no time did he explain why he or the SEC failed to correct the record upon learning of the inaccuracies or why he and the SEC doubled down on their arguments.

Indeed, the Court ruled that "nothing that Mr. Welsh just said causes me to change my preliminary view that the temporary restraining order was improvidently issued and that there's no factual or legal basis to support its remaining in place."  Tr. at 35-36.

On November 30, 2023, the Court issued its Order to Show Cause Why the Court Should Not Impose Sanctions.  (ECF No. 215).  This Court asked several questions, including when the SEC's counsel become aware that the statement concerning accounts being closed in the last 48 hours was incorrect.  Order to Show Cause at 18.

On December 21, 2023, the SEC provided its response to the Court's Order to Show Cause. ECF No. 233.  The SEC disclosed that its staff attorney, Ms. Abbott, knew of the inaccuracy from the moment that Mr. Welsh made the argument in court (approximately 146 days before the court disclosure); and that Mr. Welsh knew of the inaccuracy upon reviewing the DEBT Box Defendants' Motion to Dissolve (approximately 100 days before the court disclosure), *see* SEC's Response to Order to Show Cause at 14-16, but decided, as a matter of litigation strategy, to not correct the record.  In short, the SEC suppressed the truth from the Court for months.

* * * *

Unfortunately, the SEC has continued to make materially false and misleading statements—even after the TRO proceedings.

As discussed in the DEBT Box Defendants' Reply in Further Support of Its Motion to Dismiss (ECF No. 218), "SEC continues to flout this Court's admonitions, first delivered at the October 6, 2023 TRO dissolution hearing (and recently restated in the Court's November 30, 2023 Order to Show Cause), to tell the truth."  Reply at 1.  In fact, the SEC makes no fewer than 23 false, misleading, or otherwise incorrect statements in the eight-page "Summary of Allegations" section.  *Id*. at 4 (discussing the table setting forth the 23 inaccuracies).

Specifically, in its Opposition (ECF No. 206), the SEC:  (1) misrepresented the state of law regarding crypto assets in its "Preliminary Statement" to suggest that it was a foregone conclusion that the sales of DEBT Box node software licenses were indisputably "securities" transactions; (2)

7

spent more than 18 pages in its Opposition, in the "Summary of the Allegations" and "Argument" sections, reinventing and amending the factual allegations to attempt to satisfy Fed. R. Civ. P. 9(b)—thereby misstating its own allegations in the Complaint; and (3) falsely accused the DEBT Box Defendants of mischaracterizing YouTube videos. *Id*. at 1-2.

### III.   THE ADVERSE IMPACTS OF THE SEC'S *EX PARTE* TRO

This Court was rightly concerned about the impact of the TRO relief the SEC was seeking at the *ex parte* TRO hearing on July 28, 2023.  As the Court noted,

> I'll just tell you every time I sign one of these [TRO] orders it takes my breath away.  It is a profound and extraordinary invocation of the power of the federal judiciary.  And it affects citizens in a direct way without notice or opportunity to be heard.

Tr. at 12.  Indeed, the devasting effects of the SEC's improperly procured *ex parte* TRO in this case cannot be overstated.

As the DEBT Box platform was shut down by the TRO, there was a complete disruption to the DEBT Box community in over 130 countries and for approximately 300,000 system users. A vast majority of the users were and are outside the United States and many of the users have never even touched a single node software license—which is the subject of the SEC enforcement action.  *See* Defendants' Motion to Dissolve (ECF NO. 132) at 21.

The market impact of the SEC's TRO was indisputably material.  On August 3, 2023, after the SEC issued its press release proclaiming that "SEC Obtains Emergency Relief to Halt Utah-Based Company's Crypto Asset Fraud Scheme Involving 18 Defendants," available at https://www.sec.gov/news/press-release/2023-146, the market value for the platform token associated with DEBT Box plummeted more than 56%, from $12.0429 to $5.2853, as shown below:



Source:  Public via Dexscreener.  *See also* Defendants' Motion to Dissolve at 4, 21-22 .  Thus, the market capitalization of the platform token associated with DEBT Box plunged approximately $342.59 million in value, from approximately $598.47 million to approximately $255.88 million, as shown below:



Source:  Public via Dexscreener.  *See also* Defendants' Motion to Dissolve at 4, 21-22.

Not surprisingly, many individual holders of the DEBT Box associated token--who had nothing to do with anything alleged in the Complaint or the TRO application--lost significant amount of money.  For example, one software license/token holder, while he was on an international cruise trip, learned of the August 3, 2023 news, that the SEC had issued a press release indicating it had shut down the DEBT Box Project because it was allegedly a scam.  Declaration of Brett Peterson ¶ 8 (attached hereto as Ex. 1).  Upon learning of the news, he sat in his cabin, with intermittent internet, selling his tokens to salvage whatever value he could.  *Id*. at 9.  By his estimate, he took a loss of approximately $475,979.  *Id*.  *See also* Declaration of Brad Christian (another software license/token holder who lost $140,000) (Ex. 2 attached hereto).

But for Jason Anderson, Jake Anderson, Schad Brannon and Roy Nelson individually, the impacts of the TRO went much further:  It has been a life-altering, nightmarish experience.  Jason,

#12692785v1\031477\0001

Jake, Schad and Roy had no inkling of the SEC's investigation and were provided no due process before the draconian TRO and asset freeze were issued.[1] But unbeknownst to them, they became the victims of the SEC's lies, and as a result, their lives (personal and business) have been completely upended.

To further assist the Court in its decisional process, Jason Anderson, Jake Anderson, Brannon, and Nelson have asked the undersigned counsel to share some of their more detailed, personal experience of what can--and did--happen when the SEC lies to the Court and thereafter suppresses the truth from the Court, as follows:

\* \* \* \*

On Tuesday, August 1, 2023, when Jason Anderson tried to use his debit card to fill his car's gas tank, his charge was repeatedly denied. This was confusing to Jason because he knew he had plenty of money in his personal checking account and there was no reason the charge should not have been approved. When Jason immediately called his credit union for an explanation, the representative could not help him at that time, but advised him to call back in the next 48 hours. Not satisfied, Jason drove to the Sandy, Utah branch of the credit union, but received the cold shoulder from the tellers and managers, whom Jason has worked with for years.

Jason Anderson had no idea what was going on. He drove around frustrated for about an hour, worried about how he was going to make payroll on Friday, August 4th, just a few days away. He knew the payroll funds were to be debited from the account within 24 hours, so he was

---

[1] The SEC claims (*see* Welsh Declaration ¶ 12) that Jason and Jake Anderson may have known that they were under the SEC's investigation in this matter because the SEC had brought another case involving a software license (*SEC v. Green United*, No. 23-cv-159 (D. Utah)) and because the Andersons are litigating against one of the defendants in *SEC v. Green United* in a private lawsuit in Utah state court (*Codex United LLC, et al., v. Profit Vault VC1, LLC, et al., Civil No. 210903079*)). Neither Jason nor Jake was aware of the SEC investigation. The SEC's incorrect claims were pure speculation and have no evidentiary value.

determined to find a solution, determined to find a solution and, avoid any disruption to the employees who relied on him.

Later that night, Jason Anderson and his wife were invited to a concert with several friends. He was excited to be around friends and for the mental distraction that would provide. For Jason, everything was going great until the $25 bill came at the end of the night, and in front of his friends, the first credit card he tried to use was denied, then the second one. While his friends were teasing him about the credit card denials, Jason now understood that the earlier debit charge denial was not a mistake. He became worried that all of his financial data was compromised and perhaps his identity had been stolen.

Jason Anderson stepped away from the concert to call his brother, Jake Anderson, to have him check his accounts. Jake found out that all of his personal checking and savings accounts showed a zero "available balance" at his bank. After making a series of calls to obtain some explanation, Jason and Jake received none. But they realized that something was seriously amiss.

Next morning, on August 2nd, shortly before 8:00 am, Jason Anderson, Jake Anderson, and Nelson were on a conference call together. They discussed the unusual, disconcerting developments in their personal bank accounts and credit cards, and what they should or could do.

But shortly after the call had started, Jason Anderson's dogs started to bark furiously, indicating that someone was at his home entrance. Seconds later, Nelson noted that someone was also at his door. And Jake Anderson received calls from an unknown number.

Teams of armed U.S. Marshals and an attorney from Holland & Knight LLP (the Receiver's law firm) had descended on Jason Anderson, Jake Anderson, and Nelson's homes in Utah. The U.S. Marshals and the attorney wanted to serve court papers (the TRO and receivership papers), perform an asset search and seizure, and interview Jason, Jake, and Roy.

Contemporaneously, in California, several deputies from the Los Angeles County Sheriff's Office, wearing bullet-proof vests, and accompanied by an attorney from the Receiver's law firm, with two reams of paperwork, had arrived at Brannon's home.  As Schad was working in the Republic of Ghana, some 6,400 miles away, he learned of his wife and daughter's encounter with law enforcement and the attorney through an emergency call from his wife, who was shaken and upset.  Even without a lawful search warrant, the deputies and the attorney attempted to push their way into Schad's home, confronting his wife and his 14-year old daughter.  Schad did his best to reassure his wife and family that everything was going to be okay, but he did not know what was going on.

Meanwhile, back in Utah, when Jake Anderson learned that U.S. Marshalls were outside Jason Anderson's door, Jake decided to venture outside his home.  U.S. Marshals immediately surrounded Jake with a "one hand on hip, the other on gun" stance.  Jake was then handed a stack of papers 8-10 inches thick by a process server, while someone from the Receiver's law firm rapidly went over the TRO and receivership, terms with which Jake was unfamiliar with.  Jake tried to remain calm during this encounter, even though his heart was racing.  Jake did not know whether he was being arrested or not.

More than 300 miles away, on the other side of Utah, Nelson, his wife, and 10-year old daughter were being called into their living room to be questioned.  Roy and his family had no idea why the U.S. Marshals and the attorney came to his home.  When Roy inquired, the attorney told him that she was certain that Roy knew why they were there, and insisted that he should know. The attorney handed Roy two sets of documents, the size of several reams of paper, and continued to question Roy.  One or two of the Marshals began to go through Roy's house, while Roy and his

family sat on the couch at once terrified and dumbfounded.  Roy felt like this was a "home invasion," and, to this date, Roy and his family feel that they have PTSD.

For Jason Anderson, the encounter with the U.S. Marshals and the Receiver's attorney occurred on his home's doorsteps—away from his teenage kids who were in the kitchen,  trying to get ready for their day.  Five people were on his doorstep, and a few more were in the cars on the drive way.  One of the individuals introduced himself as a U.S. Marshal, and another introduced himself as an attorney with the Receiver's law firm.  The attorney then handed him a box the size of 10 reams of paper, and told him that he was being sued by the SEC.  The attorney also said that all of Jason's assets were now in the control of Holland & Knight LLP as the receiver for the court.

Jason Anderson's wife and kids were nervous and scared.  The kids could see that there were numerous people with guns and badges at the door speaking with their dad.  Jason's wife had watched from the Ring doorbell camera, and had come into the kitchen to be with and comfort the kids.  Later, Jason tried to reassure his family, including one daughter who was in tears, but in his head and his heart, he was starting to grasp the severity of what had just happened.

* * * *

Unfortunately, the above-described encounters with law enforcement and the Receiver's counsel were just the beginning of this life-altering, nightmarish experience for Jason Anderson, Jake Anderson, Brannon, and Nelson.

After August 2, 2023, aside from living under the constant strain and stress of not knowing if the four could even pay for their and their families' necessities,[2] Jason Anderson, Jake Anderson, Brannon, and Nelson suffered, among other things, the following:

---

[2] On August 29, 2023, the Court allowed the IRS-mandated minimum living expenses to be provided to Jason Anderson, Jake Anderson, Brannon, and Nelson.  ECF No. 120.

**Jason Anderson**:

- The receiver and SEC refused to pay any employees of BFS and Blox [Relief Defendants associated with Jason] under the TRO and asset freeze. Without being able to pay any salaries, Jason Anderson had no choice but to lay off the employees and contractors who worked for him.

- Jason Anderson's private lender for real estate with whom he has done multiple millions of dollars' worth of deals, has given him notice they are no longer willing to do any more loans for him or his entities, and they would not be extending any current notes that are out. As a result, his lending and real estate businesses have been ruined.

- USAA, where Jason Anderson has banked for over a decade, provided him notice that USAA was shutting his credit card, with no explanation offered. American Express has shut down three credit cards with substantial lines of credit, with no explanation offered either.

- The SEC published, and failed to redact, Jason's home address and each of his cars' license plate numbers. This led to strangers driving up Jason's private driveway daily to observe the house they live in. The constant, voyeuristic drive-bys were invasive, threatening, and unsafe for Jason's family.

**Jake Anderson**:

- Jake Anderson's business, Green Fusion, LLC, a legal recreational cannabis grower in south central Colorado, has been decimated. With no funds to pay payroll or the basic utilities for the property, employees walked off, and caused ultimately the loss of a 1200 plant harvest and an approximately $400,000 financial loss.

- More than five months after the TRO was issued, and three months after the TRO was dissolved, Jacob Anderson was locked out of his savings; his accounts finally became unlocked in early January 2024. This has put his personal residence, purchased in 2019, in default. Jake had to beg and borrow nearly $100,000 from friends and family just to make payments and pay the yearly taxes.

- Jake Anderson's credit score has dropped 80-plus points. Longstanding relationships with banks have been lost. His reputation has been destroyed.

- Jake Anderson has been ostracized from friends, family, community, and religious groups. His neighbors still to this day will not speak or even acknowledge him.

**Schad Brannon**:

- Brannon and Nelson's partners at Africa Exploration and Minerals Group Limited (AEMG) in Accra, Ghana have demanded that they transfer their 49% ownership of the company to them or sell their shares to another local party. The successful exploration and

development work conducted over approximately four years and their 49% (worth at least $5.7 million) of the proven gold reserve profits will likely be lost.

- Brannon's numerous business relationships have been damaged, most likely lost forever because of the SEC's actions.

- Brannon, who had traveled to Ghana for work in July 2023, was stranded there until October 2023, two additional months longer than planned, as he had no access to funds and no means to return to the United States.

- To this date, Brannon's 14-year old daughter refuses to answer the front door of their home, and has trouble staying home alone for even for a short period of time.

**Roy Nelson:**

- Roy Nelson's personal account and two business accounts were frozen, keeping him from being able to pay suppliers, contractors and help for Ignis Energy, LLC in Oklahoma.  All its workers (approximately 14) walked off.  And because they were not paid, some of them decided to steal the tools, equipment, and vehicles that belonged to Ignis Energy.  The loss in theft exceeded $125,000.

- Roy Nelson was trying to refinance his house because he was on a short-term loan.  The loan he was trying to obtain has been cancelled, and he is looking at a possible foreclosure of a home he and his family have lived in for more than 12 years.

- Roy Nelson has lost banking relationships that took him over 15 years to build.  Credit cards have been cancelled, not because of non-payment, but because the Receiver sent the TRO papers to his banking relationships and credit card companies.

- Roy Nelson has family members and friends who will probably never talk to him again.  When he walks into a crowded room, voices quiet and whispers begin.  The emotional strain and stress that Roy feels is difficult to describe, but he feels like he always has a lump in his throat, a fluttering stomach, and a pounding chest.

## IV. SANCTIONS UNDER RULE 11 AND THE COURT'S INHERENT AUTHORITY ARE WARRANTED AGAINST THE SEC

### A. Rule 11

As this Court explained in *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273 (D. Utah 2016) (Shelby, J.), "Rule 11 requires that factual contentions in pleadings 'have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'"  *Id*. at 1303.  A good faith belief in the merit

of an argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances. *White v. General Motors Corp.*, 908 F.2d 675, 690 (10th Cir. 1990). Rule 11 also imposes on litigants a "continuing duty of candor," and a litigant may be sanctioned "for continuing to insist upon a position that is no longer tenable." *Rentz v. Dynasty Apparel Industries, Inc.*, 556 F.3d 389, 395 (6th Cir. 2009) (quoting *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir.1997)).

As discussed above, the SEC knew from the outset that it had no evidentiary support of any irreparable harm, but it falsely and misleadingly suggested in its filings with the Court (Paragraph 4 of the Rule 65(b)(1)(B) Attorney Certification; in the TRO Application; at the TRO hearing; and in the SEC's Opposition to the DEBT Box Defendants' Motion to Dissolve) that it had such evidence of irreparable harm. Contrary to its suggestion (SEC's Response at 18-19), the SEC was not drawing nuanced inferences about the recent bank account closures; it was lying about them. And when further confronted with the direct, incontrovertible evidence showing that its position on irreparable harm was no longer tenable, the SEC knowingly "doubled down on its [false] argument [in a court pleading], rather than acknowledging the error." Court's Order to Show Cause at 15. To put another way, the SEC chose to pursue a "win-at-all-cost" litigation strategy that breached its duty of candor to the Court.[3]

Under any objective standard, the SEC's factual contentions in its court filings, including its Opposition to the DEBT Box Defendants' Motion to Dissolve, were unreasonable. No reasonable, competent attorneys would have undertaken the actions that the SEC's SLRO team

---

[3] "While all lawyers owe a duty of honesty and candor to the Court, this obligation lies most heavily upon [prosecutors like SEC enforcement attorneys] who are not merely partisan advocates, but public officials charged with administering justice honestly, fairly and impartially." *Morales v. Portuondo*, 165 F. Supp. 2d 601, 611 (S.D.N.Y. 2001) (internal quotation marks and citations omitted).

undertook.  And because of the SEC's conduct, the truth about the closures were suppressed approximately 100 additional days, causing additional damage to the investing public and the DEBT Box Defendants, including the substantial expenditure of attorney's fees and costs to address the TRO and asset freeze.  Rule 11 sanctions are warranted against the SEC under these circumstances, and the DEBT Box Defendants respectfully request an opportunity to provide a detailed request for reasonable attorney's fees and costs, including any attorney's fees and costs that the receiver may have incurred.  *See* Fed. R. Civ. P. 11(c)(4) (specifically allowing the award for part or all of the reasonable attorney's fees and other expenses directly resulting from the violation).

## B.  <u>The Court's Inherent Authority</u>

As this Court explained, "[f]ederal courts have very broad discretion to exercise their inherent powers to sanction a full range of litigation misconduct that abuses the judicial process." *Xyngular Corp.*, 200 F. Supp. 3d at 1300-01.  When "a lesser sanction would not serve the ends of justice," federal courts "may dismiss a party's case for misconduct that abuses the judicial process."  *Id*. at 1301.  "[D]ismissal is appropriate only when the party seeking sanctions proves, by clear and convincing evidence, 'willfulness, bad faith, or some fault' by clear and convincing evidence." *Id*.

As this Court explained,

> [c]onduct amounts to "bad faith" if it shows "intentional or reckless disregard" of the rules.  But actual ill will is not required; "substantial and prejudicial obduracy" or conduct that delays or disrupts the litigation can be enough.  And "fault" concerns "the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation."

*Id*. at 1301-02.

The Tenth Circuit in *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir.1992), has set forth the following factors that "courts should evaluate when considering whether to impose the sanction of dismissal: (1) the degree of actual prejudice to the opposing party, (2) the degree of interference with the judicial process, (3) the litigant's culpability, (4) whether the litigant was warned in advance that dismissal was a likely sanction, and (5) whether a lesser sanction would be effective." *Xyngular Corp.,* 200 F. Supp. 3d at 1302 (internal quotation marks and citations omitted).

Under the circumstances of this case, this Court should exercise its inherent authority and dismiss this case with prejudice. *First,* as discussed above, the degree of actual prejudice to the DEBT Box Defendants' legal position, as well as their circumstances, have been enormous—that is, the *ex parte* TRO was entered, and as a result, calamitous events ensued. *Second,* the SEC intentionally interfered with the judicial process--in particular, the TRO process--because it obtained the TRO by "fraud on the court"—by making materially false and misleading statements to the Court. *Third,* as admitted by the SEC, it knew of the materially false and misleading statements regarding the bank account closures, particularly the statement that 33 accounts have been closed within 48 hours of the TRO hearing, but did not even admit to making such statements until this Court directly inquired about it on October 6, 2023. Moreover, to advance its litigation strategy, the SEC intentionally or recklessly disregarded the duty of candor and concealed and suppressed the truth further by filing a misleading Opposition to the DEBT Box Defendants' Motion to Dissolve. This was unreasonable. *Fourth,* while the SEC has not received a warning, as this Court noted in *Xyngular Corp.*, "the absence of a warning is not dispositive." 200 F. Supp. 3d at 1323. *Finally,* given the extraordinary nature of this misconduct, which appears to be continuing in connection with its opposition to the motion to dismiss filed by the DEBT Box

Defendants,  this is not a one-time violation, and a lesser sanction will not serve the purpose of deterrence.

V.     **CONCLUSION**

For the foregoing reasons, sanctions under Rule 11 and under the Court's inherent authority are warranted and should be imposed on the SEC.

Respectfully submitted,

Dated:  January 12, 2024

**KUNZLER BEAN & ADAMSON, PC**
Matthew R. Lewis
Taylor J. Smith

**MORRISON COHEN LLP**

/s/ *Richard Hong*
Richard Hong (admitted *pro hac vice*)
Jason P. Gottlieb (admitted *pro hac vice*)
David E. Ross (admitted *pro hac vice*)
Jeffrey D. Brooks (admitted *pro hac vice*)
Alexander R. Yarm (admitted *pro hac vice*)

*Attorneys for Defendants Digital Licensing Inc.,*
*Jason R. Anderson, Jacob S. Anderson, Schad E.*
*Brannon, Roydon B. Nelson, and Relief Defendants*
*Business Funding Solutions, LLC; Blox Lending,*
*LLC; The Gold Collective LLC; and UIU Holdings,*
*LLC*

20