Adam L. Grundvig (12106)
KESLER & RUST
68 South Main Street, Suite 200
Salt Lake City, Utah 84101
Telephone: (801) 532-8000
agrundvig@keslerrust.com
*Attorneys for Matthew Fritzsche*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br>v.<br><br>DIGITAL LICENSING INC. (d/b/a "DEBT Box"), a Wyoming corporation; JASON R. ANDERSON, an individual; JACOB S. ANDERSON, an individual; SCHAD E. BRANNON, an individual; ROYDON B. NELSON, an individual; JAMES E. FRANKLIN, an individual; WESTERN OIL EXPLORATION COMPANY, INC., a Nevada corporation; RYAN B OWEN, an individual; IX GLOBAL, LLC, a Utah limited liability company; JOSEPH A. MARTINEZ, an individual; BENJAMIN F. DANIELS, an individual; MARK W. SCHULER, an individual; B & B INVESTMENT GROUP, LLC (d/b/a "CORE 1 CRYPTO"), a Utah limited liability company; TRAVIS A. FLAHERTY, an individual; ALTON 0. PARKER, an individual; BW HOLDINGS, LLC (d/b/a the "FAIR PROJECT"), a Utah limited liability company; BRENDAN J. STANGIS, an individual; and MATTHEW D. FRITZSCHE, an individual;<br><br>                    Defendants, | **DECLARATION OF MATTHEW FRITZSCHE IN SUPPORT OF REPLY TO THE SEC'S RESPONSE TO THE COURT'S NOVEMBER 30, 2023 ORDER TO SHOW CAUSE**<br><br>Chief Judge Robert J. Shelby<br><br>Case No. 2:23-cv-00482-RJS |

| | |
|---|---|
| ARCHER DRILLING, LLC, a Wyoming limited liability company; BUSINESS FUNDING SOLUTIONS, LLC, a Utah limited liability company; BLOX LENDING, LLC, a Utah limited liability company; CALMFRITZ HOLDING, LLC, a Utah limited liability company; CALMES & CO, INC., a Utah corporation; FLAHERTY ENTERPRISES, LLC, an Arizona limited liability company; IX VENTURES FZCO, a United Arab Emirates company; PURDY OIL, LLC, a Nebraska limited liability company; THE GOLD COLLECTIVE LLC, a Utah limited liability company; and UIU HOLDINGS, LLC, a Delaware limited liability company,<br><br>    Relief Defendants. | |

Declarant Matthew Fritzsche declares as follows:

1. I am over 18 years-old.

2. I have knowledge of all facts stated herein.

3. I am a named defendant in the above-captioned matter.

4. I am familiar with many of the filings in this case, including the SEC's response to the Court's November 30, 2023 Order to Show Cause.

5. I intend the information below to assist the Court in evaluating the impact of the TRO and asset freeze on me and my family.

6. In early August, 2023, four persons who identified themselves as federal marshals (2) and receivership attorneys (2), knocked on the front door of the home I share with my wife and our two daughters (both under six-years-old at the time). The federal marshals were

2

obviously armed with pistols on their hips. I saw a fifth person, who was not introduced to me, inside a car parked in front of my house.

7. Upon answering the door, one of the receiver attorneys represented that all my assets now were under their receivership and that the marshals and receivership attorneys needed me to answer questions. The marshals and receivership attorneys pressed me to enter my home for fear of neighbors watching. Never having been in a situation like that, seeing the armed marshals at my door, I didn't know I had a choice other than to let them in my house, which is what I did. Upon entering my home, the marshals asked me if I had weapons in the home and, if so, where I kept them.

8. Once inside my home, the receiver attorneys asked me questions about crypto, a crypto opportunity called DEBT Box, DEBT Box's operations (including how transactions were made), DEBT Box-related crypto accounts, whether I was aware of DEBT Box's fraudulent activity, and related items.

9. While the marshals and attorneys were in my home, I checked the bank accounts that contained deposited earnings from my credit card processing company employer and distributions from a business I partially own. One account showed a zero balance (when it should have had several tens of thousands of dollars), while the other had a couple thousand dollars in it. The unexpectedly low amount shocked and worried me, as my family has depended on the amounts in these bank accounts, including to pay bills.

10. While the marshals and attorneys were in my home, my young daughters awoke and entered the dining room and saw the stranger armed marshals and receiver attorneys.

11. Before leaving my home, the marshals and attorneys gave me multiple legal papers and exhibits stacked several inches high and said that I, along with the others engaged in securities fraud, had obligations in the papers that were due within days. My head was spinning.

12. The following day, I woke up to several messages from family, friends, and acquaintances about an SEC announcement, an article on KSL, and several articles in national publications about an alleged securities fraud case that named me and a company I own as defendants (some neighbors asked me why the marshals were at my house). To me, the announcement and articles (and comments on them) used strong, negative words to portray the defendants, including me and my company, in a very poor light.

13. Within days of the marshals/attorneys' visit, family members, friends, and acquaintances showed up at my home (often unannounced, which was uncharacteristic) asking me and my wife questions about the announcement, articles, or lawsuit. We also noticed others repeatedly drive by our home. I also received many calls from people who told me I'm evil and that they hoped my family and I suffered.

14. I also observed social media posts that linked the KSL article and commented the people listed in the article were filth, belong in prison, and are going to hell. A leader of a community organization to which I belong told me several people in this organization had reached out to him to ensure he knew what I had done (referencing the KSL article). Though I felt the accusations in the KSL article were none of these people's business, I nevertheless chose to defend myself and talk to the people about the article.

15. I sought legal counsel to help with my predicament. However, I had no access to funds to pay for the attorney's services. With no money to my name, I was forced to beg for

help. It took days for me to find somebody willing to loan me enough money to retain counsel. In fact, I obtained the loan proceeds on the very day I needed to respond to something in the lawsuit. Trying to find an attorney under these circumstances was enormously stressful. Also stressful is the fact I still owe no less than $25,000 on that loan.

16. About a week or so after the marshals and receiver attorneys visited my home, I was unable to pay the first position mortgage loan on my house.

17. Around the same time, my bank contacted me about a negative balance (about $4,000) on my personal account, saying I needed to pay that amount immediately or else it would call back the payments it covered for me, resulting in late payments. In addition, the bank threatened the status of my account.

18. Around this same time, I received notices from the businesses with which I had credit lines that the amount of the lines had decreased. This resulted in declined payments.

19. To my understanding, as a result of the late payments and declined payments, my credit score dropped significantly.

20. As of the time the marshals and receiver attorneys visited, I had a second mortgage loan on my home with a balloon payment that was due the next month. The lender said it could be willing to be paid in DEBT Box-related crypto. Because of that, I maintained the U.S. dollar equivalent of what I owed on the second, plus an extra amount for taxes, in crypto wallets associated with DEBT Box projects. However, after this lawsuit became public, many DEBT Box token holders began selling their tokens. The value of my DEBT Box tokens decreased by about 90% to as low as $30,000 to $50,000. As a result, I was not able to make the balloon payment in September.

21. I communicated my situation to the holder of the second mortgage and begged them to allow me to put the house on the market. The holder of the second refused, saying we could extend the due date to see if the value of my DEBT Box tokens rebounded.

22. At the same time, my employer was trying to raise capital to expand its operations. However, that effort failed around the same time a bank that owed my employer a substantial amount of money refused to pay and terminated its relationship with my employer. As a result, I made dramatically less money through this employment (which was my main source of income) than I expected.

23. I shared this development with the holder of the second mortgage, which also was my real estate agent. Because our home value was decreasing, the second holder/agent put the house on the market for less than what we paid for it. Our home is now under contract for about $200,000 less than what I owe.

24. My family has not secured a new home, although we are desperately trying to find something suitable for our children and pets. There are no options in our area, which means my wife and I will have to uproot our children from their schools, friendships, and activities.

25. I've desperately tried to manage the stresses of losing some assets and having preserved assets frozen, including by reducing household expenses. For example, in early October, my family attempted to downsize from two cars to a single different (less expensive) one. When we attempted to get the loan through a car dealership, we were told banks "were being weird" and telling the dealership "they can't tell them why, but they won't allow me to get a loan." While the dealership attempted to look for other loan options, it informed me my credit score may be blame. I learned the score, which was the lowest I'd ever seen it. The dealership

also told me my credit score reflected that I "used my credit a lot." I researched this problem and found an unusual number of credit inquiries, which I believe related to the reduction of my credit limits, which, in turn, increased the debt ratio.

26. Toward the end of last year, my credit score increased somewhat. I resumed my effort to lower my vehicle expenses; however, by that time, the values of the vehicles we wanted to trade had sharply declined compared to October. If we traded in both vehicles that we wanted to, we still would owe $37,000. Trading in both vehicles under these circumstances will not help us lower our expenses.

27. Before this lawsuit was filed, my family was able to meet its needs through my employment with the credit card company alone. Since the lawsuit was filed, and my assets were frozen and others lost tremendous value, we've had to borrow money (about $15,000) to pay for ordinary expenses, such as food, our children's school and activities, and the like. We have not been able to repay these borrowed funds.

28. The marshals/receiver attorneys' visit to my home and other lawsuit-related issues have affected my young daughters. Since early August, they have asked me and my wife if the "police" are coming back again. I've seen them jump or wince or become startled when the doorbell rings or the door is knocked. I've also observed that they no longer are invited to play with the community organization children, although my girls want to do so.

29. Since August 2023, when my assets first were frozen, became part of the receivership, and lost extraordinary value, each member of my family has experienced extreme, sometimes debilitating, stress, sadness, fear, anxiety, and embarrassment. Speaking for myself, I

had trouble eating, sleeping, getting out of bed, and leaving my house.  And, despite being athletic with low body fat, I lost 25 pounds in August alone.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**DATED** this 12th day of January, 2024 in Salt Lake County, Utah.

/s/ Matthew Fritzsche (signed by Adam L. Grundvig with Mr. Fritzsche's permission given by telephone on January 11, 2024)

_____

Matthew Fritzsche

8

9

## CERTIFICATE OF SERVICE

I certify that I caused to be delivered through CM/ECF filing a true and correct copy of the foregoing **DECLARATION OF MATTHEW FRITZSCHE IN SUPPORT OF REPLY TO THE SEC'S RESPONSE TO THE COURT'S NOVEMBER 30, 2023 ORDER TO SHOW CAUSE** on January 16, 2024 to all counsel of record.

/s/ Cindee Elmer