IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> DIGITAL LICENSING INC. dba DEBT BOX, a Wyoming corporation, et al., <br><br> Defendants/Relief Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:23-cv-00482-RJS-DBP <br><br> Chief Judge Robert J. Shelby <br><br> Chief Magistrate Judge Dustin B. Pead |

On July 26, 2023, the Securities and Exchange Commission filed a sealed Complaint[1] and an ex parte Application for Entry of Temporary Restraining Order (TRO Application).[2] After an ex parte hearing, the court issued a Temporary Restraining Order (TRO) that, among other things, froze Defendants' and Relief Defendants' assets.[3] The court also appointed a Receiver.[4]

In September 2023, multiple Defendants moved to dissolve the TRO.[5] The court held a hearing and granted the Motions to Dissolve, concluding the TRO was improvidently issued because the Commission was unable to show irreparable harm was likely without a TRO.[6] The court dissolved the TRO and determined the Receivership should not continue beyond a transition period.[7] At the hearing, the court expressed concern about potential misconduct

---

[1] Dkt. 1, *Complaint*. The Complaint is no longer sealed. *See* Dkt. 14, *Aug. 2, 2023 Order Unsealing Case*.

[2] Dkt. 3, *TRO Application*.

[3] Dkt. 9, *First TRO*; *see also* Dkt. 11, *July 28, 2023 Minute Entry*.

[4] Dkt. 10, *Temporary Receivership Order*; *see also* Fed. R. Civ. P. 66.

[5] Dkt. 132, *DEBT Box Defendants' Motion to Dissolve*; Dkt. 145, *iX Global Defendants' Motion to Dissolve*; Dkt. 159, *Fritzsche's Motion to Dissolve*.

[6] Dkt. 187, *Oct. 6, 2023 Minute Order*.

[7] *Id.*

Commission attorneys engaged in while obtaining and maintaining the TRO.[8]  On November 30, 2024, the court issued an Order to Show Cause specifically setting forth these concerns and directing the Commission to show cause why the court should not impose sanctions.[9]  The Commission filed its Response on December 21, 2023.[10]  Separately, on January 31, 2024, the Commission filed a Motion to Dismiss the action without prejudice.[11]

The court now takes up the Commission's Response and Motion to Dismiss.  For the reasons explained below, the court imposes sanctions against the Commission for bad faith conduct in obtaining, maintaining, and defending the TRO, and denies the Commission's Motion to Dismiss without prejudice to refile in accordance with the District of Utah's Local Rules.

## BACKGROUND & PROCEDURAL HISTORY

### The Commission Files a Complaint and Application for an Ex Parte TRO

On July 26, 2023, the Commission filed its sealed Complaint naming eighteen Defendants and ten Relief Defendants, comprising a network of individuals and corporations involved with cryptocurrency.[12]  For clarity, unless greater specificity is required, the court will broadly refer to the primary groups of Defendants as the DEBT Box Defendants[13] and the iX Global Defendants.[14]  The Commission alleges some Defendants, notably the DEBT Box

---

[8] Dkt. 189, *Motion to Dissolve Hearing Transcript* at 12–27.

[9] Dkt. 215, *Order to Show Cause* at 1.

[10] Dkt. 233, *Plaintiff Securities and Exchange Commission's Response to the Court's November 30, 2023 Order to Show Cause* (*Commission's Response*).

[11] Dkt. 260, *Plaintiff Securities and Exchange Commission's Motion to Dismiss Action Without Prejudice and to Vacate Upcoming Hearing* (*Motion to Dismiss*).

[12] *Complaint* ¶¶ 13–100.

[13] This includes Defendant Digital Licensing Inc. (DLI) and individual Defendants Jason Anderson, Jacob Anderson, Schad Brannon, and Roydon Nelson.

[14] This includes Defendant iX Global, LLC and individual Defendants Joseph A. Martinez and Travis Flaherty.

Defendants, made false and misleading representations to investors.[15]  It also alleges some Defendants, including the DEBT Box and iX Global Defendants, acted as unregistered brokers[16] and all Defendants offered and sold unregistered securities.[17]  With the Complaint, the Commission filed a TRO Application and an ex parte Application for Appointment of a Temporary Receiver.[18]  The Complaint and the TRO Application include numerous factual allegations, but the court focuses only on those relevant to irreparable harm.

The most pertinent allegation in the Complaint concerns Defendants' purported efforts to move assets overseas.  The Commission began a paragraph stating, "In the past two months, certain [D]efendants have taken steps to evade law enforcement."[19]  It then asserted "DEBT Box has stated that it is in the process of moving its operations to the United Arab Emirates for the express purpose of evading the federal securities laws."[20]  The Commission quoted two statements Defendant Jacob Anderson, one of the DEBT Box Defendants, made in a June 14, 2023 YouTube video: "We have moved all of [DEBT Box's] operations to Abu Dhabi" and "We're going to be under the jurisdictional control of Abu Dhabi, not the SEC."[21]  Concluding the paragraph discussing Defendants' efforts to "evade law enforcement," the Commission stated, "On June 26, 2023, Defendant iX Global . . . began closing its bank accounts in the

---

[15] *Id.* ¶¶ 64–82; *see also id.* ¶¶ 105–21.

[16] *Id.* ¶¶ 90–100; *see also id.* ¶¶ 122–24.

[17] *Id.* ¶¶ 60–63; *see also id.* ¶¶ 101–04.

[18] *TRO Application*; Dkt. 4, *Plaintiff Securities and Exchange Commission's Ex Parte Application for Appointment of a Temporary Receiver.*

[19] *Complaint* ¶ 6.

[20] *Id.*

[21] *Id.*; *see also* iX Global, *The Future of DEBT & L1 Blockchain!!!*, YouTube (June 14, 2023), https://www.youtube.com/watch?v=bvP78-I-Jv0 (*June 14, 2023 YouTube Video*) at 46:40–48:10.

United States and has since removed over $720,000 in investor funds from those bank accounts."[22]

As noted, the Commission filed its TRO Application and an ex parte Application for Appointment of a Temporary Receiver contemporaneously with its Complaint.

Because the Commission sought a TRO ex parte and without notice to Defendants, it included with its Application the required Attorney Certification.[23]  The Federal Rules of Civil Procedure provide that the Attorney Certification must state "in writing any efforts made to give notice [to defendants] and the reasons why it should not be required."[24]  In the Certification, Commission attorney Michael Welsh, trial counsel in the Commission's Salt Lake Regional Office (SLRO), first invoked the Commission's experience with the court, stating that "on at least seven occasions in the last ten years, the Commission's [SLRO] has sought and obtained emergency and/or ex parte relief for the protection of defrauded investors in cases filed in the United States District Court for the District of Utah."[25]  Welsh then asserted, "Evidence obtained by the Commission, and set forth in the [TRO Application] indicates that Defendants are currently in the process of attempting to relocate assets and investor funds overseas, where at least Defendant Jacob Anderson has contended that those assets will be outside the reach of U.S. regulators."[26]  Welsh stated in the following sentence, "For example, bank records obtained by the Commission . . . show that on June 26, 2023, Defendant iX Global, LLC—the multi-level marketing entity through which the Defendants' 'node licenses' are primarily promoted—began

---

[22] *Complaint* ¶ 6.

[23] Dkt. 3-2, *Rule 65(b)(1)(B) Attorney Certification*.

[24] Fed. R. Civ. P. 65(b)(1)(B).

[25] *Rule 65(b)(1)(B) Attorney Certification* ¶ 3.

[26] *Id.*  ¶ 4.

closing its bank accounts in the United States, and removed over $720,000 in putative investor funds from those accounts."[27]  Welsh went on to represent that DEBT Box "is in the process of moving its operations to the United Arab Emirates for the express purpose of evading the federal securities laws," citing the June 14, 2023 YouTube video.[28]  For these reasons, Welsh contended notice to Defendants of the Commission's TRO Application should not be required.[29]

In the TRO Application, the Commission argued the requirements for obtaining a TRO are relaxed when it is the movant.[30]  Typically, the movant must show: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without the requested injunction, (3) that the balance of harms tips in its favor, and (4) that the TRO is in the public interest.[31]  However, the Commission argued it was required to show only "a likelihood of prevailing on the merits and a reasonable likelihood that the wrong will be repeated."[32]  In support, the Commission cited one case from the Second Circuit and two district court cases within the Tenth Circuit.[33] Believing it was entitled to a relaxed standard, the Commission did not argue there would be irreparable harm without a TRO.  Nor did it address the balance of harms or the public interest.

Although the Commission did not attempt to establish irreparable harm, its Application included facts relevant to that prong.  For example, the second paragraph of the TRO Application stated,

---

[27] *Id.* ¶ 6.  The Certification does not include a paragraph 5.

[28] *Id.* ¶ 7.

[29] *Id.* ¶ 11.

[30] *TRO Application* at 21–22.

[31] *See Winter v. Nat. Res. Def. Box, Inc.*, 555 U.S. 7, 20 (2008); *see also Wiechmann v. Ritter*, 44 F. App'x 346, 347 (10th Cir. 2002) (unpublished) (stating the requirements for a TRO and a preliminary injunction are the same).

[32] *TRO Application* at 21 (quoting *SEC v. Traffic Monsoon, LLC,* 245 F. Supp. 3d 1275 (D. Utah 2017)).

[33] *Id.* (citing *SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990); *Traffic Monsoon*, 245 F. Supp. 3d at 1275; *SEC v. Cell>Point, LLC*, No. 21-cv-01574-PAB-KLM, 2022 WL 444397 (D. Colo. Feb. 14, 2022)).

In June, Defendants began to liquidate investor funds and move operations overseas. On June 26, 2023, Defendant iX Global . . . closed its main accounts with Bank of America and cashed out over $720,000 in putative investor funds. Meanwhile, DEBT Box's principals claim DEBT Box is in the process of moving its operations to the United Arab Emirates for the express purpose of evading the federal securities laws. For instance, in a June 14, 2023, promotional video posted on YouTube, Defendant Jacob Anderson claimed Defendants "have moved all of [DEBT Box's] operations to Abu Dhabi," so as to "be under the jurisdictional control of Abu Dhabi, not the SEC." Defendants have also taken action to block SEC investigative staff from viewing their social media sites, and appear to have recently deleted a website containing training materials for the scheme's promotors [sic].[34]

Later in the Application, the Commission repeated these points and stated, "A review of the bank records of Defendant IX Ventures FZCO, a [United Arab Emirates] company, shows that it now has over $2 million in a UAE account, at least $1.35 million of which are funds investors paid to Defendants to purchase node licenses."[35] The Commission further represented bank records "show Defendants are rapidly dissipating investor funds, both through luxury purchases and by recently draining accounts of those funds."[36]

After arguing it was entitled to a TRO, the Commission requested the court immediately freeze Defendants' and Relief Defendants' assets, order an accounting and document preservation, permit expedited discovery, and order Defendants and Relief Defendants to repatriate assets.[37]

The TRO Application incorporated several Declarations and Exhibits. Most relevant here is the Declaration of Karaz Zaki, an accountant involved with the Commission's investigation.[38]

---

[34] *Id.* at 10 (alteration in original).

[35] *Id.* at 20–21.

[36] *Id.* at 32; *see also id.* ("Defendants appear to have already gone to significant lengths to dissipate assets and relocate investor funds outside the United States.").

[37] *Id.* at 31–34.

[38] Dkt. 3-10, *First Zaki Declaration* ¶¶ 4, 6.

Zaki analyzed records for twenty-nine bank accounts associated with Defendants and Relief Defendants.[39]  The bank records included monthly statements, deposit records, canceled checks, bank signature cards, and wire details.[40]  The court will describe Zaki's Declaration in more detail below when explaining the dissolution of the TRO.

**Ex Parte TRO Hearing**

The case was randomly assigned to the undersigned on July 27,[41] and on July 28, the court held an ex parte hearing on the TRO Application.[42]  The court began by quoting the Tenth Circuit respecting the required showing to obtain injunctive relief and stated: "Any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."[43]  Because of this authority, the court did not believe it could issue a TRO under the relaxed standard proposed by the Commission in its papers.[44]  The court also explained it thought the Commission was requesting what the Tenth Circuit calls a "disfavored injunction," meaning the Commission was required to "make a strong showing both on the likelihood of success on the merits and on the balance of harms."[45]

Although the court was persuaded the Commission had shown a likelihood of success on the merits of its claims against Defendants, the Commission had not addressed the other required TRO prongs.[46]  Furthermore, the Commission had not argued it made the strong showing

---

[39] *Id.* ¶ 7.

[40] *Id.*

[41] Dkt. 7, *Case Reassignment.*

[42] Dkt. 11, *July 28, 2023 Minute Entry*; Dkt. 111, *TRO Hearing Transcript.*

[43] *TRO Hearing Transcript* at 6–7 (quoting *Diné Citizens Against Ruining our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016)).

[44] *Id.* at 4–7.

[45] *Id.* at 7–8, 18; *see also Colorado v. EPA*, 989 F.3d 874, 884 (10th Cir. 2021).

[46] *TRO Hearing Transcript* at 7–9.

necessary for a disfavored injunction.[47]   The court observed an ex parte TRO "is a profound and extraordinary invocation of the power of the federal judiciary.  And it affects citizens in a direct way without any notice or opportunity to be heard."[48]   That extraordinary power is "the reason, of course, for all these safeguards."[49]   For these reasons, the court stated it was prepared to deny the TRO Application without prejudice to refile the motion drawn to the correct legal standards in the Tenth Circuit.[50]

In response, Welsh contended that, although the Commission had not addressed the last three TRO prongs, information relevant to each prong was in its Application.[51]   He offered to address the prongs orally during the hearing, and he began doing so.[52]   For example, concerning irreparable harm, he stated, "[W]e pointed out Defendants are moving assets overseas.  They have said in videos that the reason they are doing this is to avoid SEC jurisdiction.  They have dissipated funds both in closing known accounts and using those funds to purchase exorbitant gifts for themselves . . . ."[53]

After taking a recess to consider the Commission's arguments, the court decided to let it address the missing prongs through oral argument.[54]   The court concluded this was appropriate because the Commission had included facts relevant to each prong in its Application.[55]

---

[47] *Id.* at 4–11.

[48] *Id.* at 12.

[49] *Id.*

[50] *Id.* at 4–11.

[51] *Id.* at 9.

[52] *Id.*

[53] *Id.*

[54] *Id.* at 16–17.

[55] *Id.*

Aware the court was inclined to deny its Application, the Commission made a final

attempt to orally address the three missing prongs.  Concerning irreparable harm, Welsh stated,

> Just as we were on break I was reminded by investigative staff with respect to the
> investigation which remains ongoing that even in the last 48 hours Defendants have
> closed additional bank accounts, and I believe the number, I don't have it in front
> of me, was around 33 bank accounts have been closed.[56]

These closures, Welsh asserted, demonstrated investors "would suffer irreparable harm by the

fact of their assets not being able to be returned if this is determined on the merits to be another

security [sic] violation and securities fraud."[57]  Welsh further argued Defendants "made clear

that their intentions are to move assets overseas and to dissipate funds."[58]

After the Commission addressed the missing prongs, the court ultimately concluded the

Commission had made the required showing for a TRO.[59]  To the court, the most significant

evidence was the Commission's representation that Defendants had closed bank accounts within

the last 48 hours.  As Welsh presented it, the strong implication was Defendants were actively

closing accounts and contemporaneously moving funds overseas in response to the

Commission's investigation.[60]

The court issued the first TRO after the hearing.[61]  The Order stated it would expire after

ten days and the court anticipated renewing the TRO unless there was opposition.[62]  The court

---

[56] *Id.* at 20.

[57] *Id.*

[58] *Id.* at 20–21.

[59] *Id.* at 24–25.

[60] *Id.* at 9; *see also Rule 65(b)(1)(B) Attorney Certification* ¶¶ 4–6.

[61] *First TRO.*

[62] *Id.* at 16.

also entered a Temporary Receivership Order, appointing Josias Dewey as the "temporary receiver of [DEBT Box] and its subsidiaries and affiliates."[63]

**Defendants Move to Dissolve the TRO**

After the first TRO expired, the court entered identical TROs on August 7, August 17, and August 29.[64]  In each TRO, the court stated it intended to renew the TRO unless there was opposition.[65]

On September 12, the day the fourth TRO was set to expire, the DEBT Box Defendants filed a Motion to Dissolve.[66]  This was the first challenge to the TROs.  The court set a status conference for September 15 to discuss scheduling[67] and renewed the TRO.[68]  On September 14, the iX Global Defendants filed their own Motion to Dissolve.[69]

At the status conference on Friday, September 15, the court set a briefing schedule for a preliminary injunction hearing.[70]  The court also scheduled daily status conferences for September 18–22 to address anticipated disputes relating to the expedited discovery order,[71] and

---

[63] *Temporary Receivership Order* at 3.

[64] Dkt. 33, *Second TRO;* Dkt. 78, *Third TRO;* Dkt. 121, *Fourth TRO.*

[65] *Second TRO* at 16; *Third TRO* at 17; *Fourth TRO* at 17.

[66] Dkt. 132, *DEBT Box Defendants' Motion to Dissolve.*  Relief Defendants Business Funding Solutions LLC, Blox Lending LLC, The Gold Collective LLC, and UIU Holdings LLC were also moving parties on the Motion.  *Id.*

[67] Dkt. 134, *Notice of Hearing.*

[68] Dkt. 136, *Fifth TRO.*  The court renewed the TRO for a final time on September 26, 2023.  Dkt. 165, *Sixth TRO.*

[69] Dkt. 145, *iX Global Defendants' Motion to Dissolve.*  The following week, Defendant Matthew Fritzsche filed a Motion to Dissolve, incorporating the iX Global Defendants' arguments.  Dkt. 159, *Fritzsche's Motion to Dissolve.*

[70] Dkt. 147, *Sept. 15, 2023 Minute Entry.*

[71] The court held a status conference on Monday, September 18.  Dkt. 151, *Sept. 18, 2023 Minute Entry.*  It did not hold conferences the other days as the parties informed the court they did not have disputes that required its attention.

stayed briefing on the Motions to Dissolve.[72]  The court told the parties it would review the Motions to Dissolve in greater detail and inform the parties how it intended to proceed.

The following Monday, the court ordered the Commission to respond to the Motions to Dissolve and the Receiver to respond to portions of the DEBT Box Defendants' Motion.[73]  The court set an expedited briefing schedule and a hearing date.[74]

The moving Defendants raised several arguments in the Motions to Dissolve.  Most relevant here, they argued the Commission had not shown irreparable harm.[75]  They also argued the Commission made false or misleading statements to obtain the ex parte TRO.[76]  For example, the DEBT Box Defendants asserted that Welsh's statement at the TRO hearing about account closures in the 48 hours before the hearing was false.[77]  According to Defendants, there were no DEBT Box-affiliated account closures in July 2023—as established by the Commission's own accountant.[78]  Accounts previously closed in 2021 and 2022 were actually closed by the banks, not by Defendants, presumably due to regulatory concerns about serving cryptocurrency clients.[79]  Concerning the Commission's representations about Defendants' efforts to move assets overseas, the DEBT Box Defendants contended the Commission's use of the YouTube

---

[72] *Sept. 15, 2023 Minute Entry.*

[73] *Sept. 18, 2023 Minute Entry.*  The court asked the Receiver to respond to the DEBT Box Defendants' arguments that the Receiver failed to disclose a potential conflict of interest and failed to manage DEBT Box's assets.  *See DEBT Box Defendants' Motion to Dissolve* at 28–30.

[74] *Sept. 18, 2023 Minute Entry.*

[75] *DEBT Box Defendants' Motion to Dissolve* at 15–18; *iX Global Defendants' Motion to Dissolve* at 7–8; *Fritzsche Motion to Dissolve* at 3.

[76] *DEBT Box Defendants' Motion to Dissolve* at 15–18; *iX Global Defendants' Motion to Dissolve* at 7–8.

[77] *DEBT Box Defendants' Motion to Dissolve* at 10.

[78] *Id.*

[79] *Id.* at 10–11.

video comments was "highly misleading."[80]  Anderson's comments were in response to a viewer question and, properly characterized, discussed the benefits of operating in the United Arab Emirates (UAE) in comparison to the uncertain regulatory environment in the United States.[81] Further, Defendants argued, the Commission's alleged risk of irreparable harm was undermined by the fact Defendants already moved their operations to the UAE over a year earlier, long before the YouTube video and the Commission's effort to obtain the ex parte TRO.[82]

Similarly, the iX Global Defendants alleged the Commission obtained the TRO "based on materially misleading information."[83]  Notably, the June 26, 2023 account closures the Commission offered as evidence of Defendants' ongoing efforts to dissipate assets and move funds overseas were actually accounts closed by the bank—not by Defendants.[84]  After the bank closed the accounts, iX Global deposited the funds into its Mountain America Credit Union account, a domestic bank headquartered in Sandy, Utah—not overseas.[85]  The iX Global Defendants further stressed that the Commission's accountant had this information at the time it sought the TRO.[86]

In Opposition, the Commission contended it had shown irreparable harm and had not misled the court—characterizing Defendants' assertions as "outlandish and explosive."[87]  For example, contrary to Defendants' arguments, the Commission averred the facts "reveal that the

---

[80] *Id.* at 11.

[81] *Id.* at 12.

[82] *Id.* at 13.

[83] *iX Global Defendants' Motion to Dissolve* at 3.

[84] *Id.* at 7–8.

[85] *Id.* at 3.

[86] *Id.* at 5.

[87] Dkt. 168, *Opposition to DEBT Box Defendants* at 1; *see also* Dkt. 169, *Opposition to iX Global Defendants*.

[DEBT Box] Defendants made significant efforts to move investor funds outside of the Court's jurisdiction in the months leading up to the SEC's filing."[88]  Concerning its showing of irreparable harm, the Commission responded to Defendants' argument about account closures by asserting that "mere days before the TRO Hearing—consistent with counsel's representation to the Court—the SEC learned that a substantial portion of the funds held in two bank accounts controlled by Defendants, including one controlled by [DEBT Box Defendants], had been substantially drained of assets."[89]  The Commission also included an updated Declaration from its accountant, Zaki.[90]

**The Court Dissolves the TRO**

The Motions to Dissolve were fully briefed on October 3,[91] and the court held a hearing on October 6.[92]  The court began by highlighting instances where it believed the Commission presented false or misleading information in its ex parte TRO papers and at oral argument.[93]  The court will further detail these instances below when it discusses its Memorandum Decision and Order dissolving the TRO and its Order to Show Cause, but, as an illustrative example, it was concerned there appeared to be no evidence supporting the Commission's statement in oral argument that Defendants closed bank accounts in the 48 hours before the ex parte TRO hearing.[94]

---

[88] *Opposition to DEBT Box Defendants* at 2.

[89] *Id.* at 10.

[90] Dkt. 168-1, *Second Zaki Declaration*.

[91] Dkt. 175, *DEBT Box Defendants' Reply*; Dkt. 174, *iX Global Defendants' Reply*; *see also* Dkt. 150, *DEBT Box Defendants' Notice of Supplemental Authority*; Dkt. 163, *DEBT Box Defendants' Supplemental Memorandum*.

[92] Dkt. 187, *Oct. 6, 2023 Minute Order*; *see also* Dkt. 189, *Motion to Dissolve Hearing Transcript*.

[93] *Motion to Dissolve Hearing Transcript* at 13–27.

[94] *Id.* at 22–27.

After outlining its concerns, the court explained it believed the TRO likely should not have issued in the first instance and, even considering new evidence presented, the Commission had not shown irreparable harm.[95]  The court stated it was inclined to dissolve the TRO, transition out the Receivership, and deny as moot several pending Motions concerning the Receivership.[96]  The court invited the Commission to address any topics it wished.[97]

The Commission stated it had not intended to mislead the court and explained why it presented the evidence the way it had.[98]  Notably, the Commission did not contend the court was mistaken about the evidence.[99]  Nor did the Commission argue it was entitled to a TRO.[100]

Not finding any compelling evidence to the contrary in the Commission's explanation, the court concluded the TRO was improvidently issued and, even considering new evidence, the Commission had failed to show irreparable harm.[101]  The court thus dissolved the TRO.[102]  The court also stated it was considering issuing an order to show cause concerning the Commission's apparent misrepresentations.[103]

Because there was no longer a TRO in place, the court dissolved the Receivership and denied as moot three pending Motions concerning the Receivership.[104]  It ordered Defendants to create a transition proposal, meet and confer with the Receiver, and provide an update to the

---

[95] *Id.* at 28.  The new evidence was Zaki's updated Declaration and attached Exhibits.  *See id.*

[96] *Id.* at 28–30.

[97] *Id.* at 30.

[98] *Id.* at 31–35.

[99] *Id.*

[100] *Id.*

[101] *Id.* at 46–47.

[102] *Id.*

[103] *Id.* at 12.

[104] *Id.* at 47–48.

court.[105]   The court also stated it would issue a written ruling more fully explaining its reasons for dissolving the TRO.[106]   It did so on November 30, 2023.[107]

In its Memorandum Decision and Order, the court first reiterated the applicable legal standard, emphasizing that "[i]rreparable harm 'is the single most important prerequisite' for a temporary restraining order."[108]   As the court noted, this "is 'not an easy burden to fulfill.'"[109]   It is the movant's burden to show the anticipated injury is "certain, great, actual and not theoretical."[110]   In other words, the injury "is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."[111]   The court then addressed each of the Commission's arguments for irreparable harm, beginning with the account closures.[112]

The court noted it viewed the Commission's representations at the TRO hearing concerning account closures in the 48 hours before the hearing as "significant evidence of irreparable harm because it indicated Defendants were in the process of dissipating funds."[113]   However, the Commission had not provided any evidence to support this contention.[114]

---

[105] *Id.* at 39, 43–44.

[106] *Id.* at 47.

[107] Dkt. 214, *Memorandum Decision and Order*.

[108] *Id.* at 13 (quoting *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017))).

[109] *Id.* at 14. (quoting *First W. Cap. Mgmt.*, 874 F.3d at 1141 (quoting *Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003))).

[110] *Id.* (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003))).

[111] *Id.* (quoting *Schrier*, 427 F.3d at 1267).

[112] *Id.* at 15.

[113] *Id.*

[114] *Id.*

The court observed the iX Global accounts, which the Commission stated were closed by Defendant iX Global on June 26, 2023, were actually closed by the bank—a fact the Commission now acknowledged.[115]  The court rejected the Commission's argument that fact was immaterial, noting the Commission relied on those closures to suggest iX Global was closing accounts and moving funds overseas outside the Commission's reach.[116]  Welsh's Attorney Certification highlighted these closures as an example of the Commission's evidence indicating "that Defendants are currently in the process of attempting to relocate assets and investor funds overseas."[117]  But, as the court explained, "iX Global did not close its accounts, so there is less reason to believe it was 'attempting to relocate assets and investor funds overseas.'"[118] Especially, the court continued, in view of the fact bank records the Commission possessed at the time it filed its TRO Application demonstrated "iX Global deposited the funds from its closed accounts into a Mountain America Credit Union account, not an overseas accounts."[119]

Specifically addressing Welsh's statement about account closures in the 48 hours before the TRO hearing, "the court understood this to mean Defendants had closed 33 accounts in the last 48 hours.  For the court, this was the most important evidence of irreparable harm without the requested TRO."[120]  The court noted Welsh acknowledged at the subsequent hearing on the Motions to Dissolve that no bank accounts were closed in the 48 hours before the TRO hearing

---

[115] *Id.* at 16.

[116] *Id.*

[117] *Id.* (quoting *Rule 65(b)(1)(B) Attorney Certification* ¶ 4); *see also Rule 65(b)(1)(B) Attorney Certification* ¶ 6; *Complaint* ¶ 6; *TRO Application* at 10.

[118] *Memorandum Decision and Order* at 16 (quoting *Rule 65(b)(1)(B) Attorney Certification* ¶ 4).  The court recognized the Commission's contention at the hearing on the Motions to Dissolve that it did not know the banks closed the accounts but observed the Commission "explicitly stated iX Global closed the accounts."  *Id.* n. 115.

[119] *Id.* at 16–17 (citing *First Zaki Declaration* ¶ 20(a); *First Zaki Declaration: Exhibit* 9 at 198–204).

[120] *Id.*

16

and he clarified that, in total, 24 accounts, not 33, had been closed.[121]   Notwithstanding Welsh's acknowledgment, "the fact that no accounts closed in the 48 hours before the TRO hearing drastically changes the evidentiary picture."[122]   Moreover, the court continued, there appeared to be no evidence any accounts were closed by Defendants.[123]   Though Zaki identified a total of 24 closed accounts, he did not identify who closed the accounts and Defendants had provided evidence that at least half of those were closed by banks.[124]

The court summarized this portion of its analysis by stating it "issued the TRO believing Defendants were actively in the process of closing their accounts."[125]   The court found the alleged closures to be "compelling evidence corroborating the Commission's claims that Defendants were rapidly attempting to move assets overseas," particularly in view of "other Commission statements that led the court to believe Defendants were aware of the investigation."[126]   But, the court concluded, "there is no evidence before the court that Defendants closed accounts or that accounts were closed in July 2023."[127]

The Order next considered the Commission's representations that Defendants were actively moving assets and funds overseas.[128]   The court "relied on this representation when concluding irreparable harm was likely.  But the Commission has not provided supporting

---

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.* at 18 (citing *Second Zaki Declaration* ¶ 10(a); *Second Zaki Declaration: Exhibit A* at 7–8 (identifying closed accounts); *Bank of America Letter* (identifying three iX Global accounts closed by banks in June 2023); *Bank Closure Documents* at 2–3, 12–16 (identifying two DEBT Box and five Gold Collective accounts closed by banks in January 2023, and one Blox Lending Account and one UIU Holdings account closed by banks in December 2022)).

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *Id.* (citing *Rule 65(b)(1)(B) Attorney Certification* ¶ 4).

evidence."[129]  The court recounted numerous examples from the Attorney Certification, the ex

parte TRO Application, Welsh's statements at the TRO hearing, and from the Commission's

Opposition to the Motions to Dissolve, where the Commission represented Defendants were

currently moving assets and funds overseas.[130]  It identified three pieces of evidence the

Commission purportedly based its representations on and concluded, "[T]he evidence does not

support the Commission's contention."[131]

    First, the court evaluated the Commission's representations in its TRO Application and

Welsh's statements at the hearing on the Motions to Dissolve concerning transfers to Relief

Defendant IX Ventures FZCO, a UAE Company.[132]  In its Application, the Commission stated

IX Ventures FZCO has "over $2 million in a UAE bank account, at least $1.35 million of which

are funds investors paid to Defendants to purchase node licenses."[133]  Welsh reiterated this at the

hearing on the Motions to Dissolve, stating, "[W]e're seeing . . . Relief Defendant[] IX Venture[]

FZCO being created in Abu Dhabi receiving $2 million from investor funds being transferred

there and then seeing bank accounts close on June 30th, which we were alerted to when we were

reaching out to the banks in July."[134]  The court determined that, while iX Global did wire

transfer $1.35 million to IX Ventures FZCO, the Commission's own documents attached to its

TRO Application showed the last wire transfer occurred in December 2022.[135]  And, as Welsh

confirmed at the Motion to Dissolve hearing, the Commission was unaware of any later money

---

[129] *Id.*

[130] *Id.* at 19.

[131] *Id.*

[132] *Id.* at 20.

[133] *Id.* (quoting *TRO Application* at 21).

[134] *Id.* (quoting *Motion to Dissolve Hearing Transcript* at 32).

[135] *Id.* (citing *First Zaki Declaration: Exhibit 5* at 187).

transfers to the UAE.[136]  The court concluded, "That admission is significant—transfers in 2022 do not show Defendants were moving funds overseas in July 2023."[137]

The court next considered the second piece of evidence the Commission relied on—comments by Defendant Jacob Anderson in the June 14, 2023 YouTube video.[138]  The court adjudged the Commission had "mischaracterize[d] Anderson's comments."[139]  As the court explained, the video is an hour-long discussion between Anderson and one of the iX Global Defendants about DEBT Box.[140]  Approximately forty minutes into the discussion, Anderson responded to a viewer question about the "SEC squeeze on crypto" and its potential implications for DEBT Box.[141]  In response to the question, the court recounts, Anderson explained, "DEBT Box believes Abu Dhabi has provided a clearer regulatory framework than the United States, so DEBT Box has 'moved all of the operations currently to Abu Dhabi . . . and so [it is] going to be under the jurisdictional control of Abu Dhabi, not the SEC.'"[142]  The Commission repeatedly presented this statement in isolation as evidence Defendants were moving assets overseas to evade the Commission, but, the court explained, "Given the context of the video and Anderson's full statements, the June 14, 2023 YouTube video does not show Defendants were in the process of moving assets or funds overseas."[143]

---

[136] *Id.* (citing *Motion to Dissolve Hearing Transcript* at 32–33).

[137] *Id.*

[138] *Id.*

[139] *Id.* at 21.

[140] *Id.* (citing *June 14, 2023 YouTube Video*).

[141] *Id.* (quoting *June 14 2023 YouTube Video* at 46:40–52).

[142] *Id.* (quoting *June 14, 2023 YouTube Video* at 47:00–48:08).

[143] *Id.* at 22.

The third piece of evidence the Commission relied upon was a $35,000 wire transfer from DEBT Box to Defendant Brannon, one of the DEBT Box Defendants, on June 16, 2023 with the memo line "Set up office in UAE."[144]  The court observed that, though the wire was evidence DEBT Box was moving operations overseas, "it does not show an immediate, irreparable threat of Defendants moving funds or assets."[145]  As explained, the Commission provided a spreadsheet demonstrating the funds were transferred to Brannon, "but there is no indication they were sent to an overseas account."[146]  There was no "evidence Brannon sent the money overseas."[147]  "Moreover," the court continued, "the wire was almost six weeks before the Commission requested the TRO."[148]  Like the other pieces of evidence the Commission relied upon, the court determined the $35,000 wire on June 16 "does not show Defendants were in the process of moving funds and assets overseas."[149]

The court concluded this portion of the Order by finding "there is no evidence before the court showing Defendants were moving funds and assets overseas in 2023, as the Commission affirmatively and repeatedly alleged as part of its successful efforts to obtain the TRO ex parte."[150]

The court next addressed the Commission's representations concerning the likelihood Defendants would dissipate funds unless the accounts were frozen.[151]  The Commission

---

[144] *Id.* (citing *Opposition to DEBT Box Defendants* at 16).

[145] *Id.* at 23.

[146] *Id.* (citing *Second Zaki Declaration: Exhibit B* at 13).

[147] *Id.*

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] *Id.*

contended this was likely because Defendants are "continuing to transfer assets overseas,"[152] making luxury purchases,[153] and draining accounts.[154]  The court concluded, in fact, the evidence presented did not support a finding of likely irreparable harm.[155]

First, concerning the purported transfer of assets or funds overseas, as the court previously explained, "the Commission has not shown Defendants were in the process of closing accounts and transferring assets or funds overseas in 2023."[156]

Concerning luxury purchases, the court determined they "do not demonstrate immediate, irreparable harm."[157]  The court explained the Commission provided some evidence of luxury purchases in January 2023, as well as expenditures Zaki identified as "apparent personal expenses."[158]  However, the court concluded, "[e]ven assuming these are personal expenses," the evidence only "shows payments from August 2021 to April 2023.  This does not show a threat of immediate, irreparable harm in July 2023."[159]

Similarly, the court concluded the Commission's evidence of reduced account balances "is not sufficient to show irreparable harm."[160]  The court evaluated the Commission's representation in its Opposition to the DEBT Box Defendants' Motion to Dissolve that there was evidence of dissipation because "a substantial portion of the funds held in two bank accounts

---

[152] *Id.* (quoting *Opposition to DEBT Box Defendants* at 14).

[153] *Id.* (citing *Complaint* ¶ 4; *TRO Application* at 18; *Opposition to DEBT Box Defendants* at 14).

[154] *Id.* (citing *Opposition to DEBT Box Defendants* at 14–15).

[155] *Id.*

[156] *Id.* at 24.

[157] *Id.*

[158] *Id.* (citing Dkt. 3-4, *Joseph Watkins Declaration* ¶ 32; *First Zaki Declaration* ¶ 19; *TRO Application* at 18; *Opposition to DEBT Box Defendants* at 14–15).

[159] *Id.* (citing *First Zaki Declaration: Exhibit 8* at 196–97).

[160] *Id.*

controlled by Defendants, including one controlled by [DEBT Box], had been substantially drained of assets."[161]  Analyzing the spreadsheets the Commission submitted, the court observed account balances fluctuated from month-to-month—both up and down—but concluded, "[T]here is no evidence before the court showing the withdrawn funds were sent overseas or otherwise used improperly."[162]  Defendants contended the balance fluctuations resulted from "ordinary-course business expenses."[163]  Indeed, some accounts on the list presented by the Commission showed only a balance increase.[164]  The court acknowledged the evidence "did not prove Defendants did not dissipate funds," but it also did not permit the court to infer funds were improperly dissipated.[165]  Without more, the court concluded, it "cannot be certain imminent, irreparable harm is likely—especially where evidence shows the withdrawals and transfers are not a new development."[166]

Next, the court considered the Commission's representations in its TRO Application and at the TRO hearing that Defendants had taken steps to interfere with the Commission's investigation.[167]  Specifically, the court considered the Commission's allegation that Defendants have "taken action to block SEC investigative staff from viewing their social media sites, and appear to have recently deleted a website containing training materials for the scheme's promotors [sic]."[168]  The Commission used this as evidence of irreparable harm at the TRO

---

[161] *Id.* at 24–25 (quoting *Opposition to DEBT Box Defendants* at 15).

[162] *Id.* at 25.

[163] *Id.* (quoting *DEBT Box Defendants' Reply* at 7).

[164] *Id.* at 26.

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.* (quoting *TRO Application* at 10).

hearing, arguing Defendants were "remov[ing] evidence that [it] would need to rely upon in discovery."[169]  The court noted that, while some YouTube videos were apparently no longer available, there was "no evidence before the court that Defendants were deliberately removing videos to 'block SEC investigative staff.'"[170]  The court observed the Commission later informed the court "its investigation was 'covert'" and presented no evidence suggesting Defendants knew about the investigation.[171]  The court concluded it had "no reason to believe Defendants destroyed evidence to obstruct the Commission," and "the fact that some videos are no longer available does not suggest a likelihood of irreparable harm."[172]

In summation, the court explained it "granted the TRO believing Defendants had closed bank accounts in the 48 hours before the ex parte TRO hearing and were in the process of moving assets and funds overseas."[173]  However, "The Commission has not provided evidence to support those representations.  And considering all the evidence, the Commission has not shown a likelihood of imminent, irreparable harm."[174]  Accordingly, the Commission was not entitled to a TRO.[175]

**The Court Issues an Order to Show Cause**

As suggested at the November 30, 2023 Motion to Dissolve hearing, the court issued an Order to Show Cause directing the Commission to show why the court should not impose

---

[169] *Id.* at 27 (quoting *TRO Hearing Transcript* at 10).

[170] *Id.* (quoting *TRO Application* at 10).

[171] *Id.* (quoting *TRO Hearing Transcript* at 10, 22).

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.* at 28.

sanctions for its conduct in obtaining and defending the TRO.[176]  The court provided a detailed overview of the events leading up to that point and set forth the law authorizing sanctions under Rule 11 of the Federal Rules of Civil Procedure and the court's inherent power.  The court explained, after review of the Commission's filings and statements at the ex parte TRO hearing, it was "concerned the Commission made materially false and misleading representations that violated Rule 11(b) and undermined the integrity of proceedings."[177]  The court reminded, "The context is crucial—the representations were made by a federal agency seeking an ex parte TRO and while later seeking to preserve the TRO."[178]  The court then ordered the Commission to address five specific issues and to show cause why the court should not impose sanctions.  They are included here in their entirety:

1. Paragraph 4 of the Rule 65(b)(1)(B) Attorney Certification, which states, "Evidence obtained by the Commission . . . indicates that Defendants are currently in the process of attempting to relocate assets and investor funds overseas, where at least Defendant Jacob Anderson has contended that those assets will be outside the reach of U.S. regulators."

   a. When making this statement, what factual support did counsel possess and rely on?

2. The following statement in the TRO Application: "Defendants have also taken action to block SEC investigative staff from viewing their social media sites, and appear to have recently deleted a website containing training materials for the scheme's promotors [sic]."

   a. When the Commission filed its TRO Application, had its investigation been covert, as Welsh represented at the TRO hearing?

   b. If the investigation had been covert, what factual support did counsel possess and rely on when representing Defendants had "taken action to block SEC investigative staff from viewing their social media sites"?

---

[176] Dkt. 215, *Order to Show Cause* at 1.

[177] *Id.* at 17.

[178] *Id.*

3. Welsh's statement at the TRO hearing that "even in the last 48 hours Defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed."

   a. When making this statement, what factual support did counsel possess and rely on?

   b. When did counsel become aware this statement was incorrect?

4. The following statement from the Commission's Opposition to the DEBT Council Defendants' Motion to Dissolve: "And while the DLI Defendants now lean on the technicality that certain corporate documents show attempts to move DLI's business interests overseas in 2022, those documents don't match the facts on the ground, which reveal that the DLI Defendants made significant efforts to move investor funds outside of the Court's jurisdiction in the months leading up to the SEC's filing."

   a. When making this statement, what factual support did counsel possess and rely on?

5. The following statement from the Commission's Opposition to the DEBT Council Defendants' Motion to Dissolve: "Further, mere days before the TRO Hearing—consistent with counsel's representation to the Court—the SEC learned that a substantial portion of the funds held in two bank accounts controlled by Defendants, including one controlled by DLI, had been substantially drained of assets."

   a. What statement was the Commission referencing when it stated "consistent with counsel's representation to the Court"?[179]

**Responses to the Order to Show Cause**

On December 21, 2023, the Commission filed its Response to the Order to Show Cause.[180]  In it, the Commission recognizes Congress entrusted it with "significant responsibility" to enforce federal securities laws, particularly when it "seeks emergency relief on an *ex parte* basis," and that it "cannot let its zeal to stop ongoing fraud interfere with its duty to be accurate and candid."[181]  It acknowledges "its attorneys fell short of that expectation here."[182]

---

[179] *Id.* at 18–19.

[180] *Commission's Response.*

[181] *Id.* at 1.

[182] *Id.*

Broadly, the Commission states its attorneys made inaccurate statements at the ex parte TRO hearing, failed to correct those statements when they learned they were inaccurate, and "failed to make clear that certain representations were inferences from facts known to them rather than directly supported factual assertions."[183]  Although the Commission "deeply regrets these errors," it argues sanctions are not warranted because "the circumstances here" do not reach the misconduct Rule 11 was designed to address.[184]  Further, because "Commission staff have not engaged in any bad faith conduct," sanctions under the court's inherent power are unavailable.[185] The Commission then responds to each of the court's questions.

Concerning the first question, Welsh's representations in his Attorney Certification about Defendants' efforts to move assets and funds overseas, the Commission states Welsh relied on data from Commission accountant Zaki and Defendant Anderson's comments in the June 14, 2023 YouTube video.[186]  The Commission highlights three datapoints from Zaki's analysis of bank records: (1) by December 2022, approximately $1.35 million of "investor funds" were transferred to the foreign bank account of UAE-based IX Ventures FZCO, (2) account balances in various Defendant banks accounts were substantially reduced beginning as early as spring of 2021 and continuing through May 2023, and (3) three iX Global Bank of America accounts closed on June 30, 2023.[187]  The Commission then explains Welsh interpreted Defendant Anderson's statements about moving "operations" to Abu Dhabi to be under the "jurisdictional

---

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] *Id.* at 9–10.

[187] *Id.* at 9.

control of Abu Dhabi, not the SEC," to mean Defendants were moving assets and investor funds.[188]

The Commission acknowledges Welsh's statement that Defendants were "currently in the process" of moving asses and funds overseas was based on an inference that it failed to identify as such.[189]  Welsh's assertion "reflects an inference drawn from his understanding that assets were being depleted, $1.35 million of investor funds had been transferred overseas, Defendants were engaged in an ongoing fraudulent scheme, and Defendant Anderson referred to moving operations overseas in the June 14, 2023 YouTube video."[190]  However, the Commission recognizes "staff did not have direct evidence of recent depletion of funds or recent overseas transfers, and counsel should have identified his statement as an inference rather than a factual representation with direct support."[191]  Specifically concerning the YouTube video, the Commission notes it should have identified its assertions about Defendant Anderson's remarks were the "Commission's interpretation of those remarks" and it should have provided additional context concerning the remarks.[192]  Concluding this response, the Commission states it "sincerely regrets these errors."[193]

The Commission next responds to the court's question concerning statements in the TRO Application about Defendants taking "action to block" the Commission's staff from viewing social media sites and deleting online content.[194]  The Commission explains when it filed its

---

[188] *Id.*

[189] *Id.* at 10.

[190] *Id.*

[191] *Id.*

[192] *Id.*

[193] *Id.*

[194] *Id.* at 10–13.

TRO Application the investigation was covert but it was concerned Defendants may have been alerted to the investigation.[195]  The Commission acknowledges it "did not have direct evidence that Defendants had taken action to block Commission investigative staff from viewing Defendants' social media sites.  Rather, Commission staff drew that inference based on certain events and circumstances."[196]

The Commission then explains what those events and circumstances were.  While investigating this matter, Commission staff viewed Defendants' Instagram "Stories" while logged into an account associated with the Commission's Division of Enforcement, which, staff understood, would be visible to Defendants.[197]  In late July 2023, shortly before the Commission filed its Complaint and TRO Application, staff discovered they could no longer view Defendants' social media sites—many of which were still viewable when using accounts not associated with the Commission—and that some videos Defendants posted on YouTube had been taken down.[198]  Staff concluded a possible explanation was that Defendants were aware of the investigation.[199]  Additionally, in March 2023, the Commission filed a separate lawsuit against another entity that was similar to the one in this matter.[200]  Welsh knew that some of the DEBT Box Defendants here were currently in litigation in state court against a defendant in the

---

[195] *Id.* at 10.

[196] *Id.*

[197] *Id.* at 11.

[198] *Id.* at 11–12.

[199] *Id.* at 12.

[200] *Id.*

Commission's other action.[201]  Given that, he "inferred that Defendants in this case were likely aware of the possibility that the Commission was also investigating their activities."[202]

The Commission acknowledges "staff did not have direct evidence that Defendants had taken action to block Commission staff from viewing their social media pages."[203]  Again, "[t]he Commission regrets not identifying that statement as an inference rather than a factual representation, and not making the bases for that inference clear to the court."[204]

The Commission next addresses the court's questions concerning Welsh's statement at the TRO hearing that Defendants closed bank accounts in the 48 hours before the hearing.[205] Concerning the factual support Welsh relied on, the Commission first explains the "representation occurred due to a misunderstanding between Welsh" and Commission investigative attorney, Laurie Abbott.[206]  At the direction of the SLRO Director, investigative staff contacted banks in the days before the TRO hearing to obtain current account balances.[207] During those calls, banks indicated some of Defendants' accounts had closed.[208]  However, Abbott did not realize the accounts identified were accounts the Commission already knew were closed.[209]

---

[201] Id.

[202] Id.

[203] Id. at 13.

[204] Id.

[205] Id. at 13–16.

[206] Id. at 13.

[207] Id.

[208] Id.

[209] Id.

Abbott then communicated information about account closures to Welsh during the recess the court took at the TRO hearing.[210]  Abbott and Welsh differ on precisely what Abbott said.  According to Abbott, she "told Welsh that over the past two days, the Commission's investigative staff made calls to banks and had learned of closures of Defendants' accounts."[211]  Though Welsh does not recollect exactly what was said, he recalled Abbott saying something "to the effect that there was evidence of account closures in the past 48 hours."[212]  Regardless, "[t]he Commission recognizes that this statement was inaccurate, and the Commission regrets not notifying the Court about the error when its counsel and staff became aware of the inaccuracy."[213]

The Commission then clarifies the number of Defendants' closed domestic bank accounts.  From information in Zaki's Supplemental Declaration, a total of 24 Defendant accounts had been closed, not the 33 suggested at the hearing.[214]  And the Commission admits "none were closed in July 2023."[215]  Further, while investigative staff were aware the purported "dissipation of assets" in select accounts occurred over several years, the "staff learned in the 48 hours before the TRO hearing that the balances of several bank accounts owned by certain Defendants had substantially decreased—but not closed—more recently, in July 2023."[216]

The Commission next addresses the court's second question on this issue concerning when counsel became aware the statement about account closures was incorrect.  Abbott

---

[210] *Id.*

[211] *Id.*

[212] *Id.*

[213] *Id.*

[214] *Id.* at 14.

[215] *Id.*

[216] *Id.*

recognized Welsh's statement—that "in the last 48 hours Defendants have closed additional bank accounts"—"did not accurately reflect what she had said or intended to convey to Welsh . . . as soon as Welsh made the statement about accounts *being closed* in the last two days."[217]  She did not correct Welsh at the hearing because "she had little experience attending court proceedings and was concerned about interrupting the hearing."[218]  Further, she did not inform Welsh of the misstatement after the hearing because "she did not believe the statement was material to the Commission's showing of irreparable harm, given the other evidence the Commission had presented of an ongoing fraudulent offering."[219]

Welsh became aware the statement "may have been inaccurate" upon reviewing the DEBT Box Defendants' Motion to Dissolve the TRO in September 2023.[220]  After reading Defendants' Motion, Welsh asked investigative staff attorneys about the account closures.[221]  He then learned no accounts were closed in the 48 hours before the TRO hearing.[222] Abbott's comments to him during the recess at the hearing referred to account closings she believed she had learned of in the days before the TRO hearing—not account closings that actually occurred during that time—and "in fact, the closed accounts Abbott was referring to were accounts that staff already knew were closed."[223]  During these discussions, he also learned "substantial funds" were withdrawn from some of Defendants' bank accounts during July 2023.[224]  According to

---

[217] *Id.* (emphasis in original).

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] *Id.* at 14–15.

[222] *Id.* at 15.

[223] *Id.*

[224] *Id.*

Welsh, he knew there was a distinction between accounts closing and accounts being "drained of assets," and that Abbott had not discussed accounts being drained of assets during the hearing recess.[225]  Nonetheless, he "believed that the information about the accounts being drained of assets supported a finding of irreparable harm in the same way that information about account closures supported a finding of irreparable harm."[226]  The Commission also observes that, while Welsh acknowledged at the hearing that he did not have the specific number of account closures "in front of [him]," he should have corrected the number after the hearing.[227]

Concluding this portion of its response, the Commission acknowledges it "should have notified the Court when staff learned that Welsh's statement at the TRO hearing was inaccurate in multiple respects" and it "sincerely regrets the error."[228]

The Commission next responds to the court's question concerning the factual support for the statement in its Opposition to the DEBT Box Defendants' Motion to Dissolve about Defendants' "significant efforts to move investor funds outside of the Court's jurisdiction in the months leading up to the SEC's filing."[229]  As it explains, the Commission relied on the same evidence that it discussed in response to the court's first question.[230]  Staff supplemented its Opposition by also incorporating information it had learned since the TRO hearing.[231]  This included a June 16, 2023 DEBT Box wire transfer of $35,000 to Defendant Brannon with the memo line "Set up office in UAE," the discovery of "additional investor funds" in two foreign

---

[225] *Id.*

[226] *Id.*

[227] *Id.* at 15–16.

[228] *Id.* at 16.

[229] *Id.*

[230] *Id.*

[231] *Id.*

bank accounts affiliated with certain Defendants dating back as far as 2021, and a change the Commission discovered in August 2023 to the entity listed in the terms and conditions of the customer agreement on the DEBT Box website from a United States entity to a UAE entity.[232]

According to the Commission, its staff believed this information "supported the inference that Defendants were moving investor funds overseas . . . ."[233]  They believed this "even though staff still lacked direct evidence of Defendants moving investor funds overseas in the months before the TRO hearing."[234]  Again, the Commission acknowledges "this statement should have been identified as an inference rather than a representation with direct factual support.  And the Commission regrets that the statement inaccurately characterized the record, including the timeframe of Defendants' actions."[235]

Lastly, the Commission addresses the court's final question asking what statement the Commission was referencing in its Opposition to the DEBT Box Defendants' Motion to Dissolve when it stated "consistent with counsel's representation to the Court."[236]  In its Opposition, the Commission stated, "Further, mere days before the TRO Hearing—consistent with counsel's representation to the Court—the SEC learned that a substantial portion of the funds held in two bank accounts controlled by Defendants, including one controlled by [DEBT Box] had been substantially drained of assets."[237]  The Commission responds that the statement in its Opposition was referencing Welsh's assertion at the TRO hearing where he stated, "[E]ven in the

---

[232] *Id.*

[233] *Id.* at 17.

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] *Opposition to DEBT Box Defendants* at 10.

last 48 hours Defendants have closed additional bank accounts, and I believe the number, I don't have it in front of me, was around 33 bank accounts have been closed."[238]

Despite the difference in the two statements, the Commission explains "Welsh believed there was no meaningful distinction between accounts being closed (as he had stated at the TRO hearing) and accounts being substantially drained of assets (as stated in the opposition to the motion to dissolve)."[239]   To Welsh, "both would support the inference that Defendants were moving investor funds overseas."[240]   In stating the assertion in the Commission's Opposition was consistent with Welsh's statement at the TRO hearing, he "intended to convey that both would support a finding of irreparable harm" and "did not intend to mislead the court."[241]

The Commission maintains the representation in its Opposition is accurate—insofar as staff learned in the days before the TRO hearing that certain accounts had been "substantially drained of assets"—but acknowledges the Opposition "is inaccurate in suggesting that counsel had previously made such a representation to the Court."[242]   The Commission concludes it "should have expressly acknowledged the error in Welsh's statement at the *ex parte* hearing, clarified the record, and explained why the corrected facts nonetheless supported a finding of irreparable harm."[243]   It again "apologizes for not doing so."[244]

After providing its responses to the court's questions—identifying "errors and lapses in judgment that it will take steps to remedy"—the Commission argues sanctions are not

---

[238] *Commission's Response* at 17.

[239] *Id.*

[240] *Id.*

[241] *Id.* at 17–18.

[242] *Id.* at 18.

[243] *Id.*

[244] *Id.*

warranted.[245]  It first asserts sanctions under Rule 11 of the Federal Rules of Civil Procedure are inappropriate because, though statements identified by the court "were inferences and lacked direct factual support," the factual bases for the inferences "were not so unreasonable as to violate Rule 11."[246]

Next, the Commission argues sanctions under the court's inherent power are also unwarranted because "the record would not support the 'requisite' finding of 'bad faith.'"[247]  As the Commission sees it, "its counsel and staff did not intend to mislead the court" and it did not "make the statements and filings at issue for an improper purpose, such as harassing Defendants."[248]  "Rather, the Commission's representatives failed to accurately characterize the bases for their factual assertions, failed to identify inferences as such and to explain the bases for those inferences, and failed to identify inaccuracies in those assertions once discovered."[249]  The Commission concludes these circumstances do not warrant sanctions.[250]

The Commission further argues that, even if the court finds bad faith and imposes sanctions under its inherent power, "sovereign immunity would bar monetary sanctions against the Commission."[251]  In support of this proposition, the Commission cites three cases without further explanation: *United States v. Droganes*, 728 F.3d 580, 590 (6th Cir. 2013), *United States v. Horn*, 29 F.3d 754, 761 (1st Cir. 1994), and *United States v. Carter*, No. 16-20032-02, 2020

---

[245] *Id.*

[246] *Id.*

[247] *Id.* at 19 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)).

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] *Id.*

WL 430739, at *4 (D. Kan. Jan. 28, 2020).[252]  Conversely, the Commission offers a contrasting opinion from the Fifth Circuit with a parenthetical quote stating, "[S]overeign immunity falls away when a court acts under its sanctioning powers and does not abuse its discretion in doing so."[253]

The Commission concludes its Response by stating it is taking action to address the court's concerns and prevent future issues.[254]  These steps include assignment of new counsel to the case, as well as mandatory training for Division of Enforcement staff involved in investigations and litigation emphasizing "the importance of accuracy and candor and the duty to correct inaccuracies when identified."[255]  "The Commission hopes and expects that the missteps that occurred here do not happen again."[256]

On January 12, 2024, Defendants filed Reply briefs to the Commission's Response.[257] The DEBT Box Defendants argue that, given the Commission's admissions about its conduct, the court should dismiss the case with prejudice and order an assessment of attorneys' fees and costs against the Commission for expenses resulting from the TRO and asset freeze.[258]  The iX Global Defendants assert the Commission sought and obtained the TRO with "false and materially misleading evidence," and "[w]hen confronted and given repeated opportunities to

---

[252] *Id.* at 19–20.

[253] *Id.* at 20 (citing *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 595 (5th Cir. 2008)).

[254] *Id.*

[255] *Id.*

[256] *Id.*

[257] Dkt. 246, *DEBT Box Defendants' Reply*; Dkt. 247, *iX Global Defendants' Reply*; Dkt. 248, *Defendants Benjamin F. Daniels, Mark W. Schuler, Alton O. Parker, B&B Investment Group, LLC, and BW Holdings LLC's Joinder in Defendants iX Global, LLC, Joseph A. Martinez, and Travis Flaherty's Reply to the SEC's Response to the Court's November 30, 2023 Order to Show Cause*; Dkt. 249, *Matthew Fritzsche's Reply to the SEC's Response to the Court's November 30, 2023 Order to Show Cause*.

[258] *DEBT Box Defendants' Reply* at 3.

correct its mistakes," it refused to do so—instead continuing to present "false and materially misleading evidence" to the court.[259]  Given the Commission's acknowledged conduct, the iX Global Defendants argue "the most severe sanctions, including but not limited to dismissal with prejudice, are appropriate."[260]  They concede dismissal without prejudice would also be appropriate and contend the Commission should be ordered to reimburse the iX Global Defendants for business losses resulting from the Commission's "improper actions."[261]

The court authorized the Commission to file a Surreply, which it did on January 30, 2024.[262]  In it, the Commission recognizes "its attorneys should have been more forthcoming" but reiterated its position that "sanctions are not appropriate or necessary . . . ."[263]  The Commission then states that, given the trial team's "ongoing review" of the allegations and evidence in the case, it "has determined that the best way to proceed is to dismiss this action without prejudice" and it will be filing a motion to dismiss.[264]  Although the Commission maintains sanctions are not appropriate, if the court determines otherwise, "it should decline to impose a penalty beyond dismissal without prejudice."[265]  The Commission recites its arguments why sanctions under Rule 11 and the court's inherent power are both unnecessary and unavailable—concluding again by asserting that sovereign immunity bars any monetary sanctions under the court's inherent powers.[266]

---

[259] *iX Global Defendants' Reply* at 13–14.

[260] *Id.* at 14.

[261] *Id.* at 16–17.

[262] Dkt. 259, *Plaintiff Securities and Exchange Commission's Surreply to the Court's November 30, 2023 Order to Show Cause* (*Commission's Surreply*).

[263] *Id.* at 1.

[264] *Id.*

[265] *Id.*

[266] *Id.* at 3.

**The Commission Moves to Dismiss the Action**

On January 31, 2024, the Commission filed a Motion to Dismiss the action without prejudice under Rule 41(a)(2) of the Federal Rules of Civil Procedure, which the court also takes up now.[267]  In it, the Commission states, "In light of the issues raised in connection with the Court's Order to Show Cause, the SEC intends to thoroughly review the record, take investigate steps as appropriate, and engage with Defendants and Relief Defendants to determine whether to file a new complaint and the scope of any re-filed complaint."[268]  Although Defendants— including the DEBT Box and iX Global Defendants—oppose the Motion,[269] the Commission does not provide any legal authority in support of its request.

Defendants argue dismissal without prejudice is inappropriate in these circumstances and should be denied.  Among other things, Defendants argue the Commission has not met the standards for dismissal without prejudice under Rule 41(a)(2)[270] and permitting the Commission to "cherry pick its own punishment" by granting the dismissal does not redress the harm done to the judicial process.[271]  At bottom, Defendants assert, it appears "the SEC is attempting to evade this Court's rules and oversight and to retreat to its administrative investigative process, in which there is no oversight of the SEC's conduct."[272]

---

[267] *Motion to Dismiss.*

[268] *Id.* at 2–3.

[269] Dkt. 261, *DEBT Box Defendants' Opposition to Motion to Dismiss*; Dkt. 262, *Matthew Fritzsche's Opposition to the SEC's Motion for Dismissal of This Action Without Prejudice and for Vacatur of the Court's Order for the March 7, 2024 Hearing*; Dkt. 263, *Defendants Benjamin F. Daniels, Mark W. Schuler, Alton O. Parker, B&B Investment Group, LLC, and BW Holdings LLC's Joinder in Opposition to the SEC's Motion for Dismissal of This Action Without Prejudice and for Vacatur of the Court's Order for the March 7, 2024 Hearing*; Dkt. 264, *iX Global Defendants' Opposition to Motion to Dismiss*; Dkt. 265, *Defendant Brendan J. Stangis' Joinder in Opposition to SEC's Motion to Dismiss Without Prejudice and Vacate Hearing on Motion to Dismiss*.

[270] *DEBT Box Defendants' Opposition to Motion to Dismiss* at 6.

[271] *iX Global Defendants' Opposition to Motion to Dismiss* at 2–3.

[272] *DEBT Box Defendants' Opposition to Motion to Dismiss* at 8.

On February 28, 2024, the Commission filed a Reply in support of its Motion.[273]  The Commission asserts it is not seeking dismissal to evade the court's jurisdiction as its Motion makes clear the court will retain jurisdiction over the Order to Show Cause and resolution of outstanding receivership issues.[274]  The Commission clarifies if, after its review, it determines to refile the case, "it will be filed in this district and before Your Honor."[275]  The Commission notes courts typically grant voluntary dismissals unless "a defendant can show that dismissal would cause 'legal prejudice.'"[276]  The Commission contends the court should grant its request to dismiss without prejudice because that is necessary to "protect investors and the public interest" should the Commission determine filing a new action is warranted.[277]  Further, the Commission argues, dismissal is appropriate because Defendants have failed to show legal prejudice.[278]

The court's Order to Show Cause and the Commission's Motion are now fully briefed and ripe for review.

## LEGAL STANDARDS

Federal courts possess inherent powers to preserve the integrity of judicial proceedings by punishing abuses of the judicial process through the crafting and imposition of appropriate sanctions.[279]  These powers "must necessarily result to our Courts of justice from the nature of

---

[273] Dkt. 267, *Plaintiff Securities and Exchange Commission's Reply in Support of its Motion to Dismiss Action Without Prejudice and to Vacate Upcoming Hearing* (*Commission's Motion to Dismiss Reply*).

[274] *Id.* at 2.

[275] *Id.*

[276] *Id.* at 3 (citing *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997)).

[277] *Id.*

[278] *Id.* at 4.

[279] *See Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1257 (10th Cir. 2015) ("A district court's inherent power to sanction reaches beyond the multiplication of court proceedings and authorizes sanctions for wide-ranging conduct constituting an abuse of process.") (citing *Chambers*, 501 U.S. at 57).

their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."[280]  They are "not conferred by rule or statute" and permit a court "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases."[281]  Although there are statutory mechanisms providing for the imposition of sanctions in certain limited circumstances—notably Rule 11 of the Federal Rules of Civil Procedure[282] and 28 U.S.C. § 1927[283]—"[i]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."[284]

The Tenth Circuit instructs that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."[285]  Central to that discretion "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."[286]  Permissible sanctions

---

[280] *Chambers*, 501 U.S. at 43 (quoting *United States v. Hudson*, 11 U.S. 32, 34 (1812)).

[281] *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)).

[282] Fed. R. Civ. P. 11.

[283] 28 U.S.C. § 1927 ("Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.").

[284] *Taylor v. Nat'l Collegiate Student Loan Tr., 2007-1*, 2023 WL 2147332, at *6 (10th Cir. 2023) (quoting *Chambers*, 501 U.S. at 50).  Here, the court concludes neither Rule 11 nor § 1927 provide adequate redress for the Commission's conduct.  As explained below, an appropriate sanction includes an assessment of attorneys' fees and costs against the Commission for all expenses arising from the improperly obtained and maintained TRO.  Rule 11 "prohibits a court acting on its own initiative," as the court does here, "from ordering payment of a monetary penalty to an opposing party."  *Hutchinson v. Pfeil*, 208 F.3d 1180, 1184 (10th Cir. 2000).  Further, § 1927 is ill-suited to the sanction appropriate here.  As discussed below, though there are individual attorneys against whom imposition of attorneys' fees and costs may be warranted, the pervasive misconduct exhibited demonstrates a pattern of organizational bad faith and broadly implicates the Commission itself—not just isolated individuals.  In the court's view, penalizing specific individuals in this way would be unjust, would fail to punish all those responsible for the abuse of judicial process, and would lack the necessary deterrent effect.

[285] *United States v. Akers*, 76 F.4th 982, 993 (10th Cir. 2023) (quoting *Chambers*, 501 U.S. at 44–45).

[286] *Id.*

under the court's inherent power range from "outright dismissal" of an action to the "less severe

sanction" of an assessment of attorneys' fees.[287]

The inherent power to assess attorneys' fees against a party in limited circumstances is a

longstanding exception to the "so-called 'American Rule' [which] prohibits fee shifting in most

cases."[288]  Under this "narrow exception," the court may "award attorney fees when a party's

opponent acts 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[289]  Sanctions in

this context are central to the "court's inherent power to police itself" and "serv[e] the dual

purpose of 'vindicat[ing] judicial authority without resort to the more drastic sanctions available

for contempt of court and mak[ing] the prevailing party whole for expenses caused by his

opponent's obstinacy."[290]

The Tenth Circuit "sets a high bar for bad faith awards."[291]  "Whether the bad faith

exception applies turns on the party's subjective bad faith."[292]  To find bad faith, "there must be

clear evidence that the challenged claim 'is entirely without color *and* has been asserted

wantonly, for purposes of harassment or delay, or for other improper reasons.'"[293]  The Tenth

Circuit explains "a claim lacks a colorable basis when it is utterly devoid of a legal or factual

---

[287] *Chambers*, 501 U.S. at 45 (quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980)).

[288] *Id.* (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 (1975)).

[289] *United States v. McCall*, 235 F.3d 1211, 1216 (10th Cir. 2000) (quoting *Sterling Energy Ltd. v. Friendly Nat'l Bank*, 744 F.2d 1433, 1435 (10th Cir. 1984)).

[290] *Chambers*, 501 U.S. at 46 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 (1978), *superseded by statute on other grounds as recognized in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000)).

[291] *Mountain W. Mines, Inc. v. Cleveland-Cliffs Iron Co.*, 470 F.3d 947, 954 (10th Cir. 2006) (citing *Sterling Energy*, 744 F.2d at 1435).

[292] *FTC v. Kuykendall*, 466 F.3d 1149, 1152 (10th Cir. 2006) (citing *Sterling Energy*, 744 F.2d at 1435).

[293] *Id.* (quoting *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1201 (10th Cir. 2005) (emphasis in original)).

basis."[294]  This "requires more than a mere showing of a weak or legally inadequate case, and the exception is not invoked by findings of negligence, frivolity, or improvidence."[295]  As applied here, the test is "conjunctive—it requires clear evidence of *both* a complete lack of color *and* an improper purpose on the part of the government."[296]

Should the court conclude the bad faith exception applies, it then must determine whether the sanction comports with guiding principles set forth by the Tenth Circuit.[297]  In *Farmer*, the Circuit provides a non-exhaustive list of factors the court must consider "when it sanctions a recalcitrant party for [its] abuse of process by an award of fees and costs."[298]  First, the amount of sanction must be reasonable.[299]  Second, the sanction "must be the minimum amount reasonably necessary to deter the undesirable behavior."[300]  Third, "because the principal purpose of punitive sanctions is deterrence, the offender's ability to pay must be considered."[301]  Further, "[d]epending on the circumstances, the court may consider other factors as well, including the extent to which bad faith, if any, contributed to the abusive conduct."[302]

---

[294] *Freecom Commc'ns, Inc.*, 401 F.3d at 1201 (quoting *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999)).

[295] *FDIC v. Schuchmann*, 319 F.3d 1247, 1252 (10th Cir. 2003) (quoting *Autorama Corp. v. Stewart*, 802 F.2d 1284, 1288 (10th Cir. 1986)).

[296] *Kuykendall*, 466 F.3d at 1153 (emphasis in original).

[297] *See Akers*, 76 F.4th at 992 (holding "[t]he district court acted well within the limits of its inherent power in imposing a sanction on Akers for the inclusion of frivolous arguments and assertions in the Motion, but it erred when it failed to create a sufficient record for this court to undertake the type of review mandated by *Farmer*.").

[298] *Id.* (quoting *Farmer*, 791 F.3d at 1259).

[299] *Farmer*, 791 F.3d at 1259.

[300] *Id.*

[301] *Id.*

[302] *Id.*

## ANALYSIS

The Commission responds to the court's Order to Show Cause by acknowledging its attorneys committed numerous missteps but arguing sanctions are not warranted, and separately, moving to dismiss the action without prejudice.  The court first address the Commission's Response to the Order to Show Cause and then turns to the Motion to Dismiss.

### I.    Order to Show Cause

In responding to each of the issues raised in the Order to Show Cause, the Commission validates the court's concerns and acknowledges varying degrees of misconduct.  Broadly, its attorneys repeatedly presented inferences to the court as directly supported factual assertions and did not identify the indirect support it believed justified those inferences.  However, the Commission contends sanctions are unwarranted because it did not intend to mislead the court and its statements and filings were not asserted for an improper purpose.   Further, even if the court determined sanctions were appropriate, sovereign immunity bars the imposition of any monetary sanction against the Commission.  For the reasons explained below, the court disagrees.

It is critical to keep the Commission's unique role in mind.  The Commission is a federal agency specifically chartered to enforce federal securities laws.  In pursuit of those ends, it repeatedly comes before courts seeking the extraordinary relief it sought here.  This is not unfamiliar territory for the Commission and its Attorneys.  The Commission is a sophisticated party with vast experience in federal courts.  Indeed, Welsh expressly invoked this unique expertise and experience in his Attorney Certification.[303]  Given its expertise and experience in this context, the Commission understands the importance of distinguishing between directly

---

[303] *See Rule 65(b)(1)(B) Attorney Certification* ¶ 3.

supported representations of fact and inferences presented as facts.  Further, the Commission surely understands that, particularly in the ex parte context, if it makes clear its representations are inferences, the court will likely rigorously interrogate the bases for those inferences to ensure they support the extraordinary—even disfavored—relief requested.  That fact notwithstanding— indeed, for that very reason—it is essential that inference be distinguished from facts when represented.  And the weaker the support for the inferences, the more essential it is that they be disclosed and adequately tested.

The court first addresses the Commission's responses to its questions.  It then turns to the Commission's argument concerning sovereign immunity, before considering the appropriate sanction.

### 1.  Account Closures and Related Mischaracterizations

The court begins its analysis with Welsh's statement at the July 2023 TRO hearing concerning account closures in the 48 hours before the hearing, and the subsequent mischaracterization of that statement.  The court raised these issues in separate questions in its Order to Show Cause but it addresses them in tandem here due to their close relation and because the combined sequence of events demonstrates bad faith conduct by Commission attorneys.

The Commission acknowledges Welsh's assertion at the TRO hearing was false at the time he made it and Commission staff—also licensed attorneys—participating in the hearing knew it.[304]  Not only were no accounts closed in the 48 hours before the hearing, no accounts were closed in all of July 2023.  Further, there is no evidence before the court that Defendants

---

[304] *See Commission's Response* at 13.  The Commission characterizes the statement as "inaccurate."  However, Welsh asserted Defendants closed bank accounts in the 48 hours before the hearing.  The truth is no accounts were closed, by Defendants or anyone else, in the 48 hours before the hearing.  Stating otherwise is not inaccurate, it is simply false as it has no basis in fact.

are responsible for the closure of any of the accounts in the past three years.  Defendants provide evidence demonstrating the banks closed at least 12 of the 24 total accounts closed and the Commission does not identify who is responsible for the closures of the others.[305]  Nonetheless, despite contemporaneous knowledge Welsh communicated materially false information to the court in an ex parte proceeding seeking a TRO and asset freeze, at no point did the Commission correct it.  Instead, two months later, after Defendants put the Commission on notice of the false statement, the Commission affirmed the statement and, in so doing, communicated an additional materially false and misleading statement to the court.

The Commission knew Welsh's statement at the TRO hearing about account closures in the 48 hours before the hearing was incorrect as soon as he made it.  According to the Commission, during the recess at the hearing, Commission investigative staff attorney Laurie Abbott told Welsh that over the past two days, staff had called banks and learned of the closure of Defendants' accounts.[306]  When the hearing resumed and Welsh stated Defendants had closed accounts in the last 48 hours, Abbott "recognized" his statement "did not accurately reflect what she said or intended to convey . . . as soon as Welsh made the statement . . . ."[307]  Despite this, she did not correct him at the hearing, nor did she inform him of the error after because "she did not believe the statement was material to the Commission's showing of irreparable harm, given the other evidence the Commission had presented of an ongoing fraudulent offering."[308]

---

[305] *See* Dkt. 145-3, *Martinez Declaration: Exhibit B* (*Bank of America Letter*); Dkt. 132-3, *DEBT Box Defendants' Motion to Dissolve: Exhibit 3* (*Bank Closure Documents*) at 12–16.

[306] *Commission's Response* at 13.

[307] *Id.* at 14.

[308] *Id.*

Abbott's explanation for not informing Welsh of his misrepresentation to the court—that she did not think it was material to the showing of irreparable harm—is deeply troubling.  At the outset of the TRO hearing, the court expressed its view that the Commission had failed to argue the correct legal standards by failing to argue irreparable harm and the court was prepared to deny the Commission's request for a TRO.[309]  The court then took a recess to consider whether it would permit the Commission to orally argue the absent elements.[310]  Welsh's first statement after the recess—after being told the Commission had not properly argued irreparable harm and the court was prepared to deny the TRO Application—was the statement about Defendants closing accounts in the 48 hours before the hearing.[311]  The assertion was surely designed to convey the urgency and imminence of harm that would result if the court denied the TRO and immediate asset freeze, as it stated it was inclined to do.  Given these circumstances, it is difficult to accept that Commission staff did not believe the misrepresentation was material.  Indeed, it likely was the most material and impactful representation made in support of the Commission's ex parte Application.

Further, the governing Utah Rules of Professional Conduct impose an affirmative duty of candor on all attorneys practicing before the court.[312]  Rule 3.3 of the Utah Rules of Professional Conduct states, "A lawyer shall not knowingly or recklessly make a false statement of fact or law

---

[309] *Id.* at 6–8.

[310] *Id.* at 13–15.

[311] *TRO Hearing Transcript* at 20.

[312] Any attorney admitted to practice in the United States District Court for the District of Utah "must comply" with, among other thing, the Utah Rules of Professional Conduct.  DUCivR 83-1.1(d).  The Local Rules permit an attorney employed by the United States or its agencies, "who is an active member and in good standing in the bar of any state or the District of Columbia" to practice "in this district in the attorney's official capacity."  DUCivR 83-1.1(b)(1); *see also* DUCivR 83-1.7 ("An attorney who is or has been a member of the court's bar or admitted pro hac vice is subject to the Local Rules of Practice, the Utah Rules of Professional Conduct, and the court's disciplinary jurisdiction.").

to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]"[313]  The Rule imposes a special duty on lawyers "to avoid conduct that undermines the integrity of the adjudicative process."[314]  And while a lawyer is not expected to be impartial, one "must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false."[315]  The Rule expressly clarifies the heightened responsibility counsel has in the ex parte context, stating, "In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse."[316]  The Comments to the Rule expressly use the example of an application for a temporary restraining order and note the "judge has an affirmative responsibility to accord the absent party just consideration," imposing the "correlative duty" on a lawyer to disclose all material facts "necessary to an informed decision."[317]

The Rules and Abbott's duty of candor to the court do not leave to her to decide whether a false statement must be corrected.  Welsh made a false statement to the court that was integral to the Commission's showing of irreparable harm in a hearing for an ex parte TRO.  Abbott knew it was incorrect the moment Welsh said it.  Her duty required her to correct it.

There is another troubling aspect to Abbott's explanation for her failure to correct the false statement.  According to the Commission, she did not think the statement was material because of "the other evidence the Commission had presented of an ongoing fraudulent

---

[313] Utah R. Pro. Conduct 3.3(a)(1).

[314] *Id.* 3.3 cmt. 2.

[315] *Id.*

[316] *Id.* 3.3(e).

[317] *Id.* 3.3 cmt. 14.

offering."[318]  This suggests a misunderstanding of the judicial process.  It has not been

determined whether Defendants engaged in a fraudulent offering.  That is for a trier of fact to

decide at the conclusion of the litigation.  That the Commission files a complaint does not

conclusively prove, nor serve as evidence of, fraud or anything else.  The contents of a complaint

ordinarily are nothing more than unproven allegations.  This underscores the extraordinary

nature of the relief the Commission obtained here and the grave harm suffered when a party

abuses the judicial process to obtain that relief.  Before a party has an opportunity to respond to

the allegations against it, long before the truth of those allegations is determined, the court grants

a TRO, freezes assets, and appoints a receiver to seize control of entire companies—all without

notice to the affected party.  Given the profoundly significant consequences of this relief, the

court must trust counsel take their duties to the court seriously.  Abbott's explanations reflect a

misapprehension that Commission attorneys are not only exempt from binding ethical

obligations but also operate above the traditional adjudicative process.

Concerning Welsh, the court first addresses his statement at the TRO hearing before

considering statements in the Commission's Opposition to Defendants' Motions to Dissolve.

Welsh contends he did not become aware his statement was false until reviewing the Defendants'

Motions to Dissolve the TRO in September 2023.[319]  He then consulted investigative staff and

learned no accounts closed in the 48 hours before the hearing but that funds had been withdrawn

from some of Defendants' bank accounts during July 2023.[320]  Welsh "recognized there was a

distinction between accounts closing and accounts being drained of assets," and he knew Abbott

---

[318] *Commission's Response* at 14.

[319] *Id.*

[320] *Id.* at 15.

said nothing about withdrawals during the hearing recess.[321]   However, he nevertheless "believed that the information about the accounts being drained of assets supported a finding of irreparable harm in the same way that information about account closures supported a finding of irreparable harm."[322]   The Commission also acknowledges Welsh stated at the hearing that he believed 33 accounts had been closed when, in fact, the total number (over a period of years, not the 48 hours before the hearing as represented) was 24.[323]

The Commission acknowledges it should have notified the court when it learned Welsh's statement at the hearing "was inaccurate in multiple respects" and it "sincerely regrets the error."[324]   The court appreciates the Commission's acknowledgment but, like Abbott's, Welsh's explanation for not correcting his false statement is difficult to accept and is, in any event, not an acceptable justification for breaching his duties to the court.

Welsh justifies his failure to correct his false statement on the grounds that he learned, after making the statement, that some of Defendants' accounts were being "drained of assets."[325]   As an initial matter, this characterization implies nefarious conduct on the part of Defendants which, as will be discussed more below, is unsupported by the evidence the Commission has presented.   Account balances fluctuated, both up and down, but the Commission's characterization is unsubstantiated and materially misleading.   The Commission provides no

---

[321] *Id.*

[322] *Id.*

[323] *Id.*

[324] *Id.* at 16.

[325] *Id.* at 15.

clear evidence of the improper use of funds.[326]  Welsh's attempt to excuse his failure to correct his false statement because he believed a different factually unsupported conclusion somehow supported the Commission's required legal showing is unavailing.  His explanation demonstrates a second Commission attorney who appears to believe the Utah Rules of Professional Conduct leave it to attorneys to decide when a materially false statement to the court must be corrected. The court clarifies now: when an attorney makes a false statement of material fact to a court, the lawyer is required to correct it.

Concerning the Commission's admission about the number of accounts closed, for these purposes, whether the number of accounts closed was 33, as Welsh stated at the hearing, or 24, as the Commission acknowledges is the accurate number, is immaterial.  The problem here was not a minor lapse in memory leading to numerical imprecision.  The critical issue is that the true number of accounts closed in the 48 hours before the hearing is zero.  Moreover, Welsh affirmatively (but incorrectly) stated Defendants closed the accounts.  The court accepts the Commission may not have known at the time that accounts closed in the years preceding the hearing were closed by the banks instead of Defendants.  However, in light of this lack of

---

[326] The Commission points to various "luxury purchases" and transactions identified in the First and Second Zaki Declarations.  *See, e.g., First Zaki Declaration* ¶ 19; *Complaint* ¶ 4; *TRO Application* at 18; *Opposition to DEBT Council Defendants* at 14–15.  However, as Defendants stress, the transfers and transactions were between parties in the United States and many were apparently ordinary-course business expenditures, including tax payments to the IRS.  *See, e.g.,* Dkt. 177, *DEBT Council Defendants' Reply in Support of Motion to Dissolve* at 3; Dkt. 178, *iX Global Defendants' Reply in Support of Motion to Dissolve* at 3.  Moreover, Zaki's First Declaration shows payments from August 2021 to April 2023—none of which demonstrate a threat of immediate, irreparable harm in July 2023.  *First Zaki Declaration: Exhibit 8* at 196–97.  Zaki's updated Declaration shows withdrawals through July 2023 and purportedly details "additional apparent personal expenses, continued and subsequent diversion of funds to foreign based entities, international payment processors, other apparent related entities and Relief Defendant Business funding Solutions."  *Second Zaki Declaration* ¶ 12; *Second Zaki Declaration: Exhibit B* at 9–13.  It is not clear from the data provided that each withdrawal is for personal expenses, nor is it clear why identifying property purchased by Defendants in the past would show imminent harm at the time the Commission sought and defended the TRO.  Dissipation of funds or draining of assets suggests an improper usage that would render the funds and assets beyond the reach of the court's jurisdiction should recovery be warranted.  The evidence before the court does not support this characterization.

knowledge, Welsh's unequivocal representation that Defendants were the ones closing them was at best reckless. This was not merely an inaccuracy. Welsh did not have direct evidence to support his representation. This fact required, at minimum, that Welsh inform the court he was drawing an inference and make clear what facts he believed supported that inference. As presented, his representation was simply a false statement.

Worse still, Welsh's misconduct is then compounded by his and the Commission's subsequent mischaracterization of his statement in the Commission's Opposition to the DEBT Box Defendants' Motion to Dissolve. In its Opposition, the Commission stated, "Further, mere days before the TRO Hearing—consistent with counsel's representation to the Court—the SEC learned that a substantial portion of the funds held in two bank accounts controlled by Defendants . . . had been substantially drained of assets."[327] Responding to the court's Order to Show Cause, the Commission acknowledges that, when it stated "consistent with counsel's representation to the Court," it was referencing Welsh's statement to the court at the TRO hearing that Defendants had closed bank accounts in the 48 hours before the hearing.[328] The Commission explains Welsh "did not intend to mislead the court" but he believed "there was no meaningful distinction" between the two statements.[329] He "intended to convey that both would support a finding of irreparable harm to investors absent emergency relief."[330] The Commission nevertheless concedes its Opposition is inaccurate and that Welsh should have acknowledged his

---

[327] *Opposition to DEBT Box Defendants* at 15.

[328] *Commission's Response* at 17.

[329] *Id.* at 17–18.

[330] *Id.*

previous statement was errant and then explain why the "corrected facts" support a finding of irreparable harm.[331]

The court again finds the Commission's explanation unsatisfactory.  Further, this misconduct is perhaps the starkest demonstration of subjective bad faith in the Commission's effort to obtain and defend the TRO.

The Commission acknowledges, as it must, its statement that it learned in the days before the TRO hearing that accounts were "substantially drained of assets" is not consistent with the representation made during the ex parte TRO hearing that Defendants had closed accounts in the 48 hours before the hearing.  The court observes a statement consistent with Welsh's representation at the TRO hearing would be, "Defendants closed bank accounts in the 48 hours before the hearing."  The statement in the Opposition is an altogether different statement.  But this does not even fully grapple with the extent of the malfeasance here.

Between the Commission's initial effort to obtain the TRO and the filing of its Opposition to the Motions to Dissolve, the factual picture evolved considerably.  Though the Commission had sufficient information to know its representations about account closures were false and misleading at the time it sought the ex parte TRO, Defendants put the Commission on notice of additional facts undermining these statements in their Motions to Dissolve.  For example, the DEBT Box Defendants highlighted, consistent with Zaki's information, there were no account closures in July 2023 and then provided evidence demonstrating banks—not Defendants—were responsible for the account closures in 2021 and 2022.[332]  Similarly, the iX Global Defendants provide evidence demonstrating the bank, not Defendants, was responsible

---

[331] *Id.* at 18.

[332] *DEBT Box Defendants' Motion to Dissolve* at 10–11.

for the June 2023 account closures the Commission prominently featured in its argument for irreparable harm.[333]  It was in response to this evidence that the Commission, rather than squarely engaging with the facts Defendants presented and acknowledging its prior misstatement, offered its new misrepresentation which it purported to be "consistent" with its prior misrepresentation.  And, in so doing, criticized Defendants for "ignore[ing]" evidence and "instead cling[ing] to two lines from the TRO Hearing to claim that the SEC failed to establish irreparable harm."[334]

Thus, in its Opposition the Commission not only exacerbated its misconduct from the TRO hearing by seeking to affirm and reiterate the false statement it had previously made—a statement it knew was false from the time it made it and failed to correct—but it engaged in further misconduct by communicating an additional false and misleading statement to the court after being confronted with irrefutable evidence of its error.

While these layers of false statements compound how troubling the Commission's misconduct is, they also demonstrate subjective bad faith.  By claiming the statement in the Opposition was consistent with the statement from the TRO hearing, but then offering a new unrelated representation, Welsh and the Commission demonstrate they knew they had misled the court and were attempting to obfuscate.  As the Commission was preparing its Opposition to the Motions to Dissolve, Welsh knew his statement from the TRO hearing was incorrect.  Rather than correcting the misstatement, he and the Commission attempted to subtly shift the language to gloss over and perpetuate the misconduct.

---

[333] *iX Global Defendants' Motion to Dissolve* at 7–8.

[334] *Opposition to DEBT Box Defendants* at 10.

Welsh's explanation—that he "believed there was no meaningful distinction" between the two different representations—is not credible or persuasive.  If he genuinely believed the two statements were not meaningfully distinct and they both supported a finding of irreparable harm, there was little risk in simply acknowledging the prior error and presenting the new information. Welsh and the Commission's decision to instead communicate a new misleading and incorrect representation to the court indicates they understood the actual evidence was not as compelling as the false statements made at the TRO hearing and likely would not have supported a showing of irreparable harm.

In sum, the court issued the TRO believing Defendants were actively closing their bank accounts in the hours before the hearing in which the Commission sought, among other things, to freeze Defendants' accounts.  To the court, this was "compelling evidence corroborating the Commission's claims that Defendants were rapidly attempting to move assets overseas" where they would be beyond the court's jurisdiction.[335]  In reality, there was no factual support for the Commission's assertions about account closures.  Defendants did not close accounts in the 48 hours before the hearing.  They did not close any accounts in July 2023.  Indeed, there is no evidence that Defendants, as opposed to the banks, have ever closed one of their bank accounts. Commission staff knew statements made to the court were false as soon as they were made. Others purportedly discovered that later but then, rather than correct the false statement, compounded the misconduct by obfuscating and making additional false statements to the court in defense of the TRO.

This aspect of the Commission's showing of irreparable harm was entirely without color—there is no factual basis to support the assertions—and the compounding misstatements

---

[335] *Memorandum Decision and Order* at 18.

were made wantonly and for an improper purpose—to obtain and then defend extraordinary relief the Commission obtained ex parte but was not entitled to through abuse of judicial process.[336]   At the time, statements concerning contemporaneous account closures were the most compelling evidence of immediate irreparable harm in support of the TRO and asset freeze. Now, these statements are compelling evidence of pervasive abuses of judicial process and subjective bad faith.

### 2. Movement of Assets and Funds Overseas

The court now turns to the Commission's representations concerning Defendants' efforts to move assets and funds overseas.  The Commission's statements at the TRO hearing were misleading and unsupported by the facts.  The Commission then again doubled down on these misrepresentations in its Opposition to the DEBT Box Defendants' Motion to Dissolve by stating Defendants had made "significant efforts to move investor funds outside of the Court's jurisdiction in the months leading up to the SEC's filing."[337]   The court relied on these incorrect representations when concluding irreparable harm was likely in the absence of a TRO.  The court concludes these representations serve as another example of subjective bad faith.

In its Order to Show Cause, the court asked the Commission what factual support Welsh relied on in his Rule 65(b)(1)(B) Attorney Certification when he stated Defendants were currently "attempting to relocate assets and investor funds overseas."[338]   Relatedly, the court also asked what facts the Commission relied on when in its Opposition to the DEBT Box Defendants' Motion to Dissolve it stated Defendants made "significant efforts" to move funds beyond the

---

[336] *See Kuykendall*, 466 F.3d at 1152 (noting to find bad faith "there must be clear evidence that the challenged claim is entirely without color *and* has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons.") (internal quotations omitted).

[337] *Opposition to DEBT Box Defendants* at 7.

[338] *Order to Show Cause* at 9.

court's jurisdiction in the months before the Commission filed its lawsuit.[339]  The Commission responded it primarily relied on four pieces of evidence to support these statements.  However, none of the purported evidence supports the representations made by Welsh and the Commission to obtain ex parte and then later defend the TRO.

First, the Commission points to funds transferred "[b]y December 2022" to a foreign bank account of an entity headquartered in the UAE and allegedly controlled by some of the Defendants.[340]  When attempting to establish immediate irreparable harm in support of its TRO Application, the Commission repeatedly represented that Defendants were "currently in the process" of moving funds overseas.  But, as Welsh acknowledged at the Motion to Dissolve hearing, the Commission is not aware of any transfers to the UAE later than December 2022.[341] The Commission sought its TRO in July 2023, but there is no evidence of funds transferred overseas anytime in 2023.  Evidence of funds moved in prior years does not support a finding of immediate and present risk of irreparable harm for purposes of an ex parte TRO.

Second, the Commission responds certain Defendants were "depleting assets" in domestic bank accounts "beginning as early as spring 2021."[342]  As referenced above, the Commission's characterization of balance changes in certain bank accounts over a period of years as "depleting assets" is unsupported by the record and misleading.  The Commission provides no evidence funds were used improperly.  Critically, it provides no evidence demonstrating any of these assets or funds were transferred overseas.  Conversely, Defendants provide evidence demonstrating many of the fluctuations in account balances resulted from

---

[339] *Id.* at 16.

[340] *Commission's Response* at 9.

[341] *Motion to Dissolve Hearing Transcript* at 32–33.

[342] *Id.*

legitimate business expenditures, including tax payments to the IRS and transfers or transactions involving other United States-based accounts and individuals.[343]  Fluctuations in business account balances over a period of years, particularly in conjunction with other information in the Commission's possession, do not support Welsh and the Commission's representations.[344]

Third, the Commission states it relied on the closure of the iX Global bank accounts on June 30, 2023.[345]  Welsh and the Commission directly linked these closures to the Defendants' alleged efforts to move funds overseas.  For example, in its ex parte TRO Application, the Commission stated, "In June, Defendants began to liquidate investor funds and move operations overseas."[346]  In the next sentence it discussed these account closures.[347]  In his Attorney Certification, Welsh stated the Commission had evidence indicating "Defendants are currently in the process of attempting to relocate assets and investor funds overseas."[348]  He then stated "[f]or example" and identified the June 2023 iX Global account closures.[349]  However, Defendants did not close these accounts—the bank did.  And the funds were not transferred overseas.  They were transferred to a bank headquartered in Sandy, Utah.  Most importantly, the Commission had this

---

[343] *See iX Global Defendants Reply* at 8.

[344] The fact that some account balances increased, rather than decreased, during the relevant period, is also inconsistent with the Commission's representation that the accounts were being depleted.  *See, e.g., DEBT Box Defendants' Reply: Exhibit 23* at 6.  It also undermines the Commission's main irreparable injury argument—that Defendants were actively moving these assets (including bank balances) overseas to place them outside the Commission's reach and this court's jurisdiction.

[345] *Commission's Response* at 9.

[346] *TRO Application* at 10.

[347] *See id.*

[348] *Rule 65(b)(1)(B) Attorney Certification* ¶ 4.

[349] *Id.* ¶ 6.

information at the time it sought the ex parte TRO.[350]  These closures do not support the Commission's representations and it knew or should have known that at the time it made them.

Lastly, the Commission cites Defendant Jacob Anderson's comments in the June 14, 2023 YouTube video about relocating to Abu Dhabi to be under the "jurisdictional control of Abu Dhabi, not the SEC."[351]  As the court noted when it dissolved the TRO, the Commission took this brief comment out of context and presented it in a misleading fashion to support its argument for irreparable harm.[352]  Welsh's representations of Anderson's comments—both the assertion in his Attorney Certification that, characterizing Anderson's statement, "[d]efendants are currently in the process" of moving assets and funds overseas[353] and his statement at the TRO hearing that Anderson stated "defendants are moving assets overseas"[354]—are literally false.  Those were not the words Anderson used and information in the Commission's possession at the time demonstrated Defendants had not transferred any assets overseas since December 2022.  Nonetheless, Welsh deliberately used these misrepresentations to impress upon the court the imminence of the harm and urgent need for the TRO.  Given the full context, the YouTube video does not show Defendants were in the process of moving assets and funds overseas, as the Commission stated.  Rather, the comments suggest Defendants were exercising their business judgment to make decisions about the legal and regulatory environment they believed would be best for their business.  This is a decision made by businesses and financial entities on a regular basis that is not inherently indicative of unlawful conduct.  The

---

[350] *See First Zaki Declaration* ¶ 20(a); *see also First Zaki Declaration: Exhibit 9* at 198–204.

[351] *Commission's Response* at 9.

[352] *Memorandum Decision and Order* at 20–22.

[353] *Attorney Certification* ¶ 4.

[354] *TRO Hearing Transcript* at 9.

Commission's decision to repeatedly mischaracterize a readily verifiable statement from the video indicates a deliberate and intentional choice.[355]

Concerning the court's question about the Commission's Opposition statement referring to Defendants' "significant efforts" to move funds overseas in the lead-up to the Commission's filing, the Commission states it largely relied on the same evidence discussed for the Attorney Certification.[356]  It also states the Opposition relied on some additional information—such as a $35,000 wire transfer to a Defendant with the memo line "Set up office in UAE" and the discovery of two other foreign accounts that began receiving funds (two years earlier) in 2021— but again, these facts do not support the Commission's representations.  There is no evidence the funds in the wire transfer were sent overseas and the transfer occurred nearly six weeks before the Commission requested the TRO.[357]  And, as above, funds transferred to foreign accounts in 2021 provide no evidence Defendants were moving funds overseas at any point in 2023.  As with its ex parte representations to initially obtain the TRO, the Commission's representation in its Opposition concerning Defendants' "significant efforts" to move funds overseas were factually unsupported at the time they were made.

The Commission maintains these repeated misrepresentations were only inferences and it should have made that clear to the court.  Concerning Welsh's representations in his Attorney Certification supporting the TRO Application, the Commission acknowledges "staff did not have direct evidence of recent depletion of funds or recent overseas transfers, and counsel should have identified his statement as an inference rather than a factual representation with direct

---

[355] These comments could be corroborative of other evidence to support the Commission's characterizations, but that evidence does not exist in the record before the court.

[356] *Commission's Response* at 16.

[357] *See Second Zaki Declaration: Exhibit B* at 13.

support."[358]  Similarly, the Commission states the representations in its Opposition were inferences it believed the facts supported, "even though staff still lacked direct evidence of Defendants moving investor funds overseas in the months before the TRO hearing."[359]  But, it recognizes, "this statement should have been identified as an inference rather than a representation with direct factual support.  And the Commission regrets that the statement inaccurately characterized the record, including the timeframe of Defendants' actions."[360]

This explanation is unsatisfactory.  These were not just imprecise mischaracterizations or inferences presented as fact.  The Commission led the court to believe the ex parte TRO was warranted because Defendants were rapidly and contemporaneously moving funds overseas. The Commission asserts the facts supported the inferences, even though the staff lacked "direct evidence," but this strains credulity.  The staff did not just lack "direct evidence" of Defendants moving assets overseas in the months before seeking the TRO, it lacked any evidence at all. There was no evidence to support Welsh's representation at the time of the TRO hearing.  If one affirmatively states something is true when there are no facts to support it, that cannot be characterized as an inference.  That is a falsehood.  The decision to communicate this assertion to the court as fact, when it lacked any factual basis, demonstrates subjective bad faith.

This finding is further supported by the Commission's subsequent representations in its Opposition.  The Commission knew or should have known at the time of the TRO hearing it did not have evidence to support the representations it was making about assets moving overseas. By the time it filed the Opposition and reiterated these assertions, Defendants had put the

---

[358] *Commission's Response* at 10.

[359] *Id.* at 17.

[360] *Id.*

Commission on notice and provided further evidence demonstrating the falsity of its representations.  Despite this, the Commission did not correct or clarify the bases for its assertion.  It instead affirmed and reiterated representations it now knew were unsupported—regardless of whether they are characterized as facts or inferences.

These misrepresentations cannot plausibly be excused as innocent mischaracterizations.  Combined with the false statements about bank account closures, the Commission used these misrepresentations to impress upon the court the urgency and need for the TRO and asset freeze.  But, like the representations about account closures, the Commission's statements about Defendants' efforts to move assets overseas were devoid of any factual basis.  This aspect of the Commission's showing of irreparable harm was entirely without color—there is no factual basis to support assertions that Defendants were actively moving funds overseas—and the repeated misstatements were made wantonly for an improper purpose—to improperly harm Defendants by obtaining and defending the extraordinary ex parte relief the Commission was not entitled to through abuse of judicial process.

### 3.  Blocking Social Media Sites and Deleting Content

The court next turns to the Commission's response concerning its representations that Defendants had "taken action" to block staff from viewing social media sites and were deleting online content.  The Commission again acknowledges its staff "did not have direct evidence" to support the representation in its TRO Application, but it drew the inference based on staff's inability to continue viewing certain social media cites with official Commission accounts and the disappearance of select videos on YouTube.[361]  Despite the fact this representation was an

---

[361] *Commission's Response* at 11–13.

inference, as the Commission acknowledges, it presented it to the court as "a factual representation."[362]

The court notes that, when considering this representation in isolation, the Commission's explanation is the most defensible of the issues raised in the Order to Show Cause. However, considering the totality of the circumstances, this misrepresentation was no less damaging or misleading than the others. The Commission used this representation to bolster its narrative of imminent, irreparable harm. In the Commission's telling, at the time of its request for a TRO, Defendants were actively and rapidly closing domestic bank accounts and transferring those investor funds overseas out of reach of the Commission and the court. The situation was all the more urgent because, based on Defendants' purported efforts to block the Commission from viewing their online content, Defendants appeared to be aware of the investigation. Indeed, it was Defendants' awareness of the Commission's investigation that drove their urgent action to move the assets overseas. At least that was the obvious and invited assumption for the court's consideration.

Viewed in context, it is difficult to excuse the Commission's decision to pass this representation off as a matter of fact, rather than to make clear it was simply an inference staff had drawn. This misrepresentation played an important role in the Commission's effort to obtain and defend the ex parte TRO. And, like the others, as the Commission acknowledges, it was not as the Commission led the court to believe. This representation alone would potentially not demonstrate subjective bad faith. However, considering the totality of the circumstances, the Commission's decision to mislead the court concerning the basis for its representation—and to

---

[362] *Id.* at 13.

not disclose that until its Response to the Order to Show Cause—further demonstrates the Commission's bad faith effort to obtain and defend the TRO.

### 4. Summary

It is essential to keep the broader context in mind. The Commission came to the court seeking the extraordinary relief of an ex parte TRO together with a sweeping asset freeze and court-appointed receiver to assume control of Defendants' companies. It expressly traded on its special standing as a federal agency—reminding the court it had been granted this relief several times in the past ten years—to demonstrate it could be trusted when asking for this tremendous exercise of judicial authority. An ex parte TRO is extraordinary relief that requires a fact-based compelling showing of the irreparable harm likely to result if the TRO is not granted. The Commission argued the facts demonstrated this: Defendants were contemporaneously and rapidly shutting down their domestic bank accounts, transferring investor funds in those accounts overseas to place them beyond the reach of the court, and undertaking efforts to obstruct the Commission—suggesting Defendants were aware of the Commission's investigation. Relying on the Commission's representations, the court granted the ex parte TRO, froze Defendants' accounts and other assets, and appointed the requested Receiver. As a result, companies were seized, assets were frozen, and lives were upended.

In the end, once Defendants had notice and an opportunity to respond, each purportedly factual pillar the Commission constructed to make the required showing of irreparable harm crumbled under scrutiny. It was not just a single imprecise statement or inadvertent misstatement. Each piece of support the Commission offered in seeking the TRO—and then later reiterated in defending the TRO—proved to be some combination of false, mischaracterized, and misleading. Further, the Commission not only repeated and affirmed its

misrepresentations in the face of contrary evidence, it presented new falsehoods to the court in an effort to subtly shift from its previous misrepresentations without acknowledging its previous errors.  The Commission's conduct demonstrated it knew its representations were false and it was deliberately perpetuating those falsehoods—continuing to abuse the judicial process in defense of the ex parte TRO that should not have issued.

On each of the five issues the court raised in its Order to Show Cause, the Commission acknowledges wrongdoing and validates the court's concerns.  The Commission repeatedly "regrets" its errors.  However, despite a pattern of pervasive misconduct, the Commission urges the court to accept that its "staff did not intend to mislead the court.  Nor, did the Commission make the statements and filings at issue for an improper purpose . . . ."[363]  The Commission explains its "representatives failed to accurately characterize the bases for their factual assertions, failed to identify inferences as such and to explain the bases for those inferences, and failed to identify inaccuracies in those assertions once discovered."[364]  In the Commission's view, "Sanctions are unwarranted in these circumstances."[365]

While the court recognizes the Commission's candid acknowledgment of its repeated misconduct, its explanation and justification fall far short.  The Commission is a sophisticated party that, as Welsh reminded the court early in the ex parte TRO hearing, frequently comes before this court seeking the kind of extraordinary relief it sought here.  The Commission and its attorneys understand the distinction between a directly supported factual assertion and an inference purportedly drawn from indirect factual support.  They understand that when

---

[363] *Commission's Response* at 19.

[364] *Id.*

[365] *Id.*

presenting an inference to a court, they are required to characterize it as such and make clear to the court what indirect factual support they believe supports that inference.   They understand that, particularly in an ex parte context, when its showing for obtaining the extraordinary relief sought is based on inferences, a court will closely scrutinize the bases for those inferences to ensure the relief is warranted.  Accordingly, the Commission and its attorneys' repeated failure in this case to properly characterize representations raises an overarching question that lays bare the inadequacy of the Commission's explanations.  Why did the Commission, on multiple occasions and for each piece of evidence used to show irreparable harm, elect to present inferences as fact and decline to make clear the bases for those inferences?

Given the myriad and repeated instances of misconduct, the court cannot write these issues off as non-willful, inadvertent mistakes.  Particularly in view of the discrete examples of bad faith conduct the court discusses above, the court can only conclude the Commission made these strategic decisions because it knew if it made clear the tenuous nature of the evidentiary support for its self-described inferences, the court would not issue the TRO and asset freeze the Commission sought.  Rather than excusing its conduct, the Commission's admission and attempted justification—that its "representatives failed to accurately characterize the bases for their factual assertions, failed to identify inferences as such and to explain the bases for those inferences, and failed to identify inaccuracies in those assertions once discovered"[366]—demonstrates that the Commission's effort to obtain and defend the ex parte TRO was permeated with bad faith.

Here, "failed to accurately characterize the bases for factual assertions" means failed to make clear those assertions were often entirely devoid of a factual basis, outright falsehoods, or,

---

[366] *Id.*

at best, unsupported speculation.  Next, failing to "identify inferences as such and to explain the bases for those inferences" means repeatedly misleading the court and presenting factually unsupported conclusions as statements of fact.  Last, failing "to identify inaccuracies in those assertions once discovered" means continuing to abuse the judicial process by communicating additional falsehoods to the court in support of prior falsehoods and in violation of professional duties.  Again, all this was done in an effort to obtain and defend an extraordinary ex parte TRO to which it was not entitled.  This is sanctionable conduct.

Before turning to what sanction is appropriate to address this misconduct, the court considers the Commission's assertion that sovereign immunity bars the court from imposing a monetary sanction.

### 5. Sovereign Immunity

The Commission asserts without explanation that, even if the court finds bad faith sanctions are warranted, "sovereign immunity would bar monetary sanctions against the Commission."[367]  The court disagrees.

The doctrine of sovereign immunity "means the United States cannot be sued without its consent" and applies if a "judgment sought would expend itself on the public treasury or domain."[368]  As a corollary of this, "[n]o legal proceeding, including garnishment, may be

---

[367] *Id.* at 19; *Commission's Surreply* at 3.

[368] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks*, 960 F.2d 911, 913 (10th Cir. 1992) (internal quotations and citations omitted).

brought against the United States absent a waiver of its sovereign immunity."[369]  Any waiver

must be "unequivocally expressed"[370] by Congress "in the statutory text."[371]

In the context of attorneys' fees and costs in a civil action, the Tenth Circuit—along with

others—has long held the Equal Access to Justice Act (EAJA) "constitutes a waiver of sovereign

immunity."[372]  Under the EAJA, "a court may award reasonable fees and expenses of attorneys

. . . to the prevailing party in any civil action brought by or against the United States or any

agency or official of the United States acting in his or her official capacity."[373]  Section 2412(b)

further provides "[t]he United States shall be liable for such fees and expenses to the same extent

that any other party would be liable under the common law or under the terms of any statute

which specifically provides for such an award."[374]

As discussed above, the common law permits a court exercising its inherent power to

assess attorneys' fees against a party that has "acted in bad faith, vexatiously, wantonly or for

---

[369] *Shaw v. United States*, 213 F.3d 545, 548 (10th Cir. 2000) (quoting *Millard v. United States*, 916 F.2d 1, 3 (Fed. Cir. 1990)).

[370] *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. King*, 395 U.S. 1 (1969)).

[371] *Shaw*, 213 F.3d at 548 (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34, 37 (1992); *Fostvedt v. United States*, 978 F.2d 1201, 1202–03 (10th Cir. 1992)).

[372] *Vibra-Tech Eng'rs, Inc. v. United States*, 787 F.2d 1416, 1419 (10th Cir. 1986); *see also FTC v. Kuykendall*, 466 F.3d 1149 (10th Cir. 2006) (noting "'bad faith exception' to the American Rule applies to the Government pursuant to 28 U.S.C. § 2412(b) [EAJA], which states the United States is liable for attorney fees 'to the same extent that any other party would be liable under the common law.'" (quoting 28 U.S.C. § 2412(b))); *Adamson v. Bowen*, 855 F.2d 668, 670–71 (10th Cir. 1988) (holding § 2412(b) of the EAJA "expressly waives immunity against attorney's fee awards" and noting Congress' intent that "the United States should be held to *the same standards in litigating as private parties*.") (emphasis in original) (citations omitted).

[373] 28 U.S.C. § 2412(b).

[374] *Id.*

oppressive reasons."[375]  In *Kuykendall*, the Tenth Circuit expressly stated "[t]his 'bad faith

exception' to the American Rule applies to the Government pursuant to 28 U.S.C. § 2412(b),

which states that the United States is liable for attorney fees 'to the same extent that any other

party would be liable under the common law.'"[376]  The Ninth Circuit persuasively explains that

"[t]he EAJA's explicit incorporation of the common law in its attorney's fees provision is a clear

indication that in all cases . . . we hold the government to the same standard of good faith that we

demand of all non-governmental parties."[377]

The Commission offers no explanation for its contrary position but cites three non-

binding cases to support its assertion that sovereign immunity bars the court from imposing a

monetary sanction.[378]  Each of these cases is inapposite.  They are criminal cases and each

acknowledge the question is different in the civil context where there are waivers to the

government's sovereign immunity.[379]

For example, in *United States v. Droganes,* the Sixth Circuit found the government

engaged in "otherwise-sanctionable conduct" but held that Federal Rule of Criminal Procedure

---

[375] *Chambers*, 501 U.S. at 45; *see, e.g.*, *Kerin v. USPS*, 218 F.3d 185, 190 (2d Cir. 2000) ("Section 2412(b) specifically incorporates the applicable common law with respect to awards of attorneys' fees, and effectively codified the common law exceptions to the traditional American Rule . . . . One of the recognized common law exceptions to the American Rule against fee shifting is that attorneys' fees may be awarded where the party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."); *Lu v. United States*, 921 F.3d 850, 862 (9th Cir. 2019) (reiterating EAJA waives sovereign immunity for attorneys' fee awards in civil cases and stating "[s]ection 2412(b) codified the bad faith exception to the American rule against the award of attorney's fees and made that exception applicable in suits against the United States.").

[376] *Kuykendall*, 466 F.3d at 1152 (quoting § 2412(b)).

[377] *Rodriguez v. United States*, 542 F.3d 704, 709 (9th Cir. 2008).

[378] *Commission's Response* at 19 (citing *United States v. Droganes*, 728 F.3d 580, 590 (6th Cir. 2013); *United States v. Horn*, 29 F.3d 754, 761 (1st. Cir. 1994); *United States v. Carter*, No. 16-20032-02, 2020 WL 430739, at *4 (D. Kan. Jan. 28, 2020)).

[379] To the extent these decisions opine more broadly on sovereign immunity, these portions of the opinions are dicta. This court finds that dicta unpersuasive and inconsistent with binding Tenth Circuit precedent.

41(g) did not waive the government's sovereign immunity and explained that it is not clear lower courts have any authority to sanction the government in the criminal context.[380]  In contrast, the court noted Congress has enacted certain waivers of sovereign immunity authorizing sanctions in other aspects of criminal proceedings and "has effected an even broader waiver of sovereign immunity in civil cases."[381]  Specifically, "Other circuits have held that the Equal Access to Justice Act, 28 U.S.C. § 2412, authorized sanctions against the government for misconduct under Civil Rule 11."[382]  The Sixth Circuit cites to a Tenth Circuit case, *Adamson v. Bowen*, as an example.[383]

Similarly, in *United States v. Horn*, the First Circuit held sovereign immunity barred a district court exercising its "supervisory power" from assessing attorneys' fees and costs against the United States in a criminal case, but noted the myriad other contexts in which Congress has permitted it.[384]  The court explained "several courts have held that monetary sanctions for litigation abuse are not barred by sovereign immunity in certain classes of cases on the theory that an enacted statute, typically the Equal Access to Justice Act, 28 U.S.C. § 2412 . . . serves to waive the government's immunity."[385]  The court then provides a lengthy string citation with examples from three different circuits finding a waiver of sovereign immunity in the civil

---

[380] *Droganes*, 728 F.3d at 589–90.

[381] *Id.* at 590.

[382] *Id.*

[383] *Id.*  As discussed above, other Tenth Circuit cases have addressed the EAJA's waiver of sovereign immunity for bad faith sanctions under the court's inherent powers.  *See, e.g.*, *Vibra-Tech Engineers, Inc.*, 787 F.2d at 1419; *Kuykendall*, 466 F.3d at 1152.

[384] *Horn*, 29 F.3d at 762–63.

[385] *Id.* at 762.

context.[386]  Notably, the citation includes an opinion from the Tenth Circuit finding a waiver of sovereign immunity permitting monetary sanctions under the EAJA.[387]

The Commission also cites *United States v. Carter*, a decision from another district court within the Tenth Circuit.[388]  This decision is inapt for the same reasons *Droganes* and *Horn* do not apply.  *Carter* is a criminal case and the court there concluded the EAJA did not waive sovereign immunity in the specific criminal context at issue.[389]  The court noted "the waiver analysis will differ in the civil and criminal context because the sources of waiver are different— the EAJA and the civil rules may constitute waiver in the civil context," and specifically highlighted the Tenth Circuit's *Adamson* decision.[390]  To the extent *Carter* more broadly discussed sovereign immunity and a court's ability to impose monetary sanctions under its inherent powers, this court finds the dicta unpersuasive and inconsistent with other binding Tenth Circuit precedent not discussed in the decision.[391]

In fairness, the Commission also cites *FDIC v. Maxxam, Inc.*, an opinion from the Fifth Circuit, to demonstrate there are courts who find sovereign immunity does not bar the imposition

---

[386] *Id.* at 762–63.

[387] *Id.* at 763 (citing *Adamson*, 855 F.2d at 672).

[388] *See Carter*, 2020 WL 430739, at *1.

[389] *Id.* at *3.

[390] *Id.* at *3–4.

[391] *Id.* at *4.  While not necessary for the question at issue in the decision, the *Carter* court offered that it found the First Circuit's decision in *Horn* "to be persuasive authority that monetary sanctions imposed under the Court's inherent authority against the Government are barred by the doctrine of sovereign immunity."  *Id.*  However, the *Carter* court overlooked or did not discuss the other Tenth Circuit caselaw permitting and applying the EAJA's waiver of sovereign immunity for the imposition of bad faith attorneys' fee awards.  Nor did the *Carter* court recognize that, in the civil context, courts in the First Circuit continue to find the EAJA waives sovereign immunity for the assessment of bad faith attorneys' fee sanctions.  *See, e.g.*, *Limone v. United States*, 815 F.Supp. 2d 393, 400–01 (D. Mass. 2011).

of monetary sanctions.[392]  In *Maxxam*, the Fifth Circuit held "[t]he question of the scope of a waiver of sovereign immunity falls away when a court acts under its sanctioning powers and does not abuse its discretion in doing so."[393]  Although the court appreciates the Commission's acknowledgment of contrary caselaw, *Maxxam* is not squarely on point and may be broader than the relevant Tenth Circuit caselaw.  Unlike the SEC, the FDIC's organic statute contains a "sue and be sued" provision which has been interpreted as a broad waiver of the FDIC's immunity.[394]  Thus, *Maxxam* did not have to identify a separate statutory waiver of sovereign immunity and, as this court reads it, discussed the court's sanctioning authority in terms broader than the Tenth Circuit permits.  As discussed above, the Tenth Circuit requires a clear and express waiver of sovereign immunity—which the EAJA provides for bad faith attorneys' fee sanctions pursuant to the court's inherent authority.[395]

The Commission's argument on this issue raises an additional concern.  Its position is clearly contradicted by binding Tenth Circuit precedent which the Commission does not acknowledge, much less attempt to distinguish.  As such, the court observes that in its Response to the court's Order to Show Cause why sanctions should not be imposed for litigation misconduct—a court filing which includes a declaration from the Director of the Commission's

---

[392] *Commission's Response* at 20 (citing *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 595 (5th Cir. 2008)).

[393] *Maxxam, Inc.*, 523 F.3d at 595.

[394] *Id.* at 595 n. 160.

[395] *See, e.g.*, *Vibra-Tech Eng'rs*, 787 F.2d at 1419 ("The EAJA constitutes a waiver of sovereign immunity and must be construed strictly."); *Kuykendall*, 466 F.3d at 1152 ("This 'bad faith exception' to the American Rule applies to the Government pursuant to 28 U.S.C. § 2412(b), which states that the United States is liable for attorney fees 'to the same extent that any other party would be liable under the common law.").

Division of Enforcement[396]—attorneys from the Commission's General Counsel's office likely committed another breach of their duty of candor to the court.

District of Columbia Rule of Professional Conduct 3.3(a)(3) governs treatment of adverse legal authority. Under the Rule, a lawyer must not knowingly "[f]ail to disclose to the tribunal legal authority in the controlling jurisdiction not disclosed by opposing counsel and known to the lawyer to be dispositive of a question at issue and directly adverse to the position of the client."[397] The Comments to the Rule explain "[l]egal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal."[398] While advocating for its position, a lawyer "must recognize the existence of pertinent legal authorities."[399] This means "an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction that has not been disclosed by the opposing party and that is dispositive of a question at issue."[400] Additionally, Utah Rule of Professional Conduct 3.3(a)(2), also binding on the Commission's attorneys for the purpose of this filing,[401] states a lawyer shall not knowingly or recklessly "fail to disclose to the tribunal legal authority in the controlling jurisdiction directly adverse to the position of the client and not disclosed by opposing counsel."[402]

---

[396] Dkt. 233-6, *Commission's Response, Exhibit 6: Declaration of Gurbir S. Grewal in Support of Plaintiff Securities and Exchange Commission's Response to the Court's November 30, 2023 Order to Show Cause.*

[397] D.C. R. Pro. Conduct 3.3(a)(3).

[398] *Id.* 3.3 com. 3.

[399] *Id.*

[400] *Id.*

[401] *See* DUCivR 83-1.1(d)(1) ("An attorney who practices in this court must comply with the Local Rules of Practice, ECF Procedures Manual, Utah Rules of Professional Conduct, and Utah Standards of Professionalism and Civility. An attorney's conduct and professionalism are governed by these rules and the manual.").

[402] Utah R. Pro. Conduct 3.3(a)(2).

In both its Response and its Surreply, the Commission asserts sovereign immunity bars the court from imposing any monetary sanction under its inherent powers.  It then cites three inapposite opinions—two from other circuits and one from another district court in the Tenth Circuit—and does not acknowledge the existence of on-point, binding Tenth Circuit caselaw that is contrary to its position.  In a filing in which the Commission states it takes the "Court's concerns seriously," includes a Declaration from the Director of the Division of Enforcement, and repeatedly acknowledges errors and shortcomings it "deeply regrets," it is difficult to imagine this decision was not knowing.  At minimum, this additional breach of the Commission's duty of candor is at least reckless.  Each of the decisions the Commission cites in support of its position includes reference and citation to at least one Tenth Circuit case discussing waivers of sovereign immunity applicable in the civil context and directly contradicting the Commission's argument.

In sum, the court concludes the EAJA waives the government's sovereign immunity in this context.  The court is not barred from exercising its inherent powers to impose a sanction of attorneys' fees and costs against the Commission for its bad faith abuse of judicial process.

## 6.  Sanction

The Commission's above-discussed conduct constitutes a gross abuse of the power entrusted to it by Congress and substantially undermined the integrity of these proceedings and the judicial process.  The former is not a matter for this court to consider.  But the court has an affirmative obligation to address the latter.[403]  The operation of the American judicial system

---

[403] *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1328 (D. Utah 2016) (imposing a sanction of attorneys' fees and costs under the court's inherent authority for abuse of the judicial process because it was "the sort of bad faith misconduct that the court has the power—and obligation—to sanction in order to preserve the integrity of these proceedings and engender the public's trust in the judicial process.").

rests on the fundamental proposition that every party who comes before the court is bound by and adheres to the same set of rules.

The court makes clear that, while it might hope the Commission would hold itself to a higher standard of conduct, the court does not impose an elevated standard here. It simply expects the Commission to comport with the same duties and obligations as every other litigant coming before the court. It does observe, however, that given its unique position and authority, when the Commission abuses the judicial process, as it has done here, the consequences of that abuse are more far-reaching and more impactful.

As required and discussed in detail above, the court finds subjective bad faith by the Commission. The court determines by "clear evidence" there was both a "complete lack of color *and* an improper purpose on the part of the government."[404] The critical evidence the Commission offered to obtain and defend the ex parte TRO lacked any basis in fact, yet the Commission nonetheless advanced that evidence in deliberately false and misleading ways. Further, this was done for an improper purpose—to appropriate and abuse the power of the court to impose extraordinary relief upon Defendants, relief the Commission would not have been entitled to had it been candid with the court. The Commission's bad faith conduct in misappropriating the power of the court "undermines the confidence of both litigants and the public in the fairness of judicial proceedings . . . and impugn[s] the integrity of these proceedings."[405]

In these circumstances, the court exercises its inherent authority to sanction the Commission's bad faith conduct. Accordingly, the court imposes a sanction of attorneys' fees

---

[404] *Kuykendall*, 466 F.3d at 1153.

[405] *Xyngular*, 200 F. Supp. 3d at 1317.

and costs for all expenses arising from the TRO and appointment of the Receiver—to include payment of all the Receiver's costs and fees.

This sanction is appropriate and comports with the factors identified by the Tenth Circuit in *Farmer*.[406]  There, the Tenth Circuit set forth several factors to guide a court when it "sanctions a recalcitrant party for [its] abuse of process by an award of fees and costs."[407]  First, the amount of the sanction "must be reasonable."[408]  Second, "the award must be the minimum amount reasonably necessary to deter the undesirable behavior."[409]  Third, "because the principal purpose of punitive sanctions is deterrence, the offender's ability to pay must be considered."[410]  Lastly, "[d]epending on the circumstances, the court may consider other factors as well, including the extent to which bad faith, if any, contributed to the abusive conduct."[411]

In considering each of these factors, the court concludes the contemplated sanction is appropriate.  First, in limiting the assessment of fees and costs to only those arising from the TRO and Receiver, the sanction is reasonable.  Had the Commission not engaged in the sanctionable conduct it did here, the ex parte TRO would not have been granted and the Receiver would not have been appointed.  Those expenses are directly traceable to the Commission's misconduct, and it should bear that burden.  However, the court has to date had limited opportunity to evaluate the merits of this action and has no reason to believe the action itself was

---

[406] *See Akers*, 76 F.4th at 992 (finding district court "acted well within the limits of its inherent power in imposing a sanction . . . but it erred when it failed to create a sufficient record for this court to undertake the type of review mandate by *Farmer*.").

[407] *Farmer*, 791 F.3d at 1259 (citing *White v. Gen. Motor Corp.*, 908 F.2d 675, 683–85 (10th Cir. 1990)).

[408] *Id.*

[409] *Id.*

[410] *Id.*

[411] *Id.*

not brought in good faith.[412]  Imposing a greater sanction—for example, all of Defendants'

attorneys' fees and costs for the action to date—would unreasonably include fees and costs

Defendants would have been responsible for even in the absence of the TRO.[413]  Further, the

court will ensure the reasonableness of the final amount by directing Defendants and Receiver

submit a fee request and evaluating those requests in accordance with methodologies approved

by the Tenth Circuit.[414]

Second, this sanction is the minimum amount reasonably necessary to deter the

Commission from engaging in this sort of misconduct.  If a party can come to this court seeking

ex parte relief on a bad faith basis, obtain that relief, and then leave the party who was wronged

holding the bag for the misconduct, there is little deterrent to prevent this abuse of judicial

process.  The Commission improperly obtained an ex parte TRO and Receiver, then maintained

that extraordinary relief through continued misconduct.  Any amount less than the entirety of the

fees and costs resulting from its misconduct would not deter the Commission from engaging in

these practices again and would be an inadequate sanction.

---

[412] For similar reasons, the court rejects Defendants' argument that, among other things, dismissal with prejudice is an appropriate sanction.  *See DEBT Box Defendants' Reply* at 19.  Dismissal of the entire action with prejudice is too remote from the Commission's sanctionable conduct.  Further, such an extreme sanction would potentially subject the public to future harm by foreclosing an appropriate enforcement action by the Commission, should one be warranted.

[413] The "underlying rationale of [this] fee shift is . . . punitive," not compensatory.  *Farmer*, 791 F.3d at 1258 (quoting *Chambers*, 501 U.S. at 53 (internal quotation omitted)).  The Supreme Court explains, "'[T]he award of attorney's fees for bad faith serve[s] the same purpose as a remedial fine imposed for civil contempt,' because '[i]t vindicate[s] the District Court's authority over a recalcitrant litigant . . . That the award ha[s] a compensatory effect does not in any event distinguish it from a fine for civil contempt, which also compensates a private party for the consequences of a contemnor's disobedience.'"  *Chambers*, 501 U.S. at 53 (quoting *Hutto*, 437 U.S. at 691, 691 n.17).

[414] *See Hamilton v. Boise Cascade Exp.*, 519 F.3d 1197, 1205–08 (10th Cir. 2008).

Third, the court concludes the Commission, as a federal agency, has sufficient resources to pay the sanction imposed here.[415]  The contemplated sanction is not unduly onerous considering the Commission's resources and the gravity of the harm done.

Lastly, this is a circumstance where other factors are relevant.  Notably, "the extent to which bad faith . . . contributed to the abusive conduct."[416]  As has been discussed at length, the court finds numerous examples of bad faith in the Commission's pursuit and defense of the TRO. The Commission relied on arguments unsupported by facts in its TRO Application and at the ex parte TRO hearing—many of which it knew or should have known at the time were baseless. Then, after being put on notice of the misrepresentations, it nevertheless affirmed those positions and did so in a way that demonstrated an attempt to obfuscate and continue misleading the court rather than acknowledge error.  The bad faith is inextricable from the abusive conduct and a sanction of attorneys' fees and costs for all expenses resulting from that conduct is appropriate.

Accordingly, considering the *Farmer* factors, the court concludes a sanction assessed against the Commission of attorneys' fees and costs for all expenses arising from the TRO and Receiver is a necessary and appropriate sanction.  Defendants and Receiver are ordered to submit within thirty days a petition for fees setting forth in detail all attorneys' fees and legal costs[417] arising from the TRO and appointment of the Receiver.[418]  The court notes this specifically

---

[415] *See White*, 908 F.2d at 685 (noting that an "offender's ability to pay must also be considered . . . because the purpose of monetary sanctions is to deter attorney and litigant misconduct" and "[i]nability to pay what the court would otherwise regard as an appropriate sanction should be treated as reasonably akin to an affirmative defense.").

[416] *Farmer*, 791 F.3d at 1259.

[417] Costs recoverable under the EAJA are enumerated in 28 U.S.C. § 1920.  *See Kuykendall*, 466 F.3d at 1154–56.

[418] As specified in § 2412(a)(1), costs available are limited to those enumerated in 28 U.S.C. § 1920.  The parties are instructed to include only costs permitted by § 1920 in their respective petitions.  *See Kuykendall*, 466 F.3d at 1154–56.

excludes all work attributable to the pending Motions to Dismiss filed by Defendants, as well as Defendants' Replies to the Commission's Response to the Order to Show Cause.

## II.      The Commission's Motion to Dismiss

The Commission also moves under Rule 41(a)(2) of the Federal Rules of Civil Procedure to dismiss this action without prejudice.[419]  Rule 41(a)(2) "permits a district court to dismiss an action without prejudice 'upon such terms and conditions as the court deems proper.'"[420]  "The rule is designed primarily to prevent voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions."[421]  Separately, Rule 7-1(a) of the District of Utah's Local Rules sets forth the requirements for motions filed in this court.[422]  Except as otherwise permitted by the Rule, such as in the case of a stipulated motion,[423] a motion must contain "a recitation of relevant facts, supporting authority, and argument."[424]  In its Motion, the Commission provides no legal authority or argument in support of its request[425] and the Motion

---

[419] *Motion to Dismiss*.

[420] *Brown v. Baeke*, 413 F.3d 1121, 1123 (10th Cir. 2005) (quoting *Am. Nat'l Bank & Tr. Co. v. Bic Corp.*, 931 F.2d 1411, 1412 (10th Cir. 1991)).

[421] *Frank v. Crawley Petroleum Corp.*, 992 F.3d 987, 998 (10th Cir. 2021) (quoting *Brown*, 413 F.3d at 1123).

[422] DUCivR 7-1(a).

[423] *See* DUCivR 7-1(a)(2).

[424] DUCivR 7-1(a)(1)(B).

[425] The court recognizes the Commission's Reply includes some authority and argument in support of its request. However, this does not cleanse the absence of that content in the initial Motion.  The purpose of the court's Local Rule is to ensure non-moving parties receive adequate notice and have an opportunity to respond to the movant's request.  Presenting authority and argumentation only in Reply does not achieve that objective.

is opposed by Defendants.[426] Thus, the Commission's Motion fails to comply with the Local Rules.

Accordingly, the Motion is DENIED without prejudice to the Commission refiling a proper motion in accordance with the Local Rules.

**CONCLUSION**

For the reasons provided, the court concludes the Commission engaged in bad faith conduct in seeking, obtaining, and defending the ex parte TRO, asset freeze, and appointment of a receiver. The court imposes sanctions under its inherent authority for the Commission's abuse of judicial process. The Commission is ORDERED to pay Defendants' and Receiver's attorneys' fees and legal costs arising from the TRO and the Receiver. Defendants and Receiver are ORDERED to file within 30 days petitions for fees clearly setting forth their requests in accordance with the court's guidance in this order.[427]

Separately, the Commission's Motion to Dismiss[428] is DENIED without prejudice to be refiled in accordance with the District of Utah's Local Rules.

The court cautions that it has not yet had occasion to evaluate the underlying merits of this action beyond whether the Commission's representations in furtherance of obtaining and

---

[426] Dkt. 261, *Defendants Digital Licensing Inc., Jason R. Anderson, Jacob S. Anderson, Schad E. Brannon, and Roydon B. Nelson and relief Defendants Business Funding Solutions, LLC, Blox Lending, LLC, The Gold Collective LLC, and UIU Holdings, LLC's Opposition to the SEC's Motion for Dismissal of This Action Without Prejudice and for Vacatur of the Court's Order for the March 7, 2024 Hearing*; Dkt. 262, *Matthew Fritzsche's Opposition to the SEC's Motion for Dismissal of This Action Without Prejudice and for Vacatur of the Court's Order for the March 7, 2024 Hearing;* Dkt. 263, *Defendants Benjamin F. Daniels, Mark W. Schuler, Alton O. Parker, B&B Investment Group, LLC, and BW Holdings LLC's Joinder in Opposition to the SEC's Motion for Dismissal of This Action Without Prejudice and for Vacatur of the Court's Order for the March 7, 2024 Hearing*; Dkt. 264, *Defendants iX Global, LLC, Joseph A. Martinez, and Travis Flaherty's Response in Opposition to the SEC's Motion to Dismiss Without Prejudice and Vacate Hearing on Motions to Dismiss*; Dkt. 265, *Defendant Brendan J. Stangis' Joinder in Opposition to SEC's Motion to Dismiss Without Prejudice and Vacate Hearings on Motions to Dismiss*.

[427] *See supra* p 77.

[428] Dkt. 260.

defending its ex parte TRO align with the facts presented. This Order focuses exclusively on the Commission's conduct and should not be construed as offering any views on the underlying merits of the case.

      SO ORDERED this 18th day of March 2024.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge